**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER GEORGE PABLE, | |
| Plaintiff, | Case No. 19-cv-7868 |
| v. | Judge Elaine E. Bucklo |
| CHICAGO TRANSIT AUTHORITY and CLEVER DEVICES LTD., | Magistrate Judge Sidney I. Schenkier |
| Defendants. | JURY DEMAND |

**CHICAGO TRANSIT AUTHORITY'S**
**ANSWER AND AFFIRMATIVE DEFENSES**

1.     Christopher George Pable brings this Complaint against his former employer, the Chicago Transit Authority (the "CTA"), and its contactor, Clever Devices Ltd. ("Clever Devices"), under the Public Transportation Employee Protections provision, 6 U.S.C. § 1142, of the National Transit Systems Security Act ("NTSSA").

**ANSWER:**     The CTA admits the allegations contained in this paragraph, but denies that it is in any way liable to Plaintiff.

2.     Mr. Pable was a computer programmer and analyst who worked on many of the CTA's information technology systems, including a CTA system provided to the CTA by Clever Devices called "BusTime," which broadcasts transit information and alerts to the public.

**ANSWER:**     The CTA admits that Plaintiff was a Programmer/Analyst III at the CTA and that he worked on the Clever Devices BusTime application. The CTA further admits that the BusTime application provides transit information to the public. The CTA denies that the BusTime application was a CTA system. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

3.     During the course of his work with BusTime, Mr. Pable discovered a serious security flaw in BusTime, namely, the existence of a "Skeleton Key" that could allow unauthorized, anonymous access to, and manipulation of, the BusTime system, and which could

easily be exploited to broadcast erroneous or malicious alerts to the public, otherwise disrupt the system, and endanger both CTA personnel and the general public.

**ANSWER:** The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of whether, when and how Plaintiff discovered or came to be in possession of the Skeleton Key in the BusTime application. The CTA denies the remaining allegations contained in this paragraph.

4. Mr. Pable reported the existence of the Skeleton Key to his supervisor at the CTA, Michael Haynes, who decided to test whether the Skeleton Key could be used to access other cities' BusTime systems. Mr. Haynes was able to use the key to issue an alert on the BusTime used by the Greater Dayton [Ohio] Regional Transit Authority ("Dayton RTA").

**ANSWER:** The CTA admits that Michael Haynes was Plaintiff's supervisor at the CTA. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of whether, when and how Mr. Haynes discovered or came to be in possession of the Skeleton Key in the BusTime application. The CTA further admits that the Skeleton Key was used to access and copy a service alert on the Greater Dayton Ohio Regional Transit Authority's ("Dayton RTA") BusTime system, but denies that Plaintiff did not act in concert with Mr. Haynes in using the Skeleton Key on Dayton RTA's BusTime system. The CTA denies the remaining allegations contained in this paragraph.

5. Mr. Haynes reported the widespread existence of the Skeleton Key to Clever Devices and his superiors at the CTA. In response to this report, Clever Devices erroneously accused Mr. Haynes and Mr. Pable of illegal conduct, which caused the CTA to put Mr. Haynes and Mr. Pable on leave while it purportedly conducted an "investigation" into their conduct.

**ANSWER:** The CTA admits that Mr. Haynes advised Clever Devices of the existence of the Skeleton Key. The CTA denies the remaining allegations contained in this paragraph.

6. At the conclusion of the CTA's "investigation," which did not afford Mr. Pable any opportunity to learn of or respond to the allegations made against him by Clever Devices, the CTA falsely accused Mr. Pable of misconduct and threatened to fire him, unless he resigned,

which he did in order to protect his employment record, his eligibility for reemployment, and his eligibility for security clearance status with subsequent employers.

**ANSWER:** The CTA admits that it investigated Plaintiff's conduct and that Plaintiff resigned in lieu of being terminated from the CTA. The CTA denies the remaining allegations contained in this paragraph.

7. Mr. Pable's reporting of the Skeleton Key to Mr. Haynes was a contributing factor in his termination by the CTA. The CTA gave no reason for terminating Mr. Pable that was unrelated to his reporting of the BusTime Skeleton Key and Clever Devices' subsequent (and unsubstantiated) allegation that he engaged in illegal conduct. Neither Clever Devices nor the CTA would have taken any adverse action with respect to Mr. Pable had he not reported the Skeleton Key to Mr. Haynes.

**ANSWER:** The CTA denies the allegations contained in this paragraph.

8. On May 2, 2019, Mr. Pable filed a complaint with the Occupational Health and Safety Administration alleging that the retaliatory and discriminatory acts of Clever Devices and the CTA were in violation of the protections afforded to Mr. Pable under NTSSA, that their actions caused him to lose significant income and other benefits of his employment, including insurance coverage immediately prior to a surgery he was forced to postpone, and to incur substantial physical and emotional distress, and seeking payment of compensatory, consequential, special, and punitive damages, including his costs associated with making and prosecuting his complaint, including, but not limited to, his attorney fees from the CTA and Clever Devices.

**ANSWER:** The CTA admits that Plaintiff filed a complaint with the Occupational Health and Safety Administration ("OSHA") on May 2, 2019. The CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with Plaintiff's OSHA complaint in its entirety. The CTA further denies that it is in any way liable to Plaintiff.

9.      Both the CTA and Clever Devices filed position statements in the OSHA proceeding, to which Mr. Pable responded, and to which additional replies and sur-replies were made by the parties.  To date, however, no findings or determinations have been made in the OSHA proceeding.  Mr. Pable has therefore filed this action, as is his right under 6 U.S.C. § 1142(c)(7).

