**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER GEORGE PABLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 19-cv-7868 |
| v. | ) | |
| | ) | Judge Bucklo |
| CHICAGO TRANSIT AUTHORITY | ) | |
| and CLEVER DEVICES LTD., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CLEVER DEVICES, LTD.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S WHISTLEBLOWER COMPLAINT UNDER THE NATIONAL TRANSIT SYSTEMS SECURITY ACT**

NOW COMES Defendant, CLEVER DEVICES, LTD., by and through its attorney, Steven W. Jados of SmithAmundsen LLC, and for its Answer and Affirmative Defenses to Plaintiff's Whistleblower Complaint Under the National Transit Systems Security Act, Defendant, states as follows:

**Introduction**

1.      Christopher George Pable brings this Complaint against his former employer, the Chicago Transit Authority (the "CTA"), and its contactor, Clever Devices Ltd. ("Clever Devices"), under the Public Transportation Employee Protections provision, 6 U.S.C. § 1142, of the National Transit Systems Security Act ("NTSSA").

**ANSWER:   Defendant admits that Plaintiff has brought this Complaint under the NTSSA, but Defendant denies that it has committed any wrongdoing or that any violation of the law has occurred.   Defendant also notes that the majority of the Complaint's paragraphs, and the Complaint as a whole, violate Federal Rule of Civil Procedure 8,**

which calls for **"a short and plain statement of the claim showing that the pleader is entitled to relief."**

2.      Mr. Pable was a computer programmer and analyst who worked on many of the CTA's information technology systems, including a CTA system provided to the CTA by Clever Devices called "BusTime," which broadcasts transit information and alerts to the public.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 2 of the Complaint and, therefore, Defendant denies those allegations..**

3.      During the course of his work with BusTime, Mr. Pable discovered a serious security flaw in BusTime, namely, the existence of a "Skeleton Key" that could allow unauthorized, anonymous access to, and manipulation of, the BusTime system, and which could easily be exploited to broadcast erroneous or malicious alerts to the public, otherwise disrupt the system, and endanger both CTA personnel and the general public.

**ANSWER:     Defendant denies the allegations in ¶ 3 of the Complaint.**

4.      Mr. Pable reported the existence of the Skeleton Key to his supervisor at the CTA, Michael Haynes, who decided to test whether the Skeleton Key could be used to access other cities' BusTime systems. Mr. Haynes was able to use the key to issue an alert on the BusTime used by the Greater Dayton [Ohio] Regional Transit Authority ("Dayton RTA").

**ANSWER:     Defendant admits that Haynes and Pable improperly accessed the Dayton RTA's system.  Defendant denies the remaining allegations in ¶ 4 of the Complaint.**

5.      Mr. Haynes reported the widespread existence of the Skeleton Key to Clever Devices and his superiors at the CTA. In response to this report, Clever Devices erroneously accused Mr. Haynes and Mr. Pable of illegal conduct, which caused the CTA to put Mr. Haynes and Mr. Pable on leave while it purportedly conducted an "investigation" into their conduct.

2

**ANSWER:** **Defendant denies the allegations in ¶ 5 of the Complaint.**

6.     At the conclusion of the CTA's "investigation," which did not afford Mr. Pable any opportunity to learn of or respond to the allegations made against him by Clever Devices, the CTA falsely accused Mr. Pable of misconduct and threatened to fire him, unless he resigned, which he did in order to protect his employment record, his eligibility for reemployment, and his eligibility for security clearance status with subsequent employers.

**ANSWER:** **Defendant denies the allegations in ¶ 6 of the Complaint.**

7.     Mr. Pable's reporting of the Skeleton Key to Mr. Haynes was a contributing factor in his termination by the CTA. The CTA gave no reason for terminating Mr. Pable that was unrelated to his reporting of the BusTime Skeleton Key and Clever Devices' subsequent (and unsubstantiated) allegation that he engaged in illegal conduct. Neither Clever Devices nor the CTA would have taken any adverse action with respect to Mr. Pable had he not reported the Skeleton Key to Mr. Haynes.

**ANSWER:** **Defendant denies the allegations in ¶ 7 of the Complaint.**

8.     On May 2, 2019, Mr. Pable filed a complaint with the Occupational Health and Safety Administration alleging that the retaliatory and discriminatory acts of Clever Devices and the CTA were in violation of the protections afforded to Mr. Pable under NTSSA, that their actions caused him to lose significant income and other benefits of his employment, including insurance coverage immediately prior to a surgery he was forced to postpone, and to incur substantial physical and emotional distress, and seeking payment of compensatory, consequential, special, and punitive damages, including his costs associated with making and prosecuting his complaint, including, but not limited to, his attorney fees from the CTA and Clever Devices.

**ANSWER:    Defendant admits that Plaintiff filed a complaint with OSHA on or around May 2, 2019, but Defendant denies that the complaint had any merit and Defendant denies the remaining allegations in ¶ 8 of the Complaint.**

9.    Both the CTA and Clever Devices filed position statements in the OSHA proceeding, to which Mr. Pable responded, and to which additional replies and sur-replies were made by the parties. To date, however, no findings or determinations have been made in the OSHA proceeding. Mr. Pable has therefore filed this action, as is his right under 6 U.S.C. § 1142(c)(7).

