**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER GEORGE PABLE, | |
| *Plaintiff,* | |
| v. | |
| CHICAGO TRANSIT AUTHORITY and CLEVER DEVICES LTD., | Case No. 19-cv-7868 |
| *Defendants.* | Judge Elaine E. Bucklo |
| CHICAGO TRANSIT AUTHORITY, | Magistrate Judge Heather K. McShain |
| *Counter-Plaintiff,* | |
| v. | |
| CHRISTOPHER GEORGE PABLE, | |
| *Counter-Defendant.* | |

**<u>CHICAGO TRANSIT AUTHORITY'S FIRST AMENDED MOTION FOR SANCTIONS
AGAINST PLAINTIFF CHRISTOPHER GEORGE PABLE
AND ATTORNEY TIMOTHY DUFFY FOR THE INTENTIONAL AND REPEATED
SPOLIATION OF EVIDENCE</u>**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.      Pable: the "Hacking Hyena." .................................................................. 2

    II.     Pable Hacked the Dayton RTA System, Generating an Unauthorized
          Tweet from the Dayton RTA's Twitter Account regarding a Bridge
          Closure. ................................................................................................ 3

    III.    Pable Used an Encrypted Messaging Application Called "Signal" to
          Communicate with Haynes about the Dayton Hack. .............................. 4

    IV.    The Dayton Hack is Revealed to Clever Devices and the Dayton RTA, but
          not to the CTA. .................................................................................... 4

    V.     Pable and Haynes Communicated about the Dayton Hack, Whether to
          Disclose Their Actions, and Their Guilt About Their Actions Over Signal......... 5

    VI.    Clever Notified the CTA of the Dayton Hack, Commencing the CTA's
          Internal Investigation While Pable and Haynes are Placed on Leave. ................. 6

    VII.   Pable Immediately Anticipated Litigation Against the CTA When He was
          Placed on Administrative Leave. ........................................................... 7

    VIII.  Pable and Haynes Intentionally and Permanently Destroyed All of Their
          Encrypted Signal Messages, Including All Messages Relating to the
          Skeleton Key, the Dayton Hack, and Their Cover-Up. ......................... 7

    IX.    Pable Also Destroyed Signal Messages After the Starbucks Meeting. ................. 9

    X.     Pable Sued the CTA and Clever Devices, Claiming to be a Whistleblower. ...... 10

    XI.    The CTA Filed its CFAA Counterclaim against Pable....................................... 11

LEGAL STANDARD.......................................................................................................... 12

    I.      Fed. R. Civ. P. 37(e) Provides Sanctions for Spoliated ESI. .............................. 12

    II.     The Court Also Has the Inherent Authority to Impose Sanctions for
          Spoliation. .......................................................................................... 13

    III.    Sanctions to Deter Frivolous Litigation and Abusive Practices of
          Attorneys are also Available Under 28 U.S.C. § 1927. ....................... 14

ARGUMENT ...................................................................................................................... 15

    I.      The Evidence of Pable's Intentional Spoliation of Probative ESI Evidence
          is Overwhelming. ................................................................................ 15

        A.    Pable Intentionally Destroyed His Signal Messages with Haynes
              Exchanged Prior to November 2, 2018................................................. 16

            1.     The Evidence Pable Destroyed Was ESI. .................................... 16

            2.     Pable Anticipated Litigation with the CTA and Had a Duty
                 To Preserve The ESI. .................................................................. 16

i

3.    The ESI Pable Destroyed was Relevant to the CTA's
      Defense of This Case. ................................................................. 18

4.    The ESI Evidence Destroyed by Pable is Permanently Lost
      and Irreplaceable. .......................................................................... 20

B.    Pable has Continuously Engaged in the Spoliation of Evidence
      During the Pendency of Litigation by Deliberately Configuring his
      Signal Messages with Haynes to Automatically and Permanently
      Delete Within 24 Hours in October 2019, and Duffy Knew or
      Should Have Known About it. ........................................................ 21

C.    The CTA Sought a Complete Forensic Image of Pable's Phone in
      March 2020, and Pable and Duffy Failed to Preserve All User-
      Generated Data on the Device and Lied About It For Over a Year......... 25

II.   Pable and Duffy's Conduct Warrants Sanctions.................................................. 28

A.    Pable's Claims against the CTA Should be Dismissed Pursuant to
      Rule 37(e)..................................................................................... 29

B.    Pable's Claims against the CTA Should also be Dismissed
      Pursuant to this Court's Inherent Sanction Powers................................. 34

C.    The CTA is Also Entitled to Sanctions against Duffy Under
      Section 1927................................................................................. 35

D.    The CTA is Also Entitled to Recover its Attorney's Fees and Costs
      Expended in Bringing this Motion.......................................................... 36

E.    Alternatively, and at a Minimum, the Spoliation of Evidence
      Warrants an Adverse Jury Instruction and an Award of the CTA's
      Attorney's Fees and Costs. ..................................................................... 36

CONCLUSION.................................................................................................... 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABF Freight System, Inc. v. N.L.R.B.*,
    510 U.S. 317 (1994)............................................................................................................34

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*,
    No. 15 C 10340, 2018 WL 1616725 (N.D. Ill. Apr. 4, 2018).................................................28

*Bd. of Trustees of Pipe Fitters' Ret. Fund, Loc. 597 v. Com. Cooling & Heating, Inc.*,
    No. 13 C 7731, 2019 WL 2269959 (N.D. Ill. May 28, 2019) .................................................14

*Blow v. Bijora, Inc.*,
    855 F.3d 793 (7th Cir. 2017) ................................................................................................14

*Brown v. Columbia Sussex Corp.*,
    664 F.3d 182 (7th Cir. 2011) ................................................................................................14

*Bryant v. Gardner*,
    587 F. Supp. 2d 951 (N.D. Ill. 2008) ....................................................................................25

*Burris v. JPMorgan Chase & Co.*,
    No. CV-18-03012-PHX-DWL, 2021 WL 4627312 (D. Ariz. Oct. 7, 2021) ...........................33

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991).........................................................................................................13, 36

*Choice Hotels Int'l, Inc. v. Grover*,
    792 F.3d 753 (7th Cir. 2015) ................................................................................................14

*Cohn v. Guaranteed Rate, Inc.*,
    318 F.R.D. 350 (N.D. Ill. 2016)........................................................................................13, 34

*Does 1-5 v. City of Chicago*,
    18-CV-03054, 2019 WL 2994532 (N.D. Ill. July 9, 2019) ....................................................17

*Domanus v. Lewicki*,
    742 F.3d 290 (7th Cir. 2014) ...........................................................................................29, 36

*DR Distribs., LLC v. 21 Century Smoking, Inc.*,
    513 F. Supp. 3d 839 (N.D. Ill. 2021) ............................................................................... *passim*

*Est. of Moreno by & through Moreno v. Corr. Healthcare Companies, Inc.*,
    No. 4:18-CV-5171-RMP, 2020 WL 5740265 (E.D. Wash. June 1, 2020).............................33

iii

*Faas v. Sears, Roebuck & Co.*,
    532 F.3d 633 (7th Cir. 2008) ........................................................................................28

*Fast v. GoDaddy.com LLC*,
    340 F.R.D. 326 (Ariz. 2022) ..................................................................................16, 17

*Fed. Trade Comm'n v. Noland*,
    CV-20-00047-PHX-DWL, 2021 WL 3857413 (D. Ariz. Aug. 30, 2021),
    *motion to certify appeal denied*, CV-20-00047-PHX-DWL, 2021 WL
    5138280 (D. Ariz. Nov. 4, 2021) ............................................................................16, 30

*Fuery v. City of Chicago*,
    900 F.3d 450 (7th Cir. 2018) ........................................................................................13

*Garrit v. City of Chicago*,
    16 CV 7319, 2018 WL 11199008 (N.D. Ill. Mar. 6, 2018), *report and*
    *recommendation adopted sub nom. Garrit v. O'Brien*, 1:16-CV-07319, 2018
    WL 11199016 (N.D. Ill. June 27, 2018) ......................................................................25

*Global Material Techs., Inc. v. Dazheng Metal Fibre Co. Ltd.*,
    12 CV 1851, 2016 WL 4765689 (N.D. Ill. Sept. 13, 2016) .........................29, 32, 33

*Herzig v. Ark. Found. for Med. Car, Inc.*,
    No. 2:18-CV-02101, 2019 WL 2870106 (W.D. Ark. July 3, 2019) ..................30, 31

*Kapco Mfg. Co. v. C & O Enters., Inc.*,
    886 F.2d 1485 (7th Cir. 1989) ................................................................................14, 34

*Laub v. Horbaczewski*,
    No. CV 17-6210-JAK (KS), 2020 WL 9066078 (C.D. Cal. July 22, 2020) .....................16, 17

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ........................................................................................33

*Montano v. City of Chicago*,
    535 F.3d 558 (7th Cir. 2008) ........................................................................................13

*Omnigen Research v. Wang*,
    321 F.R.D. 367 (D. Ore. 2017) .....................................................................................33

*Ordower v. Feldman*,
    826 F.2d 1569 (7th Cir. 1987) ......................................................................................34

*Overnite Transp. Co. v. Chicago Indus. Tire Co.*,
    697 F.2d 789 (7th Cir. 1983) ........................................................................................34

*PaineWebber, Inc. v. Can Am Fin. Grp., Ltd.*,
    121 F.R.D. 324 (N.D. Ill. 1988), *aff'd*, 885 F.2d 873 (7th Cir. 1989) ......................14

*Ramirez v. T&H Lemont, Inc.*,
   845 F.3d 772 (7th Cir. 2016) .................................................................................................14

*Rickels v. City of S. Bend, Ind.*,
   33 F.3d 785 (7th Cir. 1994) ...................................................................................................36

*Roadway Exp., Inc. v. Piper*,
   447 U.S. 752 (1980)...............................................................................................................36

*Rodriguez v. M & M/Mars*,
   96 C 1231, 1997 WL 349989 (N.D. Ill. June 23, 1997) .......................................................34

*Schmalz v. Vill. of N. Riverside*,
   13 C 8012, 2018 WL 1704109 (N.D. Ill. Mar. 23, 2018)................................................16, 36

*Smith v. United States*,
   293 F.3d 984 (7th Cir. 2002) .................................................................................................12

*Sonrai Sys., LLC v. Romano*,
   No. 16 C 3371, 2021 WL 1418405 (N.D. Ill. Jan. 20, 2021) ...........................................13, 36

*In re TCI Ltd.*,
   769 F.2d 441 (7th Cir. 1985) .................................................................................................34

*Trask–Morton v. Motel 6 Operating L.P.*,
   534 F.3d 672 (7th Cir. 2008) .................................................................................................17

*Tucker v. Williams*,
   682 F.3d 654 (7th Cir. 2012) .............................................................................13, 31, 32

*Walter v. Fiorenzo*,
   840 F.2d 427 (7th Cir. 1988) .............................................................................14, 34, 35

*WeRide Corp. v. Huang*,
   2020 WL 1967209 .........................................................................................................30, 33

*Williams v. Am. Coll. of Educ., Inc.*,
   No. 16 C 11746, 2019 WL 4412801 (N.D. Ill. Sept. 16, 2019).............................13, 16, 31, 34

**Statutes**

28 U.S.C. § 1927................................................................................................... *passim*

**Rules**

Federal Rule of Civil Procedure 37 ........................................................................ *passim*

## INTRODUCTION

The CTA moves for sanctions against Pable because he intentionally and permanently destroyed electronically stored information ("ESI") critical to the contested issues in this case. Pable claims he "blew the whistle" regarding purported security issues to his supervisor, Michael Haynes. Yet, Pable destroyed the very communications he exchanged with Haynes relating to his claimed whistleblowing. Pable was in exclusive control of the ESI he destroyed. Yet, when the CTA uncovered Pable's willful destruction of ESI and confronted Pable, Pable objectively lied under oath in denying his misconduct by blaming Haynes. The ESI evidence that Pable deleted included months of encrypted messages between himself and Haynes relating to the whistleblower allegations, including that Pable and Haynes hacked into the Dayton Regional Transit Authority ("Dayton RTA") computer system and hacked or attempted to hack twenty-three other transit systems across the country. With this critical ESI evidence destroyed by Pable, this Court should not allow Pable's case to continue a day longer.

