# Exhibit 1

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3    CHRISTOPHER GEORGE PABLE,    )
                            )
4       Plaintiff,        )
                            )
5       -vs-             ) Case No. 1:19-cv-7868
                            )
6    CHICAGO TRANSIT AUTHORITY and )
    CLEVER DEVICES, LTD.,     )
7                            )
       Defendants.       )
8    -----------------------------)
                            )
9    CHICAGO TRANSIT AUTHORITY,   )
                            )
10      Counter-Plaintiff,   )
                            )
11      -vs-             )
                            )
12    CHRISTOPHER GEORGE PABLE    )
                            )
13      Counter-Defendant.   )
    -----------------------------)
14
15             REPORT OF PROCEEDINGS from the
16    deposition of CHRISTOPHER GEORGE PABLE taken via Zoom
17    by Paul W. O'Connor, a CSR within and for the State of
18    Illinois, pursuant to the provisions of the Federal
19    Code of Civil Procedure and Rules of the Supreme Court
20    thereof pertaining to the taking of depositions at
21
22    Chicago, Illinois, commencing at 9:00 a.m. on
23
24    March 11, 2021.

Page 2

```
1   APPEARANCES:
2
3        LAW OFFICE OF TIMOTHY A. DUFFY, PC
             725 West Orchard Circle
4        Lake Forest, Illinois, 60093
         By: MR. TIMOTHY A. DUFFY
5        Tduffy@tduffylaw.com
             Appearing on behalf of the Plaintiff;
6
7
         TAFT STETTINIUS & HOLLISTER LLP
8        111 East Wacker Drive, Suite 2800
         Chicago, Illinois, 60601
9        By: MS. ELIZABETH BABBITT and
             MS. NICOLLETTE KHUANS and
10       MS. ALISON CZERNIAK
         MR. JOHN F. KENNEDY
11       Ebabbitt@taftlaw.com
             Appeared on behalf of the CTA;
12
13       SMITHAMUNDSEN
         3815 East Main Street, Suite A-1
14       Saint Charles, Illinois, 60174
         By: MR. STEVEN JADOS and
15           MS. JESSEKA GREEN
         Sjados@salawus.com
16           Appeared on behalf of Clever Devices.
17
18   ALSO PRESENT:
19
         MR. RICH FISHER
20           Videographer;
21
22
23       MS. JULIE FRIEDLANDER
24           Counsel for Clever Devices.
```

Page 3

```
1            I N D E X
2
3    WITNESS              PAGE
4    CHRISTOPHER GEORGE PABLE
5    Exam by Ms. Babbitt        6
     Exam by Mr. Jados        256
6    Exam by Mr. Duffy        299
7
8
     EXHIBITS:        PAGE
9
10   Exhibit No. 11    39
     Exhibit No. 12    73
     Exhibit No. 13    76
11   Exhibit No. 14    81
     Exhibit No. 15    82
12   Exhibit No. 16    86
     Exhibit No. 17    92    (Exhibits retained by
13   Exhibit No. 18   100     counsels and on Exhibit
     Exhibit No. 19   112     Share)
14   Exhibit No. 20   118
     Exhibit No. 21   124
15   Exhibit No. 22   127
     Exhibit No. 24   130
16   Exhibit No. 26   149
     Exhibit No. 32   194
17   Exhibit No. 33   209
     Exhibit No. 1    218
18   Exhibit No. 39   226
19   Exhibit No. 40   231
20   Exhibit No. 41   233
21   Exhibit No. 19   277
22   Exhibit No. 22   280
23   Exhibit No. 1    285
24   Exhibit No. 34   292
```

Page 4

```
1        THE VIDEOGRAPHER:  Good morning.  We are going on
2    the record March 11, 2021.  Time is 9:59 a.m.  Case is
3    Christopher George Pable versus Chicago Transit Authority
4    and Clever Devices, LTD, case 1:19-CV-7868.  Attorneys
5    state your name, who you represent starting with taking
6    attorney.
7        MS. BABBITT:  Elizabeth Babbitt, B-A-B-B-I-T-T, on
8    behalf of the Chicago Transit Authority.
9        MR. KENNEDY:  John F. Kennedy, one of the attorneys
10   for the CTA.
11       MS. CZERNIAK:  Alison Czerniak, also appearing for
12   the CTA.
13       MS. KHUANS:  Nicollette Khuans, K-H-U-A-N-S, also
14   appearing for the CTA.
15       MR. DUFFY:  Timothy Duffy appearing for the
16   plaintiff and witness, Christopher Pable.
17       MR. JADOS:  Steven Jados for defendant Clever
18   Devices.
19       MS. FRIEDLANDER:  Julie Friedlander, attorney for
20   Clever Devices.
21       THE VIDEOGRAPHER:  Witness may be sworn in.
22        (Witness sworn)
23       MS. BABBITT:  Okay.  Good morning, Mr. Pable,
24   thanks for joining me today.
```

Page 5

```
1          Have you ever been deposed before?
2        THE WITNESS:  No.
3        MS. BABBITT:  All right.  I'm going to go over some
4    of the ground rules.  I know you've been sitting in on a
5    lot of depositions so some of it will be very familiar to
6    you.
7          First as you know, we are going to be
8    recorded today by a court reporter in addition to the
9    video recorder.  The court reporter is going to be taking
10   down all the words you and I say and the other attorneys
11   say.  So any time you answer a question you will have to
12   respond verbally.  Is that fair?
13       THE WITNESS:  Yes.
14       MS. BABBITT:  And you understand that when you
15   respond to a question you need to use words, you can't
16   say uh-huh or shake your head yes or no.
17       THE WITNESS:  Yes.
18       MS. BABBITT:  You also understand that we need to
19   try to avoid talking over each other, so I will ask you
20   let me finish a question before you respond, is that
21   fair?
22       THE WITNESS:  Yes.
23       MS. BABBITT:  I know you mentioned breaks.  If you
24   need a break at any time you let me know and we'll take a
```

2 (Pages 2 - 5)

Page 6

1 break, is that all right?
2     THE WITNESS: Yes.
3     MS. BABBITT: And you understand that you're under
4 oath and you are obligated to tell the truth in this
5 deposition.
6     THE WITNESS: Yes.
7     MS. BABBITT: And it's the same as if you were
8 sitting in front of a federal judge in this court case to
9 testify. You understand that?
10     THE WITNESS: Yes.
11     MS. BABBITT: You understand if I ask a question
12 and you answer it, I will take that to mean you
13 understood the question.
14     THE WITNESS: Yes.
15        CHRISTOPHER GEORGE PABLE,
16 called as a witness herein, having been first duly
17 sworn, was examined upon oral interrogatories and
18 testified as follows:
19        EXAMINATION
20     By Ms. Babbitt:
21 Q. And where are you right now?
22 A. In a corner of my kitchen.
23 Q. Is that in Chicago, Illinois?
24 A. Yes.

Page 7

1 Q. What device are you using to participate in
2 this deposition?
3 A. A Dell Venue tablet.
4 Q. Is that a device you own?
5 A. It is a device that my husband had that's EOL
6 from his work.
7 Q. Is there anyone else in the room right now
8 beside you?
9 A. No.
10 Q. Do you have any other electronic communication
11 devices with you right now?
12 A. No.
13 Q. You understand that aside from breaks with your
14 attorney you're not permitted to be communicating with
15 anyone during this deposition while I'm asking you
16 questions?
17 A. Yes.
18 Q. Have you taken any medication in the last
19 24 hours?
20 A. No.
21 Q. Is there any reason that you wouldn't be able
22 to give your full, complete and truthful testimony today?
23 A. Outside of time, no.
24 Q. What do you mean outside of time?

Page 8

1 A. If details are hazy I might not be able to
2 recall all of the details.
3 Q. Okay. Fair enough. Do you have any written or
4 electronic information with you right now?
5 A. Besides the Exhibit Share, no.
6 Q. You understand that aside from the exhibits
7 that you are being shown in your deposition today, you're
8 not permitted to consult any materials during your
9 deposition while I'm asking you questions?
10 A. Yes.
11     MR. DUFFY: I don't know if that's accurate. If he
12 does consult something he's obviously entitled to know
13 that. If he happens to have a document that we have
14 already used and he recalls and wants to talk about it I
15 think he's able to look at it. I'm not saying he does, I
16 don't know.
17     MS. BABBITT: Q How did you prepare for this
18 deposition?
19     THE WITNESS: A I spoke to my attorney on
20 Tuesday.
21 Q. Did you review any materials in preparation for
22 your deposition?
23 A. Nothing specific.
24 Q. Did you review any e-mails or text messages?

Page 9

1 A. Nothing specific.
2 Q. Who would you have spoken to about this
3 deposition?
4 A. My husband.
5 Q. Anyone else?
6 A. I asked my friends to give me good vibes as I
7 give a deposition today, but that's about it.
8 Q. When is the last time you communicated with
9 Michael Haynes?
10 A. I don't recall, but that communication would be
11 logged somewhere most likely.
12 Q. Have you communicated with him in the last
13 month?
14 A. I believe so, yes.
15 Q. In the last week?
16 A. That I'm not sure about.
17 Q. You said that communication would be logged.
18     What do you mean by that?
19 A. For example if I made a phone call to him it
20 might show up in a call log.
21 Q. You don't recall if you communicated with him
22 by phone or some other means?
23 A. Well I would always use my phone to communicate
24 with him. I've not met with him in person since the

3 (Pages 6 - 9)

Page 10

1  pandemic has started.
2  Q.  Sure.  So you don't recall exactly when you
3  communicated with Haynes.
4       Do you recall communicating with Haynes
5  about this deposition or Mr. Haynes' deposition?
6  A.  I recall asking him a detail about maybe two
7  weeks ago in preparation for what is it, what was the
8  question I asked him exactly.
9       I think I asked him for, there was some
10 names of some of the people that we worked with on some
11 of the projects like the holiday bus and holiday train,
12 so I was asking for some of those names.
13 Q.  Did Mr. Haynes answer those questions?
14 A.  I believe he did, yes, but -- go ahead.
15 Q.  No, I'm sorry.
16 A.  But I do communicate with Mr. Haynes via Signal
17 and those messages are ephemeral.  So I couldn't tell you
18 for sure the exact answer he gave.
19 Q.  Why are you asking him about the names of
20 individuals you worked with on projects for the CTA?
21 A.  I was one, I was asked about, you know, other
22 individuals that might have extra information about
23 things.  I would be able to produce those names.
24       And two, I was looking for other people

Page 11

1  who might be able to give me references in my job search.
2  Q.  Did you communicate with Haynes in the last
3  months or weeks about this deposition and any other
4  issues relating to this case?
5  A.  Not that I recall at this time.
6  Q.  And I know you said you used Signal to
7  communicate with Mr. Haynes.
8       Aside from using Signal and telephone
9  calls, are there any other means by which you communicate
10 with Mr. Haynes?
11 A.  E-mail would be the only other way.
12 Q.  Okay.
13 A.  In the past there were other means but since
14 the events in question, it's always been Signal or
15 e-mail.
16 Q.  Why is that?
17 A.  E-mail or Signal?
18 Q.  Signal.
19 A.  Well I had actually started using Signal maybe
20 a year before the Dayton test and I had started trying to
21 get friends and family members using it because it was a
22 much more secure means of communication.  It allowed a
23 lot more rich media function so I could attach larger
24 pictures.  It had ephemeral settings and it allowed me to

Page 12

1  do better storage management of my conversations.
2       For example, limiting conversation length
3  so it does not take up too much space on my phone.
4  Q.  I see.  When you say the messages are
5  ephemeral, do you mean by that after you send the
6  communication it effectively disappears?
7  A.  Correct.
8  Q.  You mentioned your husband.  You're married?
9  A.  Yes.
10 Q.  Who are you married to?
11 A.  Alex Bower.
12 Q.  And do you live with Mr. Bower?
13 A.  Yes.
14 Q.  Does anyone else live in your home?
15 A.  Yes.
16 Q.  Who?
17 A.  My dog Menchi and my roommate William Nowicki.
18 Q.  Can you spell your roommate's name?
19 A.  N-O-W-I-C-K-I, I believe.
20 Q.  And did you live with Mr. Bower before you
21 married him?
22 A.  Yes.
23 Q.  How long have you been living with Mr. Bower?
24 A.  2005 I believe, maybe 2006.

Page 13

1  Q.  How long have you been living with Mr. Nowicki?
2  A.  Approximately two, two and a half years.
3  Q.  Did you have any other roommates besides
4  Mr. Bower and your dog in 2018?
5  A.  No, I do not believe so.
6  Q.  Have you discussed this litigation or anything
7  relating to your case with Mr. Nowicki?
8  A.  Beyond the details published on pacer in the
9  complaint, no.
10 Q.  When did you get married to Mr. Bower?
11 A.  Immediately following my termination.
12 Q.  Okay.  So that would have been in November of
13 2018?
14 A.  Correct.
15 Q.  You said in one of the e-mails that you
16 produced that you had to get married under duress?
17 A.  Yes.
18 Q.  Can you explain that?
19 A.  So I had an upcoming surgery scheduled and I
20 needed to make sure that I had some sort of insurance
21 coverage to cover it.  Because I had already made a
22 significant investment in getting the surgery done.
23       So since this was a life event, I was able
24 to get onto my husband's insurance since I had no

4 (Pages 10 - 13)

Page 14

1 guarantee I was going to be getting another job any time
2 soon at that time.
3 Q. Okay. Aside from the need to get on your
4 husband's insurance, no one was forcing you to marry your
5 husband I take it?
6 A. No.
7 Q. Okay. Was the only reason you got married at
8 that time because you wanted to get on your husband's
9 insurance?
10 A. At that point in time, yes. We had originally
11 planned to have a ceremony but this kind of sped up our
12 time line.
13 Q. Do you have any children?
14 A. No, besides my dog.
15 Q. Understood. Where are you employed?
16 A. Currently at Morningstar.
17 Q. You mentioned that I think you were looking for
18 references for a job or related to a job search.
19      Are you looking for another job right now?
20 A. Yes, I have been looking for another job for
21 over a year.
22 Q. Why is that?
23 A. Because while Morningstar can barely get me by,
24 it does not deliver enough financially and it is not the

Page 15

1 same how should I put it, the same development wheelhouse
2 in my specialty that I had at the Chicago Transit
3 Authority.
4 Q. Okay. You said it barely gets you by.
5      Are you referring to the compensation you
6 received at Morningstar?
7 A. The compensation and benefits package, yes.
8 Q. Okay. How long have you been employed at
9 Morningstar?
10 A. December, I started December 2018.
11 Q. Are you college educated?
12 A. Yes.
13 Q. What degrees do you have?
14 A. I have a bachelor's of science in computer
15 science with a specialty in information assurance from
16 The Department of Homeland Security. With honors.
17 Q. I'm sorry, did you say where you obtained that
18 degree from?
19 A. University of Illinois at Chicago.
20 Q. When did you graduate from there?
21 A. 2011.
22 Q. Any other degrees?
23 A. No.
24 Q. Do you hold any other certifications?

Page 16

1 A. Yes.
2 Q. What certifications?
3 A. I have an A plus certification, a CCNA
4 certification, a CEH certification and in progress a
5 CISSP certification.
6 Q. I'm going to ask you to unpack that a little
7 bit for me. That was a lot of acronyms.
8      I think you first said you had an A plus
9 certification?
10 A. Yes.
11 Q. What's that?
12 A. That's general computer repair.
13 Q. And what was the next certification you
14 mentioned?
15 A. CCNA.
16 Q. What is that certification?
17 A. Cisco Certified Network Associate.
18 Q. Does that mean you're certified to work on
19 Cisco networks I take it?
20 A. You don't have to be certified to work on Cisco
21 networks. It's just that means you've taken their
22 training and passed their test.
23 Q. Got it. Okay. I think you had two other ones.
24 Can you tell me what the third one was, Mr. Pable?

Page 17

1 A. CEH.
2 Q. What is CEH?
3 A. Certified Ethical Hacker.
4 Q. When did you get that certification?
5 A. January 2019.
6 Q. Who accredits or otherwise certifies someone to
7 be a certified ethical hacker?
8 A. A foundation called the EC Council.
9 Q. And how do you get that certification?
10 A. You have to have so much previous job
11 experience in an information security related field or
12 information security related project. They have a
13 governing board or entity that reviews that.
14      And after that they will clear you to
15 either take an exam or tell you how to take a training
16 course. Upon passing the exam you will be awarded the
17 certification.
18 Q. So did you take the exam?
19 A. Yes.
20 Q. And you passed?
21 A. Yes.
22 Q. When did you take that exam?
23 A. January 2019.
24 Q. Did you have to submit any other materials for

5 (Pages 14 - 17)

Page 18

1 your application to be certified as an ethical hacker?
2    A. I submitted summaries of projects I had done in
3 the past and I had a letter certifying the projects that
4 I did from several employees at CTA, certifying that I
5 worked on those.
6    Q. So you detailed some of the projects you worked
7 on with the CTA in your application to be a certified
8 hacker?
9    A. Yes. Certified ethical hacker, please.
10    Q. Certified ethical hacker. Did you disclose the
11 issues that are presented in your lawsuit today with
12 respect to the Clever Bustime system incident in that
13 application process?
14    A. I did not.
15    Q. Have you produced that application you
16 submitted in this litigation?
17    A. I have not.
18    MS. BABBITT: I'd ask you to produce that.
19    Q. And there was a fourth certification that you
20 mentioned that you have, what is that?
21    A. It is in progress, CISSP. I don't know what
22 the acronym stands for. But it is a certification for
23 how shall I put it, information security management.
24 There are 13 domains you have to have knowledge over. A

Page 19

1 general knowledge over. So that you are able to
2 effectively I guess manage security information
3 resources.
4    Q. You said that was CISSP. Could you spell that
5 acronym for the court reporter?
6    A. CISSP.
7    Q. Have you ever attended hacking conventions?
8    A. Yes, but I would not call them hacking
9 conventions.
10    Q. What would you call them?
11    A. Information security conferences.
12    Q. Have you ever attended something called I'm
13 going to spell it, T-H-O-T-C-O-N?
14    A. THOTCON? Yes.
15    Q. Is that what I would refer to as a hacking
16 convention, I think you said you would refer to it
17 otherwise?
18    A. An information security conference, yes.
19    Q. How many of those have you attended?
20    A. One.
21    Q. When did you attend that?
22    A. Spring of 2019 because my boss' boss at my
23 current job told me to go.
24    Q. Did you present at that conference?

Page 20

1    A. No.
2    Q. What e-mail addresses do you use or maintain or
3 have control over?
4    A. I have my primary personal one,
5 ████████████. I have ████████████, which
6 basically forwards, I have several other forwarding
7 e-mails like ████████, ████████████, et
8 cetera, but I don't know if those are functioning at the
9 moment.
10    Q. You mentioned you have ████████████?
11    A. ████████████
12    Q. Then you also mentioned you have
13 ████████████
14    A. Yes.
15    Q. And are those your two primary personal e-mail
16 addresses?
17    A. I wouldn't even say ████████████ is a
18 primary e-mail address. I put that out there so that I
19 can filter when I get things from for example Linkedin or
20 whatever. I don't want to give out my personal, personal
21 address in that regard because there are so many scams.
22    Q. Do you use ████████████ to communicate
23 or send messages?
24    A. I will usually receive messages there and those

Page 21

1 get forwarded to my primary, in my primarily e-mail
2 address. Then you can pick from a drop down, when you
3 click reply you can either say I want to send it from for
4 example ████████ or ████████████, and
5 that way I don't have to reveal my personal e-mail
6 address to someone who might be a scammer on Linkedin.
7    Q. I see. Do you use any other personal -- I know
8 you mentioned you have got e-mail addresses linked to
9 your personal website. But aside from the ones linked to
10 your personal website and those two gmail accounts, do
11 you have any other e-mail addresses you use or have
12 control over?
13    A. I might have in the past but I don't believe I
14 have control over them any longer.
15    Q. All right. I presume you likely have an e-mail
16 address that is associated with your employment at
17 Morningstar?
18    A. Correct.
19    Q. And have you used either the
20 ████████████ e-mail address, the Menchi e-mail
21 addresses or your Morningstar address to communicate in
22 any way with respect to the issues presented by this
23 lawsuit?
24    A. The only thing I have done with respect to this

6 (Pages 18 - 21)

Page 22

1 lawsuit with my Morningstar address was I sought out
2 counsel at Morningstar regarding certain things. So the
3 details of that communication are privileged. Since it's
4 counsel at Morningstar. But I did reach out to
5 Morningstar counsel.
6     Q. When you say counsel, you're referring actually
7 to attorneys at Morningstar?
8     A. Yes.
9     Q. Okay. Aside from those communications, all
10 other communications in your e-mail relating to this
11 litigation existed in your ███████ account?
12     A. Correct. I don't believe I ever used Menchi to
13 communicate and I rarely use that as is anyway.
14     Q. Good. You produced to the defendants in this
15 lawsuit a set of e-mails that appeared to be from your
16 ███████ Gmail account, is that correct?
17     A. Correct.
18     Q. Are you the author of all those e-mails that
19 are sent from your ███████ account?
20     A. Could you be a little more specific.
21     Q. Well, of the e-mails that you sent, is it your
22 position that anybody else wrote those e-mails or sent
23 those e-mails on your behalf out of your primary Gmail
24 account?

Page 23

1     A. I don't think anyone else would have access to
2 that, no.
3         MS. BABBITT: Mr. Duffy, would you stipulate to the
4 authenticity of Mr. Pable's personal e-mail that's
5 produced.
6         MR. DUFFY: I can't do that en masse. I mean, you
7 want to talk about specific ones I'm happy to stipulate.
8 I'm not going to be a jerk about it but I just can't say
9 everything is authentic without thinking about that.
10        MS. BABBITT: Okay. We will deal with that off
11 line.
12     Q. Mr. Pable, who is Ginji Terrano?
13     A. That would be a character.
14     Q. And are you associated with that character?
15     A. I'm the creator of the character.
16     Q. And for the record that's spelled
17 G-I-N-J-I-T-E-R-R-A-N-O, correct?
18     A. Correct.
19     Q. You said you were the creator of that
20 character?
21     A. I guess I should say co-creator but yes.
22     Q. Can you explain that to me?
23     A. So -- the fact that I am a co-creator?
24     Q. Who is Ginji Terrano and what sort of character

Page 24

1 is this character?
2     A. Ginji is a, he's a character that I created
3 that kind of embodies a lot of the qualities I would like
4 to see inside of myself. Usually people that create
5 characters for things like role playing or how should I
6 put it. Role playing or anthropomorphic fandoms. He's a
7 hyena and he, he was co-created by an artist that I
8 commissioned to help put together some of the artistic
9 concepts.
10     Q. And you said there's a co-creator.
11         So that co-creator is an artist you
12 commissioned?
13     A. Correct.
14     Q. Who is that?
15     A. Their name is Avi.
16     Q. Can you spell that?
17     A. A-V-I.
18     Q. What do you use or engage the Ginji Terrano
19 character for?
20     A. That's a very broad question. Can you narrow
21 that down a little bit.
22     Q. Well so you explained that you have created
23 this character and it sounds like you use it in role
24 playing, is that right?

Page 25

1     A. Yeah, a lot of role play with that. You can
2 place the character in certain situations and that's
3 usually what I do is I commission an artist and I say
4 this is the kind of scene I would like to see the
5 character in. And here are the details about the
6 character. And can you please draw this piece.
7     Q. Then what do you do with that piece once you
8 have it?
9     A. I keep it, I share; I keep some, I share some.
10 I discuss nuances with it with other people.
11     Q. I think you mentioned it was a hyena, is that
12 right?
13     A. Yes.
14     Q. You have referred to yourself in some of your
15 communication as a hacking hyena, correct?
16     A. That is the title that Ginji has.
17     Q. What do you mean by the title?
18     A. So how should I describe this.
19         A lot of people have an introduction. So
20 some people in for example Japanese animation. There
21 will be a very quick like description of a character's
22 personality, followed by their name. And that is
23 generally referred to as a title. In those kinds of
24 instances and Ginji has a lot of Japanese influences.

7 (Pages 22 - 25)

Page 26

1  Q. Do you identify as Ginji Terrano or the hacking
2 hyena?
3  A. Ginji is who I aspire to be, but it is not who
4 I am.
5  Q. Do you also use a Twitter handle of LOBSTAR85?
6  A. Yes. Well Ginji does but yes.
7  Q. You say Ginji does. When Ginji does something,
8 who is controlling those actions or activities?
9  A. I control the actions but I usually post them
10 under the moniker of that.
11  Q. But you're the one in control of what Ginji
12 does?
13  A. Yes, generally.
14  Q. Is there any instances where you are not in
15 control of what Ginji Terrano does?
16  A. Yes.
17  Q. What are those other instances?
18  A. Sometimes when my character is being used in
19 other's narratives or things of that nature, I can't
20 control what other people will say and/or do about them.
21  Q. Okay. Do you have any other pseudonyms or
22 on-line personas that you use or control or have
23 maintained in the past?
24  A. I remember when I was six, my uncle made me an

Page 27

1 AOL screen name. I think that was Chrisbug2.
2  Q. Okay. I had an AOL screen name, too. I don't
3 think I remember it though. Okay.
4  And aside from Twitter, so you have that
5 Twitter handle I mentioned. Do you access or have
6 control to any other Twitter handles?
7  A. No.
8  Q. What other social media platforms have you used
9 or accessed since 2018?
10  A. Google Plus.
11  Q. Did you access Google Plus through the ▮▮▮▮▮
12 account?
13  A. Yes.
14  Q. Did you have any other Google Plus accounts?
15  A. No.
16  Q. Google Plus is no longer in existence, right?
17  A. Correct.
18  Q. Okay. Do you also engage on Reddit?
19  A. Very infrequently. Usually when I have a
20 problem I use that for outreach, but I don't use it for
21 true discourse.
22  Q. What is your handle or username or names that
23 you use on Reddit?
24  A. ▮▮▮▮▮▮ .

Page 28

1  Q. How about Facebook?
2  A. That one's a complicated question. I don't
3 have what you would consider a normal Facebook account.
4 I have a developer account.
5  Q. What does that mean?
6  A. I have made web pages for several other people.
7 I help them with their websites. And they don't have the
8 technical expertise to set up OP secrets and manage their
9 websites.
10  So what they want to do is make Facebook
11 posts on their business' page on Facebook and have it
12 show up on their website. So I have a developer account
13 that's used to -- what is it. Pretty much it manages
14 those tokens for them so they don't have to have the know
15 how.
16  Q. And what is your username or identity through
17 your developer account on Facebook?
18  A. I honestly don't know because I set it up years
19 ago and I have never had to go back in.
20  Q. When is the last time you used that?
21  A. The developer account? Maybe 2018, early 2018.
22  Q. Aside from that developer account, have you
23 ever maintained a personal Facebook account?
24  A. When I was in college but I deleted that post

Page 29

1 graduation.
2  Q. Okay. Do you use TikTok?
3  A. I don't even know what TikTok is.
4  Q. Yeah, I don't really either.
5  You mentioned Linkedin?
6  A. Yes, I do have a Linkedin.
7  Q. Is that under Christopher Pable?
8  A. Yes, I believe it uses my
9 ▮▮▮▮▮▮▮▮▮▮▮
10  Q. Do you use something called Plus Pora?
11  A. Yes, that was where people tried to migrate to
12 after Google Plus. But none of my friends went there so
13 I think I made maybe two posts and abandoned it.
14  Q. Any other social media platforms that you use
15 or access besides the ones we just went through?
16  A. Let's see. Actively I can think of like no
17 other web-based social media that you're referring to,
18 no.
19  Q. Okay. On your Twitter account, did you delete
20 or otherwise remove any posts from your Twitter account
21 from the 2018 time period?
22  A. No.
23  Q. Did you ever Tweet anything about this
24 litigation on your Twitter account?

8 (Pages 26 - 29)

Page 30

1    A.   Directly, no.
2    Q.   Have you posted or communicated about this
3  litigation or the issues presented by this litigation in
4  any of those platforms we just discussed?
5    A.   Google Plus I did.
6    Q.   Those communications, have they been produced
7  to us in this litigation?
8    A.   I can't produce anything from Google Plus, it
9  no longer exists.
10    Q.   Okay.  So you have no access to anything that
11  was in Google Plus at this point in time?
12    A.   Correct.
13    Q.   I know you mentioned that you used Signal as a
14  messaging application, correct?
15    A.   Yes.
16    Q.   Does Signal require you to have a username or
17  handle or how are you identified in that application?
18    A.   Your phone number.
19    Q.   Okay.  What is the phone number that you use?
20    A.   ███ -- I ask that you at least please censor
21  this.  If you're going to be posting this transcript
22  on-line.  But it's ███ -- no, ███████.
23       MR. DUFFY:  That's a good point.  I don't think you
24  will be posting the transcript on-line but we should

Page 31

1  designate this confidential at least till we have a
2  chance to review the transcript.  Given the personal
3  questions asked and probably will ask.
4       MS. BABBITT:  Agreed.  Sure.  Anything that's
5  subject to the confidentiality order, we can assert that.
6    Q.   So you used Signal, you used your cell. phone
7  to log in to Signal.  Do you use Telegram?
8       THE WITNESS:  A   Yes.
9    Q.   What is Telegram?
10    A.   Telegram is an encrypted chatting platform.
11    Q.   How do you use that?
12    A.   Can you be a little more specific.
13    Q.   Is it an application sort of like Signal that
14  you use on your phone to chat with other individuals?
15    A.   It can be.  It can also be a web interface.  I
16  know there have been instances for example Apple
17  censoring certain Telegram groups, so to work around that
18  people use the web interface.
19    Q.   Is Telegram also an application where you log
20  in with your phone number?
21    A.   Yes.
22    Q.   You use the same number for Telegram?
23    A.   It asks for your phone number.  I don't
24  remember if I used that one or my Google voice number but

Page 32

1  you can also do it by handle, which I use ███ on.
2    Q.   And do you communicate with Michael Haynes or
3  anyone else related to this litigation through Telegram?
4    A.   My husband.
5    Q.   Anyone else?
6    A.   No.
7    Q.   Do you use Whatsapp?
8    A.   I don't know what that is.
9    Q.   Any other messaging or communication platforms
10  that you use?
11    A.   None that I can think of right now.
12    Q.   You mentioned you operate a website called
13  Menchi.org?
14    A.   Yes.
15    Q.   What, how would you describe that website?
16    A.   Well prior to June of 2020 it was simply a
17  singular picture of my dog.  In June 2020 I reached out
18  to someone named Haley at a company called Unfolded
19  Careers.  And she suggested that I create a more
20  interactive resume of what I have to say since a lot of
21  my projects are more complex and can't be communicated in
22  one or two sentences on an actual resume.
23       So I worked with her on wording and setup
24  and I created an engine and placed that on my domain.

Page 33

1    Q.   Does anyone aside from yourself have access to
2  control or posts to the Menchi website?
3    A.   I don't even have access.
4    Q.   All right.  So how does material get posted on
5  the website?
6    A.   Well, I assume you're asking right now,
7  correct?
8    Q.   Let's start with right now, sure.
9    A.   Nothing can get posted or changed on the
10  website.
11    Q.   Why is that?
12    A.   Sometime in December my host was compromised
13  and they have not been answering any support tickets.  So
14  I have not even been able to log into it.
15       It may have happened before December but I
16  have had tickets from December, telephone calls, nothing.
17  My host just does not answer anything.  So I haven't been
18  able to log in, refresh SSL certificates or anything to
19  my web post.
20    Q.   And prior to December of 2020 it sounds like
21  you had some issues with the hosting platform.
22       Who was able to access or control or post
23  to your website?
24    A.   I primarily did.

9 (Pages 30 - 33)

Page 34

1    Q.  Anyone else?
2    A.  None in the root folder.
3    Q.  Okay.  Anyone else beyond the root folder?
4    A.  I have a friend in Arkansas who has an
5  application that he pretty much selects a, from a
6  graphical list of games he wants one of his machines to
7  boot.  And all it does is save out a text file of what
8  game the machine should boot into and checks in with the
9  server.  But that's about it.
10   Q.  So aside from the issue with the web host and I
11 think you mentioned you had someone help develop that
12 website, are the contents that was posted on that
13 website, that was generated by you?
14   A.  That's an incorrect statement.  I created the
15 engine and -- the engine, the theme, all of that.  I
16 worked with Unfolded Careers on that.
17   Q.  Did you provide them information so that the
18 content could be described and posted?
19   A.  Yes.
20   Q.  Did anyone else provide the, that group
21 information --
22   A.  No.
23   Q.  -- to develop it?  Okay.  You mentioned this
24 persona of Ginji Terrano, which you said was a character

Page 35

1  you created.  So is that also a character that you would
2  refer to as a furry character?
3    A.  Yes.
4    Q.  Do you yourself identify as a furry?
5    A.  I identify as an anthropomorphic fan.
6    Q.  What does that mean?
7    A.  Someone who enjoys anthropomorphism of objects
8  and/or things that are not normally sensing beings.
9    Q.  Okay.  So how do you engage in sort of that I
10 guess I think you said it was fandom?  What do you do?
11   A.  One of the things I do is I am a co-chair of
12 the events for a convention in the Pacific Northwest.
13   Q.  That's a convention for furries?
14   A.  It is a convention that celebrates
15 anthropomorphism.
16   Q.  What do you do at those conventions?
17   A.  Me personally?  I organize panels, I make sure
18 the technology is working correctly.  I ensure that
19 people have what they need in order to interface.
20      I manage room sizes, make sure fire code
21 is obeyed, et cetera.
22   Q.  Okay.  Do you participate in those activities
23 wearing a fur suit?
24   A.  Yes.

Page 36

1    Q.  Is that fur suit the fur suit of Ginji Terrano?
2    A.  Yes.
3    Q.  Do you have any other -- I'm referring to them
4  as alter egos.  I think you said they are characters.
5       Do you have any other characters like that
6  that you identify with or control?
7    A.  Not any longer.  I used to have a different
8  character.  I identified with.
9    Q.  What was that one's name?
10   A.  It shared the same name but I've modified the
11 reference.
12   Q.  I see.  When did you create the Ginji Terrano
13 character?
14   A.  The original?
15   Q.  Yes.
16   A.  Probably in 2007.
17   Q.  You've maintained it in some form or likeness
18 ever since then?
19   A.  Yes.
20   MS. BABBITT:  Okay.  All right.  Now I know you
21 mentioned you'd like to get up and move.
22   THE WITNESS:  Yes, please.
23   MS. BABBITT:  Every hour or so.  Would now be a
24 good time to take maybe a five-minute break or so?

Page 37

1    THE WITNESS:  Yeah, five minutes is fine.
2    MS. BABBITT:  Come back at 9:50 everyone.  We will
3  go off the record.
4    THE VIDEOGRAPHER:  Going off the record.  Time is
5  9:44 a.m.
6        (Short recess taken.)
7    THE VIDEOGRAPHER:  Going back on the record, time
8  is 9:59 a.m.
9    MS. BABBITT:  Mr. Pable, I'm going to start things
10 a little bit out of order in terms of sequencing.  I want
11 to start first by discussing the day that you were placed
12 on leave at the CTA.
13   Q.  Do you recall being placed on administrative
14 leave on October 22, 2018?
15   THE WITNESS:  A  I recall being contacted saying
16 that I was, yes.
17   Q.  Who contacted you?
18   A.  Jim Psomas.
19   Q.  How did Jim Psomas contact you?
20   A.  Phone call.
21   Q.  Were you in the office when Jim contacted you?
22   A.  I was on vacation.
23   Q.  Where were you on vacation?
24   A.  New York.

10 (Pages 34 - 37)

Page 38

1    Q. So he contacted you on your cell. phone?
2    A. Correct.
3    Q. What did Jim tell you when he contacted you?
4    A. He said that there was a notice of paid
5 administrative leave and basically read word for word
6 some document that he then later tried to e-mail me.
7    Q. And did he tell you anything else about being
8 placed on leave?
9    A. No.
10   Q. Did you ask him any questions?
11   A. Yes.
12   Q. What questions did you ask him?
13   A. I asked him what it was about. I asked him how
14 long this leave was for. I asked him if there was
15 anything that I could do or explain. And I asked him if
16 there was anything else that he needed.
17   Q. And you asked him what it was about.
18      Did he tell you?
19   A. No.
20   Q. Do you recall what he replied when you asked
21 him that?
22   A. He told me he didn't know.
23   Q. You asked him how long you would be on leave?
24   A. Correct.

Page 39

1    Q. Did he answer?
2    A. He didn't know.
3    Q. You asked if there's anything you could do or
4 explain?
5    A. Correct.
6    Q. And how did Jim answer?
7    A. He said that he needed me to sign this document
8 and get it back to him.
9    Q. Okay. And did you at that time have any
10 inkling or idea as to why you were being placed on leave?
11   A. No.
12   MS. BABBITT: Let's pull up Exhibit 11, Nicollette.
13 Can you show that?
14   MS. KHUANS: Yes. That should already be in the
15 marked exhibit folder in Exhibit Share for everyone.
16   MS. BABBITT: Q  Mr. Pable, do you see that in
17 your folder?
18   THE WITNESS: A  Yes, I am zooming in on it right
19 now.
20   Q. So CTA Exhibit 11, that is the notice of
21 administrative leave, is it not?
22   A. Yes.
23   Q. Nicollette, can you scroll down a little bit on
24 this. That's good.

Page 40

1       Did you receive this notice to your
2 personal e-mail account, Mr. Pable?
3    A. Yes.
4    Q. Did you receive it from Mr. Psomas?
5    A. Yes.
6    Q. Did you have your CTA e-mail to be set up to be
7 forwarded to any other e-mail accounts?
8    A. No. Well not necessarily CTA e-mail. I had
9 Sprint outage alerts that went to my phone, so that we
10 knew if there was a cellular outage. But that was out of
11 band that wasn't on my e-mail.
12   Q. Did you share CTA Exhibit 11, this notice with
13 anyone?
14   A. My family.
15   Q. Who in your family did you share it with?
16   A. My mother, my father, my siblings. That's all
17 from my family that I can recall.
18   Q. Anyone else aside from those people?
19   A. I may have shared it with Mr. Haynes, I don't
20 recall. And I may have shared it when I was looking for
21 legal representation.
22   Q. Okay. It refers to being placed on paid
23 administrative leave, correct?
24   A. Correct.

Page 41

1    Q. Were you in fact paid for the time you were
2 placed on leave?
3    A. Yes.
4    MS. BABBITT: Nicollette, you can take Exhibit 11
5 down.
6    Q. Once you were placed on administrative leave
7 did you contact Mr. Haynes?
8    A. Depends on what you mean by placed on leave.
9 If you mean after I was you contacted by Jim, yes. The
10 very first thing I did was call Mike.
11   Q. Let me unpack that a little bit.
12      So you received the information from
13 Mr. Psomas, the phone call letting you know that you
14 would be being placed on leave, right?
15   A. Correct.
16   Q. And then is it your position that at some point
17 after that you were actually officially placed on leave?
18   A. I don't believe that I was placed on leave
19 officially until I signed and dated the document and
20 returned it to Jim. But on payroll that may be reflected
21 differently, but I don't consider that official until I
22 returned it to him.
23   Q. I see. All right. So once you were contacted
24 by Jim Psomas on October 22nd and you were in New York,

11 (Pages 38 - 41)

Page 42

1 you said you contacted Michael Haynes?
2    A.  I did not say I was in New York at the time Jim
3 contacted me.  You asked me where I was on vacation at
4 the time.  And I was in New York, I was returning home.
5    Q.  I'm sorry, thanks for clarifying.
6        So you had been on vacation and were you
7 back in Chicago then when Mr. Psomas contacted you on
8 October 22nd?
9    A.  It was very shortly after we returned to
10 Chicago, yes.
11    Q.  And you were still on vacation as far as on the
12 clock at the CTA, is that fair?
13    A.  Correct.
14    Q.  So then after you were contacted by Mr. Psomas
15 did you contact Mr. Haynes?
16    A.  Yes.
17    Q.  Okay.  Why did you contact Mr. Haynes?
18    A.  Because I thought he may have additional
19 details as to what's going on.
20    Q.  Okay.  How did you contact him?
21    A.  Telephone call.
22    Q.  And what do you recall about that conversation?
23    A.  There was no conversation.  It went to
24 voicemail.

Page 43

1    Q.  Did you ever connect with Mr. Haynes via
2 telephone after that phone call?
3    A.  Ever, yeah, many times.
4    Q.  What about that day or the following day after
5 you were contacted by Psomas?
6    A.  I can't recall exactly but that wouldn't strike
7 me as odd.  If we connected by call or by text.  I don't
8 recall what means we ended up finally connecting over.
9    Q.  Okay.  At some point is it your recollection
10 that while you were -- I'm going to refer to after the
11 time that you're contacted by Mr. Psomas as being on
12 leave.  I take your point on the distinction of signing
13 the form but at that point in time when you're put on
14 leave, you did have an opportunity to communicate with
15 Mr. Haynes?
16    A.  Can you clarify -- can you clarify your
17 question?
18    Q.  Sure.  After you're contacted by Jim Psomas and
19 told you're going to be placed on leave, at some point
20 during that period of leave you communicated with
21 Mr. Haynes?
22    A.  Yes, absolutely.
23    Q.  And you used a phone to do that?
24    A.  Yes.

Page 44

1    Q.  What phone did you use?
2    A.  My personal cell. phone.
3    Q.  Did you have a CTA issued cell. phone?
4    A.  No.
5    Q.  You exchanged text messages with Mr. Haynes?
6    A.  Yes.
7    Q.  When you communicated with Mr. Haynes did
8 Mr. Haynes, was Mr. Haynes aware you'd been placed on
9 leave?
10    A.  No he was not, but I also wanted to clarify
11 when you say text messages, Signal is technically a text
12 message application.  So those Signal messages I am
13 considering text messages even if they are pure data.
14    Q.  And are all those communications that you
15 exchanged with Mr. Haynes at the point in time you're
16 contacted by Jim Psomas on October 22, are those
17 communications all through Signal at that point?
18    A.  Yeah, that would probably be an accurate
19 statement.
20    Q.  Did you exchange any text messages with
21 Mr. Haynes in that same period of time outside of the
22 Signal application?
23    A.  If we did it was with e-mail.
24    Q.  And you answered that Mr. Haynes -- actually

Page 45

1 I'm not sure if you answered.
2        Was Mr. Haynes aware you'd been placed on
3 leave when you first contacted him?
4    A.  No, I don't think he was.  Because he explained
5 to me that he was placed on leave.
6    Q.  Did Mr. Haynes know why you were placed on
7 leave?
8    A.  No.
9    Q.  Did you know why Mr. Haynes was placed on
10 leave?
11    A.  No.
12    Q.  Did you have any guesses or speculation as to
13 why you might have been placed on leave?
14    A.  At that time, no.
15    Q.  When you say at that time, do you mean as of
16 the date October 22?
17    A.  And several days thereafter.  In fact we didn't
18 know until we had interviews.
19    Q.  So you weren't aware of what the bases of your
20 administrative leave and had no guesses or inkling as to
21 why you might have been placed on leave until you were
22 interviewed?
23    A.  Mr. Haynes and I enumerated many potential
24 possibilities but we had no clue.

12 (Pages 42 - 45)

Page 46

1  Q. Okay. What were those possibilities that you
2  enumerated?
3  A. I don't remember all of them. But I actually
4  do remember Jim Psomas being present while we were
5  enumerating them at Starbucks.
6  Q. Okay. So you don't recall any of the guesses
7  or possibilities?
8  A. That's not what I said. I said I didn't recall
9  all of them.
10  Q. What ones do you recall?
11  A. I thought that because the CTA, Jim had
12  forgotten to pay the warranty on the utility rocket
13  routers, they may be upset that I found out that they
14  used GPL code on their routers and tried to do something
15  illegally that way.
16  Q. Okay. Anything else?
17  A. I had found a problem with the Bombardier
18  trains and again you definitely want to censor this
19  because I don't know if it's been fixed or not.
20      There was an integer overflow problem when
21  registering an operator ID. And we didn't know what
22  Bombardier, what action Bombardier may be taking. I
23  reported that to Mr. Haynes and Mr. Haynes managed how we
24  should handle that situation.

Page 47

1  Q. So you speculated that that was a basis that
2  you may have been being placed on leave?
3  A. There were any number of potential reasons why.
4  But we had no clue why.
5  Q. Okay. Did you ever speculate or guess that you
6  may be placed on leave relating to the Bustime system and
7  the Dayton test that's the subject of your lawsuit?
8  A. I believe Mr. Haynes did.
9  Q. Okay. Did you ever expect or suspect that
10  might be the basis of your administrative leave?
11  A. I personally did not think that that had as
12  much weight as some of the other potential candidates,
13  but it could have been a possibility.
14  Q. Did you for those other candidates, were those
15  other events where you thought that you may have been
16  suspected of violating some CTA rules such that you be
17  placed on leave?
18  A. No, I assumed that companies may have contacted
19  CTA legal to figure out what for example the GPL
20  violation might be. And in that case that might be
21  proper to put, to place us on leave for something like
22  that.
23  Q. So when you were on leave there was nothing
24  that you could think of that you thought you did wrong

Page 48

1  that would have necessitated you being placed on leave or
2  being investigated?
3  A. That is correct.
4  Q. You mentioned I think referring to the various
5  reasons you may have been placed on leave in a meeting
6  with Jim Psomas at Starbucks?
7  A. Yes.
8  Q. Is that right?
9  A. That is correct.
10  Q. When did you go to Starbucks and meet with Jim
11  Psomas?
12  A. I don't remember the exact date. Mike was
13  meeting Jim there to return some equipment I believe. It
14  is either that or I was returning my badge to him. One
15  of those two times. And Mike and I were sitting at a
16  table enumerating possibilities.
17  Q. And that was, that meeting took place after you
18  were placed on leave?
19  A. That is correct.
20  Q. Did you present those enumerated possibilities
21  to Jim Psomas when you saw him at Starbucks?
22  A. He perused them. I didn't do a presentation.
23  Q. When you say perused, what do you mean by that?
24  A. We had written them down in a notebook. And

Page 49

1  Mr. Haynes and I were discussing them and we had set the
2  notebook down on the table while I forget who was
3  returning equipment or what not, but I believe Mr. Psomas
4  read over it.
5  Q. And both you and Mr. Haynes were at a Starbucks
6  and interacted with Mr. Psomas while you were on leave?
7  A. That is correct.
8  Q. Did that happen on more than one occasion?
9  A. I believe -- well I don't recall if all three
10  of us were at all meetings, but it happened at least
11  twice where Mr. Psomas and either Mike or myself was at
12  the Starbucks.
13  Q. Okay. So do you recall what Starbucks location
14  you're referring to?
15  A. I believe it was on Clinton, the closest one to
16  the CTA. I don't recall the address.
17  Q. You mentioned a notebook that had ideas in it
18  of reasons you might be on leave, is that right?
19  A. Yeah, Mr. Haynes had started writing down
20  possibilities.
21  Q. Was that notebook ever in your possession?
22  A. No.
23  Q. All right. Did you ever obtain a copy of those
24  notes?

13 (Pages 46 - 49)

1    A.  I don't know if I got those exact notes but I
2  know I got timelines and other notes from Mr. Haynes.
3    Q.  When you're referring to notebook are you
4  referring to actually a handwritten, you know, pad of
5  paper?
6    A.  Yes.
7    Q.  Did you maintain any handwritten notes
8  regarding any of this?
9    A.  At the Starbucks meetings?
10    Q.  Yes.
11    A.  No.
12    Q.  Did you maintain any handwritten notes beyond
13  the Starbucks meetings?
14    A.  I did at one of my interviews I believe.
15    Q.  You have handwritten notes?
16    A.  They were questions to ask.
17    Q.  Do you still have those questions that you had
18  written down with you or in your possession?
19    A.  I honestly don't know.
20    Q.  I'd ask you to look for those and produce them
21  if you still have them in your possession.
22         So aside from Mr. Haynes, who else if
23  anyone from the CTA did you communicate while you were on
24  leave?

1    A.  The only person I knew for sure, I can tell you
2  for sure is Sara Cochran.
3    Q.  Who is Sara Cochran?
4    A.  She's someone I worked with on the holiday
5  train and with the Bombardier stuff.
6    Q.  And what did you communicate with Miss Cochran
7  about?
8    A.  Let's see.  Seeing if she knew any information,
9  asked her for administrative policies regarding all of
10  this.  Asked her for any insight she might have.  If she
11  thought we did anything wrong or improper.
12         There was probably personal griping in
13  there I'm sure but I can't be certain.  That's all I can
14  think of off the top of my head.
15    Q.  When you say Miss Cochran, you wanted to know
16  if she knew anything, do you mean if she knew the
17  circumstances that created or caused you to be placed on
18  leave?
19    A.  Yes.  Maybe she had overheard something or if
20  she had been asked any questions about something like
21  that.
22    Q.  All right.  Did she know anything or had she
23  been asked any questions?
24    A.  The only thing she knew is we had been placed

1  on leave.
2    Q.  Did you produce communications you exchanged
3  with Miss Cochran in this litigation?
4    A.  I believe so.
5    Q.  You wrote in your e-mails that you produced to
6  us in the ▇▇▇▇▇ e-mail account that being placed on
7  leave caused you to have panic attacks, is that right?
8    A.  That is correct.
9    Q.  Can you describe those panic attacks?
10    MR. DUFFY:  Hold on, Elizabeth.  Elizabeth, hold
11  on.  Either he's frozen or I'm frozen or something.
12    THE WITNESS:  No, I can see everybody moving.  I
13  think Tim just froze.
14    THE VIDEOGRAPHER:  Going off the record 10:20 a.m.
15         (Short recess taken).
16    THE VIDEOGRAPHER:  Going back on the record, time
17  is 10:23 a.m.
18    MS. BABBITT:  Okay.  Mr. Pable, before we went off
19  record I had asked you if going on leave or being placed
20  on leave had caused you to have panic attacks.
21    Q.  And I believe your answer was yes they did, is
22  that correct?
23    THE WITNESS:  A  Correct.
24    Q.  And had you ever experienced panic attacks

1  prior to being placed on administrative leave in October
2  of 2018?
3    A.  No.
4    Q.  So the first time you had ever experienced a
5  panic attack was in October of 2018?
6    A.  Correct.
7    Q.  And can you describe those panic attacks?
8    A.  Yeah.  I would be thinking about what to do
9  about my surgery and I would get stuck in some cyclical
10  logic and my heart would start racing.  And then I would
11  get really, really, really ill.  I would start shaking.
12  And I threw up several times.
13    Q.  And you said you would get really, really,
14  really ill.  By that do you mean you threw up?
15    A.  Yes.
16    Q.  Any other issues aside from the vomiting and
17  the shaking?
18    A.  I, it didn't let me sleep.  So I was very sleep
19  deprived.  I was using a lot of over-the-counter
20  medication.  I was having trouble keeping food down
21  because of that.  So I was taking Pedialyte I believe.
22    Q.  And you say you were sleep deprived.
23         While you're on administrative leave,
24  approximately how many hours of sleep were you getting

Page 54

1 each night?
2    A.   Probably 2 to 3 but I would sometimes pass out
3 during the day, take a nap then.
4    Q.   By 2 to 3 you mean 2 to 3 hours of sleep each
5 night?
6    A.   Correct, correct.
7    Q.   You mentioned you were taking over-the-counter
8 medications.  What over-the-counter medications were you
9 taking?
10    A.   Specifically Aleve D because I'm very
11 susceptible to sinus infections of that sort.  So I was
12 trying to mitigate a lot of the symptoms I was getting
13 but it wasn't solving the root problem.
14    Q.   So you were taking Aleve D to prevent sinus
15 infections?
16    A.   No, to cope with the lack of sleep caused --
17 what I believe to be immunocompromise.  So I was more
18 susceptible to illness.  So I was taking Aleve D to
19 mitigate those symptoms.
20    Q.   So the lack of sleep you believed caused you to
21 be immunocompromised.
22        So does that mean that you were I guess
23 acquiring other illnesses like sinus infections?
24    A.   Correct.  My immune system just wasn't able to

Page 55

1 function as well as someone who was able to sleep.
2    Q.   Okay.  Any other over-the-counter medications
3 aside from Aleve D?
4    A.   If you consider Pedialyte a medication.  And
5 Nyquil.
6    Q.   You were taking Nyquil?
7    A.   Yeah, to try to sleep through the night.
8    Q.   Were you just taking Nyquil at nighttime?
9    A.   Correct.
10    Q.   How often were you taking Aleve D?
11    A.   As directed on the box.  I think it's a 12-hour
12 pill.
13    Q.   Okay.  So as a result of these issues you were
14 having the illness you were experiencing, did you consult
15 with a physician?
16    A.   I had asked my physician for his advice and
17 input.  But that was the extent of it.
18    Q.   Who's your physician?
19    A.   Greg Rauch.
20    Q.   You said you asked Dr. Rauch for his input?
21    A.   Correct.  I explained that I was having trouble
22 sleeping and I was having trouble with fluids I believe.
23 I can't remember the exact contents of the communication
24 I had with him.

Page 56

1    Q.   Did you meet with Dr. Rauch in person while you
2 were on administrative leave?
3    A.   No, I did not.
4    Q.   Did you speak to Dr. Rauch on the phone?
5    A.   No, I did not.
6    Q.   So how did you communicate these issues that
7 you're experiencing with Dr. Rauch?
8    A.   My doctor has telehealth application called My
9 Chart.  And that's how you're able to ask questions and
10 advice, get prescriptions, et cetera.
11        MS. BABBITT:  I'd ask you to produce those
12 communications to us.  I know I have asked you for a few
13 different things.  We will follow up obviously with your
14 attorney to make sure we identify all those.
15        MR. DUFFY:  For the record, Mr. Pable isn't going
16 to -- you need to direct those to me afterwards and we
17 will follow up on them.
18        MS. BABBITT:  So how many panic attacks -- I'm
19 sorry, go ahead, Mr. Pable.
20        THE WITNESS:  I honestly don't know how I would
21 produce communication sent through my chart because I
22 believe those are deleted after so long.  So that might
23 have to be something you get from my health care
24 provider.

Page 57

1        MS. BABBITT:  Okay, fair enough.
2    Q.   How often were you having these panic attacks
3 while you were on administrative leave?
4        THE WITNESS:  A   Once every day or so.
5    Q.   How long would the attack last?
6    A.   That varied.  Depended on how hopeless I
7 thought the situation was at the time.
8    Q.   Would a panic attack last for over an hour?
9    A.   I think at least in one instance it may have.
10    Q.   Was it typically under an hour then?
11    A.   Yeah typically, but the symptoms lingered on to
12 prevent me from sleeping.
13    Q.   And did anyone observe you having these panic
14 attacks?
15    A.   I believe my now husband did.  And possibly
16 some friends.
17    Q.   Do you recall which friends saw you
18 experiencing panic attacks while you were on leave?
19    A.   I believe Chris Langer and Susan Kim.
20    Q.   Are either of them CTA employees?
21    A.   No.
22    Q.   All right.  Were you evaluated by a doctor and
23 diagnosed with panic attacks?
24    A.   No.

15 (Pages 54 - 57)

Page 58

1    Q.   Were you evaluated by a doctor and diagnosed
2  with being immunocompromised in any way?
3    A.   No.
4    Q.   And you said you reported these issues to
5  Dr. Rauch.
6         What if anything did Dr. Rauch direct you
7  to do?
8    A.   He gave me some over-the-counter suggestions
9  and I believe he also gave me some strategies to try to
10 deal with the stress and anxiety.
11        But again, the communication I no longer
12 have access to because that medical information I believe
13 is ephemeral as well, so I can't recall the exact
14 contents of the communication.
15   Q.   What if any over-the-counter medications did
16 Dr. Rauch suggest you take?
17   A.   I don't remember the specific names at this
18 time.
19   Q.   And what if any strategies or tips did
20 Dr. Rauch suggest you engage in to manage the panic
21 attack?
22   A.   Again, I don't recall the exact contents of the
23 communication.
24   Q.   Do you recall if you followed any of

Page 59

1  Dr. Rauch's advice with respect to the medication or
2  those strategies he offered?
3    A.   I believe I presented some of it to my now
4  husband and we made evaluations based on that what we
5  should do.  For example, Pedialyte and I believe Aleve D
6  was, I don't remember if that was something he
7  specifically noted in his communication but my husband
8  said that that would probably be best.
9         And I was not in a good frame of mind to
10 be making those kinds of decisions for myself, which is
11 why I asked for assistance.
12   Q.   Is your husband a physician?
13   A.   No, but he has family that is.
14   Q.   Any other physicians or medical experts that
15 you consulted with respect to these issues you're
16 experiencing while you were on leave?
17   A.   Not while I was on leave and not that I did
18 personally, no.
19   Q.   When you say not that you did personally, did
20 anyone else consult physicians or medical experts on your
21 behalf while you were on leave?
22   A.   I don't know if my husband did or not.  So I
23 can't answer that.  I don't know if my friends did or
24 not.  So I can't answer for them either.  But I didn't

Page 60

1  personally.
2    Q.   Did Dr. Rauch suggest that you take Nyquil at
3  night?
4    A.   I don't recall but that would not surprise me
5  if he did.
6    Q.   Do you recall if you were taking Nyquil before
7  you consulted Dr. Rauch?
8    A.   No, I was not.
9    Q.   Do you recall how long you were experiencing
10 these issues before you contacted Dr. Rauch?
11   A.   A day or so.  I wanted to try to mitigate it as
12 quickly as possible.
13   Q.   Any other symptoms that you're experiencing
14 aside from the issues that you already identified while
15 you're on leave?
16   A.   While I was on leave, no.
17   Q.   You said in some of the e-mails you produced
18 that being placed on leave caused you to be randomly
19 paralyzed.
20        What did you mean by that?
21   A.   That would be the thought loop of hopelessness.
22 I wouldn't be able to function properly.
23        It would just consume me and I wouldn't be
24 able to function.

Page 61

1    Q.   So when you refer to paralysis, is that
2  paralysis you're referring to actually a physical
3  manifestation; in other words, you're not able to move
4  your body?
5    A.   I wouldn't say I was unable to move.  But it
6  was painful to move it.
7    Q.   You said that you also, it sounds like you
8  experienced paralyzing thoughts, is that fair?
9    A.   Yes.
10   Q.   And did you identify this issue of this
11 paralysis with anyone, including your physician?
12   A.   I believe my now husband and my friends have
13 witnessed it.  I don't recall the exact contents of the
14 communication to my physician.
15   Q.   Was the paralysis something that you're
16 experiencing in addition to those panic attacks?
17   A.   The panic attacks were the cause of the
18 paralysis.  They were essentially almost one in the same.
19   Q.   How long would you experience the paralysis?
20   A.   I believe the same as I said
21 before, probably along the lines of an hour or so every
22 time it occurred.
23   Q.   When you were paralyzed would you be unable to
24 answer questions when they were posed to you?

16 (Pages 58 - 61)

Page 62

1    A.   I could answer questions but sometimes they
2  wouldn't make sense is what I understood.
3    Q.   When you're experiencing paralysis, did you
4  lose memory or cognitive ability?
5    A.   I honestly can't recall, so that wouldn't
6  surprise me if I did.
7    Q.   Did you explain these issues to your physician
8  while you were on administrative leave?
9    A.   Again I don't recall the contents of the
10 communication to my physician.
11   Q.   All right.  Did you -- I think you said part of
12 the paralysis in addition to the mental paralysis, you
13 said it was painful to move.
14        Can you describe that?
15   A.   Yeah, it had my stomach in knots and if I
16 wasn't keeled over, my stomach would exude a lot of pain
17 and sometimes that would cause me to vomit.
18   Q.   So you experienced that pain, would you
19 experience that pain anywhere else in your body?
20   A.   No.  Primarily just my stomach and my thoughts.
21   Q.   All right.  Did you seek any medical
22 consultation as a result of that physical pain that
23 you're experiencing?
24   A.   I believe I sought the consultation with

Page 63

1  Dr. Rauch before this became as big and problematic as it
2  was.
3    Q.   The determination that the panic attacks was
4  causing your paralysis, was that a determination that you
5  made?
6    A.   Yes.
7    Q.   Did you consult any medical doctors or
8  psychiatrist or psychologist with respect to those
9  issues?
10   A.   Not with respect to those issues.
11   Q.   When you say not with respect to those issues,
12 are there other issues that you did present to a
13 psychologist, psychiatrist, therapist?
14   A.   I think that question might be getting into
15 privilege so I would have to talk to my attorney.
16   Q.   Okay.  Did you ever communicate with a
17 psychiatrist or a psychologist with your attorney
18 present?
19   A.   No.
20   Q.   Okay.  And do you communicate with or see a
21 psychologist or psychiatrist or therapist?
22   A.   Not currently.
23   Q.   Have you ever?
24   A.   Yes.

Page 64

1    Q.   When?
2    A.   Once in college and once in December 2019.
3    Q.   December 2019?
4    A.   Uh-huh.
5    Q.   Did you ever consult a therapist, a
6  psychologist or a psychiatrist when you were placed on
7  administrative leave and in the months following your
8  resignation from the CTA?
9    A.   No.
10   Q.   And did you ever have any other mental health
11 issues prior to October 2018?
12       MR. DUFFY:  Objection to that question.
13 Mischaracterizes the evidence.
14       THE WITNESS:  A  I don't know if that question
15 would constitute privilege so I would like to discuss
16 that with my attorney.
17       MR. DUFFY:  If you want to take a break and talk
18 about that if you want to, yeah.
19       MS. BABBITT:  Okay.  Let's take a 5-minute break.
20 We will go off the record.
21       THE VIDEOGRAPHER:  Off the record.  Time is
22 10:41 a.m.
23           (Short recess taken).
24       THE VIDEOGRAPHER:  Back on the record.  Time is

Page 65

1  10:46 a.m.
2        MS. BABBITT:  All right.  Mr. Pable, you mentioned
3  that you messaged Dr. Rauch before things got bad,
4  something to that effect.
5    Q.   Did you follow up with Dr. Rauch after that
6  first communication you had with him?
7        THE WITNESS:  A  Yes, verbally at my physical.
8    Q.   When was that?
9    A.   I don't recall the date, I'm sorry.
10   Q.   Were you still employed by the CTA when you had
11 your physical?
12   A.   No, I don't believe I was.
13   Q.   Was that in 2018?
14   A.   It may have been in early 2019.
15   Q.   But you didn't present these issues that you
16 were experiencing, the panic attacks while you're
17 experiencing them, aside from that first message you sent
18 them through My Charts?
19   A.   Correct.
20   Q.   Why not?
21   A.   Because I did not know what the status of my
22 benefits at the CTA was at the time and I did not want to
23 risk getting an insurance bill that I couldn't cover.
24   Q.   Any other reasons why you wouldn't contact your

17 (Pages 62 - 65)

Page 66

1 physician?

2    A. No.

3    Q. And did anyone ask you to go see a doctor or

4 take you to the doctor, to the hospital while you were

5 experiencing these panic attacks?

6    A. Possibly my husband, maybe Sara. I can't

7 recall off the top of my head.

8    Q. Did you actually go to a hospital or go to a

9 physician while you're experiencing these attacks?

10    A. No, because I was afraid I would not have

11 benefits to cover it.

12    Q. Those panic attacks, we've been talking about

13 them while you were on leave.

14         Did you continue to experience panic

15 attacks after you resigned from the CTA?

16    A. For a day or so. That's when I got an

17 opportunity for another job. And things improved

18 significantly after that.

19    Q. I'm sorry, I think you cut off.

20         Did you say you got an opportunity for a

21 job?

22    A. That is correct.

23    Q. And after that you no longer experienced what

24 you're referring to as these panic attacks?

Page 67

1    A. They eased up significantly until they

2 finished.

3    Q. When did they finish?

4    A. I want to say sometime mid December.

5    Q. Mid December 2018?

6    A. That is correct.

7    Q. Other than the panic attacks as you describe

8 them, are you claiming any other emotional distress you

9 experienced as a result of your claims that you have in

10 this lawsuit?

11    MR. DUFFY: Objection to the extent it calls for

12 legal.

13    THE WITNESS: A  I had worked up damages with my

14 attorney for the department of labor. I don't recall

15 everything that we put inside of there. And I haven't

16 really updated it since.

17        So as far as I can recall, that is the

18 only medical ailment that we have listed.

19    MS. BABBITT: Q  That medical ailment as you refer

20 to it are those panic attacks that you explained you were

21 experiencing?

22    A. Yes.

23    Q. Have you ever been diagnosed by any treating

24 physician with panic attacks?

Page 68

1    A. No.

2    Q. Have you ever been diagnosed with panic attacks

3 by a psychiatrist?

4    A. No.

5    Q. Have you ever been diagnosed with panic attacks

6 by a psychologist?

7    A. No.

8    Q. Have you ever been diagnosed with panic attacks

9 by a therapist?

10    A. No.

11    Q. Has anyone ever prescribed you with medication

12 to treat those panic attacks as you refer to them?

13    A. In general I was prescribed medication for

14 anxiety in the past.

15    Q. So you are on medication for anxiety?

16    A. I was not. I said in the past. I had been

17 prescribed medication for it, which I attribute the panic

18 attacks as extreme anxiety.

19    Q. And when were you prescribed this medication

20 for anxiety?

21    A. Before I graduated college.

22    Q. That was in 2011?

23    A. It was before 2011. I don't recall the exact

24 year.

Page 69

1    Q. Did a physician diagnose you with anxiety in

2 that time period?

3    A. No.

4    Q. Who if anyone diagnosed you with anxiety during

5 that time period?

6    A. I couldn't tell you if they made an official

7 diagnosis of anxiety, but I was given anti-anxiety

8 medication by a psychologist.

9    Q. That was prior to 2011?

10    A. Correct.

11    Q. And why were you seeing that psychologist?

12    A. I had a lot of stress at school. My family was

13 not very well off. I was having trouble paying for

14 things and I had a bunch of extra classes related to my

15 Homeland Security fellowship.

16    Q. And how long did you consult with that

17 psychologist for?

18    A. Only a couple of sessions.

19    Q. And that psychologist you said prescribed you

20 with anti-anxiety medication?

21    A. Yes.

22    Q. Do you recall the medication you were

23 prescribed?

24    A. No, it's been too long, sorry.

18 (Pages 66 - 69)

Page 70

1    Q.  Do you, did you take that medication that you
2  were prescribed?
3    A.  I took it 2 or 3 doses and then returned it.
4    Q.  And did you take any anti-anxiety medication
5  since that time in college?
6    A.  No.
7    Q.  Were you at the time that you were experiencing
8  what you're describing as panic attacks, did you consider
9  yourself to be a threat to yourself?
10   A.  No.
11   Q.  Did you consider yourself to be a threat to
12 others during that time?
13   A.  No.
14   Q.  Were you ever diagnosed with depression?
15   A.  Not that I am aware of.
16   Q.  Were you ever hospitalized as a result of the
17 panic attacks as you described them?
18   A.  No.
19   Q.  After you left the CTA you said that the
20 symptoms that you described, they lightened, is that
21 right?
22   A.  Yes, they progressively got better.
23   Q.  Have you experienced those panic attacks or
24 those symptoms since that time period in the late 2018?

Page 71

1    A.  Not as extreme but to a much lesser degree,
2  yes.
3    Q.  When did you experience those symptoms since
4  2018?
5    A.  Around December of 2019.
6    Q.  And was there any event that was causing in
7  your mind you to experience those panic attacks or
8  symptoms?
9    A.  Yes.
10   Q.  What was that?
11   A.  There were several.  One was I had lost both of
12 my parents.
13   Q.  I'm sorry.
14   A.  I was in the middle of setting up this
15 litigation with Mr. Duffy.  And this was the first
16 holidays I had without any of my family.
17   Q.  You said you lost both your parents.
18        When did they pass away?
19   A.  My mother passed in March of 2019 and my father
20 in May of 2019.
21   Q.  That's really hard.  I'm sorry to hear that.
22        And you had mentioned one of the reasons
23 in 2018 you didn't seek any treatment was because you had
24 concerns with your benefits at the CTA, is that correct?

Page 72

1    A.  Yes.
2    Q.  Did you inquire about the status of your
3  benefits while you were on leave at the CTA?
4    A.  I asked for what my employment contract was at
5  the CTA.  And I got a very non-specific answer, something
6  along the lines of you're a Section 28 employee.
7    Q.  Did you ever ask anyone if your health care or
8  medical insurance had lapsed while you were placed on
9  leave?
10   A.  When I went to go see Mr. Psomas I said I want
11 to discuss a personal matter and that this was that
12 personal matter.  And he said he didn't know, he would
13 get back to me and he never did.
14   Q.  Did you follow up with him?
15   A.  Next time I saw him at the interview, I asked
16 and he shrugged.
17   Q.  What did you ask him at the interview?
18   A.  This wasn't exactly at the interview, this was
19 in the lobby prior to the interview, or maybe it was when
20 I was leaving but it was in the lobby, not at the actual
21 interview.
22        I said did you have a chance to follow up
23 on what we discussed, and he shrugged.
24   Q.  And did you at that point in time refer to your

Page 73

1  insurance benefits when you were speaking with
2  Mr. Psomas?
3    A.  Not specifically.  But that was the only matter
4  that we had discussed.
5    MS. BABBITT:  Okay.  All right.  So going back to
6  the day, I'm referring to the day you're placed on leave,
7  the day you received the notice of your administrative
8  leave and Mr. Psomas contacted you.  October 22.
9        I'm going to show you or actually I will
10 have you look at Exhibit 12, if you're able to look at
11 that.
12   MR. DUFFY:  I don't know we established all that
13 happened on October 22 or if it makes a difference, but
14 just want to note that.
15   THE WITNESS:  Okay, I see it.
16   MS. BABBITT:  Q  CTA Exhibit 12, this is an e-mail
17 from Michael Haynes and his Gmail account to you at
18 ████████████, correct?
19   THE WITNESS:  A  Yes.
20   Q.  It was sent on October 22, 2018, correct?
21   A.  Correct.
22   Q.  In this e-mail Mr. Haynes says to you that
23 Dayton was two months ago nearly to the date, correct?
24   A.  Correct.

19 (Pages 70 - 73)

Page 74

1    Q.   And he also forwards you a note that he had
2  sent on August 24, 2018, right?
3    A.   Correct.
4    Q.   That's a note that says ugh, I don't know how
5  much more emotion I can take this week, right?
6    A.   Correct.
7    Q.   And below that is an exchange that Mr. Haynes
8  had in Exhibit 12 with someone named Tim Harrington from
9  the Dayton RTA, is that right?
10   A.   I can't make it out on my screen.
11   Q.   Okay.  Are you able to zoom in at all?
12   A.   Yeah, I'm zoomed in but it's all dotted and
13 pixilated.
14   Q.   So Mr. Haynes says to you that Dayton was two
15 months ago nearly to the date.  On that day that you
16 received your notice of leave.
17        What did you take that to mean, Mr. Pable?
18   A.   That was one of the possibilities that we were
19 discussing in that enumeration notebook that I had
20 mentioned earlier.
21   Q.   Did you think that you may be being placed on
22 leave because of the Dayton test?
23   A.   I did not.
24   Q.   You did not?

Page 75

1    A.   Correct.  As I stated earlier, I thought that
2  there were other potential candidates that had more
3  credence than Dayton.
4    Q.   Did you understand that Mr. Haynes thought that
5  you being placed on leave may be related to the Dayton
6  test?
7    A.   I don't think that he thought that was the
8  primary candidate, but it was a candidate.
9    Q.   Did Mr. Haynes send you other communication
10 relating to other instances or issues that he thought
11 might be candidates for the basis of your leave?
12   A.   I don't think so in e-mail.
13   Q.   Did he send them in any other form?
14   A.   No other electronic form that I'm aware of.
15   Q.   On Exhibit 12 Mr. Haynes also says I'm going to
16 call Thomas once the kids go to bed.
17        Do you know who he's referring to there?
18   A.   Most likely Mr. Silvestri, but I can't be sure.
19   Q.   Do you know why Mr. Haynes would be contacting
20 Thomas Silvestri?
21   A.   Perhaps to see if he had any other additional
22 information similar to what I did with Miss Cochran.
23   Q.   If you don't mind Mr. Pable, turn to CTA
24 Exhibit 13.  Tell me when you have that accessible.

Page 76

1    A.   I have it.
2    Q.   This CTA Exhibit 13, this is an e-mail from
3  Mr. Haynes to you on that same day, October 22, 2018,
4  correct?
5    A.   Correct.
6    Q.   Mr. Haynes is again forwarding you a note that
7  he had sent to Trinity Haynes and below it it may be
8  pixilated again, is an exchange relating to the Greater
9  Dayton RTA individual.
10        Are you able to see any of that?
11   A.   I can see that he had forwarded something that
12 he had sent to Trinity from the last e-mail, yes.
13   Q.   Are you able to see that that exchange that he
14 had forwarded included some exchange with Tim Harrington
15 from Greater Dayton RTA?
16   A.   I see the name Tim Harrington but I can't read
17 the message.
18   Q.   Do you know who Tim Harrington is?
19   A.   I believe he was in charge of IT at the Dayton
20 RTA, but I am only going off of information that
21 Mr. Haynes had told me.
22   Q.   Okay.  Mr. Haynes says to you in Exhibit 13
23 just so we have this, I might call this guy tomorrow just
24 to ask if they did file anything.

Page 77

1        You see that?
2    A.   Yes.
3    Q.   What did you understand Mr. Haynes to mean by
4  that?
5    A.   I honestly don't know.  I guess he -- I can't
6  really answer for what was inside of Mr. Haynes' head,
7  but he also sent it to Mr. Silvestri.  So I assume he was
8  just keeping us both apprised of what he was doing.
9    Q.   Did you understand what Mr. Haynes meant when
10 he said he's going to ask if they filed anything?
11   A.   Not really.  If there was anything from Dayton
12 then I'm sure we would have heard about it.
13        I don't know what the statute of
14 limitations would have been on something like that.  So I
15 don't know why they would file anything this late if
16 there was something.  So I don't know what he meant by
17 that.
18   Q.   So when you say statute of limitations, are you
19 referring to the fact that Dayton could potentially be
20 filing a lawsuit?
21   A.   Not necessarily.  I recall Mr. Haynes reaching
22 out to Mr. Harrington before.  And hearing or reading
23 something along the lines of Mr. Harrington explaining
24 this to one of his higher-ups.

20 (Pages 74 - 77)

Page 78

1       So if there was something that was going
2   to happen, I believe Mr. Harrington probably would have
3   reached out to Mr. Haynes anyway.  So this is, if
4   something was done at all it seems very -- it seems very
5   anachronistic.
6       Q.  So did you understand that Dayton could have
7   filed a lawsuit relating to the Dayton test on the
8   Bustime system?
9       A.  I personally don't think that they had grounds
10  for a lawsuit based on that.  But that's my personal
11  opinion.
12      Q.  So you understood that they could in fact have
13  filed a lawsuit based on the Dayton test and the Bustime
14  system?
15      A.  No, that's not what I said.
16      Q.  Okay.  So you don't think they could have filed
17  a lawsuit based on the Dayton test?
18      A.  Correct.
19      Q.  Do you believe they could have filed any
20  criminal charges or pursued any criminal action as a
21  result of the Dayton test and the Bustime system?
22      A.  No.
23      Q.  Why is that?
24      A.  Because criminal intent requires -- well,

Page 79

1   requires some sort of malicious intent.
2       Q.  Okay.  Did you have any communications with
3   Mr. Haynes, whether it was via e-mail or otherwise, about
4   any actions that Dayton might have been taking or
5   interested in taking?
6       A.  I honestly don't recall.  There were so many
7   potential candidates that we had enumerated, I did not
8   keep track of it all.
9       Q.  When you say that, there was so many different
10  reasons you could have been placed on administrative
11  leave?
12      A.  Yes.
13      Q.  When someone is placed on administrative leave
14  at the CTA, is it your understanding they are being
15  placed on leave because of the potential violation of a
16  CTA rule or procedure?
17      A.  No.
18      Q.  What is your understanding of why someone would
19  be placed on administrative leave?
20      A.  There's a myriad of reasons why I could imagine
21  someone being placed on leave.
22          For example, there could have been a
23  harassment claim that they are investigating.  There
24  could have been like I said, something sent to a legal

Page 80

1   department on something that they want to investigate.
2       There's really so many different reasons.
3   It could have been a punishment for something but that
4   didn't really jive with what the letter from Jim said.  I
5   really couldn't tell you every single reason but I don't
6   believe that the only reason would be for violation of a
7   rule.
8       Q.  Did you have any reason to expect that you
9   might be placed on leave as a result of a harassment
10  claim?
11      A.  No.
12      Q.  So you also then didn't believe that you were
13  being placed on leave as a punishment for something?
14      A.  That is correct.
15      Q.  You, did you believe you were being placed on
16  leave because of an investigation that was being
17  conducted by the legal department?
18      A.  My primary theory of why I was placed on leave
19  was that the CTA did not want to cover my surgery.
20      Q.  As you sit here today, that still why you
21  believe you were placed on leave?
22      A.  I think it was definitely a contributing
23  factor.
24      Q.  Why is that?

Page 81

1       A.  Because Mr. Psomas was apprised of my FMLA by
2   Mr. Haynes in early October.  And I would assume that any
3   sort of other investigation, anything that would have
4   prompted another some sort of investigation would have
5   given them cause to begin the process of denying my FMLA.
6       Q.  Did you believe that Mr. Haynes was also being
7   placed on leave as a result of you seeking FMLA leave?
8       A.  Yes.
9       Q.  Why is that?
10      A.  I believe that they tried to lump whatever
11  together and I originally thought that he had been
12  collateral damage as a result of me trying to get my
13  FMLA.
14      Q.  Had you ever taken FMLA while you were employed
15  by the CTA before then?
16      A.  No.
17      Q.  Do you know if Mr. Haynes had ever taken
18  FMLA --
19      A.  I have no knowledge.
20      Q.  -- while he was employed?  I'm sorry?
21      A.  I have no knowledge of that.
22      Q.  All right.  Can you turn to CTA Exhibit 14,
23  please.  Tell me when you have that.
24      A.  I have it.

21 (Pages 78 - 81)

Page 82

1    Q.   This, Mr. Pable, is an e-mail from Mr. Haynes
2  to you also dated October 22, 2018 in Exhibit 14, is that
3  right?
4    A.   Yes.
5    Q.   In this e-mail Mr. Haynes says this is for
6  criminal activity:  And then he sends a link to what I
7  will tell you is an Illinois state statute.
8         Do you see that?
9    A.   Yes.
10   Q.   Then can you turn to CTA Exhibit 15, Mr. Pable.
11   A.   Okay.
12   Q.   You have that up now?
13   A.   Yes.
14   Q.   I'll --
15     MR. DUFFY:  Hold on one second.  It's taking a
16  minute to come on my screen.  Okay.  Go ahead.
17     MS. BABBITT:  Q  Mr. Pable, this is a copy of the
18  link that was sent to you by Mr. Haynes and it is a
19  portion of a statute from the Illinois State Officials
20  and Employees Ethics Act, which is 5 ILCS 430/5-60.
21   Q.   Do you see that?
22     THE WITNESS:  A  Yes.
23   Q.   Is this a law or statute that you discussed
24  with Mr. Haynes?

Page 83

1    A.   I don't recall specifically discussing this
2  with Mr. Haynes, but I also note that the date in the
3  upper left-hand corner says 3-6-2021.  And I would argue
4  that this might not be reflective of what was on that
5  page at that time.
6    Q.   Fair enough.  So the Illinois State Official
7  and Employees Ethics Act, Mr. Pable, are you familiar
8  with that statute?
9    A.   I'm not.
10   Q.   Do you know if you're bound by this ethics act
11  when you were an employee of the CTA?
12   A.   I had no idea whether or not I was.
13   Q.   All right.  And this portion of the act that
14  Mr. Haynes directed you to in the e-mail, it refers to
15  something called administrative leave during pending
16  criminal matter.  Do you see that?
17   A.   Yes.
18   Q.   Did you discuss the possibility of being placed
19  on administrative leave as a result of a criminal matter?
20   A.   I don't specifically recall discussing that,
21  no.
22   Q.   Did you ever consider that you were placed on
23  leave as a result of a pending criminal matter?
24   A.   No, because I didn't think I had done anything

Page 84

1  criminal.
2    Q.   In that e-mail in 14 -- sorry if I'm making you
3  toggle back, Mr. Haynes says in that e-mail in Exhibit 14
4  they will have to have a really good case.
5         Do you see that?
6    A.   Yes.
7    Q.   What did you understand Mr. Haynes to mean by
8  that?
9    A.   I really don't know what was going through
10  Mr. Haynes' head with this.  If you look at the time
11  stamps on this e-mail, it looks like they were, all the
12  previous e-mails you had shown me were in close proximity
13  to each other.
14         So I assume he was doing research on one
15  of those potential things we had enumerated that I
16  discussed earlier.
17   Q.   Did you have any understanding of what
18  Mr. Haynes meant by saying they would have to have a
19  really good case?
20   A.   Not particularly, no.
21   Q.   Did you ever ask Mr. Haynes why he was sending
22  you material or communications relating to the Dayton
23  test?
24   A.   Not specifically, no I did not.

Page 85

1    Q.   Did you ever generally discuss that with
2  Mr. Haynes?
3    A.   Did I ever generally discuss what with
4  Mr. Haynes?
5    Q.   Did you ever discuss generally with Mr. Haynes
6  whether or not the Dayton test was something that you
7  would be placed on leave for?
8    A.   As I stated earlier, it was one of the
9  possibilities that we had enumerated.
10   Q.   And did you explain to Mr. Haynes you did not
11  think that was the reason you would be placed on leave?
12   A.   I believe I did.
13   Q.   Do you recall what you said about that?
14   A.   I said if I recall correctly, I believe the
15  strongest candidate was another matter, not the Dayton
16  case.
17   Q.   Okay.  On October 23, 2018, so this is the day
18  after Mr. Psomas sent you that notice of administrative
19  leave and the date I believe somebody called you about
20  the leave.  Mr. Haynes wanted to meet with you.
21         Do you recall meeting with Mr. Haynes in
22  person on that day, October 23?
23   A.   I recall meeting with Mr. Haynes several times
24  but I don't recall the exact dates.

22 (Pages 82 - 85)

Page 86

1 Q. Okay. Let's turn to CTA Exhibit 16. If you
2 can pull that up.
3 A. Okay.
4 Q. You have that?
5 A. Yes.
6 Q. In that, that is an e-mail from Mr. Haynes to
7 you and to someone named Trinity Haynes on October 23,
8 2018, correct?
9 A. Yes.
10 Q. In this message he forwards, Mr. Haynes
11 forwarding to you in Exhibit 16 a note that he sent to
12 Mr. Psomas, is that right?
13 A. That's what it looks like, yes.
14 Q. And he, Mr. Haynes says in his note to you at
15 the top, I will be in the loop, happy to meet up anytime,
16 anywhere. I have a lot of work to do. I want to make
17 sure we are covered in every way possible and can move
18 forward.
19 Do you see that?
20 A. Yes.
21 Q. Did you understand or know what a lot of work
22 to do, what Mr. Haynes was referring to?
23 A. I think he had to collect all of his belongings
24 from the CTA and return them to Mr. Psomas. I think he

Page 87

1 was making sure that he had done that.
2 He also wanted to, he wanted to discuss
3 with me the enumerations that I had mentioned earlier.
4 And I believe he felt he was, I believe we both felt that
5 the leave was improper. So I think he was, he had work
6 to do in terms of finding representation.
7 Q. Okay. So you said you were -- you understood
8 that you and Mr. Haynes were going to discuss these,
9 you're referring to them as enumerations?
10 By enumerations you mean the possible
11 bases of which you were being placed on leave?
12 A. That is correct.
13 Q. Prior to meeting up with Mr. Haynes in person
14 to discuss those enumerations, did you communicate with
15 Mr. Haynes about those possibilities for being placed on
16 leave?
17 A. I don't believe I did.
18 Q. So the first time you talked about the possible
19 reasons you might be placed on leave is when you met with
20 Mr. Haynes in person?
21 A. That sounds about right.
22 Q. Did Mr. Haynes write down those possibilities
23 in his notebook?
24 A. I believe he did.

Page 88

1 Q. Did you write them down anywhere?
2 A. No.
3 Q. Did you record them anywhere?
4 A. No.
5 Q. And do you recall meeting with Mr. Haynes in a
6 Starbucks after you were placed on administrative leave?
7 A. Yes. As I stated, I recall doing this several
8 times.
9 Q. And in those meetings did you discuss the fact
10 that you thought your medical leave was at issue?
11 A. Yes.
12 Q. Who was aware of your surgery that you had
13 planned prior to you going on leave on October 22, 2018?
14 A. My now husband, my family, Mr. Haynes,
15 Mr. Psomas and whomever Mr. Psomas may have communicated
16 it to.
17 Q. All right. How were you --
18 A. I'm sorry. And my friends were aware as well,
19 because it's a non-trivial surgery so I would have been
20 out of commission for several weeks.
21 Q. And you said that Mr. Psomas was aware that you
22 were going to have surgery?
23 A. Yes.
24 Q. How do you know that Mr. Psomas was aware of

Page 89

1 that?
2 A. Mike had me schedule a reminder on his calendar
3 for him to inform him. I believe that happened on
4 October 9th.
5 Q. I'm sorry, what date was that?
6 A. I believe Mike had me schedule an appointment
7 on his calendar for him to tell him, and I believe that
8 appointment was on October 9th.
9 Q. To your knowledge did Mr. Haynes have a meeting
10 or otherwise communicate with Mr. Psomas regarding your
11 leave?
12 A. Yes.
13 Q. What did Mr. Haynes tell you about that?
14 A. He said he communicated it and told me what
15 paperwork I had to fill out.
16 Q. Did Mr. Haynes provide you with that paperwork?
17 A. I believe he gave me a document number that I
18 requested.
19 Q. Okay. Did you tell anyone else at the CTA you
20 were going to have surgery?
21 A. I had -- I believe I worked with it or I
22 believe I mentioned it with HR when I had a medical
23 coding question.
24 Q. You recall who in HR you spoke to about your

23 (Pages 86 - 89)

1  surgery?
2      A.  That's a complicated question because every
3  time I discussed the coding issues, I spoke to a
4  completely different person, so.  I don't recall.
5      Q.  You don't recall who you spoke to in CTA about
6  coding for your surgery?
7      A.  Not off the top of my head.
8          I think Mr. Moreno may have been on a
9  e-mail I sent out.  I sent out a big catchall e-mail
10 because I wasn't getting anywhere and I think I got a
11 call back at one point.  And then I had a meeting with
12 someone else, then I got another call back from someone
13 else.
14         So I don't recall everyone's exact name
15 but I believe there's -- you may have even captured it.
16 A coding question in the e-mails.
17     Q.  Why didn't you tell Jim Psomas you were having
18 surgery?
19     A.  Because Mr. Haynes is my direct supervisor and
20 I advised him of it, and he said that he needed to make
21 sure that Jim was able to get coverage for my position.
22     Q.  Was it your understanding that Mr. Haynes had
23 the authority to approve your leave or not approve your
24 leave?

1      A.  I think he had to be a signatory on it.
2      Q.  So does that mean he had to approve it or not
3  approve it as you understand it?
4      A.  I think he had to be part of the approval.
5      Q.  What does that mean?
6      A.  There are documents where you need multiple
7  levels of approval in order for something to happen.  So
8  for example your direct supervisor might need to say
9  yeah, this is okay and then get approval one level higher
10 up.  Or even higher up than that.
11         I guess it depends on your position in the
12 org chart or what the policies specifically are.
13     Q.  And did you understand that Mr. Psomas would
14 either be in a position to approve or not approve your
15 request for leave?
16     A.  I have no knowledge of that.  That's why I
17 relied on Mike.
18     Q.  Okay.  Did you ask Mike Haynes any questions
19 about who would need to approve this leave?
20     A.  Beyond him, no.
21     Q.  And what sort of surgery were you planning on
22 having?
23     A.  Again, I would like to confer with my attorney.
24 I don't know if that's privileged information or not.

1  Tim knows but would that --
2      MR. DUFFY:  Yeah, you can tell them the type of
3  surgery and like I said earlier, we are designating this
4  whole transcript confidential so we can go and, you know,
5  redact out the portions that, you know, shouldn't be made
6  public and then go from there.
7      THE WITNESS:  A  Okay.  I had lost 300 pounds and
8  I was attempting to get my excess skin removed.
9      MS. BABBITT:  Q  Okay.  That was the surgery that
10 you had planned to have?
11     A.  Yes.  It's called an abdominoplasty.
12     Q.  We will get back to that in a minute.  Staying
13 on with this you being placed on leave.  Can you turn to
14 Exhibit 17.
15         Tell me when you're able to see that,
16 Mr. Pable.
17     A.  I see it but I need to zoom in, one moment.
18 Okay.
19     Q.  All right.  CTA Exhibit 17, this is an e-mail
20 from Mr. Haynes to you at your Gmail account dated
21 October 24, 2018, is that right?
22     A.  That is correct.
23     Q.  In this e-mail Mr. Haynes writes Chris, good to
24 meet up yesterday.  That was very important for us.

1          You see that?
2      A.  Yes.
3      Q.  And is that a meeting that you had that he's
4  referring to where you met with Mr. Haynes at a
5  Starbucks?
6      A.  It very well could be.  Again we had several
7  meet-ups where we supported each other.
8      Q.  Do you recall where you had those meet-ups?
9      A.  It was usually Starbucks.  Sometimes we meet at
10 Starbucks and potentially walk.
11     Q.  And in this e-mail in the second paragraph,
12 Mr. Haynes says that he takes full responsibility for our
13 posting of an alert to Dayton.
14         Do you see that?
15     A.  Hold on.  I need to read it.  It's really hard
16 to read so hold on.
17     Q.  Okay.
18     A.  Yes, I see that sentence.
19     Q.  Did you discuss prior to Mr. Haynes writing you
20 this e-mail this notion of Mr. Haynes taking full
21 responsibility for posting the Dayton alert?
22     A.  I mean he was the one that posted it.  So.
23     Q.  Let me make that clearer.  When you met with
24 Mr. Haynes the day prior, did you discuss the posting of

Page 94

1 the Dayton alert with Mr. Haynes?
2    A.   Potentially.  I don't remember everything we
3 discussed.  I can say that we probably discussed Dayton
4 generally but I don't know if the Dayton alert
5 specifically came up, because again I thought the
6 strongest candidate was my FMLA.
7    Q.   Okay.  So you don't recall saying anything to
8 the effect to Mr. Haynes on that Starbucks meeting on the
9 23rd I really wish we hadn't done that Dayton test or
10 anything like that?
11    A.   I don't recall him saying those exact words,
12 no.
13    Q.   Do you recall you saying anything along those
14 lines that you regretted the Dayton test or wished the
15 Dayton test hadn't been done?
16    A.   No, I don't think I said anything like that.
17    Q.   Did you ask Mr. Haynes to send you an e-mail
18 like this on October 24?
19    A.   I did not.
20    Q.   In that same paragraph in Exhibit 17,
21 Mr. Haynes says I can only think this is about a revenge
22 move from Craig.  You see that?
23    A.   Yes.
24    Q.   What did you understand that to mean?

Page 95

1    A.   I honestly don't know Mr. Haynes' relationship
2 with Mr. Lang very well.  I know that whenever Mr. Lang
3 was around for the meetings they went to lunch.  But
4 beyond that, I'm not super aware of their intricate
5 relationship.
6    Q.   So you didn't understand what he meant by a
7 revenge move from Craig?
8    A.   Later on in the sentence he says something with
9 Veronica.  And Veronica I believe is directly under
10 Mr. Carter.  And Mr. Carter and Mr. Lang have a
11 relationship.  So that's the only thing that I can
12 potentially think of.
13    Q.   So you're right.  That sentence to complete it
14 says I can only think this is about a revenge move from
15 Craig and perhaps in concert with Veronica against me and
16 you by extension.  You see that?
17    A.   Yes.
18    Q.   Who did you understand Veronica to be referring
19 to in that e-mail?
20    A.   Veronica Alanis.
21    Q.   Veronica Alanis is an employee of the CTA?
22    A.   Yes.
23    Q.   Did you have any understanding of why there may
24 be a revenge move against Mr. Haynes by Miss Alanis?

Page 96

1    A.   I don't know the exact origin of the bad blood
2 between Miss Alanis and Mr. Haynes.  I just know that it
3 existed.  And I know there was prejudice.
4    Q.   Did you ever ask?
5    A.   No, because I don't really engage in a lot of
6 gossip.
7    Q.   So when you got this e-mail where Mr. Haynes is
8 explaining that he's concerned about, you know, this
9 issue of the Dayton test and revenge being taken on him,
10 did you ask him what he meant by any of that?
11    A.   I'm sorry, can you restate the question.
12    Q.   Sure.  When you received this message from
13 Mr. Haynes where he's saying he takes full responsibility
14 for the Dayton test and that he thinks this is a revenge
15 move against him, did you ask him what he meant by any of
16 that?
17    A.   No, I didn't.
18       MS. BABBITT:  Okay.  Then let's turn to CTA
19 Exhibit 18, Mr. Pable.  Nicollette, can you get that in
20 there?
21       MS. KHUANS:  Yes.  I'm not sure why it's not there,
22 one moment.
23       MS. BABBITT:  Take 10 minutes.  11:41 we'll come
24 back.  Great.

Page 97

1       (Short recess taken.)
2       THE VIDEOGRAPHER:  Going back on the record.  Time
3 is 11:43 a.m.
4       MS. BABBITT:  Okay.  Mr. Pable, I wanted to return
5 a little bit to the FMLA issue you were explaining to me.
6    Q.   Is it your position that Mr. Psomas was made
7 aware by communications with Mr. Haynes that you were
8 going to have surgery and need to take FMLA for that
9 surgery?
10       MR. DUFFY:  I'm sorry, did you say was or wasn't?
11       MS. BABBITT:  Was.
12       THE WITNESS:  A  It was my position that yes,
13 Mr. Psomas was aware of it.
14       MS. BABBITT:  Q  Is it also your position that
15 Mr. Psomas as a result of you intending to take FMLA
16 leave, sought to have you terminated?
17    A.   I think it was a contributing factor, but I
18 don't think it was the sole purpose.  I think it lined
19 up.
20    Q.   You say it was a contributing factor to why the
21 CTA was going to have you terminated?
22    A.   Yes, I think it was additional ammunition to
23 want to separate me from the agency.
24    Q.   What were the other reasons why you think the

25 (Pages 94 - 97)

Page 98

1  CTA wanted to separate you?
2     A.  The whole purpose of the "investigation", I
3  assumed that they used both in concert with each other to
4  use that as a means to, as a means of motivation to
5  separate me.
6     Q.  So you believe that you were going to be
7  separated from the CTA because you were going to take
8  FMLA leave as one reason?
9     A.  That was a hypothesis that we had talked about
10  at the time, yes.
11     Q.  Do you believe as you sit here today, that was
12  one of the reasons you were going to be separated from
13  the CTA?
14     MR. DUFFY:  Objection, asked and answered.
15     THE WITNESS:  A  I think it contributed but I
16  don't think it was to the extent that I thought it may
17  have been.
18     MS. BABBITT:  Q  Why is that?
19     A.  Because in looking over the document production
20  and the notes and everything, I came to realize that
21  there is a lot of misunderstanding and a lot of
22  miscommunication between a lot of people, which I believe
23  escalated this to the level that it did.
24     Q.  When you say escalated this, what are you

Page 99

1  referring to?
2     A.  The litigation.  The Dayton incident and
3  everything around it.  I believe there was a lot of
4  miscommunication and misunderstanding around everything
5  that happened.  And I believe that was the largest
6  contributing factor after reviewing all of the
7  production.
8     Q.  When you refer to the incident, are you
9  referring to the test of the Dayton system, use of the
10  skeleton key there?
11     A.  The incident refers to everything as a whole.
12  So locating the service bulletin API, finding the
13  vulnerability in that API, finding the skeleton key and
14  the test.  Everything wrapped together I am describing as
15  the incident.
16     Q.  Okay.  So all of those elements that you
17  describe as the incident, those were the primary reason
18  that you believe you would be terminated from the CTA had
19  you not resigned?
20     A.  That's not what I said.  I said I believe the
21  misunderstanding and miscommunication behind all of that
22  was the biggest contributing factor that I believe after
23  reviewing the document productions.
24     Q.  So you believe that the CTA misunderstood the

Page 100

1  incident and they intended to terminate you as a result
2  of that?
3     A.  Yes.
4     Q.  In addition to the misunderstanding of the
5  Dayton incident, you say that another contributing factor
6  was the fact you were seeking to go on FMLA leave?
7     A.  Correct.
8     Q.  Any other reasons why you believe the CTA
9  sought to terminate you?
10     A.  No.
11     Q.  Turning back to our time line.  Let's turn to
12  CTA Exhibit 18.  Tell me when you're there.
13     A.  I'm there.
14     Q.  Do you see CTA Exhibit 18 as an e-mail from
15  you, Mr. Pable, in your ▮▮▮▮▮ Gmail account to
16  Mr. Psomas?
17     A.  Yes.
18     Q.  It's sent on October 24, 2018?
19     A.  Yes.
20     Q.  Is this an e-mail you wrote and sent from your
21  e-mail account?
22     A.  Yes.
23     Q.  In this e-mail Exhibit 18, you tell Mr. Psomas
24  that you had received your notice of administrative leave

Page 101

1  and you would bring it to him, is that right?
2     A.  That is correct.
3     Q.  Okay.  What device were you using to draft this
4  e-mail to Mr. Psomas?
5     A.  I actually don't recall which device I used to
6  draft this e-mail.
7     Q.  Did you have in your possession at that time on
8  October 24, 2018 your personal cell. phone?
9     A.  I did have my cell. phone and I also had gone
10  to several internet cafes.
11     Q.  And beside your personal cell. phone, do you
12  have any other computers or laptops -- I'm sorry -- did
13  you have any other computers or laptops or other tablet
14  devices you could send e-mails off of in your home in
15  2018?
16     A.  I had a HP touch pad, but I don't know if I
17  could have sent e-mail on it because it was an abandoned
18  product and the SSL certificates for it was never
19  updated.  So I don't know if it could have communicated
20  with an e-mail service.  So I did have a tablet but I
21  don't know the extent that it was usable at that time.
22     Q.  Okay.  In the second paragraph of CTA
23  Exhibit 18, this e-mail to Psomas, you say I got very
24  little sleep and I'm physically ill being left in the

26 (Pages 98 - 101)

Page 102

1 dark. You see that?
2   A.  Yes.
3   Q.  What is that physical illness you're referring
4 to in your e-mails to Psomas?
5   A.  That would be my stomach in knots and not being
6 able to move while my stomach is in pain. The paralysis
7 we spoke of earlier.
8   Q.  No other illness aside from the panic attacks
9 and the other symptoms you described earlier in your
10 testimony?
11   A.  Yeah, that is correct.
12   Q.  Then if you can go to the second page of CTA
13 Exhibit 18. At the top of that there's an image of it
14 looks like a flash drive.
15       You see that, Mr. Pable?
16   A.  That is correct.
17   Q.  In CTA Exhibit 18 on page two, you refer to
18 your personal flash drive. Is that right?
19   A.  That is correct.
20   Q.  You say it should be in or in front of my
21 computer. You see that?
22   A.  That is correct.
23   Q.  Are you referring to the computer that you used
24 at the CTA?

Page 103

1   A.  Yes.
2   Q.  And that computer was in the CTA headquarters
3 office?
4   A.  Yes.
5   Q.  And that flash drive that was in your computer,
6 you say that was a personal flash drive?
7   A.  That is correct.
8   Q.  You asked for that to be returned to you?
9   A.  That is correct.
10   Q.  Did that flash drive have an encryption key on
11 it to decrypt your CTA computer?
12   A.  It did.
13   Q.  Could the CTA computer have started or booted
14 up without the flash drive and that encryption key being
15 input into it?
16   A.  Without that flash drive specifically?
17   Q.  Yes.
18   A.  Yes.
19   Q.  How would it have turned on without the flash
20 drive being in?
21   A.  That personal flash drive had the backup of the
22 hard drive encryption key. The primary flash drive was
23 on my desk at CTA.
24   Q.  So there's a primary flash drive in addition to

Page 104

1 this personal flash drive?
2   A.  That's correct. And this just had a backup
3 copy in case something were to happen to the primary.
4   Q.  So there was a primary encryption key located
5 on another flash drive on your computer?
6   A.  How to explain this. There's not a separate
7 encryption key. It is a copy of the same file.
8   Q.  So that same file existed in two places. It
9 existed on a flash drive that was near your computer at
10 the CTA?
11   A.  Correct.
12   Q.  And then there was a copy of that encryption
13 key on this flash drive that we are referring to in CTA
14 Exhibit 18?
15   A.  That is correct.
16   Q.  And if someone did not have either this
17 personal flash drive or the other flash drive that had
18 the encryption key on it, could they turn your CTA
19 computer on or access that computer?
20   A.  It's debatable. I mean potentially there are
21 attacks on different types of encryption all the time.
22       So I believe your own forensic expert said
23 they were able to get into the encrypted partition
24 without needing a key. So based on that information that

Page 105

1 you submitted to the court, I would say no, they did not
2 need it.
3   Q.  Okay. So in order, if someone didn't have
4 either of the flash drives that had the encryption key on
5 it, they would need to go through the exercise of
6 decrypting or cracking encryption code, is that right?
7   A.  Generally. I wouldn't put it like that but
8 yes.
9   Q.  Who at the CTA was aware of the fact that your
10 CTA computer was encrypted?
11   A.  Well it was a company-wide policy. I believe
12 instituted by Mr. Radojcic.
13       So every CTA computer is encrypted with
14 bitlocker except for some of the control center
15 computers. My machine and Phil's machine were the only
16 control center style builds that made use of the
17 encryption because they were located in the headquarters
18 office. These machines had no TPM chips.
19       So because of that you had to use either a
20 USB flash drive or type in a complicated password every
21 boot.
22   Q.  So the only way you could access your computer
23 would be to input a password or to use this encryption
24 key?

27 (Pages 102 - 105)

Page 106

1   A. It wouldn't necessarily be a password. It's
2 called a recovery key and it's something like maybe a
3 50-character long string of numbers that nobody will ever
4 remember.
5   Q. So is it your testimony that you were directed
6 to encrypt it using bitlocker by the CTA?
7   A. It is my testimony that there was a policy in
8 place to have bitlocker encryption in place on all of the
9 computers. So I brought that to Mr. Haynes' attention
10 when the e-mail came out to us. And he agreed that we
11 should do our best to comply to that policy. And I
12 believe that happened sometime in 2016.
13   Q. And so as far as you were aware, all of the
14 computers in the CTA were encrypted with bitlocker?
15   A. That is correct. I should say all of the
16 computers in CTA headquarters were. I know that there
17 were some in the control center that were not because
18 they lack TPM chips.
19   Q. Did you make anyone aware when you were placed
20 on leave that in order to access your computer, you would
21 need that encryption key?
22   A. No.
23   Q. Did you make anyone at the CTA aware when you
24 were on leave that that encryption key existed on both

Page 107

1 your personal flash drive and on a second flash drive
2 that is at your desk at the CTA headquarters?
3   A. No. But I was already told that it was already
4 confiscated. So I didn't feel like I had to explain what
5 the contents of both were.
6   Q. Okay. So when you say it was already
7 confiscated what are you referring to?
8   A. I was told that for lack of a better term, both
9 mine and Mike's desk were "ransacked" following our
10 placement on leave. So that would mean they had already
11 collected any media flash drives, computers, portable
12 hard discs and SD cards that may have been on there or
13 any other portable storage.
14   Q. Who told you that they were "ransacked"?
15   A. I believe I overheard that from Miss Johnston.
16   Q. When you say overheard that, does that mean
17 that you were speaking to her about that or e-mailing her
18 about that?
19   A. No. I was not the primary person on that. I
20 believe I heard it from a conversation with Mr. Haynes.
21   Q. So Mr. Haynes told you that your desk and his
22 desk had been ransacked and that he learned that from
23 Miss Johnston?
24   A. I believe that's what happened. It happened so

Page 108

1 long ago that I can't be 100 percent certain but that
2 sounds correct.
3   Q. At any point while you were on leave did you
4 advise anyone of the location of the decryption keys for
5 your CTA computer?
6   A. No, because they had everything they needed to
7 use it.
8   Q. And did you understand that people at the CTA
9 knew that the encryption keys existed on these flash
10 drives at your desk?
11   A. I don't know what they knew.
12   Q. Did you have any knowledge that anyone knew you
13 had encryption keys on your flash drive?
14   A. I know Mr. Haynes knew and I know my co-worker
15 Phil also does the same practice. But I don't know
16 exactly who or what's communicated to what and where.
17   Q. Did you ever tell anyone personally that you
18 had your encryption key for your -- I'm sorry --
19 decryption key on your flash drive to decrypt your
20 computer?
21   A. No.
22   Q. Why not?
23   A. Well there was no reason for me to decrypt my
24 computer. All of my work I did with the CTA was stored

Page 109

1 on a file share server anyway. So anything relevant, all
2 the latest documentation and the latest stable code was
3 already pushed to a centralized server. I believe that
4 server name is called transit support.
5   Q. So you didn't believe that anyone at the CTA
6 would need to access your computer?
7   A. That is correct.
8   Q. That's why you didn't share the fact that you
9 had encryption keys and where these encryption keys were
10 located?
11   A. What I was told after the fact was that they
12 wanted passwords, which I attempted to provide. But my
13 offer to try to help was denied. Rather I should say not
14 denied but ignored.
15   Q. When you say that you were told or asked for
16 passwords, who's asking you for that?
17   A. I believe it was Mr. Psomas.
18   Q. When Mr. Psomas asked you for passwords you
19 didn't understand him to also be considering encryption
20 keys or other ways you could access a computer?
21   A. Correct. He actually asked very specifically
22 for very specific passwords. So I assumed when he asked
23 for that he already had the bitlocker key for the primary
24 partition.

28 (Pages 106 - 109)

1    Q.   How would Mr. Psomas have gotten access to
2 those encryption keys when you were on leave?
3    A.   I'm sorry, can you be a little more specific.
4 The question is a little vague.
5    Q.   Sure.  You said you assumed Mr. Psomas already
6 had the encryption keys.  Why did you assume that?
7    A.   Because he asked very specifically what is the
8 password to get onto the desktop of your computer.  And
9 that would be referring to the Windows 10 log in page.
10    Q.   So you wouldn't understand if somebody asked
11 you for your password to get on your computer, that that
12 would also contemplate how do I get on your computer and
13 decrypt it?
14    A.   If you were to turn it on without the flash
15 drive in, it would come up and say please enter your
16 bitlocker recovery key.  So he should have phrased it
17 differently if that was the case.
18    Q.   Okay.  On your CTA computer you also had a
19 partitioned secondary drive, is that right?
20    A.   There was one present, yes.
21    Q.   Why did you have a secondary drive partitioned
22 on your computer?
23    A.   The drive came provided to me in that manner.
24    Q.   And that drive was also encrypted by bitlocker,

1 is that right?
2    A.   That is correct.
3    Q.   Who encrypted it with bitlocker?
4    A.   I did.
5    Q.   And who authorized you to encrypt that
6 partition drive?
7    A.   There was no mechanism for authorization.  So I
8 would say there was no way to say not to do it and no way
9 to say do it.
10       However, I did inform my direct supervisor
11 that this is what I will be doing.  Do you think we
12 should follow this policy and do this.  And I got
13 concurrent.
14    Q.   So you told Mr. Haynes I'm going to encrypt
15 this secondary drive on my computer?
16    A.   I didn't say specifically secondary drive.  I
17 said I'm going to encrypt the machine.  Which meant
18 encompassing both the primary and secondary partitions.
19    Q.   And you said that Mr. Haynes agreed that you
20 should encrypt those drives on the computer?
21    A.   Correct.  Mr. Haynes also encrypted his
22 drive -- well his machine as well.  I believe using LUX
23 LVN.
24    Q.   At some point you lost access to those

1 encryption keys.  Is that because you no longer had
2 possession of those flash drives?
3    A.   The flash drives only permitted you to get into
4 the boot partition.
5    Q.   What does that mean?
6    A.   So you spoke earlier of a secondary partitioned
7 drive.  Think of it like in order to turn Windows on, you
8 would need the flash drive or the recovery key entered in
9 order for Windows to turn on.  Then if you wanted access
10 to the secondary partition they don't use the same key.
11 They can't.  By design.
12       So you would have to set up another
13 mechanism.
14    Q.   Okay.  So where did you keep those keys?
15    A.   Well that one wasn't done with a recovery key.
16 That one was done with a password hash.  I have that in a
17 password manager.
18    Q.   Is that that motokey password manager you use?
19    A.   Yes.
20    Q.   All right.  Let's go Mr. Pable to CTA
21 Exhibit 19.  This is an e-mail that is entitled Re:  It
22 begins already.
23       Do you see that, Mr. Pable?
24    A.   Yes.

1    Q.   And if you scroll to the bottom of this, the
2 first e-mail in CTA Exhibit 19 is an e-mail dated
3 October 24 from Jim Psomas, begins hi Chris, we have a
4 couple applications.  You see that?
5    A.   Yes.
6    Q.   That's when on October 24, Mr. Psomas was
7 asking you to provide the passwords to your desktop, is
8 that right?
9    A.   I'm sorry, hold on.  My screen just wigged out.
10 One second.
11    Q.   Okay.
12    A.   Okay, yes.  The password to the desktop.
13    Q.   He's also asking you for a password for other
14 things, right, including server IDs and application IDs
15 and passwords?
16    A.   I don't understand what he means by application
17 IDs or passwords.  But.
18    Q.   Okay.  You see that in the e-mail though?
19    A.   Yes.
20    Q.   Great.  Then you responded to Jim on that day,
21 turning now to the top page of CTA Exhibit 19.
22       Do you see that?
23    A.   Yes.
24    Q.   And your response to him begins many of these

29 (Pages 110 - 113)

Page 114

1 things I address in the e-mail to you earlier on urgent
2 matters, right?
3    A. That is correct.
4    Q. Then you forwarded your response to Jim where
5 he's inquiring, looking for passwords, you forwarded that
6 to your husband, correct?
7    A. That is correct.
8    Q. And why did you send it to your husband?
9    A. Because I wanted him to be aware of what was
10 going on and the fact that Jim was not listening to me
11 when I had already told him a lot of the information he
12 was asking for.
13    Q. Then you forward that note on -- again on CTA
14 Exhibit 19 sort of the middle of first page, you forward
15 this message on to Sara Cochran, is that right?
16    A. That is correct.
17    Q. In that note to Sara Cochran on October 24, you
18 say if they have this much trouble right now, imagine
19 when I put in my notice. You see that?
20    A. That is correct.
21    Q. What did you mean by that?
22    A. I believe you have in your discovery some
23 drafts of a resignation because I was being physically
24 ill over how I was being treated during this

Page 115

1 investigation.
2    Q. Okay. So you were planning on resigning from
3 the CTA as of October 24?
4    A. I had drafted a resignation letter discussing a
5 possibility that I may resign because of how sick their
6 investigation is making me.
7    Q. And so you were preparing to resign because of
8 the illness you were suffering from as a result of being
9 placed on leave?
10    A. You're mischaracterizing my testimony. I did
11 not say I was preparing to, I created a potential.
12    Q. Why did you create a potential notice of
13 resignation?
14    A. Because if the illness had continued, I may
15 have used it.
16    Q. Did you ultimately use it?
17    A. No.
18    Q. No you did not?
19    A. That is correct.
20    Q. And that illness you're referring to, is that
21 the same illness you were describing earlier with respect
22 to the panic attacks and paralysis you experienced?
23    A. Correct.
24    Q. Okay. Then also you tell Miss Cochran again on

Page 116

1 October 24 that it's making me sick again.
2         Is that referring to the symptoms you
3 described earlier in your testimony today?
4    A. That is correct.
5    Q. When you say again, what are you referring to
6 that's being repeated?
7    A. The panic attacks, not being able to move,
8 throwing up, not keeping liquids down.
9    Q. So when you tell Sara Cochran that it's making
10 you sick again, had you already told her between
11 October 22 and this e-mail that you were getting sick as
12 a result of many of these issues?
13    A. I may have. I don't recall exactly.
14    Q. In that same e-mail you say to Sara Cochran on
15 October 24, in CTA Exhibit 19, I'm actually going to hold
16 off on my reply to that until 4:50 or later. I will BCC
17 you. You see that?
18    A. Yes.
19    Q. And you were referring to replying to Jim
20 Psomas in that message?
21    A. I believe so, yes.
22    Q. And why were you planning on waiting till the
23 close of business to reply to Mr. Psomas?
24    A. Couple reasons. One, I wanted to make sure I

Page 117

1 had everything in there that I needed to state.
2         And two, I was not in the right state of
3 mind at the time because I was feeling sick. So I wanted
4 to make sure I didn't write something I was going to
5 regret and I told you earlier that my attacks lasted
6 probably around an hour or so. So by that time I would
7 have hopefully recovered and been able to send off a
8 coherent reply.
9    Q. Okay. Were you experiencing one of those
10 attacks while you're corresponding with Miss Cochran at
11 3:27 on October 24?
12    A. Probably that was right afterwards but I was
13 feeling very ill while I was writing to her. Like I
14 said, I had maybe 1 or 2 a day.
15    Q. Okay. So your plan was to wait till 4:50 or
16 later that day to respond?
17    A. Yeah, approximately. It's still not the close
18 of business but -- and he would be able to get the
19 information to whoever needed it so that they could
20 action it.
21    Q. Sure. Okay. Then at the top of CTA Exhibit 19
22 you sent an e-mail to Miss Cochran and you say they have
23 already told vendors we are off projects. You see that?
24    A. Yes.

30 (Pages 114 - 117)

Page 118

1  Q.  How did you come to learn that the CTA had
2  already told vendors you were off projects?
3  A.  I was speaking with Mr. Haynes and he got a
4  call from Jackie Weber at Sierra Wireless and I don't
5  think it was Frank White also there.  I think there was
6  someone by the name of Tim also at Sierra Wireless.
7  But they had a call I believe and they
8  told Mr. Haynes that Thomas told them we were off of the
9  projects.
10  Q.  And how did Mr. Haynes communicate that
11  information to you?
12  A.  I believe that was while we were at a
13  Starbucks.
14  Q.  All right.  Let's turn to CTA Exhibit 20,
15  Mr. Pable.  You tell me when you're there.
16  A.  I'm there.
17  Q.  This is -- I think you may have just been
18  referring to it.  This is entitled resignation in CTA
19  Exhibit 20.  You see that?
20  A.  Yes.
21  Q.  This is a draft resignation letter that you
22  drafted, is that right?
23  A.  That is correct.
24  Q.  You sent it to your husband Alex Bower on

Page 119

1  October 26?
2  A.  That is correct.
3  Q.  And you say, I will turn your attention to the
4  second paragraph of CTA Exhibit 20, the second sentence
5  it says ever since being made aware of my upcoming
6  medical procedure my treatment has been affected.
7  You see that?
8  A.  Yes.
9  Q.  So you had I think testified it was your
10  understanding that Mr. Psomas was made aware of your
11  upcoming medical procedure on October 10, is that right?
12  A.  Somewhere around there.
13  Q.  And at or after that date your treatment at the
14  CTA was effected, is that right?
15  A.  Yes.
16  Q.  How was it affected?
17  A.  Well for one, Jim never -- I would at least,
18  you know, raise my hand or say hi in the hall, that
19  wouldn't happen.  And then obviously being placed on
20  leave shortly after.
21  Q.  Okay.  So after the date that you say that
22  Mr. Psomas was made aware that you intended to take
23  medical leave, you say that you would see Mr. Psomas in
24  the hall and he would not acknowledge you?

Page 120

1  A.  Correct.  Well, he would not -- there are
2  like minor how should I put it.  Not a colloquialism.
3  Very minor gestures you do like say hi, how are you
4  doing.  Standard water cooler or passing a co-worker type
5  deal.
6  And I believe Mr. Psomas also was on
7  vacation for a period of time and I was also on vacation
8  for a period of time.  So there wasn't that much time in
9  between when I was placed on leave and when he is made
10  aware of my FMLA, that Mr. Psomas and I believe were in
11  the building at the exact same time.  But things
12  definitely had a different vibe after Mr. Haynes had
13  informed him.
14  Q.  You say it was a different vibe.  Describe
15  that?
16  A.  As I was saying earlier, things like gestures,
17  you would just like wave, say hi or nod to each other in
18  the hallway or something along those lines.  Those were
19  no longer reciprocated.
20  Q.  So Mr. Psomas would ignore you if you said hi
21  to him in the hall after he was made aware you would be
22  going on leave?
23  A.  Yeah, that's a fair statement.
24  Q.  And if you waved to Mr. Psomas if you saw him

Page 121

1  at the CTA headquarters after he was informed you were on
2  leave, he wouldn't reciprocate that in any way?
3  A.  I wouldn't say it's like a wave.  Kind of like
4  hold your hand up like hey, how are you or what you would
5  do if you're crossing the street and say thanks for
6  giving me right of way or something like that.
7  Q.  And that started after you believe Mr. Psomas
8  was made aware you were placed on leave?
9  A.  That is correct.
10  Q.  How else was your treatment affected aside from
11  those examples you just gave?
12  A.  The fact that I was -- well, the fact that I
13  was placed on leave was the biggest contributing factor
14  to my theory of that.
15  Like I stated earlier, it was my top
16  contender for why I thought I was being placed on leave
17  in the first place.  And something else being blown out
18  of proportion so they wouldn't have to pay for the
19  surgery.
20  Q.  Anything else that your treatment was affected
21  by?
22  A.  No.
23  Q.  And do you have any record of Mr. Psomas being
24  made aware of you being placed or you I guess requesting

31 (Pages 118 - 121)

Page 122

1  to go on medical leave?
2      A. I filled out an FMLA form after Mike had gotten
3  it for me. And I submitted that.
4      Q. Do you recall the date or approximate date you
5  completed and submitted that form?
6      A. Not off the top of my head.
7      Q. Do you have any knowledge of Mr. Psomas seeing
8  or reviewing that form?
9      A. I placed it on his desk.
10     Q. You physically placed it on his desk?
11     A. Yes.
12     Q. Okay. Was Mr. Psomas in the office at the time
13  that you placed it on his desk?
14     A. Yes, but he was walking out the door. He said
15  put it on the desk.
16     Q. Okay. Did you tell Mr. Psomas what it was you
17  were putting on his desk?
18     A. No.
19     Q. So you had a form and you were dropping it off
20  on Mr. Psomas' desk, right?
21     A. Yes.
22     Q. Was this time, sometime after October 6th?
23     A. I believe so, yes.
24     Q. And did Mr. Psomas ask what you were doing in

Page 123

1  his office or what you were dropping off?
2      A. He had an open door policy he claimed. So I
3  came to go drop off the form and let him know, but he was
4  in a hurry to leave the office. So he said just put it
5  on the desk and I did, and he then ran off to a meeting.
6      Q. And you didn't inform Mr. Psomas that you were
7  in fact putting an FMLA form on his desk when you saw him
8  then?
9      A. No. I didn't want to interrupt him on his way
10  to his meeting.
11     Q. Did Mr. Psomas ever discuss you going on leave
12  or follow up after he received that form?
13     A. No. But I shortly after went on vacation
14  myself.
15     Q. Do you know what day you went on vacation?
16     A. Let me look it up. I have to click the month
17  many times to get back.
18     Q. Are you just looking at your calendar feature?
19     A. Yeah, just looking at the calendar. So if I
20  was placed on leave on the 22nd, I would have been on
21  vacation either the 18th or 19th.
22     Q. You said you went to New York at that time?
23     A. Yes.
24     Q. What did you do in New York?

Page 124

1      A. The Nintendo store.
2      Q. I'm sorry?
3      A. The Nintendo world store. Took the tour.
4      Q. Well obviously. Okay. CTA, can you turn to
5  CTA Exhibit 21, Mr. Pable?
6      A. Yes.
7      Q. All right. You see CTA Exhibit 21 is a
8  complaint in replevin. You see that?
9      A. Yes.
10     Q. You drafted this document, is that correct?
11     A. I filled out a form on a website that created
12  it, yes.
13     Q. This is a replevin action seeking recovery of
14  property wrongfully detained by the CTA in Exhibit 21, is
15  that right?
16     A. That is correct.
17     Q. In it you are seeking recovery of your 16 gig
18  flash drive, is that right?
19     A. That is correct.
20     Q. And that was your personal drive you said?
21     A. Yes.
22     Q. What personal materials did you have on that
23  drive?
24     A. It had a work in progress drive I had been

Page 125

1  working on that I wanted to put in a portfolio.
2          I had been seeking secondary employment to
3  take care of other expenses I had. And I was going to
4  use that as the primary piece in the portfolio.
5      Q. What secondary employment were you intending to
6  seek?
7      A. There's a local arcade company called Raw
8  Thrills.
9      Q. You were seeking employment with them?
10     A. Yeah, it was going to be a contract work over
11  the weekend.
12     Q. What sort of work would you have been doing?
13     A. Driver development, most likely other sorts of
14  embedded work.
15     Q. Anything else on this personal drive aside from
16  those materials you just explained?
17     A. I don't recall everything else on the driver
18  but I remember very specifically that that's the one
19  thing that I absolutely needed. And I would have been
20  fine with even just a copy. I didn't need my original.
21     Q. Is this drive that's referred to in CTA
22  Exhibit 21 your draft replevin action, is that the same
23  drive that you said was at or near or in your CTA
24  computer?

32 (Pages 122 - 125)

Page 126

1    A.  That is correct.
2    Q.  That's the drive you requested from Jim Psomas?
3    A.  That is correct.
4    Q.  Did you ever end up filing this complaint in
5 replevin?
6    A.  No, Mr. Psomas said I would get it back within
7 a month. And then I never did. I figured one month is
8 fair. But I would like, you know, a copy of the data at
9 least. And he didn't oblige that and he went back on his
10 word about a month as well.
11    Q.  Did you ever actually obtain employment with
12 Raw Thrills?
13    A.  I did not because I did not have anything to
14 show them that I could do.
15    Q.  Okay. So eventually and I know sitting here
16 today you maintain certain of your personal items have
17 not been returned to you, but some of your personal items
18 were returned to you by Mr. Psomas, is that right? While
19 you're on leave?
20    A.  No. I personally retrieved them myself because
21 he couldn't do it.
22    Q.  So when you say you personally retrieved them
23 yourself --
24    A.  I was escorted to my desk to go pick them up.

Page 127

1    Q.  Whom were you escorted by?
2    A.  I believe Mike Radojcic.
3    Q.  Let's turn to CTA Exhibit 22. Do you have that
4 in front of you, Mr. Pable?
5    A.  Yes.
6    Q.  This is an e-mail from you to Mr. Psomas dated
7 October 29. Is that right?
8    A.  Yes.
9    Q.  In it you say that I will meet you at 9:00 a.m.
10 on Tuesday, October 30 in the lobby area by the stairs
11 near the 7/11. You see that?
12    A.  Yes.
13    Q.  So you were planning to meet Mr. Psomas at the
14 CTA headquarters on October 30?
15    A.  Yes.
16    Q.  Did you in fact meet him on that date?
17    A.  I did.
18    Q.  Is that when you were escorted to your desk to
19 retrieve some of your personal belongings?
20    A.  No, that happened immediately following my
21 forced resignation.
22    Q.  And so when you went to the CTA headquarters on
23 October 30, can you describe that interaction?
24    A.  Mr. Psomas brought some items down that were

Page 128

1 not what I described. I believe that some of them
2 weren't even mine. But they were all perishable things.
3 Now that I think about it he may have brought me the
4 shakes correctly but other things, there was practically
5 nothing else.
6    Q.  In this e-mail to Mr. Psomas on CTA Exhibit 22,
7 at the bottom of your e-mail you say I do need to meet
8 with you in addition to discuss ethics, medical and HR
9 matters. You see that?
10    A.  Yes.
11    Q.  You say while the nature of the meeting is
12 private, I respect you may need to bring in other
13 individuals. Right?
14    A.  Yes.
15    Q.  What ethics matters were you attempting to meet
16 with Mr. Psomas about?
17    A.  It was the -- well this phrase was directly in
18 reference to meeting about my health benefits coverage.
19 So I respected that he might need to bring in other HR
20 people in order to best explain what my coverage of
21 benefits was at the time. Because again, he did not know
22 or claimed he did not know. And I expected him to keep
23 the discussion confidential, hence the ethics.
24    Q.  So when you're referring to ethics you're

Page 129

1 referring to the fact that the issue of your FMLA leave
2 should be treated confidentially?
3    A.  Well that and I had general questions about my
4 benefits coverage in general. So like that was the
5 primary reason why I did not go to see my physician in
6 person was because I was afraid I was not covered with
7 benefits.
8    Q.  Did you explain that to Mr. Psomas when you saw
9 him on October 30?
10    A.  I did.
11    Q.  What did Mr. Psomas say?
12    A.  That he would look into it.
13    Q.  Was anyone else with you and Mr. Psomas when
14 you had that conversation?
15    A.  Mr. Radojcic may have been or he may have
16 brought the items down, but it was -- the conversation
17 was between me and Mr. Psomas.
18    Q.  Did you and Mr. Psomas discuss the issue of you
19 having ongoing medical coverage after that conversation?
20    A.  The, I had referenced earlier a follow-up where
21 he had shrugged at me when I asked him about the
22 discussion we had earlier.
23    Q.  That took place when you were interviewed by
24 Mr. Psomas, is that right?

33 (Pages 126 - 129)

Page 130

```
 1    A.  That is correct.
 2    Q.  Aside from that, was there any other
 3  communication with Mr. Psomas or others about your
 4  ongoing medical coverage while you were on leave?
 5    A.  No, I assumed he was still looking into it.
 6    Q.  Okay.  All right.  Then let's turn to CTA
 7  Exhibit 24, Mr. Pable.  This is an e-mail from you to
 8  Mr. Psomas dated October 30, correct?
 9    A.  Hold on, it's still loading on my end.
10    Q.  Oh, sure.  Yes?
11    A.  Yes.
12    Q.  So CTA Exhibit 24, this is you from your
13  personal Gmail account of ▮▮▮▮ to Mr. Psomas, right?
14    A.  That is correct.
15    Q.  In that e-mail you copy Alex Moreno, correct?
16    A.  Yes, as instructed.
17    Q.  And in the e-mail you say Jim, I'm at the
18  entrance by the 7/11 still, right?
19    A.  Yes.
20    Q.  And so are you referring to being at the 7/11
21  next to the CTA headquarters in Chicago?
22    A.  No, I'm in the CTA lobby.  There's an entrance
23  in the lobby.  In the lobby there's kind of like what's
24  the word; a vestibule that can go into an attached 7/11.
```

Page 131

```
 1  And there's a staircase that goes up to Chicago card and
 2  Ventra card vending and I'm at that entrance near those
 3  stairs.
 4    Q.  Okay.  And did you in fact meet Mr. Psomas at
 5  that location or thereabouts?
 6    A.  No.  When he came, when I saw him go through
 7  the turn style I went over to the benches so that I could
 8  collect what he had brought down.
 9    Q.  When you send this e-mail to advise Mr. Psomas
10  and Mr. Moreno you're near that vestibule at the CTA
11  headquarters, where are you sending that message from?
12    A.  My cell. phone.
13    Q.  Is that your personal cell. phone?
14    A.  Yes.
15    Q.  You were able to access your Gmail account on
16  your cell. phone at that time?
17    A.  Yes.
18    Q.  Is that the same phone that was imaged for this
19  lawsuit?
20    A.  Yes.
21    Q.  And that cell. phone was functioning
22  sufficiently enough for you to send e-mails off of it in
23  your personal e-mail account while you were on leave?
24    A.  That cell. phone did not touch my personal
```

Page 132

```
 1  profile.
 2    Q.  I'm sorry, can you repeat that?  You cut out.
 3    A.  Anything to do with inaccessibility of data on
 4  my cell. phone did not affect my personal profile.
 5    Q.  Okay.  So --
 6    A.  I was still able to access personal things.
 7    Q.  So you were still able to access when you were
 8  on leave your text messages?
 9    A.  Again I used Signal.  I don't use a regular
10  text message application and Signal will import text
11  messages and encrypt them for you.  So if you try to dump
12  text messages there's just nothing there.
13    Q.  So did you ever communicate with anyone without
14  using Signal for text messages at that point in time?
15    A.  At that point in time, I had used Google Voice
16  when the cellular signal was very poor.
17    Q.  Are you able to exchange messages over Signal
18  with someone who isn't also using Signal?
19    A.  That is correct.
20    Q.  So if you were to text me in October of 2018
21  and I don't have Signal on my phone, you would have been
22  able to send me a text message via Signal?
23    A.  That is correct.
24        MR. DUFFY:  Sorry, I just couldn't hear.  Both
```

Page 133

```
 1  those questions, I'm sorry, whether it is positive or
 2  negative.
 3        Did you say yes you can communicate with
 4  somebody who doesn't have Signal or no you can't?
 5        THE WITNESS:  Yes, you can communicate with someone
 6  who is not on Signal by using the Signal application.  If
 7  it's registered itself as the default text message
 8  application, and then encrypts any conversations with
 9  that person when at rest.
10        MR. DUFFY:  Thanks.
11        MS. BABBITT:  Q  All right.  And what materials
12  did Mr. Psomas return to you when you met him on
13  October 30, if you recall?
14        THE WITNESS:  A  I know he brought -- I'm pretty
15  sure he brought some shakes.  And I think that was the
16  only thing that was proper.  He brought me some game
17  paraphernalia but I don't think it was my own.  I said I
18  don't think it's mine to him.  And he says it was near
19  your desk.
20        So I'm assuming by the earlier ransacked
21  statement, that my desk was in disarray at that point and
22  so he just picked up what he saw.
23    Q.  We referred to it a bit but ultimately you were
24  interviewed by the CTA while you were on leave, is that
```

34 (Pages 130 - 133)

Page 134

1 right?
2    A.  That is correct.
3    Q.  That interview took place on November 2, 2018?
4    A.  That sounds correct.
5    Q.  Where was that interview conducted?
6    A.  CTA headquarters.
7    Q.  Who was there?
8    A.  Marie Marasovich, Mike Radojcic and Jim Psomas.
9    Q.  Had you ever met Marie Marasovich before?
10   A.  No.
11   Q.  Had you ever met Mike Radojcic before then?
12   A.  Many times.
13   Q.  And what were your, what was the basis of your
14 interactions with Mr. Radojcic prior to being interviewed
15 on November 2?
16   A.  They are quite varied.  Can you be a little
17 more specific.
18   Q.  I guess is it fair to say you had regular
19 interactions with Mr. Radojcic relating to your job
20 duties?
21   A.  You could construe it that way.  He would come
22 by and say hey, do you have something that can do X or Y.
23 And I'd be like yeah, I can whip something up for that.
24 And -- he would ask for example a chrome box.  At the

Page 135

1 time they were doing a security awareness month
2 presentation that they wanted to put on a kiosk.  And I
3 created a training solution for the CTA.
4        So I'm like yeah, I can set up a chrome
5 box so you can do this.  And I supplied him one of my
6 personal USB sticks so he could do it.  Along with the
7 chrome box that I set up for him.
8        So it was more of a as needed relationship
9 I guess you could say, but I wouldn't exactly call it
10 regular.
11   Q.  Okay.  Did you consider yourself friends with
12 Mr. Radojcic?
13   A.  I would say very good colleagues but we didn't
14 hang out beyond professional.  Like beyond any
15 professional relationship we weren't in contact outside
16 of work.  We weren't -- yeah.
17   Q.  Okay.  In this interview on November 2, was
18 anyone else besides those three individuals and yourself
19 present in the room where you interviewed?
20   A.  No.
21   Q.  And who was asking the questions in the
22 interview?
23   A.  I think all of them, but it was primarily
24 Mr. Psomas.

Page 136

1    Q.  And in that interview did they tell you why you
2 were being interviewed?
3    A.  Not in so many words, but they did hand me a
4 sheet and at the very top of the sheet they said this
5 interview is about the Dayton incident.
6    Q.  What did you understand that to mean?
7    A.  I didn't know exactly at first.  But as I read
8 through the questions I tried to understand what they
9 were asking because they did not make technical sense.
10 But I kind of pieced together at that point what he was
11 somewhat confused about.
12   Q.  Okay.  When you say you pieced together what he
13 was somewhat confused about, who are you referring to?
14   A.  Mr. Psomas.  It was my impression that he had
15 written those questions.  But if that's not accurate then
16 I apologize.
17        But that was the impression that I got,
18 that he had been the one that wrote the questions from
19 when, with my interactions with him.  I said can you
20 clarify what you mean by this.  And then he would state
21 something again incorrectly but in concert with kind of
22 what he'd written down on the paper.
23        So it seemed pretty obvious to me that he
24 was the one that wrote the questions.

Page 137

1    Q.  Okay.  And when you say he was confused, what
2 did you believe Mr. Psomas to be confused about?
3    A.  He seemed to think that I had pre-existing
4 knowledge of certain things.  He seemed to think that
5 certain things were linked together that weren't.
6 Certain things were prerequisites for other things that
7 weren't.  Things of those nature.
8    Q.  Anything specific you can recall that you
9 thought he was confused or getting wrong?
10   A.  If you have a copy of the questions, I can
11 point an example or so out.
12   Q.  No, I don't.  You don't recall anything
13 specifically he was confused by?
14   A.  Not off the top of my head but if I had the
15 questions in front of me I could absolutely point out
16 several.
17   Q.  Okay.  Do you recall being asked if Mr. Haynes
18 pressured you in any way with respect to the Dayton
19 incident?
20   A.  I don't think he asked if Mr. Haynes pressured
21 me.  I think he asked if I was being pressured in any
22 way.  Yeah.
23   Q.  How did you answer that?
24   A.  I don't think I was being pressured to perform

35 (Pages 134 - 137)

Page 138

1  anything.  Because I didn't perform the Dayton test.
2      Q.  So did you tell him that you didn't believe you
3  were being pressured to perform anything?
4      A.  I believe I did.
5      Q.  You didn't refuse to answer that question when
6  you were asked?
7      A.  That is correct.
8      Q.  Okay.  And did you --
9      A.  I'm sorry, I'm sorry.  I am recalling one thing
10 on that topic.
11     Q.  Okay.
12     A.  It's not directly related to the Dayton test.
13 I do remember Mr. Coppolleta was very excited to get the
14 service bulletin API and there was a lot of pressure from
15 him to document and get the development started on
16 American Eagle side.  But that's about the extent of
17 that.
18     Q.  Did you express or describe that pressure as
19 you put it from Mr. Coppolleta while you were in your
20 interview on November 2?
21     A.  I think I did.
22     Q.  So did you tell the individuals interviewing
23 you on November 2 that you had reservations or concerns
24 about the Dayton test being conducted?

Page 139

1      A.  Yes.
2      Q.  Tell me what you told them?
3      A.  I said that -- I don't remember the exact words
4  I used, but I believe I said something along the lines of
5  I don't think it's a good idea.
6      Q.  When you say you don't think it's a good idea,
7  can you explain what you were referring to that you did
8  not think was a good idea?
9      A.  I believe I was trying to recreate the
10 situation with Mr. Haynes where I told him that I didn't
11 think it was a good idea to test this on Dayton without
12 letting them know beforehand.
13     Q.  So you told the individuals that are
14 interviewing you on November 2 that you told Mr. Haynes
15 it was not a good idea to test Dayton?
16     A.  I don't think I said Dayton specifically, but
17 to test it anywhere without notification beforehand.
18     Q.  Who did you think should be notified
19 beforehand?
20     A.  At the very least the place that you do it, but
21 I do know it's common practice that things are tested and
22 then reported on afterwards to those agencies, especially
23 now in my current position.
24     Q.  Did you tell individuals interviewing you on

Page 140

1  November 2 that you informed anyone else besides
2  Mr. Haynes that you thought that he, that the Dayton test
3  should not be conducted?
4      A.  I'm sorry, can you rephrase that?
5      Q.  Sure.  Did you tell anyone else -- I'm sorry.
6          In your interview on November 2, did you
7  inform anyone else -- when you're being interviewed did
8  you tell them I told other people that we shouldn't do
9  this Dayton test aside from Mr. Haynes?
10     A.  I don't think I did.
11     Q.  You wrote in one of your e-mails that you
12 produced that during this interview on November 2 that
13 you were being asked leading questions?
14     A.  Yes.
15     Q.  What sort of leading questions were you being
16 asked?
17     A.  Can you read the question that was, that I said
18 was leading?
19     Q.  You didn't say in your e-mail.  So do you not
20 recall what questions you found to be leading in the
21 interview?
22     A.  I remember there was at least one occasion
23 where they implicated that, they tried to imply that I
24 had done something, like I had already admitted I had

Page 141

1  done something.  I'm like that's a leading question.
2  That's not right.
3          I don't recall exactly what that question
4  was.  But if I saw it on paper I could absolutely point
5  it out.
6      Q.  You also described in your e-mails that you
7  were asked in this interview questions with false
8  pretenses.
9          Do you recall what those false pretenses
10 were?
11     A.  That they thought that I had performed the
12 Dayton test myself.
13     Q.  And did you explain to them that you had not
14 performed the Dayton test yourself?
15     A.  I couldn't answer 100 percent definitively
16 because I hadn't been thinking about that at the time.
17         I had to think back and try to recall the
18 events of that day and I would have had to look at
19 e-mails and everything else that would have happened to
20 kind of piece together what would have happened in, at
21 that time.  But I was given no context.  So it's almost
22 as if I ask you what you had for breakfast two years ago.
23     Q.  So when you were in the interview, did you tell
24 anyone in the interview that you did not conduct the

Page 142

1 Dayton test?

2    A.   I believe I said I did not conduct the Dayton

3 test.  But I believe I said that I created the mechanism

4 by which it was possible.

5    Q.   Okay.  You also explained in one of your

6 e-mails that they were asking you in this interview on

7 November 2 about your personal hobbies, is that right?

8    A.   Yes.

9    Q.   What personal hobbies were they asking about?

10    A.   They asked if I had ever found vulnerabilities

11 in commercial software before.

12    Q.   Is that a personal hobby of yours?

13    A.   Not really.  I don't go looking for

14 vulnerabilities.  If they show up they hit me in the

15 face.

16    Q.   So why did you connect that to being questioned

17 about your personal hobbies?

18    A.   Because they didn't word it just as my personal

19 hobbies.  They said in what you do for your personal

20 hobbies do you find vulnerabilities or what's the process

21 for reporting a vulnerability, something along those

22 lines.  It was a question that Mr. Radojcic had posed to

23 me at the time.

24    Q.   Do you recall if you answered that question?

Page 143

1    A.   I started to and then I asked why it was

2 relevant.  Because my personal hobbies really didn't have

3 to do with the Dayton incident.

4    Q.   And in your e-mails that you produced to us you

5 also explained in your e-mails that during this

6 November 2 interview that you were "horribly drugged".

7         Were you drugged during the November 2

8 interview at the CTA?

9    A.   Yes.  I had a very large dose of Aleve D that

10 morning so that I could function.

11    Q.   What dose was it?

12    A.   The maximum allowed.

13    Q.   Do you recall how much that is?

14    A.   Not off the top of my head.  You could find it

15 on any box though.

16    Q.   And did taking that maximum dose of Aleve D,

17 did that cause you impairment in any way?

18    A.   I couldn't really answer that question.  To me

19 I didn't really perceive it as impairment.  But it very

20 well may have.  I probably would have caught on faster

21 about them asking about my personal hobbies had I not

22 been taking Aleve D for instance.  But it was the only

23 way that I could function and give them any sort of

24 accurate answers at the time.

Page 144

1    Q.   Did you exceed the recommended dose of Aleve D

2 that's on the box or the material that come with that

3 medicine?

4    A.   No, I just took the maximum.  I had not been

5 taking the maximum prior so I took the maximum to ensure

6 that no matter how long the interview lasted, that I

7 would at least be cognizant.

8    Q.   Were you cognizant during those interviews or

9 that interview on November 2?

10    A.   To the best of my knowledge I was.

11         Like I said, I can't tell what my specific

12 impairment might have been to myself.  But reading my

13 answers to the questions it sounded like I was at least

14 able to answer things accurately.

15    Q.   Do you recall being cognizant as you sat in the

16 interview on November 2?

17    A.   I recall feeling very light-headed.  But able

18 to think.  What the implications that had on what my

19 answers were, I couldn't tell you.

20    Q.   And how close in time before your interview at

21 the CTA on November 2 did you take that Aleve maximum?

22    A.   Two hours.

23    Q.   Two hours prior?

24    A.   Correct.

Page 145

1    Q.   And when you say you were horribly drugged, is

2 the only horrible drugging this Aleve D that you're

3 referring to now?

4    A.   Yes, because I usually don't take that much

5 medication.

6    Q.   And did you tell anyone at the CTA that you

7 were under this medication or feeling drugged?

8    A.   I expressed to Jim several times that I was

9 really sick and I believe I also mentioned that I had

10 taken something to mitigate some of the symptoms.  But I

11 don't think I told them what I took and how much of it I

12 took.

13    Q.   You said that during your interview on

14 November 2nd?

15    A.   I think that might have been in the lobby.

16    Q.   That was in the lobby.  Was that before or

17 after the interview that was conducted?

18    A.   Before.  But also in e-mails I had let

19 Mr. Psomas know I was very ill from not knowing anything

20 that was going on.

21    Q.   Did you ask that the interview be conducted at

22 a different time in light of the fact that you were so

23 drugged?

24    A.   No.  Actually I had an appointment with my

37 (Pages 142 - 145)

Page 146

1  bariatric doctor later that day and Mr. Psomas was very
2  insistent that I RSVP the day prior. He gave me only a
3  couple hours notice to RSVP for this interview that's
4  seemed to be thrown together at the last second.
5       So I had to clear up stuff with my
6  bariatric doctor so that I could go see him following the
7  interview, but unfortunately that scheduling fell
8  through.
9       MS. BABBITT: Okay. I'm sorry. Court reporter,
10  can you read the last question back.
11       (Record read.)
12       MS. BABBITT: Q  Is your answer to that question
13  no, Mr. Pable?
14       THE WITNESS: A  I had asked for my interview to
15  be first.
16       Q.  And you didn't ask that the interview be
17  delayed in light of your medical conditions?
18       A.  That is correct.
19       Q.  And you said you went to a bariatric doctor
20  after your interview on November 2, is that right?
21       A.  No, I had attempted to but that fell through.
22       Q.  Did you see your bariatric doctor at any point
23  after you were given notice you were being placed on
24  administrative leave through the date of the interview?

Page 147

1       A.  No.
2       Q.  And did you see the bariatric doctor in a week
3  after this interview was conducted?
4       A.  No.
5       Q.  Did you see any other doctors during this time
6  period from October 22, 2018 to November 2, 2018?
7       A.  In that specific time frame, no.
8       Q.  In your e-mails you produced, Mr. Pable, you
9  also mentioned that you had a very hard time speaking due
10  to illness during your interview on November 2.
11       A.  Yes.
12       Q.  What did you mean by that?
13       A.  So as anyone who has worked with me knows when
14  I get a sinus infection or a really bad cold, I lose my
15  voice. Aleve D is one of the few things that can kind of
16  help alleviate those symptoms. I have to be very well
17  hydrated.
18       At the interview I was losing my voice. I
19  had to shout a lot. What was shouting to me was probably
20  normal volume for someone else. But I tend to lose my
21  voice a lot.
22       Q.  So did you have a sinus infection at the time
23  that you were being interviewed on November 2, 2018?
24       A.  It's my belief that I did. But I was not

Page 148

1  formally diagnosed with one.
2       Q.  Did you explain to anyone during your interview
3  at the CTA that you were in fact losing your voice?
4       A.  Yes, that was very apparent when I couldn't
5  talk to Jim very well in the lobby.
6       Q.  What did you tell Jim then?
7       A.  I said I'm losing my voice, need to get a
8  drink.
9       Q.  What did Jim say?
10       A.  There was a water fountain so I went to go get
11  it.
12       Q.  Did you have any water or drinks with you while
13  you're being interviewed on November 2?
14       A.  No, I was not offered any.
15       Q.  You didn't bring any with you?
16       A.  No.
17       MS. BABBITT: Okay. I just have a couple more
18  questions on that exhibit and we can break for lunch if
19  that's okay with you, Mr. Pable.
20       THE WITNESS: Okay.
21       MS. BABBITT: Q  So you exchanged text messages
22  with Mr. Haynes during the course of this investigation
23  that we will say took place October 22 through
24  November 2, is that right?

Page 149

1       THE WITNESS: A  Sure, yes.
2       Q.  I think you explained that your messages that
3  you send on your cellular device, you sent those in the
4  Fall of 2018 on a Signal application, correct?
5       A.  Yes.
6       Q.  To your knowledge was Mr. Haynes also using
7  Signal to text with you at that period of time?
8       A.  Yes.
9       Q.  I'm going to direct your attention to CTA
10  Exhibit 26, Mr. Pable. Let me know when you're there.
11       A.  Okay.
12       Q.  You got that up?
13       A.  Yes.
14       Q.  Great. On the first page of CTA Exhibit 26,
15  this is just to orient you, this is a set of materials
16  that Mr. Haynes produced in response to a subpoena we've
17  issued in this litigation. And these messages are
18  purported to be messages exchanged between you and
19  Mr. Haynes.
20       So to extent that you don't recognize
21  these messages as we go through them, I'll ask you but
22  please let me know.
23       A.  Okay.
24       Q.  So at the bottom of the first page of CTA

38 (Pages 146 - 149)

Page 150

1 Exhibit 26 it's marked MH4. There's a message and it
2 begins SMS to me body, and that to me as I understand is
3 a message you sent to Mr. Haynes. It says don't forget
4 the tin can and fingerless gloves. Kidding. I'm
5 panicked as usual but a little less since I have some
6 answers. And I have solace in that whatever happens,
7 even if I keep my job, I think I have a case against CTA.
8        Do you see that?
9     A.   Yes.
10    Q.   Is that a message you sent Mr. Haynes?
11    A.   Yes.
12    Q.   You sent that on November 3, 2018?
13    A.   That seems correct.
14    Q.   When you said you thought you had a case
15 against the CTA, what were you referring to?
16    A.   After the interview with Mr. Psomas and finding
17 out that Mike was forced to resign, I did some research
18 into different law firms that may be able to help me with
19 the whistleblower act after I understood what the context
20 of the investigation was about.
21    Q.   Okay. Then if you could turn to the second
22 page of CTA Exhibit 26, marked MH5. There's a text that
23 I highlighted at the top of that.
24        Do you see that, Mr. Pable?

Page 151

1     A.   Yes.
2     Q.   This is a message that says SMS from me, which
3 means it's a message from Mr. Haynes and it's dated
4 November 3. It says yep, just blame me. I'm already
5 under the bus. Just toss her in reverse. That is while
6 the buses are still working.
7        Do you see that?
8     A.   Yes.
9     Q.   Is that a message you received from Mr. Haynes?
10    A.   That seems likely, yes.
11    Q.   What did you understand Mr. Haynes to mean when
12 he was saying just blame me?
13    A.   Exactly what he had been saying since August,
14 that he was the one that for lack of a better phrasing,
15 pulled the trigger on the Dayton test.
16    Q.   And then at the bottom of the page, MH5 of CTA
17 Exhibit 26, there's a message I have highlighted and it's
18 I believe to Mr. Haynes from you, Mr. Pable. And it says
19 I think they were trying to prod to find evidence that I
20 "hacked" other things. That's why they were asking about
21 hobbies and stuff. Don't feel sorry, I trust your
22 judgment. You have way more experience.
23        Do you see that?
24    A.   Yes.

Page 152

1     Q.   Did you send that message to Mr. Haynes?
2     A.   That sounds like something I would have sent
3 him.
4     Q.   It continues on the following page of
5 Exhibit 26, MH6 is the page. It says it's not entirely
6 on you though. Without me you wouldn't have the "power"
7 to have been put in that situation.
8        Do you see that?
9     A.   Yes.
10    Q.   What did you mean by that?
11    A.   That is referring to the configuration file
12 that I had made that Mike used to test Dayton.
13    Q.   Then you continued and said I feel partly
14 responsible for making things possible.
15        What did you mean by that?
16    A.   By the fact that I was the one that put that
17 configuration file together for him to use.
18    Q.   Would Mr. Haynes have been able to conduct that
19 test without you preparing that file?
20    A.   He might have been if he looked over the
21 documentation that was there and put it together himself.
22 But if I hadn't found the service bulletin API, then none
23 of this would have happened either.
24    Q.   Okay. Still on CTA Exhibit 26, turn to the

Page 153

1 next page which is marked MH7 at the bottom. And at the
2 top, the third message down, do you see a message that
3 begins it's a to me, okay, good info.
4        Do you see that?
5     A.   Yes.
6     Q.   It says okay, good info, thanks. Absolutely
7 can use this at the lawyer meeting. During the
8 interrogation they were super keen on why I wouldn't go
9 behind your back.
10        What did you mean by that?
11    A.   So Jim wanted to know why I wouldn't report it
12 up to him. And there were several reasons why.
13        One, as you saw in the previous messages,
14 I said Mike had a lot more experience than I did. And by
15 that I was referring to the fact that Mr. Haynes had
16 successfully communicated and resolved other security
17 issues in the past. So I didn't feel I had to go any
18 higher than Mr. Haynes and I trusted his judgment.
19        Secondly, I do know that Mr. Psomas and
20 Miss Alanis from Mike's I don't want to say testimony, I
21 don't know the right word to use here. From my
22 understanding of what Mike would tell me, that they
23 seemed to have some sort of vendetta against him. And I
24 did not want to tilt the scales unfairly and go behind

39 (Pages 150 - 153)

Page 154

1 his back when he would make the proper call.
2 Q. Okay. So one of the reasons you didn't report
3 it up beyond Mr. Haynes is because you trusted
4 Mr. Haynes' judgment you said?
5 A. Yes.
6 Q. Another reason that you didn't want to report
7 it up the chain beyond Mr. Haynes is because you were
8 afraid that the information would be used against
9 Mr. Haynes?
10 A. I felt that based on what I had been told, that
11 it would be taken out of context and used in some sort of
12 retaliatory manner.
13 Q. It would be used in a retaliatory manner
14 against Mr. Haynes?
15 A. Correct.
16 Q. What were you told that made you think that?
17 A. As stated earlier, I was told that Mike and
18 Veronica have some pretty bad blood and since Jim works
19 for Veronica, I believe Jim does what Veronica asks.
20 Q. Who told you that?
21 A. Mr. Haynes.
22 Q. Any other reasons why you didn't report it or
23 raise the issue that this shouldn't be conducted beyond
24 Mr. Haynes?

Page 155

1 A. No. The primary reason is absolutely the fact
2 that he had a lot more experience and had successfully
3 resolved security issues in the past.
4 Q. Okay. Then continuing on in Exhibit 26 on that
5 same text message that you sent on November 5, 2018. You
6 say why I wouldn't want to go behind your back. You
7 continue I made him leave the room and told them they
8 were threatening and had a vendetta against you.
9 Do you see that, Mr. Pable?
10 A. Yes.
11 Q. Is that part of the text message you sent
12 Mr. Haynes?
13 A. That seems like something I would have written
14 to him, yes.
15 Q. What were you referring to when you say I made
16 him leave the room?
17 A. Mr. Psomas. So I said when they asked about
18 this, I said I didn't feel comfortable discussing with
19 Mr. Psomas in the room since he was directly named by
20 Mr. Haynes.
21 Q. So you asked Mr. Psomas to leave the room
22 during your interview?
23 A. I wasn't the one that asked Mr. Psomas to leave
24 the room. I said I wasn't comfortable discussing it with

Page 156

1 Mr. Psomas around and they asked him to leave the room.
2 Q. Okay. So when you say I made him leave the
3 room, in fact it wasn't you but Mr. Radojcic or
4 Miss Marasovich who asked Mr. Psomas to leave that room
5 when you were being interviewed?
6 A. I actually think he got up and left on his own
7 accord.
8 Q. Okay.
9 A. But don't quote me on that.
10 Q. And you told them they were threatening and had
11 a vendetta against you.
12 By that did you mean that you told
13 Miss Marasovich and Mr. Radojcic that they were, that
14 someone was threatening?
15 A. I had communicated the issues that Mr. Haynes
16 had told me had happened in the past, and to me they came
17 across as threatening and very vendetta like. So, that's
18 what I wrote.
19 Q. You communicated that in your interview?
20 A. Yes. So they should be on Mr. Radojcic and
21 Miss Marasovich's notes.
22 Q. On that same page on CTA Exhibit 26, we are
23 still on the page marked MH7. I highlighted a text
24 message, the second one from the bottom.

Page 157

1 You see that, Mr. Pable?
2 A. Yes.
3 Q. Okay. And that's a message that says it's to
4 me, so I take that to be a text message from you,
5 Mr. Pable, to Mr. Haynes. It says I know, I appreciate
6 it so much. That's my only ray of light in all of this
7 honestly. Hopefully sticking this back to them. But at
8 the same time they have the personal stuff on my flash
9 drive they may use against me somehow after the whole
10 interrogation was prodding at my personal stuff.
11 Do you see that, Mr. Pable?
12 A. Yes.
13 Q. Is that a text message you sent Mr. Haynes on
14 November 5?
15 A. Sounds like one I would write.
16 Q. When you say they have the personal stuff on my
17 flash drive they may use against you, what are you
18 referring to?
19 A. I'm referring to, I would take a step back and
20 read it in a little more context.
21 I'm referring to the fact that they don't
22 seem to understand the situation with Dayton and the
23 skeleton key and the other security vulnerabilities that
24 we found. And the fact that they don't understand that

Page 158

1 may cause them to not understand my personal data on that
2 flash drive as well. And interpret it in an incorrect
3 manner. Then try to use that against me.
4 Q. And what personal stuff on your flash drive
5 could they have used and misinterpreted?
6 A. In particular driver development, since it has
7 a lot of Windows core files on it.
8 Q. Why would that be misinterpreted in a way that
9 could be used against you?
10 A. Well they seemed to think having the skeleton
11 key thrown in my face was a problem. I would assume if
12 they see something that looks cryptic and not standard to
13 them, they would treat it with fear.
14 Q. Was there anything otherwise on your personal
15 flash drive that was personal or embarrassing to you that
16 you didn't want anyone to see?
17 A. I don't remember the full contents of the flash
18 drive. I just remember that I absolutely wanted my
19 portfolio work.
20 Q. So is that no, there was nothing on your
21 personal flash drive that would be embarrassing or
22 problematic for someone to view?
23 MR. DUFFY: Objection. Asked and answered. You're
24 trying to change his answer.

Page 159

1 THE WITNESS: A I honestly don't remember
2 everything that is on the flash drive. The only thing I
3 wanted was my portfolio code.
4 Q. Okay. Let's turn to the next page on CTA
5 Exhibit 26. It's marked MH8.
6 Do you see that page, Mr. Pable?
7 A. Yes.
8 Q. I highlighted a text message on that page.
9 It's toward the bottom of it and it's again a message
10 that I understand to be from you to Mr. Haynes dated
11 November 6. Then it says just to keep you in the loop, I
12 contacted O'Malley and case law, one consult for
13 whistleblower set for Monday. I will let you know if,
14 when I need you but with the notes we made I will do the
15 leg work and should be fine solo. If I return to work I
16 will cancel the appointment. I can't thank you enough
17 for your support and I'm so sorry it's going to make you
18 out to be the bad guy.
19 Do you see that?
20 A. Yes.
21 Q. Is that a text message you sent Mr. Haynes?
22 A. That sounds like something I would write, yes.
23 Q. You refer to your meeting with lawyers,
24 correct?

Page 160

1 A. Correct.
2 Q. That's about a lawsuit that you intended to
3 bring against the CTA and/or Clever?
4 A. Correct. Primarily at that point CTA.
5 Q. And you refer to notes that you and Haynes
6 made, right?
7 A. Yes, I believe he's the one that made the
8 notes.
9 Q. Okay. What sort of notes were those?
10 A. They were time lines. They were, they were
11 primarily time lines of the significant events. And I
12 think he also wrote down what some of the interview
13 questions were.
14 Q. Okay. Are those notes that were ever provided
15 to you by Mr. Haynes?
16 A. I don't think they were, but at the time I
17 believe I -- I just had in my head exactly what I needed
18 to discuss.
19 Q. Okay. So did you ever receive those notes from
20 Mr. Haynes?
21 A. I really don't recall. But I'm pretty sure he
22 did those electronically so he may have copies.
23 Q. All right. Did you prepare any of your own
24 notes relating to this?

Page 161

1 A. Not for that case, no.
2 Q. Did you prepare any notes for any case that you
3 might bring?
4 A. To the extent that I did it was primarily I had
5 draft e-mails which I believe have already been produced
6 to you, that went over the highlights and the termination
7 paperwork.
8 Q. Okay. And your position is you produced those
9 in this case?
10 A. I believe so.
11 Q. All right. That same message on MH8 of
12 Exhibit 26, you also say I'm so sorry it's going to make
13 you out to be the bad guy to Mr. Haynes, right?
14 A. That is correct.
15 Q. What did you mean by that?
16 A. Well, if someone does something bad and there's
17 no formal announcement they did something bad, the fact
18 that I would be bringing it up and basically shining a
19 light on it may have negative impact on him, and I felt
20 sorry that that was going to be the case.
21 Q. What's the bad thing you're referring to?
22 A. In this case they considered the Dayton test a
23 bad thing. But I personally don't consider that a bad
24 thing. However, people may misconstrue it to be.

41 (Pages 158 - 161)

Page 162

1    Q.   Okay.  So when you're referring to him being a
2  bad guy it's because of the conducting of the Dayton test
3  by Mr. Haynes?
4    A.   It's because of the optics that, the optics
5  that a lay person may have in regard to that, yes.
6    Q.   Okay.  So someone without your knowledge in
7  your view would view it as a bad thing and that's what
8  you're referring to?
9    A.   Yes.
10    Q.   Okay.  Further down in CTA Exhibit 26, we will
11  go to the page that's marked at the bottom MH13.  Let me
12  know when you're there.
13    A.   Okay.
14    Q.   Do you see highlighted text messages at the
15  bottom of MH13 in CTA Exhibit 26, Mr. Pable?
16    A.   Yes.
17    Q.   I have highlighted a text message that reads to
18  Mr. Haynes.  Yeah, I will get the last laugh though even
19  if I unfortunately have to run you over with the bus
20  again.  Do you see that?
21    A.   Yes.
22    Q.   Do you mean by that?
23    A.   Which particular sentence?
24    Q.   Let's start with I will get the last laugh

Page 163

1  though?
2    A.   That I believe is directly referenced in the
3  following text message.
4    Q.   Okay.  So we will get to that then.
5          Can you explain what you mean by even if I
6  unfortunately have to run you over with the bus again?
7    A.   Yes.  That was a metaphoric joke.
8    Q.   Can you explain it to me?
9    A.   Working in transits, one of the things you
10  don't do is say crash or things like that, of those
11  nature.
12          One of the jokes Mike and I had is
13  throwing someone under the train or under the bus.  And I
14  said even if I have to unfortunately run you over with
15  the bus again, I'm not sure what the -- I don't have full
16  context here because you only highlighted a portion.  But
17  I'm assuming this was a metaphoric joke that I had
18  written.
19    Q.   So it isn't that you were referring to the fact
20  that you were going to blame this whole Dayton issue on
21  Mr. Haynes?
22    A.   If I had to, if that was the case why would I
23  use the word again.
24    Q.   So is this referring to you blaming Mr. Haynes

Page 164

1  for the Dayton incident?
2    A.   I'm not blaming him for anything.  I'm making a
3  metaphoric joke.
4    Q.   Okay.  That's funny.  All right.  Then let's go
5  to the next text message, MH13 of CTA Exhibit 26.
6          You say I mean hell, Clever is charging
7  for code that I wrote and gave them.  Plus are marketing
8  the entire idea (secure box).  They will feel my full
9  furry at some point.  I am a vengeful, spiteful adversary
10  you do not want to piss off.
11          Do you see that?
12    A.   Yes.
13    Q.   Is that a message you sent to Mr. Haynes on
14  December 6, 2018?
15    A.   It is.  I remember writing that.
16    Q.   And what did you mean by saying you're a
17  vengeful, spiteful adversary?
18    A.   If you look later on in the text messages, I
19  talk about skeletons in Clever's closets.  There's a lot
20  of issues that I have had with Clever Devices and when I
21  found out that all this had to do with Clever Devices and
22  I went ahead and I have pretty much a backlog of
23  grievances that I had with Clever but I never really
24  acted on.  And pending this litigation it's probably

Page 165

1  going to spark many of them to come out.
2    Q.   So are you bringing this litigation to seek
3  your revenge?
4    A.   I'm not seeking revenge in this litigation.
5  I'm seeking to get what was taken from me.
6          But the fact that all of the skeletons
7  will be coming out of closet is revenge enough for me.
8    Q.   Then last ones here, if you could turn to MH15
9  of CTA Exhibit 26, Mr. Pable.
10    A.   Yes.
11    Q.   I have highlighted a segment of text messages
12  there at the bottom.
13          Do you see those highlighted text messages
14  on MH15?
15    A.   Yes.
16    Q.   Can you read those and it falls onto MH16, and
17  let me know once you read them.  You can read them to
18  yourself.
19    A.   Okay.  I have read them but we should hurry up.
20  Soon my headset is saying it's about to die.
21    Q.   So in this set of text messages dated
22  December 14, 2018, are those messages you sent
23  Mr. Haynes?
24    A.   Yes, they appear to be.

42 (Pages 162 - 165)

Page 166

1   Q.   You refer to something called a zero day in
2  these text messages, is that right?
3   A.   That is correct.
4   Q.   What's a zero day?
5   A.   A zero day is a disclosure that somebody has
6  not acted upon to fix.
7   Q.   Is that like a vulnerability, security
8  vulnerability that somebody hasn't acted on?
9   A.   That's one potential.
10   Q.   Were you aware of any such vulnerabilities in
11  the CTAs systems while you were at the CTA?
12   A.   Yeah. In fact I bring it up in one of the
13  e-mails. I brought it up in an e-mail in April and I
14  believe they brought it up again in an e-mail in August
15  about something called apache struts.
16   Q.   Are those relating to CTA systems or Clever
17  systems when they are referring to those?
18   A.   That's complicated because CTA owns the servers
19  and Clever Devices provides the software. So I couldn't
20  answer your question.
21   Q.   Okay. You can't answer my question. But you
22  were aware of zero day vulnerabilities and was it your
23  thought that these zero day vulnerabilities would come
24  home to roost after you left the CTA?

Page 167

1   A.   So zero days happen all of the time. It's
2  simply a matter of if you're looking for, if you're
3  hunting around trying to find them or someone posts one
4  on-line, you can get the details on it.
5          Just the details on it don't necessarily
6  do anything. They are just something that a company has
7  not acted on. And usually that happens when they don't
8  respond to something like the CVE database. I wouldn't
9  call arbitration, but the CVE process.
10   Q.   Are you saying CEB process?
11   A.   CVE.
12   Q.   What does that stand for?
13   A.   Charlie, Victor, elephant. It's a common
14  vulnerability something. I can look it up if you would
15  like.
16   Q.   That's okay. But so these vulnerabilities,
17  whenever you discovered a vulnerability like that while
18  you were working for the CTA, did you alert someone at
19  the CTA about it?
20   A.   I didn't go discovering those vulnerabilities.
21  Like I said, I did not go hunting for them. I was made
22  aware of some of them and when I was made aware, I
23  brought them up as I said in my e-mail in August
24  referring to my e-mail in April.

Page 168

1          I was aware that Clever had not patched
2  something that I brought up in April until August, that
3  being the apache struts dependency.
4   Q.   Anything else aside from the issue that you're
5  saying was in the e-mails with respect to vulnerabilities
6  that you're aware of at the CTA?
7   A.   Nothing specific at the CTA.
8   Q.   Okay. Did you ever attempt to touch or -- to
9  touch or interact with any of the CTA systems after you
10  left CTA employment?
11   A.   Absolutely. I had to put money on my Ventra
12  card like any other Chicago public transit taker. I got
13  bus predictions from various applications. Just like any
14  other Chicago transit taker. And I interacted with their
15  vending machines like any other Chicago public transit
16  taker.
17   Q.   Okay. Aside from the functions that you used
18  as a CTA rider, did you attempt to touch any other CTA
19  systems after you left CTAs employment?
20   A.   Not that I am aware of.
21   MS. BABBITT: Okay. I think now is a good time to
22  take a break. You think 30 minutes will be okay?
23   MR. DUFFY: Let's say 2:00 o'clock if we could.
24   THE VIDEOGRAPHER: Off the record, time is

Page 169

1  1:22 p.m.
2       (Lunch recess)
3   THE VIDEOGRAPHER: Going back on the record. Time
4  is 2:01 p.m.
5   MR. DUFFY: Elizabeth, before you get started.
6  Chris asked me if he could clarify something you were
7  just talking about before the break.
8   MS. BABBITT: Sure, what's up.
9   THE WITNESS: I don't remember if you asked about
10  CTA server access since my leave.
11   MS. BABBITT: I didn't. Sorry, go ahead, yeah.
12   THE WITNESS: A I do specifically recall
13  accessing my Oracle ERP stuff and not being able to
14  access that. But beyond that in the public transit
15  stuff, I don't recall anything else specific.
16   MS. BABBITT: Q Is that Oracle referring to like
17  the employment portal?
18   A.   Yeah, the ERP, yes.
19   Q.   All right. Thanks for clarifying.
20          So I wanted to just ask you you believe
21  you were forced to the resign from the CTA, is that
22  right?
23   A.   Yes.
24   Q.   And why do you believe you were forced to

43 (Pages 166 - 169)

Page 170

1 resign?
2    A.  I was presented with either accepting an option
3 of termination with terms that I had protested weren't
4 accurate and were without merit.  And my opinion wasn't
5 heard, or I could resign.
6    Q.  Any other reasons why you feel you were forced
7 to resign?
8    A.  No, pretty much just that last meeting on the
9 8th.
10    Q.  Okay.  And you know that as part of this
11 lawsuit you're alleging to be a whistleblower?
12    A.  Yes.
13    Q.  What did you blow the whistle on?
14    MR. DUFFY:  Objection to the extent that calls for
15 any conclusion under the statute.  You can answer the
16 question.
17    THE WITNESS:  A  I believe that the skeleton key
18 is a safety and security risk.
19    MS. BABBITT:  Q  What did you do to blow the
20 whistle?
21    A.  I informed my supervisor.
22    Q.  How did you inform him?
23    A.  Verbally and through e-mail.
24    Q.  Okay.  And when you refer to your supervisor

Page 171

1 are you referring to Mr. Haynes?
2    A.  That is correct.  I also informed the vendor
3 while they were on site.
4    Q.  So you said you informed Mr. Haynes verbally?
5    A.  Yes.
6    Q.  Describe that to me?
7    A.  Starting from where?
8    Q.  First instance you remember warning or alerting
9 Mr. Haynes to the security risk?
10    A.  Of the skeleton key or the entire stacking of
11 everything combining together?
12    Q.  Well you just told me I think that you blew the
13 whistle on a key safety and security risk.  So then I
14 think you followed up and said you alerted Mr. Haynes to
15 that orally.
16        So can you describe how you orally
17 informed Mr. Haynes of this key security risk?
18    A.  Okay.  So one of the things that I was asked to
19 do was to figure out why a Bustracker upgrade was
20 failing.  And in the course of using the Bustracker admin
21 tool to diagnose what the problem was, I saw the skeleton
22 key getting passed around as I clicked around in the
23 admin tool.  Not knowing exactly what it was I put it
24 aside.  And completed my work.

Page 172

1        And then when I got a free moment I went
2 ahead and looked at it thinking it looked an awful lot
3 like a regular API key.  When I had tested it against our
4 CTA servers I had let Mr. Haynes know that this is an API
5 key that's not in our database and it has access to the
6 restricted field.
7    Q.  And you said you did that orally with
8 Mr. Haynes?
9    A.  Yes.
10    Q.  Where was that conversation?
11    A.  The skeleton key, that was at his cubicle I
12 believe.
13    Q.  Do you recall when you told Mr. Haynes about
14 that at his cubicle?
15    A.  It would be in mid August, so probably 16th or
16 17th.
17    Q.  Okay.  Did you tell Mr. Haynes or anyone else
18 at the CTA verbally about that issue?
19    A.  About the skeleton key?
20    Q.  Yes.
21    A.  When you say at the CTA do you mean CTA
22 personnel?
23    Q.  Yes.
24    A.  I told no other CTA personnel about the

Page 173

1 skeleton key.
2    Q.  You said you told Mr. Haynes in mid August.
3        Was that mid August of 2018?
4    A.  That is correct.
5    Q.  And do you recall what you said to Mr. Haynes
6 in explaining it to him?
7    A.  I don't recall exact words, but it's generally
8 what I said earlier.  This is an API key that's not in
9 our database ays.  It's still authorized to work on our
10 system and it returns to a restricted field.  And
11 obviously that means it would work with service bulletin
12 API.
13    Q.  Do you recall what Mr. Haynes if any response
14 he said to you when you told him that?
15    A.  He asked I believe one, he wanted to see it.
16 And two, I believe he wanted to know if it just affected
17 CTA or if it was a much bigger problem.
18    Q.  Okay.  So did you show it to Mr. Haynes?
19    A.  I believe I e-mailed the key to him, yes.
20    Q.  So you e-mailed him the key at his request?
21    A.  I believe so, yes.
22    Q.  And you said he also wanted to know if it
23 affected other systems?
24    A.  Yes.

44 (Pages 170 - 173)

Page 174

1    Q.   And did you answer that question?
2    A.   I couldn't answer that question.
3    Q.   Did you discuss how you might answer that
4  question with Mr. Haynes?
5    A.   I said well I'm working on this mimic API for
6  Tony for the service bulletin stuff.  You can change the
7  end points around to whatever configuration you wanted
8  and you could use it that way to test on whatever system
9  that you want to do.
10    Q.   So was that something that you said to
11  Mr. Haynes at his cubicle?
12    A.   In not those exact words, but the general
13  conveyance, yes.
14    Q.   You also said as part of your blowing the
15  whistle to the security risk, in addition to informing
16  Mr. Haynes verbally, you also informed him over e-mail.
17  Is that right?
18    A.   Well, when I say that I gave him the key over
19  e-mail.  And I don't remember if I put in exact
20  description of what the key was in the e-mail.  But I
21  definitely sent him the key over e-mail as well.
22    Q.   You maintained that sending Mr. Haynes that
23  key, this skeleton key over e-mail was alerting him to
24  that security risk?

Page 175

1       MR. DUFFY:  Objection, mischaracterizes the
2  testimony.
3       THE WITNESS:  A  I maintain that orally alerting
4  him about security risk is the security risk.
5       MS. BABBITT:  Q  So you orally alerted Mr. Haynes
6  to the security risk.  And you said you also mentioned it
7  to a vendor on site, is that right?
8    A.   It was either on site or over a phone call, one
9  of the two.  I'm pretty sure they were on site though.
10    Q.   And who was that that you were speaking to?
11    A.   It may have either been Carl Komosa, Matt
12  Turman, Mark Dima or Scott Chapuis, one of the two.  They
13  were Clever Devices personnel.
14    Q.   One of those four individuals?
15    A.   I'm sorry, one of those four, sorry.
16    Q.   Okay.  And what was that conversation like?
17       It sounded like you said -- sorry, those
18  are many questions in one.  You don't recall which one of
19  those four Clever individuals you alerted them to this
20  security risk, is that right?
21    A.   Yeah.  But they weren't super technical, so I
22  was explaining the different stages of why it was a risk.
23    Q.   You don't recall who you were giving that
24  explanation to since they weren't very technical?

Page 176

1    A.   It's probably a safe bet it was either Carl or
2  Scott.
3    Q.   You don't recall if that was on the phone or in
4  person?
5    A.   If it was Scott it was probably on the phone.
6  But I worked with Carl in the office a lot, so.
7    Q.   And when you say in the office you mean at CTA
8  headquarters?
9    A.   Yes.
10    Q.   Did you in discussing that, raising that alert
11  with Clever, that communication, did that proceed or
12  follow you informing Mr. Haynes of what you viewed as a
13  security risk?
14    A.   Mr. Haynes was first.
15    Q.   And how soon thereafter did you alert this
16  individual employed by Clever about what you viewed as a
17  security risk?
18    A.   It was within a business day at least.  Could
19  be sooner.  I honestly don't remember the exact time
20  frame.  But I do know that we conveyed it to Clever
21  Devices.
22    Q.   Was Mr. Haynes a part of that communication and
23  conveying that information to Clever Devices?
24    A.   If it was over the phone, Mr. Haynes absolutely

Page 177

1  was.  And if it was Mr. Komosa, chances are Mr. Haynes
2  was probably nearby as well since Mr. Komosa worked out
3  of one of the cubicles Mr. Haynes also used.
4    Q.   Okay.  And you stated earlier in your testimony
5  that I think Mr. Haynes "pulled the trigger", is that
6  right?
7    A.   For lack of a better colloquialism, yes.
8    Q.   By that you mean he's the one who actually
9  performed the test on Dayton?
10    A.   That is correct.
11    Q.   And when I say test on Dayton, I'm referring to
12  using the skeleton key to access the Dayton system and
13  trigger what ended up being that Tweet.
14       Do you understand that?
15    A.   Yes.
16    Q.   Okay.  And prior to Mr. Haynes conducting that
17  test, did you tell Mr. Haynes or I guess can you describe
18  that conversation you had with Mr. Haynes about
19  conducting that test?
20    A.   So once I had finished working on the Bustime
21  system upgrade, let's see.
22       I think the very first thing I did was
23  when I saw that it worked on our system was say hey,
24  there's this weird key that works on our system.  And

45 (Pages 174 - 177)

Page 178

1 it's not in our database. And then I did --
2 Q. Can I stop you there, Mr. Pable. Sorry. You
3 said you first found the key or the key appeared, however
4 it came to be visible to you. And you used it on the CTA
5 system, is that right?
6 A. Correct.
7 Q. Okay. Did you tell Mr. Haynes that you were
8 using it on the CTA system before you did that?
9 A. No.
10 Q. Did you tell anyone else that you were using it
11 on the CTA system before you did that?
12 A. No, because I didn't know it was a key.
13 Q. Okay. So you used it on the CTA system and I
14 think you may have just said it worked, is that right?
15 A. Yes. It was able to give me back information
16 on the server.
17 Q. Then what did you do after you learned that it
18 worked on the CTA system?
19 A. I told Mike hey, there's a key that let's us --
20 that's not in the listing of keys.
21 So a little context on that is the Bustime
22 system admin tool will list all of the registered keys in
23 the database. And this key didn't happen to match any of
24 those that were listed in that list.

Page 179

1 So -- and being the test system there were
2 very few in there. So you could have easily seen it was
3 not present.
4 So the next step that I did was to see
5 what permissions it had. So that's when I discovered the
6 restricted permissions and I let Mr. Haynes know that.
7 Then I said that also means this key can use the service
8 bulletin API feature.
9 Q. When you informed Mr. Haynes of that, I guess
10 at what point after that conversation did Mr. Haynes
11 determine that he was going to test the skeleton key on
12 another transit system?
13 A. Well after that I think he wanted to know if it
14 worked in production. I don't remember the exact series
15 of events with this but I think he then tested it on
16 production to see if that worked. And it did. The same
17 way.
18 Q. When you say -- I'm sorry -- when you say that
19 worked on production, was that also being tested in the
20 CTA system?
21 A. Yes, production refers to CTAs -- well, test is
22 also public facing but I guess the primary URL for CTA
23 Bustracker.
24 Q. Thank you. Did you conduct that test on the

Page 180

1 production system with Mr. Haynes' knowledge?
2 A. Yes.
3 Q. Did Mr. Haynes ask you to do that?
4 A. I don't recall if he did or not.
5 Q. Then after you did that, we were getting to
6 Mr. Haynes then determining to use the skeleton key to
7 test it on another transit system.
8 Can you tell me what you recall about
9 coming to that conclusion?
10 A. I recall him wanting to determine what the
11 scope was. And I said well, you would need another
12 Bustime agency to test with.
13 I also believe I said at that time I don't
14 think it's a good idea to do it on another agency. But I
15 mean he's the one with experience here with handling
16 things. As I mentioned before.
17 So I mean at that point it was a matter of
18 him going through a list of other transit agencies that
19 had been compiled for another purpose and just grabbing
20 one off of that list.
21 Q. Okay. So you said just so I understand what
22 you just explained to me, Mr. Pable.
23 You said that Mr. Haynes was interested to
24 see if the skeleton key worked on other transit systems,

Page 181

1 right?
2 A. He was interested in determining the scope so
3 he would know what to tell Clever Devices.
4 Q. Was Mr. Haynes -- when you determined that the
5 skeleton key existed, what was his reaction; was he
6 excited, was he panicked? How would you describe him?
7 A. Mr. Haynes has a very animated personality.
8 It's difficult to tell the exact emotions that he's
9 portraying.
10 I would say it was -- the closest
11 approximation I can probably come up with would be
12 excitement, disappointment, scared and upset.
13 Q. And you said that you told Mr. Haynes that you
14 didn't think that you should test it on another system,
15 is that right?
16 A. That is correct.
17 Q. Was anyone else present when you told
18 Mr. Haynes that?
19 A. There were people all over the floor that could
20 hear us. We spoke in an open floor plan.
21 Q. Do you recall anybody being within earshot or
22 hearing you say that to Mr. Haynes?
23 A. I'm pretty sure Thomas Silvestri was over
24 there.

46 (Pages 178 - 181)

Page 182

1    Q.   Were you standing speaking to Mr. Haynes during
2 that conversation?
3    A.   Yes, that's generally what I would do.
4    Q.   So was Mr. Haynes seated at his cubicle?
5    A.   He was either in his cubicle or the lab.
6    Q.   When you say the lab, is that another office
7 space with computers set up?
8    A.   It's a cubicle directly adjacent to Mr. Haynes'
9 cubicle.  It contains things like a bus in a box and
10 other transit technology that we would be testing and
11 working on.
12    Q.   So Mr. Haynes was either sitting at his cubicle
13 or at the lab cubicle, is that right?
14    A.   Correct.
15    Q.   You were standing?
16    A.   Yeah, I very well may have been standing
17 because I frequently do.  When I turn around I frequently
18 do stand up, so that's probably a fair statement.
19    Q.   So after you told Mr. Haynes that you didn't
20 think that another transit system should be tested, what
21 did Mr. Haynes say?
22    A.   Mr. Haynes' mantra was ask for forgiveness and
23 not for permission.  I believe that's what the avenue he
24 chose to pursue.

Page 183

1    Q.   Is that what he said to you when you said that
2 we shouldn't test another transit system?
3    A.   I don't know if he said it that exact time.
4 And if those were his exact words then.  But he has used
5 those exact words to me in the past.
6    Q.   And did you make any other remarks to
7 Mr. Haynes with respect to why you thought you shouldn't
8 conduct the test on another transit system?
9    A.   No.  Like I said, he had the experience in the
10 field and he had successfully resolved other issues
11 before as well.  So I had no reason to doubt his
12 experience in that matter.
13    Q.   So once Mr. Haynes indicated to you that you
14 would proceed with the test, you didn't express any
15 further --
16    A.   I did not proceed with the test.
17    Q.   Okay.  Once the test -- before the test was
18 executed, aside from saying to Mr. Haynes I don't think
19 we should test on another transit system or words to that
20 effect, did you express any other concerns or
21 reservations about conducting the test?
22    A.   I think I said if you want to do it that's your
23 choice.  But I don't remember if those are the exact
24 words I used.

Page 184

1    Q.   But did you tell Mr. Haynes you would not
2 conduct the test?
3    A.   M I said I didn't want to do it.
4    Q.   You told him that you did not want to conduct
5 the test?
6    A.   Correct.
7    Q.   Did you ever write those concerns down in any
8 form?
9    A.   No, because again I trust his judgment but if
10 it was something as simple as him needing to push a
11 button, then he could do that.
12    Q.   You didn't go to anyone else or e-mail anyone
13 else about the test that you believe Mr. Haynes would be
14 conducting, is that right?
15    A.   I don't think I did.  But I don't have all the
16 e-mails in front of me.  I'm pretty sure I didn't
17 communicate that out to anyone.
18    Q.   You didn't alert Mr. Psomas to the fact that
19 Mr. Haynes is going to be conducting this test, right?
20    A.   That is correct.
21    Q.   You didn't alert Miss Alanis at the CTA?
22    A.   That is correct.
23    Q.   You didn't alert anyone else at the CTA that
24 Mr. Haynes would be conducting that test, is that right?

Page 185

1    A.   That is correct.
2    Q.   Okay.  And I think you alluded to earlier in
3 some of your messages how the tests couldn't have been
4 done without you because of the work you did to set it
5 up, is that right?
6    A.   Not necessarily.  It couldn't have been done in
7 the manner it was done without me setting it up.
8    Q.   What did you do to set it up?
9    A.   That requires some history on the service
10 bulletin feature.
11    Q.   Okay.
12    A.   Do you want me to tell you about the service
13 bulletin feature?
14    Q.   If you could explain it to me, I guess what I
15 want to know is what you did to prepare Mr. Haynes to
16 execute this test as you said Mr. Haynes executed.  So
17 if that requires an explanation of the service bulletin
18 feature then go ahead.
19    A.   Okay.  Well, then I will just tell you very
20 technically I had a configuration file for an end point
21 to use the service bulletin feature that I was testing,
22 making a mimic API for.  And all we had to do was change
23 two parameters of that configuration file.
24    Q.   So you did that and then did you provide that

47 (Pages 182 - 185)

1 file or code I guess to Mr. Haynes?

2    A. It's not code, it's a configuration.

3    Q. Sorry. Did you provide that configuration to

4 Mr. Haynes?

5    A. I left it up on my screen and said this is how

6 the -- this is how the application works.

7    Q. When you say you left it up on your screen, do

8 you mean you left it on your computer at the CTA?

9    A. Yes.

10    Q. You explained to Mr. Haynes how he would need

11 to do it to execute the test?

12    A. I didn't have to explain that to him. There

13 was a big orange button that said go.

14    Q. Did you set it up so there was a big orange

15 button that said go?

16    A. No, it was part of the program basically.

17    Q. Okay. So you didn't tell Mr. Haynes anything

18 with respect to how he would execute the test?

19    A. Yeah. It was fairly obvious from the user

20 interface of what you had to do.

21    Q. Okay. And that at the time then that was set

22 up on your desktop computer at the CTA?

23    A. Correct.

24    Q. And did Mr. Haynes sit at your desktop to

1 conduct that test?

2    A. I don't recall if we were sitting or standing,

3 honestly. Standing was a common practice.

4        Like I mentioned earlier, I need to get up

5 and move around a bit. So it wouldn't be uncommon for me

6 to be standing and Mr. Haynes to walk over.

7    Q. And when Mr. Haynes as you say executed the

8 test on Dayton, did he do it from your CTA computer?

9    A. Yes.

10    Q. Did you make any other objections to Mr. Haynes

11 before he sat down at your computer and conducted a test

12 that you didn't think he should do?

13    A. I don't know if Mr. Haynes sat at the computer

14 or not. I really don't recall if anyone was sitting in

15 the chair.

16    Q. Okay. I guess I'm not as concerned about

17 whether you were sitting or standing.

18        Mr. Haynes was the one who put his hand on

19 the computer and executed the test, correct?

20    A. That is correct.

21    Q. He did so at your CTA computer, correct?

22    A. That is correct.

23    Q. And he was logged in as you on your computer

24 when he did that?

1    A. That is correct.

2    Q. And you didn't make any objections to

3 Mr. Haynes as he was sitting on your computer and I'm

4 saying sitting meaning typing at your computer, logged on

5 as you to conduct the test you didn't think he should do?

6    A. No. I had previously expressed my opinion on

7 the matter and it wasn't uncommon for us to use each

8 other's machines if we had to.

9        Sometimes I would ask him to come over and

10 write database queries. Other times he would have me go

11 over to his machine and perform an operation for him or

12 something along those lines. So it was a very common

13 practice between us to share our machines.

14    Q. So you never said to Mr. Haynes hey, you do

15 this on your own computer?

16    A. I don't believe Mr. Haynes' computer had the

17 software installed to do this.

18    Q. Okay. So if Mr. Haynes wanted to do this test,

19 he had to do it from your computer?

20    A. That is correct.

21    Q. Okay. We will leave it at that but I wanted to

22 pick up after your interview, November 2, 2018.

23    A. Actually let me clarify that. He didn't have

24 to do it at my computer, but my computer was the one set

1 up to do it at the time and it would have taken longer

2 for him to set that up on his own computer and do all of

3 that on his end rather than use something that is already

4 pre set up and ready for a one-time check.

5    Q. Okay. So I want to turn your attention to

6 November 8th of 2018. Is that the day that you resigned

7 in lieu of termination from the CTA?

8    A. That is the day I was forced to resign, yes.

9    Q. And you were asked to come to CTA headquarters,

10 is that right?

11    A. That is correct.

12    Q. And who did you meet with when you got to CTA

13 headquarters?

14    A. It was either Mr. Radojcic or Mr. Psomas. But

15 I received the invite from Miss Marasovich so it was very

16 awkward that she wasn't present.

17    Q. Okay. So you got to the CTA headquarters and

18 were you in the first floor and someone came up to escort

19 you up?

20    A. Someone came down to escort me to the third

21 floor.

22    Q. Okay. Do you recall who that was?

23    A. It would either have been Mr. Psomas or

24 Mr. Radojcic. I don't recall offhand. Most likely

Page 190

1 Mr. Psomas.
2    Q.   And then you took the elevator up with either
3 Mr. Radojcic or Mr. Psomas to the third floor?
4    A.   That is correct.
5    Q.   Were you put in a conference room?
6    A.   That is correct.
7    Q.   Who was in that conference room?
8    A.   Mr. Psomas, Mr. Radojcic and another woman from
9 HR whom I don't recall the name of.
10    Q.   Was it Miss Fletcher from HR?
11    A.   That's very possible.  Again, I don't recall
12 the name but it sounds familiar.
13    Q.   Okay.  And you recorded that meeting on
14 November 8, isn't that right?
15    A.   That is correct.
16    Q.   How did you record it?
17    A.   I used the microphone on my phone to do so.
18    Q.   And when you say your phone, are you referring
19 to the personal cell. phone you had at the time?
20    A.   That is correct.
21    Q.   Where was that phone in the room as you sat
22 there while you were meeting with those individuals on
23 November 8?
24    A.   It was either on the table or in my pocket, I

Page 191

1 don't recall.  I don't think I would have gotten good
2 audio from my pocket but, so it was probably on the
3 table.
4    Q.   Did you inform anyone at that meeting that you
5 would be recording them?
6    A.   No.
7    Q.   Did you ask anyone at that meeting for
8 permission to record them?
9    A.   No.
10    Q.   Why did you record the meeting?
11    A.   Because I was locked out of the HR system and I
12 had reason to believe that something -- I don't want to
13 say, I don't want to use the word bad, but something not
14 right was about to happen to me.
15         I had a lot of suspicion about that
16 especially after what happened to Mike.  And I also know
17 that the conversation was about me.  So I know that I am
18 entitled to record if something is about you.  And you
19 have suspicion that something is about to happen to you
20 that's not good.
21    Q.   Okay.  So it's your permission (sic) that
22 because you thought something bad was going to happen to
23 you in that meeting, that you are able to record it
24 without advising the individuals that they were being

Page 192

1 recorded?
2    A.   That is part of what I answered.  The other
3 part was that the meeting was directly about me.  That's
4 why I was entitled to do so.
5    Q.   Okay.  Did you discuss the recording of that
6 meeting with a lawyer before you did so?
7    A.   No.
8    Q.   Did you discuss the fact that you're recording
9 that meeting with anyone before you did so?
10    A.   No.
11    Q.   Did you aside from producing that recording in
12 this litigation, did you post that recording anywhere or
13 share it anywhere?
14    A.   I gave a copy to my husband for safekeeping.
15    Q.   Anything else?
16    A.   No.
17    Q.   Is that recording still in existence on the
18 phone that you had at that time?
19    A.   No.
20    Q.   What happened to that recording on the phone?
21    A.   So when I started my new job at Morningstar, I
22 had to set up my phone to take, connect to their
23 enterprise network.  And in doing so it enforced a policy
24 where it rotated encryption keys, put on a different

Page 193

1 password policy, et cetera, which involved unfortunately
2 a wipe of the personal partition.  But since I had a
3 heads up I was able to back up things I felt relevant.
4         And I didn't feel preserving that
5 recording on my phone was important since my husband had
6 a copy for safekeeping.
7    Q.   I see.  But you did have a backup of the other
8 materials that were on the personal device of that phone
9 before it was wiped by Morningstar?
10    A.   That is correct.
11    Q.   Where was that backup located?
12    A.   So my photos since I left my SD card in the
13 holiday bus and train stuff, I had already configured all
14 my photos to go to Google photos.  So I don't have to
15 save any photos to my device there.
16         My downloads folder was ephemeral so I
17 didn't care, I could always re-download whatever I
18 needed.  And applications that had settings to download
19 would be recovered from the Google cloud.  So most of it
20 was already automatically handled.  I think I lost some
21 music and that was about it.
22    Q.   Were there any communications that would be
23 saved on the cloud?
24    A.   You mean like Google hangouts, yes.

49 (Pages 190 - 193)

Page 194

1   Q. Any other communications aside from those
2 exchanged on Google hangouts?
3   A. Things like Google voice.
4   Q. Anything else?
5   A. Let me think. Not through the Google cloud,
6 no. Oh, Gmail, Gmail obviously. Because that's
7 communications. But I think that's it for Google-based
8 communications.
9   Q. Okay. But all the Google-based material would
10 be saved in your Google cloud storage?
11   A. I wouldn't call it cloud storage but yeah,
12 inside the Google account.
13   Q. Okay. So you're at this meeting, November 8
14 meeting where you are turning in your resignation letter.
15 You also obtained a copy of what would have been your
16 notice of discharge. Is that right?
17   A. That is correct.
18   Q. And who gave you that?
19   A. I believe Mr. Psomas did or the HR woman. Miss
20 Fletcher I believe is what you said her name was.
21   Q. Mr. Pable, can you turn to CTA Exhibit 32. I'm
22 showing you what we have marked as Exhibit 32 for the CTA
23 and it is your notice of discharge dated November 8th.
24     Let me know when you have that up.

Page 195

1   A. I have it up.
2   Q. Okay. And you reference in some of your
3 e-mails that you produced to us and I think you actually
4 mentioned it today, that there was information in this
5 notice of discharge that was incorrect. Is that right?
6   A. That is correct.
7   Q. Can you tell me what is incorrect in the notice
8 of discharge?
9   A. Sure. Let me go ahead and read it and I will
10 point out as I find them.
11   Q. That's great.
12   A. So the first thing you see here is the Clever
13 Devices hidden API. And as Christos had mentioned in his
14 deposition, this is an unpublic API, it's not necessarily
15 hidden. And it says I did so without notice or consent
16 to Clever Devices or the CTA.
17     That's also incorrect. Because I noticed
18 my supervisor Mr. Haynes, and Mr. Haynes I know for a
19 fact sent an e-mail to Clever Devices about it as well.
20   Q. Can I stop you there, Mr. Pable?
21   MR. DUFFY: Hold on, Elizabeth. You asked him a
22 very general question. And, you know, if you don't want
23 to spend all the time to find all the errors in this
24 letter that's fine, but then you have to withdraw that

Page 196

1 question because you're going to interrupt him and he's
2 never going to answer the original question you asked.
3   MS. BABBITT: Okay. So Mr. Pable you said --
4   MR. DUFFY: Elizabeth, please, please. I know
5 it's, I know you want to ignore me as much as possible
6 but I am going to ask you to withdraw your question if
7 you're not going to let him finish his answer to it.
8   MS. BABBITT: My first question is you said that --
9   MR. DUFFY: Are you withdrawing?
10   MS. BABBITT: I'm not withdrawing my question.
11   MR. DUFFY: Then you have to let him answer it.
12 You said go through, tell me what in this letter is
13 wrong.
14   MS. BABBITT: I'll move on. Thank you for the
15 instruction. So Mr. Pable --
16   MR. DUFFY: I am considering your question
17 withdrawn for the record.
18   MS. BABBITT: Wonderful.
19   MR. DUFFY: I'm instructing the witness to consider
20 it withdrawn as well. Thank you.
21   MS. BABBITT: Excellent. Thank you.
22   Q. Mr. Pable, you said the first problem in this
23 Exhibit 32 was with respect to referring to the hidden
24 API, correct?

Page 197

1   THE WITNESS: A That is correct.
2   Q. The second mischaracterization or issue with
3 this notice of discharge you said was that you did so
4 without notice or consent of Clever Devices or the CTA,
5 right?
6   A. That is correct.
7   Q. And you said that was because you had given
8 notice to Mr. Haynes?
9   A. That is correct.
10   Q. How did you give Mr. Haynes notice of that?
11   A. So when the service bulletin feature was found,
12 I told him hey, this is a feature that I located on the
13 Bustime server. Like I know Tony Coppolleta has a need
14 for something like this. Is this something we should
15 pursue. And he said yes. And that's when I got Tony
16 Coppolleta involved.
17   Q. Okay. And I think then you were saying that
18 you took issue with this or without the consent of Clever
19 Devices or the CTA, right?
20   A. That is correct.
21   Q. I think you were saying that there was consent
22 or notice provided to Clever?
23   A. That is correct.
24   Q. Or the CTA?

50 (Pages 194 - 197)

Page 198

1    A.   That is correct.
2    Q.   How did Clever receive notice of that?
3    A.   The monthly meeting on the action tracker.
4    Q.   And did you access that API prior to that
5  meeting with Clever?
6    A.   No.
7    Q.   Did you ask Clever if you had permission to
8  access that API at that meeting?
9    A.   No.  But we've never needed permission to
10  access any API end point in the past.
11    Q.   Did Mr. Haynes ask if it would be all right if
12  you accessed that API?
13    A.   No.  He asked if it would require additional
14  licensing to use in production.
15    Q.   And do you recall the response that was given?
16    A.   They will get back to us.
17    Q.   All right.  Then can you tell me the next issue
18  you identify as being incorrect in your notice of
19  discharge?
20    A.   That was all that I found so far.  I have only
21  gone through those sentences.
22    Q.   Okay.  You want to let me know when you find
23  another issue.
24    A.   The very next sentence.

Page 199

1    Q.   Okay.  What's the problem with that?
2    A.   It states that I without authority or
3  permission accessed the Clever Devices API of Dayton
4  transit by exploiting a hidden API key and posting an
5  unauthorized message on their systems and Twitter
6  account.  I didn't do that.
7    Q.   Okay.  Who did that?
8    A.   Mr. Haynes.
9    Q.   Okay.  You watched as Mr. Haynes did that?
10    A.   Yes.
11    Q.   Okay.  Then can you keep reading till you find
12  another issue with this notice of discharge, if there is
13  any?
14    A.   It mentions that I admitted I improperly
15  accessed a Clever Devices API.  And improperly accessed
16  Dayton transit system, which I did not.
17    Q.   To unpack that, you never admitted that you did
18  that?
19    A.   No.
20    Q.   Okay.  Is it your testimony that you also never
21  improperly accessed Clever Devices API?
22    A.   As far as I understand it there is only one way
23  to access the Clever Devices API.  So there's no proper
24  or improper -- I guess there's only the proper way to

Page 200

1  access it.  The only way.
2    Q.   Okay.  So your testimony is that you never
3  improperly accessed Clever Devices' API?
4    A.   My testimony is there's no such thing as
5  improperly accessing Clever Devices API.
6    Q.   Why is that?
7    A.   Because there's only one way to access the
8  Clever Devices API.
9    Q.   How do you do that?
10    A.   You enter the end point and you type in the
11  information.  And the end point is public.
12    Q.   And you also, did you take issue with this
13  clause that says improperly accessed the Dayton transit
14  system from your desk?
15    A.   That is correct, because I did not do that
16  either.
17    Q.   And when you met with Jim Psomas and Mike
18  Radojcic, you informed them that you did not access the
19  Dayton transit system at your desk?
20    A.   I let them know I told Mike it was a bad idea.
21    Q.   Did you tell them that you did not do that
22  yourself?
23        MR. DUFFY:  Objection, asked and answered twice
24  earlier.

Page 201

1        THE WITNESS:  A  I told them that Mike went ahead
2  and accessed the API.  I created the configuration file
3  that made it possible.  I did not admit to doing anything
4  of the sort.
5        MS. BABBITT:  Did you tell them that you did not
6  execute the test on Dayton?
7        MR. DUFFY:  Objection, asked and answered.
8        THE WITNESS:  A  I told them that I advised
9  Mr. Haynes it was a bad idea, but I gave him the means to
10  do so.
11        MS. BABBITT:  Q  So you never told anyone at the
12  CTA during your interview or in your resignation that you
13  did not access or test the Dayton system yourself?
14        MR. DUFFY:  Mischaracterizes, asked and answered.
15        THE WITNESS:  A  That's not what I said.  I said
16  that I told them that I thought it was a bad idea and
17  that Mr. Haynes, I gave Mr. Haynes the ability to do it
18  with the configuration filing that I had crafted.
19        MS. BABBITT:  Okay.  So I guess I'm sorry, I'm
20  maybe speaking past you.  It seems like a yes or no.
21    Q.   Did you tell anyone else in your investigation
22  interview or at your discharge meeting that you did not
23  test Dayton, yes or no?
24        MR. DUFFY:  Elizabeth, he doesn't have to answer

51 (Pages 198 - 201)

Page 202

1 yes or no. You asked him about this twice over before
2 lunch and now you're doing it again. I think you need to
3 move on.
4     MS. BABBITT: You can answer.
5     THE WITNESS: A At the termination meeting I
6 absolutely raised the issue that I was not the one that
7 accessed Dayton.
8     MS. BABBITT: Q What did you tell them at the
9 termination meeting that you did not access Dayton?
10    A. I don't remember the exact words but you have
11 the recording, I'm sure you can listen to it.
12    Q. So you don't recall what you said other than
13 you told them you did not access the Dayton system
14 yourself?
15    A. Yes, I told them that it was inaccurate. The
16 charges that were being placed in front of me weren't
17 correct.
18    Q. You told them that they were not correct
19 because you did not access the Dayton system yourself?
20    A. Among other things, yes.
21    Q. And was that the first time you had told Jim
22 Psomas or Mike Radojcic that you in fact yourself did not
23 access the Dayton system?
24    MR. DUFFY: Asked and answered.

Page 203

1     THE WITNESS: A I don't believe I was ever asked
2 if I had directly accessed the Dayton system or not. I
3 answered what was asked of me.
4     MS. BABBITT: Q You didn't volunteer that hey, it
5 wasn't me, I didn't do the Dayton test, right?
6     MR. DUFFY: Asked and answered.
7     THE WITNESS: A I don't recall exactly what was
8 said. But I don't believe I volunteered extra
9 information.
10    MS. BABBITT: Okay. Then can you continue on in
11 CTA Exhibit 32, in your notice of discharge and tell me
12 if there's any other incorrect statement, and stop me
13 when you get to the next one.
14    THE WITNESS: During these interviews you and your
15 reporting manager Michael Haynes admitted using a hidden
16 API from Clever Devices and to reposting a message on
17 Dayton transit systems.
18         I did not post anything on the Dayton
19 transit systems. And again, I take issue with the term
20 hidden API and there's nothing wrong with using the
21 unpublished API.
22    MS. BABBITT: Q Okay. You, do you also contend
23 you did not admit during your interview that you used
24 Clever's API?

Page 204

1     THE WITNESS: A I'm sorry, can you rephrase that
2 question.
3     Q. Sure. So the sentence says during these
4 interviews, you and Michael Haynes admitted using a
5 hidden API from Clever Devices. You see that?
6     A. That is correct.
7     Q. And is it accurate that you admitted to
8 using -- I know you don't, you take issue with the hidden
9 API -- but that Bustime or Bus bulletin or system, that
10 API, did you admit to using that API during those
11 interviews?
12    MR. DUFFY: Objection. Elizabeth, this is getting
13 harassing. You asked him the same question 20 times.
14 Your lawyers were all over me about this same kind of
15 thing so I'm not going to be bashful about it. He's
16 answered it 3 or 4 times now. Move on.
17    MS. BABBITT: Q Can you answer that question,
18 Mr. Pable?
19    THE WITNESS: A So I take issue with the term
20 hidden API. However, if you look under the heading that
21 it's under poor judgment, I used the hidden API for CTAs
22 test invite. I used the "hidden API" on CTAs test
23 instance for development purposes to create the mimic API
24 for Mr. Coppolleta. I don't consider that poor judgment

Page 205

1 in the least.
2     Q. Yeah, I didn't ask about poor judgment but
3 so --
4     A. Well you had asked if I took issue with any of
5 those sentences. And it is under the heading poor
6 judgment, which is why I consider it an improper
7 sentence.
8     Q. Okay. So you maintain that you used good
9 judgment throughout the Dayton test, is that fair?
10    A. I haven't gotten to that part yet but yes, I
11 believe I used good judgment throughout the Dayton test.
12    Q. Okay. Do you want to tell me any other
13 incorrect statements in this. And stop me when you get
14 to the next one.
15    A. Approval from Clever Devices was never obtained
16 to use the "hidden API".
17         Obviously you know how I feel about that
18 term. However, there is no approval process. We had
19 asked for a quote. If we needed to pay an extra
20 licensing fee to use it and we had never used it in any
21 sort of production manner outside of testing, which is a
22 very common use case in information technology.
23         So normally you're given a full feature of
24 things you want to use and then you'll test using them

52 (Pages 202 - 205)

Page 206

1 and if you determine there's value inside them, then you
2 will pay for that feature to use it in production.
3        So the fact that there's an implication of
4 needing approval to do so is improper.
5    Q.   Okay.  And did you use -- I think you just
6 explained to me, Mr. Pable, that Bustime alert or Bustime
7 service bulletin API, did you use that API in the CTA
8 test environment?
9    A.   I did.
10    Q.   Did you use that bus alert or bulletin API in
11 any other manner or system?
12    A.   I used -- the manner in which I used it, it was
13 used to construct a mimic API for American Eagle to
14 base -- for validation of inputs into the system for them
15 to use.
16        So when we were licensed with the Clever
17 Devices API, they would only need to change end points
18 and the code would magically start working.
19    Q.   Did American Eagle have access to that prior to
20 any licensing being provided to the CTA for the bus alert
21 API?
22    A.   Can you tell me what you mean by that?
23    Q.   Well I guess you said you I think developed
24 something for this American Eagle to be able to use the

Page 207

1 bus alert API or to be able to speak with it perhaps?
2        Did they have, did American Eagle have
3 access to that?
4    A.   So one, the mimic API that I am referring to
5 was in development.  And I never finished or was able to
6 deliver it to American Eagle prior to my separation from
7 CTA.  Two, it did not actually perform any of the
8 functions of the Clever Devices API.  It was simply a
9 means for developers to check if the inputs into the
10 system were valid syntax or not.
11    Q.   Okay.  Let me turn your attention on CTA
12 Exhibit 32.  We are still under that poor judgment
13 category.  It refers to something that says during your
14 November 2, 2018 interview, you stated you had conducted
15 a responsible disclosure by notifying Dayton transit
16 after gaining access to their system and modifying an
17 alert without their authorization.
18        What were you referring to and how did you
19 engage in responsible disclosure, if you did?
20    A.   Okay.  Well before I answer that question, did
21 you want me to continue reading the rest of the sentences
22 and bring up any issues I found?
23    Q.   No, that's okay.  You can answer that next
24 question.

Page 208

1    A.   Okay.  I did not conduct a responsible
2 disclosure.  I advised Mike to conduct the responsible
3 disclosure to the Dayton transit agency.
4        And I also take issue with the fact that
5 it says I gained access to their systems and modified an
6 alert, which I did not do and an alert was not modified,
7 it was a redundant alert was created.
8    Q.   Okay.  What's responsible disclosure mean?
9    A.   Responsible disclosure has a lot of different
10 connotations.  But generally it means to disclose to a
11 party hey, this is an issue that we found or someone has
12 found, and you could be at risk.  There may be
13 instructions on how to mitigate the risk.  Or there may
14 be other context that you might want to do about it.
15        It's very common for people to report
16 these kinds of vulnerabilities to a CVE database, and the
17 people behind that will perform the disclosure and work
18 with vendors on creating these bug fixes to protect the
19 people who report these vulnerabilities.
20    Q.   Do people typically make those responsible
21 disclosures before they test or identify -- before they
22 test the vulnerability or show that there is in fact a
23 vulnerability?
24    A.   That depends.  There are professional firms you

Page 209

1 might call pen testers.  And if you engage one of those,
2 they'll disclose like a road map of things that they want
3 to do with you and say here's what we want to do, tell us
4 if any of this should be off limits or what not.
5        But when you are working with public
6 facing things, generally anything that is exposed to the
7 public is considered consent because it's put out to the
8 public.  It's almost like hiding a bike in the bushes and
9 expecting it never to be found.
10    Q.   So the bike is hidden in the bushes, it's there
11 for the taking in other words?
12    A.   I wouldn't say it's there for the taking, but
13 it's definitely not secure, that's for sure.
14    Q.   Right.  Okay.  Let's turn to CTA Exhibit 33,
15 Mr. Pable.
16    A.   Do you want me to point out any of the other
17 inaccuracies in this Exhibit 32 before we do that?
18    Q.   No, that's okay.  Thanks.  Let me know when you
19 have Exhibit 33, the second page up.
20    A.   I have it up.
21    Q.   Great.  This is an e-mail, Mr. Pable, that you
22 sent from your ████████ Gmail account to Jeffrey
23 Schroeder, right?
24    A.   Yes.

53 (Pages 206 - 209)

Page 210

1    Q.   Who's Jeffrey Schroeder?
2    A.   Jeff Schroeder was Michael Haynes' manager at
3 one point.
4    Q.   He was a CTA employee?
5    A.   Yes.
6    Q.   And did he work at the CTA at the same time as
7 you?
8    A.   For a brief time, yes.
9    Q.   So at that point in time when he was at the CTA
10 he would be your boss' boss?
11   A.   Yes, that would be fair.
12   Q.   And you sent this e-mail to Mr. Schroeder
13 Exhibit 33 on November 20, 2018?
14   A.   Yes.
15   Q.   At this point you were already separated from
16 the CTA?
17   A.   That is correct.
18   Q.   Turning your attention to the second paragraph
19 of this first page in Exhibit 33.
20        Do you see where it says I too have been
21 planning to leave, right?  You see that?
22   A.   Yes.
23   Q.   You say but only after a lot of wrapping up of
24 projects and getting a surgery, is that right?

Page 211

1    A.   That is correct.
2    Q.   So why were you already planning to leave the
3 CTA?
4    A.   I had been planning to leave the CTA after I
5 had my vestment in our pension and at that point, at the
6 pace the CTA moves, that probably would have happened by
7 the time I wrapped up my projects.
8    Q.   When would you have estimated that vesting
9 would have occurred?
10   A.   I'd have to go check.
11        Hold on one second.  My head set says it's
12 about to die.  Do you mind if we take a brief break?
13   MS. BABBITT:  Yeah, take five minutes.
14   THE VIDEOGRAPHER:  Going off the record at
15 3:00 p.m.
16        (Short recess taken).
17   THE VIDEOGRAPHER:  Going back on the record.  Time
18 is 3:07 p.m.
19   MS. BABBITT:  Mr. Pable, we were examining CTA
20 Exhibit 33.
21   Q.   And we just talked about your plan to leave
22 after you vested and you weren't sure when you had vested
23 at the CTA, is that right?
24   THE WITNESS:  A  I don't know off the top of my

Page 212

1 head right now, but I'm sure in my damages calculation
2 that I sent to my attorney it's listed in there.
3    Q.   Okay.  And then in this e-mail that you sent to
4 Mr. Schroeder on November 20, you also offered sort of a
5 time line of events after you signed the e-mail Chris.
6        Do you see that?
7    A.   Yes.  Yeah, I believe this is that time line I
8 spoke to you earlier of actually.
9    Q.   Okay.  And who prepared this time line?
10   A.   This is definitely Mike Haynes.
11   Q.   And did Mike Haynes prepare this in
12 consultation with you?
13   A.   I believe it was made while we were at that
14 Starbucks.
15   Q.   Did Mr. Haynes type it up while you're sitting
16 with him?
17   A.   Yes, I believe he did.
18   Q.   And did you tell Mr. Haynes what to include in
19 the time line?
20   A.   We both went over the time line as we
21 remembered it, like we both contributed events to the
22 time line.
23   Q.   Okay.  Did you review the time line after it
24 was written out?

Page 213

1    A.   I think we did.  I'm pretty sure we did.  I'm
2 pretty sure that we did.
3    Q.   And I guess did you specifically review the
4 time line after it was completed?
5    A.   Me specifically, I did not read over every
6 sentence of it, no.
7    Q.   Did you modify or change any of it once you saw
8 it?
9    A.   No, I don't believe I did.
10   Q.   You did not.  All right.  Turning to the second
11 page of CTA Exhibit 33.  If you're there.
12        Do you see the second paragraph of page
13 two, it begins August 17?
14   MR. DUFFY:  I think you might mean page three.
15   MS. BABBITT:  Yes, I'm sorry.  It's the second page
16 of this e-mail, marked P001173 at the bottom of it.
17   THE WITNESS:  I'm on that page.
18   MS. BABBITT:  Q  You see it says in bold
19 August 17?
20   THE WITNESS:  A  Yes.
21   Q.   And there it says MH makes the decision to test
22 the skeleton key and alerts, and an alert on another
23 Clever Devices customer.  Do you see that?
24   A.   Yes.

54 (Pages 210 - 213)

Page 214

1    Q.   Is MH referring to Michael Haynes?
2    A.   Yes.
3    Q.   It continues to ensure that the issues was in
4  fact pervasive and not specific to CTA.  You see that?
5    A.   Yes, correct.
6    Q.   Following sentence it says MH requests Chris to
7  execute, overriding his concerns.  You see that?
8    A.   Yes.
9    Q.   And is that MH again referring to Mr. Haynes?
10    A.   Most likely, yes.
11    Q.   Is Chris referring to you?
12    A.   Most likely, yes.
13    Q.   And so in this time line that you sent to
14  Mr. Schroeder, you indicate that Mr. Haynes requested
15  that you execute.
16         What did you mean by that?
17    A.   Again I copied and pasted this from Mr. Haynes.
18  I figured it would be useful for him to see how things
19  went together.
20         Again, I wasn't the one that actually
21  executed it.  Mike I believe did request me to execute
22  but I don't believe I actually did.
23    Q.   Okay.  And did you notice that you were sending
24  this time line saying that Mr. Haynes asked you to

Page 215

1  execute it before you sent it to Mr. Schroeder?
2    A.   I didn't notice that specifically, no.
3    Q.   If you had noticed that would you have changed
4  that in any way?
5    A.   I don't know if I would change it because this
6  was Mike's work and this was all of Mike's work, so I
7  wouldn't want to change Mike's work on him.
8         But if Mike was copied on it I probably
9  would have -- if I had seen that specific line I probably
10  would have talked to him about that specific wording.
11         But this wasn't originally intended for
12  Mr. Schroeder anyway.  It just I believe Mr. Haynes said
13  go ahead and send him the time line of events that
14  happened.  So I described one that again was put
15  together.
16    Q.   Did you prepare your own time line separate
17  from this?
18    A.   No.  Again, all I did was contribute key dates
19  and points that I thought was important.  I didn't
20  directly edit this document.
21    Q.   Okay.  Did Mr. Haynes actually in fact request
22  you to execute the Dayton test?
23    A.   Originally he said, he asked me to do it and
24  that's when I said I don't think we should.

Page 216

1    Q.   What did he specifically ask you to the best of
2  your recollection?
3    A.   I believe he asked can we see if this is
4  specific to CTA.  And I believe I said yeah, you can use
5  any API call to do that.
6    Q.   Did Mr. Haynes make any other specific requests
7  of you with respect to executing the test?
8    A.   Not that I recall.
9    Q.   Why did you send this time line to
10  Mr. Schroeder?
11    A.   Again, I believe Mr. Haynes said for me to
12  include it when I spoke with him.  It was to provide
13  context.
14         Mr. Schroeder had been also forced to
15  resign from the CTA as well.  So I believe that it was
16  important that, I believe Mr. Haynes felt it was
17  important that he know that he wasn't alone in the kind
18  of antics that the CTA employed here.
19    Q.   Was there any other purpose for you to send
20  this e-mail to Mr. Schroeder aside from Mr. Haynes asking
21  you to do so?
22    A.   The time line is what Mr. Haynes asked me to
23  include I believe.  In terms of sending the e-mail, that
24  was my choice in general.

Page 217

1    Q.   Okay.  And this was sent on November 20, right,
2  2018?
3    A.   Yes.
4    Q.   So you weren't the subordinate of Mr. Haynes at
5  that point, right?
6    A.   That is correct.
7    Q.   Okay.  On that same page Mr. Pable, if you go
8  right toward the bottom there's a header that says A-FMLA
9  and salary discussion.  Do you see that?
10    A.   Yes.
11    Q.   And you say in that section that MH, I take
12  that to be Haynes, informed JP, I take that to mean
13  Psomas, about a planned surgery for CP, Chris Pable, in
14  December.  Do you see that?
15    A.   Yes, but again I was not the one that wrote
16  this part of this document.
17    Q.   Okay.  Are those initials as I ascribe them
18  correct?
19    A.   Those initials seem correct to me, yes.
20    Q.   And it also says that Mr. Haynes, MH, was
21  requesting salary adjustments for his staff.
22         Do you see that?
23    A.   Yes.
24    Q.   What did you know or recall about Mr. Haynes

55 (Pages 214 - 217)

Page 218

1  requesting salary adjustments?
2      A.  At the time Mr. Psomas had told Mr. Haynes that
3  Phil Vanasse, the junior member of our team, should be
4  promoted to a level two member instead of junior.  And he
5  would circle back at a later date for anyone else.
6          That was what I was told.
7      Q.  Okay.  Were you aware if there was any request
8  made for a salary increase for yourself or Mr. Haynes?
9      A.  Not at that time I was not.
10     Q.  Have you since then become aware that salary
11 increases on your behalf were requested?
12     A.  From what I heard in Mr. Psomas' testimony,
13 the -- there were proposals but nothing was approved and
14 they were canned shortly after.
15     Q.  Okay.  All right.  So jumping back into sort of
16 of the Dayton test itself, Mr. Pable.
17         I know that you referenced looking at some
18 API's to assist Tony Coppolleta on a project, is that
19 right?
20     A.  What do you mean by looking at some API's.
21     Q.  Well let's turn to CTA Exhibit 1.
22     A.  Okay.
23     Q.  Tell me when you're there.
24     A.  I'm there.

Page 219

1      Q.  Then if you can go to the last e-mail in CTA
2  Exhibit 1, an e-mail dated July 5, 2018.
3      A.  Yes.
4      Q.  And there Tony Coppolleta says hi guys, he's
5  sending it to you and Mr. Haynes, I'm wondering if you
6  have had a chance to talk to Clever about closing the
7  loophole in the hidden API's you found.
8          Do you know what Mr. Coppolleta was
9  referring to in that e-mail?
10     A.  He was most likely referring to the service
11 bulletin API because of the subject line, the Bustime
12 bulletin API's document.
13     Q.  Do you know why Mr. Coppolleta was referring to
14 those as hidden API's?
15     A.  I would assume he didn't understand the
16 context.
17     Q.  You never referred to those API's as hidden
18 API's?
19     A.  Not that I am aware of.  If I did it was only
20 to use the same terminology so that they wouldn't get
21 confused.
22     Q.  Did you -- how did you find those API's?
23     A.  I found it while looking for log files on the
24 Bustime server.

Page 220

1      Q.  Did they just sort of pop up out at you?
2      A.  And for clarity, it was a single API, not
3  multiple.
4      Q.  Okay.  So that single API you found, is that
5  the bus alert API?
6      A.  That is the service bulletin API.
7      Q.  The service bulletin API.  Thanks.
8          You said you saw that or found that when
9  you were looking at log files, is that right?
10     A.  No, while I was looking for log files.
11     Q.  And what sort of stood out or jumped out that
12 made you identify this API?
13     A.  Since I was unable to contact Mr. Komosa to ask
14 him where the log files were after he asked me to take a
15 look at the system.  I opened up an Explorer window and
16 did a search for Bustime and text file extensions, or
17 things can be stored in or, you know, how log files could
18 be formatted with.  So style sheets or actual dot log
19 files or TXT files, et cetera, with the word Bustime in
20 them.
21         And one of the search results that came up
22 was a service bulletin file, service bulletin style sheet
23 if you will.  And that was in the path of the API
24 folders.  So that is actually one of the top hits.

Page 221

1          So when I looked at it I'm like oh, that
2  looks interesting and different.  I don't recall ever
3  seeing anything like that.  And so I opened the document
4  and that's how I found the service bulletin API.
5      Q.  Okay.  Did you ever use any decompiling
6  software or applications in looking at Clever Bustime
7  materials?
8      A.  Only for some verification on the skeleton key
9  I believe.  But that was about the extent of it.
10     Q.  So when you did use a decompiler on the Clever
11 Bustime you had already located the skeleton key, is that
12 right?
13     A.  That's an incorrect statement.  I did not use
14 the decompiler on Bustime.
15     Q.  Okay.  What did you use the decompiler on?
16     A.  The admin console.
17     Q.  Okay.  So had you already found the skeleton
18 key before you used the decompiler on the admin console?
19     A.  That is correct.
20     Q.  Okay.  Did anybody direct you to or ask you to
21 use the decompiling software?
22     A.  Not necessarily.  But Mr. Haynes wanted to know
23 the extent of what the problem would be.  So he asked me
24 to look into it.

56 (Pages 218 - 221)

Page 222

1        And I guess you could say that that's
2  asking me to do that.
3        Q.  Did you tell him you would be using decompiling
4  software applications to do that?
5        A.  No, but it was something that I had done in the
6  past because CTA had sent me to training to do so.
7        Q.  Okay.  But you didn't have a specific
8  conversation with Mr. Haynes and said hey, I'm going to
9  throw this in the decompiler, something to that effect?
10       A.  No, no very specific conversation like that
11  took place.
12       Q.  Okay.  Moving up on CTA Exhibit 1, the next
13  e-mail up in that exchange.  It has an e-mail from
14  Mr. Haynes on July 12th to Clever folks and yourself
15  copied on it.  You see that e-mail?
16       A.  Is it the one that begins FYI?
17       Q.  No, sorry.  So this is on, it's numbered page
18  three of CTA Exhibit 1.  It begins Clever Devices per our
19  discussions yesterday, please --
20       A.  I'm there.
21       Q.  Do you see that?
22       A.  Yes.
23       Q.  In this e-mail Mr. Haynes is requesting a quote
24  with a discount as a bug bounty for finding a security

Page 223

1  issue.  Do you see that?
2        A.  Yes.
3        Q.  What's a bug bounty?
4        A.  A bug bounty is usually done by security
5  professionals.  When they find a bug or vulnerability and
6  they report it to a vendor, usually the vendor will rate
7  the severity of what was reported and issue a payout of
8  sorts depending on that severity level.
9        Q.  Had the CTA gotten a bug bounty from a vendor
10  before to your knowledge?
11       A.  Not that I'm aware.
12       Q.  Do you know whose idea it is to request a bug
13  bounty here?
14       A.  It was most likely Mr. Haynes'.
15       Q.  Was it your idea or did you discuss it with
16  him?
17       A.  I may have discussed the practice with him but
18  I have no involvement in terms of financials regarding
19  anything with our vendors.
20       Q.  Did you recommend to Mr. Haynes that he ask for
21  a bug bounty?
22       A.  No, I merely explained that they do exist.
23       Q.  In that same e-mail Mr. Haynes references
24  exposed TTC credentials.

Page 224

1        A.  Yes.
2        Q.  Do you know which TTC -- is that the Toronto
3  Transit Commission?
4        A.  I know it's Toronto.  I don't know what the
5  acronym stands for though.
6        Q.  Do you know what exposed Toronto credentials
7  Haynes is referring to there?
8        A.  Yes, I do.
9        Q.  What is that?
10       A.  Inside of or by that service bulletin API there
11  was a textual description that said this feature's in
12  development for TTC.  For use in their emergency dispatch
13  portal in not those exact words.  But then it proceeded
14  to list a link to the Toronto emergency dispatch portal
15  and a username and password to the Toronto emergency
16  dispatch portal.
17        And when I saw that I immediately threw up
18  red flags and ran into the meeting and interrupted them
19  and told them that that needs to get removed.
20       Q.  That was an in-person meeting involving
21  Mr. Haynes and Clever?
22       A.  I believe that was one of the monthly meetings.
23       Q.  That was an in-person meeting?
24       A.  Absolutely.

Page 225

1        Q.  So did you interrupt that meeting on or about
2  July 12, to inform them of that discovery?
3        A.  Somewhere around there.  It was whenever the
4  July monthly meeting was.
5        Q.  Okay.
6        A.  Or maybe it was the June monthly meeting?  It
7  was the meeting immediately prior to July 12th.
8        Q.  Okay.  All right.  And then I know you
9  mentioned that sometimes Mr. Haynes would be on your
10  computer at the CTA.  And would be using your computer
11  while you had logged into it, is that right?
12       A.  That is correct.
13       Q.  And the reverse also occurred, sometimes you
14  get Mr. Haynes' computer as he was logged on?
15       A.  Sometimes.  Very rarely though.  Usually if I
16  had to use Mr. Haynes' computer I had a separate log in.
17       Q.  You a separate log in to get into Mr. Haynes'
18  computer?
19       A.  Yes.  His system was set up to be multi-user.
20  So if I needed to do something it wouldn't necessarily
21  interrupt what he was doing at the same time.
22        So for example if he needed a driver
23  update or if he needed me to write a command to parse out
24  some information from a file, I could do that without

57 (Pages 222 - 225)

Page 226

1 interrupting his work.

2    Q. And did you ever, did you have Mr. Haynes' log

3 in and password to get onto the CTA computer?

4    A. At one point I did but he rotates it. There

5 was one point when he was on vacation, maybe in 2016,

6 where he gave me the password to get on to his desktop to

7 perform a function that he needed to do but was unable

8 to.

9    Q. Okay. Did you ever use something called Putty

10 to access other computers in network at the CTA?

11    A. Putty is a general purpose tool. But I

12 guess -- yes, I have used it to access for example

13 Mr. Haynes' computer, I have done that with Putty, yes.

14    Q. Did you use it to access any other CTA

15 employee's computers?

16    A. No one else's computer but definitely other CTA

17 assets.

18    Q. Okay. Then can you turn to Exhibit 39,

19 Mr. Pable. I know it's going to be hard to read. You

20 tell me if you're able to even read any of it or not.

21    A. It's very, very blurry, so.

22    Q. All right. Let me walk you through it. And we

23 will see what we can do. This is an excerpt from

24 something we produced, which was your internet history

Page 227

1 log that was collected off your CTA computer. And the

2 internet history from August 17 shows on the highlighted

3 fields, the accessing or use of the skeleton key in the

4 New Jersey transit bus system on August 17.

5      Were you aware that the skeleton key was

6 being used or tested on the New Jersey transit system

7 from your computer?

8    MR. DUFFY: Sorry Elizabeth, where you pointing him

9 to exactly?

10    MS. BABBITT: The last highlighted row on page one

11 of CTA 39.

12    MR. DUFFY: The one that says 6349?

13    MS. BABBITT: That's right.

14    MR. DUFFY: Can you see it, Chris?

15    THE WITNESS: It's really blurry. But I can kind

16 of make it out.

17    MS. BABBITT: Okay. We can, I can work without

18 this exhibit, too.

19    Q. Are you aware that someone seated at your

20 computer or using your computer on August 17 was using

21 the skeleton key to attempt to access the New Jersey

22 transit system, Mr. Pable?

23    THE WITNESS: A Possibly? I don't see how that

24 could possibly work though. The New Jersey transit

Page 228

1 system doesn't have the API.

2    Q. Okay.

3    A. As far as I am aware.

4    Q. Okay. Did you attempt to use that on the New

5 Jersey website?

6    A. I honestly don't recall.

7    Q. Okay. Do you know if Mr. Haynes sitting at

8 your computer attempted to use that on the New Jersey

9 site?

10    A. It's possible, but I can't really imagine why,

11 because again both of us would not know or both of us

12 both know that New Jersey doesn't have an API, so there's

13 nothing that you could know, no command you could send it

14 that would have it return anything.

15    Q. Then also on the same CTA Exhibit 39 there's

16 two highlighted rows, it's rows 6334 and 6335. And these

17 are two fields from your internet history of your CTA

18 computer where you're inputting the skeleton key at the

19 Greater Dayton RTA website?

20    A. Uh-huh, okay.

21    Q. And those instances who was inputting the

22 skeleton key?

23    A. That could have been Mr. Haynes. I can't tell

24 you for certain.

Page 229

1    Q. Could it have been you?

2    A. It could have been me. But again, I can't tell

3 you for certain.

4    Q. Okay. Is that because you are unable to recall

5 who was putting that in?

6    A. That's correct. But I also wasn't at my

7 keyboard every single time that Mr. Haynes was at my

8 computer doing something. If it is me then it wasn't

9 a -- what is it, what's the word I'm looking for; it

10 wasn't a significant enough event for me to register in

11 my memory.

12    Q. Okay. The first time Mr. Haynes tested the

13 skeleton key as you described it on your computer, were

14 you present when he did that?

15    A. I believe, yes, I am pretty sure I was.

16    Q. Did you watch him do that?

17    A. When he executed the service bulletin API test,

18 yes.

19    Q. And did you say anything to him at the time or

20 warn him not to do that at the time?

21    A. When he did the service bulletin API test as I

22 said before, I did not think it was a good idea.

23    Q. Okay. All right. Then I'm going to skip ahead

24 a bit here. About a week after the test is done, Clever

58 (Pages 226 - 229)

Page 230

1 is made aware of it, the Dayton RTA system is
2 contacted, Jim Psomas is alerted in some ways to the Dayton test, is
3 that fair?
4 A. No that's not.
5 MR. DUFFY: Objection, that's a very misleading
6 question.
7 THE WITNESS: A That's a very inaccurate
8 question.
9 MS. BABBITT: Q Okay. So when did you or you and
10 Mr. Haynes determine to tell Mr. Psomas about the Dayton
11 test?
12 A. I think I told Mike that we should disclose it
13 to Mr. Psomas after the issue was remediated. So that
14 would be maybe a day after the Dayton test or a business
15 day after the Dayton test. Or a business day or so.
16 Q. And you didn't tell Mr. Haynes that he should
17 tell Mr. Psomas before the issue was remediated?
18 A. Mr. Psomas is -- he has a strong business
19 acumen but he's not technical enough to fully understand
20 the technical details behind what was found and what was
21 done.
22 So in terms of business and affect to the
23 CTA, I felt that it was best we say there's this issue,
24 it was corrected, Clever was notified and Clever

Page 231

1 corrected it as well. And that's the end of that and
2 because that's essentially what we thought it was, was
3 the end of everything at that point.
4 Q. Okay. So turn your attention to CTA
5 Exhibit 40. Let me know when you're there.
6 A. Okay.
7 Q. This is an e-mail you sent to Mr. Haynes on
8 August 31, 2018 in Exhibit 40, correct?
9 A. That looks correct.
10 Q. This is an e-mail that you drafted as an e-mail
11 for Mr. Haynes to send to Mr. Psomas, is that right?
12 A. Somewhat. There's some misleading information
13 here. But yes, somewhat.
14 Q. What's misleading?
15 A. You're only including the sent file and are not
16 including the creation time.
17 Q. Okay. Did you draft the words that are in this
18 e-mail in CTA Exhibit 40, set aside the timing issue?
19 A. I worked with Mr. Haynes on wording.
20 At that point I was in secretary mode
21 essentially and I made sure everything that we discussed
22 was technically accurate and when he was ready for it, I
23 sent it to him to put it into his own words with any
24 modifications he might need to make.

Page 232

1 Q. So Mr. Haynes asked you to write this e-mail?
2 A. I wouldn't say that I "wrote it". We worked
3 together to identify the key points we needed to get
4 across to Mr. Psomas.
5 Q. So you wrote this e-mail together with
6 Mr. Haynes?
7 A. Not side by side. But I was the -- you could
8 say I was the one that transcribed it, yes, if that's
9 what you're getting at.
10 Q. When you say transcribed, was Mr. Haynes
11 dictating an e-mail and you were typing it for him?
12 A. Mr. Haynes and I were discussing important
13 points that we need to make to Mr. Psomas. Such as there
14 was a critical security issue. Explain what that issue
15 was. Where it was tested. How it was verified and if
16 there was any remediation done.
17 So we volleyed back and forth on which
18 issues and how to word those issues.
19 Q. And did you when you were volleying back and
20 forth suggest to Mr. Haynes that you tell Mr. Psomas that
21 you or that Mr. Haynes executed a test on the Dayton
22 transit authority?
23 A. I didn't see how that was relevant.
24 Q. So you didn't suggest that that be included?

Page 233

1 A. No.
2 Q. And you didn't include it in this e-mail, CTA
3 Exhibit 40, right?
4 A. We did. But not in those exact words. I said
5 we verified other properties.
6 Q. Right. Okay. Then on CTA Exhibit 41,
7 Mr. Haynes takes your e-mail and he sends it to
8 Mr. Psomas, is that right?
9 A. It looks like he made some minor modifications
10 to it, but yes.
11 Q. What modifications did you notice he made?
12 A. Right off the bat I see a date put in, but I
13 would have to look at them both side by side.
14 Q. Okay. And Mr. Haynes doesn't mention in his
15 e-mail to Mr. Psomas that a test was conducted on the
16 Dayton system by CTA employees, is that right?
17 A. Not in those exact words. As before, it says
18 we verified other properties such as Dayton, Ohio in
19 there.
20 MS. BABBITT: Okay. I want to turn back to --
21 actually would now be the time to take a break, maybe a 5
22 or 10-minute break, Mr. Pable?
23 THE WITNESS: That would be fine.
24 THE VIDEOGRAPHER: Off the record, time is five --

59 (Pages 230 - 233)

Page 234

1  excuse me -- going off the record, time is 3:39 p.m.
2          (Short recess taken).
3      THE VIDEOGRAPHER:  Going back on the record, time
4  is 3:47 p.m.
5      MS. BABBITT:  Mr. Pable, I want to discuss with you
6  the damages that you're seeking in this case that you
7  think you're entitled to.
8      Q.  First can you tell me what your current salary
9  is at Morningstar?
10     THE WITNESS:  A  I don't know the exact number
11 offhand because I know I was given some RSU awards
12 throughout the year.  So I couldn't accurately answer that
13 right now.
14     Q.  When you say you're given RSU, is that like
15 stock option?
16     A.  Kind of?  The way it was explained to me is
17 that it's a vested gift.  So you have to wait for it to
18 vest before you actually get it.  And it vests in very
19 strange increments.  There's a lot of weird stipulations
20 over it through Charles Schwab.  I don't exactly
21 understand it myself at the moment.
22     Q.  Okay.  Aside from the RSU component of your
23 compensation, do you know what your net salary, what
24 you're taking in each paycheck?

Page 235

1      A.  Each paycheck, each paycheck that I get is
2  just over 2,000.
3      Q.  How often are you paid?
4      A.  Twice a month.
5      Q.  All right.  So that's after taxes and
6  everything is taken out?
7      A.  I believe so.
8      Q.  And you started working at Morningstar in 2019?
9      A.  2018.
10     Q.  In 2018.  Excuse me.  Do you know what your
11 salary was in 2019?
12     A.  I believe it was the same as when I started.  I
13 believe that's in the current damage calculations.
14     Q.  You reported I think at that point that it was
15 something like --
16     A.  90 something.
17     Q.  -- 97,000, does that sound right?
18     A.  Something -- I think it was less than that but
19 it's somewhere in the 90s.
20     Q.  When you started at Morningstar was your salary
21 more or less than what you were making when you left the
22 CTA?
23     A.  I believe it is less.
24     Q.  And since you started your job at Morningstar

Page 236

1  has your salary increased to a point that exceeds your
2  last CTA salary?
3      A.  Again I don't know off the top of my head
4  because of all the RSU stuff, but it might have in the
5  end of things.  I'd have to do the calculation again.
6      Q.  Okay.  So you don't know what your annual
7  salary was in 2020?
8      A.  Not off the top of my head.
9      Q.  Were you awarded or offered RSU's in each year
10 that you've been employed at Morningstar?
11     A.  I was offered them in 2020.
12     Q.  Not in 2019?
13     A.  Correct.  I wasn't eligible.
14     Q.  Okay.  Any other bonus beyond that that you
15 earned since you worked at Morningstar?
16     A.  The bonus are the RSU's.
17     Q.  Do you have any other benefits through your job
18 at Morningstar?
19     A.  I have health insurance.
20     Q.  Does Morningstar contribute to your 401K?
21     A.  They -- I think they do.  I'd have to double
22 check that.  But I think they do.
23     Q.  Have you been on Morningstar's health care
24 insurance since you started there in 2018?

Page 237

1      A.  No.
2      Q.  When did you get on Morningstar's health
3  insurance?
4      A.  January 1st of 2019.
5      Q.  So in 2018, in December of 2018 did you
6  maintain health insurance?
7      A.  I was on my husband's health insurance.
8      Q.  Where does your husband work?
9      A.  In 2018 or now?
10     Q.  In 2018.
11     A.  I don't remember if the acquisition was
12 completed or not, but it could have been at Chicago
13 Bridge and Iron.  But they were bought out you by a
14 company called McDermott.
15     Q.  You were on your husband's insurance through
16 his employer in December of 2018?
17     A.  Correct.
18     Q.  Okay.  You claim in your damages that you're
19 entitled to $250,000 in compensatory damages for
20 medically significant pain, suffering and emotional
21 distress.  I know we spoke earlier today about some of
22 the panic attacks you experienced I believe in October
23 and November of 2018.
24          Did you experience any other medically

60 (Pages 234 - 237)

Page 238

1 significant pain, suffering or emotional distress beyond
2 what you described here today?
3     MR. DUFFY: Objection to the extent it calls for a
4 legal conclusion. You're asking him about pain and
5 suffering, you're asking him about medical issues.
6     MS. BABBITT: Okay. Well let's talk about pain and
7 suffering.
8     Q. What pain and suffering do you attribute to the
9 claims you are alleging in your lawsuit?
10    THE WITNESS: A One of the biggest things is I
11 lost a lot of time that I could have had with my parents.
12 So that is a big emotional thing for me.
13        I had to reschedule my surgery and my
14 current insurance that I had at Morningstar did not cover
15 nearly as much as CTA did. But at least it is partially
16 covered. So there's a difference there.
17    Q. Okay. Can I ask you, Mr. Pable, you said you
18 lost time with your parents.
19        How did you lose time with your parents
20 and what did the CTA do to contribute to you losing time
21 with your parents?
22    A. Instead of being able to spend time with them
23 and I knew they were both pretty ill, I had to spend time
24 looking for work and creating a resume and trying to find

Page 239

1 a job without the portfolio piece that CTA kept from me.
2 And numerous other small things that added up to not
3 being able to spend as much time with them as I used to.
4 Or as I should have been able to.
5     Q. If you had continued to be employed at the CTA
6 would you have been spending that time with your parents
7 or would you have been spending your time working at the
8 CTA?
9     A. I had barely had any vacation time, so I was
10 planning to spend it all with my parents. Including my
11 recovery time from surgery, to spend as much time as I
12 could with them.
13    Q. Then you mentioned that you had to reschedule
14 your surgery that you had planned.
15        Is that that, was it did you say skin
16 removal surgery that you had planned?
17    A. Abdominoplasty.
18    Q. Abdominoplasty. When was that scheduled for?
19    A. December 11, I believe.
20    Q. Of 2018?
21    A. Correct.
22    Q. Do you have any records of that being scheduled
23 on that date?
24    A. I can probably dig that up on my original

Page 240

1 schedule stuff. I'm pretty sure I have a calendar
2 appointment for it still on my calendar.
3     Q. Okay. And I'd ask you to produce that. Like I
4 said, I will follow up with your attorney on that.
5         And that surgery, it was rescheduled?
6     A. That is correct.
7     Q. When was it rescheduled for?
8     A. Just after my mom died.
9     Q. So when was that?
10    A. March of 2019.
11    Q. Did you have this abdominal surgery in March of
12 2019?
13    A. Yes.
14    Q. Where was the surgery at?
15    A. One of the Northwestern hospitals.
16    Q. Was this surgery an elective surgery?
17    A. I guess that depends on what you mean by
18 elective. But generally, no.
19    Q. So was it a medically-necessary procedure?
20    A. Yes, my physician had documented the dermatitis
21 and other issues surrounding the excess skin.
22    Q. And do you recall or are you aware that on a
23 Tweet you posted in March of 2019 you characterized it as
24 an elective procedure?

Page 241

1     A. That sounds probably right there, yes.
2     Q. So as you sit here today, was it elective
3 procedure?
4     A. So I would say that on the fact that it was
5 elective, I could have lived with the dermatitis and the
6 other symptoms. But it was not ideal and it was
7 determined to be medically necessary.
8         However, it did fall under the category of
9 elective on some providers. Which is why Morningstar
10 didn't cover it entirely.
11    Q. And on the CTA insurance was it -- do you know
12 if it was deemed as a medically necessary procedure?
13    A. I believe it was. That's why I had those
14 medical coding questions.
15    Q. Do you have any records of it being approved to
16 be covered on the CTA insurance?
17    A. I had those meetings and I got a letter of
18 approval that I sent to my surgeon, but I don't know if
19 he kept it at that point because I lost my insurance with
20 CTA.
21    Q. I think you said there was a physician who
22 deemed the surgery was medically necessary.
23        Who was that physician?
24    A. I believe Dr. Rauch was the one that

61 (Pages 238 - 241)

Page 242

1 documented the dermatitis and other issues.
2    Q.  So those were two of the elements you mentioned
3 with respect to medically significant pain.  Loss time
4 with your parents and rescheduling your surgery.
5         Any other medically-significant pain that
6 you believe entitles you to damages?
7    MR. DUFFY:  I think the question was what was his
8 pain and suffering and he was listing things, not the
9 medical pain.  But --
10    MS. BABBITT:  Okay.  Sure.
11    Q.  Any other pain and suffering that you would
12 attribute to entitle you to $250,000?
13    THE WITNESS:  A  Not that I can think of on the
14 spot right here.  I had done a calculation with my
15 attorney back in 2019.  And I captured most of that
16 information with him then.  So I couldn't answer that
17 question right here on the spot.
18    Q.  Can you describe the medically significant pain
19 you identified as the basis for your recovery of damages?
20    A.  So I believe those were my attorney's exact
21 words.  But there was -- I did not go with the original,
22 I didn't go with the original I guess you would call it
23 surgery plan I had.
24         Then there was also like I had mentioned

Page 243

1 earlier on the paralysis thing.  Instead of recovering in
2 a hospital recovery room, I ended up needing to go to a
3 hotel when I had my surgery done.  To recover in.  And
4 that was not very ideal.
5         So there was a lot of, not a lot of pain
6 management there.  My husband had to take time off work
7 to care for me as well.
8    Q.  Okay.  You mentioned you didn't go with the
9 original surgery plan.  What do you mean by that?
10    A.  Originally I had planned to go to one of the
11 hospitals on a certain day and then recover in like a
12 recovery room, and things of that nature.
13         But because of the less coverage at
14 Morningstar, I had to revise that plan and like I said, I
15 recovered in a hotel room instead of a recovery room.
16 And I did not have the same kind of pain management and
17 such that I would have had at a hospital.
18    Q.  Okay.  Did you have any pain medicine after
19 your surgery?
20    A.  I had some, but it only took care of some kinds
21 of pain, not all of it.
22    Q.  How long were you in pain following your
23 surgery?
24    A.  Two months.

Page 244

1    Q.  How long were you on pain medication following
2 your surgery?
3    A.  I believe the prescription ran out after 2 or
4 3 weeks.
5    Q.  Do you know what the prescription was for?
6    A.  Not off the top of my head.
7    Q.  And you mentioned that your husband had to take
8 time off of work to care for you, is that right?
9    A.  That is correct.
10    Q.  Do you assert that you're entitled to damages
11 as a result of the time off that your husband took from
12 his work?
13    A.  I believe those are included in the damage
14 calculation.
15    Q.  Is that a yes?
16    A.  I believe they are included in the damage
17 calculation.  I can't tell you for certain if they are or
18 not.
19    Q.  You also claim that you owed $54,640.06 for
20 this surgery you had in 2019.
21         Were those your out-of-pocket costs as a
22 result of the surgery you had?
23    MR. DUFFY:  Objection.
24    THE WITNESS:  A  I don't remember the exact total

Page 245

1 that I paid.  I had financed a lot of it through my wage
2 works program, which is kind of like a health savings
3 before tax payment thing.  So I couldn't tell you the
4 exact amount that I paid.
5    Q.  Do you have any records that reflect what your
6 out-of-pocket costs were with respect to your surgery?
7    MR. DUFFY:  Objection.
8    THE WITNESS:  A  I believe I submitted receipts
9 with the damage calculations.
10    MS. BABBITT:  Q  Do you, are you aware that you
11 owed over $50,000 out of pocket as a result of your
12 surgery?
13    MR. DUFFY:  Objection.
14    THE WITNESS:  A  At what time?
15    MS. BABBITT:  Q  After the surgery, once it was
16 completed in 2019?
17    A.  After the surgery when I got the bill, it was a
18 big shock to me.
19    Q.  Do you remember what the bill was for?
20    A.  I had asked -- not off the top of my head.  I
21 don't remember the exact amount but I remember it being
22 very high.
23    Q.  Do you owe anything with respect to that
24 surgery today?

62 (Pages 242 - 245)

Page 246

1    A.   No.
2    Q.   Have you had any other surgeries since that
3 March 2019 surgery?
4    A.   No.
5    Q.   Was any portion of that surgery covered through
6 your Morningstar insurance?
7        MR. DUFFY:  Objection.
8        THE WITNESS:  A  I had hernias that were covered
9 to go in to get taken care of.  So it was kind of like a
10 split cost scenario.  Where they would pay for part of it
11 and the rest of it would be covered out of pocket.
12       MS. BABBITT:  Q  Okay.  So the insurance covered
13 the hernia portion of that procedure, is that right?
14       MR. DUFFY:  Objection.
15       THE WITNESS:  A  I believe so, but I couldn't tell
16 you.  I don't have the EOB in front of me.
17       MS. BABBITT:  Q  Okay.  And do you have any other
18 surgeries planned or scheduled?
19   A.   Ideally some day I would like to have my upper
20 body taken care of, but I have nothing planned.
21   Q.   That would be a similar skin-tightening surgery
22 of some sort?
23   A.   A skin removal, yes.  But there would not be
24 the advantage of a hernia to split the cost.

Page 247

1        If you want to call a hernia an advantage.
2    Q.   Then you produced in this case a letter from
3 your physician Dr. Rauch, in which Dr. Rauch reports that
4 you said you had a history of severe work-related
5 stress resulting in panic attacks in late October of
6 2018.
7        Are you aware of getting that note from
8 Dr. Rauch and producing it in this case?
9    A.   Yes.
10   Q.   So he referred to a history of work-related
11 stress that caused panic attacks.
12       Can you describe that history of
13 work-related stress that caused panic attacks?
14   A.   It was the investigation.
15   Q.   So the commencement of that work-related stress
16 that caused panic attacks was the investigation that
17 began in October of 2018?
18   A.   That is correct.
19   Q.   In that same letter you produced from
20 Dr. Rauch, he indicated that you discussed strategies and
21 medications to address those issues, is that right?
22   A.   That is correct.
23   Q.   Do you recall what strategies you discussed
24 with Dr. Rauch?

Page 248

1    A.   Not off the top of my head.
2    Q.   Do you recall any medications that you
3 discussed with Dr. Rauch to address those issues?
4    A.   No specific ones.
5    Q.   Did Dr. Rauch refer you to any other specialist
6 or physicians, psychologists or psychiatrists?
7    A.   No.  I was very particular because I didn't
8 know about the status of my benefits.
9    Q.   So did you ask Dr. Rauch to not refer you to
10 anybody or anything?
11   A.   I mean he could refer me if he wanted to, but I
12 wouldn't be able to go.  I didn't want to be stuck with a
13 bill.
14   Q.   Okay.  But to your recollection, Dr. Rauch did
15 not refer you to anyone else for treatment?
16   A.   Correct.
17   Q.   Do you continue to be on any medications
18 prescribed or otherwise as you sit here today?
19   A.   I continue to take multivitamins.
20   Q.   What about that Aleve D, do you take that
21 routinely?
22   A.   Not routinely.  Only as needed.  I don't think
23 I have taken it all last year either.
24   Q.   And I think you mentioned a bariatric doctor

Page 249

1 that you are under the care of?
2    A.   I was in 2018, yes.
3    Q.   Are you under the care of any other medical
4 doctors?
5    A.   No, and I am no longer under his care.
6    Q.   And are you under the care or receiving
7 treatment from any psychiatrist or psychologist?
8    A.   Right now I'm not.
9    Q.   When is the last time you received treatment
10 from a psychiatrist?
11   A.   A psychiatrist specifically, probably before I
12 graduated college.
13   Q.   Okay.  What about a psychologist?
14   A.   I believe that was also before I graduated
15 college.
16   Q.   Any treatment from a therapist or social worker
17 since college?
18   A.   I saw an LCSW.
19   Q.   What did you see the LCSW for?
20   A.   Coping skills because of my parents and all of
21 the other things that were happening in my life at the
22 time.
23   Q.   When did you see that individual?
24   A.   As I stated earlier, December 2019.

63 (Pages 246 - 249)

1    Q.  How many sessions if you recall did you have?

2    A.  One, maybe two most.

3    Q.  Few more questions, Mr. Pable.

4         Did you mine for Bitcoin on your CTA

5    computer?

6    A.  If your intent is to say did I mine for

7    Bitcoin, no.  But did I run Bitcoin mining software, the

8    answer is yes.

9    Q.  Why did you run Bitcoin mining software on your

10   CTA computer?

11   A.  Well, back in the early 2010's, the buzz word

12   that was all the rage was block chain.  So one of the

13   things that I do is I try to see if there's any new and

14   emerging technologies that can assist or help out with

15   any problems that we have with respect to CTA.

16        One of the things that I thought was very

17   interesting is the way that Bitcoin maintains a

18   persistent ledger across everything in a non centralized

19   distributed manner.  At that time, one of the hot button

20   items in our front office was to get accurate predictions

21   and to find out why predictions weren't being accurate.

22        Unfortunately, in order to track down

23   inaccurate predictions we would have to turn logging on

24   on the Bustime servers.  However, CTA has such a massive

1    fleet, that by turning on logging you would quickly

2    overwhelm the server and you might accidentally bring it

3    down or overload the disc with the vast amount of data

4    that was being done.

5         So in one of the solutions I tried was I

6    researched ways in which to use a distributed block chain

7    to have individuals submit their prediction times on what

8    bus, what location and such that they were at.  And

9    maintain that in a permanent record that we could then

10   evaluate and create reports for the front office and

11   deliver the inaccuracies to our vendor.

12   Q.  Okay.  Is that something that continued

13   throughout your employment with the CTA?

14   A.  I had only done cursory research.  I had

15   determined that window, Window's block chain algorithm

16   was not suitable for performing that function.  So once I

17   had made that determination, I believe it was less than

18   an hour's worth of work with it, I switched focus to

19   other forms of block chain ledgers and I believe settled

20   if we were going to do anything, we would use the Iota

21   Tangle.

22   Q.  Did anyone direct you to investigate this block

23   chain technology for that issue?

24   A.  No.  But most of the projects I do at CTA no

1    one directs me to do.  In fact Mr. Haynes, he likes to

2    say once I completed a project and I bring it to him,

3    he's like so what would you like to do today.  And I

4    would sit down and I would look for pain points or things

5    that the agency needs and/or wants.  Or ways to make

6    things better and I would pioneer those.

7    Q.  And did you tell anybody that you were

8    investigating this block chain technology at the time?

9    A.  I believe I told Mr. Haynes that I was looking

10   into the possibility of what the block chain might be

11   able to offer us.

12   Q.  Anybody else?

13   A.  Perhaps Mr. Schroeder at the time.

14   Q.  On your CTA computer there was files that

15   contained millions and millions of usernames and

16   passwords.  You're aware of that?

17   A.  Yes.

18   Q.  And how did you come to access your files and

19   get them on your CTA computer?

20   A.  Can you define what you mean by access those

21   files?

22   Q.  How did you get them?

23   A.  They were posted publicly.

24   Q.  Why did you decide to put them on your

1    computer?

2    A.  So one of the things that happens all the time

3    is something called leaked credentials and breaches.

4    It's where a bad actor can enter into a system and

5    extract different types of credentials.

6         There are many services out there that

7    will curate this information for you.  A popular free one

8    is called Have I Been Pwned.  However, those free

9    services like Have I Been Pwned only let you search based

10   on keys.  So if you consider a username and password a

11   key value pair, you can only search for the key portion

12   or for example a username.

13        So in this instance a username might be an

14   e-mail address and you can put that in there and it would

15   say hey, this e-mail address has been compromised in all

16   of these different breaches.

17        In the case of the database that I loaded

18   up in CTA, I needed to search for values.  So although

19   again you probably want to redact this for

20   confidentiality to CTA.  But CTAs password policies and

21   entry requirements are not very high.  So CTA has a

22   common password that it uses for most of its services.

23   Like their service accounts.  Or think of it like a

24   generic default and it is not a very secure password.

Page 254

1    So what I wanted to do was find any
2  instance of that not secure password being used to see if
3  CTAs systems were breached inside. Because the breach
4  collection that was posted did not have an attribution of
5  where it came from. Usually breach collections contain
6  an origin. However, this was a collection of many
7  different smaller breaches.
8    In order to make the determination if CTA
9  had been compromised or not in terms of service accounts
10  which Mike or I had run, I had to do almost what you
11  would call a reverse search. And search on the value and
12  then try to find matching keys.
13    Q. Okay. So did somebody ask you to look into
14  this?
15    A. No, CTA had no sort of information security
16  section at that time. But it is something that many
17  companies pay very handsomely for to get that kind of
18  information delivered to them by a company such as
19  Recorded Future or Upguard Breach Site.
20    Q. So it wasn't part of your job duties to look
21  for this and research this password issue?
22    A. I wouldn't say that. I would say that my job
23  duties included making sure that the CTA was safe. And
24  by trying to make sure that we weren't compromised, I

Page 255

1  would definitely say that that's well within my job
2  duties description there.
3    Q. And did you report your findings about your
4  analysis of this password information with anyone?
5    A. I found no instances of the generic password in
6  the database and left it at that.
7    Q. So you didn't report anything that you found
8  one way or another with respect to the password files?
9    A. I may have let Mr. Haynes know that there's a
10  breach out there and I want to make sure that it's, that
11  we don't have any compromised credentials. And if I
12  didn't follow up with him he would probably assume that I
13  did not find anything.
14    MS. BABBITT: Just about done. Can we just take
15  five minutes? So I can consult.
16    THE VIDEOGRAPHER: Off the record at time is
17  4:18 p.m.
18    (Short recess taken).
19    THE VIDEOGRAPHER: Going back on the record. Time
20  is 4:25 p.m.
21    MS. BABBITT: Thank you. Mr. Pable, the CTA is
22  going to reserve and keep open your deposition with
23  respect to the issues that are still pending before the
24  court relating to your phone and your personal website

Page 256

1  but aside from that, I have nothing further.
2    MR. JADOS: Good afternoon, Mr. Pable. This is
3  Steven Jados, attorney for Clever Devices. Going to go
4  ahead and ask you, launch into a series of questions and
5  go from there.
6    EXAMINATION
7    by Mr. Jados:
8    Q. So at the time of your separation from
9  employment with CTA, did you know what specifically
10  Clever Devices had done to bring about your separation
11  from the CTA?
12    A. At the time of separation, they mentioned
13  violation of EULA clauses I believe and in one of the
14  exhibits that CTA introduced.
15    Q. Okay. I'm talking about what you yourself knew
16  at that time?
17    A. Yes. The, there's a termination paperwork
18  listed on there violations of the Clever Devices EULA I
19  believe.
20    Q. Okay. Beyond that, is there anything specific
21  you knew at the time of your termination that Clever
22  Devices had done to bring about -- when I say termination
23  I'm talking about your -- I believe you characterized it
24  as forced resignation. That's what I am talking about.

Page 257

1    Anything else that you know that Clever
2  Devices did to bring that about?
3    A. The only other information I have on that front
4  I believe was a text message exchange between Mike Haynes
5  and Craig Lang that was shown to me. And I believe it's
6  in one of these exhibits or one of the messages,
7  something along the lines of it's not what I wanted nor
8  pursued, and I tried to stop it.
9    Q. Okay. So same question but anything else you
10  haven't told me yet?
11    A. That's I believe the extent of it.
12    Q. Okay. You're aware now -- I guess for our
13  purposes I know you've been sitting on these depositions.
14    So you're aware now that Clever Devices
15  sent a letter to the CTA on or around October 22 of 2018,
16  right?
17    A. Correct.
18    Q. Did you learn about that letter for the first
19  time as part of the proceedings before the Department of
20  Labor's OSHA?
21    A. That is correct.
22    Q. I guess I kind of put the cart before the horse
23  here. You've been present for all the depositions in
24  this matter, correct?

65 (Pages 254 - 257)

Page 258

1     A.   That is correct.
2     Q.   Do you know anything beyond what has been
3  discussed in those depositions in terms of what Clever
4  Devices did to cause your forced resignation?
5     A.   Nothing beyond what I heard in the depositions
6  and what I got in the document productions.
7     Q.   You testified earlier today something along the
8  lines, of course these aren't your exact words, but
9  something along the lines of the optics of the Dayton
10  incident looked bad to lay people.
11        Do you remember what I'm talking about?
12     A.   Yes.
13     Q.   With that in mind, that testimony in mind, and
14  again if you know, in your opinion is Julie Friedlander
15  of Clever Devices, does she fit into that lay category?
16     A.   Yes, I would say so, since she relied on
17  Christos for most of her technical wording in the letter.
18     Q.   Sure.   Scott Chapuis, is he lay in your
19  opinion?
20     A.   Yes.   I would say Mr. Chapuis does not
21  understand the technical underpinnings.
22     Q.   How about Craig Lang, is he also lay in your
23  opinion?
24     A.   I honestly don't have an opinion on Mr. Lang.

Page 259

1  I don't know enough about him to know his tech. saviness.
2     Q.   Fair enough.   Again, you know, particular to
3  this issue of bad optics to lay people.
4        Is Jim Psomas lay in your opinion?
5     A.   Yes.
6     Q.   Okay.   So you answered something along the
7  lines the CTAs interview questions demonstrated a
8  misunderstanding of the situation.
9        Do you recall that?
10     A.   Yes.
11     Q.   I believe the situation was the Dayton
12  incident, right?
13     A.   Well if I remember the testimony properly, it
14  was both Clever and CTA had misunderstanding.
15     Q.   Let's go with the CTAs misunderstandings.   Are
16  those understandings -- strike that.
17        Do you have any basis to say that those
18  misunderstandings of the situation by the CTA are
19  indicative of whistleblower retaliation?
20     A.   I wouldn't know how to answer that question.
21     Q.   Yeah, that's kind of a funny question.   What
22  I'm trying to get at is, you know, people make mistakes,
23  people misunderstand things in particular.
24        Is there anything about the

Page 260

1  misunderstandings that you perceive the CTA to have had
2  that indicates to you that this is some sort of cover for
3  retaliation?
4     A.   What do you mean by this is a cover for
5  retaliation.   I don't know what this refers to.
6     Q.   So the this would be the misunderstandings that
7  the CTA had?
8     A.   I think the misunderstandings in my opinion
9  created what I could only refer to as a bizarro alternate
10  reality that Mr. Psomas most likely subscribed to.   And
11  that the information he learned first seems to be the
12  information that he kept as truth.
13        And if that information, any information
14  came up that conflicted with that first understanding, it
15  became suspect and second seat to what happened.
16     Q.   Okay.   So what you just described there about
17  Jim Psomas kind of forming an early opinion and not being
18  able to be taken off of it, again those are my words, you
19  don't have to accept that, kind of going with that, this
20  idea that he kind of formed an early impression.
21        Do you have any basis to characterize
22  that, again his forming an early impression, as
23  indicative of retaliation for any whistleblower activity
24  you may have engaged in?

Page 261

1     A.   I would say yes.   Because he used the Clever
2  Devices letter EULA in forming his basis for everything.
3  And so everything that had occurred had to fall into one
4  of the slots of the points made in the EULA letter.
5     Q.   When you're talking about what Jim Psomas drew
6  from the EULA letter, are you taking that from his
7  deposition testimony or from something else?
8     A.   From both his testimony and the document
9  productions.
10     Q.   Okay.   What specifically in the document
11  productions do you recall?
12     A.   Well one of them is the interview questions for
13  one.   Asking about Clever Devices code modifications and
14  pressing on certain matters that were in line with what
15  the EULA letter represented, but didn't make technical
16  sense.
17     Q.   Okay.   Anything else?
18     A.   I recall an e-mail where Jim had -- I believe
19  it was Jim that was happy that one of the processes that
20  was designed to reduce the work of the Clever Devices'
21  technician was successfully stopped.   And I recall a lot
22  of the questions that he posed in the voicemails to Scott
23  Chapuis to merge issues together.   For example the
24  service bulletin API and the skeleton key seemed

66 (Pages 258 - 261)

Page 262

1  inexplicably linked together.
2      Q.  Okay.  So that inexplicable link of the
3  skeleton key and the service bulletin API, is that right?
4      A.  That was one of the awkward pairings that
5  didn't make sense.
6      Q.  Is that one of those things where it's non
7  technical folks not understanding the situation or do you
8  think or do you have reason to believe that there's
9  something more nefarious at play there?
10      A.  To me it seems like he was more directed to
11  address very specific things.  And built his reality
12  around those specific things.
13          So if those specific things indicated
14  nefarious conduct, then I guess that would fall under
15  that category.  But I mean this is, it's a very awkward
16  question to be answering because I'm not Jim Psomas and I
17  can't speak for what's going on in his mind.
18      Q.  Sure.  And that he you're just referring to in
19  that answer, that was Jim Psomas, right?
20      A.  Yes.
21      Q.  And I'm not asking you to kind of get into his
22  mind.  I'm asking -- because obviously you can't.  But
23  I'm asking if you know something beyond that.  And it
24  seems kind of with that in mind of not getting into his

Page 263

1  mind, did you know anything additional to tag on to your
2  last response?
3      A.  I think that he interpreted reporting of the
4  security risk as a threat.  So -- of sorts.  Because of
5  other documents that he had pulled up in his
6  investigation.
7          For example, I believe Scott Chapuis had
8  written an e-mail where he had characterized or I'm
9  sorry, he had put quotes on a not quite coherent sentence
10  about vulnerability exposures on CVE databases.  I'm
11  pretty sure that some of that was misheard and definitely
12  wasn't a coherent sentence.
13          So I think that seeing that and taking
14  that at face value, and not doing any sort of follow-up
15  or verification definitely contributed to the fact that
16  he had an agenda in my mind.
17      Q.  Jim Psomas had an agenda, is that what you're
18  saying?
19      A.  He had an agenda.  Whether he was directed to
20  have the agenda or formed it himself, I couldn't answer.
21  But that seemed to me what the, what was apparent.
22      Q.  I'm just trying to make sure I'm getting my
23  pronoun right.  The he is Jim Psomas, right?
24      A.  Correct.  In this very specific instance, yes.

Page 264

1  You were asking about Jim Psomas and so --
2      Q.  Right.  I just wanted to make sure.
3          All right.  So talked about Jim Psomas',
4  he's a lay person in your estimation.  Do you have any
5  basis to assert that Clever Devices took advantage of Jim
6  Psomas' lack of technical understanding somehow?
7      A.  I don't think they took advantage of Mr. Psomas
8  directly.  As far as what I understood, the letter was
9  directed to Mr. Carter.
10      Q.  Okay.  Again I'm going to obliquely reference
11  your testimony.  I imagine you will correct me.
12          But I believe your testimony was something
13  along the lines of you saw the skeleton key being
14  broadcast in the Bustime admin tool, is that right?
15      A.  The Bustime admin console.  And I wouldn't -- I
16  guess you could use the word broadcast.  It was
17  definitely being thrown around in the network traffic.
18      Q.  So fair enough with that said.  I believe
19  Christos testified basically along the lines of that he
20  didn't think that would have happened, that, you know,
21  the skeleton key being thrown around in the network
22  traffic.
23      A.  That is correct.
24      Q.  Do you have any basis to say look, there's no

Page 265

1  way Christos really believes that?
2      A.  Yes.
3      Q.  Okay.  Go ahead.
4      A.  I believe CTA produced a dot class file that
5  has the skeleton key inside of it that came from the
6  Bustime admin tool itself.  So when you run the Bustime
7  admin tool it does something called, it's in something
8  called like a Java jar file, which is basically a zip
9  file.  And inside that zip file are things called class
10  files.  And those class files contain Java byte code that
11  have instructions for the program to run.  Along with
12  constants.  Along with those constant values has to be
13  the string for the skeleton key.
14      Q.  So I want to ask nearly the same question but I
15  want to confine it to the time frame of August 20, 21 or
16  so of 2018.
17          Do you think there's, you know, at that
18  point in time is your answer any different in terms of
19  whether Christos would have genuinely believed that the
20  skeleton key was not being thrown around in network
21  traffic?
22      A.  I honestly don't know what Christos would
23  think.  He said that Bustime wasn't his primary product
24  at the moment anyway.  So I don't know at that time what

67 (Pages 262 - 265)

Page 266

1 his focus was and how familiar he was with all of the
2 different projects he was working on.
3     Q.  Okay.  So obviously the Clever Devices letter
4 came in October of 2018 for, you know, ostensibly related
5 to August 2018 activity.
6         Do you have any basis to dispute the
7 explanation Clever Devices has given for that gap in
8 time?
9     A.  No.  Everything Christos said sounded pretty
10 concrete and actually very in line with a lot of good
11 practices that should have been in place already.
12         However, I do recall the letter saying
13 that the investigation was ongoing and I believe
14 Miss Friedlander said that it had concluded at that
15 point.
16     Q.  Okay.  And when you say she had, she said it
17 concluded, we are talking about something that would be
18 on our transcript, right?
19     A.  Yes.  That would be on the transcript.  If it
20 wasn't her it might be, it could be Christos.  I think
21 those are the only two Clever people we have done
22 depositions for.
23     Q.  Sure.  So really all I'm trying to kind of
24 delineate is it's something that happened in the

Page 267

1 deposition, not something you heard someone say outside
2 of a deposition, right?
3     A.  That is correct.
4     Q.  Okay.  So you testified along the lines of your
5 whistleblower activity being reporting the existence of a
6 skeleton key to Mike Haynes, right?
7     A.  That is correct.
8     Q.  How did you communicate that whistleblower
9 activity to Clever Devices prior to October of 2018?
10     A.  I believe --
11         MR. DUFFY:  Objection to the extent it calls for
12 any legal conclusion.
13         THE WITNESS:  A  I believe Mr. Haynes was the one
14 that reported it to Clever Devices formally in an e-mail
15 and I believe I made Clever Devices personnel aware of
16 both the skeleton key security risk and the security risk
17 of the service bulletin API feature being accessible by
18 anyone with a restricted key as well, earlier on.  I
19 believe that's documented in the action tracker.
20         MR. JADOS:  Q  Anything else?
21     A.  That seemed, I think that's it.
22     Q.  Some of the deposition questioning, not
23 necessarily today, it's hinted at the possibility that
24 testing the skeleton key on Dayton and other agencies was

Page 268

1 protected activity, was whistleblower activity.
2         But to be clear you're saying you didn't
3 conduct that test on Dayton, right?
4     A.  I did not conduct the service bulletin API test
5 on Dayton, that is correct.
6     Q.  You drew a distinction.  Did you conduct some
7 test on Dayton?
8     A.  If I did, that's unclear.  From what I
9 understand, the service bulletin one which made use of
10 restricted fields was the one that was the main one in
11 question and was the big event.
12         But from what I understand, there may have
13 been other checks with the skeleton key against for
14 example CTAs test system, their production systems
15 because their databases aren't exactly parodied with each
16 other but they generally are.  And I think potentially
17 properties that had no API available, period.
18     Q.  Yeah.  I think we got lost in that a little
19 bit.  Maybe I just missed the answer.
20         It's my understanding did you perform some
21 tests of some sort on Dayton?
22     A.  I personally don't recall doing that myself,
23 no.
24     Q.  I want to look at the CTAs Exhibit 32 real

Page 269

1 fast.  This is your notice of discharge, right.  And I
2 want to focus on that poor work performance section.  I
3 believe it's the third sentence.
4     A.  Still loading on my end.
5     Q.  Fair enough.  Let me know when you have it.
6     A.  It's up.
7     Q.  The third sentence was you also without any
8 authority, goes on to talking about access, Dayton
9 transit.  And I know you raised the issue of look, I
10 didn't do this.
11         My question is, is this essentially what
12 Mike Haynes did in this sentence?
13     A.  What Mike Haynes did was -- and I wouldn't
14 characterize it as exploiting a hidden API, but what he
15 did was he accessed the service bulletin API and used I
16 guess you would call it -- well we know it as the
17 skeleton key.  And had posted a redundant message on
18 Dayton's system Twitter account, so yes.
19         If that's what you're getting at, that is
20 yes, what Mike Haynes did.
21     Q.  Fair enough.  So I know we have seen it in some
22 of these documents and I can't remember if it's ones
23 necessarily, you know, been over today, but I want to say
24 at some point you referred to the Dayton incident or the

68 (Pages 266 - 269)

Page 270

1 specific posting of the alert that led to the Tweet at
2 Dayton as a penetration test.
3        Does that register in your memory at all?
4     A. I believe Mr. Haynes may have used the term
5 penetration test. I wouldn't -- I think the context in
6 which I used penetration test was in terms of penetration
7 testers that make use of responsible disclosure and have
8 rules of engagement.
9     Q. Okay. So the use of the skeleton key on Dayton
10 RTA and any of the other transit agencies that the
11 skeleton key was used on, do you consider just the mere
12 use of the skeleton key on those systems, do you consider
13 that penetration?
14     A. I wouldn't consider that penetration, no.
15 Because it's a publicly-exposed API.
16     Q. And --
17     A. The purpose of a penetration test is to gain
18 internal access. And this is something public facing.
19     Q. So you're saying the skeleton key doesn't allow
20 you internal access to a network and you can tell me if
21 I'm wrong on that, but is that right or wrong?
22     A. In the way that it was used it does not. But
23 there are ways that it potentially could be.
24     Q. When you say the way it was used, the way it

Page 271

1 was used by one or more people at the CTA that may have
2 included Haynes, may have included you?
3     A. The way that it was used by Mr. Haynes would
4 not have, I would not consider that penetration testing,
5 no.
6     Q. So I'm not, I want to ask it slightly different
7 then. I want to ask if the skeleton key as used on these
8 20 some other agencies besides the CTA, by Mr. Haynes, if
9 that's getting inside of the network of those other 20
10 some agencies?
11     A. When he performed the time queries, is that
12 what you're referring to?
13     Q. That's one of the things, yes.
14     A. The time queries, no, that would not, I would
15 not consider that getting inside the network. That's a
16 public end point.
17     Q. What about for a lay person. You think it's
18 reasonable for a lay person to consider getting that time
19 to be something that was done to get inside of these
20 networks?
21     A. I couldn't really answer that question. But I
22 can say that there are varying levels of understanding of
23 how things work.
24        There are people who consider for example

Page 272

1 if they leave their Facebook logged in and they walk away
2 and somebody posts something, they will say their
3 Facebook was hacked. So there are varying levels of
4 understanding of things. And it would really depend on
5 the technical level of that person.
6        And while I do consider Jim Psomas to be
7 not super technical, he definitely has more technical
8 merit than someone who would say their Facebook was
9 hacked by someone walking up to it. If that's what
10 you're asking.
11     Q. Yes and no. More what I'm asking and Jim
12 Psomas is a good one to talk about.
13        Do you think it's completely unreasonable
14 for him to consider the accessing of 20 some agencies to
15 get the time using the skeleton key, for him to consider
16 that, you know, to have gotten inside of those agency's
17 networks?
18     A. Yes.
19     Q. How come?
20     A. He said that he had computer science experience
21 and if you know anything about computer science, you
22 understand how API's work and you should absolutely know
23 that an end point like this exposed to the public is not
24 something internal.

Page 273

1     Q. So the Dayton test is to determine the extent
2 to which the skeleton key affected transit agencies other
3 than the CTA, right?
4     A. That was my understanding of what Mike hoped to
5 accomplish with it, yes.
6     Q. Okay. Yeah. And we can look at the exhibit or
7 I imagine you might know what I'm talking about.
8        But Mike Haynes said I believe to Craig
9 Lang yeah, we didn't need to do the Dayton test to know
10 that it was a problem for the CTA.
11        Do you have an idea what I'm talking about
12 in that e-mail?
13     A. I agree with that statement. He did not need
14 to do the test to know if it was a problem for CTA. But
15 in order to know its scope beyond the CTA, he would have
16 needed to.
17     Q. Mr. Pable, is it your position that finding the
18 skeleton key and telling Mike Haynes about it rendered
19 you somehow immune from discipline by the CTA for the
20 Dayton incident?
21        MR. DUFFY: Objection to the extent that it calls
22 for any legal opinion.
23        THE WITNESS: A I honestly don't know because I
24 didn't think there was anything improper that I had done.

69 (Pages 270 - 273)

Page 274

1  So I had never considered the Dayton incident as
2  something that I had "done". So I would have never
3  considered becoming immune to its consequences.
4      Q. Sure. It sounds like that was kind of a
5  backward thinking answer. And I don't mean your logic
6  was in any way backward. I mean you're kind of going
7  into the past.
8          I'm talking about right now. Is it your
9  position that finding the skeleton key and telling Mike
10 Haynes about it renders you immune from discipline from
11 the CTA?
12     MR. DUFFY: Same objection. The statute says what
13 it says.
14     THE WITNESS: A  I don't know what discipline I
15 would be charged with because all of the -- practically
16 every single sentence I read in that statement of
17 discharge I had a major issue with and brought that up to
18 Miss Babbitt. I believe she stopped me from pointing out
19 all the flaws in every single sentence.
20     Q. Sure. I guess my question is still this notion
21 of you brought this whistleblower retaliation claim. And
22 I'm just trying to see if it is your position, you know,
23 if there's anything, any sort of facts you can tell me or
24 say look yeah, I reported this to Mike Haynes and I

Page 275

1  reported the skeleton key to Mike Haynes so I should be
2  bulletproof.
3          I know you're not a lawyer and the statute
4  says what it says. So I'm just kind of asking as your
5  non lawyer opinion. You're not a lawyer kind of basis,
6  where you're claim is going here.
7      MR. DUFFY: Same objection. I don't know how he
8  answers it then but you can try.
9      THE WITNESS: A  It's my position that by
10 reporting the skeleton key to Michael Haynes, I did my
11 duty in reporting a security risk.
12         Now whether or not that makes me immune in
13 terms of any sort of disciplinary action, I guess that
14 depends on whether or not it was changed to a protected
15 activity. And it is my position that the test Mike
16 Haynes performed was indeed a protected activity. But I
17 didn't perform that.
18         And I was, I was swept up in being
19 disciplined for one, reporting and starting the ball
20 rolling as you will. So I think the act of reporting is
21 what I'm being disciplined on and I think that's very
22 wrong.
23     Q. Okay. The October 22, 2018 Clever Devices
24 letter, correct me if I'm wrong, you believe some of the

Page 276

1  contentions in that letter are inaccurate, is that right?
2      A. The one from Miss Friedlander?
3      Q. Yes.
4      A. I would have to review it again.
5      Q. Sure. Just off the top of your head though, is
6  there anything you can think of that's inaccurate in
7  there?
8      A. One thing if I remember correctly, I think
9  there may be an allegation of modifying Clever Devices'
10 code, which I didn't do.
11     Q. Okay. Anything else that comes to mind?
12     A. Not at this very second.
13     Q. Okay. There may be inaccuracies in that
14 letter, and I get that you're having some difficulty
15 identifying what those inaccuracies might be. But let's
16 go with the modifying of the code in particular.
17         The inclusion of that in the letter, is
18 that indicative to you of whistleblower retaliation?
19     MR. DUFFY: Objection.
20     THE WITNESS: A  I don't understand the question.
21     MR. JADOS: Q  Sure. So there's at least one
22 inaccuracy in the letter you have identified and it's the
23 discussion of modifying code.
24         Is that, that inaccuracy, do you have any

Page 277

1  basis to say that that's indicative of whistleblower
2  retaliation against you?
3      MR. DUFFY: Objection, same question.
4      MR. JADOS: I tried to rephrase it. It's not the
5  exact same.
6      MR. DUFFY: It's 99 percent the same.
7      MR. JADOS: Can you answer, Chris -- Mr. Pable,
8  forgive me.
9      THE WITNESS: I'm trying to think of how I can
10 possibly answer that because it doesn't make a lot of
11 sense to me. Let me try to parse what you might mean.
12     MR. JADOS: Mr. Pable, let's move on. Let's
13 actually look to the exhibits and it's P Dep 19, this
14 letter.
15     THE WITNESS: Okay.
16     MR. JADOS: It's actually, the letter is on the
17 second page of this document I want to say, yes, it is.
18 Starts on the second page.
19         So you talked about miscommunications. I
20 don't remember whether you used the word mistakes or not.
21 What I'm trying to figure out here is if there's
22 something you can point to in this letter where you can
23 say look, this is not an innocent miscommunication, this
24 is, you know, evidence of wrongdoing against me.

70 (Pages 274 - 277)

Page 278

1  THE WITNESS: Okay. With it in front of me I can
2  identify some sentences. One moment, please.
3  On page CTA Pable 337. Second paragraph.
4  After the text EULA. Including making improper
5  modifications to the Clever Devices software product.
6  That was one of the things that I brought up earlier.
7  Then he also right below there, there's a
8  sentence that says Haynes informed Clever Devices, see
9  attached e-mails. That he and his employee Chris Pable
10  had discovered and exploited a vulnerability they
11  uncovered in the Bustime application programming
12  interface.
13  I believe that completely mischaracterizes
14  things by inextricably linking the words discovered and
15  exploited. I also see the -- a threat in the fact that
16  they say likely in violation of federal and state laws.
17  Again for something that I had not done.
18  And then there are I wouldn't say --
19  baseless isn't quite the word, but unbacked up claims
20  that both Mr. Haynes and myself had done this in the
21  past. Which again I have not.
22  MR. JADOS: So you mentioned some things in there
23  that you had not done.
24  Q. Are you aware of any facts where you can say

Page 279

1  definitively Clever Devices knew I didn't do those things
2  as of October 22, 2018?
3  THE WITNESS: A I have no idea what Clever
4  Devices would have known or not. They said they never
5  interviewed anyone at CTA regarding this investigation,
6  so I don't see how they could have come to those
7  conclusions.
8  Q. Again so what I am driving at here and I'm not
9  really trying to conceal it. You know there's
10  miscommunications and there's misunderstandings.
11  Is there anything you can point to in this
12  letter and say look, they couldn't have possibly,
13  credibly have this understanding; Clever Devices could
14  not have?
15  A. Let me read the next page.
16  It's my understanding that they can't
17  possibly believe or back up any claims related to
18  software modification for instance. So I see that on
19  both pages of this letter here.
20  And certainly without interviewing anyone
21  at CTA or performing any kind of investigation into that,
22  which there's been testimony there has been none. So I
23  can't see how they possibly could have come to that
24  conclusion.

Page 280

1  Q. Okay. That's all based on the depositions and
2  the documents you've seen?
3  A. That is correct.
4  MR. JADOS: I want to look at Plaintiff's Dep 22.
5  That one has got this orientation. My apologies.
6  So Mr. Pable --
7  MR. DUFFY: There's a button.
8  MR. JADOS: Q Mr. Pable, are you able to kind of
9  look at this normal?
10  THE WITNESS: A Yeah. I can rotate it but it
11  looks like it's scanned in so it's very difficult to read
12  on here, so I have to scroll as I read it.
13  Q. Really what I want to talk about, you already
14  mentioned this a little bit. It's that Scott Chapuis
15  e-mail where he talks about the notion of the statement
16  you said. You said it was incoherent, I can't remember
17  how you necessarily completely described it but it's --
18  A. I would describe it as a series of fragments
19  basically.
20  Q. Sure. Fair enough. So do you remember this
21  conversation at all?
22  A. I remember talking to Scott about CVE databases
23  and how it should be handled.
24  Q. Okay. Can you go on and tell me everything you

Page 281

1  remember in terms of what you said to him about the CVE
2  databases and how it should be handled?
3  A. Yeah. I said generally when a vulnerability is
4  discovered, the vulnerability is published in this
5  database to the appropriate agency. And then the
6  protocol generally means, generally requires that the
7  vendor address the issue within a time frame either if
8  they participate in the CVE program based of their
9  choosing, or what the agency curating it does before what
10  the general description of the issue is posted publicly.
11  By participating in the CVE program, an
12  organization can for example explain that we need more
13  time to perform a certain fix or we need certain
14  requirements to validate certain vulnerabilities that are
15  found. But if you don't participate in it, I believe the
16  database curators are either validated or take your word
17  for it and bring it to the attention of the organization.
18  So at that point the organization is
19  notified in about 24 hours about it and then the number
20  is reserved. And after the number is reserved, after the
21  time period has expired or a patch has been deployed, a
22  general description of the vulnerability has been
23  published.
24  Q. And as far as you're aware was Clever Devices

71 (Pages 278 - 281)

Page 282

1 participating in the CVE database at this time,
2 August 2018?
3     A.  They were not.  And Christos says they are
4 looking at participating in the future.
5     Q.  Sure.  So this is again going to be a foggy
6 question.  I don't want you to get into Scott Chapuis'
7 head.  Not what I'm really asking you to do.
8         I'm asking you aside from that task of
9 imagining yourself as him, do you have any basis to say
10 yes, Scott Chapuis knew exactly what I was talking about
11 when I was talking about all of this?
12     A.  I honestly don't know what Mr. Chapuis thought.
13 But I can say from what he wrote down there are only
14 fragments of the conversation.  So I don't know if maybe
15 he just didn't hear everything or if he didn't comprehend
16 everything.
17         But I received no follow-up from Clever
18 Devices on that statement.
19     Q.  And other than what you may have seen in
20 documents, other than what you may have heard in
21 deposition testimony, do you have any idea of how Scott
22 Chapuis' characterization of that conversation was
23 circulated through Clever Devices?
24     A.  Other than the document productions, no.

Page 283

1         In fact, I didn't even know he told
2 anybody about the formalities that take place when these
3 sorts of things are published.
4     Q.  Do you have any basis to dispute the testimony
5 from Julie Friedlander, Scott Chapuis and Craig Lang that
6 they are not particularly tech. savvy folks and they
7 doesn't necessarily have a full understanding of the
8 technical side of what happened in this case?
9     A.  From the testimony of Miss Friedlander, she
10 told me that she relied on Christos for a lot of or
11 rather she told the court she relied on a lot of
12 technical input from Christos.  And Scott, I worked with
13 him.  I knew he was not super technical.  Already out of
14 band, but I have no basis for Mr. Lang.
15     Q.  Back to Julie Friedlander.  I kind of wanted to
16 get this straight.  I think we've been over it but
17 basically your understanding of her is that she is not
18 particularly tech. savvy, correct, herself?
19     A.  Correct, but I don't think she should have
20 signed a letter if she didn't know what she was signing.
21     Q.  Fair enough.  I want to go back to CTA
22 Exhibit 33 for a minute.  I want to go down to the --
23 this is the top or I should say the bottom of the first
24 page of the actual e-mail.  Top of the second page.

Page 284

1         So it's the second and third pages of the
2 PDF.
3     A.  The time line?
4     Q.  Yes.  Exactly.  I know you testified that this
5 is not necessarily all your doing.  But so at the top of
6 the second page of the e-mail it says ugh, and then that
7 final sentence there is at that point a global skeleton
8 API key was found.
9         That global skeleton API key as you
10 understand it, is that the skeleton key or is that
11 something else?
12     A.  Global skeleton API key is synonymous with
13 skeleton key.
14     Q.  Good.  So I'm reading that whole passage of
15 ugh, those two sentences, then I'm looking up at the
16 prior page July 28, Bustracker upgrade.  And I'm reading
17 that so the skeleton key is discovered about a week after
18 July 28, is that right?
19     A.  Possibly a bit later.  Maybe two weeks-ish.
20 That's when we started -- week or so after the upgrade is
21 when routes started falling out of the Bustime system and
22 when I started investigating.  And I found the skeleton
23 key but I didn't know what it was originally at the time.
24     Q.  About when do you think you figured out what it

Page 285

1 was, the skeleton key?
2     A.  On August 17 I'm positive based on all of the
3 interactions that occurred is when we finally discovered
4 that hey, this is an API key with restricted abilities
5 and preloaded in all Bustime systems.
6     Q.  I want to look at Plaintiff's Dep 1.  I want to
7 go to the second page of it.  And I don't know, you know,
8 this is small print.  I don't know how well you're able
9 to see it, but the properties evaluated part.  I want to
10 get the order of operations here.
11         So there's 20 some agencies listed here.
12 And these are all evaluated by attempting to use the
13 skeleton key on them in some fashion, right?
14     A.  I don't know how they were evaluated.
15 Mr. Haynes performed that evaluation.
16     Q.  Did you test the skeleton key on any agency
17 just to see if it worked in any fashion?
18     A.  The only thing that I can think of off the top
19 of my head, definitely I tested on CTA test and CTA
20 productions to make sure there was nothing there.
21         Is that what you're getting at?
22     Q.  No, I'm talking about other agencies.  Outside
23 of CTA.
24     A.  Outside of CTA?  Potentially New Jersey because

72 (Pages 282 - 285)

Page 286

1 they had no API at all. They were an anomaly I believe
2 that Mike had brought up but I don't think that anything
3 ever came of New Jersey.
4    Q. How do you figure out New Jersey doesn't have
5 an API?
6    A. They don't publish an API guidebook on their
7 website.
8    Q. So again, kind of the order of events, it might
9 be a Mike Haynes question. But are all of these
10 properties evaluated, is the skeleton key used on them
11 before the execution of I want to say you called it a
12 configuration that led to the Tweet at Dayton RTA, or is
13 the operation reversed or how did that go?
14    A. It is my understanding that before the
15 configuration change to test the Tweet on Dayton, there
16 was no, there was no -- what's the word I'm looking for.
17           There was no knowledge that this key would
18 work on any agency with restricted fields or have the
19 permission to write service bulletins for instance. So
20 that aside, that would indicate to me that these were
21 done post testing of or post Dayton test.
22    Q. How do you know the full impact of what the
23 skeleton key could do?
24    A. So when I was using the Bustime admin console,

Page 287

1 the simple act of logging in to the admin console
2 displayed to me in the traffic being transmitted up the
3 skeleton key.
4           And that to me means that it uses the
5 skeleton key to perform some sort of action through, some
6 sort of authentication of an action through Java RMI.
7 Which means that if you know the name of a remote method
8 to invoke, that's what RMI stands for, remote method
9 invocation, you could in theory use RMI in conjunction
10 with the skeleton key to do more. But I never pursued
11 that line.
12    Q. Do you agree with the contention that the
13 skeleton key in combination with the service bulletin API
14 is a bigger problem than the skeleton key alone?
15    A. No, actually. Because if it indeed does permit
16 RMI transactions to go through as an authentication
17 mechanism, there's an ability to use Java RMI to create
18 service bulletins, which is what the Bustime admin
19 console is used for already by hand.
20           So the fact that an extra end point was
21 added, public facing side, did not make that much of a
22 difference in terms of scope of what could be
23 compromised. It did make it more accessible however.
24 That depends on how you evaluate it.

Page 288

1    Q. Okay. So I want you to take a look at CD
2 Exhibit 8, I believe it's at the front of the Exhibit
3 Share, the first thing.
4    A. I have it.
5    Q. I want you to scroll down to it's the second
6 page in the PDF. It's, it's a -- hang on a minute, I
7 have lost it now. There we go. Sorry.
8           It's, this is an e-mail exchange between
9 you and Mike Haynes, correct?
10    A. That is correct.
11    Q. Among other things, well there's kind of a gray
12 box and right above that do you see the text that says
13 done, case closed, amazing?
14    A. Yes.
15    Q. Do you know what Mike Haynes thought was so
16 important about this?
17    A. Yeah. I don't know if you can see it on the
18 clipping here, I think the clipping was trimmed off. But
19 if there's an attachment on here you might be able to see
20 it. One second.
21    Q. There's a couple, yeah.
22    A. Let me try to find the second attachment. One
23 moment, please. Very slow loading on my computer. I
24 might have to just download the exhibit and try.

Page 289

1    Q. Yeah. Without seeing it, do you have an idea
2 of what should have been or what's been clipped there?
3    A. The date.
4    Q. Okay. Do you recall what the date was?
5    A. October 22, 2018.
6    Q. Why is that? I guess I will ask you for you
7 first. Why do you think that date is important?
8    A. That is the day that Mr. Haynes and I were, was
9 placed on administrative leave. It is on page 57.
10    Q. So --
11    A. Clearly there.
12    MR. DUFFY: Page 57 of what, the PDF or the
13 document?
14    THE WITNESS: Of the PDF. It is T001538.
15    MR. JADOS: Q Do you know beyond merely the date,
16 why is the date significant other than it's the, you
17 know, the date of your admin leave?
18    THE WITNESS: A Mr. Haynes was very -- what's the
19 word I'm looking for. He was always looking for
20 connections to things. And I think he got very excited
21 when he saw a reference to that date. Thinking that
22 perhaps Christos made a modification to Bustime on that
23 exact date and deployed it patching some of the security
24 flaws we had found. But there was no basis for that in

73 (Pages 286 - 289)

1 the documentation he sent over.

2    Q.  Okay.  Anything else you can think of

3 significant about this exhibit and the dates?

4    A.  No.  I'm pretty sure it was only the date and I

5 had attached both of the public development guides for

6 reference.

7    Q.  Fair enough.  I want to -- I will ask this

8 first.  So if Julie Friedlander or other higher-ups at

9 Clever Devices formed the opinion sometime leading up to

10 October 22 of 2018 that you're a hacker, operating on the

11 dark web, do you have any basis to dispute that

12 Miss Friedlander or anyone else at Clever Devices

13 genuinely held that opinion?

14    A.  I don't know where you would get the words dark

15 web or hacker from.  My definition of hacker is certainly

16 very different from many others.  But I don't know where

17 she would even get a connotation of dark web.  I never

18 even seen a reference to the words dark web in any of the

19 productions either.

20    Q.  Any other reason why she just couldn't form

21 that opinion as you understand it?

22    A.  I think it's very improper that someone form an

23 opinion on someone based entirely off of non firsthand

24 knowledge.

1    Q.  Anything else?

2    A.  Basically anything hearsay but yeah, I really

3 can't tell you what, why Miss Friedlander would think

4 what she thinks.

5    Q.  If the skeleton key was a major security issue

6 for the CTA mid afternoon on August 17, why did it take

7 three days to tell Clever Devices about it?

8    A.  From what I understand it was less than one

9 business day.

10    Q.  Sure.  But security concerns are security

11 concerns on the weekend, right?

12    A.  Absolutely.  But again, I reported it to

13 Mr. Haynes and as I stated before, Mr. Haynes is the one

14 with more experience in delegating and managing these

15 kinds of issues that had cropped up along the CTA.

16    So I trusted his judgment.  I think he

17 knew what he was doing.  I don't know the extent that

18 Bustime 5.3 was deployed either.  Maybe he was trying to

19 find that out.  But I don't know.

20    But from what I understand is he made the

21 determination to make sure that he got all of the

22 information together, accurate and relevant and not send

23 out something rushed and potentially incomplete or

24 inaccurate.  So I trust his judgment on that.

1    I can't speak for why he did it on Monday.

2 But that's really not my place to judge him.

3    Q.  Fair enough.  I want to look at CTA Exhibit 34.

4 I want to go down to the, let's see here.  The third page

5 of the PDF I think.  Give me one second.  Apologies.

6 Yeah, okay.  The third page of the PDF.  It's the third

7 full paragraph from the top.

8    A.  Can you give me the Bates number, please.

9    Q.  Sure.  The Bates number is P001215.

10    A.  Okay.  Third paragraph.

11    Q.  Third paragraph starts during the call my

12 manager.  See that?

13    A.  Yes.

14    Q.  So the last sentence of the paragraph which is

15 kind of towards the right three lines up, in fact I've

16 been writing hot fixes.  Do you see that?

17    A.  Yes.

18    Q.  Okay.  So this is you're saying you've been

19 writing hot fixes to Clever Devices applications, is that

20 right?

21    A.  Not to their code, but I have been writing hot

22 fixes for their applications to function, yes.

23    Q.  Explain that difference to me like I'm a juror

24 who knows nothing about computer science.  The

1 distinction.  You're saying you're writing hot fixes to

2 code or writing hot fixes to apps, not changing code.

3    A.  I'm writing hot fixes to correct behaviors or

4 fix certain features.  For example, I believe this is

5 also captured in one of the productions.

6    Some time ago Clever Devices used to in

7 their computer aided dispatch system sound an audible

8 alert and tell a controller when someone had pressed an

9 emergency alarm.  And that was a huge, big deal.

10 Sometime down the line that functionality was removed.

11    So in order to supplement and fix the

12 removal of that feature, even though Mr. Haynes is quite

13 adamant he wanted it fixed in fact, I created a separate

14 application that looked at a database view that

15 Mr. Haynes had created that let us know when an emergency

16 alarm was activated, sounded the alarm for the

17 controllers and turned it off when someone acknowledged

18 it.

19    Q.  Okay.  These hot fixes to apps, do you any

20 basis to say a lay person could not possibly construe

21 that as changing code?

22    A.  They might.  But again, this was a draft that I

23 had in my draft that I had been meaning to send to

24 family.  This was never sent out to anybody.

Page 294

1  Q.  Fair enough.  Are you aware of any CTA employee
2  who upper management believed participated in the hacking
3  into another transit agency system but the employer kept
4  their job?
5  A.  Can you restate that question?  Kind of missed
6  what you said there.
7  Q.  So I want to know if you know of any CTA
8  employee who upper management at CTA believes engaged in
9  hacking of another transit agency system yet that
10  employee still kept their job?
11  A.  I don't think there was anyone at CTA
12  technically capable of performing a malicious act of that
13  nature that I am aware of.  So I don't know how to answer
14  your question.
15      But you also make use of the word hacked.
16  And once again, you and I have very different definitions
17  of the word hacked.  If you look it up there's God, maybe
18  like 14 of them, many.
19      I prescribe to the definition that a hack
20  is a clever, out-of-the-box thinking solution to a
21  problem using computer code.  Some other people may
22  attribute it to like I stated earlier, walking up to your
23  Facebook that you left unattended.
24  Q.  Okay.  So asking it this way then.  Are you

Page 295

1  aware of any CTA employee who CTA management believed got
2  inside of another transit agency's system without
3  authorization and the employee kept their job?
4      And I don't mean to limit this in any way
5  to something malicious.  I'm just talking about getting
6  inside.
7  A.  I can't think of any off the top of my head.
8  But I can't think of anyone who has gotten into another
9  transit agency either in that regard.
10  Q.  Fair enough.  You mentioned during your
11  testimony there's skeletons in Clever Devices's closets.
12      Do you believe any of those skeletons led
13  to your termination?
14  A.  It's very possible.  I know that I had written
15  code for Secure Bus and given it to Rochelle Kang.
16  I know that Clever Devices had
17  accidentally re-used CTA's password on Wamatta (phonetic)
18  for our Secure Bus application and they never bothered to
19  rotate CTAs password after they exposed us to the risk.
20      So there's a lot of skeletons that I could
21  bring up that they may feel threatened by because they
22  did not want to do the work to correct it.
23  Q.  Any of those skeletons lead to your termination
24  as you understand it?

Page 296

1  A.  They very well could have.
2  Q.  Do you have any reason to believe they actually
3  did?
4  A.  I have no direct proof in the productions
5  provided.
6  Q.  How about outside of productions provided?
7  A.  Nothing firsthand.
8  Q.  Anything secondhand or more hand?
9  A.  I believe you're asking for hearsay then and I
10  don't know if that's admissible.
11  Q.  May not be but I'm still curious.
12  MR. DUFFY:  You can say what somebody told you or
13  you heard.
14  THE WITNESS:  A  Okay.  From what I understand,
15  Mr. Lang and Mr. Shore wanted to do a full patent on
16  Secure Bus in theirs and Clever Devices' name from what I
17  gathered.  And the fact that I had contributed code to
18  that could have put the kabash on them being able to do
19  so.  So --
20  Q.  Go ahead.
21  A.  And Craig Lang was the person who for lack of a
22  better word introduced the letter to Mr. Carter.  With
23  whom he had a relationship of and wanted to do away with
24  me, in my opinion.

Page 297

1  Q.  Okay.  Any factual basis to support all of that
2  that you haven't already told me?
3  A.  As I said, this is purely hearsay.
4  Q.  Who did you hear it from or have you already
5  told us that today?  I don't want you to repeat things
6  you already told us.
7  A.  I believe I had overheard Mr. Lang on a, on one
8  side of a conversation with Mr. Shore and when Mr. Shore
9  was demonstrating the Secure Bus features of the Clever
10  CAD system at CTA on initial pitch for us to purchase the
11  system.  Again, they were one-sided conversations, I
12  didn't hear everything.  And I didn't think too much of
13  it at the time.
14  Q.  Ever applied for employment with Clever
15  Devices?
16  A.  I did.
17  Q.  What happened there?
18  A.  What I wanted to do was work on enhancing other
19  transit agencies and I was told that I could work with
20  CTA through Clever Devices, so I decided to pursue that
21  at one point.  I felt I could fix a lot of the problems
22  that we had been experiencing with Clever Devices
23  software given that I had a lot of experience in a lot of
24  different programming languages.

75 (Pages 294 - 297)

Page 298

1 Unfortunately the interview basically
2 consisted of me giving off a technical proposal for an
3 interbus communication, authenticated interbus
4 communication protocol and I was never talked to again.
5 Q. That experience, did that motivate you in any
6 way to bring your claim against Clever Devices in this
7 action?
8 A. No. That motivated me to work on the
9 Bombardier rail system.
10 Q. Mr. Pable, I don't want you to repeat your
11 testimony. In fact I want to specifically avoid that.
12 But with that in mind, my question is
13 whether there's anything else that you know about and
14 have not already mentioned in your deposition today that
15 Clever Devices did to cause your separation from
16 employment with the CTA?
17 MR. DUFFY: You can answer to the best of your
18 ability.
19 THE WITNESS: A Not that I can think of at the
20 top of my head.
21 MR. JADOS: That's all I have.
22 MR. DUFFY: Okay. Just a few quick things, Chris.
23
24

Page 299

1 EXAMINATION
2 by Mr. Duffy:
3 Q. You recall Mr. Jados asking you questions about
4 sort of getting at whether Christos may have believed the
5 skeleton key was in the network traffic or not.
6 You recall that?
7 A. Yes.
8 Q. Regardless of what Christos knew --
9 A. I'm sorry, hold on one second. My headset just
10 died. Okay. Can you hear me okay through the computer
11 speaker?
12 Q. Yeah. Regardless of what Christos knew,
13 somebody at Clever Devices at some point in time knew
14 where the skeleton key was and what this was doing,
15 right?
16 A. Yes, I believe that was Noreen Lynch.
17 Q. Even if she didn't know, Clever Devices put the
18 key in there and put it to do whatever it was doing,
19 isn't that a fair conclusion?
20 A. Correct. I believe Christos said it had been
21 around for a very long time so it likely pre-dated
22 Noreen.
23 Q. If Christos wasn't sure where the key was, he
24 never asked you to tell him where you found it, did he?

Page 300

1 A. No, he did not.
2 Q. You know from sitting in Miss Friedlander's
3 deposition that Clever Devices conducted a couple of
4 investigations.
5 Did anyone in those investigations ever
6 ask you for any information?
7 A. No, I was never contacted.
8 Q. Did anyone ask you for your side of the story
9 with regard to any of these events?
10 A. No, I was never contacted at all.
11 Q. Are you aware of any, were you given any
12 opportunity to see what or hear what people at Clever
13 Devices had concluded or might conclude and give your
14 position with respect to it?
15 A. No I was not.
16 Q. The CTA also conducted an investigation of
17 sorts, correct?
18 A. Correct.
19 Q. And other than the interviews, other than the
20 interview session that we talked about with Mr. Psomas,
21 Mr. Radojcic and Miss Marasovich, were you given any
22 other chance to tell your side of the story?
23 A. I attempted to tell my side of the story and
24 explain why I thought the charges brought against me

Page 301

1 weren't proper and they were fabricated. And as I
2 started explaining them, the only response I got from
3 Mr. Psomas was but still. His exact words.
4 Q. Are you talking about the, your first interview
5 or the second session where you resigned?
6 A. The second session where I was forced to
7 resign.
8 Q. Can you recall any way that you have seen in
9 any of these documents or any of the testimony where
10 anyone at CTA questioned the allegations that had come
11 over from Clever Devices that you and Mr. Haynes had
12 engaged in wrongdoing?
13 A. No, I have not seen anything that questioned
14 the validity of those concerns.
15 Q. Did anyone ever, are you aware of anyone at CTA
16 asking for specifics and proof of the particular
17 allegations in Miss Friedlander's letter?
18 A. No.
19 Q. Did anyone ever even show you
20 Miss Friedlander's letter so you can see exactly what had
21 been said about you and what you were alleged to have
22 done?
23 A. I believe Clever Devices produced it in the
24 Department of Labor file. That was the first time I had

76 (Pages 298 - 301)

Page 302

1 seen it.

2    Q.  Okay.  But no one at CTA ever showed it to you?

3    A.  That is correct.

4    Q.  No one at Clever Devices ever showed it to you

5 at the time they sent it, around the time they sent it

6 either, right?

7    A.  Correct.

8    Q.  I believe even Mr. Jados said he wasn't trying

9 to hide it and I don't think he was, he was essentially

10 saying that well Clever Devices might have been wrong,

11 they might have made a mistake, but that doesn't mean

12 they were out to retaliate against you.  And I don't want

13 to ask you about retaliation because you're not a lawyer.

14        But do you think the investigation that

15 they under undertook in your mind was a fair and unbiased

16 attempt to get at the truth?

17    A.  When you say they, who do you refer to?

18    Q.  Clever.

19    A.  Clever?  No, I don't think so, because I was

20 never contacted or consulted or nothing was ever

21 verified.

22    Q.  How about with respect to the CTA, same

23 question?

24    A.  Same answer.

Page 303

1    Q.  If somebody -- well, never mind.  In your view

2 was this -- there obviously were misunderstandings or

3 strike that.

4        You testified there were misunderstandings

5 or confusion about some of the technical things.  But in

6 your view are you the victim of kind of an honest mistake

7 or an honest misunderstanding either on the part of

8 Clever or CTA or both?

9    A.  I don't think that I was a victim of a

10 misunderstanding.  I feel I was a victim of some sort of

11 agenda.

12    MR. DUFFY:  Okay.  That's it.  That's all I have.

13    THE WITNESS:  I think there was one more.

14    MR. DUFFY:  I don't want to unless you want to talk

15 about it, we can take a break, but I don't think we need

16 to.

17    THE WITNESS:  Okay.

18    MR. DUFFY:  We will reserve signature.

19    THE VIDEOGRAPHER:  Going off the record, time is

20 5:45 p.m.

21

22       (Whereupon, proceedings were

23       adjourned in this deposition)

24

Page 304

1 STATE OF ILLINOIS  )

             ) SS

2 COUNTY OF COOK    )

3

4      I, PAUL W. O'CONNOR, do hereby certify

5 that I reported in machine shorthand and via real time

6 transcription the testimony taken at the deposition of

7 CHRISTOPHER GEORGE PABLE on March 11, 2021; and that

8 this transcript is a true and accurate transcription

9 of my machine shorthand notes so taken to the best of

10 my ability, and contains all of the proceedings given

11 at said deposition.

12

13

14

15

16    Paul W O'Connor, CSR

     License No. 084.002955

17

18

19

20

21

22

23

24

Page 305

1          Veritext Legal Solutions

            1100 Superior Ave

2              Suite 1820

          Cleveland, Ohio 44114

3         Phone: 216-523-1313

4

5 March 15, 2021

  To: Mr. Duffy

6

  Case Name: Pable, Christopher George v. Chicago Transit Authority And

7   Clever Devices, Ltd.

8   Veritext Reference Number: 4464081

9   Witness:  Christopher G. Pable     Deposition Date:  3/11/2021

10

  Dear Sir/Madam:

11

12 Enclosed please find a deposition transcript.  Please have the witness

13 review the transcript and note any changes or corrections on the

14 included errata sheet, indicating the page, line number, change, and

15 the reason for the change.  Have the witness' signature notarized and

16 forward the completed page(s) back to us at the Production address

  shown

17

  above, or email to production-midwest@veritext.com.

18

19 If the errata is not returned within thirty days of your receipt of

20 this letter, the reading and signing will be deemed waived.

21

  Sincerely,

22

  Production Department

23

24 NO NOTARY REQUIRED IN CA

77 (Pages 302 - 305)

Page 306

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS

2

3    ASSIGNMENT REFERENCE NO: 4464081
     CASE NAME: Pable, Christopher George v. Chicago Transit
   Authority And Clever Devices, Ltd.
   DATE OF DEPOSITION: 3/11/2021

4   WITNESS' NAME: Christopher G. Pable

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7    I have made no changes to the testimony
   as transcribed by the court reporter.

8   _____

9   Date       Christopher G. Pable

10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11  the referenced witness did personally appear
   and acknowledge that:

12

     They have read the transcript;

13    They signed the foregoing Sworn
       Statement; and

14    Their execution of this Statement is of
     their free act and deed.

15

    I have affixed my name and official seal

16

  this _____ day of_____, 20_____.

17

18    Notary Public

19   _____

    Commission Expiration Date

20
21
22
23
24
25

---

Page 308

1        ERRATA SHEET
   VERITEXT LEGAL SOLUTIONS MIDWEST

2     ASSIGNMENT NO: 4464081

3  PAGE/LINE(S) /     CHANGE    /REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

   _____  _____

20 Date      Christopher G. Pable

21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22 DAY OF _____, 20_____ .

23 _____
      Notary Public

24 _____

25   Commission Expiration Date

---

Page 307

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS

2

3    ASSIGNMENT REFERENCE NO: 4464081
     CASE NAME: Pable, Christopher George v. Chicago Transit
   Authority And Clever Devices, Ltd.
   DATE OF DEPOSITION: 3/11/2021

4   WITNESS' NAME: Christopher G. Pable

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as

8  well as the reason(s) for the change(s).

9    I request that these changes be entered
   as part of the record of my testimony.

10

    I have executed the Errata Sheet, as well

11 as this Certificate, and request and authorize
   that both be appended to the transcript of my

12 testimony and be incorporated therein.

13 _____
   Date       Christopher G. Pable

14

    Sworn to and subscribed before me, a

15 Notary Public in and for the State and County,
   the referenced witness did personally appear

16 and acknowledge that:

17    They have read the transcript;
    They have listed all of their corrections

18     in the appended Errata Sheet;
    They signed the foregoing Sworn

19      Statement; and
    Their execution of this Statement is of

20     their free act and deed.

21   I have affixed my name and official seal

22 this _____ day of_____, 20_____.

23 _____
    Notary Public

24 _____

25   Commission Expiration Date

Veritext Legal Solutions

www.veritext.com                 888-391-3376

**[& - 26]** Page 1

| & |
| --- |
| **&** 2:7 |

**0**

**084.002955** 304:16

**1**

**1** 2:13 3:17,23
117:14 218:21
219:2 222:12,18
285:6
**10** 96:23 110:9
119:11 233:22
**100** 3:13 108:1
141:15
**10:20** 52:14
**10:23** 52:17
**10:41** 64:22
**10:46** 65:1
**11** 1:24 3:9 4:2
39:12,20 40:12
41:4 239:19 304:7
**1100** 305:1
**111** 2:8
**112** 3:13
**118** 3:14
**11:41** 96:23
**11:43** 97:3
**12** 3:10 55:11
73:10,16 74:8
75:15 225:2
**124** 3:14
**127** 3:15
**12th** 222:14 225:7
**13** 3:10 18:24
75:24 76:2,22
**130** 3:15
**14** 3:11 81:22 82:2
84:2,3 165:22
294:18
**149** 3:16

**15** 3:11 82:10
305:4
**16** 3:12 86:1,11
124:17
**16th** 172:15
**17** 3:12 92:14,19
94:20 213:13,19
227:2,4,20 285:2
291:6
**17th** 172:16
**18** 3:13 96:19
100:12,14,23
101:23 102:13,17
104:14
**1820** 305:2
**18th** 123:21
**19** 3:13,21 112:21
113:2,21 114:14
116:15 117:21
277:13
**194** 3:16
**19th** 123:21
**1:19** 1:5 4:4
**1:22** 169:1
**1st** 237:4

**2**

**2** 54:2,4,4 70:3
117:14 134:3,15
135:17 138:20,23
139:14 140:1,6,12
142:7 143:6,7
144:9,16,21
146:20 147:6,10
147:23 148:13,24
188:22 207:14
244:3
**2,000** 235:2
**20** 3:14 118:14,19
119:4 204:13
210:13 212:4
217:1 265:15

271:8,9 272:14
285:11 306:16
307:22 308:22
**2005** 12:24
**2006** 12:24
**2007** 36:16
**2010's** 250:11
**2011** 15:21 68:22
68:23 69:9
**2016** 106:12 226:5
**2018** 13:4,13 15:10
27:9 28:21,21
29:21 37:14 53:2
53:5 64:11 65:13
67:5 70:24 71:4
71:23 73:20 74:2
76:3 82:2 85:17
86:8 88:13 92:21
100:18 101:8,15
132:20 134:3
147:6,6,23 149:4
150:12 155:5
164:14 165:22
173:3 188:22
189:6 207:14
210:13 217:2
219:2 231:8 235:9
235:10 236:24
237:5,5,9,10,16,23
239:20 247:6,17
249:2 257:15
265:16 266:4,5
267:9 275:23
279:2 282:2 289:5
290:10
**2019** 17:5,23 19:22
64:2,3 65:14 71:5
71:19,20 235:8,11
236:12 237:4
240:10,12,23
242:15 244:20

245:16 246:3
249:24
**2020** 32:16,17
33:20 236:7,11
**2021** 1:24 4:2
304:7 305:4
**209** 3:17
**21** 3:14 124:5,7,14
125:22 265:15
**216-523-1313**
305:3
**218** 3:17
**22** 3:15,22 37:14
44:16 45:16 73:8
73:13,20 76:3
82:2 88:13 116:11
127:3 128:6 147:6
148:23 257:15
275:23 279:2
280:4 289:5
290:10
**226** 3:18
**22nd** 41:24 42:8
123:20
**23** 85:17,22 86:7
**231** 3:19
**233** 3:20
**23rd** 94:9
**24** 3:15 7:19 74:2
92:21 94:18
100:18 101:8
113:3,6 114:17
115:3 116:1,15
117:11 130:7,12
281:19
**24765** 304:15
**250,000** 237:19
242:12
**256** 3:5
**26** 3:16 119:1
149:10,14 150:1

150:22 151:17
152:5,24 155:4
156:22 159:5
161:12 162:10,15
164:5 165:9
**277** 3:21
**28** 72:6 284:16,18
**280** 3:22
**2800** 2:8
**285** 3:23
**29** 127:7
**292** 3:24
**299** 3:6
**2:00** 168:23
**2:01** 169:4
**2nd** 145:14

**3**

**3** 54:2,4,4 70:3
150:12 151:4
204:16 244:4
**3-6-2021** 83:3
**3/11/2021** 305:9
306:3 307:3
**30** 127:10,14,23
129:9 130:8
133:13 168:22
**300** 92:7
**31** 231:8
**32** 3:16 194:21,22
196:23 203:11
207:12 209:17
268:24
**33** 3:17 209:14,19
210:13,19 211:20
213:11 283:22
**337** 278:3
**34** 3:24 292:3
**340-2676** 30:22
**3815** 2:13
**39** 3:9,18 226:18
227:11 228:15

**3:00** 211:15
**3:07** 211:18
**3:27** 117:11
**3:39** 234:1
**3:47** 234:4

**4**

**4** 204:16
**40** 3:19 231:5,8,18
233:3
**401k** 236:20
**41** 3:20 233:6
**430/5-60** 82:20
**44114** 305:2
**4464081** 305:8
306:2 307:2 308:2
**4:18** 255:17
**4:25** 255:20
**4:50** 116:16
117:15

**5**

**5** 64:19 82:20
155:5 157:14
219:2 233:21
**5.3** 291:18
**50** 106:3
**50,000** 245:11
**54,640.06** 244:19
**57** 289:9,12
**5:45** 303:20

**6**

**6** 3:5 159:11
164:14
**60093** 2:4
**60174** 2:14
**60601** 2:8
**630** 30:20,22
**630240** 30:22
**6334** 228:16
**6335** 228:16

**6349** 227:12
**6th** 122:22

**7**

**7/11** 127:11
130:18,20,24
**725** 2:3
**73** 3:10
**76** 3:10
**7868** 1:5 4:4

**8**

**8** 190:14,23 194:13
288:2
**81** 3:11
**82** 3:11
**86** 3:12
**8th** 170:9 189:6
194:23

**9**

**90** 235:16
**90s** 235:19
**92** 3:12
**97,000** 235:17
**99** 277:6
**9:00** 1:22 127:9
**9:44** 37:5
**9:50** 37:2
**9:59** 4:2 37:8
**9th** 89:4,8

**a**

**a.m.** 1:22 4:2 37:5
37:8 52:14,17
64:22 65:1 97:3
127:9
**abandoned** 29:13
101:17
**abdominal** 240:11
**abdominoplasty**
92:11 239:17,18

**abilities** 285:4
**ability** 62:4 201:17
287:17 298:18
304:10
**able** 7:21 8:1,15
10:23 11:1 13:23
19:1 33:14,18,22
54:24 55:1 56:9
60:22,24 61:3
73:10 74:11 76:10
76:13 90:21 92:15
102:6 104:23
116:7 117:7,18
131:15 132:6,7,17
132:22 144:14,17
150:18 152:18
169:13 178:15
191:23 193:3
206:24 207:1,5
226:20 238:22
239:3,4 248:12
252:11 260:18
280:8 285:8
288:19 296:18
**absolutely** 43:22
125:19 137:15
141:4 153:6 155:1
158:18 168:11
176:24 202:6
224:24 272:22
291:12
**accept** 260:19
**accepting** 170:2
**access** 23:1 27:5
27:11 29:15 30:10
33:1,3,22 58:12
104:19 105:22
106:20 109:6,20
110:1 111:24
112:9 131:15
132:6,7 169:10,14

172:5 177:12
198:4,8,10 199:23
200:1,7,18 201:13
202:9,13,19,23
206:19 207:3,16
208:5 226:10,12
226:14 227:21
252:18,20 269:8
270:18,20
**accessed** 27:9
198:12 199:3,15
199:15,21 200:3
200:13 201:2
202:7 203:2
269:15
**accessible** 75:24
267:17 287:23
**accessing** 169:13
200:5 227:3
272:14
**accidentally** 251:2
295:17
**accomplish** 273:5
**accord** 156:7
**account** 22:11,16
22:19,24 27:12
28:3,4,12,17,21,22
28:23 29:19,20,24
40:2 52:6 73:17
92:20 100:15,21
130:13 131:15,23
194:12 199:6
209:22 269:18
**accounts** 21:10
27:14 40:7 253:23
254:9
**accredits** 17:6
**accurate** 8:11
44:18 136:15
143:24 170:4
204:7 231:22

250:20,21 291:22
304:8
**accurately** 144:14
234:12
**acknowledge**
119:24 306:11
307:16
**acknowledged**
293:17
**acquiring** 54:23
**acquisition** 237:11
**acronym** 18:22
19:5 224:5
**acronyms** 16:7
**act** 82:20 83:7,10
83:13 150:19
275:20 287:1
294:12 306:14
307:20
**acted** 164:24
166:6,8 167:7
**action** 46:22 78:20
117:20 124:13
125:22 198:3
267:19 275:13
287:5,6 298:7
**actions** 26:8,9 79:4
**activated** 293:16
**actively** 29:16
**activities** 26:8
35:22
**activity** 82:6
260:23 266:5
267:5,9 268:1,1
275:15,16
**actor** 253:4
**actual** 32:22 72:20
220:18 283:24
**acumen** 230:19
**adamant** 293:13

**added** 239:2
287:21
**addition** 5:8 61:16
62:12 100:4
103:24 128:8
174:15
**additional** 42:18
75:21 97:22
198:13 263:1
**address** 20:18,21
21:2,6,16,20,21
22:1 49:16 114:1
247:21 248:3
253:14,15 262:11
281:7 305:16
**addresses** 20:2,16
21:8,11,21
**adjacent** 182:8
**adjourned** 303:23
**adjustments**
217:21 218:1
**admin** 20:7 171:20
171:23 178:22
221:16,18 264:14
264:15 265:6,7
286:24 287:1,18
289:17
**administrative**
37:13 38:5 39:21
40:23 41:6 45:20
47:10 51:9 53:1
53:23 56:2 57:3
62:8 64:7 73:7
79:10,13,19 83:15
83:19 85:18 88:6
100:24 146:24
289:9
**admissible** 296:10
**admit** 201:3
203:23 204:10

**admitted** 140:24
199:14,17 203:15
204:4,7
**advantage** 246:24
247:1 264:5,7
**adversary** 164:9
164:17
**advice** 55:16 56:10
59:1
**advise** 108:4 131:9
**advised** 90:20
201:8 208:2
**advising** 191:24
**affect** 132:4
230:22
**affixed** 306:15
307:21
**afraid** 66:10 129:6
154:8
**afternoon** 256:2
291:6
**agencies** 139:22
180:18 267:24
270:10 271:8,10
272:14 273:2
285:11,22 297:19
**agency** 97:23
180:12,14 208:3
252:5 281:5,9
285:16 286:18
294:3,9 295:9
**agency's** 272:16
295:2
**agenda** 263:16,17
263:19,20 303:11
**ago** 10:7 28:19
73:23 74:15 108:1
141:22 293:6
**agree** 273:13
287:12

| | | | |
|---|---|---|---|
| **agreed** 31:4 | **alleged** 301:21 | 268:19 271:21 | 198:12 199:3,4,15 |
| 106:10 111:19 | **alleging** 170:11 | 274:5 277:7,10 | 199:21,23 200:3,5 |
| **ahead** 10:14 56:19 | 238:9 | 294:13 298:17 | 200:8 201:2 |
| 82:16 164:22 | **alleviate** 147:16 | 302:24 | 203:16,20,21,24 |
| 169:11 172:2 | **allow** 270:19 | **answered** 44:24 | 204:5,9,10,10,20 |
| 185:18 195:9 | **allowed** 11:22,24 | 45:1 98:14 142:24 | 204:21,22,23 |
| 201:1 215:13 | 143:12 | 158:23 192:2 | 205:16 206:7,7,10 |
| 229:23 256:4 | **alluded** 185:2 | 200:23 201:7,14 | 206:13,17,21 |
| 265:3 296:20 | **alter** 36:4 | 202:24 203:3,6 | 207:1,4,8 216:5 |
| **aided** 293:7 | **alternate** 260:9 | 204:16 259:6 | 219:11 220:2,4,5,6 |
| **ailment** 67:18,19 | **amazing** 288:13 | **answering** 33:13 | 220:7,12,23 221:4 |
| **alanis** 95:20,21,24 | **american** 138:16 | 262:16 | 224:10 228:1,12 |
| 96:2 153:20 | 206:13,19,24 | **answers** 143:24 | 229:17,21 261:24 |
| 184:21 | 207:2,6 | 144:13,19 150:6 | 262:3 267:17 |
| **alarm** 293:9,16,16 | **ammunition** 97:22 | 275:8 | 268:4,17 269:14 |
| **alert** 93:13,21 94:1 | **amount** 245:4,21 | **anthropomorphic** | 269:15 270:15 |
| 94:4 167:18 | 251:3 | 24:6 35:5 | 284:8,9,12 285:4 |
| 176:10,15 184:18 | **anachronistic** 78:5 | **anthropomorphi...** | 286:1,5,6 287:13 |
| 184:21,23 206:6 | **analysis** 255:4 | 35:7,15 | **api's** 218:18,20 |
| 206:10,20 207:1 | **animated** 181:7 | **anti** 69:7,20 70:4 | 219:7,12,14,17,18 |
| 207:17 208:6,6,7 | **animation** 25:20 | **antics** 216:18 | 219:22 272:22 |
| 213:22 220:5 | **announcement** | **anxiety** 58:10 | **apologies** 280:5 |
| 270:1 293:8 | 161:17 | 68:14,15,18,20 | 292:5 |
| **alerted** 171:14 | **annual** 236:6 | 69:1,4,7,7,20 70:4 | **apologize** 136:16 |
| 175:5,19 230:2 | **anomaly** 286:1 | **anybody** 22:22 | **apparent** 148:4 |
| **alerting** 171:8 | **answer** 5:11 6:12 | 181:21 221:20 | 263:21 |
| 174:23 175:3 | 10:13,18 33:17 | 248:10 252:7,12 | **appear** 165:24 |
| **alerts** 40:9 213:22 | 39:1,6 52:21 | 283:2 293:24 | 306:11 307:15 |
| **aleve** 54:10,14,18 | 59:23,24 61:20,24 | **anytime** 86:15 | **appearances** 2:1 |
| 55:3,10 59:5 | 62:1 72:5 77:6 | **anyway** 22:13 | **appeared** 2:11,16 |
| 143:9,16,22 144:1 | 137:23 138:5 | 78:3 109:1 215:12 | 22:15 178:3 |
| 144:21 145:2 | 141:15 143:18 | 265:24 | **appearing** 2:5 |
| 147:15 248:20 | 144:14 146:12 | **aol** 27:1,2 | 4:11,14,15 |
| **alex** 12:11 118:24 | 158:24 166:20,21 | **apache** 166:15 | **appended** 307:11 |
| 130:15 | 170:15 174:1,2,3 | 168:3 | 307:18 |
| **algorithm** 251:15 | 196:2,7,11 201:24 | **api** 99:12,13 | **apple** 31:16 |
| **alison** 2:10 4:11 | 202:4 204:17 | 138:14 152:22 | **application** 18:1,7 |
| **allegation** 276:9 | 207:20,23 234:12 | 172:3,4 173:8,12 | 18:13,15 30:14,17 |
| **allegations** 301:10 | 242:16 250:8 | 174:5 179:8 | 31:13,19 34:5 |
| 301:17 | 259:20 262:19 | 185:22 195:13,14 | 44:12,22 56:8 |
| | 263:20 265:18 | 196:24 198:4,8,10 | 113:14,16 132:10 |

133:6,8 149:4
186:6 278:11
293:14 295:18
**applications** 113:4
168:13 193:18
221:6 222:4
292:19,22
**applied** 297:14
**appointment** 89:6
89:8 145:24
159:16 240:2
**appreciate** 157:5
**apprised** 77:8 81:1
**appropriate** 281:5
**approval** 91:4,7,9
205:15,18 206:4
241:18
**approve** 90:23,23
91:2,3,14,14,19
**approved** 218:13
241:15
**approximate**
122:4
**approximately**
13:2 53:24 117:17
**approximation**
181:11
**apps** 293:2,19
**april** 166:13
167:24 168:2
**arbitration** 167:9
**arcade** 125:7
**area** 127:10
**argue** 83:3
**arkansas** 34:4
**artist** 24:7,11 25:3
**artistic** 24:8
**ascribe** 217:17
**aside** 7:13 8:6 11:8
14:3 21:9 22:9
27:4 28:22 33:1

34:10 40:18 50:22
53:16 55:3 60:14
65:17 102:8
121:10 125:15
130:2 140:9 168:4
168:17 171:24
183:18 192:11
194:1 216:20
231:18 234:22
256:1 282:8
286:20
**asked** 9:6 10:8,9
10:21 31:3 38:13
38:13,14,15,17,20
38:23 39:3 42:3
51:9,10,20,23
52:19 55:16,20
56:12 59:11 72:4
72:15 98:14 103:8
109:15,18,21,22
110:7,10 129:21
137:17,20,21
138:6 140:13,16
141:7 142:10
143:1 146:14
155:17,21,23
156:1,4 158:23
169:6,9 171:18
173:15 189:9
195:21 196:2
198:13 200:23
201:7,14 202:1,24
203:1,3,6 204:13
205:4,19 214:24
215:23 216:3,22
220:14 221:23
232:1 245:20
299:24
**asking** 7:15 8:9
10:6,12,19 33:6
109:16 113:7,13

114:12 135:21
136:9 142:6,9
143:21 151:20
216:20 222:2
238:4,5 261:13
262:21,22,23
264:1 272:10,11
275:4 282:7,8
294:24 296:9
299:3 301:16
**asks** 31:23 154:19
**aspire** 26:3
**assert** 31:5 244:10
264:5
**assets** 226:17
**assignment** 306:2
307:2 308:2
**assist** 218:18
250:14
**assistance** 59:11
**associate** 16:17
**associated** 21:16
23:14
**assume** 33:6 77:7
81:2 84:14 110:6
158:11 219:15
255:12
**assumed** 47:18
98:3 109:22 110:5
130:5
**assuming** 133:20
163:17
**assurance** 15:15
**attach** 11:23
**attached** 130:24
278:9 290:5 307:7
**attachment**
288:19,22
**attack** 53:5 57:5,8
58:21

**attacks** 52:7,9,20
52:24 53:7 56:18
57:2,14,18,23
61:16,17 63:3
65:16 66:5,9,12,15
66:24 67:7,20,24
68:2,5,8,12,18
70:8,17,23 71:7
102:8 104:21
115:22 116:7
117:5,10 237:22
247:5,11,13,16
**attempt** 168:8,18
227:21 228:4
302:16
**attempted** 109:12
146:21 228:8
300:23
**attempting** 92:8
128:15 285:12
**attend** 19:21
**attended** 19:7,12
19:19
**attention** 106:9
119:3 149:9 189:5
207:11 210:18
231:4 281:17
**attorney** 4:6,19
7:14 8:19 56:14
63:15,17 64:16
67:14 91:23 212:2
240:4 242:15
256:3
**attorney's** 242:20
**attorneys** 4:4,9
5:10 22:7
**attribute** 68:17
238:8 242:12
294:22
**attribution** 254:4

**audible** 293:7
**audio** 191:2
**august** 74:2
  151:13 166:14
  167:23 168:2
  172:15 173:2,3
  213:13,19 227:2,4
  227:20 231:8
  265:15 266:5
  282:2 285:2 291:6
**authentic** 23:9
**authenticated**
  298:3
**authentication**
  287:6,16
**authenticity** 23:4
**author** 22:18
**authority** 1:6,9
  4:3,8 15:3 90:23
  199:2 232:22
  269:8 305:6 306:3
  307:3
**authorization**
  111:7 207:17
  295:3
**authorize** 307:11
**authorized** 111:5
  173:9
**automatically**
  193:20
**available** 268:17
**ave** 305:1
**avenue** 182:23
**avi** 24:15
**avoid** 5:19 298:11
**awarded** 17:16
  236:9
**awards** 234:11
**aware** 44:8 45:2
  45:19 70:15 75:14
  88:12,18,21,24

95:4 97:7,13
105:9 106:13,19
106:23 114:9
119:5,10,22
120:10,21 121:8
121:24 166:10,22
167:22,22 168:1,6
168:20 218:7,10
219:19 223:11
227:5,19 228:3
230:1 240:22
245:10 247:7
252:16 257:12,14
267:15 278:24
281:24 294:1,13
295:1 300:11
301:15
**awareness** 135:1
**awful** 172:2
**awkward** 189:16
  262:4,15
**ays** 173:9

### b

**b** 4:7,7,7
**babbitt** 2:9 3:5 4:7
  4:7,23 5:3,14,18
  5:23 6:3,7,11,20
  8:17 18:18 23:3
  23:10 31:4 36:20
  36:23 37:2,9
  39:12,16 41:4
  52:18 56:11,18
  57:1 64:19 65:2
  67:19 73:5,16
  82:17 92:9 96:18
  96:23 97:4,11,14
  98:18 133:11
  146:9,12 148:17
  148:21 168:21
  169:8,11,16
  170:19 175:5

196:3,8,10,14,18
196:21 201:5,11
201:19 202:4,8
203:4,10,22
204:17 211:13,19
213:15,18 227:10
227:13,17 230:9
233:20 234:5
238:6 242:10
245:10,15 246:12
246:17 255:14,21
274:18
**bachelor's** 15:14
**back** 28:19 37:2,7
  39:8 42:7 52:16
  64:24 72:13 73:5
  84:3 90:11,12
  92:12 96:24 97:2
  100:11 123:17
  126:6,9 141:17
  146:10 153:9
  154:1 155:6 157:7
  157:19 169:3
  178:15 193:3
  198:16 211:17
  218:5,15 232:17
  232:19 233:20
  234:3 242:15
  250:11 255:19
  279:17 283:15,21
  305:16
**backlog** 164:22
**backup** 103:21
  104:2 193:7,11
**backward** 274:5,6
**bad** 65:3 96:1
  147:14 154:18
  159:18 161:13,16
  161:17,21,23,23
  162:2,7 191:13,22
  200:20 201:9,16

253:4 258:10
259:3
**badge** 48:14
**ball** 275:19
**band** 40:11 283:14
**barely** 14:23 15:4
  239:9
**bariatric** 146:1,6
  146:19,22 147:2
  248:24
**base** 206:14
**based** 29:17 59:4
  78:10,13,17
  104:24 154:10
  194:7,9 253:9
  280:1 281:8 285:2
  290:23
**baseless** 278:19
**bases** 45:19 87:11
**bashful** 204:15
**basically** 20:6 38:5
  161:18 186:16
  264:19 265:8
  280:19 283:17
  291:2 298:1
**basis** 47:1,10
  75:11 134:13
  242:19 259:17
  260:21 261:2
  264:5,24 266:6
  275:5 277:1 282:9
  283:4,14 289:24
  290:11 293:20
  297:1
**bat** 233:12
**bates** 292:8,9
**bcc** 116:16
**becoming** 274:3
**bed** 75:16
**began** 247:17

**begins** 112:22
113:3,24 150:2
153:3 213:13
222:16,18
**behalf** 2:5,11,16
4:8 22:23 59:21
218:11
**behaviors** 293:3
**beings** 35:8
**belief** 147:24
**believe** 9:14 10:14
12:19,24 13:5
21:13 22:12 29:8
41:18 47:8 48:13
49:3,9,15 50:14
52:4,21 53:21
54:17 55:22 56:22
57:15,19 58:9,12
59:3,5 61:12,20
62:24 65:12 76:19
78:2,19 80:6,12,15
80:21 81:6,10
85:12,14,19 87:4,4
87:17,24 89:3,6,7
89:17,21,22 90:15
95:9 98:6,11,22
99:3,5,18,20,22,24
100:8 104:22
105:11 106:12
107:15,20,24
109:3,5,17 111:22
114:22 116:21
118:7,12 120:6,10
121:7 122:23
127:2 128:1 137:2
138:2,4 139:4,9
142:2,3 145:9
151:18 154:19
160:7,17 161:5,10
163:2 166:14
169:20,24 170:17

172:12 173:15,16
173:19,21 180:13
182:23 184:13
188:16 191:12
194:19,20 203:1,8
205:11 212:7,13
212:17 213:9
214:21,22 215:12
216:3,4,11,15,16
216:23 221:9
224:22 229:15
235:7,12,13,23
237:22 239:19
241:13,24 242:6
242:20 244:3,13
244:16 245:8
246:15 249:14
251:17,19 252:9
256:13,19,23
257:4,5,11 259:11
261:18 262:8
263:7 264:12,18
265:4 266:13
267:10,13,15,19
269:3 270:4 273:8
274:18 275:24
278:13 279:17
281:15 286:1
288:2 293:4
295:12 296:2,9
297:7 299:16,20
301:23 302:8
**believed** 54:20
265:19 294:2
295:1 299:4
**believes** 265:1
294:8
**belongings** 86:23
127:19
**benches** 131:7

**benefits** 15:7
65:22 66:11 71:24
72:3 73:1 128:18
128:21 129:4,7
236:17 248:8
**best** 59:8 106:11
128:20 144:10
216:1 230:23
298:17 304:9
**bet** 176:1
**better** 12:1 70:22
107:8 151:14
177:7 252:6
296:22
**beyond** 13:8 34:3
50:12 91:20 95:4
135:14,14 154:3,7
154:23 169:14
236:14 238:1
256:20 258:2,5
262:23 273:15
289:15
**big** 63:1 90:9
186:13,14 238:12
245:18 268:11
293:9
**bigger** 173:17
287:14
**biggest** 99:22
121:13 238:10
**bike** 209:8,10
**bill** 65:23 245:17
245:19 248:13
**bit** 16:7 24:21
37:10 39:23 41:11
97:5 133:23 187:5
229:24 268:19
280:14 284:19
**bitcoin** 250:4,7,7,9
250:17

**bitlocker** 105:14
106:6,8,14 109:23
110:16,24 111:3
**bizarro** 260:9
**blame** 151:4,12
163:20
**blaming** 163:24
164:2
**blew** 171:12
**block** 250:12
251:6,15,19,22
252:8,10
**blood** 96:1 154:18
**blow** 170:13,19
**blowing** 174:14
**blown** 121:17
**blurry** 226:21
227:15
**board** 17:13
**body** 61:4 62:19
150:2 246:20
**bold** 213:18
**bombardier** 46:17
46:22,22 51:5
298:9
**bonus** 236:14,16
**boot** 34:7,8 105:21
112:4
**booted** 103:13
**boss** 19:22,22
210:10,10
**bothered** 295:18
**bottom** 113:1
128:7 149:24
151:16 153:1
156:24 159:9
162:11,15 165:12
213:16 217:8
283:23
**bought** 237:13

**bound** 83:10
**bounty** 222:24
223:3,4,9,13,21
**bower** 12:11,12,20
12:23 13:4,10
118:24
**box** 55:11 134:24
135:5,7 143:15
144:2 164:8 182:9
288:12 294:20
**breach** 254:3,5,19
255:10
**breached** 254:3
**breaches** 253:3,16
254:7
**break** 5:24 6:1
36:24 64:17,19
148:18 168:22
169:7 211:12
233:21,22 303:15
**breakfast** 141:22
**breaks** 5:23 7:13
**bridge** 237:13
**brief** 210:8 211:12
**bring** 101:1
128:12,19 148:15
160:3 161:3
166:12 207:22
251:2 252:2
256:10,22 257:2
281:17 295:21
298:6
**bringing** 161:18
165:2
**broad** 24:20
**broadcast** 264:14
264:16
**brought** 106:9
127:24 128:3
129:16 131:8
133:14,15,16

166:13,14 167:23
168:2 274:17,21
278:6 286:2
300:24
**bug** 208:18 222:24
223:3,4,5,9,12,21
**building** 120:11
**builds** 105:16
**built** 262:11
**bulletin** 99:12
138:14 152:22
173:11 174:6
179:8 185:10,13
185:17,21 197:11
204:9 206:7,10
219:11,12 220:6,7
220:22,22 221:4
224:10 229:17,21
261:24 262:3
267:17 268:4,9
269:15 287:13
**bulletins** 286:19
287:18
**bulletproof** 275:2
**bunch** 69:14
**bus** 10:11 151:5
162:19 163:6,13
163:15 168:13
182:9 193:13
204:9 206:10,20
207:1 220:5 227:4
251:8 295:15,18
296:16 297:9
**buses** 151:6
**bushes** 209:8,10
**business** 28:11
116:23 117:18
176:18 230:14,15
230:18,22 291:9
**bustime** 18:12
47:6 78:8,13,21

177:20 178:21
180:12 197:13
204:9 206:6,6
219:11,24 220:16
220:19 221:6,11
221:14 250:24
264:14,15 265:6,6
265:23 278:11
284:21 285:5
286:24 287:18
289:22 291:18
**bustracker** 171:19
171:20 179:23
284:16
**button** 184:11
186:13,15 250:19
280:7
**buzz** 250:11
**byte** 265:10

**c**

**c** 12:19 19:13
**ca** 305:24
**cad** 297:10
**cafes** 101:10
**calculation** 212:1
236:5 242:14
244:14,17
**calculations**
235:13 245:9
**calendar** 89:2,7
123:18,19 240:1,2
**call** 9:19,20 19:8
19:10 37:20 41:10
41:13 42:21 43:2
43:7 75:16 76:23
90:11,12 118:4,7
135:9 154:1 167:9
175:8 194:11
209:1 216:5
242:22 247:1
254:11 269:16

292:11
**called** 6:16 17:8
19:12 29:10 32:12
32:18 56:8 83:15
85:19 92:11 106:2
109:4 125:7 166:1
166:15 226:9
237:14 253:3,8
265:7,8,9 286:11
**calls** 11:9 33:16
67:11 170:14
238:3 267:11
273:21
**cancel** 159:16
**candidate** 75:8,8
85:15 94:6
**candidates** 47:12
47:14 75:2,11
79:7
**canned** 218:14
**capable** 294:12
**captured** 90:15
242:15 293:5
**card** 131:1,2
168:12 193:12
**cards** 107:12
**care** 56:23 72:7
125:3 193:17
236:23 243:7,20
244:8 246:9,20
249:1,3,5,6
**careers** 32:19
34:16
**carl** 175:11 176:1
176:6
**cart** 257:22
**carter** 95:10,10
264:9 296:22
**case** 1:5 4:2,4 6:8
11:4 13:7 47:20
84:4,19 85:16

104:3 110:17
150:7,14 159:12
161:1,2,9,20,22
163:22 205:22
234:6 247:2,8
253:17 283:8
288:13 305:6
306:3 307:3
**catchall** 90:9
**category** 207:13
241:8 258:15
262:15
**caught** 143:20
**cause** 61:17 62:17
81:5 143:17 158:1
258:4 298:15
**caused** 51:17 52:7
52:20 54:16,20
60:18 247:11,13
247:16
**causing** 63:4 71:6
**ccna** 16:3,15
**cd** 288:1
**ceb** 167:10
**ceh** 16:4 17:1,2
**celebrates** 35:14
**cell** 31:6 38:1 44:2
44:3 101:8,9,11
131:12,13,16,21
131:24 132:4
190:19
**cellular** 40:10
132:16 149:3
**censor** 30:20
46:18
**censoring** 31:17
**center** 105:14,16
106:17
**centralized** 109:3
250:18

**ceremony** 14:11
**certain** 22:2 25:2
31:17 51:13 108:1
126:16 137:4,5,6
228:24 229:3
243:11 244:17
261:14 281:13,13
281:14 293:4
**certainly** 279:20
290:15
**certificate** 307:11
**certificates** 33:18
101:18
**certification** 16:3
16:4,4,5,9,13,16
17:4,9,17 18:19,22
306:1 307:1
**certifications**
15:24 16:2
**certified** 16:17,18
16:20 17:3,7 18:1
18:7,9,10
**certifies** 17:6
**certify** 304:4
**certifying** 18:3,4
**cetera** 20:8 35:21
56:10 193:1
220:19
**chain** 154:7
250:12 251:6,15
251:19,23 252:8
252:10
**chair** 35:11 187:15
**chance** 31:2 72:22
219:6 300:22
**chances** 177:1
**change** 158:24
174:6 185:22
206:17 213:7
215:5,7 286:15
305:14,15 307:8

308:3
**changed** 33:9
215:3 275:14
**changes** 305:13
306:7 307:7,9
**changing** 293:2,21
**chapuis** 175:12
258:18,20 261:23
263:7 280:14
282:6,10,12,22
283:5
**character** 23:13
23:14,15,20,24
24:1,2,19,23 25:2
25:5,6 26:18
34:24 35:1,2 36:8
36:13 106:3
**character's** 25:21
**characterization**
282:22
**characterize**
260:21 269:14
**characterized**
240:23 256:23
263:8
**characters** 24:5
36:4,5
**charge** 76:19
**charged** 274:15
**charges** 78:20
202:16 300:24
**charging** 164:6
**charles** 2:14
234:20
**charlie** 167:13
**chart** 56:9,21
91:12
**charts** 65:18
**chat** 31:14
**chatting** 31:10

**check** 189:4 207:9
211:10 236:22
**checks** 34:8
268:13
**chicago** 1:6,9,22
2:8 4:3,8 6:23
15:2,19 42:7,10
130:21 131:1
168:12,14,15
237:12 305:6
306:3 307:3
**children** 14:13
**chips** 105:18
106:18
**choice** 183:23
216:24
**choosing** 281:9
**chose** 182:24
**chris** 20:7 57:19
92:23 113:3 169:6
212:5 214:6,11
217:13 227:14
277:7 278:9
298:22
**chris.pable** 20:5
20:13,17,22 21:4
21:20 29:9
**chrisbug2** 27:1
**christopher** 1:3,12
1:16 3:4 4:3,16
6:15 29:7 304:7
305:6,9 306:3,4,9
307:3,4,13 308:20
**christos** 195:13
258:17 264:19
265:1,19,22 266:9
266:20 282:3
283:10,12 289:22
299:4,8,12,20,23
**chrome** 134:24
135:4,7

circle 2:3 218:5
circulated 282:23
circumstances
  51:17
cisco 16:17,19,20
cissp 16:5 18:21
  19:4,6
civil 1:19 306:5
  307:5
claim 79:23 80:10
  237:18 244:19
  274:21 275:6
  298:6
claimed 123:2
  128:22
claiming 67:8
claims 67:9 238:9
  278:19 279:17
clarify 43:16,16
  44:10 136:20
  169:6 188:23
clarifying 42:5
  169:19
clarity 220:2
class 265:4,9,10
classes 69:14
clause 200:13
clauses 256:13
clear 17:14 146:5
  268:2
clearer 93:23
clearly 289:11
cleveland 305:2
clever 1:6 2:16,24
  4:4,17,20 18:12
  160:3 164:6,20,21
  164:23 166:16,19
  168:1 175:13,19
  176:11,16,20,23
  181:3 195:12,16
  195:19 197:4,18

197:22 198:2,5,7
199:3,15,21,23
200:3,5,8 203:16
204:5 205:15
206:16 207:8
213:23 219:6
221:6,10 222:14
222:18 224:21
229:24 230:24,24
256:3,10,18,21
257:1,14 258:3,15
259:14 261:1,13
261:20 264:5
266:3,7,21 267:9
267:14,15 275:23
276:9 278:5,8
279:1,3,13 281:24
282:17,23 290:9
290:12 291:7
292:19 293:6
294:20 295:11,16
296:16 297:9,14
297:20,22 298:6
298:15 299:13,17
300:3,12 301:11
301:23 302:4,10
302:18,19 303:8
305:7 306:3 307:3
clever's 164:19
  203:24
click 21:3 123:16
clicked 171:22
clinton 49:15
clipped 289:2
clipping 288:18,18
clock 42:12
close 84:12 116:23
  117:17 144:20
closed 288:13
closest 49:15
  181:10

closet 165:7
closets 164:19
  295:11
closing 219:6
cloud 193:19,23
  194:5,10,11
clue 45:24 47:4
cochran 51:2,3,6
  51:15 52:3 75:22
  114:15,17 115:24
  116:9,14 117:10
  117:22
code 1:19 35:20
  46:14 105:6 109:2
  159:3 164:7 186:1
  186:2 206:18
  261:13 265:10
  276:10,16,23
  292:21 293:2,2,21
  294:21 295:15
  296:17
coding 89:23 90:3
  90:6,16 241:14
cognitive 62:4
cognizant 144:7,8
  144:15
coherent 117:8
  263:9,12
cold 147:14
collateral 81:12
colleagues 135:13
collect 86:23 131:8
collected 107:11
  227:1
collection 254:4,6
collections 254:5
college 15:11
  28:24 64:2 68:21
  70:5 249:12,15,17
colloquialism
  120:2 177:7

combination
  287:13
combining 171:11
come 37:2 82:16
  96:23 110:15
  118:1 134:21
  144:2 165:1
  166:23 181:11
  188:9 189:9
  252:18 272:19
  279:6,23 301:10
comes 276:11
comfortable
  155:18,24
coming 165:7
  180:9
command 225:23
  228:13
commencement
  247:15
commencing 1:22
commercial
  142:11
commission 25:3
  88:20 224:3
  306:19 307:25
  308:25
commissioned
  24:8,12
common 139:21
  167:13 187:3
  188:12 205:22
  208:15 253:22
communicate 9:23
  10:16 11:2,7,9
  20:22 21:21 22:13
  32:2 43:14 50:23
  51:6 56:6 63:16
  63:20 87:14 89:10
  118:10 132:13
  133:3,5 184:17

267:8
communicated 9:8
  9:12,21 10:3 30:2
  32:21 43:20 44:7
  88:15 89:14
  101:19 108:16
  153:16 156:15,19
communicating
  7:14 10:4
communication
  7:10 9:10,17
  11:22 12:6 22:3
  25:15 32:9 55:23
  56:21 58:11,14,23
  59:7 61:14 62:10
  65:6 75:9 130:3
  176:11,22 298:3,4
communications
  22:9,10 30:6
  44:14,17 52:2
  56:12 79:2 84:22
  97:7 193:22 194:1
  194:7,8
companies 47:18
  254:17
company 32:18
  105:11 125:7
  167:6 237:14
  254:18
compensation
  15:5,7 234:23
compensatory
  237:19
compiled 180:19
complaint 13:9
  124:8 126:4
complete 7:22
  95:13
completed 122:5
  171:24 213:4
  237:12 245:16

completely 90:4
  272:13 278:13
  280:17
complex 32:21
complicated 28:2
  90:2 105:20
  166:18
comply 106:11
component 234:22
comprehend
  282:15
compromised
  33:12 253:15
  254:9,24 255:11
  287:23
computer 15:14
  16:12 102:21,23
  103:2,5,11,13
  104:5,9,19,19
  105:10,13,22
  106:20 108:5,20
  108:24 109:6,20
  110:8,11,12,18,22
  111:15,20 125:24
  186:8,22 187:8,11
  187:13,19,21,23
  188:3,4,15,16,19
  188:24,24 189:2
  225:10,10,14,16
  225:18 226:3,13
  226:16 227:1,7,20
  227:20 228:8,18
  229:8,13 250:5,10
  252:14,19 253:1
  272:20,21 288:23
  292:24 293:7
  294:21 299:10
computers 101:12
  101:13 105:15
  106:9,14,16

107:11 182:7
  226:10,15
conceal 279:9
concepts 24:9
concerned 96:8
  187:16
concerns 71:24
  138:23 183:20
  184:7 214:7
  291:10,11 301:14
concert 95:15 98:3
  136:21
conclude 300:13
concluded 266:14
  266:17 300:13
conclusion 170:15
  180:9 238:4
  267:12 279:24
  299:19
conclusions 279:7
concrete 266:10
concurrent
  111:13
conditions 146:17
conduct 141:24
  142:2 152:18
  179:24 183:8
  184:2,4 187:1
  188:5 208:1,2
  262:14 268:3,4,6
conducted 80:17
  134:5 138:24
  140:3 145:17,21
  147:3 154:23
  187:11 207:14
  233:15 300:3,16
conducting 162:2
  177:16,19 183:21
  184:14,19,24
confer 91:23

conference 19:18
  19:24 190:5,7
conferences 19:11
confidential 31:1
  92:4 128:23
confidentiality
  31:5 253:20
confidentially
  129:2
configuration
  152:11,17 174:7
  185:20,23 186:2,3
  201:2,18 286:12
  286:15
configured 193:13
confine 265:15
confiscated 107:4
  107:7
conflicted 260:14
confused 136:11
  136:13 137:1,2,9
  137:13 219:21
confusion 303:5
conjunction 287:9
connect 43:1
  142:16 192:22
connected 43:7
connecting 43:8
connections
  289:20
connotation
  290:17
connotations
  208:10
consent 195:15
  197:4,18,21 209:7
consequences
  274:3
consider 28:3
  41:21 55:4 70:8
  70:11 83:22

135:11 161:23
196:19 204:24
205:6 253:10
270:11,12,14
271:4,15,18,24
272:6,14,15
**considered** 161:22
209:7 274:1,3
**considering** 44:13
109:19 196:16
**consisted** 298:2
**console** 221:16,18
264:15 286:24
287:1,19
**constant** 265:12
**constants** 265:12
**constitute** 64:15
**construct** 206:13
**construe** 134:21
293:20
**consult** 8:8,12
55:14 59:20 63:7
64:5 69:16 159:12
255:15
**consultation** 62:22
62:24 212:12
**consulted** 59:15
60:7 302:20
**consume** 60:23
**contact** 37:19 41:7
42:15,17,20 65:24
135:15 220:13
**contacted** 37:15
37:17,21 38:1,3
41:9,23 42:1,3,7
42:14 43:5,11,18
44:16 45:3 47:18
60:10 73:8 159:12
230:1 300:7,10
302:20

**contacting** 75:19
**contain** 254:5
265:10
**contained** 252:15
**contains** 182:9
304:10
**contemplate**
110:12
**contend** 203:22
**contender** 121:16
**content** 34:16,18
**contention** 287:12
**contentions** 276:1
**contents** 34:12
55:23 58:14,22
61:13 62:9 107:5
158:17
**context** 141:21
150:19 154:11
157:20 163:16
178:21 208:14
216:13 219:16
270:5
**continue** 66:14
155:7 203:10
207:21 248:17,19
**continued** 115:14
152:13 239:5
251:12
**continues** 152:4
214:3
**continuing** 155:4
**contract** 72:4
125:10
**contribute** 215:18
236:20 238:20
**contributed** 98:15
212:21 263:15
296:17
**contributing**
80:22 97:17,20

99:6,22 100:5
121:13
**control** 20:3 21:12
21:14 26:9,11,15
26:20,22 27:6
33:2,22 36:6
105:14,16 106:17
**controller** 293:8
**controllers** 293:17
**controlling** 26:8
**convention** 19:16
35:12,13,14
**conventions** 19:7
19:9 35:16
**conversation** 12:2
42:22,23 107:20
129:14,16,19
172:10 175:16
177:18 179:10
182:2 191:17
222:8,10 280:21
282:14,22 297:8
**conversations**
12:1 133:8 297:11
**conveyance**
174:13
**conveyed** 176:20
**conveying** 176:23
**cook** 304:2
**cooler** 120:4
**cope** 54:16
**copied** 214:17
215:8 222:15
**copies** 160:22
**coping** 249:20
**coppolleta** 138:13
138:19 197:13,16
204:24 218:18
219:4,8,13
**copy** 49:23 82:17
104:3,7,12 125:20

126:8 130:15
137:10 192:14
193:6 194:15
**core** 158:7
**corner** 6:22 83:3
**correct** 12:7 13:14
21:18 22:12,16,17
23:17,18 24:13
25:15 27:17 30:12
30:14 33:7 38:2
38:24 39:5 40:23
40:24 41:15 42:13
48:3,9,19 49:7
54:2,8,22,23 53:6
54:6,6,24 55:9,21
65:19 66:22 67:6
69:10 71:24 73:18
73:20,21,23,24
74:3,6 75:1 76:4,5
78:18 80:14 86:8
87:12 92:22 100:7
101:2 102:11,16
102:19,22 103:7,9
104:2,11,15
106:15 108:2
109:7,21 111:2,21
114:3,6,7,16,20
115:19,23 116:4
118:23 119:2
120:1 121:9
124:10,16,19
126:1,3 130:1,8,14
130:15 132:19,23
134:2,4 138:7
144:24 146:18
149:4 150:13
154:15 159:24
160:1,4 161:14
166:3 171:2 173:4
177:10 178:6
181:16 182:14

184:6,20,22 185:1
186:23 187:19,20
187:21,22 188:1
188:20 189:11
190:4,6,15,20
193:10 194:17
195:6 196:24
197:1,6,9,20,23
198:1 200:15
202:17,18 204:6
210:17 211:1
214:5 217:6,18,19
221:19 225:12
229:6 231:8,9
236:13 237:17
239:21 240:6
244:9 247:18,22
248:16 257:17,21
257:24 258:1
263:24 264:11,23
267:3,7 268:5
275:24 280:3
283:18,19 288:9
288:10 293:3
295:22 299:20
300:17,18 302:3,7
**corrected** 230:24
231:1
**corrections** 305:13
307:17
**correctly** 35:18
85:14 128:4 276:8
**corresponding**
117:10
**cost** 246:10,24
**costs** 244:21 245:6
**council** 17:8
**counsel** 2:24 22:2
22:4,5,6
**counsels** 3:13

**counter** 1:10,13
53:19 54:7,8 55:2
58:8,15
**county** 304:2
306:10 307:15
**couple** 69:18
113:4 116:24
146:3 148:17
288:21 300:3
**course** 17:16
148:22 171:20
258:8
**court** 1:1,19 5:8,9
6:8 19:5 105:1
146:9 255:24
283:11 306:7
**cover** 13:21 65:23
66:11 80:19
238:14 241:10
260:2,4
**coverage** 13:21
90:21 128:18,20
129:4,19 130:4
243:13
**covered** 86:17
129:6 238:16
241:16 246:5,8,11
246:12
**cp** 217:13
**cracking** 105:6
**crafted** 201:18
**craig** 94:22 95:7
95:15 257:5
258:22 273:8
283:5 296:21
**crash** 163:10
**create** 24:4 32:19
36:12 115:12
204:23 251:10
287:17

**created** 24:2,7,22
32:24 34:14 35:1
51:17 115:11
124:11 135:3
142:3 201:2 208:7
260:9 293:13,15
**creating** 208:18
238:24
**creation** 231:16
**creator** 23:15,19
23:21,23 24:10,11
**credence** 75:3
**credentials** 223:24
224:6 253:3,5
255:11
**credibly** 279:13
**criminal** 78:20,20
78:24 82:6 83:16
83:19,23 84:1
**critical** 232:14
**cropped** 291:15
**crossing** 121:5
**cryptic** 158:12
**csr** 1:17 304:16
**cta** 2:11 4:10,12
4:14 10:20 18:4,7
37:12 39:20 40:6
40:8,12 42:12
44:3 46:11 47:16
47:19 49:16 50:23
57:20 64:8 65:10
65:22 66:15 70:19
71:24 72:3,5
73:16 75:23 76:2
79:14,16 80:19
81:15,22 82:10
83:11 86:1,24
89:19 90:5 92:19
95:21 96:18 97:21
98:1,7,13 99:18,24
100:8,12,14

101:22 102:12,17
102:24 103:2,11
103:13,23 104:10
104:13,18 105:9
105:10,13 106:6
106:14,16,23
107:2 108:5,8,24
109:5 110:18
112:20 113:2,21
114:13 115:3
116:15 117:21
118:1,14,18 119:4
119:14 121:1
124:4,5,7,14
125:21,23 127:3
127:14,22 128:6
130:6,12,21,22
131:10 133:24
134:6 135:3 143:8
144:21 145:6
148:3 149:9,14,24
150:7,15,22
151:16 152:24
156:22 159:4
160:3,4 162:10,15
164:5 165:9
166:11,16,18,24
167:18,19 168:6,7
168:9,10,18,18
169:10,21 172:4
172:18,21,21,24
173:17 176:7
178:4,8,11,13,18
179:20,22 184:21
184:23 186:8,22
187:8,21 189:7,9
189:12,17 194:21
194:22 195:16
197:4,19,24
201:12 203:11
206:7,20 207:7,11

209:14 210:4,6,9
210:16 211:3,4,6
211:19,23 213:11
214:4 216:4,15,18
218:21 219:1
222:6,12,18 223:9
225:10 226:3,10
226:14,16 227:1
227:11 228:15,17
230:23 231:4,18
233:2,6,16 235:22
236:2 238:15,20
239:1,5,8 241:11
241:16,20 250:4
250:10,15,24
251:13,24 252:14
252:19 253:18,20
253:21 254:8,15
254:23 255:21
256:9,11,14
257:15 259:14,18
260:1,7 265:4
271:1,8 273:3,10
273:14,15,19
274:11 278:3
279:5,21 283:21
285:19,19,23,24
291:6,15 292:3
294:1,7,8,11 295:1
295:1 297:10,20
298:16 300:16
301:10,15 302:2
302:22 303:8
**cta's** 295:17
**ctas** 166:11 168:19
179:21 204:21,22
253:20 254:3
259:7,15 268:14
268:24 295:19
**cubicle** 172:11,14
174:11 182:4,5,8,9

182:12,13
**cubicles** 177:3
**curate** 253:7
**curating** 281:9
**curators** 281:16
**curious** 296:11
**current** 19:23
139:23 234:8
235:13 238:14
**currently** 14:16
63:22
**cursory** 251:14
**customer** 213:23
**cut** 66:19 132:2
**cv** 1:5 4:4
**cve** 167:8,9,11
208:16 263:10
280:22 281:1,8,11
282:1
**cyclical** 53:9
**czerniak** 2:10 4:11
4:11

**d**

**d** 3:1 54:10,14,18
55:3,10 59:5
143:9,16,22 144:1
145:2 147:15
248:20
**damage** 81:12
235:13 244:13,16
245:9
**damages** 67:13
212:1 234:6
237:18,19 242:6
242:19 244:10
**dark** 102:1 290:11
290:14,17,18
**data** 44:13 126:8
132:3 158:1 251:3
**database** 167:8
172:5 173:9 178:1

178:23 188:10
208:16 253:17
255:6 281:5,16
282:1 293:14
**databases** 263:10
268:15 280:22
281:2
**date** 45:16 48:12
65:9 73:23 74:15
83:2 85:19 89:5
119:13,21 122:4,4
127:16 146:24
218:5 233:12
239:23 289:3,4,7
289:15,16,17,21
289:23 290:4
305:9 306:3,9,19
307:3,13,25
308:20,25
**dated** 41:19 82:2
92:20 113:2 127:6
130:8 151:3
159:10 165:21
194:23 219:2
299:21
**dates** 85:24 215:18
290:3
**day** 37:11 43:4,4
54:3 57:4 60:11
66:16 73:6,6,7
74:15 76:3 85:17
85:22 93:24
113:20 117:14,16
123:15 141:18
146:1,2 166:1,4,5
166:22,23 176:18
189:6,8 230:14,15
230:15 243:11
246:19 289:8
291:9 306:16
307:22 308:22

**days** 45:17 167:1
291:7 305:19
**dayton** 11:20 47:7
73:23 74:9,14,22
75:3,5 76:9,15,19
77:11,19 78:6,7,13
78:17,21 79:4
84:22 85:6,15
93:13,21 94:1,3,4
94:9,14,15 96:9,14
99:2,9 100:5
136:5 137:18
138:1,12,24
139:11,15,16
140:2,9 141:12,14
142:1,2 143:3
151:15 152:12
157:22 161:22
162:2 163:20
164:1 177:9,11,12
187:8 199:3,16
200:13,19 201:6
201:13,23 202:7,9
202:13,19,23
203:2,5,17,18
205:9,11 207:15
208:3 215:22
218:16 228:19
230:1,2,10,14,15
232:21 233:16,18
258:9 259:11
267:24 268:3,5,7
268:21 269:8,24
270:2,9 273:1,9,20
274:1 286:12,15
286:21
**dayton's** 269:18
**deal** 23:10 58:10
120:5 293:9
**dear** 305:10

debatable 104:20
december 15:10
  15:10 33:12,15,16
  33:20 64:2,3 67:4
  67:5 71:5 164:14
  165:22 217:14
  237:5,16 239:19
  249:24
decide 252:24
decided 297:20
decision 213:21
decisions 59:10
decompiler 221:10
  221:11,14,15,18
  222:9
decompiling 221:5
  221:21 222:3
decrypt 103:11
  108:19,23 110:13
decrypting 105:6
decryption 108:4
  108:19
deed 306:14
  307:20
deemed 241:12,22
  305:20
default 133:7
  253:24
defendant 1:13
  4:17
defendants 1:7
  22:14
define 252:20
definitely 46:18
  80:22 120:12
  174:21 209:13
  212:10 226:16
  255:1 263:11,15
  264:17 272:7
  285:19

definition 290:15
  294:19
definitions 294:16
definitively
  141:15 279:1
degree 15:18 71:1
degrees 15:13,22
delayed 146:17
delegating 291:14
delete 29:19
deleted 28:24
  56:22
delineate 266:24
deliver 14:24
  207:6 251:11
delivered 254:18
dell 7:3
demonstrated
  259:7
demonstrating
  297:9
denied 109:13,14
denying 81:5
dep 277:13 280:4
  285:6
department 15:16
  67:14 80:1,17
  257:19 301:24
  305:22
depend 272:4
depended 57:6
dependency 168:3
depending 223:8
depends 41:8
  91:11 208:24
  240:17 275:14
  287:24
deployed 281:21
  289:23 291:18
deposed 5:1

deposition 1:16
  6:5 7:2,15 8:7,9
  8:18,22 9:3,7 10:5
  10:5 11:3 195:14
  255:22 261:7
  267:1,2,22 282:21
  298:14 300:3
  303:23 304:6,11
  305:9,12 306:1,3
  307:1,3
depositions 1:20
  5:5 257:13,23
  258:3,5 266:22
  280:1
depression 70:14
deprived 53:19,22
dermatitis 240:20
  241:5 242:1
describe 25:18
  32:15 52:9 53:7
  62:14 67:7 99:17
  120:14 127:23
  138:18 171:6,16
  177:17 181:6
  242:18 247:12
  280:18
described 34:18
  70:17,20 102:9
  116:3 128:1 141:6
  215:14 229:13
  238:2 260:16
  280:17
describing 70:8
  99:14 115:21
description 25:21
  174:20 224:11
  255:2 281:10,22
design 112:11
designate 31:1
designating 92:3

designed 261:20
desk 103:23 107:2
  107:9,21,22
  108:10 122:9,10
  122:13,15,17,20
  123:5,7 126:24
  127:18 133:19,21
  200:14,19
desktop 110:8
  113:7,12 186:22
  186:24 226:6
detail 10:6
detailed 18:6
details 8:1,2 13:8
  22:3 25:5 42:19
  167:4,5 230:20
detained 124:14
determination
  63:3,4 251:17
  254:8 291:21
determine 179:11
  180:10 206:1
  230:10 273:1
determined 181:4
  241:7 251:15
determining 180:6
  181:2
develop 34:11,23
developed 206:23
developer 28:4,12
  28:17,21,22
developers 207:9
development 15:1
  125:13 138:15
  158:6 204:23
  207:5 224:12
  290:5
device 7:1,4,5
  101:3,5 149:3
  193:8,15

**devices** 1:6 2:16
2:24 4:4,18,20
7:11 101:14
164:20,21 166:19
175:13 176:21,23
181:3 195:13,16
195:19 197:4,19
199:3,15,21,23
200:3,5,8 203:16
204:5 205:15
206:17 207:8
213:23 222:18
256:3,10,18,22
257:2,14 258:4,15
261:2,13,20 264:5
266:3,7 267:9,14
267:15 275:23
276:9 278:5,8
279:1,4,13 281:24
282:18,23 290:9
290:12 291:7
292:19 293:6
295:16 296:16
297:15,20,22
298:6,15 299:13
299:17 300:3,13
301:11,23 302:4
302:10 305:7
306:3 307:3

**devices's** 295:11

**diagnose** 69:1
171:21

**diagnosed** 57:23
58:1 67:23 68:2,5
68:8 69:4 70:14
148:1

**diagnosis** 69:7

**dictating** 232:11

**die** 165:20 211:12

**died** 240:8 299:10

**difference** 73:13
238:16 287:22
292:23

**different** 36:7
56:13 79:9 80:2
90:4 104:21
120:12,14 145:22
150:18 175:22
192:24 208:9
221:2 253:5,16
254:7 265:18
266:2 271:6
290:16 294:16
297:24

**differently** 41:21
110:17

**difficult** 181:8
280:11

**difficulty** 276:14

**dig** 239:24

**dima** 175:12

**direct** 56:16 58:6
90:19 91:8 111:10
149:9 221:20
251:22 296:4

**directed** 55:11
83:14 106:5
262:10 263:19
264:9

**directly** 30:1 95:9
128:17 138:12
155:19 163:2
182:8 192:3 203:2
215:20 264:8

**directs** 252:1

**disappears** 12:6

**disappointment**
181:12

**disarray** 133:21

**disc** 251:3

**discharge** 194:16
194:23 195:5,8
197:3 198:19
199:12 201:22
203:11 269:1
274:17

**disciplinary**
275:13

**discipline** 273:19
274:10,14

**disciplined** 275:19
275:21

**disclose** 18:10
208:10 209:2
230:12

**disclosure** 166:5
207:15,19 208:2,3
208:8,9,17 270:7

**disclosures** 208:21

**discount** 222:24

**discourse** 27:21

**discovered** 167:17
179:5 278:10,14
281:4 284:17
285:3

**discovering**
167:20

**discovery** 114:22
225:2

**discs** 107:12

**discuss** 25:10
64:15 72:11 83:18
85:1,3,5 87:2,8,14
88:9 93:19,24
123:11 128:8
129:18 160:18
174:3 192:5,8
223:15 234:5

**discussed** 13:6
30:4 72:23 73:4
82:23 84:16 90:3

94:3,3 223:17
231:21 247:20,23
248:3 258:3

**discussing** 37:11
49:1 74:19 83:1
83:20 115:4
155:18,24 176:10
232:12

**discussion** 128:23
129:22 217:9
276:23

**discussions** 222:19

**dispatch** 224:12
224:14,16 293:7

**displayed** 287:2

**dispute** 266:6
283:4 290:11

**distinction** 43:12
268:6 293:1

**distress** 67:8
237:21 238:1

**distributed** 250:19
251:6

**district** 1:1,1

**division** 1:2

**doctor** 56:8 57:22
58:1 66:3,4 146:1
146:6,19,22 147:2
248:24

**doctors** 63:7 147:5
249:4

**document** 8:13
38:6 39:7 41:19
89:17 98:19 99:23
124:10 138:15
215:20 217:16
219:12 221:3
258:6 261:8,10
277:17 282:24
289:13

**documentation**
109:2 152:21
290:1
**documented**
240:20 242:1
267:19
**documents** 91:6
263:5 269:22
280:2 282:20
301:9
**dog** 12:17 13:4
14:14 32:17
**doing** 77:8 84:14
88:7 111:11 120:4
122:24 125:12
135:1 192:23
201:3 202:2
225:21 229:8
263:14 268:22
284:5 291:17
299:14,18
**domain** 32:24
**domains** 18:24
**door** 122:14 123:2
**dose** 143:9,11,16
144:1
**doses** 70:3
**dot** 220:18 265:4
**dotted** 74:12
**double** 236:21
**doubt** 183:11
**download** 193:17
193:18 288:24
**downloads** 193:16
**dr** 55:20 56:1,4,7
58:5,6,16,20 59:1
60:2,7,10 63:1
65:3,5 241:24
247:3,3,8,20,24
248:3,5,9,14

**draft** 101:3,6
118:21 125:22
161:5 231:17
293:22,23
**drafted** 115:4
118:22 124:10
231:10
**drafts** 114:23
**draw** 25:6
**drew** 261:5 268:6
**drink** 148:8
**drinks** 148:12
**drive** 2:8 102:14
102:18 103:5,6,10
103:14,16,20,21
103:22,22,24
104:1,5,9,13,17,17
105:20 107:1,1
108:13,19 110:15
110:19,21,23,24
111:6,15,16,22
112:7,8 124:18,20
124:23,24 125:15
125:21,23 126:2
157:9,17 158:2,4
158:15,18,21
159:2
**driver** 125:13,17
158:6 225:22
**drives** 105:4
107:11 108:10
111:20 112:2,3
**driving** 279:8
**drop** 21:2 123:3
**dropping** 122:19
123:1
**drugged** 143:6,7
145:1,7,23
**drugging** 145:2
**due** 147:9

**duffy** 2:3,4 3:6
4:15,15 8:11 23:3
23:6 30:23 52:10
56:15 64:12,17
67:11 71:15 73:12
82:15 92:2 97:10
98:14 132:24
133:10 158:23
168:23 169:5
170:14 175:1
195:21 196:4,9,11
196:16,19 200:23
201:7,14,24
202:24 203:6
204:12 213:14
227:8,12,14 230:5
238:3 242:7
244:23 245:7,13
246:7,14 267:11
273:21 274:12
275:7 276:19
277:3,6 280:7
289:12 296:12
298:17,22 299:2
303:12,14,18
305:5
**duly** 6:16
**dump** 132:11
**duress** 13:16
**duties** 134:20
254:20,23 255:2
**duty** 275:11

**e**

**e** 3:1 8:24 11:11,15
11:17 13:15 20:2
20:7,15,18 21:1,5
21:8,11,15,20,20
22:10,15,18,21,22
22:23 23:4,17
38:6 40:2,6,7,8,11
44:23 52:5,6

60:17 73:16,22
75:12 76:2,12
79:3 82:1,5 83:14
84:2,3,11,12 86:6
90:9,9,16 92:19,23
93:11,20 94:17
95:19 96:7 100:14
100:20,21,23
101:4,6,14,17,20
101:23 102:4
106:10 107:17
112:21 113:2,2,18
114:1 116:11,14
117:22 127:6
128:6,7 130:7,15
130:17 131:9,22
131:23 140:11,19
141:6,19 142:6
143:4,5 145:18
147:8 161:5
166:13,13,14
167:23,24 168:5
170:23 173:19,20
174:16,19,20,21
174:23 184:12,16
195:3,19 209:21
210:12 212:3,5
213:16 216:20,23
219:1,2,9 222:13
222:13,15,23
223:23 231:7,10
231:10,18 232:1,5
232:11 233:2,7,15
253:14,15 261:18
263:8 267:14
273:12 278:9
280:15 283:24
284:6 288:8
**eagle** 138:16
206:13,19,24
207:2,6

earlier  74:20 75:1
  84:16 85:8 87:3
  92:3 102:7,9
  112:6 114:1
  115:21 116:3
  117:5 120:16
  121:15 129:20,22
  133:20 154:17
  173:8 177:4 185:2
  187:4 200:24
  212:8 237:21
  243:1 249:24
  258:7 267:18
  278:6 294:22
early  28:21 65:14
  81:2 250:11
  260:17,20,22
earned  236:15
earshot  181:21
eased  67:1
easily  179:2
east  2:8,13
eastern  1:2
ebabbitt  2:11
ec  17:8
edit  215:20
educated  15:11
effect  65:4 94:8
  183:20 222:9
effected  119:14
effectively  12:6
  19:2
egos  36:4
either  17:15 21:3
  21:19 29:4 48:14
  49:11 52:11 57:20
  59:24 91:14
  104:16 105:4,19
  123:21 152:23
  170:2 175:8,11
  176:1 182:5,12

189:14,23 190:2
  190:24 200:16
  248:23 281:7,16
  290:19 291:18
  295:9 302:6 303:7
elective  240:16,18
  240:24 241:2,5,9
electronic  7:10 8:4
  75:14
electronically
  160:22
elements  99:16
  242:2
elephant  167:13
elevator  190:2
eligible  236:13
elizabeth  2:9 4:7
  52:10,10 169:5
  195:21 196:4
  201:24 204:12
  227:8
else's  226:16
email  305:17
embarrassing
  158:15,21
embedded  125:14
embodies  24:3
emergency  224:12
  224:14,15 293:9
  293:15
emerging  250:14
emotion  74:5
emotional  67:8
  237:20 238:1,12
emotions  181:8
employed  14:15
  15:8 65:10 81:14
  81:20 176:16
  216:18 236:10
  239:5

employee  72:6
  83:11 95:21 210:4
  278:9 294:1,8,10
  295:1,3
employee's  226:15
employees  18:4
  57:20 82:20 83:7
  233:16
employer  237:16
  294:3
employment  21:16
  72:4 125:2,5,9
  126:11 168:10,19
  169:17 251:13
  256:9 297:14
  298:16
en  23:6
enclosed  305:12
encompassing
  111:18
encrypt  106:6
  111:5,14,17,20
  132:11
encrypted  31:10
  104:23 105:10,13
  106:14 110:24
  111:3,21
encryption  103:10
  103:14,22 104:4,7
  104:12,18,21
  105:4,6,17,23
  106:8,21,24 108:9
  108:13,18 109:9,9
  109:19 110:2,6
  112:1 192:24
encrypts  133:8
ended  43:8 177:13
  243:2
enforced  192:23
engage  24:18
  27:18 35:9 58:20

96:5 207:19 209:1
engaged  260:24
  294:8 301:12
engagement  270:8
engine  32:24
  34:15,15
enhancing  297:18
enjoys  35:7
ensure  35:18
  144:5 214:3
enter  110:15
  200:10 253:4
entered  112:8
  307:9
enterprise  192:23
entire  164:8
  171:10 306:5
  307:5
entirely  152:5
  241:10 290:23
entitle  242:12
entitled  8:12
  112:21 118:18
  191:18 192:4
  234:7 237:19
  244:10
entitles  242:6
entity  17:13
entrance  130:18
  130:22 131:2
entry  253:21
enumerated  45:23
  46:2 48:20 79:7
  84:15 85:9
enumerating  46:5
  48:16
enumeration
  74:19
enumerations
  87:3,9,10,14

environment
206:8
eob 246:16
eol 7:5
ephemeral 10:17
11:24 12:5 58:13
193:16
equipment 48:13
49:3
erp 169:13,18
errata 305:14,19
307:7,10,18 308:1
errors 195:23
escalated 98:23,24
escort 189:18,20
escorted 126:24
127:1,18
especially 139:22
191:16
essentially 61:18
231:2,21 269:11
302:9
established 73:12
estimated 211:8
estimation 264:4
et 20:7 35:21
56:10 193:1
220:19
ethical 17:3,7 18:1
18:9,10
ethics 82:20 83:7
83:10 128:8,15,23
128:24
eula 256:13,18
261:2,4,6,15 278:4
evaluate 251:10
287:24
evaluated 57:22
58:1 285:9,12,14
286:10

evaluation 285:15
evaluations 59:4
event 13:23 71:6
229:10 268:11
events 11:14 35:12
47:15 141:18
160:11 179:15
212:5,21 215:13
286:8 300:9
eventually 126:15
everybody 52:12
everyone's 90:14
evidence 64:13
151:19 277:24
exact 10:18 48:12
50:1 55:23 58:13
58:22 61:13 68:23
85:24 90:14 94:11
96:1 120:11 139:3
173:7 174:12,19
176:19 179:14
181:8 183:3,4,5,23
202:10 224:13
233:4,17 234:10
242:20 244:24
245:4,21 258:8
277:5 289:23
301:3
exactly 10:2,8
43:6 72:18 108:16
116:13 135:9
136:7 141:3
151:13 160:17
171:23 203:7
227:9 234:20
268:15 282:10
284:4 301:20
exam 3:5,5,6
17:15,16,18,22
examination 6:19
256:6 299:1

examined 6:17
examining 211:19
example 9:19 12:2
20:19 21:4 25:20
31:16 47:19 59:5
79:22 91:8 134:24
137:11 225:22
226:12 253:12
261:23 263:7
268:14 271:24
281:12 293:4
examples 121:11
exceed 144:1
exceeds 236:1
excellent 196:21
excerpt 226:23
excess 92:8 240:21
exchange 44:20
74:7 76:8,13,14
132:17 222:13
257:4 288:8
exchanged 44:5,15
52:2 148:21
149:18 194:2
excited 138:13
181:6 289:20
excitement 181:12
excuse 234:1
235:10
execute 185:16
186:11,18 201:6
214:7,15,21 215:1
215:22
executed 183:18
185:16 187:7,19
214:21 229:17
232:21 307:10
executing 216:7
execution 286:11
306:14 307:19

exercise 105:5
exhibit 3:9,10,10
3:11,11,12,12,13
3:13,13,14,14,15
3:15,16,16,17,17
3:18,19,20,21,22
3:23,24 8:5 39:12
39:15,15,20 40:12
41:4 73:10,16
74:8 75:15,24
76:2,22 81:22
82:2,10 84:3 86:1
86:11 92:14,19
94:20 96:19
100:12,14,23
101:23 102:13,17
104:14 112:21
113:2,21 114:14
116:15 117:21
118:14,19 119:4
124:5,7,14 125:22
127:3 128:6 130:7
130:12 148:18
149:10,14 150:1
150:22 151:17
152:5,24 155:4
156:22 159:5
161:12 162:10,15
164:5 165:9
194:21,22 196:23
203:11 207:12
209:14,17,19
210:13,19 211:20
213:11 218:21
219:2 222:12,18
226:18 227:18
228:15 231:5,8,18
233:3,6 268:24
273:6 283:22
288:2,2,24 290:3
292:3

**exhibits** 3:8,12 8:6
  256:14 257:6
  277:13
**exist** 223:22
**existed** 22:11 96:3
  104:8,9 106:24
  108:9 181:5
**existence** 27:16
  192:17 267:5
**existing** 137:3
**exists** 30:9
**expect** 47:9 80:8
**expected** 128:22
**expecting** 209:9
**expenses** 125:3
**experience** 17:11
  61:19 62:19 66:14
  71:3,7 151:22
  153:14 155:2
  180:15 183:9,12
  237:24 272:20
  291:14 297:23
  298:5
**experienced** 52:24
  53:4 61:8 62:18
  66:23 67:9 70:23
  115:22 237:22
**experiencing**
  55:14 56:7 57:18
  59:16 60:9,13
  61:16 62:3,23
  65:16,17 66:5,9
  67:21 70:7 117:9
  297:22
**expert** 104:22
**expertise** 28:8
**experts** 59:14,20
**expiration** 306:19
  307:25 308:25
**expired** 281:21

**explain** 13:18
  23:22 38:15 39:4
  62:7 85:10 104:6
  107:4 128:20
  129:8 139:7
  141:13 148:2
  163:5,8 185:14
  186:12 232:14
  281:12 292:23
  300:24
**explained** 24:22
  45:4 55:21 67:20
  125:16 142:5
  143:5 149:2
  180:22 186:10
  206:6 223:22
  234:16
**explaining** 77:23
  96:8 97:5 173:6
  175:22 301:2
**explanation**
  175:24 185:17
  266:7
**exploited** 278:10
  278:15
**exploiting** 199:4
  269:14
**explorer** 220:15
**exposed** 209:6
  223:24 224:6
  270:15 272:23
  295:19
**exposures** 263:10
**express** 138:18
  183:14,20
**expressed** 145:8
  188:6
**extension** 95:16
**extensions** 220:16
**extent** 55:17 67:11
  98:16 101:21

138:16 149:20
  161:4 170:14
  221:9,23 238:3
  257:11 267:11
  273:1,21 291:17
**extra** 10:22 69:14
  203:8 205:19
  287:20
**extract** 253:5
**extreme** 68:18
  71:1
**exude** 62:16

## f

**f** 2:10 4:9
**fabricated** 301:1
**face** 142:15 158:11
  263:14
**facebook** 28:1,3
  28:10,11,17,23
  272:1,3,8 294:23
**facing** 179:22
  209:6 270:18
  287:21
**fact** 23:23 41:1
  45:17 77:19 78:12
  88:9 100:6 105:9
  109:8,11 114:10
  121:12,12 123:7
  127:16 129:1
  131:4 145:22
  148:3 152:16
  153:15 155:1
  156:3 157:21,24
  161:17 163:19
  165:6 166:12
  184:18 192:8
  195:19 202:22
  206:3 208:4,22
  214:4 215:21
  241:4 252:1
  263:15 278:15

283:1 287:20
  292:15 293:13
  296:17 298:11
**factor** 80:23 97:17
  97:20 99:6,22
  100:5 121:13
**facts** 274:23
  278:24
**factual** 297:1
**failing** 171:20
**fair** 5:12,21 8:3
  42:12 57:1 61:8
  83:6 120:23 126:8
  134:18 182:18
  205:9 210:11
  230:3 259:2
  264:18 269:5,21
  280:20 283:21
  290:7 292:3 294:1
  295:10 299:19
  302:15
**fairly** 186:19
**fall** 149:4 241:8
  261:3 262:14
**falling** 284:21
**falls** 165:16
**false** 141:7,9
**familiar** 5:5 83:7
  190:12 266:1
**family** 11:21 40:14
  40:15,17 59:13
  69:12 71:16 88:14
  293:24
**fan** 35:5
**fandom** 35:10
**fandoms** 24:6
**far** 42:11 67:17
  106:13 198:20
  199:22 228:3
  264:8 281:24

**fashion** 285:13,17
**fast** 269:1
**faster** 143:20
**father** 40:16 71:19
**fear** 158:13
**feature** 123:18
179:8 185:10,13
185:18,21 197:11
197:12 205:23
206:2 267:17
293:12
**feature's** 224:11
**features** 293:4
297:9
**federal** 1:18 6:8
278:16
**fee** 205:20
**feel** 107:4 151:21
152:13 153:17
155:18 164:8
170:6 193:4
205:17 295:21
303:10
**feeling** 117:3,13
144:17 145:7
**fell** 146:7,21
**fellowship** 69:15
**felt** 87:4,4 154:10
161:19 193:3
216:16 230:23
297:21
**field** 17:11 172:6
173:10 183:10
**fields** 227:3
228:17 268:10
286:18
**figure** 47:19
171:19 277:21
286:4
**figured** 126:7
214:18 284:24

**file** 34:7 76:24
77:15 104:7,8
109:1 152:11,17
152:19 185:20,23
186:1 201:2
220:16,22 225:24
231:15 265:4,8,9,9
301:24
**filed** 77:10 78:7,13
78:16,19
**files** 158:7 219:23
220:9,10,14,17,19
220:19 252:14,18
252:21 255:8
265:10,10
**filing** 77:20 126:4
201:18
**fill** 89:15
**filled** 122:2 124:11
**filter** 20:19
**final** 284:7
**finally** 43:8 285:3
**financed** 245:1
**financially** 14:24
**financials** 223:18
**find** 142:20 143:14
151:19 167:3
195:10,23 198:22
199:11 219:22
223:5 238:24
250:21 254:1,12
255:13 288:22
291:19 305:12
**finding** 87:6 99:12
99:13 150:16
222:24 273:17
274:9
**findings** 255:3
**fine** 37:1 125:20
159:15 195:24
233:23

**fingerless** 150:4
**finish** 5:20 67:3
196:7
**finished** 67:2
177:20 207:5
**fire** 35:20
**firms** 150:18
208:24
**first** 5:7 6:16 16:8
37:11 41:10 45:3
53:4 65:6,17
71:15 87:18 113:2
114:14 121:17
136:7 146:15
149:14,24 171:8
176:14 177:22
178:3 189:18
195:12 196:8,22
202:21 210:19
229:12 234:8
257:18 260:11,14
283:23 288:3
289:7 290:8 301:4
301:24
**firsthand** 290:23
296:7
**fisher** 2:19
**fit** 258:15
**five** 36:24 37:1
211:13 233:24
255:15
**fix** 166:6 281:13
293:4,11 297:21
**fixed** 46:19 293:13
**fixes** 208:18
292:16,19,22
293:1,2,3,19
**flags** 224:18
**flash** 102:14,18
103:5,6,10,14,16
103:19,21,22,24

104:1,5,9,13,17,17
105:4,20 107:1,1
107:11 108:9,13
108:19 110:14
112:2,3,8 124:18
157:8,17 158:2,4
158:15,17,21
159:2
**flaws** 274:19
289:24
**fleet** 251:1
**fletcher** 190:10
194:20
**floor** 181:19,20
189:18,21 190:3
**fluids** 55:22
**fmla** 81:1,5,7,13
81:14,18 94:6
97:5,8,15 98:8
100:6 120:10
122:2 123:7 129:1
217:8
**focus** 251:18 266:1
269:2
**foggy** 282:5
**folder** 34:2,3
39:15,17 193:16
**folders** 220:24
**folks** 222:14 262:7
283:6
**follow** 56:13,17
65:5 72:14,22
111:12 123:12
129:20 176:12
240:4 255:12
263:14 282:17
**followed** 25:22
58:24 171:14
**following** 13:11
43:4 64:7 107:9
127:20 146:6

152:4 163:3 214:6
243:22 244:1
**follows** 6:18
**food** 53:20
**forced** 127:21
150:17 169:21,24
170:6 189:8
216:14 256:24
258:4 301:6
**forcing** 14:4
**foregoing** 306:13
307:18
**forensic** 104:22
**forest** 2:4
**forget** 49:2 150:3
**forgive** 277:8
**forgiveness** 182:22
**forgotten** 46:12
**form** 36:17 43:13
75:13,14 122:2,5,8
122:19 123:3,7,12
124:11 184:8
290:20,22
**formal** 161:17
**formalities** 283:2
**formally** 148:1
267:14
**formatted** 220:18
**formed** 260:20
263:20 290:9
**forming** 260:17,22
261:2
**forms** 251:19
**forth** 232:17,20
**forward** 86:18
114:13,14 305:16
**forwarded** 21:1
40:7 76:11,14
114:4,5
**forwarding** 20:6
76:6 86:11

**forwards** 20:6
74:1 86:10
**found** 46:13,17
140:20 142:10
152:22 157:24
164:21 178:3
197:11 198:20
207:22 208:11,12
209:9 219:7,23
220:4,8 221:4,17
230:20 255:5,7
281:15 284:8,22
289:24 299:24
**foundation** 17:8
**fountain** 148:10
**four** 175:14,15,19
**fourth** 18:19
**fragments** 280:18
282:14
**frame** 59:9 147:7
176:20 265:15
281:7
**frank** 118:5
**free** 172:1 253:7,8
306:14 307:20
**frequently** 182:17
182:17
**friedlander** 2:23
4:19,19 258:14
266:14 276:2
283:5,9,15 290:8
290:12 291:3
**friedlander's**
300:2 301:17,20
**friend** 34:4
**friends** 9:6 11:21
29:12 57:16,17
59:23 61:12 88:18
135:11
**front** 6:8 102:20
127:4 137:15

184:16 202:16
246:16 250:20
251:10 257:3
278:1 288:2
**froze** 52:13
**frozen** 52:11,11
**full** 7:22 93:12,20
96:13 158:17
163:15 164:8
205:23 283:7
286:22 292:7
296:15
**fully** 230:19
**function** 11:23
55:1 60:22,24
143:10,23 226:7
251:16 292:22
**functionality**
293:10
**functioning** 20:8
131:21
**functions** 168:17
207:8
**funny** 164:4
259:21
**fur** 35:23 36:1,1
**furries** 35:13
**furry** 35:2,4 164:9
**further** 162:10
183:15 256:1
**future** 254:19
282:4
**fyi** 222:16

**g**

**g** 23:17 305:9
306:4,9 307:4,13
308:20
**gain** 270:17
**gained** 208:5
**gaining** 207:16

**game** 34:8 133:16
**games** 34:6
**gap** 266:7
**gathered** 296:17
**general** 16:12 19:1
68:13 129:3,4
174:12 195:22
216:24 226:11
281:10,22
**generally** 25:23
26:13 85:1,3,5
94:4 105:7 173:7
182:3 208:10
209:6 240:18
268:16 281:3,6,6
**generated** 34:13
**generic** 253:24
255:5
**genuinely** 265:19
290:13
**george** 1:3,12,16
3:4 4:3 6:15 304:7
305:6 306:3 307:3
**gestures** 120:3,16
**getting** 13:22 14:1
53:24 54:12 63:14
65:23 90:10
116:11 137:9
171:22 180:5
204:12 210:24
232:9 247:7
262:24 263:22
269:19 271:9,15
271:18 285:21
295:5 299:4
**gift** 234:17
**gig** 124:17
**ginji** 23:12,24 24:2
24:18 25:16,24
26:1,3,6,7,7,11,15
34:24 36:1,12

**give** 7:22 9:6,7
11:1 20:20 143:23
178:15 197:10
292:5,8 300:13
**given** 31:2 69:7
81:5 141:21
146:23 197:7
198:15 205:23
234:11,14 266:7
295:15 297:23
300:11,21 304:10
**giving** 121:6
175:23 298:2
**global** 284:7,9,12
**gloves** 150:4
**gmail** 21:10 22:16
22:23 73:17 92:20
100:15 130:13
131:15 194:6,6
209:22
**gmail.com** 20:5,10
20:13,17,22 21:4,4
21:20 73:18
**gmail.com.** 20:5
20:11 29:9
**go** 5:3 10:14 19:23
28:19 37:3 48:10
56:19 64:20 66:3
66:8,8 72:10
75:16 82:16 92:4
92:6 100:6 102:12
105:5 112:20
122:1 123:3
126:24 129:5
130:24 131:6
142:13 146:6
148:10 149:21
153:8,17,24 155:6
162:11 164:4
167:20,21 169:11
184:12 185:18

186:13,15 188:10
193:14 195:9
196:12 211:10
215:13 217:7
219:1 242:21,22
243:2,8,10 246:9
248:12 256:3,5
259:15 265:3
276:16 280:24
283:21,22 285:7
286:13 287:16
288:7 292:4
296:20
**god** 294:17
**goes** 131:1 269:8
**going** 4:1 5:3,7,9
14:1 16:6 19:13
23:8 30:21 37:4,7
37:9 42:19 43:10
43:19 52:14,16,19
56:15 73:5,9
75:15 76:20 77:10
78:1 84:9 87:8
88:13,22 89:20
97:2,8,21 98:6,7
98:12 111:14,17
114:10 116:15
117:4 120:22
123:11 125:3,10
145:20 149:9
159:17 161:12,20
163:20 165:1
169:3 179:11
180:18 184:19
191:22 196:1,2,6,7
204:15 211:14,17
222:8 226:19
229:23 234:1,3
251:20 255:19,22
256:3 260:19
262:17 264:10

274:6 275:6 282:5
303:19
**good** 4:1,23 9:6
22:14 30:23 36:24
39:24 59:9 84:4
84:19 92:23
135:13 139:5,6,8
139:11,15 153:3,6
168:21 180:14
191:1,20 205:8,11
229:22 256:2
266:10 272:12
284:14
**google** 27:10,11,14
27:16 29:12 30:5
30:8,11 31:24
132:15 193:14,19
193:24 194:2,3,5,7
194:9,10,12
**gossip** 96:6
**gotten** 110:1 122:2
191:1 205:10
223:9 272:16
295:8
**governing** 17:13
**gpl** 46:14 47:19
**grabbing** 180:19
**graduate** 15:20
**graduated** 68:21
249:12,14
**graduation** 29:1
**graphical** 34:6
**gray** 288:11
**great** 96:24 113:20
149:14 195:11
209:21
**greater** 76:8,15
228:19
**green** 2:15
**greg** 55:19

**grievances** 164:23
**griping** 51:12
**ground** 5:4
**grounds** 78:9
**group** 34:20
**groups** 31:17
**guarantee** 14:1
**guess** 19:2 23:21
35:10 47:5 54:22
77:5 91:11 121:24
134:18 135:9
177:17 179:9,22
185:14 186:1
187:16 199:24
201:19 206:23
213:3 222:1
226:12 240:17
242:22 257:12,22
262:14 264:16
269:16 274:20
275:13 289:6
**guesses** 45:12,20
46:6
**guidebook** 286:6
**guides** 290:5
**guy** 76:23 159:18
161:13 162:2
**guys** 219:4

**h**

**h** 4:13 19:13
**hack** 294:19
**hacked** 151:20
272:3,9 294:15,17
**hacker** 17:3,7 18:1
18:8,9,10 290:10
290:15,15
**hacking** 19:7,8,15
25:15 26:1 294:2
294:9
**haley** 32:18

**half** 13:2
**hall** 119:18,24
  120:21
**hallway** 120:18
**hand** 83:3 119:18
  121:4 136:3
  187:18 287:19
  296:8
**handle** 26:5 27:5
  27:22 30:17 32:1
  46:24
**handled** 193:20
  280:23 281:2
**handles** 27:6
**handling** 180:15
**handsomely**
  254:17
**handwritten** 50:4
  50:7,12,15
**hang** 135:14 288:6
**hangouts** 193:24
  194:2
**happen** 49:8 78:2
  91:7 104:3 119:19
  167:1 178:23
  191:14,19,22
**happened** 33:15
  49:10 73:13 89:3
  99:5 106:12
  107:24,24 127:20
  141:19,20 152:23
  156:16 191:16
  192:20 211:6
  215:14 260:15
  264:20 266:24
  283:8 297:17
**happening** 249:21
**happens** 8:13
  150:6 167:7 253:2
**happy** 23:7 86:15
  261:19

**harassing** 204:13
**harassment** 79:23
  80:9
**hard** 71:21 93:15
  103:22 107:12
  147:9 226:19
**harrington** 74:8
  76:14,16,18 77:22
  77:23 78:2
**hash** 112:16
**haynes** 9:9 10:3,4
  10:5,13,16 11:2,7
  11:10 32:2 40:19
  41:7 42:1,15,17
  43:1,15,21 44:5,7
  44:8,8,15,21,24
  45:2,6,9,23 46:23
  46:23 47:8 49:1,5
  49:19 50:2,22
  73:17,22 74:7,14
  75:4,9,15,19 76:3
  76:6,7,21,22 77:3
  77:6,9,21 78:3
  79:3 81:2,6,17
  82:1,5,18,24 83:2
  83:14 84:3,7,10,18
  84:21 85:2,4,5,10
  85:20,21,23 86:6,7
  86:10,14,22 87:8
  87:13,15,20,22
  88:5,14 89:9,13,16
  90:19,22 91:18
  92:20,23 93:4,12
  93:19,20,24 94:1,8
  94:17,21 95:1,24
  96:2,7,13 97:7
  106:9 107:20,21
  108:14 111:14,19
  111:21 118:3,8,10
  120:12 137:17,20
  139:10,14 140:2,9

148:22 149:6,16
  149:19 150:3,10
  151:3,9,11,18
  152:1,18 153:15
  153:18 154:3,4,7,9
  154:14,21,24
  155:12,20 156:15
  157:5,13 159:10
  159:21 160:5,15
  160:20 161:13
  162:3,18 163:21
  163:24 164:13
  165:23 171:1,4,9
  171:14,17 172:4,8
  172:13,17 173:2,5
  173:13,18 174:4
  174:11,16,22
  175:5 176:12,14
  176:22,24 177:1,3
  177:5,16,17,18
  178:7 179:6,9,10
  180:1,3,6,23 181:4
  181:7,13,18,22
  182:1,4,8,12,19,21
  182:22 183:7,13
  183:18 184:1,13
  184:19,24 185:15
  185:16 186:1,4,10
  186:17,24 187:6,7
  187:10,13,18
  188:3,14,16,18
  195:18,18 197:8
  197:10 198:11
  199:8,9 201:9,17
  201:17 203:15
  204:4 210:2
  212:10,11,15,18
  214:1,9,14,17,24
  215:12,21 216:6
  216:11,16,20,22
  217:4,12,20,24

218:2,8 219:5
  221:22 222:8,14
  222:23 223:14,20
  223:23 224:7,21
  225:9,14,16,17
  226:2,13 228:7,23
  229:7,12 230:10
  230:16 231:7,11
  231:19 232:1,6,10
  232:12,20,21
  233:7,14 252:1,9
  255:9 257:4 267:6
  267:13 269:12,13
  269:20 270:4
  271:2,3,8 273:8,18
  274:10,24 275:1
  275:10,16 278:8
  278:20 285:15
  286:9 288:9,15
  289:8,18 291:13
  291:13 293:12,15
  301:11
**hazy** 8:1
**head** 5:16 51:14
  66:7 77:6 84:10
  90:7 122:6 137:14
  143:14 160:17
  211:11 212:1
  236:3,8 244:6
  245:20 248:1
  276:5 282:7
  285:19 295:7
  298:20
**headed** 144:17
**header** 217:8
**heading** 204:20
  205:5
**headquarters**
  103:2 105:17
  106:16 107:2
  121:1 127:14,22

130:21 131:11
134:6 176:8 189:9
189:13,17
**heads** 193:3
**headset** 165:20
299:9
**health** 56:23 64:10
72:7 128:18
236:19,23 237:2,6
237:7 245:2
**hear** 71:21 132:24
181:20 282:15
297:4,12 299:10
300:12
**heard** 77:12
107:20 170:5
218:12 258:5
267:1 282:20
296:13
**hearing** 77:22
181:22
**hearsay** 291:2
296:9 297:3
**heart** 53:10
**held** 290:13
**hell** 164:6
**help** 24:8 28:7
34:11 109:13
147:16 150:18
250:14
**hernia** 246:13,24
247:1
**hernias** 246:8
**hey** 121:4 134:22
177:23 178:19
188:14 197:12
203:4 208:11
222:8 253:15
285:4
**hi** 113:3 119:18
120:3,17,20 219:4

**hidden** 195:13,15
196:23 199:4
203:15,20 204:5,8
204:20,21,22
205:16 209:10
219:7,14,17
269:14
**hide** 302:9
**hiding** 209:8
**high** 245:22
253:21
**higher** 77:24 91:9
91:10 153:18
290:8
**highlighted**
150:23 151:17
156:23 159:8
162:14,17 163:16
165:11,13 227:2
227:10 228:16
**highlights** 161:6
**hinted** 267:23
**history** 185:9
226:24 227:2
228:17 247:4,10
247:12
**hit** 142:14
**hits** 220:24
**hobbies** 142:7,9,17
142:19,20 143:2
143:21 151:21
**hobby** 142:12
**hold** 15:24 52:10
52:10 82:15 93:15
93:16 113:9
116:15 121:4
130:9 195:21
211:11 299:9
**holiday** 10:11,11
51:4 193:13

**holidays** 71:16
**hollister** 2:7
**home** 12:14 42:4
101:14 166:24
**homeland** 15:16
69:15
**honest** 303:6,7
**honestly** 28:18
50:19 56:20 62:5
77:5 79:6 95:1
157:7 159:1
176:19 187:3
228:6 258:24
265:22 273:23
282:12
**honors** 15:16
**hoped** 273:4
**hopefully** 117:7
157:7
**hopeless** 57:6
**hopelessness**
60:21
**horrible** 145:2
**horribly** 143:6
145:1
**horse** 257:22
**hospital** 66:4,8
243:2,17
**hospitalized** 70:16
**hospitals** 240:15
243:11
**host** 33:12,17
34:10
**hosting** 33:21
**hot** 250:19 292:16
292:19,21 293:1,2
293:3,19
**hotel** 243:3,15
**hour** 36:23 55:11
57:8,10 61:21
117:6

**hour's** 251:18
**hours** 7:19 53:24
54:4 144:22,23
146:3 281:19
**hp** 101:16
**hr** 89:22,24 128:8
128:19 190:9,10
191:11 194:19
**huge** 293:9
**huh** 5:16 64:4
228:20
**hunting** 167:3,21
**hurry** 123:4
165:19
**husband** 7:5 9:4
12:8 14:5 32:4
57:15 59:4,7,12,22
61:12 66:6 88:14
114:6,8 118:24
192:14 193:5
237:8 243:6 244:7
244:11
**husband's** 13:24
14:4,8 237:7,15
**hydrated** 147:17
**hyena** 24:7 25:11
25:15 26:2
**hypothesis** 98:9

**i**

**idea** 39:10 83:12
139:5,6,8,11,15
164:8 180:14
200:20 201:9,16
223:12,15 229:22
260:20 273:11
279:3 282:21
289:1
**ideal** 241:6 243:4
**ideally** 246:19
**ideas** 49:17

**identified** 30:17
36:8 60:14 242:19
276:22
**identify** 26:1 35:4
35:5 36:6 56:14
61:10 198:18
208:21 220:12
232:3 278:2
**identifying** 276:15
**identity** 28:16
**ids** 113:14,14,17
**ignore** 120:20
196:5
**ignored** 109:14
**ilcs** 82:20
**illegally** 46:15
**illinois** 1:1,18,22
2:4,8,14 6:23
15:19 82:7,19
83:6 304:1
**illness** 54:18 55:14
102:3,8 115:8,14
115:20,21 147:10
**illnesses** 54:23
**image** 102:13
**imaged** 131:18
**imagine** 79:20
114:18 228:10
264:11 273:7
**imagining** 282:9
**immediately** 13:11
127:20 224:17
225:7
**immune** 54:24
273:19 274:3,10
275:12
**immunocompro...**
54:17
**immunocompro...**
54:21 58:2

**impact** 161:19
286:22
**impairment**
143:17,19 144:12
**implicated** 140:23
**implication** 206:3
**implications**
144:18
**imply** 140:23
**import** 132:10
**important** 92:24
193:5 215:19
216:16,17 232:12
288:16 289:7
**impression** 136:14
136:17 260:20,22
**improper** 51:11
87:5 199:24 205:6
206:4 273:24
278:4 290:22
**improperly**
199:14,15,21
200:3,5,13
**improved** 66:17
**inaccessibility**
132:3
**inaccuracies**
209:17 251:11
276:13,15
**inaccuracy** 276:22
276:24
**inaccurate** 202:15
230:7 250:23
276:1,6 291:24
**incident** 18:12
99:2,8,11,15,17
100:1,5 136:5
137:19 143:3
164:1 258:10
259:12 269:24
273:20 274:1

**include** 212:18
216:12,23 233:2
**included** 76:14
232:24 244:13,16
254:23 271:2,2
305:14
**including** 61:11
113:14 231:15,16
239:10 278:4
**inclusion** 276:17
**incoherent** 280:16
**incomplete** 291:23
**incorporated**
307:12
**incorrect** 34:14
158:2 195:5,7,17
198:18 203:12
205:13 221:13
**incorrectly** 136:21
**increase** 218:8
**increased** 236:1
**increases** 218:11
**increments** 234:19
**indicate** 214:14
286:20
**indicated** 183:13
247:20 262:13
**indicates** 260:2
**indicating** 305:14
**indicative** 259:19
260:23 276:18
277:1
**individual** 76:9
176:16 249:23
**individuals** 10:20
10:22 31:14
128:13 135:18
138:22 139:13,24
175:14,19 190:22
191:24 251:7

**inexplicable** 262:2
**inexplicably** 262:1
**inextricably**
278:14
**infection** 147:14
147:22
**infections** 54:11
54:15,23
**influences** 25:24
**info** 153:3,6
**inform** 89:3
111:10 123:6
140:7 170:22
191:4 225:2
**information** 8:4
10:22 15:15 17:11
17:12 18:23 19:2
19:11,18 34:17,21
41:12 51:8 58:12
75:22 76:20 91:24
104:24 114:11
117:19 118:11
154:8 176:23
178:15 195:4
200:11 203:9
205:22 225:24
231:12 242:16
253:7 254:15,18
255:4 257:3
260:11,12,13,13
291:22 300:6
**informed** 120:13
121:1 140:1
170:21 171:2,4,17
174:16 179:9
200:18 217:12
278:8
**informing** 174:15
176:12
**infrequently**
27:19

**initial** 297:10
**initials** 217:17,19
**inkling** 39:10
  45:20
**innocent** 277:23
**input** 55:17,20
  103:15 105:23
  283:12
**inputs** 206:14
  207:9
**inputting** 228:18
  228:21
**inquire** 72:2
**inquiring** 114:5
**inside** 24:4 67:15
  77:6 194:12 206:1
  224:10 254:3
  265:5,9 271:9,15
  271:19 272:16
  295:2,6
**insight** 51:10
**insistent** 146:2
**installed** 188:17
**instance** 57:9
  143:22 171:8
  204:23 253:13
  254:2 263:24
  279:18 286:19
**instances** 25:24
  26:14,17 31:16
  75:10 228:21
  255:5
**instituted** 105:12
**instructed** 130:16
**instructing** 196:19
**instruction** 196:15
**instructions**
  208:13 265:11
**insurance** 13:20
  13:24 14:4,9
  65:23 72:8 73:1

236:19,24 237:3,6
237:7,15 238:14
241:11,16,19
246:6,12
**integer** 46:20
**intended** 100:1
  119:22 160:2
  215:11
**intending** 97:15
  125:5
**intent** 78:24 79:1
  250:6
**interact** 168:9
**interacted** 49:6
  168:14
**interaction** 127:23
**interactions**
  134:14,19 136:19
  285:3
**interactive** 32:20
**interbus** 298:3,3
**interested** 79:5
  180:23 181:2
**interesting** 221:2
  250:17
**interface** 31:15,18
  35:19 186:20
  278:12
**internal** 270:18,20
  272:24
**internet** 101:10
  226:24 227:2
  228:17
**interpret** 158:2
**interpreted** 263:3
**interrogation**
  153:8 157:10
**interrogatories**
  6:17
**interrupt** 123:9
  196:1 225:1,21

**interrupted**
  224:18
**interrupting** 226:1
**interview** 72:15,17
  72:18,19,21 134:3
  134:5 135:17,22
  136:1,5 138:20
  140:6,12,21 141:7
  141:23,24 142:6
  143:6,8 144:6,9,16
  144:20 145:13,17
  145:21 146:3,7,14
  146:16,20,24
  147:3,10,18 148:2
  150:16 155:22
  156:19 160:12
  188:22 201:12,22
  203:23 207:14
  259:7 261:12
  298:1 300:20
  301:4
**interviewed** 45:22
  129:23 133:24
  134:14 135:19
  136:2 140:7
  147:23 148:13
  156:5 279:5
**interviewing**
  138:22 139:14,24
  279:20
**interviews** 45:18
  50:14 144:8
  203:14 204:4,11
  300:19
**intricate** 95:4
**introduced** 256:14
  296:22
**introduction**
  25:19
**investigate** 80:1
  251:22

**investigated** 48:2
**investigating**
  79:23 252:8
  284:22
**investigation**
  80:16 81:3,4 98:2
  115:1,6 148:22
  150:20 201:13
  247:14,16 263:6
  266:13 279:5,21
  300:16 302:14
**investigations**
  300:4,5
**investment** 13:22
**invite** 189:15
  204:22
**invocation** 287:9
**invoke** 287:8
**involved** 193:1
  197:16
**involvement**
  223:18
**involving** 224:20
**iota** 251:20
**iron** 237:13
**ish** 284:19
**issue** 34:10 61:10
  88:10 96:9 97:5
  129:1,18 154:23
  163:20 168:4
  172:18 197:2,18
  198:17,23 199:12
  200:12 202:6
  203:19 204:8,19
  205:4 208:4,11
  223:1,7 230:13,17
  230:23 231:18
  232:14,14 251:23
  254:21 259:3
  269:9 274:17
  281:7,10 291:5

**issued** 44:3 149:17
**issues** 11:4 18:11
  21:22 30:3 33:21
  53:16 55:13 56:6
  58:4 59:15 60:10
  60:14 62:7 63:9
  63:10,11,12 64:11
  65:15 75:10 90:3
  116:12 153:17
  155:3 156:15
  164:20 183:10
  207:22 214:3
  232:18,18 238:5
  240:21 242:1
  247:21 248:3
  255:23 261:23
  291:15
**items** 126:16,17
  127:24 129:16
  250:20

**j**

**j** 23:17
**jackie** 118:4
**jados** 2:14 3:5
  4:17,17 256:2,3,7
  267:20 276:21
  277:4,7,12,16
  278:22 280:4,8
  289:15 298:21
  299:3 302:8
**january** 17:5,23
  237:4
**japanese** 25:20,24
**jar** 265:8
**java** 265:8,10
  287:6,17
**jeff** 210:2
**jeffrey** 209:22
  210:1
**jerk** 23:8

**jersey** 227:4,6,21
  227:24 228:5,8,12
  285:24 286:3,4
**jesseka** 2:15
**jim** 37:18,19,21
  38:3 39:6 41:9,20
  41:24 42:2 43:18
  44:16 46:4,11
  48:6,10,13,21 80:4
  90:17,21 113:3,20
  114:4,10 116:19
  119:17 126:2
  130:17 134:8
  145:8 148:5,6,9
  153:1 154:18,19
  200:17 202:21
  230:2 259:4
  260:17 261:5,18
  261:19 262:16,19
  263:17,23 264:1,3
  264:5 272:6,11
**jive** 80:4
**job** 11:1 14:1,18
  14:18,19,20 17:10
  19:23 66:17,21
  134:19 150:7
  192:21 235:24
  236:17 239:1
  254:20,22 255:1
  294:4,10 295:3
**john** 2:10 4:9
**johnston** 107:15
  107:23
**joining** 4:24
**joke** 163:7,17
  164:3
**jokes** 163:12
**jp** 217:12
**judge** 6:8 292:2
**judgment** 151:22
  153:18 154:4

  184:9 204:21,24
  205:2,6,9,11
  207:12 291:16,24
**julie** 2:23 4:19
  258:14 283:5,15
  290:8
**july** 219:2 222:14
  225:2,4,7 284:16
  284:18
**jumped** 220:11
**jumping** 218:15
**june** 32:16,17
  225:6
**junior** 218:3,4
**juror** 292:23

**k**

**k** 4:13 12:19
**kabash** 296:18
**kang** 295:15
**keeled** 62:16
**keen** 153:8
**keep** 25:9,9 79:8
  112:14 128:22
  150:7 159:11
  199:11 255:22
**keeping** 53:20
  77:8 116:8
**kennedy** 2:10 4:9
  4:9
**kept** 239:1 241:19
  260:12 294:3,10
  295:3
**key** 99:10,13
  103:10,14,22
  104:4,7,13,18,24
  105:4,24 106:2,21
  106:24 108:18,19
  109:23 110:16
  112:8,10,15
  157:23 158:11
  170:17 171:10,13

  171:17,22 172:3,5
  172:11,19 173:1,8
  173:19,20 174:18
  174:20,21,23,23
  177:12,24 178:3,3
  178:12,19,23
  179:7,11 180:6,24
  181:5 199:4
  213:22 215:18
  221:8,11,18 227:3
  227:5,21 228:18
  228:22 229:13
  232:3 253:11,11
  261:24 262:3
  264:13,21 265:5
  265:13,20 267:6
  267:16,18,24
  268:13 269:17
  270:9,11,12,19
  271:7 272:15
  273:2,18 274:9
  275:1,10 284:8,9
  284:10,12,13,17
  284:23 285:1,4,13
  285:16 286:10,17
  286:23 287:3,5,10
  287:13,14 291:5
  299:5,14,18,23
**keyboard** 229:7
**keys** 108:4,9,13
  109:9,9,20 110:2,6
  112:1,14 178:20
  178:22 192:24
  253:10 254:12
**khuans** 2:9 4:13
  4:13 39:14 96:21
**kidding** 150:4
**kids** 75:16
**kim** 57:19
**kind** 14:11 24:3
  25:4 121:3 130:23

136:10,21 141:20
147:15 204:14
216:17 227:15
234:16 243:16
245:2 246:9
254:17 257:22
259:21 260:17,19
260:20 262:21,24
266:23 274:4,6
275:4,5 279:21
280:8 283:15
286:8 288:11
292:15 294:5
303:6
**kinds** 25:23 59:10
208:16 243:20
291:15
**kiosk** 135:2
**kitchen** 6:22
**knew** 40:10 51:1,8
51:16,16,24 108:9
108:11,12,14
238:23 256:15,21
279:1 282:10
283:13 291:17
299:8,12,13
**knots** 62:15 102:5
**know** 5:4,7,23,24
8:11,12,16 10:21
11:6 18:21 20:8
21:7 28:14,18
29:3 30:13 31:16
32:8 36:20 38:22
39:2 41:13 45:6,9
45:18 46:19,21
50:1,2,4,19 51:15
51:22 56:12,20
59:22,23 64:14
65:21 72:12 73:12
74:4 75:17,19
76:18 77:5,13,15

77:16 81:17 83:10
84:9 86:21 88:24
91:24 92:4,5 94:4
95:1,2 96:1,2,3,8
101:16,19,21
106:16 108:11,14
108:14,15 119:18
123:3,15 126:8,15
128:21,22 133:14
136:7 139:12,21
145:19 149:10,22
153:11,19,21
157:5 159:13
162:12 165:17
170:10 172:4
173:16,22 176:20
178:12 179:6,13
181:3 183:3
185:15 187:13
191:16,17 194:24
195:18,22 196:4,5
197:13 198:22
200:20 204:8
205:17 209:18
211:24 215:5
216:17 217:24
218:17 219:8,13
220:17 221:22
223:12 224:2,4,4,6
225:8 226:19
228:7,11,12,13
231:5 234:10,11
234:23 235:10
236:3,6 237:21
241:11,18 244:5
248:8 255:9 256:9
257:1,13 258:2,14
259:1,1,2,20,22
260:5 262:23
263:1 264:20
265:17,22,24

266:4 269:5,9,16
269:21,23 272:16
272:21,22 273:7,9
273:14,15,23
274:14,22 275:3,7
277:24 279:9
282:12,14 283:1
283:20 284:4,23
285:7,7,8,14
286:22 287:7
288:15,17 289:15
289:17 290:14,16
291:17,19 293:15
294:7,7,13 295:14
295:16 296:10
298:13 299:17
300:2
**knowing** 145:19
171:23
**knowledge** 18:24
19:1 81:19,21
89:9 91:16 108:12
122:7 137:4
144:10 149:6
162:6 180:1
223:10 286:17
290:24
**known** 279:4
**knows** 92:1 147:13
292:24
**komosa** 175:11
177:1,2 220:13

**l**

**lab** 182:5,6,13
**labor** 67:14
301:24
**labor's** 257:20
**lack** 54:16,20
106:18 107:8
151:14 177:7
264:6 296:21

**lake** 2:4
**lang** 95:2,2,10
257:5 258:22,24
273:9 283:5,14
296:15,21 297:7
**langer** 57:19
**languages** 297:24
**lapsed** 72:8
**laptops** 101:12,13
**large** 143:9
**larger** 11:23
**largest** 99:5
**lasted** 117:5 144:6
**late** 70:24 77:15
247:5
**latest** 109:2,2
**laugh** 162:18,24
**launch** 256:4
**law** 2:3 82:23
150:18 159:12
**laws** 278:16
**lawsuit** 18:11
21:23 22:1,15
47:7 67:10 77:20
78:7,10,13,17
131:19 160:2
170:11 238:9
**lawyer** 153:7
192:6 275:3,5,5
302:13
**lawyers** 159:23
204:14
**lay** 162:5 258:10
258:15,18,22
259:3,4 264:4
271:17,18 293:20
**lcsw** 249:18,19
**lead** 295:23
**leading** 140:13,15
140:18,20 141:1
290:9

**[leaked - lobby]**                                                        Page 30

leaked  253:3
learn  118:1 257:18
learned  107:22
  178:17 260:11
leave  37:12,14
  38:5,8,14,23 39:10
  39:21 40:23 41:2
  41:6,8,14,17,18
  43:12,14,19,20
  44:9 45:3,5,7,10
  45:13,20,21 47:2,6
  47:10,17,21,23
  48:1,5,18 49:6,18
  50:24 51:18 52:1
  52:7,19,20 53:1,23
  56:2 57:3,18
  59:16,17,21 60:15
  60:16,18 62:8
  64:7 66:13 72:3,9
  73:6,8 74:16,22
  75:5,11 79:11,13
  79:15,19,21 80:9
  80:13,16,18,21
  81:7,7 83:15,19,23
  85:7,11,19,20 87:5
  87:11,16,19 88:6
  88:10,13 89:11
  90:23,24 91:15,19
  92:13 97:16 98:8
  100:6,24 106:20
  106:24 107:10
  108:3 110:2 115:9
  119:20,23 120:9
  120:22 121:2,8,13
  121:16 122:1
  123:4,11,20
  126:19 129:1
  130:4 131:23
  132:8 133:24
  146:24 155:7,16
  155:21,23 156:1,2

156:4 169:10
  188:21 210:21
  211:2,4,21 272:1
  289:9,17
leaving  72:20
led  270:1 286:12
  295:12
ledger  250:18
ledgers  251:19
left  70:19 83:3
  101:24 156:6
  166:24 168:10,19
  186:5,7,8 193:12
  235:21 255:6
  294:23
leg  159:15
legal  40:21 47:19
  67:12 79:24 80:17
  238:4 267:12
  273:22 305:1
  308:1
length  12:2
lesser  71:1
letter  18:3 80:4
  115:4 118:21
  194:14 195:24
  196:12 241:17
  247:2,19 257:15
  257:18 258:17
  261:2,4,6,15 264:8
  266:3,12 275:24
  276:1,14,17,22
  277:14,16,22
  279:12,19 283:20
  296:22 301:17,20
  305:20
letting  41:13
  139:12
level  91:9 98:23
  218:4 223:8 272:5

levels  91:7 271:22
  272:3
license  304:16
licensed  206:16
licensing  198:14
  205:20 206:20
lieu  189:7
life  13:23 249:21
light  144:17
  145:22 146:17
  157:6 161:19
lightened  70:20
likeness  36:17
likes  252:1
limit  295:4
limitations  77:14
  77:18
limiting  12:2
limits  209:4
line  14:12 23:11
  26:22 30:22,24
  100:11 167:4
  212:5,7,9,19,20,22
  212:23 213:4
  214:13,24 215:9
  215:13,16 216:9
  216:22 219:11
  261:14 266:10
  284:3 287:11
  293:10 305:14
  307:7 308:3
lined  97:18
lines  61:21 72:6
  77:23 94:14
  120:18 139:4
  142:22 160:10,11
  188:12 257:7
  258:8,9 259:7
  264:13,19 267:4
  292:15

lingered  57:11
link  82:6,18
  224:14 262:2
linked  21:8,9
  137:5 262:1
linkedin  20:19
  21:6 29:5,6
linking  278:14
liquids  116:8
list  34:6 178:22,24
  180:18,20 224:14
listed  67:18
  178:24 212:2
  256:18 285:11
  307:7,17
listen  202:11
listening  114:10
listing  178:20
  242:8 307:7
litigation  13:6
  18:16 22:11 29:24
  30:3,3,7 32:3 52:3
  71:15 99:2 149:17
  164:24 165:2,4
  192:12
little  16:6 22:20
  24:21 31:12 37:10
  39:23 41:11 97:5
  101:24 110:3,4
  134:16 150:5
  157:20 178:21
  268:18 280:14
live  12:12,14,20
lived  241:5
living  12:23 13:1
llp  2:7
loaded  253:17
loading  130:9
  269:4 288:23
lobby  72:19,20
  127:10 130:22,23

130:23 145:15,16
148:5
**lobstar85** 26:5
**local** 125:7
**located** 104:4
105:17 109:10
193:11 197:12
221:11
**locating** 99:12
**location** 49:13
108:4 131:5 251:8
**locked** 191:11
**log** 9:20 31:7,19
33:14,18 110:9
219:23 220:9,10
220:14,17,18
225:16,17 226:2
227:1
**logged** 9:11,17
187:23 188:4
225:11,14 272:1
**logging** 250:23
251:1 287:1
**logic** 53:10 274:5
**long** 12:23 13:1
15:8 38:14,23
56:22 57:5 60:9
61:19 69:16,24
106:3 108:1 144:6
243:22 244:1
299:21
**longer** 21:14 27:16
30:9 36:7 58:11
66:23 112:1
120:19 189:1
249:5
**look** 8:15 50:20
73:10,10 84:10
123:16 129:12
141:18 164:18
167:14 204:20

220:15 221:24
233:13 252:4
254:13,20 264:24
268:24 269:9
273:6 274:24
277:13,23 279:12
280:4,9 285:6
288:1 292:3
294:17
**looked** 152:20
172:2,2 221:1
258:10 293:14
**looking** 10:24
14:17,19,20 40:20
98:19 114:5
123:18,19 130:5
142:13 167:2
218:17,20 219:23
220:9,10 221:6
229:9 238:24
252:9 282:4
284:15 286:16
289:19,19
**looks** 84:11 86:13
102:14 158:12
221:2 231:9 233:9
280:11
**loop** 60:21 86:15
159:11
**loophole** 219:7
**lose** 62:4 147:14
147:20 238:19
**losing** 147:18
148:3,7 238:20
**loss** 242:3
**lost** 71:11,17 92:7
111:24 193:20
238:11,18 241:19
268:18 288:7
**lot** 5:5 11:23 16:7
24:3 25:1,19,24

32:20 53:19 54:12
62:16 69:12 86:16
86:21 96:5 98:21
98:21,22 99:3
114:11 138:14
147:19,21 153:14
155:2 158:7
164:19 172:2
176:6 191:15
208:9 210:23
234:19 238:11
243:5,5 245:1
261:21 266:10
277:10 283:10,11
295:20 297:21,23
297:23
**lump** 81:10
**lunch** 95:3 148:18
169:2 202:2
**lux** 111:22
**lvn** 111:23
**lynch** 299:16

**m**

**m** 184:3
**machine** 34:8
105:15,15 111:17
111:22 188:11
304:5,9
**machines** 34:6
105:18 168:15
188:8,13
**madam** 305:10
**magically** 206:18
**mail** 11:11,15,17
20:2,15,18 21:1,5
21:8,11,15,20,20
22:10 23:4 38:6
40:2,6,7,8,11
44:23 52:6 73:16
73:22 75:12 76:2
76:12 79:3 82:1,5

83:14 84:2,3,11
86:6 90:9,9 92:19
92:23 93:11,20
94:17 95:19 96:7
100:14,20,21,23
101:4,6,17,20,23
106:10 112:21
113:2,2,18 114:1
116:11,14 117:22
127:6 128:6,7
130:7,15,17 131:9
131:23 140:19
166:13,14 167:23
167:24 170:23
174:16,19,20,21
174:23 184:12
195:19 209:21
210:12 212:3,5
213:16 216:20,23
219:1,2,9 222:13
222:13,15,23
223:23 231:7,10
231:10,18 232:1,5
232:11 233:2,7,15
253:14,15 261:18
263:8 267:14
273:12 280:15
283:24 284:6
288:8
**mailed** 173:19,20
**mailing** 107:17
**mails** 8:24 13:15
20:7 22:15,18,21
22:22,23 52:5
60:17 84:12 90:16
101:14 102:4
131:22 140:11
141:6,19 142:6
143:4,5 145:18
147:8 161:5
166:13 168:5

184:16 195:3
278:9
**main** 2:13 268:10
**maintain** 20:2
50:7,12 126:16
175:3 205:8 237:6
251:9
**maintained** 26:23
28:23 36:17
174:22
**maintains** 250:17
**major** 274:17
291:5
**making** 59:10 84:2
87:1 115:6 116:1
116:9 152:14
164:2 185:22
235:21 254:23
278:4
**malicious** 79:1
294:1 295:5
**manage** 19:2 28:8
35:20 58:20
**managed** 46:23
**management** 12:1
18:23 243:6,16
294:2,8 295:1
**manager** 112:17
112:18 203:15
210:2 292:12
**manages** 28:13
**managing** 291:14
**manifestation**
61:3
**manner** 110:23
154:12,13 158:3
185:7 205:21
206:11,12 250:19
**mantra** 182:22
**map** 209:2

**marasovich** 134:8
134:9 156:4,13
189:15 300:21
**marasovich's**
156:21
**march** 1:24 4:2
71:19 240:10,11
240:23 246:3
304:7 305:4
**marie** 134:8,9
**mark** 175:12
**marked** 39:15
150:1,22 153:1
156:23 159:5
162:11 194:22
213:16
**marketing** 164:7
**married** 12:8,10
12:21 13:10,16
14:7
**marry** 14:4
**masse** 23:6
**massive** 250:24
**match** 178:23
**matching** 254:12
**material** 33:4
84:22 144:2 194:9
**materials** 8:8,21
17:24 124:22
125:16 133:11
149:15 193:8
221:7
**matt** 175:11
**matter** 72:11,12
73:3 83:16,19,23
85:15 144:6 167:2
180:17 183:12
188:7 257:24
**matters** 114:2
128:9,15 261:14

**maximum** 143:12
143:16 144:4,5,5
144:21
**mcdermott** 237:14
**mean** 6:12 7:24
9:18 12:5 16:18
23:6 25:17 28:5
35:6 41:8,9 45:15
48:23 51:16 53:14
54:4,22 60:20
74:17 77:3 84:7
87:10 91:2,5
93:22 94:24
104:20 107:10,16
112:5 114:21
136:6,20 147:12
151:11 152:10,15
153:10 156:12
161:15 162:22
163:5 164:6,16
172:21 176:7
177:8 180:15,17
186:8 193:24
206:22 208:8
213:14 214:16
217:12 218:20
240:17 243:9
248:11 252:20
260:4 262:15
274:5,6 277:11
295:4 302:11
**meaning** 188:4
293:23
**means** 9:22 11:9
11:13,22 16:21
43:8 98:4,4
113:16 151:3
173:11 179:7
201:9 207:9
208:10 281:6
287:4,7

**meant** 77:9,16
84:18 95:6 96:10
96:15 111:17
**mechanism** 111:7
112:13 142:3
287:17
**media** 11:23 27:8
29:14,17 107:11
**medical** 58:12
59:14,20 62:21
63:7 67:18,19
72:8 88:10 89:22
119:6,11,23 122:1
128:8 129:19
130:4 146:17
238:5 241:14
242:9 249:3
**medically** 237:20
237:24 240:19
241:7,12,22 242:3
242:5,18
**medication** 7:18
53:20 55:4 59:1
68:11,13,15,17,19
69:8,20,22 70:1,4
145:5,7 244:1
**medications** 54:8
54:8 55:2 58:15
247:21 248:2,17
**medicine** 144:3
243:18
**meet** 48:10 56:1
85:20 86:15 92:24
93:7,8,9 127:9,13
127:16 128:7,15
131:4 189:12
**meeting** 48:5,13
48:17 85:21,23
87:13 88:5 89:9
90:11 93:3 94:8
123:5,10 128:11

128:18 153:7
159:23 170:8
190:13,22 191:4,7
191:10,23 192:3,6
192:9 194:13,14
198:3,5,8 201:22
202:5,9 224:18,20
224:23 225:1,4,6,7
**meetings** 49:10
50:9,13 88:9 95:3
224:22 241:17
**member** 218:3,4
**members** 11:21
**memory** 62:4
229:11 270:3
**menchi** 12:17
21:20 22:12 33:2
**menchi.org** 20:7,7
32:13
**mental** 62:12
64:10
**mention** 233:14
**mentioned** 5:23
12:8 14:17 16:14
18:20 20:10,12
21:8 25:11 27:5
29:5 30:13 32:12
34:11,23 36:21
48:4 49:17 54:7
65:2 71:22 74:20
87:3 89:22 145:9
147:9 175:6
180:16 187:4
195:4,13 225:9
239:13 242:2,24
243:8 244:7
248:24 256:12
278:22 280:14
295:10 298:14
**mentions** 199:14

**mere** 270:11
**merely** 223:22
289:15
**merge** 261:23
**merit** 170:4 272:8
**message** 44:12
65:17 76:17 86:10
96:12 114:15
116:20 131:11
132:10,22 133:7
150:1,3,10 151:2,3
151:9,17 152:1
153:2,2 155:5,11
156:24 157:3,4,13
159:8,9,21 161:11
162:17 163:3
164:5,13 199:5
203:16 257:4
269:17
**messaged** 65:3
**messages** 8:24
10:17 12:4 20:23
20:24 44:5,11,12
44:13,20 132:8,11
132:12,14,17
148:21 149:2,17
149:18,21 153:13
162:14 164:18
165:11,13,21,22
166:2 185:3 257:6
**messaging** 30:14
32:9
**met** 9:24 87:19
93:4,23 133:12
134:9,11 200:17
**metaphoric** 163:7
163:17 164:3
**method** 287:7,8
**mh** 213:21 214:1,6
214:9 217:11,20

**mh13** 162:11,15
164:5
**mh15** 165:8,14
**mh16** 165:16
**mh4** 150:1
**mh5** 150:22
151:16
**mh6** 152:5
**mh7** 153:1 156:23
**mh8** 159:5 161:11
**michael** 9:9 32:2
42:1 73:17 203:15
204:4 210:2 214:1
275:10
**microphone**
190:17
**mid** 67:4,5 172:15
173:2,3 291:6
**middle** 71:14
114:14
**midwest** 305:17
308:1
**migrate** 29:11
**mike** 41:10 48:12
48:15 49:11 89:2
89:6 91:17,18
122:2 127:2 134:8
134:11 150:17
152:12 153:14,22
154:17 163:12
178:19 191:16
200:17,20 201:1
202:22 208:2
212:10,11 214:21
215:8 230:12
254:10 257:4
267:6 269:12,13
269:20 273:4,8,18
274:9,24 275:1,15
286:2,9 288:9,15

**mike's** 107:9
153:20 215:6,6,7
**millions** 252:15,15
**mimic** 174:5
185:22 204:23
206:13 207:4
**mind** 59:9 71:7
75:23 117:3
211:12 258:13,13
262:17,22,24
263:1,16 276:11
298:12 302:15
303:1
**mine** 107:9 128:2
133:18 250:4,6
**mining** 250:7,9
**minor** 120:2,3
233:9
**minute** 36:24
64:19 82:16 92:12
233:22 283:22
288:6
**minutes** 37:1
96:23 168:22
211:13 255:15
**mischaracterizat...**
197:2
**mischaracterizes**
64:13 175:1
201:14 278:13
**mischaracterizing**
115:10
**miscommunicati...**
98:22 99:4,21
277:23
**miscommunicati...**
277:19 279:10
**misconstrue**
161:24
**misheard** 263:11

misinterpreted 158:5,8

misleading 230:5 231:12,14

missed 268:19 294:5

mistake 302:11 303:6

mistakes 259:22 277:20

misunderstand 259:23

misunderstanding 98:21 99:4,21 100:4 259:8,14 303:7,10

misunderstandin... 259:15,18 260:1,6 260:8 279:10 303:2,4

misunderstood 99:24

mitigate 54:12,19 60:11 145:10 208:13

mode 231:20

modification 279:18 289:22

modifications 231:24 233:9,11 261:13 278:5

modified 36:10 208:5,6

modify 213:7

modifying 207:16 276:9,16,23

mom 240:8

moment 20:9 92:17 96:22 172:1 234:21 265:24 278:2 288:23

monday 159:13 292:1

money 168:11

moniker 26:10

month 9:13 123:16 126:7,7,10 135:1 235:4

monthly 198:3 224:22 225:4,6

months 11:3 64:7 73:23 74:15 243:24

moreno 90:8 130:15 131:10

morning 4:1,23 143:10

morningstar 14:16,23 15:6,9 21:17,21 22:1,2,4 22:5,7 192:21 193:9 234:9 235:8 235:20,24 236:10 236:15,18,20 238:14 241:9 243:14 246:6

morningstar's 236:23 237:2

mother 40:16 71:19

motivate 298:5

motivated 298:8

motivation 98:4

motokey 112:18

move 36:21 61:3,5 61:6 62:13 86:17 94:22 95:7,14,24 96:15 102:6 116:7 187:5 196:14 202:3 204:16 277:12

moves 211:6

moving 52:12 222:12

multi 225:19

multiple 91:6 220:3

multivitamins 248:19

music 193:21

myriad 79:20

**n**

n 3:1 4:13 12:19 19:13 23:17,17

name 4:5 12:18 24:15 25:22 27:1 27:2 36:9,10 76:16 90:14 109:4 118:6 190:9,12 194:20 287:7 296:16 305:6 306:3,4,15 307:3,4 307:21

named 32:18 74:8 86:7 155:19

names 10:10,12,19 10:23 27:22 58:17

nap 54:3

narratives 26:19

narrow 24:20

nature 26:19 128:11 137:7 163:11 243:12 294:13

near 104:9 125:23 127:11 131:2,10 133:18

nearby 177:2

nearly 73:23 74:15 238:15 265:14

necessarily 40:8 77:21 106:1 167:5

185:6 195:14 221:22 225:20 267:23 269:23 280:17 283:7 284:5

necessary 240:19 241:7,12,22

necessitated 48:1

need 5:15,18,24 14:3 35:19 56:16 91:6,8,19 92:17 93:15 97:8 105:2 105:5 106:21 109:6 112:8 125:20 128:7,12 128:19 148:7 159:14 180:11 186:10 187:4 197:13 202:2 206:17 231:24 232:13 273:9,13 281:12,13 303:15

needed 13:20 38:16 39:7 90:20 108:6 117:1,19 125:19 135:8 160:17 193:18 198:9 205:19 225:20,22,23 226:7 232:3 248:22 253:18 273:16

needing 104:24 184:10 206:4 243:2

needs 224:19 252:5

nefarious 262:9,14

negative 133:2 161:19

**net** 234:23
**network** 16:17
  192:23 226:10
  264:17,21 265:20
  270:20 271:9,15
  299:5
**networks** 16:19,21
  271:20 272:17
**never** 28:19 72:13
  101:18 119:17
  126:7 164:23
  188:14 196:2
  198:9 199:17,20
  200:2 201:11
  205:15,20 207:5
  209:9 219:17
  274:1,2 279:4
  287:10 290:17
  293:24 295:18
  298:4 299:24
  300:7,10 302:20
  303:1
**new** 37:24 41:24
  42:2,4 123:22,24
  192:21 227:4,6,21
  227:24 228:4,8,12
  250:13 285:24
  286:3,4
**nicollette** 2:9 4:13
  39:12,23 41:4
  96:19
**night** 54:1,5 55:7
  60:3
**nighttime** 55:8
**nintendo** 124:1,3
**nod** 120:17
**non** 72:5 88:19
  250:18 262:6
  275:5 290:23
**noreen** 299:16,22

**normal** 28:3
  147:20 280:9
**normally** 35:8
  205:23
**northern** 1:1
**northwest** 35:12
**northwestern**
  240:15
**notarized** 305:15
**notary** 305:24
  306:10,18 307:15
  307:23 308:23
**note** 73:14 74:1,4
  76:6 83:2 86:11
  86:14 114:13,17
  247:7 305:13
**notebook** 48:24
  49:2,17,21 50:3
  74:19 87:23
**noted** 59:7
**notes** 49:24 50:1,2
  50:7,12,15 98:20
  156:21 159:14
  160:5,8,9,14,19,24
  161:2 304:9
**notice** 38:4 39:20
  40:1,12 73:7
  74:16 85:18
  100:24 114:19
  115:12 146:3,23
  194:16,23 195:5,7
  195:15 197:3,4,8
  197:10,22 198:2
  198:18 199:12
  203:11 214:23
  215:2 233:11
  269:1
**noticed** 195:17
  215:3
**notification**
  139:17

**notified** 139:18
  230:24 281:19
**notifying** 207:15
**notion** 93:20
  274:20 280:15
**november** 13:12
  134:3,15 135:17
  138:20,23 139:14
  140:1,6,12 142:7
  143:6,7 144:9,16
  144:21 145:14
  146:20 147:6,10
  147:23 148:13,24
  150:12 151:4
  155:5 157:14
  159:11 188:22
  189:6 190:14,23
  194:13,23 207:14
  210:13 212:4
  217:1 237:23
**nowicki** 12:17
  13:1,7
**nuances** 25:10
**number** 30:18,19
  31:20,22,23,24
  47:3 89:17 234:10
  281:19,20 292:8,9
  305:8,14
**numbered** 222:17
**numbers** 106:3
  307:7
**numerous** 239:2
**nyquil** 55:5,6,8
  60:2,6

---

**o**

**o** 12:19 19:13,13
  23:17
**o'clock** 168:23
**o'connor** 1:17
  304:4,16

**o'malley** 159:12
**oath** 6:4
**obeyed** 35:21
**objection** 64:12
  67:11 98:14
  158:23 170:14
  175:1 200:23
  201:7 204:12
  230:5 238:3
  244:23 245:7,13
  246:7,14 267:11
  273:21 274:12
  275:7 276:19
  277:3
**objections** 187:10
  188:2
**objects** 35:7
**obligated** 6:4
**oblige** 126:9
**obliquely** 264:10
**observe** 57:13
**obtain** 49:23
  126:11
**obtained** 15:17
  194:15 205:15
**obvious** 136:23
  186:19
**obviously** 8:12
  56:13 119:19
  124:4 173:11
  194:6 205:17
  262:22 266:3
  303:2
**occasion** 49:8
  140:22
**occurred** 61:22
  211:9 225:13
  261:3 285:3
**october** 37:14
  41:24 42:8 44:16
  45:16 53:1,5

| | | | |
|---|---|---|---|
| 64:11 73:8,13,20 | 14:7 15:4,8 16:23 | 172:17 173:18 | 289:4 290:2 292:6 |
| 76:3 81:2 82:2 | 22:9 23:10 26:21 | 175:16 177:4,16 | 292:10,18 293:19 |
| 85:17,22 86:7 | 27:2,3,18 29:2,19 | 178:7,13 180:21 | 294:24 296:14 |
| 88:13 89:4,8 | 30:10,19 34:3,23 | 183:17 185:2,11 | 297:1 298:22 |
| 92:21 94:18 | 35:9,22 36:20 | 185:19 186:17,21 | 299:10,10 302:2 |
| 100:18 101:8 | 39:9 40:22 42:17 | 187:16 188:18,21 | 303:12,17 |
| 113:3,6 114:17 | 42:20 43:9 46:1,6 | 189:5,17,22 | **once** 25:7 41:6,23 |
| 115:3 116:1,11,15 | 46:16 47:5,9 | 190:13 191:21 | 57:4 64:2,2 75:16 |
| 117:11 119:1,11 | 49:13 52:18 55:2 | 192:5 194:9,13 | 165:17 177:20 |
| 122:22 127:7,10 | 55:13 57:1 63:16 | 195:2 196:3 | 183:13,17 213:7 |
| 127:14,23 129:9 | 63:20 64:19 73:5 | 197:17 198:22 | 245:15 251:16 |
| 130:8 132:20 | 73:15 74:11 76:22 | 199:1,7,9,11,20 | 252:2 294:16 |
| 133:13 147:6 | 78:16 79:2 82:11 | 200:2 201:19 | **one's** 28:2 36:9 |
| 148:23 237:22 | 82:16 85:17 86:1 | 203:10,22 205:8 | **ones** 16:23 21:9 |
| 247:5,17 257:15 | 86:3 87:7 89:19 | 205:12 206:5 | 23:7 29:15 46:10 |
| 266:4 267:9 | 91:9,18 92:7,9,18 | 207:11,20,23 | 165:8 248:4 |
| 275:23 279:2 | 93:17 94:7 96:18 | 208:1,8 209:14,18 | 269:22 |
| 289:5 290:10 | 97:4 99:16 101:3 | 212:3,9,23 214:23 | **ongoing** 129:19 |
| **odd** 43:7 | 101:22 105:3 | 215:21 217:1,7,17 | 130:4 266:13 |
| **offer** 109:13 | 107:6 110:18 | 218:7,15,22 220:4 | **op** 28:8 |
| 252:11 | 112:14 113:11,12 | 221:5,15,17,20 | **open** 123:2 181:20 |
| **offered** 59:2 | 113:18 115:2,24 | 222:7,12 225:5,8 | 255:22 |
| 148:14 212:4 | 117:9,15,21 | 226:9,18 227:17 | **opened** 220:15 |
| 236:9,11 | 119:21 122:12,16 | 228:2,4,7,20 229:4 | 221:3 |
| **offhand** 189:24 | 124:4 126:15 | 229:12,23 230:9 | **operate** 32:12 |
| 234:11 | 130:6 131:4 132:5 | 231:4,6,17 233:6 | **operating** 290:10 |
| **office** 2:3 37:21 | 135:11,17 136:12 | 233:14,20 234:22 | **operation** 188:11 |
| 103:3 105:18 | 137:1,17 138:8,11 | 236:6,14 237:18 | 286:13 |
| 122:12 123:1,4 | 142:5 146:9 | 238:6,17 240:3 | **operations** 285:10 |
| 176:6,7 182:6 | 148:17,19,20 | 242:10 243:8,18 | **operator** 46:21 |
| 250:20 251:10 | 149:11,23 150:21 | 246:12,17 248:14 | **opinion** 78:11 |
| **official** 41:21 69:6 | 152:24 153:3,6 | 249:13 251:12 | 170:4 188:6 |
| 83:6 306:15 | 154:2 155:4 156:2 | 254:13 256:15,20 | 258:14,19,23,24 |
| 307:21 | 156:8 157:3 159:4 | 257:9,12 259:6 | 259:4 260:8,17 |
| **officially** 41:17,19 | 160:9,14,19 161:8 | 260:16 261:10,17 | 273:22 275:5 |
| **officials** 82:19 | 162:1,6,10,13 | 262:2 264:10 | 290:9,13,21,23 |
| **oh** 130:10 194:6 | 163:4 164:4 | 265:3 266:3,16 | 296:24 |
| 221:1 | 165:19 166:21 | 267:4 270:9 273:6 | **opportunity** 43:14 |
| **ohio** 233:18 305:2 | 167:16 168:8,17 | 275:23 276:11,13 | 66:17,20 300:12 |
| **okay** 4:23 8:3 | 168:21,22 170:10 | 277:15 278:1 | **optics** 162:4,4 |
| 11:12 13:12 14:3 | 170:24 171:18 | 280:1,24 288:1 | 258:9 259:3 |

**[option - paraphernalia]**

**option** 170:2
234:15
**oracle** 169:13,16
**oral** 6:17
**orally** 171:15,16
172:7 175:3,5
**orange** 186:13,14
**orchard** 2:3
**order** 31:5 35:19
37:10 91:7 105:3
106:20 112:7,9
128:20 250:22
254:8 273:15
285:10 286:8
293:11
**org** 91:12
**organization**
281:12,17,18
**organize** 35:17
**orient** 149:15
**orientation** 280:5
**origin** 96:1 254:6
**original** 36:14
125:20 196:2
239:24 242:21,22
243:9
**originally** 14:10
81:11 215:11,23
243:10 284:23
**osha** 257:20
**ostensibly** 266:4
**outage** 40:9,10
**outreach** 27:20
**outside** 7:23,24
44:21 135:15
205:21 267:1
285:22,24 296:6
**overflow** 46:20
**overheard** 51:19
107:15,16 297:7

**overload** 251:3
**overriding** 214:7
**overwhelm** 251:2
**owe** 245:23
**owed** 244:19
245:11
**owns** 166:18

**p**

**p** 277:13
**p.m.** 169:1,4
211:15,18 234:1,4
255:17,20 303:20
**p001173** 213:16
**p001215** 292:9
**pable** 1:3,12,16
3:4 4:3,16,23 6:15
16:24 23:12 29:7
37:9 39:16 40:2
52:18 56:15,19
65:2 74:17 75:23
82:1,10,17 83:7
92:16 96:19 97:4
100:15 102:15
112:20,23 118:15
124:5 127:4 130:7
146:13 147:8
148:19 149:10
150:24 151:18
155:9 157:1,5,11
159:6 162:15
165:9 178:2
180:22 194:21
195:20 196:3,15
196:22 204:18
206:6 209:15,21
211:19 217:7,13
218:16 226:19
227:22 233:22
234:5 238:17
250:3 255:21
256:2 273:17

277:7,12 278:3,9
280:6,8 298:10
304:7 305:6,9
306:3,4,9 307:3,4
307:13 308:20
**pable's** 23:4
**pace** 211:6
**pacer** 13:8
**pacific** 35:12
**package** 15:7
**pad** 50:4 101:16
**page** 3:3,8 28:11
83:5 102:12,17
110:9 113:21
114:14 149:14,24
150:22 151:16
152:4,5 153:1
156:22,23 159:4,6
159:8 162:11
209:19 210:19
213:11,12,14,15
213:17 217:7
222:17 227:10
277:17,18 278:3
279:15 283:24,24
284:6,16 285:7
288:6 289:9,12
292:4,6 305:14,16
307:7 308:3
**pages** 28:6 279:19
284:1
**paid** 38:4 40:22
41:1 235:3 245:1
245:4
**pain** 62:16,18,19
62:22 102:6
237:20 238:1,4,6,8
242:3,5,8,9,11,18
243:5,16,18,21,22
244:1 252:4

**painful** 61:6 62:13
**pair** 253:11
**pairings** 262:4
**pandemic** 10:1
**panels** 35:17
**panic** 52:7,9,20,24
53:5,7 56:18 57:2
57:8,13,18,23
58:20 61:16,17
63:3 65:16 66:5
66:12,14,24 67:7
67:20,24 68:2,5,8
68:12,17 70:8,17
70:23 71:7 102:8
115:22 116:7
237:22 247:5,11
247:13,16
**panicked** 150:5
181:6
**paper** 50:5 136:22
141:4
**paperwork** 89:15
89:16 161:7
256:17
**paragraph** 93:11
94:20 101:22
119:4 210:18
213:12 278:3
292:7,10,11,14
**paralysis** 61:1,2
61:11,15,18,19
62:3,12,12 63:4
102:6 115:22
243:1
**paralyzed** 60:19
61:23
**paralyzing** 61:8
**parameters**
185:23
**paraphernalia**
133:17

**parents** 71:12,17
238:11,18,19,21
239:6,10 242:4
249:20
**parodied** 268:15
**parse** 225:23
277:11
**part** 62:11 91:4
155:11 170:10
174:14 176:22
186:16 192:2,3
205:10 217:16
246:10 254:20
257:19 285:9
303:7 307:9
**partially** 238:15
**participate** 7:1
35:22 281:8,15
**participated** 294:2
**participating**
281:11 282:1,4
**particular** 158:6
162:23 248:7
259:2,23 276:16
301:16
**particularly** 84:20
283:6,18
**partition** 104:23
109:24 111:6
112:4,10 193:2
**partitioned** 110:19
110:21 112:6
**partitions** 111:18
**partly** 152:13
**party** 208:11
**pass** 54:2 71:18
**passage** 284:14
**passed** 16:22
17:20 71:19
171:22

**passing** 17:16
120:4
**password** 105:20
105:23 106:1
110:8,11 112:16
112:17,18 113:12
113:13 193:1
224:15 226:3,6
253:10,20,22,24
254:2,21 255:4,5,8
295:17,19
**passwords** 109:12
109:16,18,22
113:7,15,17 114:5
252:16
**pasted** 214:17
**patch** 281:21
**patched** 168:1
**patching** 289:23
**patent** 296:15
**path** 220:23
**paul** 1:17 304:4,16
**pay** 46:12 121:18
205:19 206:2
246:10 254:17
**paycheck** 234:24
235:1,1
**paying** 69:13
**payment** 245:3
**payout** 223:7
**payroll** 41:20
**pc** 2:3
**pdf** 284:2 288:6
289:12,14 292:5,6
**pedialyte** 53:21
55:4 59:5
**pen** 209:1
**pending** 83:15,23
164:24 255:23
**penetration** 270:2
270:5,6,6,13,14,17

271:4
**pension** 211:5
**people** 10:10,24
24:4 25:10,19,20
26:20 28:6 29:11
31:18 35:19 40:18
98:22 108:8
128:20 140:8
161:24 181:19
208:15,17,19,20
258:10 259:3,22
259:23 266:21
271:1,24 294:21
300:12
**perceive** 143:19
260:1
**percent** 108:1
141:15 277:6
**perform** 137:24
138:1,3 188:11
207:7 208:17
226:7 268:20
275:17 281:13
287:5
**performance**
269:2
**performed** 141:11
141:14 177:9
271:11 275:16
285:15
**performing**
251:16 279:21
294:12
**period** 29:21
43:20 44:21 69:2
69:5 70:24 120:7
120:8 147:6 149:7
268:17 281:21
**perishable** 128:2
**permanent** 251:9

**permission** 182:23
191:8,21 198:7,9
199:3 286:19
**permissions** 179:5
179:6
**permit** 287:15
**permitted** 7:14 8:8
112:3
**persistent** 250:18
**person** 9:24 51:1
56:1 85:22 87:13
87:20 90:4 107:19
129:6 133:9 162:5
176:4 224:20,23
264:4 271:17,18
272:5 293:20
296:21
**persona** 34:24
**personal** 20:4,15
20:20,20 21:5,7,9
21:10 23:4 28:23
31:2 40:2 44:2
51:12 72:11,12
78:10 101:8,11
102:18 103:6,21
104:1,17 107:1
124:20,22 125:15
126:16,17 127:19
130:13 131:13,23
131:24 132:4,6
135:6 142:7,9,12
142:17,18,19
143:2,21 157:8,10
157:16 158:1,4,14
158:15,21 190:19
193:2,8 255:24
**personality** 25:22
181:7
**personally** 35:17
47:11 59:18,19
60:1 78:9 108:17

126:20,22 161:23
268:22 306:11
307:15
**personas** 26:22
**personnel** 172:22
172:24 175:13
267:15
**pertaining** 1:20
**perused** 48:22,23
**pervasive** 214:4
**phil** 108:15 218:3
**phil's** 105:15
**phone** 9:19,22,23
12:3 30:18,19
31:6,14,20,23
37:20 38:1 40:9
41:13 43:2,23
44:1,2,3 56:4
101:8,9,11 131:12
131:13,16,18,21
131:24 132:4,21
175:8 176:3,5,24
190:17,18,19,21
192:18,20,22
193:5,8 255:24
305:3
**phonetic** 295:17
**photos** 193:12,14
193:14,15
**phrase** 128:17
**phrased** 110:16
**phrasing** 151:14
**physical** 61:2
62:22 65:7,11
102:3
**physically** 101:24
114:23 122:10
**physician** 55:15
55:16,18 59:12
61:11,14 62:7,10
66:1,9 67:24 69:1

129:5 240:20
241:21,23 247:3
**physicians** 59:14
59:20 248:6
**pick** 21:2 126:24
188:22
**picked** 133:22
**picture** 32:17
**pictures** 11:24
**piece** 25:6,7 125:4
141:20 239:1
**pieced** 136:10,12
**pill** 55:12
**pioneer** 252:6
**piss** 164:10
**pitch** 297:10
**pixilated** 74:13
76:8
**pkgingo** 20:5 21:4
22:11,16,19 27:11
27:24 32:1 52:6
73:18 100:15
130:13 209:22
**place** 25:2 47:21
48:17 106:8,8
121:17 129:23
134:3 139:20
148:23 222:11
266:11 283:2
292:2
**placed** 32:24
37:11,13 38:8
39:10 40:22 41:2
41:6,8,14,17,18
43:19 44:8 45:2,5
45:6,9,13,21 47:2
47:6,17 48:1,5,18
51:17,24 52:6,19
53:1 60:18 64:6
72:8 73:6 74:21
75:5 79:10,13,15

79:19,21 80:9,13
80:15,18,21 81:7
83:18,22 85:7,11
87:11,15,19 88:6
92:13 106:19
115:9 119:19
120:9 121:8,13,16
121:24 122:9,10
122:13 123:20
146:23 202:16
289:9
**placement** 107:10
**places** 104:8
**plaintiff** 1:4,10 2:5
4:16
**plaintiff's** 280:4
285:6
**plan** 117:15
181:20 211:21
242:23 243:9,14
**planned** 14:11
88:13 92:10
217:13 239:14,16
243:10 246:18,20
**planning** 91:21
115:2 116:22
127:13 210:21
211:2,4 239:10
**platform** 31:10
33:21
**platforms** 27:8
29:14 30:4 32:9
**play** 25:1 262:9
**playing** 24:5,6,24
**please** 18:9 25:6
30:20 36:22 81:23
110:15 149:22
196:4,4 222:19
278:2 288:23
292:8 305:12,12

**plus** 16:3,8 27:10
27:11,14,16 29:10
29:12 30:5,8,11
164:7
**pocket** 190:24
191:2 244:21
245:6,11 246:11
**point** 14:10 30:11
30:23 41:16 43:9
43:12,13,19 44:15
44:17 72:24 90:11
108:3 111:24
132:14,15 133:21
136:10 137:11,15
141:4 146:22
160:4 164:9
179:10 180:17
185:20 195:10
198:10 200:10,11
209:16 210:3,9,15
211:5 217:5 226:4
226:5 231:3,20
235:14 236:1
241:19 265:18
266:15 269:24
271:16 272:23
277:22 279:11
281:18 284:7
287:20 297:21
299:13
**pointing** 227:8
274:18
**points** 174:7
206:17 215:19
232:3,13 252:4
261:4
**policies** 51:9 91:12
253:20
**policy** 105:11
106:7,11 111:12
123:2 192:23

193:1
**poor** 132:16
204:21,24 205:2,5
207:12 269:2
**pop** 220:1
**popular** 253:7
**pora** 29:10
**portable** 107:11
107:13
**portal** 169:17
224:13,14,16
**portfolio** 125:1,4
158:19 159:3
239:1
**portion** 82:19
83:13 163:16
246:5,13 253:11
**portions** 92:5
**portraying** 181:9
**posed** 61:24
142:22 261:22
**position** 22:22
41:16 90:21 91:11
91:14 97:6,12,14
139:23 161:8
273:17 274:9,22
275:9,15 300:14
**positive** 133:1
285:2
**possession** 49:21
50:18,21 101:7
112:2
**possibilities** 45:24
46:1,7 48:16,20
49:20 74:18 85:9
87:15,22
**possibility** 47:13
83:18 115:5
252:10 267:23
**possible** 60:12
86:17 87:10,18

142:4 152:14
190:11 196:5
201:3 228:10
295:14
**possibly** 57:15
66:6 227:23,24
277:10 279:12,17
279:23 284:19
293:20
**post** 26:9 28:24
33:19,22 192:12
203:18 286:21,21
**posted** 30:2 33:4,9
34:12,18 93:22
240:23 252:23
254:4 269:17
281:10
**posting** 30:21,24
93:13,21,24 199:4
270:1
**posts** 28:11 29:13
29:20 33:2 167:3
272:2
**potential** 45:23
47:3,12 75:2 79:7
79:15 84:15
115:11,12 166:9
**potentially** 77:19
93:10 94:2 95:12
104:20 268:16
270:23 285:24
291:23
**pounds** 92:7
**power** 152:6
**practically** 128:4
274:15
**practice** 108:15
139:21 187:3
188:13 223:17
**practices** 266:11

**pre** 137:3 189:4
299:21
**prediction** 251:7
**predictions** 168:13
250:20,21,23
**prejudice** 96:3
**preloaded** 285:5
**preparation** 8:21
10:7
**prepare** 8:17
160:23 161:2
185:15 212:11
215:16
**prepared** 212:9
**preparing** 115:7
115:11 152:19
**prerequisites**
137:6
**prescribe** 294:19
**prescribed** 68:11
68:13,17,19 69:19
69:23 70:2 248:18
**prescription** 244:3
244:5
**prescriptions**
56:10
**present** 2:18 19:24
46:4 48:20 63:12
63:18 65:15
110:20 135:19
179:3 181:17
189:16 229:14
257:23
**presentation**
48:22 135:2
**presented** 18:11
21:22 30:3 59:3
170:2
**preserving** 193:4
**pressed** 293:8

**pressing** 261:14
**pressure** 138:14
138:18
**pressured** 137:18
137:20,21,24
138:3
**presume** 21:15
**pretenses** 141:8,9
**pretty** 28:13 34:5
133:14 136:23
154:18 160:21
164:22 170:8
175:9 181:23
184:16 213:1,2
229:15 238:23
240:1 263:11
266:9 290:4
**prevent** 54:14
57:12
**previous** 17:10
84:12 153:13
**previously** 188:6
**primarily** 21:1
33:24 62:20
135:23 160:4,11
161:4
**primary** 20:4,15
20:18 21:1 22:23
75:8 80:18 99:17
103:22,24 104:3,4
107:19 109:23
111:18 125:4
129:5 155:1
179:22 265:23
**print** 285:8
**prior** 32:16 33:20
53:1 64:11 69:9
72:19 87:13 88:13
93:19,24 134:14
144:5,23 146:2
177:16 198:4

206:19 207:6
225:7 267:9
284:16
**private** 128:12
**privilege** 63:15
64:15
**privileged** 22:3
91:24
**probably** 31:3
36:16 44:18 51:12
54:2 59:8 61:21
78:2 94:3 117:6
117:12 143:20
147:19 164:24
172:15 176:1,5
177:2 181:11
182:18 191:2
211:6 215:8,9
239:24 241:1
249:11 253:19
255:12
**problem** 27:20
46:17,20 54:13
158:11 171:21
173:17 196:22
199:1 221:23
273:10,14 287:14
294:21
**problematic** 63:1
158:22
**problems** 250:15
297:21
**procedure** 1:19
79:16 119:6,11
240:19,24 241:3
241:12 246:13
306:5 307:5
**proceed** 176:11
183:14,16
**proceeded** 224:13

**proceedings** 1:15
257:19 303:22
304:10
**process** 18:13 81:5
142:20 167:9,10
205:18
**processes** 261:19
**prod** 151:19
**prodding** 157:10
**produce** 10:23
18:18 30:8 50:20
52:2 56:11,21
240:3
**produced** 13:16
18:15 22:14 23:5
30:6 52:5 60:17
140:12 143:4
147:8 149:16
161:5,8 195:3
226:24 247:2,19
265:4 301:23
**producing** 192:11
247:8
**product** 101:18
265:23 278:5
**production** 98:19
99:7 179:14,16,19
179:21 180:1
198:14 205:21
206:2 268:14
305:16,17,22
**productions** 99:23
258:6 261:9,11
282:24 285:20
290:19 293:5
296:4,6
**professional**
135:14,15 208:24
**professionals**
223:5

**profile** 132:1,4
**program** 186:16
245:2 265:11
281:8,11
**programming**
278:11 297:24
**progress** 16:4
18:21 124:24
**progressively**
70:22
**project** 17:12
218:18 252:2
**projects** 10:11,20
18:2,3,6 32:21
117:23 118:2,9
210:24 211:7
251:24 266:2
**promoted** 218:4
**prompted** 81:4
**pronoun** 263:23
**proof** 296:4
301:16
**proper** 47:21
133:16 154:1
199:23,24 301:1
**properly** 60:22
259:13
**properties** 233:5
233:18 268:17
285:9 286:10
**property** 124:14
**proportion** 121:18
**proposal** 298:2
**proposals** 218:13
**protect** 208:18
**protected** 268:1
275:14,16
**protested** 170:3
**protocol** 281:6
298:4

**provide** 34:17,20
89:16 109:12
113:7 185:24
186:3 216:12
**provided** 110:23
160:14 197:22
206:20 296:5,6
**provider** 56:24
**providers** 241:9
**provides** 166:19
**provisions** 1:18
**proximity** 84:12
**pseudonyms** 26:21
**psomas** 37:18,19
40:4 41:13,24
42:7,14 43:5,11,18
44:16 46:4 48:6
48:11,21 49:3,6,11
72:10 73:2,8 81:1
85:18 86:12,24
88:15,15,21,24
89:10 90:17 91:13
97:6,13,15 100:16
100:23 101:4,23
102:4 109:17,18
110:1,5 113:3,6
116:20,23 119:10
119:22,23 120:6
120:10,20,24
121:7,23 122:7,12
122:16,20,24
123:6,11 126:2,6
126:18 127:6,13
127:24 128:6,16
129:8,11,13,17,18
129:24 130:3,8,13
131:4,9 133:12
134:8 135:24
136:14 137:2
145:19 146:1
150:16 153:19

155:17,19,21,23
156:1,4 184:18
189:14,23 190:1,3
190:8 194:19
200:17 202:22
217:13 218:2,12
230:2,10,13,17,18
231:11 232:4,13
232:20 233:8,15
259:4 260:10,17
261:5 262:16,19
263:17,23 264:1,3
264:6,7 272:6,12
300:20 301:3
**psychiatrist** 63:8
63:13,17,21 64:6
68:3 249:7,10,11
**psychiatrists**
248:6
**psychologist** 63:8
63:13,17,21 64:6
68:6 69:8,11,17,19
249:7,13
**psychologists**
248:6
**public** 92:6 168:12
168:15 169:14
179:22 200:11
209:5,7,8 270:18
271:16 272:23
287:21 290:5
306:10,18 307:15
307:23 308:23
**publicly** 252:23
270:15 281:10
**publish** 286:6
**published** 13:8
281:4,23 283:3
**pull** 39:12 86:2
**pulled** 151:15
177:5 263:5

**punishment** 80:3
80:13
**purchase** 297:10
**pure** 44:13
**purely** 297:3
**purported** 149:18
**purpose** 97:18
98:2 180:19
216:19 226:11
270:17
**purposes** 204:23
257:13
**pursuant** 1:18
**pursue** 182:24
197:15 297:20
**pursued** 78:20
257:8 287:10
**push** 184:10
**pushed** 109:3
**put** 15:1 18:23
20:18 24:6,8
43:13 47:21 67:15
105:7 114:19
120:2 122:15
123:4 125:1 135:2
138:19 152:7,16
152:21 168:11
171:23 174:19
187:18 190:5
192:24 209:7
215:14 231:23
233:12 252:24
253:14 257:22
263:9 296:18
299:17,18
**putting** 122:17
123:7 229:5
**putty** 226:9,11,13
**pwned** 253:8,9

## q

**qualities** 24:3
**queries** 188:10
271:11,14
**question** 5:11,15
5:20 6:11,13 10:8
11:14 24:20 28:2
43:17 63:14 64:12
64:14 89:23 90:2
90:16 96:11 110:4
138:5 140:17
141:1,3 142:22,24
143:18 146:10,12
166:20,21 170:16
174:1,2,4 195:22
196:1,2,6,8,10,16
204:2,13,17
207:20,24 230:6,8
242:7,17 257:9
259:20,21 262:16
265:14 268:11
269:11 271:21
274:20 276:20
277:3 282:6 286:9
294:5,14 298:12
302:23
**questioned** 142:16
301:10,13
**questioning**
267:22
**questions** 7:16 8:9
10:13 31:3 38:10
38:12 50:16,17
51:20,23 56:9
61:24 62:1 91:18
129:3 133:1
135:21 136:8,15
136:18,24 137:10
137:15 140:13,15
140:20 141:7
144:13 148:18

160:13 175:18
241:14 250:3
256:4 259:7
261:12,22 299:3
**quick** 25:21
298:22
**quickly** 60:12
251:1
**quite** 134:16 263:9
278:19 293:12
**quote** 156:9
205:19 222:23
**quotes** 263:9

## r

**r** 23:17,17
**racing** 53:10
**radojcic** 105:12
127:2 129:15
134:8,11,14,19
135:12 142:22
156:3,13,20
189:14,24 190:3,8
200:18 202:22
300:21
**rage** 250:12
**rail** 298:9
**raise** 119:18
154:23
**raised** 202:6 269:9
**raising** 176:10
**ran** 123:5 224:18
244:3
**randomly** 60:18
**ransacked** 107:9
107:14,22 133:20
**rarely** 22:13
225:15
**rate** 223:6
**rauch** 55:19,20
56:1,4,7 58:5,6,16
58:20 60:2,7,10

63:1 65:3,5
241:24 247:3,3,8
247:20,24 248:3,5
248:9,14
**rauch's** 59:1
**raw** 125:7 126:12
**ray** 157:6
**reach** 22:4
**reached** 32:17
78:3
**reaching** 77:21
**reaction** 181:5
**read** 38:5 49:4
76:16 93:15,16
136:7 140:17
146:10,11 157:20
165:16,17,17,19
195:9 213:5
226:19,20 274:16
279:15 280:11,12
306:5,6,12 307:5,6
307:17
**reading** 77:22
144:12 199:11
207:21 284:14,16
305:20
**reads** 162:17
**ready** 189:4
231:22
**real** 268:24 304:5
**reality** 260:10
262:11
**realize** 98:20
**really** 29:4 53:11
53:11,11,13,13,14
67:16 71:21 77:6
77:11 80:2,4,5
84:4,9,19 93:15
94:9 96:5 142:13
143:2,18,19 145:9
147:14 160:21

164:23 187:14
227:15 228:10
265:1 266:23
271:21 272:4
279:9 280:13
282:7 291:2 292:2
**reason** 7:21 14:7
80:5,6,8 85:11
98:8 99:17 108:23
129:5 154:6 155:1
183:11 191:12
262:8 290:20
296:2 305:15
307:8 308:3
**reasonable** 271:18
**reasons** 47:3 48:5
49:18 65:24 71:22
79:10,20 80:2
87:19 97:24 98:12
100:8 116:24
153:12 154:2,22
170:6
**recall** 8:2 9:10,21
10:2,4,6 11:5
37:13,15 38:20
40:17,20 42:22
43:6,8 46:6,8,10
49:9,13,16 57:17
58:13,22,24 60:4,6
60:9 61:13 62:5,9
65:9 66:7 67:14
67:17 68:23 69:22
77:21 79:6 83:1
83:20 85:13,14,21
85:23,24 88:5,7
89:24 90:4,5,14
93:8 94:7,11,13
101:5 116:13
122:4 125:17
133:13 137:8,12
137:17 140:20

141:3,9,17 142:24
143:13 144:15,17
160:21 169:12,15
172:13 173:5,7,13
175:18,23 176:3
180:4,8,10 181:21
187:2,14 189:22
189:24 190:9,11
191:1 198:15
202:12 203:7
216:8 217:24
221:2 228:6 229:4
240:22 247:23
248:2 250:1 259:9
261:11,18,21
266:12 268:22
289:4 299:3,6
301:8
**recalling** 138:9
**recalls** 8:14
**receipt** 305:19
**receipts** 245:8
**receive** 20:24 40:1
40:4 160:19 198:2
**received** 15:6
41:12 73:7 74:16
96:12 100:24
123:12 151:9
189:15 249:9
282:17
**receiving** 249:6
**recess** 37:6 52:15
64:23 97:1 169:2
211:16 234:2
255:18
**reciprocate** 121:2
**reciprocated**
120:19
**recognize** 149:20
**recollection** 43:9
216:2 248:14

**recommend**
223:20
**recommended**
144:1
**record** 4:2 23:16
37:3,4,7 52:14,16
52:19 56:15 64:20
64:21,24 88:3
97:2 121:23
146:11 168:24
169:3 190:16
191:8,10,18,23
196:17 211:14,17
233:24 234:1,3
251:9 255:16,19
303:19 307:9
**recorded** 5:8
190:13 192:1
254:19
**recorder** 5:9
**recording** 191:5
192:5,8,11,12,17
192:20 193:5
202:11
**records** 239:22
241:15 245:5
**recover** 243:3,11
**recovered** 117:7
193:19 243:15
**recovering** 243:1
**recovery** 106:2
110:16 112:8,15
124:13,17 239:11
242:19 243:2,12
243:15
**recreate** 139:9
**red** 224:18
**redact** 92:5 253:19
**reddit** 27:18,23
**reduce** 261:20

**redundant** 208:7
269:17
**refer** 19:15,16
35:2 43:10 61:1
67:19 68:12 72:24
99:8 102:17
159:23 160:5
166:1 170:24
248:5,9,11,15
260:9 302:17
**reference** 36:11
128:18 195:2
264:10 289:21
290:6,18 305:8
306:2 307:2
**referenced** 129:20
163:2 218:17
306:11 307:15
**references** 11:1
14:18 223:23
**referred** 25:14,23
125:21 133:23
219:17 247:10
269:24
**referring** 15:5
22:6 29:17 36:3
48:4 49:14 50:3,4
61:2 66:24 73:6
75:17 77:19 86:22
87:9 93:4 95:18
99:1,9 102:3,23
104:13 107:7
110:9 115:20
116:2,5,19 118:18
128:24 129:1
130:20 136:13
139:7 145:3
150:15 152:11
153:15 155:15
157:18,19,21
161:21 162:1,8

163:19,24 166:17
167:24 169:16
171:1 177:11
190:18 196:23
207:4,18 214:1,9
214:11 219:9,10
219:13 224:7
262:18 271:12
**refers** 40:22 83:14
99:11 179:21
207:13 260:5
**reflect** 245:5
**reflected** 41:20
**reflective** 83:4
**refresh** 33:18
**refuse** 138:5
**regard** 20:21
162:5 295:9 300:9
**regarding** 22:2
50:8 51:9 89:10
223:18 279:5
**regardless** 299:8
299:12
**register** 229:10
270:3
**registered** 133:7
178:22
**registering** 46:21
**regret** 117:5
**regretted** 94:14
**regular** 132:9
134:18 135:10
172:3
**related** 14:18
17:11,12 32:3
69:14 75:5 138:12
247:4,10,13,15
266:4 279:17
**relating** 11:4 13:7
22:10 47:6 75:10
76:8 78:7 84:22

134:19 160:24
166:16 255:24
**relationship** 95:1
95:5,11 135:8,15
296:23
**relevant** 109:1
143:2 193:3
232:23 291:22
**relied** 91:17
258:16 283:10,11
**remarks** 183:6
**remediated**
230:13,17
**remediation**
232:16
**remember** 26:24
27:3 31:24 46:3,4
48:12 55:23 58:17
59:6 94:2 106:4
125:18 138:13
139:3 140:22
158:17,18 159:1
164:15 169:9
171:8 174:19
176:19 179:14
183:23 202:10
237:11 244:24
245:19,21,21
258:11 259:13
269:22 276:8
277:20 280:16,20
280:22 281:1
**remembered**
212:21
**reminder** 89:2
**remote** 287:7,8
**removal** 239:16
246:23 293:12
**remove** 29:20
**removed** 92:8
224:19 293:10

**rendered** 273:18
**renders** 274:10
**repair** 16:12
**repeat** 132:2 297:5
298:10
**repeated** 116:6
**rephrase** 140:4
204:1 277:4
**replevin** 124:8,13
125:22 126:5
**replied** 38:20
**reply** 21:3 116:16
116:23 117:8
**replying** 116:19
**report** 1:15 153:11
154:2,6,22 208:15
208:19 223:6
255:3,7
**reported** 46:23
58:4 139:22 223:7
235:14 267:14
274:24 275:1
291:12 304:5
**reporter** 5:8,9
19:5 146:9 306:7
**reporting** 142:21
203:15 263:3
267:5 275:10,11
275:19,20
**reports** 247:3
251:10
**reposting** 203:16
**represent** 4:5
**representation**
40:21 87:6
**represented**
261:15
**request** 91:15
173:20 214:21
215:21 218:7
223:12 307:9,11

| | | | |
|---|---|---|---|
| **requested** 89:18 126:2 214:14 218:11 | **resigned** 66:15 99:19 189:6 301:5 | 83:19,23 97:15 100:1 115:8 | **reviews** 17:13 |
| **requesting** 121:24 217:21 218:1 222:23 | **resigning** 115:2 | 116:12 244:11,22 245:11 | **revise** 243:14 |
| **requests** 214:6 216:6 | **resolved** 153:16 155:3 183:10 | **resulting** 247:5 | **rich** 2:19 11:23 |
| **require** 30:16 198:13 | **resources** 19:3 | **results** 220:21 | **rider** 168:18 |
| **required** 305:24 | **respect** 18:12 21:22,24 59:1,15 | **resume** 32:20,22 238:24 | **right** 5:3 6:1,21 7:7,11 8:4 14:19 |
| **requirements** 253:21 281:14 | 63:8,10,11 115:21 128:12 137:18 | **retained** 3:12 | 21:15 24:24 25:12 27:16 32:11 33:4 |
| **requires** 78:24 79:1 185:9,17 281:6 | 168:5 183:7 186:18 196:23 | **retaliate** 302:12 | 33:6,8 36:20 39:18 41:14,23 |
| **reschedule** 238:13 239:13 | 216:7 242:3 245:6 245:23 250:15 | **retaliation** 259:19 260:3,5,23 274:21 | 48:8 49:18,23 51:22 52:7 57:22 |
| **rescheduled** 240:5 240:7 | 255:8,23 300:14 302:22 | 276:18 277:2 302:13 | 62:11,21 65:2 70:21 73:5 74:2,5 |
| **rescheduling** 242:4 | **respected** 128:19 | **retaliatory** 154:12 154:13 | 74:9 81:22 82:3 83:13 86:12 87:21 |
| **research** 84:14 150:17 251:14 254:21 | **respond** 5:12,15 5:20 117:16 167:8 | **retrieve** 127:19 | 88:17 92:19,21 95:13 101:1 |
| **researched** 251:6 | **responded** 113:20 | **retrieved** 126:20 126:22 | 102:18 105:6 110:19 111:1 |
| **reservations** 138:23 183:21 | **response** 113:24 114:4 149:16 | **return** 48:13 86:24 97:4 133:12 | 112:20 113:8,14 114:2,15,18 117:2 |
| **reserve** 255:22 303:18 | 173:13 198:15 263:2 301:2 | 159:15 228:14 | 117:12 118:14,22 119:11,14 121:6 |
| **reserved** 281:20 281:20 | **responsibility** 93:12,21 96:13 | **returned** 41:20,22 42:9 70:3 103:8 | 122:20 124:7,15 124:18 126:18 |
| **resign** 115:5,7 150:17 169:21 | **responsible** 152:14 207:15,19 | 126:17,18 305:19 | 127:7 128:13 129:24 130:6,13 |
| 170:1,5,7 189:8 216:15 301:7 | 208:1,2,8,9,20 270:7 | **returning** 42:4 48:14 49:3 | 130:18 133:11 134:1 141:2 142:7 |
| **resignation** 64:8 114:23 115:4,13 | **rest** 133:9 207:21 246:11 | **returns** 173:10 | 146:20 148:24 153:21 160:6,23 |
| 118:18,21 127:21 194:14 201:12 | **restate** 96:11 294:5 | **reveal** 21:5 | 161:11,13 164:4 166:2 169:19,22 |
| 256:24 258:4 | **restricted** 172:6 173:10 179:6 | **revenge** 94:21 95:7,14,24 96:9,14 | 174:17 175:7,20 177:6 178:5,14 |
| | 267:18 268:10 285:4 286:18 | 165:3,4,7 | 181:1,15 182:13 184:14,19,24 |
| | **result** 55:13 62:22 67:9 70:16 78:21 | **reverse** 151:5 225:13 254:11 | 185:5 189:10 190:14 191:14 |
| | 80:9 81:7,12 | **reversed** 286:13 | 194:16 195:5 |
| | | **review** 8:21,24 31:2 212:23 213:3 276:4 305:13 306:1 307:1 | |
| | | **reviewing** 99:6,23 122:8 | |

197:5,19 198:11
198:17 203:5
209:14,23 210:21
210:24 211:23
212:1 213:10
217:1,5,8 218:15
218:19 220:9
221:12 225:8,11
226:22 227:13
229:23 231:11
233:3,6,8,12,16
234:13 235:5,17
241:1 242:14,17
244:8 246:13
247:21 249:8
257:16 259:12
262:3,19 263:23
263:23 264:2,3,14
266:18 267:2,6
268:3 269:1
270:21 273:3
274:8 276:1 278:7
284:18 285:13
288:12 291:11
292:15,20 299:15
302:6
**risk** 65:23 170:18
171:9,13,17
174:15,24 175:4,4
175:6,20,22
176:13,17 208:12
208:13 263:4
267:16,16 275:11
295:19
**rmi** 287:6,8,9,16
287:17
**road** 209:2
**rochelle** 295:15
**rocket** 46:12
**role** 24:5,6,23 25:1

**rolling** 275:20
**room** 7:7 35:20
135:19 155:7,16
155:19,21,24
156:1,3,4 190:5,7
190:21 243:2,12
243:15,15
**roommate** 12:17
**roommate's** 12:18
**roommates** 13:3
**roost** 166:24
**root** 34:2,3 54:13
**rotate** 280:10
295:19
**rotated** 192:24
**rotates** 226:4
**routers** 46:13,14
**routes** 284:21
**routinely** 248:21
248:22
**row** 227:10
**rows** 228:16,16
**rsu** 234:11,14,22
236:4
**rsu's** 236:9,16
**rsvp** 146:2,3
**rta** 74:9 76:9,15
76:20 228:19
230:1 270:10
286:12
**rule** 79:16 80:7
**rules** 1:19 5:4
47:16 270:8 306:5
307:5
**run** 162:19 163:6
163:14 250:7,9
254:10 265:6,11
**rushed** 291:23

**s**

**s** 4:13 305:16
307:8,8 308:3
**safe** 176:1 254:23
**safekeeping**
192:14 193:6
**safety** 170:18
171:13
**saint** 2:14
**salary** 217:9,21
218:1,8,10 234:8
234:23 235:11,20
236:1,2,7
**salawus.com** 2:15
**sara** 51:2,3 66:6
114:15,17 116:9
116:14
**sat** 144:15 187:11
187:13 190:21
**save** 34:7 193:15
**saved** 193:23
194:10
**saviness** 259:1
**savings** 245:2
**savvy** 283:6,18
**saw** 48:21 57:17
72:15 120:24
123:7 129:8 131:6
133:22 141:4
153:13 171:21
177:23 213:7
220:8 224:17
249:18 264:13
289:21
**saying** 8:15 37:15
84:18 94:7,11,13
96:13 120:16
151:12,13 164:16
165:20 167:10
168:5 183:18
188:4 197:17,21

214:24 263:18
266:12 268:2
270:19 292:18
293:1 302:10
**says** 73:22 74:4,14
75:15 76:22 82:5
83:3 84:3 86:14
93:12 94:21 95:8
95:14 119:5
133:18 150:3
151:2,4,18 152:5
153:6 157:3,5
159:11 195:15
200:13 204:3
207:13 208:5
210:20 211:11
213:18,21 214:6
217:8,20 219:4
227:12 233:17
274:12,13 275:4,4
278:8 282:3 284:6
288:12
**scales** 153:24
**scammer** 21:6
**scams** 20:21
**scanned** 280:11
**scared** 181:12
**scenario** 246:10
**scene** 25:4
**schedule** 89:2,6
240:1
**scheduled** 13:19
239:18,22 246:18
**scheduling** 146:7
**school** 69:12
**schroeder** 209:23
210:1,2,12 212:4
214:14 215:1,12
216:10,14,20
252:13

schwab 234:20
science 15:14,15
272:20,21 292:24
scope 180:11
181:2 273:15
287:22
scott 175:12 176:2
176:5 258:18
261:22 263:7
280:14,22 282:6
282:10,21 283:5
283:12
screen 27:1,2
74:17 82:16 113:9
186:5,7
scroll 39:23 113:1
280:12 288:5
sd 107:12 193:12
seal 306:15 307:21
search 11:1 14:18
220:16,21 253:9
253:11,18 254:11
254:11
seat 260:15
seated 182:4
227:19
second 82:15
93:11 101:22
102:12 107:1
113:10 119:4,4
146:4 150:21
156:24 197:2
209:19 210:18
211:11 213:10,12
213:15 260:15
276:12 277:17,18
278:3 283:24
284:1,6 285:7
288:5,20,22 292:5
299:9 301:5,6

secondary 110:19
110:21 111:15,16
111:18 112:6,10
125:2,5
secondhand 296:8
secondly 153:19
secretary 231:20
secrets 28:8
section 72:6
217:11 254:16
269:2
secure 11:22 164:8
209:13 253:24
254:2 295:15,18
296:16 297:9
security 15:16
17:11,12 18:23
19:2,11,18 69:15
135:1 153:16
155:3 157:23
166:7 170:18
171:9,13,17
174:15,24 175:4,4
175:6,20 176:13
176:17 222:24
223:4 232:14
254:15 263:4
267:16,16 275:11
289:23 291:5,10
291:10
see 12:4 21:7 24:4
25:4 29:16 36:12
39:16 41:23 51:8
52:12 63:20 66:3
72:10 73:15 75:21
76:10,11,13,16
77:1 82:8,21
83:16 84:5 86:19
92:15,17 93:1,14
93:18 94:22 95:16
100:14 102:1,15

102:21 112:23
113:4,18,22
114:19 116:17
117:23 118:19
119:7,23 124:7,8
127:11 128:9
129:5 146:6,22
147:2,5 150:8,24
151:7,23 152:8
153:2,4 155:9
157:1,11 158:12
158:16 159:6,19
162:14,20 164:11
165:13 173:15
177:21 179:4,16
180:24 193:7
195:12 204:5
210:20,21 212:6
213:12,18,23
214:4,7,18 216:3
217:9,14,22
222:15,21 223:1
226:23 227:14,23
232:23 233:12
249:19,23 250:13
254:2 274:22
278:8,15 279:6,18
279:23 285:9,17
288:12,17,19
292:4,12,16
300:12 301:20
seeing 51:8 69:11
122:7 221:3
263:13 289:1
seek 62:21 71:23
125:6 165:2
seeking 81:7 100:6
124:13,17 125:2,9
165:4,5 234:6
seen 179:2 215:9
269:21 280:2

282:19 290:18
301:8,13 302:1
segment 165:11
selects 34:5
send 12:5 20:23
21:3 75:9,13
94:17 101:14
114:8 117:7 131:9
131:22 132:22
149:3 152:1
215:13 216:9,19
228:13 231:11
291:22 293:23
sending 84:21
131:11 174:22
214:23 216:23
219:5
sends 82:6 233:7
sense 62:2 136:9
261:16 262:5
277:11
sensing 35:8
sent 22:19,21,22
56:21 65:17 73:20
74:2 76:7,12 77:7
79:24 82:18 85:18
86:11 90:9,9
100:18,20 101:17
117:22 118:24
149:3 150:3,10,12
152:2 155:5,11
157:13 159:21
164:13 165:22
174:21 195:19
209:22 210:12
212:2,3 214:13
215:1 217:1 222:6
231:7,15,23
241:18 257:15
290:1 293:24
302:5,5

**sentence** 93:18
95:8,13 119:4
162:23 198:24
204:3 205:7 213:6
214:6 263:9,12
269:3,7,12 274:16
274:19 278:8
284:7 292:14
**sentences** 32:22
198:21 205:5
207:21 278:2
284:15
**separate** 97:23
98:1,5 104:6
215:16 225:16,17
293:13
**separated** 98:7,12
210:15
**separation** 207:6
256:8,10,12
298:15
**sequencing** 37:10
**series** 179:14
256:4 280:18
**server** 34:9 109:1
109:3,4 113:14
169:10 178:16
197:13 219:24
251:2
**servers** 166:18
172:4 250:24
**service** 99:12
101:20 138:14
152:22 173:11
174:6 179:7 185:9
185:12,17,21
197:11 206:7
219:10 220:6,7,22
220:22 221:4
224:10 229:17,21
253:23 254:9

261:24 262:3
267:17 268:4,9
269:15 286:19
287:13,18
**services** 253:6,9
253:22
**session** 300:20
301:5,6
**sessions** 69:18
250:1
**set** 22:15 28:8,18
40:6 49:1 112:12
135:4,7 149:15
159:13 165:21
182:7 185:4,8
186:14,21 188:24
189:2,4 192:22
211:11 225:19
231:18
**setting** 71:14
185:7
**settings** 11:24
193:18
**settled** 251:19
**setup** 32:23
**severe** 247:4
**severity** 223:7,8
**shake** 5:16
**shakes** 128:4
133:15
**shaking** 53:11,17
**share** 3:13 8:5
25:9,9 39:15
40:12,15 109:1,8
188:13 192:13
288:3
**shared** 36:10
40:19,20
**sheet** 136:4,4
220:22 305:14
307:7,10,18 308:1

**sheets** 220:18
**shining** 161:18
**shock** 245:18
**shore** 296:15
297:8,8
**short** 37:6 52:15
64:23 97:1 211:16
234:2 255:18
**shorthand** 304:5,9
**shortly** 42:9
119:20 123:13
218:14
**shout** 147:19
**shouting** 147:19
**show** 9:20 28:12
39:13 73:9 126:14
142:14 173:18
208:22 301:19
**showed** 302:2,4
**showing** 194:22
**shown** 8:7 84:12
257:5 305:16
**shows** 227:2
**shrugged** 72:16,23
129:21
**siblings** 40:16
**sic** 191:21
**sick** 115:5 116:1
116:10,11 117:3
145:9
**side** 138:16 232:7
232:7 233:13,13
283:8 287:21
297:8 300:8,22,23
**sided** 297:11
**sierra** 118:4,6
**sign** 39:7
**signal** 10:16 11:6,8
11:14,17,18,19
30:13,16 31:6,7,13
44:11,12,17,22

132:9,10,14,16,17
132:18,21,22
133:4,6,6 149:4,7
**signatory** 91:1
**signature** 303:18
304:15 305:15
**signed** 41:19 212:5
283:20 306:13
307:18
**significant** 13:22
160:11 229:10
237:20 238:1
242:3,5,18 289:16
290:3
**significantly** 66:18
67:1
**signing** 43:12
283:20 305:20
**silvestri** 75:18,20
77:7 181:23
**similar** 75:22
246:21
**simple** 184:10
287:1
**simply** 32:16
167:2 207:8
**sincerely** 305:21
**single** 80:5 220:2,4
229:7 274:16,19
**singular** 32:17
**sinus** 54:11,14,23
147:14,22
**sir** 305:10
**sit** 80:20 98:11
186:24 241:2
248:18 252:4
**site** 171:3 175:7,8
175:9 228:9
254:19
**sitting** 5:4 6:8
48:15 126:15

182:12 187:2,14
187:17 188:3,4
212:15 228:7
257:13 300:2
**situation** 46:24
57:7 139:10 152:7
157:22 259:8,11
259:18 262:7
**situations** 25:2
**six** 26:24
**sizes** 35:20
**sjados** 2:15
**skeleton** 99:10,13
157:23 158:10
170:17 171:10,21
172:11,19 173:1
174:23 177:12
179:11 180:6,24
181:5 213:22
221:8,11,17 227:3
227:5,21 228:18
228:22 229:13
261:24 262:3
264:13,21 265:5
265:13,20 267:6
267:16,24 268:13
269:17 270:9,11
270:12,19 271:7
272:15 273:2,18
274:9 275:1,10
284:7,9,10,12,13
284:17,22 285:1
285:13,16 286:10
286:23 287:3,5,10
287:13,14 291:5
299:5,14
**skeletons** 164:19
165:6 295:11,12
295:20,23
**skills** 249:20

**skin** 92:8 239:15
240:21 246:21,23
**skip** 229:23
**sleep** 53:18,18,22
53:24 54:4,16,20
55:1,7 101:24
**sleeping** 55:22
57:12
**slightly** 271:6
**slots** 261:4
**slow** 288:23
**small** 239:2 285:8
**smaller** 254:7
**smithamundsen**
2:13
**sms** 150:2 151:2
**social** 27:8 29:14
29:17 249:16
**software** 142:11
166:19 188:17
221:6,21 222:4
250:7,9 278:5
279:18 297:23
**solace** 150:6
**sole** 97:18
**solo** 159:15
**solution** 135:3
294:20
**solutions** 251:5
305:1 308:1
**solving** 54:13
**somebody** 85:19
110:10 133:4
166:5,8 254:13
272:2 296:12
299:13 303:1
**somewhat** 136:11
136:13 231:12,13
**soon** 14:2 165:20
176:15

**sooner** 176:19
**sorry** 10:15 15:17
42:5 56:19 65:9
66:19 69:24 71:13
71:21 81:20 84:2
88:18 89:5 96:11
97:10 101:12
108:18 110:3
113:9 124:2 132:2
132:24 133:1
138:9,9 140:4,5
146:9 151:21
159:17 161:12,20
169:11 175:15,15
175:17 178:2
179:18 186:3
201:19 204:1
213:15 222:17
227:8 263:9 288:7
299:9
**sort** 13:20 23:24
31:13 35:9 54:11
79:1 81:3,4 91:21
114:14 125:12
140:15 143:23
153:23 154:11
160:9 201:4
205:21 212:4
218:15 220:1,11
246:22 254:15
260:2 263:14
268:21 274:23
275:13 287:5,6
299:4 303:10
**sorts** 125:13 223:8
263:4 283:3
300:17
**sought** 22:1 62:24
97:16 100:9
**sound** 235:17
293:7

**sounded** 144:13
175:17 266:9
293:16
**sounds** 24:23
33:20 61:7 87:21
108:2 134:4 152:2
157:15 159:22
190:12 241:1
274:4
**space** 12:3 182:7
**spark** 165:1
**speak** 56:4 207:1
262:17 292:1
**speaker** 299:11
**speaking** 73:1
107:17 118:3
147:9 175:10
182:1 201:20
**specialist** 248:5
**specialty** 15:2,15
**specific** 8:23 9:1
22:20 23:7 31:12
58:17 72:5 109:22
110:3 134:17
137:8 144:11
147:7 168:7
169:15 214:4
215:9,10 216:4,6
222:7,10 248:4
256:20 262:11,12
262:13 263:24
270:1
**specifically** 54:10
59:7 73:3 83:1,20
84:24 91:12 94:5
103:16 109:21
110:7 111:16
125:18 137:13
139:16 169:12
213:3,5 215:2
216:1 249:11

**[specifically - suggested]** Page 50

256:9 261:10 298:11
**specifics** 301:16
**speculate** 47:5
**speculated** 47:1
**speculation** 45:12
**sped** 14:11
**spell** 12:18 19:4,13 24:16
**spelled** 23:16
**spend** 195:23 238:22,23 239:3 239:10,11
**spending** 239:6,7
**spiteful** 164:9,17
**split** 246:10,24
**spoke** 8:19 89:24 90:3,5 102:7 112:6 181:20 212:8 216:12 237:21
**spoken** 9:2
**spot** 242:14,17
**spring** 19:22
**sprint** 40:9
**ss** 304:1
**ssl** 33:18 101:18
**stable** 109:2
**stacking** 171:10
**staff** 217:21
**stages** 175:22
**staircase** 131:1
**stairs** 127:10 131:3
**stamps** 84:11
**stand** 167:12 182:18
**standard** 120:4 158:12
**standing** 182:1,15 182:16 187:2,3,6

187:17
**stands** 18:22 224:5 287:8
**starbucks** 46:5 48:6,10,21 49:5,12 49:13 50:9,13 88:6 93:5,9,10 94:8 118:13 212:14
**start** 33:8 37:9,11 53:10,11 162:24 206:18
**started** 10:1 11:19 11:20 15:10 49:19 103:13 121:7 138:15 143:1 169:5 192:21 235:8,12,20,24 236:24 284:20,21 284:22 301:2
**starting** 4:5 171:7 275:19
**starts** 277:18 292:11
**state** 1:17 4:5 82:7 82:19 83:6 117:1 117:2 136:20 278:16 304:1 306:10 307:15
**stated** 75:1 85:8 88:7 121:15 154:17 177:4 207:14 249:24 291:13 294:22
**statement** 34:14 44:19 120:23 133:21 182:18 203:12 221:13 273:13 274:16 280:15 282:18 306:13,14 307:19

307:19
**statements** 205:13
**states** 1:1 199:2
**status** 65:21 72:2 248:8
**statute** 77:13,18 82:7,19,23 83:8 170:15 274:12 275:3
**staying** 92:12
**step** 157:19 179:4
**stettinius** 2:7
**steven** 2:14 4:17 256:3
**sticking** 157:7
**sticks** 135:6
**stipulate** 23:3,7
**stipulations** 234:19
**stock** 234:15
**stomach** 62:15,16 62:20 102:5,6
**stood** 220:11
**stop** 178:2 195:20 203:12 205:13 257:8
**stopped** 261:21 274:18
**storage** 12:1 107:13 194:10,11
**store** 124:1,3
**stored** 108:24 220:17
**story** 300:8,22,23
**straight** 283:16
**strange** 234:19
**strategies** 58:9,19 59:2 247:20,23
**street** 2:13 121:5
**stress** 58:10 69:12 247:5,11,13,15

**strike** 43:6 259:16 303:3
**string** 106:3 265:13
**strong** 230:18
**strongest** 85:15 94:6
**struts** 166:15 168:3
**stuck** 53:9 248:12
**stuff** 51:5 146:5 151:21 157:8,10 157:16 158:4 169:13,15 174:6 193:13 236:4 240:1
**style** 105:16 131:7 220:18,22
**subject** 31:5 47:7 219:11
**submit** 17:24 251:7
**submitted** 18:2,16 105:1 122:3,5 245:8
**subordinate** 217:4
**subpoena** 149:16
**subscribed** 260:10 306:10 307:14 308:21
**successfully** 153:16 155:2 183:10 261:21
**suffering** 115:8 237:20 238:1,5,7,8 242:8,11
**sufficiently** 131:22
**suggest** 58:16,20 60:2 232:20,24
**suggested** 32:19

**suggestions** 58:8
**suit** 35:23 36:1,1
**suitable** 251:16
**suite** 2:8,13 305:2
**summaries** 18:2
**super** 95:4 153:8
 175:21 272:7
 283:13
**superior** 305:1
**supervisor** 90:19
 91:8 111:10
 170:21,24 195:18
**supplement**
 293:11
**supplied** 135:5
**support** 33:13
 109:4 159:17
 297:1
**supported** 93:7
**supreme** 1:19
**sure** 9:16 10:2,18
 13:21 31:4 33:8
 35:17,20 43:18
 45:1 51:1,2,13
 56:14 75:18 77:12
 86:17 87:1 90:21
 96:12,21 110:5
 116:24 117:4,21
 130:10 133:15
 140:5 149:1
 160:21 163:15
 169:8 175:9
 181:23 184:16
 195:9 202:11
 204:3 209:13
 211:22 212:1
 213:1,2 229:15
 231:21 240:1
 242:10 254:23,24
 255:10 258:18
 262:18 263:11,22

264:2 266:23
 274:4,20 276:5,21
 280:20 282:5
 285:20 290:4
 291:10,21 292:9
 299:23
**surgeon** 241:18
**surgeries** 246:2,18
**surgery** 13:19,22
 53:9 80:19 88:12
 88:19,22 89:20
 90:1,6,18 91:21
 92:3,9 97:8,9
 121:19 210:24
 217:13 238:13
 239:11,14,16
 240:5,11,14,16,16
 241:22 242:4,23
 243:3,9,19,23
 244:2,20,22 245:6
 245:12,15,17,24
 246:3,5,21
**surprise** 60:4 62:6
**surrounding**
 240:21
**susan** 57:19
**susceptible** 54:11
 54:18
**suspect** 47:9
 260:15
**suspected** 47:16
**suspicion** 191:15
 191:19
**swept** 275:18
**switched** 251:18
**sworn** 4:21,22
 6:17 306:10,13
 307:14,18 308:21
**symptoms** 54:12
 54:19 57:11 60:13
 70:20,24 71:3,8

102:9 116:2
 145:10 147:16
 241:6
**synonymous**
 284:12
**syntax** 207:10
**system** 18:12 47:6
 54:24 78:8,14,21
 99:9 173:10 174:8
 177:12,21,23,24
 178:5,8,11,13,18
 178:22 179:1,12
 179:20 180:1,7
 181:14 182:20
 183:2,8,19 191:11
 199:16 200:14,19
 201:13 202:13,19
 202:23 203:2
 204:9 206:11,14
 207:10,16 220:15
 225:19 227:4,6,22
 228:1 230:1
 233:16 253:4
 268:14 269:18
 284:21 293:7
 294:3,9 295:2
 297:10,11 298:9
**systems** 166:11,16
 166:17 168:9,19
 173:23 180:24
 199:5 203:17,19
 208:5 254:3
 268:14 270:12
 285:5

**t**

**t** 4:7,7 19:13,13
 23:17
**t001538** 289:14
**table** 48:16 49:2
 190:24 191:3

**tablet** 7:3 101:13
 101:20
**taft** 2:7
**taftlaw.com** 2:11
**tag** 263:1
**take** 5:24 6:12
 12:3 14:5 16:19
 17:15,15,18,22
 36:24 41:4 43:12
 54:3 58:16 60:2
 64:17,19 66:4
 70:1,4 74:5,17
 96:23 97:8,15
 98:7 119:22 125:3
 144:21 145:4
 157:4,19 168:22
 192:22 200:12
 203:19 204:8,19
 208:4 211:12,13
 217:11,12 220:14
 233:21 243:6
 244:7 248:19,20
 255:14 281:16
 283:2 288:1 291:6
 303:15
**taken** 1:16 7:18
 16:21 37:6 52:15
 64:23 81:14,17
 96:9 97:1 145:10
 154:11 165:5
 189:1 211:16
 234:2 235:6 246:9
 246:20 248:23
 255:18 260:18
 304:6,9
**taker** 168:12,14,16
**takes** 93:12 96:13
 233:7
**talk** 8:14 23:7
 63:15 64:17 148:5
 164:19 219:6

238:6 272:12
280:13 303:14
**talked** 87:18 98:9
211:21 215:10
264:3 277:19
298:4 300:20
**talking** 5:19 66:12
169:7 256:15,23
256:24 258:11
261:5 266:17
269:8 273:7,11
274:8 280:22
282:10,11 285:22
295:5 301:4
**talks** 280:15
**tangle** 251:21
**task** 282:8
**tax** 245:3
**taxes** 235:5
**tduffy** 2:5
**tduffylaw.com** 2:5
**team** 218:3
**tech** 259:1 283:6
283:18
**technical** 28:8
136:9 175:21,24
230:19,20 258:17
258:21 261:15
262:7 264:6 272:5
272:7,7 283:8,12
283:13 298:2
303:5
**technically** 44:11
185:20 231:22
294:12
**technician** 261:21
**technologies**
250:14
**technology** 35:18
182:10 205:22
251:23 252:8

**telegram** 31:7,9,10
31:17,19,22 32:3
**telehealth** 56:8
**telephone** 11:8
33:16 42:21 43:2
**tell** 6:4 10:17
16:24 17:15 38:3
38:7,18 51:1 69:6
75:24 80:5 81:23
82:7 89:7,13,19
90:17 92:2,15
100:12,23 108:17
115:24 116:9
118:15 122:16
136:1 138:2,22
139:2,24 140:5,8
141:23 144:11,19
145:6 148:6
153:22 172:17
177:17 178:7,10
180:8 181:3,8
184:1 185:12,19
186:17 195:7
196:12 198:17
200:21 201:5,21
202:8 203:11
205:12 206:22
209:3 212:18
218:23 222:3
226:20 228:23
229:2 230:10,16
230:17 232:20
234:8 244:17
245:3 246:15
252:7 270:20
274:23 280:24
291:3,7 293:8
299:24 300:22,23
**telling** 273:18
274:9

**tend** 147:20
**term** 107:8 203:19
204:19 205:18
270:4
**terminate** 100:1,9
**terminated** 97:16
97:21 99:18
**termination** 13:11
161:6 170:3 189:7
202:5,9 256:17,21
256:22 295:13,23
**terminology**
219:20
**terms** 37:10 87:6
170:3 216:23
223:18 230:22
254:9 258:3
265:18 270:6
275:13 281:1
287:22
**terrano** 23:12,24
24:18 26:1,15
34:24 36:1,12
**test** 11:20 16:22
47:7 74:22 75:6
78:7,13,17,21
84:23 85:6 94:9
94:14,15 96:9,14
99:9,14 138:1,12
138:24 139:11,15
139:17 140:2,9
141:12,14 142:1,3
151:15 152:12,19
161:22 162:2
174:8 177:9,11,17
177:19 179:1,11
179:21,24 180:7
180:12 181:14
183:2,8,14,16,17
183:17,19,21
184:2,5,13,19,24

185:16 186:11,18
187:1,8,11,19
188:5,18 201:6,13
201:23 203:5
204:22,22 205:9
205:11,24 206:8
208:21,22 213:21
215:22 216:7
218:16 229:17,21
229:24 230:2,11
230:14,15 232:21
233:15 268:3,4,7
268:14 270:2,5,6
270:17 273:1,9,14
275:15 285:16,19
286:15,21
**tested** 139:21
172:3 179:15,19
182:20 227:6
229:12 232:15
285:19
**testers** 209:1
270:7
**testified** 6:18
119:9 258:7
264:19 267:4
284:4 303:4
**testify** 6:9
**testimony** 7:22
102:10 106:5,7
115:10 116:3
153:20 175:2
177:4 199:20
200:2,4 218:12
258:13 259:13
261:7,8 264:11,12
279:22 282:21
283:4,9 295:11
298:11 301:9
304:6 306:6,7
307:6,9,12

**testing** 182:10
  185:21 205:21
  267:24 271:4
  286:21
**tests** 185:3 268:21
**text** 8:24 34:7 43:7
  44:5,11,11,13,20
  132:8,10,10,12,14
  132:20,22 133:7
  148:21 149:7
  150:22 155:5,11
  156:23 157:4,13
  159:8,21 162:14
  162:17 163:3
  164:5,18 165:11
  165:13,21 166:2
  220:16 257:4
  278:4 288:12
**textual** 224:11
**thank** 159:16
  179:24 196:14,20
  196:21 255:21
**thanks** 4:24 42:5
  121:5 133:10
  153:6 169:19
  209:18 220:7
**theirs** 296:16
**theme** 34:15
**theory** 80:18
  121:14 287:9
**therapist** 63:13,21
  64:5 68:9 249:16
**thereabouts** 131:5
**thereof** 1:20
**thing** 21:24 41:10
  51:24 95:11
  125:19 133:16
  138:9 159:2
  161:21,23,24
  162:7 177:22
  195:12 200:4

204:15 238:12
243:1 245:3 276:8
285:18 288:3
**things** 10:23 20:19
22:2 24:5 26:19
35:8,11 37:9
56:13 65:3 66:17
69:14 84:15
113:14 114:1
120:11,16 128:2,4
132:6 137:4,5,6,6
137:7 139:21
144:14 147:15
151:20 152:14
163:9,10 171:18
180:16 182:9
193:3 194:3
202:20 205:24
209:2,6 214:18
220:17 236:5
238:10 239:2
242:8 243:12
249:21 250:13,16
252:4,6 253:2
259:23 262:6,11
262:12,13 265:9
271:13,23 272:4
278:6,14,22 279:1
283:3 288:11
289:20 297:5
298:22 303:5
**think** 8:15 10:9
14:17 16:8,23
19:16 23:1 25:11
27:1,3 29:13,16
30:23 32:11 34:11
35:10 36:4 45:4
47:11,24 48:4
51:14 52:13 55:11
57:9 62:11 63:14
66:19 74:21 75:7

75:12 78:9,16
80:22 83:24 85:11
86:23,24 87:5
90:8,10 91:1,4
94:16,21 95:12,14
97:17,18,18,22,24
98:15,16 111:11
112:7 118:5,5,17
119:9 128:3
133:15,17,18
135:23 137:3,4,20
137:21,24 138:21
139:5,6,8,11,16,18
140:10 141:17
144:18 145:11,15
149:2 150:7
151:19 154:16
156:6 158:10
160:12,16 168:21
168:22 171:12,14
177:5,22 178:14
179:13,15 180:14
181:14 182:20
183:18,22 184:15
185:2 187:12
188:5 191:1
193:20 194:5,7
195:3 197:17,21
202:2 206:5,23
213:1,14 215:24
229:22 230:12
234:7 235:14,18
236:21,22 241:21
242:7,13 248:22
248:24 253:23
260:8 262:8 263:3
263:13 264:7,20
265:17,23 266:20
267:21 268:16,18
270:5 271:17
272:13 273:24

275:20,21 276:6,8
277:9 283:16,19
284:24 285:18
286:2 288:18
289:7,20 290:2,22
291:3,16 292:5
294:11 295:7,8
297:12 298:19
302:9,14,19 303:9
303:13,15
**thinking** 23:9 53:8
141:16 172:2
274:5 289:21
294:20
**thinks** 96:14 291:4
**third** 16:24 153:2
189:20 190:3
269:3,7 284:1
292:4,6,6,10,11
**thirty** 305:19
**thomas** 75:16,20
118:8 181:23
**thotcon** 19:14
**thought** 42:18
46:11 47:15,24
51:11 57:7 60:21
75:1,4,7,10 81:11
88:10 94:5 98:16
121:16 137:9
140:2 141:11
150:14 166:23
183:7 191:22
201:16 215:19
231:2 250:16
282:12 288:15
300:24
**thoughts** 61:8
62:20
**threat** 70:9,11
263:4 278:15

| | | | |
|---|---|---|---|
| **threatened** 295:21 | 117:3,6 120:7,8,8 | 303:19 304:5 | 201:16 202:13,15 |
| **threatening** 155:8 | 120:11 122:12,22 | **timelines** 50:2 | 202:18,21 218:2,6 |
| 156:10,14,17 | 123:22 128:21 | **times** 43:3 48:15 | 224:19 230:12 |
| **three** 49:9 135:18 | 131:16 132:14,15 | 53:12 85:23 88:8 | 252:9 257:10 |
| 213:14 222:18 | 135:1 141:16,21 | 123:17 134:12 | 283:1,10,11 |
| 291:7 292:15 | 142:23 143:24 | 145:8 188:10 | 296:12 297:2,5,6 |
| **threw** 53:12,14 | 144:20 145:22 | 204:13,16 251:7 | 297:19 |
| 224:17 | 147:5,7,9,22 149:7 | **timing** 231:18 | **tomorrow** 76:23 |
| **thrills** 125:8 | 157:8 160:10,11 | **timothy** 2:3,4 4:15 | **tony** 174:6 197:13 |
| 126:12 | 160:16 167:1 | **tin** 150:4 | 197:15 218:18 |
| **throw** 222:9 | 168:21,24 169:3 | **tips** 58:19 | 219:4 |
| **throwing** 116:8 | 176:19 180:13 | **title** 25:16,17,23 | **tool** 171:21,23 |
| 163:13 | 183:3 186:21 | **tkgingo** 20:10,11 | 178:22 226:11 |
| **thrown** 146:4 | 189:1,4 190:19 | **today** 4:24 5:8 | 264:14 265:6,7 |
| 158:11 264:17,21 | 192:18 195:23 | 7:22 8:7 9:7 18:11 | **top** 51:14 66:7 |
| 265:20 | 202:21 210:6,8,9 | 80:20 98:11 116:3 | 86:15 90:7 102:13 |
| **tickets** 33:13,16 | 211:7,17 212:5,7,9 | 126:16 195:4 | 113:21 117:21 |
| **tightening** 246:21 | 212:19,20,22,23 | 237:21 238:2 | 121:15 122:6 |
| **tiktok** 29:2,3 | 213:4 214:13,24 | 241:2 245:24 | 136:4 137:14 |
| **till** 31:1 116:22 | 215:13,16 216:9 | 248:18 252:3 | 143:14 150:23 |
| 117:15 199:11 | 216:22 218:2,9 | 258:7 267:23 | 153:2 211:24 |
| **tilt** 153:24 | 225:21 229:7,12 | 269:23 297:5 | 220:24 236:3,8 |
| **tim** 52:13 74:8 | 229:19,20 231:16 | 298:14 | 244:6 245:20 |
| 76:14,16,18 92:1 | 233:21,24 234:1,3 | **toggle** 84:3 | 248:1 276:5 |
| 118:6 | 238:11,18,19,20 | **tokens** 28:14 | 283:23,24 284:5 |
| **time** 4:2 5:11,24 | 238:22,23 239:3,6 | **told** 19:23 38:22 | 285:18 292:7 |
| 7:23,24 9:8 11:5 | 239:7,9,11,11 | 43:19 76:21 89:14 | 295:7 298:20 |
| 14:1,2,8,10,12 | 242:3 243:6 244:8 | 107:3,8,14,21 | **topic** 138:10 |
| 28:20 29:21 30:11 | 244:11 245:14 | 109:11,15 111:14 | **toronto** 224:2,4,6 |
| 36:24 37:4,7 39:9 | 249:9,22 250:19 | 114:11 116:10 | 224:14,15 |
| 41:1 42:2,4 43:11 | 252:8,13 253:2 | 117:5,23 118:2,8,8 | **toss** 151:5 |
| 43:13 44:15,21 | 254:16 255:16,19 | 139:2,10,13,14 | **total** 244:24 |
| 45:14,15 52:16 | 256:8,12,16,21 | 140:8 145:11 | **touch** 101:16 |
| 53:4 57:7 58:18 | 257:19 265:15,18 | 154:10,16,17,20 | 131:24 168:8,9,18 |
| 61:22 64:21,24 | 265:24 266:8 | 155:7 156:10,12 | **tour** 124:3 |
| 65:22 69:2,5 70:5 | 271:11,14,18 | 156:16 171:12 | **tpm** 105:18 106:18 |
| 70:7,12,24 72:15 | 272:15 281:7,13 | 172:13,24 173:2 | **track** 79:8 250:22 |
| 72:24 83:5 84:10 | 281:21 282:1 | 173:14 178:19 | **tracker** 198:3 |
| 87:18 90:3 97:2 | 284:3,23 293:6 | 181:13,17 182:19 | 267:19 |
| 98:10 100:11 | 297:13 299:13,21 | 184:4 197:12 | **traffic** 264:17,22 |
| 101:7,21 104:21 | 301:24 302:5,5 | 200:20 201:1,8,11 | 265:21 287:2 |

299:5
train   10:11 51:5
  163:13 193:13
training   16:22
  17:15 135:3 222:6
trains   46:18
transactions
  287:16
transcribed   232:8
  232:10 306:7
transcript   30:21
  30:24 31:2 92:4
  266:18,19 304:8
  305:12,13 306:5
  306:12 307:5,11
  307:17
transcription
  304:6,8
transit   1:6,9 4:3,8
  15:2 109:4 168:12
  168:14,15 169:14
  179:12 180:7,18
  180:24 182:10,20
  183:2,8,19 199:4
  199:16 200:13,19
  203:17,19 207:15
  208:3 224:3 227:4
  227:6,22,24
  232:22 269:9
  270:10 273:2
  294:3,9 295:2,9
  297:19 305:6
  306:3 307:3
transits   163:9
transmitted   287:2
treat   68:12 158:13
treated   114:24
  129:2
treating   67:23
treatment   71:23
  119:6,13 121:10

121:20 248:15
  249:7,9,16
tried   29:11 38:6
  46:14 81:10 136:8
  140:23 251:5
  257:8 277:4
trigger   151:15
  177:5,13
trimmed   288:18
trinity   76:7,12
  86:7
trivial   88:19
trouble   53:20
  55:21,22 69:13
  114:18
true   27:21 304:8
trust   151:21 184:9
  291:24
trusted   153:18
  154:3 291:16
truth   6:4 260:12
  302:16
truthful   7:22
try   5:19 55:7 58:9
  60:11 109:13
  132:11 141:17
  158:3 250:13
  254:12 275:8
  277:11 288:22,24
trying   11:20 54:12
  81:12 139:9
  151:19 158:24
  167:3 238:24
  254:24 259:22
  263:22 266:23
  274:22 277:9,21
  279:9 291:18
  302:8
ttc   223:24 224:2
  224:12

tuesday   8:20
  127:10
turman   175:12
turn   75:23 81:22
  82:10 86:1 92:13
  96:18 100:11
  104:18 110:14
  112:7,9 118:14
  119:3 124:4 127:3
  130:6 131:7
  150:21 152:24
  159:4 165:8
  182:17 189:5
  194:21 207:11
  209:14 218:21
  226:18 231:4
  233:20 250:23
turned   103:19
  293:17
turning   100:11
  113:21 194:14
  210:18 213:10
  251:1
tweet   29:23
  177:13 240:23
  270:1 286:12,15
twice   49:11 200:23
  202:1 235:4
twitter   26:5 27:4,5
  27:6 29:19,20,24
  199:5 269:18
two   10:6,24 13:2,2
  16:23 20:15 21:10
  29:13 32:22 48:15
  73:23 74:14
  102:17 104:8
  117:2 141:22
  144:22,23 173:16
  175:9,12 185:23
  207:7 213:13
  218:4 228:16,17

242:2 243:24
  250:2 266:21
  284:15,19
txt   220:19
type   92:2 105:20
  120:4 200:10
  212:15
types   104:21 253:5
typically   57:10,11
  208:20
typing   188:4
  232:11

u

u   4:13
ugh   74:4 284:6,15
uh   5:16 64:4
  228:20
ultimately   115:16
  133:23
unable   61:5,23
  220:13 226:7
  229:4
unattended
  294:23
unauthorized
  199:5
unbacked   278:19
unbiased   302:15
uncle   26:24
unclear   268:8
uncommon   187:5
  188:7
uncovered   278:11
underpinnings
  258:21
understand   5:14
  5:18 6:3,9,11 7:13
  8:6 75:4 77:3,9
  78:6 84:7 86:21
  91:3,13 94:24
  95:6,18 108:8

109:19 110:10
113:16 136:6,8
150:2 151:11
157:22,24 158:1
159:10 177:14
180:21 199:22
219:15 230:19
234:21 258:21
268:9,12 272:22
276:20 284:10
290:21 291:8,20
295:24 296:14
**understanding**
79:14,18 84:17
90:22 95:23
119:10 153:22
260:14 262:7
264:6 268:20
271:22 272:4
273:4 279:13,16
283:7,17 286:14
**understandings**
259:16
**understood** 6:13
14:15 62:2 78:12
87:7 150:19 264:8
**undertook** 302:15
**unfairly** 153:24
**unfolded** 32:18
34:16
**unfortunately**
146:7 162:19
163:6,14 193:1
250:22 298:1
**united** 1:1
**university** 15:19
**unpack** 16:6 41:11
199:17
**unpublic** 195:14
**unpublished**
203:21

**unreasonable**
272:13
**upcoming** 13:19
119:5,11
**update** 225:23
**updated** 67:16
101:19
**upgrade** 171:19
177:21 284:16,20
**upguard** 254:19
**upper** 83:3 246:19
294:2,8
**ups** 77:24 93:7,8
290:8
**upset** 46:13
181:12
**urgent** 114:1
**url** 179:22
**usable** 101:21
**usb** 105:20 135:6
**use** 5:15 9:23 20:2
20:22 21:7,11
22:13 24:18,23
26:5,22 27:20,20
27:23 29:2,10,14
30:19 31:7,11,14
31:18,22 32:1,7,10
44:1 98:4 99:9
105:16,19,23
108:7 112:10,18
115:16 125:4
132:9 152:17
153:7,21 157:9,17
158:3 163:23
174:8 179:7 180:6
185:21 188:7
189:3 191:13
198:14 205:16,20
205:22,24 206:2,5
206:7,10,15,24
216:4 219:20

221:5,10,13,15,21
224:12 225:16
226:9,14 227:3
228:4,8 251:6,20
264:16 268:9
270:7,9,12 285:12
287:9,17 294:15
**useful** 214:18
**user** 186:19
225:19
**username** 27:22
28:16 30:16
224:15 253:10,12
253:13
**usernames** 252:15
**uses** 29:8 253:22
287:4
**usual** 150:5
**usually** 20:24 24:4
25:3 26:9 27:19
93:9 145:4 167:7
223:4,6 225:15
254:5
**utility** 46:12

**v**

**v** 24:17 305:6
306:3 307:3
**vacation** 37:22,23
42:3,6,11 120:7,7
123:13,15,21
226:5 239:9
**vague** 110:4
**valid** 207:10
**validate** 281:14
**validated** 281:16
**validation** 206:14
**validity** 301:14
**value** 206:1
253:11 254:11
263:14

**values** 253:18
265:12
**vanasse** 218:3
**varied** 57:6 134:16
**various** 48:4
168:13
**varying** 271:22
272:3
**vast** 251:3
**vendetta** 153:23
155:8 156:11,17
**vending** 131:2
168:15
**vendor** 171:2
175:7 223:6,6,9
251:11 281:7
**vendors** 117:23
118:2 208:18
223:19
**vengeful** 164:9,17
**ventra** 131:2
168:11
**venue** 7:3
**verbally** 5:12 65:7
170:23 171:4
172:18 174:16
**verification** 221:8
263:15
**verified** 232:15
233:5,18 302:21
**veritext** 305:1,8
308:1
**veritext.com.**
305:17
**veronica** 95:9,9,15
95:18,20,21
154:18,19,19
**versus** 4:3
**vest** 234:18
**vested** 211:22,22
234:17

**vestibule** 130:24
131:10
**vesting** 211:8
**vestment** 211:5
**vests** 234:18
**vibe** 120:12,14
**vibes** 9:6
**victim** 303:6,9,10
**victor** 167:13
**video** 5:9
**videographer** 2:20
4:1,21 37:4,7
52:14,16 64:21,24
97:2 168:24 169:3
211:14,17 233:24
234:3 255:16,19
303:19
**view** 158:22 162:7
162:7 293:14
303:1,6
**viewed** 176:12,16
47:16
**violating** 47:16
**violation** 47:20
79:15 80:6 256:13
278:16
**violations** 256:18
**visible** 178:4
**voice** 31:24 132:15
147:15,18,21
148:3,7 194:3
**voicemail** 42:24
**voicemails** 261:22
**volleyed** 232:17
**volleying** 232:19
**volume** 147:20
**volunteer** 203:4
**volunteered** 203:8
**vomit** 62:17
**vomiting** 53:16
**vs** 1:5,11

**vulnerabilities**
142:10,14,20
157:23 166:10,22
166:23 167:16,20
168:5 208:16,19
281:14
**vulnerability**
99:13 142:21
166:7,8 167:14,17
208:22,23 223:5
263:10 278:10
281:3,4,22

**w**

**w** 1:17 12:19
304:4,16
**wacker** 2:8
**wage** 245:1
**wait** 117:15
234:17
**waiting** 116:22
**waived** 305:20
**walk** 93:10 187:6
226:22 272:1
**walking** 122:14
272:9 294:22
**wamatta** 295:17
**want** 20:20 21:3
23:7 28:10 37:10
46:18 64:17,18
65:22 67:4 72:10
73:14 80:1,19
86:16 97:23 123:9
153:20,24 154:6
155:6 158:16
164:10 174:9
183:22 184:3,4
185:12,15 189:5
191:12,13 195:22
196:5 198:22
205:12,24 207:21
208:14 209:2,3,16

215:7 233:20
234:5 247:1
248:12 253:19
255:10 265:14,15
268:24 269:2,23
271:6,7 277:17
280:4,13 282:6
283:21,22 285:6,6
285:9 286:11
288:1,5 290:7
292:3,4 294:7
295:22 297:5
298:10,11 302:12
303:14,14
**wanted** 14:8 44:10
51:15 60:11 85:20
87:2,2 97:4 98:1
109:12 112:9
114:9 116:24
117:3 125:1 135:2
153:11 158:18
159:3 169:20
173:15,16,22
174:7 179:13
188:18,21 221:22
248:11 254:1
257:7 264:2
283:15 293:13
296:15,23 297:18
**wanting** 180:10
**wants** 8:14 34:6
252:5
**warn** 229:20
**warning** 171:8
**warranty** 46:12
**watch** 229:16
**watched** 199:9
**water** 120:4
148:10,12
**wave** 120:17 121:3

**waved** 120:24
**way** 11:11 21:5,22
46:15 58:2 86:17
105:22 111:8,8
121:2,6 123:9
134:21 137:18,22
143:17,23 151:22
158:8 174:8
179:17 199:22,24
200:1,7 215:4
234:16 250:17
255:8 265:1
270:22,24,24
271:3 274:6
294:24 295:4
298:6 301:8
**ways** 109:20 230:2
251:6 252:5
270:23
**we've** 66:12
149:16 198:9
283:16
**wearing** 35:23
**web** 28:6 29:17
31:15,18 33:19
34:10 290:11,15
290:17,18
**weber** 118:4
**website** 21:9,10
28:12 32:12,15
33:2,5,10,23 34:12
34:13 124:11
228:5,19 255:24
286:7
**websites** 28:7,9
**week** 9:15 74:5
147:2 229:24
284:17,20
**weekend** 125:11
291:11

**weeks** 10:7 11:3
88:20 244:4
284:19
**weight** 47:12
**weird** 177:24
234:19
**went** 29:12,15
40:9 42:23 52:18
72:10 95:3 123:13
123:15,22 126:9
127:22 131:7
146:19 148:10
161:6 164:22
172:1 201:1
212:20 214:19
**west** 2:3
**whatsapp** 32:7
**wheelhouse** 15:1
**whip** 134:23
**whistle** 170:13,20
171:13 174:15
**whistleblower**
150:19 159:13
170:11 259:19
260:23 267:5,8
268:1 274:21
276:18 277:1
**white** 118:5
**wide** 105:11
**wigged** 113:9
**william** 12:17
**window** 220:15
251:15
**window's** 251:15
**windows** 110:9
112:7,9 158:7
**wipe** 193:2
**wiped** 193:9
**wireless** 118:4,6
**wish** 94:9

**wished** 94:14
**withdraw** 195:24
196:6
**withdrawing**
196:9,10
**withdrawn** 196:17
196:20
**witness** 3:3 4:16
4:21,22 5:2,13,17
5:22 6:2,6,10,14
6:16 8:19 31:8
36:22 37:1,15
39:18 52:12,23
56:20 57:4 64:14
65:7 67:13 73:15
73:19 82:22 92:7
97:12 98:15 133:5
133:14 146:14
148:20 149:1
159:1 169:9,12
170:17 175:3
196:19 197:1
201:1,8,15 202:5
203:1,7,14 204:1
204:19 211:24
213:17,20 227:15
227:23 230:7
233:23 234:10
238:10 242:13
244:24 245:8,14
246:8,15 267:13
273:23 274:14
275:9 276:20
277:9,15 278:1
279:3 280:10
289:14,18 296:14
298:19 303:13,17
305:9,12 306:1,4
306:11 307:1,4,15
**witnessed** 61:13

**witness'** 305:15
**woman** 190:8
194:19
**wonderful** 196:18
**wondering** 219:5
**word** 38:5,5
126:10 130:24
142:18 153:21
163:23 191:13
220:19 229:9
232:18 250:11
264:16 277:20
278:19 281:16
286:16 289:19
294:15,17 296:22
**wording** 32:23
215:10 231:19
258:17
**words** 5:10,15
61:3 94:11 136:3
139:3 173:7
174:12 183:4,5,19
183:24 202:10
209:11 224:13
231:17,23 233:4
233:17 242:21
258:8 260:18
278:14 290:14,18
301:3
**work** 7:6 16:18,20
31:17 86:16,21
87:5 108:24
124:24 125:10,12
125:14 135:16
158:19 159:15,15
171:24 173:9,11
185:4 208:17
210:6 215:6,6,7
226:1 227:17,24
237:8 238:24
243:6 244:8,12

247:4,10,13,15
251:18 261:20
269:2 271:23
272:22 286:18
295:22 297:18,19
298:8
**worked** 10:10,20
18:5,6 32:23
34:16 51:4 67:13
89:21 147:13
176:6 177:2,23
178:14,18 179:14
179:16,19 180:24
231:19 232:2
236:15 283:12
285:17
**worker** 108:14
120:4 249:16
**working** 35:18
125:1 151:6 163:9
167:18 174:5
177:20 182:11
206:18 209:5
235:8 239:7 266:2
**works** 154:18
177:24 186:6
245:2
**world** 124:3
**worth** 251:18
**wrapped** 99:14
211:7
**wrapping** 210:23
**write** 87:22 88:1
117:4 157:15
159:22 184:7
188:10 225:23
232:1 286:19
**writes** 92:23
**writing** 49:19
93:19 117:13
164:15 292:16,19

**[writing - zooming]**

292:21 293:1,2,3
**written** 8:3 48:24
50:18 136:15,22
155:13 163:18
212:24 263:8
295:14
**wrong** 47:24 51:11
137:9 196:13
203:20 270:21,21
275:22,24 302:10
**wrongdoing**
277:24 301:12
**wrongfully** 124:14
**wrote** 22:22 52:5
100:20 136:18,24
140:11 156:18
160:12 164:7
217:15 232:2,5
282:13

| x |
| --- |

**x** 3:1 134:22

| y |
| --- |

**y** 134:22
**yeah** 25:1 29:4
37:1 43:3 44:18
49:19 53:8 55:7
57:11 62:15 64:18
74:12 91:9 92:2
102:11 117:17
120:23 123:19
125:10 134:23
135:4,16 137:22
162:18 166:12
169:11,18 175:21
182:16 186:19
194:11 205:2
211:13 212:7
216:4 259:21
268:18 273:6,9
274:24 280:10

281:3 288:17,21
289:1 291:2 292:6
299:12
**year** 11:20 14:21
68:24 234:12
236:9 248:23
**years** 13:2 28:18
141:22
**yep** 151:4
**yesterday** 92:24
222:19
**york** 37:24 41:24
42:2,4 123:22,24

| z |
| --- |

**zero** 166:1,4,5,22
166:23 167:1
**zip** 265:8,9
**zoom** 1:16 74:11
92:17
**zoomed** 74:12
**zooming** 39:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 307

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 4464081
3       CASE NAME: Pable, Christopher George v. Chicago Transit
   Authority And Clever Devices, Ltd.
        DATE OF DEPOSITION: 3/11/2021
4       WITNESS' NAME: Christopher G. Pable
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9       I request that these changes be entered
   as part of the record of my testimony.
10

        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  3-24-2021            Chris G
   Date                 Christopher G. Pable

14

        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21       I have affixed my name and official seal
22  this 24 day of March            , 20 21.
23
                Notary Public
24                                    DUY T NGUYEN
                                     Official Seal
                              Notary Public - State of Illinois
                              My Commission Expires Feb 14, 2023
25       Commission Expiration Date

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 308

```
 1                    ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
 2              ASSIGNMENT NO: 4464081
 3   PAGE/LINE(S) /        CHANGE        /REASON
 4   _____
 5   See Attached List
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     3-24-2021              CWPa
20   Date              Christopher G. Pable
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS  24
22   DAY OF  March              , 20 21  .
23
     Notary Public
24
                            DUY T NGUYEN
                             Official Seal
                    Notary Public - State of Illinois
                    My Commission Expires Feb 14, 2023
25   _____
     Commission Expiration Date
```

| Page/Line(s) | Change | Reason |
|---|---|---|
| 12:11, 12:12, 12:20, 12:23, 13:4, 13:10, 118:24 | Bower to Bauer | Misspelling |
| 16:3, 16:8 | A plus to A+ | Misspelling |
| 20:10, 20:11 | ███████████ | Mistranscribed |
| 28:8 | OP secrets to APIs *Secrets* | Mistranscribed |
| 51:2, 51:3, 66:6 114:15, 114:17, 116:9, 116:14 | Sara to Sarah | Misspelling |
| 111:22-23 | LUX LVN to LUKS LVM | Mistranscribed |
| 124:3 | Took the tour to Took a pizza tour | Mistranscribed |
| 124:24 | drive to driver | Mistranscribed |
| 125:17 | driver to drive | Mistranscribed |
| 164:8 | box to bus | Mistranscribed |
| 173:9 | database ays to database | Mistranscribed |
| 184:3 | M I said to I said | Mistranscribed |
| 204:22 | invite to instance | Mistranscribed |
| 237:13 | out you by to out by | Mistranscribed |
| 239:9 | had to used | Mistranscribed |
| 251:15 | window, Window's to Bitcoin's | Mistranscribed |
| 268:15 | parodied to parity | Mistranscried |

| 289:14 | T001538 to P001538 | Mistranscribed |
| 294:17 | a God to a, God | Mistranscribed |
| 295:15 | Kang to Cang | Misspelled |
| 295:17 | Wamatta to WMATA | Misspelled |

Christopher G. Pable