# Exhibit 4

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3
   CHRISTOPHER GEORGE PABLE,           )
4                                      )
            Plaintiff,                 )
5                                      )
   vs.                                 ) No. 19 CV 7868
6                                      )
   CHICAGO TRANSIT AUTHORITY and       )
7  CLEVER DEVICES, LTD.,               )
                                       )
8            Defendants.               )
   _____
9
   CHICAGO TRANSIT AUTHORITY,          )
10                                     )
11          Counter-Plaintiff,         )
12  vs.                                )
13  CHRISTOPHER GEORGE PABLE,          )
14          Counter-Defendant.         )
15                  The Deposition of MICHAEL HAYNES,
   called by the Defendants for examination, pursuant
16  to Notice and pursuant to the Federal Rules of Civil
   Procedure for the United States District Courts,
17  taken before Victoria D. Rocks, CSR, and Notary
   Public in and for the County of Cook, State of
18  Illinois, held remotely, commencing at 9:00 o'clock
   a.m., on the 16th day of March 2021, A.D.
19
20
21
22
23
24

Page 2

```
 1  APPEARANCES:
 2
        LAW OFFICE OF TIMOTHY A. DUFFY
 3      MR. TIMOTHY A. DUFFY
        725 West Orchard Circle
 4      Lake Forest, Illinois  60093
        Tduffy@tduffylaw.com
 5
        appeared on behalf of the Plaintiff;
 6
 7      TAFT STETTINIUS & HOLLISTER, LLP
        MS. ELIZABETH BABBITT
 8      MS. ALLISON CZERNIAK
        MS. NICOLLETTE KHUANS
 9      111 E. Wacker Drive, Suite 2800
        Chicago, Illinois  60601
10      ebabbitt@taftlaw.com
11      appeared on behalf of the Defendant,
        CTA;
12
13      SMITHAMUNDSEN
        MR. STEVEN JADOS
14      MS. JULIE FRIEDLANDER
        3815 E. Main Street
15      Suite A-1
        St. Charles, Illinois  60174
16      sjados@salawus.com
17      appeared on behalf of the Defendant,
        Clever Devices, Ltd.;
18
19      LADUZINSKY & ASSOCIATES, PC
        MR. STEVEN LADUZINSKY
20      216 S. Jefferson Street, Suite 301
        Chicago, Illinois  60661
21      sladuzinsky@laduzinsky.com
22      appeared on behalf of Michael Haynes.
23
24
```

Page 3

```
 1              I-N-D-E-X
 2
 3  WITNESS:  MICHAEL HAYNES
 4  Direct Examination by MS. BABBITT:   8 - 238
    Cross-Examination by MR. JADOS:   238 - 256
 5  Cross-Examination by MR. DUFFY:   256 - 277
 6
    EXHIBITS                          PAGE
 7
    Exhibit 1  email July 5th         57
 8  Exhibit 2  email 7-28-12          62
    Exhibit 39  excerpt of web history  88
 9  Exhibit 3  email 8-17-17          94
    Exhibit 4  email 8-20-18          102
10  Exhibit 5  email 8-20-18          108
    Exhibit 8  Harrington email       118
11  Exhibit 9  email 8-24-18          121
    Exhibit 10 email                  123
12  Exhibit 40 email 8-31-18          128
    Exhibit 41 email 8-31-18          132
13  Exhibit 13 email 10-22-18         161
    Exhibit 15 employee ethics act    164
14  Exhibit 17 email 10-24-18         169
    Exhibit 46 email 10-24-18         175
15  Exhibit 47 email                  176
    Exhibit 26 phone messages         201
16  Exhibit 36 email 12-6-18          217
    Exhibit 49 text messages          218
17  Exhibit 33 email 11-20-18         222
18
19
20
21
22
23
24
```

Page 4

```
 1      THE VIDEOGRAPHER:  We are now on the record.
 2  Today's date is March 16, 2021, and the time on the
 3  monitor is 9:10 a.m.
 4      This is a remote video deposition of Michael
 5  Haynes in the matter of Christopher George Pable
 6  versus Chicago Transit Authority and Clever Devices,
 7  Ltd. filed at the United States District Court for
 8  the Northern District of Illinois, Eastern Division,
 9  case number 19 CV 7868.
10      The court reporter is Victoria Rocks, and I
11  am the videographer, Michael Alexander, both with
12  Veritext Midwest.  Beginning with the noticing
13  attorney, counsel and all present please state your
14  appearances and affiliations for the record.
15      MS. BABBITT:  Good morning.  My name is
16  Elizabeth Babbitt, B-a-b-b-i-t-t, on behalf of the
17  Chicago Transit Authority.
18      MS. CZERNIAK:  Allison Czerniak,
19  C-z-e-r-n-i-a-k, also appearing on behalf of the
20  Chicago Transit Authority.
21      MS. KHUANS:  Nicollette Khuans, K-h-u-a-n-s
22  also appearing on behalf of CTA.
23      MR. JADOS:  Steven Jados, J-a-d-o-s, of
24  SmithAmundsen for defendant, Clever Devices.
```

Page 5

```
 1      MS. FRIEDLANDER:  Julie Friedlander,
 2  F-r-i-e-d-l-a-n-d-e-r, counsel for Clever Devices.
 3      MR. LADUZINSKY:  Steven Laduzinsky,
 4  L-a-d-u-z-i-n-s-k-y, on behalf of Michael Haynes.
 5      MR. DUFFY:  And Timothy Duffy on behalf of the
 6  plaintiff, Christopher Pable.  I don't think Jesseka
 7  said anything.
 8      MS. GREEN:  Jesseka, J-e-s-s-e-k-a, G-r-e-e-n,
 9  for Clever Devices.
10      THE VIDEOGRAPHER:  You may proceed.
11      MS. BABBITT:  Good morning.  As I said, my name
12  is Elizabeth Babbitt.  Thanks for joining us today.
13  Are you able to hear me?
14      THE WITNESS:  Yes, I can.
15      MS. BABBITT:  Great.  And have you ever been
16  deposed before, Mr. Haynes?
17      THE WITNESS:  Yes, I have.
18      MS. BABBITT:  How many times have you been
19  deposed before?
20      THE WITNESS:  I am going to guess about a
21  dozen.
22      MS. BABBITT:  We might talk about some of those
23  matters in a bit.  I want to make sure we're going
24  over the same ground rules that you might be
```

2 (Pages 2 - 5)

Page 6

1  familiar with.
2      Have you ever been deposed over Zoom?
3      THE WITNESS:  No, I have not.
4      MS. BABBITT:  So it is a little bit different,
5  as you could imagine.  We have got a lot of
6  attorneys here and, of course, we have our court
7  reporter, who is going to be taking down all of my
8  questions and all of your answers.  So we'll need to
9  make sure that we don't speak over each other.
10     So I will ask that you wait until I finish a
11 question before you provide an answer.  You may also
12 hear objections from attorneys, and you want to make
13 sure they are able to get those on the record as
14 well.
15     So you will need to speak up and make all of
16 your answers verbally so the court reporter is able
17 to take those answers down.  Is that fair?
18     THE WITNESS:  Understood.
19     MS. BABBITT:  So that means you won't use
20 uh-huh, uh-uh or nod your head.  You understand?
21     THE WITNESS:  I understand.
22     MS. BABBITT:  If you need a break at any time I
23 would ask that you wait until you have answered a
24 question.  And, in other words, don't have a

Page 7

1  question pending and then ask for a break.
2      Aside from that if you need a break at any
3  time let me know.  Okay?
4      THE WITNESS:  Understood.
5      MS. BABBITT:  Do you understand that you are
6  under oath, and you must tell the truth in this
7  deposition?
8      THE WITNESS:  I do.
9      MS. BABBITT:  You understand that you are
10 obligated to tell the truth just as if you were
11 sworn in under oath and sitting in a federal
12 courthouse?
13     THE WITNESS:  I do.
14     MS. BABBITT:  If I ask a question that you do
15 not understand, I will expect you to tell me that
16 you don't understand it or ask me to rephrase.  Is
17 that fair?
18     THE WITNESS:  Fair.
19     MS. BABBITT:  Otherwise, I'm going to assume
20 you understood the question as I asked it.  Is that
21 all right?
22     THE WITNESS:  Correct.
23
24

Page 8

1          MICHAEL HAYNES,
2  called as a witness herein, having been first duly
3  sworn, was examined upon oral interrogatories and
4  testified as follows:
5          DIRECT EXAMINATION
6          BY MS. BABBITT:
7
8      Q.  Where are you right now?
9      A.  I am in Mr. Steve Laduzinsky's conference
10 room in Chicago, Illinois.
11     Q.  And what device are you using to
12 participate in this deposition?
13     A.  There's a Mac book and an Owl camera
14 attached to it.
15     Q.  Do you have any other devices with you
16 right now?
17     A.  I have two cell phones sitting on the
18 table.  One is a work phone, and one is my personal
19 phone.  Both are on silent.
20     Q.  I would ask that you don't communicate
21 with anyone during the course of this deposition
22 aside from your attorney unless we're on a break.
23 Is that fair?
24     A.  Understood.

Page 9

1      Q.  Is there anyone else in the room with you
2  right now aside from your attorney?
3      A.  Not at the moment.
4      Q.  Have you taken any medications in the last
5  24 hours?
6      A.  Yes.
7      Q.  Any medication that could impact your
8  ability to testify in any way today?
9      A.  No.
10     Q.  Is there any reason that you wouldn't be
11 able to give full, complete and truthful testimony
12 as you sit here today?
13     A.  No, there is no reason that I could not
14 give full and complete testimony as I sit here
15 today.
16     Q.  Great.  Do you have any written or
17 electronic information with you as you sit in the
18 deposition right now?
19     A.  No.
20     Q.  You understand that aside from the
21 exhibits I share with you, you are not permitted to
22 consult any materials whether on your phone or
23 computer as we're in the deposition?
24     A.  Understood.  I brought an old resume to

3 (Pages 6 - 9)

Page 10

1 help jog my memory, if that is something we need to
2 discuss.
3     Q.  Fair enough.  If we do I'll ask you, and
4 you could look at it then.  Fair enough?
5     A.  Yes.
6     Q.  You said that you had been deposed I think
7 you said about a dozen times before?
8     A.  Probably.  Trial twice.  Maybe a half
9 dozen to a dozen at least.
10     Q.  Were those civil lawsuits or depositions
11 then?
12     A.  Every deposition I have ever given it was
13 on behalf of the CTA related to my role at the
14 Chicago Transit Authority.
15     Q.  When was the last deposition you gave, if
16 you recall, approximately?
17     A.  It would have been 2018, probably spring
18 or summer of 2018 would be the best recollection.
19     Q.  Were you ever named as a party in any of
20 those lawsuits?
21     A.  Never.
22     Q.  Have you ever brought a lawsuit yourself?
23     A.  No, I have not.
24     Q.  In those lawsuits, were any of those

Page 11

1 lawsuits relating to an employee or a former
2 employee of the CTA suing the CTA?
3     A.  No.
4     Q.  How did you prepare for this deposition?
5     A.  I reviewed the complaint as filed on the
6 Pacer federal records documentation site.
7         I think there was about, I don't know,
8 about a 15 page document.  I reviewed that.  I
9 reviewed some resumes.  I reviewed my old job
10 description, which I also have as a printed copy in
11 case it's necessary and just kind of thought through
12 events of the past to refresh my memory and try to
13 center myself to the conversation and topic at hand.
14     Q.  I think you said you reviewed the
15 complaint in this case.  You reviewed an old job
16 description and reviewed a resume that you had of
17 yourself.
18         Did you review anything else?
19     A.  Other than the stuff that I prepared I
20 believe back in November, October or November
21 subject to the production subpoena.  I did not
22 review any of that additional material in detail to
23 prepare for today.
24     Q.  So when you say you reviewed those

Page 12

1 materials that you produced in response to the
2 subpoena, are you referring to the e-mails and the
3 text message information that you produced?
4     A.  Yes.  But, as I said, I haven't looked at
5 them since October, November when I produced them
6 for you at that time.
7     Q.  Understood.  And did you do anything else
8 to prepare for the deposition?
9     A.  I tried to stay calm.
10     Q.  And who have you spoken to about this
11 deposition?
12     A.  My wife.  I think I mentioned it to my dad
13 and my attorney.
14     Q.  No one aside from those three individuals?
15     A.  Not to my knowledge that I have said
16 anything.  In fact, at work I said I was taking a
17 personal business day.  I haven't really disclosed
18 anything that I was taking a deposition today.
19     Q.  When was the last time you communicated
20 with Mr. Pable?
21     A.  A text message through the Signal app.
22 Perhaps last week I think he sent me a joke or
23 something.  We're friends.  So some light
24 communication.

Page 13

1         I have not had any face to face
2 communication with Mr. Pable.  The last time would
3 have been October of 2020.  We met for lunch.
4     Q.  You said you exchanged a text message
5 through the Signal application with Mr. Pable, is
6 that right?
7     A.  Correct.
8     Q.  And when you text message with Mr. Pable,
9 have you texted about anything that is the subject
10 of this lawsuit?
11     A.  Yes.
12     Q.  Yes, you have?
13     A.  Yes, I have.
14     Q.  All right.  When was the last time you
15 messaged with Mr. Pable about the subject of this
16 lawsuit?
17     A.  Probably last week.  He was indicating who
18 was being deposed next or that sort of thing.
19     Q.  What else has Mr. Pable communicated with
20 you about via text message regarding this lawsuit
21 that you can recall?
22     A.  Well, all the messages would have been
23 through the Signal app.  And there's no history of
24 them past 24 hours.  The messages self erase.

4 (Pages 10 - 13)

Page 14

1    Any of the conversations would have been
2    very on the surface who was being deposed, just
3    general sort of status of checking in on how this
4    whole process is going for him.
5    Q.  Did Mr. Pable provide you with any
6    information about testimony you should give here
7    today?
8    A.  No.
9    Q.  Did Mr. Pable ever communicate with you
10   about this litigation aside from using the Signal
11   text messaging?
12   A.  No.  Other than in person and again the
13   last time we were in person was October 22,
14   somewhere in there, in 2020.
15       And before that would have been probably
16   a year prior, if not at least early 2020 at the most
17   recent.
18   Q.  When you met with Mr. Pable I think you
19   said in October of 2020, you discussed this
20   litigation at that time?
21   A.  And the subject came up we were meeting
22   for a friendly lunch.  I don't recall the details of
23   our conversation other than at that time checking in
24   on what he was talking about, what was going on and

Page 15

1    the progress of it.
2    Q.  Do you recall anything about what
3    Mr. Pable shared in that lunch regarding this case?
4    A.  Just that depositions were being set up in
5    early May or coming up in a few months.  I think
6    that was October.
7        So some of the materials had just been
8    provided.  I think kind of his status and his
9    thoughts on how the progress was going.  Obviously,
10   I'm interested in the case.  I don't have a vested
11   interest, but I am interested in it from the
12   standpoint of knowing when I would have to appear
13   and that sort of thing.
14   Q.  And did you discuss or communicate in any
15   way with Mr. Pable about the materials you produced
16   in response to the subpoena you were issued?
17   A.  I think I mentioned that I found a Signal
18   message log and turned that over as well as e-mails.
19   Q.  Any other conversations or communications
20   about that with Mr. Pable?
21   A.  No.
22   Q.  When did you start using Signal as a
23   messaging application?
24   A.  I don't know exactly when.  I know that

Page 16

1    Mr. Pable and I initially communicated via Google
2    Hangouts and then Google Hangouts sort of stopped or
3    went away.
4        And Chris was always sort of adverse to
5    text messaging, regular SMS messaging.  So at one
6    point he told me about the Signal app.  I can't
7    remember whether it was two phones ago or three
8    phones ago at this point.
9        And I used that app exclusively to
10   communicate with Mr. Pable.  And again, I kind of
11   can't remember the exact time or date that I started
12   using that app to communicate with Mr. Pable.
13   Q.  Did Mr. Pable suggest that you use the
14   Signal messaging application?
15   A.  Yes.
16   Q.  And do you use the Signal messaging
17   application to communicate with anyone else?
18   A.  No.  I believe at the time I did use the
19   Signal app to communicate with some others, but
20   really the Signal app was an app that was used to
21   communicate with Mr. Pable.
22   Q.  I mentioned that you had produced in
23   response to the subpoena the Signal message log,
24   right?

Page 17

1    A.  Correct.
2    Q.  Do you recall how far back the Signal
3    message log went?
4    A.  Yes.  It would have gone until -- it would
5    have started.  There's an exhibit.  I don't have it
6    in front of me, but the top one was a message
7    somewhere in the vicinity of the day that we were
8    both brought in for questioning by the CTA.
9        I remember and vividly recall meeting at
10   a Starbucks before we both got brought in for
11   conversations with the CTA.  Presumably interviews.
12       We were on a two week paid suspension,
13   administrative leave they called it.  And in that
14   Starbucks I believe I said fine, purge all old
15   messages from that moment backwards.  CTA had not
16   told either of us the subject matter of any
17   investigation.
18       There was no protective order.  There
19   was no discussion.  Nothing was communicated, and we
20   just felt we don't need any of these old
21   conversations, and I believe that those
22   conversations were already not on Mr. Pable's phone.
23   But there was old conversations on my phone, and we
24   deleted those.

5 (Pages 14 - 17)

Page 18

1       And from that moment forward there's a
2  message log. And that was the message log that I
3  found as a backup on an old phone and was able to
4  restore that as a text dump on my computer, my
5  personal laptop and extract out those messages and
6  their raw content.
7       I believe that at some point in our
8  signal history, Mr. Pable sent what's called
9  disappearing messages such that any communication on
10  either side would automatically delete from both
11  logs, both the sender and the receiver log 24 hours
12  after eyeballs are on it.
13       So the body of messages that I was able
14  to produce was from a period of the day of my
15  ultimate untimely CTA termination and some point
16  when Mr. Pable turned on that disappearing message
17  feature.
18       Q. I see. Okay. That was helpful and a lot
19  of information. So I am going to try to unpack it a
20  little bit.
21       You mentioned that you and Mr. Pable I
22  think met at a Starbucks right around the time you
23  were placed on administrative leave from the CTA.
24  Is that right?

Page 19

1       A. We had met continuously throughout that
2  two weeks. As you might imagine when you and a
3  colleague are let go for unknown reasons and placed
4  on paid administrative leave, you tend to talk and
5  have conversations with your friends to cope and
6  manage with the stress of that.
7       So we met several times over those two
8  weeks of paid administrative leave, and we were both
9  subsequently summoned to the CTA offices for what
10  was billed as an interview. And that was the
11  interviewed that I then was ultimately either
12  terminated or I chose to resign from the CTA.
13       And prior to meeting at the CTA, we did
14  meet and console each other at a Starbucks that we
15  frequented and discussed what could they possibly be
16  asking us. There was no information provided. And
17  so at that moment prior messages on the Signal app
18  were deleted.
19       Q. So again, that is helpful. We're going to
20  get into a lot of that as you can imagine in greater
21  detail.
22       I guess I want to focus on what you said
23  a few answers ago, which was it sounded like you and
24  Mr. Pable met at a Starbucks after you were placed

Page 20

1  on leave and made the decision to purge all the
2  messages that were on your phone, is that correct?
3       A. I made a decision to purge the messages
4  that remained on my phone.
5       Q. And that was after you had been given
6  notice that you were being placed on administrative
7  leave?
8       A. Correct.
9       Q. Was that meeting at the Starbucks where
10  you purged your phone, was that before you resigned
11  in lieu of termination from the CTA?
12       A. Hour before.
13       Q. So that same day before you actually were
14  resigning in lieu of termination from the CTA that
15  is when you determined to purge your phone?
16       A. Yes.
17       Q. Was anyone else present when you were
18  meeting at the Starbucks and electing to purge your
19  phone?
20       A. No. It was a personal meeting between
21  Mr. Pable and myself in advance of walking into the
22  CTA for what amounted to be separate interrogations.
23       I might add that no information was
24  provided to me about the context of the paid

Page 21

1  administrative leave. So there really was no
2  information about what this was about. So I just
3  felt, you know, the CTA had ample time during the
4  two weeks of internal investigation while myself and
5  Mr. Pable were on paid administrative leave.
6       They had ample time to notify me that
7  relevant communications should be kept. And no
8  information was provided to me about the context of
9  the investigation. So I chose to delete all
10  personal communications that I had from my personal
11  device to Mr. Pable's personal device.
12       Q. So when you did that purge, was that just
13  purging the communications that you had exchanged
14  with Mr. Pable or was it a purging of your phone
15  entirely?
16       A. It was a purging of my communications with
17  Mr. Pable via the Signal app.
18       Q. So you had already been using the Signal
19  app at that point in time, around the time you were
20  placed on administrative leave?
21       A. Yes. I believe in a prior question we
22  already established that we don't know when I
23  started to use the Signal app, but it had been well
24  in advance of this, possibly a year or two at least

6 (Pages 18 - 21)

Page 22

1 which would be whenever I stopped using Google
2 Hangouts to communicate with Mr. Pable, and we
3 started using the Signal app.
4          I believe in my subpoenaed materials the
5 last ever message from Google Hangouts is provided.
6 So you could look at that production and identify
7 the last date of communication with Google Hangouts
8 would be the start date of communication with the
9 Signal app.
10   Q.   So when you determined, you said you're
11 sitting there, and you decided you were going to
12 purge the communications you had had with Mr. Pable
13 and that was purging off of the Signal App, right?
14   A.   Correct.
15   Q.   Did Mr. Pable ask you to do that?
16   A.   I don't recall if he asked me directly or
17 if it was a joint decision or if it was just a fit
18 of I am very mad that the CTA has placed me on paid
19 administrative leave for two weeks with no
20 information during that period of two weeks and is
21 now bringing me in for an interview of interrogation
22 of no explanation, at which I was ultimately
23 terminated.  I had in my possession at that time a
24 resignation letter assuming that this was going to

Page 23

1 go the worst.
2   Q.   And so you don't recall then if Mr. Pable
3 asked you to purge your phone?
4   A.   I do not recall if it was a direct request
5 or a joint decision or even if it was just a
6 personal decision of myself, screw it, I am deleting
7 all these messages.
8          Nobody told what this interrogation is
9 about and what this is all about.  We both put on
10 paid administrative leave on the same day for an
11 undetermined and unknown reason.  And I felt they
12 had ample time to tell me to maintain communications
13 during a specified period and to discuss the matter
14 of what we were being interrogated for.
15          That was not taken.  I believe anyone in
16 a position of frustration would do the same.
17   Q.   Were there any communications that you
18 purged from that phone that you were concerned the
19 CTA might review if they had access to it?
20   A.   No, because I had no knowledge of what the
21 CTA was actually after at that moment.  And they had
22 ample time if they needed to state that that was the
23 subject of that.
24          And I felt that those conversations were

Page 24

1 personal and without any information as to what this
2 interrogation that I was walking into was related.
3 So there was nothing communicated to me for any kind
4 of preservation.
5   Q.   What phone were you using at the time that
6 you purged it in 2018?
7   A.   It was whatever the phone was before the
8 phone that I have now, which I used until sometime
9 in December of I think 2019, I think I got a new
10 phone.
11          The phone that I am currently using I
12 believe I got in 2019.  I do not know when I started
13 using the prior phone, but the phone prior to this
14 phone would have been the phone in question.  And I
15 hope that answers your question.
16   Q.   So you don't know the model or what sort
17 of phone you had prior to the one you are using
18 right now?
19   A.   It was a Motorola Android phone.  I have
20 always used Android phones.  Generally they have
21 been Motorola.  I'm pretty sure.  My current phone
22 is a Motorola, and my last phone was a Motorola.
23          I don't remember or waste time
24 remembering model numbers of my phones.

Page 25

1   Q.   Do you still have that phone in your
2 possession?
3   A.   At my house.  It's been -- I cleaned it
4 off because I was planning to use it for the kids.
5 It's basically an empty phone.
6          I transferred the content of the phone
7 to my new phone at that time when I switched phones.
8 Like I said, I used that old phone.  I had a backup
9 of those signal messages on that old phone and was
10 able to restore a bio off that old phone in order to
11 produce the materials requested by the production
12 subpoena of October of 2020.
13   Q.   Where do you live, Mr. Haynes?
14   A.   ████████████████████████████
15 ████████████████████████████
16   Q.   Are you married?
17   A.   Yes.
18   Q.   And to whom are you married?
19   A.   Trinity Mary Zevallos.
20   Q.   Can you spell that?
21   A.   Her maiden name is Z-e-v-a-l-l-o-s.
22   Q.   When did you get married?
23   A.   October 13, 2007.
24   Q.   I think you said you mentioned kids.  Do

7 (Pages 22 - 25)

Page 26

1 you have children?
2    A.  I do.
3    Q.  How many?
4    A.  Two.
5    Q.  I'm sorry, could you say that again.  I
6 think you cut out.
7    A.  Two children.  I have two children.
8    Q.  Do you live in your home with your wife
9 and your two children?
10   A.  Yes, I do.
11   Q.  Does anyone else live with you?
12   A.  No, they do not.
13   Q.  And how old are you, Mr. Haynes?
14   A.  Forty three.
15   Q.  What degrees do you hold?
16   A.  I have a bachelors of science in civil
17 engineering from Lafayette College,
18 L-a-f-a-y-e-t-t-e, in Easton, Pennsylvania.
19       And I have a masters of science and
20 transportation engineering from the University of
21 Texas at Austin.
22   Q.  When did you get your bachelors degree?
23   A.  In 1999.  I'm sorry, the masters degree
24 was December of 2000.  The undergrad was 1999.

Page 27

1    Q.  So a bachelors degree in 1999 and masters
2 in 2000, you said?
3    A.  Correct.
4    Q.  Do you hold any other professional
5 certifications?
6    A.  No, I do not.
7    Q.  Where are you currently employed?
8    A.  I am currently employed by Transdev North
9 America based in Lombard, Illinois.
10   Q.  How long have you worked there?
11   A.  I started there in May of 2019.
12   Q.  What is your role there?
13   A.  I am the director of business improvement.
14   Q.  I know you ended your employment with the
15 CTA obviously in November of 2018.  Any employment
16 between the CTA and picking up your role at
17 Transdev?
18   A.  I was on unemployment and received
19 unemployment compensation from the time I left CTA
20 to the time I started with Transdev Services North
21 America.
22   Q.  Do you maintain any other secondary
23 employment?
24   A.  No, I do not.

Page 28

1    Q.  Do you recall when you began working at
2 the CTA?
3    A.  September 30, 2002.
4    Q.  What job were you hired into at the CTA?
5    A.  Project coordinator APC slash IT in the
6 planning department.
7    Q.  How long were you in that department for?
8    A.  I believe until 2004.  At some point in
9 the planning department I was promoted to project
10 manager.
11       Before then taking a position in the IT
12 department, a lateral move.  Also project manager
13 and that I believe was around 2004.
14   Q.  It might make things quicker and perhaps
15 easier on your memory if we start in reverse order.
16 So can you remind us of what your last title that
17 you held at the CTA was?
18   A.  Working backwards, my last title at the
19 CTA was manager transit systems support.
20   Q.  How long were you in that role?
21   A.  I believe that that role started in 2015,
22 early 2015.
23   Q.  And you remained in that role from 2015
24 through 2018?

Page 29

1    A.  Correct.
2    Q.  What was the title that you held before
3 you were the manager in transit support systems or
4 systems support rather?
5    A.  There was a point where I was senior
6 project manager.  I don't know the exact year, but
7 somewhere along the line there was a reorganization.
8 Basically everybody lost their jobs and go to
9 reapply for these positions, that kind of game that
10 occurred.
11       At some year prior to that, again, if I
12 pull up my resume I could give you those exact
13 years.  So the senior project manager and prior to
14 that was project manager.  And prior to that was
15 projectt manager in the planning department and then
16 we're back to the first job project coordinator APC
17 in the planning department.  So four total titles.
18   Q.  Perfect.  So in that role that you had
19 from 2015 to 2018, did you supervise Christopher
20 Pable in that period of time?
21   A.  Yes, I did.
22   Q.  Did you supervise anyone else aside from
23 Mr. Pable during that period of time?
24   A.  Yes, I did.

8 (Pages 26 - 29)

Page 30

1    Q.  Could you tell me who else you supervised
2 while you were in that role?
3    A.  In that role I supervised two. And at one
4 time I believe there were three additional positions
5 that reported to me, both sort of programmer
6 analysts.
7       I believe Chris was a programmer
8 analyst three. And I had a programmer analyst two.
9 And I don't recall the exact titles of everyone, but
10 I had about three staff, three positions. I think
11 that got cut down to two and a number of people in
12 and out of them.
13    Q.  Who did you supervise at the time you left
14 the CTA besides Mr. Pable, if anyone?
15    A.  Mr. Phil Vanasse, V-a-n-a-s-s-e, if I were
16 to suggest the spelling.
17    Q.  And do you recall how long you supervised
18 Mr. Vanasse?
19    A.  I do not. I believe it was about a year
20 and a half at the time of departure.
21    Q.  You supervised Mr. Pable. Was anyone else
22 a supervisor to Mr. Pable during the time of 2015 to
23 2018, a direct supervisor, I should say?
24    A.  No. The entire time that Mr. Pable was at

Page 31

1 the Chicago Transit Authority, I was his direct
2 supervisor.
3    Q.  And who did you report to from 2015 to
4 2018?
5    A.  I don't know exactly when Mr. Psomas
6 started, but I reported to a Mr. Jim Psomas,
7 P-s-o-m-a-s.
8    Q.  And you reported to him directly in 2018,
9 is that right?
10    A.  Correct.
11    Q.  Do you know who Mr. Psomas reported to?
12    A.  At the time in 2018, it would have been
13 Veronica Alanis. A-l -- I really can't remember the
14 last name.
15    Q.  I believe it's A-l-a-n-i-s. Does that
16 sound right?
17    A.  That sounds correct.
18    Q.  I think you mentioned obviously you had
19 your personal cell phone in 2018. Did you also have
20 a cell phone issued by the CTA?
21    A.  No, I never had a cell phone issued by the
22 CTA. I believe for a period of six months I had a
23 Blackberry issued to me for a little while and
24 returned that.

Page 32

1    Q.  And what e-mail addresses do you use or
2 maintain, Mr. Haynes?
3    A.  I have one personal e-mail,
4 mhaynes001@gmail.com.
5       At one point I had an older hotmail
6 account, so mhaynes001@hotmail.com Years ago I set
7 that up to forward to the gmail. And I really never
8 looked back. So I have no access to the old
9 hotmail.com, which was years ago, decades ago
10 probably at this point. I have one e-mail address,
11 the gmail address.
12    Q.  So the hotmail account, fair to say you
13 never communicated with Mr. Pable to or from that
14 hotmail account?
15    A.  Very fair to say.
16    Q.  Any other e-mails that you use or
17 maintain?
18    A.  I have a work e-mail.
19 Michael.Haynes@transdev.com. Of course, I don't
20 maintain that. That is maintained by my current
21 employers.
22    Q.  Have you communicated with anyone about
23 this litigation in that e-mail account?
24    A.  Absolutely not.

Page 33

1    Q.  And you produced a set of e-mails. I
2 think you touched on them earlier that appeared to
3 be from your gmail account mhaynes001 and that was
4 in response to a subpoena, is that right?
5    A.  Correct.
6    Q.  Are you the author of those e-mails that
7 you produced that came out of mhaynes001, if you
8 know?
9    A.  Yes, I am the only one with access to the
10 mhaynes001@gmail.com account.
11    Q.  Do you use any social media, Mr. Haynes?
12    A.  Yes.
13    Q.  What sort media do you use?
14    A.  I have a Facebook account, a Twitter
15 account, and a LinkedIn account.
16    Q.  What is your Twitter handle?
17    A.  Oh, gosh. I don't really know. I use it
18 to look at other things and news.
19    Q.  Have you ever posted on your Twitter
20 account regarding anything that is the subject of
21 this lawsuit?
22    A.  Absolutely not.
23    Q.  Have you ever posted on your Twitter
24 account about anything relating to the Chicago

9 (Pages 30 - 33)

Page 34

1 Transit Authority?
2    A.  No.  I was not even an active user of
3 Twitter when I was there.  I think I had set up the
4 account while I was at the CTA, but I never posted
5 anything.  Maybe a picture of me or a picture of a
6 bus.  I would have to look.
7    Q.  What about Facebook.  You said you had a
8 Facebook account.  Is that an account that you still
9 actively use?
10    A.  Yes.  I post very infrequently.  Mostly to
11 give family updates and some information.
12 Occasionally, I will post a picture I think in a
13 rare post I take a picture of myself and posted it,
14 actually one of us.
15        But I never posted anything on there that
16 would have been related to this in any way.
17    Q.  By this you mean the subject of this
18 lawsuit?
19    A.  Or even my departure from CTA.
20    Q.  Aside from posting on the social media
21 platforms, have you ever exchanged communications
22 about the CTA or about the subject of this lawsuit?
23    A.  Not to my knowledge.  I mean like I said I
24 discussed this with my father and my wife and my

Page 35

1 attorney here.  And that is really it.  And never
2 via a social media platform to a broader audience.
3 Never.
4    Q.  And you also mentioned you had a LinkedIn.
5 The same questions there.  Never posted or
6 communicated about anything related to this lawsuit
7 on your LinkedIn account?
8    A.  Absolutely not.
9    Q.  Do you use any other social media
10 platforms?
11    A.  No.
12    Q.  Have you ever since 2018 to the present
13 used any other social media platforms?
14    A.  No.
15    Q.  I'm sorry, say that again.
16    A.  From 2018 to present no, no other social
17 media platforms.
18    Q.  I know you mentioned that you used the
19 Signal application to communicate with Mr. Pable,
20 correct?
21    A.  Correct.
22    Q.  And are there any other communication
23 platforms or applications that you use to
24 communicate with people?

Page 36

1    A.  I use the What's App application.  I use
2 that for exclusive communication with my wife, and
3 there are a couple of groups we chat with,
4 particularly because her brother lives out of the
5 country.  So this What's App works a lot better.
6        So my inlaws and my brother-in-law and
7 some groups that are on that What's App and some
8 other friends.
9    Q.  And do you communicate with anyone who was
10 ever an employee of the CTA on What's App?
11    A.  No, I don't.  I never have.
12    Q.  Do you use the What's App or have you ever
13 used the What's App to communicate about your
14 departure from the CTA or the subject of this
15 litigation?
16    A.  No.
17    Q.  So aside from Signal and What's App, I
18 believe you mentioned that you used Google Hangouts
19 until it died?
20    A.  I used Google Hangouts to communicate with
21 Mr. Pable.  That was the only function of Google
22 Hangouts.
23        I think I tried once or twice to video
24 chat with my father and his grandchildren, one point

Page 37

1 just to try it.  That was before of course the world
2 now has a zillion ways of communicating with video.
3 But I have not used Google Hangouts since that died
4 and one again I only used Google Hangouts for
5 communications with Mr. Pable.
6    Q.  All those Google Hangouts communications,
7 were they saved in your Google cloud or backup
8 space?
9    A.  I believe so, and I produced the last
10 message from that, which was well in advance of 2018
11 showing that that was the last message ever
12 communicated via Google Hangout with Mr. Pable.  And
13 I don't have it in front of me.  You probably do in
14 the exhibits.  I believe it was 2016.  Don't quote
15 me on that.  It will be in your records.
16    Q.  Sure.  Aside from Google Hangouts and
17 those other communication platforms we discussed,
18 anything else that you use, Mr. Haynes?
19    A.  Regular SMS like the rest of the country
20 or the world.  So text messages very rarely with my
21 wife.  There are group chats I have on text messages
22 with some friends.
23        I have not used that to communicate with
24 this litigation other than hey, I had a deposition

10 (Pages 34 - 37)

Page 38

1 today or something like that to a friend.
2         Mostly it was just my wife. And the
3 SMS, I do not use SMS with my wife. I use the
4 What's App platform.
5     MS. BABBITT: Well, I think now would be a good
6 time to take a break and maybe we could go off the
7 record.
8     THE VIDEOGRAPHER: We're going off the record.
9 The time on the monitor is 9:57 a.m.
10         (Recess)
11     THE VIDEOGRAPHER: Back on the record, the time
12 on the monitor is 10:07 a.m.
13 BY MS. BABBITT:
14     Q. Mr. Haynes, we were discussing before the
15 break a little bit about the use of the Signal
16 application and how you purged messages when you
17 were sitting at a Starbucks with Mr. Pable.
18         Do you recall that testimony?
19     A. Yes.
20     Q. And can you tell me how you went about
21 purging those messages on your phone?
22     A. Select all delete.
23     Q. Was there any other mechanism or anything
24 that you would need to do within the Signal app to

Page 39

1 remove those messages?
2     A. No.
3     Q. And was Mr. Pable the only person you were
4 communicating with in 2018 on the Signal
5 application?
6     A. To my knowledge, there might have been one
7 or two others.
8     Q. Do you recall who those others would have
9 been?
10     A. Potentially Jackie Johnston. Perhaps Phil
11 Vanasse. And the Signal App at the time was
12 configured to be my SMS.
13         So everything was in one place, but all
14 the SMS messages were over in SMS land. So Signal
15 was just doing the Signal communications with
16 Mr. Pable and, like I said, one or two others.
17     Q. When you purged those Signal messages, did
18 you also purge the communications with those one or
19 two other folks you were communicating with that
20 Signal application?
21     A. Not at that moment.
22     Q. So you just selected the communications
23 with Mr. Pable on the Signal App and purged those?
24     A. Correct.

Page 40

1     Q. We're going to talk about what we refer to
2 as the skeleton key, relating to Clever BusTime.
3         Do you know what I'm referring to when I
4 refer to the skeleton key, Mr. Haynes?
5     A. Yes.
6     Q. Was that yes, you broke up?
7     A. Yes.
8     Q. Were you ever made aware at any point in
9 time that Clever Devices had sent a notice to the
10 CTA, informing the CTA that you and Mr. Pable had
11 exploited a vulnerability in the BusTime system by
12 injecting a customer alert into the API of another
13 Clever customer?
14     A. Only after all of this started did I learn
15 that Clever Devices sent a letter to the CTA
16 regarding the issue at hand, which is what
17 ultimately led to the CTA placing myself and
18 Mr. Pable on paid administrative leave.
19     Q. Do you recall when you learned that that
20 letter was sent from Clever to the CTA?
21     A. I don't. I believe I learned it from
22 Mr. Pable in the months after as he began to look
23 into filing the case.
24     Q. Is it fair to say you were not aware of

Page 41

1 that letter at the time that you left the CTA
2 employment?
3     A. It is fair to say that.
4     Q. And were you aware then while you were
5 employed by the CTA that Clever had informed the CTA
6 that the actions taken on the Dayton system violated
7 the Clever contract and possibly violated federal or
8 state law?
9     A. Are you referring to the contents of this
10 letter?
11     Q. Yes. If you know that Clever communicated
12 those things to CTA?
13     A. I was not aware of any of that at the time
14 of my forced resignation from the CTA.
15     Q. When did you become aware of that?
16     A. I stated I do not know exactly when I
17 became aware of the content of the letter from
18 Clever Devices to the CTA.
19     Q. Did Mr. Pable ever share that letter with
20 you?
21     A. I believe he did, and I believe that's how
22 I was able to see that letter. I do not know when
23 or under what circumstances I laid eyes on that
24 letter.

11 (Pages 38 - 41)

Page 42

1  Q.  Do you know if Mr. Pable sent that letter
2 to you?
3  A.  I believe it's my understanding it was
4 probably sent through the Signal App sometime after
5 our mutual departure or after our departure from the
6 CTA and in the lead up to or after his filing this
7 case.
8  Q.  So your recollection is that Mr. Pable
9 sent you that letter informing the CTA from Clever,
10 informing the CTA of the Dayton issue through the
11 Signal application?
12  A.  Correct.
13  Q.  And did you communicate with Mr. Pable
14 about receiving that?
15  A.  I'm sure I did.  Thanks.  Wow, I can't
16 believe they did that.  Those messages would have
17 been deleted 24 hours after submission.
18  Q.  Right, because you guys make sure that all
19 those messages disappear right away, right?
20  A.  There's a configuration in the Signal app
21 called disappearing messages as previously stated
22 where messages delete on both sides.
23  Q.  I think you mentioned that Mr. Pable set
24 it up so that the messages delete on both sides, is

Page 43

1 that right?
2  A.  As I understand it, either party can
3 choose to have disappearing messages set up, and I
4 do believe that it's Mr. Pable that initiated that
5 initial disappearing.
6  Q.  Did Mr. Pable tell you he was configuring
7 your messages with him to be set up in that way?
8  A.  The Signal app notifies you as a little
9 message that says disappearing messages set to 24
10 hours or one day or something.
11  Q.  And did you discuss having it be set to
12 disappearing messages with Mr. Pable before he made
13 that change?
14  A.  I don't recall discussing that with him.
15 And I believe I just saw it and said okay, messages
16 are disappearing within a day.  Okay.  Fine.
17  Q.  Did you discuss that with Mr. Pable that
18 he changed that after you saw the disappearing
19 messages?
20  A.  I don't believe I ever referred to
21 commented on it, no.
22  Q.  You mentioned that Mr. Pable sent you that
23 correspondence, that letter from Clever to the CTA
24 on the Signal app.

Page 44

1  What other materials do you recall
2 Mr. Pable shared with you relevant to this case or
3 relevant to the CTA via the Signal app?
4  A.  I believe he shared with me some of the
5 materials that he was producing for his attorney or
6 some of the other background information on the
7 case.
8  Again, none of it saved to my phone for
9 more than a day and was just viewed within the
10 Signal app itself.  I don't believe files ever come
11 down or stay on the local phone device.  I believe
12 it was just the letter and some exhibits or
13 production materials or responses to his lawyer.
14  Q.  So Mr. Pable shared communications that he
15 had with his lawyer with you?
16  A.  I believe he shared copies of something
17 that he was preparing to send.
18  Q.  What was that?
19  A.  I don't recall exactly.  I believe at one
20 point there was a, hey, this is what I'm going to
21 reply to my lawyer.  And I looked it over and
22 thought okay.  Again, I am not a party to this.  I
23 am just sort of interested.
24  Q.  Understood.  And so those communications

Page 45

1 that he shared with you, do you recall what the
2 subject matter of them was specifically or even
3 generally?
4  A.  Just some general can you believe this is
5 what, you know, what they did or how this came
6 about.  And where the progress or where the state of
7 things were.
8  Generally nothing that wasn't then
9 later subsequently available on the Pacer website
10 that the federal government maintains for the court
11 records.
12  Q.  How do you know that those materials ended
13 up on the Pacer website for the court?
14  A.  I got myself an account for Pacer and
15 checked on the status of this.
16  Q.  So you have a log into the Pacer system
17 for the Northern District of Illinois?
18  A.  The Northern District of Illinois, it's an
19 account with the Pacer system.  You get 30 free, ten
20 cent pages a month.  And I have pulled down a number
21 of the documents in the docket.
22  Q.  And do you pull those down after Mr. Pable
23 alerts you that something has been filed?
24  A.  No.  I check it maybe once a week, once a

12 (Pages 42 - 45)

Page 46

1 month. Just kind of curious about the status of
2 what's going on with this.
3    Q.  We talked a bit.  I think I had a question
4 if you were familiar with the skeleton question.
5        Can you describe the skeleton key for
6 me, Mr. Haynes?
7    A.  Yes.  The skeleton key is an API key that
8 is universal to all of the Clever Device's BusTime
9 systems.  It consists of a long list of letters and
10 random characters.
11        Think of it as the worst password that
12 you ever had to type.  And Mr. Pable informed me
13 that this skeleton key seemed to be in existence in
14 the CTA system and seemed to be a global key that
15 could do anything in the BusTime system.
16    Q.  So you said Mr. Haynes -- or Mr. Pable
17 informed you that the skeleton key exists, is that
18 right?
19    A.  Right.
20    Q.  Do you recall when Mr. Pable informed you
21 that the skeleton key existed?
22    A.  It was in the days prior to the incident,
23 in August of 2018.  He informed me that there was
24 this skeleton key and what it could do and that it

Page 47

1 was sort of a wide open access to the BusTime API,
2 where it was not managed in the normal BusTime admin
3 console for like a developer or for an application
4 where we would assign or develop a key or produce a
5 key for an individual developer with rights.
6        He indicated this was sort of a back end
7 key that was not reported in that log.
8    Q.  How was the key discovered?
9    A.  To my knowledge at the time, Mr. Pable was
10 looking into some issues that we had been having
11 with an upgrade to the BusTime system.
12        And in his work of getting that upgrade
13 to work successfully he ran what's called a Wire
14 Shark trace.  Wire shark is a way of listening to
15 network traffic.  The network traffic that he
16 listened to was between servers on the CTA's private
17 network.
18        So this is sort of listening to the
19 traffic on the wire between two servers and saw this
20 string that was common as plain text.  He is one of
21 the most talented individuals I know and was able to
22 deduce that this set of characters was actually an
23 open API key.
24        That is how the back end, the Clever

Page 48

1 Devices system communicated with other components.
2    Q.  And you mentioned that Mr. Pable I think
3 used something called Wire Shark trace to listen to
4 the network traffic, right?
5    A.  Right.
6    Q.  Is that something that Mr. Pable did in
7 the course of his work with the CTA, using the Wire
8 Shark trace?  I'm sorry, I cut you off.  What did
9 you say?
10    A.  Yes.  Even I used the Wire Shark
11 application as part of normal business for the CTA,
12 diagnosing and troubleshooting issues with
13 connectivity between buses and servers and servers
14 and servers and trains and buses and internal
15 trains.
16        The Wire Shark was something that was
17 commonly used to sort of diagnose and understand
18 root cause problems between systems.
19    Q.  And you said that Mr. Pable was able to
20 deduce that it was a skeleton key.  Did Mr. Pable
21 explain how he was able to deduce that?
22    A.  I am sure he did at the time in broad
23 general terms.  I don't recall the details of that
24 other than hey, Mike, I saw this in the Wire Shark

Page 49

1 trace that I was looking at when I was working on
2 solving the latest BusTime upgrade issues.
3        This looks like a generic API key and
4 would potentially work on other BusTime systems and
5 have a higher level of access than even the standard
6 developer API keys or the restricted developer API
7 keys.
8    Q.  And as you understood it, was Mr. Pable
9 able to deduce that that string of characters was
10 able to do that simply by looking at the key?
11    A.  Simply by looking at the network traffic
12 and the packets of information that were going from
13 one server, one of the CTA's Clever Device's servers
14 to another.
15        I believe the DCC and BusTime, which is
16 the day communications controller and the BusTime
17 applications server.  He might have been looking at
18 it as the test server.
19        Typically when we do an upgrade, we have
20 a test version of BusTime and a production version
21 of BusTime.  Both were accessible to the outside
22 world.  One would have been the new version we were
23 going to and was working, and the other was sort of
24 the old one.  And in the course of the upgrade there

13 (Pages 46 - 49)

1 were problems getting the new upgrade, the server
2 upgrade. And he had been investigating that. And I
3 don't recall whether he was investigating it
4 directly on the production server or on the other
5 server, but determined that this string of
6 characters was an API key and had higher levels of
7 access and seemed to come on both systems, but not
8 available in the BusTime administration tool.
9     Q.  Did Mr. Pable explain to you how he
10 determined that it would provide that sort of
11 access?
12     A.  I think he saw it in this and tested it
13 against the test server.  He shared that key with
14 me, and we were able to test that key against both
15 our test and production servers.
16     Q.  Did Mr. Pable test it on the test server
17 first, you said?
18     A.  Again, I don't know the exact
19 circumstances other than it was related to an
20 upgrade and during an upgrade we had a test server
21 at CTA, a test server on the outside which is
22 AmericanEagle.com, which is the web hosting.
23         There's a test server in the world, a
24 test server at CTA, and there's a production server

1 at CTA and a production server out in the world.
2 Actually, there are two called a load balancer and
3 how that works is a bit of a mystery to me, but at
4 the time I had diagrams and understood.
5         Where Mr. Pable tested and exactly where
6 he tested the API key is not known to me.
7     Q.  But did Mr. Pable test the key and report
8 to you that he had tested it on either the CTA's
9 test server or production server and explained what
10 he discovered?
11     A.  To my knowledge he found this, showed that
12 it did what it did, and brought it to my attention
13 immediately.
14     Q.  When you say showed that it did what it
15 did, could you tell me what you mean by that?
16     A.  He explained that this was sort of a
17 generic API key.  I am, of course, well versed in
18 the API keys, having managed multiple myself for
19 internal applications at the CTA.
20         I also would occasionally approve API
21 keys for external users.  And so I knew what keys
22 could do.  I had been very involved in the
23 development of the BusTime API, conversations with
24 Clever years prior and knew about the API keys.

1         He explained that this was an API key
2 that was not issued or managed by us, the CTA IT in
3 the BusTime administration console.  Mr. Pable
4 informed me that this was actually a key used
5 internal to the system to communicate with itself
6 internally, and he had found it through a Wire Shark
7 trace.
8     Q.  Did Mr. Pable inform you that he had
9 tested it on the CTA server to do what you just, in
10 fact, described it to be?
11     A.  I don't recall exactly whether he informed
12 me that it did that or if we immediately turned
13 around and tried it and said oh, yes, this key gives
14 you access.  And it's not a key we ever issued, was
15 ever managed in the BusTime admin console.
16     Q.  So you don't recall as you sit here today
17 whether or not you with Mr. Pable sat and attempted
18 to test the skeleton key in the CTA system?
19     A.  I know that I participated and tested it
20 myself on both the test server and the production
21 server.  Whether Mr. Pable did it prior to me or
22 whether he did it with me, I do not recall.
23     Q.  And I know that you said Mr. Pable deduced
24 it by reviewing what he got from I think the Wire

1 Shark usage.
2         Did you ask Mr. Pable to do what he was
3 doing with respect to using Wire Shark or direct him
4 to do it?
5     A.  I know he was tasked at the time with
6 assisting Clever Devices with getting this upgrade
7 off the ground.  I know that there was a BusTime
8 upgrade in June, I believe, of 2018 that had gone
9 awry.  And I think it was our second or third time
10 trying to get this upgrade off the ground.
11         And that he worked with Clever Devices
12 technical staff to try to troubleshoot and get that
13 off the ground.  And I believe at that time he
14 learned about that there was a service bulletin API
15 that was something we had been asking for Clever
16 Devices to give a quote on for some time that we
17 wanted that feature.
18         I don't know exactly where he learned of
19 the key's existence.  And I don't recall exactly
20 what testing was being done in August specifically,
21 but we were responsible for the upgrades,
22 maintenance and security of the BusTime application.
23 So he would have been looking at and validating that
24 all systems are operational, safe, secure and

14 (Pages 50 - 53)

Page 54

1 functional.
2    Q.   And do you recall what computer the
3 skeleton key was found on when it was initially
4 discovered or identified?
5    A.   The initial finding of it would have been
6 using Mr. Pable's machine.  Whether he was remote
7 desk topped to one of the other servers is unknown
8 to me, but he would have been sitting at his desk at
9 his cubicle using his work station.
10        Possibly remote desk topped to one of
11 the production or test servers to identify and
12 troubleshoot issues related to BusTime.  And gotten
13 that information, I believe he e-mailed me that key
14 combination because it's not the kind of thing you
15 want to write down on a piece of paper because it's
16 several characters long.
17        So the CTA would have a record of that
18 e-mail from Mr. Pable to me with the key.  And then
19 I would have simply used the key in a web browser to
20 return information from our production BusTime
21 server and say wow, there's a key that gives access
22 to the broader BusTime system.
23    Q.   So when Mr. Pable found that key, did he
24 communicate that he found that key to you verbally

Page 55

1 or in person?
2    A.   Yes.  He was sitting right next to me.  We
3 share a cubicle half wall.
4    Q.   Do you recall what he said to you and how
5 you responded?
6    A.   He said he had found a global key that
7 seemed the back end communications, and he was quite
8 concerned.
9        If I recall correctly, he probably
10 pulled me into a conference room to speak privately
11 and explain what this was.  And again, there are two
12 sort of incidents.  There's an earlier incident in
13 June where we were investigating a BusTime upgrade
14 issue, and he found under the service alert API end
15 points I believe they're called.
16        And then there was, in August there was
17 a bit more.  And I can't recall exactly whether --
18 the skeleton key potentially was found as part of
19 that upgrade, but the severity of the API key was
20 identified potentially later in August.
21        So when he identified that there was
22 this key and that he was concerned, I then tested
23 that key on our production and test servers and saw
24 that okay, this key works on both of these.

Page 56

1    Q.   And you mentioned that Mr. Pable told you
2 about it, and I think you said he pulled you into a
3 conference room to discuss it, is that right?
4    A.   To my knowledge, yes.
5    Q.   What did you say to Mr. Pable when he told
6 you about this key?
7    A.   I don't recall exactly what I said.  I
8 believe I was concerned that there was, you know,
9 some general vulnerability there.
10        Chris always was generally more
11 concerned about security and erred on the side of
12 caution and concern more than myself necessarily.
13        And I believe we raised that issue or
14 that there was a potential key.  Again, I am fuzzy
15 on the differences between what happened in June and
16 what happened in August.  Somewhere along the line
17 in August it was brought to my attention that this
18 was a more serious issue and that this key could
19 ultimately get into other systems.
20    Q.   And by other systems, do you mean other
21 transit systems?
22    A.   Yes.  It worked on both of our production
23 and test server, and he said it was generic in
24 nature, that it was in the code -- not in the code

Page 57

1 in the conversation, in the packets that were going
2 back and forth between internal things.
3        And that that code was also accessible
4 externally.  We became concerned, and we tested it
5 against other transit agencies and our servers.
6    Q.   Let's turn to CTA Exhibit 1 if you are
7 able to, Mr. Haynes.  Let me know when you are
8 there.
9    A.   Yes.
10    Q.   So if you could go to the last page of CTA
11 Exhibit 1.  It should be an e-mail dated July 5 from
12 Tony Coppoletta.  Let me know when you see that.
13    A.   Yes.  This is an e-mail from Tony
14 Coppoletta.
15    Q.   You see Mr. Haynes it says hi, guys, and
16 it's to you and Mr. Pable, right?
17    A.   Correct.
18    Q.   "I am wondering if you had a chance to
19 talk to Clever about closing a loophole in the
20 hidden APIs that you found."  Do you see that?
21    A.   Yes.
22    Q.   Can you describe what hidden APIs is Tony
23 referring to there?
24    A.   So this is from July.  So this would be

15 (Pages 54 - 57)

Page 58

1 shortly after June, which was the upgrade. And
2 these were related to the service bulletin APIs.
3         In the process of upgrading the BusTime
4 server and troubleshooting the issues with the
5 BusTime server, Mr. Pable found that there were end
6 points or hooks to doing automated updates to the
7 service bulletins. The bus tracker systems had an
8 opportunity to post bulletins or service
9 information.
10        And it had long been a desire of ours to
11 consolidate that because the Chicago Transit
12 Authority people in Anthony's group, Tony was the
13 director of external communications, and his staff
14 would enter information into an American Eagle
15 website for the customer alerts API and also for bus
16 tracker enter the same or similar alert, copy and
17 paste it into the BusTime application. And we had
18 long wanted a way of saying no, let them just enter
19 them into the CTA's customer alerts API and let's
20 have BusTime read the customer alert to keep itself
21 up to date.
22        And that's exactly what this is
23 referring to. This e-mail is referring to have you
24 had a chance to talk to Clever about getting access

Page 59

1 to, legitimate access to these APIs that had been
2 found. And we had that as an action tracker items
3 with Clever Devices to get a quote because Tony is
4 interested in hey, should I start talk to my folks
5 at American Eagle so we could start to have customer
6 alerts talk to each other -- I shouldn't do hand
7 motions, but showing that the two systems would be
8 talking to each other over these APIs that Chris had
9 found in the system as part of the upgrade.
10    Q. So the hidden APIs are the APIs that
11 Mr. Pable found that would allow the systems to talk
12 to each other for lack of a better word?
13    A. Correct, and those were identified in June
14 as part of this aforementioned upgrade.
15    Q. How were those hidden APIs found by
16 Mr. Pable?
17    A. My understanding is it would have been
18 through the Wire Shark traces that he had collected
19 in an effort to troubleshoot the issues that we were
20 having with the bus tracker upgrade of June of 2018.
21    Q. How did you learn that these hidden APIs
22 were discovered?
23    A. Mr. Pable informed me and would have
24 informed me at some point prior to this July 5

Page 60

1 e-mail in June. And we had raised it to
2 Mr. Coppoletta, hey, the opportunity exists.
3 Technologically the opportunity exists to have the
4 CTA customer alerts API, which was controlled by
5 Mr. Coppoletta and the bus tracker API, which was
6 ultimately controlled by my group and by extension
7 Clever Devices.
8    Q. Did ask Mr. Pable to look for or locate
9 these hidden APIs?
10    A. No, I did not. They were stumbled upon
11 and found in the course of the troubleshooting this
12 June 28 issue.
13    Q. Did you alert Clever to the discovery of
14 these hidden APIs?
15    A. Yes, we informed Clever, look, these hooks
16 are here and actually at the time our concern, the
17 reason he states closing the loophole in the hidden
18 API, the reason Mr. Coppoletta is concerned is that
19 in theory any developer with one of these, with a
20 standard API key where the API key had access to the
21 restricted fields.
22        So by way of explanation the API when
23 you would query the server for information you would
24 get back information about the bus, about the

Page 61

1 predictions, about the route.
2        We had initially asked for operator ID
3 number and the speed of the bus. We had felt at CTA
4 that that information was not something that the
5 general public or the general developer should have
6 access to. So as part of an upgrade to BusTime well
7 in advance of this, the concept of a restricted API
8 key was born.
9        The restricted API key gave you access
10 to the operator badge and the speed. We only used
11 that internally and for occasional developers of the
12 academic sort that were interested in studying data
13 of the CTA.
14        When Mr. Pable found these hooks in the
15 API that were undocumented about the service
16 bulletin, we recognized that a restricted API key
17 would theoretically be able to post a service alert
18 in the BusTime system.
19        Mr. Coppoletta was concerned about that.
20 He's concerned about it, but also interested and
21 intrigued by it because it would solve the problem
22 that I mentioned earlier about double entry of
23 customer alerts where we could tie the systems
24 together.

16 (Pages 58 - 61)

1    Q.  So my question was did you alert Clever to
2  that issue and is your answer to that yes?
3    A.  Yes.  We asked them to price it so we
4  could A, have them close the loop that was above and
5  B, so we could utilize that functionality with our
6  own restricted internal key to facilitate the
7  aforementioned communication between servers.
8    Q.  Exhibit 2 is the next e-mail, a July 12th
9  e-mail that you sent to Clever.  Do you see that,
10  Mr. Haynes?
11    A.  Working on it.  Yes.
12    Q.  And you say in there that you want a quote
13  for use of the service bulletin API, is that right?
14    A.  Yes.  Please work up a quote for us to use
15  the undocumented BusTime service bulletin API.
16    Q.  And in this e-mail in CTA Exhibit 1,
17  Mr. Haynes, you also said please list on the quote
18  a discount for a bug bounty for finding a security
19  issue.  Do you see that?
20    A.  Yes, I do.  And I don't recall typing
21  that, but now that it's in front of me I see that.
22    Q.  What is a bug bounty, Mr. Haynes?
23    A.  The idea that, hey, we finding a problem
24  and a security risk in your system, looking out for

1  the needs of the public, not just here, but also at
2  other locations.
3       I believe the next line I mention
4  something called TTC, which is the Toronto Transit
5  Commission where we saw exposed credentials in the
6  application.  So what is common in the world as I
7  understand it of security is hey, look we found a
8  problem in your system, but it's with a feature that
9  we actually want.
10       So in here, and this is the kind of -- I
11  am a very casual e-mailer.  I kind of throw ideas
12  out there to see if they stick against the wall and
13  sort of hey, let's get a quote for using the CTA
14  bulletin API and not for nothing.  We found, public
15  civil servants of Chicago found a problem with our
16  vendor's software.
17       The citizens of Chicago and the CTA
18  should probably get some credit for our ingenuity
19  of finding an issue for getting this feature.  That
20  is throwing it against the wall.  Clever comes back
21  with a quote of $20,000.  Whatever their quote was,
22  we wanted this feature.
23       So the CTA was going to take that under
24  advisement and to cure that upgrade as part of our

1  BusTime system.
2    Q.  So that bug bounty that you requested,
3  have you ever requested a bug bounty from Clever
4  before?
5    A.  I wouldn't know unless I saw every e-mail
6  I had ever written.  We had monthly meetings with
7  Clever Devices, and there were many times over the
8  course of my time with the CTA we found problems
9  with Clever's systems, and we joked we're over here
10  making their systems more secure or better.
11       A lot of ideas that came out of
12  particularly my head as well as my staffs' head
13  ultimately became features in Clever Device's
14  products that they then sold and made a profit.
15  Well, those ideas were coming from a public servant.
16       So I am looking for recognition on
17  behalf of the public in getting sort of features
18  that ultimately benefit the public based on the
19  provisions that we're finding issues and fixing
20  problems.
21    Q.  So you had asked Clever Devices for bug
22  bounties before.  Is that what you're saying?
23    A.  You're saying that.  I am just saying we
24  would talk about the benefits that myself and my

1  staff provided to Clever Devices on a routine basis.
2    Q.  Do you recall if you ever requested a bug
3  bounty from Clever aside from this instance?
4    A.  No, I do not.
5    Q.  Do you recall discussing a bug bounty with
6  Mr. Pable before you requested it in this e-mail on
7  July 12?
8    A.  I don't know.  I would probably -- this
9  was typed at 3:18 p.m.
10       Mr. Pable would have probably been
11  walking out the door at that time.  He was an early
12  starter to 3:00, 3:30.  So I probably didn't.
13    Q.  You mentioned in this e-mail there's an
14  issue of exposed TTC credentials, which you
15  indicated referred to the Toronto Transit
16  Commission, correct?
17    A.  Correct.  I believe in Mr. Pables'
18  investigation of the BusTime admin issue or what was
19  going on, he found credentials in plain text I
20  believe that the TTC, Toronto Transit Commission was
21  using.
22       We addressed it in the mail.  I even
23  stated we don't require these immediate fixes for
24  the security issue, but hey, we want to get access

Page 66

1 to this BusTime API service bulletin and get a quote
2 for that so we could start working on it.
3     Q.   Right.  So my question is about the
4 Toronto Commission credentials.  Is that referring
5 to a user name and password from someone in the
6 Toronto Transit Commission?
7     A.   As I understand, there's a generic user
8 and password for sending the customer alerts and
9 that's the extent of my knowledge, and it's all
10 being refreshed by seeing it in this e-mail.
11    Q.   So do you recall what that user name was
12 that was discovered from Toronto?
13    A.   No.  I only recall it because of the three
14 words in this e-mail that you presented to me.
15    Q.   Do you know anyone who is employed by the
16 Toronto Transit Commission?
17    A.   No.  I believe in my professional world I
18 have had a casual relationship with somebody who
19 formerly worked there who now works for Transdev,
20 but he would have been far removed from any of this.
21       And as stated earlier, I never
22 discussed anything related to any BusTime at CTA
23 with anybody at my current employment.
24    Q.   That's the only individual you know of or

Page 67

1 knew of that worked at the Toronto Transit
2 Commission?
3     A.   Correct.  And I know I didn't reach out to
4 anyone at the TTC at this time.
5     Q.   Let's turn back to the first page of CTA
6 Exhibit 1.  So that will be at the top, Mr. Haynes.
7        Let me know when you're there.  It's an
8 e-mail you sent on August 14.
9     A.   Yes.  Yes, I see this.
10    Q.   And this is August 14.  You again asked
11 for a quote for the service bulletin API, is that
12 right?
13    A.   Yes.
14    Q.   And then you also say, "I suppose we could
15 blackmail with a threat of a message in TTC's
16 System."
17       Do you see that?
18    A.   Yes.  And I have not seen that before.
19 And in hindsight, that is a terrible sentence to
20 have written, given what ultimately occurred
21 throughout this.  And that message is going to Carl
22 Komosa's Snapchat with a copy to Erik Mills, Scott
23 Chapius.  Chris Pable and Tom Silvestri, those are
24 both internal CTA.

Page 68

1        Mr. Komosa, Mr. Mills and Mr. Chapius
2 are all colleagues from Clever Devices at the
3 project management level.  There is nothing --
4 Mr. Lang and others higher up are not on this
5 thread.
6     Q.   My question was just it says that you got
7 this comment about I suppose we could blackmail with
8 the threat of a message, right?  And you wrote that
9 e-mail, correct?
10    A.   Correct.
11    Q.   Were you suggesting that you or someone at
12 the CTA could post a message in the TTC's customer
13 alerts?
14    A.   I am suggesting that it is possible.  In
15 no way am I even contemplating actually doing that.
16 It's hyperbole.
17    Q.   Can you turn to CTA Exhibit 2, Mr. Haynes.
18 Let me know when you're there.
19    A.   Working on it.
20    Q.   So on CTA Exhibit 2, there's a bunch of
21 messages.  The third message down is this note from
22 Tony Coppoletta to you copying Mr. Pable on
23 August 14 at 2:01 p.m.  Do you see that?
24    A.   Yes, I do.

Page 69

1     Q.   It begins any news on this.  I'd really
2 like to be enacting this ASAP.
3        Do you see that from Tony Coppoletta?
4     A.   Yes.
5     Q.   So in this e-mail Mr. Coppoletta is
6 referring to that issue that you explained to me
7 about people in his team having to duplicate their
8 efforts of entering information into the system,
9 correct?
10    A.   Correct.
11    Q.   And then the e-mail above that is from
12 Mr. Pable to you on August 14 at 2:23 p.m.  Do you
13 see that, Mr. Hayes?
14    A.   I do.
15    Q.   He says is this something you want to make
16 an API compatible path that we could use until we
17 could officially do it.
18       Do you see that?
19    A.   Yes.
20    Q.   What do you take that to mean, Mr. Haynes?
21    A.   I take it to mean Chris, Tony is really
22 looking for this in advance of getting the quote
23 from Clever since we have knowledge of how this
24 works.

Page 70

1      Chris is asking me in this to allow him
2 to develop what's needed on the test server so that
3 when Clever does sort of give us the permission to
4 utilize the hidden BusTime service bulletin API
5 we're ready to go.
6      And we have already worked with Tony's
7 group so that we could line it up as soon as we get
8 a quote and pay for it.
9    Q.   And the e-mail above that, that's an
10 e-mail of you responding to Mr. Pable in CTA
11 Exhibit 2 on the same day on August 14.
12      Do you see the top e-mail?
13   A.   Yes.
14   Q.   And you say yes, let's make an unofficial
15 method and push for it to be official.
16   A.   Yes, I see that.
17   Q.   You were agreeing with Mr. Pable that he
18 could make something unofficial until you got
19 something approved through Clever or licensed
20 through Clever, is that right?
21   A.   Yes, and I indicate make an unofficial
22 method, and we will push for official.
23   Q.   So was the CTA using this unofficial
24 method until the official method came through Clever

Page 71

1 Devices?
2    A.   Well, this is Tuesday August 14, and this
3 is only the discussion of me saying yes, let's get
4 started on the development work.  So if we could do
5 development work off the test server, not in
6 production, not in public use and start to have the
7 conversations that are necessary to have with Tony's
8 team and his contractor in advance of making sure
9 that all of this is going to work.
10      It's very common in our work to make
11 sure that things are going to work before you then
12 turn around and say when you get the quote from
13 Clever.  And now I've got to go internal CTA and say
14 to my boss we should spend X on this because it will
15 do Z.  And it's nice to have Z proven out that it's
16 going to work before you spend the money on the X
17 that you want.
18   Q.   My question is a little different.  So you
19 approved that Mr. Pable should go forward with an
20 unofficial method or develop an unofficial method to
21 do this.  Is that fair?
22   A.   To begin that effort, correct.
23   Q.   And so did you or Mr. Pable create an
24 unofficial method that was then used prior to

Page 72

1 getting a license from Clever on using that API?
2    A.   I really don't recall how much further we
3 went on this other than to kind of test it out.  We
4 never got a quote from Clever Devices to continue.
5 So I don't have access to subsequent e-mails here.
6      But it's possible we got busy with other
7 items and didn't actually do that.  I don't recall
8 having this unofficial method other than me saying
9 yes, go ahead, get started.  Take a look at it.
10   Q.   So we're done with CTA Exhibit 2.  But I
11 want to turn your attention and your memory, Mr.
12 Haynes, to the use of the skeleton key and the
13 discovery of the skeleton key.
14      And a few days later after this e-mail
15 on August 17, the skeleton key was tested on the
16 Dayton system.  Do you recall that?
17   A.   Was August 17 a Friday?
18   Q.   Yes, August 17, 2018.
19   A.   Yes.  So this e-mail the 14th was sent in
20 follow up to what was in June.  And the skeleton key
21 would have been identified in those days after this
22 on either the 16th or the 17th and ultimately tested
23 against the Dayton system on the 17th.
24   Q.   So who first attempted to use the skeleton

Page 73

1 key on the Dayton system?
2    A.   I discussed it with Mr. Pable when he
3 raised the issue that there was a skeleton key.  I
4 used that skeleton key to test against our test
5 servers as well as a bunch of other sites that I had
6 listed as Clever Devices' BusTime clients and
7 BusTime sites.
8      And we picked out of a hat Dayton.  And
9 I said if this API key not only as an open API key,
10 but also is an exploitable path for service alerts.
11 Let's see if this API does what we think it would
12 do.  And if this API key exists in our system and it
13 works on somebody else's system, then it means that
14 the CTA has a global vulnerability inside of its own
15 system.
16   Q.   So who first attempted to use the skeleton
17 key on the Dayton system?
18   A.   I would have done that with Mr. Pable at
19 the same time.  I would not have the knowledge to
20 type the commands.  I do believe I am the individual
21 that pressed enter and executed the command.
22      I could not generate the command.  I
23 did not have the necessary skills for that.  I know
24 that on Friday, August 17, Mr. Pable was against the

19 (Pages 70 - 73)

Page 74

1 idea of the test. And I suggested I think we should
2 do this so that we could prove to ourselves and
3 others that this is as serious as we're making it
4 out to be. And I am sure that I am the one that
5 pressed enter.
6    Q.  And so if you could set the scene for me a
7 little more on that, that is really helpful,
8 Mr. Haynes.
9        You are with Mr. Pable at the CTA
10 headquarters at your desks?
11    A.  Yes.
12    Q.  And were you seated in front of your
13 computer, and Mr. Pable was seated in front of his
14 computer?
15    A.  Our arrangement was I had a desk
16 immediately next to him and then we had a work
17 station across the aisle.
18        I bounced between the work station
19 spending a lot of my time at the work station and
20 occasional time at my own desk. And so Chris and I
21 could diagonally see each other across the aisle of
22 cubicles. We would talk all the time. We were
23 coworkers. PreCovid you could talk and work
24 together in person.

Page 75

1        He would have said something. I would
2 have been at the other terminal work station that I
3 was at. And I believe I had a LINUX terminal
4 connected to my own work station, and we were
5 testing things. I looked up the Dayton website and
6 said, well, as a test it doesn't impact anybody.
7        Let's find an alert on somebody's system
8 that is just a benign alert and just host that alert
9 again, and we'll take the period off the end so that
10 we know it's a duplicate. And all we did was I
11 found an alert on the Dayton system about a bridge
12 being out of service, the Keowee Bridge over
13 whatever river runs through Dayton, and we saw that
14 there was an alert in their system about that.
15        We copied the text. I would have
16 e-mailed that over to Chris or have Chris copy it
17 out of the Dayton page. He reformulated the command
18 that would reissue that alert, minus the period, and
19 we executed that and confirmed on the Dayton website
20 that yes, in fact, we had duplicated the alert.
21        Chris, before we even started that, I
22 said make sure that you have the commands to delete
23 the duplicate at the ready in case this does work.
24 We'd like to send an issue command to delete it

Page 76

1 immediately, having already tested these commands on
2 our own CTA test server by posting an alert and
3 removing the alert with the global API key.
4        So he worked up the commands and had
5 them at the ready. I came over to his desk. We
6 talked about it, and I struck the enter key, and we
7 sent the message.
8    Q.  So I am going to unpack that a little bit.
9 That was a lot of information. It was helpful.
10        So you said that you picked Dayton out
11 of a hat. When you say we, are you referring to you
12 and Mr. Pable deciding to pick Dayton or did you
13 specifically pick Dayton?
14    A.  I picked Dayton.
15    Q.  You did, right?
16    A.  Right.
17    Q.  And then you explained you didn't have the
18 knowledge or skill set to develop the commands to
19 execute this test on Dayton. Is that fair?
20    A.  Fair.
21    Q.  And so Mr. Pable created those commands
22 for you?
23    A.  Yes.
24    Q.  And did Mr. Pable do that at his desk

Page 77

1 station on his computer?
2    A.  Yes.
3    Q.  And did you observe Mr. Pable inputting
4 those commands and setting that up for you?
5    A.  To a degree over his shoulder, yes. We
6 often worked over each others' shoulders.
7    Q.  So was Mr. Pable seated in front of his
8 computer, and you were standing behind him, behind
9 his shoulder?
10    A.  I believe that was the arrangement.
11    Q.  And how long did it take for Mr. Pable to
12 develop those commands to use to execute the Dayton
13 test?
14    A.  Maybe five or ten minutes.
15    Q.  And you may have observed Mr. Pable
16 setting that up for you, is that right?
17    A.  I may have. I mean he had just tested it
18 on our own system. So it was a matter of copying it
19 and pointing it to a different server, a different
20 web address.
21    Q.  Why did you press enter?
22    A.  Because I wanted to test that this would,
23 in fact, affect someone else's system besides just
24 the CTA's setup.

20 (Pages 74 - 77)

Page 78

1    Q.  I guess did Mr. Pable say I'm not going to
2  touch enter and so you did it?
3    A.  He was uncomfortable with the test, with
4  the idea that we were doing this.  And I sort of
5  made the unilateral decision let's do it.  And I
6  guess as a method of asserting his concerns, I
7  pressed the enter key.
8    Q.  Did he ask you to do that?
9    A.  I don't recall if we engaged in a
10 conversation or a discussion on exactly that.  I
11 don't know.
12   Q.  So you don't recall as you're sitting here
13 today whether or not Mr. Pable set up five to ten
14 minutes of code and then let you come over and press
15 enter on his computer.
16        You don't recall having any conversation
17 about that?
18   A.  I recall in the moment doing all this.  I
19 do not recall the specifics that I or Mr. Pable said
20 regarding the actual pressing of the enter key, but
21 I could tell you that I am the one who made the
22 decision.  And I am the one that pressed the enter
23 key.
24       I did not type the commands because I

Page 79

1  would not have had that skill, but I alone pressed
2  the enter key.
3    Q.  I think you said that you also had a LINUX
4  terminal set up our own work station, is that right?
5    A.  Yes.  The work station I worked at across
6  the aisle I would remote back through a terminal to
7  my own desktop, that is correct.
8    Q.  Were you using the skeleton key on that
9  LINUX terminal to do any testing of your own?
10   A.  Yes, I was.  Both on our systems and the
11 others.  My knowledge was more limited.  I did not
12 have the knowledge of the hidden API that we're
13 talking about regarding the service bulletins.
14       I did not have that knowledge or that
15 skill set, but I would run a command to benignly get
16 the current server time from another BusTime setup,
17 which proved that the key was, in fact, a generic
18 key at these other locations.
19   Q.  So you were able to test it in that way on
20 the LINUX terminal?
21   A.  Yes.  I ran a script called a Bash,
22 B-a-s-h, script that had a series of curl commands
23 or W get commands that would go out and ask another
24 BusTime server for its clock, for its server time.

Page 80

1        It is a one line response.  It is very
2  benign.  I had a list of other websites of Bus
3  Tracker due to an issue about four months earlier
4  where Clever came to us in a bit of a panic and said
5  we have to upgrade your Google Maps API key, and it
6  has to be done tonight.
7        And I said wait a minute.  You guys have
8  BusTime API key Google Maps all over the place.  And
9  at that time I had made a list and went to various
10 Bus Tracker sites that had Bus Tracker, and I was
11 looking to see what their Google Maps configuration
12 was as part of refuting Clever Devices' the sky is
13 falling, we need to update a Google Maps API key
14 integration.
15        So I had at the ready a list of websites
16 that were other Bus Tracker setups that Clever
17 Devices had implemented.  So I sent that list with
18 the API key to determine the vulnerability spread.
19   Q.  Did you do that before or after you
20 executed the Dayton test?
21   A.  That was done before the Dayton test, all
22 in the same half hour, hour.
23   Q.  I think you said that Mr. Pable expressed
24 some objections to conducting the Dayton test.

Page 81

1  Could you describe that for me?
2    A.  Mr. Pable was against it because he said
3  Mike, you know it's going to do it.  You know it
4  works.  Because if the API key, this skeleton key
5  was able to get the time from all of these servers
6  and that same key on our test server was able to
7  inject a service alert and was able to delete a
8  service alert, Chris's point was Mike, you don't
9  need to prove this.
10       You have what you need.  You know that
11 the scope of vulnerability is all of these other
12 customers by just fetching their time, their clock.
13 And you know that this key has access to that.
14       I was still wanting to know that this
15 really was as serious as Chris was making it out to
16 be.  And I felt the benign test of repeating a
17 service alert was a low risk, low penetration that
18 would prove that the vulnerability that existed at
19 CTA existed outside of CTA, and other systems
20 outside of CTA had this same code and could be
21 vectors of a problem for CTA.
22   Q.  If I am hearing you, was Mr. Pables'
23 objection that you didn't need to conduct this test
24 because you had already confirmed what you had

21 (Pages 78 - 81)

Page 82

1 viewed as a vulnerability?
2   A.  Correct.
3   Q.  And did you insist that Mr. Pable set up a
4 command for you to do this?
5   A.  I asked him to set this test up.
6   MR. DUFFY:  Chris needs a few minutes when it's
7 convenient.
8   MS. BABBITT:  Sure.  Can I ask two more
9 questions and then we'll take a break.
10   MR. DUFFY:  Yes.
11 BY MS. BABBITT:
12   Q.  I didn't catch your last answer.  Did you
13 insist that Mr. Pable create this command for the
14 Dayton test?
15   A.  I asked him to set up the command.
16   Q.  Did you pressure him in any way to set up
17 the command for the Dayton test?
18   A.  No.  I was his manager.  We had a very
19 cordial, friendly relationship.  I said let's test
20 it.  That is the extent of the insistence.
21   Q.  Can you recall any other information about
22 Mr. Pable's objections to running the Dayton test?
23   A.  Mr. Pable was always concerned about
24 security and vulnerabilities and would have

Page 83

1 naturally felt uneasy touching or doing anything
2 outside.
3       And I felt I wanted that confirmation so
4 that when we presented this case to Clever Devices
5 as an issue or as a deeper issue, it was taken more
6 seriously than the issue that we had raised in June,
7 which it's now August and that issue is still not
8 resolved.  I wanted confirmation.
9   Q.  But did Mr. Pable express his objections
10 in any way other than what you have already
11 described?
12   A.  No further information.  He expressed
13 concerns, and he said we shouldn't do that.  I said
14 I think we should.
15   Q.  And did Mr. Pable express those concerns?
16 He just said them to you out loud, is that right?
17   A.  Correct.
18   Q.  Did he communicate those concerns in
19 writing?
20   A.  No.
21   Q.  Did anyone else hear or was it within
22 earshot of Mr. Pable expressing these concerns?
23   A.  Others might have been in earshot.  Phil
24 Vanasse might have been in earshot, but didn't know

Page 84

1 what we were doing or what we were talking about.
2 It's not like there was some heated discussion,
3 debate and intimidation.
4   Q.  Okay.
5   MS. BABBITT:  Now would be a good time to take
6 a break.
7   THE VIDEOGRAPHER:  We're going off the record.
8 The time on the monitor is 11:15 a.m.
9       (Recess)
10   THE VIDEOGRAPHER:  We are back on the record.
11 The time on the monitor is 11:28 a.m.
12 BY MS. BABBITT:
13   Q.  Mr. Haynes, we were discussing before we
14 took a break executing the test on Dayton and the
15 determination of finding the skeleton key.
16       One question that I wanted to ask you
17 specifically was once you determined that there was
18 something that you viewed as a vulnerability and
19 that Mr. Pable had viewed as a vulnerability, why
20 did you decide to test it in other systems?
21   A.  To see that it was a vulnerability that
22 affected more than just us and that would indicate
23 that there is code, and the security hole that we
24 had found that is apparent with us is on others,

Page 85

1 which would then mean that there's code, this API
2 key code exists on both systems.
3   Q.  Why did you not alert Clever to that
4 before doing those tests?
5   A.  We had already alerted Clever to the fact
6 that there was this undocumented service bulletin
7 API where any restricted key would have access to
8 this.
9       And you could see that from June to
10 August, there was no acknowledgment or fix of that
11 security risk, and no quote for that functionality.
12 So before we raised or I raised another issue, I
13 wanted to be sure that this issue was as severe and
14 serious as Mr. Pable was indicating to me and had
15 confirmation that this did not just affect the CTA,
16 that this was a larger problem, bigger than just the
17 CTA's system that needed to get fixed because these
18 vulnerable systems actually made CTA's system
19 vulnerable.
20   Q.  Did you alert anyone else at the CTA once
21 those discoveries had been made in August?
22   A.  No.
23   Q.  Why didn't you?
24   A.  Honestly, the folks above me would not

22 (Pages 82 - 85)

Page 86

1 have understood, and I wanted to understand the
2 severity and how it functioned before we went
3 further.
4      I will note that Tony Coppoletta, who
5 was above me in the communications department, was
6 aware of the security vulnerability with the
7 customer alert API. And I do believe he was also
8 around when we were finding the skeleton key, and we
9 had indicated that that was a concern to him as
10 well.
11      So to the extent that others at CTA
12 knew, I felt it was also important to keep it on a
13 small basis because this is a fairly open security
14 risk. I wanted to have confirmation before I went
15 further.
16      Q. So you mentioned Mr. Coppoletta was
17 around. What do you mean by that? Was he present
18 when you tested Dayton?
19      A. I do not believe he was present when we
20 tested Dayton. I believe he was on our floor at
21 some point throughout that afternoon of Friday the
22 17th.
23      I can't say for exactly when, but he was
24 aware of, obviously aware per the e-mails of the

Page 87

1 security vulnerability with the BusTime API
2 undocumented features for the service bulletins.
3      He was made aware on that Friday. I
4 believe he dropped by at some point, and we had
5 indicated or I mentioned to him or Chris and I
6 mentioned to him that we had found this more global
7 key. To the extent I indicated to him of any of the
8 tests, I don't have any knowledge of whether I did
9 that or not or what I communicated to him.
10      Q. I think you testified that part of the
11 reason you didn't discuss it with many others at the
12 CTA was because you wanted to keep it closely held
13 because of the sensitive nature of it. Is that
14 fair?
15      A. Fair.
16      Q. And that included not disclosing that to
17 Jim Psomas or anyone above him?
18      A. Correct. And that also Jim Psomas and
19 anybody above him, the effort to explain it to them
20 did not really warrant until we got a better
21 understanding.
22      Q. I'm sorry, you cut off at the end there.
23 You didn't want to explain it to Jim Psomas because
24 why?

Page 88

1      A. Jim Psomas would not understand.
2      Q. Did you believe that there would not be a
3 way to explain it to Jim Psomas in a way that he
4 would understand?
5      A. I wanted to get further and make sure I
6 understood the full details and then allow Clever
7 Devices' technical staff to deal with it and inform
8 senior management, my management when if the issue
9 was resolved. We found this, we did this, we fixed
10 this.
11      Q. Did you discuss with Mr. Pable prior to
12 conducting the Dayton test alerting Mr. Psomas or
13 anyone else at the CTA?
14      A. I don't believe I discussed alerting
15 anyone else at the CTA.
16      Q. With Mr. Pable?
17      A. Correct, or anybody.
18      Q. Did Mr. Pable ever suggest that hey, we
19 should bring this up to Jim?
20      A. I don't recall if we had that
21 conversation.
22      Q. Could you turn to CTA Exhibit 39,
23 Mr. Haynes. It will be one you'll need to zoom in
24 on. Let me know when you're there, Mr. Haynes.

Page 89

1      A. I'm getting there. Yes, we're here, CTA
2 Exhibit 39.
3      Q. Yes. It should look like an Excel
4 spreadsheet, Mr. Haynes. This is an excerpt from
5 the web history from Mr. Pables' CTA computer from
6 August 17, 2018.
7      And I have highlighted a few rows of
8 this web history that reflects where the skeleton
9 key has been inputted. So if you could turn your
10 attention to, it's a row, the last highlighted row
11 on the first page of CTA Exhibit 39 numbered 6349.
12      Do you see that, Mr. Haynes?
13      A. I do.
14      Q. And it's dated August 17, 2018. The time
15 stamp is 11:33.37 a.m. Do you see that?
16      A. Yes, I do.
17      Q. And the URL, there is a URL connecting to
18 mybusnownjtransit.com. Do you see that?
19      A. Yes I do.
20      Q. And at the end of that there is a key
21 inputted. It says key equal sign. Then it begins
22 ambg. Do you see that, Mr. Haynes?
23      A. I do.
24      Q. And that skeleton key is the key being

23 (Pages 86 - 89)

Page 90

1 inputted that begins ambg, is that right?
2    A. Yes, that is the skeleton key.
3    Q. Are you aware of who attempted to use the
4 skeleton key to access the New Jersey transit system
5 on Mr. Pable's computer on that date?
6    A. I would assume Mr. Pable. Go ahead.
7    Q. Did you say something else?
8    A. If this is a log of records from
9 Mr. Pable's computer, then I would assume that he
10 executed this command.
11    Q. And you don't recall sitting at
12 Mr. Pable's computer and executing that on the New
13 Jersey transit system, do you?
14    A. No.
15    Q. Do you recall if you observed Mr. Pable
16 doing that on his computer?
17    A. I do not recall if I observed this.
18    Q. Did you ask Mr. Pable to input that
19 skeleton key on the New Jersey transit system site?
20    A. I don't recall. I may have e-mailed him
21 the link and said hey, did this work for you. I
22 don't know.
23    Q. Do you recall if Mr. Pable objected to
24 inputting this on his computer?

Page 91

1    A. I don't know.
2    Q. And then if you could turn your attention,
3 it's a few rows up on CTA Exhibit 39, Mr. Haynes.
4 This is row 6346. Do you see that highlighted row?
5    A. Yes, I do.
6    Q. It's also August 17, 2018, right?
7    A. Yes, it is.
8    Q. And it's just seconds later at 11:33 a.m.?
9    A. Yes, later time.
10    Q. And then the URL there, that is the
11 CTA.com BusTime tracker, right, and Mr. Pable. And
12 the URL there has the key, the skeleton key inputted
13 into the CTA BusTracker. Do you see that?
14    A. Yes, I do.
15    Q. And do you recall who made this attempt to
16 use the skeleton key?
17    A. No.
18    Q. Do you recall if you were sitting on
19 Mr. Pable's computer and used the skeleton key on
20 the CTA website?
21    A. I did not sit at or type on Mr. Pable's
22 computer.
23    Q. Do you recall observing Mr. Pable input or
24 type this on his computer?

Page 92

1    A. Not to my knowledge.
2    Q. And then if you could again on that same
3 page of the CTA Exhibit 39. There is two additional
4 rows highlighted in 6334 and 6335.
5    Mr. Haynes, do you see those highlighted
6 rows?
7    A. Yes, I do.
8    Q. And the time stamp for that is August 17
9 and now it's at 12:15 p.m. Right?
10    A. Yes. Correct.
11    Q. And the URLs for those entries, that links
12 to the Greater Dayton RTA BusTime, is that correct?
13    A. Correct.
14    Q. And then there's also a key that is
15 inputted, which is again the skeleton key that
16 begins ambg. Do you see that?
17    A. Yes.
18    Q. You believe, you said you did not type
19 anything on Mr. Pables's computer, but just to
20 confirm did you input the skeleton key into the
21 Greater Dayton RTA bus website in these instances?
22    A. Not from Mr. Pable's computer. I may have
23 copied this and pasted it and e-mailed it to him.
24    I don't have emails between myself and

Page 93

1 Mr. Pable during this time, but this is a request to
2 get the vehicle list on two routes from Dayton with
3 the skeleton key.
4    Q. And you don't recall inputting that on
5 Mr. Pable's CTA computer, is that right?
6    A. As previously stated, I did not type on
7 Mr. Pable's computer.
8    Q. Great. And did you observe Mr. Pable
9 inputting the skeleton key on the Dayton RTA
10 website?
11    A. I may have. I may have been at my own
12 desk. I don't recall.
13    Q. So you don't recall if you saw him or
14 asked him to input the skeleton key on to the Dayton
15 site?
16    A. Well, I would have for the purposes of the
17 test that was eventually performed. I don't recall
18 these instances.
19    Q. And then on the second page of CTA
20 Exhibit 39, if you can turn your attention to that.
21 There is just one more highlighted row, and it's row
22 6285, Mr. Haynes, if you see that?
23    A. Yes.
24    Q. Again, this is from Mr. Pable's CTA

24 (Pages 90 - 93)

Page 94

1 computer and his web history and that row
2 highlighted is dated August 20, 2018 at 11:03 a.m.
3 Do you see that?
4     A.   Yes.
5     Q.   And this entry in the URL is again the
6 Greater Dayton RTA's website and their BusTime
7 website.  Right?
8     A.   Yes.
9     Q.   And it's again inputting that skeleton
10 key, the key equals ambg and continues.  Do you see
11 that?
12     A.   Yes.
13     Q.   And are you aware of who inputted this on
14 Mr. Pable's machine on August 20?
15     A.   I am not aware of who typed that or
16 entered that.
17     Q.   Did you type that or input that into
18 Mr. Pable's computer on August 20?
19     A.   As previously stated, I did not type on
20 Mr. Pable's computer.
21     Q.   And was this inputted onto the Dayton
22 website on August 20th at your direction by
23 Mr. Pable?
24     A.   I don't recall.  For all I know it could

Page 95

1 be a refresh of the tab that would have been opened
2 from Friday.
3     Q.   I believe Mr. Pable had testified that
4 when he set up the Dayton test on his computer it
5 had something like an orange button that said go on
6 it.  Do you recall that?
7     A.   I don't recall the exact specifics.  I
8 remember hitting enter.  Perhaps I used a mouse and
9 clicked.  I just remember the customer alert was not
10 in a web browser.  It was in a tool that Mr. Pable
11 had set up.
12     Q.   Can you turn your attention to CTA
13 Exhibit 3, Mr. Haynes.  Let me know when you're
14 there.
15     A.   We're there.
16     Q.   So CTA Exhibit 3, the last e-mail on the
17 first page of CTA Exhibit 3 is an e-mail from
18 Mr. Pable to you dated August 17, at 11:34 a.m,
19 correct?
20     A.   Yes.  Correct.
21     Q.   And the subject is skeleton key and then
22 the body of that e-mail includes the skeleton key
23 itself, right?
24     A.   Yes, I see that.

Page 96

1     Q.   Did you ask Mr. Pable to send that email
2 to you?
3     A.   I very likely asked him to send me the key
4 so I could do the testing on my work station.
5     Q.   So that's a yes?
6     A.   Affirmative.
7     Q.   And what do you recall about that
8 conversation where you asked him to send you the
9 skeleton key?
10     A.   Hey, send me the key.  I'll test it on
11 another server.  That's what I recall.
12     Q.   Did Mr. Pable object when you made that
13 request of him?
14     A.   I do not believe so.
15     Q.   And then the next e-mail up on CTA
16 Exhibit 3 is an e-mail from again Mr. Pable to you
17 at 12:15.  And he sends you a link to the Greater
18 Dayton RTA BusTime.  Do you see that?
19     A.   Yes, I do.
20     Q.   And he says view the source, right?
21     A.   Yes, he does.
22     Q.   What did you take that to mean?
23     A.   This looks like the same URL that we were
24 just speaking about on the previous prior exhibit.

Page 97

1 And what I took that to mean was just take a look at
2 that and see that we're, in fact, getting the
3 vehicle positions for Route 60 from the Dayton
4 system with this skeleton key.  And view the source
5 would be just look at the data that it returns.
6     Q.   So that testing that Mr. Pable is
7 conducting is returning information about a specific
8 bus route?
9     A.   Right.  At the end of it, it says RT
10 equals 60 and that means Route 60.
11     Q.   Did you ask Mr. Pable to do that, to test
12 that for you?
13     A.   I don't recall.
14     Q.   Ultimately, you learned that the Dayton
15 test you conducted resulted in a tweet being pushed
16 out to Dayton's Twitter feed, is that right?
17     A.   Correct.  When the command was issued,
18 something came back that said tweet sent or
19 something.
20     Q.   So once you press enter, click the mouse
21 to conduct the test it alerted you and Mr. Pable on
22 Mr. Pable's computer that a tweet had been pushed
23 out?
24     A.   Correct.  There was some response that

25 (Pages 94 - 97)

Page 98

1 said tweet sent or something along those lines,
2 which would have indicated that the Dayton system
3 had an integration with Twitter for their alerts.
4     CTA did not have that integration set
5 up. So we were unfamiliar with that, but something
6 came back that indicated Twitter updated.
7     Q.  Were you aware that it would kick
8 something out to Twitter before you conducted the
9 test?
10    A.  I'm sorry, restate the question.
11    Q.  Were you aware that something would be
12 kicked out the Twitter from the Dayton system before
13 you conducted the Dayton test?
14    A.  No.
15    Q.  And you sent that tweet then to Mr. Pable,
16 right, on that same day in CTA Exhibit 3?
17    A.  Yes.  So that is the link.  So when I hit
18 enter and saw that, we noticed the response said
19 something about Twitter.
20        I went to my machine, went to Twitter.
21 I went to the Greater Dayton Regional Transit
22 Authority Twitter account and saw this a brand new
23 tweet with the message we just assembled minus the
24 period had just been tweeted.  And I was then giving

Page 99

1 Mr. Pable a link to that.
2     Q.  Why did you give Mr. Pable the link to
3 that?
4     A.  Just to copy it and have it as a record.
5     Q.  And then above that the top e-mail, CTA
6 Exhibit 3 is an e-mail from you to Mr. Pable that
7 says so we have them dot dot dot.  Right?
8     A.  Yes.  Looks like later in the evening
9 7:19 p.m. I sent that.
10    Q.  And then if you look at the two pages or
11 three pages that follow in CTA Exhibit 3, those are
12 the materials that you sent Mr. Pable that evening,
13 right?
14    A.  It appears to be.
15    Q.  And it's bates stamped at the bottom of
16 Exhibit 3, CTA Pable 00000654, and it's a screen
17 capture of a tweet from Greater Dayton RTA, right?
18    A.  It is, in fact, a screen shot of a tweet
19 from the Greater Dayton RTA.
20    Q.  Right.  And it includes the tweet of the
21 Keowee, K-e-o-w-e-e Street bridge, right?
22    A.  Yes.
23    Q.  And I think you mentioned that you
24 intentionally tried to drop a period out of the

Page 100

1 alert that you pushed out, right?
2     A.  Yes, I did.
3     Q.  And there is a period at the end of this
4 tweet on CTA Exhibit 3, right?
5     A.  Oddly, there is.  This is the first time I
6 am sort of recognizing that fact.
7     Q.  And is it possible that someone else
8 posted the tweet or the tweet was done that added a
9 period?
10    A.  I really don't know how the integration
11 with Twitter is.  Perhaps there were two periods,
12 and I deleted one.  I would have to see the history
13 of exactly what we sent.
14        Maybe there was a comma, and I always
15 thought it was a period.  I don't know.  I am
16 actually surprised to see a period there.  It's the
17 first time I am noticing that.
18    Q.  And you directed Mr. Pable when he was
19 preparing the test to have that period dropped from
20 the alert, is that right?
21    A.  Yes.
22    Q.  He agreed to do that?
23    A.  Yes.
24    Q.  Did Mr. Pable ask you to send these

Page 101

1 materials to him?
2     A.  No.
3     Q.  Why did you send them to him?
4     A.  For a record of what happened, what we
5 did.
6     Q.  Mr. Haynes, who is Anthony Clunies,
7 C-l-u-n-i-e-s, if you know?  And it's not in CTA
8 Exhibit 3.  So you don't need to look at that.
9     A.  The name sounds familiar.  I would need
10 more context.  I don't recall.  The name sounds
11 familiar, like a colleague in the transit world that
12 I feel like I might know him.  I don't know.
13    Q.  Are you familiar with Mr. Clunies being an
14 employee of the Toronto Transit Commission?
15    A.  No.  It does sound like somebody I might
16 have met.  Clever Devices would hold a user
17 conference and that name sounds familiar.  That name
18 sounds familiar from a guy in San Francisco.
19        But like I said, I've met a lot of
20 people, and the name sounds familiar as a colleague
21 within the transit industry.  I'm taking your word
22 for TTC.
23    Q.  Let's turn your attention to CTA
24 Exhibit 4, and this might refresh your recollection

26 (Pages 98 - 101)

Page 102

1 more, Mr. Haynes. Let me know when you have it.
2    A.   Exhibit 4?
3    Q.   Correct. Do you have that up?
4    A.   Yes.
5    Q.   That is an e-mail to Mr. Clunies at TTC.CA
6 from you, Mr. Haynes, dated August 20, 2018,
7 correct?
8    A.   Correct.
9    Q.   You say in this email to Mr. Clunies,
10 "I'll keep you posted on this. They have the
11 Twitter integration. So we actually pushed out a
12 tweet on them about a detour for a bridge that's
13 been out for months."
14    A.   Right. I see that now.
15    Q.   And then you also say in the second
16 paragraph, "Oops, but a good piece of white hat
17 hacking. I'll give you a copy of what I sent to
18 senior management at Clever Devices, probably draft
19 that up later this morning."
20        Do you see that?
21    A.   I see that now.
22    Q.   And you drafted this e-mail and sent it to
23 Mr. Clunies, correct?
24    A.   Yes. I didn't realize that I did this,

Page 103

1 but seeing it, yes. I believe that at the time I
2 was working, I was answering some questions from
3 this Anthony Clunies about some setup and some
4 configuration stuff that they were doing. And I
5 guess I thought that he should know about the issue.
6    Q.   So you alerted Mr. Clunies from the
7 Toronto Transit Commission about this issue and
8 about this test before you alerted Clever, right?
9    A.   I don't know what time the e-mail was sent
10 to Clever, but according to this I hadn't yet
11 drafted it or I maybe had it in draft.
12        I would have to refresh my memory on
13 when exactly I sent them to Clever Devices.
14    Q.   And when you said we actually pushed out a
15 tweet on them about a detour for a bridge, who are
16 you referring to when you say we?
17    A.   Myself and Mr. Pable, in terms of him
18 typing and me pressing enter as previously stated.
19    Q.   If you could turn to the second page of
20 CTA Exhibit 4. This is part of what you forwarded
21 to Mr. Clunies.
22        Let me know when you see it. It's an
23 e-mail from you to someone at greater Dayton RTA.
24    A.   Yes, I see that there. I forwarded the

Page 104

1 e-mail.
2    Q.   Can you tell me why you shared this note
3 that you sent to Dayton to Mr. Clunies in Toronto?
4    A.   As I mentioned, he and I must have been
5 working on exchanging some information and so he was
6 on the top of mind at the time.
7        And I must have thought to keep him in
8 the loop on it, and I sent it to him. As you stated
9 when you said his name, I didn't recall other than a
10 name I knew or recognized. I don't recall sending
11 these messages except that I am now seeing them in
12 front of me.
13    Q.   And with respect to the message you sent
14 to Jessica Olsen at the Greater Dayton RTA, who
15 drafted that e-mail to Jessica?
16    A.   I did.
17    Q.   Did you draft it in coordination or in
18 consultation with Mr. Pable?
19    A.   Yes.
20    Q.   Do you know if Mr. Pable reviewed the
21 e-mail before you sent it to Ms. Olsen?
22    A.   I don't know for a fact, but it's likely.
23    Q.   And who made the decision to send this
24 note to Dayton and to Ms. Olsen from Dayton?

Page 105

1    A.   I did in consultation with Chris.
2    Q.   And why did you decide to alert Dayton in
3 this way?
4    A.   Chris had told me in some communications
5 over the weekend that there's sort of a responsible
6 disclosure. And when you touch somebody else's site
7 and have impacted them, you have a responsibility of
8 notifying them of what you did and what you found.
9        And I pondered on that and thought on
10 that over the weekend, this occurring from a Friday
11 business day and then this is, as we could see here
12 8:21 a.m. on Monday, August 20. So pretty much the
13 beginning of the next business day. And I found
14 this e-mail address of this Jessica Olsen and
15 e-mailed her the story of what was done.
16    Q.   So you were communicating with Mr. Pable
17 over the weekend about what to do next after you
18 conducted the Dayton test?
19    A.   Yes. I was distraught over sort of that
20 we did this and that it worked and shoot, we've got
21 this security hole and oh, darn, a tweet went out
22 that we didn't know that was going to happen.
23        So regret on executing it and yes, there
24 was a communication between myself and Mr. Pable, as

27 (Pages 102 - 105)

Page 106

1 there was most weekends.
2   Q.   Were those communications over Signal?
3   A.   They would have been over Signal.
4   Q.   So those communications would have been
5 purged when you conducted that purging in the
6 Starbucks in November of 2018?
7   A.   They would have been purged from my phone
8 at that moment.
9   Q.   Do you know if they would have been purged
10 from Mr. Pable's phone?
11  A.   I don't know what his settings or what he
12 did with his messages.
13  Q.   Can you say that again?
14  A.   I deleted them from my phone at that
15 Starbucks.  I can't speak to what happened to his.
16  Q.   When you were with Mr. Pable when you were
17 purging your phone at the Starbucks, did he take any
18 action on his phone to purge materials?
19  A.   I don't know.  I don't recall.
20  Q.   Did he say he was going to do that to you?
21  A.   I don't know if he told me that messages
22 had already been removed from his phone or that it
23 was a moot point.
24      I don't recall any of the conversation

Page 107

1 other than that I know that I could send a text
2 message to somebody, and they delete it, and it no
3 longer exists on their phone.
4      I could sent a Signal message to
5 somebody and delete it for them, and I could also
6 send a message and delete it just for me.  So I
7 don't know what his status was.
8   Q.   And he didn't tell you when you were
9 purging your phone?
10  A.   Not to my knowledge.
11  Q.   So after you communicated with Ms. Olsen
12 at the Greater Dayton RTA and Mr. Clunies at
13 Toronto, then you determined to let Clever know what
14 had happened, right?
15  A.   Yes.  I have to look at this, but I
16 believe in here I say that we are in the process of
17 drafting a notice to Clever Devices' senior
18 management exposing the vulnerability.
19      So as early as 08:21 on Monday, the 20th
20 there was full intention of drafting and notifying
21 Clever Devices.
22  Q.   Is there a reason that you notified
23 Mr. Cluniess from Toronto and Ms. Olsen from Dayton
24 RTA before you notified Clever?

Page 108

1   A.   No reason.  I think that they were maybe
2 easier e-mails to write, and I felt a little bit
3 more time sensitive, particularly the Jessica Olsen
4 one.  Since we had interjected a tweet in their
5 system on Friday, I felt that that was the higher
6 priority.
7      So I composed that e-mail it looks like
8 within about 20 or 40 minutes.  I would typically
9 arrive at 7:45 in the morning.  So this was the
10 first thing that I did.  Forwarding it to Clunies, I
11 don't know what other communication I had with him.
12 Maybe he was already in my inbox, and I was oh, let
13 me send this to him.  I don't know.
14  Q.   Can you turn your attention to CTA
15 Exhibit 5 and go to the third page of CTA Exhibit 5.
16 Let me know when you're there.
17  A.   Exhibit 5, third page.
18  Q.   And it should begin with on August 20,
19 2018 at 1757.  Do you see this?
20  A.   Yes, I do.
21  Q.   And this is an email that you drafted to
22 Craig Lang at Clever Devices, correct?
23  A.   Correct.
24  Q.   And why did you wait until Monday morning

Page 109

1 to send this note to Clever?
2   A.   This is Monday 1757.  So that is p.m.  Can
3 you restate the question.
4   Q.   Sure.  Why did you wait to Monday to
5 notify Clever of the test you conducted on Friday?
6   A.   I really don't know.  I think I decided
7 over the weekend mulling it over and in some
8 consultation with Chris about responsible
9 disclosure, what is called responsible disclosure
10 where you find an incident of a security nature, and
11 decided that we needed to notify the manager, both
12 of Clever Devices and the Dayton folks of what had
13 transpired.
14  Q.   Prior to that were you considering not
15 informing anyone that you had conducted the test?
16  A.   It crossed my mind that really didn't have
17 to say anything to anybody.  I think the fact that
18 it pushed out a Twitter tweet was partly what took
19 me over the edge of all right, you really have to
20 explain here everything in detail.
21  Q.   Who drafted this e-mail in CTA Exhibit 5,
22 page three from you to Mr. Lang?
23  A.   I did.
24  Q.   And did Mr. Pable assist you in drafting

28 (Pages 106 - 109)

1 this email?
2  A.  I believe he did.
3  Q.  Do you recall if Mr. Pable reviewed or
4 edited the email before you sent it?
5  A.  I recall him looking over my shoulder.  I
6 don't recall any substantive changes or suggestions
7 other than maybe a sentence here or hey, clarify
8 that there.  That's all I recall.
9  Q.  You say in the e-mail that my team has
10 identified a security risk to the BusTime
11 application program interface, right?
12  A.  Yes.
13  Q.  And you say we actually successfully
14 posted a duplicate alert in Dayton's BusTime.
15 Right?
16  A.  Yes, I do.
17  Q.  And when you're referring to my team, who
18 are you referring to?
19  A.  Myself and Chris.
20  Q.  When you are referring to we actually
21 successfully posted a duplicate alert, who are you
22 referring to?
23  A.  The specific action of Chris setting up
24 the command and me pressing or checking to execute

1 it.
2  Q.  Did Mr. Pable when he was reviewing this
3 e-mail ask you to not refer to your team or to we?
4  A.  I don't recall.  I don't think so.
5  Q.  Did you share this e-mail with any other
6 CTA employees?
7  A.  I mean at the risk of a sort of a gotcha,
8 I'm sure I forwarded this to others, potentially
9 Jackie Johnston, Thomas Silvestri.  I don't know.
10  I don't have a history of my e-mails.
11 So tell me if I pushed this around.  I know I
12 sent it to my personal e-mail and my wife.  So I
13 know I shared this e-mail.
14  Q.  On the last page of CTA Exhibit 5, can you
15 look at that, Mr. Haynes.  It's also included in the
16 email to Mr. Lang in CTA Exhibit 5 and has a list of
17 properties evaluated.  Do you see that?
18  A.  This is the e-mail to Mr. Lang?
19  Q.  Right.
20  A.  You said also included?
21  Q.  It's a continuation.  It's a few pages,
22 right?
23  A.  Correct.
24  Q.  So the last page of RTA Exhibit 5, it

1 includes properties evaluated.  Do you see that?
2  A.  I do.
3  Q.  And what did it mean for a property to be
4 evaluated in this context?
5  A.  This would have been the script that I ran
6 in the test script.  I remembered that I ran a pearl
7 or W get against this list of BusTime URLs for
8 various properties and determined whether I was able
9 to get the system's time from those systems.
10  Q.  And so were you the only one who evaluated
11 these properties?
12  A.  Yes.
13  Q.  And are you the one that created the
14 mechanism for that evaluation?
15  A.  Yes.
16  Q.  Did Mr. Pable assist you in evaluating any
17 of these properties?
18  A.  Other than providing me the API key, no.
19  Q.  Was Mr. Pable aware that you were testing
20 and evaluating these other properties?
21  A.  It would have helped to review the e-mail.
22 So I think he saw that I definitely did that.  I
23 can't speak to exactly what transpired on that
24 Friday, whether he knew I was testing a larger list.

1 But it stands to reason that we would have discussed
2 it on the Friday the 17th.
3  Q.  So the properties were evaluated that you
4 have listed here in CTA Exhibit 5, they were also
5 evaluated on Friday, August 17?
6  A.  I believe so.  I would have to look at
7 history and things.  I am pretty sure I did that all
8 on Friday the 17th at or about the same time that we
9 performed the Dayton test.
10  Q.  Did Mr. Pable object to you performing
11 these evaluations of the other properties?
12  A.  I don't recall if he did or not.  This
13 test is really just asking for the time on servers.
14 So there's no interaction.  There's no pushing
15 anything up.  So it's certainly a less intrusive
16 test.
17  Q.  And you don't recall Mr. Pable objecting
18 or sharing concerns that you were conducting that
19 test?
20  A.  I don't recall.
21  Q.  Was Mr. Pable, to your knowledge, aware
22 that you were doing those evaluations?
23  A.  I believe he was.  I wouldn't know exactly
24 what we said or talked about on that day.  I believe

29 (Pages 110 - 113)

Page 114

1  he was aware that I was doing that.
2      Q.  If you could move up a bit on CTA
3  Exhibit 5, Mr. Haynes.  On the fourth page of this
4  exhibit it has a request.  Do you see that language?
5      A.  Yes, I do.
6      Q.  And it says we request that the CTA have
7  access to the customer alert insert API feature of
8  the BusTime in exchange for having found this
9  potentially serious security flaw. Please document a
10  zero cost quote and provide documentation that
11  indicates that we are allowed full access to these
12  features of the BusTime API.
13          Did you draft that request?
14      A.  I did.
15      Q.  And whose idea was it to request a zero
16  cost quote from Clever?
17      A.  Mine and mine alone.
18      Q.  And did you tell Mr. Pable that you were
19  going to make a request for a zero cost quote?
20      A.  I don't recall specifically discussing it
21  with him.  He may have seen that in the review of
22  the email.
23          I may have even typed that after he
24  reviewed the draft, I don't recall.  But the we

Page 115

1  there is 100 percent the royal me and myself and I
2  in reference to requesting a zero cost quote.  If
3  you'll recall from the earlier discussion, they have
4  not provided. Clever Devices, we asked them for a
5  quote for this feature in June.
6          It is now August, and we don't have
7  that.  We have now found two security issues.  This
8  is again somewhat hyperbole, blank threat, so to
9  speak, of hey, not for nothing we're helping you
10  here.  Of course, knowing what I know now, would I
11  ever write that, absolutely not.
12      Q.  Did Mr. Pable ever share concerns with you
13  about you making this request for a zero cost quote?
14      A.  I don't recall discussing this sentiment
15  or thought before, during or after.
16      Q.  Fair enough.  And if you could move up in
17  CTA Exhibit 5, Mr. Haynes.  The first page of CTA
18  Exhibit 5.  Let me know when you're there.
19      A.  Yes.
20      Q.  And the second e-mail on the first page of
21  CTA Exhibit 5, this is an e-mail from you to
22  Mr. Lang on August 21st, is that correct?
23      A.  Correct.
24      Q.  And it copies Mr. Pable, right?

Page 116

1      A.  Correct.
2      Q.  And then it also copies a number of other
3  Clever Devices' employees, right?
4      A.  Correct.
5      Q.  And the first paragraph of your e-mail
6  where you address Mr. Lang, you say again I am
7  apologetic that we tested this serious issue with a
8  customer.  That was inappropriate as we already knew
9  the issue was apparent.
10          What do you mean by that, we knew that
11  was inappropriate as we knew the issue was already
12  apparent?
13      A.  As I stated earlier, it was already clear
14  that this key did what we knew it would do because
15  this key let us into both the CTA's test server and
16  the CTA's private server.
17          And we also know that this key had the
18  ability to inject the undocumented service alert
19  API.  And I had run a test of this against those
20  other sites where we were able to pull the time for
21  the buses on Route 60 in Dayton.
22          So we already knew that this key was an
23  issue, and I took it a step further to prove to
24  myself that this key did do everything we thought it

Page 117

1  would do to another customer and that exposed the
2  vulnerability on both systems, and this is my mea
3  culpa.  This is my apology.
4      Q.  So Mr. Pable, like you, was also aware and
5  knew that the issue was already apparent prior to
6  conducting the Dayton test, right?
7      A.  Yes, and he objected to my direct testing
8  of the Dayton system.
9      Q.  Did he object to you indirectly testing
10  the Dayton system?
11      A.  No.  We shared that link, and you proved
12  earlier that that link was executed on his computer
13  requesting the list of vehicles on Route 60 from
14  Dayton on Friday the 17th.
15      Q.  And at the top of CTA Exhibit 5, this is
16  the forward of the chain from you to Jacqueline
17  Johnston and Thomas Silvestri at the CTA, correct?
18      A.  Yes.  I'm glad I did state earlier that I
19  did send it to those two individuals.
20      Q.  And you say that they are just for our
21  records, right?
22      A.  I do say just for our records.
23      Q.  Why did you want to send that to them for
24  your records?

30 (Pages 114 - 117)

Page 118

1  A.  In hindsight, I should never send another
2  e-mail as long as I live, but this was letting them
3  know what was transpiring.
4      Jackie was responsible for the planning
5  department side of things and attending our monthly
6  meetings with Clever Devices, and Thomas Silvestri
7  was sort of a project manager.  And so I am just
8  cluing them in.
9  Q.  And you didn't include Mr. Psomas on this
10  exchange, right?
11  A.  Yes.  No.
12  Q.  Can you turn your attention to CTA
13  Exhibit 8, Mr. Haynes.
14  A.  Yes.
15  Q.  And it's the first page, we'll see a full
16  version of the message on CTA Exhibit 8 before the
17  lower half, but the message forwarded is an e-mail
18  message from you to Tim Harrington of Greater Dayton
19  RTA, correct?
20  A.  Yes.  This is a forwarded message that I
21  sent to Tim Harrington of the RTA.
22  Q.  And then did you forward that message to
23  your personal gmail account?
24  A.  Yes, I did.

Page 119

1  Q.  Why did you do that?
2  A.  I guess I wanted a record of it, and I
3  wanted to let my wife know.  And it looks like I
4  copied Chris.  This is just pure stupidity.
5  Q.  Can you repeat that?
6  A.  This is just pure stupidity of sending an
7  e-mail from work to not only my personal account,
8  but that of Mr. Pable and my wife.
9  Q.  So why did you send it to Mr. Pable's
10  gmail account?
11  A.  I don't know.  I think this is just me
12  Friday, August 24 in the afternoon being concerned
13  about the e-mail that I sent to Mr. Harrington.
14      I thought there was a reply.  This is me
15  expressing exasperation and frustration offline to
16  my wife and my friend Chris Pable.  And I started
17  off with ugh, which I believe is exasperation.
18  Q.  At the top of CTA Exhibit 8 is an email, a
19  note, as you said, to your wife and Chris Pable at
20  their personal e-mail accounts, right?
21  A.  And it looks like it's from my personal
22  e-mail as well.
23  Q.  Right.  And you said I guess I just wish
24  we never did this last week.  Right?

Page 120

1  A.  Correct.
2  Q.  And so why were you expressing regret?
3  A.  I think it's pretty apparent from the
4  other exhibits that this sort of triggered a, shall
5  we say, shit storm.  And I'm expressing regret for
6  going down this path, and the stress of having to
7  deal with this.
8      And by this point on that week, this is
9  Friday of that Monday, and Monday was the 28th.  We
10  talked about those e-mails to Clever and to the RTA.
11  It's been a fairly stressful week, and I am
12  regretting my actions the prior week.
13  Q.  And in this message Mr. Pable or you say
14  to Mr. Pable in parens, just got your text, Chris
15  dot dot dot.  Right?
16  A.  Correct.
17  Q.  And that would have been a text message he
18  sent you via Signal, right?
19  A.  Correct.
20  Q.  So that message would have been purged
21  when you purged the other Signal messages you
22  exchanged with Mr. Pable in November of 2018?
23  A.  Correct.
24  Q.  Would you turn to CTA Exhibit 9,

Page 121

1  Mr. Haynes.  Let me know when you see it.
2  A.  I'm there.
3  Q.  This is another e-mail you sent to
4  Mr. Pable to his gmail from your gmail account,
5  correct?
6  A.  Correct.
7  Q.  In it again it has that exchange we were
8  just looking at with Mr. Harrington's note and then
9  you saying ugh, et cetera, on August 24th.  Right?
10  A.  Correct.
11  Q.  And then you also on August 24 sent an
12  e-mail that identifies patched and vulnerable
13  transit systems, is that right?
14  A.  Correct.
15  Q.  What did that mean?
16  A.  I reran the script that generated the list
17  that we looked at on the August 20th afternoon
18  e-mail to Mr. Lang, where I listed properties and
19  whether they were affected.
20      I ran that script again.  It failed on
21  the ones listed as patched, and it still succeeded
22  on the ones listed as vulnerable.
23  Q.  Did you make Clever aware that you were
24  running these evaluations or tests on August 24?

31 (Pages 118 - 121)

Page 122

1    A.  No.
2    Q.  And why were you using your gmail account
3 to share that information with Mr. Pable?
4    A.  Probably just responding to this thread,
5 and I had started it as gmail as sort of outside of
6 the purview of CTA.
7        So the risk of purging myself, I was
8 communicating work related stuff on a nonwork
9 related email.  Not proud, but that's what happened.
10   Q.  And Mr. Pable responded from his gmail
11 account and said curious about wmta, is that
12 correct?
13   A.  Correct.
14   Q.  Mr. Pable is referring to being curious
15 about the Washington metro transit, is that right?
16   A.  Yes, Washington Metropolitan Area Transit
17 Authority.
18   Q.  And you confirmed with Mr. Pable that this
19 system does not use the BusTime or BusTime alerts,
20 right?
21   A.  Correct.
22   Q.  And did you use this e-mail, your gmail
23 account on your CTA work computer?
24   A.  Yes.

Page 123

1    Q.  And was Mr. Pable using his CTA work
2 computer to correspond with you via gmail?
3    A.  I don't know if that or his phone.
4    Q.  Would you both have been at work at the
5 time that you were sending these messages?
6    A.  I could say that I was.  I can't speak for
7 Mr. Pable's whereabouts at that exact moment.
8    Q.  Let's turn to CTA Exhibit 10, Mr. Haynes.
9 And let me know when you're there.
10   A.  I'm here.
11   Q.  So if you start at the bottom of CTA
12 Exhibit 10, some of this is going to look familiar,
13 Mr. Haynes.
14       The last e-mail in this chain in CTA
15 Exhibit 10 is the message you sent to Jessica Olsen
16 at the Greater Dayton RTA, right?
17   A.  Correct.
18   Q.  And you copied Mr. Pable on that
19 transmission to Dayton?
20   A.  Correct.
21   Q.  And then it looks like in CTA Exhibit 10,
22 if you follow up that chain, Jessica Olsen forwarded
23 this note to various individuals who appear to be at
24 the Dayton RTA, right?

Page 124

1    A.  Correct.
2    Q.  And then Mr. Harrington responds directly
3 to you.  Now, I'm looking at the second page of CTA
4 Exhibit 10, right?
5    A.  Correct.
6    Q.  Yes?
7    A.  Yes.
8    Q.  And Mr. Harrington in that e-mail in the
9 third paragraph says, "In the future, will you
10 please let me know prior to attempting such quote
11 testing?  Question mark.  My boss, our CFO, was
12 quite concerned and is considering whether we should
13 be considering legal action against you."
14       Do you see that?
15   A.  Yes, I do.
16   Q.  And what did you take that to mean,
17 Mr. Haynes?
18   A.  Exactly what it stated.  There is a second
19 sentence there.  "I am working to convince her you
20 did not do or intend to do any harm."
21       And that actual statement that I did not
22 do or intend to do any harm, but it's clearly a
23 reaction from internal to the Dayton RTA.
24   Q.  So did you understand that Dayton could

Page 125

1 pursue criminal action against you or Mr. Pable or
2 the CTA?
3       MR. LADUZINSKY:  I am going to object to you
4 asking him to speculate.
5 BY MS. BABBITT:
6    Q.  You could answer, Mr. Haynes.
7    A.  I mean I take this at its words.  We could
8 even see that I responded to him later that day
9 within the hour.
10   Q.  Yes.  And we'll get to that e-mail, but my
11 question was did you understand that Dayton could
12 bring criminal action against you or Mr. Pable or
13 the CTA?
14   A.  I wouldn't know.  Not being a lawyer, I
15 wouldn't know what the legal action would be.
16   Q.  Were you concerned that Dayton could bring
17 legal action against you or Mr. Pable or the CTA?
18   A.  Sure.  Of course I was, as evidenced by my
19 response.
20   Q.  So let's turn to the top of CTA Exhibit 10
21 the first page.  And this is a forward from you,
22 Mr. Haynes, right, to Mr. Pable and Mr. Silvestri?
23   A.  Yes.
24   Q.  And you said ugh, dot dot dot, now my

32 (Pages 122 - 125)

Page 126

1 stomach is churning. Right?
2    A. Yes, I do.
3    Q. You say that -- well, let me ask you this.
4 Why were you feeling like your stomach was churning
5 after you were getting this messaging from the
6 Dayton RTA folks?
7    A. I think anytime anyone gets an e-mail that
8 says the word legal action gets concerned. I think
9 that that is a fair statement, that I would be
10 concerned.
11    Q. Did you discuss with Mr. Pable those
12 feelings?
13    A. I don't know. Looking at the time of
14 these e-mails I don't know Mr. Pable's whereabouts
15 or what. I can't speak to that.
16    Q. Do you recall discussing those feelings
17 with Mr. Pable?
18    A. I don't.
19    Q. And after the test is conducted and you
20 had these exchanges with the Dayton folks, did
21 Mr. Pable suggest to you that you should alert
22 anyone else at the CTA about what had transpired?
23    A. I don't know whose idea that was, but the
24 very next sentence here states I think we are

Page 127

1 through this. I suppose I should inform Jim and
2 Veronica maybe next week.
3    Q. Is that to say that it was your idea to
4 inform the supervisors at the CTA of what had
5 happened?
6    A. When I wrote that sentence it was in my
7 head. Whether that was discussed with Mr. Pable
8 prior to that or not, I do not recall.
9    Q. You don't recall if you discussed alerting
10 your supervisors at the CTA with Mr. Pable?
11    A. I recall discussing it from the extent of
12 do you think they even understand it or know what's
13 going on and to the extent we should probably keep
14 this to ourselves until the security issue is
15 actually resolved.
16    Q. When you say you wanted to keep the
17 security issue to yourself until it was resolved,
18 did you include in that that you didn't want
19 Ms. Alanis or Mr. Psomas to know about the security
20 issue until it was resolved?
21    A. Right. Ms. Alanis would not have the
22 capability to understand this and would likely
23 overreact to me anyway. And so I wanted to make
24 sure that we were past it and discussed the issue

Page 128

1 with them in general terms.
2    Q. I'm sorry, you said discuss it and what
3 did you say?
4    A. Discuss it with Mr. Psomas in more general
5 terms that he would understand that there was an
6 issue. We found it. We had Clever fix it.
7    Q. Was it your intention to not tell
8 Mr. Psomas that you had conducted the Dayton test?
9    A. I wasn't going to. I didn't even want to
10 tell Dayton except that then there was that tweet we
11 talked about earlier. We talked about the idea of
12 responsible disclosure where when someone finds an
13 issue what are the steps one should take to
14 responsibly tell people about the risks. So I took
15 what steps I could.
16    Q. And responsible disclosure is when you
17 find a risk, does it entail telling someone after
18 you have exploited the risk or did you tell them
19 about the risk before there is something done with
20 that risk?
21    A. It's a leading question, but I stated
22 before that my regret is I should have discussed
23 this more before testing deeper.
24    Q. So ultimately you do decide to tell

Page 129

1 Mr. Psomas something about these issues, right?
2    A. Yes. There was an email the following
3 week. And I'm sure you have it in the exhibits, and
4 we could discuss it.
5    Q. Great. Let's do that. So if you could
6 turn to CTA Exhibit 40 and let me know when you're
7 there.
8    A. We're there.
9    Q. Okay. So Exhibit 40, Mr. Haynes. This is
10 an e-mail from Mr. Pable to you dated August 31,
11 2018. Correct?
12    A. Yes.
13    Q. And this appears to be an e-mail drafted
14 to Jim on your behalf that Mr. Pable sent to you.
15 Right?
16    A. Yes. It looked like we worked on this
17 together possibly at his machine and interacted it
18 and sent it to me to ultimately cut and paste and
19 send to Mr. Psomas.
20    Q. Could you tell me what you recall about
21 discussing the drafting of this e-mail with
22 Mr. Pable?
23    A. I don't know other than we must have been
24 discussing this shortly after lunch on Friday,

33 (Pages 126 - 129)

1 August 31 and discussed how best to go about
2 informing more senior management.
3    Q.   Did you ask Mr. Pable to draft this for
4 you?
5    A.   I'm sure that I did if he's emailing me a
6 draft.
7    Q.   Did Mr. Pable object or have any concerns
8 about drafting this e-mail for Mr. Psomas?
9    A.   I don't know if he replied or we did this
10 together.
11    Q.   I'm sorry, you cut out a little there. Can
12 you repeat your answer?
13    A.   I don't believe so.  I don't believe so,
14 if he replied or if we worked on this together.
15    Q.   Do you recall if Mr. Pable was sitting at
16 his computer and typing this while you observed?
17    A.   I believe so.  This looks like something
18 we would have done over each others' shoulders kind
19 of thing.
20    Q.   Would you have been dictating what the
21 e-mail said to Mr. Pable or would you have been
22 drafting it in collaboration with Mr. Pable?
23    A.   Both would be reasonable.
24    Q.   Did Mr. Pable suggest that you inform

1 Mr. Psomas in this e-mail that you or you and
2 Mr. Pable, in fact, conducted a test on the Dayton
3 system?
4    A.   Could you repeat the question.
5        (Question read)
6    A.   I'm sure we discussed it collaboratively
7 creating this e-mail.
8    Q.   So if we look at this email, the language
9 that is in the third sentence says we also verified
10 other properties that have Clever BusTracker such as
11 Greater Dayton Regional Transit Authority were
12 affected.  Right?
13    A.   I see that sentence.
14    Q.   And was that sentence to you informing
15 Mr. Psomas that you or you and Mr. Pable, in fact,
16 tested the Dayton system?
17    A.   That was my intent.  I did not believe
18 that the details of that test, as mentioned, I am
19 keeping it pretty general.
20        In hindsight, I wish I had been very
21 specific so that Mr. Psomas could have also been
22 implicated in this, but I kept it general and
23 explained that we found a vulnerability.  We tested
24 it.  I called out the specific site that we tested

1 deeper.
2        And I indicate that there were others
3 without going into the detail of both the specific
4 Dayton test with the duplicate post or provided him
5 with a list of vulnerable slash now patched
6 locations.
7    Q.   Did Mr. Pable suggest that you be more
8 specific in this e-mail to Mr. Psomas about the
9 Dayton test?
10    A.   I honestly don't recall.
11    Q.   And was anyone else present when you and
12 Mr. Pable were drafting this e-mail in CTA
13 Exhibit 40?
14    A.   Not to my knowledge.  Other coworkers in
15 the distance, but not to my knowledge and nobody
16 else worked on this other than he and I.
17    Q.   And if you could turn to CTA Exhibit 41.
18 Let me know when you're there, Mr. Haynes.
19    A.   We're there.
20    Q.   So CTA Exhibit 41 this is the e-mail that
21 you did, in fact, send to Mr. Psomas on August 31,
22 2018, right?
23    A.   It appears to be.
24    Q.   And you copied Mr. Pable on this e-mail?

1    A.   According to this I did.
2    Q.   And this e-mail it has some modifications
3 from CTA Exhibit 40, but the substance of it is
4 effectively the same in what you informed
5 Mr. Psomas, is that fair?
6    A.   Fair.
7    Q.   And in this e-mail again you are not
8 specific about the test that you conducted on the
9 Dayton system, right?
10    A.   Correct.
11    Q.   And after you sent this note to
12 Mr. Psomas, did you follow up or discuss it with
13 Mr. Psomas in the weeks that followed this e-mail?
14    A.   I believe I did in person.  I don't know.
15 It would be nice to see if Mr. Psomas replied to
16 this.  I don't know.
17        I don't recall a reply.  It was sort of
18 a moot and final issue.  We were sort of closing out
19 the issue, and this was my message to sort of inform
20 and close the loop, close the issue.
21    Q.   I could represent to you that Mr. Psomas
22 replied thanks to this e-mail I think the following
23 Monday or Tuesday, but aside from that
24 representation or that thanks that Mr. Psomas sent

34 (Pages 130 - 133)

Page 134

1 to you, did you have any follow-up conversation with
2 Mr. Psomas about this issue?
3    A.  Not to my knowledge.  As I mentioned
4 earlier, I don't think he would understand the
5 technical side of it anyway.
6    Q.  And this e-mail that you sent to
7 Mr. Psomas was August 31, 2018, right?
8    A.  Correct.
9    Q.  So that is two weeks after you conducted
10 the Dayton test?
11    A.  Correct.
12    Q.  Is there a reason that you waited two
13 weeks to tell Mr. Psomas about this in the way that
14 you did?
15    A.  First was the fact the 17th was a Friday.
16 I responded that prior week was a challenging week
17 with the e-mails to Clever and Dayton and apparently
18 TTC.
19        That concluded, that Friday the 20th, I
20 believe, concluded with the e-mail we talked about
21 from Tim Harrington of the Dayton RTA.  The
22 following week would have been when Clever was
23 patching other sites and patched our own site -- I
24 know they patched our site that week.  I waited

Page 135

1 until I felt that the issue was past us.
2    Q.  And when you say the issue is past us,
3 what do you mean by that?
4    A.  There's no more followup from the Dayton
5 RTA.  There's no more followup from Clever.  Clever
6 issued a security bulletin or patch, and the issue
7 is in my opinion closed out.
8    Q.  And you had mentioned that you didn't
9 explain or go into further detail with Mr. Psomas
10 the issues of the Dayton test because you didn't
11 believe that he would understand the technical
12 issues, right?
13    A.  That, and you saw that I felt like what I
14 did was wrong.  And the last I checked you don't
15 generally scream from the rooftops what you did
16 wrong if you feel you made a mistake.  I made a
17 mistake.
18    Q.  Is it fair you were sort of sending this
19 vaguer e-mail to Mr. Psomas because you wanted to
20 check the box in letting him know without letting
21 him know what you had done wrong?
22    A.  That would be a fair assessment.
23    MS. BABBITT:  I think it would be a good time
24 to take a lunch break, if that's okay with you.

Page 136

1 Should we come back around 1:25?
2    THE VIDEOGRAPHER:  Off the record.  The time on
3 the monitor is 12:46 p.m.
4        (Recess)
5    THE VIDEOGRAPHER:  We are back on the record.
6 The time on the monitor is 1:32 p.m.
7 BY MS. BABBITT:
8    Q.  Mr. Haynes, right before we broke for
9 lunch we were talking about what you were sharing or
10 deciding to share with Jim Psomas about the Dayton
11 test.
12        And you had said that one of your
13 concerns was that Mr. Psomas would not be able to
14 understand technologically what had happened.  Is
15 that right?
16    A.  Correct.  He wasn't versed in our role.
17    Q.  Can you explain specifically what
18 Mr. Psomas, what you believe he wouldn't be able to
19 understand?
20    A.  Just the nuances of the seriousness of
21 the implications and the wherewithal of what this
22 ultimately meant for our operation.
23        I felt that I was the subject matter
24 expert on all things BusTracker at the CTA, and I

Page 137

1 felt it best to resolve this internally in my group.
2 For example, Mr. Psomas rarely if ever came to our
3 check in meetings with Clever Devices.  So he didn't
4 really have a handle on the customer alert API and
5 the request for a quote and all of the different
6 pieces of the puzzle.
7    Q.  So was it part of your job to make
8 Mr. Psomas aware when things needed to bubble up to
9 his level?
10    A.  Clearly, at the end of the day CTA thought
11 so and discharged me for misconduct.
12    Q.  Do you think that was part of your job
13 duty?
14    A.  I should have brought it to his attention,
15 but he really didn't support me or my work.  So I
16 didn't see the immediate need.  Plus like anything
17 else, I made a mistake.  And it's not necessarily
18 something I necessarily wanted to do.
19    Q.  And when you say not something you
20 necessarily wanted to do, you mean you didn't want
21 to explain it in full to Mr. Psomas?
22    A.  Correct.
23    Q.  And you've said that you made a mistake,
24 and I think you said it was wrong for you to do the

35 (Pages 134 - 137)

1 Dayton test and for the Dayton test to be conducted.
2          Likewise, was it wrong for Mr. Pable to
3 prepare the Dayton test and to work with you in
4 developing the Dayton test?
5     A.  He was acting at my direction.
6     Q.  Did you force him in any way to prepare
7 the Dayton test and to assist you in preparing it?
8     A.  No.
9     Q.  And didn't Mr. Pable also have an
10 obligation to report this if it was wrongdoing even
11 if he thought he wasn't the actor?
12     A.  I think he felt he was reporting it to me,
13 and this was sufficient.
14     Q.  Could Mr. Pable have reported the issue to
15 anyone else aside from you?
16     A.  I suppose so.
17     Q.  Who could he have reported it to?
18     A.  If he chose, he could have gone directly
19 to Mr. Psomas or I think that there was a Mike
20 Radojcic.  I don't know how to spell the last name,
21 but he was chief security officer.  But likewise, he
22 wasn't involved in our daily business.
23     Q.  Anyone else that Mr. Pable could have
24 reported this issue to?

1     A.  Not that I'm aware of.
2     Q.  I mean I guess the reason I was hung up on
3 saying that Mr. Psomas wouldn't understand, I will
4 certainly submit I am one of the least technical
5 people on this Zoom.
6          I am sure I am less technical than you
7 and Mr. Pable and Mr. Psomas as well, and I think
8 you have been able to explain it to me in this
9 deposition.  So are there things you explained to me
10 that you didn't expect Mr. Psomas to understand?
11     A.  I guess -- well, I wasn't looking to go
12 down the rabbit hole of all that transpired and
13 exposing all of the mistakes that I felt I made with
14 my management, who was already not supportive of me.
15          So to the extent that I am stating that
16 Mr. Psomas wouldn't understand, I am not necessarily
17 meaning strictly from a technological standpoint,
18 although he is far less technical than his
19 subordinates.
20          I am saying that he wouldn't understand
21 the nuances of the relationship with Clever Devices
22 and the intricacies of these various systems.  And I
23 didn't really want to go down the exposition of
24 things that I did wrong that I felt had already been

1 addressed and that the issue was closed.
2          In my opinion, the issue was closed.
3 Clearly, in Clever Devices' opinion it wasn't.
4     Q.  And did you ever discuss at any point in
5 time with Mr. Pable that you would sort of take the
6 fall for him on this?
7     A.  I never discussed it as take the fall
8 because I never felt that this was anything that
9 serious.  I think it's very clear in my
10 communications that I take and maintain full
11 responsibility for the actions of directly the test
12 on the Dayton system as well as my own testing of
13 grabbing time stamps from the other various systems.
14          So in my communication I clearly
15 apologized and take responsibility for the actions.
16     Q.  In your view, did Mr. Pable have any
17 responsibility for what happened?
18     A.  To the extent that he found the key, and
19 alerted me to it.  I mean if he never found the key,
20 we wouldn't be sitting here today.  But what was
21 done with that key and the testing that was done
22 with that key and e-mails or lack of e-mails, post
23 use of that key, was really all of my own doing.
24     Q.  Did you ever tell Mr. Pable not to

1 disclose this to anyone?
2     A.  I don't recall directly saying not to tell
3 anyone.
4     Q.  Did you ever tell Mr. Pable not to e-mail
5 about this to anyone?
6     A.  The same question.  The same answer.  I
7 don't recall telling him not to e-mail or to
8 communicate this with anyone.
9     Q.  I think you mentioned that you didn't
10 think Mr. Psomas was supportive of you.  Can you
11 explain what you mean by that?
12     A.  It was clear that Mr. Psomas reported to
13 Veronica, and there's a long string of conversations
14 about trying to get myself adequately compensated
15 and fairly compensated.
16          I was not a senior manager.  I had been
17 promised to be promoted to senior manager quite a
18 number of times and was never, never really cared
19 about or looked after.  And if you are not getting
20 the respect that you deserve at work you really
21 don't want to go in and say you screwed up in order
22 to try to gain that respect.
23     Q.  So did you ask Mr. Psomas for raises or
24 for promotions?

36 (Pages 138 - 141)

Page 142

1    A.   Absolutely.  It had been a long standing
2 discussion both for myself and looking after my
3 staff.
4        Previously, I looked after another
5 individual on my staff.  And then I was looking for
6 a raise for Mr. Pable, as well as being made senior
7 manager myself, having watched folks with far less
8 skills and experience being promoted.
9    Q.   Who was the other individual aside from
10 Mr. Pable that you said you were looking out for?
11    A.   I was successful in getting a raise for
12 Reginald Davis.  He worked for me before then,
13 transferring to the control center.
14        He had not been given a raise in many,
15 many years.  So I pushed hard and was successful
16 there.  And I took my sort of -- I don't want to say
17 fight, but my direction push towards getting
18 Mr. Pable more adequately and properly compensated
19 with his skills and benefits to the agency as well
20 as my own.
21    Q.   And was that in 2018 that you were making
22 those requests?
23    A.   Yes.  Reginald Davis stuff, we were
24 talking about I believe was 2017.  Every other year

Page 143

1 I would kind of push with various folks on my staff.
2    Q.   And did you receive any raises from 2015
3 to 2018?
4    A.   I believe that I was promoted to manager
5 in early 2015 by a then Mr. John Flynn, who was the
6 chief technology officer.
7        I was promoted days after a merit based
8 raise that went to all employees.  So effectively
9 even when CTA did care enough about me to give me a
10 promotion, they made sure to do it after everyone
11 got a promotion, bonus, raise.  Which, as you know,
12 if you got the raise first, the promotion first and
13 then the raise it would actually be more and
14 correct.  I was substantially underpaid from others
15 of my peers at CTA.
16    Q.   When you said you were promoted in early
17 2015, was Mr. Psomas your supervisor then?
18    A.   No, I don't believe he was there yet.  I
19 don't know exactly when he started with the CTA.
20        There was a John Flynn and a woman named
21 Heamus Doran, who reported to John Flynn, and I
22 reported to Heamus.  And then she pushed John Flynn
23 out and became the head.  It is a revolving door of
24 senior managers.

Page 144

1    Q.   In 2018, you were asking Mr. Psomas for a
2 promotion and raise for yourself, correct?
3    A.   Absolutely.  I long deserved the title of
4 senior manager of the department.
5    Q.   And you were also asking Mr. Psomas for a
6 raise on Mr. Pable's behalf?
7    A.   Correct.
8    Q.   That was correct?
9    A.   Correct.  Affirmative.
10    Q.   Thank you.  And you were aware that in
11 October of 2018, Mr. Psomas was speaking to CTA HR
12 and suggesting that you and Mr. Pable receive
13 raises?
14    A.   I believe I was.  I kind of discussed it
15 with him on a near weekly basis.  So yes.  I didn't
16 know that he was actually taking that up the chain.
17    Q.   Did Mr. Psomas tell you that he was, in
18 fact, taking it to HR or up the chain?
19    A.   I don't think in so many words, but I
20 think he said I'm working on it.  I don't know what
21 I'm working on it means, but he would indicate that
22 he was working on it.
23    Q.   I want to turn now to Mr. Pable.  And
24 again this is in 2018.  At some point in 2018, did

Page 145

1 Mr. Pable inform you that he was going to have a
2 surgery done?
3    A.   Yes.
4    Q.   What did he tell you about the surgery?
5    A.   I don't want to violate personal health
6 protection information, but that he was getting some
7 surgery related to his rapid weight loss that he had
8 done on natural causes and that he needed fairly
9 significant surgery.
10        We talked about it.  I don't want to say
11 at length, but we would go for a walk on occasion,
12 and he would tell me some personal life issues.  And
13 that he was going to be getting a surgery and that
14 he was planning on that for late fall of 2018,
15 possibly even December.
16        I don't remember the exact dates.
17 Mostly giving me the advance heads up that he would
18 need to be out for a week and then possibly work
19 from home for a period of time.
20    Q.   So let me ask you this.  Do you recall
21 when Mr. Pable informed you that he would be
22 planning a surgery in 2018?
23    A.   I don't recall the conversation, when it
24 was first broached.  I'm sure it was broached

37 (Pages 142 - 145)

Page 146

1 earlier on from a general perspective and then as
2 things I guess were firming up, at some point he
3 would have told me the target date, target time
4 range, which I was just tucking in the back of my
5 mind for general project manager staff management.
6    Q.   And I think you said he expected to be out
7 for a week due to the surgery, is that right?
8    A.   That's my recollection.  And then that
9 there would be fairly significant period of time
10 where it might be best for him to work from home.
11        And I said yes, we could accommodate
12 that.  And I have worked with various bureaucracies
13 with CTA to make sure that that happened, reasonable
14 accommodation.
15    Q.   Was anyone else present when you discussed
16 the planning around Mr. Pable taking time off for
17 his surgery?
18    A.   No.  We would have had those conversations
19 in private on a walk around the building or outside
20 or a Starbucks or something.  Or if it were in the
21 building he would have pulled me into a conference
22 room.
23    Q.   And so in addition to the week off that he
24 expected to need, you said he would likely work from

Page 147

1 home for some period of time, is that right?
2    A.   I believe we had discussed that that was a
3 possibility depending on the outcome.
4    Q.   Is that something that you had seen be
5 accommodated at the CTA before?
6    A.   Absolutely.  We even did the same with
7 Mr. Pable.  At one point he slipped and fell on ice
8 just outside of CTA headquarters and had hurt his
9 knee or hip, I believe.
10        And we went through all of the proper
11 paperwork to have reasonable accommodation so he
12 could work from home for a period of, it feels like
13 a month, maybe two.  I don't remember exactly when
14 that was except it would have been cold when that
15 started.
16    Q.   Was Mr. Psomas the manager at the time
17 that Mr. Pable took that work from home?
18    A.   No.  That would have been when I was
19 reporting to Heamus Doran, either in her role as the
20 acting chief technology officer with a vacancy or
21 her role as kind of doing both jobs, being my boss
22 and being my boss's boss.
23    Q.   So was Mr. Pable, if he wanted to take a
24 leave, is that something that he needed to request

Page 148

1 with you?
2    A.   Yes, that request would start with me.
3 CTA being fairly bureaucratic with a fair amount of
4 paperwork, I suppose he could have gone directly to
5 HR and then I would be notified through HR if he
6 wanted to keep it more -- but we had a personal
7 relationship, and it was easy to initiate those
8 conversations.
9        And when the timing was right, we would
10 call the necessary places for sort of FMLA or work
11 departure time off and then ADA reasonable
12 accommodations upon return.
13    Q.   And was the leave something you had the
14 ability to approve or deny?
15    A.   At least tangentially.  You would have to
16 go from me up to a number of signatures.  I'm sure
17 Mr. Psomas would have been involved.  If you are
18 talking about a request for leave, a hypothetical
19 request for leave post our termination, yes, it
20 would have started with me and would have gone to
21 HR.  And would have gone to my management.
22    Q.   And just to be clear, I'm not speaking in
23 the hypothetical.  I guess I want to know from you,
24 one, did Mr. Pable request leave from you?

Page 149

1        And then let's have you answer that and
2 then I'll follow up.
3    A.   He indicated that he would be having a
4 medical procedure at some point in the near future,
5 three month window.
6        I believe he gave me a more specific
7 date range and began to initiate the I am going to
8 need to take a week off, and I might need to stay
9 home and work from home after that as part of
10 recovery.  That is the extent of the request.
11 Nothing formal, nothing written.  I probably
12 mentioned it to Mr. Psomas in general passing that
13 hey, coming up I'm going to need to do whatever
14 paperwork or Mr. Pable might need to work from home
15 for a period of time.
16        I don't think anything written or
17 documented other than all I was going to do is pull
18 up the documents that he did when he slipped and
19 fell on the ice and needed time and pull the same
20 administrative procedures and follow the steps.
21    Q.   Aside from Mr. Pable alerting you to this
22 request, did you take any further steps in that
23 process to get him approved for leave?
24    A.   There was nothing to do until it got

38 (Pages 146 - 149)

Page 150

1 closer, and I got confirmation and understood what
2 was needed.
3    Q.   When you say you got confirmation, would
4 that be confirmation from Mr. Pable?
5    A.   Correct.
6    Q.   And do you recall if you, in fact, did
7 inform Mr. Psomas of Mr. Pable's plan to take leave
8 or have a surgery?
9    A.   As I stated, I'm sure it came up in a
10 sidebar or in a conversation with Mr. Psomas in the
11 weeks leading up in October or September when
12 Mr. Pable indicated it, and I raised it.
13         I would have raised it to Mr. Psomas in
14 an oh, by the way, this is something coming up that
15 we might need to work through the administrative
16 procedures.  I likely said I've done it before.  I
17 know what we need to do or I'll pull out the old
18 paperwork, and we'll figure it out.
19         Just to give him the courtesy heads up
20 that one of my staff, ultimately one of his staff
21 was going to be in need of a week's sick time and
22 potentially work from home.
23    Q.   What was Mr. Psomas' reaction if you
24 recall?

Page 151

1    A.   Probably just if I am recall correctly
2 probably thanks for letting me know.  Sounds like
3 you'll take care of it and keep me in the loop or
4 whatever.  I am purely speculating from a sidebar or
5 a casual conversation on my end.
6    Q.   Did Mr. Psomas ever indicate to you that
7 he would not approve Mr. Pable taking this time off?
8    A.   No, there was no indication.
9    Q.   Did you tell Mr. Pable that you spoke to
10 Mr. Psomas about this issue?
11    A.   Perhaps in passing.  I really can't say
12 one way or the other definitively.  If there were
13 any concerns I would have raised them with
14 Mr. Pable, and we would have discussed it.
15    Q.   Did you notice that Mr. Psomas, did he
16 treat Mr. Pable different in any way after the point
17 in time that you may have disclosed this leave about
18 Mr. Pable?
19    A.   No.  Mr. Psomas had very little
20 interaction with Mr. Pable as it was.  And I would
21 not notice.
22    Q.   I want to turn now to the time when you
23 were placed on administrative leave at the CTA.  You
24 were placed on leave on or about October 22, 2018,

Page 152

1 is that correct?
2    A.   That is a Monday.  Correct.
3    Q.   Was this a paid leave?
4    A.   It was a paid administrative leave.
5    Q.   And how did you come to know that you were
6 being placed on leave?
7    A.   I had left the building early that day and
8 had walked a block away to take a personal phone
9 call at a Starbucks.
10         While on that personal phone call, shall
11 I say my phone blew up with messages.  My boss Jim
12 Psomas was looking for me and requesting my
13 presence.  I said I haven't left the area.  I could
14 come back.  I returned to the CTA headquarters,
15 which I had just departed merely 45 minutes prior.
16 And my employee ID would no longer let me in the
17 building.
18         And I called I think an employee, a
19 colleague of mine came out of the building, and I
20 asked her.  I think it was Jackie or I called Jackie
21 and said could you go and tell Jim, Mr. Psomas that
22 I am here because it seemed like there was an urgent
23 need to meet with me.  And I said I was outside the
24 building.

Page 153

1         An HR person, Mr. Mike Bowen, I believe,
2 B-o-w-e-n, met me on the street and handed me a blue
3 personal CTA envelope and contained inside was a
4 notification that I was being placed on paid
5 administrative leave pending an internal
6 investigation.
7         He subsequently confiscated my badge,
8 and I was left to find my own way home because I
9 didn't even have a transit card.  And I had to take
10 an Uber home, quite distraught and quite shaken.
11    Q.   Did you ask Mr. Bowen any questions once
12 he handed you that notice of leave?
13    A.   Of course, I did.  And he had no answers.
14    Q.   What questions did you ask Mr. Bowen?
15    A.   I am being placed on administrative leave.
16 What is the subject of the investigation, what is
17 this concerning.  What do I have to do next?
18         Place yourself in that position of being
19 told you're on two weeks paid administrative leave
20 with no other details.  Those sort of questions.
21    Q.   You said that Mr. Bowen didn't provide you
22 any answers to those questions?
23    A.   To my knowledge, no.  He was you'll be
24 contacted or something to that effect.

39 (Pages 150 - 153)

Page 154

1    Q.   When were you contacted next by the CTA?

2    A.   I believe the next morning Mr. Psomas

3  reached out to me via my personal e-mail asking if I

4  had any items from CTA in my possession and to make

5  arrangements to return them to the CTA.

6        I had a CTA work laptop that I kept at

7  home, and I think I had a few CTA keys or maybe a

8  radio.  And we had arranged to meet either the next

9  day or the following day.  I don't know exactly.  It

10 would be in e-mail threads that we met at a

11 Starbucks, and I handed those materials over.

12       Mr. Psomas gave very little details

13 about what was going on.  And that was the extent of

14 my communication with the CTA in that early part of

15 those two weeks leave.

16   Q.   Who did you tell that you were placed on

17 administrative leave?

18   A.   I called my wife.  That is kind of step

19 one.  And I let Jackie Johnston know.  I think I

20 messaged Thomas Silvestri.  Just a couple of other

21 close colleagues that I had meetings and things set

22 up for the next day.

23       And being a commiserate professional, I

24 was advising people that I'm not going to be there.

Page 155

1  I think I called my dad.

2    Q.   Did you contact Mr. Pable?

3    A.   Yes.  When I got my message I contacted

4  him.  I believe he was contacting me as well.

5  Mr. Pable on that day was returning from vacation on

6  that Monday, the 22nd.

7        And I believe he was in the air

8  traveling from La Guardia Airport to Midway and

9  learned of the messages upon his arrival at Midway.

10   Q.   Did you contact Mr. Pable by calling him

11 on the phone or vice versa?

12   A.   I do believe we spoke on the phone.  There

13 were definitely some Signal messages.  Again, they

14 would have been lost in the sands of time.

15       I believe we did talk on the phone.  We

16 were both quite distraught as you would imagine and

17 confused.

18   Q.   And so those messages, I think you just

19 said you lost them in the sands of time.  Those were

20 the messages that you purged from your Signal

21 application that we discussed earlier today?

22   A.   Those messages would have been purged

23 about eight or nine days later prior to walking into

24 my interrogation and termination.

Page 156

1    Q.   Did you have an idea of why you were being

2  placed on leave?

3    A.   The first thing that came to mind was

4  related potentially to this Dayton stuff because

5  that was the only recent thing.

6        I do recall racking my brain on anything

7  else.  What kept leading it back to the Dayton

8  things and the skeleton key really was that both

9  Mr. Pable and myself were placed on paid

10 administrative leave at the same time.

11       If it were just me I'd scratch my head

12 more, did I do something wrong with contract

13 management.  Did I sign an invoice incorrectly or

14 something else.  Did I say something wrong.  But the

15 fact that it was both of us identically under the

16 same circumstances led me to believe the only common

17 denominator there was this Dayton skeleton key

18 issue.

19       I did not know whether it was the Dayton

20 RTA decided to take action against CTA or whether

21 Clever said something.  I believe I called Craig

22 Lang in that he and I were up to that moment

23 professional colleagues, professional friends.

24       I believe he said something like we

Page 157

1  shouldn't talk.  Mr. Lang said something like that.

2  And I think at that moment I deleted all references

3  to Mr. Lang and considered the man persona non grata

4  to myself forever.

5    Q.   When you say you deleted all the

6  references to Mr. Lang, can you explain what you

7  mean by that?

8    A.   I'm pretty sure I went to my phone,

9  deleted all messages that I ever had with Mr. Lang

10 after his, you know, rudeness to me and Mike, we

11 shouldn't talk.

12       I believe he was in London at the time

13 or maybe I'm mixing up the two weeks, but he

14 indicated best that he and I not talk.  Mr. Lang and

15 I would go to lunch about once every other month and

16 talk things CTA, career, otherwise.

17       And after that and sensing that this was

18 related to the skeleton key issue and potentially

19 emanated from Clever Devices, I made the personal

20 decision in what could be amounted to a fit of

21 frustration or rage that I wanted nothing to do with

22 Mr. Lang forever.  It's done.

23       So I deleted all messages from him and

24 deleted his contact information and never contacted

40 (Pages 154 - 157)

Page 158

1  him again.
2  Q. Did you tell Mr. Pable you were doing that
3  with Mr. Lang's information?
4  A. I might have mentioned that, that I was
5  frustrated with Mr. Lang and was done with that.
6  Q. Did Mr. Pable suggest that you delete your
7  communications that you had with Mr. Lang?
8  A. No, absolutely not.
9  Q. So aside from the Dayton incident, did you
10 have any other guesses as to why you might have been
11 placed on leave?
12 A. No, particularly because it was tied, both
13 Chris and I, Mr. Pable and I at the same time. It
14 was the only logical conclusion.
15      You know, I was trying to think of
16 anything else, any other projects that we both
17 worked on if there was something that wasn't right.
18 But the issue had been dormant and not discussed at
19 all since the end of August.
20      So I will say it was quite a shock,
21 which is why I think it did lead me to sort of
22 think about anything else because I thought the
23 issue was over.
24 Q. Was Mr. Pable on the same page with you as

Page 159

1  to what he thought the basis for the leave would be?
2  A. I presume that would be a fair assessment
3  from our conversations when we met up in the days
4  following that we were generally on the same page
5  with I guess it's related to this, but what, where,
6  who, how, were all unknowns.
7  Q. Did Mr. Pable suggest any other bases that
8  he thought might be a reason why you were put on
9  leave and he was put on leave?
10 A. Not to my knowledge.
11 Q. Did you communicate with anyone else at
12 the CTA while you were on leave?
13 A. I think it was mostly with Mr. Psomas. I
14 think there might have been certainly Ms. Johnston,
15 Jackie Johnston. It was a fair amount of shock
16 across the agency.
17      I know there were a few technical
18 questions that had arisen. I believe Phil Vanasse
19 who is my other subordinate, reached out with some
20 technical questions. And I responded the best I
21 could with how to fix -- getting the system to
22 resolve an issue. And the two weeks were a very
23 stressful lonely two weeks.
24 Q. Let me step back. You didn't have access

Page 160

1  to your CTA e-mail once you were placed on
2  administrative leave, correct?
3  A. Correct.
4  Q. And so the folks that you just identified,
5  how did you communicate with them?
6  A. Either through text message, Signal. I
7  believe maybe with Jackie Johnston through Signal.
8  I'm not 100 percent sure. And personal e-mail
9  through Jim Psomas or Phil Vanasse.
10 Q. Did you call Thomas Silvestri after you
11 were placed on leave?
12 A. I did.
13 Q. Why did you do that?
14 A. He was a colleague. He sat on the other
15 side of the wall from me. It seemed like we were
16 becoming professional friends, and he was mentoring
17 me or I was discussing with him. And we were
18 commiserating.
19      I called him to let people know that I
20 wouldn't be there tomorrow morning. This is Monday
21 night. He was a work colleague, and I wanted to get
22 some guidance or advice. He was less senior than me
23 in rank, so called rank, but he was more senior
24 than me certainly from a life perspective.

Page 161

1       So I reached out to him sort of for
2  advice and commiseration. I believe that's the only
3  time I talked to him since. There might have been
4  some e-mails or text messages in the weeks that
5  followed. But I basically cut all ties with him and
6  haven't been in communication since that time in
7  early November.
8  Q. Can you turn your attention, Mr. Haynes,
9  to CTA Exhibit 13 and let me know when you have it.
10 Do you see that?
11 A. I do.
12 Q. It says CTA Exhibit 13 is an e-mail that
13 is a forward from you, Mr. Haynes, in your personal
14 e-mail account to Mr. Pable and Mr. Silvestri on
15 October 22, correct?
16 A. Correct.
17 Q. And it may be difficult to see, but it's
18 forwarding the exchange that we talked about
19 earlier, which is a message from Tim Harrington to
20 you, right?
21 A. Yes. I am forwarding what looks like a
22 screen shot, that is forwarding an e-mail that was
23 sent from me to my wife dated Friday August 24, 2018
24 at 12:43 p.m where I had sent a screen shot of the

41 (Pages 158 - 161)

Page 162

1 Tim Harrington e-mail to myself at gmail.

2    Q.   In CTA Exhibit 13 in your top e-mail with
3 the forward, you say just so we have this, right?

4    A.   Correct.

5    Q.   And then you say, "I might call this guy
6 tomorrow just to ask if they did file anything. I
7 doubt it since it was over seven weeks ago now.
8 We'll be in touch, but this is good to have for our
9 records."

10        You drafted that, right?

11   A.   Correct.

12   Q.   And what did you mean by saying it would
13 be good to have for your records?

14   A.   I said for our records. I guess I meant
15 for defense in case this is what it was all about.
16 This is at 9:00 p.m. on the evening in question on
17 the day I was placed on paid administrative leave.

18        And knowing what I know now, I don't
19 think I'll ever send another e-mail again. But this
20 was me, I believe I either just had a conversation
21 with or was about to have a conversation with Thomas
22 Silvestri. I don't know.

23        And as you noted earlier, Thomas
24 Silvestri was copied on other e-mails while I was at

Page 163

1 the CTA. So he was aware of what was going on.

2    Q.   And when you said you wanted to ask if
3 they did file anything, what are you referring to
4 when you say that?

5    A.   I am referring to exactly the line which
6 is a little hard to read in this one. But my boss,
7 our CFO, was quite concerned and was considering
8 whether we should be considering legal action
9 against you.

10        So I am referring to if they filed legal
11 action against us. I will say this. I never did
12 call this guy. I was just thinking out loud, you
13 know, was it him that called or filed something to
14 the CTA. And that is what prompted all this.

15   Q.   And also on that same night on October 22
16 you sent Mr. Pable from your personal e-mail to his
17 personal email a link to the Illinois statute called
18 the State Officials and Employees Ethics Act. Are
19 you familiar with that Act?

20   A.   No, other than I must have Googled it,
21 copied it and sent it to Mr. Pable's personal
22 e-mail.

23   Q.   Is that an Act that you understood that
24 you were bound to by virtue of being a CTA employee?

Page 164

1    A.   Without having the Act in front of me to
2 review I don't know what you're exactly referring
3 to.

4    Q.   Let's take a look at CTA Exhibit 15,
5 Mr. Haynes, and tell me when you are there.

6        Do you see CTA Exhibit 15, Mr. Haynes?

7    A.   No. Give me a second here.

8        MS. BABBITT: Why don't we go off the record
9 for five minutes, and we'll let you set that up and
10 take a quick break.

11       THE VIDEOGRAPHER: We're going off the record.
12 The time on the monitor is 2:16 p.m.

13       (Recess)

14       THE VIDEOGRAPHER: We are back on the record.
15 The time on the monitor is 2:23 p.m.

16 BY MS. BABBITT:

17   Q.   Mr. Haynes, before we broke we were having
18 you pull up CTA Exhibit 15. Do you now have that
19 exhibit in front of you?

20   A.   Yes.

21   Q.   This is a copy of the Illinois code that I
22 was referring to, which is the Illinois State
23 Officials and Employees Ethics Act. And in
24 particular, it is a section of the Act that refers

Page 165

1 to administrative leave during a pending criminal
2 matter. Do you see that?

3    A.   Yes, I do.

4    Q.   Why did you send this provision of this
5 Act to Mr. Pable on the day that you were put on
6 leave?

7    A.   We were both in the same boat, and I was
8 doing my due diligence and research on what it means
9 to be placed on paid administrative leave.

10        And I came across this and felt that we
11 were in the same boat, and I shared it with him.

12   Q.   And the fact that you were flagging a
13 portion of the statute that refers to administrative
14 leave pending a criminal matter, did you believe you
15 may be involved in a criminal matter when you were
16 placed on administrative leave?

17   A.   I don't know why I was placed on paid
18 administrative leave. So anything was possible, and
19 I came across this in a Google search.

20   Q.   And did you discuss the possibility of
21 having committed criminal acts with Pable related to
22 the Dayton test?

23   A.   I believe I discussed with him in light of
24 this. Did we do anything criminally wrong, and we

42 (Pages 162 - 165)

Page 166

1 discussed things about responsible disclosure and
2 sort of vulnerability testing of systems from that
3 perspective.
4         I didn't send this to my knowledge with
5 the direct thought that we were directly involved
6 with a criminal matter.  There was nothing provided
7 to us from the CTA as part of the paid
8 administrative leave that would lead me to any
9 conclusion.
10        So anything was on the table, and I
11 thought it better to be knowledgeable than ignorant.
12   Q.  When you said you had discussed the
13 possibility of whether or not you had done anything
14 criminal with Mr. Pable, were those discussions
15 during the course of you both being placed on leave?
16   A.  I believe so.  We met at least three,
17 maybe two or three times that week.  Tuesday,
18 Wednesday, possibly again Friday.  I don't remember
19 the exact dates.
20        And we had numerous conversations over
21 lunch.  We were essentially out of work.  So we had
22 nothing to do but think about this.  So mulling over
23 some ideas.  This was a topic.
24   Q.  And you met up with Mr. Pable the

Page 167

1 following day after you were placed on leave, is
2 that right?
3   A.  I'm pretty sure that was the day.  It
4 might also have been Wednesday.  It might have been
5 both.  I know that there was setting up the time to
6 drop stuff off.
7        Both Mr. Pable and I were present when I
8 returned my CTA property to Mr. Psomas at a
9 Starbucks on Washington and Clinton.  I can't tell
10 you whether that it was Tuesday or Wednesday, but
11 was one of those mornings.
12   Q.  So within a day or two of you being placed
13 on leave you returned those items that Mr. Psomas
14 requested of you?
15   A.  Correct.
16   Q.  And that was at a Starbucks you said?
17   A.  Correct.
18   Q.  Mr. Pable was at that Starbucks as well?
19   A.  Correct.
20   Q.  And did you meet with Mr. Pable alone
21 first and then Mr. Psomas arrived?
22   A.  Correct.
23   Q.  Do you recall how long you were meeting
24 with Mr. Pable at the Starbucks before Mr. Psomas

Page 168

1 arrived?
2   A.  I don't recall exactly.  Maybe an hour.
3   Q.  Did you take any notes at this meeting?
4   A.  No.
5   Q.  Did you have any papers with you at this
6 meeting?
7   A.  I don't believe so.  I was returning the
8 laptop.
9   Q.  That was when you were returning the
10 laptop to Mr. Psomas?
11   A.  Yes.  I had the laptop and some keys and
12 items to return.
13   Q.  Did you have any other devices with you
14 that you were using when you were meeting with
15 Mr. Pable?
16   A.  My personal cell phone.
17   Q.  Did you take any notes or jot anything
18 down on your cell phone?
19   A.  Not to my knowledge.  Not in that time.
20   Q.  And Mr. Pable, did he have any devices
21 with him?
22   A.  I'm sure he had his phone.
23   Q.  Was Mr. Pable taking down notes or putting
24 things into his phone while you were discussing

Page 169

1 matters with him?
2   A.  No.
3   Q.  Can you turn your attention, Mr. Haynes,
4 to CTA Exhibit 17.  Let me know when you're there.
5   A.  We're here.  October 24?
6   Q.  Right.  So Mr. Haynes, CTA Exhibit 17,
7 this is an e-mail that you sent Mr. Pable from your
8 personal account to Mr. Pable's personal gmail on
9 October 24, 2018, correct?
10   A.  Correct.
11   Q.  And you reference in the first paragraph
12 in this email to Mr. Pable that it was good to meet
13 up yesterday, right?
14   A.  Correct.
15   Q.  And in the second paragraph of CTA
16 Exhibit 17, you say that you regretted that you even
17 tried to reach out to Craig Lang.  Right?
18   A.  I see that.
19   Q.  And then if you turn to the second page of
20 CTA Exhibit 17, is this a text exchange that you had
21 with Mr. Lang?
22   A.  Yes, it is.
23   Q.  Is this a text exchange you had within a
24 day or two of you being placed on administrative

43 (Pages 166 - 169)

Page 170

1  leave?
2      A.  Yes.  This is dated looks like Tuesday.
3  And this would have been that week.  So if the 20th
4  was -- we determined that the 22nd was the day I was
5  placed on administrative leave.  So that was a
6  Monday.
7          So the 23rd would be Tuesday.  So
8  Tuesday at 0603, I got a message from Mr. Lang,
9  Mike, noticed you called.  I am in London meeting
10  with the FL all week.
11      Q.  So this was an e-mail exchange with
12  Mr. Lang via SMS text message, and this was a text
13  message that was on your personal cell phone?
14      A.  Yes.  That is a screen shot of my personal
15  cell phone.
16      Q.  And you say to Mr. Lang you might want to
17  take my call.  I could pretty much guarantee it is
18  more important than anything else.  Is that right?
19      A.  I am trying to garner his attention, yes.
20      Q.  And the reason that you thought it was
21  more important than anything else is likely because
22  you were anxious to talk to him about being placed
23  on leave?
24      A.  At the time I considered him a

Page 171

1  professional colleague and an advocate that was
2  interested in my well being and what I did.
3          So I was merely stating, you know, it's
4  great that you are in London with transport for
5  London, but you may want to return my call.  I'm
6  pretty sure it's worth your time.
7      Q.  Why did you think it would be worth
8  Mr. Lang's time?
9      A.  Because I thought Mr. Lang cared about me,
10  but I found out later that he doesn't.  So I thought
11  that he had my interests at heart, at least he had
12  led me to believe that over the years of our
13  professional relationship.
14      Q.  And if you could turn back to the first
15  page of CTA Exhibit 17, Mr. Haynes.  And I am
16  looking at the second paragraph of your e-mail to
17  Mr. Pable.
18          You say in the middle of that
19  paragraph, of course, everything was white hat in
20  the interest of public good.  I said it then, and I
21  will say it again and forever, in caps, I take full
22  responsibility for our posting of an alert to Dayton
23  and against your wishes, not fully thought out.
24          When you say that, was that something

Page 172

1  that you had discussed with Pable the day before,
2  about taking responsibility for Dayton?
3      A.  Perhaps.  The day before here would have
4  been Wednesday.  So that lines up with the Starbucks
5  meeting, and the return of items to the CTA.
6      Q.  And so did you discuss the idea of taking
7  responsibility for the Dayton test with Pable when
8  you met with him?
9      A.  I am sure that that sentiment was conveyed
10  at that meeting, as indicated by this discussion.
11      Q.  Did you discuss with Mr. Pable making an
12  e-mail record or a written record of you saying that
13  you were taking responsibility?
14      A.  No.
15      Q.  When you met with Pable the day before was
16  he angry?
17      A.  No.
18      Q.  Did he ever express being upset with you
19  that this test was conducted?
20      A.  No.  He shared the mutual disappointment
21  in the turn of events.
22      Q.  And you say in this e-mail as well, CTA
23  Exhibit 17, in the last sentence of the second
24  paragraph, I can only think that this is about a

Page 173

1  revenge move from Craig and perhaps in concert with
2  Veronica against me and you by extension.
3          Do you see that?
4      A.  I do.
5      Q.  Why do you think that Craig would want to
6  exact revenge on you?
7      A.  Earlier in the paragraph it states in the
8  third or fourth sentence he was really mad at us for
9  finding issues with things and looking at back end
10  data flows.
11          So it was clear that Mr. Lang was very
12  mad.  And Mr. Lang would have discussed this with
13  Veronica and his colleague and friend Mr. Dorval
14  Carter, the president of the CTA.  He would have
15  conversations with them without my knowledge.  And
16  it's just me speculating during a stressful week of
17  paid administrative leave pending the internal
18  investigation of what might ultimately be going on
19  here.
20      Q.  And why did you say that Veronica may be
21  seeking revenge against you?
22      A.  As evidenced by not getting fairly
23  compensated.  It was fairly well-known that Veronica
24  did not have my best interests or think very highly

44 (Pages 170 - 173)

Page 174

1 of me at all.
2   Q.  You said that was fairly well-known.  How
3 did that come to be known at the CTA or otherwise?
4   A.  Veronica was my boss's boss.  She never
5 did anything for me.  She never attended any
6 meetings.
7       Jim Psomas said that she was cold to me
8 or, you know, not supportive of me.  It was pretty
9 apparent.
10   Q.  Was Veronica supposed to attend meetings
11 with you as part of her role?
12   A.  There were occasionally times when we
13 would have monthly check in meetings.  And she was
14 invited and seemed indifferent about any of the work
15 that we did or that my group was involved with.
16   Q.  As you sit here today, do you think that
17 Veronica, and I guess I should say when you're
18 referring to Veronica, you're referring to Veronica
19 Alanis?
20   A.  Correct.
21   Q.  And as you sit here today, do you think
22 that Veronica had anything to do with your
23 separation from CTA employment?
24   A.  As my boss's boss, I certainly think she

Page 175

1 was involved in the process.
2   Q.  But aside from a supervisory role, do you
3 have any belief that she had any role?
4   A.  She was close to the president.  As you
5 indicated, there is the letter from Clever Devices
6 to Mr. Carter.  And I could only imagine that a
7 conversation was had.
8   Q.  Can you turn your attention, Mr. Haynes,
9 to CTA Exhibit 46.  Let me know when you have it
10 available.
11   A.  I do.
12   Q.  CTA Exhibit 46, this is another e-mail
13 from you, Mr. Haynes, from your personal gmail
14 account to Mr. Pable's account on October 24, 2018,
15 right?
16   A.  Uh-huh.
17   Q.  In it the fourth paragraph down you say I
18 have to prepare for this interview tomorrow.  I have
19 no idea how I am going to rally myself here.
20       Could you tell me what you are referring
21 to?
22   A.  Yes.  I had a job interview previously
23 scheduled and was taking a personal business day on
24 Thursday, October 24th.

Page 176

1   Q.  And what was that job interview for?
2   A.  It was for a company called A to B. I had
3 explored them as an opportunity.  They had a
4 contract with the Illinois Tollway Authority for
5 toll booth electronic upgrades.
6       And I had sort of thrown my hat in
7 there.  They were a big player in mobility as a
8 service, applications in Portugal, and they had a
9 presence here in Illinois.  So I had reached out to
10 that and gotten as far along as an interview.  I was
11 not ultimately offered a job with them.
12   Q.  And in the paragraph that follows that in
13 CTA Exhibit 46, you say "I know it may seem like it
14 is not getting to me as much as you or you're
15 marveling at how I'm handling it, and it's not easy.
16       This is deeply painful and now living
17 this double life."   What do you mean by saying you
18 are living a double life?
19   A.  I had not yet told my children and my
20 inlaws about being placed on paid administrative
21 leave.  I did that on Friday evening at the
22 conclusion of this week.
23       So the double life I was living was I
24 was still getting up every morning and leaving the

Page 177

1 house as if I was going to work so my children would
2 not see that I was out of work or the pain and scars
3 of this and what it was doing to me.  So I would
4 leave the house as if I was going to work, go to a
5 Starbucks or something in town.
6       Sometimes I'd even come home and then
7 have to leave the house before my children and
8 father-in-law got back home with the kids so that I
9 wasn't there because why is daddy home.
10       So the double life that I was leading
11 was pretending to be employed, which only my spouse,
12 father and others knew that I was on administrative
13 leave.
14   Q.  I see.  Okay.  Could you turn your
15 attention, Mr. Haynes, to CTA Exhibit 47.  Let me
16 know when you have that up.
17   A.  We're there.
18   Q.  So CTA Exhibit 47, this is an e-mail,
19 Mr. Hayne, that you forwarded to Mr. Pable on
20 October 24, 2018.  Correct?
21   A.  Correct.
22   Q.  And it's forwarding a message that you had
23 sent to Mr. Psomas in response to certain questions
24 he had asked of you after you were placed on leave,

45 (Pages 174 - 177)

Page 178

1 right?

2    A. Correct.

3    Q. And you mentioned that you had returned to

4 Mr. Psomas your CTA issued laptop, correct?

5    A. Yes.

6    Q. And did you have any other CTA issued

7 devices in your possession that you returned to

8 Mr. Psomas?

9    A. I think I mentioned earlier a couple of

10 keys. Perhaps a radio. I think the radio was on my

11 desk. I think it was just the CTA laptop and a

12 handful of keys is what I returned to Mr. Psomas.

13    Q. And in addition to your CTA laptop when

14 you were at CTA headquarters working you had a

15 desktop computer, is that right?

16    A. Actually, it's two desktops. I had my

17 LUNIX work station on my primary desk, and I used a

18 Clever CAD work station in kind of a workshop

19 cubicle that we had set up. The physical computer

20 never left.

21    Q. Right. Did you have either of those

22 computers encrypted, Mr. Haynes?

23    A. I believe that the LINUX computer that was

24 on my desk was encrypted pursuant to CTA had done

Page 179

1 this thing. Michael Radojcic spear headed this. He

2 was the CIO for the acting chief information

3 security officer or something.

4    And they come around with this idea of

5 putting bit locker on all of the computers and

6 encrypting the hard drives. I had a nonstandard

7 desktop because I had turned my desktop into a LINUX

8 work station that allowed me to do more of

9 the work I was doing.

10    At one point we ran an encryption

11 process across that, but I didn't have anything

12 special. And I think this e-mail that you are

13 referring to even gives the password to my local

14 desktop.

15    Q. So your local desktop was not encrypted

16 then?

17    A. As mentioned, the LUNIX or Ubuntu,

18 U-b-u-n-t-u work station at my primary desk was

19 encrypted. This e-mail that I can see I believe

20 gives the information to connect and get into that

21 machine. It looks correct.

22    Q. The desktop, you said Ubuntu. that was

23 the LINUX machine at your cubicle?

24    A. Yes.

Page 180

1    Q. And then you also have information for a

2 desktop, CAD work station?

3    A. Yes. That was in the sort of CAD lab we

4 called it. It was in the cubicle across the way

5 where I spent the vast majority of my time.

6    I bounced between the two, but I spent a

7 lot of my time on the CAD work station. And this

8 e-mail provides the user name and password for my

9 account and the administrative account for that

10 machine.

11    Q. I'm sorry if I am belaboring it. I want

12 to make sure I understand. Which of the devices

13 that were within your control at CTA headquarters

14 were encrypted?

15    A. The Ubuntu desktop in my main cubicle was

16 encrypted. The desktop CAD work station was not

17 encrypted because that work station was meant to be

18 an image of the work station that was used in the

19 control center so that if there ever was a problem

20 with one of the work stations in the control center

21 we could make a copy of my work station and get it

22 over to the control center, and it be spun up as a

23 fresh work station.

24    So my machine was like a testing ground

Page 181

1 for the work stations that were more critical in the

2 control center, and the work station in the control

3 center remained unencrypted.

4    Q. So thank you. That's helpful. Were you

5 aware that Mr. Pable had his CTA computer encrypted?

6    A. Yes. Around the same time we encrypted my

7 Ubunto when this administrative policy regarding

8 security came out, Chris took security and as you

9 could tell, encryption very seriously. And we

10 complied with that directly.

11    Q. Were you aware that Mr. Pable used a

12 password manager to manage his passwords for his CTA

13 devices?

14    A. I was aware he had a password manager of

15 some kind and that his phone and him were a part of

16 that.

17    I wasn't aware of the intricacies of how

18 it worked, just that there was a security, that he

19 had an integrated security with his phone.

20    Q. Did you authorize Mr. Pable to use that

21 password manager to manage his passwords for the CTA

22 devices?

23    A. I wouldn't say directly, but it's not like

24 I objected to it. I knew there was this

46 (Pages 178 - 181)

Page 182

1  administrative procedure that we needed to have our
2  computers in Bit Locker or whatever and that CTA was
3  actively going around to work stations to do that.
4      Our work stations, we needed to be
5  administrators of our work stations for the type of
6  work we did. Our work stations were kind of off the
7  grid, so to speak, of the overall CTA network. I do
8  recall at one point CTA sent around somebody
9  checking all work stations if they were bit
10 lockered, and they were sort of in screen trying
11 computers and taking down serial numbers of
12 computers.
13     And I said they were in Chris's
14 computer. That is one of the CAD stations that's
15 got the encryption on it. My desktop is LINUX,
16 nonstandard. It's encrypted, and I would have
17 pointed to the CAD work station across the aisle and
18 said that one remains unencrypted for the reasons I
19 mentioned.
20     Q. Understood. Thank you. I know you
21 mentioned that in the course of being on leave you
22 had a job interview.
23     Were you actively looking for other
24 employment while you were still employed with the

Page 183

1  CTA before you were placed on leave?
2      A. Yes.
3      Q. And did you have any other job interviews
4  while you were still employed by the CTA?
5      A. Yes. One day in September of 2018, I had
6  a one day interview with Trapeze, a transit software
7  company. And I flew out to Baltimore area for a one
8  day interview.
9      Q. And were you aware if Mr. Pable was
10 looking for other employment while he was still
11 employed by the CTA?
12     A. In some of our conversations on walks I
13 knew that he was entertaining a company called Roth
14 Ross in the video game industry local to the
15 Chicagoland area. But no formal offers or anything.
16     We talked in broad strokes about the
17 future and things like that, as close colleagues do.
18     Q. I want to turn now, Mr. Haynes, to the
19 interview that you anticipated at from the CTA,
20 which was conducted on November 2, 2018. Do you
21 recall that?
22     A. Yes. Is November 2 a Friday?
23     Q. I believe it is. So you were asked to
24 come to the CTA headquarters by Jim Psomas on that

Page 184

1  day, is that right?
2      A. Correct. I believe an e-mail came out on
3  a Wednesday to me requesting my presence at
4  9:00 a.m. at CTA headquarters on November 2.
5      Q. When you were walking into that interview,
6  had you prepared for the interview with Mr. Pable
7  prior to that?
8      A. Yes. As previously discussed, we met sort
9  of to console and counsel each other at the
10 aforementioned Starbucks prior to that, prior to
11 that meeting.
12     So I believe we met at 8:00 a.m. and
13 then walked over separately. I think our times for
14 entry were staggered or 9:00 and 9:30 or maybe it
15 was both at the same time.
16     Q. When you met with Mr. Pable, did you
17 discuss anything that you both intended to say or
18 not say during your interviews?
19     A. I don't really remember the context of
20 everything. I mean we were still in the dark over
21 what the exact substantive nature of the
22 investigation was other than that it was likely the
23 Dayton incident, as we referred to it, or as seemed
24 to be referred.

Page 185

1      Notably because we were both placed on
2  paid administrative leave at the same time, Mr. Lang
3  cut off communications. So that kind of tied pieces
4  together. I went into that interview having a
5  typed up resignation letter. I believe I provided
6  that in my subpoena materials, request for materials
7  because I went into that thinking that they're
8  probably going to do something here to me, and I
9  better have a resignation letter on hand.
10     I was hoping it would be a legitimate
11 investigation interview, seeking sort of a full
12 picture of the story, but it wasn't. I believe when
13 I got there they brought me up, the secretary, the
14 administrative assistant to Veronica I believe
15 brought me up and sat with me in a conference room
16 killing time while they discussed things with
17 Mr. Pable. And then they brought me into a
18 conference room for discussion.
19     Q. So as you recall, you were interviewed
20 after Mr. Pable?
21     A. That is how I recall it, yes.
22     Q. Did you consult or communicate at all with
23 Mr. Pable prior to going into your interview after
24 he had been interviewed?

47 (Pages 182 - 185)

Page 186

1    A.  No.
2    Q.  Did you have your wife contact Mr. Pable
3  to ask what he had learned in the interview to share
4  with you?
5    A.  No, I didn't ask my wife to contact him.
6    Q.  You mentioned that you brought your typed
7  resignation letter because you intended to resign
8  that day or you thought you might resign that day?
9    A.  I didn't really know exactly what I was
10  walking into and if I was walking into a situation
11  where I anticipated where you could either be fired
12  or you need to resign, I felt that the prudent thing
13  to do to be prepared was to have a resignation
14  letter on hand with me.
15    Q.  Did you bring anything else with you into
16  the interview?
17    A.  I don't believe so.
18    Q.  And who was interviewing you that day?
19    A.  Mr. Psomas, Mr. Mike Radojcic, again, I
20  can't spell the last name.  And someone from HR.  I
21  don't know her name, but it was a female.
22    Q.  Was it Marie Marosevich?  Does that ring a
23  bell?
24    A.  Maybe.  Female, that is all I remember.

Page 187

1    Q.  It wasn't a woman or anybody that you had
2  ever interacted before at the CTA?
3    A.  Correct.  It wasn't anybody that I knew.
4    Q.  And you had had prior dealings with Mike,
5  and his name for the record is spelled
6  R-a-d-o-j-c-i-c.
7        You had had dealings with Mike Radojcic
8  before, right, Mr. Haynes?
9    A.  Correct.
10    Q.  And the interview took place in a CTA
11  conference room?
12    A.  Correct.
13    Q.  Did you take any notes with you when you
14  were in the interview?
15    A.  I might have scribbled some thoughts down
16  on a piece of paper.  I tend to be -- when I learn
17  things I like to write it down, but I don't
18  necessarily keep the paper as nostalgic or anything.
19  I honestly don't think I wrote much if anything
20  down.
21    Q.  And you don't have anything from that
22  interview that you wrote down?
23    A.  No.
24    Q.  Can you describe the interview for me?

Page 188

1    A.  Caustic.  Certainly, Jim Psomas had I
2  believe a printed list of some questions.
3  Ironically we all sat spread out it was like a pre
4  Covid kind of a doomsday meeting.
5        Jim was on one side.  Mike Radojcic was
6  on the other side, and the HR person sat near by.  I
7  don't believe the HR person ever said anything.  And
8  it was just a series of questions related to the
9  Dayton incident, I believe.  Honestly I don't really
10  remember the substance of it other than at the end I
11  was given the option of either being terminated or
12  resigning.
13        There really wasn't any sort of due
14  process, if you could call it that.  I was quite
15  distraught.  I signed the paper, the resignation
16  letter that I had brought.  I passed that across the
17  table.  The HR woman brought me downstairs to HR for
18  some COBRA paperwork or something I think I asked
19  for.
20        I sat in a small conference room or
21  interview room down in HR and cried my eyes out for
22  about ten or 15 minutes.  The HR person was sort of
23  I know you need to collect yourself here.  And I
24  collected myself.  She brought me some papers, COBRA

Page 189

1  and maybe a pension phone number or something,
2  pension office phone number.  And I believe I called
3  my wife.  One should call their wife when they get
4  terminated from their employer.
5        And my mom happened to be in town that
6  day.  She had met up with a friend of hers for lunch
7  at Oglive Northwestern station.  And after I left
8  the CTA I called my mom and Chris.  And Chris, my
9  mom and I had lunch together.
10    Q.  Sorry, I wanted to pull back a little bit
11  on the interview process.  And then we will follow
12  up like you said if that's okay.
13        So when you were sitting in the
14  interview I think you said the woman from HR did not
15  ask questions, is that right?
16    A.  Correct.
17    Q.  And Jim Psomas asked questions in the
18  interview?
19    A.  Correct.  He led the meeting.
20    Q.  Did Mike Radojcic ask any questions?
21    A.  I believe so.  I don't know the substance.
22    Q.  Did you explain to them how the Dayton
23  test had transpired?
24    A.  I am positive that I explained what I knew

48 (Pages 186 - 189)

Page 190

1 and answered their questions truthfully and honestly
2 to the best of my ability at the time.
3    Q.   And do you recall what you told them about
4 conducting the Dayton testing?
5    A.   I really don't.  I imagine they had notes.
6 I imagine that the CTA had done a thorough and
7 comprehensive investigation over the two weeks.  I
8 thought that this was just part of that continuing
9 investigation.
10        And it really seemed to be a foregone
11 conclusion that it was, how shall we say, a kangaroo
12 court to just make it look like we're doing an
13 investigation, and the whole thing could have been
14 summed in five minutes if they had just started with
15 the you're either going to be terminated or you
16 could resign.  But they went through the motions.
17 They have notes.
18        I would ask them the substantive nature
19 of the conversations because it was pretty traumatic
20 for me.
21    Q.   I understand and obviously we will follow
22 up with those individuals for their notes.  I am
23 trying to get an understanding of what, if anything,
24 you recall about what you told them in the interview

Page 191

1 and in particular what I would want to know is what
2 you recall telling them about the Dayton test.
3    A.   I would have told them what happened and
4 what I and Chris did as part of the Dayton test.
5 That is the best of my recollection.
6    Q.   So did you tell them who conducted what as
7 part of the Dayton test?
8    A.   I would have answered the questions they
9 gave me to the best of my ability.  I don't know
10 exactly what I said.  I don't have a recording of
11 it.  I don't have any notes of that meeting.
12        They're the ones who asked the questions
13 and took notes.
14    Q.   Right.  So do you recall if you told
15 anyone in that meeting that you had Pable set up
16 code or a test for you to press enter on?
17    A.   I don't know their exact questions, and I
18 don't know exactly how I answered them.
19    Q.   So you don't recall any answers that you
20 gave in the meeting right before you were terminated
21 from a job that you had for 18 years?
22    A.   I don't recall exactly what was asked and
23 what I said.  And if something was written down or a
24 transcript was made of that, I would prefer to work

Page 192

1 off of notes.
2        I didn't take notes.  After that being
3 presented with the decision to be terminated I
4 really blocked a lot of that out from that meeting
5 other than to recognize that it was all a farce and
6 a show before my termination.  I don't know the
7 specifics of the answers to their questions.
8    Q.   I am probing your memory to see if any of
9 these questions, if you recall any answers.  I will
10 ask you a few more questions to see if you remember
11 anything that you said in the interview right before
12 you lost your job.
13        Did you explain to anyone in the
14 interview that Pable had objected to conducting the
15 Dayton test?
16    A.   I don't know if I conveyed that.  It seems
17 reasonable if I were asked, I would have said that
18 Chris didn't want to do this.  I don't know what
19 their questions were at this point, and I don't know
20 my exact answer.
21    Q.   So you don't recall if you told them that
22 you were the one that conducted the test or if Pable
23 was the one that conducted the test?
24    A.   I would have taken the responsibility for

Page 193

1 my actions in the event.  I don't know exactly what
2 I said.
3        They didn't set it up in any way where
4 it was a formal interview with sort of
5 transcriptions or notes or signed statements or
6 anything.
7    Q.   So is there anything that you recall
8 saying to them at all in the interview that you had?
9    A.   I don't know the specifics of what I said
10 in that interview.
11    Q.   Do you know anything generally that you
12 recall telling them in the interview that you had?
13    A.   I would have answered their questions from
14 whatever they said, and I know that the topic was
15 the Dayton incident.
16    Q.   Right.  But you don't recall anything that
17 you actually said.  All you know is that you
18 answered their questions?  Is that fair?
19    A.   Fair.
20    Q.   So the interview then concluded, right, or
21 do you recall that?
22    A.   Correct.
23    Q.   What happened after the interview
24 concluded?

49 (Pages 190 - 193)

Page 194

1    A.  I went through this.  They provided me,
2  Mr. Psomas provided me a piece of paper.  I think he
3  had two pieces of paper.  One was you're fired,
4  you're terminated, and one was you resigned.
5        I think I pulled out a resignation
6  letter that I had previously typed, which I provided
7  in my subpoenaed materials.  I signed that, slid it
8  across the table to Mr. Psomas, and I cried.  And
9  went down with the HR woman to call my wife and get
10  some paperwork before being escorted out.
11    Q.   Then you said you had lunch with your
12  mother and with Mr. Pable?
13    A.   That is correct.
14    Q.   Where did you have lunch?
15    A.   The pizza place in Oglive.  I forget what
16  it's called, in the back of the Oglive
17  transportation center on the Canal side.
18    Q.   Did you and Mr. Pable discuss the
19  interviews that you participated in that morning?
20    A.   Yes.
21    Q.   What do you recall Mr. Pable telling you
22  about his interview?
23    A.   That his interview was similar.  Mike
24  Radojcic, Jim Psomas, someone from HR.  He told me

Page 195

1  it was very similar, the conversation, that the
2  questions and things from my recollection it seemed
3  like we were interviewed the same.
4        The difference being at the conclusion
5  of his interview he was not given the ultimatum of
6  termination or resignation.  So to my knowledge the
7  only difference between the two were he went first,
8  but he didn't get the you're going to be terminated
9  or resign.
10        I got the same except that mine ended
11  with termination or resignation, and it was clear
12  that that was their intent going in because they had
13  both pieces of paper ready to go.  There was no
14  third option.  There was no, we're keeping Mike if
15  he says the right things in this interview.
16    Q.   And did Mr. Pable when you met with him
17  after his interviews and after your resignation did
18  he tell you in the interview that he told the CTA
19  that he objected to the Dayton test?
20    A.   It's likely that he told me that he would
21  have said that he objected to it.
22    Q.   Do you have a recollection of that or are
23  you supposing that as we sit here?
24    A.   I don't have an exact recollection of

Page 196

1  everything that we talked about in the interview or
2  after the interview.  It was a traumatic day, and I
3  remember who and where and what transpired.  I do
4  not remember the exact specific questions, answers
5  and comments, but it is very likely that Mr. Pable
6  told me that he told them that he objected to doing
7  the test because as stated he did object to doing
8  the test.
9    Q.   What was Mr. Pable's state when you saw
10  him?  How did he appear?
11    A.   Similarly distraught and upset.
12    Q.   Was Mr. Pable coherent when you saw him?
13    A.   Yes.  Absolutely.
14    Q.   Did Mr. Pable tell you that he had a hard
15  time speaking during his interview with the CTA?
16    A.   That sounds familiar.  That sounds like
17  something Chris might have said, that he was worked
18  up or was distraught.
19        I think his was a half hour interview.
20  I think mine may have been 40 minutes, 45 minutes if
21  memory serves.
22    Q.   Did Mr. Pable tell you that he had been
23  drugged prior to participating in his interview?
24    A.   No.

Page 197

1    Q.   Did Mr. Pable tell you at any point while
2  he was on leave that he had been experiencing panic
3  attacks?
4    A.   I believe that topic came up, that he
5  was -- as evidenced in one of the exhibits you
6  showed.  I believe I indicated or Mr. Pable
7  indicated that I was handling this much better than
8  he was.
9        I think the fact that I had as I
10  mentioned, the double life to live, maintaining my
11  composure with my children and my inlaws at least
12  during the first week that I was forced to buckle
13  down and work through my emotions.  And I do believe
14  that Mr. Pable, I believe he mentioned that he had a
15  panic attack or was distraught, we'll say it that
16  way.
17    Q.   Did you ever observe Mr. Pable having a
18  panic attack?
19    A.   Not directly.
20    Q.   Did Mr. Pable ever discuss with you that
21  he was seeking treatment or care for his panic
22  attacks?
23    A.   I believe at one point he mentioned that
24  he was either looking into some home remedies or

50 (Pages 194 - 197)

Page 198

1 discussing with a doctor. That is really all I
2 know.
3    Q. Did Mr. Pable ever describe the panic
4 attacks to you?
5    A. Not in any detail.
6    Q. Were you aware if Mr. Pable was taking any
7 narcotics or other medication at the time of his CTA
8 interview?
9    A. No. I was not aware of any medication
10 that Mr. Pable would have been on at the time of the
11 CTA interview.
12    Q. Were you aware of any other mental health
13 or emotional distress that Mr. Pable was
14 experiencing while he was on administrative leave?
15    A. No, other than distraught and worked up
16 over it, similar to me being worked up. But I guess
17 he took it harder.
18    MS. BABBITT: Why don't we take a five minute
19 break off the record.
20    THE VIDEOGRAPHER: We're going off the record.
21 The time on the monitor is 3:13 p.m.
22       (Recess)
23    THE VIDEOGRAPHER: We're back on the record.
24 The time on the monitor is 3:22 p.m.

Page 199

1 BY MS. BABBITT:
2    Q. Mr. Haynes, before we move on to our next
3 exhibit I want to follow up on a few comments about
4 the interview that you participated in.
5       You mentioned I think you said there was
6 not due process in the interview proceeding. Could
7 you tell me what you mean by that?
8    A. I didn't feel like there was an
9 opportunity to really present or be presented, to
10 present another side of the story and be heard.
11       And it very much especially when it
12 concluded with termination or resignation it very
13 much had the tone of we have already made up our
14 mind. We're just doing this so that it looks to you
15 like we're caring about your thoughts and your
16 opinions and documenting things.
17       I do believe that at one point in that
18 interview I said am I being accused of any
19 wrongdoing or anything improper or something, and I
20 believe I was told no. That's about the only
21 substantive thing that I might have said. My main
22 feeling in that was that the decision was made, this
23 is just a fake opportunity to make it look like
24 we're getting your side of the story before we walk

Page 200

1 you out the door officially.
2    Q. And did you have any knowledge or any
3 sense of any other investigation that had been
4 conducted prior to you being interviewed by the CTA?
5    A. In the two week period there was no
6 questions, communication or anything to me related
7 to the subject matter of what this investigation was
8 regarding. No questions or statements were ever
9 made.
10    Q. And we talked a bit earlier today about
11 how part of the reason you said you didn't want to
12 tell Jim Psomas what happened with the Dayton test
13 is because you had concerns that he wouldn't
14 understand what had transpired, right?
15    A. Correct, that he wouldn't understand the
16 full nuances of what we were after and what we did.
17    Q. Did you attempt in this interview to
18 explain to Mr. Psomas what you did, in fact, do with
19 respect to the Dayton test in the interview?
20    A. Yes. I'm sure I went into the details of
21 answering their questions along the lines of what
22 happened when and how everything transpired.
23       I had sent Mr. Psomas that e-mail on I
24 believe it was August 31. He replied with thanks.

Page 201

1 If he felt that that was too vague, he could have
2 certainly emailed and asked for more detail at that
3 time.
4       I don't think that Mr. Psomas knew where
5 this came from or anything. This just came out of
6 the blue, and he was left to lead an interview with
7 an employee and get rid of me.
8    Q. But they asked you questions in the
9 interview about what actually transpired, as you
10 answered them, right?
11    A. Correct. He asked a question, and I gave
12 an answer. He took notes. So where those notes are
13 would be the account of what transpired on that day.
14    Q. Mr. Haynes, could you turn to CTA
15 Exhibit 26, please. Let me know when you have it
16 up.
17    A. I have it up.
18    Q. Mr. Haynes, do you recognize this to be
19 the set of messages that you produced in response to
20 the subpoena you received a few months ago?
21    A. Yes I do.
22    Q. CTA Exhibit 26, it reflects messages that
23 say to me. Those are messages you received from
24 Mr. Pable, is that right?

51 (Pages 198 - 201)

Page 202

1    A.   Correct.  Affirmative.
2    Q.   And the messages in each line where it
3  says from me, those are messages you sent to
4  Mr. Pable, is that correct?
5    A.   Affirmative.
6    Q.   And these are messages -- well, I guess
7  can you explain how you collected these messages to
8  produce them?
9    A.   So in my subpoena statement I mentioned
10  that I found an old backup of Signal messages either
11  on my old phone or in my Google cloud backup, and I
12  restored those messages on my local desktop.
13       And it said they were encrypted, but I
14  had a picture of the encryption key, and I was
15  unable to unencrypt them, and I was able to extract
16  this out and figure out which ones were from me to
17  Mr. Pable and which ones were from Mr. Pable to me.
18       And the version that you are seeing here
19  is where I spent time to clean them up and make it
20  more readable by putting the to me, from me and
21  cleaning out some of the other junk that was in the
22  message headers.  I believe I was requested to make
23  a subsequent production that had just a raw dump of
24  everything.

Page 203

1    Q.   And the messages that begin on CTA
2  Exhibit 26, the first one is dated November 2, 2018,
3  right?
4    A.   Correct.
5    Q.   And is that the first message that you
6  were able to recover in that recovery you just
7  explained to me?
8    A.   Correct.
9    Q.   And that is because prior to that text
10  message you had purged all the messages that you had
11  exchanged with Mr. Pable on your Signal application?
12    A.   Correct.  November 2 is the day I was
13  terminated.  1:20 p.m. would be after that
14  termination transpired.
15    Q.   And those messages, that purge that you
16  had conducted, that occurred before you participated
17  in your interview with the CTA, right?
18    A.   As mentioned previously, yes.  That
19  happened at the Starbucks that we met at prior to
20  arriving at the CTA.
21    Q.   And aside from those messages that you
22  purged, would you have had any other messages on
23  your phone or communications on your phone with
24  Mr. Pable beyond those purged messages?

Page 204

1    A.   No, because this was the only thing and
2  the e-mail were the only communication mediums used
3  to communicate between myself and Mr. Pable.
4    Q.   On the first page of CTA Exhibit 26, I
5  have highlighted some of the text messages.  I will
6  turn your attention to the last text message on the
7  first page of CTA Exhibit 26, which is highlighted
8  in yellow.  Do you see that message?
9    A.   I do.
10    Q.   And this is a message to you from
11  Mr. Pable, right?
12    A.   Correct.
13    Q.   In it, it says "Don't forget the tin can
14  and fingerless gloves dot dot dot kidding.  I'm
15  panicked as usual, but a little less since I have in
16  caps some answers.  And I have solace in whatever
17  happens even if I keep my job I think I have a case
18  against CTA." Do you see that?
19    A.   I do see that.
20    Q.   Have you discussed the possibility of
21  Mr. Pable having a case or filing suit against the
22  CTA?
23    A.   Yes.  During that two weeks we had talked
24  about a potential case.  Mr. Pable and I did meet

Page 205

1  with a lawyer at one point and then that
2  conversation really went nowhere.  And I didn't
3  pursue any case with Mr. Pable as a result of this.
4    Q.   What sort of case did Mr. Pable discuss
5  that he might pursue against the CTA when you were
6  on leave?
7    A.   The discussion revolved around whistle
8  blower protection, identifying security risk,
9  responsible disclosure and then being terminated for
10  identifying a security risk.
11    Q.   And what whistle blower activities were
12  you aware that Mr. Pable had conducted?
13    A.   He had mentioned something about OSHA,
14  National Transit Safety Act.  Something along those
15  lines where there is some legislation out there to
16  protect whistle blowers for identifying an unsafe
17  condition or an insecure situation, raising it to
18  their employer and then being harassed, dismissed
19  for raising the alarm.
20    Q.   Did Mr. Pable discuss with you that he
21  intended to sue on the basis that he had blown the
22  whistle to you about the purported security risk?
23    A.   I don't know the details of what we talked
24  about.  You have highlighted in the next one, yes,

52 (Pages 202 - 205)

Page 206

1 blame me.
2        I had already in numerous communications
3 I had taken the responsibility for the actions. He
4 told me it was something about this OSHA
5 Occupational Safety Health, Department of Labor or
6 under this and that is really the extent of it. I
7 kind of didn't follow his line, of course.
8        I thought I will support you in
9 whatever you decide to do, but I am moving on with
10 my life.
11    Q.  So did you understand that Mr. Pable
12 intended to assert a claim that as a result of him
13 reporting a security risk to you that the CTA
14 terminated him?
15    A.  That was my understanding.
16    Q.  And do you think that is why the CTA was
17 going to terminate him before he resigned?
18    A.  Yes.
19    Q.  Why is that?
20    A.  I think the CTA terminated both of us
21 because we found this, did this, and CTA just knee
22 jerked it and said we'll just get rid of them both.
23    Q.  And you believe that the CTA got rid of
24 both of you because you identified a security risk?

Page 207

1    A.  I think they got rid of both of us because
2 they didn't like the letter that Clever Devices
3 sent, and they took the solution of just we'll just
4 get rid of them and nobody sought to get our side of
5 the story and our perspective.
6        They didn't even share with us the
7 letter that Clever Devices sent to Mr. Carter. And
8 they terminated us on the basis of finding this
9 problem, reporting it and Clever's assertion in this
10 letter that we did things improperly.
11    Q.  Do you believe that the CTA terminated or
12 sought to terminate you and Mr. Pable because you
13 had conducted the test on another transit system?
14    A.  Yes, all related. The whole thing.
15    Q.  So you pointed out on page two of CTA
16 Exhibit 26, this is a text message back from you to
17 Mr. Pable that says yep, just blame me. I am
18 already under the bus. Just toss here in reverse.
19 That is why the buses are still working.
20        So what did you mean by yep, just blame
21 me?
22    A.  Exactly that. You know, I am already the
23 one that has taken responsibility for deciding to
24 do, executing the test on Dayton with Mr. Pable's

Page 208

1 support or help against his recommendation. I sent
2 e-mails to Dayton and Clever Devices.
3        I could have just as easily not sent any
4 e-mail to Dayton or Clever Devices after this and
5 just forgotten the whole thing. But I reported it.
6 I did what I did. And that is exactly what I am
7 getting at there is fine. Mr. Pable reported to me,
8 and I was his supervisor. This is all happening the
9 day after I have been terminated.
10        At this time I have already applied for
11 unemployment, and no further comment on this.
12    Q.  So your understanding was even while
13 Mr. Pable remained on administrative leave he was at
14 that point considering how he could sue the CTA?
15    A.  As I mentioned, we had met with a lawyer
16 earlier in the week. So I don't know if it was to
17 directly sue the CTA or to at least file a complaint
18 with this OSHA and National Transit statute and see
19 where that goes.
20    Q.  And the following text message on page two
21 of CTA Exhibit 26, I don't have it highlighted, but
22 do you see the message that says to me no, this is
23 absolutely in quotes a hostile environment
24 territory. Do you see that?

Page 209

1    A.  I do see that.
2    Q.  And did Mr. Pable discuss being in a
3 hostile work environment with you?
4    A.  According to this message that is him
5 discussing that he looks at this as if it's a
6 hostile work environment.
7        We talk at length about that it was a
8 very toxic work environment. We talked earlier
9 about Veronica Alanis and Mr. Psomas not really
10 looking out for their own staff or seeking to
11 rightfully compensate their staffs. So I believe
12 that is just Mr. Pable expressing the grounds that
13 he has in filing a whistle blower protection case.
14    Q.  The last text message highlighted on page
15 two of Exhibit 26, you see this message that you
16 received from Mr. Pable, Mr. Haynes.
17        It says, "I think they were trying to
18 prod to find evidence that I, quote, hacked other
19 things. That is why they were asking about hobbies
20 and stuff. Don't feel sorry. I trust your
21 judgment. You have way more experience. It's not
22 entirely on you, though.
23        Without me you wouldn't have had the
24 quote power to be put in that situation. I feel

53 (Pages 206 - 209)

Page 210

1 partly responsible for making things possible."
2 You received that message from Mr. Pable?
3     A.   Yes, November 4, 2018 at about noon.
4     Q.   What did you understand Mr. Pable to mean
5 or was saying to you that he felt partly responsible
6 for making things happen?
7     A.   Well, certainly without Mr. Pable we would
8 not have found the skeleton key lying on the ground
9 so to speak or in plain text in the Wire Shark
10 traces communication.
11         And without Mr. Pable we would not have
12 found the undocumented back end customer service
13 alert API, which is what facilitated the injection
14 of the ability to inject an alert into an active
15 BusTime system.  So what he means by you, being
16 Mr. Haynes, wouldn't have the power in quotes to
17 have been put in that situation.
18         As we mentioned, I did not have the
19 knowledge to type the command to input and inject
20 the message into the Dayton or any other system.
21 And without Mr. Pable I would not have learned of
22 the skeleton key.  I certainly had the ability to
23 take the skeleton key and sort of benignly test it
24 on our bus tracking installations.  I hope that

Page 211

1 answers what you're looking for there.
2     Q.   Yes, thank you.  It does.  Can you turn to
3 page four of CTA Exhibit 26, Mr. Haynes.  It's
4 marked MH 7 at the bottom.
5     A.   Yes, I'm there.
6     Q.   I have highlighted the third text on that
7 page.  Do you see that text message?
8     A.   Yes.
9     Q.   Would you read that message and let me
10 know when you've read it.
11     A.   I've read it.
12     Q.   In this it says Mr. Pable says to you that
13 they were super keen on why I wouldn't go behind
14 your back during the interrogation.
15         What did you understand that to mean?
16     A.   That during the -- I don't know exactly
17 other than it sounds like what is describing is that
18 during his interview with the CTA they were trying
19 to I guess have Chris sort of really give them the
20 fodder and the piece that would give them all they
21 needed to say we're going to go and toss me to the
22 curb.
23         So it sounds like they really wanted to
24 know why Chris wasn't going to just I guess sell me

Page 212

1 out directly in a conversation.  That's all I can
2 say on what that sentiment seems to be, that they
3 were maybe trying to get Chris to really push that I
4 did everything or something along those lines.  I
5 don't know.
6     Q.   And then following on that same page at
7 the bottom of page four, CTA Exhibit 26, do you see
8 that highlighted text message that begins I know.  I
9 appreciate it so much.
10     A.   I do see that.
11     Q.   This is another text message from
12 Mr. Pable to you?
13     A.   Correct.
14     Q.   And he says that's my only ray of light in
15 all this honestly, hopefully sticking this back to
16 them.  But at the same time they have the personal
17 stuff on my flash drive they may use against me
18 somehow after the whole interrogation was prodding
19 at my personal stuff.
20         Do you know what materials Mr. Pable was
21 referring to on his flash drive?
22     A.   No, I'm not aware of what personal things
23 Mr. Pable had on a flash drive in his computer.
24     Q.   Were you aware of anything that Mr. Pable

Page 213

1 kept on his computer or on his flash drive that the
2 CTA could use against Mr. Pable?
3     A.   No.
4     Q.   On the following page of CTA Exhibit 26,
5 there is a text message I have highlighted.  Let me
6 know when you see it.
7     A.   Okay.
8     Q.   It says just to keep you in the loop I
9 contacted O'Malley and case law, one consult for
10 whistle blower set for Monday.  I'll let you know if
11 slash when I need you, but with the notes we made
12 I'll do the leg work and should be fine solo.
13         If I return to work I will cancel the
14 appointment.  I can't thank you enough for your
15 support, and I'm so sorry it's going to make you out
16 to be the bad guy.  Do you see that?
17     A.   I do.
18     Q.   And that message Mr. Pable sent you on
19 November 6, what notes is Mr. Pable referring to in
20 that message?
21     A.   He and I had met with a lawyer in that two
22 week period as we talked about.  We had met with a
23 lawyer, and I scribbled down some notes.  And I had
24 gotten them to Chris, kind of our conversation.

54 (Pages 210 - 213)

Page 214

1 That lawyer, he was somewhere on Michigan Avenue.
2         We met with them for like a half hour,
3 45 minutes, and they didn't seem interested in the
4 case. But I scribbled down some notes as I tend to
5 sort of -- I mentioned earlier I tend to scribble.
6 So I got those notes to Chris. As I mentioned
7 earlier, I had no intention of pursuing any legal
8 action. That was my one and only meeting with a
9 lawyer related to this at that time.
10     Q.   And you said you scribbled notes. I am
11 inferring from that that they are handwritten notes.
12 Is that an accurate statement?
13     A.   Yes, I believe I typed them up and sent
14 them to Mr. Pable.
15     Q.   And have you shared or produced those
16 notes in response to the subpoena?
17     A.   I think I did. And we might have taken
18 them out because we thought that they were attorney
19 client privilege because it was a conversation we
20 had had with an attorney.
21     Q.   We will follow up with your attorney, but
22 I would ask you to produce those notes if they had
23 not been produced with the subpoena.
24     A.   They have been.

Page 215

1     Q.   They have been produced. Thank you. You
2 also received in that message from Mr. Pable, he
3 says I'm so sorry it's going to make you out to be
4 the bad guy.
5         What was he referring to, making you the
6 bad guy in this message?
7     A.   I would presume he's making me say that
8 I'm sorry, it's going to make me, Mr. Haynes, look
9 like the bad guy for taking the whistle blower
10 information or the security alert information from
11 Mr. Pable and not taking it up the chain, and
12 choosing to use it against the Dayton system.
13         And the subsequent e-mails to Dayton and
14 Clever Devices and as you mentioned now the Toronto
15 Transit Commission, which I forgot about until now.
16 So I think that Chris is merely saying I'm sorry
17 that it's going to make me, Mr. Haynes, look like
18 the guy who didn't do his job by taking the whistle
19 blower security information further up the chain.
20         In hindsight, if I had ran immediately
21 to Jim Psomas and Veronica Alanis and explained all
22 this in exquisite detail perhaps they would be
23 sitting here with me out of a job as well.
24     Q.   Did you think that Mr. Pable did anything

Page 216

1 bad in his role here?
2     A.   No. He to objected the test. He found
3 the skeleton key. As I state in the next message I
4 don't care about being the quote bad guy. Don't
5 even worry about that. I'm already out in my arse.
6     Q.   But you don't think that Mr. Pable did
7 anything wrong in this scenario or broke any CTA
8 rules?
9     A.   I guess he could have gone above me and
10 reported it and said Mike didn't raise it up the
11 chain, so I will. I guess he could have done that.
12 I don't fault him for it. He was leaving it to my
13 discretion for further communication.
14         He found the security problem. He
15 raised it to my attention. We raised a concern to
16 Clever Devices about some open security issues in
17 June regarding the service bulletin API. And then
18 again in late August when the key was identified.
19         In hindsight, definitely should have
20 pumped the brakes and had conversations with Clever
21 Devices before testing it further. But I guess I
22 really wanted to make sure that this was a serious
23 and as big a deal of an issue given that we had seen
24 Clever Devices' lackluster response to earlier calls

Page 217

1 for concern.
2     Q.   Can you turn, Mr. Haynes, to page ten
3 which is marked MH 13 of CTA Exhibit 36 and tell me
4 when you have found the highlighted text messages on
5 that page.
6     A.   Got it.
7     Q.   And that is a message that Mr. Pable sent
8 to you on December 6, 2018, right? He says Yeah,
9 I'll get the last laugh though even if I have to
10 unfortunately run you over with the bus again. Do
11 you see that?
12     A.   Yes.
13     Q.   When Mr. Pable is referring to running you
14 over with the bus again I guess what I was wondering
15 is what he had run you over the bus with previously
16 if you understood that?
17     A.   I mean I guess to the extent saying I was
18 the one that demanded the execution of the more
19 invasive test against Dayton.
20         So I think he's alluding to sort of hey,
21 I hate to break it to you. I'm going to pursue this
22 and that will drag me further into this, such as why
23 I'm sitting here today.
24     Q.   So Mr. Haynes, this CTA Exhibit 36, the

55 (Pages 214 - 217)

Page 218

1 first message you produced is dated November 2,
2 2018, right? If you go up to the top.
3    A.  Yes.
4    Q.  And then if you could go to CTA
5 Exhibit 49, Mr. Haynes.  It is in the shared folder.
6    A.  Yes, I could see it.
7    Q.  Mr. Haynes, tell me when you've got it up.
8    A.  Yes, CTA Exhibit 49.
9    Q.  This is the remaining chunk of text
10 messages that you produced in response to the
11 subpoena or actually the complete set.
12      So it has November 2, 2018 as the first
13 message and then the last message produced on
14 page MH 22, that is dated October 29, 2019, if you
15 go all the way to the end.  Is that right?
16    A.  Yes.  Correct.  This is the exact same
17 only without the highlights.
18    Q.  Exactly right.  This is the full set.  So
19 you had testified earlier today that you didn't, of
20 course, produce the Signal messages prior to the
21 date of November 2, 2018 because you had purged
22 those messages from your phone, right?
23    A.  Correct.
24    Q.  And that is a phone that you said I

Page 219

1 believe you said you still have in your possession,
2 but that you had wiped that phone, is that right?
3    A.  Yes, I cleaned that phone off with the
4 intention of using it with my kids.
5    Q.  And I would ask you to maintain that phone
6 and not do anything else to it for the course of
7 this litigation, and we'll follow-up with your
8 lawyer to provide you notice on that point.
9      But I guess what I am still a little
10 unclear about is how you were able to produce
11 messages from November 2, 2018 through October 29,
12 2019 and why those were all still visible or
13 available on your phone?
14    MR. LADUZINSKY:  Counsel, I am going to object.
15 He's already asked and answered.  He could answer
16 again for the third time.
17    THE WITNESS:  So I found in the course of being
18 subpoenaed for this case, when I was requested to
19 identify any and all materials related to my
20 communications with Mr. Pable, I happened to find a
21 file in my, I think it was in my Google drive Signal
22 backup where Signal had automatically backed up my
23 files.
24      It was either there or I saw it on my old

Page 220

1 phone, and I pushed it up to Google drive for
2 purposes of bringing it down to my Macintosh laptop
3 at home where I found some crypted line that says
4 this is how you take a Signal file and extract it.
5 And I extracted all of the messages related to
6 communications with Mr. Pable, and I went through
7 the trouble for you guys of cleaning it up by
8 putting to me and from me.  And it goes from the
9 moment of Starbucks, the first meeting and after the
10 Starbucks purge to October 29.
11      That last message is presumably after that
12 when Mr. Pable enacted the disappearing messages
13 feature where any new message that came in after
14 that disappeared within a day from both devices is
15 the way that works now.
16 BY MS. BABBITT:
17    Q.  I know you also mentioned and produced to
18 us, you had I think sort of pulled out or redacted
19 some of the messages and then you produced a fuller
20 set.
21      Did you withhold any other messages in
22 that second production that you made to us?
23    A.  No, that was a complete raw dump.  I was
24 sort of doing you a favor spending considerable time

Page 221

1 getting it down to 19 pages of relevant nonpersonal
2 communication.
3      And then when the response came back I
4 just went and ran the command again against this
5 archive and threw all of that into one giant
6 document.  And I believe it got rebates and sent
7 over.
8    Q.  On October 29, 2019, that is when
9 Mr. Pable switched the setting so that your messages
10 would disappear that you exchange with him within 24
11 hours?
12    A.  By a logical conclusion it seems that
13 would be the date that that occurred or that's the
14 last date of this backup.  But that's the last
15 Signal message that I have in archive.
16      I believe I mentioned earlier I got a
17 new phone somewhere in the time frame of this phone
18 that I have today, somewhere in the time frame of
19 December 2019.
20    Q.  Do you have any logs or any backups of
21 anything related to Signal after the date of
22 October 29, 2019?
23    A.  What I have you have.  I took a Signal
24 backup and saw that there were messages in there

56 (Pages 218 - 221)

Page 222

1 relevant to this subpoena. And I extracted all
2 communications between myself and Mr. Pable that I
3 have in my possession.
4     Q. Thank you. Can you turn to Exhibit
5 CTA 33, Mr. Haynes. Let me know when you have that
6 up.
7     A. We do.
8     Q. The second page of CTA Exhibit 33 is an
9 e-mail from Mr. Pable to Jeffrey Schroeder copying
10 you, Mr. Haynes. Correct?
11     A. Correct.
12     Q. It's dated November 20, 2018?
13     A. Correct.
14     Q. Who is Mr. Schroeder?
15     A. He was my former manager at the CTA when I
16 was in the technology department. And he and I were
17 peers in the planning department and then he moved
18 down to technology, and I moved down to technology.
19     I worked for Mr. Schroeder as a project
20 manager and then a senior project manager until
21 Mr. Schroeder was dismissed by the CTA, and I don't
22 know when that happened.
23     Q. This email that Mr. Pable sent
24 Mr. Shroeder on November 20, 2018, in it and I will

Page 223

1 direct you towards a little more than half way down
2 the paragraph begins so as for what happened, Mike
3 and I wrote this out for a meeting with a lawyer,
4 but it's really comprehensive. I'll share it at the
5 end. Do you see that?
6     A. I do.
7     Q. And so after Mr. Pable signs the e-mail
8 Chris, it includes some information and some dates
9 that appear in a different font on the second page
10 of Exhibit 33. Do you see that?
11     A. Yes.
12     Q. Is that a time line or a summary of the
13 events that you prepared with Mr. Pable?
14     A. It appears to be.
15     Q. And who wrote this?
16     A. It looks like something I would write. It
17 looks like my style, my writing and my font.
18     Q. Do you recall when you prepared this?
19     A. No, I don't recall when I wrote this.
20     Q. It's dated November 20, 2018. Do you
21 recall sharing or discussing this time line or
22 summary with Mr. Pable?
23     A. According to the paragraph I have reason
24 to believe that I prepared this with Mr. Pable or

Page 224

1 discussing with him. The fact that it is in this
2 e-mail from November 20, 2018 tells me that it was
3 written before that.
4     I did not come across this material in
5 my search other than in this e-mail because I know
6 that this e-mail was one I believe I produced
7 because the fact that it is ccing Mike Haynes, this
8 would have been produced as part of my subpoena
9 production. But the exact notes are not something
10 that I uncovered in my subpoena. So I don't have
11 the original of that.
12     Q. Do you have any recollection of you
13 preparing this outline or summary of events?
14     A. Not directly. It's probably something
15 that I typed up with Chris during those two weeks.
16 I am kind of seeing it again for the first time
17 here.
18     I know I produced these e-mails, but I
19 didn't dig in and read every word. So this looks
20 like something that we put together to collect our
21 thoughts before meeting with a lawyer in the period
22 of that two week paid administrative leave. And
23 then, of course, I moved on and decided not to
24 pursue any kind of legal action anyway.

Page 225

1     Q. Do you recall, Mr. Haynes, if Mr. Pable
2 modified this time line or had you change any of it?
3     A. I don't know. I mean it's copied in his
4 e-mail to Mr. Schroeder copying me. I just don't
5 know the origin.
6     I would have to search through the
7 other materials I produced or attempt to go back to
8 other raw files that may have overlooked entirely in
9 the production because I haven't seen this in years.
10     Q. You don't recall, for example, having this
11 being handwritten on paper and then typing it up
12 into a computer?
13     A. I don't recall. I wouldn't put it past us
14 that I scribbled notes down and then decided to sit
15 down and type them out in preparation for
16 discussion.
17     Q. And on page three of CTA Exhibit 33, this
18 is where it begins Aug. I suppose that is short for
19 August. Do you see that at the top of the page?
20     A. Yes, this would be bates number POO1173.
21     Q. Right. So it says on that page Mr. Haynes
22 for August 17 it says MH. Is MH referring to you in
23 this time line?
24     A. Correct.

57 (Pages 222 - 225)

Page 226

1    Q. MH makes the decision to test the skeleton
2 key and alert on another Clever Devices customer to
3 ensure that the issue was, in fact, pervasive and
4 not specific to CTA. Do you see that?
5    A. Yes.
6    Q. And then you say MH asks Chris to execute
7 override in his concerns.
8    A. Yes.
9    Q. Could you tell me what you mean by that?
10    A. Again, with seeing this closer maybe Chris
11 and I worked on this together. Maybe he wrote that.
12 I don't know, but it's indicating that as I stated
13 earlier I requested Chris to execute the command.
14        He stated that I clicked okay or the
15 enter button in objection to Mr. Pable not wanting
16 me to do that.
17    Q. And so I guess here you say that MH
18 Michael Haynes requests Chris to execute. Does that
19 mean at that point in time you were describing that
20 you asked Mr. Pable to execute the Dayton test?
21    A. This is writing up a summary of what
22 happened. As previously mentioned, I did not have
23 the technical capability of executing the Dayton
24 test. So Mr. Pable prepared it. We discussed it.

Page 227

1        I told him to continue. He prepared it.
2 I clicked, either I clicked the button or pressed
3 enter. So the word execute here, implied word in
4 between there is prepared to execute. Prepare the
5 execution of, and I was the executor as we
6 previously discussed. Is that clear?
7    Q. Yes, that's clear. So you're implying now
8 as you sit here today that you asked him to prepare
9 to execute it, okay.
10        And Mr. Pable sent this e-mail to
11 Mr. Schroeder and copied you?
12    A. Correct. We established that at the top
13 of the previous page.
14    Q. Then on August 28th in this time line or
15 summary in CTA Exhibit 33 for August 28 it says MH
16 e-mails Jim Psomas in parentheses his manager about
17 issuing resolution. Email is drafted by CP. CP, is
18 that Chris Pable?
19    A. Yes.
20    Q. In that you say we did not mention the
21 Dayton incident, we wanted to make sure the issue
22 was resolved, and we were all secure and not cause
23 harm to our CD-CTA relationship. Right?
24    A. That's exactly what it says.

Page 228

1    Q. We did not mention the Dayton incident. Is
2 that referring to you not explaining to Jim Psomas
3 that you executed that test on Dayton?
4    A. Correct.
5    MS. BABBITT: Can we take a five minute break
6 and then I have a few more questions for you.
7    THE VIDEOGRAPHER: We're going off the record.
8 The time on the monitor is 4:09 p.m.
9        (Recess)
10    THE VIDEOGRAPHER: We're back on the record.
11 The time on the monitor is 4:16 p.m.
12 BY MS. BABBITT:
13    Q. Mr. Haynes, I know we have talked quite a
14 bit about the Signal application on your phone. And
15 you mentioned how the feature was turned on to have
16 messages set up so that they disappeared within 24
17 hours.
18        Is that a setting that you can turn off?
19    A. I believe any party can change the overall
20 setting of disappearing messages.
21    Q. And so are you able as you sit here today
22 if you wanted to turn that setting off with respect
23 to your messages with Mr. Pable, you would be able
24 do that?

Page 229

1    A. I believe I could. I would refer you to
2 whatever Signal user documentation there is out
3 there.
4    Q. And in the course of preparing for this
5 deposition and in the course of discussing this
6 litigation, did you ever meet with Mr. Duffey,
7 Mr. Pable's attorney?
8    A. One time Mr. Pable's attorney met with me
9 very early on downtown on Michigan Avenue at We Work
10 location for about an hour just giving me the
11 general overview of the case and that I would
12 ultimately be likely subpoenaed and deposed.
13        And he just wanted to meet me and
14 understand what I knew of the situation.
15    Q. And was Mr. Pable at that meeting?
16    A. No, he was not.
17    Q. And aside from sort of generalities,
18 discussing the fact that you may be subpoenaed or
19 deposed in this case can you recall anything else
20 that you discussed with Mr. Duffey about the case?
21    A. Mostly just I was curious about time
22 lines. I think he was curious about what kind of a
23 witness I might be. And just sort of what's my
24 availability and what's going on. That was really

58 (Pages 226 - 229)

Page 230

1 the extent of the conversation.
2    Q.   Have you communicated with Mr. Pable in
3 the last 24 hours?
4    A.   Not in the last 24 hours.
5    Q.   With respect to Mr. Pable, when he was
6 under your supervision at the CTA, were you ever
7 made aware of the fact that Mr. Pable was engaging
8 in activities related to bitcoin or block chain
9 technology on his CTA computer?
10    A.   Not directly on his CTA computer.  I knew
11 he was researching.  I knew in his private life he
12 had bitcoin or was involved in bitcoin.  I know on
13 his CTA computer we had a conversation once about
14 the block chain in general as a methodology for
15 secure transactions with records.
16         And he indicated he was exploring that
17 as an opportunity to potentially solve a problem
18 that we were having.  I don't recall the specifics
19 of the problems or that sort of thing, but if we
20 think of our daily life as IT R and D, research and
21 development it's not outside of the realm of our
22 jobs to look for the latest and greatest of new
23 technology ideas that might be of benefit to the
24 CTA.

Page 231

1    Q.   Is that something that you have discussed
2 with Mr. Pable since the litigation began, the use
3 of block chain technology while he was at the CTA?
4    A.   I don't recall other than maybe he
5 mentioned something like they're after some kind of
6 block chain stuff we talked about.  And like I said,
7 I don't recall exactly what problem or idea we were
8 trying to solve with the block chain concept.
9         It was not a concept that was very
10 familiar to me.  But I know that he was interested
11 in it because of a particular solution it might have
12 offered for us.  Like I said, we really were the
13 tinkerers and the developers of lots of new and
14 innovative solutions at the CTA over our years.
15    Q.   And do you recall that you said something
16 like they're probably after me about block chain.
17 Was that a communication that he exchanged with you
18 on Signal?
19    A.   Yes.  As I mentioned, we only met in
20 person once or twice in the last year.
21    Q.   And do you talk on the phone with
22 Mr. Pable?
23    A.   Never.  I only use the Signal app as chat.
24    Q.   So in the last year aside from I know

Page 232

1 because of Covid you said you obviously have not met
2 in person.  All of your other communications with
3 Mr. Pable then have been via Signal?
4    A.   To my knowledge, yes.  I don't think I ever
5 had a phone call with him.  Any phone calls with him
6 would have been through the Signal app, which also
7 allows for phone calls.
8         And I can't recall the last time I heard
9 Chris's voice other than briefly here about the dogs
10 or needing a break.
11    Q.   And were you aware that Mr. Pable had on
12 his CTA computer files that contained hundreds of
13 thousands or hundreds of millions of passwords and
14 user names?
15    A.   He had mentioned that as part of his sort
16 of normal course of checking into systems and
17 things, that he keeps a tab on sort of the latest
18 breaches.
19         And I believe he mentioned he had
20 searched for or had gotten one of these exploits,
21 and he searched for any common passwords that we
22 were using.  I am not the best at security.  I know
23 I had the same password for lots of different things
24 inside of CTA.

Page 233

1
2         So I think he was searching that for any
3 of our names and passwords or that would potentially
4 compromise the CTA system.  But I wasn't aware of
5 the full extent of that or that it was on his
6 computer at the CTA.  I just knew he kept abreast of
7 large security outbreaks or exploits or
8 understanding the security landscape.
9    Q.   Did Mr. Pable disclose to you that those
10 password files that he had acquired from apparently
11 a data breach included user names of CTA users?
12    A.   At the time he probably told me that there
13 were some people in there.  I think he had indicated
14 if I remember correctly that we were like clean.  I
15 don't know.
16         He may have told me that my wife's user
17 name was compromised or something.  I remember on
18 occasion Chris being tied to sort of security data
19 breaches.  He was much better at it than our own,
20 CTA's own security officer.  I think he would inform
21 me if there was something he knew about that might
22 affect, do you use this app or do you use this, that
23 you might want to change your password, that sort of
24 thing.

59 (Pages 230 - 233)

Page 234

1    Q.   And did you ever alert anyone else at the
2  CTA about these issues relating to the passwords?
3    A.   Not to my knowledge, unless it was a
4  direct person that I worked with, and we felt that
5  there was a risk.  But I don't recall any situation
6  where there was a risk identified.
7    Q.   And was doing this, reviewing these
8  passwords and evaluating password security part of
9  Mr. Pable's job duties?
10    A.   From a broad general IT security
11  perspective, keeping the BusTracker system secure
12  and the nightly or weekly patches to servers and the
13  shelters signs and making sure that bad actors
14  stayed out of the systems that we were responsible
15  for, yes, I would say that he provided a valuable
16  asset to monitoring those trends and situations.
17    Q.   Did you ever discuss these password files
18  that were located on Mr. Pable's CTA computer with
19  him in the course of this litigation?
20    A.   No.  He might have mentioned that they
21  found this trove of passwords on his computer.
22  Again, I mentioned that I didn't even know that this
23  trove of passwords was on his CTA computer.
24         I didn't know whether it was on the CTA

Page 235

1  computer or whether he searched something in the
2  cloud.  So he mentioned that I believe in a message
3  to me that there was this issue of these passwords
4  and in asking me do I remember when and since it
5  didn't affect me or I didn't have direct knowledge
6  of being breached or, so to speak, in that data
7  breach or being in that data breach, I don't really
8  remember the details.
9    Q.   And those messages were on Signal, of
10  course?
11    A.   Yes.
12    Q.   Are you aware that Mr. Pable maintains any
13  personal websites?
14    A.   Yes.  He has a website at Menche.org,
15  which is the name of his dog.  He had showed me some
16  of that because he was going after a job with
17  Nintendo, I believe, and was putting together some
18  portfolios of various projects that he's done over
19  the years in his personal life, professional life,
20  his current employer and that we worked on together.
21         And I believe I reviewed some of his
22  websites for that in preparation for his job
23  application with Nintendo.
24    Q.   Was that after you both had left the

Page 236

1  employment of the CTA that you first reviewed
2  Mr. Pable's personal website?
3    A.   Oh, considerably after that departure.
4    Q.   Are you aware of any other alter egos or
5  aliases or pseudonyms that Mr. Pable uses aside from
6  his given name?
7    A.   Twitter.  I follow him on Twitter.  I
8  think it's Hackinghyena.  I wouldn't know exactly.
9  I couldn't spell it.  Or whatever the front part of
10  his gmail, which we've seen in a number of exhibits.
11         I don't know.  I just know that those
12  are some of his sort of online handles.
13    Q.   Are you aware that Mr. Pable role plays as
14  a character who he refers to as Gingeturano on the
15  hackinghyena?
16    A.   Yes.  I believe that's the full name from
17  the Twitter.  Chris is very big into the gaming
18  world, and we often joke that our worlds are very
19  different.  Me a family man on the south side, and
20  him as a big gamer, and our worlds are very
21  different.  But as they say opposites attract, and
22  we were good friends.
23    Q.   Is Mr. Pable a hacker?
24    A.   I would ask for a definition of hacker.

Page 237

1    Q.   How would you define a hacker?
2    A.   You know, a hacker, that term can come
3  across as very negative.  I look at a hacker as
4  somebody who likes to figure out how things work.
5  How to make things better both from a protection as
6  well as a how can I make someone's life easier.
7         One could argue that I'm a hacker.  I am
8  trying to find the best way to take data and turn it
9  into information.  And so I hack on the data.  I
10  hack away at it.  So from the context of a very
11  skilled computer programmer who is interested in
12  security, that would definitely describe Chris.
13         If that also describes a hacker, I would
14  put that in.  I know there are white hat hacker and
15  black hat hacker.  And a white hat hacker is looking
16  for penetration, testing from benign what's going
17  on, how can we make things better.
18         And the black hat tends to have the
19  connotation of negative hacking.  But I would say
20  that Chris is a very skilled, very curious
21  individual who is always looking out for the common
22  man and making systems better and work better.
23    Q.   Are you aware of Mr. Pable ever accessing
24  another network or system without the owner or

60 (Pages 234 - 237)

Page 238

1 user's knowledge or permission?
2     A.  I'm not aware of anything specific.  We
3 did the Dayton thing, and we came clean with that
4 the next Monday.
5         Everything done at CTA was on the CTA
6 network with the systems that he had access to.
7     MS. BABBITT:  I don't have anything further.
8 Thank you.
9         CROSS-EXAMINATION
10         BY MR. JADOS:
11
12     Q.  Good afternoon.  I am Steve Jados,
13 representing Clever Devices.  I don't think I have
14 too much.  So like I say I'll launch right into it.
15         Earlier on this morning there was a
16 discussion of a letter from Clever Devices to CTA
17 that you became aware of after your forced
18 resignation from the CTA.  I want to leave that
19 letter alone for purposes of my question, and my
20 question is are you aware of any communications in
21 which Clever Devices pressured or urged the CTA to
22 fire you or Mr. Pable at any time in the second half
23 of 2018?
24     A.  I am not aware of any conversations or

Page 239

1 communication.
2     Q.  Earlier today you looked at a string of
3 e-mails to and from Clever Devices in what was the
4 CTA's Exhibit 5.
5         Obviously, the document speaks for
6 itself, but my question is whether you or Mr. Pable
7 provided any elaboration orally and beyond what's in
8 that Exhibit 5 to Clever Devices as to what the
9 skeleton key could do?
10     A.  Exhibit 5, the conversation with Mr. Lang
11 and the name thread where I identified the issue.
12 Okay.
13         Short of a -- there was a conversation
14 that Mr. Lang set up with a Mr. Christos.  I think
15 that's his first name, I don't know how to say the
16 last name, where they discussed the issue with us
17 and admonished us.  And we discussed the severity of
18 the situation.
19         I don't recall any specific voice
20 conversations other than in our monthly meeting when
21 we talked about the issue in the action tracker.  I
22 think it's itemized in one of those e-mails where
23 the customer service alert bulletin is essentially
24 open and anybody who had a so called restricted key

Page 240

1 could theoretically post alerts to a message and
2 that is even without the skeleton key.
3         So we certainly made them aware of our
4 concerns of what could be done with the exploits of
5 the open and undocumented customer alert API, as
6 well as subsequent skeleton key identification.
7     Q.  Anything else in that regard that comes to
8 mind?
9     A.  No.  Just verbal conversations or
10 thoughts.  And, like I said, the entire issue went
11 completely dark, and no one really talked about it
12 ever again after about August 31.
13         And the next time we knew anything of it
14 was the letter you don't want me to mention.
15     Q.  Do you have any information beyond what
16 you have already stated today regarding with whom
17 your statements to Clever Devices about the skeleton
18 key and the service alert API were shared within
19 Clever Devices?
20     MR. DUFFY:  Can you say that again, I didn't
21 understand it.
22     MR. JADOS:  I will ask it a slightly different
23 way.
24

Page 241

1 BY MR. JADOS:
2     Q.  The information of what you have already
3 testified about today in terms of telling the folks
4 at Clever Devices about the skeleton key and the
5 risks and the service alert API and the risks, you
6 talked about what you said in that regard to folks
7 at Clever Devices.
8         I am curious whether you have any
9 knowledge of how that information you shared with
10 Clever Devices may have worked its way up the chain
11 within Clever Devices to other folks?
12     A.  Other than that Clever Devices issued a
13 technical services security bulletin related to the
14 BusTracker API where they came out and said to their
15 customers, hey, somebody found our key, and it
16 affects your system, and we need to patch it.
17         That was the extent of what I understood
18 Clever's cleaning up of their system.  I have no
19 knowledge of what happened behind the Clever closed
20 doors.  I have been in contact with numerous Clever
21 Device customers as part of my career, and I have
22 not mentioned, nor will I ever mention anything
23 related to this skeleton key and these issues.
24     Q.  Do you have any reason to believe that the

61 (Pages 238 - 241)

Page 242

1  CTA and the Clever Devices believed the story that
2  Pable just stumbled on the skeleton key and the
3  service bulletin API?
4      A.  I don't believe I understand the question,
5  but to the extent that -- Yes, I don't understand
6  the question.
7      Q.  Fair enough.  My contention essentially is
8  that Clever Devices and perhaps the CTA don't
9  believe the notion that Pable just stumbled upon the
10  skeleton key and that Pable just stumbled upon the
11  service bulletin API.
12          There's testimony from depositions,
13  things you weren't necessarily privy to, but assume
14  for purposes of my question that the CTA and Clever
15  Devices don't believe that this was just stumbled
16  upon.
17          So my question is if you have any
18  reason, any knowledge that would dispute Clever
19  Device's disbelief of the story?
20      MR. DUFFY:  I object because that
21  mischaracterizes the record the statement both in
22  terms of what they believe or don't believe and in
23  terms of what Mr. Pable says happened and what he
24  didn't say happened.  But you could answer.

Page 243

1      THE WITNESS:  If Clever Devices and the CTA
2  powers that be, both legally and internally don't
3  believe that, it's mere technological
4  misunderstanding.
5          Mr. Pable analyzed Wire Shark logs of
6  communications and identified in plain text the
7  skeleton key.  In my opinion, it is no different
8  than looking inside, being in your own home and
9  listening to your pipes and hearing something
10  rattling around in the pipes and look inside your
11  own pipes and see something, a house key.
12          So to the extent they don't believe that is
13  what I would call technical ignorance.
14  BY MR. JADOS:
15      Q.  You testified that the Dayton test would
16  be low penetration.  With that in mind, do you agree
17  with the assertion that the Dayton test was an
18  unauthorized access of the Dayton RTA's computer
19  system?
20      A.  Yes, I admit that it was an unauthorized
21  access of the Dayton system.  However, it was
22  performed in a -- well, the getting of the server
23  time update as well as others, Dayton as well as
24  others was an unobtrusive unauthorized access, but a

Page 244

1  nonauthorized access nonetheless.  But a completely
2  benign test to determine the scope of the problem.
3          And the actual test of posting the alert
4  was deliberately done in a way so as to not
5  disrupt -- we certainly could have put any message
6  that we wanted or profanity out there, and this was
7  not the case.  We took an existing message and
8  duplicated it.
9          I know in a lot of conversations we took
10  the period off.  I guess we didn't take the period
11  off.  I guess we took a word away.  Regardless, we
12  did it in such a way as to be as benign and
13  unobtrusive as possible and that message, that
14  duplicated message was immediately deleted.
15          So to the extent it was unauthorized was
16  from a test perspective to validate that this key
17  that existed at CTA, and the vulnerability that
18  existed at CTA, that that same key existed in
19  somebody else's house, which meant that both of our
20  houses were insecure, both Dayton's and the Chicago
21  Transit Authority were unsecure.
22      Q.  There's a lot going on there.  I want to
23  make sure I got one piece of it right.  You just
24  said that the use of the skeleton key to access all

Page 245

1  the other agencies' systems to get the time, that
2  was also an unauthorized access of those agencies'
3  systems, is that right?
4      A.  To the extent that those agencies did not
5  provide myself or us with a key, yes.  The API keys
6  are requested and obtained, but in that case, all it
7  was was going to a URL with a particular identifier
8  that was out in the open, plain text on our system
9  and saying this plain text information with this
10  publicly facing URL can return the server time of
11  your system without prior authorization through the
12  BusTime admin console.
13      Q.  It's a relatively simple process to use
14  the skeleton key to gain unauthorized access to all
15  these other agencies, correct?
16      A.  The skeleton key was something that was
17  left in the open in the Clever Devices system, was a
18  vulnerability at all of their customers.
19          The URL, the uniform reference language,
20  the web addresses for various Clever Devices
21  customers is easily obtained by going to different
22  transit agencies and seeing who their real time
23  passenger information solutions provider is.  That
24  get you the link.  Attaching the key to the end of

62 (Pages 242 - 245)

Page 246

1 that publicly available link and attaching this key
2 lets you on to a web page on those systems to get
3 the clock. That is really all there is to it.
4     Q. Sure. And going back I believe it was the
5 CTA Exhibit 5, your original e-mail to Craig Lang in
6 which you have that list of I want to say 20 some
7 agencies where the property is evaluated I believe
8 is the term.
9        So those properties evaluated, did any
10 of them give you keys to go in and access time from
11 those systems?
12    A. No.
13    Q. I want you to take a look at what's marked
14 CTA Exhibit 8 in the exhibit share. I believe it's
15 at the top of the list, at least it is on mine.
16       Go to the second page of that PDF.
17 There's some communication between you and Mr. Pable
18 and in your communication the second paragraph, I am
19 looking at a portion that says okay. So then I want
20 to look at the documentation and now. Just wow.
21       We have Exhibit 1 in your case against
22 Clever Devices. Do you see that?
23    A. I do.
24    Q. Explain to me what is so important here,

Page 247

1 what is so critical about this document?
2     A. So a publicly available document at the
3 Fairfax County Connector, a client of Clever
4 Devices, has a developer API guide version 3.O.
5        And I believe further down in that is --
6 there it is. Somewhere in there I remember coming
7 across this as part of my normal course of duties in
8 my current job, and I saw that the date of the last
9 update of the documentation was coincidentally the
10 same day that we were summarily or placed on paid
11 administrative leave.
12       I mean looking at your attachment, which
13 is lengthy. If you go to it, it looks like there's two
14 copies of the BusTracker API documentation, which
15 are those two links there. If you go to bates
16 number POO1538, you will see that the BusTime
17 developer API version three guide, revision 3.8 was
18 released October 22, 2018.
19       That is from a publicly available
20 document on the Fairfax County Connector site for
21 API work. And I was, as part of my current job,
22 working with Fairfax County Connector, and I had
23 been given an API key for valid authorized access to
24 the Fairfax County system.

Page 248

1        And I grabbed the documentation because
2 I needed to brush up and get my skills back up. And
3 as you might imagine in coming across that date,
4 which is the date in my life that will live in
5 infamy, I see -- it could be purely coincidental,
6 but I don't know. You tell me.
7        There's the day that we were let go from
8 CTA is the date of a major revision of documentation
9 from Clever Devices BusTime API.
10    Q. Got it. So shifting gears off of this
11 exhibit, based on some of the exhibits we have
12 looked at before and in particular the e-mail to Jim
13 Psomas that I want to say was two weeks, that was
14 about two weeks after the Dayton incident. The date
15 there is not important. There was just the one.
16       But my question is with respect to that
17 e-mail and any other communications that you may
18 have had with Jim Psomas, my impression is that as
19 of October 22, 2018 neither you nor Mr. Pable has
20 told Mr. Psomas that one or more CTA employees
21 penetrated the Dayton RTA's BusTime system, is that
22 right?
23    A. To the extent there was an e-mail on
24 August 31, it's stated that we found the

Page 249

1 vulnerability. We tested it against various
2 properties.
3        Specifically in that e-mail, which as
4 was discussed earlier was written by Chris, copied
5 by me and sent to Mr. Psomas, we indicate that we
6 did touch the Dayton system in that e-mail and
7 identified the security issue, notified Clever, and
8 it has been patched. We're now following up with
9 Mr. Psomas, and I believe we have confirmation. And
10 Mr. Psomas replied thanks, seeking no additional
11 information.
12    Q. Right. So that e-mail, that's the
13 entirety of the communication to Mr. Psomas prior to
14 October 22, 2018 about the Dayton incident, right?
15    A. Correct. He expressed no further
16 interest.
17    Q. We have established, I believe, during the
18 course of this deposition that you are not a lawyer,
19 but as someone who works in the field you do, my
20 question is whether, as you understand it, entering
21 another government agency's computer network without
22 permission, might that be a violation of the law?
23    A. I don't know the law. I don't know that
24 accessing a publicly facing web address that is just

63 (Pages 246 - 249)

Page 250

1 out on the web is -- nothing was raised.
2         I did specifically mention that I asked
3 in my termination interview, am I accused of any
4 wrongdoing, and I was told no. So without knowing
5 the intricacies of the law, a benign check of a
6 vulnerability with subsequent follow-up of said
7 vulnerability, I don't know. I don't know the law
8 in that regard.
9     Q.  I want to go back to your testimony about
10 CTA Exhibit 13. Let me know when you've got that
11 one up.
12     A.  Yes, sir, I have it.
13     Q.  During your testimony on the exhibit you
14 said something along the lines of you wanted to have
15 this in terms of having records for defense.
16         I just want to touch on that a bit.
17 Were you contemplating defense against litigation
18 brought by the Dayton RTA?
19     A.  To the best of my knowledge, that was the
20 only potential litigation that I was aware of.
21 Again, this is hours after both Mr. Pable and I were
22 placed on paid administrative leave with no
23 indication as to why.
24         And the only logical why was the so

Page 251

1 called Dayton incident. So all I did was take an
2 e-mail that I had forwarded from my personal e-mail
3 to my wife, and I forwarded that to Mr. Pable and
4 Mr. Silvestri because at the time I was conversing
5 with Mr. Silvestri as a professional colleague as to
6 why I was being placed on paid administrative leave.
7         I subsequently dropped that
8 communication with Mr. Silvestri.
9     Q.  So am I correct that you contemplated the
10 possibility that Dayton RTA would sue the CTA over
11 the use of the skeleton key on the Dayton RTA?
12     A.  Sure. To the best of my knowledge, that
13 was the only potential grounds that I had seen.
14         Nowhere -- the only time I ever saw the
15 word legal action with the word legal in it in any
16 of its grammatical forms related to this was that
17 e-mail from Mr. Tim Harrington.
18         I never saw anything from Clever Devices
19 regarding anything legal. So I was merely
20 forwarding that to my compatriot as sort of maybe
21 this is what it is, what this is all about.
22     Q.  You testified -- and this is not with
23 respect to Exhibit 13, but you testified that the
24 interrogation of you by Mr. Psomas and Mr. Radojcic

Page 252

1 in November of 2018 was a farce or a show.
2         And I don't want you to repeat anything
3 you already said. In fact, I want to avoid exactly
4 that. So my question is with respect to that
5 testimony that the interrogation was a farce or a
6 show, do you have any other basis for that statement
7 beyond what you have already testified to here
8 today?
9     A.  I believe at some point Mr. Pable told me
10 that he heard from one of the security folks that he
11 saw on the train after the fact that they were on
12 standby that day to walk us out or particularly to
13 walk me out, indicating that it was already a
14 foregone conclusion that that was to be my last day
15 of employment with the CTA.
16         And putting that with the aforementioned
17 way that the conversation with, and the fact they
18 came with only two letters terminate or resign tells
19 me there was no intention of maintaining a
20 relationship between Mr. Haynes and the Chicago
21 Transit Authority.
22     Q.  You also testified you weren't allowed to
23 tell your side of the story to the CTA. I'm curious
24 what's your side of the story in that regard?

Page 253

1     A.  I don't know if that is exactly how I put
2 it. I indicated that I answered all of their
3 questions.
4         And to the extent that their questions
5 asked what I knew, but it's not like there was --
6 it's not like Clever Devices was there, and CTA was
7 there and everybody was trying to get to the bottom
8 of what happened. It was Chris interviewed
9 separately. Haynes interviewed separately. Haynes
10 terminated.
11         If it were truly to get at my side and
12 my full interpretation and a full discussion, it
13 would be with all parties involved discussing and
14 hashing out exactly what happened.
15     Q.  Is there some part of the story, some part
16 of your account of events that you were not given
17 the opportunity to tell the CTA that you believe
18 might have changed the outcome?
19     A.  No. I believe that whatever they asked
20 and whatever I answered, was all that was going to
21 be said on the matter.
22         And in a 45 minute conversation of
23 futility to make it appear as if they were
24 interested in my side, they conducted that so that I

64 (Pages 250 - 253)

Page 254

1 felt better, and they let me go. But they had
2 already known they were going to let me go before I
3 walked in that door.
4      Q.  Do you believe there's something that the
5 CTA didn't know about the situation that would have
6 had an effect on your continued employment?
7           And when I say the situation, I mean the
8 Dayton incident.
9      A.  They were not interested in anything --
10 there is nothing that I know that would have changed
11 their mind.
12           I was going to be terminated the minute
13 they put me on paid administrative leave. That two
14 weeks was just a holding pattern so they could get
15 their stories straight, and they could ask some
16 questions and terminate me. The only question I
17 asked in this that I recall was am I accused of
18 wrongdoing. No.
19      Q.  So you just described how the CTA spent
20 the two weeks of your paid administrative leave. Is
21 that just your speculation or do you have some
22 specific knowledge as to what the CTA was doing?
23      A.  They didn't reach out to me at all for any
24 information regarding any of this. They didn't ask

Page 255

1 me to preserve my phones or my text messages. By
2 phone, I mean singular or conversations or anything
3 related to the matter.
4           They placed me on a paid administrative
5 leave. The following week they summoned me for a
6 Friday meeting, and they discharged me. That's the
7 extent of the internal investigation that I am aware
8 of.
9      Q.  Got it. So nothing else that you are
10 aware of in terms of how the CTA spent those two
11 weeks, right?
12      A.  Correct.
13      Q.  Again, this is another one of these
14 questions where I don't want you to repeat your
15 testimony, and I want to specifically avoid that.
16           But with that in mind my question is
17 whether there's anything else that you know about
18 and if not already mentioned in your deposition
19 today that Clever Devices did to cause your or
20 Mr. Pable's separation from employment with the CTA?
21      A.  Other than this letter that was written to
22 Mr. Carter, I am not aware of anything.
23      Q.  Have you formed any belief as to whether
24 any of the contentions in that Clever Devices letter

Page 256

1 are inaccurate?
2      A.  I don't have that letter in front of me.
3 I believe I read it once almost a year ago or more.
4 I really can't comment on a letter that was never
5 officially provided to me.
6      Q.  Fair enough. Do you feel the need to
7 change or clarify any of the deposition testimony
8 you've given so far today?
9      A.  No.
10 MR. JADOS:  That is all I have.
11         CROSS-EXAMINATION
12         BY MR. DUFFY:
13      Q.  Good afternoon, Mr. Haynes. As you know,
14 I am Tim Duffy. Just a few more questions and
15 hopefully we could cut you loose here.
16           I think you alluded to the fact earlier
17 that you could have chosen not to report or you
18 and/or Mr. Pable could have chosen not to report the
19 existence of the skeleton key to anybody, right?
20      A.  Correct.
21      Q.  Or you could have even done the Dayton
22 test and not told anyone that it had been done,
23 right?
24      A.  Correct.

Page 257

1      Q.  To your knowledge, was there any way that
2 if you hadn't told anyone they would have figured
3 out that someone at CTA had put that alert up or
4 caused that tweet to issue?
5      A.  To my knowledge they could have looked at
6 their server logs. I think it's a patchy Tomcat
7 server log, and identify that somebody from this
8 particular IP address and figure out that that
9 particular IP address maps back to CTA.
10           They would have to sort of have a
11 suspicion. I don't know how long logs of that sort
12 typically last. So that sort of thing would have to
13 be investigated fairly quickly.
14      Q.  And do you think that there were other
15 ways even if you knew or suspected what the key
16 would have done, you could have told Clever Devices
17 about the key, without talking about the Dayton test
18 or any of the other tests that were done on the
19 other systems?
20      A.  Yes. Looking back I could have sent a
21 very different e-mail on that Monday morning and
22 calmly and cooly and without any detail I could have
23 told Clever that we found this key that is an open
24 key that does things that it shouldn't. I could

65 (Pages 254 - 257)

Page 258

1  have done that on that Monday morning, never told
2  Dayton, never told anybody else.
3       I think it's apparent that Clever would
4  have done absolutely nothing with that. They most
5  likely speculative would not have fixed it, would
6  already have been identified of a security risk with
7  the BusTime service bulletin API that they had been
8  informed of an issue in early June and did nothing.
9  So yes, I could have e-mailed them a completely
10 different way.
11      Q.  But you didn't do those things and, in
12 fact, you basically told Dayton and you told Clever
13 everything that happened, right?
14      A.  In exquisite detail.
15      Q.  Did you feel you were withholding
16 information from either Clever or Dayton in any way
17 to help get this problem addressed?
18      A.  I think a three page e-mail isn't
19 withholding anything.
20      Q.  And you were asked some questions by
21 Mr. Jados about what you specifically described, how
22 Mr. Pable found the key.
23      In response to the e-mail or in the
24 followup conversations you had with them in that

Page 259

1  week, did they ask more specifically how the key had
2  been found?
3       A.  They had a conversation with us I believe
4  on Tuesday afternoon of that week. So the Monday
5  was the e-mails -- Friday was the text. Monday was
6  the e-mails.
7       I believe it was a Tuesday meeting with
8  Christos. It might have been Wednesday. Don't
9  quote me. And they basically admonished us for
10 doing things with very little interest in how
11 exposed or the key was in plain text sitting there
12 in a Wire Shark trace.
13      Q.  Did they evidence any curiosity about that
14 or ask you guys to send more information or to
15 demonstrate or anything of that sort?
16      A.  There was no interest in appreciation for
17 finding a problem or interest in how did one find
18 our key that is supposed to be kept secret. There
19 was no interest.
20      Q.  Any reason you could think of why you
21 would not have provided whatever information they
22 asked for?
23      A.  Anything that they asked for, the Wire
24 Shark logs, we would have immediately sent them the

Page 260

1  Wire Shark logs and said, you know, Chris did not
2  show me the Wire Shark log.
3       I took him at his word. I believed him
4  and that it was in plain text in the Wire Shark
5  trace.
6       Q.  When you think about it, if anybody should
7  have known where the key was or what it was being
8  used for, it wasn't you or Mr. Pable. It was Clever
9  Devices, right?
10      A.  Correct.
11      Q.  There's been one of the allegations in the
12 case, in fact, it's in the letter. One of the
13 allegations in the case is that Mr. Pable improperly
14 accessed Clever Devices' source code.
15      Are you aware of him ever doing that?
16      A.  No. We certainly worked closely with
17 Clever, particularly the Clever CAD system. Chris
18 did not work directly on any source code of Clever
19 Devices' systems.
20      To the extent that he listened to
21 traffic between systems, and we worked on databases
22 and looked at the back end databases to which the
23 CTA had full rights to the back end databases and
24 built all kinds of reporting off of that.

Page 261

1       Another one of my staff members, we did
2  look at the back end of the bus of the Clever CAD
3  incident manager system and cleaned up some
4  templates to make the navigation of the BusTime CAD
5  incident manager system more user friendly. Those
6  issues were all documented for Clever Devices in
7  their action tracker where we were then waiting for
8  Clever to sort of put our fixes into their release.
9       Q.  And I think when you were describing the
10 skeleton key in the beginning of your deposition,
11 you sort of used the word code in maybe a more
12 general sense.
13      The skeleton key as you understand
14 Mr. Pable found wasn't buried in their source code
15 somewhere. It was being used on the network traffic
16 as you said several times, right?
17      A.  Correct. If I used the word code in any
18 relation to -- and we could let the record state
19 that any time I used the word code in relation to
20 the skeleton key, it's merely a synonym for a
21 complex string of letters and numbers.
22      And to the extent that that is a code,
23 not that was found in source code. The varied uses
24 of that word.

66 (Pages 258 - 261)

Page 262

1    Q.   Could you pull up CTA Exhibit 5 quick. I
2 want to look at the fourth page.  It's the one with
3 the green graphic on the top.
4        Do you see in the line that has the red
5 circle drawn on it, I assume that is a circle that
6 somebody drew on the graphic that was put in there,
7 that is an after the fact edit, right?
8    A.   Yes.  This is in the e-mail I sent to
9 Clever Devices.  That is my scribble on top of a
10 Windows screen grab.
11   Q.   And are you circling there the evidence
12 that you were able to post this alert that the title
13 of which was Route 17, Keowee Bridge?
14   A.   Yes.  It looks like as now memory serves
15 we took the word detour off.  I know earlier we
16 talked about a period.
17       It looks like in order to test this and
18 show it at its root level with just the title, the
19 word detour was removed.  So this is the indication
20 that Route 17 has two alerts at the same time for
21 the same Keowee Bridge, one missing the word detour.
22 The one we posted missed the word detour.
23   Q.   So if we were looking at this five minutes
24 earlier, we only see the second half of the line.

Page 263

1 And if we look at it five minutes later we would
2 only see the second half of the line, the Keowee
3 Bridge detour.  The red circle indicates the
4 temporary alert you put up and then took down,
5 right?
6    A.   Correct.  And I would state that it was
7 less than five minutes.  The two alerts were only
8 active for 60 to 120 seconds.
9    Q.   Do you know, and I don't know, so I am not
10 trying to trap you or anything, whether when the
11 first original alert that you copied was issued
12 whether Dayton had the Twitter integration going on
13 so whether there was a tweet when they originally
14 put that particular alert up?
15   A.   I don't know for a fact, but it stands to
16 reason that they had the Twitter integration from
17 the beginning of their implementation with
18 BusTracker.
19       And the tweet that went out, a customer
20 or somebody following RTA responded to that tweet
21 with a hey, Dayton, thanks for telling us something
22 we already know.  I believe that is in some of the
23 other exhibits.  So it is to my knowledge when they
24 first issued the one on the right, Route 17 Keowee

Page 264

1 bridge detour that produced a tweet.  The one that
2 Chris constructed and I executed also sent a tweet.
3    Q.   There was some discussion about you
4 looking for other employment, and Mr. Pable looking
5 for other employment.
6        Do you recall that one of the things
7 Mr. Pable was considering was trying to move to CTA
8 Rail?
9    A.   Yes.  He was looking at a position up in
10 the Skokie shops area.  And I, of course, didn't
11 want to see him leave my group.  But I supported
12 him.
13       If nothing came through with the Jim
14 Psomas, Veronica Alanis right sizing and right
15 paying myself and my staff, he had every opportunity
16 to go to the Skokie shops and work out there.
17   Q.   Do you know if he had done that he would
18 have kept his pension status and eligibility?
19   A.   Yes, he would have -- it would have been a
20 lateral promotion if he had moved to the Skokie
21 shops operation as a technical source up there.
22   Q.   We could look at it if we need to, but do
23 you recall seeing the email that has the paragraph
24 that starts Chris, got your text?

Page 265

1    A.   Yes.
2    Q.   And Ms. Babbitt asked you about Signal and
3 all this stuff.  I don't think anybody has asked you
4 do you recall at all what that text was?
5    A.   My recollection was that that text was
6 something about responsible disclosure.  I might be
7 a week off.  I know that that seems that that
8 message was -- do you have the date of that message
9 in front of you?
10   Q.   Yes.  I think it's Exhibit -- I scratched
11 something on of my paper.  Now I can't read it.
12 Exhibit 8.  Yes, it's Exhibit 8.
13       So the e-mail is Friday, August 24.  So
14 it's the following Friday after the Dayton test,
15 1:42 p.m.  And you're talking about contacting
16 Mr. Harrington and then you say just got your text,
17 Chris.
18       I am curious if you have any
19 recollection of what the text was?
20   A.   I think I thought that that was something
21 related to like August 18, which would have been the
22 day after or the same day the August 17th of the
23 initial test.
24       And I have it in my head that that text

Page 266

1 is always related to something about responsible
2 disclosure. The fact that this is a week later, I
3 don't know the contents of that text. This is me
4 sitting at work copied and pasted stupidly a message
5 from my work e-mail into my personal e-mail and
6 sending it to my wife and Mr. Pable. So what the
7 text inquired, I don't know.
8      Q. Did you recall that Mr. Pable, do you
9 recall him communicating to you more than once about
10 responsible disclosures or sending you examples of
11 responsible disclosure?
12     A. I do. So it's possible that there are
13 multiple messages that were exchanged about the
14 concept of responsible disclosure or Wikipedia
15 article I believe at one point, which I think is
16 somewhere in these threads, as well as some articles
17 about sort of the process by which somebody who
18 stumbles upon vulnerability should notify others
19 about that vulnerability.
20     Q. Ms. Babbitt asked you a lot of questions
21 about messages that may have disappeared or may have
22 been purged, whatever.
23          Is there anything in your mind that is
24 in a message that we could no longer see or don't

Page 267

1 see in these documents that is an important part of
2 the story that we are missing?
3      A. I mean obviously everybody wants to know
4 what just got your text, Chris is, but that message
5 would have been purged on November 2 at 8:20 a.m. at
6 Starbucks.
7      Q. Right. So my question is do you recall
8 whether it's this message or anyone oh, my gosh if
9 we only had the text messages we'd remember or see
10 because there was some dramatic or text message that
11 would tell us something that we don't see through
12 other means or you don't remember?
13     A. The e-mails to Clever Devices on the
14 Monday after and Dayton, Ohio on the Monday after
15 really stand on their own.
16          And we even found you guys one of the
17 things that I apparently produced this e-mail from
18 Chris to Mr. Schroeder that has an accurate time
19 line of everything that transpired is more than
20 sufficient of the what happened.
21     Q. Did you ever think or do you think now
22 that Mr. Pable deleted anything or caused anything
23 to disappear with the intent of hiding it because he
24 had admitted something or admitted some wrongdoing

Page 268

1 or contradicted himself?
2      A. No. Chris had his phone set up to delete
3 messages within a day or within a week already just
4 because that is how he is and how he was.
5          To the extent I deleted messages on that
6 Friday morning before walking into the
7 interrogation, I didn't know what the interrogation
8 was about. Nobody asked me to preserve any
9 information. It was the conclusion of a full two
10 weeks of paid administrative leave. I just wanted
11 to clear my personal chat with a colleague who was
12 also placed on paid administrative leave.
13     Q. Do you recall telling Chris you wanted to
14 make a clean break with the CTA?
15     A. Not at that moment. I was still hopeful
16 that it was an actual investigation.
17     Q. No, I mean afterwards. After you were
18 terminated and to the extent you were deleting
19 contacts and deleting messages and that sort of
20 thing.
21     A. Yes. I saw that one text message that I
22 screen shot and sent to Mr. Pable regarding Mr. Lang
23 and wanted nothing to do with that individual
24 persona non grata in the future.

Page 269

1          I had dealings with Clever Devices as
2 part of my professional life. I've had no dealings
3 with CTA other than casual conversations with
4 colleagues. So to the extent I've had a clean break
5 with CTA, I've had a clean break with CTA.
6      Q. Do you recall mentioning that although you
7 couldn't be 100 percent sure, you thought that the
8 Dayton incident was likely the cause of your being
9 put on leave mostly because it was both you and
10 Mr. Pable, et cetera. Do you remember that?
11          Do you recall Mr. Pable having other
12 candidates for reasoning why this might have
13 occurred in your discussions?
14     A. No. Mr. Pable was an exemplary employee
15 and would have had no reason to be placed on leave.
16     Q. Do you have a recollection that he was
17 concerned that this was motivated because he was
18 going to be taking leave for his surgery?
19     A. I don't think that anybody as I mentioned
20 earlier above Mr. Psomas knew of the pending
21 surgery.
22     Q. I am not asking you if it's true or not.
23 I'm asking if it was something that Chris had as a
24 theory or as a concern that they might be doing this

68 (Pages 266 - 269)

Page 270

1 because of my insurance and the coverage for my
2 surgery, and the fact that I am going to be
3 requesting FMLA leave for my surgery?
4      A.   He might have.
5      Q.   How about work with something called the
6 the TSP rocket utility?
7      A.   We worked on something called the rocket.
8 The rocket was a mobile communications device on
9 board the bus that provided the backbone
10 communication for BusTracker and communications for
11 CAD and others.
12          We got the rocket to communicate with a
13 rocket at the mass arm for purposes of the transit
14 signal priority project, which was an initiative run
15 by the Regional Transportation Authority, the RTA.
16 And they wanted open codes so that Pace bus and CTA
17 buses could get to the same intersection.  You get
18 the green light.
19          And we were instrumental in
20 architecting the logic for that and was able to do
21 that with a very simple device called raspberry pie
22 at a very significant cost savings to the CTA.
23      Q.   Do you remember Chris being afraid there
24 was some criticism, whether founded or not,

Page 271

1 criticism or suspicion about that project at all
2 that could have led to an investigation?
3      A.   Maybe, again, we used the word hacking,
4 but sort of the hacking of figuring out how this
5 open sourced communication between the rocket and
6 the rocket communications, sure.
7          I think there was some thought in our
8 thinking that maybe this whole internal
9 investigation was brought about by the company of
10 the rocket.  But they didn't ask any questions about
11 that at the investigation.  So no.  And that
12 development was all done under the auspices of the
13 Regional Transportation Authority, the RTA.
14      Q.   I take it from your answer to the
15 questions by Mr. Jados that throughout this whole
16 thing, no one at CTA, Mr. Psomas, Ms. Alanis,
17 Mr. Carter, Mr. Radojcic or anybody just called you
18 up or sat you down and said Mike, what the heck
19 happened here?  What's going on.  Could you tell me
20 what happened or what did you and Chris do?
21      A.   Other than the meeting on November 2 to
22 terminate me, there was no communication about that.
23          And the only information I had is when I
24 filed for unemployment, they were required to give a

Page 272

1 reason, and they just simply stated misconduct as
2 their reason for terminating me.  They didn't
3 challenge the unemployment context.
4      Q.   But they never showed you the letter from
5 Clever Devices and said oh, my gosh somebody is
6 accusing you of doing this.  Tell me about it.  Just
7 explain it to me or give me your side of the story?
8      A.   No, other than that Friday with
9 resignation and termination letters at the ready.
10      Q.   I think we saw, we could go back to the
11 chronology.  I think we saw in the chronology that
12 you worked on that you said in your interview they
13 asked you the questions and then they left for a
14 short while and came back with the resignation
15 letters.
16          Is that what you recall happening or is
17 it something else?
18      A.   Now that you say that, I do remember being
19 left in the room either by myself or with the HR
20 woman for a few minutes.  And then they came back in
21 with the termination letters.
22          I do recall that now.  And if I had
23 written that down more in the moment, then yes, I do
24 remember them now leaving.  And I know I didn't

Page 273

1 state that earlier, but my memory wasn't jogged.
2      Q.   That's fine.  And I know you said you
3 couldn't remember, but I will ask you to think
4 because it's potentially important.
5          If you were alone or if Ms. Marosevich,
6 her name is in that entry too, also left with them?
7      A.   I don't know if she left at that same
8 time, and I was in the room by myself.  I believe
9 she was still there.
10          I believe she sat there with me and
11 didn't say anything, like I said, she didn't say
12 anything the whole time, and I think I just sat
13 there for whatever duration that Radojcic and Psomas
14 left the room.
15      Q.   Well, to the extent the interview was --
16 to the extent it was a question mark what they were
17 going to do at the start of the interview and maybe
18 it wasn't.  But if it were, or if it had been a
19 question mark at the beginning of the interview,
20 presumably this exit was for them to decide and
21 decide to pull the trigger so to speak or did you
22 have that sense?
23      A.   I had the sense that they were leaving the
24 room to discuss my responses to their questions.

69 (Pages 270 - 273)

Page 274

1  And they were going to come back with a
2  determination or a discussion or further, and they
3  came back with the folder and handed me the options
4  to resign or terminate.
5      Q.  But as far as you can recall right now
6  it's to the best of your recollection that
7  Ms. Marosevich would not have been part of that
8  discussion?
9      A.  I don't believe she was.  I believe she
10 stayed with me in the room.  There was no other
11 person or nobody reporting.  In hindsight, I wish I
12 wrote everything down and kept it as a record.
13     Q.  Did anybody ever tell you that she thought
14 you shouldn't be fired?
15     A.  No.
16     Q.  Did anybody ask you what you thought
17 should be done with regard to Chris?
18     A.  No. I was already gone.
19     Q.  Sorry?
20     A.  They had already terminated me on that
21 Friday.  And they were bringing Chris back the next
22 week.
23     Q.  So at the time of your interview Chris had
24 not yet been terminated.  So my question was during

Page 275

1  your interview did they say well, Mike,
2  unfortunately we're going to have to let you go or
3  before they even get to that in your interview at
4  all did they say what do you think we should do with
5  Mr. Pable, what responsibility do you think he did
6  anything wrong, any questions like that?
7      A.  No.  They certainly didn't ask me if I
8  thought Mr. Pable should be terminated.  I certainly
9  would have remembered that question.
10     Q.  Right.  Obviously, you have admitted here
11 today and you admitted in the e-mails in hindsight
12 that deciding to conduct the Dayton test was a
13 mistake.
14         Did you have a view at the time or do
15 you have the view now that it was a mistake for
16 which you should have been fired or forced to
17 resign?
18     A.  I don't believe it was a mistake that I
19 should have been fired or forced to resign.  I think
20 an honest discussion, a hand slap, a reprimand.  As
21 I mentioned I was already looking for another job.
22     Q.  To the best of your knowledge, did anyone
23 at the CTA ever ask either you or Mr. Pable to show
24 them either how this API had been found originally,

Page 276

1  how the skeleton key had been found or how the
2  Dayton test had been conducted or who was sitting
3  where, to recreate it or anything of that nature?
4      A.  No.  There was no interest in us showing
5  what was done from a technical perspective in any
6  way whatsoever.
7      Q.  Did you ever get the sense that the CTA
8  was defending you or Mr. Pable as CTA employees
9  against allegations by Clever?
10     A.  Clearly, the CTA did not have any interest
11 in defending myself or Mr. Pable to the response to
12 the Clever Devices letter.
13     Q.  Throughout this whole incident that we've
14 been discussing, was it ever your intention to cause
15 any harm to any transit system, whether CTA or
16 anyone else's?
17     A.  Never.
18     Q.  In your view, were you always working to
19 to what you -- strike that.
20         Were you in your mind always working to
21 the best of your ability in furtherance of the
22 interests of the CTA?
23     A.  Not only in furtherance of the CTA, but
24 the riding public and the taxpayer dollars that fund

Page 277

1  the CTA.
2      Q.  Did anyone ever explain to you or
3  demonstrate to you any harm arising from either the
4  Dayton test or any of these other tests beyond what
5  we have seen, the issuance of the tweet and maybe a
6  comment by one follower?
7      A.  No, other than Clever expressing that they
8  felt embarrassed and had to issue the fix.
9      MR. DUFFY:  That is all I have.
10     MS. BABBITT:  Nothing else from the CTA.
11     MR. JADOS:  Nothing else from Clever.
12     THE VIDEOGRAPHER:  This concludes today's
13 testimony of Michael Haynes.  The time on the
14 monitor 5:32 p.m.  We are off the record.
15
16
17
18
19
20
21
22
23
24

70 (Pages 274 - 277)

Page 278

1  STATE OF ILLINOIS   )
2                      ) ss:
3  COUNTY OF C O O K   )
4
5      I, VICTORIA D. ROCKS, C.S.R., Notary
6  Public, within and for the County of Cook, State of
7  Illinois, a Certified Shorthand Reporter of said
8  state, do hereby certify:
9      That previous the commencement of the
10  examination of the witness, MICHAEL HAYNES, was
11  first duly sworn to testify to the whole truth
12  concerning the matters herein;
13      That the foregoing deposition
14  transcript was reported stenographically by me and
15  was thereafter reduced to typewriting via
16  computer-aided transcription under my personal
17  direction, and constitutes a true record of the
18  testimony given and the proceedings had;
19      That the said deposition was taken
20  before me at the time and place specified;
21      That the reading and signing by the
22  witness of the deposition transcript was not waived;
23      That I am not a relative or employee of
24  attorney or counsel, nor a relative or employee of

Page 279

1  such attorney or counsel for any of the parties
2  hereto, nor interested directly or indirectly in the
3  outcome of this action.
4      IN WITNESS WHEREOF, I do hereunto set
5  my hand and affix my seal of office at Chicago,
6  Illinois this 18th day of March, 2021.
7
8      *Victoria Rocks*
9      VICTORIA D. ROCKS, C.S.R.
        License No. 084-002692
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 280

1          Veritext Legal Solutions
            1100 Superior Ave
2           Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4
   March 18, 2021
5
   To: STEVEN LADUZINSKY
6
   Case Name: Pable, Christopher George v. Chicago Transit Authority, Et
7  Al.
8  Veritext Reference Number: 4486556
9  Witness:  Michael Haynes      Deposition Date:  3/16/2021
10
   Dear Sir/Madam:
11
12 Enclosed please find a deposition transcript.  Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change.  Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
17 shown

   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24 NO NOTARY REQUIRED IN CA

Page 281

1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 4486556
3  Pable, Christopher George v. Chicago Transit Authority, Et Al.
   DATE OF DEPOSITION: 3/16/2021
4  WITNESS' NAME: Michael Haynes
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date _____  Michael Haynes
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17     _____
18     Notary Public
19     _____
       Commission Expiration Date
20
21
22
23
24
25

71 (Pages 278 - 281)

Page 282

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4486556
3   Pable, Christopher George v. Chicago Transit Authority, Et Al.
    DATE OF DEPOSITION: 3/16/2021
4   WITNESS' NAME: Michael Haynes
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
    as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Michael Haynes
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20  their free act and deed.
21     I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23  _____
       Notary Public
24
25  Commission Expiration Date

Page 283

1      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 4486556
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date            Michael Haynes
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
       Notary Public
24
    _____
25  Commission Expiration Date

72 (Pages 282 - 283)

[& - 24]

| & | |
|---|---|
| **&** | 2:7,19 |

**0**

**00000654** 99:16
**0603** 170:8
**084-002692** 279:9
**08:21** 107:19

**1**

**1** 2:15 3:7 57:6,11
  62:16 67:6 246:21
**10** 3:11 123:8,12
  123:15,21 124:4
  125:20
**10-22-18** 3:13
**10-24-18** 3:14,14
**100** 115:1 160:8
  269:7
**102** 3:9
**108** 3:10
**10:07** 38:12
**11-20-18** 3:17
**1100** 280:1
**111** 2:9
**118** 3:10
**11:03** 94:2
**11:15** 84:8
**11:28** 84:11
**11:33** 91:8
**11:33.37** 89:15
**11:34** 95:18
**12** 65:7
**12-6-18** 3:16
**120** 263:8
**121** 3:11
**123** 3:11
**12754** 279:8
**128** 3:12
**12:15** 92:9 96:17
**12:43** 161:24

**12:46** 136:3
**12th** 62:8
**13** 3:13 25:23
  161:9,12 162:2
  217:3 250:10
  251:23
**132** 3:12
**14** 67:8,10 68:23
  69:12 70:11 71:2
**14th** 72:19
**15** 3:13 11:8 164:4
  164:6,18 188:22
**16** 4:2
**161** 3:13
**164** 3:13
**169** 3:14
**16th** 1:18 72:22
**17** 3:14 72:15,17
  72:18 73:24 89:6
  89:14 91:6 92:8
  95:18 113:5 169:4
  169:6,16,20
  171:15 172:23
  225:22 262:13,20
  263:24
**175** 3:14
**1757** 108:19 109:2
**176** 3:15
**17th** 72:22,23
  86:22 113:2,8
  117:14 134:15
  265:22
**18** 191:21 265:21
  280:4
**1820** 280:2
**18th** 279:6
**19** 1:5 4:9 221:1
**1999** 26:23,24 27:1
**1:20** 203:13
**1:25** 136:1

**1:32** 136:6
**1:42** 265:15

**2**

**2** 3:8 62:8 68:17
  68:20 70:11 72:10
  183:20,22 184:4
  203:2,12 218:1,12
  218:21 219:11
  267:5 271:21
**20** 94:2,14,18
  102:6 105:12
  108:8,18 222:12
  222:24 223:20
  224:2 246:6
  281:16 282:22
  283:22
**20,000** 63:21
**2000** 26:24 27:2
**2002** 28:3
**2004** 28:8,13
**2007** 25:23
**201** 3:15
**2015** 28:21,22,23
  29:19 30:22 31:3
  143:2,5,17
**2016** 37:14
**2017** 142:24
**2018** 10:17,18 24:6
  27:15 28:24 29:19
  30:23 31:4,8,12,19
  35:12,16 37:10
  39:4 46:23 53:8
  59:20 72:18 89:6
  89:14 91:6 94:2
  102:6 106:6
  108:19 120:22
  129:11 132:22
  134:7 142:21
  143:3 144:1,11,24
  144:24 145:14,22
  151:24 161:23

  169:9 175:14
  177:20 183:5,20
  203:2 210:3 217:8
  218:2,12,21
  219:11 222:12,24
  223:20 224:2
  238:23 247:18
  248:19 249:14
  252:1
**2019** 24:9,12 27:11
  218:14 219:12
  221:8,19,22
**2020** 13:3 14:14,16
  14:19 25:12
**2021** 1:18 4:2
  279:6 280:4
**20th** 94:22 107:19
  121:17 134:19
  170:3
**216** 2:20
**216-523-1313**
  280:3
**217** 3:16
**218** 3:16
**21st** 115:22
**22** 14:13 151:24
  161:15 163:15
  218:14 247:18
  248:19 249:14
**222** 3:17
**22nd** 155:6 170:4
**238** 3:4,4
**23rd** 170:7
**24** 9:5 13:24 18:11
  42:17 43:9 119:12
  121:11,24 161:23
  169:5,9 175:14
  177:20 221:10
  228:16 230:3,4
  265:13

**24th**  121:9 175:24
**256**  3:4,5
**26**  3:15 201:15,22
  203:2 204:4,7
  207:16 208:21
  209:15 211:3
  212:7 213:4
**277**  3:5
**28**  60:12 227:15
**2800**  2:9
**28th**  120:9 227:14
**29**  218:14 219:11
  220:10 221:8,22
**2:01**  68:23
**2:16**  164:12
**2:23**  69:12 164:15

**3**

**3**  3:9 95:13,16,17
  96:16 98:16 99:6
  99:11,16 100:4
  101:8
**3.8**  247:17
**3.o.**  247:4
**3/16/2021**  280:9
  281:3 282:3
**30**  28:3 45:19
**301**  2:20
**31**  129:10 130:1
  132:21 134:7
  200:24 240:12
  248:24
**33**  3:17 222:5,8
  223:10 225:17
  227:15
**36**  3:16 217:3,24
**37th**  25:14
**3815**  2:14
**39**  3:8 88:22 89:2
  89:11 91:3 92:3
  93:20

**3:00**  65:12
**3:13**  198:21
**3:18**  65:9
**3:22**  198:24
**3:30**  65:12

**4**

**4**  3:9 101:24 102:2
  103:20 210:3
**40**  3:12 108:8
  129:6,9 132:13
  133:3 196:20
**41**  3:12 132:17,20
**44114**  280:2
**4486556**  280:8
  281:2 282:2 283:2
**45**  152:15 196:20
  214:3 253:22
**46**  3:14 175:9,12
  176:13
**47**  3:15 177:15,18
**49**  3:16 218:5,8
**4:09**  228:8
**4:16**  228:11

**5**

**5**  3:10 57:11 59:24
  108:15,15,17
  109:21 111:14,16
  111:24 113:4
  114:3 115:17,18
  115:21 117:15
  239:4,8,10 246:5
  262:1
**57**  3:7
**5:32**  277:14
**5th**  3:7

**6**

**6**  213:19 217:8
**60**  97:3,10,10
  116:21 117:13
  263:8

**60093**  2:4
**60174**  2:15
**60601**  2:9
**60609**  25:15
**60661**  2:20
**62**  3:8
**6285**  93:22
**6334**  92:4
**6335**  92:4
**6346**  91:4
**6349**  89:11

**7**

**7**  211:4
**7-28-12**  3:8
**725**  2:3
**7868**  1:5 4:9
**7:19**  99:9
**7:45**  108:9

**8**

**8**  3:4,10 118:13,16
  119:18 246:14
  265:12,12
**8-17-17**  3:9
**8-20-18**  3:9,10
**8-24-18**  3:11
**8-31-18**  3:12,12
**88**  3:8
**8:00**  184:12
**8:20**  267:5
**8:21**  105:12

**9**

**9**  3:11 120:24
**94**  3:9
**959**  25:14
**9:00**  1:18 162:16
  184:4,14
**9:10**  4:3
**9:30**  184:14
**9:57**  38:9

**a**

**a.d.**  1:18
**a.m**  95:18
**a.m.**  1:18 4:3 38:9
  38:12 84:8,11
  89:15 91:8 94:2
  105:12 184:4,12
  267:5
**ability**  9:8 116:18
  148:14 190:2
  191:9 210:14,22
  276:21
**able**  5:13 6:13,16
  9:11 18:3,13
  25:10 41:22 47:21
  48:19,21 49:9,10
  50:14 57:7 61:17
  79:19 81:5,6,7
  112:8 116:20
  136:13,18 139:8
  202:15 203:6
  219:10 228:21,23
  262:12 270:20
**abreast**  233:6
**absolutely**  32:24
  33:22 35:8 115:11
  142:1 144:3 147:6
  158:8 196:13
  208:23 258:4
**academic**  61:12
**access**  23:19 32:8
  33:9 47:1 49:5
  50:7,11 52:14
  54:21 58:24 59:1
  60:20 61:6,9
  65:24 72:5 81:13
  85:7 90:4 114:7
  114:11 159:24
  238:6 243:18,21
  243:24 244:1,24
  245:2,14 246:10

247:23
accessed 260:14
accessible 49:21
57:3
accessing 237:23
249:24
accommodate
146:11
accommodated
147:5
accommodation
146:14 147:11
accommodations
148:12
account 32:6,12
32:14,23 33:3,10
33:14,15,15,20,24
34:4,8,8 35:7
45:14,19 98:22
118:23 119:7,10
121:4 122:2,11,23
161:14 169:8
175:14,14 180:9,9
201:13 253:16
accounts 119:20
accurate 214:12
267:18
accused 199:18
250:3 254:17
accusing 272:6
acknowledge
281:11 282:16
acknowledgment
85:10
acquired 233:10
act 3:13 163:18,19
163:23 164:1,23
164:24 165:5
205:14 281:14
282:20

acting 138:5
147:20 179:2
action 59:2 106:18
110:23 124:13
125:1,12,15,17
126:8 156:20
163:8,11 214:8
224:24 239:21
251:15 261:7
279:3
actions 41:6
120:12 140:11,15
193:1 206:3
active 34:2 210:14
263:8
actively 34:9
182:3,23
activities 205:11
230:8
actor 138:11
actors 234:13
acts 165:21
actual 78:20
124:21 244:3
268:16
ada 148:11
add 20:23
added 100:8
addition 146:23
178:13
additional 11:22
30:4 92:3 249:10
address 32:10,11
77:20 105:14
116:6 249:24
257:8,9 280:16
addressed 65:22
140:1 258:17
addresses 32:1
245:20

adequately 141:14
142:18
admin 47:2 52:15
65:18 245:12
administration
50:8 52:3
administrative
17:13 18:23 19:4
19:8 20:6 21:1,5
21:20 22:19 23:10
40:18 149:20
150:15 151:23
152:4 153:5,15,19
154:17 156:10
160:2 162:17
165:1,9,13,16,18
166:8 169:24
170:5 173:17
176:20 177:12
180:9 181:7 182:1
185:2,14 198:14
208:13 224:22
247:11 250:22
251:6 254:13,20
255:4 268:10,12
administrators
182:5
admit 243:20
admitted 267:24
267:24 275:10,11
admonished
239:17 259:9
advance 20:21
21:24 37:10 61:7
69:22 71:8 145:17
adverse 16:4
advice 160:22
161:2
advisement 63:24
advising 154:24

advocate 171:1
affect 77:23 85:15
233:22 235:5
affiliations 4:14
affirmative 96:6
144:9 202:1,5
affix 279:5
affixed 281:15
282:21
aforementioned
59:14 62:7 184:10
252:16
afraid 270:23
afternoon 86:21
119:12 121:17
238:12 256:13
259:4
agencies 57:5
245:1,2,4,15,22
246:7
agency 142:19
159:16
agency's 249:21
ago 16:7,8 19:23
32:6,9,9 162:7
201:20 256:3
agree 243:16
agreed 100:22
agreeing 70:17
ahead 72:9 90:6
aided 278:16
air 155:7
airport 155:8
aisle 74:17,21 79:6
182:17
al 280:7 281:3
282:3
alanis 31:13
127:19,21 174:19
209:9 215:21
264:14 271:16

**alarm** 205:19
**alert** 40:12 55:14
58:16,20 60:13
61:17 62:1 75:7,8
75:8,11,14,18,20
76:2,3 81:7,8,17
85:3,20 86:7 95:9
100:1,20 105:2
110:14,21 114:7
116:18 126:21
137:4 171:22
210:13,14 215:10
226:2 234:1
239:23 240:5,18
241:5 244:3 257:3
262:12 263:4,11
263:14
**alerted** 85:5 97:21
103:6,8 140:19
**alerting** 88:12,14
127:9 149:21
**alerts** 45:23 58:15
58:19 59:6 60:4
61:23 66:8 68:13
73:10 98:3 122:19
240:1 262:20
263:7
**alexander** 4:11
**aliases** 236:5
**allegations** 260:11
260:13 276:9
**allison** 2:8 4:18
**allow** 59:11 70:1
88:6
**allowed** 114:11
179:8 252:22
**allows** 232:7
**alluded** 256:16
**alluding** 217:20
**alter** 236:4

**ambg** 89:22 90:1
92:16 94:10
**america** 27:9,21
**american** 58:14
59:5
**americaneagle.c...**
50:22
**amount** 148:3
159:15
**amounted** 20:22
157:20
**ample** 21:3,6
23:12,22
**analyst** 30:8,8
**analysts** 30:6
**analyzed** 243:5
**android** 24:19,20
**angry** 172:16
**answer** 6:11 62:2
82:12 125:6
130:12 141:6
149:1 192:20
201:12 219:15
242:24 271:14
**answered** 6:23
190:1 191:8,18
193:13,18 201:10
219:15 253:2,20
**answering** 103:2
200:21
**answers** 6:8,16,17
19:23 24:15
153:13,22 191:19
192:7,9 196:4
204:16 211:1
**anthony** 101:6
103:3
**anthony's** 58:12
**anticipated** 183:19
186:11

**anxious** 170:22
**anybody** 66:23
75:6 87:19 88:17
109:17 187:1,3
239:24 256:19
258:2 260:6 265:3
269:19 271:17
274:13,16
**anytime** 126:7
**anyway** 127:23
134:5 224:24
**apc** 28:5 29:16
**api** 40:12 46:7
47:1,23 49:3,6,6
50:6 51:6,17,18,20
51:23,24 52:1
53:14 55:14,19
58:15,19 60:4,5,18
60:20,20,22 61:7,9
61:15,16 62:13,15
63:14 66:1 67:11
69:16 70:4 72:1
73:9,9,11,12 76:3
79:12 80:5,8,13,18
81:4 85:1,7 86:7
87:1 112:18 114:7
114:12 116:19
137:4 210:13
216:17 240:5,18
241:5,14 242:3,11
245:5 247:4,14,17
247:21,23 248:9
258:7 275:24
**apis** 57:20,22 58:2
59:1,8,10,10,15,21
60:9,14
**apologetic** 116:7
**apologized** 140:15
**apology** 117:3
**app** 12:21 13:23
16:6,9,12,19,20,20

19:17 21:17,19,23
22:3,9,13 36:1,5,7
36:10,12,13,17
38:4,24 39:11,23
42:4,20 43:8,24
44:3,10 231:23
232:6 233:22
**apparent** 84:24
116:9,12 117:5
120:3 174:9 258:3
**apparently** 134:17
233:10 267:17
**appear** 15:12
123:23 196:10
223:9 253:23
281:11 282:15
**appearances** 2:1
4:14
**appeared** 2:5,11
2:17,22 33:2
**appearing** 4:19,22
**appears** 99:14
129:13 132:23
223:14
**appended** 282:11
282:18
**application** 13:5
15:23 16:14,17
35:19 36:1 38:16
39:5,20 42:11
47:3 48:11 53:22
58:17 63:6 110:11
155:21 203:11
228:14 235:23
**applications** 35:23
49:17 51:19 176:8
**applied** 208:10
**appointment**
213:14
**appreciate** 212:9

[appreciation - available]

**appreciation**
259:16
**approve** 51:20
148:14 151:7
**approved** 70:19
71:19 149:23
**approximately**
10:16
**architecting**
270:20
**archive** 221:5,15
**area** 122:16
152:13 183:7,15
264:10
**argue** 237:7
**arisen** 159:18
**arising** 277:3
**arm** 270:13
**arranged** 154:8
**arrangement**
74:15 77:10
**arrangements**
154:5
**arrival** 155:9
**arrive** 108:9
**arrived** 167:21
168:1
**arriving** 203:20
**arse** 216:5
**article** 266:15
**articles** 266:16
**asap** 69:2
**aside** 7:2 8:22 9:2
9:20 12:14 14:10
29:22 34:20 36:17
37:16 65:3 133:23
138:15 142:9
149:21 158:9
175:2 203:21
229:17 231:24
236:5

**asked** 7:20 22:16
23:3 61:2 62:3
64:21 67:10 82:5
82:15 93:14 96:3
96:8 115:4 152:20
177:24 183:23
188:18 189:17
191:12,22 192:17
201:2,8,11 219:15
226:20 227:8
250:2 253:5,19
254:17 258:20
259:22,23 265:2,3
266:20 268:8
272:13
**asking** 19:16
53:15 70:1 113:13
125:4 144:1,5
154:3 209:19
235:4 269:22,23
**asks** 226:6
**assembled** 98:23
**assert** 206:12
**asserting** 78:6
**assertion** 207:9
243:17
**assessment** 135:22
159:2
**asset** 234:16
**assign** 47:4
**assignment** 281:2
282:2 283:2
**assist** 109:24
112:16 138:7
**assistant** 185:14
**assisting** 53:6
**associates** 2:19
**assume** 7:19 90:6
90:9 242:13 262:5
**assuming** 22:24

**attached** 8:14
282:7
**attaching** 245:24
246:1
**attachment**
247:12
**attack** 197:15,18
**attacks** 197:3,22
198:4
**attempt** 91:15
200:17 225:7
**attempted** 52:17
72:24 73:16 90:3
**attempting** 124:10
**attend** 174:10
**attended** 174:5
**attending** 118:5
**attention** 51:12
56:17 72:11 89:10
91:2 93:20 95:12
101:23 108:14
118:12 137:14
161:8 169:3
170:19 175:8
177:15 204:6
216:15
**attorney** 4:13 8:22
9:2 12:13 35:1
44:5 214:18,20,21
229:7,8 278:24
279:1
**attorneys** 6:6,12
**attract** 236:21
**audience** 35:2
**aug** 225:18
**august** 46:23
53:20 55:16,20
56:16,17 67:8,10
68:23 69:12 70:11
71:2 72:15,17,18
73:24 83:7 85:10

85:21 89:6,14
91:6 92:8 94:2,14
94:18,22 95:18
102:6 105:12
108:18 113:5
115:6,22 119:12
121:9,11,17,24
129:10 130:1
132:21 134:7
158:19 161:23
200:24 216:18
225:19,22 227:14
227:15 240:12
248:24 265:13,21
265:22
**auspices** 271:12
**austin** 26:21
**author** 33:6
**authority** 1:6,9
4:6,17,20 10:14
31:1 34:1 58:12
98:22 122:17
131:11 176:4
244:21 252:21
270:15 271:13
280:6 281:3 282:3
**authorization**
245:11
**authorize** 181:20
282:11
**authorized** 247:23
**automated** 58:6
**automatically**
18:10 219:22
**availability**
229:24
**available** 45:9
50:8 175:10
219:13 246:1
247:2,19

[ave - believe]                                                                 Page 6

**ave** 280:1
**avenue** 214:1
  229:9
**avoid** 252:3
  255:15
**aware** 40:8,24
  41:4,13,15,17 86:6
  86:24,24 87:3
  90:3 94:13,15
  98:7,11 112:19
  113:21 114:1
  117:4 121:23
  137:8 139:1
  144:10 163:1
  181:5,11,14,17
  183:9 198:6,9,12
  205:12 212:22,24
  230:7 232:11
  233:4 235:12
  236:4,13 237:23
  238:2,17,20,24
  240:3 250:20
  255:7,10,22
  260:15
**awry** 53:9

                **b**

**b** 4:16,16,16 62:5
  79:22 153:2 176:2
  179:18
**babbitt** 2:7 3:4
  4:15,16 5:11,12,15
  5:18,22 6:4,19,22
  7:5,9,14,19 8:6
  38:5,13 82:8,11
  84:5,12 125:5
  135:23 136:7
  164:8,16 198:18
  199:1 220:16
  228:5,12 238:7
  265:2 266:20
  277:10

**bachelors** 26:16
  26:22 27:1
**back** 11:20 17:2
  29:16 32:8 38:11
  47:6,24 55:7 57:2
  60:24 63:20 67:5
  79:6 84:10 97:18
  98:6 136:1,5
  146:4 152:14
  156:7 159:24
  164:14 171:14
  173:9 177:8
  189:10 194:16
  198:23 207:16
  210:12 211:14
  212:15 221:3
  225:7 228:10
  246:4 248:2 250:9
  257:9,20 260:22
  260:23 261:2
  272:10,14,20
  274:1,3,21 280:16
**backbone** 270:9
**backed** 219:22
**background** 44:6
**backup** 18:3 25:8
  37:7 202:10,11
  219:22 221:14,24
**backups** 221:20
**backwards** 17:15
  28:18
**bad** 213:16 215:4
  215:6,9 216:1,4
  234:13
**badge** 61:10 153:7
**balancer** 51:2
**baltimore** 183:7
**based** 27:9 64:18
  143:7 248:11
**bases** 159:7

**bash** 79:21
**basically** 25:5 29:8
  161:5 258:12
  259:9
**basis** 65:1 86:13
  144:15 159:1
  205:21 207:8
  252:6
**bates** 99:15 225:20
  247:15
**becoming** 160:16
**began** 28:1 40:22
  149:7 231:2
**beginning** 4:12
  105:13 261:10
  263:17 273:19
**begins** 69:1 89:21
  90:1 92:16 212:8
  223:2 225:18
**behalf** 2:5,11,17
  2:22 4:16,19,22
  5:4,5 10:13 64:17
  129:14 144:6
**belaboring** 180:11
**belief** 175:3
  255:23
**believe** 11:20
  16:18 17:14,21
  18:7 21:21 22:4
  23:15 24:12 28:8
  28:13,21 30:4,7,19
  31:15,22 36:18
  37:9,14 40:21
  41:21,21 42:3,16
  43:4,15,20 44:4,10
  44:11,16,19 45:4
  49:15 53:8,13
  54:13 55:15 56:8
  56:13 63:3 65:17
  65:20 66:17 73:20
  75:3 77:10 86:7

86:19,20 87:4
88:2,14 92:18
95:3 96:14 103:1
107:16 110:2
113:6,23,24
119:17 130:13,13
130:17 131:17
133:14 134:20
135:11 136:18
142:24 143:4,18
144:14 147:2,9
149:6 153:1 154:2
155:4,7,12,15
156:16,21,24
157:12 159:18
160:7 161:2
162:20 165:14,23
166:16 168:7
171:12 178:23
179:19 183:23
184:2,12 185:5,12
185:14 186:17
188:2,7,9 189:2,21
197:4,6,13,14,23
199:17,20 200:24
202:22 206:23
207:11 209:11
214:13 219:1
221:6,16 223:24
224:6 228:19
229:1 232:19
235:2,17,21
236:16 241:24
242:4,9,15,22,22
243:3,12 246:4,7
246:14 247:5
249:9,17 252:9
253:17,19 254:4
256:3 259:3,7
263:22 266:15
273:8,10 274:9,9

275:18
**believed** 242:1
260:3
**bell** 186:23
**benefit** 64:18
230:23
**benefits** 64:24
142:19
**benign** 75:8 80:2
81:16 237:16
244:2,12 250:5
**benignly** 79:15
210:23
**best** 10:18 130:1
137:1 146:10
157:14 159:20
173:24 190:2
191:5,9 232:22
237:8 250:19
251:12 274:6
275:22 276:21
**better** 36:5 59:12
64:10 87:20
166:11 185:9
197:7 233:19
237:5,17,22,22
254:1
**beyond** 203:24
239:7 240:15
252:7 277:4
**big** 176:7 216:23
236:17,20
**bigger** 85:16
**billed** 19:10
**bio** 25:10
**bit** 5:23 6:4 18:20
38:15 46:3 51:3
55:17 76:8 80:4
108:2 114:2 179:5
182:2,9 189:10
200:10 228:14

250:16
**bitcoin** 230:8,12
230:12
**black** 237:15,18
**blackberry** 31:23
**blackmail** 67:15
68:7
**blame** 206:1
207:17,20
**blank** 115:8
**blew** 152:11
**block** 152:8 230:8
230:14 231:3,6,8
231:16
**blocked** 192:4
**blower** 205:8,11
209:13 213:10
215:9,19
**blowers** 205:16
**blown** 205:21
**blue** 153:2 201:6
**board** 270:9
**boat** 165:7,11
**body** 18:13 95:22
**bonus** 143:11
**book** 8:13
**booth** 176:5
**born** 61:8
**boss** 71:14 124:11
147:21,22 152:11
163:6 174:4,24
**boss's** 147:22
174:4,24
**bottom** 99:15
123:11 211:4
212:7 253:7
**bounced** 74:18
180:6
**bound** 163:24
**bounties** 64:22

**bounty** 62:18,22
64:2,3 65:3,5
**bowen** 153:1,11
153:14,21
**box** 135:20
**brain** 156:6
**brakes** 216:20
**brand** 98:22
**breach** 233:11
235:7,7
**breached** 235:6
**breaches** 232:18
233:19
**break** 6:22 7:1,2
8:22 38:6,15 82:9
84:6,14 135:24
164:10 198:19
217:21 228:5
232:10 268:14
269:4,5
**bridge** 75:11,12
99:21 102:12
103:15 262:13,21
263:3 264:1
**briefly** 232:9
**bring** 88:19
125:12,16 186:15
**bringing** 22:21
220:2 274:21
**broached** 145:24
145:24
**broad** 48:22
183:16 234:10
**broader** 35:2
54:22
**broke** 40:6 136:8
164:17 216:7
**brother** 36:4,6
**brought** 9:24
10:22 17:8,10
51:12 56:17

137:14 185:13,15
185:17 186:6
188:16,17,24
250:18 271:9
**browser** 54:19
95:10
**brush** 248:2
**bubble** 137:8
**buckle** 197:12
**bug** 62:18,22 64:2
64:3,21 65:2,5
**building** 146:19
146:21 152:7,17
152:19,24
**built** 260:24
**bulletin** 53:14
58:2 61:16 62:13
62:15 63:14 66:1
67:11 70:4 85:6
135:6 216:17
239:23 241:13
242:3,11 258:7
**bulletins** 58:7,8
79:13 87:2
**bunch** 68:20 73:5
**bureaucracies**
146:12
**bureaucratic**
148:3
**buried** 261:14
**bus** 34:6 58:7,15
59:20 60:5,24
61:3 80:2,10,10,16
92:21 97:8 207:18
210:24 217:10,14
217:15 261:2
270:9,16
**buses** 48:13,14
116:21 207:19
270:17

**business** 12:17 27:13 48:11 105:11,13 138:22 175:23
**bustime** 40:2,11 46:8,15 47:1,2,11 49:2,4,15,16,20,21 50:8 51:23 52:3 52:15 53:7,22 54:12,20,22 55:13 58:3,5,17,20 61:6 61:18 62:15 64:1 65:18 66:1,22 70:4 73:6,7 79:16 79:24 80:8 87:1 91:11 92:12 94:6 96:18 110:10,14 112:7 114:8,12 122:19,19 210:15 245:12 247:16 248:9,21 258:7 261:4
**bustracker** 91:13 131:10 136:24 234:11 241:14 247:14 263:18 270:10
**busy** 72:6
**button** 95:5 226:15 227:2

**c**

**c** 4:19 101:7 187:6 187:6 278:3
**c.s.r.** 278:5 279:9
**ca** 280:24
**cad** 178:18 180:2,3 180:7,16 182:14 182:17 260:17 261:2,4 270:11
**call** 148:10 152:9 152:10 160:10

162:5 163:12 170:17 171:5 188:14 189:3 194:9 232:5 243:13
**called** 1:15 8:2 17:13 18:8 42:21 47:13 48:3 51:2 55:15 63:4 79:21 109:9 131:24 152:18,20 154:18 155:1 156:21 160:19,23 163:13 163:17 170:9 176:2 180:4 183:13 189:2,8 194:16 239:24 251:1 270:5,7,21 271:17
**calling** 155:10
**calls** 216:24 232:5 232:7
**calm** 12:9
**calmly** 257:22
**camera** 8:13
**canal** 194:17
**cancel** 213:13
**candidates** 269:12
**capability** 127:22 226:23
**caps** 171:21 204:16
**capture** 99:17
**card** 153:9
**care** 143:9 151:3 197:21 216:4
**cared** 141:18 171:9
**career** 157:16 241:21

**caring** 199:15
**carl** 67:21
**carter** 173:14 175:6 207:7 255:22 271:17
**case** 4:9 11:11,15 15:3,10 40:23 42:7 44:2,7 75:23 83:4 162:15 204:17,21,24 205:3,4 209:13 213:9 214:4 219:18 229:11,19 229:20 244:7 245:6 246:21 260:12,13 280:6
**casual** 63:11 66:18 151:5 269:3
**catch** 82:12
**cause** 48:18 227:22 255:19 269:8 276:14
**caused** 257:4 267:22
**causes** 145:8
**caustic** 188:1
**caution** 56:12
**ccing** 224:7
**cd** 227:23
**cell** 8:17 31:19,20 31:21 168:16,18 170:13,15
**cent** 45:20
**center** 11:13 142:13 180:19,20 180:22 181:2,3 194:17
**certain** 177:23
**certainly** 113:15 139:4 159:14 160:24 174:24

188:1 201:2 210:7 210:22 240:3 244:5 260:16 275:7,8
**certificate** 282:11
**certification** 281:1 282:1
**certifications** 27:5
**certified** 278:7
**certify** 278:8
**cetera** 121:9 269:10
**cfo** 124:11 163:7
**chain** 117:16 123:14,22 144:16 144:18 215:11,19 216:11 230:8,14 231:3,6,8,16 241:10
**challenge** 272:3
**challenging** 134:16
**chance** 57:18 58:24
**change** 43:13 225:2 228:19 233:23 256:7 280:14,15 282:8 283:3
**changed** 43:18 253:18 254:10
**changes** 110:6 280:13 281:7 282:7,9
**chapius** 67:23 68:1
**character** 236:14
**characters** 46:10 47:22 49:9 50:6 54:16

charles 2:15
chat 36:3,24
  231:23 268:11
chats 37:21
check 45:24
  135:20 137:3
  174:13 250:5
checked 45:15
  135:14
checking 14:3,23
  110:24 182:9
  232:16
chicago 1:6,9 2:9
  2:20 4:6,17,20
  8:10 10:14 25:14
  25:15 31:1 33:24
  58:11 63:15,17
  244:20 252:20
  279:5 280:6 281:3
  282:3
chicagoland
  183:15
chief 138:21 143:6
  147:20 179:2
children 26:1,7,7
  26:9 176:19 177:1
  177:7 197:11
choose 43:3
choosing 215:12
chose 19:12 21:9
  138:18
chosen 256:17,18
chris 16:4 30:7
  56:10 59:8 67:23
  69:21 70:1 74:20
  75:16,16,21 81:15
  82:6 87:5 105:1,4
  109:8 110:19,23
  119:4,16,19
  120:14 158:13
  181:8 189:8,8

191:4 192:18
196:17 211:19,24
212:3 213:24
214:6 215:16
223:8 224:15
226:6,10,13,18
227:18 233:18
236:17 237:12,20
249:4 253:8 260:1
260:17 264:2,24
265:17 267:4,18
268:2,13 269:23
270:23 271:20
274:17,21,23
chris's 81:8
  182:13 232:9
christopher 1:3,13
  4:5 5:6 29:19
  280:6 281:3 282:3
christos 239:14
  259:8
chronology
  272:11,11
chunk 218:9
churning 126:1,4
cio 179:2
circle 2:3 262:5,5
  263:3
circling 262:11
circumstances
  41:23 50:19
  156:16
citizens 63:17
civil 1:16 10:10
  26:16 63:15 281:5
  282:5
claim 206:12
clarify 110:7
  256:7
clean 202:19
  233:14 238:3

268:14 269:4,5
cleaned 25:3 219:3
  261:3
cleaning 202:21
  220:7 241:18
clear 116:13 140:9
  141:12 148:22
  173:11 195:11
  227:6,7 268:11
clearly 124:22
  137:10 140:3,14
  276:10
cleveland 280:2
clever 1:7 2:17 4:6
  4:24 5:2,9 40:2,9
  40:13,15,20 41:5,7
  41:11,18 42:9
  43:23 46:8 47:24
  49:13 51:24 53:6
  53:11,15 57:19
  58:24 59:3 60:7
  60:13,15 62:1,9
  63:20 64:3,7,13,21
  65:1,3 68:2 69:23
  70:3,19,20,24
  71:13 72:1,4 73:6
  80:4,12,16 83:4
  85:3,5 88:6
  101:16 102:18
  103:8,10,13
  107:13,17,21,24
  108:22 109:1,5,12
  114:16 115:4
  116:3 118:6
  120:10 121:23
  128:6 131:10
  134:17,22 135:5,5
  137:3 139:21
  140:3 156:21
  157:19 175:5
  178:18 207:2,7

208:2,4 215:14
216:16,20,24
226:2 238:13,16
238:21 239:3,8
240:17,19 241:4,7
241:10,11,12,19
241:20 242:1,8,14
242:18 243:1
245:17,20 246:22
247:3 248:9 249:7
251:18 253:6
255:19,24 257:16
257:23 258:3,12
258:16 260:8,14
260:17,17,18
261:2,6,8 262:9
267:13 269:1
272:5 276:9,12
277:7,11
clever's 64:9 207:9
  241:18
click 97:20
clicked 95:9
  226:14 227:2,2
client 214:19
  247:3
clients 73:6
clinton 167:9
clock 79:24 81:12
  246:3
close 62:4 133:20
  133:20 154:21
  175:4 183:17
closed 135:7 140:1
  140:2 241:19
closely 87:12
  260:16
closer 150:1
  226:10
closing 57:19
  60:17 133:18

cloud 37:7 202:11
235:2
cluing 118:8
clunies 101:6,13
102:5,9,23 103:3,6
103:21 104:3
107:12 108:10
cluniess 107:23
cobra 188:18,24
code 56:24,24 57:3
78:14 81:20 84:23
85:1,2 164:21
191:16 260:14,18
261:11,14,17,19
261:22,23
codes 270:16
coherent 196:12
coincidental 248:5
coincidentally
247:9
cold 147:14 174:7
collaboration
130:22
collaboratively
131:6
colleague 19:3
101:11,20 152:19
160:14,21 171:1
173:13 251:5
268:11
colleagues 68:2
154:21 156:23
183:17 269:4
collect 188:23
224:20
collected 59:18
188:24 202:7
college 26:17
combination
54:14

come 44:10 50:7
78:14 136:1 152:5
152:14 174:3
177:6 179:4
183:24 224:4
237:2 274:1
comes 63:20 240:7
coming 15:5 64:15
149:13 150:14
247:6 248:3
comma 100:14
command 73:21
73:22 75:17,24
79:15 82:4,13,15
82:17 90:10 97:17
110:24 210:19
221:4 226:13
commands 73:20
75:22 76:1,4,18,21
77:4,12 78:24
79:22,23
commencement
278:9
commencing 1:18
comment 68:7
208:11 256:4
277:6
commented 43:21
comments 196:5
199:3
commiserate
154:23
commiserating
160:18
commiseration
161:2
commission 63:5
65:16,20 66:4,6,16
67:2 101:14 103:7
215:15 281:19
282:25 283:25

committed 165:21
common 47:20
63:6 71:10 156:16
232:21 237:21
commonly 48:17
communicate 8:20
14:9 15:14 16:10
16:12,17,19,21
22:2 35:19,24
36:9,13,20 37:23
42:13 52:5 54:24
83:18 141:8
159:11 160:5
185:22 204:3
270:12
communicated
12:19 13:19 16:1
17:19 24:3 32:13
32:22 35:9 37:12
41:11 48:1 87:9
107:11 230:2
communicating
37:2 39:4,19
105:16 122:8
266:9
communication
12:24 13:2 18:9
22:7,8 35:22 36:2
37:17 62:7 105:24
108:11 140:14
154:14 161:6
200:6 204:2
210:10 216:13
221:2 231:17
239:1 246:17,18
249:13 251:8
270:10 271:5,22
communications
15:19 21:7,10,13
21:16 22:12 23:12
23:17 34:21 37:5

37:6 39:15,18,22
44:14,24 49:16
55:7 58:13 86:5
105:4 106:2,4
140:10 158:7
185:3 203:23
206:2 219:20
220:6 222:2 232:2
238:20 243:6
248:17 270:8,10
271:6
company 176:2
183:7,13 271:9
compatible 69:16
compatriot 251:20
compensate
209:11
compensated
141:14,15 142:18
173:23
compensation
27:19
complaint 11:5,15
208:17
complete 9:11,14
218:11 220:23
completed 280:16
completely 240:11
244:1 258:9
complex 261:21
complied 181:10
components 48:1
composed 108:7
composure 197:11
comprehensive
190:7 223:4
compromise 233:4
compromised
233:17
computer 9:23
18:4 54:2 74:13

**[computer - conversation]**

74:14 77:1,8
78:15 89:5 90:5,9
90:12,16,24 91:19
91:22,24 92:19,22
93:5,7 94:1,18,20
95:4 97:22 117:12
122:23 123:2
130:16 178:15,19
178:23 181:5
182:14 212:23
213:1 225:12
230:9,10,13
232:12 233:6
234:18,21,23
235:1 237:11
243:18 249:21
278:16
**computers** 178:22
179:5 182:2,11,12
**concept** 61:7
231:8,9 266:14
**concern** 56:12
60:16 86:9 216:15
217:1 269:24
**concerned** 23:18
55:8,22 56:8,11
57:4 60:18 61:19
61:20 82:23
119:12 124:12
125:16 126:8,10
163:7 269:17
**concerning** 153:17
278:12
**concerns** 78:6
83:13,15,18,22
113:18 115:12
130:7 136:13
151:13 200:13
226:7 240:4
**concert** 173:1

**concluded** 134:19
134:20 193:20,24
199:12
**concludes** 277:12
**conclusion** 158:14
166:9 176:22
190:11 195:4
221:12 252:14
268:9
**condition** 205:17
**conduct** 81:23
97:21 275:12
**conducted** 97:15
98:8,13 105:18
106:5 109:5,15
126:19 128:8
131:2 133:8 134:9
138:1 172:19
183:20 191:6
192:22,23 200:4
203:16 205:12
207:13 253:24
276:2
**conducting** 80:24
88:12 97:7 113:18
117:6 190:4
192:14
**conference** 8:9
55:10 56:3 101:17
146:21 185:15,18
187:11 188:20
**configuration**
42:20 80:11 103:4
**configured** 39:12
**configuring** 43:6
**confirm** 92:20
**confirmation** 83:3
83:8 85:15 86:14
150:1,3,4 249:9
**confirmed** 75:19
81:24 122:18

**confiscated** 153:7
**confused** 155:17
**connect** 179:20
**connected** 75:4
**connecting** 89:17
**connectivity** 48:13
**connector** 247:3
247:20,22
**connotation**
237:19
**considerable**
220:24
**considerably**
236:3
**considered** 157:3
170:24
**considering**
109:14 124:12,13
163:7,8 208:14
264:7
**consists** 46:9
**console** 19:14 47:3
52:3,15 184:9
245:12
**consolidate** 58:11
**constitutes** 278:17
**constructed** 264:2
**consult** 9:22
185:22 213:9
**consultation**
104:18 105:1
109:8
**contact** 155:2,10
157:24 186:2,5
241:20
**contacted** 153:24
154:1 155:3
157:24 213:9
**contacting** 155:4
265:15

**contacts** 268:19
**contained** 153:3
232:12
**contemplated**
251:9
**contemplating**
68:15 250:17
**content** 18:6 25:6
41:17
**contention** 242:7
**contentions**
255:24
**contents** 41:9
266:3
**context** 20:24 21:8
101:10 112:4
184:19 237:10
272:3
**continuation**
111:21
**continue** 72:4
227:1
**continued** 254:6
**continues** 94:10
**continuing** 190:8
**continuously** 19:1
**contract** 41:7
156:12 176:4
**contractor** 71:8
**contradicted**
268:1
**control** 142:13
180:13,19,20,22
181:2,2
**controlled** 60:4,6
**controller** 49:16
**convenient** 82:7
**conversation**
11:13 14:23 57:1
78:10,16 88:21
96:8 106:24 134:1

145:23 150:10
151:5 162:20,21
175:7 195:1 205:2
212:1 213:24
214:19 230:1,13
239:10,13 252:17
253:22 259:3

**conversations**
14:1 15:19 17:11
17:21,22,23 19:5
23:24 51:23 71:7
141:13 146:18
148:8 159:3
166:20 173:15
183:12 190:19
216:20 238:24
239:20 240:9
244:9 255:2
258:24 269:3

**conversing** 251:4

**conveyed** 172:9
192:16

**convince** 124:19

**cook** 1:17 278:6

**cooly** 257:22

**coordination**
104:17

**coordinator** 28:5
29:16

**cope** 19:5

**copied** 75:15
92:23 119:4
123:18 132:24
162:24 163:21
225:3 227:11
249:4 263:11
266:4

**copies** 44:16
115:24 116:2
247:14

**coppoletta** 57:12
57:14 60:2,5,18
61:19 68:22 69:3
69:5 86:4,16

**copy** 11:10 58:16
67:22 75:16 99:4
102:17 164:21
180:21

**copying** 68:22
77:18 222:9 225:4

**cordial** 82:19

**correct** 7:22 13:7
17:1 20:2,8 22:14
27:3 29:1 31:10
31:17 33:5 35:20
35:21 39:24 42:12
57:17 59:13 65:16
65:17 67:3 68:9
68:10 69:9,10
71:22 79:7 82:2
83:17 87:18 88:17
92:10,12,13 95:19
95:20 97:17,24
102:3,7,8,23
108:22,23 111:23
115:22,23 116:1,4
117:17 118:19
120:1,16,19,23
121:5,6,10,14
122:12,13,21
123:17,20 124:1,5
129:11 133:10
134:8,11 136:16
137:22 143:14
144:2,7,8,9 150:5
152:1,2 160:2,3
161:15,16 162:4
162:11 167:15,17
167:19,22 169:9
169:10,14 174:20
177:20,21 178:2,4

179:21 184:2
187:3,9,12 189:16
189:19 193:22
194:13 200:15
201:11 202:1,4
203:4,8,12 204:12
212:13 218:16,23
222:10,11,13
225:24 227:12
228:4 245:15
249:15 251:9
255:12 256:20,24
260:10 261:17
263:6

**corrections** 280:13
282:17

**correctly** 55:9
151:1 233:14

**correspond** 123:2

**correspondence**
43:23

**cost** 114:10,16,19
115:2,13 270:22

**counsel** 4:13 5:2
184:9 219:14
278:24 279:1

**counter** 1:11,14

**country** 36:5
37:19

**county** 1:17 247:3
247:20,22,24
278:3,6 281:10
282:15

**couple** 36:3
154:20 178:9

**course** 6:6 8:21
32:19 37:1 48:7
49:24 51:17 60:11
64:8 115:10
125:18 153:13
166:15 171:19

182:21 206:7
218:20 219:6,17
224:23 229:4,5
232:16 234:19
235:10 247:7
249:18 264:10

**court** 1:1 4:7,10
6:6,16 45:10,13
190:12 281:7

**courtesy** 150:19

**courthouse** 7:12

**courts** 1:16

**coverage** 270:1

**covid** 188:4 232:1

**coworkers** 74:23
132:14

**cp** 227:17,17

**craig** 108:22
156:21 169:17
173:1,5 246:5

**create** 71:23 82:13

**created** 76:21
112:13

**creating** 131:7

**credentials** 63:5
65:14,19 66:4

**credit** 63:18

**cried** 188:21 194:8

**criminal** 125:1,12
165:1,14,15,21
166:6,14

**criminally** 165:24

**critical** 181:1
247:1

**criticism** 270:24
271:1

**cross** 3:4,5 238:9
256:11

**crossed** 109:16

**crypted** 220:3

csr   1:17
cta   2:11 4:22
    10:13 11:2,2 17:8
    17:11,15 18:15,23
    19:9,12,13 20:11
    20:14,22 21:3
    22:18 23:19,21
    27:15,16,19 28:2,4
    28:17,19 30:14
    31:20,22 34:4,19
    34:22 36:10,14
    40:10,10,15,17,20
    41:1,5,5,12,14,18
    42:6,9,10 43:23
    44:3 46:14 48:7
    48:11 50:21,24
    51:1,19 52:2,9,18
    54:17 57:6,10
    60:4 61:3,13
    62:16 63:13,17,23
    64:8 66:22 67:5
    67:24 68:12,17,20
    70:10,23 71:13
    72:10 73:14 74:9
    76:2 81:19,19,20
    81:21 85:15,20
    86:11 87:12 88:13
    88:15,22 89:1,5,11
    91:3,13,20 92:3
    93:5,19,24 95:12
    95:16,17 96:15
    98:4,16 99:5,11,16
    100:4 101:7,23
    103:20 108:14,15
    109:21 111:6,14
    111:16 113:4
    114:2,6 115:17,17
    115:21 117:15,17
    118:12,16 119:18
    120:24 122:6,23
    123:1,8,11,14,21

    124:3 125:2,13,17
    125:20 126:22
    127:4,10 129:6
    132:12,17,20
    133:3 136:24
    137:10 143:9,15
    143:19 144:11
    146:13 147:5,8
    148:3 151:23
    152:14 153:3
    154:1,4,5,6,7,14
    156:20 157:16
    159:12 160:1
    161:9,12 162:2
    163:1,14,24 164:4
    164:6,18 166:7
    167:8 169:4,6,15
    169:20 171:15
    172:5,22 173:14
    174:3,23 175:9,12
    176:13 177:15,18
    178:4,6,11,13,14
    178:24 180:13
    181:5,12,21 182:2
    182:7,8 183:1,4,11
    183:19,24 184:4
    187:2,10 189:8
    190:6 195:18
    196:15 198:7,11
    200:4 201:14,22
    203:1,17,20 204:4
    204:7,18,22 205:5
    206:13,16,20,21
    206:23 207:11,15
    208:14,17,21
    211:3,18 212:7
    213:2,4 216:7
    217:3,24 218:4,8
    222:5,8,15,21
    225:17 226:4
    227:15,23 230:6,9

    230:10,13,24
    231:3,14 232:12
    232:24 233:4,6,11
    234:2,18,23,24
    236:1 238:5,5,16
    238:18,21 242:1,8
    242:14 243:1
    244:17,18 246:5
    246:14 248:8,20
    250:10 251:10
    252:15,23 253:6
    253:17 254:5,19
    254:22 255:10,20
    257:3,9 260:23
    262:1 264:7
    268:14 269:3,5,5
    270:16,22 271:16
    275:23 276:7,8,10
    276:15,22,23
    277:1,10
cta's   47:16 49:13
    51:8 58:19 77:24
    85:17,18 116:15
    116:16 233:20
    239:4
cta.com   91:11
cubicle   54:9 55:3
    178:19 179:23
    180:4,15
cubicles   74:22
culpa   117:3
curb   211:22
cure   63:24
curiosity   259:13
curious   46:1
    122:11,14 229:21
    229:22 237:20
    241:8 252:23
    265:18
curl   79:22

current   24:21
    32:20 66:23 79:16
    235:20 247:8,21
currently   24:11
    27:7,8
customer   40:12,13
    58:15,19,20 59:5
    60:4 61:23 66:8
    68:12 86:7 95:9
    114:7 116:8 117:1
    137:4 210:12
    226:2 239:23
    240:5 263:19
customers   81:12
    241:15,21 245:18
    245:21
cut   26:6 30:11
    48:8 87:22 129:18
    130:11 161:5
    185:3 256:15
cv   1:5 4:9
czerniak   2:8 4:18
    4:18

d

d   1:17 3:1 4:23 5:2
    5:2,4 187:6
    230:20 278:5
    279:9
dad   12:12 155:1
daddy   177:9
daily   138:22
    230:20
dark   184:20
    240:11
darn   105:21
data   61:12 97:5
    173:10 233:11,18
    235:6,7 237:8,9
databases   260:21
    260:22,23

**date** 4:2 16:11
22:7,8 58:21 90:5
146:3 149:7
218:21 221:13,14
221:21 247:8
248:3,4,8,14 265:8
280:9 281:3,9,19
282:3,13,25
283:20,25
**dated** 57:11 89:14
94:2 95:18 102:6
129:10 161:23
170:2 203:2 218:1
218:14 222:12
223:20
**dates** 145:16
166:19 223:8
**davis** 142:12,23
**day** 1:18 12:17
17:7 18:14 20:13
23:10 43:10,16
44:9 49:16 70:11
98:16 105:11,13
113:24 125:8
137:10 152:7
154:9,9,22 155:5
162:17 165:5
167:1,3,12 169:24
170:4 172:1,3,15
175:23 183:5,6,8
184:1 186:8,8,18
189:6 196:2
201:13 203:12
208:9 220:14
247:10 248:7
252:12,14 265:22
265:22 268:3
279:6 281:16
282:22 283:22
**days** 46:22 72:14
72:21 143:7

155:23 159:3
280:19
**dayton** 41:6 42:10
72:16,23 73:1,8,17
75:5,11,13,17,19
76:10,12,13,14,19
77:12 80:20,21,24
82:14,17,22 84:14
86:18,20 88:12
92:12,21 93:2,9,14
94:6,21 95:4
96:18 97:3,14
98:2,12,13,21
99:17,19 103:23
104:3,14,24,24
105:2,18 107:12
107:23 109:12
113:9 116:21
117:6,8,10,14
118:18 123:16,19
123:24 124:23,24
125:11,16 126:6
126:20 128:8,10
131:2,11,16 132:4
132:9 133:9
134:10,17,21
135:4,10 136:10
138:1,1,3,4,7
140:12 156:4,7,17
156:19 158:9
165:22 171:22
172:2,7 184:23
188:9 189:22
190:4 191:2,4,7
192:15 193:15
195:19 200:12,19
207:24 208:2,4
210:20 215:12,13
217:19 226:20,23
227:21 228:1,3
238:3 243:15,17

243:18,21,23
248:14,21 249:6
249:14 250:18
251:1,10,11 254:8
256:21 257:17
258:2,12,16
263:12,21 265:14
267:14 269:8
275:12 276:2
277:4
**dayton's** 97:16
110:14 244:20
**dcc** 49:15
**deal** 88:7 120:7
216:23
**dealings** 187:4,7
269:1,2
**dear** 280:10
**debate** 84:3
**decades** 32:9
**december** 24:9
26:24 145:15
217:8 221:19
**decide** 84:20 105:2
128:24 206:9
273:20,21
**decided** 22:11
109:6,11 156:20
224:23 225:14
**deciding** 76:12
136:10 207:23
275:12
**decision** 20:1,3
22:17 23:5,6 78:5
78:22 104:23
157:20 192:3
199:22 226:1
**deduce** 47:22
48:20,21 49:9
**deduced** 52:23

**deed** 281:14
282:20
**deemed** 280:20
**deeper** 83:5
128:23 132:1
**deeply** 176:16
**defendant** 1:14
2:11,17 4:24
**defendants** 1:8,15
**defending** 276:8
276:11
**defense** 162:15
250:15,17
**define** 237:1
**definitely** 112:22
155:13 216:19
237:12
**definition** 236:24
**definitively**
151:12
**degree** 26:22,23
27:1 77:5
**degrees** 26:15
**delete** 18:10 21:9
38:22 42:22,24
75:22,24 81:7
107:2,5,6 158:6
268:2
**deleted** 17:24
19:18 42:17
100:12 106:14
157:2,5,9,23,24
244:14 267:22
268:5
**deleting** 23:6
268:18,19
**deliberately** 244:4
**demanded** 217:18
**demonstrate**
259:15 277:3

**denominator**
  156:17
**deny** 148:14
**departed** 152:15
**department** 28:6,7
  28:9,12 29:15,17
  86:5 118:5 144:4
  206:5 222:16,17
  280:22
**departure** 30:20
  34:19 36:14 42:5
  42:5 148:11 236:3
**depending** 147:3
**deposed** 5:16,19
  6:2 10:6 13:18
  14:2 229:12,19
**deposition** 1:15
  4:4 7:7 8:12,21
  9:18,23 10:12,15
  11:4 12:8,11,18
  37:24 139:9 229:5
  249:18 255:18
  256:7 261:10
  278:13,19,22
  280:9,12 281:1,3
  282:1,3
**depositions** 10:10
  15:4 242:12
**describe** 46:5
  57:22 81:1 187:24
  198:3 237:12
**described** 52:10
  83:11 254:19
  258:21
**describes** 237:13
**describing** 211:17
  226:19 261:9
**description** 11:10
  11:16
**deserve** 141:20

**deserved** 144:3
**desire** 58:10
**desk** 54:7,8,10
  74:15,20 76:5,24
  93:12 178:11,17
  178:24 179:18
**desks** 74:10
**desktop** 79:7
  178:15 179:7,7,14
  179:15,22 180:2
  180:15,16 182:15
  202:12
**desktops** 178:16
**detail** 11:22 19:21
  109:20 132:3
  135:9 198:5 201:2
  215:22 257:22
  258:14
**details** 14:22
  48:23 88:6 131:18
  153:20 154:12
  200:20 205:23
  235:8
**determination**
  84:15 274:2
**determine** 80:18
  244:2
**determined** 20:15
  22:10 50:5,10
  84:17 107:13
  112:8 170:4
**detour** 102:12
  103:15 262:15,19
  262:21,22 263:3
  264:1
**develop** 47:4 70:2
  71:20 76:18 77:12
**developer** 47:3,5
  49:6,6 60:19 61:5
  247:4,17

**developers** 61:11
  231:13
**developing** 138:4
**development**
  51:23 71:4,5
  230:21 271:12
**device** 8:11 21:11
  21:11 44:11
  241:21 270:8,21
**device's** 46:8
  49:13 64:13
  242:19
**devices** 1:7 2:17
  4:6,24 5:2,9 8:15
  40:9,15 41:18
  48:1 53:6,11,16
  59:3 60:7 64:7,21
  65:1 68:2 71:1
  72:4 73:6 80:12
  80:17 83:4 88:7
  101:16 102:18
  103:13 107:17,21
  108:22 109:12
  115:4 116:3 118:6
  137:3 139:21
  140:3 157:19
  168:13,20 175:5
  178:7 180:12
  181:13,22 207:2,7
  208:2,4 215:14
  216:16,21,24
  220:14 226:2
  238:13,16,21
  239:3,8 240:17,19
  241:4,7,10,11,12
  242:1,8,15 243:1
  245:17,20 246:22
  247:4 248:9
  251:18 253:6
  255:19,24 257:16
  260:9,14,19 261:6

  262:9 267:13
  269:1 272:5
  276:12
**diagnose** 48:17
**diagnosing** 48:12
**diagonally** 74:21
**diagrams** 51:4
**dictating** 130:20
**died** 36:19 37:3
**difference** 195:4,7
**differences** 56:15
**different** 6:4 71:18
  77:19,19 137:5
  151:16 223:9
  232:23 236:19,21
  240:22 243:7
  245:21 257:21
  258:10
**difficult** 161:17
**dig** 224:19
**diligence** 165:8
**direct** 3:4 8:5 23:4
  30:23 31:1 53:3
  117:7 166:5 223:1
  234:4 235:5
**directed** 100:18
**direction** 94:22
  138:5 142:17
  278:17
**directly** 22:16
  31:8 50:4 124:2
  138:18 140:11
  141:2 148:4 166:5
  181:10,23 197:19
  208:17 212:1
  224:14 230:10
  260:18 279:2
**director** 27:13
  58:13
**disappear** 42:19
  221:10 267:23

disappeared
  220:14 228:16
  266:21
disappearing 18:9
  18:16 42:21 43:3
  43:5,9,12,16,18
  220:12 228:20
disappointment
  172:20
disbelief 242:19
discharged 137:11
  255:6
disclose 141:1
  233:9
disclosed 12:17
  151:17
disclosing 87:16
disclosure 105:6
  109:9,9 128:12,16
  166:1 205:9 265:6
  266:2,11,14
disclosures 266:10
discount 62:18
discovered 47:8
  51:10 54:4 59:22
  66:12
discoveries 85:21
discovery 60:13
  72:13
discretion 216:13
discuss 10:2 15:14
  23:13 43:11,17
  56:3 87:11 88:11
  126:11 128:2,4
  129:4 133:12
  140:4 165:20
  172:6,11 184:17
  194:18 197:20
  205:4,20 209:2
  234:17 273:24

discussed 14:19
  19:15 34:24 37:17
  66:22 73:2 88:14
  113:1 127:7,9,24
  128:22 130:1
  131:6 140:7
  144:14 146:15
  147:2 151:14
  155:21 158:18
  165:23 166:1,12
  172:1 173:12
  184:8 185:16
  204:20 226:24
  227:6 229:20
  231:1 239:16,17
  249:4
discussing 38:14
  43:14 65:5 84:13
  114:20 115:14
  126:16 127:11
  129:21,24 160:17
  168:24 198:1
  209:5 223:21
  224:1 229:5,18
  253:13 276:14
discussion 17:19
  71:3 78:10 84:2
  115:3 142:2
  172:10 185:18
  205:7 225:16
  238:16 253:12
  264:3 274:2,8
  275:20
discussions 166:14
  269:13
dismissed 205:18
  222:21
dispute 242:18
disrupt 244:5
distance 132:15

distraught 105:19
  153:10 155:16
  188:15 196:11,18
  197:15 198:15
distress 198:13
district 1:1,1,16
  4:7,8 45:17,18
division 1:2 4:8
docket 45:21
doctor 198:1
document 11:8
  114:9 221:6 239:5
  247:1,2,20
documentation
  11:6 114:10 229:2
  246:20 247:9,14
  248:1,8
documented
  149:17 261:6
documenting
  199:16
documents 45:21
  149:18 267:1
dog 235:15
dogs 232:9
doing 39:15 53:3
  58:6 68:15 78:4
  78:18 83:1 84:1
  85:4 90:16 103:4
  113:22 114:1
  140:23 147:21
  158:2 165:8 177:3
  179:9 190:12
  196:6,7 199:14
  220:24 234:7
  254:22 259:10
  260:15 269:24
  272:6
dollars 276:24
doomsday 188:4

door 65:11 143:23
  200:1 254:3
doors 241:20
doran 143:21
  147:19
dormant 158:18
dorval 173:13
dot 99:7,7,7
  120:15,15,15
  125:24,24,24
  204:14,14,14
double 61:22
  176:17,18,23
  177:10 197:10
doubt 162:7
downstairs 188:17
downtown 229:9
dozen 5:21 10:7,9
  10:9
draft 102:18
  103:11 104:17
  114:13,24 130:3,6
drafted 102:22
  103:11 104:15
  108:21 109:21
  129:13 162:10
  227:17
drafting 107:17,20
  109:24 129:21
  130:8,22 132:12
drag 217:22
dramatic 267:10
drawn 262:5
drew 262:6
drive 2:9 212:17
  212:21,23 213:1
  219:21 220:1
drives 179:6
drop 99:24 167:6
dropped 87:4
  100:19 251:7

**drugged** 196:23
**due** 80:3 146:7
  165:8 188:13
  199:6
**duffey** 229:6,20
**duffy** 2:2,3 3:5 5:5
  5:5 82:6,10
  240:20 242:20
  256:12,14 277:9
**duly** 8:2 278:11
**dump** 18:4 202:23
  220:23
**duplicate** 69:7
  75:10,23 110:14
  110:21 132:4
**duplicated** 75:20
  244:8,14
**duration** 273:13
**duties** 234:9 247:7
**duty** 137:13

**e**

**e** 2:9,14 3:1 4:19
  5:2,2,8,8,8,8 12:2
  15:18 25:21 26:18
  26:18 30:15 32:1
  32:3,10,16,18,23
  33:1,6 54:13,18
  57:11,13 58:23
  60:1 62:8,9,16
  63:11 64:5 65:6
  65:13 66:10,14
  67:8 68:9 69:5,11
  70:9,10,12 72:5,14
  72:19 75:16 86:24
  90:20 92:23 95:16
  95:17,22 96:15,16
  99:5,6,21,21,21
  101:7 102:5,22
  103:9,23 104:1,15
  104:21 105:14,15
  108:2,7 109:21

110:9 111:3,5,10
111:12,13,18
112:21 115:20,21
116:5 118:2,17
119:7,13,20,22
120:10 121:3,12
121:18 122:22
123:14 124:8
125:10 126:7,14
129:10,13,21
130:8,21 131:1,7
132:8,12,20,24
133:2,7,13,22
134:6,17,20
135:19 140:22,22
141:4,7 153:2
154:3,10 160:1,8
161:4,12,14,22
162:1,2,19,24
163:16,22 169:7
170:11 171:16
172:12,22 175:12
177:18 179:12,19
180:8 184:2
200:23 204:2
208:2,4 215:13
222:9 223:7 224:2
224:5,6,18 225:4
227:10,16 239:3
239:22 246:5
248:12,17,23
249:3,6,12 251:2,2
251:17 257:21
258:9,18,23 259:5
259:6 262:8
265:13 266:5,5
267:13,17 275:11
**eagle** 58:14 59:5
**earlier** 33:2 55:12
  61:22 66:21 80:3
  115:3 116:13

117:12,18 128:11
134:4 146:1
155:21 161:19
162:23 173:7
178:9 200:10
208:16 209:8
214:5,7 216:24
218:19 221:16
226:13 238:15
239:2 249:4
256:16 262:15,24
269:20 273:1
**early** 14:16 15:5
  28:22 65:11
  107:19 143:5,16
  152:7 154:14
  161:7 229:9 258:8
**earshot** 83:22,23
  83:24
**easier** 28:15 108:2
  237:6
**easily** 208:3
  245:21
**eastern** 1:2 4:8
**easton** 26:18
**easy** 148:7 176:15
**ebabbitt** 2:10
**edge** 109:19
**edit** 262:7
**edited** 110:4
**effect** 153:24
  254:6
**effectively** 133:4
  143:8
**effort** 59:19 71:22
  87:19
**efforts** 69:8
**egos** 236:4
**eight** 155:23
**either** 17:16 18:10
  19:11 43:2 51:8

72:22 147:19
154:8 160:6
162:20 178:21
186:11 188:11
190:15 197:24
202:10 219:24
227:2 258:16
272:19 275:23,24
277:3
**elaboration** 239:7
**electing** 20:18
**electronic** 9:17
  176:5
**eligibility** 264:18
**elizabeth** 2:7 4:16
  5:12
**else's** 73:13 77:23
  105:6 244:19
  276:16
**email** 3:7,8,9,9,10
  3:10,11,11,12,12
  3:13,14,14,15,16
  3:17 96:1 102:9
  108:21 110:1,4
  111:16 114:22
  119:18 122:9
  129:2 131:8
  163:17 169:12
  222:23 227:17
  264:23 280:17
**emailed** 201:2
**emailing** 130:5
**emails** 92:24
**emanated** 157:19
**embarrassed**
  277:8
**emotional** 198:13
**emotions** 197:13
**employed** 27:7,8
  41:5 66:15 177:11
  182:24 183:4,11

employee  3:13
  11:1,2 36:10
  101:14 152:16,18
  163:24 201:7
  269:14 278:23,24
employees  111:6
  116:3 143:8
  163:18 164:23
  248:20 276:8
employer  189:4
  205:18 235:20
employers  32:21
employment  27:14
  27:15,23 41:2
  66:23 174:23
  182:24 183:10
  236:1 252:15
  254:6 255:20
  264:4,5
empty  25:5
enacted  220:12
enacting  69:2
enclosed  280:12
encrypted  178:22
  178:24 179:15,19
  180:14,16,17
  181:5,6 182:16
  202:13
encrypting  179:6
encryption  179:10
  181:9 182:15
  202:14
ended  27:14 45:12
  195:10
engaged  78:9
engaging  230:7
engineering  26:17
  26:20
ensure  226:3
entail  128:17

enter  58:14,16,18
  73:21 74:5 76:6
  77:21 78:2,7,15,20
  78:22 79:2 95:8
  97:20 98:18
  103:18 191:16
  226:15 227:3
entered  94:16
  282:9
entering  69:8
  249:20
entertaining
  183:13
entire  30:24
  240:10 281:5
  282:5
entirely  21:15
  209:22 225:8
entirety  249:13
entries  92:11
entry  61:22 94:5
  184:14 273:6
envelope  153:3
environment
  208:23 209:3,6,8
equal  89:21
equals  94:10 97:10
erase  13:24
erik  67:22
errata  280:14,19
  282:7,10,18 283:1
erred  56:11
escorted  194:10
especially  199:11
essentially  166:21
  239:23 242:7
established  21:22
  227:12 249:17
et  121:9 269:10
  280:6 281:3 282:3

ethics  3:13 163:18
  164:23
evaluated  111:17
  112:1,4,10 113:3,5
  246:7,9
evaluating  112:16
  112:20 234:8
evaluation  112:14
evaluations
  113:11,22 121:24
evening  99:8,12
  162:16 176:21
event  193:1
events  11:12
  172:21 223:13
  224:13 253:16
eventually  93:17
everybody  29:8
  253:7 267:3
evidence  209:18
  259:13 262:11
evidenced  125:18
  173:22 197:5
exact  16:11 29:6
  29:12 30:9 50:18
  95:7 123:7 145:16
  166:19 173:6
  184:21 191:17
  192:20 195:24
  196:4 218:16
  224:9
exactly  15:24 31:5
  41:16 44:19 51:5
  52:11 53:18,19
  55:17 56:7 58:22
  78:10 86:23
  100:13 103:13
  112:23 113:23
  124:18 143:19
  147:13 154:9
  163:5 164:2 168:2

186:9 191:10,18
  191:22 193:1
  207:22 208:6
  211:16 218:18
  227:24 231:7
  236:8 252:3 253:1
  253:14
examination  1:15
  3:4,4,5 8:5 238:9
  256:11 278:10
examined  8:3
example  137:2
  225:10
examples  266:10
exasperation
  119:15,17
excel  89:3
excerpt  3:8 89:4
exchange  114:8
  118:10 121:7
  161:18 169:20,23
  170:11 221:10
exchanged  13:4
  21:13 34:21
  120:22 203:11
  231:17 266:13
exchanges  126:20
exchanging  104:5
exclusive  36:2
exclusively  16:9
execute  76:19
  77:12 110:24
  226:6,13,18,20
  227:3,4,9
executed  73:21
  75:19 80:20 90:10
  117:12 228:3
  264:2 282:10
executing  84:14
  90:12 105:23
  207:24 226:23

execution 217:18
227:5 281:14
282:19
executor 227:5
exemplary 269:14
exhibit 3:7,8,8,9,9
3:10,10,11,11,12
3:12,13,13,14,14
3:15,15,16,16,17
17:5 57:6,11 62:8
62:16 67:6 68:17
68:20 70:11 72:10
88:22 89:2,11
91:3 92:3 93:20
95:13,16,17 96:16
96:24 98:16 99:6
99:11,16 100:4
101:8,24 102:2
103:20 108:15,15
108:17 109:21
111:14,16,24
113:4 114:3,4
115:17,18,21
117:15 118:13,16
119:18 120:24
123:8,12,15,21
124:4 125:20
129:6,9 132:13,17
132:20 133:3
161:9,12 162:2
164:4,6,18,19
169:4,6,16,20
171:15 172:23
175:9,12 176:13
177:15,18 199:3
201:15,22 203:2
204:4,7 207:16
208:21 209:15
211:3 212:7 213:4
217:3,24 218:5,8
222:4,8 223:10

225:17 227:15
239:4,8,10 246:5
246:14,14,21
248:11 250:10,13
251:23 262:1
265:10,12,12
exhibits 3:6 9:21
37:14 44:12 120:4
129:3 197:5
236:10 248:11
263:23
existed 46:21
81:18,19 244:17
244:18,18
existence 46:13
53:19 256:19
existing 244:7
exists 46:17 60:2,3
73:12 85:2 107:3
exit 273:20
expect 7:15 139:10
expected 146:6,24
experience 142:8
209:21
experiencing
197:2 198:14
expert 136:24
expiration 281:19
282:25 283:25
explain 48:21 50:9
55:11 87:19,23
88:3 109:20 135:9
136:17 137:21
139:8 141:11
157:6 189:22
192:13 200:18
202:7 246:24
272:7 277:2
explained 51:9,16
52:1 69:6 76:17
131:23 139:9

189:24 203:7
215:21
explaining 228:2
explanation 22:22
60:22
exploitable 73:10
exploited 40:11
128:18
exploits 232:20
233:7 240:4
explored 176:3
exploring 230:16
exposed 63:5
65:14 117:1
259:11
exposing 107:18
139:13
exposition 139:23
express 83:9,15
172:18
expressed 80:23
83:12 249:15
expressing 83:22
119:15 120:2,5
209:12 277:7
exquisite 215:22
258:14
extension 60:6
173:2
extent 66:9 82:20
86:11 87:7 127:11
127:13 139:15
140:18 149:10
154:13 206:6
217:17 230:1
233:5 241:17
242:5 243:12
244:15 245:4
248:23 253:4
255:7 260:20
261:22 268:5,18

269:4 273:15,16
external 51:21
58:13
externally 57:4
extract 18:5
202:15 220:4
extracted 220:5
222:1
eyeballs 18:12
eyes 41:23 188:21

f

f 5:2 26:18
face 13:1,1
facebook 33:14
34:7,8
facilitate 62:6
facilitated 210:13
facing 245:10
249:24
fact 12:16 52:10
75:20 77:23 79:17
85:5 97:2 99:18
100:6 104:22
109:17 131:2,15
132:21 134:15
144:18 150:6
156:15 165:12
197:9 200:18
224:1,7 226:3
229:18 230:7
252:3,11,17
256:16 258:12
260:12 262:7
263:15 266:2
270:2
failed 121:20
fair 6:17 7:17,18
8:23 10:3,4 32:12
32:15 40:24 41:3
71:21 76:19,20
87:14,15 115:16

126:9 133:5,6
135:18,22 148:3
159:2,15 193:18
193:19 242:7
256:6
**fairfax** 247:3,20
247:22,24
**fairly** 86:13
120:11 141:15
145:8 146:9 148:3
173:22,23 174:2
257:13
**fake** 199:23
**fall** 140:6,7 145:14
**falling** 80:13
**familiar** 6:1 46:4
101:9,11,13,17,18
101:20 123:12
163:19 196:16
231:10
**family** 34:11
236:19
**far** 17:2 66:20
139:18 142:7
176:10 256:8
274:5
**farce** 192:5 252:1
252:5
**father** 34:24 36:24
177:8,12
**fault** 216:12
**favor** 220:24
**feature** 18:17
53:17 63:8,19,22
114:7 115:5
220:13 228:15
**features** 64:13,17
87:2 114:12
**federal** 1:16 7:11
11:6 41:7 45:10

**feed** 97:16
**feel** 101:12 135:16
199:8 209:20,24
256:6 258:15
**feeling** 126:4
199:22
**feelings** 126:12,16
**feels** 147:12
**fell** 147:7 149:19
**felt** 17:20 21:3
23:11,24 61:3
81:16 83:1,3
86:12 108:2,5
135:1,13 136:23
137:1 138:12
139:13,24 140:8
165:10 186:12
201:1 210:5 234:4
254:1 277:8
**female** 186:21,24
**fetching** 81:12
**field** 249:19
**fields** 60:21
**fight** 142:17
**figure** 150:18
202:16 237:4
257:8
**figured** 257:2
**figuring** 271:4
**file** 162:6 163:3
208:17 219:21
220:4
**filed** 4:7 11:5
45:23 163:10,13
271:24
**files** 44:10 219:23
225:8 232:12
233:10 234:17
**filing** 40:23 42:6
204:21 209:13

**final** 133:18
**find** 75:7 109:10
128:17 153:8
209:18 219:20
237:8 259:17
280:12
**finding** 54:5 62:18
62:23 63:19 64:19
84:15 86:8 173:9
207:8 259:17
**finds** 128:12
**fine** 17:14 43:16
208:7 213:12
273:2
**fingerless** 204:14
**finish** 6:10
**fire** 238:22
**fired** 186:11 194:3
274:14 275:16,19
**firming** 146:2
**first** 8:2 29:16
50:17 67:5 72:24
73:16 89:11 95:17
100:5,17 108:10
115:17,20 116:5
118:15 125:21
134:15 143:12,12
145:24 156:3
167:21 169:11
171:14 195:7
197:12 203:2,5
204:4,7 218:1,12
220:9 224:16
236:1 239:15
263:11,24 278:11
**fit** 22:17 157:20
**five** 77:14 78:13
164:9 190:14
198:18 228:5
262:23 263:1,7

**fix** 85:10 128:6
159:21 277:8
**fixed** 85:17 88:9
258:5
**fixes** 65:23 261:8
**fixing** 64:19
**fl** 170:10
**flagging** 165:12
**flash** 212:17,21,23
213:1
**flaw** 114:9
**flew** 183:7
**floor** 86:20
**flows** 173:10
**flynn** 143:5,20,21
143:22
**fmla** 148:10 270:3
**focus** 19:22
**fodder** 211:20
**folder** 218:5 274:3
**folks** 39:19 59:4
85:24 109:12
126:6,20 142:7
143:1 160:4 241:3
241:6,11 252:10
**follow** 72:20 99:11
123:22 133:12
134:1 149:2,20
189:11 190:21
199:3 206:7
214:21 219:7
236:7 250:6
**followed** 133:13
161:5
**follower** 277:6
**following** 129:2
133:22 134:22
154:9 159:4 167:1
208:20 212:6
213:4 249:8 255:5
263:20 265:14

follows 8:4 176:12
followup 135:4,5
  258:24
font 223:9,17
force 138:6
forced 41:14
  197:12 238:17
  275:16,19
foregoing 278:13
  281:13 282:18
foregone 190:10
  252:14
forest 2:4
forever 157:4,22
  171:21
forget 194:15
  204:13
forgot 215:15
forgotten 208:5
formal 149:11
  183:15 193:4
formed 255:23
former 11:1
  222:15
formerly 66:19
forms 251:16
forth 57:2
forty 26:14
forward 18:1 32:7
  71:19 117:16
  118:22 125:21
  161:13 162:3
  280:16
forwarded 103:20
  103:24 111:8
  118:17,20 123:22
  177:19 251:2,3
forwarding
  108:10 161:18,21
  161:22 177:22
  251:20

found 15:17 18:3
  51:11 52:6 54:3
  54:23,24 55:6,14
  55:18 57:20 58:5
  59:2,9,11,15 60:11
  61:14 63:7,14,15
  64:8 65:19 75:11
  84:24 87:6 88:9
  105:8,13 114:8
  115:7 128:6
  131:23 140:18,19
  171:10 202:10
  206:21 210:8,12
  216:2,14 217:4
  219:17 220:3
  234:21 241:15
  248:24 257:23
  258:22 259:2
  261:14,23 267:16
  275:24 276:1
founded 270:24
four 25:15 29:17
  80:3 211:3 212:7
fourth 114:3 173:8
  175:17 262:2
frame 221:17,18
francisco 101:18
free 45:19 281:14
  282:20
frequented 19:15
fresh 180:23
friday 72:17 73:24
  86:21 87:3 95:2
  105:10 108:5
  109:5 112:24
  113:2,5,8 117:14
  119:12 120:9
  129:24 134:15,19
  161:23 166:18
  176:21 183:22
  255:6 259:5

265:13,14 268:6
  272:8 274:21
friedlander 2:14
  5:1,1
friend 38:1 119:16
  173:13 189:6
friendly 14:22
  82:19 261:5
friends 12:23 19:5
  36:8 37:22 156:23
  160:16 236:22
front 17:6 37:13
  62:21 74:12,13
  77:7 104:12 164:1
  164:19 236:9
  256:2 265:9
frustrated 158:5
frustration 23:16
  119:15 157:21
full 9:11,14 88:6
  107:20 114:11
  118:15 137:21
  140:10 171:21
  185:11 200:16
  218:18 233:5
  236:16 253:12,12
  260:23 268:9
fuller 220:19
fully 171:23
function 36:21
functional 54:1
functionality 62:5
  85:11
functioned 86:2
fund 276:24
further 72:2 83:12
  86:3,15 88:5
  116:23 135:9
  149:22 208:11
  215:19 216:13,21
  217:22 238:7

247:5 249:15
  274:2
furtherance
  276:21,23
futility 253:23
future 124:9 149:4
  183:17 268:24
fuzzy 56:14

**g**

g 5:8
gain 141:22
  245:14
game 29:9 183:14
gamer 236:20
gaming 236:17
garner 170:19
gears 248:10
general 14:3 45:4
  48:23 56:9 61:5,5
  128:1,4 131:19,22
  146:1,5 149:12
  229:11 230:14
  234:10 261:12
generalities
  229:17
generally 24:20
  45:3,8 56:10
  135:15 159:4
  193:11
generate 73:22
generated 121:16
generic 49:3 51:17
  56:23 66:7 79:17
george 1:3,13 4:5
  280:6 281:3 282:3
getting 47:12 50:1
  53:6 58:24 63:19
  64:17 69:22 72:1
  89:1 97:2 126:5
  141:19 142:11,17
  145:6,13 159:21

[getting - hacked]

173:22 176:14,24
199:24 208:7
221:1 243:22
**giant** 221:5
**gingeturano**
236:14
**give** 9:11,14 14:6
29:12 34:11 53:16
70:3 99:2 102:17
143:9 150:19
164:7 211:19,20
246:10 271:24
272:7
**given** 10:12 20:5
67:20 142:14
188:11 195:5
216:23 236:6
247:23 253:16
256:8 278:18
**gives** 52:13 54:21
179:13,20
**giving** 98:24
145:17 229:10
**glad** 117:18
**global** 46:14 55:6
73:14 76:3 87:6
**gloves** 204:14
**gmail** 32:7,11 33:3
118:23 119:10
121:4,4 122:2,5,10
122:22 123:2
162:1 169:8
175:13 236:10
**gmail.com** 33:10
**gmail.com.** 32:4
**go** 19:3 23:1 29:8
38:6 57:10 70:5
71:13,19 72:9
79:23 90:6 95:5
108:15 130:1
135:9 139:11,23

141:21 145:11
148:16 152:21
157:15 164:8
177:4 195:13
211:13,21 218:2,4
218:15 225:7
246:10,16 247:13
247:15 248:7
250:9 254:1,2
264:16 272:10
275:2
**goes** 208:19 220:8
**going** 5:20,23 6:7
7:19 14:4,24 15:9
18:19 19:19 22:11
22:24 38:8 40:1
44:20 46:2 49:12
49:23 57:1 63:23
65:19 67:21 71:9
71:11,16 76:8
78:1 81:3 84:7
105:22 106:20
114:19 120:6
123:12 125:3
127:13 128:9
132:3 145:1,13
149:7,13,17
150:21 154:13,24
163:1 164:11
173:18 175:19
177:1,4 182:3
185:8,23 190:15
195:8,12 198:20
206:17 211:21,24
213:15 215:3,8,17
217:21 219:14
228:7 229:24
235:16 237:16
244:22 245:7,21
246:4 253:20
254:2,12 263:12

269:18 270:2
271:19 273:17
274:1 275:2
**good** 4:15 5:11
38:5 84:5 102:16
135:23 162:8,13
169:12 171:20
236:22 238:12
256:13
**google** 16:1,2 22:1
22:5,7 36:18,20,21
37:3,4,6,7,12,16
80:5,8,11,13
165:19 202:11
219:21 220:1
**googled** 163:20
**gosh** 33:17 267:8
272:5
**gotcha** 111:7
**gotten** 54:12
176:10 213:24
232:20
**government** 45:10
249:21
**grab** 262:10
**grabbed** 248:1
**grabbing** 140:13
**grammatical**
251:16
**grandchildren**
36:24
**graphic** 262:3,6
**grata** 157:3
268:24
**great** 5:15 9:16
93:8 129:5 171:4
**greater** 19:20
92:12,21 94:6
96:17 98:21 99:17
99:19 103:23
104:14 107:12

118:18 123:16
131:11
**greatest** 230:22
**green** 5:8 262:3
270:18
**grid** 182:7
**ground** 5:24 53:7
53:10,13 180:24
210:8
**grounds** 209:12
251:13
**group** 37:21 58:12
60:6 70:7 137:1
174:15 264:11
**groups** 36:3,7
**guarantee** 170:17
**guardia** 155:8
**guess** 5:20 19:22
78:1,6 103:5
119:2,23 139:2,11
146:2 148:23
159:5 162:14
174:17 198:16
202:6 211:19,24
216:9,11,21
217:14,17 219:9
226:17 244:10,11
**guesses** 158:10
**guidance** 160:22
**guide** 247:4,17
**guy** 101:18 162:5
163:12 213:16
215:4,6,9,18 216:4
**guys** 42:18 57:15
80:7 220:7 259:14
267:16

**h**

**h** 4:21 79:22
**hack** 237:9,10
**hacked** 209:18

**hacker** 236:23,24
237:1,2,3,7,13,14
237:15,15
**hacking** 102:17
237:19 271:3,4
**hackinghyena**
236:8,15
**half** 10:8 30:20
55:3 80:22 118:17
196:19 214:2
223:1 238:22
262:24 263:2
**hand** 11:13 40:16
59:6 185:9 186:14
275:20 279:5
**handed** 153:2,12
154:11 274:3
**handful** 178:12
**handle** 33:16
137:4
**handles** 236:12
**handling** 176:15
197:7
**handwritten**
214:11 225:11
**hangout** 37:12
**hangouts** 16:2,2
22:2,5,7 36:18,20
36:22 37:3,4,6,16
**happen** 105:22
210:6
**happened** 56:15
56:16 101:4
106:15 107:14
122:9 127:5
136:14 140:17
146:13 189:5
191:3 193:23
200:12,22 203:19
219:20 222:22
223:2 226:22

**happening** 208:8
272:16
**happens** 204:17
**harassed** 205:18
**hard** 142:15 163:6
179:6 196:14
**harder** 198:17
**harm** 124:20,22
227:23 276:15
277:3
**harrington** 3:10
118:18,21 119:13
124:2,8 134:21
161:19 162:1
251:17 265:16
**harrington's**
121:8
**hashing** 253:14
**hat** 73:8 76:11
102:16 171:19
176:6 237:14,15
237:15,18
**hate** 217:21
**hayes** 69:13
**hayne** 177:19
**haynes** 1:15 2:22
3:3 4:5 5:4,16 8:1
25:13 26:13 32:2
33:11 37:18 38:14
40:4 46:6,16 57:7
57:15 62:10,17,22
67:6 68:17 69:20
72:12 74:8 84:13
88:23,24 89:4,12
89:22 91:3 92:5
93:22 95:13 101:6
102:1,6 111:15
114:3 115:17

241:19 242:23,24
253:8,14 258:13
267:20 271:19,20
118:13 121:1
123:8,13 124:17
125:6,22 129:9
132:18 136:8
161:8,13 164:5,6
164:17 169:3,6
171:15 175:8,13
177:15 178:22
183:18 187:8
199:2 201:14,18
209:16 210:16
211:3 215:8,17
217:2,24 218:5,7
222:5,10 224:7
225:1,21 226:18
228:13 252:20
253:9,9 256:13
277:13 278:10
280:9 281:4,9
282:4,13 283:20
**head** 6:20 64:12
64:12 127:7
143:23 156:11
265:24
**headed** 179:1
**headers** 202:22
**headquarters**
74:10 147:8
152:14 178:14
180:13 183:24
184:4
**heads** 145:17
150:19
**health** 145:5
198:12 206:5
**heamus** 143:21,22
147:19
**hear** 5:13 6:12
83:21
**heard** 199:10
232:8 252:10

**hearing** 81:22
243:9
**heart** 171:11
**heated** 84:2
**heck** 271:18
**held** 1:18 28:17
29:2 87:12
**help** 10:1 208:1
258:17
**helped** 112:21
**helpful** 18:18
19:19 74:7 76:9
181:4
**helping** 115:9
**hereto** 279:2
**hereunto** 279:4
**hey** 37:24 44:20
48:24 59:4 60:2
62:23 63:7,13
65:24 88:18 90:21
96:10 110:7 115:9
149:13 217:20
241:15 263:21
**hi** 57:15
**hidden** 57:20,22
59:10,15,21 60:9
60:14,17 70:4
79:12
**hiding** 267:23
**higher** 49:5 50:6
68:4 108:5
**highlighted** 89:7
89:10 91:4 92:4,5
93:21 94:2 204:5
204:7 205:24
208:21 209:14
211:6 212:8 213:5
217:4
**highlights** 218:17
**highly** 173:24

hindsight 67:19 118:1 131:20 215:20 216:19 274:11 275:11
hip 147:9
hired 28:4
history 3:8 13:23 18:8 89:5,8 94:1 100:12 111:10 113:7
hit 98:17
hitting 95:8
hobbies 209:19
hold 26:15 27:4 101:16
holding 185:4 254:14
hole 84:23 105:21 139:12
hollister 2:7
home 26:8 145:19 146:10 147:1,12 147:17 149:9,9,14 150:22 153:8,10 154:7 177:6,8,9 197:24 220:3 243:8
honest 275:20
honestly 85:24 132:10 187:19 188:9 190:1 212:15
hooks 58:6 60:15 61:14
hope 24:15 210:24
hopeful 268:15
hopefully 212:15 256:15
hoping 185:10
host 75:8

hostile 208:23 209:3,6
hosting 50:22
hotmail 32:5,12,14
hotmail.com 32:6 32:9
hour 20:12 80:22 80:22 125:9 168:2 196:19 214:2 229:10
hours 9:5 13:24 18:11 42:17 43:10 221:11 228:17 230:3,4 250:21
house 25:3 177:1,4 177:7 243:11 244:19
houses 244:20
hr 144:11,18 148:5 148:5,21 153:1 186:20 188:6,7,17 188:17,21,22 189:14 194:9,24 272:19
huh 6:20 175:16
hundreds 232:12 232:13
hung 139:2
hurt 147:8
hyperbole 68:16 115:8
hypothetical 148:18,23

**i**

ice 147:7 149:19
idea 62:23 74:1 78:4 114:15 126:23 127:3 128:11 156:1 172:6 175:19 179:4 231:7

ideas 63:11 64:11 64:15 166:23 230:23
identically 156:15
identification 240:6
identified 54:4 55:20,21 59:13 72:21 110:10 160:4 206:24 216:18 234:6 239:11 243:6 249:7 258:6
identifier 245:7
identifies 121:12
identify 22:6 54:11 219:19 257:7
identifying 205:8 205:10,16
ignorance 243:13
ignorant 166:11
illinois 1:1,18 2:4 2:9,15,20 4:8 8:10 25:14,15 27:9 45:17,18 163:17 164:21,22 176:4,9 278:1,7 279:6
image 180:18
imagine 6:5 19:2 19:20 155:16 175:6 190:5,6 248:3
immediate 65:23 137:16
immediately 51:13 52:12 74:16 76:1 215:20 244:14 259:24
impact 9:7 75:6

impacted 105:7
implementation 263:17
implemented 80:17
implicated 131:22
implications 136:21
implied 227:3
implying 227:7
important 86:12 170:18,21 246:24 248:15 267:1 273:4
impression 248:18
improper 199:19
improperly 207:10 260:13
improvement 27:13
inaccurate 256:1
inappropriate 116:8,11
inbox 108:12
incident 46:22 55:12 109:10 158:9 184:23 188:9 193:15 227:21 228:1 248:14 249:14 251:1 254:8 261:3 261:5 269:8 276:13
incidents 55:12
include 118:9 127:18
included 87:16 111:15,20 233:11 280:14
includes 95:22 99:20 112:1 223:8

**incorporated**
282:12
**incorrectly** 156:13
**indicate** 70:21
84:22 132:2
144:21 151:6
249:5
**indicated** 47:6
65:15 86:9 87:5,7
98:2,6 149:3
150:12 157:14
172:10 175:5
197:6,7 230:16
233:13 253:2
**indicates** 114:11
263:3
**indicating** 13:17
85:14 226:12
252:13 280:14
**indication** 151:8
250:23 262:19
**indifferent** 174:14
**indirectly** 117:9
279:2
**individual** 47:5
66:24 73:20 142:5
142:9 237:21
268:23
**individuals** 12:14
47:21 117:19
123:23 190:22
**industry** 101:21
183:14
**infamy** 248:5
**inferring** 214:11
**inform** 52:8 88:7
127:1,4 130:24
133:19 145:1
150:7 233:20
**information** 9:17
12:3 14:6 18:19

19:16 20:23 21:2
21:8 22:20 24:1
34:11 44:6 49:12
54:13,20 58:9,14
60:23,24 61:4
69:8 76:9 82:21
83:12 97:7 104:5
122:3 145:6
157:24 158:3
179:2,20 180:1
215:10,10,19
223:8 237:9
240:15 241:2,9
245:9,23 249:11
254:24 258:16
259:14,21 268:9
271:23
**informed** 41:5
46:12,17,20,23
52:4,11 59:23,24
60:15 133:4
145:21 258:8
**informing** 40:10
42:9,10 109:15
130:2 131:14
**infrequently**
34:10
**ingenuity** 63:18
**initial** 43:5 54:5
265:23
**initially** 16:1 54:3
61:2
**initiate** 148:7
149:7
**initiated** 43:4
**initiative** 270:14
**inject** 81:7 116:18
210:14,19
**injecting** 40:12
**injection** 210:13

**inlaws** 36:6 176:20
197:11
**innovative** 231:14
**input** 90:18 91:23
92:20 93:14 94:17
210:19
**inputted** 89:9,21
90:1 91:12 92:15
94:13,21
**inputting** 77:3
90:24 93:4,9 94:9
**inquired** 266:7
**insecure** 205:17
244:20
**insert** 114:7
**inside** 73:14 153:3
232:24 243:8,10
**insist** 82:3,13
**insistence** 82:20
**installations**
210:24
**instance** 65:3
**instances** 92:21
93:18
**instrumental**
270:19
**insurance** 270:1
**integrated** 181:19
**integration** 80:14
98:3,4 100:10
102:11 263:12,16
**intend** 124:20,22
**intended** 184:17
186:7 205:21
206:12
**intent** 131:17
195:12 267:23
**intention** 107:20
128:7 214:7 219:4
252:19 276:14

**intentionally**
99:24
**interacted** 129:17
187:2
**interaction** 113:14
151:20
**interest** 15:11
171:20 249:16
259:10,16,17,19
276:4,10
**interested** 15:10
15:11 44:23 59:4
61:12,20 171:2
214:3 231:10
237:11 253:24
254:9 279:2
**interests** 171:11
173:24 276:22
**interface** 110:11
**interjected** 108:4
**internal** 21:4
48:14 51:19 52:5
57:2 62:6 67:24
71:13 124:23
153:5 173:17
255:7 271:8
**internally** 52:6
61:11 137:1 243:2
**interpretation**
253:12
**interrogated**
23:14
**interrogation**
22:21 23:8 24:2
155:24 211:14
212:18 251:24
252:5 268:7,7
**interrogations**
20:22
**interrogatories**
8:3

**intersection** 270:17

**interview** 19:10 22:21 175:18,22 176:1,10 182:22 183:6,8,19 184:5,6 185:4,11,23 186:3 186:16 187:10,14 187:22,24 188:21 189:11,14,18 190:24 192:11,14 193:4,8,10,12,20 193:23 194:22,23 195:5,15,18 196:1 196:2,15,19,23 198:8,11 199:4,6 199:18 200:17,19 201:6,9 203:17 211:18 250:3 272:12 273:15,17 273:19 274:23 275:1,3

**interviewed** 19:11 185:19,24 195:3 200:4 253:8,9

**interviewing** 186:18

**interviews** 17:11 183:3 184:18 194:19 195:17

**intimidation** 84:3

**intricacies** 139:22 181:17 250:5

**intrigued** 61:21

**intrusive** 113:15

**invasive** 217:19

**investigated** 257:13

**investigating** 50:2 50:3 55:13

**investigation** 17:17 21:4,9 65:18 153:6,16 173:18 184:22 185:11 190:7,9,13 200:3,7 255:7 268:16 271:2,9,11

**invited** 174:14

**invoice** 156:13

**involved** 51:22 138:22 148:17 165:15 166:5 174:15 175:1 230:12 253:13

**ip** 257:8,9

**ironically** 188:3

**issuance** 277:5

**issue** 40:16 42:10 55:14 56:13,18 60:12 62:2,19 63:19 65:14,18,24 69:6 73:3 75:24 80:3 83:5,5,6,7 85:12,13 88:8 103:5,7 116:7,9,11 116:23 117:5 127:14,17,20,24 128:6,13 133:18 133:19,20 134:2 135:1,2,6 138:14 138:24 140:1,2 151:10 156:18 157:18 158:18,23 159:22 216:23 226:3 227:21 235:3 239:11,16 239:21 240:10 249:7 257:4 258:4 277:8

**issued** 15:16 31:20 31:21,23 52:2,14

97:17 135:6 178:4 178:6 241:12 263:11,24

**issues** 47:10 48:12 49:2 54:12 58:4 59:19 64:19 115:7 129:1 135:10,12 145:12 173:9 216:16 234:2 241:23 261:6

**issuing** 227:17

**itemized** 239:22

**items** 59:2 72:7 154:4 167:13 168:12 172:5

**j**

**j** 4:23 5:8 187:6

**jackie** 39:10 111:9 118:4 152:20,20 154:19 159:15 160:7

**jacqueline** 117:16

**jados** 2:13 3:4 4:23,23 238:10,12 240:22 241:1 243:14 256:10 258:21 271:15 277:11

**jefferson** 2:20

**jeffrey** 222:9

**jerked** 206:22

**jersey** 90:4,13,19

**jesseka** 5:6,8

**jessica** 104:14,15 105:14 108:3 123:15,22

**jim** 31:6 87:17,18 87:23 88:1,3,19 127:1 129:14 136:10 152:11,21 160:9 174:7

183:24 188:1,5 189:17 194:24 200:12 215:21 227:16 228:2 248:12,18 264:13

**job** 11:9,15 28:4 29:16 137:7,12 175:22 176:1,11 182:22 183:3 191:21 192:12 204:17 215:18,23 234:9 235:16,22 247:8,21 275:21

**jobs** 29:8 147:21 230:22

**jog** 10:1

**jogged** 273:1

**john** 143:5,20,21 143:22

**johnston** 39:10 111:9 117:17 154:19 159:14,15 160:7

**joining** 5:12

**joint** 22:17 23:5

**joke** 12:22 236:18

**joked** 64:9

**jot** 168:17

**judgment** 209:21

**julie** 2:14 5:1

**july** 3:7 57:11,24 59:24 62:8 65:7

**june** 53:8 55:13 56:15 58:1 59:13 59:20 60:1,12 72:20 83:6 85:9 115:5 216:17 258:8

**junk** 202:21

| k | | | |
| --- | --- | --- | --- |

**k**  4:19,21 5:4,8
99:21 278:3
**kangaroo**  190:11
**keen**  211:13
**keep**  58:20 86:12
87:12 102:10
104:7 127:13,16
148:6 151:3
187:18 204:17
213:8
**keeping**  131:19
195:14 234:11
**keeps**  232:17
**keowee**  75:12
99:21 262:13,21
263:2,24
**kept**  21:7 131:22
154:6 156:7 213:1
233:6 259:18
264:18 274:12
**key**  40:2,4 46:5,7
46:7,13,14,17,21
46:24 47:4,5,7,8
47:23 48:20 49:3
49:10 50:6,13,14
51:6,7,17 52:1,4
52:13,14,18 54:3
54:13,18,19,21,23
54:24 55:6,18,19
55:22,23,24 56:6
56:14,18 60:20,20
61:8,9,16 62:6
72:12,13,15,20
73:1,3,4,9,9,12,17
76:3,6 78:7,20,23
79:2,8,17,18 80:5
80:8,13,18 81:4,4
81:6,13 84:15
85:2,7 86:8 87:7
89:9,20,21,24,24

90:2,4,19 91:12,12
91:16,19 92:14,15
92:20 93:3,9,14
94:10,10 95:21,22
96:3,9,10 97:4
112:18 116:14,15
116:17,22,24
140:18,19,21,22
140:23 156:8,17
157:18 202:14
210:8,22,23 216:3
216:18 226:2
239:9,24 240:2,6
240:18 241:4,15
241:23 242:2,10
243:7,11 244:16
244:18,24 245:5
245:14,16,24
246:1 247:23
251:11 256:19
257:15,17,23,24
258:22 259:1,11
259:18 260:7
261:10,13,20
276:1
**key's**  53:19
**keys**  49:6,7 51:18
51:21,21,24 154:7
168:11 178:10,12
245:5 246:10
**khuans**  2:8 4:21
4:21
**kick**  98:7
**kicked**  98:12
**kidding**  204:14
**kids**  25:4,24 177:8
219:4
**killing**  185:16
**kind**  11:11 15:8
16:10 24:3 29:9
46:1 54:14 63:10

63:11 72:3 130:18
143:1 144:14
147:21 154:18
178:18 181:15
182:6 185:3 188:4
206:7 213:24
224:16,24 229:22
231:5
**kinds**  260:24
**knee**  147:9 206:21
**knew**  51:21,24
67:1 86:12 104:10
112:24 116:8,10
116:11,14,22
117:5 177:12
181:24 183:13
187:3 189:24
201:4 229:14
230:10,11 233:6
233:21 240:13
253:5 257:15
269:20
**know**  7:3 11:7
15:24,24 21:3,22
24:12,16 27:14
29:6 31:5,11 33:8
33:17 35:18 40:3
41:11,16,22 42:1
45:5,12 47:21
50:18 52:19,23
53:5,7,18 56:8
57:7,12 64:5 65:8
66:15,24 67:3,7
68:18 73:23 75:10
78:11 81:3,3,10,13
81:14 83:24 88:24
90:22 91:1 94:24
95:13 100:10,15
101:7,12,12 102:1
103:5,9,22 104:20
104:22 105:22

106:9,11,19,21
107:1,7,13 108:11
108:13,16 109:6
111:9,11,13
113:23 115:10,18
116:17 118:3
119:3,11 121:1
123:3,9 124:10
125:14,15 126:13
126:14,23 127:12
127:19 129:6,23
130:9 132:18
133:14,16 134:24
135:20,21 138:20
143:11,19 144:16
144:20 148:23
150:17 151:2
152:5 154:9,19
156:19 157:10
158:15 159:17
160:19 161:9
162:18,22 163:13
164:2 165:17
167:5 169:4 171:3
174:8 175:9
176:13 177:16
182:20 186:9,21
188:23 189:21
191:1,9,17,18
192:6,16,18,19
193:1,9,11,14,17
198:2 201:15
205:23 207:22
208:16 211:10,16
211:24 212:5,8,20
213:6,10 220:17
222:5,22 224:5,18
225:3,5 226:12
228:13 230:12
231:10,24 232:22
233:15 234:22,24

236:8,11,11 237:2
237:14 239:15
244:9 248:6
249:23,23 250:7,7
250:10 253:1
254:5,10 255:17
256:13 257:11
260:1 262:15
263:9,9,15,22
264:17 265:7
266:3,7 267:3
268:7 272:24
273:2,7
**knowing** 15:12
115:10 162:18
250:4
**knowledge** 12:15
23:20 34:23 39:6
47:9 51:11 56:4
66:9 69:23 73:19
76:18 79:11,12,14
87:8 92:1 107:10
113:21 132:14,15
134:3 153:23
159:10 166:4
168:19 173:15
195:6 200:2
210:19 232:4
234:3 235:5 238:1
241:9,19 242:18
250:19 251:12
254:22 257:1,5
263:23 275:22
**knowledgeable**
166:11
**known** 51:6
173:23 174:2,3
254:2 260:7
**komosa** 68:1
**komosa's** 67:22

**l**

**l** 5:2,4 25:21,21
26:18 31:13,15
101:7
**la** 155:8
**lab** 180:3
**labor** 206:5
**lack** 59:12 140:22
**lackluster** 216:24
**laduzinsky** 2:19
2:19 5:3,3 125:3
219:14 280:5
**laduzinsky's** 8:9
**laduzinsky.com**
2:21
**lafayette** 26:17
**laid** 41:23
**lake** 2:4
**land** 39:14
**landscape** 233:8
**lang** 68:4 108:22
109:22 111:16,18
115:22 116:6
121:18 156:22
157:1,3,6,9,14,22
158:5,7 169:17,21
170:8,12,16 171:9
173:11,12 185:2
239:10,14 246:5
268:22
**lang's** 158:3 171:8
**language** 114:4
131:8 245:19
**laptop** 18:5 154:6
168:8,10,11 178:4
178:11,13 220:2
**large** 233:7
**larger** 85:16
112:24
**late** 145:14 216:18

**lateral** 28:12
264:20
**latest** 49:2 230:22
232:17
**laugh** 217:9
**launch** 238:14
**law** 2:2 36:6 41:8
177:8 213:9
249:22,23 250:5,7
**lawsuit** 10:22
13:10,16,20 33:21
34:18,22 35:6
**lawsuits** 10:10,20
10:24 11:1
**lawyer** 44:13,15
44:21 125:14
205:1 208:15
213:21,23 214:1,9
219:8 223:3
224:21 249:18
**lead** 42:6 158:21
166:8 201:6
**leading** 128:21
150:11 156:7
177:10
**learn** 40:14 59:21
187:16
**learned** 40:19,21
53:14,18 97:14
155:9 186:3
210:21
**leave** 17:13 18:23
19:4,8 20:1,7 21:1
21:5,20 22:19
23:10 40:18
147:24 148:13,18
148:19,24 149:23
150:7 151:17,23
151:24 152:3,4,6
153:5,12,15,19
154:15,17 156:2

156:10 158:11
159:1,9,9,12 160:2
160:11 162:17
165:1,6,9,14,16,18
166:8,15 167:1,13
170:1,5,23 173:17
176:21 177:4,7,13
177:24 182:21
183:1 185:2 197:2
198:14 205:6
208:13 224:22
238:18 247:11
250:22 251:6
254:13,20 255:5
264:11 268:10,12
269:9,15,18 270:3
**leaving** 176:24
216:12 272:24
273:23
**led** 40:17 156:16
171:12 189:19
271:2
**left** 27:19 30:13
41:1 152:7,13
153:8 178:20
189:7 201:6
235:24 245:17
272:13,19 273:6,7
273:14
**leg** 213:12
**legal** 124:13
125:15,17 126:8
163:8,10 214:7
224:24 251:15,15
251:19 280:1
283:1
**legally** 243:2
**legislation** 205:15
**legitimate** 59:1
185:10

**length** 145:11
209:7
**lengthy** 247:13
**letter** 22:24 40:15
40:20 41:1,10,17
41:19,22,24 42:1,9
43:23 44:12 175:5
185:5,9 186:7,14
188:16 194:6
207:2,7,10 238:16
238:19 240:14
255:21,24 256:2,4
260:12 272:4
276:12 280:20
**letters** 46:9 252:18
261:21 272:9,15
272:21
**letting** 118:2
135:20,20 151:2
**level** 49:5 68:3
137:9 262:18
**levels** 50:6
**license** 72:1 279:9
**licensed** 70:19
**lieu** 20:11,14
**life** 145:12 160:24
176:17,18,23
177:10 197:10
206:10 230:11,20
235:19,19 237:6
248:4 269:2
**light** 12:23 165:23
212:14 270:18
**likes** 237:4
**likewise** 138:2,21
**limited** 79:11
**line** 29:7 56:16
63:3 70:7 80:1
163:5 202:2 206:7
220:3 223:12,21
225:2,23 227:14

262:4,24 263:2
267:19 280:14
282:7 283:3
**lines** 98:1 172:4
200:21 205:15
212:4 229:22
250:14
**link** 90:21 96:17
98:17 99:1,2
117:11,12 163:17
245:24 246:1
**linkedin** 33:15
35:4,7
**links** 92:11 247:15
**linux** 75:3 79:3,9
79:20 178:23
179:7,23 182:15
**list** 46:9 62:17
80:2,9,15,17 93:2
111:16 112:7,24
117:13 121:16
132:5 188:2 246:6
246:15
**listed** 73:6 113:4
121:18,21,22
282:7,17
**listen** 48:3
**listened** 47:16
260:20
**listening** 47:14,18
243:9
**listing** 282:7
**litigation** 14:10,20
32:23 36:15 37:24
219:7 229:6 231:2
234:19 250:17,20
**little** 6:4 18:20
31:23 38:15 43:8
71:18 74:7 76:8
108:2 130:11
151:19 154:12

163:6 189:10
204:15 219:9
223:1 259:10
**live** 25:13 26:8,11
118:2 197:10
248:4
**lives** 36:4
**living** 176:16,18
176:23
**llp** 2:7
**load** 51:2
**local** 44:11 179:13
179:15 183:14
202:12
**locate** 60:8
**located** 234:18
**location** 229:10
**locations** 63:2
79:18 132:6
**locker** 179:5 182:2
**lockered** 182:10
**log** 15:18 16:23
17:3 18:2,2,11
45:16 47:7 90:8
257:7 260:2
**logic** 270:20
**logical** 158:14
221:12 250:24
**logs** 18:11 221:20
243:5 257:6,11
259:24 260:1
**lombard** 27:9
**london** 157:12
170:9 171:4,5
**lonely** 159:23
**long** 27:10 28:7,20
30:17 46:9 54:16
58:10,18 77:11
118:2 141:13
142:1 144:3
167:23 257:11

**longer** 107:3
152:16 266:24
**look** 10:4 22:6
33:18 34:6 40:22
60:8,15 63:7 72:9
89:3 97:1,5 99:10
101:8 107:15
111:15 113:6
123:12 131:8
164:4 190:12
199:23 215:8,17
230:22 237:3
243:10 246:13,20
261:2 262:2 263:1
264:22
**looked** 12:4 32:8
44:21 75:5 121:17
129:16 141:19
142:4 239:2
248:12 257:5
260:22
**looking** 47:10 49:1
49:10,11,17 53:23
62:24 64:16 69:22
80:11 110:5 121:8
124:3 126:13
139:11 142:2,5,10
152:12 171:16
173:9 182:23
183:10 197:24
209:10 211:1
237:15,21 243:8
246:19 247:12
257:20 262:23
264:4,4,9 275:21
**looks** 49:3 96:23
99:8 108:7 119:3
119:21 123:21
130:17 161:21
170:2 179:21
199:14 209:5

223:16,17 224:19
247:13 262:14,17
**loop** 62:4 104:8
133:20 151:3
213:8
**loophole** 57:19
60:17
**loose** 256:15
**loss** 145:7
**lost** 29:8 155:14,19
192:12
**lot** 6:5 18:18 19:20
36:5 64:11 74:19
76:9 101:19 180:7
192:4 244:9,22
266:20
**lots** 231:13 232:23
**loud** 83:16 163:12
**low** 81:17,17
243:16
**lower** 118:17
**lunch** 13:3 14:22
15:3 129:24
135:24 136:9
157:15 166:21
189:6,9 194:11,14
**lunix** 178:17
179:17
**lying** 210:8

**m**

**m** 31:7
**mac** 8:13
**machine** 54:6
94:14 98:20
129:17 179:21,23
180:10,24
**macintosh** 220:2
**mad** 22:18 173:8
173:12
**madam** 280:10

**maiden** 25:21
**mail** 32:1,3,10,18
32:23 54:18 57:11
57:13 58:23 60:1
62:8,9,16 64:5
65:6,13,22 66:10
66:14 67:8 68:9
69:5,11 70:9,10,12
72:14,19 95:16,17
95:22 96:15,16
99:5,6 102:5,22
103:9,23 104:1,15
104:21 105:14
108:7 109:21
110:9 111:3,5,12
111:13,18 112:21
115:20,21 116:5
118:2,17 119:7,13
119:20,22 121:3
121:12,18 122:22
123:14 124:8
125:10 126:7
129:10,13,21
130:8,21 131:1,7
132:8,12,20,24
133:2,7,13,22
134:6,20 135:19
141:4,7 154:3,10
160:1,8 161:12,14
161:22 162:1,2,19
163:16,22 169:7
170:11 171:16
172:12,22 175:12
177:18 179:12,19
180:8 184:2
200:23 204:2
208:4 222:9 223:7
224:2,5,6 225:4
227:10 246:5
248:12,17,23
249:3,6,12 251:2,2

251:17 257:21
258:18,23 262:8
265:13 266:5,5
267:17
**mailed** 54:13
75:16 90:20 92:23
105:15 258:9
**mailer** 63:11
**mails** 12:2 15:18
32:16 33:1,6 72:5
86:24 108:2
111:10 120:10
126:14 134:17
140:22,22 161:4
162:24 208:2
215:13 224:18
227:16 239:3,22
259:5,6 267:13
275:11
**main** 2:14 180:15
199:21
**maintain** 23:12
27:22 32:2,17,20
140:10 219:5
**maintained** 32:20
**maintaining**
197:10 252:19
**maintains** 45:10
235:12
**maintenance**
53:22
**major** 248:8
**majority** 180:5
**making** 64:10 71:8
74:3 81:15 115:13
142:21 172:11
210:1,6 215:5,7
234:13 237:22
**man** 157:3 236:19
237:22

**manage** 19:6
181:12,21
**managed** 47:2
51:18 52:2,15
**management** 68:3
88:8,8 102:18
107:18 130:2
139:14 146:5
148:21 156:13
**manager** 28:10,12
28:19 29:3,6,13,14
29:15 82:18
109:11 118:7
141:16,17 142:7
143:4 144:4 146:5
147:16 181:12,14
181:21 222:15,20
222:20 227:16
261:3,5
**managers** 143:24
**maps** 80:5,8,11,13
257:9
**march** 1:18 4:2
279:6 280:4
**marie** 186:22
**mark** 124:11
273:16,19
**marked** 211:4
217:3 246:13
**marosevich**
186:22 273:5
274:7
**married** 25:16,18
25:22
**marveling** 176:15
**mary** 25:19
**mass** 270:13
**masters** 26:19,23
27:1
**material** 11:22
224:4

**materials** 9:22
12:1 15:7,15 22:4
25:11 44:1,5,13
45:12 99:12 101:1
106:18 154:11
185:6,6 194:7
212:20 219:19
225:7
**matter** 4:5 17:16
23:13 45:2 77:18
136:23 165:2,14
165:15 166:6
200:7 253:21
255:3
**matters** 5:23
169:1 278:12
**mea** 117:2
**mean** 34:17,23
51:15 56:20 69:20
69:21 77:17 85:1
86:17 96:22 97:1
111:7 112:3
116:10 121:15
124:16 125:7
135:3 137:20
139:2 140:19
141:11 157:7
162:12 176:17
184:20 199:7
207:20 210:4
211:15 217:17
225:3 226:9,19
247:12 254:7
255:2 267:3
268:17
**meaning** 139:17
**means** 6:19 73:13
97:10 144:21
165:8 210:15
267:12

**meant** 136:22
162:14 180:17
244:19
**mechanism** 38:23
112:14
**media** 33:11,13
34:20 35:2,9,13,17
**medical** 149:4
**medication** 9:7
198:7,9
**medications** 9:4
**mediums** 204:2
**meet** 19:14 152:23
154:8 167:20
169:12 204:24
229:6,13
**meeting** 14:21
17:9 19:13 20:9
20:18,20 167:23
168:3,6,14 170:9
172:5,10 184:11
188:4 189:19
191:11,15,20
192:4 214:8 220:9
223:3 224:21
229:15 239:20
255:6 259:7
271:21
**meetings** 64:6
118:6 137:3
154:21 174:6,10
174:13
**members** 261:1
**memory** 10:1
11:12 28:15 72:11
103:12 192:8
196:21 262:14
273:1
**menche.org**
235:14

**mental** 198:12
**mention** 63:3
227:20 228:1
240:14 241:22
250:2
**mentioned** 12:12
15:17 16:22 18:21
25:24 31:18 35:4
35:18 36:18 42:23
43:22 48:2 56:1
61:22 65:13 86:16
87:5,6 99:23
104:4 131:18
134:3 135:8 141:9
149:12 158:4
178:3,9 179:17
182:19,21 186:6
197:10,14,23
199:5 202:9
203:18 205:13
208:15 210:18
214:5,6 215:14
220:17 221:16
226:22 228:15
231:5,19 232:15
232:19 234:20,22
235:2 241:22
255:18 269:19
275:21
**mentioning** 269:6
**mentoring** 160:16
**mere** 243:3
**merely** 152:15
171:3 215:16
251:19 261:20
**merit** 143:7
**message** 12:3,21
13:4,8,20 15:18
16:23 17:3,6 18:2
18:2,16 22:5
37:10,11 43:9

67:15,21 68:8,12
68:21 76:7 98:23
104:13 107:2,4,6
118:16,17,18,20
118:22 120:13,17
120:20 123:15
133:19 155:3
160:6 161:19
170:8,12,13
177:22 202:22
203:5,10 204:6,8
204:10 207:16
208:20,22 209:4
209:14,15 210:2
210:20 211:7,9
212:8,11 213:5,18
213:20 215:2,6
216:3 217:7 218:1
218:13,13 220:11
220:13 221:15
235:2 240:1 244:5
244:7,13,14 265:8
265:8 266:4,24
267:4,8,10 268:21
**messaged** 13:15
154:20
**messages** 3:15,16
13:22,24 17:15
18:5,9,13 19:17
20:2,3 23:7 25:9
37:20,21 38:16,21
39:1,14,17 42:16
42:19,21,22,24
43:3,7,9,12,15,19
68:21 104:11
106:12,21 120:21
123:5 152:11
155:9,13,18,20,22
157:9,23 161:4
201:19,22,23
202:2,3,6,7,10,12

203:1,10,15,21,22
203:24 204:5
217:4 218:10,20
218:22 219:11
220:5,12,19,21
221:9,24 228:16
228:20,23 235:9
255:1 266:13,21
267:9 268:3,5,19
**messaging** 14:11
15:23 16:5,5,14,16
126:5
**met** 13:3 14:18
18:22 19:1,7,24
101:16,19 153:2
154:10 159:3
166:16,24 172:8
172:15 184:8,12
184:16 189:6
195:16 203:19
208:15 213:21,22
214:2 229:8
231:19 232:1
**method** 70:15,22
70:24,24 71:20,20
71:24 72:8 78:6
**methodology**
230:14
**metro** 122:15
**metropolitan**
122:16
**mh** 211:4 217:3
218:14 225:22,22
226:1,6,17 227:15
**mhaynes001** 32:4
32:6 33:3,7,10
**michael** 1:15 2:22
3:3 4:4,11 5:4 8:1
179:1 226:18
277:13 278:10
280:9 281:4,9

282:4,13 283:20
**michael.haynes**
32:19
**michigan** 214:1
229:9
**middle** 171:18
**midway** 155:8,9
**midwest** 4:12
280:17 283:1
**mike** 48:24 81:3,8
138:19 153:1
157:10 170:9
186:19 187:4,7
188:5 189:20
194:23 195:14
216:10 223:2
224:7 271:18
275:1
**millions** 232:13
**mills** 67:22 68:1
**mind** 104:6 109:16
146:5 156:3
199:14 240:8
243:16 254:11
255:16 266:23
276:20
**mine** 114:17,17
152:19 195:10
196:20 246:15
**minus** 75:18 98:23
**minute** 80:7
198:18 228:5
253:22 254:12
**minutes** 77:14
78:14 82:6 108:8
152:15 164:9
188:22 190:14
196:20,20 214:3
262:23 263:1,7
272:20

**mischaracterizes**
242:21
**misconduct**
137:11 272:1
**missed** 262:22
**missing** 262:21
267:2
**mistake** 135:16,17
137:17,23 275:13
275:15,18
**mistakes** 139:13
**misunderstanding**
243:4
**mixing** 157:13
**mobile** 270:8
**mobility** 176:7
**model** 24:16,24
**modifications**
133:2
**modified** 225:2
**mom** 189:5,8,9
**moment** 9:3 17:15
18:1 19:17 23:21
39:21 78:18 106:8
123:7 156:22
157:2 220:9
268:15 272:23
**monday** 105:12
107:19 108:24
109:2,4 120:9,9
133:23 152:2
155:6 160:20
170:6 213:10
238:4 257:21
258:1 259:4,5
267:14,14
**money** 71:16
**monitor** 4:3 38:9
38:12 84:8,11
136:3,6 164:12,15
198:21,24 228:8

228:11 277:14
**monitoring** 234:16
**month** 45:20 46:1
147:13 149:5
157:15
**monthly** 64:6
118:5 174:13
239:20
**months** 15:5 31:22
40:22 80:3 102:13
201:20
**moot** 106:23
133:18
**morning** 4:15 5:11
102:19 108:9,24
154:2 160:20
176:24 194:19
238:15 257:21
258:1 268:6
**mornings** 167:11
**mother** 194:12
**motions** 59:7
190:16
**motivated** 269:17
**motorola** 24:19,21
24:22,22
**mouse** 95:8 97:20
**move** 28:12 114:2
115:16 173:1
199:2 264:7
**moved** 222:17,18
224:23 264:20
**moving** 206:9
**mulling** 109:7
166:22
**multiple** 51:18
266:13
**mutual** 42:5
172:20
**mybusnownjtran...**
89:18

**mystery** 51:3

**n**

**n** 3:1 4:19,21 5:2,4
5:8 30:15 31:15
101:7 153:2
179:18
**name** 4:15 5:11
25:21 31:14 66:5
66:11 101:9,10,17
101:17,20 104:9
104:10 138:20
180:8 186:20,21
187:5 233:17
235:15 236:6,16
239:11,15,16
273:6 280:6 281:4
281:15 282:4,21
**named** 10:19
143:20
**names** 232:14
233:3,11
**narcotics** 198:7
**national** 205:14
208:18
**natural** 145:8
**naturally** 83:1
**nature** 56:24
87:13 109:10
184:21 190:18
276:3
**navigation** 261:4
**near** 144:15 149:4
188:6
**necessarily** 56:12
137:17,18,20
139:16 187:18
242:13
**necessary** 11:11
71:7 73:23 148:10
**need** 6:8,15,22 7:2
10:1 17:20 38:24

80:13 81:9,10,23
88:23 101:8,9
137:16 145:18
146:24 149:8,8,13
149:14 150:15,17
150:21 152:23
186:12 188:23
213:11 241:16
256:6 264:22
**needed** 23:22 70:2
85:17 109:11
137:8 145:8
147:24 149:19
150:2 182:1,4
211:21 248:2
**needing** 232:10
**needs** 63:1 82:6
**negative** 237:3,19
**neither** 248:19
**network** 47:15,15
47:17 48:4 49:11
182:7 237:24
238:6 249:21
261:15
**never** 10:21 31:21
32:7,13 34:4,15
35:1,3,5 36:11
66:21 72:4 118:1
119:24 140:7,8,19
141:18,18 157:24
163:11 174:4,5
178:20 231:23
251:18 256:4
258:1,2 272:4
276:17
**new** 24:9 25:7
49:22 50:1 90:4
90:12,19 98:22
220:13 221:17
230:22 231:13

**news** 33:18 69:1
**nice** 71:15 133:15
**nicollette** 2:8 4:21
**night** 160:21
163:15
**nightly** 234:12
**nine** 155:23
**nintendo** 235:17
235:23
**nod** 6:20
**non** 157:3 268:24
**nonauthorized**
244:1
**nonpersonal** 221:1
**nonstandard**
179:6 182:16
**nonwork** 122:8
**noon** 210:3
**normal** 47:2 48:11
232:16 247:7
**north** 27:8,20
**northern** 1:1 4:8
45:17,18
**northwestern**
189:7
**nostalgic** 187:18
**notably** 185:1
**notarized** 280:15
**notary** 1:17 278:5
280:24 281:10,18
282:15,23 283:23
**note** 68:21 86:4
104:2,24 109:1
119:19 121:8
123:23 133:11
280:13
**noted** 162:23
**notes** 168:3,17,23
187:13 190:5,17
190:22 191:11,13
192:1,2 193:5

201:12,12 213:11
213:19,23 214:4,6
214:10,11,16,22
224:9 225:14
**notice** 1:16 20:6
40:9 107:17
151:15,21 153:12
219:8
**noticed** 98:18
170:9
**noticing** 4:12
100:17
**notification** 153:4
**notified** 107:22,24
148:5 249:7
**notifies** 43:8
**notify** 21:6 109:5
109:11 266:18
**notifying** 105:8
107:20
**notion** 242:9
**november** 11:20
11:20 12:5 27:15
106:6 120:22
161:7 183:20,22
184:4 203:2,12
210:3 213:19
218:1,12,21
219:11 222:12,24
223:20 224:2
252:1 267:5
271:21
**nuances** 136:20
139:21 200:16
**number** 4:9 25:15
30:11 45:20 61:3
116:2 141:18
148:16 189:1,2
225:20 236:10
247:16 280:8,14

numbered 89:11
numbers 24:24
182:11 261:21
282:7
numerous 166:20
206:2 241:20

**o**

o 4:23 25:21 31:7
99:21 153:2 187:6
278:3,3
o'clock 1:18
o'malley 213:9
oath 7:6,11
object 96:12
113:10 117:9
125:3 130:7 196:7
219:14 242:20
objected 90:23
117:7 181:24
192:14 195:19,21
196:6 216:2
objecting 113:17
objection 81:23
226:15
objections 6:12
80:24 82:22 83:9
obligated 7:10
obligation 138:10
observe 77:3 93:8
197:17
observed 77:15
90:15,17 130:16
observing 91:23
obtained 245:6,21
obviously 15:9
27:15 31:18 86:24
190:21 232:1
239:5 267:3
275:10
occasion 145:11
233:18

occasional 61:11
74:20
occasionally 34:12
51:20 174:12
occupational
206:5
occurred 29:10
67:20 203:16
221:13 269:13
occurring 105:10
october 11:20 12:5
13:3 14:13,19
15:6 25:12,23
144:11 150:11
151:24 161:15
163:15 169:5,9
175:14,24 177:20
218:14 219:11
220:10 221:8,22
247:18 248:19
249:14
oddly 100:5
offered 176:11
231:12
offers 183:15
office 2:2 189:2
279:5
officer 138:21
143:6 147:20
179:3 233:20
offices 19:9
official 70:15,22
70:24 281:15
282:21
officially 69:17
200:1 256:5
officials 163:18
164:23
offline 119:15
oglive 189:7
194:15,16

oh 33:17 52:13
105:21 108:12
150:14 236:3
267:8 272:5
ohio 267:14 280:2
okay 7:3 18:18
43:15,16 44:22
55:24 84:4 129:9
135:24 177:14
189:12 213:7
226:14 227:9
239:12 246:19
old 9:24 11:9,15
17:14,20,23 18:3
25:8,9,10 26:13
32:8 49:24 150:17
202:10,11 219:24
older 32:5
olsen 104:14,21,24
105:14 107:11,23
108:3 123:15,22
once 36:23 45:24
45:24 84:17 85:20
97:20 153:11
157:15 160:1
230:13 231:20
256:3 266:9
ones 121:21,22
191:12 202:16,17
online 236:12
oops 102:16
open 47:1,23 73:9
86:13 216:16
239:24 240:5
245:8,17 257:23
270:16 271:5
opened 95:1
operation 136:22
264:21
operational 53:24

operator 61:2,10
opinion 135:7
140:2,3 243:7
opinions 199:16
opportunity 58:8
60:2,3 176:3
199:9,23 230:17
253:17 264:15
opposites 236:21
option 188:11
195:14
options 274:3
oral 8:3
orally 239:7
orange 95:5
orchard 2:3
order 17:18 25:10
28:15 141:21
262:17
origin 225:5
original 224:11
246:5 263:11
originally 263:13
275:24
osha 205:13 206:4
208:18
outbreaks 233:7
outcome 147:3
253:18 279:3
outline 224:13
outside 49:21
50:21 81:19,20
83:2 122:5 146:19
147:8 152:23
230:21
overall 182:7
228:19
overlooked 225:8
overreact 127:23
override 226:7

[overview - page]

| | | | |
|---|---|---|---|
| **overview** 229:11 | 76:12,21,24 77:3,7 | 159:7 161:14 | 242:2,9,10,23 |
| **owl** 8:13 | 77:11,15 78:1,13 | 163:16 165:5,21 | 243:5 246:17 |
| **owner** 237:24 | 78:19 80:23 81:2 | 166:14,24 167:7 | 248:19 250:21 |
| **p** | 82:3,13,23 83:9,15 | 167:18,20,24 | 251:3 252:9 |
| **p** 31:7 | 83:22 84:19 85:14 | 168:15,20,23 | 256:18 258:22 |
| **p.m** 161:24 | 88:11,16,18 90:6 | 169:7,12 171:17 | 260:8,13 261:14 |
| **p.m.** 65:9 68:23 | 90:15,18,23 91:11 | 172:1,7,11,15 | 264:4,7 266:6,8 |
| 69:12 92:9 99:9 | 91:23 93:1,8 | 177:19 181:5,11 | 267:22 268:22 |
| 109:2 136:3,6 | 94:23 95:3,10,18 | 181:20 183:9 | 269:10,11,14 |
| 162:16 164:12,15 | 96:1,12,16 97:6,11 | 184:6,16 185:17 | 275:5,8,23 276:8 |
| 198:21,24 203:13 | 97:21 98:15 99:1 | 185:20,23 186:2 | 276:11 280:6 |
| 228:8,11 265:15 | 99:2,6,12,16 | 191:15 192:14,22 | 281:3 282:3 |
| 277:14 | 100:18,24 103:17 | 194:12,18,21 | **pable's** 17:22 |
| **pable** 1:3,13 4:5 | 104:18,20 105:16 | 195:16 196:5,12 | 21:11 54:6 82:22 |
| 5:6 12:20 13:2,5,8 | 105:24 106:16 | 196:14,22 197:1,6 | 90:5,9,12 91:19,21 |
| 13:15,19 14:5,9,18 | 109:24 110:3 | 197:14,17,20 | 92:22 93:5,7,24 |
| 15:3,15,20 16:1,10 | 111:2 112:16,19 | 198:3,6,10,13 | 94:14,18,20 97:22 |
| 16:12,13,21 18:8 | 113:10,17,21 | 201:24 202:4,17 | 106:10 119:9 |
| 18:16,21 19:24 | 114:18 115:12,24 | 202:17 203:11,24 | 123:7 126:14 |
| 20:21 21:5,14,17 | 117:4 119:8,16,19 | 204:3,11,21,24 | 144:6 150:7 |
| 22:2,12,15 23:2 | 120:13,14,22 | 205:3,4,12,20 | 163:21 169:8 |
| 29:20,23 30:14,21 | 121:4 122:3,10,14 | 206:11 207:12,17 | 175:14 196:9 |
| 30:22,24 32:13 | 122:18 123:1,18 | 208:7,13 209:2,12 | 207:24 229:7,8 |
| 35:19 36:21 37:5 | 125:1,12,17,22 | 209:16 210:2,4,7 | 234:9,18 236:2 |
| 37:12 38:17 39:3 | 126:11,17,21 | 210:11,21 211:12 | 255:20 |
| 39:16,23 40:10,18 | 127:7,10 129:10 | 212:12,20,23,24 | **pables** 65:17 81:22 |
| 40:22 41:19 42:1 | 129:14,22 130:3,7 | 213:2,18,19 | 89:5 |
| 42:8,13,23 43:4,6 | 130:15,21,22,24 | 214:14 215:2,11 | **pables's** 92:19 |
| 43:12,17,22 44:2 | 131:2,15 132:7,12 | 215:24 216:6 | **pace** 270:16 |
| 44:14 45:22 46:12 | 132:24 138:2,9,14 | 217:7,13 219:20 | **pacer** 11:6 45:9,13 |
| 46:16,20 47:9 | 138:23 139:7 | 220:6,12 221:9 | 45:14,16,19 |
| 48:2,6,19,20 49:8 | 140:5,16,24 141:4 | 222:2,9,23 223:7 | **packets** 49:12 57:1 |
| 50:9,16 51:5,7 | 142:6,10,18 | 223:13,22,24 | **page** 3:6 11:8 |
| 52:3,8,17,21,23 | 144:12,23 145:1 | 225:1 226:15,20 | 57:10 67:5 75:17 |
| 53:2 54:18,23 | 145:21 146:16 | 226:24 227:10,18 | 89:11 92:3 93:19 |
| 56:1,5 57:16 58:5 | 147:7,17,23 | 228:23 229:15 | 95:17 103:19 |
| 59:11,16,23 60:8 | 148:24 149:14,21 | 230:2,5,7 231:2,22 | 108:15,17 109:22 |
| 61:14 65:6,10 | 150:4,12 151:7,9 | 232:3,11 233:9 | 111:14,24 114:3 |
| 67:23 68:22 69:12 | 151:14,16,18,20 | 235:12 236:5,13 | 115:17,20 118:15 |
| 70:10,17 71:19,23 | 155:2,5,10 156:9 | 236:23 237:23 | 124:3 125:21 |
| 73:2,18,24 74:9,13 | 158:2,6,13,24 | 238:22 239:6 | 158:24 159:4 |

169:19 171:15
204:4,7 207:15
208:20 209:14
211:3,7 212:6,7
213:4 217:2,5
218:14 222:8
223:9 225:17,19
225:21 227:13
246:2,16 258:18
262:2 280:14,16
282:7 283:3
**pages** 45:20 99:10
99:11 111:21
221:1
**paid** 17:12 19:4,8
20:24 21:5 22:18
23:10 40:18 152:3
152:4 153:4,19
156:9 162:17
165:9,17 166:7
173:17 176:20
185:2 224:22
247:10 250:22
251:6 254:13,20
255:4 268:10,12
**pain** 177:2
**painful** 176:16
**panic** 80:4 197:2
197:15,18,21
198:3
**panicked** 204:15
**paper** 54:15
187:16,18 188:15
194:2,3 195:13
225:11 265:11
**papers** 168:5
188:24
**paperwork** 147:11
148:4 149:14
150:18 188:18
194:10

**paragraph** 102:16
116:5 124:9
169:11,15 171:16
171:19 172:24
173:7 175:17
176:12 223:2,23
246:18 264:23
**parens** 120:14
**parentheses**
227:16
**part** 48:11 55:18
59:9,14 61:6
63:24 80:12 87:10
103:20 137:7,12
149:9 154:14
166:7 174:11
181:15 190:8
191:4,7 200:11
224:8 232:15
234:8 236:9
241:21 247:7,21
253:15,15 267:1
269:2 274:7 282:9
**participate** 8:12
**participated** 52:19
194:19 199:4
203:16
**participating**
196:23
**particular** 164:24
191:1 231:11
245:7 248:12
257:8,9 263:14
**particularly** 36:4
64:12 108:3
158:12 252:12
260:17
**parties** 253:13
279:1
**partly** 109:18
210:1,5

**party** 10:19 43:2
44:22 228:19
**passed** 188:16
**passenger** 245:23
**passing** 149:12
151:11
**password** 46:11
66:5,8 179:13
180:8 181:12,14
181:21 232:23
233:10,23 234:8
234:17
**passwords** 181:12
181:21 232:13,21
233:3 234:2,8,21
234:23 235:3
**paste** 58:17 129:18
**pasted** 92:23
266:4
**patch** 135:6
241:16
**patched** 121:12,21
132:5 134:23,24
249:8
**patches** 234:12
**patching** 134:23
**patchy** 257:6
**path** 69:16 73:10
120:6
**pattern** 254:14
**pay** 70:8
**paying** 264:15
**pc** 2:19
**pdf** 246:16
**pearl** 112:6
**peers** 143:15
222:17
**pending** 7:1 153:5
165:1,14 173:17
269:20

**penetrated** 248:21
**penetration** 81:17
237:16 243:16
**pennsylvania**
26:18
**pension** 189:1,2
264:18
**people** 30:11
35:24 58:12 69:7
101:20 128:14
139:5 154:24
160:19 233:13
**percent** 115:1
160:8 269:7
**perfect** 29:18
**performed** 93:17
113:9 243:22
**performing**
113:10
**period** 18:14
22:20 23:13 29:20
29:23 31:22 75:9
75:18 98:24 99:24
100:3,9,15,16,19
145:19 146:9
147:1,12 149:15
200:5 213:22
224:21 244:10,10
262:16
**periods** 100:11
**permission** 70:3
238:1 249:22
**permitted** 9:21
**person** 14:12,13
39:3 55:1 74:24
133:14 153:1
188:6,7,22 231:20
232:2 234:4
274:11
**persona** 157:3
268:24

**personal** 8:18
12:17 18:5 20:20
21:10,10,11 23:6
24:1 31:19 32:3
111:12 118:23
119:7,20,21 145:5
145:12 148:6
152:8,10 153:3
154:3 157:19
160:8 161:13
163:16,17,21
168:16 169:8,8
170:13,14 175:13
175:23 212:16,19
212:22 235:13,19
236:2 251:2 266:5
268:11 278:16
**personally** 281:11
282:15
**perspective** 146:1
160:24 166:3
207:5 234:11
244:16 276:5
**pervasive** 226:3
**phil** 30:15 39:10
83:23 159:18
160:9
**phone** 3:15 8:18
8:19 9:22 17:22
17:23 18:3 20:2,4
20:10,15,19 21:14
23:3,18 24:5,7,8
24:10,11,13,13,14
24:14,17,19,21,22
25:1,5,6,7,8,9,10
31:19,20,21 38:21
44:8,11 106:7,10
106:14,17,18,22
107:3,9 123:3
152:8,10,11
155:11,12,15

157:8 168:16,18
168:22,24 170:13
170:15 181:15,19
189:1,2 202:11
203:23,23 218:22
218:24 219:2,3,5
219:13 220:1
221:17,17 228:14
231:21 232:5,5,7
255:2 268:2 280:3
**phones** 8:17 16:7,8
24:20,24 25:7
255:1
**physical** 178:19
**pick** 76:12,13
**picked** 73:8 76:10
76:14
**picking** 27:16
**picture** 34:5,5,12
34:13 185:12
202:14
**pie** 270:21
**piece** 54:15 102:16
187:16 194:2
211:20 244:23
**pieces** 137:6 185:3
194:3 195:13
**pipes** 243:9,10,11
**pizza** 194:15
**place** 39:13 80:8
153:18 187:10
194:15 278:20
**placed** 18:23 19:3
19:24 20:6 21:20
22:18 151:23,24
152:6 153:4,15
154:16 156:2,9
158:11 160:1,11
162:17 165:9,16
165:17 166:15
167:1,12 169:24

170:5,22 176:20
177:24 183:1
185:1 247:10
250:22 251:6
255:4 268:12
269:15
**places** 148:10
**placing** 40:17
**plain** 47:20 65:19
210:9 243:6 245:8
245:9 259:11
260:4
**plaintiff** 1:4,11 2:5
5:6
**plan** 150:7
**planning** 25:4
28:6,9 29:15,17
118:4 145:14,22
146:16 222:17
**platform** 35:2
38:4
**platforms** 34:21
35:10,13,17,23
37:17
**player** 176:7
**plays** 236:13
**please** 4:13 62:14
62:17 114:9
124:10 201:15
280:12,12
**plus** 137:16
**point** 16:6,8 18:7
18:15 21:19 28:8
29:5 32:5,10
36:24 40:8 44:20
59:24 81:8 86:21
87:4 106:23 120:8
140:4 144:24
146:2 147:7 149:4
151:16 179:10
182:8 192:19

197:1,23 199:17
205:1 208:14
219:8 226:19
252:9 266:15
**pointed** 182:17
207:15
**pointing** 77:19
**points** 55:15 58:6
**policy** 181:7
**pondered** 105:9
**poo1173** 225:20
**poo1538** 247:16
**portfolios** 235:18
**portion** 165:13
246:19
**portugal** 176:8
**position** 23:16
28:11 153:18
264:9
**positions** 29:9
30:4,10 97:3
**positive** 189:24
**possession** 22:23
25:2 154:4 178:7
219:1 222:3
**possibility** 147:3
165:20 166:13
204:20 251:10
**possible** 68:14
72:6 100:7 165:18
210:1 244:13
266:12
**possibly** 19:15
21:24 41:7 54:10
129:17 145:15,18
166:18
**post** 34:10,12,13
58:8 61:17 68:12
132:4 140:22
148:19 240:1
262:12

**[posted - production]**

**posted** 33:19,23
34:4,13,15 35:5
100:8 102:10
110:14,21 262:22
**posting** 34:20 76:2
171:22 244:3
**potential** 56:14
204:24 250:20
251:13
**potentially** 39:10
49:4 55:18,20
111:8 114:9
150:22 156:4
157:18 230:17
233:3 273:4
**power** 209:24
210:16
**powers** 243:2
**pre** 188:3
**precovid** 74:23
**predictions** 61:1
**prefer** 191:24
**preparation**
225:15 235:22
**prepare** 11:4,23
12:8 138:3,6
175:18 227:4,8
**prepared** 11:19
184:6 186:13
223:13,18,24
226:24 227:1,4
**preparing** 44:17
100:19 138:7
224:13 229:4
**presence** 152:13
176:9 184:3
**present** 4:13 20:17
35:12,16 86:17,19
132:11 146:15
167:7 199:9,10

**presented** 66:14
83:4 192:3 199:9
**preservation** 24:4
**preserve** 255:1
268:8
**president** 173:14
175:4
**press** 77:21 78:14
97:20 191:16
**pressed** 73:21 74:5
78:7,22 79:1
227:2
**pressing** 78:20
103:18 110:24
**pressure** 82:16
**pressured** 238:21
**presumably** 17:11
220:11 273:20
**presume** 159:2
215:7
**pretending** 177:11
**pretty** 24:21
105:12 113:7
120:3 131:19
157:8 167:3
170:17 171:6
174:8 190:19
**previous** 96:24
227:13 278:9
**previously** 42:21
93:6 94:19 103:18
142:4 175:22
184:8 194:6
203:18 217:15
226:22 227:6
**price** 62:3
**primary** 178:17
179:18
**printed** 11:10
188:2

**prior** 14:16 19:13
19:17 21:21 24:13
24:13,17 29:11,13
29:14 46:22 51:24
52:21 59:24 71:24
88:11 96:24
109:14 117:5
120:12 124:10
127:8 134:16
152:15 155:23
184:7,10,10
185:23 187:4
196:23 200:4
203:9,19 218:20
245:11 249:13
**priority** 108:6
270:14
**private** 47:16
116:16 146:19
230:11
**privately** 55:10
**privilege** 214:19
**privy** 242:13
**probably** 10:8,17
13:17 14:15 32:10
37:13 42:4 55:9
63:18 65:8,10,12
102:18 122:4
127:13 149:11
151:1,2 185:8
224:14 231:16
233:12
**probing** 192:8
**problem** 61:21
62:23 63:8,15
81:21 85:16
180:19 207:9
216:14 230:17
231:7 244:2
258:17 259:17

**problems** 48:18
50:1 64:8,20
230:19
**procedure** 1:16
149:4 182:1 281:5
282:5
**procedures** 149:20
150:16
**proceed** 5:10
**proceeding** 199:6
**proceedings**
278:18
**process** 14:4 58:3
107:16 149:23
175:1 179:11
188:14 189:11
199:6 245:13
266:17
**prod** 209:18
**prodding** 212:18
**produce** 18:14
25:11 47:4 202:8
214:22 218:20
219:10
**produced** 12:1,3,5
15:15 16:22 33:1
33:7 37:9 201:19
214:15,23 215:1
218:1,10,13
220:17,19 224:6,8
224:18 225:7
264:1 267:17
**producing** 44:5
**production** 11:21
22:6 25:11 44:13
49:20 50:4,15,24
51:1,9 52:20
54:11,20 55:23
56:22 71:6 202:23
220:22 224:9
225:9 280:16,17

280:22
**products** 64:14
**profanity** 244:6
**professional** 27:4
66:17 154:23
156:23,23 160:16
171:1,13 235:19
251:5 269:2
**profit** 64:14
**program** 110:11
**programmer** 30:5
30:7,8 237:11
**progress** 15:1,9
45:6
**project** 28:5,9,12
29:6,13,14,16 68:3
118:7 146:5
222:19,20 270:14
271:1
**projects** 158:16
235:18
**projectt** 29:15
**promised** 141:17
**promoted** 28:9
141:17 142:8
143:4,7,16
**promotion** 143:10
143:11,12 144:2
264:20
**promotions**
141:24
**prompted** 163:14
**proper** 147:10
**properly** 142:18
**properties** 111:17
112:1,8,11,17,20
113:3,11 121:18
131:10 246:9
249:2
**property** 112:3
167:8 246:7

**protect** 205:16
**protection** 145:6
205:8 209:13
237:5
**protective** 17:18
**proud** 122:9
**prove** 74:2 81:9,18
116:23
**proved** 79:17
117:11
**proven** 71:15
**provide** 6:11 14:5
50:10 114:10
153:21 219:8
245:5
**provided** 15:8
19:16 20:24 21:8
22:5 65:1 115:4
132:4 166:6 185:5
194:1,2,6 234:15
239:7 256:5
259:21 270:9
**provider** 245:23
**provides** 180:8
**providing** 112:18
**provision** 165:4
**provisions** 64:19
**prudent** 186:12
**pseudonyms** 236:5
**psomas** 31:5,6,11
87:17,18,23 88:1,3
88:12 118:9
127:19 128:4,8
129:1,19 130:8
131:1,15,21 132:8
132:21 133:5,12
133:13,15,21,24
134:2,7,13 135:9
135:19 136:10,13
136:18 137:2,8,21
138:19 139:3,7,10

139:16 141:10,12
141:23 143:17
144:1,5,11,17
147:16 148:17
149:12 150:7,10
150:13,23 151:6
151:10,15,19
152:12,21 154:2
154:12 159:13
160:9 167:8,13,21
167:24 168:10
174:7 177:23
178:4,8,12 183:24
186:19 188:1
189:17 194:2,8,24
200:12,18,23
201:4 209:9
215:21 227:16
228:2 248:13,18
248:20 249:5,9,10
249:13 251:24
264:14 269:20
271:16 273:13
**public** 1:17 61:5
63:1,14 64:15,17
64:18 71:6 171:20
276:24 278:6
281:10,18 282:15
282:23 283:23
**publicly** 245:10
246:1 247:2,19
249:24
**pull** 29:12 45:22
116:20 149:17,19
150:17 164:18
189:10 262:1
273:21
**pulled** 45:20 55:10
56:2 146:21 194:5
220:18

**pumped** 216:20
**pure** 119:4,6
**purely** 151:4
248:5
**purge** 17:14 20:1,3
20:15,18 21:12
22:12 23:3 39:18
106:18 203:15
220:10
**purged** 20:10
23:18 24:6 38:16
39:17,23 106:5,7,9
120:20,21 155:20
155:22 203:10,22
203:24 218:21
266:22 267:5
**purging** 21:13,14
21:16 22:13 38:21
106:5,17 107:9
122:7
**purported** 205:22
**purposes** 93:16
220:2 238:19
242:14 270:13
**pursuant** 1:15,16
178:24
**pursue** 125:1
205:3,5 217:21
224:24
**pursuing** 214:7
**purview** 122:6
**push** 70:15,22
142:17 143:1
212:3
**pushed** 97:15,22
100:1 102:11
103:14 109:18
111:11 142:15
143:22 220:1
**pushing** 113:14

**put** 23:9 159:8,9
165:5 209:24
210:17 224:20
225:13 237:14
244:5 253:1
254:13 257:3
261:8 262:6 263:4
263:14 269:9
**putting** 168:23
179:5 202:20
220:8 235:17
252:16
**puzzle** 137:6

## q

**query** 60:23
**question** 6:11,24
7:1,14,20 21:21
24:14,15 46:3,4
62:1 66:3 68:6
71:18 84:16 98:10
109:3 124:11
125:11 128:21
131:4,5 141:6
162:16 201:11
238:19,20 239:6
242:4,6,14,17
248:16 249:20
252:4 254:16
255:16 267:7
273:16,19 274:24
275:9
**questioning** 17:8
**questions** 6:8 35:5
82:9 103:2 153:11
153:14,20,22
159:18,20 177:23
188:2,8 189:15,17
189:20 190:1
191:8,12,17 192:7
192:9,10,19
193:13,18 195:2

196:4 200:6,8,21
201:8 228:6 253:3
253:4 254:16
255:14 256:14
258:20 266:20
271:10,15 272:13
273:24 275:6
**quick** 164:10
262:1
**quicker** 28:14
**quickly** 257:13
**quite** 55:7 124:12
141:17 153:10,10
155:16 158:20
163:7 188:14
228:13
**quote** 37:14 53:16
59:3 62:12,14,17
63:13,21,21 66:1
67:11 69:22 70:8
71:12 72:4 85:11
114:10,16,19
115:2,5,13 124:10
137:5 209:18,24
216:4 259:9
**quotes** 208:23
210:16

## r

**r** 4:19 5:2,2,8
187:6 230:20
**rabbit** 139:12
**racking** 156:6
**radio** 154:8
178:10,10
**radojcic** 138:20
179:1 186:19
187:7 188:5
189:20 194:24
251:24 271:17
273:13

**rage** 157:21
**rail** 264:8
**raise** 142:6,11,14
143:8,11,12,13
144:2,6 216:10
**raised** 56:13 60:1
73:3 83:6 85:12
85:12 150:12,13
151:13 216:15,15
250:1
**raises** 141:23
143:2 144:13
**raising** 205:17,19
**rally** 175:19
**ran** 47:13 79:21
112:5,6 121:20
179:10 215:20
221:4
**random** 46:10
**range** 146:4 149:7
**rank** 160:23,23
**rapid** 145:7
**rare** 34:13
**rarely** 37:20 137:2
**raspberry** 270:21
**rattling** 243:10
**raw** 18:6 202:23
220:23 225:8
**ray** 212:14
**reach** 67:3 169:17
254:23
**reached** 154:3
159:19 161:1
176:9
**reaction** 124:23
150:23
**read** 58:20 131:5
163:6 211:9,10,11
224:19 256:3
265:11 281:5,6,12
282:5,6,17

**readable** 202:20
**reading** 278:21
280:20
**ready** 70:5 75:23
76:5 80:15 195:13
272:9
**real** 245:22
**realize** 102:24
**really** 12:17 16:20
21:1 31:13 32:7
33:17 35:1 69:1
69:21 72:2 74:7
81:15 87:20
100:10 109:6,16
109:19 113:13
137:4,15 139:23
140:23 141:18,20
151:11 156:8
173:8 184:19
186:9 188:9,13
190:5,10 192:4
198:1 199:9 205:2
206:6 209:9
211:19,23 212:3
216:22 223:4
229:24 231:12
235:7 240:11
246:3 256:4
267:15
**realm** 230:21
**reapply** 29:9
**reason** 9:10,13
23:11 60:17,18
87:11 107:22
108:1 113:1
134:12 139:22
159:8 170:20
200:11 223:23
241:24 242:18
259:20 263:16
269:15 272:1,2

280:15 282:8
283:3
**reasonable** 130:23
146:13 147:11
148:11 192:17
**reasoning** 269:12
**reasons** 19:3
182:18
**rebates** 221:6
**recall** 10:16 13:21
14:22 15:2 17:2,9
22:16 23:2,4 28:1
30:9,17 38:18
39:8 40:19 43:14
44:1,19 45:1
46:20 48:23 50:3
52:11,16,22 53:19
54:2 55:4,9,17
56:7 62:20 65:2,5
66:11,13 72:2,7,16
78:9,12,16,18,19
82:21 88:20 90:11
90:15,17,20,23
91:15,18,23 93:4
93:12,13,17 94:24
95:6,7 96:7,11
97:13 101:10
104:9,10 106:19
106:24 110:3,5,6,8
111:4 113:12,17
113:20 114:20,24
115:3,14 126:16
127:8,9,11 129:20
130:15 132:10
133:17 141:2,7
145:20,23 150:6
150:24 151:1
156:6 167:23
168:2 182:8
183:21 185:19,21
190:3,24 191:2,14

191:19,22 192:9
192:21 193:7,12
193:16,21 194:21
223:18,19,21
225:1,10,13
229:19 230:18
231:4,7,15 232:8
234:5 239:19
254:17 264:6,23
265:4 266:8,9
267:7 268:13
269:6,11 272:16
272:22 274:5
**receipt** 280:19
**receive** 143:2
144:12
**received** 27:18
201:20,23 209:16
210:2 215:2
**receiver** 18:11
**receiving** 42:14
**recess** 38:10 84:9
136:4 164:13
198:22 228:9
**recognition** 64:16
**recognize** 192:5
201:18
**recognized** 61:16
104:10
**recognizing** 100:6
**recollection** 10:18
42:8 101:24 146:8
191:5 195:2,22,24
224:12 265:5,19
269:16 274:6
**recommendation**
208:1
**record** 4:1,14 6:13
38:7,8,11 54:17
84:7,10 99:4
101:4 119:2 136:2

136:5 164:8,11,14
172:12,12 187:5
198:19,20,23
228:7,10 242:21
261:18 274:12
277:14 278:17
282:9
**recording** 191:10
**records** 11:6 37:15
45:11 90:8 117:21
117:22,24 162:9
162:13,14 230:15
250:15
**recover** 203:6
**recovery** 149:10
203:6
**recreate** 276:3
**red** 262:4 263:3
**redacted** 220:18
**reduced** 278:15
**refer** 40:1,4 111:3
229:1
**reference** 115:2
169:11 245:19
280:8 281:2 282:2
**referenced** 281:11
282:15
**references** 157:2,6
**referred** 43:20
65:15 184:23,24
**referring** 12:2
40:3 41:9 57:23
58:23,23 66:4
69:6 76:11 103:16
110:17,18,20,22
122:14 163:3,5,10
164:2,22 174:18
174:18 175:20
179:13 212:21
213:19 215:5
217:13 225:22

228:2
**refers** 164:24
165:13 236:14
**reflects** 89:8
201:22
**reformulated**
75:17
**refresh** 11:12 95:1
101:24 103:12
**refreshed** 66:10
**refuting** 80:12
**regard** 240:7
241:6 250:8
252:24 274:17
**regarding** 13:20
15:3 33:20 40:16
78:20 79:13 181:7
200:8 216:17
240:16 251:19
254:24 268:22
**regardless** 244:11
**reginald** 142:12
142:23
**regional** 98:21
131:11 270:15
271:13
**regret** 105:23
120:2,5 128:22
**regretted** 169:16
**regretting** 120:12
**regular** 16:5 37:19
**reissue** 75:18
**related** 10:13 24:2
34:16 35:6 50:19
54:12 58:2 66:22
122:8,9 145:7
156:4 157:18
159:5 165:21
188:8 200:6
207:14 214:9
219:19 220:5

221:21 230:8
241:13,23 251:16
255:3 265:21
266:1
**relating** 11:1
33:24 40:2 234:2
**relation** 261:18,19
**relationship** 66:18
82:19 139:21
148:7 171:13
227:23 252:20
**relative** 278:23,24
**relatively** 245:13
**release** 261:8
**released** 247:18
**relevant** 21:7 44:2
44:3 221:1 222:1
**remained** 20:4
28:23 181:3
208:13
**remaining** 218:9
**remains** 182:18
**remedies** 197:24
**remember** 16:7,11
17:9 24:23 31:13
95:8,9 145:16
147:13 166:18
184:19 186:24
188:10 192:10
196:3,4 233:14,17
235:4,8 247:6
267:9,12 269:10
270:23 272:18,24
273:3
**remembered**
112:6 275:9
**remembering**
24:24
**remind** 28:16
**remote** 4:4 54:6,10
79:6

**remotely** 1:18
**remove** 39:1
**removed** 66:20
106:22 262:19
**removing** 76:3
**reorganization**
29:7
**repeat** 119:5
130:12 131:4
252:2 255:14
**repeating** 81:16
**rephrase** 7:16
**replied** 130:9,14
133:15,22 200:24
249:10
**reply** 44:21 119:14
133:17
**report** 31:3 51:7
138:10 256:17,18
**reported** 30:5 31:6
31:8,11 47:7
138:14,17,24
141:12 143:21,22
208:5,7 216:10
278:14
**reporter** 4:10 6:7
6:16 278:7 281:7
**reporting** 138:12
147:19 206:13
207:9 260:24
274:11
**represent** 133:21
**representation**
133:24
**representing**
238:13
**reprimand** 275:20
**request** 23:4 93:1
96:13 114:4,6,13
114:15,19 115:13
137:5 147:24

148:2,18,19,24
149:10,22 185:6
282:9,11
**requested** 25:11
64:2,3 65:2,6
167:14 202:22
219:18 226:13
245:6
**requesting** 115:2
117:13 152:12
184:3 270:3
**requests** 142:22
226:18
**require** 65:23
**required** 271:24
280:24
**reran** 121:16
**research** 165:8
230:20
**researching**
230:11
**resign** 19:12 186:7
186:8,12 190:16
195:9 252:18
274:4 275:17,19
**resignation** 22:24
41:14 185:5,9
186:7,13 188:15
194:5 195:6,11,17
199:12 238:18
272:9,14
**resigned** 20:10
194:4 206:17
**resigning** 20:14
188:12
**resolution** 227:17
**resolve** 137:1
159:22
**resolved** 83:8 88:9
127:15,17,20
227:22

**respect** 53:3
104:13 141:20,22
200:19 228:22
230:5 248:16
251:23 252:4
**responded** 55:5
122:10 125:8
134:16 159:20
263:20
**responding** 70:10
122:4
**responds** 124:2
**response** 12:1
15:16 16:23 33:4
80:1 97:24 98:18
125:19 177:23
201:19 214:16
216:24 218:10
221:3 258:23
276:11
**responses** 44:13
273:24
**responsibility**
105:7 140:11,15
140:17 171:22
172:2,7,13 192:24
206:3 207:23
275:5
**responsible** 53:21
105:5 109:8,9
118:4 128:12,16
166:1 205:9 210:1
210:5 234:14
265:6 266:1,10,11
266:14
**responsibly**
128:14
**rest** 37:19
**restate** 98:10
109:3

**restore** 18:4 25:10
**restored** 202:12
**restricted** 49:6
60:21 61:7,9,16
62:6 85:7 239:24
**result** 205:3
206:12
**resulted** 97:15
**resume** 9:24 11:16
29:12
**resumes** 11:9
**return** 54:20
148:12 154:5
168:12 171:5
172:5 213:13
245:10
**returned** 31:24
152:14 167:8,13
178:3,7,12 280:19
**returning** 97:7
155:5 168:7,9
**returns** 97:5
**revenge** 173:1,6
173:21
**reverse** 28:15
207:18
**review** 11:18,22
23:19 112:21
114:21 164:2
280:13 281:1
282:1
**reviewed** 11:5,8,9
11:9,14,15,16,24
104:20 110:3
114:24 235:21
236:1
**reviewing** 52:24
111:2 234:7
**revision** 247:17
248:8

**revolved** 205:7
**revolving** 143:23
**rid** 201:7 206:22
206:23 207:1,4
**riding** 276:24
**right** 7:21 8:8,16
9:2,18 13:6,14
16:24 18:22,24
22:13 24:18 31:9
31:16 33:4 42:18
42:19,19 43:1
46:18,19 48:4,5
55:2 56:3 57:16
62:13 66:3 67:12
68:8 70:20 76:15
76:16 77:16 79:4
83:16 90:1 91:6
91:11 92:9 93:5
94:7 95:23 96:20
97:9,16 98:16
99:7,13,17,20,21
100:1,4,20 102:14
103:8 107:14
109:19 110:11,15
111:19,22 115:24
116:3 117:6,21
118:10 119:20,23
119:24 120:15,18
121:9,13 122:15
122:20 123:16,24
124:4 125:22
126:1 127:21
129:1,15 131:12
132:22 133:9
134:7 135:12
136:8,15 146:7
147:1 148:9
158:17 161:20
162:3,10 167:2
169:6,13,17
170:18 175:15

178:1,15,21 184:1
187:8 189:15
191:14,20 192:11
193:16,20 195:15
200:14 201:10,24
203:3,17 204:11
217:8 218:2,15,18
218:22 219:2
225:21 227:23
238:14 244:23
245:3 248:22
249:12,14 255:11
256:19,23 258:13
260:9 261:16
262:7 263:5,24
264:14,14 267:7
274:5 275:10
**rightfully** 209:11
**rights** 47:5 260:23
**ring** 186:22
**risk** 62:24 81:17
85:11 86:14
110:10 111:7
122:7 128:17,18
128:19,20 205:8
205:10,22 206:13
206:24 234:5,6
258:6
**risks** 128:14 241:5
241:5
**river** 75:13
**rocket** 270:6,7,8
270:12,13 271:5,6
271:10
**rocks** 1:17 4:10
278:5 279:9
**role** 10:13 27:12
27:16 28:20,21,23
29:18 30:2,3
136:16 147:19,21
174:11 175:2,3

216:1 236:13
**rooftops** 135:15
**room** 8:10 9:1
55:10 56:3 146:22
185:15,18 187:11
188:20,21 272:19
273:8,14,24
274:10
**root** 48:18 262:18
**ross** 183:14
**roth** 183:13
**route** 61:1 97:3,8
97:10 116:21
117:13 262:13,20
263:24
**routes** 93:2
**routine** 65:1
**row** 89:10,10 91:4
91:4 93:21,21
94:1
**rows** 89:7 91:3
92:4,6
**royal** 115:1
**rt** 97:9
**rta** 92:12,21 93:9
96:18 99:17,19
103:23 104:14
107:12,24 111:24
118:19,21 120:10
123:16,24 124:23
126:6 134:21
135:5 156:20
250:18 251:10,11
263:20 270:15
271:13
**rta's** 94:6 243:18
248:21
**rudeness** 157:10
**rules** 1:16 5:24
216:8 281:5 282:5

**run** 79:15 116:19
217:10,15 270:14
**running** 82:22
121:24 217:13
**runs** 75:13

**s**

**s** 2:20 4:21,23 5:4
5:8,8 25:21 30:15
30:15 31:7,7,15
79:22 101:7
280:16 282:8,8
283:3
**safe** 53:24
**safety** 205:14
206:5
**salawus.com** 2:16
**san** 101:18
**sands** 155:14,19
**sat** 52:17 160:14
185:15 188:3,6,20
271:18 273:10,12
**saved** 37:7 44:8
**savings** 270:22
**saw** 43:15,18
47:19 48:24 50:12
55:23 63:5 64:5
75:13 93:13 98:18
98:22 112:22
135:13 196:9,12
219:24 221:24
247:8 251:14,18
252:11 268:21
272:10,11
**saying** 58:18 64:22
64:23,23 71:3
72:8 121:9 139:3
139:20 141:2
162:12 172:12
176:17 193:8
210:5 215:16
217:17 245:9

**says** 43:9 57:15
68:6 69:15 89:21
96:20 97:9 99:7
114:6 124:9 126:8
131:9 161:12
195:15 202:3
204:13 207:17
208:22 209:17
211:12,12 212:14
213:8 215:3 217:8
220:3 225:21,22
227:15,24 242:23
246:19
**scars** 177:2
**scenario** 216:7
**scene** 74:6
**scheduled** 175:23
**schroeder** 222:9
222:14,19,21
225:4 227:11
267:18
**science** 26:16,19
**scope** 81:11 244:2
**scott** 67:22
**scratch** 156:11
**scratched** 265:10
**scream** 135:15
**screen** 99:16,18
161:22,24 170:14
182:10 262:10
268:22
**screw** 23:6
**screwed** 141:21
**scribble** 214:5
262:9
**scribbled** 187:15
213:23 214:4,10
225:14
**script** 79:21,22
112:5,6 121:16,20

**seal** 279:5 281:15
282:21
**search** 165:19
224:5 225:6
**searched** 232:20
232:21 235:1
**searching** 233:2
**seated** 74:12,13
77:7
**second** 53:9 93:19
102:15 103:19
115:20 124:3,18
164:7 169:15,19
171:16 172:23
220:22 222:8
223:9 238:22
246:16,18 262:24
263:2
**secondary** 27:22
**seconds** 91:8
263:8
**secret** 259:18
**secretary** 185:13
**section** 164:24
**secure** 53:24 64:10
227:22 230:15
234:11
**security** 53:22
56:11 62:18,24
63:7 65:24 82:24
84:23 85:11 86:6
86:13 87:1 105:21
109:10 110:10
114:9 115:7
127:14,17,19
135:6 138:21
179:3 181:8,8,18
181:19 205:8,10
205:22 206:13,24
215:10,19 216:14
216:16 232:22

233:7,8,18,20
234:8,10 237:12
241:13 249:7
252:10 258:6
**see** 18:18 41:22
57:12,15,20 62:9
62:19,21 63:12
67:9,17 68:23
69:3,13,18 70:12
70:16 73:11 74:21
80:11 84:21 85:9
89:12,15,18,22
91:4,13 92:5,16
93:22 94:3,10
95:24 96:18 97:2
100:12,16 102:14
102:20,21 103:22
103:24 105:11
108:19 111:17
112:1 114:4
118:15 121:1
124:14 125:8
131:13 133:15
137:16 161:10,17
164:6 165:2
169:18 173:3
177:2,14 179:19
192:8,10 204:8,18
204:19 208:18,22
208:24 209:1,15
211:7 212:7,10
213:6,16 217:11
218:6 223:5,10
225:19 226:4
243:11 246:22
247:16 248:5
262:4,24 263:2
264:11 266:24
267:1,9,11
**seeing** 66:10 103:1
104:11 202:18

224:16 226:10
245:22 264:23
**seeking** 173:21
185:11 197:21
209:10 249:10
**seen** 67:18 114:21
147:4 216:23
225:9 236:10
251:13 277:5
**select** 38:22
**selected** 39:22
**self** 13:24
**sell** 211:24
**send** 44:17 75:24
96:1,3,8,10 100:24
101:3 104:23
107:1,6 108:13
109:1 117:19,23
118:1 119:9
129:19 132:21
162:19 165:4
166:4 259:14
**sender** 18:11
**sending** 66:8
104:10 119:6
123:5 135:18
266:6,10
**sends** 96:17
**senior** 29:5,13
88:8 102:18
107:17 130:2
141:16,17 142:6
143:24 144:4
160:22,23 222:20
**sense** 200:3 261:12
273:22,23 276:7
**sensing** 157:17
**sensitive** 87:13
108:3
**sent** 12:22 18:8
40:9,15,20 42:1,4

42:9 43:22 62:9
67:8 72:19 76:7
80:17 97:18 98:1
98:15 99:9,12
100:13 102:17,22
103:9,13 104:3,8
104:13,21 107:4
110:4 111:12
118:21 119:13
120:18 121:3,11
123:15 129:14,18
133:11,24 134:6
161:23,24 163:16
163:21 169:7
177:23 182:8
200:23 202:3
207:3,7 208:1,3
213:18 214:13
217:7 221:6
222:23 227:10
249:5 257:20
259:24 262:8
264:2 268:22
**sentence** 67:19
110:7 124:19
126:24 127:6
131:9,13,14
172:23 173:8
**sentiment** 115:14
172:9 212:2
**separate** 20:22
**separately** 184:13
253:9,9
**separation** 174:23
255:20
**september** 28:3
150:11 183:5
**serial** 182:11
**series** 79:22 188:8
**serious** 56:18 74:3
81:15 85:14 114:9

116:7 140:9
216:22
**seriously** 83:6
181:9
**seriousness** 136:20
**servant** 64:15
**servants** 63:15
**server** 49:13,17,18
50:1,4,5,13,16,20
50:21,23,24,24
51:1,9,9 52:9,20
52:21 54:21 56:23
58:4,5 60:23 70:2
71:5 76:2 77:19
79:16,24,24 81:6
96:11 116:15,16
243:22 245:10
257:6,7
**servers** 47:16,19
48:13,13,14 49:13
50:15 54:7,11
55:23 57:5 62:7
73:5 81:5 113:13
234:12
**serves** 196:21
262:14
**service** 53:14
55:14 58:2,7,8
61:15,17 62:13,15
66:1 67:11 70:4
73:10 75:12 79:13
81:7,8,17 85:6
87:2 116:18 176:8
210:12 216:17
239:23 240:18
241:5 242:3,11
258:7
**services** 27:20
241:13
**set** 15:4 32:6 33:1
34:3 42:23 43:3,7

43:9,11 47:22
74:6 76:18 78:13
79:4,15 82:3,5,15
82:16 95:4,11
98:4 154:21 164:9
178:19 191:15
193:3 201:19
213:10 218:11,18
220:20 228:16
239:14 268:2
279:4
**setting** 77:4,16
110:23 167:5
221:9 228:18,20
228:22
**settings** 106:11
**setup** 77:24 79:16
103:3
**setups** 80:16
**seven** 162:7
**severe** 85:13
**severity** 55:15
86:2 239:17
**shaken** 153:10
**share** 9:21 41:19
55:3 111:5 115:12
122:3 136:10
186:3 207:6 223:4
246:14
**shared** 15:3 44:2,4
44:14,16 45:1
50:13 104:2
111:13 117:11
165:11 172:20
214:15 218:5
240:18 241:9
**sharing** 113:18
136:9 223:21
**shark** 47:14,14
48:3,8,10,16,24
52:6 53:1,3 59:18

210:9 243:5
259:12,24 260:1,2
260:4
**sheet** 280:14 282:7
282:10,18 283:1
**shelters** 234:13
**shifting** 248:10
**shit** 120:5
**shock** 158:20
159:15
**shoot** 105:20
**shops** 264:10,16
264:21
**short** 225:18
239:13 272:14
**shorthand** 278:7
**shortly** 58:1
129:24
**shot** 99:18 161:22
161:24 170:14
268:22
**shoulder** 77:5,9
110:5
**shoulders** 77:6
130:18
**show** 192:6 252:1
252:6 260:2
262:18 275:23
**showed** 51:11,14
197:6 235:15
272:4
**showing** 37:11
59:7 276:4
**shown** 280:16
**shroeder** 222:24
**sick** 150:21
**side** 18:10 56:11
118:5 134:5
160:15 188:5,6
194:17 199:10,24
207:4 236:19

252:23,24 253:11
253:24 272:7
**sidebar** 150:10
151:4
**sides** 42:22,24
**sign** 89:21 156:13
signal 12:21 13:5
13:23 14:10 15:17
15:22 16:6,14,16
16:19,20,23 17:2
18:8 19:17 21:17
21:18,23 22:3,9,13
25:9 35:19 36:17
38:15,24 39:4,11
39:14,15,17,20,23
42:4,11,20 43:8,24
44:3,10 106:2,3
107:4 120:18,21
155:13,20 160:6,7
202:10 203:11
218:20 219:21,22
220:4 221:15,21
221:23 228:14
229:2 231:18,23
232:3,6 235:9
265:2 270:14
**signature** 279:8
280:15
**signatures** 148:16
**signed** 188:15
193:5 194:7
281:13 282:18
**significant** 145:9
146:9 270:22
**signing** 278:21
280:20
**signs** 223:7 234:13
**silent** 8:19
**silvestri** 67:23
111:9 117:17
118:6 125:22

154:20 160:10
161:14 162:22,24
251:4,5,8
**similar** 58:16
194:23 195:1
198:16
**similarly** 196:11
**simple** 245:13
270:21
**simply** 49:10,11
54:19 272:1
**sincerely** 280:21
**singular** 255:2
**sir** 250:12 280:10
**sit** 9:12,14,17
52:16 91:21
174:16,21 195:23
225:14 227:8
228:21
**site** 11:6 90:19
93:15 105:6
131:24 134:23,24
247:20
**sites** 73:5,7 80:10
116:20 134:23
**sitting** 7:11 8:17
22:11 38:17 54:8
55:2 78:12 90:11
91:18 130:15
140:20 189:13
215:23 217:23
259:11 266:4
276:2
**situation** 186:10
205:17 209:24
210:17 229:14
234:5 239:18
254:5,7
**situations** 234:16
**six** 31:22

**sizing** 264:14
**sjados** 2:16
**skeleton** 40:2,4
46:4,5,7,13,17,21
46:24 48:20 52:18
54:3 55:18 72:12
72:13,15,20,24
73:3,4,16 79:8
81:4 84:15 86:8
89:8,24 90:2,4,19
91:12,16,19 92:15
92:20 93:3,9,14
94:9 95:21,22
96:9 97:4 156:8
156:17 157:18
210:8,22,23 216:3
226:1 239:9 240:2
240:6,17 241:4,23
242:2,10 243:7
244:24 245:14,16
251:11 256:19
261:10,13,20
276:1
**skill** 76:18 79:1,15
**skilled** 237:11,20
**skills** 73:23 142:8
142:19 248:2
**skokie** 264:10,16
264:20
**sky** 80:12
**sladuzinsky** 2:21
**slap** 275:20
**slash** 28:5 132:5
213:11
**slid** 194:7
**slightly** 240:22
**slipped** 147:7
149:18
**small** 86:13
188:20

smithamundsen
  2:13 4:24
sms  16:5 37:19
  38:3,3 39:12,14,14
  170:12
snapchat  67:22
social  33:11 34:20
  35:2,9,13,16
software  63:16
  183:6
solace  204:16
sold  64:14
solo  213:12
solution  207:3
  231:11
solutions  231:14
  245:23 280:1
  283:1
solve  61:21 230:17
  231:8
solving  49:2
somebody  66:18
  73:13 101:15
  105:6 107:2,5
  182:8 237:4
  241:15 244:19
  257:7 262:6
  263:20 266:17
  272:5
somebody's  75:7
someone's  237:6
somewhat  115:8
soon  70:7
sorry  26:5,23
  35:15 48:8 87:22
  98:10 128:2
  130:11 180:11
  189:10 209:20
  213:15 215:3,8,16
  274:19

sort  13:18 14:3
  15:13 16:2,4
  24:16 30:5 33:13
  44:23 47:1,6,18
  48:17 49:23 50:10
  51:16 55:12 61:12
  63:13 64:17 70:3
  78:4 100:6 105:5
  105:19 111:7
  118:7 120:4 122:5
  133:17,18,19
  135:18 140:5
  142:16 148:10
  153:20 158:21
  161:1 166:2 176:6
  180:3 182:10
  184:8 185:11
  188:13,22 193:4
  205:4 210:23
  211:19 214:5
  217:20 220:18,24
  229:17,23 230:19
  232:15,17 233:18
  233:23 236:12
  251:20 257:10,11
  257:12 259:15
  261:8,11 266:17
  268:19 271:4
sought  207:4,12
sound  31:16
  101:15
sounded  19:23
sounds  31:17
  101:9,10,17,18,20
  151:2 196:16,16
  211:17,23
source  96:20 97:4
  260:14,18 261:14
  261:23 264:21
sourced  271:5

south  236:19
space  37:8
speak  6:9,15 55:10
  106:15 112:23
  115:9 123:6
  126:15 182:7
  210:9 235:6
  273:21
speaking  96:24
  144:11 148:22
  196:15
speaks  239:5
spear  179:1
special  179:12
specific  97:7
  110:23 131:21,24
  132:3,8 133:8
  149:6 196:4 226:4
  238:2 239:19
  254:22
specifically  45:2
  53:20 76:13 84:17
  114:20 136:17
  249:3 250:2
  255:15 258:21
  259:1
specifics  78:19
  95:7 192:7 193:9
  230:18
specified  23:13
  278:20
speculate  125:4
speculating  151:4
  173:16
speculation
  254:21
speculative  258:5
speed  61:3,10
spell  25:20 138:20
  186:20 236:9

spelled  187:5
spelling  30:16
spend  71:14,16
spending  74:19
  220:24
spent  180:5,6
  202:19 254:19
  255:10
spoke  151:9
  155:12
spoken  12:10
spouse  177:11
spread  80:18
  188:3
spreadsheet  89:4
spring  10:17
spun  180:22
ss  278:2
st  2:15
staff  30:10 53:12
  58:13 65:1 88:7
  142:3,5 143:1
  146:5 150:20,20
  209:10 261:1
  264:15
staffs  64:12
  209:11
staggered  184:14
stamp  89:15 92:8
stamped  99:15
stamps  140:13
stand  267:15
standard  49:5
  60:20
standby  252:12
standing  77:8
  142:1
standpoint  15:12
  139:17
stands  113:1
  263:15

**starbucks** 17:10 17:14 18:22 19:14 19:24 20:9,18 38:17 106:6,15,17 146:20 152:9 154:11 167:9,16 167:18,24 172:4 177:5 184:10 203:19 220:9,10 267:6

**start** 15:22 22:8 28:15 59:4,5 66:2 71:6 123:11 148:2 273:17

**started** 16:11 17:5 21:23 22:3 24:12 27:11,20 28:21 31:6 40:14 71:4 72:9 75:21 119:16 122:5 143:19 147:15 148:20 190:14

**starter** 65:12

**starts** 264:24

**state** 1:17 4:13 23:22 41:8 45:6 117:18 163:18 164:22 196:9 216:3 261:18 263:6 273:1 278:1 278:6,8 281:10 282:15

**stated** 41:16 42:21 65:23 66:21 93:6 94:19 103:18 104:8 116:13 124:18 128:21 150:9 196:7 226:12,14 240:16 248:24 272:1

**statement** 124:21 126:9 202:9 214:12 242:21 252:6 281:13,14 282:19,19

**statements** 193:5 200:8 240:17

**states** 1:1,16 4:7 60:17 126:24 173:7

**stating** 139:15 171:3

**station** 54:9 74:17 74:18,19 75:2,4 77:1 79:4,5 96:4 178:17,18 179:8 179:18 180:2,7,16 180:17,18,21,23 181:2 182:17 189:7

**stations** 180:20 181:1 182:3,4,5,6 182:9,14

**status** 14:3 15:8 45:15 46:1 107:7 264:18

**statute** 163:17 165:13 208:18

**stay** 12:9 44:11 149:8

**stayed** 234:14 274:10

**stenographically** 278:14

**step** 116:23 154:18 159:24

**steps** 128:13,15 149:20,22

**stettinius** 2:7

**steve** 8:9 238:12

**steven** 2:13,19 4:23 5:3 280:5

**stick** 63:12

**sticking** 212:15

**stomach** 126:1,4

**stopped** 16:2 22:1

**stories** 254:15

**storm** 120:5

**story** 105:15 185:12 199:10,24 207:5 242:1,19 252:23,24 253:15 267:2 272:7

**straight** 254:15

**street** 2:14,20 25:14 99:21 153:2

**stress** 19:6 120:6

**stressful** 120:11 159:23 173:16

**strictly** 139:17

**strike** 276:19

**string** 47:20 49:9 50:5 141:13 239:2 261:21

**strokes** 183:16

**struck** 76:6

**studying** 61:12

**stuff** 11:19 103:4 122:8 142:23 156:4 167:6 209:20 212:17,19 231:6 265:3

**stumbled** 60:10 242:2,9,10,15

**stumbles** 266:18

**stupidity** 119:4,6

**stupidly** 266:4

**style** 223:17

**subject** 11:21 13:9 13:15 14:21 17:16 23:23 33:20 34:17

34:22 36:14 45:2 95:21 136:23 153:16 200:7

**submission** 42:17

**submit** 139:4

**subordinate** 159:19

**subordinates** 139:19

**subpoena** 11:21 12:2 15:16 16:23 25:12 33:4 185:6 201:20 202:9 214:16,23 218:11 222:1 224:8,10

**subpoenaed** 22:4 194:7 219:18 229:12,18

**subscribed** 281:10 282:14 283:21

**subsequent** 72:5 202:23 215:13 240:6 250:6

**subsequently** 19:9 45:9 153:7 251:7

**substance** 133:3 188:10 189:21

**substantially** 143:14

**substantive** 110:6 184:21 190:18 199:21

**succeeded** 121:21

**successful** 142:11 142:15

**successfully** 47:13 110:13,21

**sue** 205:21 208:14 208:17 251:10

**sufficient** 138:13 267:20

[suggest - talked]                                                                 Page 49

**suggest** 16:13
30:16 88:18
126:21 130:24
132:7 158:6 159:7
**suggested** 74:1
**suggesting** 68:11
68:14 144:12
**suggestions** 110:6
**suing** 11:2
**suit** 204:21
**suite** 2:9,15,20
280:2
**summarily** 247:10
**summary** 223:12
223:22 224:13
226:21 227:15
**summed** 190:14
**summer** 10:18
**summoned** 19:9
255:5
**super** 211:13
**superior** 280:1
**supervise** 29:19,22
30:13
**supervised** 30:1,3
30:17,21
**supervision** 230:6
**supervisor** 30:22
30:23 31:2 143:17
208:8
**supervisors** 127:4
127:10
**supervisory** 175:2
**support** 28:19
29:3,4 137:15
206:8 208:1
213:15
**supported** 264:11
**supportive** 139:14
141:10 174:8

**suppose** 67:14
68:7 127:1 138:16
148:4 225:18
**supposed** 174:10
259:18
**supposing** 195:23
**sure** 5:23 6:9,13
24:21 37:16 42:15
42:18 48:22 71:8
71:11 74:4 75:22
82:8 85:13 88:5
109:4 111:8 113:7
125:18 127:24
129:3 130:5 131:6
139:6 143:10
145:24 146:13
148:16 150:9
157:8 160:8 167:3
168:22 171:6
172:9 180:12
200:20 216:22
227:21 234:13
244:23 246:4
251:12 269:7
271:6
**surface** 14:2
**surgery** 145:2,4,7
145:9,13,22 146:7
146:17 150:8
269:18,21 270:2,3
**surprised** 100:16
**suspected** 257:15
**suspension** 17:12
**suspicion** 257:11
271:1
**switched** 25:7
221:9
**sworn** 7:11 8:3
278:11 281:10,13
282:14,18 283:21

**synonym** 261:20
**system** 40:11 41:6
45:16,19 46:14,15
47:11 48:1 52:5
52:18 54:22 59:9
61:18 62:24 63:8
64:1 67:16 69:8
72:16,23 73:1,12
73:13,15,17 75:7
75:11,14 77:18,23
85:17,18 90:4,13
90:19 97:4 98:2
98:12 108:5 117:8
117:10 122:19
131:3,16 133:9
140:12 159:21
207:13 210:15,20
215:12 233:4
234:11 237:24
241:16,18 243:19
243:21 245:8,11
245:17 247:24
248:21 249:6
260:17 261:3,5
276:15
**system's** 112:9
**systems** 28:19
29:3,4 46:9 48:18
49:4 50:7 53:24
56:19,20,21 58:7
59:7,11 61:23
64:9,10 79:10
81:19 84:20 85:2
85:18 112:9 117:2
121:13 139:22
140:13 166:2
232:16 234:14
237:22 238:6
245:1,3 246:2,11
257:19 260:19,21

**t**

**t** 4:16,16 26:18,18
179:18
**tab** 95:1 232:17
**table** 8:18 166:10
188:17 194:8
**taft** 2:7
**taftlaw.com** 2:10
**take** 6:17 34:13
38:6 63:23 69:20
69:21 72:9 75:9
77:11 82:9 84:5
96:22 97:1 106:17
124:16 125:7
128:13 135:24
140:5,7,10,15
147:23 149:8,22
150:7 151:3 152:8
153:9 156:20
164:4,10 168:3,17
170:17 171:21
187:13 192:2
198:18 210:23
220:4 228:5 237:8
244:10 246:13
251:1 271:14
**taken** 1:17 9:4
23:15 41:6 83:5
192:24 206:3
207:23 214:17
278:19
**talented** 47:21
**talk** 5:22 19:4 40:1
57:19 58:24 59:4
59:6,11 64:24
74:22,23 155:15
157:1,11,14,16
170:22 209:7
231:21
**talked** 46:3 76:6
113:24 120:10

128:11,11 134:20
145:10 161:3,18
183:16 196:1
200:10 204:23
205:23 209:8
213:22 228:13
231:6 239:21
240:11 241:6
262:16
**talking** 14:24 59:8
79:13 84:1 136:9
142:24 148:18
257:17 265:15
**tangentially**
148:15
**target** 146:3,3
**tasked** 53:5
**taxpayer** 276:24
**tduffy** 2:4
**tduffylaw.com** 2:4
**team** 69:7 71:8
110:9,17 111:3
**technical** 53:12
88:7 134:5 135:11
139:4,6,18 159:17
159:20 226:23
241:13 243:13
264:21 276:5
**technological**
139:17 243:3
**technologically**
60:3 136:14
**technology** 143:6
147:20 222:16,18
222:18 230:9,23
231:3
**tell** 7:6,10,15
23:12 30:1 38:20
43:6 51:15 78:21
104:2 107:8
111:11 114:18

128:7,10,14,18,24
129:20 134:13
140:24 141:2,4
144:17 145:4,12
151:9 152:21
154:16 158:2
164:5 167:9
175:20 181:9
191:6 195:18
196:14,22 197:1
199:7 200:12
217:3 218:7 226:9
248:6 252:23
253:17 267:11
271:19 272:6
274:13
**telling** 128:17
141:7 191:2
193:12 194:21
241:3 263:21
268:13
**tells** 224:2 252:18
**templates** 261:4
**temporary** 263:4
**ten** 45:19 77:14
78:13 188:22
217:2
**tend** 19:4 187:16
214:4,5
**tends** 237:18
**term** 237:2 246:8
**terminal** 75:2,3
79:4,6,9,20
**terminate** 206:17
207:12 252:18
254:16 271:22
274:4
**terminated** 19:12
22:23 188:11
189:4 190:15
191:20 192:3

194:4 195:8
203:13 205:9
206:14,20 207:8
207:11 208:9
253:10 254:12
268:18 274:20,24
275:8
**terminating** 272:2
**termination** 18:15
20:11,14 148:19
155:24 192:6
195:6,11 199:12
203:14 250:3
272:9,21
**terms** 48:23
103:17 128:1,5
241:3 242:22,23
250:15 255:10
**terrible** 67:19
**territory** 208:24
**test** 49:18,20 50:13
50:14,15,16,20
50:21,23,24 51:7,9
52:18,20 54:11
55:23 56:23 70:2
71:5 72:3 73:4,4
74:1 75:6 76:2,19
77:13,22 78:3
79:19 80:20,21,24
81:6,16,23 82:5,14
82:17,19,22 84:14
84:20 88:12 93:17
95:4 96:10 97:11
97:15,21 98:9,13
100:19 103:8
105:18 109:5,15
112:6 113:9,13,16
113:19 116:15,19
117:6 126:19
128:8 131:2,18
132:4,9 133:8

134:10 135:10
136:11 138:1,1,3,4
138:7 140:11
165:22 172:7,19
189:23 191:2,4,7
191:16 192:15,22
192:23 195:19
196:7,8 200:12,19
207:13,24 210:23
216:2 217:19
226:1,20,24 228:3
243:15,17 244:2,3
244:16 256:22
257:17 262:17
265:14,23 275:12
276:2 277:4
**tested** 50:12 51:5,6
51:8 52:9,19
55:22 57:4 72:15
72:22 76:1 77:17
86:18,20 116:7
131:16,23,24
249:1
**testified** 8:4 87:10
95:3 218:19 241:3
243:15 251:22,23
252:7,22
**testify** 9:8 278:11
**testimony** 9:11,14
14:6 38:18 242:12
250:9,13 252:5
255:15 256:7
277:13 278:18
281:6,7 282:6,9,12
**testing** 53:20 75:5
79:9 96:4 97:6
112:19,24 117:7,9
124:11 128:23
140:12,21 166:2
180:24 190:4
216:21 237:16

**tests** 85:4 87:8
121:24 257:18
277:4
**texas** 26:21
**text** 3:16 12:3,21
13:4,8,20 14:11
16:5 18:4 37:20
37:21 47:20 65:19
75:15 107:1
120:14,17 160:6
161:4 169:20,23
170:12,12 203:9
204:5,6 207:16
208:20 209:14
210:9 211:6,7
212:8,11 213:5
217:4 218:9 243:6
245:8,9 255:1
259:5,11 260:4
264:24 265:4,5,16
265:19,24 266:3,7
267:4,9,10 268:21
**texted** 13:9
**thank** 144:10
181:4 182:20
211:2 213:14
215:1 222:4 238:8
**thanks** 5:12 42:15
133:22,24 151:2
200:24 249:10
263:21
**theoretically**
61:17 240:1
**theory** 60:19
269:24
**thing** 13:18 15:13
54:14 108:10
130:19 156:3,5
179:1 186:12
190:13 199:21
204:1 207:14

208:5 230:19
233:24 238:3
257:12 268:20
271:16
**things** 28:14 33:18
41:12 45:7 57:2
71:11 75:5 113:7
118:5 136:24
137:8 139:9,24
146:2 154:21
156:8 157:16
166:1 168:24
173:9 183:17
185:16 187:17
195:2,15 199:16
207:10 209:19
210:1,6 212:22
232:17,23 237:4,5
237:17 242:13
257:24 258:11
259:10 264:6
267:17
**think** 5:6 10:6
11:7,14 12:12,22
14:18 15:5,8,17
18:22 24:9,9
25:24 26:6 30:10
31:18 33:2 34:3
34:12 36:23 38:5
42:23 46:3,11
48:2 50:12 52:24
53:9 56:2 73:11
74:1 79:3 80:23
83:14 87:10 99:23
108:1 109:6,17
111:4 112:22
119:11 120:3
126:7,8,24 127:12
133:22 134:4
135:23 137:12,24
138:12,19 139:7

140:9 141:9,10
144:19,20 146:6
149:16 152:18,20
154:7,19 155:1,18
157:2 158:15,21
158:22 159:13,14
162:19 166:22
171:7 172:24
173:5,24 174:16
174:21,24 178:9
178:10,11 179:12
184:13 187:19
188:18 189:14
194:2,5 196:19,20
197:9 199:5 201:4
204:17 206:16,20
207:1 209:17
214:17 215:16,24
216:6 217:20
219:21 220:18
229:22 230:20
232:4 233:2,13,20
236:8 238:13
239:14,22 256:16
257:6,14 258:3,18
259:20 260:6
261:9 265:3,10,20
266:15 267:21,21
269:19 271:7
272:10,11 273:3
273:12 275:4,5,19
**thinking** 163:12
185:7 271:8
**third** 53:9 68:21
108:15,17 124:9
131:9 173:8
195:14 211:6
219:16
**thirty** 280:19
**thomas** 111:9
117:17 118:6

154:20 160:10
162:21,23
**thorough** 190:6
**thought** 11:11
44:22 100:15
103:5 104:7 105:9
115:15 116:24
119:14 137:10
138:11 158:22
159:1,8 166:5,11
170:20 171:9,10
171:23 186:8
190:8 206:8
214:18 265:20
269:7 271:7
274:13,16 275:8
**thoughts** 15:9
187:15 199:15
224:21 240:10
**thousands** 232:13
**thread** 68:5 122:4
239:11
**threads** 154:10
266:16
**threat** 67:15 68:8
115:8
**three** 12:14 16:7
26:14 30:4,8,10,10
66:13 99:11
109:22 149:5
166:16,17 225:17
247:17 258:18
**threw** 221:5
**throw** 63:11
**throwing** 63:20
**thrown** 176:6
**thursday** 175:24
**tie** 61:23
**tied** 158:12 185:3
233:18

**ties** 161:5

**tim** 118:18,21
134:21 161:19
162:1 251:17
256:14

**time** 4:2 6:22 7:3
12:6,19 13:2,14
14:13,20,23 16:11
16:18 18:22 21:3
21:6,19,19 22:23
23:12,22 24:5,23
25:7 27:19,20
29:20,23 30:4,13
30:20,22,24 31:12
38:6,9,11 39:11
40:9 41:1,13 47:9
48:22 51:4 53:5,9
53:13,16 60:16
64:8 65:11 67:4
73:19 74:19,20,22
79:16,24 80:9
81:5,12 84:5,8,11
89:14 91:9 92:8
93:1 100:5,17
103:1,9 104:6
108:3 112:9 113:8
113:13 116:20
123:5 126:13
135:23 136:2,6
140:5,13 145:19
146:3,9,16 147:1
147:16 148:11
149:15,19 150:21
151:7,17,22
155:14,19 156:10
157:12 158:13
161:3,6 164:12,15
167:5 168:19
170:24 171:6,8
180:5,7 181:6
184:15 185:2,16

190:2 196:15
198:7,10,21,24
201:3 202:19
208:10 212:16
214:9 219:16
220:24 221:17,18
223:12,21 224:16
225:2,23 226:19
227:14 228:8,11
229:8,21 232:8
233:12 238:22
240:13 243:23
245:1,10,22
246:10 251:4,14
261:19 262:20
267:18 273:8,12
274:23 275:14
277:13 278:20

**times** 5:18 10:7
19:7 64:7 141:18
166:17 174:12
184:13 261:16

**timing** 148:9

**timothy** 2:2,3 5:5

**tin** 204:13

**tinkerers** 231:13

**title** 28:16,18 29:2
144:3 262:12,18

**titles** 29:17 30:9

**today** 5:12 9:8,12
9:15 11:23 12:18
14:7 38:1 52:16
78:13 140:20
155:21 174:16,21
200:10 217:23
218:19 221:18
227:8 228:21
239:2 240:16
241:3 252:8
255:19 256:8
275:11

**today's** 4:2 277:12

**told** 16:6 17:16
23:8 56:1,5 105:4
106:21 146:3
153:19 176:19
190:3,24 191:3,14
192:21 194:24
195:18,20 196:6,6
199:20 206:4
227:1 233:12,16
248:20 250:4
252:9 256:22
257:2,16,23 258:1
258:2,12,12

**toll** 176:5

**tollway** 176:4

**tom** 67:23

**tomcat** 257:6

**tomorrow** 160:20
162:6 175:18

**tone** 199:13

**tonight** 80:6

**tony** 57:12,13,22
58:12 59:3 68:22
69:3,21 86:4

**tony's** 70:6 71:7

**tool** 50:8 95:10

**top** 17:6 67:6
70:12 99:5 104:6
117:15 119:18
125:20 162:2
218:2 225:19
227:12 246:15
262:3,9

**topic** 11:13 166:23
193:14 197:4

**topped** 54:7,10

**toronto** 63:4 65:15
65:20 66:4,6,12,16
67:1 101:14 103:7
104:3 107:13,23

215:14

**toss** 207:18 211:21

**total** 29:17

**touch** 78:2 105:6
162:8 249:6
250:16

**touched** 33:2

**touching** 83:1

**town** 177:5 189:5

**toxic** 209:8

**trace** 47:14 48:3,8
49:1 52:7 259:12
260:5

**traces** 59:18
210:10

**tracker** 58:7,16
59:2,20 60:5 80:3
80:10,10,16 91:11
239:21 261:7

**tracking** 210:24

**traffic** 47:15,15,19
48:4 49:11 260:21
261:15

**train** 252:11

**trains** 48:14,15

**transactions**
230:15

**transcribed** 281:7

**transcript** 191:24
278:14,22 280:12
280:13 281:5,12
282:5,11,17

**transcription**
278:16

**transcriptions**
193:5

**transdev** 27:8,17
27:20 66:19

**transdev.com.**
32:19

transferred 25:6
transferring
  142:13
transit 1:6,9 4:6
  4:17,20 10:14
  28:19 29:3 31:1
  34:1 56:21 57:5
  58:11 63:4 65:15
  65:20 66:6,16
  67:1 90:4,13,19
  98:21 101:11,14
  101:21 103:7
  121:13 122:15,16
  131:11 153:9
  183:6 205:14
  207:13 208:18
  215:15 244:21
  245:22 252:21
  270:13 276:15
  280:6 281:3 282:3
transmission
  123:19
transpired 109:13
  112:23 126:22
  139:12 189:23
  196:3 200:14,22
  201:9,13 203:14
  267:19
transpiring 118:3
transport 171:4
transportation
  26:20 194:17
  270:15 271:13
trap 263:10
trapeze 183:6
traumatic 190:19
  196:2
traveling 155:8
treat 151:16
treatment 197:21

trends 234:16
trial 10:8
tried 12:9 36:23
  52:13 99:24
  169:17
trigger 273:21
triggered 120:4
trinity 25:19
trouble 220:7
troubleshoot
  53:12 54:12 59:19
troubleshooting
  48:12 58:4 60:11
trove 234:21,23
true 269:22
  278:17
truly 253:11
trust 209:20
truth 7:6,10
  278:11
truthful 9:11
truthfully 190:1
try 11:12 18:19
  37:1 53:12 141:22
trying 53:10
  141:14 158:15
  170:19 182:10
  190:23 209:17
  211:18 212:3
  231:8 237:8 253:7
  263:10 264:7
tsp 270:6
ttc 63:4 65:14,20
  67:4 101:22
  134:18
ttc's 67:15 68:12
ttc.ca 102:5
tucking 146:4
tuesday 71:2
  133:23 166:17
  167:10 170:2,7,8

259:4,7
turn 57:6 67:5
  68:17 71:12 72:11
  88:22 89:9 91:2
  93:20 95:12
  101:23 103:19
  108:14 118:12
  120:24 123:8
  125:20 129:6
  132:17 144:23
  151:22 161:8
  169:3,19 171:14
  172:21 175:8
  177:14 183:18
  201:14 204:6
  211:2 217:2 222:4
  228:18,22 237:8
turned 15:18
  18:16 52:12 179:7
  228:15
tweet 97:15,18,22
  98:1,15,23 99:17
  99:18,20 100:4,8,8
  102:12 103:15
  105:21 108:4
  109:18 128:10
  257:4 263:13,19
  263:20 264:1,2
  277:5
tweeted 98:24
twice 10:8 36:23
  231:20
twitter 33:14,16
  33:19,23 34:3
  97:16 98:3,6,8,12
  98:19,20,22
  100:11 102:11
  109:18 236:7,7,17
  263:12,16
two 8:17 16:7
  17:12 19:2,7 21:4

21:24 22:19,20
  26:4,7,7,9 30:3,8
  30:11 39:7,16,19
  47:19 51:2 55:11
  59:7 82:8 92:3
  93:2 99:10 100:11
  115:7 117:19
  134:9,12 147:13
  153:19 154:15
  157:13 159:22,23
  166:17 167:12
  169:24 178:16
  180:6 190:7 194:3
  195:7 200:5
  204:23 207:15
  208:20 209:15
  213:21 224:15,22
  247:13,15 248:13
  248:14 252:18
  254:13,20 255:10
  262:20 263:7
  268:9
type 46:12 73:20
  78:24 91:21,24
  92:18 93:6 94:17
  94:19 182:5
  210:19 225:15
typed 65:9 94:15
  114:23 185:5
  186:6 194:6
  214:13 224:15
typewriting
  278:15
typically 49:19
  108:8 257:12
typing 62:20
  103:18 130:16
  225:11

**[u - vectors]**

| u |
|---|
| **u** 4:21 5:4 101:7 179:18,18,18 |
| **uber** 153:10 |
| **ubunto** 181:7 |
| **ubuntu** 179:17,22 180:15 |
| **ugh** 119:17 121:9 125:24 |
| **uh** 6:20,20,20 175:16 |
| **ultimate** 18:15 |
| **ultimately** 19:11 22:22 40:17 56:19 60:6 64:13,18 67:20 72:22 97:14 128:24 129:18 136:22 150:20 173:18 176:11 229:12 |
| **ultimatum** 195:5 |
| **unable** 202:15 |
| **unauthorized** 243:18,20,24 244:15 245:2,14 |
| **unclear** 219:10 |
| **uncomfortable** 78:3 |
| **uncovered** 224:10 |
| **undergrad** 26:24 |
| **underpaid** 143:14 |
| **understand** 6:20 6:21 7:5,9,15,16 9:20 43:2 48:17 63:7 66:7 86:1 88:1,4 124:24 125:11 127:12,22 128:5 134:4 135:11 136:14,19 139:3,10,16,20 180:12 190:21 |

200:14,15 206:11
210:4 211:15
229:14 240:21
242:4,5 249:20
261:13
**understanding**
42:3 59:17 87:21
190:23 206:15
208:12 233:8
**understood** 6:18
7:4,20 8:24 9:24
12:7 44:24 49:8
51:4 86:1 88:6
150:1 163:23
182:20 217:16
241:17
**undetermined**
23:11
**undocumented**
61:15 62:15 85:6
87:2 116:18
210:12 240:5
**uneasy** 83:1
**unemployment**
27:18,19 208:11
271:24 272:3
**unencrypt** 202:15
**unencrypted**
181:3 182:18
**unfamiliar** 98:5
**unfortunately**
217:10 275:2
**uniform** 245:19
**unilateral** 78:5
**unit** 25:15
**united** 1:1,16 4:7
**universal** 46:8
**university** 26:20
**unknown** 19:3
23:11 54:7

**unknowns** 159:6
**unobtrusive**
243:24 244:13
**unofficial** 70:14
70:18,21,23 71:20
71:20,24 72:8
**unpack** 18:19 76:8
**unsafe** 205:16
**unsecure** 244:21
**untimely** 18:15
**update** 80:13
243:23 247:9
**updated** 98:6
**updates** 34:11
58:6
**upgrade** 47:11,12
49:2,19,24 50:1,2
50:20,20 53:6,8,10
55:13,19 58:1
59:9,14,20 61:6
63:24 80:5
**upgrades** 53:21
176:5
**upgrading** 58:3
**upset** 172:18
196:11
**urged** 238:21
**urgent** 152:22
**url** 89:17,17 91:10
91:12 94:5 96:23
245:7,10,19
**urls** 92:11 112:7
**usage** 53:1
**use** 6:19 16:13,16
16:18 21:23 25:4
32:1,16 33:11,13
33:17 34:9 35:9
35:23 36:1,1,12
37:18 38:3,3,15
62:13,14 69:16
71:6 72:12,24

73:16 77:12 90:3
91:16 122:19,22
140:23 181:20
212:17 213:2
215:12 231:2,23
233:22,22 244:24
245:13 251:11
**user** 34:2 66:5,7
66:11 101:16
180:8 229:2
232:14 233:11,16
261:5
**user's** 238:1
**users** 51:21 233:11
**uses** 236:5 261:23
**usual** 204:15
**utility** 270:6
**utilize** 62:5 70:4

| v |
|---|
| **v** 25:21 30:15 280:6 281:3 282:3 |
| **vacancy** 147:20 |
| **vacation** 155:5 |
| **vague** 201:1 |
| **vaguer** 135:19 |
| **valid** 247:23 |
| **validate** 244:16 |
| **validating** 53:23 |
| **valuable** 234:15 |
| **vanasse** 30:15,18 39:11 83:24 159:18 160:9 |
| **varied** 261:23 |
| **various** 80:9 112:8 123:23 139:22 140:13 143:1 146:12 235:18 245:20 249:1 |
| **vast** 180:5 |
| **vectors** 81:21 |

**vehicle** 93:2 97:3
**vehicles** 117:13
**vendor's** 63:16
**verbal** 240:9
**verbally** 6:16
  54:24
**verified** 131:9
**veritext** 4:12
  280:1,8 283:1
**veritext.com.**
  280:17
**veronica** 31:13
  127:2 141:13
  173:2,13,20,23
  174:4,10,17,18,18
  174:22 185:14
  209:9 215:21
  264:14
**versa** 155:11
**versed** 51:17
  136:16
**version** 49:20,20
  49:22 118:16
  202:18 247:4,17
**versus** 4:6
**vested** 15:10
**vice** 155:11
**vicinity** 17:7
**victoria** 1:17 4:10
  278:5 279:9
**video** 4:4 36:23
  37:2 183:14
**videographer** 4:1
  4:11 5:10 38:8,11
  84:7,10 136:2,5
  164:11,14 198:20
  198:23 228:7,10
  277:12
**view** 96:20 97:4
  140:16 275:14,15
  276:18

**viewed** 44:9 82:1
  84:18,19
**violate** 145:5
**violated** 41:6,7
**violation** 249:22
**virtue** 163:24
**visible** 219:12
**vividly** 17:9
**voice** 232:9 239:19
**vs** 1:5,12
**vulnerabilities**
  82:24
**vulnerability**
  40:11 56:9 73:14
  80:18 81:11,18
  82:1 84:18,19,21
  86:6 87:1 107:18
  117:2 131:23
  166:2 244:17
  245:18 249:1
  250:6,7 266:18,19
**vulnerable** 85:18
  85:19 121:12,22
  132:5

|   **w**   |

**w** 79:23 99:21
  112:7 153:2
**wacker** 2:9
**wait** 6:10,23 80:7
  108:24 109:4
**waited** 134:12,24
**waiting** 261:7
**waived** 278:22
  280:20
**walk** 145:11
  146:19 199:24
  252:12,13
**walked** 152:8
  184:13 254:3
**walking** 20:21
  24:2 65:11 155:23

184:5 186:10,10
  268:6
**walks** 183:12
**wall** 55:3 63:12,20
  160:15
**want** 5:23 6:12
  19:22 54:15 62:12
  63:9 65:24 69:15
  71:17 72:11 87:23
  117:23 127:18
  128:9 137:20
  139:23 141:21
  142:16 144:23
  145:5,10 148:23
  151:22 170:16
  171:5 173:5
  180:11 183:18
  191:1 192:18
  199:3 200:11
  233:23 238:18
  240:14 244:22
  246:6,13,19
  248:13 250:9,16
  252:2,3 255:14,15
  262:2 264:11
**wanted** 53:17
  58:18 63:22 77:22
  83:3,8 84:16
  85:13 86:1,14
  87:12 88:5 119:2
  119:3 127:16,23
  135:19 137:18,20
  147:23 148:6
  157:21 160:21
  163:2 189:10
  211:23 216:22
  227:21 228:22
  229:13 244:6
  250:14 268:10,13
  268:23 270:16

**wanting** 81:14
  226:15
**wants** 267:3
**warrant** 87:20
**washington**
  122:15,16 167:9
**waste** 24:23
**watched** 142:7
**way** 9:8 15:15
  34:16 43:7 47:14
  58:18 60:22 68:15
  79:19 82:16 83:10
  88:3,3 105:3
  134:13 138:6
  150:14 151:12,16
  153:8 180:4 193:3
  197:16 209:21
  218:15 220:15
  223:1 237:8
  240:23 241:10
  244:4,12 252:17
  257:1 258:10,16
  276:6
**ways** 37:2 257:15
**we've** 105:20
  236:10 276:13
**web** 3:8 50:22
  54:19 77:20 89:5
  89:8 94:1 95:10
  245:20 246:2
  249:24 250:1
**website** 45:9,13
  58:15 75:5,19
  91:20 92:21 93:10
  94:6,7,22 235:14
  236:2
**websites** 80:2,15
  235:13,22
**wednesday** 166:18
  167:4,10 172:4
  184:3 259:8

**week** 12:22 13:17
17:12 45:24
119:24 120:8,11
120:12 127:2
129:3 134:16,16
134:22,24 145:18
146:7,23 149:8
166:17 170:3,10
173:16 176:22
197:12 200:5
208:16 213:22
224:22 255:5
259:1,4 265:7
266:2 268:3
274:22
**week's** 150:21
**weekend** 105:5,10
105:17 109:7
**weekends** 106:1
**weekly** 144:15
234:12
**weeks** 19:2,8 21:4
22:19,20 133:13
134:9,13 150:11
153:19 154:15
157:13 159:22,23
161:4 162:7 190:7
204:23 224:15
248:13,14 254:14
254:20 255:11
268:10
**weight** 145:7
**went** 16:3 17:3
38:20 72:3 80:9
86:2,14 98:20,20
98:21 105:21
143:8 147:10
157:8 185:4,7
190:16 194:1,9
195:7 200:20
205:2 220:6 221:4

240:10 263:19
**west** 2:3 25:14
**whatsoever** 276:6
**whereabouts**
123:7 126:14
**whereof** 279:4
**wherewithall**
136:21
**whistle** 205:7,11
205:16,22 209:13
213:10 215:9,18
**white** 102:16
171:19 237:14,15
**wide** 47:1
**wife** 12:12 26:8
34:24 36:2 37:21
38:2,3 111:12
119:3,8,16,19
154:18 161:23
186:2,5 189:3,3
194:9 251:3 266:6
**wife's** 233:16
**wikipedia** 266:14
**window** 149:5
**windows** 262:10
**wiped** 219:2
**wire** 47:13,14,19
48:3,7,10,16,24
52:6,24 53:3
59:18 210:9 243:5
259:12,23 260:1,2
260:4
**wish** 119:23
131:20 274:11
**wishes** 171:23
**withhold** 220:21
**withholding**
258:15,19
**witness** 3:3 5:14
5:17,20 6:3,18,21
7:4,8,13,18,22 8:2

219:17 229:23
243:1 278:10,22
279:4 280:9,12
281:1,4,11 282:1,4
282:15
**witness'** 280:15
**wmta** 122:11
**woman** 143:20
187:1 188:17
189:14 194:9
272:20
**wondering** 57:18
217:14
**word** 59:12 101:21
126:8 224:19
227:3,3 244:11
251:15,15 260:3
261:11,17,19,24
262:15,19,21,22
271:3
**words** 6:24 66:14
125:7 144:19
**work** 8:18 12:16
32:18 47:12,13
48:7 49:4 54:9
62:14 71:4,5,9,10
71:11,16 74:16,18
74:19,23 75:2,4,23
79:4,5 90:21 96:4
119:7 122:8,23
123:1,4 137:15
138:3 141:20
145:18 146:10,24
147:12,17 148:10
149:9,14 150:15
150:22 154:6
160:21 166:21
174:14 177:1,2,4
178:17,18 179:8,9
179:18 180:2,7,16
180:17,18,20,21

180:23 181:1,2
182:3,4,5,6,6,9,17
191:24 197:13
209:3,6,8 213:12
213:13 229:9
237:4,22 247:21
260:18 264:16
266:4,5 270:5
**worked** 27:10
53:11 56:22 66:19
67:1 70:6 76:4
77:6 79:5 105:20
129:16 130:14
132:16 142:12
146:12 158:17
181:18 196:17
198:15,16 222:19
226:11 234:4
235:20 241:10
260:16,21 270:7
272:12
**working** 28:1,18
49:1,23 62:11
66:2 68:19 103:2
104:5 124:19
144:20,21,22
178:14 207:19
247:22 276:18,20
**works** 36:5 51:3
55:24 66:19 69:24
73:13 81:4 220:15
249:19
**workshop** 178:18
**world** 37:1,20
49:22 50:23 51:1
63:6 66:17 101:11
236:18
**worlds** 236:18,20
**worry** 216:5
**worst** 23:1 46:11

**worth** 171:6,7
**wow** 42:15 54:21
  246:20,20
**write** 54:15 108:2
  115:11 187:17
  223:16
**writing** 83:19
  223:17 226:21
**written** 9:16 64:6
  67:20 149:11,16
  172:12 191:23
  224:3 249:4
  255:21 272:23
**wrong** 135:14,16
  135:21 137:24
  138:2 139:24
  156:12,14 165:24
  216:7 275:6
**wrongdoing**
  138:10 199:19
  250:4 254:18
  267:24
**wrote** 68:8 127:6
  187:19,22 223:3
  223:15,19 226:11
  274:12

**x**

**x** 3:1 71:14,16

**y**

**y** 5:4 26:18
**yeah** 217:8
**year** 14:16 21:24
  29:6,11 30:19
  142:24 231:20,24
  256:3
**years** 29:13 32:6,9
  51:24 142:15
  171:12 191:21
  225:9 231:14
  235:19

**yellow** 204:8
**yep** 207:17,20
**yesterday** 169:13

**z**

**z** 4:19 5:4 25:21
  71:15,15
**zero** 114:10,15,19
  115:2,13
**zevallos** 25:19
**zillion** 37:2
**zoom** 6:2 88:23
  139:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.