**ANSWER:**    The CTA admits the allegations contained in the first sentence of this paragraph.  The CTA denies the allegations contained in the second sentence of this paragraph.  The CTA objects to the remaining allegations contained in this paragraph because they call for a legal conclusion for which no answer is required.  Subject to and without waiving this objection, the CTA admits that Plaintiff purports to bring this lawsuit pursuant to 6 U.S.C. § 1142 (c)(7).

### The Parties

10.      Mr. Pable is a 34-year-old information technology professional. He is a citizen of Illinois and resides at 5306 West Hanson Avenue in Chicago, Illinois 60639.

**ANSWER:**    The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

11.      Mr. Pable terminated his employment with the CTA under threat of discharge on November 8, 2018. At the time of his termination, he was a Programmer Analyst III, making an annual salary of $94,473.97, plus significant health-insurance, pension, and other benefits.

**ANSWER:**    The CTA admits Plaintiff resigned in lieu of termination on November 8, 2018. The CTA further admits that at the time of his resignation, Plaintiff was a Programmer/ Analyst III and was making an annual salary of $94,474.00, plus health insurance, pension and other benefits. The CTA denies the remaining allegation contained in this paragraph.

12.     Mr. Pable was an "employee" for purposes of the whistleblower protection provision of NTSSA via-a-vis the CTA, as he was "an individual presently or formerly working for ... a public transportation agency ...." and also vis-à-vis Clever Devices, as he was "an individual whose employment could be affected by ... a contractor or subcontractor of a public transportation agency." 29 U.S.C. § 101(d).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that it is a public transportation agency and employed Plaintiff from May 7, 2012 through November 8, 2018. The CTA lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations contained in this paragraph as they relate to Defendant Clever Devices.

13.     The CTA is [sic] independent government agency established by the State of Illinois under the Metropolitan Transit Authority Act. 70 ILCS 3605 et seq. The CTA is headquartered, and Mr. Pable worked for the CTA, at 567 West Lake Street, Chicago, Illinois 60661.

**ANSWER:**     The CTA admits the allegations contained in this paragraph.

14.     The CTA operates the nation's second-largest transportation system, and provides "public transportation" for purposes of the whistleblower protection provision of NTSSA, defined as "regular, continuing shared-ride surface transportation services that are open to the general public ...." 29 U.S.C. § 101(h).

**ANSWER:**     The CTA admits it operates the nation's second-largest transportation system. The CTA objects to the remaining allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that it provides transportation services that are available to the general public. The CTA denies that the quoted language accurately cites 29 U.S.C. § 101 and, therefore, denies the remaining allegations contained in this paragraph.

15.     The CTA receives funding from the U.S. Department of Transportation and is therefore a "public transportation agency" for purposes of the whistleblower protection provision

of NTSSA, as it is a "publicly owned operator of public transportation eligible to receive federal assistance" from the Department of Transportation. 29 C.F.R. § 101(i).

**ANSWER:** The CTA admits it receives funding from the U.S. Department of Transportation. The CTA objects to the remaining allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that it is a transportation agency that provides public transportation services and is eligible to receive federal assistance from the Department of Transportation. The CTA denies that the quoted language accurately cites 29 C.F.R. § 101 and, therefore, denies the remaining allegations contained in this paragraph.

16. Clever Devices is a New York corporation headquartered at 300 Crossways Park Drive, Woodbury, New York 11797. Clever Devices provides technology solutions to some of the largest transit agencies in the world, including BusTime, which provides real-time passenger communications for bus systems, and which is used by the CTA and several other transit agencies.

**ANSWER:** The CTA admits that it had a license from Clever Devices to use the BusTime application. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

17. Clever Devices and/or one or more affiliated entities is a contractor and/or subcontractor of the CTA for purposes of the whistleblower protection provision of NTSSA, which prohibits "a contractor or subcontractor of a public transportation agency" from engaging in retaliatory or discriminatory conduct against not only its own employees, but also "an individual whose employment could be affected by" the actions of the contractor or subcontractor. 29 U.S.C. § 1982.101(d).

**ANSWER:** The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA denies the allegations contained in this paragraph.

## Jurisdiction and Venue

18.     The whistleblower provision of NTSSA and the Department of Labor ("DOL") regulations promulgated thereunder provide that a "public transportation agency, or a contractor or a subcontractor of such agency ... shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for ... reporting a hazardous safety or security condition .... 6 U.S.C. § 1142(b). *See also* 29 U.S.C. § 1982.102(a)(2). A person "discharged or otherwise discriminated against" in violation of NTSSA may file a complaint with the DOL within 180 days of the violation. 6 U.S.C. § 1142(c)(1). *See also* 29 U.S.C. § 1982.103(d).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that the quoted language accurately cites phrases from 6 U.S.C. §§ 1142(b) and (c)(1). The CTA denies that it committed any discriminatory or illegal conduct, or is in any way liable to Plaintiff.

19.     Mr. Pable was threatened with discharge and terminated his employment with the CTA on November 8, 2018. He filed a timely complaint under NTSSA and DOL regulations on May 2, 2019.

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that Plaintiff resigned in lieu of termination on November 8, 2018 and filed an OSHA complaint on May 2, 2019. The CTA denies the remaining allegations contained in this paragraph.