**ANSWER:    Defendant admits the allegations in ¶ 9 of the Complaint.**

<u>**The Parties**</u>

10.    Mr. Pable is a 34-year-old information technology professional. He is a citizen of Illinois and resides at 5306 West Hanson Avenue in Chicago, Illinois 60639.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 10 of the Complaint and, therefore, Defendant denies those allegations.**

11.    Mr. Pable terminated his employment with the CTA under threat of discharge on November 8, 2018. At the time of his termination, he was a Programmer Analyst III, making an annual salary of $94,473.97, plus significant health-insurance, pension, and other benefits.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 11 of the Complaint and, therefore, Defendant denies those allegations.**

12.    Mr. Pable was an "employee" for purposes of the whistleblower protection provision of NTSSA via-a-vis the CTA, as he was "an individual presently or formerly working for ... a public transportation agency ...." and also vis-à-vis Clever Devices, as he was "an

individual whose employment could be affected by ... a contractor or subcontractor of a public transportation agency." 29 U.S.C. § 101(d).

**ANSWER:    Defendant denies the allegations in ¶ 12 of the Complaint.**

13.    The CTA is independent government agency established by the State of Illinois under the Metropolitan Transit Authority Act. 70 ILCS 3605 *et seq*. The CTA is headquartered, and Mr. Pable worked for the CTA, at 567 West Lake Street, Chicago, Illinois 60661.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 13 of the Complaint and, therefore, Defendant denies those allegations.**

14.    The CTA operates the nation's second-largest transportation system, and provides "public transportation" for purposes of the whistleblower protection provision of NTSSA, defined as "regular, continuing shared-ride surface transportation services that are open to the general public ...." 29 U.S.C. § 101(h).

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 14 of the Complaint and, therefore, Defendant denies those allegations.**

15.    The CTA receives funding from the U.S. Department of Transportation and is therefore a "public transportation agency" for purposes of the whistleblower protection provision of NTSSA, as it is a "publicly owned operator of public transportation eligible to receive federal assistance" from the Department of Transportation. 29 C.F.R. § 101(i).

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 15 of the Complaint and, therefore, Defendant denies those allegations.**

16.    Clever Devices is a New York corporation headquartered at 300 Crossways Park Drive, Woodbury, New York 11797. Clever Devices provides technology solutions to some of the largest transit agencies in the world, including BusTime, which provides real-time passenger

communications for bus systems, and which in used by the CTA and several other transit agencies.

**ANSWER: Defendant admits the allegations in ¶ 16 of the Complaint.**

17.     Clever Devices and/or one or more affiliated entities is a contractor and/or subcontractor of the CTA for purposes of the whistleblower protection provision of NTSSA, which prohibits "a contractor or subcontractor of a public transportation agency" from engaging in retaliatory or discriminatory conduct against not only its own employees, but also "an individual whose employment could be affected by" the actions of the contractor or subcontractor. 29 U.S.C. § 1982.101(d).

**ANSWER: Defendant denies the allegations in ¶ 17 of the Complaint.**

**JURISDICTION AND VENUE**

18.     The whistleblower provision of NTSSA and the Department of Labor ("DOL") regulations promulgated thereunder provide that a "public transportation agency, or a contractor or a subcontractor of such agency ... shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for ... reporting a hazardous safety or security condition .... 6 U.S.C. § 1142(b). *See also* 29 U.S.C. § 1982.102(a)(2). A person "discharged or otherwise discriminated against" in violation of NTSSA may file a complaint with the DOL within 180 days of the violation. 6 U.S.C. § 1142(c)(1). *See also* 29 U.S.C. § 1982.103(d).

**ANSWER: Defendant admits that Plaintiff has accurately quoted a portion of 6 U.S.C. §§ 1142(b) and (c), but Defendant denies that 29 U.S.C. §§ 1982.102(a)(2) and 1982.103(d) exist, and Defendant denies that any violation has occurred.**

19.     Mr. Pable was threatened with discharge and terminated his employment with the CTA on November 8, 2018. He filed a timely complaint under NTSSA and DOL regulations on May 2, 2019.

**ANSWER:     Defendant denies the allegations in ¶ 19 of the Complaint.**

20.     Pursuant to DOL regulations, NTSSA whistleblower complaints "should be filed with the OSHA office responsible for enforcement activities in the geographical area where the employee resides and is employed, but may be filed with any OSHA office or employee." 29 U.S.C. § 1982.103(c). Mr. Pable resides in and was employed in the geographical area served by the Chicago North Area Office of OSHA, and therefore filed this Complaint with the appropriate agency and office.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 20 of the Complaint and, therefore, Defendant denies those allegations.**

21.     Through no fault of Mr. Pable's, there have been no findings or determinations made in the OSHA proceeding. Mr. Pable has therefore chosen to file this Complaint pursuant to 6 U.S.C. § 1142(c)(7), which provides that "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tied by the court with a jury. The action shall be governed by the same legal burdens of proof specific in paragraph (2)(B) for review by the Secretary of Labor." *See also* 29 C.F.R. § 1982.114.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and, therefore, Defendant denies those allegations.**

22.    This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 and 6 U.S.C. § 1142(c)(7).

**ANSWER:    Defendant admits that the Court has jurisdiction over this matter, but Defendant denies that any violation has occurred.**

23.    Venue in this District is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to Mr. Pable's claim occurred in this District.