But for the perseverance and resources of the CTA and this Court's careful monitoring of the disturbing developments uncovered in discovery over the last two years, Pable would have gotten away with it. Pable attempted to confuse and obfuscate the record of his misdeeds to the point where the true facts would be so obscured that the threat of sanctions would fade away into the vagaries of pre-trial discovery. His malfeasance has been uncovered. Consequently, the CTA seeks the dismissal of Pable's case with prejudice and related relief under Rule 37(e) and this Court's inherent authority. In addition, the CTA seeks sanctions against Pable's attorney, Timothy Duffy, as a result of Duffy's efforts in aiding and concealing Pable's bad acts, under 28 U.S.C. § 1927.

Every fact in support of this motion is supported by citation to the factual record, developed by the CTA after an exhaustive and costly investigation.

1

**FACTUAL BACKGROUND**

**I.    Pable: the "Hacking Hyena."**

Pable is a sophisticated computer technician with expertise in developing and modifying computer code, IT security, encryption, and managing computer systems. He holds a degree in computer science from the University of Illinois at Chicago. (Pable Dep. Pt. I 15:14-19, attached hereto as <u>Exhibit 1</u>.) Pable also holds a number of certifications relating to computer repair, computer networks, computer hacking, and information security. (Pable Resume, attached hereto as <u>Exhibit 2</u>; *About Me*, https://menchi.dog/about.php (last visited June 24, 2022) (taken from one of Pable's personal websites), attached hereto as <u>Exhibit 24</u>; <u>Ex. 1</u> Pable Dep. Pt. I 16:3-19:6.) Pable is also a self-proclaimed computer hacker and goes by the alias "the Hacking Hyena." (<u>Ex. 1</u> Pable Dep. Pt. I 25:14-16.) Pable attends and speaks at hacking conventions. (*See, e.g.*, *DEFCON Furs – About DEFCON Furs*, https://2020.dcfurs.com/about.php (last visited June 24, 2022) (describing DEFCON Furs as "a 501c3 non-profit group that organizes events and parties at DEF CON[1]" that "started as a room meetup for furries that regularly attended the DEF CON hacker conference"), attached hereto as <u>Exhibit 25</u>); *see also DEFCON Furs – Events*, https://2020.dcfurs.com/events.php (last visited June 24, 2022) (identifying "Hacking Hyena 🐾 Ginji Terrano (@lobstar85)[2]" as a speaker during the 2020 DEFCON Furs conference)), attached <u>Exhibit 26</u>. Pable was employed by the CTA as a Programmer/Analyst III from May 7, 2012,

---

[1] DEFCON bills itself as "the world's biggest hacker convention" and is described by its organizers as "a computer underground party for hackers." (*See, e.g.*, *Hackers Convene in Las Vegas*, https://abcnews.go.com/Technology/story?id=119623&page=1 (last visited June 24, 2022), attached as <u>Exhibit 27</u>).
[2] During his first deposition, Pable testified that the name "Ginji Terrano" refers to his furry hyena character that he created for his own various roleplaying purposes "that kind of embodies a lot of the qualities [Pable] would like to see inside of [him]self," (<u>Ex. 1</u> Pable Dep. Pt. I 23:12-24:9); that Ginji Terrano's title is the "Hacking Hyena" (<u>Ex. 1</u> Pable Dep. Pt. I 25:14-16); and that "Lobstar85" is Ginji Terrano's Twitter handle that Pable controls. (<u>Ex. 1</u> Pable Dep. Pt. I 26:5-10.)

until he resigned in lieu of termination on November 8, 2018. (Dkt. 34 ¶ 4.) He was supervised at the CTA by Michael Haynes. (Dkt. 8 ¶ 2.)

## II.     Pable Hacked the Dayton RTA System, Generating an Unauthorized Tweet from the Dayton RTA's Twitter Account regarding a Bridge Closure.

The CTA employs a bus tracking system developed by Defendant Clever Devices called the "BusTime" application. This system provides tracking information for public transportation systems across the United States, including the CTA. (Dkt. 34 ¶ 10.) The BusTime application uses GPS technology and scheduling data to calculate the real-time arrival of buses and trains for public transportation riders. (*See BusTime*, https://www.cleverdevices.com/products/bustime/ (last visited June 24, 2022), attached hereto as Exhibit 28).

On Friday, August 17, 2018, Pable discovered a "Skeleton Key" within the BusTime computer code, which allowed access to the BusTime platforms used by other cities, without the knowledge or authorization of Clever Devices or the CTA. (Dkt. 34 ¶ 11.) Pable, working with his friend and supervisor, Michael Haynes, used the Skeleton Key to hack, or attempt to hack, the BusTime application used by 24 transit systems across the nation, including the New Jersey Transit, the Dayton RTA, and the CTA. (Pable's CTA Computer Aug. 17, 2018 Internet History Log at lines 6285, 6334, 6335, 6346, and 6349, attached hereto as Exhibit 3; Haynes Dep. 111:14-112:12, attached as Exhibit 4.)

Pable modified a file so that Haynes and Pable could use the Skeleton Key to secretly hack the Dayton RTA's BusTime system from Pable's CTA computer, without the knowledge or authorization of the CTA, Clever Devices, or the Dayton RTA (the "Dayton Hack"). (Ex. 4 Haynes Dep. 73:16-23; 76:17-77:24; Ex. 1 Pable Dep. Pt. I 185:14-187:9.) Pable and Haynes successfully hacked into Dayton's RTA system and caused the Dayton RTA to issue an unauthorized public

alert via Twitter regarding a bridge closure. (Aug. 17, 2018 Dayton RTA Alert, attached hereto as Exhibit 5; Aug. 17, 2018 Dayton RTA Tweet, attached hereto as Exhibit 6.)

### III. Pable Used an Encrypted Messaging Application Called "Signal" to Communicate with Haynes about the Dayton Hack.

Pable's use of Signal, an encrypted text messaging application, plays an important part in his spoliation of evidence and proof of his intent to do so. During the days that followed the Dayton Hack, Pable and Haynes communicated about their hacking activities using Signal. (Ex. 4 Haynes Dep. 105:16-106:1, 109:4-13; Pable Dep. Pt. II 375:21-24, attached hereto as Exhibit 7.) In fact, Pable and Haynes used Signal to discuss their misconduct for at least the three months following the Dayton Hack: from August 2018 through November 2, 2018. (Ex. 7 Pable Dep. Pt. II 375:21-24.)

Pable testified that he began using Signal at least one year before the Dayton Hack because "it was a much more secure means of communication" (due to its encryption features), and because "[i]t had ephemeral settings" – meaning settings that could be used to make the messages permanently disappear under certain conditions. (Ex. 1 Pable Dep. Pt. I 11:19-12:7.) Prior to the Dayton Hack and thereafter, and with the exception of certain conversations that occurred via Google Hangouts or in person, Pable and Haynes "exclusively" communicated via email and Signal at Pable's request. (Ex. 1 Pable Dep. Pt. I 10:16-17, 11:6-11, 44:10-23, 149:2-8; Ex. 7 Pable Dep. Pt. II 375:21-24; Ex. 4 Haynes Dep. 15:22-16:21.)

### IV. The Dayton Hack is Revealed to Clever Devices and the Dayton RTA, but not to the CTA.

On Monday, August 20, 2018, three days after the Dayton Hack, Haynes emailed a Dayton RTA employee, copying Pable, and reported to the Dayton RTA their misuse of Skeleton Key and the Dayton Hack. (Aug. 20-24, 2018 Email Exchange, attached hereto as Exhibit 8.) Later that same day, Haynes sent a similar email to Clever Devices, copying Pable, disclosing the Dayton

Hack and their attempts to hack 23 other transit systems. (Aug. 20-21, 2018 Email Exchange, attached hereto as Exhibit 9; Ex. 4 Haynes Dep. 111:14-112:12.) Haynes admitted to Clever that he and Pable did not report the Dayton Hack to the CTA. (Ex. 9 Aug. 20-21, 2018 Email Exchange.)

## V.    Pable and Haynes Communicated about the Dayton Hack, Whether to Disclose Their Actions, and Their Guilt About Their Actions Over Signal.

After the Dayton Hack, Pable and Haynes communicated with each other, expressing their "regret" and "stress" over the "shit storm" their hacking caused, and whether to disclose their hacking to the CTA. (Aug. 24, 2018 Email, attached hereto as Exhibit 10; Ex. 4 Haynes Dep. 119:14-120:12.) Neither Pable nor Haynes, however, had yet informed the CTA of their misconduct.

On August 31, 2018, Pable drafted an email for Haynes to send to their CTA supervisor, Jim Psomas. In Pable's draft email, he mischaracterized the "shit storm" they created in benign terms, stating that they "identified a critical security issue in Clever Device's bustime [sic] that would let anyone publish, modify or delete service alerts for bus tracker," and that "[w]e also verified other properties that have Clever's bus tracker, such as Greater Dayton Regional Transit Authority, were affected." (Aug. 31, 2018 Email, attached hereto as Exhibit 11.) Pable and Haynes further diminished their culpability by omitting any reference to, or description of, the actual Dayton Hack, their resulting unauthorized issuance of a tweet from the Dayton RTA Twitter account, and their attempted hacking into 23 additional transit systems. Haynes sent a nearly identical version of Pable's draft email to Psomas, copying Pable. (Aug. 31, 2018 Email, attached hereto as Exhibit 12.)