20.     Pursuant to DOL regulations, NTSSA whistleblower complaints "should be filed with the OSHA office responsible for enforcement activities in the geographical area where the employee resides and is employed, but may be filed with any OSHA office or employee." 29 U.S.C. § 1982.103(c). Mr. Pable resides in and was employed in the geographical area served by the Chicago North Area Office of OSHA, and therefore filed this Complaint with the appropriate agency and office.[1]

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits that the quoted language accurately cites a phrase from 29 U.S.C. § 1982.103(c). The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph. The CTA objects to the allegations contained in the footnote because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA admits the allegations in the first sentence of the footnote. The CTA denies the remaining allegations contained in the footnote.

21.     Through no fault of Mr. Pable's, there have been no findings or determinations made in the OSHA proceeding.  Mr. Pable has therefore chosen to file this Complaint pursuant to 6 U.S.C. § 1142(c)(7), which provides that "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tied by the court with a jury. The action shall be governed by the same legal burdens of proof specific in paragraph (2)(B) for review by the Secretary of Labor." *See also* 29 C.F.R. § 1982.114.

**ANSWER:**     The CTA denies the allegations contained in the first sentence of this paragraph. The CTA objects to the remaining allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving

---

[1]  The DOL has delegated enforcement of the Occupational Safety and Health Act of 1970 with respect to public-sector employees, which Mr. Pable was, to the Illinois Occupational Safety and Health Administration pursuant to a "State Plan." Whistleblower complaints and enforcement under NTSSA, however, are handled by federal OSHA.

this objection, the CTA admits that the quoted language accurately cites a phrase from 6 U.S.C.

§ 1142(c)(7) and that Plaintiff purports to bring this lawsuit pursuant to that section. The CTA

denies that it is in any way liable to Plaintiff.

22.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 and
6 U.S.C. § 1142(c)(7).

**ANSWER:**     The CTA admits the allegations contained in this paragraph.

23.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) as a substantial part
of the events or omissions giving rise to Mr. Pable's claim occurred in this District.

**ANSWER:**     The CTA admits venue is proper in this District but denies that it is in any

way liable to Plaintiff.

24.     The CTA is subject to this Court's personal jurisdiction as it maintains its
principal place of business within this District.

**ANSWER:**     The CTA admits the allegations contained in this paragraph.

25.     Clever Devices is subject to this Court's personal jurisdiction with respect to this
civil action as a result of its transaction of business with the CTA within this District and
its adverse actions against Mr. Pable made in communications to the CTA within this District and
affecting Mr. Pable's employment by the CTA within this District.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations contained in this paragraph.

## Statement of Facts

26.     Mr. Pable earned a bachelor's degree in computer science from the University of
Illinois, Chicago in 2011. He first worked for the CTA as an extern in the summer of 2010 under
a fellowship from the Department of Homeland Security, and, after graduating college, was
retained by the CTA as a contractor, and then hired as an employee in 2012. During the course of
his employment, Mr. Pable worked on, among other things, the implementation and operation of
the CTA's BusTime system, which was licensed to the CTA by Clever Devices.

**ANSWER:**     The CTA admits that Plaintiff was first employed by the CTA as an extern

from June 7, 2010 to August 15, 2010, then as a college extern from August 16, 2010 to May 5,

2012. The CTA further admits that Plaintiff was hired as an Analyst III for the CTA in 2012, and

later became a Programmer/Analyst III. Answering further, the CTA admits that it had a license

from Clever Device to use the BusTime application and that Plaintiff worked on the BusTime

application during his employment with the CTA. The CTA lacks information or knowledge

sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this

paragraph.

27. From the time Mr. Pable was hired as an employee by the CTA in 2012 until the events that led to his termination, his work had always been considered exemplary. From the time of his internship, the CTA was eager to have him continue working for the agency. He consistently demonstrated abilities and commitment that went beyond the basic requirements of his job, took on and was the key person working on numerous projects that benefitted the CTA, and always received positive feedback and reviews.

**ANSWER:** The CTA admits that Plaintiff was hired by the CTA in 2012. The CTA

denies the remaining allegations contained in this paragraph.

28. During the relevant portion of his work at the CTA, Mr. Pable reported to Mr. Haynes, Manager Transit Systems Support, who in turn reported to Jim Psomas, Director, Enterprise Applications and IT-PMO for the CTA.

**ANSWER:** The CTA admits the allegations contained in this paragraph.

29. During his employment with the CTA, Mr. Pable worked extensively with a product developed and licensed to the CTA (and several other transit agencies in the U.S. and abroad) by Clever Devices called BusTime. Among others things, BusTime has the ability to broadcast service alerts and other information directly to passengers via an application and across the CTA's transit network.

**ANSWER:** The CTA admits that it had a license from Clever Devices to use the

BusTime application and that Plaintiff worked on the BusTime application during his

employment with the CTA. The CTA further admits that BusTime had the ability to provide

transit information to passengers. The CTA lacks information or knowledge sufficient to form a

belief as to the truth or falsity of the remaining allegations contained in this paragraph.

30.     During the spring and summer of 2018, Mr. Pable worked with Clever Devices and their sub-contractors to implement an upgrade of BusTime on the CTA's servers. In the course of working on this upgrade, Mr. Pable became aware that BusTime had a feature that the CTA had long-desired to implement. Specifically, BusTime had an application programming interface, or "API," that would allow for the automated delivery of service alerts to the BusTime system. This Service Alert API was a feature that was of interest to the CTA because as the system then operated, any service alerts had to be entered into CTAs [sic] website and into BusTime separately, whereas the API could be used to allow the staff to input alerts on the website that would automatically be sent to BusTime and disseminated there as well.