**ANSWER:    Defendant admits that venue is proper, but Defendant denies that any violation has occurred and Defendant denies the remaining allegations in ¶ 23 of the Complaint.**

24.    The CTA is subject to this Court's personal jurisdiction as it maintains its principal place of business within this District.

**ANSWER:    Defendant admits that the Court has jurisdiction over the CTA.**

25.    Clever Devices is subject to this Court's personal jurisdiction with respect to this civil action as a result of its transaction of business with the CTA within this District and its adverse actions against Mr. Pable made in communications to the CTA within this District and affecting Mr. Pable's employment by the CTA within this District.

**ANSWER:    Defendant admits that the Court has jurisdiction over Defendant, but Defendant denies the remaining allegations in ¶ 25 of Plaintiff's Complaint.**

<u>**Statement of Facts**</u>

26.    Mr. Pable earned a bachelor's degree in computer science from the University of Illinois, Chicago in 2011. He first worked for the CTA as an extern in the summer of 2010 under

a fellowship from the Department of Homeland Security, and, after graduating college, was retained by the CTA as a contractor, and then hired as an employee in 2012. During the course of his employment, Mr. Pable worked on, among other things, the implementation and operation of the CTA's BusTime system, which was licensed to the CTA by Clever Devices.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 26 of the Complaint and, therefore, Defendant denies those allegations.**

27.    From the time Mr. Pable was hired as an employee by the CTA in 2012 until the events that led to his termination, his work had always been considered exemplary. From the time of his internship, the CTA was eager to have him continue working for the agency. He consistently demonstrated abilities and commitment that went beyond the basic requirements of his job, took on and was the key person working on numerous projects that benefitted the CTA, and always received positive feedback and reviews.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and, therefore, Defendant denies those allegations.**

28.    During the relevant portion of his work at the CTA, Mr. Pable reported to Mr. Haynes, Manager Transit Systems Support, who in turn reported to Jim Psomas, Director, Enterprise Applications and IT-PMO for the CTA.

**ANSWER:    Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 28 of the Complaint and, therefore, Defendant denies those allegations.**

29.    During his employment with the CTA, Mr. Pable worked extensively with a product developed and licensed to the CTA (and several other transit agencies in the U.S. and abroad) by Clever Devices called BusTime. Among others things, BusTime has the ability to

broadcast service alerts and other information directly to passengers via an application and across the CTA's transit network.

**ANSWER:    Defendant denies the allegations in ¶ 29 of the Complaint.**

30.    During the spring and summer of 2018, Mr. Pable worked with Clever Devices and their sub-contractors to implement an upgrade of BusTime on the CTA's servers. In the course of working on this upgrade, Mr. Pable became aware that BusTime had a feature that the CTA had long-desired to implement. Specifically, BusTime had an application programming interface, or "API," that would allow for the automated delivery of service alerts to the BusTime system. This Service Alert API was a feature that was of interest to the CTA because as the system then operated, any service alerts had to be entered into CTAs website and into BusTime separately, whereas the API could be used to allow the staff to input alerts on the website that would automatically be sent to BusTime and disseminated there as well.

**ANSWER:    Defendant denies the allegations in ¶ 30 of the Complaint.**

31.    An API uses a "key," or a string of characters, to identify the source of information coming into the receiving system. These keys can be configured to allow various levels of access to the system and ensure that only trusted input is accepted into the system. In the case of BusTime as used by the CTA, for example, a key would be used to identify input from the CTA website and allow it to be passed onto BusTime. Similarly, administrators or developers working on the system might have individual keys that would allow them, but not others, to access or modify some or all of the information in the system. Keys can be configured in a variety of ways, either allowing or not allowing access to restricted information in the system as dictated by the business and security needs of the client.

**ANSWER:    Defendant denies the allegations in ¶ 31 of the Complaint.**

32.     Developers, such as Clever Devices, will sometimes use what is referred to as a "Skeleton Key," which is simply a key that is set up to allow full, unrestricted access into a system. A Skeleton Key allows developers to access and work on systems more quickly without worrying about securing the permissions that would be necessary to access the system once it is implemented and vulnerable to unauthorized access. A skeleton key is obviously useful when designing and testing a system in a development environment, but should never exist in a production environment system intended to be secure against unauthorized access, because anyone with the skeleton key (a relatively simply string of characters easily written down and copied and entered from virtually any device) can obtain direct, unrestricted, and undocumented access to some portion of, or even total access to, a system.

**ANSWER:     Defendant denies the allegations in ¶ 32 of the Complaint.**

33.     On Friday, August 17, 2018, Mr. Pable discovered that Clever Devices had inserted a Skeleton Key into the CTA's BusTime system.