5

**VI.    Clever Notified the CTA of the Dayton Hack, Commencing the CTA's Internal Investigation While Pable and Haynes are Placed on Leave.**

On October 22, 2018, over two months after the Dayton Hack, Clever Devices sent a letter to the President of the CTA. The letter notified the CTA in stark terms that, based on the hacking activities of Pable and Haynes, the CTA was in breach of its contract with Clever Devices and in violation of various statutes. (Oct. 22, 2018 Notice to CTA of Dayton Hack from Clever Devices, attached hereto as Exhibit 13.) Consequently, the CTA placed Pable and Haynes on administrative leave with pay that day, and commenced an internal CTA investigation. (Ex. 1 Pable Dep. Pt. I 37:13-16.) Pable and Haynes immediately concluded that their administrative leave was related to the Dayton Hack. (Ex. 4 Haynes Dep. 156:1-18.) Pable communicated with Haynes almost exclusively over Signal during their administrative leave. (Ex. 1 Pable Dep. Pt. I 43:18-44:19.)

When the CTA placed Pable on administrative leave, he successfully blocked the CTA from accessing his CTA work computer. Without the CTA's knowledge or consent, Pable had rigged his CTA computer with passwords to encrypt his CTA computer, which he alone controlled from his personal cell phone ("Phone" or "Pable's Phone"). (Oct. 24-25, 2018 Email Exchange, attached hereto as Exhibit 14.) Upon placing Pable on administrative leave, the CTA discovered that his CTA computer was encrypted, and Pable claimed he was unable to decrypt the CTA computer. (Ex. 14 Oct. 24-25, 2018 Email Exchange.) This delayed the CTA from accessing that CTA computer assigned to Pable in furtherance of the internal investigation into the Dayton Hack and the allegations set forth in the Clever Device letter. Pable denied he was responsible for disabling the CTA's access to his CTA computer. (Dkt. 34 ¶ 24.) Instead, Pable has falsely and repeatedly represented that the CTA had "wiped" his Phone when it placed him on administrative leave, thereby preventing him from decrypting it. (*See, e.g.*, Dkt. 34; Dkt. 96 at 3-4 (cataloging lies surrounding the CTA's purported "wipe" of the Phone).) Pable never disclosed his encryption

of the CTA computer to the CTA, and it was only until he was placed on administrative leave and the computer became inaccessible that his encryption actions were revealed to the CTA.

**VII.    Pable Immediately Anticipated Litigation Against the CTA When He was Placed on Administrative Leave.**

While the CTA conducted its internal investigation, Pable began contacting attorneys about his potential claims against the CTA as they involved the Dayton Hack and his resulting administrative leave. On October 29, 2018, just seven days after being placed on paid administrative leave, Pable contacted attorney Arthur Ehrlich of the law firm of Goldman & Ehrlich regarding potential litigation against the CTA. (Oct. 29-30, 2018 Email Exchange, attached hereto as Exhibit 15.) That same day, Pable also contacted attorney Richard Johnson of the law firm of Katz, Friedman, Eisenstein, Johnson, Bareck & Bertuca regarding potential litigation against the CTA. (Oct. 29-30, 2018 Email Exchange, attached hereto as Exhibit 16.) At the time Pable was contemplating suing the CTA, he was aware of the need to preserve any evidence relating to his claims. (Ex. 7 Pable Dep. Pt. II 536:3-537:10.)

**VIII.   Pable and Haynes Intentionally and Permanently Destroyed All of Their Encrypted Signal Messages, Including All Messages Relating to the Skeleton Key, the Dayton Hack, and Their Cover-Up.**

On the morning of November 2, 2018, Pable and Haynes were interviewed by the CTA as part of its internal investigation into their hacking activities. Prior to their interviews, they met at a Starbucks that morning (the "Starbucks Meeting"). (Ex. 4 Haynes Dep. 17:9-11, 19:7-16, 19:22-20:16, 184:2-11; Ex. 7 Pable Dep. Pt. II 383:19-24, 386:7-387:7, 409:7-10.[3]) During the Starbucks Meeting, Haynes deleted from his cell phone all of the Signal messages he exchanged with Pable up to that date, including the messages material to this whistleblower case, the Skeleton Key, the

---

[3] *See also* Haynes video deposition clip separately submitted to the Court via the U.S. District Court for the Northern District of Illinois's Digital Media Exhibit Submission process.

Dayton Hack, their administrative leave, and the CTA's investigation. (*See, e.g.*, Ex. 4 Haynes Dep. at 105:16-106:8 (relevant Pable/Haynes Signal messages over the weekend following the Dayton Hack were deleted); 109:4-13, 120:13-23 (relevant Pable/Haynes Signal messages regarding whether to report the Skeleton Key and the Dayton Hack to the CTA were deleted).)

Pable testified that when Haynes deleted the Signal messages from his own phone, Haynes instantaneously caused the same Signal messages on Pable's Phone to also be permanently deleted via some sort of remote deletion setting in Signal. Pable testified under oath:

> When Mr. Haynes was terminated from the CTA, I believe he wanted to make a clean break. I can't stipulate if that is exactly why he wanted to do it or what his full motivation was, but I do recall him selecting our conversation thread and Craig Lang's[4] conversation thread and just deleting in Signal. ***And as a Signal user when that happens, the policy applies to the other person. You have the option of having it apply there.***

(Ex. 7 Pable Dep. Pt. II 380:24-381:10, 381:21-383:16[5]) (emphasis added). This is an objective lie. Nevertheless, Pable doubled down on this lie.

Pable also lied when he testified that he only learned that Haynes remotely deleted Pable's entire Signal message history from Pable's Phone when he opened up their Signal conversation thread the afternoon of November 2, 2018, after the Starbucks Meeting and their CTA interviews, and saw that their entire Signal message history was gone. (Ex. 7 Pable Dep. Pt. II 404:11-405:11.) Pable testified that he felt "hurt" that Haynes deleted their Signal messages; "like a third of [his] life was just being erased." (Ex. 7 Pable Dep. Pt. II 393:5-21.) Pable's sworn representations that Haynes deleted Pable's Signal messages off Pable's Phone—ESI critical to this case—were all objective lies.

---

[4] Craig Lang is an employee at Clever Devices.
[5] *See also* Pable video deposition clips separately submitted to the Court via the U.S. District Court for the Northern District of Illinois's Digital Media Exhibit Submission process.

That Pable perjured himself is not open to interpretation or argument. The Chief Operating Officer of Signal, Ms. Aruna Harder, has testified under oath that "Signal has never had a feature allowing a Signal user to unilaterally, manually, and permanently delete messages they *received* in a Signal message thread from the electronic devices of any or all other Signal users in the same message thread." (Signal Affidavit at ¶ 9, attached hereto as Exhibit 17.) Put simply, Haynes could not have deleted the Signal messages on Pable's Phone when he deleted the Signal messages from his own phone. Signal did not have this setting. This objective evidence from Signal demonstrates that Pable lied when he blamed Haynes for destroying their Signal messages on Pable's own Phone. Only Pable could have deleted these messages from his Phone. Ms. Harder further confirmed that the deleted Signal messages cannot be recovered, testifying that, "[a]s for content of any messages, Signal does not possess or control backups or copies of Signal messages sent and received by Signal users (whether on its servers or otherwise) due to Signal messaging platform's end-to-end encryption protocol." (Ex. 17 Signal Affidavit ¶ 10.)

Following the Starbucks Meeting, Haynes was interviewed by the CTA regarding his misconduct, and immediately resigned in lieu of termination during his interview. (Ex. 4 Haynes Dep. at 17:9-11, 19:7-12, 185:13-21, 253:4-10.) Pable was separately interviewed that same day, and ultimately resigned in lieu of termination a week later, on November 8, 2018. (Ex. 1 Pable Dep. Pt. I 189:5-8.) All of the Signal messages exchanged between Haynes and Pable prior to November 2, 2018, the date of the Starbucks Meeting, no longer exist and cannot be recovered.

## IX. Pable Also Destroyed Signal Messages After the Starbucks Meeting.

From November 2, 2018 through October 29, 2019, Pable and Haynes continued to communicate via Signal. Those messages were produced from Haynes in response to a subpoena issued by the CTA. Based on those produced Signal messages, it appears that Haynes and Pable colluded to manufacture a claim against the CTA. (Pable/Haynes Signal message thread produced

9

by Haynes, attached hereto as Exhibit 18.) On November 3, 2018—the day after Haynes resigned from the CTA—Haynes responded to Pable's Signal message where Pable stated, "I think I have a case against the cta [sic]" by saying, "[y]ep, just blame me! I'm already under the bus, just toss her in reverse…that is while the buses are still working!" (Ex. 18, Pable/Haynes Signal message thread produced by Haynes at MH4-MH5.)

However, the Signal messages between Pable and Haynes end on October 29, 2019 because Pable enabled Signal's "Disappearing Messages" setting so that all of their future Signal messages would automatically and permanently delete from both of their devices within 24 hours.[6] (Ex. 4 Haynes Dep. 18:7-17, 42:20-43:5; 220:5-15.)

## X.     Pable Sued the CTA and Clever Devices, Claiming to be a Whistleblower.

On December 2, 2019, Pable sued the CTA, claiming he was fired from the CTA for "blowing the whistle" to Haynes regarding what he viewed as potential security concerns.[7] (Dkt. 1.) Missing from the Complaint, however, is the fact that rather than 'blow the whistle" to Haynes, Pable and Haynes acted in concert to conduct the Dayton Hack, and then destroyed their Signal communications covering the very time period and subjects of Pable's so-called whistleblowing activities.

It took over two years to uncover the nature and extent of Pable's sanctionable conduct. As early as March 2020, the CTA sought the preservation of ESI regarding the Skeleton Key, the

---

[6] It is important to note that the "Disappearing Messages" feature is separate and distinct from the unilateral deletion by Pable (and Haynes) of all of their Signal messages prior to November 2, 2018. At some point, Pable chose to select all of the Haynes Signal messages he maintained on his Phone, and delete them from his own Phone. Haynes testified that he likewise deleted all of the Signal messages he had with Pable prior to November 2, 2018 from his phone during the Starbucks Meeting. On October 29, 2019, Pable enabled the "Disappearing Messages" feature to delete messages from both of their phones on a rolling, ongoing basis. This means that, as of October 29, 2019, and going forward, the Signal messages Pable and Haynes exchanged disappear from both of their phones within 24 hours of receipt of the message. The "Disappearing Messages" setting does not apply to old messages which had been previously stored on a phone to suddenly be deleted.

[7] The filing of this lawsuit followed Pable's filing of a whistleblower complaint against the CTA and Clever Devices under the NTSSA before the Occupational Health and Safety Administration ("OSHA") on May 2, 2019.