     **ANSWER:**     The CTA admits that, during the summer of 2018, it worked with Clever Devices to implement an upgrade of the BusTime application and that Plaintiff worked on the BusTime upgrade. The CTA further admits that service alerts had to be entered into CTA's website and into BusTime separately. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

31.     An API uses a "key," or a string of characters, to identify the source of information coming into the receiving system. These keys can be configured to allow various levels of access to the system and ensure that only trusted input is accepted into the system. In the case of BusTime as used by the CTA, for example, a key would be used to identify input from the CTA website and allow it to be passed onto BusTime. Similarly, administrators or developers working on the system might have individual keys that would allow them, but not others, to access or modify some or all of the information in the system. Keys can be configured in a variety of ways, either allowing or not allowing access to restricted information in the system as dictated by the business and security needs of the client.

     **ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

32.     Developers, such as Clever Devices, will sometimes use what is referred to as a "Skeleton Key," which is simply a key that is set up to allow full, unrestricted access into a system. A Skeleton Key allows developers to access and work on systems more quickly without worrying about securing the permissions that would be necessary to access the system once it is implemented and vulnerable to unauthorized access. A skeleton key is obviously useful when designing and testing a system in a development environment, but should never exist in a production environment system intended to be secure against unauthorized access, because anyone with the skeleton key (a relatively simply string of characters easily written down and copied and entered from virtually any device) can obtain direct, unrestricted, and undocumented access to some portion of, or even total access to, a system.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

33.     On Friday, August 17, 2018, Mr. Pable discovered that Clever Devices had inserted a Skeleton Key into the CTA's BusTime system.

**ANSWER:**     The CTA admits that on August 17, 2018, Plaintiff sent an email to Mr. Haynes with a copy of the code that has since been identified as the "Skeleton Key." Answering further, the CTA states that Plaintiff did not include any other CTA management on the email or provide any information concerning the Skeleton Key. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.

34.     Mr. Pable was assisting Clever Devices (actually Clever Devices's contracted personnel) with the troubleshooting of a recent software upgrade to CTA's BusTime system. The upgrade had repeatedly failed and Mr. Pable was helping identify why. He was using a common tool, named Wireshark, to display the network traffic being generated by the BusTime system on the CTA's network. In reviewing this display, Mr. Pable saw that the BusTime system was using an unprotected Skeleton Key to accept inputs rather than requiring that access be allowed only with a unique, authorized key associated with a particular user.

**ANSWER:**     The CTA admits that Plaintiff worked with Clever Devices to upgrade the BusTime application for the CTA, and that his responsibilities included troubleshooting and identifying components of the application that were not working. The CTA lacks information or

knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.

35.     The Service Alert API, for example, which should have had a CTA-issued "key" to allow it to access the system, was instead accessing the system with a generic Skeleton Key that, if copied from the network traffic (which could easily be intercepted with common tools), would allow anyone with it unrestricted access to the system.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

36.     Anyone with this Skeleton Key would thus have the ability to fully access and manipulate CTAs BusTime service alerts and other information as well. While it is not unheard of to find such a key in a program, perhaps inadvertently left over from development work, its presence in the CTA's BusTime system was a serious concern, as anyone who had the key could use it to issue service alerts (or any other message) on the CTA's system, and could even potentially manipulate route, scheduling, and other information as well. This was a serious security issue, with respect to the integrity of CTAs public messages and ultimately CTA personnel, rider, and public safety.

**ANSWER:**     The CTA denies the allegations contained in this paragraph that the Skeleton Key was a "serious security issue" or a "serious concern." The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

37.     Upon discovering the Skeleton Key, Mr. Pable immediately informed Mr. Haynes. In discussing the Skeleton Key with Mr. Haynes, the question arose as to whether the Skeleton Key was something that Clever Devices had been put in only the CTA's BusTime system or whether it existed in the other BusTime systems used by other transit authorities. Both Mr. Pable and Mr. Haynes understood that if the Skeleton Key existed in other BusTime systems, this would have significant implications for the seriousness of the security threat posed by the Skeleton Key and the urgency and manner in which it needed to be raised with Clever Devices.

**ANSWER:**     The CTA admits that on August 17, 2018, Plaintiff sent an email to Mr. Haynes with a copy of the code that has since been identified as the "Skeleton Key." The

CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

38.    Mr. Haynes decided to conduct a test to determine if the same Skeleton Key Mr. Pable had discovered in the CTA's BusTime system would work to allow access to another BusTime system. Mr. Haynes randomly chose the Dayton RTA from a list he had of other BusTime installations. Mr. Haynes proposed using the Skeleton Key to see if he could duplicate, and then remove, an existing alert (so as not to cause any disruption or disseminate erroneous information on the Dayton system if the Skeleton Key worked).

**ANSWER:**    The CTA denies the allegations contained in this paragraph that Mr. Haynes randomly chose the Dayton RTA BusTime system to test the Skeleton Key. Answering further, the CTA states that, at 12:15 P.M. on August 17, 2018, Plaintiff sent Mr. Haynes a link to the Dayton RTA BusTime site. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

39.    Mr. Pable advised Mr. Haynes not to conduct this test without first advising Dayton RTA, but Mr. Haynes nevertheless decided to go forward with it. Mr. Haynes was the one who actually sent the command to the Dayton BusTime system.