**ANSWER:     Defendant denies the allegations in ¶ 33 of the Complaint.**

34.     Mr. Pable was assisting Clever Devices (actually Clever Devices's contracted personnel) with the troubleshooting of a recent software upgrade to CTAs BusTime system. The upgrade had repeatedly failed and Mr. Pable was helping identify why. He was using a common tool, named Wireshark, to display the network traffic being generated by the BusTime system on the CTA's network. In reviewing this display, Mr. Pable saw that the BusTime system was using an unprotected Skeleton Key to accept inputs rather than requiring that access be allowed only with a unique, authorized key associated with a particular user.

**ANSWER:     Defendant denies the allegations in ¶ 34 of the Complaint.**

35.     The Service Alert API, for example, which should have had a CTA-issued "key" to allow it to access the system, was instead accessing the system with a generic Skeleton Key that, if copied from the network traffic (which could easily be intercepted with common tools), would allow anyone with it unrestricted access to the system.

**ANSWER:     Defendant denies the allegations in ¶ 35 of the Complaint.**

36.     Anyone with this Skeleton Key would thus have the ability to fully access and manipulate CTAs BusTime service alerts and other information as well. While it is not unheard of to find such a key in a program, perhaps inadvertently left over from development work, its presence in the CTA's BusTime system was a serious concern, as anyone who had the key could use it to issue service alerts (or any other message) on the CTA's system, and could even potentially manipulate route, scheduling, and other information as well. This was a serious security issue, with respect to the integrity of CTAs public messages and ultimately CTA personnel, rider, and public safety.

**ANSWER:     Defendant denies the allegations in ¶ 36 of the Complaint.**

37.     Upon discovering the Skeleton Key, Mr. Pable immediately informed Mr. Haynes. In discussing the Skeleton Key with Mr. Haynes, the question arose as to whether the Skeleton Key was something that Clever Devices had been [*sic*] put in only the CTA's BusTime system or whether it existed in the other BusTime systems used by other transit authorities. Both Mr. Pable and Mr. Haynes understood that if the Skeleton Key existed in other BusTime systems, this would have significant implications for the seriousness of the security threat posed by the Skeleton Key and the urgency and manner in which it needed to be raised with Clever Devices.

**ANSWER:     Defendant denies the allegations in ¶ 37 of the Complaint.**

38.     Mr. Haynes decided to conduct a test to determine if the same Skeleton Key Mr. Pable had discovered in the CTA's BusTime system would work to allow access to another BusTime system. Mr. Haynes randomly chose the Dayton RTA from a list he had of other BusTime installations. Mr. Haynes proposed using the Skeleton Key to see if he could duplicate, and then remove, an existing alert (so as not to cause any disruption or disseminate erroneous information on the Dayton system if the Skeleton Key worked).

**ANSWER:     Defendant denies the allegations in ¶ 38 of the Complaint.**

39.     Mr. Pable advised Mr. Haynes not to conduct this test without first advising the Dayton RTA, but Mr. Haynes nevertheless decided to go forward with it. Mr. Haynes was the one who actually sent the command to the Dayton BusTime system.

**ANSWER:     Defendant denies the allegations in ¶ 39 of the Complaint.**

40.     Mr. Haynes was able to use the Skeleton Key to access and copy a service alert with respect to a bridge that was out in Dayton. Unbeknownst to Mr. Haynes when he did the test, Dayton's BusTime system had an integration with its Twitter account whereby service alerts were pushed to Twitter and sent out as tweets. The duplicate service alert, which told the public that a bridge would be out of service for several months, repeated that message via Twitter. The tweet was accurate, but unnecessary given that the bridge has been out for some time already and the public had already been alerted accordingly some time ago.

**ANSWER:     Defendant denies the allegations in ¶ 40 of the Complaint.**

41.     Mr. Haynes proceeded to conduct similar, but less visible, tests (for example, asking the system to return the current time) on other BusTime systems of which he was aware, and found several he was able to access with the Skeleton Key. Mr. Pable did not participate in conducting these tests.

**ANSWER:      Defendant denies the allegations in ¶ 41 of the Complaint.**

42.      Mr. Pable knew that it was critical to address the Skeleton Key issue with Clever Devices. He was also concerned that the Dayton RTA alert and tweet would attraction [*sic*] attention and be of concern to the Dayton RTA, which had not issued the alert itself. Mr. Pable discussed these issues with Mr. Haynes and advocated notifying both Clever Devices to allow them the opportunity to remove the Skeleton Key before its existence became more widely known and to advise the Dayton RTA of what had occurred.

**ANSWER:      Defendant denies the allegations in ¶ 42 of the Complaint.**

43.      On Monday, August 20, 2018, Mr. Haynes sent an e-mail to Jessica Olsen, Communications Director of the Dayton RTA informing her of the test, the service alert, and thus the source of the tweet. He attached to his email to Ms. Olsen a draft email to Clever Devices in furtherance of "the effort of making our respective BusTime systems secure."