Dayton Hack and all related evidence through several Rule 37.2 conferences relating to Pable's Mandatory Initial Discovery Pilot Program ("MIDPP") obligations. (Mar. 18, 2020 Rule 37.2 Letter from E. Babbitt, attached hereto as Exhibit 19.) Pable and his counsel concealed from the CTA that Pable had already intentionally and permanently destroyed the subject Signal messages. In October 2020, more than seven months after the CTA demanded a forensic image of Pable's Phone and its ESI, Pable and his counsel produced what they represented to be a complete forensic image of Pable's Phone and they agreed that Pable would continue to preserve Pable's Phone ("First Image"). (Dkt. 96 at 3-4.) Their representations were false. Pable's computer vendor, Daniel Jerger ("Jerger") of Quest, testified under oath that he never made a forensic image of Pable's Phone and all its ESI because Pable's counsel never told him to do so. (Jerger Dep. Pt. I 45:12-46:17, 101:3-23, attached hereto as Exhibit 20.) As set forth in related pleadings and this Court's rulings, the misrepresentations of Pable and his counsel as to the integrity of the preservation of ESI on Pable's Phone are well-documented and incorporated by reference.[8]

## XI.    The CTA Filed its CFAA Counterclaim against Pable.

On August 3, 2020, the CTA filed its Counterclaim against Pable, alleging he violated the Computer Fraud & Abuse Act, 18 U.S.C. § 1030, *et seq.*, (the "CFAA"). The ESI permanently destroyed by Pable was also relevant to the CTA's Counterclaim. (*See generally* Dkt. 32.).

Upon this Court's Order of April 2, 2021, the CTA had Pable's Phone re-imaged by the CTA's third-party consultants ("Second Image"). The Second Image confirmed two facts relevant to this motion for sanctions. First, the ESI destroyed by Pable and Haynes, including the subject Signal messages from August 17, 2018 to November 2, 2018, cannot be recovered from Pable's

---

[8] The convoluted history of the Parties' dispute regarding the initial imaging of Pable's Phone is set forth in detail in the CTA's Motion to Compel Plaintiff to Produce his Cell Phone for Inspection and Imaging (Dkt. 45), which this Court granted on April 2, 2021. (Dkt. 54.) The CTA incorporates its Motion to Compel and the findings of the Court's April 2, 2021 Order herein.

Phone (or from Signal), and Pable's counsel perpetuated unnecessary litigation through his objectively unreasonable conduct under 28 U.S.C. § 1927. Second, contrary to the bold and false representations by Pable and/or his counsel to the CTA and to this Court as to the "completeness" of the First Image, Pable and his counsel never had the Phone imaged in the first place. (Dkt. 97 at 2-3.)

**LEGAL STANDARD**

**I.      Fed. R. Civ. P. 37(e) Provides Sanctions for Spoliated ESI.**

Evidence is spoliated "when one party destroys evidence relevant to an issue in the case." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). Under Federal Rule of Civil Procedure 37(e), this Court may order remedies when a party either fails to preserve or otherwise destroys evidence constituting ESI. Fed. R. Civ. P. 37(e). To recover sanctions under Rule 37(e), five requirements must be met:

> 1) the information must be ESI;
>
> 2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI;
>
> 3) the relevant ESI should have been preserved at the time . . . the litigation was anticipated or ongoing;
>
> 4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and
>
> 5) the lost ESI cannot be restored or replaced through additional discovery.

*DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (N.D. Ill. 2021).

Once these requirements are met, then the Court has two options. If the Court finds that the loss of the information has prejudiced the party seeking the ESI but was not intentional, then it may take curative measures under Rule 37(e)(1). Fed. R. Civ. P. 37(e)(1). Alternatively, if the Court finds that the party responsible for spoliating the ESI "acted with the intent to deprive

12

another party of the information's use in the litigation," it can impose further sanctions under Rule 37(e)(2), "including presuming that the information was unfavorable, instructing the jury to presume the information was unfavorable, or entering dismissal or default." Fed. R. Civ. P. 37(e)(2); *DR Distribs.*, 513 F. Supp. 3d at 958-59. Under Rule 37(e)(2), "[i]ntentional destruction and bad faith may be proved inferentially and with circumstantial evidence, and this Court need not leave experience and commonsense at the courthouse door when making its determination." *Sonrai Sys., LLC v. Romano*, No. 16 C 3371, 2021 WL 1418405, at *13 (N.D. Ill. Jan. 20, 2021), *report and recommendation adopted*, No. 1:16-CV-03371, 2021 WL 1418403 (N.D. Ill. Mar. 18, 2021) (internal citations and quotations omitted).

## II.     The Court Also Has the Inherent Authority to Impose Sanctions for Spoliation.

The Court has the inherent authority to impose sanctions for "a full range of litigation abuses" of the judicial system. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). The Court's inherent authority can be used to: "sanction those who show 'willful disobedience of a court order,' act in 'bad faith, vexatiously, wantonly, or for oppressive reasons,' for fraud on the court, delay, disruption, or 'hampering enforcement of a court's order.'" *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (quoting *Chambers*, 501 U.S. at 45-46). This "broad, inherent power to impose sanctions . . . for destruction of evidence," is not limited by the Federal Rules or by statute. *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016). Under the court's inherent authority, sanctions are warranted for willful abuses of the judicial process or for litigating in bad faith, and may include an award of attorneys' fees or an entry of judgment against a party. *Tucker v. Williams*, 682 F.3d 654, 661-62 (7th Cir. 2012); *Fuery*, 900 F.3d at 463. When there is "fraud on the court, perjury may warrant the sanction of dismissal." *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008); *Williams v. Am. Coll. of Educ., Inc.*, No. 16 C 11746, 2019 WL 4412801,

at *15 (N.D. Ill. Sept. 16, 2019) (sanction of dismissal "under both Rule 37(e)(2) (as to [plaintiff's] destruction of data from his laptop) and the court's inherent authority (as to his perjury)").

This Court may also use its inherent authority to sanction a party for his lawyer's misconduct, which is imputed to the client. *Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015) (intentional lawyer misconduct imputed to client); *Bd. of Trustees of Pipe Fitters' Ret. Fund, Loc. 597 v. Com. Cooling & Heating, Inc.*, No. 13 C 7731, 2019 WL 2269959, at *16 (N.D. Ill. May 28, 2019) (same).

## III. Sanctions to Deter Frivolous Litigation and Abusive Practices of Attorneys are also Available Under 28 U.S.C. § 1927.

This Court may sanction Pable's counsel under 28 U.S.C. § 1927 to deter frivolous litigation and the abusive practices of attorneys. *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989). Section 1927 authorizes this Court to sanction "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously[.]" 28 U.S.C. § 1927. Accordingly, under Section 1927, this Court may impose sanctions "against an attorney where that attorney has acted in an objectively unreasonable manner by engaging in a 'serious and studied disregard for the orderly process of justice.'" *Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988) (quoting *Overnite Transp. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983)). Sanctions under Section 1927 may include an award of attorney's fees and costs resulting from abusive litigation. *PaineWebber, Inc. v. Can Am Fin. Grp., Ltd.*, 121 F.R.D. 324, 335 (N.D. Ill. 1988), *aff'd*, 885 F.2d 873 (7th Cir. 1989); *Blow v. Bijora, Inc.*, 855 F.3d 793, 807 (7th Cir. 2017).

As the party seeking sanctions, the CTA bears the burden of establishing that the sanctionable conduct occurred by a preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 781 (7th Cir. 2016). This Court has broad discretion to sanction Pable and his

counsel for intentional spoliation, and such orders are reviewed for an abuse of discretion. *Brown*

*v. Columbia Sussex Corp.*, 664 F.3d 182, 190 (7th Cir. 2011).

## ARGUMENT

### I. The Evidence of Pable's Intentional Spoliation of Probative ESI Evidence is Overwhelming.

Pable has intentionally and continuously spoliated evidence integral to the Parties' claims

and defenses. There are three categories of ESI spoliation that are the subject of this Motion:

- Pable's permanent, deliberate destruction of months of Signal messages between Pable and Haynes prior to the Starbucks Meeting, including messages relating to the Skeleton Key, the Dayton Hack, the CTA's ongoing internal investigation, their respective resignations, and their intent to sue the CTA;

- Pable's intentional destruction of relevant Signal messages exchanged between Pable and Haynes from October 2019 to the present, including their messages directly pertaining to the Skeleton Key, the Dayton Hack, and this litigation, due to Pable's decision to engage Signal's "Disappearing Messages" feature and subsequent refusal to disable it; and

- Pable and Duffy's intentional decision to refuse to forensically preserve all of Pable's user-generated data[9] on Pable's Phone since March 2020, despite Duffy's repeated representations to the CTA and this Court that a complete image of the Phone was taken in June 2020.

The unfair prejudice to the CTA resulting from Pable's intentional spoliation is irreparable.

Pable has destroyed evidence relevant to his whistleblower claim against the CTA, and the CTA's

defenses to that claim. Moreover, Pable's destruction of evidence unfairly prejudices the CTA's

prosecution of its CFAA Counterclaim against Pable because the destroyed data covers the time

period and subjects relating to Pable's unauthorized use of the CTA's computer system.

---

[9] In this context, "user-generated data" refers to the information, data, and content resulting from an individual's use of a cell phone, whether directly or indirectly, including through their use of various third-party applications. Examples of user-generated data that typically present on a cell phone may include photographs, videos, text messages, Internet browsing history, call histories, third-party application use histories, etc.

### A. Pable Intentionally Destroyed His Signal Messages with Haynes Exchanged Prior to November 2, 2018.

By intentionally and permanently purging his entire Signal message history with Haynes prior to November 2, 2018, and later lying under oath about his actions, this Court should dismiss Pable's case with prejudice under Rule 37(e) and the Court's inherent powers. Pable's intentional spoliation of relevant ESI satisfies the five requirements for Rule 37(e) sanctions. *See DR Distribs.*, 513 F. Supp. 3d at 958. Moreover, sanctions for Pable's deliberate spoliation of evidence are also available and appropriate through this Court's inherent powers. *See, e.g.*, *Williams*, 2019 WL 4412801, at *10 (explaining that "[a]side from its Rule 37 authority," a court has the inherent ability to issue sanctions).

#### 1. The Evidence Pable Destroyed Was ESI.

As to the first of the five requirements for Rule 37(e) sanctions: the spoliated evidence at issue (namely, electronic Signal messages exchanged between Pable and Haynes) is undisputedly ESI. *See, e.g.*, *Schmalz v. Vill. of N. Riverside*, 13 C 8012, 2018 WL 1704109 at *3 (N.D. Ill. Mar. 23, 2018) (text messages are ESI in awarding Rule 37(e) sanctions); *see also Fed. Trade Comm'n v. Noland*, CV-20-00047-PHX-DWL, 2021 WL 3857413 at * (D. Ariz. Aug. 30, 2021), *motion to certify appeal denied*, CV-20-00047-PHX-DWL, 2021 WL 5138280 (D. Ariz. Nov. 4, 2021) (considering Signal messages as ESI in awarding Rule 37(e) sanctions).