**ANSWER:**    The CTA denies that Plaintiff did not act in concert with Mr. Haynes to use the Skeleton Key on Dayton RTA's BusTime system. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

40.     Mr. Haynes was able to use the Skeleton Key to access and copy a service alert with respect to a bridge that was out in Dayton. Unbeknownst to Mr. Haynes when he did the test, Dayton's BusTime system had an integration with its Twitter account whereby service alerts were pushed to Twitter and sent out as tweets. The duplicate service alert, which told the public that a bridge would be out of service for several months, repeated that message via Twitter. The tweet was accurate, but unnecessary given that the bridge has been out for some time already and the public had already been alerted accordingly some time ago.

**ANSWER:**     The CTA admits that the Skeleton Key was used to access and copy a service alert on Dayton RTA's BusTime system, but denies that Plaintiff did not act in concert with Mr. Haynes in using the Skeleton Key on Dayton RTA's BusTime system. The CTA further admits that Dayton RTA's BusTime system was integrated with its Twitter account and that the duplicate service alert was sent out as a tweet on Dayton RTA's Twitter account. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

41.     Mr. Haynes proceeded to conduct similar, but less visible, tests (for example, asking the system to return the current time) on other BusTime systems of which he was aware, and found several he was able to access with the Skeleton Key. Mr. Pable did not participate in conducting these tests.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

42.     Mr. Pable knew that it was critical to address the Skeleton Key issue with Clever Devices. He was also concerned that the Dayton RTA alert and tweet would attraction [sic] attention and be of concern to the Dayton RTA, which had not issued the alert itself. Mr. Pable discussed these issues with Mr. Haynes and advocated notifying both Clever Devices to allow them the opportunity to remove the Skeleton Key before its existence became more widely known and to advise the Dayton RTA of what had occurred.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

43.     On Monday, August 20, 2018, Mr. Haynes sent an e-mail to Jessica Olsen, Communications Director of the Dayton RTA informing her of the test, the service alert, and

thus the source of the tweet. He attached to his email to Ms. Olsen a draft email to Clever Devices in furtherance of "the effort of making our respective BusTime systems secure."

**ANSWER:** The CTA admits that Mr. Haynes sent an email to Jessica Olsen at the Dayton RTA at 9:22 A.M. on August 20, 2018. While the subject email contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety.

44.     Later that same day, Mr. Haynes sent a final version of that draft email to Craig Lang, Vice President Business Development & Government Relations at Clever Devices, copying Mr. Pable and several other Clever Devices personnel with the subject "BusTime API Security Risk: All Customers." Among other things, Mr. Haynes wrote: "My team has identified a security risk ... that affects all BusTime customers, allows for the potential to post malicious consumer alerts on any property using the API."

**ANSWER:** The CTA admits that Mr. Haynes sent an email to Craig Lang at Clever Devices at 10:57 A.M. on August 20, 2019 with the subject "BusTime API Security Risk: All Customers." While the subject email contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety. Answering further, the CTA admits that Plaintiff was copied on Mr. Haynes's email to Mr. Lang, and states that no CTA management were included on Mr. Haynes's email to Mr. Lang, and that Plaintiff did not alert the CTA to this alleged "security risk."

45.     Mr. Haynes also informed Mr. Lang of the Dayton RTA test, alert, and tweet, that he had informed the Dayton RTA, and that he had found this issue in several other systems, which he listed for Mr. Lang. Haynes noted: "We recognize the value in having a common test API key across all customers, however that key should not be active after deployment and testing are complete."

**ANSWER:** The CTA admits that Mr. Haynes sent an email to Craig Lang at Clever Devices at 10:57 A.M. on August 20, 2019 with the subject "BusTime API Security Risk: All Customers." While the subject email contains the words quoted in this paragraph, the CTA

denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety.

46.     Mr. Lang responded to Mr. Haynes later that day with a short note indicating he was in Europe but was "concerned and disappointed that your actions have affected one of our other clients." Mr. Haynes wrote back to Mr. Lang on Tuesday morning with apologies for the Dayton RTA test, but stressing that his intent was to bring this issue to Clever Devices's attention so it could be fixed and that he was "disappointed that the thrust of your message is admonishment and not acknowledgement."

**ANSWER:**     The CTA admits that Mr. Lang responded to Mr. Haynes's email in an email sent at 3:45 P.M. on August 20, 2018. While Mr. Lang's August 20, 2018 email contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety. Answering further, the CTA admits that Mr. Haynes responded to Mr. Lang at 11:21 A.M. on August 21, 2018. While Mr. Haynes's August 21, 2018 response email to Mr. Lang contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety.

47.     On August 21, 2018, Clever Devices issued a service bulletin alerting its customers that all previously issued versions of BusTime contained a "vulnerability"; namely, the Skeleton Key, which it labeled a "Developer API Key," which could be used by anyone with knowledge of it "to create unauthorized Service Bulletins on a BusTime system, and which "must be disabled" since it "has been discovered by individuals outside of Clever Devices."

**ANSWER:**     The CTA admits that Clever Devices issued a service bulletin on August 21, 2018. While the service bulletin contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with the service bulletin in its entirety.