**ANSWER:      Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 43 of the Complaint and, therefore, Defendant denies those allegations.**

44.      Later that same day, Mr. Haynes sent a final version of that draft email to Craig Lang, Vice President Business Development & Government Relations at Clever Devices, copying Mr. Pable and several other Clever Devices personnel with the subject "BusTime API Security Risk: All Customers." Among other things, Mr. Haynes wrote: "My team has identified a security risk ... that affects all BusTime customers, allows for the potential to post malicious consumer alerts on any property using the API."

**ANSWER:      Defendant admits that Haynes sent an email to Craig Lang on or around August 20, 2018, and that Pable and others were copied on the email.  Defendant denies the remaining allegations in ¶ 44 of the Complaint.**

45.     Mr. Haynes also informed Mr. Lang of the Dayton RTA test, alert, and tweet, that he had informed the Dayton RTA, and that he had found this issue in several other systems, which he listed for Mr. Lang. Haynes noted: "We recognize the value in having a common test API key across all customers, however that key should not be active after deployment and testing are complete."

**ANSWER:     Defendant admits that Haynes's email to Lang mentioned the Dayton RTA test, alert, and tweet, among other matters, and that the email included the sentence, "We recognize the value in having a common test API key across all customers, however that key should not be active after deployment and testing are complete."  Defendant denies the remaining allegations in ¶ 45 of the Complaint.**

46.     Mr. Lang responded to Mr. Haynes later that day with a short note indicating he was in Europe but was "concerned and disappointed that your actions have affected one of our other clients." Mr. Haynes wrote back to Mr. Lang on Tuesday morning with apologies for the Dayton RTA test, but stressing that his intent was to bring this issue to Clever Devices's attention so it could be fixed and that he was "disappointed that the thrust of your message is admonishment and not acknowledgement."

**ANSWER:     Defendant admits that Lang stated that he was "concerned and disappointed that your actions have affected one of our other clients."  Defendant also admits that Haynes stated that he was "disappointed that the thrust of [Lang's] message is admonishment and not acknowledgement."  Defendant denies that the thrust of Lang's message was admonishment and not acknowledgement, and Defendant denies the remaining allegations in ¶ 46 of the Complaint.**

47.     On August 21, 2108, Clever Devices issued a service bulletin alerting its customers that all previously issued versions of BusTime contained a "vulnerability"; namely, the Skeleton Key, which it labeled a "Developer API Key," which could be used by anyone with knowledge of it "to create unauthorized Service Bulletins on a BusTime system, and which "must be disabled" since it "has been discovered by individuals outside of Clever Devices."

**ANSWER:     Defendant admits that it issued a service bulletin on August 21, 2018, alerting customers to a vulnerability that could be used to create unauthorized Service Bulletins. Defendant denies the remaining allegations in ¶ 47 of the Complaint.**

48.     Even though Clever Devices did not disclose in its bulletin that the Skeleton Key was easily visible to anyone who might intercept the network traffic generated by the BusTime system, nor that the Skeleton Key should therefore have been disabled separate and apart from Mr. Pable's reporting of it, the issuance of the service bulletin acknowledges the severity of the risks posed by the Skeleton Key,

**ANSWER:     Defendant denies the allegations in ¶ 48 of the Complaint.**

49.     Later that week, Mr. Pable and Mr. Haynes participated in a conference call with several people from Clever Devices, including Mr. Lang and the lead developer of BusTime. The developer spent most of that call interrogating Mr. Haynes and Mr. Pable about the issue, berating them for finding the key and for the conduct of the Dayton RTA test. Among other things, the developer accused Mr. Pable of "unauthorized" access to the CTA's BusTime system, even though Clever Devices and its sub-contractors were well aware that Mr. Pable had been working on the system regularly to assist Clever Devices with implementing its latest upgrade to the system.

**ANSWER:     Defendant denies the allegations in ¶ 49 of the Complaint.**

50.     On Friday, August 24. 2018, Mr. Haynes received an email from Tim Harrington, the CIO of the Dayton RTA. Mr. Harrington acknowledged that Mr. Haynes "did not do or intend to do any harm," and told him that, "I see and appreciate the value of what you did."

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 50 of the Complaint and, therefore, Defendant denies those allegations.**

51.     Mr. Haynes responded to on Mr. Harrington soon thereafter in an email in which he repeatedly apologized for the test, and in which he said, "I take full responsibility." He said, "We intended no harm then, now or in the future." And also wrote, "I sincerely regret my actions but I am glad we were able to make all of our systems more secure. I am disappointed in Clever Devices that such a global API key would exist in their system ...."

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 51 of the Complaint and, therefore, Defendant denies those allegations.**

52.     Mr. Haynes forwarded a copy of this email to Mr. Pable in which he said, "I guess I just wish we never did this last week. Totally my fault." He suggested informing CTA management of the issue "next week," and also noted that "this is a huge embarrassment to Clever Devices and they are mad at us." Mr. Haynes did, in fact, send an email to his supervisor, Mr. Psomas, notifying him of this issue no later than Monday, August 27, 2018.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 52 of the Complaint and, therefore, Defendant denies those allegations.**

53.     Mr. Pable heard nothing further on this issue for several weeks. Then, on October 22, 2018, Clever Devices sent a letter to the CTA in which it accused Mr. Haynes and Mr. Pable of violating the user agreement between Clever Devices and the CTA by "making improper

modifications to" the BusTime system and "injecting a customer alert into the API of another

Clever Devices customer," which was also "likely in violation of federal and state laws."