#### 2. Pable Anticipated Litigation with the CTA and Had a Duty To Preserve The ESI.

Next, Pable had a duty to preserve and not deliberately delete his Signal message history with Haynes as of the date of the Starbucks Meeting, because Pable was actively anticipating litigation against the CTA based on the very evidence contained in these Signal messages. Pable's duty to preserve the Signal messages was triggered, at minimum, when he began soliciting lawyers to sue the CTA on October 29, 2018. *See, e.g.*, *Laub v. Horbaczewski*, No. CV 17-6210-JAK (KS),

2020 WL 9066078, at \*2-\*5 (C.D. Cal. July 22, 2020) (ESI was spoliated when destroyed by plaintiff prior to litigation, where plaintiff failed to preserve text messages a year prior to filing suit, and plaintiff had been contemplating litigation and speaking with potential counsel); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 337 (Ariz. 2022) (sanctioning plaintiff who failed to preserve ESI (including Facebook posts and Telegram messages) for two years prior to filing suit); *see also Does 1-5 v. City of Chicago*, 18-CV-03054, 2019 WL 2994532 (N.D. Ill. July 9, 2019). Here, as of the date of the Starbucks Meeting, the CTA's internal investigation was underway. Pable was colluding with Haynes to "throw Haynes under the bus," and as with the *Laub* and *Fast* plaintiffs, Pable had already solicited at least two law firms about pursuing claims against the CTA. (Ex. 15 Oct. 29-30, 2018 Email Exchange; Ex. 16 Oct. 29-30, 2018 Email Exchange.) Under these facts, Pable had a duty under the law to preserve the relevant ESI.

Moreover, Pable had actual knowledge that the Signal messages were relevant to the CTA's internal investigation into the Dayton Hack. Haynes's email communications from October 22, 2018, the same day that they were placed on administrative leave, reveal that they immediately concluded the Dayton Hack and the Skeleton Key were the catalyst for their leave. (Oct. 22, 2018 Email, attached hereto as Exhibit 21.) Pable and Haynes were "on the same page" that the Dayton Hack precipitated their administrative leaves. (Ex. 4 Haynes Dep. 158:24-159:6.)

Further, in contacting multiple attorneys regarding the CTA's internal investigation prior to the Starbucks Meeting, Pable knew or should have known that his Signal communications regarding *that very topic* should have been preserved. *See, e.g.*, *Trask–Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (the obligation to preserve evidence arises when a party "knew, or should have known, that litigation was imminent"). Pable testified that he *knew*

17

he was obligated to preserve materials that would potentially be relevant to his claims at the time he was contacting attorneys:

> Q. [*By the CTA's* Counsel] . . .You were aware at the time that you thought you may have a claim against the CTA that you had an ongoing duty to preserve relevant materials relating to any claims that you bring against the CTA?
>
> . . .
>
> THE WITNESS: I was aware of that, as well as CTA should be cognizant of preserving their materials.

(Ex. 7 Pable Dep. Pt. II at 537:1-10.) The CTA and Pable agree that Pable had a duty to preserve the ESI at issue, and Pable anticipated litigation against the CTA. The second and third elements of Rule 37(e)—that there was anticipated litigation and a duty to preserve relevant ESI—are satisfied as to Pable's spoliation of the pre-November 2, 2018 Signal messages. *DR Distribs.*, 513 F. Supp. 3d at 958.

### 3. The ESI Pable Destroyed was Relevant to the CTA's Defense of This Case.

The fourth threshold requirement of Rule 37(e), that the ESI was lost because the party failed to take reasonable steps to preserve it, is easily met here. Not only did Pable fail to take reasonable steps to preserve the ESI at issue, he *intentionally and permanently* destroyed the ESI—including, significantly, his entire Signal message history with Haynes prior to November 2, 2018. This spoliation prevents the CTA from accessing all of the necessary proof to defend Pable's claim. Sanctions are appropriate. *See, e.g.*, *DR Distribs.*, 513 F. Supp. 3d at 979 ("In spoliation circumstances, the party seeking sanctions does not have access to all the necessary proofs in large part because the other side spoliated the evidence.")*.* Worse still, Pable lied about it.

The evidence is overwhelming that critical ESI is irretrievably lost. The actions Pable took to destroy his Signal messages exchanged with Haynes prior to November 2, 2018 were

18

intentional.  Haynes testified that during the Starbucks Meeting, he deleted from his own cell phone

his Signal message history with Pable. Haynes could not recall "if [Pable] asked [him] directly [to

purge the Signal messages] or if it was a joint decision . . . ." (Ex. 4 Haynes Dep. 22:16-23.)

Pable committed perjury in blaming Haynes for the destruction of Pable's Signal messages

maintained on Pable's own Phone. Pable testified under oath that his Signal messages with Haynes

from prior to November 2, 2018 were permanently deleted from Pable's Phone during the

Starbucks Meeting by virtue of *Haynes* deleting the Signal messages from Haynes's own phone,

stating:

> When Mr. Haynes was terminated from the CTA, I believe he
> wanted a clean break.  I can't stipulate if that is exactly why he
> wanted to do it or what his motivation was but I do recall him
> [Haynes] selecting our conversation thread and Craig Lang's
> conversation thread and just deleting in Signal. And as a Signal user
> when that happens, the policy applies to the other person. You have
> the option of having it apply there."

(Ex. 7 Pable Dep. Pt. II 380:24-381:10, 381:21-383:16.) Thus, according to Pable, under Signal's

"policy," Haynes's deletion of their Signal messages on Haynes's cell phone caused the same

messages to be deleted from Pable's Phone.

Pable's explanation for the spoliated Signal messages exchanged prior to November 2,

2018 is an unequivocal lie. As confirmed by Signal in sworn testimony, there was no such "policy"

or technology for Signal users to cause the remote deletion of data on another phone. At no point

in 2018 could Haynes have used his own phone to unilaterally delete all of his Signal messages he

shared with Pable off of Pable's Phone. No such feature existed then, and it does not exist even

now. Indeed, Signal confirmed in its affidavit that "Signal has never had a feature allowing a Signal

user to unilaterally, manually, and permanently delete messages they *received* in a Signal message

thread from the electronic devices of any or all other Signal users in the same message thread."

(Ex. 17 Signal Affidavit ¶ 9) (emphasis in original).

This category of evidence spoliated is clearly relevant to the litigation, and includes:

- Pable's Signal messages exchanged with Haynes during the weekend following the Dayton Hack where they discussed their hacking activities involving the Skeleton Key and the Dayton Hack and what they should do next (Ex. 4 Haynes Dep. 105:16-106:8);

- Pable's Signal messages exchanged with Haynes during the weeks following the Dayton Hack where they continued to discuss their misconduct regarding the Skeleton Key and the Dayton Hack, and whether they should reveal their misconduct to the CTA (Ex. 4 Haynes Dep. 120:8-23); and

- Pable's Signal messages exchanged with Haynes immediately after learning that they were both placed on administrative leave. (Ex. 4 Haynes Dep. 155:2-24.)

The CTA was successful in revealing Pable's perjury relating to his destruction of relevant evidence only after exhaustive and costly discovery and contested motion practice that few litigants could sustain. Only Pable could have deleted these Signal messages off his Phone, and he lied to cover up his destruction of this evidence. Pable's perjured testimony demands dismissal of his case with prejudice and reimbursement of all attorneys' fees and costs incurred by the CTA.

### 4. The ESI Evidence Destroyed by Pable is Permanently Lost and Irreplaceable.

The final element of Rule 37(e), that the lost ESI cannot be restored or recovered through other discovery, is also satisfied regarding the pre-November 2, 2018 Signal messages exchanged between Pable and Haynes. Those messages are forever lost and cannot be restored or otherwise replaced through additional discovery. Quest, Pable's computer expert, could not recover the Signal messages between Pable and Haynes exchanged prior to November 2, 2018. In addition, Signal has confirmed that unless Signal messages are maintained on a user's device or otherwise backed up by the user in some fashion, they are gone forever once deleted. (Ex. 17 Signal Affidavit, ¶ 10 ("Signal does not possess or control backups or copies of Signal messages sent and received by Signal users (whether on its servers or otherwise) due to the Signal messaging platform's end-

to-end encryption protocol.") Pable and Haynes's Signal relevant message history prior to November 2, 2018 cannot be restored or replaced through any additional discovery.

Because each of the Rule 37(e) requirements for Pable's deliberate spoliation of his pre-November 2, 2018 Signal messages with Haynes have been met, sanctions are appropriate.

**B. Pable has Continuously Engaged in the Spoliation of Evidence During the Pendency of Litigation by Deliberately Configuring his Signal Messages with Haynes to Automatically and Permanently Delete Within 24 Hours in October 2019, and Duffy Knew or Should Have Known About it.**

Pable's spoliation of evidence is not limited to those Signal messages exchanged with Haynes prior to November 2, 2018. Pable has also engaged in the continuous spoliation of relevant Signal messages exchanged with Haynes—even after filing this lawsuit against the CTA. On October 29, 2019, Pable deliberately enabled Signal's "Disappearing Messages" feature in his message thread with Haynes such that all of their subsequent communications—including those relevant to this matter—automatically and permanently deleted from both of their devices after 24 hours. (Ex. 4 Haynes Dep. 18:7-17, 42:20-43:5; 220:5-15.) As a result, all of their Signal messages exchanged after October 29, 2019 have been destroyed. As Pable's counsel since 2019, Duffy knew or should have known about Pable's continuous destruction of evidence and put an end to it. *See DR Distribs.*, 513 F. Supp. 3d at 931 (observing that "critically, an [attorney's] adequate hold notice must include a warning to disable autodelete functions" and that, in cases involving ESI, "parties must investigate and disable autodelete functions on email accounts (client and web-based) at the onset of litigation if those accounts reasonably contain relevant information and it is reasonable under the circumstances of the case to do so."). But Duffy did no such thing.