48.     Even though Clever Devices did not disclose in its bulletin that the Skeleton Key was easily visible to anyone who might intercept the network traffic generated by the BusTime system, nor that the Skeleton Key should therefore have been disabled separate and apart from Mr. Pable's reporting of it, the issuance of the service bulletin acknowledges the severity of the risks posed by the Skeleton Key, [sic]

**ANSWER:**     The CTA admits that Clever Devices issued a service bulletin on August 21, 2018. The CTA denies that the Skeleton Key posed a severe security risk. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

49.     Later that week, Mr. Pable and Mr. Haynes participated in a conference call with several people from Clever Devices, including Mr. Lang and the lead developer of BusTime. The developer spent most of that call interrogating Mr. Haynes and Mr. Pable about the issue, berating them for finding the key and for the conduct of the Dayton RTA test. Among other things, the developer accused Mr. Pable of "unauthorized" access to the CTA's BusTime system, even though Clever Devices and its sub-contractors were well aware that Mr. Pable had been working on the system regularly to assist Clever Devices with implementing its latest upgrade to the system.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

50.     On Friday, August 24. 2018, Mr. Haynes received an email from Tim Harrington, the CIO of the Dayton RTA. Mr. Harrington acknowledged that Mr. Haynes "did not do or intend to do any harm," and told him that, "I see and appreciate the value of what you did."

**ANSWER:**     The CTA admits that the Chief Information Officer at Dayton RTA, Tim Harrington, sent Mr. Haynes an email on August 24, 2018. While the subject email contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety.

51.     Mr. Haynes responded to Mr. Harrington soon thereafter in an email in which he repeatedly apologized for the test, and in which he said, "I take full responsibility." He said, "We intended no harm then, now or in the future." And also wrote, "I sincerely regret my actions but I am glad we were able to make all of our systems more secure. I am disappointed in Clever Devices that such a global API key would exist in their system ...."

**ANSWER:**     The CTA admits that Mr. Haynes responded to Mr. Harrington's email on August 24, 2018. While the subject email contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with this email in its entirety.

52.     Mr. Haynes forwarded a copy of this email to Mr. Pable in which he said, "I guess I just wish we never did this last week. Totally my fault." He suggested informing CTA management of the issue "next week," and also noted that "this is a huge embarrassment to Clever Devices and they are mad at us." Mr. Haynes did, in fact, send an email to his supervisor, Mr. Psomas, notifying him of this issue no later than Monday, August 27, 2018.

**ANSWER:**     Plaintiff has failed to attach the email upon which the allegations in the first two sentences are allegedly based. The CTA, therefore, lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in the first two sentences of this paragraph. Answering further, the CTA admits that Mr. Haynes sent an email to Mr. Psomas on August 27, 2018, and that Plaintiff was copied on that email. The CTA denies the remaining allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with Mr. Haynes's August 27, 2018 email in its entirety.

53.     Mr. Pable heard nothing further on this issue for several weeks. Then, on October 22, 2018, Clever Devices sent a letter to the CTA in which it accused Mr. Haynes and Mr. Pable of violating the user agreement between Clever Devices and the CTA by "making improper modifications to" the BusTime system and "injecting a customer alert into the API of another Clever Devices customer," which was also "likely in violation of federal and state laws."

**ANSWER:**     The CTA admits that Clever Devices sent a letter to the CTA on or about October 22, 2018. While the subject letter contains the words quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the rule of completeness and to the

extent they are inconsistent with this letter in its entirety. The CTA lacks information or

knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in the

first sentence of this paragraph.

54. Clever Devices specifically accused [sic] of violating the user agreement by "modifying" the BusTime system and "operating" it for a "non-business purpose and outside of CTA's Designated Environment." Neither of these allegations were substantiated with any documentation or evidence, nor were they true. Clever Devices repeated that Mr. Pable "likely violate[d] state and federal laws," but cited no specific facts or laws in support of this statement.

**ANSWER:** The CTA admits that Clever Devices sent a letter addressed to CTA

President Dorval Carter, Jr., on October 22, 2018. While the subject letter contains the words

quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the

rule of completeness and to the extent they are inconsistent with this letter in its entirety. The

CTA further denies that the allegations against Plaintiff contained in the October 22, 2018 Clever

Devices letter were not true.

55. Clever Devices' letter did not offer any explanation, justification, or apology for the existence of the Skeleton Key in the CTA's (or any other agency's) BusTime system. Nor did it reference any efforts to remediate the security risks posed by the Skeleton Key. It, did, however, confirm that the Skeleton Key was a "vulnerability" that posed significant security and safety risks. In addition to allowing the issuance of false alerts, it stated that the use of the Skeleton Key to access the Dayton BusTime system "could have a detrimental impact on the overall running of the system," which is described as "mission critical to the CTA's every day operation," and that "unauthorized changes or modifications could cause partial or complete system failure, resulting in loss of communication and location information for vehicles in your fleet."

**ANSWER:** The CTA admits that Clever Devices sent a letter addressed to CTA

President Dorval Carter, Jr., on October 22, 2018. While the subject letter contains the words

quoted in this paragraph, the CTA denies the allegations contained in this paragraph under the

rule of completeness and to the extent they are inconsistent with this letter in its entirety.

56.     Mr. Pable was not sent, or ever given, a copy of Clever Devices' October 22, 2018 letter, but on that same day – he was notified he was being placed on administrative leave pending an internal investigation – though at the time he was not even told the subject matter of the investigation.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

57.     The CTA interviewed Mr. Pable on November 2, 2018, about his and Mr. Haynes' activities in relation to the BusTime system, but did not at that time advise Mr. Pable that it considered any of his conduct improper, nor did it inform him of any of the accusations leveled against him by Clever Devices.