**ANSWER:    Defendant denies the allegations in ¶ 53 of the Complaint.**

54.    Clever Devices specifically accused of violating the user agreement by

"modifying" the BusTime system and "operating" it for a "non-business purpose and outside of

CTA's Designated Environment." Neither of these allegations were substantiated with any

documentation or evidence, nor were they true. Clever Devices repeated that Mr. Pable "likely

violate[d] state and federal laws," but cited no specific facts or laws in support of this statement.

**ANSWER:    Defendant denies the allegations in ¶ 54 of the Complaint.**

55.    Clever Devices' letter did not offer any explanation, justification, or apology for

the existence of the Skeleton Key in the CTA's (or any other agency's) BusTime system. Nor did

it reference any efforts to remediate the security risks posed by the Skeleton Key. It, did,

however, confirm that the Skeleton Key was a "vulnerability" that posed significant security and

safety risks. In addition to allowing the issuance of false alerts, it stated that the use of the

Skeleton Key to access the Dayton BusTime system "could have a detrimental impact on the

overall running of the system," which is described as "mission critical to the CTA's every day

operation," and that "unauthorized changes or modifications could cause partial or complete

system failure, resulting in loss of communication and location information for vehicles in your

fleet."

**ANSWER:    Defendant denies the allegations in ¶ 55 of the Complaint.**

56.    Mr. Pable was not sent, or ever given, a copy of Clever Devices' October 22,

2018 letter, but on that same day, he was notified he was being placed on administrative leave

pending an internal investigation – though at the time he was not even told the subject matter of the investigation.

**ANSWER:** **Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 56 of the Complaint and, therefore, Defendant denies those allegations.**

57.     The CTA interviewed Mr. Pable on November 2, 2018, about his and Mr. Haynes' activities in relation to the BusTime system, but did not at that time advise Mr. Pable that it considered any of his conduct improper, nor did it inform him of any of the accusations leveled against him by Clever Devices.

**ANSWER:** **Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 57 of the Complaint and, therefore, Defendant denies those allegations.**

58.     On November 8, 2018, without giving him any meaningful opportunity to rebut the allegations made against him, the CTA told Mr. Pable he would be fired, or he could resign for his actions involving the BusTime system.

**ANSWER:** **Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 58 of the Complaint and, therefore, Defendant denies those allegations.**

59.     Mr. Pable was given a Notice of Discharge at the November 8, 2018 meeting that purported to set out the grounds for his termination. The Notice claimed that because Mr. Pable did not seek permission from Clever Devices, CTA upper management, or the Dayton RTA before testing the Skeleton Key and because he did not report the existence of the Skeleton Key, the test, or communications regarding them, he had violated a number of general rules applicable to his job.

**ANSWER:** **Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 56 of the Complaint and, therefore, Defendant denies those allegations.**

60.     The CTA's decision to terminate Mr. Pable as documented in the Notice was wrong in several respects.

**ANSWER:     Defendant denies the allegations in ¶ 60 of the Complaint.**

61.     First and foremost, Mr. Pable did not conduct the test of the Skeleton Key, Mr. Haynes did, and he did so against Mr. Pable's advice to communicate with the relevant parties first. Mr. Pable did assist with the test, but only at Mr. Haynes' direction.

**ANSWER:     Defendant denies the allegations in ¶ 61 of the Complaint.**

62.     Second, Mr. Pable did communicate all the information he learned about the Skeleton Key to his supervisor, Mr. Haynes, to whom he had reported other security-related issues in the past without any negative repercussions.

**ANSWER:     Defendant denies the allegations in ¶ 62 of the Complaint.**

63.     Third, Mr. Pable's conduct did not violate any of the rules cited in the Notice.

**ANSWER:     Defendant denies the allegations in ¶ 63 of the Complaint.**

64.     There was nothing "improper" about Mr. Pable finding and reporting the Skeleton Key in the BusTime system. He was responsible for its operation and assisting Clever Devices with the upgrade underway at the time, and was only able to provide solutions for multiple problems Clever Devices was having by accessing the installation environment, log files, configurations, and bidirectional communications of the BusTime system, which he did with the full knowledge of the Clever Device personnel working on the project, who voiced no concern or objection concerning his access.

**ANSWER:     Defendant denies the allegations in ¶ 64 of the Complaint.**

65.     It was in the course this work that Mr. Pable discovered the Skeleton Key, which was actually being used by Clever Devices's BusTime administration tool to access the BusTime

system, and the Skeleton Key was thus visible in communications being generated on the CTA's network. Moreover, contrary to Mr. Pable's repeated advice to his superiors that CTA's communications should be encrypted, these communications were being generated and transmitted without encryption or the use of secure communication channels, which meant the Skeleton Key was visible and accessible to anyone who might undertake the relatively easy task of intercepting those communications.