Pable's deliberate destruction of Signal messages exchanged with Haynes since October 29, 2019 likewise satisfies the five requirements for Rule 37(e) sanctions and give rise to sanctions pursuant to Court's inherent powers. As to the *first* Rule 37(e) requirement, the spoliated Signal

21

messages constitute ESI. (*See supra,* p. 20.) ***Second***, Pable had an ongoing duty to preserve the Signal messages on October 29, 2019 and thereafter because he was actively pursuing claims against the CTA at that time. Specifically, Pable, represented by Duffy, filed a whistleblower complaint against the CTA and Clever Devices under the NTSSA before OSHA on May 2, 2019—months *before* Pable elected to enable the "Disappearing Messages" feature in his Signal message thread with Haynes. Duffy, as Pable's counsel, knew or should have known that Pable communicated with Haynes via Signal since at least June 2020, when Pable and Duffy engaged Quest to perform limited work on Pable's Phone. (Jerger Dep. Pt. III 333:1-15, attached hereto as Exhibit 22 (Jerger and Duffy discussed Pable's use of Signal in June 2020).) Duffy had an affirmative obligation to direct Pable to preserve his relevant ESI at all times, and certainly when he learned Pable was using Signal and the "Disappearing Messages" feature. *See, e.g.*, *DR Distribs.*, 513 F. Supp. 3d at 931 ("Rather than providing general statements directing clients not to delete anything relevant, attorneys must give reasonable and specific instructions detailing where ESI might be stored and what steps the client may need to take to preserve it.")

    ***Third***, Pable implemented a setting in Signal to automatically and permanently delete the post-October 29, 2019 Signal messages. Those messages were relevant to this case and should have been preserved at all times after October 29, 2019. Yet, with claims against the CTA pending, Pable elected to use the "Disappearing Messages" feature in communicating with Haynes via Signal so that those communications with his key witness in this case—the person to whom he claims he "blew the whistle"—could avoid detection or production in discovery. With the exception of an in-person meeting sometime in October 2020 and a second meeting in April 2021, Pable and Haynes exclusively used Signal to communicate regarding this litigation. (Ex. 4 Haynes Dep. 13:1-3, 14:9-14; Ex. 7 Pable Dep. Pt. II 344:24-345:12.)

The evidence shows that Pable and Haynes communicated via Signal while the litigation was ongoing, and that Pable destroyed these encrypted messages through the *Disappearing Messages* setting. Haynes recalled the subjects matter of these deleted messages in his deposition:

- Pable's communications and draft responses to his attorney, Duffy, related to the case (Ex. 4 Haynes Dep. 44:8-23);

- the names of certain people with whom they worked on CTA projects in preparation for Pable's first deposition (Ex. 1 Pable Dep. Pt. I 10:4-18);

- the individuals being deposed in the case (Ex. 4 Haynes Dep. 13:14-24);

- materials Pable has received during discovery in this lawsuit (including, for instance, Clever Device's October 22, 2018 letter to the CTA) (Ex. 4 Haynes Dep. 42:3-12);

- materials that Pable was producing to Duffy during the course of litigation, including background information for the case (Ex. 4 Haynes Dep. 44:1-7);

- the CTA's additional affirmative defenses to Pable's claims (Dkt. 30), including that Pable mined for Bitcoin on the CTA computer Pable used during the course of his employment, and Pable's related response in written discovery that Pable "was investigat[ing] the use of blockchain technology for potential use by the CTA" (Ex. 4 Haynes Dep. 230:5-231:20) (Pable messaged Haynes over Signal that the CTA was pursuing "some kind of block chain stuff we talked about"); and

- the CTA's additional affirmative defenses to Pable's claims (Dkt. 30), including that Pable had files containing hundreds of thousands of usernames and passwords on his CTA computer (Ex. 4 Haynes Dep. 232:11-235:11 (Pable messaged Haynes over Signal that the CTA discovered this "trove of passwords on his [CTA] computer").

And these are only the topics relating to the litigation that the CTA knows of by virtue of Haynes's testimony. It is likely that other Signal messages relating to the litigation, including preparation for Haynes's deposition, were also exchanged between Pable and Haynes over Signal, but were automatically deleted. The CTA will never know due to Pable's bad acts.

*Fourth*, the post-October 29, 2019 Signal messages were lost because Pable deliberately took steps to ensure that relevant communications exchanged with his star witness in this case

23

would automatically and permanently self-destruct after 24 hours. At any point in time,[10] Pable could have easily disabled Signal's "Disappearing Messages" feature in his message thread with Haynes such that relevant communications were preserved during litigation. In fact, Pable testified that "two minutes is more than enough time" to do so. (Ex. 7 Pable Dep. Pt. II 353:18-354:10.) *Fifth*, the post-October 29, 2019 Signal messages exchanged between Pable and Haynes are forever lost by Pable's design. In deliberately enabling the "Disappearing Messages" feature while actively pursuing claims against the CTA, Pable and Haynes' relevant Signal messages automatically and permanently deleted off of their respective devices after 24 hours, and cannot be restored or replaced through additional discovery.

"[D]isabling an autodelete function is universally understood to be one of the most basic and simple functions a party must do to preserve ESI." *DR Distribs.*, 513 F. Supp. 3d at 979. Yet Pable intentionally enabled the "Disappearing Messages" feature in his Signal message thread with Haynes, resulting in the spoliation of relevant ESI during the period of October 29, 2019 through at least March 16, 2021. Duffy knew or should have known about Pable's deliberate destruction of ESI and put an end to it (he himself acknowledged that "it is common and expected that all parties will take steps necessary to avoid the deletion of relevant ESI"), but he did not. (Dkt. 73 at 8.) Sanctions are thus warranted pursuant to Rule 37(e), Section 1927, and the Court's inherent powers.

---

[10] The CTA first learned that Pable and Haynes continued to exchange communications relevant to this litigation via Signal with the "Disappearing Messages" feature enabled during Haynes' deposition on March 16, 2021. The following day, the CTA demanded that Pable take actions on his devices to ensure that any communications going forward relating to or relevant to this litigation be preserved, and that any "Disappearing Messages" functionality be disabled. (Dkt. 69 at p. 10.) Pable refused to do so.

**C.** **The CTA Sought a Complete Forensic Image of Pable's Phone in March 2020, and Pable and Duffy Failed to Preserve All User-Generated Data on the Device and Lied About It For Over a Year.**

Finally, and even beyond the spoliation of the Signal messages prior to November 2, 2018 and after October 29, 2019, both Duffy and Pable are complicit in the spoliation of other relevant ESI that should have been preserved on Pable's Phone. As this Court knows, the CTA sought the forensic preservation of Pable's Phone as early as March 2020 upon learning that Pable used the Phone to message Haynes about the Dayton Hack in August 2018. (Ex. 19 Mar. 18, 2020 Rule 37.2 Letter from E. Babbitt.) In response, Duffy agreed to preserve Pable's Phone in his letter of March 25, 2020. (Dkt. 45-1.) Despite Duffy's repeated representations to the contrary, Pable and Duffy never took steps to preserve a complete forensic image of Pable's Phone in March 2020, and no such complete image exists. Their misrepresentations were ultimately revealed at the depositions of Pable's consultant, Dan Jerger. At most, Duffy told Jerger to collect limited data from Pable's Phone based on search terms and parameters provided by Duffy, and Duffy was aware that no complete forensic image of the Phone existed since as early as June 2020. (Ex. 20 Jerger Dep. Pt. I 45:12-46:17, 101:3-23; Jerger Dep. Pt. II 25:7-12, 131:12-22, 222:7-9, attached hereto as Exhibit 23; Ex. 22 Jerger Dep. Pt. III 302:3-10, 302:23-304:2, 305:21-306:10.) As a result, Pable's Phone—which is directly implicated in the CTA's CFAA counterclaim and Pable's defenses thereto—was not processed for a complete forensic image until the CTA was granted leave to image it in April 2021. (Dkt. 54.) Pable and Duffy's failure to forensically image the Phone at the outset of litigation and their subsequent lies concealing that they took no steps to do so warrants sanctions pursuant to Rule 37(e), Section 1927, and the Court's inherent authority.

In applying the Rule 37(e) requirements to the circumstances surrounding Pable's Phone, it is clear that relevant data once available on the device is forever lost. *First*, the user-generated data once available on the Phone constitutes ESI. *See, e.g.*, *Garrit v. City of Chicago*, 16 CV 7319,

25

2018 WL 11199008, at \*3 (N.D. Ill. Mar. 6, 2018), *report and recommendation adopted sub nom. Garrit v. O'Brien*, 1:16-CV-07319, 2018 WL 11199016 (N.D. Ill. June 27, 2018) (discovery sought from a cell phone, including "text messages, emails and electronically stored photographs and call logs," was ESI under Rule 37(e) analysis.) **Second**, there is no question that actual litigation triggered Pable's obligation to preserve ESI on his Phone. At the very least, Pable had an obligation to preserve the user-generated data on his Phone as of March 2020, when the CTA requested and Duffy agreed to forensically preserve the Phone during the course of discovery. *See, e.g.*, *Bryant v. Gardner*, 587 F. Supp. 2d 951, 967-68 (N.D. Ill. 2008).

*Third*, relevant data available on Pable's Phone should have been preserved once Pable anticipated litigation, and by March 2020 at the latest—certainly well before April 2021, when the CTA took the first complete forensic image of the device by Court order. As a result of Pable's and Duffy's actions, the Parties were unable to collect and analyze user-generated data from Pable's Phone as it existed at the time he was placed on administrative leave in October 2018, or even at the time that the CTA first requested the image in March 2020. This information is relevant to the CTA's Counterclaim, which alleges that Pable encrypted his CTA computer at multiple points of access without the CTA's authorization or knowledge, including through encryption applications on Pable's Phone. (*See generally* Dkt. 32.) It is likewise relevant to Pable's defenses to the CTA's Counterclaim. Pable alleges in relevant part that the CTA "disabled all access to [Pable's] cell phone data" and, in so doing, prevented Pable from accessing his password storage application, Moto Key, which allegedly contained the information necessary to access Pable's computer at the CTA. (Dkt. 45-1; Dkt. 34.)

Pable has continuously claimed (without support) that when the CTA terminated his access to his CTA email and the CTA network at the time he was placed on administrative leave, this

termination triggered a complete disabling or deletion of the contents of Pable's Phone. (*See* Dkt. 54 at 4) (This Court has recognized that Pable has yet to corroborate this claim). Because Pable's Phone was only first forensically preserved in April 2021, over two years after Pable was placed on administrative leave, the CTA will never have access to all evidence relating to Pable's encryption scheme as it existed in 2018. The CTA is also unable to discover all evidence from Pable's Phone at that time that would rebut his false claims that: (i) the CTA "wiped" the Phone in October 2018; and (ii) the scant data available in the First Image of the Phone was due to the CTA's "wipe."

*Fourth*, and in continuation of an integral theme in their prosecution of this case, Pable and Duffy did more than merely *fail* to take reasonable steps to preserve Pable's Phone during the litigation—they also lied to the CTA and this Court about that failure for nearly two years. As early as March 2020, Duffy agreed to preserve and image Pable's Phone at the CTA's request. (Dkt. 45-1.) But the Phone was not preserved at that point in time, nor was it preserved in June 2020. Duffy repeatedly maintained[11] that the First Image "is a complete forensic image," and that the First Image "is a complete image of the data on the phone when the phone was imaged; nothing about the imaging process affected the 'completeness' of the image." (Dkt. 45-1 at 57-58.) *Fifth*, the ESI lost due to Pable and Duffy's failure to preserve the Phone cannot be replaced through additional discovery. Because Pable's Phone has since been used, connected to the Internet, and even later wiped by his new employer (Ex. 1 Pable Dep. Pt I 192:21-193:6), no party can retroactively replicate and preserve the exact state of the user-generated data on the device as of November 2018 (or even as of March 2020).