**ANSWER:**     The CTA admits that it interviewed Plaintiff and Mr. Haynes on November 2, 2018, regarding their activities in relation to the BusTime application. The CTA further admits that it did not inform Plaintiff as to any of the accusations leveled against him by Clever Devices. The CTA denies the remaining allegations contained in this paragraph.

58.     On November 8, 2018, without giving him any meaningful opportunity to rebut the allegations made against him, the CTA told Mr. Pable he would be fired, or he could resign for his actions involving the BusTime system.

**ANSWER:**     The CTA admits that, on November 8, 2018, the CTA gave Plaintiff the option to resign in lieu of being terminated. The CTA denies the remaining allegations contained in this paragraph.

59.     Mr. Pable was given a Notice of Discharge at the November 8, 2018 meeting that purported to set out the grounds for his termination. The Notice claimed that because Mr. Pable did not seek permission from Clever Devices, CTA upper management, or the Dayton RTA before testing the Skeleton Key and because he did not report the existence of the Skeleton Key, the test, or communications regarding them, he had violated a number of general rules applicable to his job.

**ANSWER:**     The CTA admits that Plaintiff was given a Notice of Discharge on November 8, 2018. The CTA denies the allegations contained in this paragraph under the rule of completeness and to the extent they are inconsistent with the Notice of Discharge in its entirety.

21

60.     The CTA's decision to terminate Mr. Pable as documented in the Notice was wrong in several respects.

   **ANSWER:**     The CTA denies the allegations contained in this paragraph.

61.     First and foremost, Mr. Pable did not conduct the test of the Skeleton Key, Mr. Haynes did, and he did so against Mr. Pable's advice to communicate with the relevant parties first. Mr. Pable did assist with the test, but only at Mr. Haynes' direction.

   **ANSWER:**     The CTA denies the allegations contained in this paragraph.

62.     Second, Mr. Pable did communicate all the information he learned about the Skeleton Key to his supervisor, Mr. Haynes, to whom he had reported other security-related issues in the past without any negative repercussions.

   **ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations contained in this paragraph.

63.     Third, Mr. Pable's conduct did not violate any of the rules cited in the Notice.

   **ANSWER:**     The CTA denies the allegations contained in this paragraph.

64.     There was nothing "improper" about Mr. Pable finding and reporting the Skeleton Key in the BusTime system. He was responsible for its operation and assisting Clever Devices with the upgrade underway at the time, and was only able to provide solutions for multiple problems Clever Devices was having by accessing the installation environment, log files, configurations, and bidirectional communications of the BusTime system, which he did with the full knowledge of the Clever Device personnel working on the project, who voiced no concern or objection concerning his access.

   **ANSWER:**     The CTA denies the allegations contained in this paragraph.

65.     It was in the course this work that Mr. Pable discovered the Skeleton Key, which was actually being used by Clever Devices's BusTime administration tool [sic] to access the BusTime system, and the Skeleton Key was thus visible in communications being generated on the CTA's network. Moreover, contrary to Mr. Pable's repeated advice to his superiors that CTA's communications should be encrypted, these communications were being generated and transmitted without encryption or the use of secure communication channels, which meant the Skeleton Key was visible and accessible to anyone who might undertake the relatively easy task of intercepting those communications.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations contained in this paragraph.

66.     Even if Mr. Pable had used the Skeleton Key to access the Dayton RTA system without permission (which he did not do), such action, as undertaken by Mr. Haynes, was not malicious nor did it cause any harm, and in fact was ultimately helpful to, and acknowledged as such by, the Dayton RTA.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

67.     The very purpose of Mr. Pable's reporting of the Skeleton Key (and Mr. Haynes's use of it) was very much in keeping with their responsibility to maintain the security and safety of the CTA's system.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

68.     There was no requirement that Mr. Pable or Mr. Haynes obtain approval from Clever Devices before using the Skeleton Key, nor did any activity of Mr. Pable's (or Mr. Haynes's) constitute unauthorized access to, or modification of, anything belonging to Clever Devices.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

69.     Clever Devices was at best grossly negligent in placing and allowing the Skeleton Keys to remain in the BusTime systems of several transit agencies. Instead, however, of taking responsibility for this error when it was discovered and reported by Mr. Pable, Clever Devices acted to divert attention away from its improper conduct by criticizing the conduct of Mr. Pable and Mr. Haynes, accusing the CTA and/or Mr. Pable and Mr. Haynes of improper and even illegal conduct in finding and testing the Skeleton Key, thus causing the CTA to fear it would suffer negative repercussions from the conduct of Mr. Pable and Mr. Haynes and thus causing the CTA to terminate Mr. Pable as a scapegoat when it fact it should have commended him for discovering and reporting the security and safety risk posed by the Skeleton Key.

**ANSWER:**     The CTA lacks information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations contained in this paragraph as they relate to Clever Devices.

The CTA denies the remaining allegations contained in this paragraph.


70.     Mr. Pable's conduct, and even the conduct he did not engage in for which he was ostensibly terminated, was all undertaken for the purpose of identifying and remedying a security flaw in the CTA's, and multiple other, public transit systems. None of Mr. Pable's conduct, in fact or ever as erroneously alleged by Clever Devices and the CTA, justified his discharge. In fact, his conduct, namely the identification and reporting of the Skeleton Key, protected and insulated him from any adverse employment action under the whistleblower provision of NTSSA.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.


71.     Mr. Pable disputed the statements in the CTA's Notice, and he delivered a letter that same day to the CTA in which he submitted his "compulsory resignation" rather than be discharged, given the risks that would pose to him in terms of subsequent employment, reemployment, and security clearances.