**ANSWER:     Defendant denies the allegations in ¶ 65 of the Complaint.**

66.     Even if Mr. Pable had used the Skeleton Key to access the Dayton RTA system without permission (which he did not do), such action, as undertaken by Mr. Haynes, was not malicious nor did it cause any harm, and in fact was ultimately helpful to, and acknowledged as such by, the Dayton RTA.

**ANSWER:     Defendant denies the allegations in ¶ 66 of the Complaint.**

67.     The very purpose of Mr. Pable's reporting of the Skeleton Key (and Mr. Haynes's use of it) was very much in keeping with their responsibility to maintain the security and safety of the CTA's system.

**ANSWER:     Defendant denies the allegations in ¶ 67 of the Complaint.**

68.     There was no requirement that Mr. Pable or Mr. Haynes obtain approval from Clever Devices before using the Skeleton Key, nor did any activity of Mr. Pable's (or Mr. Haynes's) constitute unauthorized access to, or modification of, anything belonging to Clever Devices.

**ANSWER:     Defendant denies the allegations in ¶ 68 of Plaintiff's Complaint.**

69.     Clever Devices was at best grossly negligent in placing and allowing the Skeleton Keys to remain in the BusTime systems of several transit agencies. Instead, however, of taking

responsibility for this error when it was discovered and reported by Mr. Pable, Clever Devices acted to divert attention away from its improper conduct by criticizing the conduct of Mr. Pable and Mr. Haynes, accusing the CTA and/or Mr. Pable and Mr. Haynes of improper and even illegal conduct in finding and testing the Skeleton Key, thus causing the CTA to fear it would suffer negative repercussions from the conduct of Mr. Pable and Mr. Haynes and thus causing the CTA to terminate Mr. Pable as a scapegoat when it fact it should have commended him for discovering and reporting the security and safety risk posed by the Skeleton Key.

**ANSWER:     Defendant denies the allegations in ¶ 69 of Plaintiff's Complaint.**

70.     Mr. Pable's conduct, and even the conduct he did not engage in for which he was ostensibly terminated, was all undertaken for the purpose of identifying and remedying a security flaw in the CTA's, and multiple other, public transit systems. None of Mr. Pable's conduct, in fact or ever as erroneously alleged by Clever Devices and the CTA, justified his discharge. In fact, his conduct, namely the identification and reporting of the Skeleton Key, protected and insulated him from any adverse employment action under the whistleblower provision of NTSSA.

**ANSWER:     Defendant denies the allegations in ¶ 70 of Plaintiff's Complaint.**

71.     Mr. Pable disputed the statements in the CTA's Notice, and he delivered a letter that same day to the CTA in which he submitted his "compulsory resignation" rather than be discharged, given the risks that would pose to him in terms of subsequent employment, reemployment, and security clearances.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 71 of the Complaint and, therefore, Defendant denies those allegations.**

72.     On December 10, 2018, Mr. Pable took a new position as employee of Morningstar, Inc., which he still holds. His current salary is approximately $4,500 per year lower than it was at the CTA, and his other benefits of his employment are significantly less valuable than those he was forced to abandon at the CTA. In particular, Mr. Pable lost his progress toward a pension with the CTA, and was forced to change his health insurance, which disrupted his plans for a medically necessary surgery, which was originally scheduled for the fall of 2018, and which he was forced to defer until early March, 2019.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 72 of the Complaint and, therefore, Defendant denies those allegations.**

73.     In addition to its economic effects, Mr. Pable's termination has caused him significant medically documented stress, illness, and anxiety since his reporting of the existence of the Skeleton Key.

**ANSWER:     Defendant lacks information sufficient to form a belief about the truth of the allegations in ¶ 73 of the Complaint and, therefore, Defendant denies those allegations.**

**Count I – Violation of Public Transportation Employee Protection Provision of NTSSA**

74.     Mr. Pable realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:     Defendant incorporates its responses to the prior allegations as if fully set forth herein.**

75.     The CTA terminated Mr. Pable for identifying and reporting a hazardous security condition, namely, the existence of the Skeleton Key, in the CTA's (and ultimately other transit agencies') BusTime systems.

**ANSWER:     Defendant denies the allegations in ¶ 75 of Plaintiff's Complaint.**

76.     Clever Devices encouraged and/or otherwise directly or indirectly caused the CTA to terminate Mr. Pable as a direct result of his identifying and reporting a hazardous security condition, namely, the existence of the Skeleton Key, in the CTA's (and ultimately other transit agencies') BusTime systems by, at a minimum, falsely alleging that his conduct violated the contract between the CTA and Clever Devices and that his conduct was illegal.

**ANSWER:     Defendant denies the allegations in ¶ 76 of Plaintiff's Complaint.**

77.     Both Clever Devices and the CTA knew or suspected, or should have known or suspected, that Mr. Pable's reporting of the Skeleton Key was protected activity under the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:     Defendant denies the allegations in ¶ 77 of Plaintiff's Complaint.**

78.     Notwithstanding any other characterization of Mr. Pable's conduct, his reporting of the Skeleton Key to his supervisor was, at a minimum, a contributing factor in his discharge by the CTA.