---

[11] Pable and Duffy's misrepresentations and lies pertaining to Pable's Phone are set forth in detail in the CTA's Reply in Support of its Motion to Enforce the Subpoena for Documents Against Quest and for Sanctions against Quest and Duffy. (Dkt. 96.) The CTA incorporates its summary of those misrepresentations and lies herein.

Because Pable and Duffy's acts and omissions forever spoliated relevant data on Pable's Phone, and because those circumstances were shrouded in lies that vexatiously fueled protracted motion practice for over a year, the CTA is entitled to sanctions pursuant to Rule 37(e), Section 1927, and the Court's inherent authority.

## II.  Pable and Duffy's Conduct Warrants Sanctions.

Given the inescapable conclusion that multiple tranches of ESI—including relevant Signal messages and user-generated data once available on Pable's Phone—are forever lost as described above, this Court should impose sanctions pursuant to Rule 37(e), Section 1927, and the Court's inherent authority to address the resulting harm to the CTA. The deliberate spoliation of evidence in this case warrants the dismissal of Pable's claims against the CTA, with prejudice, and an award of the CTA's attorney's fees and costs incurred in bringing this Motion. In the alternative, and at a minimum, Pable and Duffy's conduct requires an adverse jury instruction at trial, in addition to an award of the CTA's attorney's fees and costs for pursuing this Motion.

Pable and Duffy deliberately and maliciously spoliated evidence. "A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). In proving the deliberate destruction of evidence, circumstantial evidence is "by far the most common means of proving intentional destruction of evidence." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 1616725, at *11 (N.D. Ill. Apr. 4, 2018). Their conduct warrants sanctions.

Here, the circumstances surrounding the spoliated Signal messages and user-generated data on Pable's Phone prove that Pable and Duffy deliberately destroyed evidence in bad faith such that the resulting prejudice to the CTA is presumed. The evidence shows that, as a person with sophisticated technological and information security skills, Pable:

- deliberately used Signal to communicate with others due in part to its "ephemeral" messaging capabilities;

- instructed Haynes to use Signal in communicating with him through their personal devices; and

- knowingly caused the deletion of their pre-November 2, 2018 Signal message history, even though he was corresponding with attorneys regarding his claims against that CTA just days before the Starbucks Meeting and was independently aware of his obligation to preserve relevant evidence at that time.

The fact that Pable lied under oath, blaming the spoliation of the pre-November 2, 2018 Signal messages on Haynes's unilateral actions, only cements the conclusion that Pable intentionally destroyed evidence in bad faith.

A similar conclusion follows as to the destruction of Pable and Haynes's Signal messages exchanged after October 29, 2019. Pable engaged the "Disappearing Messages" feature in their Signal message thread so that their messages directly relating to this litigation, including about their deposition testimony and discovery produced in this case, would automatically and permanently delete after 24 hours, and Duffy knew or should have known about this conduct to prevent it. He did not. Pable's use of Signal to shroud his communications about this case with Haynes was intentional. Similarly, Pable and Duffy's conduct in failing to preserve Pable's Phone and repeatedly, knowingly lying about those circumstances also amounts to the intentional spoliation of evidence.

### A. Pable's Claims against the CTA Should be Dismissed Pursuant to Rule 37(e).

Because Pable and Duffy destroyed the ESI intentionally in order to deprive the CTA of the information's use, this Court should dismiss Pable's claims against the CTA. Fed. R. Civ. P. 37(e)(2). Default judgment is an appropriate sanction where: (1) there is "a clear record of delay or contumacious conduct;" (2) less drastic sanctions have proven ineffective; or (3) a party has demonstrated willfulness, bad faith, or fault. *Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir.

2014) (internal quotation omitted). But, "[a] specific finding of prejudice is not required under Rule 37(e)(2) once the court has found . . . an intent by the party who lost or destroyed the evidence to prevent the other party from using it in the litigation." *Global Material Techs., Inc. v. Dazheng Metal Fibre Co. Ltd.*, 12 CV 1851, 2016 WL 4765689, at \*10 (N.D. Ill. Sept. 13, 2016) (citing Advisory Committee Note to 2015 Amendment to Fed. R. Civ. P. 37(e)). A specific finding of prejudice is not required because the finding of intent to deprive the other party of the spoliated evidence supports the inference that it was unfavorable to the destroying party, which furthers "the inference that the party who now cannot use the lost evidence has been prejudiced by that loss." *Id*. Here, however, the facts reflect both prejudice to the CTA in its defense to Pable's claim and prosecution of its counterclaim, and Pable's intent to prevent the CTA from accessing the relevant ESI.

At least three other courts have specifically recognized that a party's decision to exchange relevant communications using ephemeral messages (including through the Signal application's "Disappearing Messages" feature) enabled warrants Rule 37(e)(2) sanctions. In *WeRide Corp. v. Huang*, the court issued terminating sanctions under Rule 37(b) and Rule 37(e) due to the willful, bad-faith spoliation of potentially relevant evidence, including ephemeral messages exchanged on the DingTalk application during the pendency of litigation. No. 5:18-cv-07233-EJD, 2020 WL 1967209, at \*9-\*10 (N.D. Cal. Apr. 16, 2020). Specifially, a defendant directed his company to use DingTalk's autodeletion feature to correspond internally because he believed it to be "more secure"—and he did so even after a preliminary injunction had been entered in the case prohibiting the destruction of evidence. *Id.* at \*8-\*9.

In *Fed. Trade Comm'n v. Noland*, the court granted an adverse inference instruction that spoliated evidence was presumed unfavorable to the defendants, where the defendants switched

their communications to Signal and utilized its auto-delete function, in violation of their duty to preserve. 2021 WL 3857413, at \*13. The *Noland* court also noted that the defendants intended to deprive the plaintiff of responsive discovery through its Signal usage. *Id*. at \*12-13.

And in *Herzig v. Ark. Found. for Med. Car, Inc.*, the court likewise found that plaintiffs engaged in "intentional, bad-faith spoliation" warranting Rule 37(e)(2) for communicating via Signal. No. 2:18-CV-02101, 2019 WL 2870106, at \*4-5 (W.D. Ark. July 3, 2019). Similar to Pable here, the *Herzig* court also found that based on the plaintiffs' "familiarity with information technology, their reluctance to produce responsive communications, the initial misleading response from [one of the plaintiffs] that he had no responsive communications, their knowledge that they must retain and produce discoverable evidence, and the necessity of manually configuring Signal to delete text communications," the plaintiffs' "decision to withhold and destroy those likely-responsive communications was intentional and done in bad faith." *Id.* at \*5. However, the court did not consider which sanction under Rule 37(e)(2) was appropriate because the court granted the defendant's motion for summary judgment, thereby dismissing the case. *Id.*

Pable's intentional spoliation of evidence in this case also closely parallels the plaintiff's bad acts in *Williams*, which necessitated the dismissal of his claims with prejudice under Rule 37(e)(2)(C). 2019 WL 4412801, at \*17. In that case, Judge Feinerman granted the defendant's sanctions motion, finding that the plaintiff—much like Pable—"intentionally destroyed evidence and then repeatedly lied about it under oath." *Id*. at \*15. Specifically, the plaintiff reinstalled an operating system on the defendant-issued laptop, which is a "common method of deleting information from a computer." *Id*. at \*14. This resulted in the "wiping and destruction of potentially relevant information" from the device. *Id*. The court found that this was "willful" and intentional in part because of the plaintiff's "experience as an IT professional, he must have known

31

that reinstalling the operating system had the potential to overwrite—and thus render unrecoverable—previously deleted files." *Id*. Because the plaintiff's reinstallation of the operating system was intentional (meaning, he knew and he chose to do what he did), he "repeatedly lied" about his actions in his deposition, declaration, and hearing testimony. *Id*. at \*15. Judge Feinerman concluded that the plaintiff's lies amounted to perjury and constituted an additional reason for the dismissal of his claims. *Id*. at \*16.

The Court's reasoning in *Williams* is instructive here. Pable intentionally: (i) deleted his pre-November 2, 2018 Signal message history with Haynes while actively making plans to sue the CTA; and (ii) enabled "Disappearing Messages" to automatically and permanently destroy his messages with Haynes beginning in October 2019 while pursuing his claims against the CTA. Pable knew he was obligated to preserve relevant communications while first communicating with attorneys to sue the CTA in 2018, and yet he still chose to delete the pre-November 2, 2018 Signal messages with Haynes—and to later arrange for the automatic deletion of all messages after October 29, 2019. Just as the *Williams* plaintiff "repeatedly lied" about his deliberate actions throughout litigation, Pable also lied under oath by repeatedly blaming Haynes for the deleted Signal messages through a version of events that was (and still is) technologically impossible. Applying the court's reasoning in *Williams* here likewise warrants the dismissal of Pable's claims against the CTA with prejudice under Rule 37(e)(2)(C).

*Global Material Technologies, Inc. v. Dazheng Metal Fibre Co. Ltd*. should also guide this Court in dismissing Pable's claims against the CTA. WL 4765689. In that case, Judge Shah granted the plaintiff's motion for default judgment under Rule 37(e)(2)(C) as a result of defendants' repeated discovery abuses. *Id.* at \*1. The *Global Material Technologies* defendants: disposed of their computers while the lawsuit was pending; "sat on the e-mail account of a key custodian (and

named defendant)," and then feigned surprise when the email account was later deleted by Yahoo! when it ceased operations in China; and lied to the plaintiff and the Court about these circumstances. *Id*. at \*9. Judge Shah thus concluded that "defendants lied" and deliberately spoliated evidence "in order to prevent GMT from obtaining that evidence and using it against defendants in the litigation." *Id*. In entering a default judgment against the defendants, Judge Shah noted that "lesser sanctions . . . would not adequately reflect the seriousness of defendant' wrongs. Defendants were not merely dilatory or misleading by omission in their litigation tactics; they were affirmatively deceitful, to GMT and to the court." *Id*. at \*10.