**ANSWER:**     The CTA admits that Plaintiff submitted a written, signed statement to the

CTA upon resigning in lieu of termination from the CTA on November 8, 2018. The CTA denies

the remaining allegations contained in this paragraph.

72.     On December 10, 2018, Mr. Pable took a new position as employee of Morningstar, Inc., which he still holds. His current salary is approximately $4,500 per year lower than it was at the CTA, and his other benefits of his employment are significantly less valuable than those he was forced to abandon at the CTA. In particular, Mr. Pable lost his progress toward a pension with the CTA, and was forced to change his health insurance, which disrupted his plans for a medically necessary surgery, which was originally scheduled for the fall of 2018, and which he was forced to defer until early March, 2019.

**ANSWER:**     The CTA denies that it is in any way liable to Plaintiff. The CTA lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

73.     In addition to its economic effects, Mr. Pable's termination has caused him significant medically documented stress, illness, and anxiety since his reporting of the existence of the Skeleton Key.

**ANSWER:**     The CTA denies that Plaintiff was terminated and further denies that it is in any way liable to Plaintiff.  The CTA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

### Count I – Violation of Public Transportation Employee Protection Provision of NTSSA

74.     Mr. Pable realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**     The CTA realleges its answers to the foregoing paragraphs as if fully set forth herein.

75.     The CTA terminated Mr. Pable for identifying and reporting a hazardous security condition, namely, the existence of the Skeleton Key, in the CTA's (and ultimately other transit agencies') BusTime systems.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

76.     Clever Devices encouraged and/or otherwise directly or indirectly caused the CTA to terminate Mr. Pable as a direct result of his identifying and reporting a hazardous security condition, namely, the existence of the Skeleton Key, in the CTA's (and ultimately other transit agencies') BusTime systems by, at a minimum, falsely alleging that his conduct violated the contract between the CTA and Clever Devices and that his conduct was illegal.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

77.     Both Clever Devices and the CTA knew or suspected, or should have known or suspected, that Mr. Pable's reporting of the Skeleton Key was protected activity under the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA denies the allegations contained in this paragraph.

78.     Notwithstanding any other characterization of Mr. Pable's conduct, his reporting of the Skeleton Key to his supervisor was, at a minimum, a contributing factor in his discharge by the CTA.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

79.     Neither Clever Devices nor the CTA would have undertaken the adverse actions they did with respect to Mr. Pable and his employment with the CTA had he not reported the Skeleton Key to his supervisor.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.

80.     As a public transportation agency, the CTA's discharge of its employee, Mr. Pable, for reporting a hazardous security condition, violated the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA denies the allegations contained in this paragraph.

81.     As a contractor of a public transportation agency, Clever Devices's actions that encouraged or otherwise caused or contributed to the CTA's discharge of its employee, Mr. Pable, for reporting a hazardous security condition, violated the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA denies the allegations contained in this paragraph directed towards it.

82.     The existence of the Skeleton Key was and is a serious security risk to multiple public transit systems in the United States and abroad and the employees who operate such systems and the general public where such systems are used.

**ANSWER:**     The CTA denies the allegations contained in this paragraph.


83.     Particularly in light of the seriousness of the security issues raised by the Skeleton Key, the CTA's and Clever Devices's actions to with respect to Mr. Pable were egregious and directly contrary to the letter and spirit of the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:**     The CTA objects to the allegations contained in this paragraph because they call for a legal conclusion for which no answer is required. Subject to and without waiving this objection, the CTA denies the allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

The CTA states the following affirmative defenses to Plaintiff's Complaint:

### First Affirmative Defense:
### No Hazardous Safety or Security Condition

The Skeleton Key in the BusTime application was not a hazardous safety or security condition, as defined under Section 1142(b)(1)(A) of the NTSSA.

### Second Affirmative Defense:
### No Protected Activity

Plaintiff did not engage in a protected activity as defined by the NTSSA because he did not report the existence of the Skeleton Key in the BusTime application as required under Section 1142(b)(1)(A).

### Third Affirmative Defense:
### Alleged Protected Activity was not a Contributing Factor in Personnel Action

Even if Plaintiff properly reported the existence of the Skeleton Key in the BusTime application (he did not), and the Skeleton Key constituted a hazardous safety or security

condition (it did not), this conduct was not a contributing factor in Plaintiff's resignation in lieu of termination from the CTA.

### Fourth Affirmative Defense:
### The CTA Would Have Taken the same Personnel Action in the Absence of the Alleged Protected Activity

The CTA would have taken the same personnel action against Plaintiff in the absence of Plaintiff's alleged reporting of the existence of the Skeleton Key in the BusTime application.

### Fifth Affirmative Defense:
### No Punitive Damages Against the CTA

Plaintiff's punitive damages claim must be dismissed because the CTA is immune from liability for punitive damages under the Illinois Tort Immunity Act, 745 ILCS 10/2–102.

### Sixth Affirmative Defense:
### Duty to Mitigate

To the extent the CTA is found liable, any recovery must be reduced to the extent Plaintiff has failed to properly mitigate his damages.

Dated:  January 31, 2020

Respectfully submitted,

CHICAGO TRANSIT AUTHORITY

By:  *s/ Elizabeth E. Babbitt*
One of Its Attorneys

John F. Kennedy
jkennedy@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Allison E. Czerniak
aczerniak@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker, Suite 2800
Chicago, Illinois 60601
(312) 527-4000
Attorney No. 29143

26494819.3