**ANSWER:     Defendant denies the allegations in ¶ 78 of Plaintiff's Complaint.**

79.     Neither Clever Devices nor the CTA would have undertaken the adverse actions they did with respect to Mr. Pable and his employment with the CTA had he not reported the Skeleton Key to his supervisor.

**ANSWER:     Defendant denies the allegations in ¶ 79 of Plaintiff's Complaint.**

80.     As a public transportation agency, the CTA's discharge of its employee, Mr. Pable, for reporting a hazardous security condition, violated the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:     Defendant denies the allegations in ¶ 80 of Plaintiff's Complaint.**

81.     As a contractor of a public transportation agency, Clever Devices's actions that encouraged or otherwise caused or contributed to the CTA's discharge of its employee, Mr. Pable, for reporting a hazardous security condition, violated the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:     Defendant denies the allegations in ¶ 81 of Plaintiff's Complaint.**

82.     The existence of the Skeleton Key was and is a serious security risk to multiple public transit systems in the United States and abroad and the employees who operate such systems and the general public where such systems are used.

**ANSWER:     Defendant denies the allegations in ¶ 82 of Plaintiff's Complaint.**

83.     Particularly in light of the seriousness of the security issues raised by the Skeleton Key, the CTA's and Clever Devices's actions to with respect to Mr. Pable were egregious and directly contrary to the letter and spirit of the Public Transportation Employee Protection provision of NTSSA, 6 U.S.C. § 1142(b).

**ANSWER:     Defendant denies the allegations in ¶ 83 of Plaintiff's Complaint.**

## AFFIRMATIVE DEFENSES

NOW COMES Defendant, CLEVER DEVICES, LTD., by and through its attorney, Steven W. Jados of SmithAmundsen LLC, and for Defendant's Affirmative Defenses to Plaintiff's Whistleblower Complaint Under the National Transit Systems Security Act, Defendant, states as follows:

1.     Plaintiffs' claims are barred to the extent they were not filed within the applicable statutes of limitations and administrative filing periods.

2.     Plaintiff's claims are barred to the extent Plaintiff failed to timely and properly exhaust all necessary administrative, statutory, and jurisdictional prerequisites for the

commencement of this action. Further, Plaintiff's claims are barred to the extent that they are not included within the scope of an administrative agency charge and any related proceedings.

3.      Plaintiff's claims are barred to the extent he failed to mitigate his alleged damages as required by law, and his entitlement to backpay, front pay, and reinstatement are limited and eliminated to the extent he obtained replacement employment or otherwise mitigated his alleged damages in this matter.

4.      At all relevant times, Defendant implemented policies, acted in good faith, did not knowingly allow unlawful conduct to occur, and reasonably believed that its conduct was in compliance with all state and federal laws regarding all decisions and actions that may have affected Plaintiff's employment. Defendant had legitimate, non-discriminatory and non-retaliatory reasons for all actions that may have affected Plaintiff's employment. Further, because Defendant would have taken the same actions with respect to Plaintiff, regardless of any alleged unlawful action, Plaintiff's claims for damages are barred in whole or in part.

5.      Plaintiff is not entitled to punitive damages because Defendant did not, at any time, engage in knowing or willful unlawful conduct, and at no time engaged in any unlawful practice with malice or reckless indifference to Plaintiff's rights.

6.      Defendant reserves the right to assert additional affirmative defenses or other defenses, and to file such amended answers and defenses as may be appropriate in light of Defendant's ongoing investigation and discovery.

WHEREFORE, Defendant denies that Plaintiff is entitled to any relief, and respectfully asks this Court to dismiss the Complaint, in its entirety, with prejudice, and to award Defendant its costs, reasonable attorneys' fees and such other just and equitable relief as the Court deems proper.

Dated: January 31, 2020.                    C**LEVER DEVICES, LTD.,**

                                            By: s/ Steven W. Jados
                                                    Defendant's Attorney

Steven W. Jados, Esq. (ARDC No.: 6289821)
SmithAmundsen LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7934 - Telephone
(630) 587-7960 - Facsimile
sjados@salawus.com
**ATTORNEY FOR CLEVER DEVICES, LTD.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2020, I electronically filed the foregoing ***Defendant Clever Devices, LTD.'s Answer and Affirmative Defenses to Plaintiff's Whistleblower Complaint Under The National Transit Systems Security Act*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Timothy A. Duffy | Elizabeth Erin Babbitt |
| Law Office of Timothy A. Duffy, P.C. | Taft Stettinius & Hollister LLP |
| 290 Shadwood Lane | 111 E. Wacker Drive, Suite 2800 |
| Northfield, IL 60093 | Chicago, IL 60601 |
| Email: tduffy@tduffylaw.com | Email: ebabbitt@taftlaw.com |
| ***Plaintiff's Attorney*** | ***Attorney for Defendant Chicago Transit Authority*** |

By: s/ Steven W. Jados
Defendant's Attorney