So too here. Just as the *Global Material Technologies* defendants intentionally spoliated evidence in multiple tranches by "discard[ing] one source of electronic evidence and fail[ing] to preserve others," *id*. at \*9, Pable followed suit in destroying his pre-November 2, 2018 Signal messages with Haynes and then deliberately configuring their subsequent messages to automatically delete on an ongoing basis in October 2019. And Pable and Duffy unquestionably failed to preserve the user-generated data on Pable's Phone such that it is too late to ever recover that information. Just as Judge Shah considered the defendants' lies in entering Rule 37(e)(2)(C) sanctions against the *Global Material Technologies* defendants, so too should this Court. Pable and Duffy's continuous efforts to conceal the truth from the CTA and this Court requires the dismissal of Pable's claims against the CTA with prejudice. Indeed, other courts have awarded Rule 37(e) dismissal sanctions for similar conduct. *See, e.g*., *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959-60 (9th Cir. 2006) (affirming dismissal with prejudice as a sanction for the plaintiff-employee's willful, bad-faith destruction of data on his employer-owned laptop); *Omnigen Research v. Wang*, 321 F.R.D. 367, 372-76 (D. Ore. 2017) (default judgment entered against the defendants for intentionally deleting numerous types of ESI in violation of Rule 37(e)); *Burris v.*

*JPMorgan Chase & Co.*, No. CV-18-03012-PHX-DWL, 2021 WL 4627312, at *12-18 (D. Ariz. Oct. 7, 2021) (Rule 37(e)(2)(C) dismissal where plaintiff intentionally deleted potentially relevant evidence); *Est. of Moreno by & through Moreno v. Corr. Healthcare Companies, Inc.*, No. 4:18-CV-5171-RMP, 2020 WL 5740265, at *5, 7-10 (E.D. Wash. June 1, 2020) (awarding Rule 37(e)(2) sanctions for intentional deletion of emails following filing of lawsuit); *see also WeRide Corp. v. Huang*, 2020 WL 1967209, at *16 (awarding terminating sanctions and attorney's fees and costs to plaintiff under Rule 37(e) where defendants deliberately destroyed ESI).

**B.     Pable's Claims against the CTA Should also be Dismissed Pursuant to this Court's Inherent Sanction Powers.**

This Court may also rely on its inherent sanction powers to dismiss Pable's claims. As a preliminary matter, this Court has relied on both Rule 37(e) *and* its inherent authority in authorizing sanctions. *See, e.g., Cohn*, 318 F.R.D. at *355; *Williams*, 2019 WL 4412801 at *10-11. But Pable and Duffy's dishonest conduct in this case can also justify sanctions pursuant to the court's inherent powers alone. Lying cannot be condoned in any formal proceeding. *See ABF Freight System, Inc. v. N.L.R.B.,* 510 U.S. 317, 323 (1994). Accordingly, dismissal may be the appropriate sanction when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false. *Rodriguez v. M & M/Mars*, 96 C 1231, 1997 WL 349989 at *2 (N.D. Ill. June 23, 1997).

Such is the case here, where Pable lied during a deposition as to how his pre-November 2, 2018 Signal messages with Haynes came to be permanently deleted off of his Phone. And for his part, Duffy perpetuated lies to the CTA and this Court regarding Pable's Phone since as early as March 2020.

34

**C. The CTA is Also Entitled to Sanctions against Duffy Under Section 1927.**

Section 1927 seeks to deter conduct that impedes, unnecessarily multiplies, or delays ongoing litigation proceedings. *Overnite Transp. Co.*, 697 F.2d at 794; *see also Kapco Mfg. Co., Inc.*, 886 F.2d at 1491. An attorney acts in an objectively unreasonable manner by engaging in a "serious and studied disregard for the orderly process of justice" or where a "claim [is] without a plausible legal or factual basis and lacking in justification." *Walter*, 840 F.2d at 433 (internal citations and quotations omitted); *see also Ordower v. Feldman,* 826 F.2d 1569, 1574 (7th Cir. 1987) (intentional ill will or reckless conduct constitutes vexatious conduct); *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985). An attorney may be required to "personally" satisfy sanctions under Section 1927, including the "excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

As the Court knows, Duffy's and Pable's misrepresentations and lies relating to the imaging of Pable's Phone unnecessarily multiplied litigation through countless Rule 37.2 conferences and substantial motion practice, all of which ultimately delayed the taking of a complete forensic image of the Phone until April 2021. Duffy's actions are objectively unreasonable, where he:

- failed to appropriately instruct Pable to preserve his relevant communications;

- unilaterally preserved only a portion of the Phone's data in June 2020 without agreeing upon an imaging protocol with the CTA;

- failed to take a complete forensic image of the Phone and only directed Quest to preserve specific information on the device;

- continuously misrepresented to the CTA and this Court that the First Image was a complete forensic image of the Phone, even though he knew it was not since June 2020;

- refused to cooperate in re-imaging the Phone when the First Image was revealed to contain a scant amount of user-generated data, resulting in motion practice;

35

- repeatedly and falsely blamed the scant amount of data in the First Image on the CTA's supposed "wipe" of the device, for which Pable can identify no supporting evidence; and

- unreasonably withheld other information obtained by Quest in June 2020 relating to the Phone, including a native extraction of Pable's Signal messages that the CTA specifically sought throughout discovery.

Taken together, these acts require sanctions against Duffy pursuant to Section 1927: "[i]f a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Walter*, 840 F.2d at 433-34.

### D.    The CTA is Also Entitled to Recover its Attorney's Fees and Costs Expended in Bringing this Motion.

In addition to the dismissal of Pable's claims against it, the CTA should recover its attorney's fees and costs incurred in bringing this Motion under Rule 37(a)(5). *See, e.g.*, *Rickels v. City of S. Bend, Ind.*, 33 F.3d 785, 786 (7th Cir. 1994) (under this Rule, "the loser pays"). This Court may also rely on its inherent authority to assess attorney's fees against Pable, who has litigated in bad faith, and Duffy, "who willfully abuse[d] judicial processes." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980). A federal court can also sanction attorneys appearing before them for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46. Such sanctions are likewise available against Duffy under Section 1927. Here, Pable and Duffy's intentional acts and lies surrounding the Signal messages and Pable's Phone amount to bad faith and further warrant an award of attorney's fees and costs to the CTA.

### E.    Alternatively, and at a Minimum, the Spoliation of Evidence Warrants an Adverse Jury Instruction and an Award of the CTA's Attorney's Fees and Costs.

If this Court does not dismiss Pable's claims against the CTA pursuant to Rule 37(e)(2)(C), the deliberate spoliation of evidence in this case still justifies, at minimum: the presumption that the lost information was unfavorable to Pable; an instruction to the jury that it must presume the

information was unfavorable to Pable; and an award of the CTA's attorney's fees and costs. Fed. R. Civ. P. 37(e)(2)(A)-(B); *see also Sonrai*, 2021 WL 1418405 at \*16 (sanctions awarded pursuant to Rule 37(e)(2)(B))*; Schmalz*, 2018 WL 1704109 at \*8 (Rule 37(e)(1) sanctions awarded; the parties were allowed to present evidence to jury regarding spoliated evidence and the likely relevance of lost information; and awarded attorneys' fees and costs incurred in making the motion); *Domanus*, 742 F.3d at 299 (precluding defendants from using as evidence all documents culled from a hard drive before they destroyed it and awarding attorneys' fees for bringing motion for sanctions.)

Finally, and as argued in detail above, the CTA may still recover its attorney's fees and costs incurred in bringing in this Motion in the event that this Court awards alternative relief under Rule 37(e)(2)(A) and/or Rule 37(e)(2)(B), as well as pursuant to Section 1927 and the Court's inherent powers.

## CONCLUSION

WHEREFORE, CTA respectfully requests that this Court enter an order granting CTA's Motion for Sanctions for Spoliation of Evidence, imposing the sanction of dismissal of Pable's Complaint, with prejudice, and awarding any other such further relief as this Court deems equitable and just.

Dated: June 27, 2022                 Respectfully submitted,

                                       CHICAGO TRANSIT AUTHORITY

                           By:      */s/ John F. Kennedy*
                                    One of Its Attorneys

John F. Kennedy
jkennedy@taftlaw.com
Kim R. Walberg
kwalberg@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Nicollette L. Khuans

nkhuans@taftlaw.com
Elizabeth Winkowski
ewinkowski@taftlaw.com
TAFT STETTINIUS & HOLLISTER
LLP
111 East Wacker, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

## TABLE OF SUPPORTING EXHIBITS

| | |
|---|---|
| **Exhibit 1** | March 11, 2021 Deposition of Christopher Pable |
| **Exhibit 2** | Christopher Pable Resume |
| **Exhibit 3** | Pable's CTA Computer August 17, 2018 Internet History Log |
| **Exhibit 4** | March 16, 2021 Deposition of Michael Haynes |
| **Exhibit 5** | August 17, 2018 Dayton RTA Alert |
| **Exhibit 6** | August 17, 2018 Dayton RTA Tweet |
| **Exhibit 7** | July 6, 2021 Deposition of Christopher Pable |
| **Exhibit 8** | August 20-24, 2018 Haynes Email Exchange with Dayton RTA |
| **Exhibit 9** | August 20-21, 2018 Haynes Email Exchange with Clever Devices |
| **Exhibit 10** | August 24, 2018 Haynes Email to Pable |
| **Exhibit 11** | August 31, 2018 Pable Draft Explanation Email to the CTA |
| **Exhibit 12** | August 31, 2018 Haynes Sent Explanation Email to the CTA |
| **Exhibit 13** | October 22, 2018 Notice to CTA of Dayton Hack from Clever Devices |
| **Exhibit 14** | Oct. 24-25, 2018 Pable Email Exchange with CTA |
| **Exhibit 15** | Oct. 29-30, 2018 Pable Email Exchange with Ehrlich |
| **Exhibit 16** | Oct. 29-30, 2018 Pable Email Exchange with Johnson |
| **Exhibit 17** | Signal Affidavit |
| **Exhibit 18** | Pable/Haynes Signal Message Thread Produced by Haynes |
| **Exhibit 19** | Mar. 18, 2020 Rule 37.2 Letter from E. Babbitt |
| **Exhibit 20** | October 12, 2021 Deposition of Daniel Jerger |
| **Exhibit 21** | October 22, 2018 Haynes Email to Pable |
| **Exhibit 22** | March 9, 2022 Deposition of Daniel Jerger |
| **Exhibit 23** | October 19, 2021 Deposition of Daniel Jerger |
| **Exhibit 24** | *About Me*, https://menchi.dog/about.php (last visited June 24, 2022) |
| **Exhibit 25** | *DEFCON Furs – About DEFCON Furs*, https://2020.dcfurs.com/about.php (last visited June 24, 2022) |
| **Exhibit 26** | *DEFCON Furs – Events*, https://2020.dcfurs.com/events.php (last visited June 24, 2022) |

| **Exhibit 27** | *Hackers Convene in Las Vegas*, https://abcnews.go.com/Technology/story?id=119623&page=1 (last visited June 24, 2022) |
| **Exhibit 28** | *BusTime*, https://www.cleverdevices.com/products/bustime/ (last visited June 24, 2022) |