# Exhibit 7

Page 309

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHRISTOPHER GEORGE PABLE,

                           )

     Plaintiff,          )

                           )

vs.                    ) No. 19 CV 7868

                           )

CHICAGO TRANSIT AUTHORITY and    )

CLEVER DEVICES, LTD.,        )

                           )

     Defendants.        )

_____

CHICAGO TRANSIT AUTHORITY,    )

                           )

     Counter-Plaintiff,   )

vs.                    )

CHRISTOPHER GEORGE PABLE,     )

     Counter-Defendant.   )

The Continued Deposition of CHRISTOPHER GEORGE PABLE, called by the Defendants for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 10:00 o'clock a.m., on the 6th day of July 2021, A.D.

Page 310

APPEARANCES:

LAW OFFICE OF TIMOTHY A. DUFFY
MR. TIMOTHY A. DUFFY
725 West Orchard Circle
Lake Forest, Illinois 60093
Tduffy@tduffylaw.com
appeared on behalf of the Plaintiff;

TAFT STETTINIUS & HOLLISTER, LLP
MS. ELIZABETH BABBITT
MR. JOHN KENNEDY
MS. NICOLLETTE KHUANS
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
jkennedy@taftlaw.com

appeared on behalf of the Defendant,
CTA;

SMITHAMUNDSEN
MR. STEVEN JADOS
3815 E. Main Street
Suite A-1
St. Charles, Illinois 60174
sjados@salawus.com

appeared on behalf of the Defendant,
Clever Devices, Ltd.

Page 311

I-N-D-E-X

WITNESS: CHRISTOPHER G. PABLE

Direct Examination by MS. BABBITT:     315 - 581
Cross-Examination by MR. JADOS:        581 - 586
Cross-Examination by MR. DUFFY:        587 - 588

EXHIBITS                    PAGE
Exhibit 70 Signal application     365
Exhibit 71 Signal messages        396
Exhibit 72 message 6-1-19         400
Exhibit 28 email 10-24-18         477
Exhibit 73 communication excerpt  502
Exhibit 29 email 6-20-20          512
Exhibit 74 surgery proposal       554
Exhibit 75 1-23-19 surgery proposal  562
Exhibit 76 PayPal receipt         566
Exhibit 77 Schick Signal messages   543
Exhibit 38 hospital invoices      569

Page 312

(Witness sworn.)

THE VIDEOGRAPHER: Good morning. We are going on the video record at 10:02 a.m. on July 6, 2021. Please note your microphones are sensitive and could pick up whispering, private conversations and cellular interference. Be mindful that this can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

Here continues media unit one in the video recorded deposition of Mr. Christopher G. Pable, taken on behalf of defendants in the case matter of Christopher G. Pable versus Chicago Transit Authority, et al., filed in the U.S. District Court, Northern District of Illinois, Eastern Division, bearing case number 1:19 CV 7868.

This is a remote virtual deposition hosted by Veritext Legal Solutions. My name is Kevin Duncan. I'm a certified legal video specialist with the firm of Veritext Legal Solutions. The court reporter today is Ms. Victoria Rocks from Veritext Legal Solutions.

I am not authorized to administer an oath,

Page 313

nor related to any party in this action, nor am I financially interested in the outcome.

Counsel, will you please identify yourselves starting with the noticing party.

MS. BABBITT: My name is Elizabeth Babbitt, B-a-b-b-i-t-t, on behalf of the Chicago Transit Authority, appearing on behalf of the CTA today with Attorneys Nicollette Khuans and Kim Walberg.

MR. DUFFY: Timothy A. Duffy, for the plaintiff Mr. Pable.

MR. JADOS: Stephen J-a-d-o-s for the defendant, Clever Devices. I have Jesseka Green and Julie Friedlander present as well.

THE VIDEOGRAPHER: Thank you, counsel. You may proceed.

MS. BABBITT: Good morning, Mr. Pable. I know we went through this a few months ago, and I want to cover some of the same ground rules which I know you have now heard several times through these depositions.

Just so we're on the same page, I'm going to be asking you questions. My questions and your answers are obviously going to be recorded by the court reporter, in addition to the videographer, and

2 (Pages 310 - 313)

Page 314

you will need to speak up so that those answers are transcribed as well as my questions.

Do you understand that?

THE WITNESS: Yes.

MS. BABBITT: And you understand that that means you can't answer with nonverbal cues or by saying uh-huh or uh-uh, is that right?

THE WITNESS: Correct.

MS. BABBITT: And I would ask that you wait until I complete a question before you provide your answer, and I will try to do the same so we are not crossing over each other when we are speaking.

THE WITNESS: Okay.

MS. BABBITT: If you need a break at any time let me know, and we could take a break. I just ask that you wait until you complete answering a question before we take a break. Is that fair?

THE WITNESS: Yes.

MS. BABBITT: And you understand you are obligated to tell the truth in this deposition as if you were testifying before a federal judge in federal court?

THE WITNESS: Correct.

MS. BABBITT: If you don't understand a

Page 315

question that I'm asking you, will you tell me that you don't understand it so that I could rephrase it?

THE WITNESS: Or I'll ask you to rephrase it.

MS. BABBITT: Great. Otherwise, I'm going to assume you understood the question as I asked it. Is that fair?

THE WITNESS: Yes.

CHRISTOPHER G. PABLE, recalled as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

BY MS. BABBITT:

Q. Where are you right now?

A. Chicago.

Q. Are you in your home?

A. Yes.

Q. And what device are you using to participate in this deposition?

A. The same one as the last time.

Q. Which is what?

A. The EOL tablet from my husband's work.

Q. Is there anyone else in the room besides you right now?

Page 316

A. My dog.

Q. Is there anyone else in your home aside from you right now?

A. Yes. My roommate is in his room and knows not to come out.

Q. Anyone else in your home besides your roommate, your dog and yourself?

A. No.

Q. Do you have any other electronic communication devices accessible to you right now?

A. No.

Q. You don't have a cell phone with you right now?

A. It's on the other side of the room.

Q. You understand that aside from breaks that you might take with your lawyer, you're not permitted to communicate with anyone during the course of this deposition while you're testifying?

A. I think I am, but I am required to disclose all that to you if I do.

Q. Okay. I won't fight you on that. I would expect you wouldn't be communicating with someone during a live deposition.

Have you taken any medications in the

Page 317

last 24 hours?

A. No.

Q. Is there any reason that you wouldn't be able to provide full, complete and truthful testimony today?

A. The same as last time, outside of time, having hazy details, no.

Q. Do you understand that you are not to consult with other materials aside from those exhibits that I show you when I ask you to review them during the deposition?

A. Again, I think that I am allowed to, but I'm required to disclose them if I do.

Q. Okay. I'm not sure where you got that information, but I will ask that you do disclose if you start studying other materials that I haven't presented to you.

How did you prepare for this deposition?

A. I spoke with my lawyer yesterday.

Q. Have you spoken with anyone else about this deposition?

A. My husband.

Q. Anyone else aside from your husband?

A. I let my roommate know it was occurring

3 (Pages 314 - 317)

Page 318

and not to leave his room.

Q. And aside from speaking to your husband, your roommate and your lawyer, have you communicated in any way about this deposition with anyone else?

A. Yes. I have let my work colleagues know that I will be unavailable today.

Q. And any other communications about this deposition?

A. Yesterday I had an internet outage caused by fireworks. So I had to discus with our secretary about potentially using a conference room at my employer's place just in case as a backup. But beyond that no, I don't believe so.

Q. You haven't e-mailed or text messaged or messaged with anyone else about this deposition that you are sitting for today?

A. Not that I'm aware of.

Q. So no?

A. Not that I can recall. I don't think I have.

Q. Did you review any materials or documents or communications to prepare for this deposition?

A. Nothing specific.

Q. So when you say nothing specific, is that

Page 319

no, you haven't reviewed any materials?

A. I tried to look at some of the materials that were produced by your forensic expert, but obviously some of it just would not work.

Q. What materials did you attempt to review that were produced?

A. They were proprietary file formats. I couldn't tell you what their contents were.

Q. Any other materials or documents that you reviewed in advance of this deposition?

A. Nothing specific.

Q. Sorry, I'm trying to make sure I'm clear. When you say that there's nothing specific, is that because you don't recall anything specifically or what do you mean by that?

A. I am assuming you're talking in the immediate vicinity of the past few weeks, correct?

Q. Since your last deposition, have you reviewed any materials related to this case?

A. Yes. Obviously, I have gone over many depositions since my last deposition.

Q. When you say you have gone over depositions, do you mean that you reviewed transcripts of other depositions?

Page 320

THE WITNESS: Tim, is what I'm about to answer okay to disclose or no?

MR. DUFFY: Yes, you can say you've done whatever with the documents or transcripts. Not specifically, but generally.

THE WITNESS: I have gone through, and I have annotated transcripts and gone through the document productions that have been made since, yes.

BY MS. BABBITT:

Q. And did you review your own transcript in advance of this deposition?

A. Back in March I did.

Q. Did you review the transcript of Mr. Haynes in advance of this deposition?

A. Back in March I did.

Q. You haven't reviewed those deposition transcripts since March, though?

A. Correct.

Q. I think you answered this. You're still living in the same home that you resided in in March, is that correct?

A. Correct.

Q. And you said you mentioned your husband. I take it that is still Mr. Alex Bower?

Page 321

A. Yes.

Q. Are you still employed by Morning Star?

A. Yes.

Q. And do you have any other additional employment outside of Morning Star?

A. No.

Q. And if I refer to your first deposition or your prior deposition, you understand that to mean the deposition you gave in this matter in March of 2021?

A. Yes.

Q. We're going to talk a bit about a phone in this case and generally unless I specify otherwise, when I am referring to the phone that you produced for reimaging in this litigation in April of 2021. Do you understand what phone I mean by that?

A. Yes.

Q. What is the make and model of that phone?

A. Motorola Z2 Force.

Q. When did you first come to own or possess that phone?

A. I can't give you the exact day, but it was close to release day.

4 (Pages 318 - 321)

Page 322

Q.  Could you give me a year, perhaps a month and a year?

A.  Maybe the second half of 2017.

Q.  So it sounds like at least in 2O17 is when you believe you obtained that phone?

A.  Yes.

Q.  And you purchased it yourself?

A.  Correct.

Q.  Do you have that phone in your possession as you sit here today?

A.  Not at the moment.

Q.  Where is that phone?

A.  I actually don't know.  I handed it to my husband to put away.

Q.  When did you do that?

A.  Shortly after I got it back.  It's probably in a box somewhere.

Q.  When you say shortly after you got it back, do you mean after you received it back from the imaging that was conducted in this case in April of 2021?

A.  Correct.

Q.  So you received the phone back, and the next thing you did with the phone is give it to your

Page 323

husband?

A.  No.  The next thing I did was inspect the phone for damage.

Q.  Was the phone damaged in any way?

A.  Yes.

Q.  Tell me about that.

A.  The case was put on backwards and inside out and had a problem with the power button.  So I had to work around that issue.

Upon booting it there appeared to be some sort of potential data anomalies, but I didn't go too much into it because I needed to rely on what your expert provided.

Q.  You mentioned there was an issue with the case, and you said there was an issue with the power button.

Was the phone able to turn on?

A.  Not immediately.

Q.  How about at what point, if any, was it able to turn on?

A.  After I pried the power button out, it was able to.  But then there was problems with the power cutting out on it.

Q.  Can you describe those problems?

Page 324

A.  It would turn off sporadically.  These were the same issues that it had going in there, but I don't know if they were exasperated by the power button being depressed constantly in the wrong position or not.

I am trying to remember if I had to plug it in to recharge it or not because the way the power button was pushed in it would have caused it to endlessly boot and potentially drain the battery.

Q.  Did the power button have an issue prior to you submitting it for re-imaging?

A.  The power button did not, no.

Q.  You mentioned there was other intermittent issues with the power turning on and off?

A.  Correct.

Q.  Could you describe that for me?

A.  You would use it, and it would just cut out.

Q.  Why was that?

A.  I believe that there was a power contact issue internal to the phone.  I had submitted it to be repaired several times, but since receiving it back it looks like the issue has been grossly exaggerated.

Page 325

Q.  When you say you had it submitted to be repaired, can you tell me what you mean by that?

A.  Back in 2019, I sent my phone off to get a new battery installed inside of it.  I believe the place was called Cell Phone Repair.  It was in the West Loop.  It was maybe three blocks away from For Discovery.

They ordered the battery, replaced the battery.  And several months later after that the phone just started randomly dying on me.  So I didn't know if that was related to perhaps a bad battery cell or voltage was low or there was a contract issue.

But I brought it back there several times to have it looked at, and each time he would do something with it, and it would be fine for several months and then start getting worse again.

Q.  When did those problems with your phone first begin?

A.  As soon as I got the battery replaced.

Q.  And that was in 2019, you said?

A.  Yes.

Q.  Do you recall what month?

A.  It would have been around October.

5 (Pages 322 - 325)

Page 326

Q. October of 2019?

A. Around there, yes.

Q. What precipitated you getting the battery of your phone replaced at that point?

A. The phone was more than capable of doing everything I needed it to do. It's just the battery life was very low.

Over time, especially if the phone was released in 2017, a battery is only designed to last about two years. So at that point the cells had started to wear out, and I wanted to get a replacement and get hopefully another two years out of it without needing to purchase over a thousand dollars for another phone.

Q. When we're referring to this phone, is this the same phone that you used as your personal phone when you were employed by the CTA in 2018?

A. Yes.

Q. Did you have any other phones in your possession or control in 2018, when you were employed by the CTA?

A. Not that I'm aware of. What do you mean by possession? I mean my husband had a phone too. I mean I obviously could use his phone

Page 327

to make a phone call if I had to, but it's not like I kept any other phone on my person.

Q. So fair to say in 2018 when you were employed by CTA, the phone that we're discussing today is the phone you used and you kept on your person?

A. Correct.

Q. And that phone we're referring to, is that the same phone that you produced yourself to Quest in June of 2020 to be imaged?

A. Yes.

Q. And that is the same phone that you produced an image of to the CTA late last year in 2020, correct?

A. I didn't produce an image to the CTA. I believe my counsel did or our expert did.

Q. But that image that we received, that's the image that you had done by Quest that was produced to the CTA?

A. I never saw what was produced to the CTA. So I couldn't tell you what was produced.

Q. Did you ever see what was imaged by Quest in 2020?

A. No.

Page 328

Q. No, you did not?

A. No.

Q. Did you ever ask to see what was imagined by Quest in 2020?

A. I don't recall. I think I may have asked what format it was in, but I don't know if I ever asked about the contents of it.

I mean an image is a fairly standard thing. It should be just a bit for bit copy of the N chip in there.

Q. So this phone that we're discussing, do you continue to use that phone today?

A. No.

Q. Why is that?

A. It's not reliable. I had to get another phone that I could use.

Q. When did you get another phone?

A. That is a complicated question. Sometime between May and July of 2020.

Q. Why is that a complicated question?

A. Because I had ordered the phone in May, a replacement phone in May, and I had to go through several of them to get one that was not defective. Every time I had completed a quote,

Page 329

unquote migration or data copy over to the new phone there would be an issue that would pop up. For example, crushed blacks or issues with the HRD display or the digitizer not functioning correctly.

I believe I went through three different phones before I settled on the one I have now.

Q. I've sorry, I think I didn't hear you. You said something was an image before the HDR issue. Could you repeat what it was?

A. It's like crushed black. So if you look at an image that is supposed to be like dark, it will bias it to be a black color, and you will see color banding.

Q. Was the phrase you used crushed black, so I have it for the record?

A. Correct.

Q. So that issue of getting a new phone and having your data migrate into the new phone, that occurred between May and July of 2020, is that right?

A. Correct.

Q. And do you know what day you initiated or first ordered the new phone that you intended to use in May of 2020?

6 (Pages 326 - 329)

Page 330

A. Not off the top of my head, but it should be in the document production you have. In fact, it's probably on the phone, the e-mail invoices.

Q. And the phone that you are using today, is that same phone that you purchased in the summer of 2020?

A. Yes. The same model anyway.

Q. The same model?

A. Yes.

Q. What model is that?

A. A One Plus 8 Pro.

Q. Is that an android?

A. Yes.

Q. And that phone, the new phone you have, you mentioned that it sounds like there was some technical difficulties in getting the data migrated from your old phone into the new phone, is that correct?

A. No. There were defects with the phones that I received from the manufacturer that manifested after I had attempted to start using those.

Q. Were you able to migrate data from the old phone we've been discussing into this new phone you

Page 331

got in the summer of 2020?

A. The stuff I cared about I was able to copy over the several times I tried, yes.

Q. When you say the stuff you cared about, can you be more specific about what data you were able to transfer over?

A. So I had music. That is the primary thing that I tried to transfer over because if you upload that to the Google cloud it compresses it and MP3s don't sound very good.

So I had music I transferred over. My pictures are all saved to the Google cloud. My e-mails, text messages, you can't really transfer over easily because of Signal. I mean you can, but that requires a lot of -- what's the word they used, safety number.

I would have to go ahead and impersonate a safety number of my old device and that is not something I want to do. I didn't want anyone contacting me through that to know I had a new device and to only correspond with me on a specific safety number, very specifically in case someone tried to impersonate me with the data they retrieved from my old phone.

Page 332

Q. That's helpful. To unpack that a little bit, and I will start with the last point you made about the Signal messages.

You mentioned that you were concerned that someone would be able to impersonate you using the data collected from the old phone, is that right?

A. Correct.

Q. And that would have been your consultant that collected the data in May or June of 2020. Is that what you were concerned about?

A. I am not concerned about the consultant that my counsel retained. I am concerned about the CTA taking it and misusing the information.

Q. So that was why you -- I guess did you transfer or move your Signal messages that you had on your old phone to your new phone?

A. No. Like I said, I specifically didn't move that over because that would have meant that it kept my same safety number.

So I did not move my Signal messages over. So when my device registered, people would know they were speaking with a new device. And if my old device started communicating, they would know

Page 333

that it was from a bad actor.

Q. When you started communicating over Signal on your new phone, did you have to implement settings in the same way or did those settings transfer over?

In other words, if you had disappearing messages set up with your husband on your old phone did you have to go and set that up on the new phone?

A. I did not set up a conversation specific policy. I set it up to be a global. I changed it to be a date retention instead of a specific disappearing message retention.

Outside of that in general and if I were to speak with anyone else I would generally turn on disappearing messages that way.

Q. Okay.

A. That way --

Q. Go ahead.

A. That way it covers traditional SMS as well.

Q. And so when you said you -- I think as a general matter you changed your settings to retain the messages for a certain period of time, is that right?

7 (Pages 330 - 333)

Page 334

A. Correct.

Q. Did you do that when you moved over to the new phone?

A. I did not move that information over. I did it on an initial setup, but yes.

Q. In other words, when you got your new phone you set up Signal. It's got a new account --

A. Safety number.

Q. Safety number associated with it and then you set it up so that as a general matter someone communicating with you, those communications were retained for only a certain period of time?

A. Correct.

Q. What was that period of time?

A. It was a month. It was mainly a space saving issue because this phone didn't have an SD card slot. So if I run out of space, I am out of space for good.

Q. When you're saying this phone, you're referring to the new phone, it doesn't have an SD card slot?

A. Correct.

Q. And then you also mentioned it sounded like on more of a user basis, you modified settings

Page 335

to those specific communications, is that correct?

A. If the conversation didn't already have it associated with it, I could have set it. But I believe since the safety numbers are device specific, your Signal account, you can use Signal on a desktop for instance or on a tablet and still communicate with it.

And those settings do transfer over. So if it wasn't set up to already be disappearing I could set it up to be. That is more what I was trying to get across.

Q. Did you, in fact, set that up for specific communications where you, once you got this new phone so that certain communications were set to be disappearing?

A. Since I got the new phone -- well, I did set some messages to be disappearing. They were already set to be disappearing. I actually made their retention time longer.

Q. So when you're saying that the messages are disappearing and you have modified the retention time, that means it disappears after a longer period of time?

A. Correct.

Page 336

Q. And who specifically did you modify that for?

A. Let's see. I'm trying to remember. This was over a year ago at this point. I think my husband, I made it last a little longer. And I think my brother I made it last a little longer.

Q. Anyone else?

A. Not that I can recall off the top of my head.

Q. Did you modify your settings with Michael Haynes' Signal when you got your new phone in the summer of 2020?

A. No.

Q. And we'll return to Signal in a little bit, but I want to make sure I got all of the information on the phones and the phone we're discussing.

You mentioned the new phone you purchased in the summer of 2020, which, that fair to say, it's a replacement for the old phone you were using you were employed at CTA and beyond that?

A. Yes.

Q. Do you have any other cell phones? I know you mentioned your husband has one, but any other

Page 337

cell phones that you use that are in your possession or control?

A. Occasionally we still have my parents' old cell phones available because we're still working out issues with their estate.

But I don't have them on my person. My siblings have them, and I use them to correspond with people who have their numbers on file.

Q. Do you have any company issued devices from Morning Star?

A. Yes, I have a Morning Star laptop.

Q. Do you have a Morning Star phone?

A. No.

Q. When did you last use the phone that we had imaged or reimaged in April of 2021?

A. When I got it back to make sure that it was functioning.

Q. What did you do aside from evaluate it for functionality when you had it returned to you?

A. That was essentially it. And then I set it down.

Q. Aside from that instance when you got your new phone it sounds like in July of 2020, the kinks were worked out, and you were able to use it, did

8 (Pages 334 - 337)

Page 338

you continue to use the old phone or did you store that old phone?

A. I put the phone away.

Q. Where did you put it?

A. I think on the top of my -- it's called a Collax from Ikea. I put it on the top shelf of that.

Q. Do you do anything with that phone until you were ordered to produce it for reimaging in 2021?

A. Not that I recall. I mean this is over a year ago, and I had to charge it up and get ready to make sure I turned it back on before I sent it over to you guys. But I think that was the extent of it.

Q. After you had it imaged by Quest in May or June of 2020 was the phone turning on at that point in time?

A. The phone turned on, but again it would turn off randomly. It caused a lot of data corruption issues.

Q. What do you mean by data corruption issues?

A. When you write a file in a computer and it's not done saving the file the data will

Page 339

obviously be truncated, but the file allocation table that lists the entry I believe on the phone, it uses high node, may have incomplete information and, therefore, the data may become, I guess the integrity could become compromised.

Q. So was that phone able to be turned on in October of 2020?

A. It probably was.

Q. Are you aware that your attorney informed the CTA and Clever in October of 2020 that that phone no longer turned on?

A. I'm not aware of what communications my attorneys sent counsel in 2020.

Q. As far as you know, the phone was able to be turned on in October of 2020?

A. It could probably turn on, but it would probably turn off on you.

Q. And the phone we had imaged in April of 2021, is that phone set to have language in Korean?

A. No, I do not use Korean.

Q. Is there any reason when the phone was turned over to the CTA and the CTA's forensic expert that it was in a Korean language setting?

A. I didn't see any Korean language setting

Page 340

when it was sent over for imaging.

Q. When you have your attorney correspond with the CTA, do you review that correspondence prior to it being sent to the CTA or Clever?

A. Usually not. In fact, most of the time I am not even aware that any correspondence has occurred.

Q. All right. Understood. And back to Korean. Do you speak or read Korean?

A. I know very little Hangul, but that is a phonetic character set. I think I have used it on a handful of occasions when I took a crash course in Hangul.

Q. Hangul, could you spell that? If you don't know, that is fine.

A. I think it is H-a-n-g-u-l or g-o-l. It's a Korean character set.

Q. That's a Korean character set, thank you. So your phone was not set to be in Korean characters?

A. Absolutely not.

Q. And you mentioned that you know a handful of those Korean characters, is that right?

A. Correct. I could identify Korean out of

Page 341

other Eastern languages.

Q. Do you communicate with anyone in Korean?

A. No, I don't communicate with anyone in Korean.

Q. Do you speak any other languages aside from English?

A. Proficiently I speak, I guess if you want to consider it an official language, I grew up with a pigeon of German, Hungarian and Romanian.

Q. Aside from that language, is there any other language that you speak proficiently or communicate in?

A. Proficiently, no.

Q. Let's turn back. I know we talked a bit about your Signal communications, but I want to get into that a little bit more with you.

You use Signal on your phone to communicate with people as a form of messaging, is that correct?

A. One form, yes.

Q. And you also mentioned that Signal also has a desktop and tablet application, correct?

A. Correct.

Q. Do you use those applications and

9 (Pages 338 - 341)

Page 342

communicate via Signal over a desktop or a tablet?

A. I do not.

Q. Do you have Signal applications downloaded on any other computers or other devices aside from your phone?

A. Just my One Plus 8 Pro.

Q. And that is the device you're communicating on right now?

A. That is currently my new phone.

Q. Your new phone, thanks. When did you first start using Signal?

A. It's been years. I want to say I think I originally signed up to use it before 2010 and then I stopped because my phone couldn't handle it.

I think I went back to it later on, maybe 2015, 2016 when I had a phone that was more capable of keeping up with things. But I can't tell you anything before 2015, 2016 more definitively.

Q. When I asked you if you used Signal to communicate with people on your phone, you mentioned that I think that was one of maybe other options.

What other means do you use to communicate or send messages to people on your phone?

Page 343

A. As I stated in my previous deposition, I use Google Hangouts. I use G mail. I have used Telegram.

I have used Google Voice and Google Plus when that was around.

Q. Anything else aside from those applications you just identified?

A. Nothing else that I could think of on the spot.

Q. What would you say is your primary form for application that you use to communicate on your phone?

A. Right now it's probably e-mail.

Q. When you say e-mail, are you referring to your G mail account?

A. G mail and probably my Morning Star e-mail. I have significantly reduced my communication from other applications.

Q. That includes your communications over Signal?

A. Correct.

Q. Why did you reduce your footprint in communicating in those other forms?

A. Because when you guys wanted to image the

Page 344

phone, I knew that you would be demandful of wanting to have me change settings from what I was told.

So I decided, well, if you want to dictate what I can do with my device I am just not going to perform that action anymore and find another way to do it.

Q. So how did you find another way to do it?

A. I can either use a regular phone call or go in person, especially now that the pandemic restrictions have been significantly eased.

Q. So you now communicate more routinely over the phone, is that correct?

A. I have used phone calls more often, yes.

Q. Who have you had more phone call communications with since you made this shift in your usage of communication?

A. My husband especially. I think I mentioned before that I work on convention planning.

So I switched a lot of those communications for convention planning to telephone calls and video conferences in that regard. So things along those lines.

Q. What about your communications with

Page 345

Michael Haynes?

A. Since the deposition I have had one in person meeting with him.

Q. When was that?

A. Sometime in April.

Q. Was it just the two of you?

A. Yes.

Q. The beginning of April or the end of April, do you recall?

A. It may be the second or third week of April. I couldn't give you an exact date, sorry. I'm looking at my Google history.

Q. Do you recall if you had already produced your phone to be reimaged by the time you were meeting with Mr. Haynes?

A. The phone had already been produced, I believe. Actually, no. I can't be sure if it was or not.

Q. Where did you meet -- go ahead

A. I don't recall the exact date that it happened. Sorry.

Q. Where did you meet with Mr. Haynes?

A. Kaiser Tiger.

Q. It was just the two of you at Kaiser Tiger

10 (Pages 342 - 345)

Page 346

in April of 2021?

A. Correct.

Q. How long did you meet?

A. I wouldn't be able to tell you. It was a shorter meeting after work. So maybe an hour or so.

Q. What did you discuss at that meeting?

A. Generally how unfair the questions were and how you misrepresented them to him.

Q. So it's a shame I wasn't there. Okay. So you were discussing the deposition testimony of yourself, is that right?

A. No. I was specifically discussing how you claim to understand what was going on in the case when you obviously didn't with the question you asked him.

Q. So you're referring to the deposition that I took of Mr. Haynes?

A. That is correct.

Q. And did you discuss the communications that you exchanged with Mr. Haynes about the litigation at that meeting?

A. No.

Q. So the meeting was focused it sounds like on my lack of understanding about how I deposed

Page 347

Mr. Haynes. Is that fair?

A. Beyond that, also how you would ask him questions that he obviously didn't remember and then provide -- I guess Anthony Clunies was a good example where he honestly did not know he was speaking with a TTC employee and then out of left field you produced an e-mail about Mr. Clunies, for instance.

Q. Did you discuss anything else about this litigation aside from what you viewed as the unfair questions?

A. That was primarily it.

Q. What other instances of my misunderstanding about the case or the evidence in the case did you discuss with Mr. Haynes in that meeting?

A. The CVE procedures --

Q. I'm sorry, I don't mean to interrupt. Did you say CVE?

A. Correct. Charlie Victor Elephant.

Q. Great.

A. CVE procedures, how database breaches work with key value systems.

I'm sure there were others, but that's

Page 348

all I can recall off the top of my head. It was far more fresh the questions you had asked him back then.

Q. Did you bring the deposition transcript with you to this meeting?

A. Oh, no. I don't think it was ready by then.

Q. Did you bring any other materials or view any other materials with Mr. Haynes when you met with him in April of 2021?

A. I don't believe so.

Q. Any other topics about the litigation or the depositions that you discussed with Mr. Haynes?

A. Not about the litigation or depositions, no.

Q. Did you discuss any of the communications you exchanged with Mr. Haynes via Signal or otherwise at that April of 2021 meeting?

A. I told him I wouldn't be messaging him on Signal much anymore.

Q. Why did you tell him that?

A. Because I didn't want to put him at an unnecessary risk.

Q. What do you mean by unnecessary risk?

Page 349

A. I don't want to inconvenience him by you saying oh, now you want to go image his phone and see if you can unearth some hidden messages that obviously wouldn't exist on there either.

Q. And they wouldn't exist because they have set to be disappearing messages?

A. Or they wouldn't exist because they never existed in the first place.

Q. So yes, they may not be on the phone because they are disappearing, is that right?

A. You mean in the past or since?

Q. Either way.

A. In the past if they were disappearing they're gone. Since, I haven't messaged Mr. Haynes.

Q. Are your settings with Mr. Haynes set to be not disappearing as we sit here today?

A. I haven't changed my settings with Mr. Haynes at all because I don't use Signal with Mr. Haynes.

Q. If Mr. Haynes were to message you right now, that message would still be set to be a disappearing message?

A. Probably, but in order for that to take effect I would have to take a look at it.

11 (Pages 346 - 349)

Page 350

Q. Right. So you have not done anything to modify the settings that you have with Mr. Haynes?

A. Correct.

Q. Have you instructed Mr. Haynes not to communicate with you via Signal?

A. I told him I did not want to communicate and put him at unnecessary risk, and I would assume that he would feel similarly.

Q. And how did you communicate with Mr. Haynes to set up that meeting in April of 2021?

A. Immediately following his deposition I asked my attorney if it were okay if we discussed how unfair his questions were.

Q. So when you say immediately following the deposition, was that over Zoom in the meeting directly after the deposition or did you communicate with him in some other way?

A. I gave him a phone call after I got the okay from my attorney.

Q. Was that the same day as Mr. Haynes' deposition?

A. I believe so.

Q. That was a phone call to Mr. Haynes' cell phone?

Page 351

A. Correct.

Q. Did you have any other phone calls with Mr. Haynes?

A. Not that I recall.

Q. Have you had any phone calls with Mr. Haynes since that meeting in April of 2021?

A. No, I haven't had any phone calls since the depositions and that would have included that time period.

Q. Did you say -- sorry.

A. Could you restate your question. That might make things clearer.

Q. Sure. So you set up a meeting with Mr. Haynes for April of 2021 by calling him after Mr. Haynes' deposition in March of 2021, is that right?

A. Correct.

Q. And aside from that phone call and the in person meeting in April of 2021, have you had any other communications or met with or spoken to Mr. Haynes?

A. No.

Q. So there's been no communications between you and Mr. Haynes aside from the phone call

Page 352

following the deposition and the meeting at Kaiser Tiger with Mr. Haynes?

A. That is correct.

Q. Why didn't you change your settings to not be disappearing messages with Mr. Haynes following his deposition?

A. Well, one, that would necessitate me needing to create a new thread with him.

Q. Why is that?

A. I told you the settings on my phone are set up to have a day retention and that would require me to go through and find his contact and substantiate a new thread in there.

I'm sure you have seen the list of contacts in my phone, how massive it is. I would have to go scroll through that and set up his specific Signal number to do that.

Since I wasn't communicating with him, it didn't really matter.

Q. And you don't have a search function or you can't type in H-a and pull up somebody whose last name starts with H-a on your phone?

A. I'm sure I could, but why would I even bother needing to do that if I am not going to

Page 353

communicate with him?

Q. So is it your testimony that you determined that you wouldn't be communicating with Mr. Haynes anymore and so that is why you elected not to change the settings to not be disappearing anymore?

A. I absolutely have every intention to continue to communicate with Mr. Haynes. I have known Mr. Haynes for over a third of my life.

It's not something that you could just have a litigation come in and say you can't speak with someone anymore or whatever. So I am not sure what you're trying to get at here.

If I am just not going to talk to him over Signal, why would I bother opening his contact up in Signal and making a record on the Signal surfer?

Q. How long would that process take to set Mr. Haynes' messages to be not disappearing?

A. It would be pretty quick, honestly. But again, that would also create another blip on the Signal server that I communicate with Mr. Haynes' device.

And I wouldn't put it past the CTA to go

12 (Pages 350 - 353)

Page 354

subpoena Whisper Systems to go find out the communications between Mr. Haynes and myself. So in order to not red flag that, I guess, I just decided I am not even going to open the contact because that would create a blip on there.

Q. And you said it wouldn't take very much time to modify your communications with Mr. Haynes. Is it two minutes, ten minutes? How long would it take?

A. Two minutes is more than enough time.

Q. And I know you mentioned when you were meeting with Mr. Haynes in April of 2021 the different things that I misunderstood or you thought were unfair about the questions in Mr. Haynes' deposition.

You mentioned the e-mail exchange with Anthony Clunies from the Toronto Transit Commission, and I believe you said something about the CVE. Could you explain what I misunderstood about that or what was problematic about those issues and questions?

A. I would have to go back and look at that. This was a while ago. And again, I don't remember exactly what was said.

Page 355

So I would have to review the transcript of what was said in order to make the determination about what you did not understand correctly.

Q. Can you walk me through any of the other misunderstandings that you found to be problematic of my deposition of Mr. Haynes?

A. That is all I can think of off the top of my head.

Q. Okay. So when we last spoke at your last deposition about using Signal, I had asked you why you used Signal. And you explained you were trying to get your friends and family to use it more because you thought it was much more secure and had a social media function and had ephemeral settings and allowed you to do better storage management on your phone.

Are there any other reasons aside from those as to why you would elect to use Signal to communicate on your phone?

A. Well, those are the primary reasons.

Q. What about Signal makes it more secure?

A. So if you look at how the databases are encrypted at rest, that is one way. In transmission, I don't know if you're aware how the

Page 356

Signal protocol works, but the Signal protocol works very efficiently for how it's able to send keyed messages.

So that is one of the other nice things. And because there is no arbitrary 160 character limitation, your messages can be as long as you want them, and you could encode whatever media you want inside of the database.

Q. And you mentioned some efficiencies with respect to the Signal messages. I don't know what you mean by that.

Can you explain what you mean by that?

A. Yes. The Signal protocol is designed to be a -- it doesn't rely on -- I don't know if you know what a Google fire base is.

Q. I don't.

A. Okay. So in order to push certain notifications to a device like an android phone you need to subscribe to, I believe it's called Google fire base and that is what you could use to manage communications.

There are versions of Signal that you can acquire that could still efficiently notify you of when you have incoming messages and completely

Page 357

bypass any sort of notification through Google, and it still saves battery.

And things are done on the quote, unquote lazy way so the actions only occur when like on demand instead of on timers that execute automatically in the background.

Q. When you were deposed previously in this case, you would refer to settings and Signal as being ephemeral.

When you use the word ephemeral, are you referring to the disappearing messages function?

A. Yes. I shouldn't say the settings are ephemeral. They allow things to be ephemeral.

Q. And when you say ephemeral, you mean that they could disappear?

A. They expire.

Q. And by expire, does that mean they are no longer available or accessible on the phone or phones that are set that way?

A. Ephemeral is a concept in computer science where you could set something to have a specific lifetime. And after that lifetime it essentially dies.

So you can do this with things like

13 (Pages 354 - 357)

Page 358

Cooper mini clusters and virtual machines on there or you could do it with messages. So if something, if an ephemeral piece of data expires, depending on the implementation of the application it may or may not still be accessible. But it is not quote, unquote in play. It's not fair game for the application to use it.

Q. And so when a message expires, is the message still visible on the phone?

A. That depends on the specific implementation you use.

Q. And if you have your phone set to have a message expire after 24 hours and it's set that way, are you able to view it on your phone after that expiration date?

A. I am not able to view it, but it may very well exist somewhere where it can be viewed in some manner.

Q. And when you say it may be viewed or accessible in some manner, do you mean it could be viewed or accessible by, for example, Signal or Signal's parent company or on their servers?

A. I wouldn't know if it would exist on their servers. I don't think it would, but it may.

Page 359

But those messages very likely could exist, for example, in a SQlite database vacuum, garbage, for instance. When you delete something from a SQlite database, it still lingers, and there's an operation called vacuuming that you perform to shrink the database.

However, when you shrink the database there are left over inodes on the file system that, may contain that text message or fragments of the data that you are referring to, but they would still be encoded in some manner. So you have to decode that.

Q. So that vacuuming that you reference, is that something you do or have done on your phone?

A. That is something that an application developer uses when they use a SQlite database. It's a standard feature of SQlite databases.

Q. The same question. Is that something you have done on your phone?

A. The user can't do that. It's something that an application does to manage its own data.

Q. So you don't do that because you are just the user on Signal?

A. Correct. I can't invoke that to happen if

Page 360

that's what you're saying.

Q. Yes. You don't cause that to happen, correct?

A. I cannot forcibly make that happen, correct, unless I go in and I delete Signal like entirely. That would then delete the SQlite database.

Q. That would require you to delete the full application from your phone?

A. Yes. That would delete the full application from my phone, but my account still exists on Signal servers, for instance.

Q. It would just -- if the application was deleted from your phone, then you would not have access to it on your phone anymore, correct?

A. Correct.

Q. If you did that and still had messages you would exchange with others, it wouldn't make those messages disappear, for example, on your husband's phone unless he also deleted the application, is that right?

A. That is correct. And it also would not impact if, for example, I had a desktop and used the Signal application on there, and the message was

Page 361

received on the desktop application as well. That would also be unaffected.

Q. Right. Okay. Good.

MS. BABBITT: Now is a good time to take a ten minute break.

THE VIDEOGRAPHER: Going off the video record at 11:00 o'clock a.m.

(Recess)

THE VIDEOGRAPHER: We are back on the record at 11:11a.m. You may proceed.

BY MS. BABBITT:

Q. Mr. Pable, I want to ask you one thing that you mentioned when you moved to your new phone.

You mentioned that you I think set the different safety number when you set up or reset up Signal on the new phone, is that right?

A. It generates a new one when you register a new device.

Q. Is the cell phone number that you used in 2018, is that still the same phone number that you are using in the phone that you use today?

A. Correct.

Q. And one other issue. You mentioned that when you had the old phone, the imaged phone

14 (Pages 358 - 361)

Page 362

returned to you this spring it was boot looping and had some issues.

When you had the phone returned to you during the imaging last year by Quest, was that an issue as well? In other words, was there boot looping going on when you were having the phone imaged by Quest?

A. So that is two separate issues. The boot looping I described when I got it back from For Discovery was because the power button was depressed in a wrong way.

I don't know if you ever held down your power button on your phone before, but that causes your device to reboot. If you keep holding it down, it's going to continuously reboot over and over. So that is a physical boot loop.

That is different from another type of boot loop that I've had in the past.

Q. So that other type of boot loop, is that something you experienced when you had your phone imaged by Quest?

A. I can't definitively pin it on Quest. But there was a remnant of what Quest put on my phone and when I saw the logs, it seemed to potentially

Page 363

implicate that that may be causing it.

But there was a lot of other things happening as well because my phone was rooted. So the Microsoft authenticator that we have to use for my job, that recently got an update in how it interacted with things.

And generally when you update other applications they need to be cognizant of how other applications are performing. When you update applications that do things as low level as root, you have to be cognizant of other applications interact with things on your device.

I could explain technically, but it is a pretty advanced topic.

Q. I'm sure it is. So the boot looping that occurred or the issues that occurred with Quest, you mentioned that was because you saw remnants of something that Quest put on your phone when they were conducting the imaging. Is that right?

A. Yes. So that was a softer boot loop. So yes, that is a softer caused boot loop and that was crashing.

It usually crashed when it accessed the module that had the name Paraben in it. And I had

Page 364

not installed an application that came from a company or used the name Paraben before. So that would indicate to me that that is potentially something that was put on from Quest, but I couldn't tell you for sure.

Q. So after Quest imaged the phone, was the data on your phone still intact?

A. Parts of it were -- how should I put it. I don't want to say -- it appeared like it was quote, unquote wiped, but it wasn't. It was unlinked. I eventually was able to relink the data.

Q. That was after you received the phone back from Quest after they imaged it?

A. Correct. It looked like -- the root image I use is called Magisk and that puts a mirror partition inside of your root partition.

I don't know if you know what a assist call hook is, but multiple things were attaching to the same assist call hook which made it appear like there was issues with accessibility.

So it was a hooking function called F Open, F-o-p-e-n.

Q. So to back up, when you got your phone back from Quest, I think you mentioned that it

Page 365

looked like the data was wiped but, in fact, you were able to recover the data. Is that fair?

A. I wouldn't say it was recovered. It was relinked. One of the first things I did was I got an application called Disk Digger that I tried to run to recover any deleted files off of it off to some other storage and that was able to grab pretty much everything.

So and then from there I was able to rebuild the link table. It wasn't deleted. It was just unlinked.

Q. So I would like you to look at CTA Exhibit 70 and tell me when you have it up, okay. And you see CTA Exhibit 70?

A. Yes.

Q. And this is what I have marked as an example of a Signal application for an Android phone that shows the menu for certain Signal settings.

Do you see that?

A. Yes.

Q. Are you familiar with this?

A. Not exactly how this looks, but this looks pretty close to what I have seen. Yes, this looks like a fair representation.

15 (Pages 362 - 365)

Page 366

Q. So when you are in a chat in Signal, you could get to this menu in CTA Exhibit 70, is that right?

A. Yes. That's the context menu.

Q. So you select settings, right, and then this menu would appear. Right?

A. No, you would select context.

Q. Context, okay. So you select context and is this the menu that would appear?

A. On the left, yes.

Q. Yes, on the left of CTA Exhibit 70. And then there is an option on that menu that says disappearing messages. Do you see that?

A. Correct.

Q. And then the image to the right of CTA Exhibit 70, that gives you a menu option of disappearing messages, correct?

A. Correct.

Q. So this is something that you can access and then in the disappearing messages screen determine what sort of length you'd want a message to be retained for before it disappears, is that right?

A. That's correct.

Page 367

Q. If you had a text exchange with your sibling, you could have it turned to off, right?

A. I could, yes.

Q. And then otherwise you can select anywhere from four weeks down to 30 seconds or a custom amount of time that you retain the message, right?

A. Correct.

Q. And so you would use this menu to select how long if you wanted to have disappearing messages, how long you would have the message retained before it disappears, is that right?

A. That would be for an individual conversation thread.

Q. Right.

A. There is still a global setting to do similar. That context menu actually only appears if both parties are using Signal.

Q. Let me make sure I understand what you're saying, Mr. Pable.

I know you mentioned that you had set up your disappearing messages on sort of a global basis so that they were retained I think you said about a month?

A. Yes.

Page 368

Q. In a general sense?

A. That is not disappearing. That is a trimming so you could save space.

Disappearing messages imply that all parties are using Signal. The retention policy is made so that you can control the space and number of messages so that you don't exceed a large amount of space on a device that has fixed storage.

Q. So we'll focus on those individuals that you communicate with who also have Signal, okay?

A. Yes.

Q. In that instance, if you set your general settings to have a general retention period of a month those messages will be retained for one month and then they'll disappear, is that right?

A. Only off of my device, but yes.

Q. Only off of your device?

A. Uh-huh.

Q. And the other user who is a Signal user, they would have to select their own setting on how long the message would be retained?

A. Correct.

Q. And that is when you're modifying the general settings for certain uses?

Page 369

A. Correct.

Q. And then if you have an individual conversation, say you're messaging with me, and I'm on Signal as well, you could go to the menu in CTA Exhibit 70, and you could modify it so that you and I have a message that is disappearing after one week, is that right?

A. Correct. That would enforce the same policy on both parties.

Q. So that would then be on both ends of the communication it would disappear after one week if that is how we set it?

A. That's correct.

Q. And that setting for disappearing messaging amongst two Signal users, that could be done by either party that is communicating, is that right?

A. That is correct.

Q. On your phone that you used in 2018 and ultimately replaced last summer, do you recall who you had disappearing messages set up with?

A. Not off the top of my head.

Q. Did you have disappearing messages set up with your husband on that phone?

16 (Pages 366 - 369)

Page 370

A. I'm pretty sure I did.

Q. Did you have disappearing messages set with any current or former employees of the CTA on that phone?

A. Absolutely, Mr. Haynes. That is all that comes to mind right away. My siblings. I think when we're not in a group text, I think my siblings as well. My brother and sister were both employees of the CTA.

Q. I know you said certainly Mr. Haynes on that old phone. And that disappearing message, that was a setting that you used using sort of that same menu that we just reviewed in CTA Exhibit 70?

A. That is correct.

Q. How long did you set the messages to be available prior to disappearing in your communications with Mr. Haynes?

A. I honestly don't recall. I haven't looked in there because it that would make an entry on the Signal server that I interacted with Mr. Haynes' conversation thread.

Q. So you don't recall how long the disappearing messages were set to be retained with Mr. Haynes before they disappeared?

Page 371

A. Correct.

Q. Do you recall who set the messages to be disappearing in your communication with Mr. Haynes?

A. Not at this time.

Q. So the only people in that communication between you and Mr. Haynes that could have set it to disappearing would be you or Mr. Haynes, is that right?

A. That's correct.

Q. But you don't recall if it was you that did it or if it was Mr. Haynes that did that?

A. Correct, but I do know Mr. Haynes produced a Signal backup log. And there's very likely an entry inside of that backup log that denotes which parties set the disappearing messages inside of there.

Q. So speaking specifically about 2020, did you meet in person with Mr. Haynes in 2020?

A. I think for our fire-versary, but that was it.

Q. And aside from that in person meeting, that's the fire-versary is what you refer to as the anniversary of the date you both left your CTA employment?

Page 372

A. No. We both separated from CTA on different days. So the only day in common we have is October 22. So we celebrate fire-versary on October 22nd.

Q. Okay. And October 22, is that day selected because that's the day you were put on administrative leave?

A. That is correct. That is the only common date between both of us.

Q. That's nice. And how do you celebrate your fire-versary?

A. Usually pizza.

Q. I wasn't invited to that either. So you met with Mr. Haynes in person on that date in 2020.

Aside from that, your communications with Mr. Haynes in 2020 were exclusively via Signal, isn't that right?

A. That sounds correct.

Q. And you never spoke with Mr. Haynes on the phone in 2020, correct?

A. I think I did. I think we called each other to wish Merry Christmas or Happy New Year.

Q. Aside from those holiday greetings, did you speak with Mr. Haynes via phone in 2020?

Page 373

A. Not that I can recall.

Q. I know you mentioned that you have since Mr. Haynes' deposition, you have ceased communicating with Mr. Haynes via Signal, right?

A. Correct.

Q. Prior to Mr. Haynes' deposition, which was I believe March 16, 2021, were you communicating with Mr. Haynes via Signal in 2021?

A. I may have been. I can't recall off the top of my head right now. I am sure I was asked this at my prior deposition, and the answer would have been more fresh in my head then.

Q. Okay. And so aside from in person meetings, phone calls and Signal, any other means by which you communicated with Mr. Haynes in 2021?

A. There might have been an e-mail. I don't think so, though. I don't think there was any e-mail in 2021. In 2020 I know he had sent me job stuff.

Q. And that would have been via e-mail?

A. Yes, that would have been via e-mail and you would have already received copies of that.

Q. And that would be via your Gmail account?

A. Correct.

17 (Pages 370 - 373)

Page 374

Q. Is that the ▮▮▮▮▮▮?

A. Correct.

Q. And Mr. Pable, does that continue to be your primary e-mail, personal e-mail address that you use?

A. Yes.

Q. Do you have any other e-mails, accounts or addresses that you have accessed or opened since your last deposition?

A. Let's see. I recently got added to a distribution list. So that kind of shows up like an alias. That is ▮▮▮▮▮▮▮▮.

Q. Can you spell that?

A. ▮▮▮▮▮▮.

Q. What is that?

A. That is convention planning that I mentioned in my previous deposition.

Q. Conventions for what?

A. Anthropomorphic fandom.

Q. Is that where people wear fur suits?

A. Some people do.

Q. And do you?

A. As of right now, I have.

Q. I want to focus your attention on a period

Page 375

of time in August to October of 2018. So that is starting with the time of the Dayton test, and by Dayton test I am referring to when the skeleton key was used on the Dayton system on August 17, 2018. Do you understand what time frame I'm referring to?

A. August of 2018, yes.

Q. At that time you were still employed by the CTA, as was Mr. Haynes, correct?

A. Correct.

Q. You communicated with Mr. Haynes in person certainly?

A. Yes.

Q. And you also communicated with Mr. Haynes via e-mail at that point in time, right?

A. Correct.

Q. That would have been both through your CTA e-mail accounts and your personal e-mail accounts, right?

A. Correct.

Q. And you also communicated with Mr. Haynes via Signal during that time period August to October of 2018, right?

A. Correct.

Page 376

Q. Aside from the e-mail and the in person communications you were having, was the only other form of communication you used with Mr. Haynes during that time period via Signal?

A. Potentially Google Hangouts too. I know that that has been supplied, but I don't know when the last time stamp on that was.

Q. Were the messages that you exchanged with Mr. Haynes from August to October of 2018 on Signal, were those set to be disappearing messages?

A. Not at that time, no.

Q. And so why were they not set to be disappearing messages at that time?

A. Well, one, I had a phone with an SD card. So I had practically unlimited space. So I was not concerned about space retention at that moment in time.

And secondly, I mean space was usually the biggest reason I would want to truncate things.

Q. And Mr. Haynes was also using Signal. He was a signal user during the time period of August to October of 2018, correct?

A. In that time period, yes. I think he was also several years prior as well.

Page 377

Q. When that Dayton test was conducted in August of 2018, according to Mr. Haynes you and he communicated about the Dayton test on the weekend that followed the test. Do you recall that?

A. Not specifically, but it wouldn't surprise me.

Q. So you don't recall the substance of those communications you exchanged with Mr. Haynes following the Dayton test in August of 2018?

MR. DUFFY: I'm sorry, Elizabeth. You're saying Mike Haynes specifically said they communicated over the weekend. The 17th was a Friday.

MS. BABBITT: Yes.

MR. DUFFY: Via text?

MS. BABBITT: Via Signal.

THE WITNESS: I don't necessarily recall communicating with him over Signal at that time. But I do know that he was very uneasy about the situation.

So I had been over the weekend educating him about a practice called responsible disclosure and how other security professionals report these kinds of vulnerabilities.

18 (Pages 374 - 377)

Page 378

I know he had not reported it to Clever yet, and I know he was mulling over how he was going to write up the general e-mail, who he was going to inform over there. I know he originally wanted to talk to Frank Ingrassia at Clever Devices, but I talked him down to Craig Lang because I didn't think the president of Clever Devices is someone you should be reaching out to over that.

And he had a relationship with Craig Lang. So I figured that would be a much easier avenue for him to get this taken care of. Let's see if there is anything else we might have discussed then. No, that is primarily it. Responsible disclosure, best practices, how this works in the information security realm. And etiquette of who to inform and how to inform them.

Q. Were all of those communications over Signal then?

A. No. In fact, I don't recall using Signal to do that. I think most of that was over CTA or personal e-mail.

Q. So those communications that were over e-mail had not been produced with respect to Frank Ingrassia etiquette, how this works from a security

Page 379

standpoint?

A. Well, as I said, I can't stipulate what exactly was said over the weekend. I could only tell you what I know I talked to him about after the test occurred.

Whether that happened on the weekend or whether that happened Friday afternoon or Monday morning, I couldn't tell you.

Q. If that happened Monday morning, would that have been an in person conversation or would that have been via electronic communication?

A. Very likely in person if things happened on Monday morning or on Friday for that matter.

Q. So you mentioned that you discussed responsible disclosure and how to inform Clever about the Dayton test, right?

A. The general best practices around that, yes.

Q. As you sit here today, you don't recall whether or not those messages were exchanged via Signal?

A. I don't recall, but I really don't think they were.

Q. And you mentioned someone named Frank at

Page 380

Clever. I'm sorry, I didn't catch his last name?

A. Ingrassia. I believe he's the president of Clever Devices.

Q. You suggested to Mr. Haynes that rather than contact the president of Clever, he contact Craig Lang?

A. Correct, because he had a relationship with Craig Lang, and Craig was a fairly senior person over there.

Q. Was that over Signal?

A. Again, I don't know if that was on Signal or in person, but I do distinctly recall talking him down from emailing Mr. Ingrassia and instead going to Mr. Lang.

Q. And you mentioned that those messages that were exchanged in August of 2019 between you and Mr. Haynes, those would not have been set to disappearing, right?

A. Correct.

Q. So why don't those communications exist on your phone?

MR. DUFFY: Objection, misstates the record. Go ahead.

THE WITNESS: When Mr. Haynes was terminated

Page 381

from the CTA, I believe he wanted to make a clean break.

I can't stipulate if that is exactly why he wanted to do it or what his full motivation was, but I do recall him selecting our conversation thread and Craig Lang's conversation thread and just deleting in Signal.

And as a Signal user when that happens, the policy applies to the other person. You have the option of having it apply there.

BY MS. BABBITT:

Q. So Mr. Haynes when he left the CTA's employment he elected to deleted those messages that you had exchanged with him in August of 2018?

A. Yes, I had nothing from him prior to November 3, I believe.

Q. When you say you have nothing with him prior to November 3rd, you're saying you had messages with Mr. Haynes that you received November 3, 2018 going forward?

A. So when he deleted the messages, I know I had messages that existed. So when he deleted them they no longer existed on my device since we were both Signal users.

19 (Pages 378 - 381)

Page 382

Q. When Mr. Haynes elected to delete the messages you had exchanged in August or perhaps August through October of 2018, those messages were not just deleted on Mr. Haynes' phone, they were deleted from your phone as well?

A. So I will say that he didn't specifically select that date range. He selected the entire conversation thread.

Q. So Mr. Haynes selected the entire conversation thread that you and him had on Signal and deleted them in November of 2018?

A. Yes. As well as Craig Lang, I believe.

Q. And when he selected to delete those messages, he had the option to have them deleted off of your phone as well?

A. I believe the user is prompted, like which deletion policy you want to use.

Q. Can you tell me more about that?

A. I couldn't tell you exactly how the app worked in 2018, but nowadays as a Signal user you send another Signal message to a user and then you opt to go in and delete it.

You are saying do you want to just delete for me or delete for everyone or cancel.

Page 383

Q. Is it your understanding that Mr. Haynes elected to delete for both you and him on your phone?

A. It's possible he elected to do that, but I can't stipulate to how the Signal application was written in 2018.

You would have to get the exact version of Signal that his phone was running at that time to see what the specific behavior was. It has undergone many changes since.

Q. I'm not asking you to stipulate to anything. I am asking when Mr. Haynes deleted the messages that he exchanged with you over Signal in November of 2018, that deletion also deleted them off of your phone?

A. That is correct.

Q. Were you present when Mr. Haynes deleted those messages?

A. I honestly don't know if I was or not. I know for a fact I watched him do Craig Lang. But after that I think I went up to the counter to get a drink. This was in a Starbucks.

Q. This was November 3 of 2018?

A. No, this was November 2. I think it was

Page 384

immediately after he was terminated.

Q. So Mr. Haynes is terminated from the CTA and then you meet him at a Starbucks, is that right?

A. I met him there with his mother ,yes.

Q. So you met him at a Starbucks. Can you recall which location you were at with Starbucks?

A. It was the one on Clinton. I think that is south of CTA headquarters, the closest one that is south from CTA headquarters on Clinton Street.

Q. And you said it was you and Mr. Haynes and Mr. Haynes' mother there at Starbucks?

A. That's correct. Excuse me, Ms. Babbitt, I need to change headsets. This one is about to die. Can we take a two minute break?

MS. BABBITT: Sure.

THE VIDEOGRAPHER: Going off the video record at 11:41 a.m.

(Recess)

THE VIDEOGRAPHER: We are back on the record at 11:44 a.m. You may proceed.

BY MS. BABBITT:

Q. So Mr. Pable, I want to keep going with the thread that we were just discussing, which is the deletion of the messages exchanged between you

Page 385

and Mr. Haynes that occurred you said on November 2 of 2018. Right?

A. Correct.

Q. And so can you go through the time line of that day as you remember it. That day was the day that you and Mr. Haynes were interviewed by the CTA. Correct?

MR. DUFFY: I need to put an objection on the record here. The purpose of this deposition is to follow-up on information you got with the newly produced imaging stuff from the phone.

This is all stuff that not only could have been covered before was covered before. You're free to ask some more questions, but this is retreading old ground. It really has nothing to do with the newly discovered evidence, which is why we're having the session.

I will ask you to limit it and if you continue, this will become too much.

MS. BABBITT: This is related to Signal messages that we didn't get on the phone because the phone was not imaged properly. So we got it imaged in April of 2O21.

MR. DUFFY: These people had already told you

20 (Pages 382 - 385)

Page 386

they erased those messages, and those messages were erased in November of 2018. So there was never any suspicion that the phone was somehow going to restore these particular messages. But go ahead.

(Question read)

BY MS. BABBITT:

Q. On November 2, 2O18, you were both interviewed by the CTA, correct?

A. Correct.

Q. And you met with Mr. Haynes at a Starbucks on that day?

A. Correct.

Q. Did you meet with Mr. Haynes at a Starbucks more than once on that day?

A. Yes.

Q. And so can you tell me the time sequence of when you met with Mr. Haynes at Starbucks on that day?

A. Yes. So we received quote, unquote an invitation to CTA for the interviews. So about 15 minutes before we went in, we both met at a Starbucks since the appointment times were the same.

We just supported each other and then walked in like maybe five minutes -- he went

Page 387

ahead -- no, I don't remember if he went first or I went first. But we left from the Starbucks staggered so we would not arrive at exactly the same time because he wanted to avoid a -- I don't know if a scene is the right word, but he thought it would be awkward for us to be in together if they wanted us interviewed separately.

So one of us went in first and then the other one went in several minutes after, and we were escorted up to our respective rooms. I was interviewed first and after the interview I left, and I went back to the Starbucks where I met Mike's mom. I tried to tell her, you know, what happened with my interview.

Trinity had texted me asking if I heard anything about Mike, but I didn't. Then an hour-ish later, maybe two I got a text from Trinity saying that Mike was on his way over and to sync up with his mom, and I was there.

Mike was there. He cried a bit. I believe that is when at least one of the text message threads was deleted. I went to go grab a green tea from the counter I ordered earlier, and I came back with Mike and his mom. And we went to

Page 388

lunch at a pizza restaurant in Ogilvie.

Q. So that first meeting at the Starbucks that preceded your interview at the CTA headquarters, was that at the same Starbucks location that you met at after your CTA meetings?

A. Correct. We basically went there, hugged each other and said whatever this is about, it's going to be okay.

And I don't remember like I said why he wanted to stagger, but we staggered going into headquarters and then were escorted to our rooms.

Q. And then after your CTA interviews or your CTA interview, Mr. Pable, you went back to that Starbucks, and you were there with Mr. Haynes' mother?

A. Correct.

Q. And you and Mr. Haynes' mother waited at the Starbucks until Mr. Haynes arrived?

A. That is correct.

Q. At that point in time you met up with Mr. Haynes once he arrived at the Starbucks?

A. Correct.

Q. How long were you at that Starbucks for?

A. Like I said, an hour, maybe two at the

Page 389

most.

Q. What were you doing for the hour or two that you were at Starbucks with Mr. Haynes and his mother?

A. You mean before we left for lunch. I thought you meant while I was waiting for Mr. Haynes. Sorry.

Before we left for lunch, no. We were probably there for ten, 15 minutes and then left.

Q. In that ten to 15 minute time period when Mr. Haynes arrived at the Starbucks after your CTA meetings, Mr. Haynes deleted the Signal communications you had with him?

A. I'm sorry, say that again.

Q. The second Starbucks meeting after you both had your CTA meetings on November 2, 2018, Mr. Haynes arrives and in that 15 minute time period you're at the Starbucks he deletes the messages he he had exchanged with you via Signal?

A. I don't know if I witnessed him deleting mine or Mr. Lang's, but I definitely watched him delete messages off of his phone, yes.

Q. Did you discuss deleting those messages with Mr. Haynes at that time?

21 (Pages 386 - 389)

Page 390

A. No.

Q. How did you know that Mr. Haynes was deleting messages off of his phone?

A. Because I watched him do it.

Q. Did you ask him what he was doing when he was deleting messages off the phone?

A. I believe he answered something along the lines of wanting a clean break.

Q. Did you ask Mr. Haynes if he was deleting messages between you and him on his phone?

A. No.

Q. Did you tell Mr. Haynes not to delete the messages that he exchanged between you and him on his phone?

A. No.

Q. And did you tell Mr. Haynes that not to delete any messages he had exchanged with Mr. Lang on his phone?

A. No.

Q. Why not?

A. Well, to start with I didn't know what he was doing on his phone at first. When I saw him delete it, I was like oh, okay.

I said why did you do that. Like I

Page 391

said, I believe he mentioned he wanted a clean break. That's when they called my name over at the counter to go get my drink and that's where I went.

Q. And did you have any other conversation or questions with Mr. Haynes about him deleting months or years of communications between the two of you?

A. No.

Q. And the testimony of Mr. Haynes is that he deleted those messages prior to meeting with the CTA at the Starbucks the morning of November 2, 2018?

MR. DUFFY: Objection. When you say those messages, that is unclear.

BY MS. BABBITT:

Q. Mr. Haynes testified that he deleted and purged all the Signal messages while he was with you at the Starbucks before you met with the CTA the morning of November 2, 2018.

Do you recall that testimony, Mr. Pable?

MR. DUFFY: Objection, I don't think that is accurate. But the question stands as it's posed.

THE WITNESS: That is entirely possible. Again, this was a pretty traumatic day. You asked me to reconstruct the time line as accurately as I can remember here right now and that is what I

Page 392

recall at the moment.

So I honestly don't know. I could not give you a definitive unless I looked at security camera footage at the time he did what he did.

BY MS. BABBITT:

Q. So do you recall if Mr. Haynes' mother was present and also observed Mr. Haynes deleting messages from his phone?

A. I don't know if his mother would know what he was doing on his phone if she saw it.

Q. Do you recall Mrs. Haynes being present when he was deleting messages from his phone?

A. Well, now that you put some doubt on it, I really couldn't answer that. I don't recall one way or another because that was an interaction between me and Mike that I saw.

Q. Did Mr. Haynes, did he think he wanted a clean break prior to his meeting with the CTA on the morning of November 2, 2018?

A. I honestly don't know, but he had a resignation letter prepared before we even knew what any of this was about.

Q. And so you don't recall Mr. Haynes telling you anything about how there was no obligation for

Page 393

him to maintain those messages and that was why he was deleting the messages off of Signal?

A. Correct. I don't recall him saying anything along those lines to me.

Q. After Mr. Haynes deleted the communications you shared with him over Signal, did you do anything to attempt to recover those messages?

A. No, but I felt a little hurt.

Q. Why did you feel hurt?

A. I felt like, you know, my past, like a third of my life was just being erased.

Q. Can you explain what you mean by that?

A. Mr. Haynes is someone that I have seen almost every single day for approximately a third of my life at that point.

And the fact that, you know, he was emotional enough to just get rid of that it hurt a little bit, that I didn't know how I fit into the puzzle. Was I as important to him as he was to me? Like I said, it hurt a little bit.

Q. And did you share any of those feelings with Mr. Haynes after he deleted all of your communications?

22 (Pages 390 - 393)

Page 394

A. Not right then and there. I know that it was a very stressful time, especially since he was terminated. And I know he does do a lot of very drastic things.

So I didn't bring it up right then and there. But I'm pretty sure I brought it up at some point that I felt, you know, hey, I don't want to fall out of touch with you. I want to remain in contact with you. You know, you're a significant part of my life.

Q. Do you recall when you discussed the deletion of those messages with Mr. Haynes after the November 2, 2018 meeting?

A. I don't think we specifically discussed the deletion of the messages. I think it was more, you know, I just want to make sure that we are -- I wanted clarity on our relationship.

Like he's someone that I worked with professionally, did he respect me enough to want to continue to converse with me, could we be professional references for each other? I mean he was almost like an older brother to me.

Q. So I think the question was did you discuss deleting the messages. And it sounds like

Page 395

the answer to that is no?

A. We didn't discuss that specifically. We discussed the, I guess, the symptoms of what deleting the messages caused.

Q. What do you mean by that?

A. What I just said. So the root cause of you know my hurt feelings was that he deleted the messages.

And I just wanted to make sure that hey, do I still matter to you as a colleague or are you trying to get a clean break from me as well. Or are you trying to distance yourself from everything CTA.

Q. When Mr. Haynes deleted the messages did you have any notification or any alert on your phone that the messages were deleted?

A. No. The application doesn't alert you that it's been deleted.

Q. Did you delete anything on your phone or on any communication devices on November 2, 2018?

A. No.

Q. Did you ever delete your communications with Haynes at any time?

A. I'm sure I have unsent some stuff before. Maybe a typo or if I paste a link and send it, but

Page 396

it was the wrong link because you could have a multi link clipboard. I'm sure I have done things like that before.

Q. When you say unsent, what do you mean?

A. Like, for example, delete before being read.

Q. Aside from that after a message was sent and read or received by Mr. Haynes, did you delete any of those messages?

A. Again, not unless it was, you know, inaccurate, and I had replaced it with an accurate one.

For example, I sent him a link, but it was on android. You have a clipboard, and you could put multiple things in there. I may have tried to paste him something, but I pasted the wrong clipboard contents.

Q. Aside from that have you deleted any communications with Mr. Haynes?

A. No.

Q. I want to have you look at, Mr. Pable, CTA Exhibit 71, and those are the messages you referred to that Mr. Haynes produced.

Let me know when you have that up.

Page 397

MR. DUFFY: I only have an NRL.

MS. BABBITT: You should refresh.

MR. DUFFY: I see it now. Do you see it, Chris?

THE WITNESS: It's reloading. One moment, please.

MS. BABBITT: Sure. Yes.

BY MS. BABBITT:

Q. You have it up?

A. Yes, I do.

Q. Great. So the date range of CTA Exhibit 71, the messages that Mr. Haynes produced are from November 2, 2018 through October 29, 2019.

And by virtue of Mr. Haynes producing that, is it accurate that Mr. Haynes and you did not have disappearing messages set up to be --

MR. DUFFY: Hold on. I'm sorry, Elizabeth. Can you say those dates again. I am not sure you said the right thing.

BY MS. BABBITT:

Q. Sure. I said the messages produced were from a time period of November 2, 2018 through October 29, 2O19.

MR. DUFFY: Maybe I'm having trouble with the

23 (Pages 394 - 397)

Page 398

pagination. It's kind of skipping. I can't see all of them. Are they all in chronological order?

MS. BABBITT: I believe so, yes.

MR. DUFFY: The last one is October 2019, but the first one I see in this exhibit at least is May 23, 2019.

MS. BABBITT: Okay. Are you at the bates number SH 303, Tim?

MR. DUFFY: I'm sorry, that is 72.

MS. BABBITT: We're on 71.

MR. DUFFY: Okay. This is the one that is kind of messy. Go ahead.

BY MS. BABBITT:

Q. So this is the messages in Exhibit 71 that Mr. Haynes produced November 2, 2O18 through October 29, 2019.

My question for you on this message set, Mr. Pable, is by virtue of those being accessible and able to be produced by Mr. Haynes, these messages were not set to be disappearing messages, is that correct?

A. That seems accurate, yes.

Q. And would you delete certain messages that you exchanged with Mr. Haynes even if the message

Page 399

wasn't as a thread set to be a disappearing message set?

A. In the instances I described previously, yes.

Q. So those instances would be when you, I think you said you misdirected a link or you mis-pasted something that was a typo or something that you inadvertently sent?

A. Correct.

Q. Would those messages then, would they not appear on Mr. Haynes' phone because you recalled them effectively?

A. Correct.

Q. Would those messages appear on your phone still if you recalled them?

A. No.

Q. So they would be deleted and wouldn't be on either phone if you took that action, correct?

A. Correct. It also depends on when it happened too.

Q. It depends on when it happened?

A. When it happened. Should I put this. There is only a certain amount of time in which a session is valid inside of Signal.

Page 400

So I can't, for example, go back in time and delete a random message from both parties.

Q. You cannot do that?

A. Correct. You can't go an arbitrary amount of time. I believe the session is only active, I believe you can only do it within a certain time frame, at least that's my understanding of it.

Q. Do you know what that time frame is?

A. No, I don't.

Q. Go ahead.

A. But even still, I don't think there is anything that was deleted in this time period.

Q. Then if you could turn to, Mr. Pable, CTA Exhibit 72. Let me know when you're there.

A. I will say based on the time stamp in 71 it would appear that Mike's recollection of time would be more correct.

Q. Can you tell me what you mean by that?

A. It looks like the first entry on there was made in the afternoon of November 2nd. So if he had wiped his phone, it would have likely happened in the morning instead of the afternoon.

Q. So you're saying by virtue of the time stamp in CTA Exhibit 72, which is Mr --

Page 401

A. Seventy-one.

Q. Seventy-one, sorry. The time stamp on the first page of CTA Exhibit 71, that refers to a message at 1:20 p.m. on November 2, correct?

A. Yes.

Q. And I think you're texting Mr. Haynes, and you say OTC or hill, question mark?

A. Correct.

Q. So that you're asking about --

A. Which Starbucks location.

Q. Which Starbucks to meet Mr. Haynes?

A. Correct.

Q. That would have been in the morning or afternoon?

A. Hold on let me pull 71 back up.

Q. Sure.

A. That would have been in the afternoon. I believe at that time Trinity said Mike is on his way to Starbucks.

So I was asking whether OTC, which is the Starbucks I met him at, so Ogilvie Transit Center or there is another one equidistant over on Des Plaines across the street from a Jewel, and we call that the hill.

24 (Pages 398 - 401)

Page 402

Q. By virtue of reviewing those messages are you telling me that is your recollection or understanding now that the deletion of your Signal messages between you and Mr. Haynes occurred in the morning prior to your CTA interviews?

A. That's what it appears based on the time stamp, yes.

Q. Does reviewing that refresh your recollection in any way with respect to the conversation you had with Mr. Haynes about deleting the Signal messages?

A. Again, we didn't really talk about deleting the Signal messages so much as what the action meant between our relationship.

Q. So when you observed Mr. Haynes deleting the Signal messages the morning of November 2, 2018, was anyone else present at the Starbucks at that point in time?

A. If there was it would have been his mother. But again, this was a while ago. And my memory is a bit hazy.

Q. Do you recall if you got a drink off the Starbucks counter in the morning?

A. I definitely got a drink off the Starbucks

Page 403

counter because my throat was -- I was having trouble speaking. So I got a green tea to try to take care of that.

Q. You got a green tea in the morning when you met with Mr. Haynes in the Starbucks before your interviews?

A. I got a green tea several times throughout the day.

Q. But your testimony as it is now having reviewed this exhibit is that deletion of your Signal messages occurred prior to the CTA interviews on November 2, is that right?

MR. DUFFY: Objection, asked and answered about three times.

THE WITNESS: Based on the time stamps that I see here, that seems to be what the time line of events is.

BY MS. BABBITT:

Q. And do you recall if Mr. Haynes in the morning of November 2 when you were at the Starbucks said that he wanted to make a clean break with the CTA at that point in time?

A. I don't know if he was referring to specifically to the CTA or Craig Lang, but I recall

Page 404

those words being used, clean break.

Q. Do you recall any other comments or remarks that Mr. Haynes made with respect to deleting the messages when you met with him in the morning of November 2, 2018?

A. Not off to top of my head because, again, we were only there very briefly before we went to our interviews at headquarters.

Q. And you don't recall if you -- strike that.

Did you ask Mr. Haynes why he was deleting messages the morning of November 2, 2018?

A. Again, like I said, he had mentioned something about a clean break. And so I don't believe at the time I knew he had deleted my messages.

Q. When did you come to learn that he had deleted your messages?

A. When I asked him which location he was coming to.

Q. How did you learn that the messages had been deleted at that point in time?

A. When I opened the conversation thread, they were gone.

Page 405

Q. So you opened the conversation thread. This is now I think in the afternoon of November 2, 2018, right?

A. Correct.

Q. And you're discussing whether you're meeting at Ogilvie or the hill?

A. Correct.

Q. And you noticed that none of your messages with Mr. Haynes prior to that message existed on the phone anymore?

A. Correct.

Q. When you saw Mr. Haynes, did you ask him what happened to your messages?

A. No. Like I said, he was incredibly distraught when he came in, and he wanted to be with his mother.

And I did my best to console him that I could. Then we went to lunch at the pizza restaurant. It wasn't until afterwards I talked to him a little bit about what that meant between us.

Q. And the conversations you had with Mr. Haynes about the deletion of those messages, those communications were focused on how it impacted your relationship with Mr. Haynes?

25 (Pages 402 - 405)

Page 406

A.  That is correct.

Q.  Did you ever discuss the deletion of those messages with Mr. Haynes in the context of this litigation?

A.  No.

Q.  I'm sorry I had you jump back.  Did you ever discuss the deletion of those messages between you and Mr. Haynes in the context of the CTA interviews?

A.  State that again, please.

Q.  Did you ever discuss the fact that Mr. Haynes deleted all of your communications with him and how that might impact the CTA's investigation?

A.  No, not really because we had no idea what we were even being interviewed about.  And I had already heard from someone on the train that Mike Haynes was being terminated.

Q.  Who did you hear that from?

A.  One of the ladies that runs security at the front desk that rides the train or rode the train in with me in the mornings, and we would talk sometimes.

Q.  Do you recall her name?

Page 407

A.  No, I don't.

Q.  And do you recall when she told you that she learned that Michael Haynes was being terminated from the CTA?

A.  That morning.

Q.  November 2, 2018?

A.  She just said his access -- no, I'm sorry.  This was -- Yes, this was on November 2nd when I rode in at that time.

I know that she's a very early shift person.  She would normally ride in with me when I would come into the office.

Q.  So you rode in that day of your interview on November 2, 2018, and there was a CTA employee on the train with you?

A.  She wasn't a CTA employee.  She was a JAL employee.

Q.  She worked the security desk?

A.  Yes.

Q.  And she informed you that Haynes' access to the building was being revoked?

A.  Correct.

Q.  Did you inform Mr. Haynes of that once you learned of it?

Page 408

A.  After the fact because we didn't have time to discuss that before the interviews.  He had --

Q.  Go ahead.

A.  Mr. Haynes had already prepared a resignation letter well before I had even learned about the access being terminated, but at the same time our access to the building was already terminated.

So this was kind of like a compound effect essentially, the fact that she specifically called out his name.

Q.  Did she tell you that your access was terminated from the building?

A.  She asked why I wasn't in the building.  Like where have I been because it's been, you know.  I don't want to say tradition, but it has been commonplace that I would see her on the train in the morning usually, and we would talk.

And then I would come into the building.  But when I did see her that morning she specifically asked me where I was.  I said well, I have been placed on a leave along with my manager Mike.  And she said Mike Haynes?  I said yes, and she said oh,

Page 409

yea.  He's gone.  And I'm like what.  And that's essentially how the conversation went.

Q.  What did she say when you said what?

A.  I don't recall the exact specifics.  But she said Mike Haynes is gone.  That is about the extent that she was probably informed of.

Q.  Then you met with Mr. Haynes at the Starbucks prior to your CTA interviews on November 2nd?

A.  Yes.

Q.  And did you relay that conversation that you had with the Jones Lang LaSalle employee with Mr. Haynes?

A.  Not until several days after.

Q.  Why didn't you tell Mr. Haynes that you heard he was getting fired?

MR. DUFFY:  Elizabeth, you already asked each of those questions.  He has already answered them, and this has nothing to do with data on the phone.

These are events that both these witnesses have been questioned about in their existing depositions.  So we need to move on.

You were going to go to Exhibit 72, which is at least something from the phone.  So can we please

26 (Pages 406 - 409)

Page 410

do that.

MS. BABBITT: Can you answer the question?

MR. DUFFY: Why didn't you tell Mr. Haynes the woman said he was gone? That was essentially the question.

MS. BABBITT: Read the question back.

(Question read)

THE WITNESS: I did not hear the words that he was fired. I heard the words that he was gone. A JLL employee wouldn't know the employment status of someone.

However, they would know whether or not their access has been terminated or not, especially if they had been informed beforehand. So the fact that we already had our badges confiscated, and the fact that she said Haynes was gone means that he wouldn't have access to the building, which was already a known fact. But what really struck me is the fact that she knew very specifically that Mike Haynes was finger pointed there.

So they must have said something very specifically about him.

BY MS. BABBITT:

Q. So why did that strike you and how did

Page 411

that strike you?

A. That is a compound question. Can you break that up.

Q. Why did that strike you specifically?

A. Strike me which way?

Q. Tell me how it struck you that he was identified specifically.

A. Normally when someone's access is terminated and you scan your badge, it would just say like access denied or not let you through, and it would show up on the computer screen.

The fact that it was verbally conveyed meant that someone had told her that prior.

Q. And you didn't share that with Mr. Haynes?

A. Well, no, because we already knew his access was terminated.

Q. Then sorry. Do you have CTA Exhibit 72 up, Mr. Pable?

A. I could pull it up. Give me a second.

Q. Sure.

A. Okay.

Q. So you have CTA Exhibit 72 up?

A. Yes.

Q. And this is a set of Signal messages that

Page 412

were recovered in the re-imaging of your phone that were exchanged between you and Mr. Haynes.

The date range of this is May 23, 2019 through October 29, 2019. Do you see that?

A. Yes.

Q. Why did you never produce these messages in this litigation?

MR. DUFFY: Objection, calls for a legal conclusion. Lack of foundation. You could answer if you know.

THE WITNESS: I gave my phone to our forensic expert. And from what I understood, he provided the contents of what was relevant. So I honestly don't know what was produced. So I couldn't tell you if this was omitted or not.

BY MS. BABBITT:

Q. Did you ever go look on your phone, the phone that was imaged to see if you have any messages on your phone exchanged between you and Mr. Haynes?

A. No, I did not. Not at that time.

Q. You never at any point in time looked at that phone to see if you had any messages exchanged between you and Mr. Haynes on your phone?

Page 413

A. I mean I obviously knew I had messages exchanged with Mr. Haynes on my phone. And I'm pretty sure that all of this is already produced by Mr. Haynes.

However, I had given my phone to our forensic expert and from what I understood all of the relevant information that was required of it was submitted for it. So I honestly couldn't tell you like what was missing and what wasn't.

So why would I go through digging for extra information?

Q. So you never reviewed any of the materials that were produced off of your phone from the Quest images that were given to the CTA and Clever?

A. That is correct. I have never even seen it.

Q. And you're aware that the CTA moved to compel to get the phone reimaged, right?

A. Yes, I was.

Q. And were you aware that the motion to compel the reimaging of the phone was filed because we didn't have certain communications that we thought existed between you and Mr. Haynes on your phone?

27 (Pages 410 - 413)

Page 414

A. From what I understood was you were looking for communications that would have been erased in the November 2nd time line. And you thought that you could undelete them in some manner. That was my interpretation of what I read.

Q. So you didn't think that there was any messages that were relevant on your phone between you and Mr. Haynes?

A. No, that is not what I said. I didn't think that you didn't have anything else that you were looking -- anything that was responsive to your searches already.

Q. Why didn't you think that?

A. Well, I trusted the imaging that our expert sent over to include the relevant information. I did not review that information.

Q. Were you ever advised that the image that was produced from the Quest imaging that was done contains less than a gigabyte of data?

MR. DUFFY: Objection. I will instruct the witness not to answer that question. We're getting into communications now with attorneys.

Look, you could ask him what was on the phone, ask him about his messages, ask him about

Page 415

motivations for motions and grounds. Totally appropriate.

This was not called for in our original discovery agreement time period. It's very confusing, misleading. I am not going to let him answer questions in this vein. You can ask him about the messages, deleting them, whatever he did or something he saw or something he could react to.

MS. BABBITT: Are you instructing the witness not to answer?

MR. DUFFY: Yes, I did.

BY MS. BABBITT:

Q. And Mr. Pable, are you refusing to answer that question that I asked you?

A. I am going to follow my attorney's instructions.

MR. DUFFY: Thank you. He's not refusing, he's following my instructions.

MS. BABBITT: Great.

BY MS. BABBITT:

Q. And so are you aware of what the search protocol was to pull information off of your phone when you had it imaged?

MR. DUFFY: Objection, lack of foundation,

Page 416

irrelevant and harassing. You could answer it, though.

THE WITNESS: I very loosely know that there is a collection of terms that you guys had agreed upon in March and anything that would quote, unquote hit upon those terms was to be supplied.

How or what mechanisms that you use to pull or associate data related to those terms I am not privy to.

BY MS. BABBITT:

Q. Are you aware of what terms were used?

A. I think I was at some point, and I also know that there is a temporal component to it as well. But I don't know what those are right now.

Q. And you produced screen shots of other messages that you had exchange on your phone. Do you recall that?

A. I didn't produce any screen shots.

Q. Well, did anyone on your behalf produce screen shots of messages that you exchanged on your phone?

A. My experts may have. Again, I don't know what deliverable my expert gave to you precisely. But he may have supplied them.

Page 417

Q. And you never reviewed those materials that were produced?

A. I think I saw several screen shots when you were speaking with Trinity Haynes or Nicollette was.

Q. Aside from what was used as exhibits in depositions you never reviewed any materials that were produced on your behalf?

MR. DUFFY: Objection, lack of foundation and calls for attorney-client communications.

BY MS. BABBITT:

Q. So why do the messages in Exhibit CTA 72, why do they begin on May 24, 2019?

A. There is a policy to retain the 50 most recent messages, I believe.

Q. When you say there's a policy to retain, is that a policy that is set up on your phone?

A. That's the Signal policy. So, for example, let's say I sent 5O messages in a row. The 51st would cause the last one to disappear off. It's a means of controlling how big a message thread can get.

Q. Is that a setting that you have set with all of your communications on Signal?

28 (Pages 414 - 417)

Page 418

MR. DUFFY: Objection, lack of foundation. Go ahead.

THE WITNESS: Correct. It is a global setting that applies to all conversations to control the database size.

BY MS. BABBITT:

Q. And is that a global setting that you elected to apply?

A. Yes.

Q. When did you elect to apply that 50 message limitation?

A. A long time ago. Well before the Dayton incident, I believe.

Q. Is that setting of 50 messages saved, is that across all of your communications with all Signal users?

A. Not just Signal users, any user.

Q. And you said that was in 2018 or prior to August of 2018, you had it set so that you only had 50 messages saved?

A. I believe so.

Q. And so why was it so upsetting that Mr. Haynes deleted your 50 last messages that you exchanged with him in 2018?

Page 419

MR. DUFFY: Objection, asked and answered.

THE WITNESS: I believe a lot of it was us consoling each other. A lot of, you know, I think you might have seen some of it in his messages like I love you, man. We're going to get through this.

I just felt very connected with him. And when, you know, just to see that it was gone, it hurt a little bit.

BY MS. BABBITT:

Q. And that hurt was just the hurt of those last 50 messages you had exchanged with Mr. Haynes prior to November 2?

A. Because it was a symbolic gesture, yes.

Q. Is there anyone that you communicate via Signal that you maintained messages for longer than 5O messages or for more than that range?

A. No. It's a policy that is global on the application. You can't override that for any specific individual.

Q. So I guess to make sure I understand, this isn't something that you elect, then Signal just uniformly applies that across the board?

A. No. You set the global policy. I don't believe you can make an exception for a thread to go

Page 420

beyond what he set the global policy.

You could make it more restrictive, but I don't think you could make it more permissive.

BY MS. BABBITT:

Q. That policy you applied, you applied it globally with all of the folks you were communicating with on Signal, right?

A. And traditional SMS because Signal handles traditional SMS.

Q. Does that in any way impact the amount of messages that are stored or retained on the other end of the communication?

A. No, not at all.

Q. All right. Can you flip back to Mr. Haynes' production, CTA Exhibit 71, Mr. Pable. Let me know when you're back to that.

A. Okay.

Q. I am going to have you turn to the last page of CTA Exhibit 71, which is bates MH 353 at the bottom right. Let me know when you're there.

A. I'm there, but it's still loading.

Q. So you're on MH 353 of CTA Exhibit 71, Mr. Pable?

A. Yes.

Page 421

Q. Do you see a message that's been highlighted in yellow at the middle of the page?

A. Yes.

Q. That is a message that you sent to Mr. Haynes on June 4, 2019. Do you see that?

A. Yes.

Q. And it says need to send something secure. Moment, period?

A. Yes.

Q. What do you mean by sending something secure?

A. What happened was Mr. Haynes had Signal installed, but was trying to use it for more than just -- trying to use it as his primary SMS application at one point.

However, he uses Google FYI. So there was an issue where if Signal was set to be the primary SMS application he could not send regular SMS messages and interact with people on his, I believe there were iphone people that used like i-message or something, and it was causing a conflict with that.

So he switched to unsecure SMS messages. So we were testing and trying to find out if we

29 (Pages 418 - 421)

Page 422

could make it work. And eventually I stumbled across I think it's called a UMC code that he could enter to fixate his cell phone radio to a single SMSC and that seemed to resolve the issue.

Q. So all of that is what you meant by saying that you needed to send him something secure?

A. Well, no. I wanted to test sending him a secure message.

Q. So was that secure message something that was sent via Signal?

A. Yes, but again, it was probably just something like the word test.

Q. Would that have been in a file of some sort?

A. What do you mean by a file of some sort?

Q. I guess what did you send him that was secure?

A. Just like the text test or something along those lines.

Q. Would that test message or whatever you sent to him that was secure, would that have shown up in his Signal messages or would it have shown up elsewhere?

A. Like I said, he was switching in and out

Page 423

of using Signal at the time. So when that happened he got a different safety number associated with his account.

Eventually we found out what the root cause was, and I gave him a UMC code to fix it. Let me read through here a little bit. I'm curious if it notes when he reestablished secure communications or dropped out of it or the new safety number was set.

This looks like it was not in Signal's native data base export, though.

Q. You sent him a message. It was not over Signal, and it was something you wanted to send him securely?

A. So usually when I want to send something as an attachment, you can't send an arbitrary file as an attachment, as a regular SMS. It just doesn't work.

So there are things like V cards or whatever that just don't work exactly properly on every system. It looks like this around here, we were discussing things to do about my father's death. I was probably trying to send him the info card of exactly how to navigate to the cemetery or

Page 424

something along those lines.

Q. Why did you need to send that securely?

A. Because it was an attachment. If you tried to send that as a regular SMS, you can't send an arbitrary file that way.

But Signal lets you send an arbitrary file securely as a quote, unquote secure message.

Q. Mr. Haynes wasn't able to receive that securely over Signal?

A. So, like I said, Mr. Haynes' phone was not operating under secure messages at the time. He was not using the Signal application at certain periods. He can reimport certain chats to reencrypt them at rest or bypass the secure, send -- you can hold down the send button. It lets you send an unencrypted message or traditional SMS or SMS.

So when you do that, if you are sending something that is not a Signal message, you are very limited in the file types you're able to send a recipient. For example, why don't you try sending an executable file to someone or a Java file to someone over SMS. It is not going to work.

However, if you attach that same file as a Signal message it doesn't discriminate based on

Page 425

the media type. You can open any arbitrary file.

Q. And these issues that Mr. Haynes was having with respect to having secure files sent, you were trying to troubleshoot that with him?

A. We were trying to troubleshoot it on and off for a while. So what he would have to do is he would be messaging from the regular I guess text message application or whatever was compatible with i-message.

But when he converses with his family which is more important for him to communicate with, so when he would message me and I would need to send for example, an attachment of some sort, like a V card or something along those lines, I would send it as a signal secure message, and he would probably have to forcibly open the file and grab it that way.

Q. When you would send him something like that --

A. I would alert him beforehand so he would know to check it.

Q. And he would check it in his SMS messages or he would go check it in a different space?

A. So I would tell him to go check it in his regular SMS application so he would know to launch

30 (Pages 422 - 425)

Page 426

Signal so since that was no longer the primary SMS application on his phone.

Q. With respect to this message you sent him June 4, 2019, what is it that you recall sending him that you needed to send him securely?

MR. DUFFY: Objection, asked and answered.

THE WITNESS: This looks like information about my father's death, and he wanted to attend my father's funeral.

And so I believe I sent him the V card of the GPS coordinates of where to put in because the cemetery address, you can't enter the way the Google Maps would direct you. You have to navigate to very specific GPS coordinates to enter the cemetery and that can be very confusing for somebody who has never been there.

BY MS. BABBITT:

Q. You sent him that and that was sent securely to him, right?

A. Because it was sent securely, the fact that it was secure is just a side effect of needing to send an arbitrary file.

Q. Did you send anything aside from the GPS coordinates of the cemetery where your father was

Page 427

being buried securely to Mr. Haynes?

A. I believe that was encapsulated in what is called a V card.

Q. So did you send anything else aside from that to Mr. Haynes securely?

A. Not that I recall.

Q. Did you ever send something securely to Mr. Haynes related to this litigation?

A. I am trying to recall. It's been several years. So I don't think I did, but if I did it probably would have been noted in my previous deposition.

Q. So as you sit here today, do you recall if you sent anything securely to Mr. Haynes aside from the directions to your father's burial?

MR. DUFFY: Objection, asked and answered.

THE WITNESS: Not off the top of my head.

BY MS. BABBITT:

Q. Did you ever send Mr. Haynes the CTA's response to the OSHA position statement that was filed in this case?

A. I believe that was produced on Pacer, but I don't recall if that was the case or not.

Q. Did you ever share that with Mr. Haynes?

Page 428

A. I think I told him I was doing it, and I believe I told him about things, for example, the CTA went ahead and publicly published the skeleton key and didn't redact it when they made that public filing.

Q. Did you ever share with Mr. Haynes on your phone or on your computer any of the filings in the OSHA action?

MR. DUFFY: By share you mean electronically send?

MS. BABBITT: In any format, any form.

MR. DUFFY: You don't mean tell him about it, you mean share in some way?

MS. BABBITT: Yes.

THE WITNESS: Sharing documents, I don't recall. It may have happened, but I really don't recall.

BY MS. BABBITT:

Q. You don't recall if you shared any documents with Mr. Haynes relating to this litigation?

A. Relating to the OSHA?

Q. Let's start there. Did you ever share any documents with Mr. Haynes relating to OSHA and the

Page 429

OSHA pre-litigation?

A. Again, I don't recall that.

Q. And did you share any documents with Mr. Haynes about this litigation once you filed the lawsuit?

A. I believe I shared the complaint and documents that were available on Pacer.

Q. How did you share those documents with Mr. Haynes?

A. So there's a website called Court Lister that runs, that you install an extension called Recap for.

And as you access documents from Pacer, it will index them on Court Lister, and you are able to directly bypass the Pacer pay wall and share those documents directly.

Q. How did you share those links to that Court Lister website with Mr. Haynes?

A. I mean they could have been copied and pasted, but it's much easier for him to subscribe to the XML feed and be notified whenever there is an update on there or he checks Pacer himself.

Q. Did you ever send Mr. Haynes links to documents of materials that were on the Pacer

31 (Pages 426 - 429)

Page 430

website for this lawsuit?

A. I think I sent him the landing page to Court Lister, but I don't think I sent him a specific document.

Q. How did you send him that specific landing page?

A. That was probably a Signal message way back when.

Q. When you say way back when, do you recall what year?

A. Probably close to when the complaint was filed. So late 2019.

Q. If you could turn back to CTA Exhibit 72, Mr. Pable, and let me know when you're there.

A. Okay.

Q. On CTA Exhibit 72 you'll see there's a message on June 1, 2019, right? And the message it looks like it says ha ha ha, nice. Right? Some three quarters of the way down the page.

A. Okay.

MR. DUFFY: They all have an ID number. Maybe we should use that. You're talking about 9958?

MS. BABBITT: Yes.

Page 431

BY MS. BABBITT:

Q. And if you could look at the IDs for 9961 and 9974 and tell me when you read those.

A. Okay.

Q. Those are messages dated June 4, 2019, right?

A. Yes.

Q. And the message that you had sent to Mr. Haynes on June 4, 2019 that said need to send something secure, moment, that doesn't appear in the messages that were recovered on your phone?

A. Correct.

Q. Why is that?

A. That's probably because the disappearing messages policy was enacted at the time. And when he switched to download the attachment, because it was a Signal secure message it was automatically expired at the end.

Q. So just that single message was deleted, the disappearing message?

A. So as you could see on these other messages here they were, let's see. Does this mention whether or not they were sent -- this expert doesn't mention whether or not they were sent with

Page 432

traditional SMS or not.

I think that there are more fields in a traditional database export that might indicate that or not. As I was saying before, Mr. Haynes was having trouble using the secure messaging on Signal. So he had switched to traditional SMS for some time.

Q. The message need to send something secure moment, that wasn't a message that was sent securely, was it?

A. That's correct.

Q. Why would that not appear on your phone, but appear on Mr. Haynes' phone?

A. I honestly don't know. I could not tell you that.

Q. Did you delete that message from your phone?

A. I don't think I did.

Q. Do you have any recollection of deleting any messages from this exchange in 2019 with Mr. Haynes on your phone?

A. Not specifically this exchange, no. I don't recall doing any deletion for anything related to my father at all.

Q. Do you recall deleting any messages

Page 433

unrelated to your father or just generally deleting any messages you exchanged with Mr. Haynes in 2019?

A. Like I said, if I had accidentally pasted something wrong or I had to correct a typo or something, I would essentially delete that and then send a replacement message. But I have not deleted anything along those lines.

Q. Okay. So you didn't accidentally paste or inadvertently send the message you needed to send something secure, moment, correct?

A. That's correct, and I cannot explain why it does not appear in this export.

Q. And then following down on CTA Exhibit 72, which I believe you still have, these are the messages pulled from the second imaging of your phone.

You'll see that there are messages, I am looking at ID 10124. It is like the third line up from the bottom. Do you see that, Mr. Pable?

A. 10124?

Q. Yes.

A. Yes.

Q. And that is a message dated June 15, 2019, right?

32 (Pages 430 - 433)

Page 434

A.  Yes.

Q.  And then the next message that follows is October 29, 2019.  Do you see that?

A.  Correct.

Q.  Why is there a gap in the communications between you and Mr. Haynes from June 15 of 2019 to October 29, 2019?

A.  It's not uncommon for us to have not talked for a period of months because we did not want to implicate anything for each other, I guess. I don't know what you expect me to say.  I can not talk to someone.

Q.  Did you not communicate with Mr. Haynes from July to October of 2019?

A.  I don't believe that I did.  And if I had, it would have shown up in his export as well.

Q.  So you didn't communicate with Mr. Haynes for those months in 2019?

A.  Correct.  As you could see the very last two messages look like we found out how to fix the issue with his Signal messages.

Q.  So you didn't communicate with Mr. Haynes for three or four months and then the next message you pick up is sorting out how to fix Mr. Haynes'

Page 435

issue with his Signal messages?

A.  That sounds about right, yes.

Q.  So you didn't speak to him on the phone in that period of time either?

A.  I may have, but I don't recall.

Q.  So did you communicate with Mr. Haynes in any other means aside from Signal from June 15 to October 29, 2019?

A.  In 2019, I may have met up with him at a Starbucks.  I know we went rock climbing once.

Q.  And did you coordinate those meetings where you met with him either at a Starbucks or rock climbing, did you coordinate those meetings over Signal?

A.  I believe I ran into him at one point.  I need to look up when I went rock climbing with him. But that may have been after we corrected his Signal issue, but it wouldn't be out of the ordinary for me to run into him if he was downtown.

And it wouldn't be out of the ordinary for me to give him a phone call or to speak with him in person if I saw him.

Q.  And so you didn't communicate with him over Signal for three months and then you picked it

Page 436

back up by switching to this default SMS to Signal and then you sent him a code in October of 2019?

MR. DUFFY:  Objection.  You asked him that exact question a minute ago.

THE WITNESS:  That is a UNC code for fixing his SMSC so that there wouldn't be a conflict when he roamed between the two different carriers.

BY MS. BABBITT:

Q.  Did you delete any messages you exchanged with Mr. Haynes between July and October of 2019?

A.  Outside of disappearing messages, no.

Q.  So were there disappearing messages exchanged?

A.  I'm sorry, what was the time range again?

Q.  July to October of 2019.

A.  No.  I don't believe I spoke with him at all in that period through Signal.

Q.  So you didn't have any messages that were set to be disappearing in that time period of July to October of 2019?

A.  Correct.  While the policy may have been set at that time, his phone would not have obeyed it because it wouldn't have been going through Signal.

Q.  So when you have those last two messages

Page 437

that we recovered in CTA Exhibit 72, you send Haynes a code which tells him to switch default SMS to Signal.

Can you explain what you were instructing him to do there and what that would do to your messages?

A.  So that code doesn't set the default SMS. I said try this code.  Enter at the dialer, that is step one.  So you enter that code at the dialer. That is set up to -- that is a Google FYI specific UNC code.

When you enter that, that fixates your carrier to one specific carrier.  Google FYI is a network in which your carriers roam between different providers.  So once you do that, then you could switch your default SMS application away from what you're currently using back to Signal.  And if that works, then I would be able to use Signal with the policies that we had agreed on.

Q.  And Mr. Haynes testified that those steps may have been how you turned the disappearing messages feature on in the communications between him, is that correct?

A.  No.  That code specifically locks you to a

33 (Pages 434 - 437)

Page 438

specific carrier.

Q. Did you communicate via Signal with Mr. Haynes after October 29, 2018?

A. I'm sure I have.

Q. And were those messages set to be disappearing?

A. Most likely. Like I said, the policy was already set to be.

Q. When you say policy, the policy wasn't at some point in time, right, because we have some of the messages, and they were not disappearing, right?

A. So some of the messages that you have are traditional SMS messages that were not subject to the policy.

Q. Then after this date, October 29, 2019, then messages between you and Mr. Haynes did become subject to the disappearing policy, right?

A. They very well could, yes. I don't recall the exact time line of events of everything that happened, but that sounds plausible.

Q. So do you recall when the messages began disappearing on your phone between you and Mr. Haynes?

A. Not off the top of my head because I also

Page 439

had a linked policy instituted. So it probably would have occurred -- I would say I couldn't tell you just by looking at this small fragment.

Q. At some point after October 29, 2019, the messages were set to be disappearing?

A. The messages were set to be disappearing even before that.

Q. And they were set to be disappearing after you left your employment with the CTA?

A. Yes.

MS. BABBITT: I think it's a good time to take a break. Do we want to reconvene at 1:30.

THE VIDEOGRAPHER: Going off the video record at 12:52 p.m.

MR. DUFFY: What's your best estimate?

MS. BABBITT: A couple hours.

(Recess)

THE VIDEOGRAPHER: Good afternoon. We are back on the record at 1:31 p.m. You may proceed.

BY MS. BABBITT:

Q. Mr. Pable, I will remind you you continue to be under oath.

I want to discuss a bit more about your communications with Mr. Haynes. And in particular I

Page 440

want to discuss with you any materials that you produced to Mr. Haynes that were related to this litigation.

Specifically, did you ever send Mr. Haynes drafts of anything that you were planning to file or produce in this case?

A. I might have sent things that were pending Pacer, but I don't think so. I might have.

Q. When you say pending Pacer, what do you mean by that?

A. Documents that would have ended up on the Pacer website.

Q. And did you send final drafts to Mr. Haynes of things that ended up on the Pacer website?

A. I might have or I might have sent the, like I said, the landing page or the XML feed.

Q. So those landing page documents, those would have been actually the file materials that went on the website for the court?

A. I think so. I don't know exactly how that feed works.

Q. Aside from the landing feed to that Pacer behind the pay wall website that you mentioned, did

Page 441

you send any other drafts or documents to Mr. Haynes relating to this litigation?

A. Not that I'm aware of.

Q. Did you share any of those materials relating to the litigation with anyone aside from Mr. Haynes?

A. Definitely my husband.

Q. Anyone aside from your husband?

A. My attorney.

Q. Anyone aside from your attorney and your husband?

A. Not that I'm aware of.

Q. And when you say not that you are aware of, is that because you don't recall or you are not sure if you did or not?

A. I can't control, for example, if my husband shared something like with his family or something like that. I wouldn't know if that percolated around in that regard or if my husband talked to my siblings or whatever.

Q. I am asking specifically about what you sent. So aside from materials that you exchanged with your attorney and with your husband, did you share any other materials relating to this

34 (Pages 438 - 441)

Page 442

litigation with anyone else?

A. I have shared no file materials with anyone else.

Q. I am not just asking about file materials. I am asking about any documents relating to this litigation?

A. I definitely shared the termination letter, for instance, with people. I asked other people for input on like the resignation letter that I ended up drafting. Things like that I know for sure I've done that have ended up as documents in here.

MR. DUFFY: Your question started out like litigation materials. And I don't know if he's answering stuff that is related to the litigation because it's about the events of 2018 or litigation materials. And you are obviously entitled to ask both, but I suggest we clarify.

BY MS. BABBITT:

Q. When you refer to the termination letter, Mr. Pable, what are you referring to?

A. The false charges that CTA brought against me that they said I could either sign that or resign.

Page 443

Q. The letter that the CTA provided you at the meeting where your employment was terminated?

A. Correct, as well as packets and whatnot.

Q. Who did you share that letter with?

A. Friends and family.

Q. What friends?

A. Definitely my friend Chris Langer and Susan Kim. They may have had a mutual friend around while I did it. Her name is Natalie. I don't think she saw it. I'm not 100 percent sure.

Q. Go ahead.

A. That is all I can really recall off the top of my head like specifically.

Q. Did you share that termination letter with Mr. Haynes?

A. Yes, I did.

Q. How did you share that letter with Mr. Haynes?

A. When I was looking for representation after I was forced to resign I said, well, here is like more fodder to go on the wood pile.

And we discussed different law firms and whatnot for representation.

Q. My question is a little different. How

Page 444

specifically did you share that document with Mr. Haynes? Was it over e-mail?

Did you give him a hard copy, over Signal?

A. No, it was in person. I literally was fired, and he picked me up. And I had the paper in my hand.

Q. You gave the actual termination letter that you had to Mr. Haynes?

A. I didn't give him anything. He saw it.

Q. So you didn't give it to him, and you didn't send it to him. You showed it to Mr. Haynes when you were in person with him?

A. Yes.

Q. And with respect to other materials, did you ever share any drafts of answers to discovery or materials that you produced in litigation with Mr. Haynes?

A. I don't think I did. I am trying to remember.

Q. Maybe to clarify, by answers to discovery I mean interrogatories or interrogatory responses in this case or a request for production of documents or a request to admit?

Page 445

A. I don't think I shared any drafts of that with him, no.

Q. Did you share any drafts with Mr. Haynes of any communications that you intended to send to your attorney?

A. I might have, but they would probably obviously have been revised from what that was.

Q. What kinds of communications that you were ultimately sending to your attorney did you first share with Mr. Haynes?

A. I believe the complaint.

Q. You're saying you send a draft complaint of the lawsuit that you filed, you sent that to Mr. Haynes?

A. No. You asked if I sent any drafts of communications to my attorney to Mr. Haynes and not a draft of a legal document. I was writing a course of events and whatnot. I think I asked him am I missing anything on this.

Q. And so sorry because you then referred to a complaint, which was a filing in the case. If I hear you, you're saying that you wrote up a summary of events which would be the basis for the complaint, and you shared that with Mr. Haynes. Is

35 (Pages 442 - 445)

Page 446

that right?

A. I believe so. And I believe that was partially that time line that we worked together on.

Q. And partially what you are qualifying, that was there more added after that?

A. No, the time line is what -- there was other content in addition to the time line such as I believe I mentioned Section 28, employee, the Metropolitan Transit Act, the transit safety security whistleblower, things like that.

Q. And that was in a communication that you shared with Mr. Haynes prior to sending it to your attorney?

A. It was right up to all of the elements that would end up in the complaint, yes.

Q. How did you share that material or materials with Mr. Haynes?

A. I believe in person. I don't recall 100 percent.

Q. You printed a copy of that, and you handed it to Mr. Haynes?

A. No. I frequently write drafts in my e-mail, and I keep that information there, and I could just pull up the draft.

Page 447

Q. So you showed a draft that was in your e-mail to Mr. Haynes when you were in person with him?

A. I believe so. It wouldn't be uncommon for me to write something in an e-mail draft.

Q. And then did Mr. Haynes provide any feedback or offer any suggestions or modifications to that document that you are referring to was in your e-mail draft?

A. I don't recall. I don't think so.

Q. Do you recall when you met up with Mr. Haynes to have him review that e-mail draft?

A. No, I don't. It would have been prior to the complaint being filed.

Q. Would it have been prior to you filing the OSHA complaint?

A. It may have been. No, I think it was after the OSHA complaint because I believe the inspector for OSHA had been silent for a while. So I thought we would have to take this to the next step.

Q. Do you recall where you met with Mr. Haynes to share that draft in your e-mail?

A. If it was an in person meeting it was most

Page 448

likely at a Starbucks somewhere.

Q. If it wasn't in an in person meeting how else would you have shared the material with Mr. Haynes?

A. If it wasn't, I mean it's possible it could have been a Signal message, and I honestly don't recall.

That doesn't strike me as something I would send over Signal because it's not something I would be copying and pasting and being more of a living document. So if I needed to make any changes or whatnot before I sent something off, I would want to be able to see it. And a Signal message by its very nature -- what's the term for it. You can't go back and change it. It's not an editable document.

Q. Any reason you wouldn't just send the e-mail to Mr. Haynes of the draft rather than arrange a meeting in person for him to review a draft email in your inbox?

A. Because then that would mean I have to make another e-mail and edit that out. And I can't edit things very easily in line on a cell phone.

Q. Do you have any other ways of actually seeing your e-mail aside from a cell phone?

Page 449

A. I think stated before I have an X box. I get EOL devices from my husband. I do not have like an actual computer that I own.

I use literally things that are thrown away. I use things that are thrown away, and my phone is basically my life line. So I keep everything in the cloud.

Q. Did Mr. Haynes send you any communications or any other documents either via Signal or provided to you in person or via e-mail regarding the litigation?

A. I'm sorry, can you say that again.

(Question read)

A. I think we discussed dates specifically. There was a revision to a Clever Devices APR programming guide that came out suspiciously on the same day that we were placed on administrative leave, and the author's name was Christos.

So it seemed a little suspicious that that kind of happened, and I wasn't privy to that happening, but I believe Mike brought that up and discussed that with me at one point.

Q. And how did he discuss that with you?

A. I am pretty sure that was over Signal.

36 (Pages 446 - 449)

Page 450

Q. And what was suspicious about that?

A. The date. Well, the fact that Christos is a major player in this. The date was the date as I said we were placed on leave, and the fact that it related to the BusTime application.

Q. And you sent Mr. Haynes the letter that Clever sent to the CTA about the Dayton test, right?

A. I don't remember if I did or not. It's possible that I did.

Q. And Mr. Haynes testified that you did send it to him, and you sent it to him over Signal. Is that correct?

A. That may have happened. I honestly don't recall.

Q. So do you recall when you would have sent him the Clever letter?

A. If I did, it would have been after not hearing anything from the OSHA inspector.

MR. DUFFY: I'm sorry, Elizabeth. Did you say that Mr. Haynes testified that Mr. Haynes sent Mr. Pable the letter from Clever Devices to Dorval Carter?

MS. BABBITT: No, I didn't.

MR. DUFFY: Then I misheard when we're talking

Page 451

about the letter because that is what I thought I heard.

MS. BABBITT: Yes, it's the letter from Clever to CTA through Dorval Carter, and Mr. Haynes testified that Mr. Pable sent it to Mr. Haynes.

MR. DUFFY: I'm sorry, I thought you said it the other way around.

MS. BABBITT: If I did, let me make sure I'm clear on that.

BY MS. BABBITT:

Q. I am referring to the letter that Clever sent to the CTA, the CTA president, Mr. Carter, that was disclosing or describing the Dayton test.

Are you familiar with the document I am referring to, Mr. Pable?

A. Yes, I am.

Q. Mr. Haynes testified that that letter is a letter that you sent to him in the course of this litigation.

Do you recall sending that to Mr. Haynes?

A. If I did, I don't recall off the top of my head doing it, but it's possible that I did.

Q. And if you did, what method of

Page 452

communications would you have sent that to Mr. Haynes or would you have delivered that to him in person as well?

A. Well, I know that I had several friends that --

MR. DUFFY: Objection, calls for speculation. If you don't remember doing it, you can answer how you might do it, but you can't answer how you did it if you don't remember doing it.

THE WITNESS: Okay. So I know that I had several friends issue FOIA requests to find out what was going on because I didn't want to tell them about it.

And so I know the document was publicly posted to be attainable there. Sorry, I don't think I got the actual copy from the OSHA investigation, but I believe I would have gotten it from a FOIA if I did and that would have been passed on probably in person.

BY MS. BABBITT:

Q. You delivered that to Mr. Haynes in person?

MR. DUFFY: Objection, this whole thing, he said he doesn't remember how he got it to him. You

Page 453

could ask him hypotheticals, yes, but you can't rephrase a question like it actually happened and trip him up like that. It's not fair. Reask the question.

MS. BABBITT: Thanks, Tim. So helpful.

BY MS. BABBITT:

Q. So is Mr. Haynes lying when he says you sent him the Clever letter?

MR. DUFFY: Objection, lack of foundation. Argumentative.

THE WITNESS: I honestly couldn't tell you because I don't remember sending it to him.

BY MS. BABBITT:

Q. Mr. Haynes also testified that you and he communicated about that letter.

Do you recall discussing or communicating about that letter with him?

A. I recall discussing Craig Lang being involved and being friends with Mr. Carter. I'm sorry, my screen just did something very funny.

MS. BABBITT: Jesseka started screen sharing. Could we go off the record for a minute.

THE VIDEOGRAPHER: Going off the record 1:5O p.m.

37 (Pages 450 - 453)

Page 454

(Off record)

THE VIDEOGRAPHER: We are back on the record at 1:5O p.m. You may proceed.

(Question and answer read)

BY MS. BABBITT:

Q. Did you communicate in any way with Mr. Haynes about the Clever letter that I am referring to aside from the connection that Craig Lang apparently had to the incident?

A. I don't believe I did.

Q. How did you communicate with Mr. Haynes about that topic?

A. If I did, it likely again would have probably been in person because the FOIA requests that I saw were all printed documents.

Q. And you mentioned FOIA a few times. Who FOIAed these documents?

A. I had several people that were interested in the case on Google Plus. And so I said well, here is, you know, what I'm submitting. So if you want you could go ahead and grab that.

From there they could issue whatever FOIA they want. I have several -- -- I don't want to say URL friends, but for lack of a better word,

Page 455

friends that I am familiar with outside of just the internet that have issued FOIAs before. And I have seen documents.

Q. Did you issue any FOIAs or have FOIAs issued on your behalf to the CTA?

A. I actually did issue a FOIA to the CTA in January. It was January. I don't recall the year. But --

MR. DUFFY: I'm sorry. When you asked about issuing a FOIA to the CTA, do you mean sending a request to the CTA for information, Elizabeth?

MS. BABBITT: Yes.

MR. DUFFY: I just want to be very clear.

THE WITNESS: Yes, I did issue a FOIA request to the CTA for information surrounding me to see what I had prior to getting any of the discovery materials.

And I heard absolutely nothing back. So I assumed that the CTA had nothing. So I wanted to make sure that I had all my bases covered in that regard basically.

BY MS. BABBITT:

Q. So when you say you wanted to have all your cases covered, is that when you asked your in

Page 456

real life friends to issue FOIA requests on your behalf?

A. I didn't ask them to issue any FOIA requests. Anything they would have done, they would have done on their own.

Q. So you said you wanted to be sure you had your bases covered. Could you tell me what you mean by that?

A. My FOIA request was independent of any of this. I was trying to find any and all e-mails related to myself and Mr. Haynes and find out what what was going on.

Q. So that was the subject of the FOIA that you issued to the CTA?

A. I wanted all e-mail communication related to myself and Mr. Haynes for the period of 2018.

Q. And that FOIA request that you issued to the CTA was denied?

A. Never responded to.

Q. You're aware that others that you know and are friends with issued FOIAs to the CTA relating to the subject of this litigation, is that right?

A. I don't know if they did it to the CTA or OSHA, but I am aware that they asked if they're

Page 457

allowed to do a FOIA, and I said yes. My name is public.

My salary is public. I was a public employee. So they could get all the information they needed to do their FOIA request.

Q. Who are those friends that issued FOIA requests that you are aware of?

MR. DUFFY: Objection. He hasn't said anyone issued a FOIA request. He said they asked him how.

THE WITNESS: Correct.

BY MS. BABBITT:

Q. So did anyone else besides you that you are aware of issue a FOIA request?

A. I can't speculate if they did or not, but it seemed like that was indeed their intention, but I don't know which agency they FOIAed.

Q. Let's back up. A minute ago you testified that the letter you got that you showed Mr. Haynes in person, the Clever to CTA letter was a letter you obtained through someone getting it through a FOIA request?

MR. DUFFY: Objection. You're doing it again. You're taking what he said might have happened, and you're acting like it did.

38 (Pages 454 - 457)

Page 458

BY MS. BABBITT:

Q. Okay. Tell me how you got the letter, Mr. Pable?

MR. DUFFY: I gave him the letter because the first time I ever saw it was in the document production. I forget if it was OSHA or here, and I gave it to him, and I don't think he saw it before that. But you could ask him.

BY MS. BABBITT:

Q. Yes, that's what I'm asking. How did you get the letter, Mr. Pable?

A. I may have gotten the letter from my attorney. I have gotten other materials from other friends, but I don't think they were CTA FOIAs.

I really honestly don't recall because Google Plus is deleted.

Q. Who are the friends that gave you materials related to this case?

A. I could not tell you their names. It's the Google Plus posts I had, but is gone.

Q. So these are just individuals that you associate with on the internet via Google Plus?

A. That is some of them. I associated with individuals on the internet and away from the

Page 459

internet. They were part of my quote, unquote circles, and I honestly could not tell you who participated in that thread.

Q. Are you aware of any individuals who participated in that thread issuing FOIA requests or otherwise obtaining materials related to this litigation and providing them to you?

A. Not specifically at this time. This was years ago, and I really don't remember all of the details.

Q. But you did get the letter, the Clever to CTA letter and did you share it with Mr. Haynes or did you not?

MR. DUFFY: Objection, asked and answered.

THE WITNESS: I did obtain the letter. I don't remember who I got the letter from. It is very possible I got it from my attorney, and it is very possible I shared it with Mr. Haynes, but I don't recall sharing specifically the letter with Mr. Haynes.

BY MS. BABBITT:

Q. But you do recall communicating with Mr. Haynes about the fact that something was connected to the letter?

Page 460

A. Yes.

Q. How did you communicate with Mr. Haynes about that?

A. That was very likely an in person meeting.

Q. And how often did you meet with Mr. Haynes in person in 2019?

A. Maybe once every three or four months.

Q. And so aside from your fireversary and perhaps one other date you didn't meet with Mr. Haynes in 2020, correct?

A. Correct.

Q. So it would have been one of those approximately quarterly meetings that you had with Mr. Haynes in 2019 where you would have communicated about Craig Lang's connection to the cover letter?

A. That is the most plausible thing I could think of, yes.

Q. Mr. Haynes also testified that you shared some other materials that you were preparing to send to your lawyer, and responses you gave to your lawyer.

Do you recall sharing any materials like that with Mr. Haynes?

A. I think that is what we covered earlier

Page 461

when I said I was going over the drafts.

Q. And those drafts were the drafts relating to outlines of facts that were going to be used to draft the complaint in this case?

A. Correct.

Q. Any other drafts that you shared with Mr. Haynes?

A. Not that I'm aware of.

Q. And that again was shared in person, and you showed your phone to Mr. Haynes while you met with him in person to review a draft?

A. That's very likely, but again, I don't 100 percent recall. I don't remember some of these events that are being said happening actually happening.

Q. So Mr. Haynes recalls them happening, but you don't recall them happening?

MR. DUFFY: Objection. Mr. Haynes' testimony speaks for itself, and you haven't put them in front of the witness.

BY MS. BABBITT:

Q. Can you answer that question, Mr. Pable, or do you need it read back?

A. Read it back, please.

39 (Pages 458 - 461)

Page 462

(Question read)

A. Yes, that seems like the logical conclusion that someone remembers something that someone else doesn't.

Q. And Mr. Haynes also testified you shared with him that the CTA was inquiring about your usage of bitcoin or other block chain technology when you were employed at the CTA and that those communications occurred over Signal.

Do you recall those communications?

A. Can you say that one more time, please. Sorry.

(Question read)

MR. DUFFY: Objection. Are you saying those communications, meaning the conversations with Mr. Haynes or the usage of bitcoin?

BY MS. BABBITT:

Q. Do you understand the question, Mr. Pable?

A. I would like you to clarify it, please.

Q. Sure. So Mr. Haynes testified that you shared with him during the course of this litigation that the CTA was making inquiries about the use of bitcoin by yourself and block chain technology while you were employed by the CTA.

Page 463

And he testified that you communicated about that during litigation. Do you recall communicating with Mr. Haynes about the CTA's inquiries into your use of block chain technology and bitcoin while you were employed at the CTA?

A. I do recall that. I believe there was an interrogatory posted on Pacer.

Q. Okay.

MR. DUFFY: Elizabeth, I am looking at Haynes' transcript. And I searched for bitcoin, and he does not say in there that they communicated about it.

You asked him about bitcoin, and he talked about what he knew about Chris doing bitcoin. There is not one word that says they talked about it or talked about it on Signal.

Now, obviously, I am looking at this in response to your question. But the word bitcoin only appears on two pages.

MS. BABBITT: Okay. Let's go to block chain, it's on page 231. I don't need to show it to him.

MR. DUFFY: No, you don't need to show it to him, but I have a concern that you're playing fast and loose with how you characterize his testimony and then you're focusing the witness on the method

Page 464

of communication when that was not what Mr. Haynes said.

MS. BABBITT: Then you can fix it on your redirect. I am asking my questions.

MR. DUFFY: I will tell the witness not to speculate if he doesn't remember how something occurred or exactly what Mr. Haynes said. You could go ahead.

(Question read)

BY MS. BABBITT:

Q. That interrogatory that was posted, was that something that you then shared with Mr. Haynes, Mr. Pable?

A. I don't know if I was the one that shared it with him or if he got it and brought it up.

Q. And when you say he brought it up or if it was shared one way or another, did you communicate with him about that over Signal?

A. I may have. I honestly don't recall.

Q. Did you communicate with him about it in person?

A. I may have. I honestly don't recall.

Q. But you do recall communicating with Mr. Haynes about the questions the CTA had about

Page 465

your block chain technology usage?

A. I do recall discussing with him the block chain stuff that I had researched in the past, yes.

Q. When you say you recall discussing it, do you recall if that was in person or electronically or over the phone?

A. No, I don't recall the method.

Q. Do you recall when you communicated with Mr. Haynes on that?

A. It would have been after the interrogatory was posted.

Q. And Mr. Haynes also testified that you had mentioned to him that the issue of the password files that were found on your CTA computer had come up in litigation and that you also communicated with him about that over Signal.

Do you recall those communications?

A. I don't specifically recall that, but I wouldn't put it past us having spoken about it.

Q. Do you recall how Mr. Haynes would have come to know -- let me rephrase that.

Are you aware of how Mr. Haynes came to know that the topic of the password files came up in this litigation?

40 (Pages 462 - 465)

Page 466

A. All I can say is that I would imagine -- I honestly don't know what all of the court filings are because I haven't gone back and read over them. But it's possible that a database was listed in one of the filings.

I honestly don't know, but I wouldn't put it past us discussing it if it was.

Q. If it was in a court filing, is that something that you shared with Mr. Haynes or do you believe Mr. Haynes found that himself online?

A. I believe Mr. Haynes testified that he watches the Pacer feed himself. Anyone can subscribe to an XML feed when documents are updated on the different systems.

Q. So Mr. Haynes testified that you communicated with him over Signal about that.

Do you recall communicating with him over Signal about that?

A. I don't recall the method of communication because I don't recall very specifically talking about it. I wouldn't put it past us doing it, but I don't recall doing it.

Q. Do you recall the substance of those communications about the password files that you had

Page 467

with Mr. Haynes?

A. Again, I don't recall actually doing it, but I wouldn't put it past us having done it. So I don't know how I could answer substance for something I don't recall actually doing.

Q. Right. You're aware that as a plaintiff in a lawsuit that you have an obligation to preserve any information that is relevant to the case, right?

A. Yes.

Q. And you're aware that that includes communications?

A. Yes.

Q. And you're aware that that includes communications that you exchanged during the course of the litigation?

MR. DUFFY: Objection to you're asking him for legal opinions about his duties, and communications is a broad word.

He's certainly under no obligation to produce all of his communications with anybody. You could ask the question I guess.

MS. BABBITT: Thanks, Tim. I know.

MR. DUFFY: I could make an objection too,

Page 468

okay.

MS. BABBITT: When you're speaking for four minutes and telling me I could ask a question every time I ask it, I don't really need the assist.

(Question read).

MR. DUFFY: Objection, vague.

THE WITNESS: So I am aware that there is certain communications that you would want to preserve, but I know that you can't preserve everything.

You can't preserve, for example, a phone call or an in person meeting.

BY MS. BABBITT:

Q. Right. What communications are you aware of that you can preserve in litigation, and you would have an obligation to preserve?

MR. DUFFY: Objection, calls for speculation. Calls for a legal conclusion. Vague.

THE WITNESS: The only thing that really comes to mind is e-mails and potentially SMS.

BY MS. BABBITT:

Q. Why is there a qualifier of potentially for SMS?

A. Because SMS, how shall I put it. Well,

Page 469

you're what, 50 or 60. So you've been around a while. You understand how the SMS protocol worked probably back in the '70s.

It was actually a piggyback on a carrier message that got delivered onto a cellular system. So what is the reliability of a message being delivered accurately over SMS was, how shall I put it, you had no reliability like a TCPIP stack.

It was more like a UDP stack where you would attempt, it was more of a best effort to try to deliver the information. So if the information wasn't delivered, you can't possibly preserve it.

Q. And if the information is delivered can you preserve it?

A. You may able to. It depends also on storage capabilities of the device receiving it.

Q. And if you send it to disappearing or not, right?

A. I am talking more old school. I am talking analogue telephones where messages were stored on sim cards, not internal storage.

Q. I think you covered this, but just so we're clear, you know obviously Mr. Haynes was deposed on March 16 and then you had your little

41 (Pages 466 - 469)

Page 470

session with him at Kaiser Tiger to talk about the deposition after that, right?

And you also had a phone call with him after that deposition, right?

A. Sounds right.

Q. And then you haven't exchanged any other communications with Mr. Haynes or communicated with with him or seen him in any way aside from those two instances at his deposition?

A. That sounds correct.

Q. And you never modified your communication settings with Mr. Haynes via Signal to not be disappearing messages anymore, right?

A. That is correct.

Q. You're aware that the CTA specifically requested that you set those messages to not be disappearing after Mr. Haynes' deposition on March 17, is that right?

A. I don't know that that was ever communicated to me directly.

Q. Okay. So you were never told that you shouldn't set your messages to not be disappearing?

A. I don't know if I was or wasn't. But I don't see how the CTA can demand a setting change on

Page 471

my phone.

Q. Were you ever instructed at any point in time that you should have your messages be set to not be disappearing?

MR. DUFFY: I object and instruct the witness not to answer if the instruction was by me or if you are asking for instructions by me.

So if anyone besides me ever instructed you to do that?

THE WITNESS: No one outside of attorney-client privilege has that been instructed.

BY MS. BABBITT:

Q. Or that hasn't been instructed?

MS. BABBITT: Let's take a five minute break.

THE VIDEOGRAPHER: Off the video record at 2:14 p.m.

(Off record)

THE VIDEOGRAPHER: We are back on the record at 2:21 p.m. You may proceed.

BY MS. BABBITT:

Q. Mr. Pable, you mentioned earlier in the deposition that the phone that you had, the phone that was imaged twice for this case that the phone was rooted, correct?

Page 472

A. Correct.

Q. And I guess before we get into the rooting, was that phone ever stolen or lost while you had it in your possession?

A. No, I don't believe it was.

Q. When did you root that phone?

A. I guess shortly when it became possible to root it. Shortly after that point.

Q. Do you recall when that was?

A. No, I don't recall exactly when that was. You have to do research on that phone model and find out when that was possible.

Q. Okay. Was that phone rooted while you were employed by the CTA?

A. Yes, it was.

Q. So was the phone rooted at the time that you were placed on administrative leave with the CTA in October of 2018?

A. Yes, it was.

Q. Why did you root your phone?

A. A lot of reasons. Rooting gives you abilities to work with things that you normally can't use as an end user. If you are a power user and you understand what you're doing, for instance,

Page 473

you could install certain modules like system wide ad blockers and install certain themes called substratum themes.

You're able to customize settings on the phone that you are not normally able to customize, things of that nature.

Q. Any other reasons why you root your phone?

A. Those are the primary ones.

Q. And can you tell us what method you use to root your phone or how you rooted it?

A. Magisk.

Q. Can you spell that for the record. I think you said that before?

A. M-a-g-i-s-k.

Q. Is that the method of rooting that you've used each time you rooted your phone?

A. What do you mean by each time?

Q. Well, good point. Aside from that initial rooting that occurred at whatever point in time that android model was able to be rooted, so that was at least as early as 2018 it sounds like.

Did you ever root the phone again after that?

A. So when you do a system update there's an

42 (Pages 470 - 473)

Page 474

application called Magisk manager that will patch the boot image.

So when you boot it into the inactive partition after the update, that essentially performs the reroot, but that is to survive for example, like an update.

Q. So did you do that on this phone that we had imaged?

A. I believe that's the default behavior of the Magisk manager.

Q. Did you manually reroot your phone more than once?

A. I don't understand the question.

Q. Well, I think you just explained that there is some sort of updating that can occur with the rooting of your phone, and it sounds like that took place without you doing anything to it once it was rooted.

Did you ever take any steps to root the phone after that initial instance where you rooted it?

A. I may have updated the Magisk binaries, if that's what you're asking.

Q. Did you ever root your phone outside of

Page 475

the automatic system patches?

A. Well, yes. I had to patch the boot image to be rooted when I initially did it.

Q. Any instances beyond that initial one?

A. I don't recall, but I don't think I would have had to because once you have it the manager application will then edit the boot image for the inactive partition.

Q. How did you maintain your phone once it was rooted? I know you talked about some updating. Was there any other updating you yourself did or implemented on your phone once it was rooted?

A. I don't quite understand the question. Can you be a little more specific.

Q. Well, did you do anything to your phone after it was rooted that sort of maintained it in a way it maintained its functionality and maintained it in the way you wanted it?

A. I let the manager application run and perform its duty prior to restarting after a system update.

Q. And that management system, is that the same as the Magisk or am I saying it right?

Page 476

A. The application is called Magisk Manager.

Q. I'm sorry I don't have the names right. I'm sure you'll correct me.

Is that the platform that you use to root your phone?

A. I believe that phone used the Magisk platform, yes.

Q. On the new phone you have and use today as you sit here, is that phone also rooted?

A. Yes.

Q. Is it rooted in the same manner as the last one?

A. Yes.

Q. Can you walk us through a bit more how you actually rooted that prior phone you had and what you did with it to root it?

A. I believe when it became available for that device, someone posted a patched boot image that was available for it.

So you would go into something called -- it's not recovery. It starts with an F. This is another mode that you use to flash the boot partition chips basically -- FastBoot. That is what it is. You would use the FastBoot tool to upload

Page 477

the patched signed boot image and after you perform an OEM unlock.

Once you do that, your phone will start up and have the root capability. And that is when you installed the management application, and you can use that to keep it to persist across system updates, for instance.

Q. I want to turn now to the wiping of your phone. Again, when I am referring to the phone I am referring to the phone that was imaged twice for this case.

Can you turn your attention, Mr. Pable, to the exhibit marked CTA Exhibit 28. Let me know when you have that up.

A. It's up. I am making sure all of the pages load. Okay.

Q. And CTA Exhibit 28, this is an e-mail sent from you at your personal Gmail account to Jim Psomas on October 24, 2018, correct?

A. Yes.

Q. And this was a message that you sent to Mr. Psomas after you were placed on administrative leave with the CTA, right?

A. Yes.

43 (Pages 474 - 477)

Page 478

Q. In this e-mail I will point you to that first sentence. It says Jim, my phone runs Android for work.

Do you see that?

A. Yes.

Q. What did you mean by that?

A. So back in the early days of sand boxing environments, there were several solutions for isolating personal information and enterprise information on devices.

One of those solutions was called Samsung Knocks and that evolved into what became known as Android for Work, which basically lets you maintain a separate work profile that isolates your personal data from the enterprise data.

Android for Work has since grown and evolved over time, but the intent has stayed the same, that it's used for separating personal and work information on the phone.

Q. So with that Android for Work profile, what CTA work or account was accessible on the work profile on your phone?

A. What CTA was accessible on it, primarily e-mail.

Page 479

Q. Anything else aside from e-mail?

A. Maybe attachments from the e-mail.

Q. Anything aside from e-mail and attachments?

A. I believe it also had a VPN profile.

Q. And so what could you do with that VPN profile that was on your Android for Work proile?

A. You could use that to access, for example, Mr. Haynes had written something called RTBM. Before we got a computer to dispatch application from Clever Devices, these were a set of web pages that Mr. Haynes had written to essentially be our sort of computer dispatched light mode.

Q. So aside from the VPM in the e-mail and the e-mail attachments, anything else accessible via the work profile accessible on your phone?

A. No, that's pretty much it.

Q. And when did you put that CTA or I'm sorry that Android for Work profile on your phone?

A. When I first got the phone, I had created the secondary work user. And since I did not want work e-mails going to the same place as my personal e-mail I used that as a way to separate my work e-mails from there. So I guess the day I synced it

Page 480

up in Microsoft Exchange.

Q. Would that been close in time to when you first purchased the phone?

A. Yes, that sounds about right.

Q. I don't want to put words in your mouth. Did you say you got that phone in 2015 or 2016, Mr. Pable?

A. No. I don't think I ever said a specific year. I said I got it very close to its release date.

Q. But that release date preceded 2018?

A. Correct.

Q. And did it precede 2017, if you recall?

A. It might have been in 2017.

Q. So close in time after you actually purchased the phone. So prior to 2018 you set up this Android for Work profile and had your CTA Microsoft Exchange linked to your phone?

A. Correct.

Q. And who at the CTA assisted you in doing that?

A. No one. All I did was enter in my e-mail address and password and agreed to the device administrator prompt, and I was able to use it.

Page 481

Q. Did you make anyone at the CTA aware that you were doing that?

A. My manager was aware. In the past prior to using the automated setup on previous phones when I had done this similar I had asked, I believe, David Warnick, I think was his name for the server details before there was an auto discover system set up on the mail server.

Q. That communication with David Warnick, that was with a prior phone you had?

A. Yes.

Q. So with this specific phone, aside from your manager I guess -- when you say manager are you referring to Michael Haynes?

A. Correct.

Q. Aside from Michael Haynes, was there anyone else at the CTA who was made aware of the fact that you were connecting your phone to the CTA's Microsoft Exchange?

A. I'm not sure if I told anyone explicitly other than when I initially enrolled my other devices.

Q. So you enrolled your other devices. Could you tell me what you mean by that?

44 (Pages 478 - 481)

Page 482

A. Like my old phone. My prior phone was a Nexus 6.

Q. So with your old phone it interacted with that David Warnick so you could confirm how you could connect your phone to the CTA Microsoft Exchange, right?

A. Correct.

Q. Then you didn't do it with this phone?

A. I didn't have to. It was set up to automatically configure by that time.

Q. And as far as you know, you didn't have any obligation to alert the CTA to the fact that you had your personal device connecting to the CTA Microsoft Exchange?

A. I guess that's a correct statement.

Q. And that phone, I believe you confirmed you purchased that yourself. It was not a phone issued to you by the CTA, right?

A. That's correct.

Q. The CTA didn't install any programs or software on your phone?

A. If you are referring to like spyware such as Air Watch or Mobile Iron, no.

Q. Did the CTA install anything on your

Page 483

phone?

A. They didn't install any applications, but they pushed a policy down.

Q. When you say they didn't install any applications, did they place anything on your phone, software, applications, spyware or anything like that?

A. Just a policy.

Q. And how did they place a policy on your phone?

A. When you connect to the Microsoft Exchange server it says here are the policies of this server, and you have to adhere to them in order to use it. Do you agree to allow the android device administrator to enforce this policy.

Q. Do you know what that policy was called?

A. It would have been whatever the policy that came from Microsoft Exchange was.

Q. Was that a policy that just applied to your e-mail?

A. It would have applied to the work user.

Q. When you say work user, do you mean that work profile that you set up?

A. Yes. So on a computer you could have more

Page 484

than one person log in. On a phone it's very much the same thing.

So I created a separate one on the phone for the CTA's policy management to control.

Q. You said you set up your phone so that the CTA's policy would control the work profile?

A. No. I set it up so that the CTA's policy would only be able to control the work profile.

Q. So what could the CTA control in your work profile by virtue of that?

A. Anything that the policy made you agree to. For instance, they can require a complexity of pin to unlock your phone.

They could require a certain strength of encryption on your device drive. They can require the ability to remote wipe. They could require the ability to lock the device. There are a lot of things.

I don't know what the default policy is, but I know that I had to agree to a number of policy enforcements in order to be able to synchronize my e-mail with Microsoft Exchange.

Q. So you had to agree to that policy when you set up the phone. You did that for the work

Page 485

profile?

A. Correct. I had to agree to enable the CTA to enable that policy on my phone.

Q. I think you said that was a policy that came from the Microsoft Exchange?

A. Correct.

Q. Did you have to check a box?

A. What do you mean check a box?

Q. How did you accept or consent to that policy?

A. I think when you install an application from the store it will say here are the permissions that manage the application. Will you allow it to have access to these things. This is a similar prompt for special device administrator permissions.

Q. So you got a prompt like that, and you accepted the prompt in some way?

A. That is correct.

Q. And you mentioned special device administrator privileges, is that right?

A. Correct.

Q. Were you the special device administrator with those privileges?

A. No. The device administrator, that is the

45 (Pages 482 - 485)

Page 486

name of the enforcing thing called the android device administrator. That's the name of the enforcer you could say.

Q. So that enforcer is coming from android then?

A. The enforcement is built into android or the mail application that you have, and it receives its instructions or the policy that it enforces from Microsoft Exchange.

Q. What of the policy did the CTA enforce on your phone?

A. I believe all of the defaults. I've had to enable named encryption. I believe I had to have a complex pin.

I had to agree to a remote wipe. And I had to agree to allow the CTA to lock the screen. I am sure there were other things as well.

Q. Did that happen automatically once you consented to that policy that you just explained?

A. Yes. Once you consent, the device administrator says okay, you're all good. If we get instructions from the exchange server to enforce these policies, then we will enforce them.

So one of the ones that was definitely

Page 487

set was require named encryption. And another one was a complex pin. So those were two things that had to be set immediately.

Q. I don't know if you still have it up, but the second sentence of CTA Exhibit 28, do you have that up still?

A. Yes.

Q. That second sentence of the email says this gives the CTA full control over my device on the work profile.

What did you mean by the CTA having full control over your device in that manner?

A. They could essentially lock out the screen. They had control over the encryption keys on the nand. They were the ones that created it. I had no way of backing up those keys that I am aware of.

I believe those have been hopefully communicated to the exchange server. I had to allow the CTA to remotely wipe the phone. I had to allow the CTA to -- that's all I can remember off the top of my head. I am positive there were other things.

So those special capabilities are what I referred to as being able to have control over the

Page 488

device.

Q. And are you aware of who at the CTA was aware of or knew of this control the CTA had over your phone?

A. I was not privy to that part of the CTA. They had contracted it out to a third party called SDI.

Q. Do you know what SDI's function was?

A. I believe that they were general user administration and help desk.

Q. So why did you set up the phone in this manner with the profiles the way you did?

A. As I said, I did not like the idea of, one, mixing my work e-mails and my personal e-mails. I didn't want to accidentally reply to a professional colleague from my personal address and vice versa.

I didn't like being able to have a combined view and not know whether an e-mail came from work or from a personal thing. So I wouldn't be able to easily at a glance tell its origin.

And I also didn't like the fact that if something were to happen, such as a remote wipe I did not want that impacting my personal user or

Page 489

corporate profile on the device.

Q. So when you say you didn't want to mix the personal and work e-mails I want to make sure I understand.

As I often see it, and I suppose we're obviously much less technical than you. But when you look at your phone you could go into your e-mail, and you could select an inbox, whether it's a work inbox or personal inbox, and it sounds to me that you wanted to configure your phone in a way so that those two inboxes were further apart or further removed, is that right?

A. Correct.

Q. And the reason you did that is you were concerned you would inadvertently respond to Michael Haynes from █████.com as opposed to your CTA account?

A. Not just Michael Haynes. For example, at the time I was working with Sierra Wireless. I worked with people from Utility and Clever Devices, and many of them don't know my personal address.

And that is not something that I want to disclose. And depending on what the default e-mail application on your phone is that behavior is

46 (Pages 486 - 489)

Page 490

actually sometimes more integrated than what you described.

Sometimes they show a combined inbox. So I did not want to inadvertently come across a situation where that might cause an issue like that.

And I also like the idea of my personal stuff not being able to affect my work stuff, and my work stuff not being able to affect my personal stuff.

Q. Were you aware of the CTA wiping other user's phones through this policy that you are referencing?

A. I had never heard that CTA had ever done that. I did know they used an application called Air Watch for their issued devices, but I didn't have an issued device.

Q. So did you read the policy language that was provided when you set up your phone in this manner to determine that there was going to be a wipe of the phone?

A. So agreeing to the policy didn't force the wipe of the phone, but the policy did spell out that they had permission to do so.

Q. Did you become aware for the first time

Page 491

when you reviewed that policy?

A. Become aware of what?

Q. That the CTA apparently had the ability or that you were agreeing that the CTA had the ability to wipe your phone?

A. I had seen the exact same policy delivered on my previous connected device, and I had done similar.

Q. So you are aware of that policy because of how you had configured your prior device that you used when you were employed with the CTA?

A. Correct.

Q. If you could go down further in CTA Exhibit 28. I am looking at the third paragraph of CTA Exhibit 28.

A. Okay.

Q. Can you just to yourself, could you read that third paragraph, Mr. Pable. Let me know when you've read it.

A. I read it.

Q. In paragraph 28, you say when my account was deactivated a remote wipe also was initiated. It removed all e-mails, safe passwords and documents, my work in Android sandbox. Right?

Page 492

A. Correct.

Q. When you refer to your account being deactivated, are you referring to your CTA work account?

A. I believe that's what they disabled, yes.

Q. And what saved passwords would have been in your CTA or your Android for Work profile?

A. So when you create a new user, every application that you use has its own application database of information in there.

So, for example, if you had a web browser that saved passwords or a password manager that saved passwords, if you had a remove wipe happen on that user profile then the user data for those applications are gone and that includes those safe credentials.

Q. What safe credentials did you have on your Android for Work profile?

A. A multitude.

Q. Can you recall any with specificity?

A. Let's see. I think my BusTracker account. I think desktop passwords. The transit support password. IOT device passwords. Shelter sign credentials. Secure bus credentials. That is all I

Page 493

can think of off the top of my head.

Q. Was moto key part of your Android for Work profile?

A. Moto key was a system application. So it was an installed application on all profiles, but it had a specific user account tied to that.

Q. So the moto key, it sounds like it straddled -- I am explaining this crudely, but so I understand the moto key, it was something that had its hooks in both your work profile and your personal profile, is that right?

A. Let's break that down into a much easier to understand analogy. Obviously, many people use Google Chrome.

You could have Google Chrome installed on your computer. You log in. You could use Google Chrome. It has your bookmarks and passwords, correct? Do you understand that?

Q. I understand.

A. So you log out, and someone else logs in, and they open Google Chrome, and they do not have your bookmarks and passwords and stuff saved, correct?

A. Correct.

47 (Pages 490 - 493)

Page 494

Q. I'll take your word for it.

A. Well, they shouldn't and if they do, that is a bit of a problem. It's the same kind of methodology that would happen on a multiuser device that had a system application installed.

Q. So to put it another way, you had moto key on this phone. Are there some passwords that are saved in moto key that are just with the work profile and some passwords in moto key that are just affiliated with the personal profile?

A. They were, yes.

Q. You're saying they were. Is there a distinction I am missing there?

A. I no longer use moto key.

Q. But on the phone we're talking about in 2018, that's how it was set up?

A. Correct. At that time, yes.

Q. So then in this same paragraph of CTA Exhibit 28, you say a remote wipe was initiated. What you are saying is wiped from your phone at that time?

A. I'm saying that data profile lost the session from the account. So when you have a user on Android, if you go ahead and you basically

Page 495

eradicate it Google and Microsoft have no way of correlating information about a device to you or correlating your user to any data that may be saved in, for example, the Google cloud.

Q. I think my question is a little different. On your work profile, this wipe is initiated, right?

A. Uh-huh.

Q. When you go to look at your work profile on your phone or go to access it, what does that look like in 2018?

A. Before the wipe or after the wipe?

Q. After the wipe.

A. After the wipe it looks like a brand new user desktop essentially. Like you just turned the phone on brand new.

Q. And so does it have your log in there?

A. What do you mean by your log in?

Q. Does it say C Pable at CTA or whatever?

A. No, it wouldn't have anything configured.

Q. So it's just a blank screen?

A. A blank slate.

Q. Who initiated that wipe?

A. There are a multitude of possibilities. I personally believe it came from CTA, whether or not

Page 496

it was intentional, but I obviously can't discount the potential for one either. There was a flaw with the software used in complying with the policy or that I would have wiped it.

But I can't imagine I would have wiped it if I had every intention of returning to work.

Q. So let's unpack those scenarios. The first possibility is that the CTA wiped it, right?

A. Yes, perhaps unintentionally.

Q. And how would an unintentional wipe have occurred?

A. One of the things you can do when you're disabling a user account is Microsoft supplies a batch powershell scripts that can run.

What you do is in the case of an emergency termination, if you want to completely restrict access to someone in an urgent manner you can execute this powershell script against their network account, and it will find any attached mobile devices as well and automatically give those so that that user is no longer a threat.

Q. So when you're saying automatic, if I'm hearing it that is like somebody says I'm putting Chris Pable's administrative access, we're putting

Page 497

it on ice. We're turning it off. However you want to phrase it.

And by doing that the process you explained would wipe that work profile on your phone?

A. Yes. SDI is a company that does this kind of administration for many different companies. So as a managed provider like that they likely have standards and scripts for emergency terminations.

I am not sure of the exact nomenclature that they use for a situation like that, but if someone were to need to be urgently deactivated and treated as a bad actor or a threat, they would probably use a high-risk set of scripts to disable the access of that user.

Q. And you mentioned also the possibility that the wipe could be a flaw with the software?

A. That's correct.

Q. What software are you referring to that would have a flaw?

A. The e-mail application, the operating system or anything that had to adhere to that policy.

Q. By the e-mail application, are you

48 (Pages 494 - 497)

Page 498

referring to Microsoft Exchange?

A. That would be the e-mail server. I am talking about the mail application on the operating system.

Q. What was that?

A. I believe it was just called mail.

Q. And then what was the operating system?

A. Android.

Q. Do you have any other information or evidence that anyone at the CTA or on behalf of the CTA initiated this wipe of your phone?

A. No, because I didn't see them personally do it.

Q. And then in the fifth paragraph of CTA Exhibit 28, if you still have it up, let me know when you're there.

A. What's the first few words?

Q. I think it's moto key is the system app. Do you see that?

A. Yes.

Q. And in this paragraph you suggested that you come to try to unlock the computer in person, though you doubted it would work.

Could you tell me why you doubted it

Page 499

would work if you came to unlock the computer in person?

A. Yes. So since the user data for moto key was no longer present, if you went ahead and tried to sign back into Microsoft Exchange, there is a small remote possibility that the session identifiers for the applications might be restored, and the cloud backup of the applications could be restored to them so the moto key user database.

But since Microsoft Exchange and Google are two different platforms, I doubted that that would actually work, but I was willing to try.

Q. Okay. Did anyone at the CTA to your knowledge know that deactivating your CTA account would result in a wipe on your phone?

MR. DUFFY: Objection, if that's what happened.

THE WITNESS: So again, I don't know if deactivating the account is necessarily what caused it. It could have been a batch set of actions that were compiled together to be run in case of an emergency situation.

So the act of simply disabling my network account might not have caused it, but it's possible it could have caused it, and there's also the

Page 500

potential that they ran more than just a simple account disable.

BY MS. BABBITT:

Q. Was any personal data wiped from your phone as a result of this October of 2018 wipe?

A. Unfortunately, yes, but not to such a great extent. And it is entirely my fault that that data got wiped.

Q. What was wiped?

A. I took several pictures in New York on my work profile on accident, and I did not have an SD card to move them over to my personal profile so that I could back them up to the cloud.

Q. Anything else wiped that was personal data?

A. No, just a couple of pictures of my vacation.

Q. And was your phone wiped again, that same phone after the October of 2018 wipe?

A. In a sense it was. The encryption keys were changed.

Q. Can you tell me more about that?

A. So similar to when I connected it to the Microsoft Exchange server at CTA, when I went to

Page 501

Morning Star, Morning Star had a different policy that my phone had to adhere to.

And so that caused an underlying change in what the nand encryption key was. It had problems at first when I was trying to do that. So what I ended up having to do was move the data from one spot to another, perform the encryption on a fresh nand and then move it back.

Q. Where did you move the data to when you were doing that?

A. Just another partition.

Q. Another partition on your phone?

A. Correct.

Q. And then after those steps occurred you moved the data back on to the other partition?

A. Correct.

Q. That was when you started your employment at Morning Star?

A. Not immediately when I started my employment there. At first I did not tie my phone to the exchange server.

Q. Was your phone wiped at any other time aside from the two instances you just detailed?

A. I don't know if you want to call it a

49 (Pages 498 - 501)

Page 502

wipe, but I believe we covered it earlier. It was an unlinking.

When I had a soft boot loop, I was able to restore the information with an application called Disk Digger and restore the links on the i-notes.

Q. When did that occur, Mr. Pable?

A. April or May of 2019 or 2020, one of those two.

Q. Was that the boot looping that occurred?

A. Yes. That's what was the primary cause.

Q. When that occurred, was that related to you getting your phone ready to be imaged by Quest?

A. It was after I received it back.

Q. Can you tell me who Brendon Thommes is, T--h-o-m-m-e-s?

A. He's my manager.

Q. He's your manager at Morning Star?

A. Correct.

Q. Has he been your manager at Morning Star throughout your employment with Morning Star?

A. Generally, yes.

Q. Can you turn your attention to Exhibit 73, Mr. Pable. Tell me when you are there.

Page 503

A. I'm there.

Q. So CTA Exhibit 73, this is an excerpt of Microsoft teams communication that you had with Brandon Thommes on May 26.

On May 26 you said to Brendon Thommes, "Thanks for court, I had to install some bullshit program for them to do a probe." Do you see that?

A. Yes.

Q. Are you referring to something you had to put on your phone in furtherance of this litigation?

A. No. I had to permit essentially a probe for the Quest discovery. I had to do the exact same for the For Discovery as well.

Q. So I guess to be clear, that program that you installed you were doing that in furtherance of getting the phone imaged for this lawsuit that we are deposing you about?

A. I didn't personally install this application. This was installed, and I had to consent to it.

Q. But fair to say it's related to this lawsuit that that step was taken?

A. Yes.

Q. And I hear you say you didn't specifically

Page 504

or personally install the program, but Quest did, is that right?

A. Correct.

Q. What program did they install?

A. I honestly don't know the full details other than the package contains the word Paraben.

Q. And when was it installed on your phone?

A. I would assume at some point during the imaging process.

Q. So it have would been prior to this message that you exchanged with Mr. Thommes on May 26, 2020?

A. That sounds correct.

Q. Because you say I had to install some bullshit program for them to do a probe last week.

A. I am trying to recall the exact time line here to see if there was anything else I had to do personally to prepare for it.

I do recall -- I'm also trying not to divulge any privilege, but I know I had to also get authorization tokens for access into my electronic cloud stuff. So there was another thing that I was collaborating with to handle those tokens and authorize that to be able to go into it.

Page 505

Q. Was that Paraben program that was placed on your phone, was that to your knowledge what was installed to have the image prepared of your phone?

A. I would only be speculating because I wasn't there when it was done, and I don't know all of the tools and software used.

Q. So you didn't install it, but someone installed it on your phone on your behalf?

A. That's correct. But again, this might also be referring -- I know for a fact that the Paraben program was installed on there, and I know I had problems seeing it. But I can't say that is the root cause of what you're reading in the thread here.

Q. So in order words, the fact that your boot looping on your phone May 26, you don't know with certainty that it was because Paraben was placed on your phone for the imaging process?

A. Correct. In fact, I told you earlier that my phone would like to randomly turn off on me. When a device file gets corrupted that could cause data integrity issues. And if the parsing mechanism android cannot handle a bad data file, that could result in a boot loop.

50 (Pages 502 - 505)

Page 506

Q. Midway down on CTA Exhibit 73 it looks like the time stamp is May 27, 2020 at 12:44. Do you see that?

A. May 27 at 12:44. Yes.

Q. And there you say my phone was wiped with a frowning face icon?

A. Yes.

Q. How did your phone get wiped in this instance?

A. That would be that unlinking issue I was telling you about. When I was having trouble with the boot loop I was not able to get into my system.

So what I did is I loaded up an application called TWRP, which allows a recovery shell. From there I didn't see any data on my user partition.

Eventually further on past the conversation you're seeing here, I was able to relink the data and reconstruct the inode database and that solved the issue I was having.

Q. Prior to you providing your phone for this imaging and prior to you having that Paraben software installed on your phone, did you make a backup of your phone?

Page 507

A. I really didn't need to back up anything other than music. So no, not really.

Q. So no, you did not?

A. I mean there were pictures from my siblings of my parents that I really wanted, but I could always ask for them back. But it was a really tough subject at the time.

Q. So I apologize for repeating myself, but you did not back up anything on this phone prior to having the Paraben software installed?

A. No, I don't believe I did.

Q. Did you remove anything from this phone or put anything in a backup platform prior to having the Paraben software installed?

A. The Google cloud offers the user data backups that my applications use. Google photos houses my photos. Google e-mail holds my Gmail. Almost all of the data is already in the cloud aside from text messages.

Q. Ultimately you were able to recover everything that was on that phone by relinking?

A. Mostly everything that mattered, yes.

Q. Well, what were you not able to recover by relinking it?

Page 508

A. Because my phone started up and had overwritten certain data. So on a computer when you'll write to a sector on a hard drive that has data already written on it you compromise the data that's been sitting there.

It is called the lazy delete. So anything this android chronologues may have overwritten based on the remnants when attempted to boot, that was lost. But I can't think of anything specific that was lost.

Q. Any Signal messages that were lost as a result of this?

A. I don't believe there were any Signal messages lost. Without a fully intact user database the encryption wouldn't function. So it wouldn't be able to be read.

Q. And then the next message after you said your phone is wiped in CTA Exhibit 73, you say but at least it turns on. They made a call to the app and because I was rooted it crashed and corrupted a system file.

Could you tell me what app you're referring to?

A. I believe this was the Microsoft

Page 509

authenticator.

Q. When you say they made a call to the app, who are you referring to?

A. So when you attempt to log into a device on the enterprise network, one of the requirements at Morning Star is multi factor authentication.

So in order to -- what's the word, be able to provide the FMA, similar to if you log into your Gmail somewhere it will ask you hey, is this you. For Microsoft service you use the Microsoft authenticator, and they say hey, is this you. And you would approve or deny it.

Q. So one thing that I think you referred to a minute ago, you said that the phone wouldn't be able to read certain messages.

Were certain messages rendered inaccessible even if they were still on your device as a result of this wipe?

A. I don't understand the question. Can you rephrase it.

Q. Let me move on to the next page of CTA Exhibit 73. And that is page two. You say at the top message on May 27, some small good news. The Signal team did own up to it, and you can manually

51 (Pages 506 - 509)

Page 510

use boot force to recreate the data.

Q. Do you see that?

A. Yes.

Q. What are you referring to in that message?

A. So there was a bug filed on the Signal Get Hub a problem with attachments inside of Signal.

So basically Signal tries to be intelligent about sending files. It will only store one copy of a file if it's sent to multiple places for instance. So with my siblings in a group chat, there were multiple copies of pictures of my parents and what happened was that cross linking in the database was not 100 percent fully working correctly, but they did publish a fix on their Get Hub and going forward the new version of Signal corrected that issue.

Q. Was that data you were able to recover as a result of that bug being patched?

A. The cross linking issue, it wasn't recovered data. It was making duplicates of cross linked data so that it appeared correctly.

Q. Were you only able to restore attachments as a result of that?

A. Yes. It specifically affected pictures.

Page 511

Q. Who is ████████████████?

A. That would be an artist I commissioned to help with some of the character compositions I have commissioned.

Q. Do you know their real name?

A. Only their first name. Avi.

Q. Is that A-v-i?

A. Correct.

Q. How did you come to know this person?

A. I interacted with them through anthropomorphic fandom.

Q. I'm sorry, I think you cut off.

A. Through the anthropomorphic fandom.

Q. Is that like a community or what are you referring to when you say that is how you met him? Is that online, in person?

A. I am trying to remember exactly where I met Avi. I don't know if it was a high end open for commissions post or if it was an event planning for the convention that I am helping run, but I'm guessing it's the former, hey, I am open for commissions and here is my work. Contact me if you would like to do anything.

Q. And you had artistic renderings

Page 512

commissioned?

A. Correct.

Q. And you paid this Avi individual to create artistic renderings?

A. Correct, and help with character design.

Q. What are the artistic renderings of?

A. My character.

Q. And your character being?

A. Hyena.

Q. Is that Gingi Turano?

A. Correct.

Q. Can you turn, Mr. Pable, to CTA Exhibit 29. Let me know when you're there.

A. I'm there.

Q. This is an e-mail exchange with Avi in June of 2020. I want to focus your attention to the last paragraph of the first page of CTA Exhibit 29. It says one of the things my employer did.

Do you see that?

A. Correct.

Q. You said one of the things your employer did was issue a remote wipe on your phone. So they deleted everything, including encryption keys to assets they own and any personal data. Do you see

Page 513

that?

A. Yes.

Q. Are you referring to the CTA in that paragraph?

A. I am.

Q. And is this the wipe that you claim occurred when you were placed on administrative leave with the CTA in October of 2018?

A. That is correct.

Q. And with respect to the CTA assets that you refer to, which CTA assets are you referring to there?

A. Let me read it for context. So that would be the Windows 10 desktop, but obviously that was worked around, and the bit locker key and that obviously was worked around.

That would be also I believe the chrome boxes for the training kiosk I worked on. I think that also had a nand encryption key on there.

Q. When you say they were worked around, you mean the CTA was able to ultimately access it either because we discovered the encryption key that was saved on a USB drive?

A. Correct.

52 (Pages 510 - 513)

Page 514

Q. Or it was worked around because we hired a forensic expert to break the code. Is that what you're referring to?

A. Both.

Q. Then you also, as I mention, you said personal data of yours was deleted. Can you confirm what personal data you're referring to in that email?

A. Just the pictures that were my fault for putting in on the work profile on accident.

Q. And then you also say in paragraph CTA 29 I still used that phone until a few days ago. My former employer's defense now wants copies of the phone they themselves erased.

I had to pony up for that and to top it off my old phone was dying. So I just bought another one. Is that the phone you bought, the new phone you have and are currently using?

A. Correct.

Q. And you moved your data from -- the next sentence says so I was moving all my data and trying to coordinate things without having a phone, and it was a nightmare.

Can you explain what you mean by moving

Page 515

your data?

A. Yes. So I attempted to migrate my data several times to several broken devices that I had ordered from One Plus and/or Amazon.

And in the process of trying to migrate that data over I discovered the phones were not up to snuff. So eventually by July I finally had a workable phone that I could copy the data onto.

Q. Did you use backups of anything you had to remove the data or materials into this new phone that you are using currently?

A. When you sign into your Google account it downloads the cloud backup so that information onto it.

Q. Any other backups aside from what was other Google cloud account that you used to put on your new phone?

A. I believe there was an application called Nova Launcher that I used on my new phone. And I had to make a specific backup of that because you can't migrate that over because it's customized widget settings, background wallpaper, icon placement, that sort of stuff.

So that one had to be specially moved

Page 516

over, and I believe just some music. But I don't know if I moved all of the music over because my new phone doesn't have any removable storage.

Q. Do you know or can you approximate how much data was moved from your own phone and made accessible to your new phone?

A. Through the Google cloud?

Q. Through Google Cloud and any other means.

A. I can't tell you how much through the Google Cloud. I have no way of quantifying that. But the manual moveover, I think the Nova Launcher file is maybe four megabytes at the most and music, if I moved any of that, the flack files are very large. So it would be like maybe ten megs a minute.

Q. And the last line in that paragraph CTA Exhibit 29 you say in addition to my first suit, I had ordered my first real suit ever too for court next week. Coordinating that and measurements was really tough.

And so your first suit is referring to your hyena suit, is that right?

A. That is correct.

Q. And then you said you ordered your first real suit ever for court. Did you appear for court

Page 517

in any matter?

A. I had every intention to and then I was told that the status meeting was rescheduled because of Covid.

Q. And you didn't appear in court in any other matter or any other litigation, is that right?

A. No. We haven't been able to attend any of that in person since the start of the pandemic. But I am wearing said suit now.

Q. Looking sharp.

A. Thank you.

Q. Let's turn to this first imaging of your phone that was done in May or June of 2020.

Was that a complete image of the phone when it was conducted and produced?

A. I honestly wouldn't know because I didn't see the data that was produced.

Q. Was it your understanding that it would be a complete image that was produced?

A. It was my understanding when I hear the word image that you supply essentially a byte map of the nand blocks or platter.

Q. Is that sort of the same thing as mirror image or identical set of data?

53 (Pages 514 - 517)

Page 518

A. If you were given the chips you could write the ones and zeros on the next chips the same way, but there are other means of creating images and/or proprietary formats that are more efficient and file based instead of byte map based.

Q. Did you ask that certain materials on your phone not be imaged as part of that imaging process?

A. No.

Q. Did anyone inform you that certain materials would not be imaged as part of the process?

A. No.

MS. BABBITT: Let's take ten minutes. We will come back at 3:35.

THE VIDEOGRAPHER: Going off the record at 3:26 p.m.

(Recess)

THE VIDEOGRAPHER: We are back on the record at 3:36 p.m. You may proceed.

BY MS. BABBITT:

Q. Mr. Pable, we were talking a bit about the image, the first image that was conducted last summer of your phone.

And do you know or could you describe

Page 519

the process that was used to conduct that image?

A. No, I have absolutely zero insight into what was done.

Q. And were you aware that the result of that image was less than .2 gigabytes of data?

A. I think I may have seen that figure on one of the court filings in January.

Q. Were you aware of it containing only that amount of data prior to the court filing?

A. I don't know if I was or not. I don't think so.

Q. And do you know why the image didn't contain any information besides the .2 gigabytes that were produced?

A. I don't.

Q. Did you ever attempt to have the phone reimaged after the first imaging in May or June of 2020 last year?

A. I honestly didn't know that there was a -- I knew there was a first imaging. I didn't know that there was any want of a second image. So no.

Q. You never elected to get the phone reimaged as a result of it having such scant amount of data on it, is that right?

Page 520

MR. DUFFY: Objection, lack of foundation. You just said he didn't know that. You could answer.

THE WITNESS: I honestly don't know what the image contains or it doesn't contain or even its format. So I honestly don't know what to tell you.

BY MS. BABBITT:

Q. So you never attempted to have the phone reimaged yourself?

A. Correct.

Q. Are you aware that you represented to the Court that the reason that the image didn't contain much data was because most of the data was wiped when the CTA disabled your work profile on the device in October of 2018?

MR. DUFFY: Objection to the extent that it's a legal characterization. But go ahead.

THE WITNESS: I am honestly not sure what representation -- like where that representation came from.

There's any number of reasons that that production could be like that. I mean CTA's own image was from what I understand the production that we saw was 5O megabytes less than what you're claiming here.

Page 521

BY MS. BABBITT:

Q. So is it accurate to say that the reason that the first image of the phone contains less than a gigabyte of data was because of the purported wipe by the CTA?

MR. DUFFY: Objection, lack of foundation.

THE WITNESS: I honestly wouldn't know because I didn't look at it, and I wouldn't know what to tell you because I haven't seen it.

BY MS. BABBITT:

Q. Did the phone contain more or less than a gigabyte of data after you left the CTA?

A. Of user data or system data because that is also an important distinction?

Q. All data.

A. All data, I believe the system ROM is several hundred megabytes. So the system ROM in itself would be -- so if the system ROM is several hundred megabytes, then it would probably be more than a gigabyte, then sure.

Q. When you left the employment of the CTA in November of 2018, did your phone contain more than a gigabyte of data?

A. I honestly couldn't tell you because I

54 (Pages 518 - 521)

Page 522

didn't measure it, but I suppose it's possible.

Q. How much data do you have on your phone today?

A. My current phone I haven't measured it. So I wouldn't be able to tell you. I try to keep things in check because it's a fixed storage.

Q. Does it have more than a gigabyte of data on it?

A. I honestly don't know. I haven't seen the system ROM for this new phone.

Q. Okay. Let's talk about backups. I know you said you have backups. A lot of them were Google cloud based backups or saved materials on the Google cloud.

MR. DUFFY: What he said was those things are backed up. You're mischaracterizing his testimony. He didn't say he backed it up. He said those things back up.

BY MS. BABBITT:

Q. Tell me about any other backups you use aside from Google cloud to back up data on your phone.

A. That I use right now?

Q. Let's start in 2018.

Page 523

A. In 2018, I believe beyond the Google backups anything that I personally did I think I e-mailed myself a Nova Launcher backup file, which is that home screen I was discussing earlier. That's all I can think of off the top of my head.

Q. And have you ever taken a third party application backup aside from that Nova Launcher that you mentioned?

A. Do you mean like an exporter user data from an application?

Q. Yes.

A. I'm trying to think. Maybe in the past, but I can't think of anything recent.

Q. When you say in the past do you mean prior to 2018?

A. Prior to even that phone.

Q. Have you ever taken a backup of the Signal application on the phone that was imaged?

A. I believe it can do an automatic backup, but you would then have to store that encryption key for it somewhere.

And I didn't have any sort of secure storage to store that encryption key. So if it did make an automatic backup I wouldn't have the ability

Page 524

to access it.

Q. So you said it's automatic. How does that work? It just automatically backs it up without you doing anything?

A. I believe you can set a policy, but when you do that, it sets the encryption key. Now, I don't think that I had it configured on that phone to do that.

But I did see in your production that you produced a single encryption archive.

Q. Could you have set up something that your Signal messages had a backup?

A. I could, but I didn't.

Q. The reason for not doing that is because you didn't have a means for storing the encryption key?

A. Well, that, and that would have required double the amount of space.

Q. Any other reasons why you didn't do that?

A. Space is probably the biggest one, but also needing a good place to keep that key. It's a fairly large key.

Q. Could you have used moto key to save that?

A. Moto key is no longer supported by

Page 525

Motorola. They removed it from their ROM I believe when they went to Oreo.

Q. Do you have any other similar applications to moto key that you use to save passwords or encryptions or decryption keys?

A. I have moved my password management to an open source application called Bitwarden.

Q. When did you do that?

A. In 2020 I think.

Q. Was that done on the phone that was imaged in this litigation?

A. No, that was done on my latest device.

Q. In 2018, the phone that we were talking about prior to your latest device, you did have moto key on that phone, and it was accessible in 2018 on that phone, correct?

A. In 2018, yes, it was.

Q. And why did you have moto key on your phone?

A. It came installed from the factory with it.

Q. Well, first did you use moto key?

A. I used it for work stuff, and I tried it out on some personal things.

55 (Pages 522 - 525)

Page 526

Q.   What work stuff did you use it for?

A.   The same things that I covered with you already earlier.  Like my desktop password, things like that and those other assets.

Q.   So those CTA assets or accounts that were related to your CTA employment, those passwords were saved on moto key?

A.   Correct.

Q.   And I'm sorry, you said a few personal passwords were saved, is that right?

A.   Yes, but that was on the other profile.

Q.   What personal passwords did you have saved or rather what applications that were personal did you have moto key save the passwords or keys for?

A.   My Gmail was a big one.  I was testing it out on there, and I was testing it out on -- actually, I think I primarily used it for Gmail.

Q.   And did anyone at the CTA instruct you or ask you to use moto key to save these passwords or keys?

A.   No.

Q.   Did you tell anyone at the CTA that you were using moto key to save the passwords or keys?

A.   I may have told Mr. Haynes because he also

Page 527

had a Motorola device that would have been capable of doing it.

Q.   Anyone aside from Mr. Haynes aware that you were using moto key to save these passwords?

A.   I don't think so.

Q.   Did anyone at the CTA authorize you to use moto key to save your passwords in that manner?

A.   No, but nobody didn't unauthorize.

Q.   Did you share the passwords that were related to CTA's assets with anyone at the CTA so that the CTA had access to those passwords in addition to that being saved in your moto key?

A.   Can you rephrase that question.

Q.   Sure.  So you had passwords saved to CTA assets in the moto key app on your phone, right?

A.   Correct.

Q.   Did you have those passwords shared with anyone else at the CTA so if your phone was destroyed or you lost access to moto key that those passwords could be recovered in some way?

A.   For the ones that were like project based, the documentation had the user names and passwords in there, yes.

Q.   So what ones didn't you have the passwords

Page 528

shared or other people that had CTA passwords relating to CTA assets?

A.   I believe primarily my desktop.  No.  I don't know if -- I think the Trent support password was a personal password that I generated on there too, but that's a multi user system that I didn't have administrative privileges on.  So CTA could just reset that one easily.

Q.   So you said your CTA computer, that password no one else had access to, is that right?

A.   I believe so.

Q.   Then likewise, that partitioned drive on your CTA computer, no one else had access to that key, is that right?

A.   I believe so.

Q.   Why is that?

A.   Because I would use the moto key to supply the password for those.  I mean they were randomly generated gibberish passwords.

Q.   So if you lost the phone with the moto key or if it was destroyed, how would you get into those devices otherwise?

A.   Well, one, if the phone was lost or destroyed, in theory one of the things we could have

Page 529

tried is like I wanted to try with Jim was logging in and seeing if that would work.

But barring that, not having access to those partitions isn't the end of the world.  All of my work and anything relevant is already stored on the file server.  So the desktop environment is more of an ephemeral data and a state from our code repositories and a set of installed applications where if you could easily rebuild it, and Mr. Haynes had an image to effectively reimage that to the factory settings in case of any of the Clever cloud computers needed to be reimaged in that manner.

Q.   Aside from you physically approaching the computer like you said you suggested you do to Jim Psomas, was there any other method if your phone was lost or destroyed that you could have accessed that computer for the secondary partition drive?

A.   I guess it depends if they took it offline you might be able to do it through remote desktop.  But I believe they disconnected the machine and took it offline.

Q.   So if they had kept it online, you think you would have been able to log on without moto key using remote desktop?

56 (Pages 526 - 529)

Page 530

A. No, I would definitely be using moto key to do the log into the desktop.

Q. I'm speaking about if you don't have access to your phone and don't have access to moto key, in what manner would you access that CTA computer or the secondary drive of computer?

A. You could boot a live CD. This is about the secondary partition?

Q. Let's stick with the primary drive first.

A. The primary drive, you don't need moto key for that at all. You plug the flash drive in and go.

Q. So if you didn't have the moto key and you didn't have flash drive, could you get on to the primary drive?

A. Again, I believe I stipulated to this before in my previous deposition. It's debatable. There are attacks on encryption all the time. And as you said, without a password you said your expert gained access into both partitions. So in theory, I could load a live CD and gain access that way.

Q. Any other ways aside from those to gain access?

A. There may be, but I'm not aware of any.

Page 531

Q. Did moto key generate a new key each time you accessed the CTA computer or was that a stored saved key that would recognize your computer when you approached it?

A. It's a saved secret.

Q. When you say saved secret, is that a password?

A. Yes. Secrets can be any number of things the encryption key password. It is something to be kept private.

Q. But it was static. In other words, it was saved and set so that each time you would approach it it would be that same key that decrypted it?

A. Correct.

Q. And then just returning briefly, I know you mentioned SD cards a few times. In 2018 at the time that you were placed on administrative leave was there an SD card in your personal phone?

A. At the time I was placed on leave, no.

Q. When did you put an SD card after you were placed on leave?

A. I don't think I put an SD card in since I was placed on leave. I don't think I have since.

Q. So you don't have any recollection of

Page 532

installing a separate SD card after you had left the CTA?

A. No, because I had everything already in the cloud. And I had already been essentially determined to -- When you say left the CTA, you're talking after November 8?

Q. Yes.

A. Okay. I did not put an SD card in my machine after the 8th.

Q. When did you last put an SD card in that phone that you were using in 2018?

A. I really can't recall. It was most likely before I was placed on leave was the last time an SD card was in it.

Q. Do you have that SD card, the last one that was connected to this phone that we're discussing?

A. No. What I was doing prior to my leave was I was working on the holiday printer and holiday camera project.

And in order to test the different storage mechanisms I was using my SD card in one of those. I copied the contents off to my secondary partition on my work computer, and I formatted that

Page 533

and put it in, as it's called adoptable storage inside of I believe it was a Samsung Galaxy camera 2 to test ready images to adoptable storage.

Q. Do you recall who at the CTA last had possession of that camera with the SD card associated with it?

A. I believe no one did. I had several cameras sitting on my desk.

Q. So they were on your desk at the CTA when you last left it there?

A. Correct, next to the printer and router and access point.

Q. And the SD card was there, was it in that device?

A. In one of the cameras.

Q. Have you ever used an SD card to create copies of the data that existed on the prior phone?

A. Yes. Like I said, if I had accidentally, for example, taken pictures on the work partition the SD card kind of works as an arbitrator.

So you could send -- it's kind of neutral ground. It's one place that both profiles could read if need be. So you could move the information from the one profile to the neutral

57 (Pages 530 - 533)

Page 534

ground to the other.

Q. Have you done that since 2018?

A. No.

Q. And you haven't done that since you left the CTA?

A. Correct.

Q. And you testified in your first deposition that when you were placed on leave your primary theory for why you were being placed on leave initially is because you thought the CTA didn't want to cover your surgery.

Do you remember that?

A. Yes.

Q. And you texted Mr. Haynes on November 3, 2018 that you believe you had a case against the CTA.

Do you remember what you thought your case was at that point in time?

A. After I found out what the investigation was about, I immediately thought about hey, this isn't right. This is going against CTA's own -- they have a campaign called if you see something, say something. And I clearly saw something and said something.

Page 535

So there was also -- I don't know what kind of document it was, but they said they wouldn't take any action against any employees who with good intentions reported some sort of risk or security issue.

Q. And you also said on November 3 to Michael Haynes in a Signal message that this is an absolutely hostile environment territory.

What did you mean by that?

A. Similar to what Mr. Odocheck (phonetic) said. Even if I did come back to work at that point, it's clear that no one there in the higher ups would trust me, and I would be treated abjectly because of that.

Q. You contacted attorneys about a potential whistleblower claim in 2018, is that correct?

MR. DUFFY: This is really far afield of the new phone data, not to mention we have already been over it in the first deposition.

BY MS. BABBITT:

Q. Can you answer the question?

THE WITNESS: Yes.

MS. BABBITT: Mr. Pable.

THE WITNESS: Could you repeat the question,

Page 536

please.

BY MS. BABBITT:

Q. You contacted attorneys regarding a potential whistleblower claim in November of 2018 while you were still employed by the CTA, correct?

A. That sounds accurate.

Q. You contacted an attorney named O'Mally?

A. That sounds accurate.

Q. And you contacted a law firm called Case Law?

A. That sounds accurate. I don't remember that one off the top of my head, but that sounds familiar.

Q. Were you aware at the time that you believe that you had a claim against the CTA, you had a duty at that time to preserve relevant materials that would be relevant in the litigation?

MR. DUFFY: Objection to the extent it calls for a legal conclusion and to the extent it misstates the record about what he may have thought his claim was.

Go ahead, you could answer.

THE WITNESS: Could you restate the question, please.

Page 537

BY MS. BABBITT:

Q. Sure. You were aware at the time that you thought you may have a claim against the CTA that you had an ongoing duty to preserve relevant materials relating to any claims that you bring against the CTA?

MR. DUFFY: The same objections.

THE WITNESS: I was aware of that, as well as CTA should be cognizant of preserving their materials.

BY MS. BABBITT:

Q. Who is Deana Schick?

A. She is an individual I met at a pool party at an information security conference.

Q. When did you first meet Ms. Schick?

A. August of 2019, I think.

Q. And you said you met her at a pool party. Was it an internet security conference?

A. Information security.

Q. Sorry, information security conference. Where was that conference at?

A. Las Vegas.

Q. What is Ms. Shick -- I'll spell her name for the record. D-e-a-n-a S-c-h-i-c-k.

58 (Pages 534 - 537)

Page 538

What is your relationship with Ms. Schick?

A. We are technical acquaintances.

Q. What do you mean by technical acquaintances?

A. She is an incredibly technical, talented individual, and we are simply acquaintances.

Q. When you first met Ms. Schick, did you come to disclose any information relating to this litigation or your claims against the CTA or Clever?

A. When I first met Ms. Schick, she was asking me if I was wearing any underwear.

Q. Okay. Great. So did you, after you answered the question discuss anything relating to this litigation with Ms. Schick?

A. Not this litigation at that time, no.

Q. Have you ever since discussed this litigation with Ms. Schick?

A. Ms. Schick, I believe, was the one that connected me with other counsel.

Q. What other counsel did Ms. Schick connect you with?

A. The EFF.

Q. What topics relating to the CTA or Clever

Page 539

have you discussed with Ms. Schick?

A. Let's see. Only that I had an OSHA complaint, and I wanted to be able to insure that the vulnerability I found was properly taken care of because I couldn't personally verify it.

Q. What vulnerability are you referring to when you say vulnerability with respect to your communications with Ms. Schick?

A. The skeleton key and the service bulletin API.

Q. Any other issues relating to Clever or the CTA that you discussed with Ms. Schick?

A. I believe she said that she was involved with a Department of Transportation audit of their security.

Q. When you say their security, who are you referring to?

A. Clever Devices.

Q. Ms. Shick was involved with a Department of Transportation audit of Clever Devices security?

A. Yes.

Q. Did you know that Ms. Shick was involved with that audit prior to speaking with her?

A. No.

Page 540

Q. And you just came to learn that because you talked to her at a pool party?

A. Yes.

Q. Did that come up at the pool party?

A. No.

Q. When did that first come up?

A. After we discussed the talks that she was attending at the conference.

Q. So that did come up at the conference itself that you attended in 2019 with Ms. Schick?

A. Yes.

Q. You said that she connected you with other counsel. What other counsel did she connect you with?

A. The EFF in general.

Q. What is EFF?

A. The Electronic Frontier Foundation.

Q. Do you have them engaged with respect to this litigation?

MR. DUFFY: Objection to the extent that calls for a legal conclusion. There is an attorney-client relationship between Mr. Pable and the lawyers who work at EFF, yes.

MS. BABBITT: Is it relating to this

Page 541

litigation?

MR. DUFFY: His claims, both OSHA and this one, yes.

MS. BABBITT: Okay.

BY MS. BABBITT:

Q. So EFF is retained as your legal counsel in addition to Mr. Duffy in this matter?

MR. DUFFY: That's not quite right. I say he has an attorney-client relationship with them. They're not representing him in this specific litigation.

MS. BABBITT: Okay.

BY MS. BABBITT:

Q. Have you retained EFF as your counsel in any manner, Mr. Pable?

A. I don't know how to answer that question.

MR. DUFFY: The word retained, I am telling you they have an attorney-client relationship. I don't know how much clearer I could be.

BY MS. BABBITT:

Q. Have you ever paid EFF to do anything on your behalf?

MR. DUFFY: You don't have to pay people to have an attorney-client relationship. You could

59 (Pages 538 - 541)

Page 542

answer the question.

MS. BABBITT: I'm not asking that.

MR. DUFFY: I'm just telling him he could answer the question.

THE WITNESS: I have donated to the EFF in the past, yes.

BY MS. BABBITT:

Q. Have you had EFF perform any actions on your behalf?

MR. DUFFY: I object to the extent that calls for any specifics as to what they may have done in response to inquiries from you, did they do anything for you at your request, which would include the answering of a question or anything.

THE WITNESS: I didn't have any direct contact with the EFF, I believe.

BY MS. BABBITT:

Q. You never had direct contact with EFF?

A. No, I take that back. I did have direct contact with EFF.

Q. Without getting into that contact, when did you have contact with EFF?

A. In 2019.

Q. And have you had any contact with EFF

Page 543

beyond 2019?

A. I do not believe so.

Q. Who is Andrew Crocker?

A. Andrew Crocker is an attorney with EFF.

Q. Is that the attorney at the EFF that you interacted with in 2019?

A. No.

Q. Is there another attorney at EFF that you interacted with in 2019?

A. I honestly can't recall the names of everyone. So I believe I can't give a specific date because I don't recall.

Q. Can you turn, Mr. Pable, to CTA Exhibit 77. Let me know when you're there.

A. I'm there.

Q. In this exchange with, this is CTA Exhibit 77. This is Signal messages exchanged between you and Ms. Schick in 2019, and in it it refers to a DOT report.

Is that the audit that Ms. Schick was working on with respect to Clever Devices?

A. I believe so.

Q. Did you share information about the CTA or Clever in furtherance of Ms. Schick's audit?

Page 544

A. Nothing beyond what's mentioned here.

Q. Did you ever share any documents or materials with Ms. Schick?

A. Never.

Q. Did she share any documents or materials with you?

A. Never.

Q. And then there's two highlighted text messages. The IDs for them are 11262 and 11282.

Do you see those in CTA Exhibit 77, Mr. Pable?

A. Yes.

Q. And you say, "Hi, I'm still recovering, but I told Andrew Crocker and my lawyers spoke. I don't have the detail," in the first message. Right?

A. Correct.

Q. The second highlighted message in CTA Exhibit 577, "I heard back regarding Andrew on the case. He suggested we wait until the case is filled{sic} in federal court before moving forward because then all interactions with Cert have to be preserved and can be discovered. Whereas, doing this beforehand means it's a giant black box and can

Page 545

hurt us."

Do you see that?

A. Yes.

Q. Are you referring to this lawsuit when you're referring to the case?

A. No, I am referring to a disclosure.

Q. What disclosure are you referring to?

A. Submitting a formal CVE about the skeleton key.

Q. What is a CVE?

A. Again, I went over this in my previous deposition. I don't know what the acronym stands for, but it's a vulnerability report.

Q. So when you say we're ready to file, but must wait out the clock on the OSHA investigation because they're refusing to make a judgment, that ready to file is referring to that CVE disclosure?

A. Correct.

Q. And why were you communicating with Andrew about this CVE and that disclosure?

A. Andrew may have been one of the people I spoke with. Again, I don't remember all of the names. I don't know if I could answer that.

Q. Not just with respect to Andrew, but what

60 (Pages 542 - 545)

Page 546

were you communicating about with respect to this CVE?

MR. DUFFY: I need to clarify something because I can't let it go on in good conscious. The case and filing refer to this case, not the CVE.

MS. BABBITT: Okay.

MR. DUFFY: When we talk about the case filed in federal court, we're talking about this case.

THE WITNESS: Correct.

MR. DUFFY: I think he misheard your first question on that.

THE WITNESS: Then I misinterpreted your question, yes. I apologize. There's two quote, unquote filings at issue.

BY MS. BABBITT:

Q. So the first filing at issue is this CVE, the disclosure report you're referring to?

A. What about it?

Q. There's two filings I guess we're talking about, right? There is one that is the CVE disclosure, right?

A. Correct.

Q. And there's also the lawsuit that we are sitting in your deposition for right now, right?

Page 547

A. Correct.

Q. And so when you're referring in this message to CTA 77, are you referring to filing this lawsuit in federal court?

A. I am referring to filing the lawsuit in federal court. So then when the VCE is filed, then all of the information is preserved.

Q. And when you say that all of the information will be preserved, what information are you referring to that would be preserved?

A. Probably like Git Committ history.

Q. Where would that be collected from or preserved at?

A. Clever Devices.

Q. To your knowledge, was that CVE report or disclosure filed or issued?

A. No, we did not file it.

Q. Why not?

A. That gets into attorney-client privilege right now.

Q. So you don't know or you can't speak to why you're filing or not filing that? I'm not asking what your attorney told you, but what your understanding is?

Page 548

A. I honestly don't understand the reasoning. So I can't speak to it. I am just following my attorney's advice.

Q. So you don't understand why you're waiting to have the CVE disclosure issued or filed?

A. Correct.

Q. Why was it suggested that you wait until this lawsuit was filed to do the CVE disclosure?

A. As I just stated, to preserve all of the information surrounding it.

Q. To preserve all of the information that Clever has in its servers or otherwise?

A. The Git Committ history.

Q. All right. And then I have a few shorter topics that relate to materials that you produced after your deposition.

Q. In 2016, did you have reportable income aside from what you earned from the CTA?

A. In 2016?

MR. DUFFY: Elizabeth, if you want to ask him about something that we produced recently we could let you do that, but general questions like this about damages, which we have already been through at the first deposition are way beyond the scope of

Page 549

this deposition.

MS. BABBITT: Tim, you didn't produce it before the first deposition.

MR. DUFFY: That's what I'm saying. If you want to show him a document.

MS. BABBITT: I don't need to show him a document. The question is --

MR. DUFFY: You asked him before about other income extensively. So now you're revisiting it.

MS. BABBITT: I am asking again based on documents that were received.

MR. DUFFY: Then use the document to prove to me that this is --

MS. BABBITT: I don't need to prove anything to you.

MR. DUFFY: Yes, you do. Let me finish. Then you could speak.

This deposition was held open for the purposes of further discovery for data on the phone. I know there was some supplemental documents produced on damages.

If you want to ask him about those documents I will let you do it even though it's beyond the scope of the deposition, but that is different than

61 (Pages 546 - 549)

Page 550

open ended questions about damages. So if it's about a document, let's take him to the document, please.

MS. BABBITT: I am not taking him to a document. This is a very simple question.

MR. DUFFY: Then it's improper because you covered this before.

MS. BABBITT: I let you speak. Let me speak. You produced documents after the deposition. I have the documents. There is no rule and no obligation that I need to show him the document.

You know what you produced, and you know what you produced late and under a court order. So we could revisit that if you want, and you're happy to go pull those up on your redirect.

BY MS. BABBITT:

Q. It's a simple question. Did you have any other employment and any other income in 2016 aside from the CTA, Mr. Pable?

MR. DUFFY: Objection, asked and answered and outside the scope. You could answer if you remember.

THE WITNESS: I honestly don't remember. It was five-ish years ago.

Page 551

BY MS. BABBITT:

Q. Do you have any reportable income aside from what you earned in the CTA in 2017?

MR. DUFFY: The same objection.

THE WITNESS: Same answer.

BY MS. BABBITT:

Q. Do you recall if you had any reportable income aside from what you earned in CTA and Morning Star in 2018?

MR. DUFFY: The same objection.

THE WITNESS: I don't believe I did.

BY MS. BABBITT:

Q. And if you did, you would report it to the IRS, correct?

A. Yes.

Q. What about in 2019, any other reportable income aside from what you earned from Morning Star in 2019?

MR. DUFFY: Same objection.

THE WITNESS: Not that I'm aware of.

BY MS. BABBITT:

Q. What about in 2020, did you have any other reportable income last year aside from what you earned at Morning Star?

Page 552

MR. DUFFY: The same objection.

THE WITNESS: If that encompasses RSUs or not, I don't know, but I do't believe so.

BY MS. BABBITT:

Q. By RSUs, you mean the restricted stock that you received as compensation with Morning Star?

A. Yes.

Q. As you sit here today in 2021, have you earned any income aside from the earnings you received from your employment with Morning Star?

A. I don't believe I have, no.

Q. And do you have any documentation that reflects the total present value of your restricted stock units that you testified is part of your compensation with Morning Star?

A. I believe I supplied that. That is literally every document I have on the RSUs.

Q. So you have not produced anything that reflects the values of the RSUs today?

MR. DUFFY: Objection, that wasn't his testimony. Mischaracterizes the record.

MS. BABBITT: Well, I'm telling Mr. Pable and telling you, Mr. Duffy. And we'll follow up with that request because you still haven't produced it.

Page 553

MR. DUFFY: He testified he produced every document he has about the RSUs. So how you want to characterize it is not for us to argue about now.

MS. BABBITT: Great. Thanks.

BY MS. BABBITT:

Q. Then you also produced after your deposition additional materials relating to your surgery expenses that you had.

You claim when you submitted your material to OSHA relating to your damages that you owed $54,000 for the surgery you had in 2019.

Do you still owe that $54,000?

A. I told you that that bill was closed out, and I also said that was financed through a wage work program, and that hospital bill was a shock to me.

It wasn't a surgery bill, it was a hospital bill.

Q. So that was financed through a wage work program that you participated in with Morning Star?

A. I believe so, yes.

Q. Is that $54,000 sum then is no longer a liability of yours or something that you owe?

A. Correct, that is taken care of now.

62 (Pages 550 - 553)

Page 554

Q. And since you were deposed in March, you also produced two surgery proposals from Northwestern Memorial Hospital each dated January 23, 2019, and they're from someone named Dr. Clark Schierle, S-c-h-i-e-r-l-e.

Who is Dr. Schierle?

A. He's the surgeon that performed my procedure.

Q. And I would like you to turn, Mr. Pable, to CTA Exhibit 74. Let me know when you're there.

A. I'm there.

Q. And this is one of the proposals that you produced after your deposition, and it's a proposal dated January 23, 2019.

Did you receive this proposal on the date of January 23, 2019?

A. That sounds accurate.

Q. And in CTA Exhibit 74 in this proposal it proposes procedures, including a panniculectomy and an umbilical hernia repair in parens insurance and liposuction of flank slash thigh (cosmetic), correct?

A. Correct.

Q. The panniculectomy is removal of excess

Page 555

skin in the lower abdomen, is that right?

A. Not necessarily lower abdomen, but anywhere.

Q. Is a panniculectomy, is that where you had yours done, in the lower abdomen?

A. Yes.

Q. And you also had liposuction done?

A. Yes.

Q. And that is a cosmetic procedure?

A. Yes.

Q. So that would not have been covered by your insurance?

A. That is correct.

Q. And that wouldn't have been covered by your CTA insurance, correct?

A. Correct.

Q. And it also wasn't covered by your Morning Star insurance?

A. That is correct.

Q. Were the rest of the procedures listed aside from the liposuction, were they covered by your insurance?

A. I believe so, yes.

Q. And that was covered through your Morning

Page 556

Star insurance?

A. So what like I mentioned earlier I got the hospital bill, which should not have happened since if you look at the very bottom there is a grand total of what I should have been charged and then what I was actually charged.

So things were very complicated, and I didn't quite understand what was going on. And in addition, on the CTA insurance I was due to get an abdominoplasty instead of a standard panniculectomy, which would have essentially performed the same function of the liposuction.

Q. So with that, what was the procedure you said you would get when you were on CTA insurance?

A. An abdominoplasty.

Q. Abdominoplasty, and it was your understanding that would be covered by the CTA insurance you had at the time?

A. I believe so.

Q. Did you have any proof or record that reflected that it would be, in fact, covered by the CTA insurance?

A. I believe at one point I got a letter of preauthorization.

Page 557

Q. Did that letter reflect that it was preauthorized, in other words, it would, in fact, be covered by your insurance?

A. At the time I gave it to my surgeon to interpret. And I believe that's what the determination was, yes.

Q. And when you say surgeon, are you referring to Dr. Schierle, who we just referred to a moment ago?

A. Yes.

Q. And so does Mr. Schierle have that letter, to your knowledge?

A. I don't believe he retained it anymore since I lost my employment with CTA, and it was no longer relevant.

Q. How did you provide that letter to Dr. Schierle?

A. In person.

Q. Did you retain a copy of it for your own records?

A. No, it was a sealed letter.

Q. When you say it was a sealed letter, do you mean it was sealed and addressed to Dr. Schierle?

63 (Pages 554 - 557)

Page 558

A. It was sealed and much like an academic transcript. I don't believe I am supposed to open it to prevent any integrity issues.

Q. So you never viewed the letter yourself then, you just gave it to Dr. Schierle?

A. Correct. But when I spoke with the individual on the phone for the plan administrator, they said they were sending me a letter of preapproval.

Q. When approximately did you have that phone call to the plan administrator?

A. The fall of 2018.

Q. Prior to you being placed on administrative leave?

A. Yes.

Q. Do you recall who you spoke to on that phone call when they said a preapproval letter was coming?

A. No, I don't.

Q. Do you have any other records that reflect you were informed that there was preapproval?

A. Cigna may have them. I don't.

Q. So you don't have any in your possession?

A. Not that I'm aware of at the moment.

Page 559

Q. And this total that is on CTA Exhibit 74, it says the grand total, and it says NSPS, plus hospital. And it's a total of $5,976, correct?

A. Correct.

Q. Is that what you anticipated would be the cost of the surgery as it is detailed in this proposal?

A. That is correct.

Q. Ultimately, was that how much was charged for the surgery?

A. No.

Q. How much was charged for the surgery?

A. This in addition to the hospital bill.

Q. The hospital bill was a separate sum that you owed directly to Northwestern Hospital?

A. Correct, which is why I was very confused since the grand total stated both of them.

Q. And that is the total you owed to Northwestern Hospital, $54,640 and some change?

A. That is the valuation that they put on it, yes.

Q. How much did you actually pay to Northwestern to settle that up?

A. I don't recall off the top of my head.

Page 560

Q. Was it the full $54,000 amount?

A. It wasn't, but there were several factors that assisted at the time that we put together our damages.

I was in the process of trying to get a courtesy adjustment, and I was also financing this through pretax dollars through the wage works program. So it's a little hard to quantify the exact number that I paid at the moment.

Q. Are you able to estimate a percentage of the $54,000 that you ended up paying to Northwestern?

A. Not on the spot. I would really have to go back and check my records.

Q. And those are records that you would have in the wage works program that you have with Morning Star?

A. It would be in the wage works. I have to go check.

Q. Where else would they be?

A. They might be at Northwestern Hospital.

Q. When you say that, is that something you have access to by virtue of being a patient at Northwestern?

Page 561

A. No. I actually had to go through several hoops to get an itemized breakdown what that was. They only sent me a generic two line item bill.

And I had to fight to get the itemization to find out what was going on.

Q. So do you have any way or have any records in your possession that reflects ultimately how much you paid to Northwestern Hospital?

A. I don't recall off the top of my head.

Q. And it was your understanding that the CTA, the insurance that you had when you were employed by the CTA would have covered that $54,000 by virtue of this preapproval letter you handed to Dr. Schierle?

A. Very likely. Again, that $54,000 bill was completely unexpected. I wasn't expecting that at all. I was expecting the approximate $6,000 line item total.

Q. Just so I'm clear, that $6,000 line item, was that in addition to the $54,000 surprising bill you got from the hospital?

A. That is correct.

Q. So it was closer to $60,000?

A. Correct.

64 (Pages 558 - 561)

Page 562

Q. But you didn't end up paying the full $54,000 to Northwestern. You paid some discounted amount of that?

A. Correct.

Q. Would that be reflected in your -- let me ask you another question first.

Did you pay personally Northwestern on that debt that you owed them?

A. I did not pay Northwestern personally, no. I paid some of them personally and some of them through H Works.

Q. Aside from your personal payments and the payments made through the H Works program, did anyone else make payments to Northwestern on your behalf?

A. Not that I'm aware of.

Q. The other proposal that you produced since your deposition in March is CTA Exhibit 75. Can you turn to that, Mr. Pable. Let me know when you're there.

A. I'm there.

Q. And this is, it looks in many ways similar to CTA Exhibit 74. This is another January 23, 2019 surgery proposal from Dr. Schierle, correct?

Page 563

A. Correct.

Q. And it's got, I'll represent to you that you could toggle back and forth if you want. The professional fees of $4,000 listed on both.

And then a surgery fee in Exhibit 75 that is $1,15O as opposed to $1500 in the prior proposal. An anesthesia fee of $476 in the first proposal versus $465 here and some other minor differences.

Do you recall what the purpose was of getting two separate proposals from Dr. Schierle?

A. Yes. He wanted to know if I wanted to schedule my surgery at the hospital or the surgery center, and I said whichever is cheaper.

Q. And Exhibit 74, CTA Exhibit 74, which is the one that says NSPS plus hospital, that is a cheaper amount?

A. Yes.

Q. So that's the proposal that you elected to go with?

A. That is correct.

Q. Did you end up having all those procedures done that are listed on the proposal in CTA Exhibit 74?

Page 564

A. I would certainly hope so.

Q. Is that a yes?

A. I believe so. I have no reason to believe they were not done, but I can't look inside myself to see if my hernia is repaired or not.

Q. And when did you have these procedures done?

A. In March of 2019.

Q. What of that surgery did you anticipate would be an out of pocket expense for you prior to the surgery?

A. Can you be a little more specific. I don't quite follow your question.

Q. It sounds like you expected from CTA Exhibit 74 that you would be out of pocket something like close to $6,000 as a result of your surgery, is that right?

A. That's correct.

Q. And did you anticipate the remainder of any amount you owed would be covered by your insurance?

A. I believe that was all encompassing of everything.

Q. And did Dr. Schierle ever give you a

Page 565

proposal like this prior to 2019?

A. He may have, but I don't recall.

Q. And so do you know if Dr. Schierle gave you proposals that you submitted to your insurance that you had with the CTA?

A. I don't think he gave me these kinds of proposals. I think this was at the time I believe there was only one option available of location to have the procedure done.

So it was do you want to have it done or not. So I don't think it was a proposal.

Q. So there was no written proposal provided?

A. Correct, I don't believe so.

Q. And there is no written proposal provided to your Cigna insurance?

A. This did not get billed -- Cigna did not receive any of these proposals.

Q. Did Cigna ever receive any proposals about the surgery whatsoever to your knowledge?

A. Cigna received -- I believe my physician Mr. Greg Rauch documented the dermatitis and other issues I had on my medical file. And I believe that is what was provided to Cigna.

Q. And to clarify, Cigna was the insurance

65 (Pages 562 - 565)

Page 566

you had when you were employed with the CTA in 2018?

A. CTA provides their own insurance. Cigna is just a plan administrator.

Q. You had Cigna insurance when you were employed by CTA in 2018?

A. I had CTA insurance. It was just administered by Cigna.

Q. You also produced Paypal receipts that showed payments you made to Northwestern in January and February of 2019.

Can you turn to Exhibit 76.

A. Okay.

Q. Do you recognize these documents in CTA Exhibit 76, Mr. Pable?

A. Yes, this looks like a Paypal receipt.

Q. If you want to page through it there's a few, I think four of them. Let me know when you've seen all of them.

A. Okay.

Q. The total amount here is, it looks like $3400 in CTA Exhibit 76 that you paid to Northwestern via PayPal, is that correct?

A. That sounds about right.

Q. What were these payments to Northwestern

Page 567

made for?

A. Those proposals. Or rather the proposal it shows.

Q. So you paid $3400 in advance of the surgery you had in March of 2019, based on the proposal?

A. Correct. At that time, yes.

Q. Do you have any other receipts or other records that reflect other payments you made to Northwestern?

A. I might have one for an initial consult which was prorated applied to it. And I think everything else was cash, and I no longer have that receipt.

Q. So you paid -- aside from the invoices or the receipts we just mentioned and the one you just mentioned you otherwise paid cash to Northwestern?

A. Yes, I believe I did back when I was going to have it done in December.

Q. I'm sorry. So did you have the procedure in March of 2019 or December?

A. I was originally scheduled to have it done in December of 2018, but then I was placed on leave and ultimately lost my employment with CTA.

Page 568

Q. So you made payments to Northwestern in December of 2018?

A. No. I made them for the original scheduled date and what I believe the estimate was at that time.

Q. When you say at that time, I guess, when did you make those cash payments to Northwestern?

A. It was before I was placed on administrative leave.

Q. So prior to October 23 of 2018, you made cash payments to Northwestern?

A. I believe so.

Q. Do you recall the amount?

A. It would have been the difference between that proposal and what is missing.

Q. When you say the difference between the proposal and what's missing, are you saying the difference between that $6,000 or so proposal and the $3400 in Paypal receipts?

A. Correct. And I believe that there is a $500 consult fee that also got applied to that as well and then the remainder of that would have been what I had paid earlier up front for the first quote, unquote proposal that we had scheduled.

Page 569

Q. And that was prior to you being placed on leave you said?

A. Correct.

Q. And that was done in cash payments?

A. I believe so.

Q. And where did you go to pay Northwestern in cash?

A. What is it, it's the Arc Family Pavilion.

Q. And so you were at a counter at Northwestern, and you had three grand plus in cash and handed it over and were given a written or printed receipt?

A. Very likely, yes. But I don't think it was three grand. I think it was less than three grand.

Q. Can you turn to CTA Exhibit 38, Mr. Pable. And the last page of CTA Exhibit 38. Let me know when you're there.

A. I'm there, but it's loading. Okay.

Q. Is this the itemized invoices you received in CTA Exhibit 38 in the last page for the surgery that you received for the $54,000 charge from Northwestern?

A. That's correct.

66 (Pages 566 - 569)

Page 570

Q. And this is the charges that were charged to you as a result of your hospital stay for the procedures detailed in that proposal we reviewed a moment ago?

A. Correct.

Q. And as you sit here today, you can't recall the amount that you were actually paid on the $54,000, but it's less than that sum?

A. That's correct.

MS. BABBITT: Can we take five minute. I think I may have three or four more questions.

THE VIDEOGRAPHER: We're going off the record at 4:40 p.m.

(Recess)

THE VIDEOGRAPHER: We are back on the record at 4:47 p.m. You may proceed.

BY MS. BABBITT:

Q. Mr. Pable, in the first deposition you testified that in December of 2020, the host to your personal website, which is Menchi.org was compromised, and you were not able to log into it.

Were you able to access the website since your first deposition?

A. No.

Page 571

Q. Are you aware that that website now redirects to your Linkedin page?

A. Yes, but that is not the website.

Q. What do you mean by that?

A. DMS records and websites are two different things.

Q. And so did someone arrange for the Menchi.org URL to redirect users to your Linkedin page?

A. I did.

Q. You did that?

A. Correct.

Q. And when did you do that?

A. April or May.

Q. And how were you able to do that?

A. The DMS is hosted by Google or rather bought through Google. It's not controlled by the Boston company. I could modify the DMS record to point to anything I want.

Q. Are you able to otherwise modify the Menchi.org website?

A. You mean the host? No, I can't touch anything the host can do. All I can do is modify the DMS record to point to a different host.

Page 572

Q. Why did you reconfigure it so that it points to your Linkedin page?

A. Because I was applying for another job at Nintendo, and I didn't want it to go to a black hole.

Q. So when you applied to that other job at Nintendo, did you have that website or URL link shared as part of your application to Nintendo?

A. Correct. That was part of the candidate profile that it did not let me change.

Q. When did you first initiate your application with Nintendo?

A. Which application? There have been many.

Q. You just referred to an application that you were not able to change with respect to this URL website.

What application, when was that application submitted?

A. The latest application was submitted I believe in May.

Q. Any other applications submitted to Nintendo in 2021?

A. Possibly. I can't recall all of them.

Q. What is the website Menchi.dog?

Page 573

A. That is another DMS record that points to that same old host.

Q. Who set up that record to point to the website?

A. I did.

Q. When did you do that?

A. Maybe last June.

Q. And why did you do that?

A. I originally was trying to do a secondary -- I was trying to use my hosting space to host something as kind of like a tribute to my dog and still keep my professional content on another one.

So I figured that dot dog domain would be far more fitting for my dog rather than an org TLD.

Q. Did you do anything to modify the website so it could be a tribute to your dog?

A. No, I haven't had a chance to do that unfortunately.

Q. Have you modified Menchi.dog in any other way or does it mirror what the Menchi.org website looked like when you last accessed it?

A. It points to the exact same route that

67 (Pages 570 - 573)

Page 574

Menchi.org did except the C panel certificate uses I believe the C name record for Menchi.dog.

Q. What is DeltaDance.com?

A. That is a website run by an acquaintance that I have who was also an arcade enthusiast.

Q. Who created the website?

A. He has a domain name, but it points to Menchi.org.

Q. Who created the website Deltadance.com?

A. Can you be more specific? Are you talking about the content or the DMS record?

Q. Yes, the content.

A. The content, that belongs to me. That is me.

Q. And when did you create the content for Deltadance.com?

A. 2015, 2016.

Q. What's the purpose of that website?

A. To display high scores in video games.

Q. And you have since had that website redirected to point to your Linkedin page as well?

A. No.

Q. Did someone else have that website set up to redirect your Linkedin page?

Page 575

A. No.

Q. Are you aware that it does redirect your Linkedin page?

MR. DUFFY: Elizabeth, websites don't point to it. It's the address that points to the website.

MS. BABBITT: Thanks, Tim.

BY MS. BABBITT:

Q. So do you know how it came to be that when you go to Deltadance.com it redirects you to your Linkedin page?

A. Yes.

Q. How?

A. Because Deltadance.com points to Menchi.org, and Menchi.org points to Linkedin.

Q. Why is that?

A. I told you because of the black hole when I was applying at Nintendo. You wouldn't be able to use Deltadance anyway because the content wouldn't work with the bad certificate, and you can't host or use it anyway.

Q. So because Deltadance was no longer functioning in the way you wanted it, you set it up so it would redirect to your Linkedin page?

A. No. You are mischaracterizing and not

Page 576

understanding. Deltadance points to Menchi.org. Mechi.org points to Linkedin.

So therefore Deltadance also by transit of property points to Linkedin. I have no control over where Deltadance points to.

Q. So does anyone have control over where Deltadance points to?

A. Probably the domain owner, whom I am no longer in contact with.

Q. Who is that?

A. He was a random person on a farm. I don't recall his exact name.

Q. So that was just an individual that you never met, but interacted with on the internet?

A. That is correct.

Q. And you have since taken action to have that -- I'm sure you'll correct me, point to Menchi.org, which then points or redirects to your Linkedin page?

A. I'm sorry, is there a question pending?

Q. I'm asking is that how it's set up?

A. So when Deltadance was registered by this individual, they liked the concept that I wanted to do, and they offered to -- they owned the domain so

Page 577

they offered to point it at my host at the time.

And since that has no longer existed. It hasn't existed for a long time, but nobody used it anyway. So it's basically been a defunct link going directly right to Menchi.org. And I assume that this individual has several domain names just set to auto renew so they maintain control over them and never thought of changing the redirection record.

Q. So you went and changed the redirection record to Menchi.org?

A. Correct.

Q. And the Menchi.org website is now changed so that it sent you to your Linkedin page?

A. That is correct.

Q. And what is A-r-i-a D-e-a-r.com?

A. I don't know an Ariadear.com, but I know an Aria.Dear screen name.

Q. Who is that?

A. Susan Kim.

Q. Who is Susan Kim?

A. She's one of my closest friends.

Q. Did you ever assist her in setting up a website Ariadear.com?

68 (Pages 574 - 577)

Page 578

A. She may have, but I did not.

Q. So there is no connection between you and Ariadear.com?

A. She had an e-mail account on the Menchi.org server, but the DMS records I believe was able to process Ariadear.com. That is I believe the extent of it.

Q. Is there a reason you didn't disclose these other websites, Menchi.org, Deltadance.com or Ariadear.com?

A. They are not websites.

Q. What are they?

A. They're DMS records.

Q. So because the Court didn't direct you to disclose the DMS records, that you didn't feel you had to disclose these URLs?

MR. DUFFY: Objection, calls for a legal conclusion.

THE WITNESS: For one, I have no knowledge of Ariadear.com. I don't own it and I don't control it, and I can't control how that gets pointed to where.

As for Deltadance, once again, I don't own it. I don't control it, and I don't even know how

Page 579

to get in contact with the person who owns it anymore.

BY MS. BABBITT:

Q. But you know enough to point it to your personal website, right?

A. I am not the one that pointed it. The owners are the ones that pointed it.

Q. Did they do that at your direction?

A. No.

Q. They just happened to point it to your website?

A. As I said before, when I was experimenting with video game high score logging, this individual that registered Deltadance liked the concept and then used one of the domain names that they owned and pointed it at my website so if people went there it would go directly to a score board.

Now, Ariadear.com I have absolutely no idea how that is configured in the DMS records because I didn't even know that she had pointed something to my old host.

Q. With respect to Menchi.dog, did you not disclose that because that is a DMS record rather than a website within your control?

Page 580

A. Well, Menchi.dog and Menchi.org are one and the same essentially except for since I just changed the redirection on Menchi.org to be in my Linkedin because I haven't published Menchi.dog on any of my candidate profiles. But they pointed to the exact same things. They are the same website.

Q. And you didn't disclose Menchi.dog at any point in this litigation, correct?

A. I didn't disclose any -- Menchi.dog is a DMS record and not another website. So I believe I fulfilled my obligations.

Q. You mentioned earlier that you had I believe some siblings that were employed by the CTA, is that right?

A. That is correct.

Q. Are they still employed by the CTA?

A. I do not believe so.

Q. What are the names of the siblings that were employed by the CTA?

A. Andrew and Brooke.

Q. Do they share the same last name as you?

A. Yes.

Q. Do you know what their job titles are or were at the CTA?

Page 581

A. Intern.

Q. When to your knowledge were they last employed by the CTA?

A. I don't know when Brooke was last employed, but Andrew was last employed prior to -- it was well before the events of 2018.

Q. And the employment with your brother and CTA has ceased, to your knowledge?

A. Correct.

Q. And you don't have knowledge as to whether or not your sister remains employed with the CTA?

A. I'm pretty sure she doesn't, but I don't know when her employment ceased.

Q. Was she employed by the CTA when you were employed in 2018?

A. I believe so.

MS. BABBITT: I don't have anything further at this time.

MR. DUFFY: Steve, do you have any questions?

MR. JADOS: I have a few.

CROSS-EXAMINATION

BY MR. JADOS:

Q. Mr. Pable, I want to go back to CTA Exhibit 77, the conversation about Diana Schick.

69 (Pages 578 - 581)

Page 582

These conversations mention the DOT, Department of Transportation presumably. Is that your understanding of DOT is Department of Transportation?

A. Yes.

Q. Do you have any idea which Department of Transportation, whether it's federal or some city or state?

A. No, I have no knowledge.

Q. Any indication at all as to what it might be?

A. No. I have no knowledge beyond DOT.

Q. There's also mention in CTA Exhibit 77, I believe this is the ID line 10854. And then the body of the message is we have the actual boxes.

It looks to me like we received perhaps, them via Volpe or V-o-l-p-e, out of DOT. To your knowledge, who or what is Volpe?

A. I'm not familiar with that acronym number. However, I am familiar with the acronym of V-o-l-t, which is voiceover LT.

It's a communication thing for -- a cellular communication protocol for routing voice over a data network instead of the standard GSM.

Page 583

Q. And you think that is what -- as I understand it, that is Deana Schick making that statement with the Volpe?

A. Correct.

Q. And you believe she may have intended that to be V-o-l-t-e?

A. No, I honestly don't know what she intended that to be. That could be an acronym I'm just not familiar with.

Q. Do you have any idea who Deana Schick's employer was at the time of this message?

A. Either Cert or EFF.

Q. Do you have any idea who her current employer is, if it's different?

A. I know she left her position sometime ago, but I have no idea where she is currently.

Q. I know you testified about this, and I want to make sure I got the detail exactly right.

Is it that she was conducting an audit of Clever Devices?

A. I believe she was involved with the audit of Clever Devices.

Q. But you're not sure necessarily who she was employed by?

Page 584

A. It would have been either Cert or EFF at the Department of Transit's direction.

Q. And whatever Department of Transit that may have been?

A. Yes.

Q. You mentioned the new phone you got in the summer of 2020 that had no SD card and that you had some concerns about the storage filling up because of that, right?

A. Correct.

Q. How much storage space did that phone have?

A. The new one?

Q. Yes, the one in July of 2020 or the summer of 2020 when you got it.

A. That one should have 256 gigs, but keep in mind that the camera was significantly enhanced over my previous model.

So pictures are quite frankly ginormous. We're talking ten megabytes apiece.

Q. Earlier on in the deposition there was some discussion as to whether there may be Korean characters or I think you may have said Hangul.

I have seen some of these images of your

Page 585

phone. If it wasn't Korean or perhaps Hangul, are you aware of some other Asian language or Asian characters being used on your phone or being displayed on your phone or something you used?

A. Yes.

Q. What language are we talking about?

A. Japanese.

Q. And there was some discussion about the languages that you have been proficient in speaking and all that sort of thing.

I don't want to get hung up on proficiency. I guess I want to ask more generally what is your ability in terms of understanding written Japanese?

A. Probably a fifth grade level for Congi.

Q. Is it fair to say that you communicate on your cell phone in Japanese?

A. On occasion I do. I do a lot of Kamoto photo shoots. So I like to try to appease the Japanese audience so they don't have to translate it themselves.

Q. I want to go back to discussion about Michael Haynes deleting messages. I believe among what he deleted were strings of conversations with

70 (Pages 582 - 585)

Page 586

Craig Lang.

I want to sort out a detail here. As you understand it, were these messages that Mike Haynes deleted that were between Haynes and Craig Lang were those messages that were sent or received using the Signal app?

A. It wouldn't surprise me. I am pretty sure that at the time the Signal application took over SMS functionality for him. So by technicality, yes.

Q. So I want to sort that out. So is your testimony that it's possible that these messages were exchanged through Signal, but you don't know for sure or is it something else?

A. With Craig Lang?

Q. Between Craig Lang, yes.

A. It's very possible it was through Signal. The user interface looked exactly like it. So I have no reason to believe that it wasn't, but you can have an SMS application look just like any other one too.

MR. JADOS: That is all I have.

Page 588

A. Absolutely.

MR. DUFFY: That is all.

MS. BABBITT: Nothing further from the CTA.

THE VIDEOGRAPHER: We are going off the video record at 5:09 p.m.

This concludes today's testimony. Master media will be retained by Veritext Legal Solutions.

Page 587

CROSS-EXAMINATION
BY MR. DUFFY:

Q. Real quick, Mr. Pable. You recall Ms. Babbitt was asking you about what would happen if your work phone when you were at the CTA was lost or stolen, and you talked about various things that could be tried to get access back to your passwords or encryption keys.

Do you recall that?

A. Yes.

Q. And is it true that one of the things, and I think you referred to it in the e-mail to Mr. Psomas, if you got a new phone and your account was still intact you could simply resync, and it would restore from the cloud. Is that right?

A. That is correct.

Q. When you first met Ms. Schnick, why did she ask you, if you know, whether you were wearing underwear?

A. She was in a scavenger hunt for the Diana Initiative, I believe, and we were just getting out of the pool. So it was a pretty logical question.

Q. And you were wearing a swim suit at the time and no underwear?

Page 589

STATE OF ILLINOIS   )
                    ) ss:
COUNTY OF C O O K   )

I, VICTORIA D. ROCKS, C.S.R., Notary Public, within and for the County of Cook, State of Illinois, a Certified Shorthand Reporter of said state, do hereby certify:

That previous the commencement of the examination of the witness, CHRISTOPHER G. PABLE, was first duly sworn to testify to the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me and was thereafter reduced to typewriting via computer-aided transcription under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was not waived;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of

71 (Pages 586 - 589)

Page 590

such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois this 11th day of July, 2021.

*Victoria Rocks*

VICTORIA D. ROCKS, C.S.R.
License No. 084-002692

Page 591

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

July 13, 2021

To: Mr. Duffy

Case Name: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
Veritext Reference Number: 4666379
Witness: Christopher George Pable     Deposition Date: 7/6/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 592

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4666379
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
DATE OF DEPOSITION: 7/6/2021
WITNESS' NAME: Christopher George Pable
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____
Date          Christopher George Pable
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 593

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4666379
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
DATE OF DEPOSITION: 7/6/2021
WITNESS' NAME: Christopher George Pable
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____
Date          Christopher George Pable

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections
in the appended Errata Sheet;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

72 (Pages 590 - 593)

Page 594

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4666379

PAGE/LINE(S) /     CHANGE     /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____     _____

Date          Christopher George Pable

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

73 (Page 594)

**[& - 29]**

Page 1

| & | |
|---|---|
| **&** 310:6 | |

| **0** | |
|---|---|
| **084-002692** 590:9 | |

**1**

**1** 310:13 430:17
**1,15o** 563:6
**1-23-19** 311:10
**10** 513:14
**10-24-18** 311:8
**100** 443:10 446:19
　461:13 510:13
**10124** 433:18,20
**10854** 582:14
**10:02** 312:3
**1100** 591:1
**111** 310:8
**11262** 544:9
**11282** 544:9
**11:00** 361:7
**11:11a.m.** 361:10
**11:41** 384:17
**11:44** 384:20
**11th** 590:6
**12754** 590:8
**12:44** 506:2,4
**12:52** 439:14
**13** 591:4
**15** 386:20 389:9,10
　389:17 433:23
　434:6 435:7
**1500** 563:6
**16** 373:7 469:24
**160** 356:5
**17** 375:4 470:18
**17th** 377:12
**1820** 591:2
**19** 309:5
**1:19** 312:17

**1:20** 401:4
**1:30** 439:12
**1:31** 439:19
**1:5o** 453:23 454:3

**2**

**2** 383:24 385:1
　386:7 389:16
　391:10,17 392:19
　394:13 395:19
　397:13,22 398:15
　401:4 402:16
　403:12,20 404:5
　404:12 405:2
　407:6,14 419:12
　519:5,13 533:2
**20** 592:16 593:22
　594:22
**2010** 342:13
**2015** 342:16,18
　480:6 574:17
**2016** 342:16,18
　480:6 548:17,19
　550:18 574:17
**2017** 322:3 326:9
　480:13,14 551:3
**2018** 326:17,20
　327:3 361:20
　369:19 375:1,4,7
　375:23 376:9,22
　377:2,9 381:14,20
　382:3,11,20 383:6
　383:14,23 385:2
　386:2 389:16
　391:10,17 392:19
　394:13 395:19
　397:13,22 402:16
　404:5,12 405:3
　407:6,14 418:18
　418:19,24 438:3
　442:16 456:16
　472:18 473:21

477:19 480:11,16
494:16 495:10
500:5,19 513:8
520:14 521:22
522:24 523:1,15
525:13,15,17
531:16 532:11
534:2,15 535:16
536:4 551:9
558:12 566:1,5
567:23 568:2,10
581:6,15
**2019** 325:3,21
　326:1 380:16
　397:13 398:4,6,16
　412:3,4 417:13
　421:5 426:4
　430:12,17 431:5,9
　432:19 433:2,23
　434:3,6,7,14,18
　435:8,9 436:2,10
　436:15,20 438:15
　439:4 460:6,14
　502:8 537:16
　540:10 542:23
　543:1,6,9,18
　551:16,18 553:11
　554:4,14,16
　562:23 564:8
　565:1 566:10
　567:5,21
**2020** 327:10,14,23
　328:4,19 329:19
　329:24 330:6
　331:1 332:10
　336:12,19 337:23
　338:16 339:7,10
　339:13,15 371:17
　371:18 372:14,16
　372:20,24 373:18
　460:10 502:8

504:12 506:2
512:16 517:13
519:18 525:9
551:22 570:19
584:7,14,15
**2021** 309:22 312:3
　321:10,15 322:21
　337:15 338:10
　339:19 346:1
　348:10,18 350:10
　351:6,14,15,19
　354:12 373:7,8,15
　373:18 552:8
　572:22 590:6
　591:4
**216-523-1313**
　591:3
**22** 372:3,5
**22nd** 372:4
**23** 398:6 412:3
　554:4,14,16
　562:23 568:10
**231** 463:20
**24** 317:1 358:13
　417:13 477:19
**256** 584:16
**26** 503:4,5 504:12
　505:16
**27** 506:2,4 509:23
**28** 311:8 446:8
　477:13,17 487:5
　491:14,15,21
　494:19 498:15
**2800** 310:8
**29** 311:9 397:13,23
　398:16 412:4
　434:3,7 435:8
　438:3,15 439:4
　512:13,17 514:11
　516:16

**[2:14 - able]** Page 2

**2:14** 471:16
**2:21** 471:19
**2nd** 400:20 407:8 409:9 414:3
**2o17** 322:4
**2o18** 386:7 398:15
**2o19** 397:23
**2o21** 385:23

**3**

**3** 381:16,20 383:23 534:14 535:6
**30** 367:5
**303** 398:8
**315** 311:4
**3400** 566:21 567:4 568:19
**353** 420:19,22
**365** 311:7
**38** 311:12 569:16 569:17,21
**3815** 310:13
**396** 311:7
**3:26** 518:16
**3:35** 518:14
**3:36** 518:19
**3rd** 381:18

**4**

**4** 421:5 426:4 431:5,9
**4,000** 563:4
**400** 311:8
**44114** 591:2
**465** 563:8
**4666379** 591:8 592:2 593:2 594:2
**476** 563:7
**477** 311:8
**4:40** 570:13
**4:47** 570:16

**5**

**5,976** 559:3
**50** 417:14 418:10 418:14,20,23 419:11 469:1
**500** 568:21
**502** 311:9
**512** 311:9
**51st** 417:20
**54,000** 553:11,12 553:22 560:1,11 561:12,15,20 562:2 569:22 570:8
**54,640** 559:19
**543** 311:11
**554** 311:10
**562** 311:10
**566** 311:11
**569** 311:12
**577** 544:19
**581** 311:4,4
**586** 311:4
**587** 311:5
**588** 311:5
**5:09** 588:5
**5o** 417:19 419:16 520:23

**6**

**6** 312:3 482:2
**6,000** 561:17,19 564:16 568:18
**6-1-19** 311:8
**6-20-20** 311:9
**60** 469:1
**60,000** 561:23
**60093** 310:3
**60174** 310:14
**60601** 310:9

**6th** 309:22

**7**

**7/6/2021** 591:9 592:3 593:3
**70** 311:7 365:13,14 366:2,11,16 369:5 370:13
**70s** 469:3
**71** 311:7 396:22 397:12 398:10,14 400:15 401:3,15 420:15,19,22
**72** 311:8 398:9 400:14,24 409:23 411:17,22 417:12 430:13,16 433:13 437:1
**725** 310:3
**73** 311:9 502:23 503:2 506:1 508:18 509:22
**74** 311:10 554:10 554:18 559:1 562:23 563:15,15 563:24 564:15
**75** 311:10 562:18 563:5
**76** 311:11 566:11 566:14,21
**77** 311:11 543:14 543:17 544:10 547:3 581:24 582:13
**7868** 309:5 312:17

**8**

**8** 330:11 342:6 532:6
**8th** 532:9

**9**

**9958** 430:22
**9961** 431:2
**9974** 431:3

**a**

**a.d.** 309:22
**a.m.** 309:22 312:3 361:7 384:17,20
**a.org.** 374:14
**abdomen** 555:1,2 555:5
**abdominoplasty** 556:10,15,16
**abilities** 472:22
**ability** 484:16,17 491:3,4 523:24 585:13
**abjectly** 535:13
**able** 317:4 323:17 323:20,22 330:23 331:2,6 332:5 337:24 339:6,14 346:4 356:2 358:14,16 364:11 365:2,7,9 398:19 424:8,19 429:14 437:18 448:13 469:15 473:4,5,20 480:24 484:8,21 487:24 488:18,21 490:7,8 502:3 504:24 506:12,18 507:20,23 508:16 509:8,15 510:17 510:22 513:21 517:7 522:5 529:19,23 539:3 560:10 570:21,22 571:15,20 572:15 575:17 578:6

**[absolutely - al]** Page 3

**absolutely** 340:21 353:7 370:5 455:18 519:2 535:8 579:18 588:1
**academic** 558:1
**accept** 485:9
**accepted** 485:17
**access** 360:15 366:19 407:7,20 408:7,8,13 410:13 410:17 411:8,10 411:16 429:13 479:8 485:14 495:9 496:17,24 497:15 504:21 513:21 524:1 527:11,19 528:10 528:13 529:3 530:4,4,5,20,21,23 533:12 560:23 570:22 587:7
**accessed** 363:23 374:8 529:16 531:2 573:23
**accessibility** 364:20
**accessible** 316:10 357:18 358:5,20 358:21 398:18 478:21,23 479:15 479:16 516:6 525:15
**accident** 500:11 514:10
**accidentally** 433:3 433:8 488:15 533:18
**account** 334:7 335:5 343:15 360:11 373:23

**accounts** 374:7 375:18,18 526:5
**accurate** 391:20 396:11 397:15 398:22 521:2 536:6,8,11 554:17
**accurately** 391:23 469:7
**acknowledge** 592:11 593:16
**acquaintance** 574:4
**acquaintances** 538:3,5,7
**acquire** 356:23
**acronym** 545:12 582:19,20 583:8
**act** 446:9 499:22 592:14 593:20
**acting** 457:24
**action** 313:1 344:6 399:18 402:14 428:8 535:3 576:16 590:3
**actions** 357:4 499:19 542:8
**active** 400:5
**actor** 333:1 497:13
**actual** 444:8 449:3 452:16 582:15
**ad** 473:2
**added** 374:10 446:5
423:3 477:18 478:21 489:17 491:21 492:2,4,21 493:6 494:23 496:13,19 499:14 499:18,23 500:2 515:12,16 578:4 587:13

**addition** 313:24 446:7 516:16 527:12 541:7 556:9 559:13 561:20
**additional** 321:4 553:7
**address** 374:4 426:12 480:23 488:16 489:21 575:5 591:16
**addressed** 557:23
**addresses** 374:8
**adhere** 483:13 497:22 501:2
**adjustment** 560:6
**administer** 312:24
**administered** 566:7
**administration** 488:10 497:7
**administrative** 372:7 449:17 472:17 477:22 496:24 513:7 528:7 531:17 558:14 568:9
**administrator** 480:24 483:15 485:15,20,22,24 486:2,21 558:7,11 566:3
**admit** 444:24
**adoptable** 533:1,3
**advance** 319:10 320:11,14 567:4
**advanced** 363:14
**advice** 548:3
**advised** 414:17
**affect** 490:7,8

**affiliated** 494:10
**affix** 590:5
**affixed** 592:15 593:21
**afield** 535:17
**afternoon** 379:7 400:20,22 401:14 401:17 405:2 439:18
**agency** 457:16
**ago** 313:17 336:4 338:12 354:23 402:20 418:12 436:4 457:17 459:9 509:14 514:12 550:24 557:9 570:4 583:15
**agree** 312:9 483:14 484:11,20 484:23 485:2 486:15,16
**agreed** 416:4 437:19 480:23
**agreeing** 490:21 491:4
**agreement** 415:4
**ahead** 331:17 333:18 345:19 380:23 386:4 387:1 398:12 400:10 408:4 418:2 428:3 443:11 454:21 464:8 494:24 499:4 520:16 536:22
**aided** 589:16
**air** 482:23 490:15
**al** 312:15

**[alert - april]** Page 4

| | | | |
|---|---|---|---|
| **alert** 395:14,16 425:19 482:12 | **anomalies** 323:11 | **api** 539:10 | 493:4,5 494:5 |
| **alex** 320:24 | **answer** 314:6,11 320:1 373:11 392:14 395:1 410:2 412:9 414:21 415:6,10 415:13 416:1 452:7,8 454:4 461:22 467:4 471:6 520:2 535:21 536:22 541:16 542:1,4 545:23 550:21 551:5 | **apiece** 584:20 | 497:21,24 498:3 |
| **alias** 374:12 | | **apologize** 507:8 546:13 | 502:4 503:19 |
| **allocation** 339:1 | | **app** 382:19 498:18 508:19,22 509:2 527:15 586:6 | 506:14 515:18 523:7,10,18 525:7 572:8,12,13,14,17 572:18,19 586:8 586:19 |
| **allow** 357:13 483:14 485:13 486:16 487:19,20 | | **apparently** 454:9 491:3 | **applications** 341:24 342:3 343:7,18 363:8,9 363:10,11 483:2,5 483:6 492:15 499:7,8 507:16 525:3 526:13 529:8 572:21 |
| **allowed** 317:12 355:15 457:1 | | **appear** 364:19 366:6,9 399:11,14 400:16 431:10 432:11,12 433:12 516:24 517:5 592:11 593:15 | |
| **allows** 506:14 | | | |
| **amazon** 515:4 | | **appearances** 310:1 | **applied** 420:5,5 483:19,21 567:12 568:21 572:6 |
| **amount** 367:6 368:7 399:23 400:4 420:10 519:9,23 524:18 560:1 562:3 563:17 564:20 566:20 568:13 570:7 | | **appeared** 310:5,10 310:15 323:10 364:9 510:21 | **applies** 381:9 418:4 419:22 |
| | | **appearing** 313:7 | **apply** 381:10 418:8,10 |
| | **answered** 320:19 390:7 403:13 409:18 419:1 426:6 427:16 459:14 538:14 550:20 | **appears** 367:16 402:6 463:18 | **applying** 572:3 575:17 |
| | | **appease** 585:19 | |
| **analogue** 469:20 | **answering** 314:16 442:15 542:14 | **appended** 593:11 593:18 | **appointment** 386:22 |
| **analogy** 493:13 | **answers** 313:23 314:1 444:16,21 | **application** 311:7 341:22 343:11 358:4,7 359:15,21 360:9,11,13,20,24 361:1 364:1 365:5 365:17 383:5 395:16 419:18 421:15,18 424:12 425:8,24 426:2 437:16 450:5 474:1 475:7,20 476:1 477:5 479:10 485:11,13 486:7 489:24 490:14 492:9,9 | **approach** 531:12 |
| **andrew** 543:3,4 544:14,19 545:19 545:21,24 580:20 581:5 | | | **approached** 531:4 |
| | **anthony** 347:4 354:17 | | **approaching** 529:13 |
| | **anthropomorphic** 374:19 511:11,13 | | **appropriate** 415:2 |
| **android** 330:12 356:18 365:17 396:14 473:20 478:2,13,16,20 479:7,19 480:17 483:14 486:1,4,6 491:24 492:7,18 493:2 494:24 498:8 505:23 508:7 | **anticipate** 564:9 564:19 | | **approve** 509:12 |
| | **anticipated** 559:5 | | **approximate** 516:4 561:17 |
| | **anybody** 467:21 | | **approximately** 393:15 460:13 558:10 |
| | **anymore** 344:6 348:20 353:4,6,12 360:15 405:10 470:13 557:13 579:2 | | |
| | | | **apr** 449:15 |
| **anesthesia** 563:7 | | | **april** 321:15 322:21 337:15 |
| **anniversary** 371:23 | **anyway** 330:7 575:18,20 577:4 | | |
| **annotated** 320:7 | **apart** 489:11 | | |

[april - automated] Page 5

339:18 345:5,8,9
345:11 346:1
348:10,18 350:10
351:6,14,19
354:12 385:23
502:8 571:14
**arbitrary** 356:5
400:4 423:16
424:5,6 425:1
426:22
**arbitrator** 533:20
**arc** 569:8
**arcade** 574:5
**archive** 524:10
**argue** 553:3
**argumentative**
453:10
**aria.dear** 577:18
**ariadear.com**
577:17,24 578:3
578:10 579:18
**ariadear.com.**
578:6,20
**arrange** 448:18
571:7
**arrive** 387:3
**arrived** 388:18,21
389:11
**arrives** 389:17
**artist** 511:2
**artistic** 511:24
512:4,6
**asian** 585:2,2
**aside** 316:2,15
317:9,23 318:2
337:18,22 341:5
341:10 342:4
343:6 347:10
351:18,24 355:17
371:21 372:15,23
373:13 376:1

396:7,18 417:6
426:23 427:4,14
435:7 440:23
441:5,8,10,22
448:24 454:8
460:8 470:8
473:18 479:1,3,14
481:12,16 501:23
507:18 515:15
522:21 523:7
527:3 529:13
530:22 548:18
550:18 551:2,8,17
551:23 552:9
555:21 562:12
567:15
**asked** 315:5 328:5
328:7 342:19
346:15 348:2
350:12 355:10
373:10 391:22
403:13 404:19
408:15,22 409:17
415:14 419:1
426:6 427:16
436:3 442:8
445:15,18 455:9
455:24 456:24
457:9 459:14
463:12 481:5
549:8 550:20
**asking** 313:22
315:1 383:11,12
387:15 401:9,20
441:21 442:4,5
458:10 464:4
467:17 471:7
474:23 538:12
542:2 547:23
549:10 576:21
587:4

**assets** 512:24
513:10,11 526:4,5
527:10,15 528:2
**assignment** 592:2
593:2 594:2
**assist** 364:17,19
468:4 577:23
**assisted** 480:20
560:3
**associate** 416:8
458:22
**associated** 334:9
335:3 423:2
458:23 533:6
**assume** 315:5
350:7 504:8 577:5
**assumed** 455:19
**assuming** 319:16
**attach** 424:23
**attached** 496:19
593:7
**attaching** 364:18
**attachment**
423:16,17 424:3
425:13 431:16
**attachments** 479:2
479:4,15 510:6,22
**attacks** 530:18
**attainable** 452:15
**attempt** 319:5
393:7 469:10
509:4 519:16
**attempted** 330:21
508:8 515:2 520:7
**attend** 426:8 517:7
**attended** 540:10
**attending** 540:8
**attention** 374:24
477:12 502:23
512:16

**attorney** 339:9
340:2 350:12,19
417:10 441:9,10
441:23 445:5,9,16
446:13 458:13
459:17 471:10
536:7 540:21
541:9,18,24 543:4
543:5,8 547:19,23
589:24 590:1
**attorney's** 415:15
548:3
**attorneys** 313:8
339:13 414:22
535:15 536:3
**audience** 585:20
**audio** 312:7,8
**audit** 539:14,20,23
543:20,24 583:19
583:21
**august** 375:1,4,7
375:22 376:9,21
377:2,9 380:16
381:14 382:2,3
418:19 537:16
**authentication**
509:6
**authenticator**
363:4 509:1,11
**author's** 449:18
**authority** 309:6,9
312:15 313:7
591:6 592:3 593:3
**authorization**
504:21
**authorize** 504:24
527:6 593:11
**authorized** 312:24
**auto** 481:7 577:7
**automated** 481:4

[automatic - behalf]                                                                    Page 6

**automatic** 475:1 496:22 523:19,24 524:2
**automatically** 357:6 431:17 482:10 486:18 496:20 524:3
**available** 337:4 357:18 370:16 429:7 476:17,19 565:8
**ave** 591:1
**avenue** 378:10
**avi** 511:6,18 512:3 512:15
**avoid** 387:4
**aware** 318:17 326:22 339:9,12 340:6 355:24 413:17,20 415:21 416:11 441:3,12 441:13 456:20,24 457:7,13 459:4 461:8 465:22 467:6,11,14 468:7 468:14 470:15 481:1,3,17 487:16 488:2,3 490:10,24 491:2,9 519:4,8 520:10 527:3 530:24 536:14 537:2,8 551:20 558:24 562:16 571:1 575:2 585:2
**awkward** 387:6

**b**

**b** 313:6,6,6
**babbitt** 310:7 311:4 313:5,5,16 314:5,9,14,19,24 315:4,13 320:9

361:4,11 377:14 377:16 381:11 384:12,15,21 385:20 386:6 391:13 392:5 397:2,7,8,20 398:3 398:7,10,13 403:18 410:2,6,23 412:16 415:9,12 415:19,20 416:10 417:11 418:6 419:9 420:4 426:17 427:18 428:11,14,18 430:23 431:1 436:8 439:11,16 439:20 442:19 450:23 451:3,8,10 452:20 453:5,6,13 453:21 454:5 455:12,22 457:11 458:1,9 459:21 461:21 462:17 463:19 464:3,10 467:23 468:2,13 468:21 471:12,14 471:20 500:3 518:13,20 520:6 521:1,10 522:19 535:20,23 536:2 537:1,11 540:24 541:4,5,12,13,20 542:2,7,17 546:6 546:15 549:2,6,10 549:14 550:4,8,16 551:1,6,12,21 552:4,22 553:4,5 570:10,17 575:6,7 579:3 581:17 587:4 588:3

**back** 320:12,15 322:16,19,19,23 324:23 325:3,14 337:16 338:13 340:8 341:14 342:15 348:2 354:22 361:9 362:9 364:12,23 364:24 384:19 387:12,24 388:13 400:1 401:15 406:6 410:6 420:14,16 430:8,9 430:13 436:1 437:17 439:18 448:15 454:2 455:18 457:17 461:23,24 466:3 469:3 471:18 478:7 499:5 500:13 501:8,15 502:14 507:1,6,9 518:14,18 522:18 522:21 535:11 542:19 544:19 560:14 563:3 567:18 570:15 581:23 585:22 587:7 591:16
**backed** 522:16,17
**background** 357:6 515:22
**backing** 487:16
**backs** 524:3
**backup** 318:12 371:13,14 499:8 506:24 507:13 515:13,20 523:3,7 523:17,19,24 524:12

**backups** 507:16 515:9,15 522:11 522:12,13,20 523:2
**backwards** 323:7
**bad** 325:11 333:1 497:13 505:23 575:19
**badge** 411:9
**badges** 410:15
**banding** 329:13
**barring** 529:3
**base** 356:15,20 423:11
**based** 400:15 402:6 403:15 424:24 508:8 518:5,5 522:13 527:21 549:10 567:5
**bases** 455:20 456:7
**basically** 388:6 449:6 455:21 476:23 478:13 494:24 510:7 577:4
**basis** 334:24 367:21 445:23
**batch** 496:14 499:19
**bates** 398:7 420:19
**battery** 324:9 325:4,8,9,12,20 326:3,6,9 357:2
**bearing** 312:17
**began** 438:21
**beginning** 345:8
**behalf** 310:5,10,15 312:13 313:6,7 416:19 417:8

**[behalf - brought]**

455:5 456:2
498:10 505:8
541:22 542:9
562:15
**behavior** 383:9
474:9 489:24
**believe** 318:13
322:5 324:20
325:4 327:16
329:5 335:4 339:2
345:17 348:11
350:22 354:18
356:19 373:7
380:2 381:1,16
382:12,16 387:21
390:7 391:1 398:3
400:5,6 401:18
404:15 417:15
418:13,21 419:2
419:24 421:20
426:10 427:2,22
428:2 429:6
433:14 434:15
435:15 436:16
445:11 446:2,2,8
446:18 447:4,18
449:21 452:17
454:10 463:6
466:10,11 472:5
474:9 476:6,17
479:5 481:5
482:16 486:12,13
487:18 488:9
492:5 495:24
498:6 502:1
507:11 508:13,24
513:17 515:18
516:1 521:16
523:1,19 524:5
525:1 528:3,11,15
529:20 530:16

533:2,7 534:15
536:15 538:19
539:13 542:16
543:2,11,22
551:11 552:3,11
552:16 553:21
555:23 556:19,23
557:5,13 558:2
564:3,3,22 565:7
565:13,20,22
567:18 568:4,12
568:20 569:5
572:20 574:2
578:5,6 580:10,13
580:17 581:16
582:14 583:5,21
585:23 586:18
587:21
**belongs** 574:13
**best** 378:13 379:17
405:17 439:15
469:10
**better** 355:15
454:24
**beyond** 318:13
336:21 347:2
420:1 475:4 523:1
543:1 544:1
548:24 549:23
582:12
**bias** 329:12
**big** 417:21 526:15
**biggest** 376:19
524:20
**bill** 553:13,15,17
553:18 556:3
559:13,14 561:3
561:15,20
**billed** 565:16
**binaries** 474:22

**bit** 321:12 328:9,9
332:2 336:15
341:14,16 387:20
393:19,21 402:21
405:20 419:8
423:6 439:23
476:14 494:3
513:15 518:21
**bitcoin** 462:7,16
462:23 463:5,10
463:12,13,17
**bitwarden** 525:7
**black** 329:10,12
329:14 544:24
572:4 575:16
**blacks** 329:3
**blank** 495:20,21
**blip** 353:21 354:5
**block** 462:7,23
463:4,19 465:1,2
**blockers** 473:2
**blocks** 325:6
517:22
**board** 419:22
579:17
**body** 582:15
**bookmarks**
493:17,22
**boot** 324:9 362:1,5
362:8,16,18,19
363:15,20,21
474:2,3 475:2,7
476:18,22 477:1
502:3,10 505:16
505:24 506:12
508:9 510:1 530:7
**booting** 323:10
**boston** 571:18
**bother** 352:24
353:15

**bottom** 420:20
433:19 556:4
**bought** 514:16,17
571:17
**bower** 320:24
**box** 322:17 449:1
485:7,8 544:24
**boxes** 513:18
582:15
**boxing** 478:7
**brand** 495:13,15
**brandon** 503:4
**breaches** 347:22
**break** 314:14,15
314:17 361:5
381:2 384:14
390:8 391:2
392:18 395:11
403:21 404:1,14
411:3 439:12
471:14 493:12
514:2
**breakdown** 561:2
**breaks** 316:15
**brendon** 502:15
503:5
**briefly** 404:7
531:15
**bring** 348:4,8
394:5 537:5
**broad** 467:19
**broken** 515:3
**brooke** 580:20
581:4
**brother** 336:6
370:8 394:22
581:7
**brought** 325:14
394:6 442:22
449:21 464:15,16

**[browser - certify]**

**browser** 492:12
**bug** 510:5,18
**building** 407:21
  408:8,14,15,20
  410:17
**built** 486:6
**bulletin** 539:9
**bullshit** 503:6
  504:15
**burial** 427:15
**buried** 427:1
**bus** 492:24
**bustime** 450:5
**bustracker** 492:21
**button** 323:8,16
  323:21 324:4,8,10
  324:12 362:10,13
  424:15
**bypass** 357:1
  424:14 429:15
**byte** 517:21 518:5

**c**

**c** 495:18 537:24,24
  554:5 574:1,2
  589:3
**c.s.r.** 589:5 590:9
**ca** 591:24
**call** 327:1 344:9,15
  350:18,23 351:18
  351:24 364:18,19
  401:24 435:21
  468:12 470:3
  501:24 508:19
  509:2 558:11,17
**called** 309:16
  325:5 338:5
  356:19 359:5
  364:15,21 365:5
  372:21 377:22
  391:2 408:12
  415:3 422:2 427:3

429:10,11 473:2
474:1 476:1,20
478:11 479:9
483:16 486:1
488:6 490:14
498:6 502:5
506:14 508:6
515:18 525:7
533:1 534:22
536:9
**calling** 351:14
**calls** 344:14,22
  351:2,5,7 373:14
  412:8 417:10
  452:6 468:17,18
  536:18 540:20
  542:10 578:17
**camera** 392:3
  532:20 533:2,5
  584:17
**cameras** 533:8,15
**campaign** 534:22
**cancel** 382:24
**candidate** 572:9
  580:5
**capabilities**
  469:16 487:23
**capability** 477:4
**capable** 326:5
  342:17 527:1
**card** 334:17,21
  376:14 423:24
  425:14 426:10
  427:3 500:12
  531:18,20,22
  532:1,8,10,14,15
  532:22 533:5,13
  533:16,20 584:7
**cards** 423:19
  469:21 531:16

**care** 378:11 403:3
  539:4 553:24
**cared** 331:2,4
**carrier** 437:13,13
  438:1 469:4
**carriers** 436:7
  437:14
**carter** 450:22
  451:4,12 453:19
**case** 312:13,17
  318:12 319:19
  321:13 322:20
  323:7,15 331:22
  346:13 347:14,15
  357:8 427:21,23
  440:6 444:23
  445:21 454:19
  458:18 461:4
  467:9 471:23
  477:11 496:15
  499:20 529:11
  534:15,18 536:9
  544:20,20 545:5
  546:4,5,7,8 591:6
  592:3 593:3
**cases** 455:24
**cash** 567:13,17
  568:7,11 569:4,7
  569:10
**catch** 380:1
**cause** 360:2 395:6
  417:20 423:5
  490:5 502:11
  505:13,21
**caused** 318:9
  324:8 338:19
  363:21 395:4
  499:18,23,24
  501:3
**causes** 362:13

**causing** 363:1
  421:21
**cd** 530:7,21
**ceased** 373:3
  581:8,13
**celebrate** 372:3,10
**cell** 316:12 325:5
  325:12 336:23
  337:1,4 350:23
  361:19 422:3
  448:22,24 585:17
**cells** 326:10
**cellular** 312:6
  469:5 582:23
**cemetery** 423:24
  426:12,14,24
**center** 401:22
  563:14
**cert** 544:22 583:12
  584:1
**certain** 333:23
  334:12 335:14
  356:17 365:18
  368:24 398:23
  399:23 400:6
  413:22 424:12,13
  468:8 473:1,2
  484:14 508:2
  509:15,16 518:6,9
**certainly** 370:10
  375:12 467:20
  564:1
**certainty** 505:17
**certificate** 574:1
  575:19 593:11
**certification** 592:1
  593:1
**certified** 312:20
  589:7
**certify** 589:8

**[chain - combined]** Page 9

chain 462:7,23
463:4,19 465:1,3
chance 573:19
change 344:2
352:4 353:5
384:13 448:15
470:24 501:3
559:19 572:10,15
591:14,15 593:8
594:3
changed 333:10
333:22 349:17
500:21 577:10,13
580:3
changes 383:10
448:11 591:13
592:7 593:7,9
changing 577:8
character 340:11
340:17,18 356:5
511:3 512:5,7,8
characterization
520:16
characterize
463:23 553:3
characters 340:20
340:23 584:23
585:3
charge 338:12
569:22
charged 556:5,6
559:9,12 570:1
charges 442:22
570:1
charles 310:14
charlie 347:20
chat 366:1 510:10
chats 424:13
cheaper 563:14,17
check 425:20,21
425:22,23 485:7,8

522:6 560:14,19
checks 429:22
chicago 309:6,9
310:9 312:14
313:6 315:15
590:5 591:6 592:3
593:3
chip 328:10
chips 476:23 518:1
518:2
chris 397:4 443:7
463:13 496:24
christmas 372:22
christopher 309:3
309:13,16 311:3
312:12,14 315:8
589:10 591:6,9
592:3,4,9 593:3,4
593:13 594:20
christos 449:18
450:2
chrome 493:14,15
493:17,21 513:17
chronological
398:2
chronologues
508:7
cigna 558:22
565:15,16,18,20
565:23,24 566:2,4
566:7
circle 310:3
circles 459:2
city 582:7
civil 309:18 592:5
593:5
claim 346:13
513:6 535:16
536:4,15,21 537:3
553:9

claiming 520:24
claims 537:5
538:10 541:2
clarify 442:18
444:21 462:19
546:3 565:24
clarity 394:17
clark 554:5
clean 381:1 390:8
391:1 392:18
395:11 403:21
404:1,14
clear 319:12 451:9
455:13 469:23
503:14 535:12
561:19
clearer 351:12
541:19
clearly 534:23
cleveland 591:2
clever 309:7
310:16 313:12
339:10 340:4
378:1,5,7 379:15
380:1,3,5 413:14
449:15 450:7,16
450:21 451:3,11
453:8 454:7
457:19 459:11
479:11 489:20
529:11 538:10,24
539:11,18,20
543:21,24 547:14
548:12 583:20,22
591:7 592:3 593:3
client 417:10
471:10 540:21
541:9,18,24
547:19
climbing 435:10
435:13,16

clinton 384:7,9
clipboard 396:2
396:14,17
clock 545:15
close 321:24
365:23 430:11
480:2,9,15 564:16
closed 553:13
closer 561:23
closest 384:8
577:22
cloud 331:9,12
449:7 495:4 499:8
500:13 504:22
507:15,18 515:13
515:16 516:7,8,10
522:13,14,21
529:11 532:4
587:15
clunies 347:4,7
354:17
clusters 358:1
code 422:2 423:5
436:2,5 437:2,7,8
437:9,11,24 514:2
529:7
cognizant 363:8
363:11 537:9
collaborating
504:23
collax 338:6
colleague 395:10
488:16
colleagues 318:5
collected 332:6,10
547:12
collection 416:4
color 329:12,13
combined 488:19
490:3

**[come - conducting]**

**come** 316:5 321:21 353:11 404:17 407:12 408:20 465:14,21 490:4 498:22 511:9 518:14 535:11 538:9 540:4,6,9

**comes** 370:6 468:19

**coming** 404:20 486:4 558:18

**commencement** 589:9

**commencing** 309:21

**comments** 404:2

**commission** 354:17 592:19 593:25 594:25

**commissioned** 511:2,4 512:1

**commissions** 511:19,22

**committ** 547:11 548:13

**common** 372:2,8

**commonplace** 408:18

**communicate** 316:17 335:7 341:2,3,12,18 342:1,20,23 343:11 344:12 350:5,6,9,16 353:1 353:8,22 355:19 368:10 419:14 425:11 434:13,17 434:22 435:6,23 438:2 454:6,11 460:2 464:17,20 585:16

**communicated** 318:3 373:15 375:11,14,21 377:3,12 453:15 460:14 463:1,11 465:8,15 466:16 470:7,20 487:19

**communicating** 316:22 332:24 333:2 334:11 342:8 343:23 352:18 353:3 369:16 373:4,7 377:18 420:7 453:17 459:22 463:3 464:23 466:17 545:19 546:1

**communication** 311:9 316:10 343:18 344:17 369:11 371:3,5 376:3 379:11 395:19 420:12 446:11 456:15 464:1 466:19 470:11 481:9 503:3 582:22,23

**communications** 318:7,22 334:11 335:1,13,14 339:12 341:15 343:19 344:16,21 344:24 346:19 348:16 351:20,23 354:2,7 356:21 370:17 372:15 376:2 377:8 378:17,22 380:20 389:13 391:6 393:6,24 395:21

396:19 405:23 406:12 413:22 414:2,22 417:10 417:24 418:15 423:7 434:5 437:22 439:24 445:4,8,16 449:8 452:1 462:9,10,15 465:17 466:24 467:12,15,18,21 468:8,14 470:7 539:8

**community** 511:14

**companies** 497:7

**company** 337:9 358:22 364:2 497:6 571:18

**compatible** 425:8

**compel** 413:18,21

**compensation** 552:6,15

**compiled** 499:20

**complaint** 429:6 430:11 445:11,12 445:21,24 446:15 447:14,16,18 461:4 539:3

**complete** 314:10 314:16 317:4 517:14,19

**completed** 328:24 591:16

**completely** 356:24 496:16 561:16

**complex** 486:14 487:2

**complexity** 484:12

**complicated** 328:18,20 556:7

**complying** 496:3

**component** 416:13

**compositions** 511:3

**compound** 408:10 411:2

**compresses** 331:9

**compromise** 508:4

**compromised** 339:5 570:21

**computer** 338:23 357:20 411:11 428:7 449:3 465:14 479:10,13 483:24 493:16 498:22 499:1 508:2 528:9,13 529:14,17 530:6,6 531:2,3 532:24 589:16

**computers** 342:4 529:12

**concept** 357:20 576:23 579:14

**concern** 463:22

**concerned** 332:4 332:11,12,13 376:16 489:15

**concerning** 589:12

**concerns** 584:8

**concludes** 588:6

**conclusion** 412:9 462:3 468:18 536:19 540:21 578:18

**conduct** 519:1

**conducted** 322:20 377:1 517:15 518:22

**conducting** 363:19 583:19

**[conference - correct]** Page 11

conference 318:11 537:14,18,20,21 540:8,9
conferences 344:22
configure 482:10 489:10
configured 491:10 495:19 524:7 579:19
confirm 482:4 514:6
confirmed 482:16
confiscated 410:15
conflict 421:22 436:6
confused 559:16
confusing 415:5 426:15
congi 585:15
connect 482:5 483:11 538:21 540:13
connected 419:6 459:24 491:7 500:23 532:16 538:20 540:12
connecting 481:18 482:13
connection 454:8 460:15 578:2
conscious 546:4
consent 485:9 486:20 503:20
consented 486:19
consider 341:8
console 405:17
consoling 419:3
constantly 324:4
constitutes 589:17

consult 317:9 567:11 568:21
consultant 332:9 332:12
contact 324:20 352:12 353:15 354:4 380:5,5 394:9 511:22 542:15,18,20,21 542:22,24 576:9 579:1
contacted 535:15 536:3,7,9
contacting 331:20
contacts 352:15
contain 359:9 519:13 520:4,11 521:11,22
containing 519:8
contains 414:19 504:6 520:4 521:3
content 446:7 573:12 574:11,12 574:13,15 575:18
contents 319:8 328:7 396:17 412:13 532:23
context 366:4,7,8 366:8 367:16 406:3,8 513:13
continue 312:8 328:12 338:1 353:8 374:3 385:19 394:20 439:21
continued 309:15
continues 312:11
continuously 362:15
contract 325:13

contracted 488:6
control 326:20 337:2 368:6 418:4 441:16 484:4,6,8,9 487:9,12,14,24 488:3 576:4,6 577:7 578:20,21 578:24 579:24
controlled 571:17
controlling 417:21
convention 344:19 344:21 374:16 511:20
conventions 374:18
conversation 333:9 335:2 367:13 369:3 370:21 379:10 381:5,6 382:8,10 391:4 402:10 404:23 405:1 409:2,11 506:18 581:24
conversations 312:5 405:21 418:4 462:15 582:1 585:24
converse 394:20
converses 425:10
conveyed 411:12
cook 309:21 589:6
cooper 358:1
coordinate 435:11 435:13 514:22
coordinates 426:11,14,24
coordinating 516:18
copied 429:19 532:23

copies 373:22 510:11 514:13 533:17
copy 328:9 329:1 331:2 444:3 446:20 452:16 510:9 515:8 557:19
copying 448:10
corporate 489:1
correct 314:8,23 319:17 320:18,21 320:22 322:8,22 324:15 327:7,14 329:16,21 330:18 332:8 334:1,13,22 335:1,24 340:24 341:19,22,23 343:21 344:13 346:2,18 347:20 350:3 351:1,17 352:3 359:24 360:3,5,15,16,22 361:22 364:14 366:14,17,18,24 367:7 368:22 369:1,8,13,18 370:14 371:1,9,12 372:8,18,20 373:5 373:24 374:2 375:9,10,16,20,24 376:22 380:7,19 383:16 384:12 385:3,7 386:8,9,12 388:6,16,19,22 393:3 398:21 399:9,13,18,19 400:4,17 401:4,8 401:12 405:4,7,11 406:1 407:22 413:15 418:3

**[correct - cta]** Page 12

431:12 432:10
433:4,10,11 434:4
434:19 436:21
437:23 443:3
450:12 457:10
460:10,11 461:5
470:10,14 471:24
472:1 476:3
477:19 480:12,19
481:15 482:7,15
482:19 485:2,6,18
485:21 489:13
491:12 492:1
493:18,23,24
494:17 497:18
501:13,16 502:19
504:3,13 505:9,19
511:8 512:2,5,11
512:20 513:9,24
514:19 516:22
520:9 525:16
526:8 527:16
531:14 533:11
534:6 535:16
536:5 544:17
545:18 546:9,22
547:1 548:6
551:14 553:24
554:22,23 555:13
555:15,16,19
558:6 559:3,4,8,16
561:22,24 562:4
562:24 563:1,21
564:18 565:13
566:22 567:7
568:20 569:3,24
570:5,9 571:12
572:9 576:15,17
577:12,15 580:8
580:15 581:9
583:4 584:10

587:16
**corrected** 435:17
510:16
**corrections** 591:13
593:17
**correctly** 329:4
355:3 510:14,21
**correlating** 495:2
495:3
**correspond**
331:21 337:7
340:2
**correspondence**
340:3,6
**corrupted** 505:21
508:20
**corruption** 338:20
338:21
**cosmetic** 554:21
555:9
**cost** 559:6
**counsel** 313:3,14
327:16 332:13
339:13 538:20,21
540:13,13 541:6
541:14 589:24
590:1
**counter** 309:11,14
383:21 387:23
391:3 402:23
403:1 569:9
**county** 309:20
589:3,6 592:10
593:15
**couple** 439:16
500:16
**course** 316:18
340:12 445:17
451:18 462:21
467:15

**court** 309:1
312:15,21 313:24
314:22 429:10,14
429:18 430:3
440:20 466:2,8
503:6 516:17,24
516:24 517:5
519:7,9 520:11
544:21 546:8
547:4,6 550:13
578:14 592:7
**courtesy** 560:6
**courts** 309:19
**cover** 313:18
460:15 534:11
**covered** 385:13,13
455:20,24 456:7
460:24 469:22
502:1 526:2 550:7
555:11,14,17,21
555:24 556:17,21
557:3 561:12
564:20
**covers** 333:19
**covid** 517:4
**craig** 378:6,9
380:6,8,8 381:6
382:12 383:20
403:24 453:18
454:8 460:15
586:1,4,14,15
**crash** 340:12
**crashed** 363:23
508:20
**crashing** 363:22
**create** 352:8
353:21 354:5
492:8 512:3
533:16 574:15
**created** 479:20
484:3 487:15

574:6,9
**creating** 518:3
**credentials** 492:16
492:17,24,24
**cried** 387:20
**crocker** 543:3,4
544:14
**cross** 311:4,5
510:12,19,20
581:21 587:1
**crossing** 314:12
**crudely** 493:8
**crushed** 329:3,10
329:14
**csr** 309:20
**cta** 310:11 313:7
326:17,21 327:4
327:13,15,19,20
332:14 336:21
339:10,22 340:3,4
353:24 365:12,14
366:2,11,15 369:4
370:3,9,13 371:23
372:1 375:9,17
378:20 381:1
384:2,8,9 385:6
386:8,20 388:3,5
388:12,13 389:11
389:16 391:9,16
392:18 395:12
396:21 397:11
400:13,24 401:3
402:5 403:11,22
403:24 406:8
407:4,14,16 409:8
411:17,22 413:14
413:17 417:12
420:15,19,22
428:3 430:13,16
433:13 437:1
439:9 442:22

443:1 450:7 451:4
451:12,12 455:5,6
455:10,11,15,19
456:14,18,21,23
457:19 458:14
459:12 462:6,8,22
462:24 463:5
464:24 465:14
470:15,24 472:14
472:17 477:13,17
477:23 478:21,23
479:18 480:17,20
481:1,17 482:5,12
482:13,18,20,24
484:9 485:2
486:10,16 487:5,9
487:11,20,21
488:2,3,5 489:16
490:10,13 491:3,4
491:11,13,15
492:3,7 494:18
495:18,24 496:8
498:10,11,14
499:13,14 500:24
503:2 506:1
508:18 509:21
512:12,17 513:3,8
513:10,11,21
514:11 516:15
520:13 521:5,12
521:21 526:5,6,18
526:22 527:6,10
527:11,14,18
528:1,2,7,9,13
530:5 531:2 532:2
532:5 533:4,9
534:5,10,16 536:5
536:15 537:3,6,9
538:10,24 539:12
543:13,16,23
544:10,18 547:3

548:18 550:19
551:3,8 554:10,18
555:15 556:9,14
556:17,22 557:14
559:1 561:11,12
562:18,23 563:15
563:23 564:14
565:5 566:1,2,5,6
566:13,21 567:24
569:16,17,21
580:13,16,19,24
581:3,8,11,14,23
582:13 587:5
588:3
**cta's** 339:22
381:12 406:13
427:19 463:3
481:19 484:4,6,7
520:21 527:10
534:21
**cues** 314:6
**curious** 423:6
**current** 370:3
522:4 583:13
**currently** 342:9
437:17 514:18
515:11 583:16
**custom** 367:5
**customize** 473:4,5
**customized** 515:21
**cut** 324:17 511:12
**cutting** 323:23
**cv** 309:5 312:17
**cve** 347:17,19,22
354:18 545:8,10
545:17,20 546:2,5
546:16,20 547:15
548:5,8

**d**

**d** 309:19 311:1
313:11 537:24
577:16 589:5
590:9
**damage** 323:3
**damaged** 323:4
**damages** 548:23
549:21 550:1
553:10 560:4
**dark** 329:11
**data** 323:11 329:1
329:18 330:16,23
331:5,23 332:6,10
338:19,21,24
339:4 358:3
359:10,21 364:7
364:11 365:1,2
409:19 414:19
416:8 423:11
478:15,15 492:14
494:22 495:3
499:3 500:4,8,15
501:6,9,15 505:22
505:23 506:15,19
507:15,18 508:2,4
508:4 510:1,17,20
510:21 512:24
514:6,7,20,21
515:1,2,6,8,10
516:5 517:17,24
519:5,9,24 520:12
520:12 521:4,12
521:13,13,15,16
521:23 522:2,7,21
523:9 529:7
533:17 535:18
549:19 582:24
**database** 347:22
356:8 359:2,4,6,7
359:16 360:7

418:5 432:3 466:4
492:10 499:9
506:19 508:14
510:13
**databases** 355:22
359:17
**date** 333:11
345:11,20 358:15
371:23 372:9,14
382:7 397:11
412:3 438:15
450:2,3,3 460:9
480:10,11 543:11
554:16 568:4
591:9 592:3,9,19
593:3,13,25
594:20,25
**dated** 431:5
433:23 554:3,14
**dates** 397:18
449:14
**david** 481:6,9
482:4
**day** 309:22 321:23
321:24 329:22
350:20 352:11
372:2,5,6 385:5,5
385:5 386:11,14
386:18 391:22
393:15 403:8
407:13 449:17
479:24 590:6
592:16 593:22
594:22
**days** 372:2 409:14
478:7 514:12
591:19
**dayton** 375:2,3,4
377:1,3,9 379:16
418:12 450:7
451:13

**[deactivated - desktop]** Page 14

**deactivated** 491:22 492:3 497:12

**deactivating** 499:14,18

**deana** 537:12 583:2,10

**dear** 591:10

**death** 423:23 426:8

**debatable** 530:17

**debt** 562:8

**december** 567:19 567:21,23 568:2 570:19

**decided** 344:4 354:3

**decode** 359:11

**decrypted** 531:13

**decryption** 525:5

**deed** 592:14 593:20

**deemed** 591:20

**default** 436:1 437:2,7,16 474:9 484:19 489:23

**defaults** 486:12

**defective** 328:23

**defects** 330:19

**defendant** 309:14 310:10,15 313:12

**defendants** 309:8 309:16 312:13

**defense** 514:13

**definitely** 389:21 402:24 441:7 442:7 443:7 486:24 530:1

**definitive** 392:3

**definitively** 342:18 362:22

**defunct** 577:4

**delete** 359:3 360:5 360:6,8,10 382:1 382:13,22,24,24 383:2 389:22 390:12,17,23 395:18,21 396:5,8 398:23 400:2 432:15 433:5 436:9 508:6

**deleted** 360:14,20 365:6,10 381:13 381:21,22 382:4,5 382:11,14 383:12 383:14,17 387:22 389:12 391:9,14 393:5,23 395:7,13 395:15,17 396:18 399:17 400:12 404:15,18,22 406:12 418:23 431:19 433:6 458:16 512:23 514:6 585:24 586:4

**deletes** 389:18

**deleting** 381:7 389:20,23 390:3,6 390:9 391:5 392:7 392:12 393:2 394:24 395:4 402:10,13,15 404:4,12 415:7 432:18,24 433:1 585:23

**deletion** 382:17 383:14 384:24 394:12,15 402:3 403:10 405:22 406:2,7 432:22

**deliver** 469:11

**deliverable** 416:23

**delivered** 452:2,21 469:5,7,12,13 491:6

**deltadance** 575:18 575:21 576:1,3,5,7 576:22 578:23 579:14

**deltadance.com** 574:3,9,16 575:9 575:13 578:9

**demand** 357:5 470:24

**demandful** 344:1

**denied** 411:10 456:18

**denotes** 371:14

**deny** 509:12

**department** 539:14,19 582:2,3 582:6 584:2,3 591:22

**depending** 358:3 489:23

**depends** 358:10 399:19,21 469:15 529:18

**deposed** 346:24 357:7 469:24 554:1

**deposing** 503:17

**deposition** 309:15 312:7,12,18 314:20 315:19 316:18,23 317:11 317:18,21 318:4,8 318:15,22 319:10 319:18,21 320:11 320:14,16 321:7,8 321:9 343:1 345:2

346:10,16 348:4 350:11,15,16,21 351:15 352:1,6 354:15 355:6,10 373:3,6,11 374:9 374:17 385:9 427:12 470:2,4,9 470:17 471:22 530:17 534:7 535:19 545:12 546:24 548:16,24 549:1,3,18,24 550:9 553:7 554:13 562:18 570:18,23 584:21 589:13,19,22 591:9,12 592:1,3 593:1,3

**depositions** 313:20 319:21,23,24 348:13,14 351:8 409:22 417:7

**depressed** 324:4 362:10

**dermatitis** 565:21

**des** 401:23

**describe** 323:24 324:16 518:24

**described** 362:9 399:3 490:2

**describing** 451:13

**design** 512:5

**designed** 326:9 356:13

**desk** 406:21 407:18 488:10 533:8,9

**desktop** 335:6 341:22 342:1 360:23 361:1 492:22 495:14

**[desktop - discussing]** Page 15

513:14 526:3 528:3 529:6,19,24 530:2
**destroyed** 527:19 528:21,24 529:16
**detail** 544:15 583:18 586:2
**detailed** 501:23 559:6 570:3
**details** 317:7 459:10 481:7 504:5
**determination** 355:2 557:6
**determine** 366:21 490:19
**determined** 353:3 532:5
**developer** 359:16
**device** 315:18 331:18,21 332:22 332:23,24 335:4 342:7 344:5 353:23 356:18 361:18 362:14 363:12 368:8,16 368:17 381:23 469:16 476:18 480:23 482:13 483:14 484:15,17 485:15,19,22,24 486:2,20 487:9,12 488:1 489:1 490:16 491:7,10 492:23 494:4 495:2 505:21 509:4,17 520:14 525:12,14 527:1 533:14
**devices** 309:7 310:16 313:12

316:10 337:9 342:4 378:5,7 380:3 395:19 449:2,15 450:21 478:10 479:11 481:22,23 489:20 490:15 496:20 515:3 528:22 539:18,20 543:21 547:14 583:20,22 591:7 592:3 593:3
**dialer** 437:8,9
**diana** 581:24 587:20
**dictate** 344:5
**die** 384:13
**dies** 357:23
**difference** 568:14 568:16,18
**differences** 563:9
**different** 329:5 354:13 361:15 362:17 372:2 423:2 425:22 436:7 437:15 443:22,24 466:14 495:5 497:7 499:11 501:1 532:21 549:24 571:5,24 583:14
**difficulties** 330:16
**digger** 365:5 502:5
**digging** 413:10
**digitizer** 329:4
**direct** 311:4 315:12 426:13 542:15,18,19 578:14
**direction** 579:8 584:2 589:17

**directions** 427:15
**directly** 350:16 429:15,16 470:20 559:15 577:5 579:17 590:2
**disable** 497:14 500:2
**disabled** 492:5 520:13
**disabling** 496:13 499:22
**disappear** 357:15 360:19 368:15 369:11 417:20
**disappeared** 370:24
**disappearing** 333:6,12,15 335:9 335:15,17,18,21 349:6,10,13,16,22 352:5 353:5,19 357:11 366:13,17 366:20 367:9,21 368:2,4 369:6,14 369:21,23 370:2 370:11,16,23 371:3,7,15 376:10 376:13 380:18 397:16 398:20 399:1 431:14,20 436:11,12,19 437:21 438:6,11 438:17,22 439:5,6 439:8 469:17 470:13,17,22 471:4
**disappears** 335:22 366:22 367:11
**disclose** 316:20 317:13,15 320:2 489:23 538:9

578:8,15,16 579:23 580:7,9
**disclosing** 451:13
**disclosure** 377:22 378:13 379:15 545:6,7,17,20 546:17,21 547:16 548:5,8
**disconnected** 529:20
**discount** 496:1
**discounted** 562:2
**discover** 481:7
**discovered** 385:16 513:22 515:6 544:23
**discovery** 325:7 362:10 415:4 444:16,21 455:16 503:12,13 549:19
**discriminate** 424:24
**discus** 318:10
**discuss** 346:6,19 347:9,15 348:16 389:23 394:24 395:2 406:2,7,11 408:2 439:23 440:1 449:23 538:14
**discussed** 348:13 350:12 378:12 379:14 394:11,14 395:3 443:22 449:14,22 538:17 539:1,12 540:7
**discussing** 327:4 328:11 330:24 336:17 346:10,12 384:23 405:5 423:22 453:16,18

**[discussing - e]**

465:2,4 466:7 523:4 532:17

**discussion** 584:22 585:8,22

**disk** 365:5 502:5

**dispatch** 479:10

**dispatched** 479:13

**display** 329:4 574:19

**displayed** 585:4

**distance** 395:12

**distinction** 494:13 521:14

**distinctly** 380:12

**distraught** 405:15

**distribution** 374:11

**district** 309:1,1,19 312:15,16

**division** 309:2 312:16

**divulge** 504:20

**dms** 571:5,16,18 571:24 573:1 574:11 578:5,13 578:15 579:19,23 580:10

**do't** 552:3

**document** 320:7 330:2 430:4 444:1 445:17 447:8 448:11,15 451:14 452:14 458:5 535:2 549:5,7,12 550:2,2,5,11 552:17 553:2

**documentation** 527:22 552:12

**documented** 565:21

**documents** 318:21 319:9 320:4 428:15,20,24 429:3,7,8,13,16,24 440:11,18 441:1 442:5,11 444:23 449:9 454:15,17 455:3 466:13 491:24 544:2,5 549:11,20,22 550:9,10 566:13

**dog** 316:1,7 573:11,14,15,18

**doing** 326:5 389:2 390:5,22 392:10 428:1 432:22 451:23 452:7,9 457:22 463:13 466:21,22 467:2,5 472:24 474:17 480:20 481:2 497:3 501:10 503:15 524:4,14 527:2 532:18 544:23

**dollars** 326:14 560:7

**domain** 573:14 574:7 576:8,24 577:6 579:15

**donated** 542:5

**dorval** 450:21 451:4

**dot** 543:19 573:14 582:1,3,12,17

**double** 524:18

**doubt** 392:13

**doubted** 498:23,24 499:11

**download** 431:16

**downloaded** 342:3

**downloads** 515:13

**downtown** 435:19

**dr** 554:5,6 557:8 557:17,24 558:5 561:14 562:24 563:11 564:24 565:3

**draft** 445:12,17 446:24 447:1,5,9 447:12,23 448:17 448:19 461:4,11

**drafting** 442:10

**drafts** 440:5,13 441:1 444:16 445:1,3,15 446:22 461:1,2,2,6

**drain** 324:9

**drastic** 394:4

**drink** 383:22 391:3 402:22,24

**drive** 310:8 484:15 508:3 513:23 528:12 529:17 530:6,9,10,11,14 530:15

**dropped** 423:8

**due** 556:9

**duffy** 310:2,2 311:5 313:9,9 320:3 377:10,15 380:22 385:8,24 391:11,19 397:1,3 397:17,24 398:4,9 398:11 403:13 409:17 410:3 412:8 414:20 415:11,17,24 417:9 418:1 419:1 426:6 427:16 428:9,12 430:21

436:3 439:15 442:13 450:19,24 451:6 452:6,23 453:9 455:9,13 457:8,22 458:4 459:14 461:18 462:14 463:9,21 464:5 467:17,24 468:6,17 471:5 499:16 520:1,15 521:6 522:15 535:17 536:18 537:7 540:20 541:2,7,8,17,23 542:3,10 546:3,7 546:10 548:20 549:4,8,12,16 550:6,20 551:4,10 551:19 552:1,20 552:23 553:1 575:4 578:17 581:19 587:2 588:2 591:5

**duly** 315:9 589:11

**duncan** 312:19

**duplicates** 510:20

**duties** 467:18

**duty** 475:21 536:16 537:4

**dying** 325:10 514:16

**e**

**e** 310:8,13 311:1 318:14 330:3 331:13 343:13,14 343:17 347:7 354:16 364:22 373:16,18,20,21 374:4,4,7 375:15 375:18,18 376:1 378:3,21,23 444:2

**[e - enter]**

446:23 447:2,5,9
447:12,23 448:17
448:21,24 449:10
456:10,15 468:20
477:17 478:1,24
479:1,2,3,14,15,22
479:23,24 480:22
483:20 484:22
488:14,14,19
489:3,8,23 491:23
497:21,24 498:2
502:16 507:17
512:15 523:3
537:24 554:5,5
577:16 578:4
582:17 583:6
587:12
**earlier** 387:23
460:24 471:21
502:1 505:19
523:4 526:3 556:2
568:23 580:12
584:21
**early** 407:10
473:21 478:7
**earned** 548:18
551:3,8,17,24
552:9
**earnings** 552:9
**eased** 344:11
**easier** 378:10
429:20 493:12
**easily** 331:14
448:22 488:21
528:8 529:9
**eastern** 309:2
312:16 341:1
**edit** 448:21,22
475:7
**editable** 448:15

**educating** 377:21
**eff** 538:23 540:15
540:16,23 541:6
541:14,21 542:5,8
542:16,18,20,22
542:24 543:4,5,8
583:12 584:1
**effect** 349:24
408:11 426:21
**effectively** 399:12
529:10
**efficiencies** 356:9
**efficient** 518:4
**efficiently** 356:2
356:23
**effort** 469:10
**either** 344:9 349:4
349:12 369:16
372:13 399:18
435:4,12 442:23
449:9 496:2
513:21 583:12
584:1
**elect** 355:18
418:10 419:21
**elected** 353:4
381:13 382:1
383:2,4 418:8
519:22 563:19
**electronic** 316:9
379:11 504:21
540:17
**electronically**
428:9 465:5
**elements** 446:14
**elephant** 347:20
**elizabeth** 310:7
313:5 377:10
397:17 409:17
450:19 455:11
463:9 548:20

575:4
**email** 311:8,9
448:19 487:8
514:8 591:17
**emailing** 380:13
**emergency** 496:16
497:9 499:21
**emotional** 393:18
**employed** 321:2
326:17,21 327:4
336:21 375:8
462:8,24 463:5
472:14 491:11
536:5 561:12
566:1,5 580:13,16
580:19 581:3,5,5
581:11,14,15
583:24
**employee** 347:6
407:14,16,17
409:12 410:10
446:8 457:4
589:23,24
**employees** 370:3,8
535:3
**employer** 512:18
512:21 583:11,14
**employer's** 318:12
514:13
**employment** 321:5
371:24 381:13
410:10 439:9
443:2 501:17,20
502:21 521:21
526:6 550:18
552:10 557:14
567:24 581:7,13
**enable** 485:2,3
486:13
**enacted** 431:15

**encapsulated**
427:2
**enclosed** 591:12
**encode** 356:7
**encoded** 359:11
**encompasses**
552:2
**encompassing**
564:22
**encrypted** 355:23
**encryption** 484:15
486:13 487:1,14
500:20 501:4,7
508:15 512:23
513:19,22 523:20
523:23 524:6,10
524:15 530:18
531:9 587:8
**encryptions** 525:5
**ended** 440:11,14
442:10,11 501:6
550:1 560:11
**endlessly** 324:9
**ends** 369:10
**enforce** 369:8
483:15 486:10,22
486:23
**enforcement**
486:6
**enforcements**
484:21
**enforcer** 486:3,4
**enforces** 486:8
**enforcing** 486:1
**engaged** 540:18
**english** 341:6
**enhanced** 584:17
**enrolled** 481:21,23
**enter** 422:3 426:12
426:14 437:8,9,12
480:22

**[entered - exist]** Page 18

entered 593:9

enterprise 478:9 478:15 509:5

enthusiast 574:5

entire 382:7,9 592:5 593:5

entirely 360:6 391:21 500:7

entitled 442:17

entry 339:2 370:19 371:14 400:19

environment 529:6 535:8

environments 478:8

eol 315:22 449:2

ephemeral 355:14 357:9,10,13,13,14 357:20 358:3 529:7

equidistant 401:22

eradicate 495:1

erased 386:1,2 393:12 414:3 514:14

errata 591:14,19 593:7,10,18 594:1

escorted 387:10 388:11

especially 326:8 344:10,18 394:2 410:13

essentially 337:20 357:22 408:11 409:2 410:4 433:5 474:4 479:12 487:13 495:14 503:11 517:21 532:4 556:11 580:2

estate 337:5

estimate 439:15 560:10 568:4

et 312:15

etiquette 378:15 378:24

evaluate 337:18

event 511:19

events 374:12 403:17 409:20 438:19 442:16 445:18,23 461:14 581:6

eventually 364:11 422:1 423:4 506:17 515:7

evidence 347:14 385:16 498:10

evolved 478:12,17

exact 321:23 345:11,20 383:7 409:4 436:4 438:19 491:6 497:10 503:12 504:16 560:9 573:24 576:12 580:6

exactly 354:24 365:22 379:3 381:3 382:19 387:3 423:20,24 440:21 464:7 472:10 511:17 583:18 586:17

exaggerated 324:24

examination 309:17 311:4,4,5 315:12 581:21 587:1 589:10

examined 315:10

example 329:3 347:5 358:21 359:2 360:19,23 365:17 396:5,13 400:1 417:19 424:20 425:13 428:2 441:16 468:11 474:6 479:8 489:18 492:11 495:4 533:19

exasperated 324:3

exceed 368:7

exception 419:24

excerpt 311:9 503:2

excess 554:24

exchange 354:16 360:18 367:1 416:16 432:19,21 480:1,18 481:19 482:6,14 483:11 483:18 484:22 485:5 486:9,22 487:19 498:1 499:5,10 500:24 501:21 512:15 543:16

exchanged 346:20 348:17 376:8 377:8 379:20 380:16 381:14 382:2 383:13 384:24 389:19 390:13,17 398:24 412:2,19,23 413:2 416:20 418:24 419:11 433:2 436:9,13 441:22 467:15 470:6

504:11 543:17 586:12

exclusively 372:16

excuse 384:12

executable 424:21

execute 357:5 496:18

executed 593:10

execution 592:14 593:19

exhibit 311:7,7,8,8 311:9,9,10,10,11 311:11,12 365:13 365:14 366:2,11 366:16 369:5 370:13 396:22 397:12 398:5,14 400:14,24 401:3 403:10 409:23 411:17,22 417:12 420:15,19,22 430:13,16 433:13 437:1 477:13,13 477:17 487:5 491:14,15 494:19 498:15 502:23 503:2 506:1 508:18 509:22 512:13,17 516:16 543:14,17 544:10 544:19 554:10,18 559:1 562:18,23 563:5,15,15,24 564:15 566:11,14 566:21 569:16,17 569:21 581:24 582:13

exhibits 311:6 317:10 417:6

exist 349:4,5,7 358:17,23 359:2

380:20
**existed** 349:8
381:22,23 405:9
413:23 533:17
577:2,3
**existing** 409:21
**exists** 360:12
**expect** 316:22
434:11
**expected** 564:14
**expecting** 561:16
561:17
**expense** 564:10
**expenses** 553:8
**experienced**
362:20
**experimenting**
579:12
**expert** 319:3
323:13 327:16
339:22 412:12
413:6 414:15
416:23 431:23
514:2 530:19
**experts** 416:22
**expiration** 358:15
592:19 593:25
594:25
**expire** 357:16,17
358:13
**expired** 431:18
**expires** 358:3,8
**explain** 354:19
356:12 363:13
393:13 433:11
437:4 514:24
**explained** 355:11
474:14 486:19
497:4
**explaining** 493:8

**explicitly** 481:20
**export** 423:11
432:3 433:12
434:16
**exporter** 523:9
**extension** 429:11
**extensively** 549:9
**extent** 338:14
409:6 500:7
520:15 536:18,19
540:20 542:10
578:7
**extra** 413:11

**f**

**f** 364:21,22 374:14
476:21
**face** 506:6
**fact** 330:2 335:12
340:5 365:1
378:19 383:20
393:17 406:11
408:1,11 410:14
410:15,18,18
411:12 426:20
450:2,4 459:23
481:18 482:12
488:22 505:10,15
505:19 556:21
557:2
**factor** 509:6
**factors** 560:2
**factory** 525:20
529:11
**facts** 461:3
**fair** 314:17 315:6
327:3 336:19
347:1 358:6 365:2
365:24 453:3
503:21 585:16
**fairly** 328:8 380:8
524:22

**fall** 394:8 558:12
**false** 442:22
**familiar** 365:21
451:14 455:1
536:13 582:19,20
583:9
**family** 355:12
425:10 441:17
443:5 569:8
**fandom** 374:19
511:11,13
**far** 339:14 348:1
482:11 535:17
573:15
**farm** 576:11
**fast** 463:22
**fastboot** 476:23,24
**father** 426:24
432:23 433:1
**father's** 423:22
426:8,9 427:15
**fault** 500:7 514:9
**feature** 359:17
437:22
**february** 566:10
**federal** 309:18
314:21,22 544:21
546:8 547:4,6
582:7
**fee** 563:5,7 568:21
**feed** 429:21
440:17,22,23
466:12,13
**feedback** 447:7
**feel** 350:8 393:10
578:15
**feelings** 393:22
395:7
**fees** 563:4
**felt** 393:9,11 394:7
419:6

**field** 347:7
**fields** 432:2
**fifth** 498:14
585:15
**fight** 316:21 561:4
**figure** 519:6
**figured** 378:10
573:14
**file** 319:7 337:8
338:23,24 339:1
359:8 422:13,15
423:16 424:5,7,19
424:21,21,23
425:1,16 426:22
440:6,19 442:2,4
505:21,23 508:21
510:9 516:12
518:5 523:3 529:6
545:14,17 547:17
565:22
**filed** 312:15
413:21 427:21
429:4 430:12
445:13 447:14
510:5 546:7 547:6
547:16 548:5,8
**files** 365:6 425:3
465:14,23 466:24
510:8 516:13
**filing** 428:5 445:21
447:15 466:8
519:9 546:5,16
547:3,5,22,22
**filings** 428:7 466:2
466:5 519:7
546:14,19
**filled** 544:21
**filling** 584:8
**final** 440:13
**finally** 515:7

**financed** 553:14 553:19
**financially** 313:2
**financing** 560:6
**find** 344:6,8 352:12 354:1 421:24 452:11 456:10,11 472:11 496:19 561:5 591:12
**fine** 325:16 340:15
**finger** 410:20
**finish** 549:16
**fire** 356:15,20 371:19,22 372:3 372:11
**fired** 409:16 410:9 444:6
**fireversary** 460:8
**fireworks** 318:10
**firm** 312:20 536:9
**firms** 443:22
**first** 315:9 321:7 321:21 325:19 329:23 342:11 349:8 365:4 387:1 387:2,8,11 388:2 390:22 398:5 400:19 401:3 445:9 458:5 478:2 479:20 480:3 490:24 496:8 498:17 501:5,20 511:6 512:17 516:16,17,20,23 517:12 518:22 519:17,20 521:3 525:22 530:9 534:7 535:19 537:15 538:8,11 540:6 544:15

546:10,16 548:24 549:3 562:6 563:7 568:23 570:18,23 572:11 587:17 589:11
**fit** 393:19
**fitting** 573:15
**five** 386:24 471:14 550:24 570:10
**fix** 423:5 434:20 434:24 464:3 510:14
**fixate** 422:3
**fixates** 437:12
**fixed** 368:8 522:6
**fixing** 436:5
**flack** 516:13
**flag** 354:3
**flank** 554:21
**flash** 476:22 530:11,14
**flaw** 496:2 497:17 497:20
**flip** 420:14
**fma** 509:8
**focus** 368:9 374:24 512:16
**focused** 346:23 405:23
**focusing** 463:24
**fodder** 443:21
**foia** 452:11,17 454:14,16,23 455:6,10,14 456:1 456:3,9,13,17 457:1,5,6,9,13,20 459:5
**foiaed** 454:17 457:16
**foias** 455:2,4,4 456:21 458:14

**folks** 420:6
**follow** 385:10 415:15 552:23 564:13
**followed** 377:4
**following** 350:11 350:14 352:1,5 377:9 415:18 433:13 548:2
**follows** 315:11 434:2
**footage** 392:4
**footprint** 343:22
**force** 321:20 490:21 510:1
**forced** 443:20
**forcibly** 360:4 425:16
**foregoing** 589:13 592:13 593:18
**forensic** 319:3 339:22 412:11 413:6 514:2
**forest** 310:3
**forget** 458:6
**form** 341:18,20 343:10 376:3 428:11
**formal** 545:8
**format** 328:6 428:11 520:5
**formats** 319:7 518:4
**formatted** 532:24
**former** 370:3 511:21 514:13
**forms** 343:23
**forth** 563:3
**forward** 381:20 510:15 544:21 591:16

**found** 355:5 423:4 434:20 465:14 466:10 534:19 539:4
**foundation** 412:9 415:24 417:9 418:1 453:9 520:1 521:6 540:17
**four** 367:5 434:23 460:7 468:2 516:12 566:17 570:11
**fragment** 439:3
**fragments** 359:9
**frame** 375:5 400:7 400:8
**frank** 378:5,23 379:24
**frankly** 584:19
**free** 385:13 592:14 593:20
**frequently** 446:22
**fresh** 348:2 373:12 501:8
**friday** 377:13 379:7,13
**friedlander** 313:13
**friend** 443:7,8
**friends** 355:12 443:5,6 452:4,11 453:19 454:24 455:1 456:1,21 457:6 458:14,17 577:22
**front** 406:21 461:19 568:23
**frontier** 540:17
**frowning** 506:6
**fulfilled** 580:11

**[full - google]** Page 21

**full** 317:4 360:8,10 381:4 487:9,12 504:5 560:1 562:1
**fully** 508:14 510:13
**function** 352:20 355:14 357:11 364:21 488:8 508:15 556:12
**functionality** 337:19 475:18 586:9
**functioning** 329:4 337:17 575:22
**funeral** 426:9
**funny** 453:20
**fur** 374:20
**further** 489:11,11 491:13 506:17 549:19 581:17 588:3
**furtherance** 503:10,15 543:24
**furvana.org.** 374:12
**fyi** 421:16 437:10 437:13

**g**

**g** 311:3 312:12,14 315:8 340:16,16 343:2,15,16 473:14 589:10
**gain** 530:21,22
**gained** 530:20
**galaxy** 533:2
**game** 358:6 579:13
**games** 574:19
**gap** 434:5
**garbage** 359:3

**general** 333:13,22 334:10 368:1,12 368:13,24 378:3 379:17 488:9 540:15 548:22
**generally** 320:5 321:13 333:14 346:7 363:7 433:1 502:22 585:12
**generate** 531:1
**generated** 528:5 528:19
**generates** 361:17
**generic** 561:3
**george** 309:3,13 309:16 591:6,9 592:3,4,9 593:3,4 593:13 594:20
**german** 341:9
**gesture** 419:13
**getting** 325:17 326:3 329:17 330:16 409:16 414:21 455:16 457:20 502:13 503:16 542:21 563:11 587:21
**giant** 544:24
**gibberish** 528:19
**gigabyte** 414:19 521:4,12,20,23 522:7
**gigabytes** 519:5,13
**gigs** 584:16
**gingi** 512:10
**ginormous** 584:19
**git** 547:11 548:13
**give** 321:23 322:1 322:24 345:11 392:2 411:19 435:21 444:3,10

444:11 496:20 543:11 564:24
**given** 413:5,14 518:1 569:11 589:18
**gives** 366:16 472:21 487:9
**glance** 488:21
**global** 333:10 367:15,21 418:3,7 419:17,23 420:1
**globally** 420:6
**gmail** 373:23 477:18 507:17 509:9 526:15,17
**gmail.com** 374:1 511:1
**go** 312:9 323:12 328:22 331:17 333:8,18 344:10 345:19 349:2 352:12,16 353:24 354:1,22 360:5 369:4 380:23 382:22 385:4 386:4 387:22 391:3 398:12 400:1,4,10 408:4 409:23 412:17 413:10 418:1 419:24 425:22,23 443:11,21 448:14 453:22 454:21 463:19 464:8 476:20 489:7 491:13 494:24 495:8,9 504:24 520:16 530:12 536:22 546:4 550:15 560:14,19 561:1 563:20

569:6 572:4 575:9 579:17 581:23 585:22
**going** 312:2 313:21,23 315:4 321:12 324:2 344:6 346:13 352:24 353:14 354:4 361:6 362:6 362:15 378:2,3 380:13 381:20 384:16,22 386:3 388:8,10 409:23 415:5,15 419:5 420:18 424:22 436:23 439:13 452:12 453:23 456:12 461:1,3 479:22 490:19 510:15 518:15 534:21 556:8 561:5 567:18 570:12 577:5 588:4
**good** 312:2 313:16 331:10 334:18 347:4 361:3,4 439:11,18 473:18 486:21 509:23 524:21 535:3 546:4
**google** 331:9,12 343:2,4,4 345:12 356:15,19 357:1 376:5 421:16 426:12 437:10,13 454:19 458:16,20 458:22 493:14,15 493:16,21 495:1,4 499:10 507:15,16 507:17 515:12,16

**[google - haynes]**

516:7,8,10 522:13 522:14,21 523:1 571:16,17
**gotten** 452:17 458:12,13
**gps** 426:11,14,23
**grab** 365:7 387:22 425:16 454:21
**grade** 585:15
**grand** 556:4 559:2 559:17 569:10,14 569:15
**great** 315:4 347:21 397:11 415:19 500:7 538:13 553:4
**green** 313:12 387:23 403:2,4,7
**greetings** 372:23
**greg** 565:21
**grew** 341:8
**grossly** 324:23
**ground** 313:18 385:15 533:22 534:1
**grounds** 415:1
**group** 370:7 510:10
**grown** 478:16
**gsm** 582:24
**guess** 332:15 339:4 341:7 347:4 354:3 395:3 419:20 422:16 425:7 434:10 467:22 472:2,7 479:24 481:13 482:15 503:14 529:18 546:19 568:6 585:12

**guessing** 511:21
**guide** 449:16
**guys** 338:14 343:24 416:4

**h**

**h** 340:16 352:21 352:22 502:16 537:24 554:5 562:11,13
**ha** 430:18,18,18
**half** 322:3
**hand** 444:7 590:5
**handed** 322:13 446:20 561:13 569:11
**handful** 340:12,22
**handle** 342:14 504:23 505:23
**handles** 420:8
**hangouts** 343:2 376:5
**hangul** 340:10,13 340:14 584:23 585:1
**happen** 359:24 360:2,4 486:18 488:23 492:14 494:4 587:4
**happened** 345:21 379:6,7,9,12 387:13 399:20,21 399:22 400:21 405:13 421:12 423:1 428:16 438:20 449:20 450:13 453:2 457:23 499:16 510:12 556:3 579:10
**happening** 363:3 449:21 461:14,15

461:16,17
**happens** 381:8
**happy** 372:22 550:14
**harassing** 416:1
**hard** 444:3 508:3 560:8
**haynes** 320:14 336:11 345:1,15 345:22 346:17,20 347:1,15 348:9,13 348:17 349:14,15 349:18,19,20 350:2,4,10,20,23 351:3,6,14,15,21 351:24 352:2,5 353:4,8,9,19,22 354:2,7,12,14 355:6 370:5,10,17 370:20,24 371:3,6 371:7,11,12,18 372:14,16,19,24 373:3,4,6,8,15 375:9,11,14,21 376:3,9,20 377:2,8 377:11 380:4,17 380:24 381:12,19 382:1,4,9 383:1,12 383:17 384:2,10 384:11 385:1,6 386:10,13,17 388:14,17,18,21 389:3,7,11,12,17 389:24 390:2,9,12 390:16 391:5,8,14 392:6,7,11,17,23 393:5,14,23 394:12 395:13,22 396:8,19,23 397:12,14,15 398:15,19,24

399:11 401:6,11 402:4,10,15 403:5 403:19 404:3,11 405:9,12,22,24 406:3,8,12,18 407:3,20,23 408:5 408:24 409:5,7,13 409:15 410:3,16 410:19 411:14 412:2,20,24 413:2 413:4,23 414:8 417:4 418:23 419:11 420:15 421:5,12 424:8,10 425:2 427:1,5,8,14 427:19,24 428:6 428:20,24 429:4,9 429:18,23 431:9 432:4,12,20 433:2 434:6,13,17,22,24 435:6 436:10 437:1,20 438:3,16 438:23 439:24 440:2,5,14 441:1,6 443:15,18 444:2,9 444:12,18 445:3 445:10,14,16,24 446:12,17,21 447:2,6,12,23 448:4,17 449:8 450:6,10,20,20 451:4,5,17,21 452:2,21 453:7,14 454:7,11 456:11 456:16 457:18 459:12,18,20,23 460:2,5,10,14,18 460:23 461:7,10 461:16,18 462:5 462:16,20 463:3,9 464:1,7,12,24

465:9,12,20,22 466:9,10,11,15 467:1 469:23 470:7,12,17 479:9 479:12 481:14,16 489:16,18 526:24 527:3 529:9 534:14 535:7 585:23 586:4,4

**hazy** 317:7 402:21

**hdr** 329:8

**head** 330:1 336:9 348:1 355:8 369:22 373:10,12 404:6 427:17 438:24 443:13 451:23 487:22 493:1 523:5 536:12 559:24 561:9

**headquarters** 384:8,9 388:4,11 404:8

**headsets** 384:13

**hear** 329:7 406:19 410:8 445:22 503:24 517:20

**heard** 313:19 387:15 406:17 409:16 410:9 451:2 455:18 490:13 544:19

**hearing** 450:18 496:23

**held** 362:12 549:18

**help** 488:10 511:3 512:5

**helpful** 332:1 453:5

**helping** 511:20

**hereto** 590:2

**hereunto** 590:4

**hernia** 554:20 564:5

**hey** 394:7 395:9 509:9,11 511:21 534:20

**hi** 544:13

**hidden** 349:3

**high** 339:3 497:14 511:18 574:19 579:13

**higher** 535:12

**highlighted** 421:2 544:8,18

**hill** 401:7,24 405:6

**hired** 514:1

**history** 345:12 547:11 548:13

**hit** 416:5

**hold** 397:17 401:15 424:14

**holding** 362:14

**holds** 507:17

**hole** 572:5 575:16

**holiday** 372:23 532:19,19

**hollister** 310:6

**home** 315:16 316:2,6 320:20 523:4

**honestly** 347:5 353:20 370:18 383:19 392:2,20 412:13 413:8 432:13 448:6 450:13 453:11 458:15 459:2 464:19,22 466:2,6 504:5 517:16

519:19 520:3,5,17 521:7,24 522:9 543:10 548:1 550:23 583:7

**hook** 364:18,19

**hooking** 364:21

**hooks** 493:10

**hoops** 561:2

**hope** 564:1

**hopefully** 326:12 487:18

**hospital** 311:12 553:15,18 554:3 556:3 559:3,13,14 559:15,19 560:21 561:8,21 563:13 563:16 570:2

**host** 570:19 571:22,23,24 573:2,11 575:19 577:1 579:21

**hosted** 312:18 571:16

**hostile** 535:8

**hosting** 573:10

**hour** 346:5 387:16 388:24 389:2

**hours** 317:1 358:13 439:16

**houses** 507:17

**hrd** 329:3

**hub** 510:6,15

**hugged** 388:6

**huh** 314:7 368:18 495:7

**hundred** 521:17 521:19

**hung** 585:11

**hungarian** 341:9

**hunt** 587:20

**hurt** 393:9,10,18 393:21 395:7 419:8,10,10 545:1

**husband** 317:22 317:23 318:2 320:23 322:14 323:1 326:23 333:7 336:5,24 344:18 369:24 441:7,8,11,17,19 441:23 449:2

**husband's** 315:22 360:19

**hyena** 512:9 516:21

**hypotheticals** 453:1

**i**

**ice** 497:1

**icon** 506:6 515:22

**idea** 406:15 488:13 490:6 579:19 582:6 583:10,13,16

**identical** 517:24

**identified** 343:7 411:7

**identifiers** 499:7

**identify** 313:3 340:24

**ids** 431:2 544:9

**ikea** 338:6

**illinois** 309:1,21 310:3,9,14 312:16 589:1,7 590:6

**image** 327:13,15 327:17,18 328:8 329:8,11 343:24 349:2 364:15 366:15 414:17 474:2 475:2,7

**[image - installed]**

476:18 477:1
505:3 517:14,19
517:21,24 518:22
518:22 519:1,5,12
519:21 520:4,11
520:22 521:3
529:10
**imaged** 327:10,22
337:15 338:15
339:18 361:24
362:7,21 364:6,13
385:22,22 412:18
415:23 471:23
474:8 477:10
502:13 503:16
518:7,10 523:18
525:10
**images** 413:14
518:3 533:3
584:24
**imagine** 466:1
496:5
**imagined** 328:3
**imaging** 322:20
324:11 340:1
362:4 363:19
385:11 412:1
414:14,18 433:15
504:9 505:18
506:22 517:12
518:7 519:17,20
**immediate** 319:17
**immediately**
323:18 350:11,14
384:1 487:3
501:19 534:20
**impact** 360:23
406:13 420:10
**impacted** 405:23
**impacting** 488:24

**impersonate**
331:17,23 332:5
**implement** 333:3
**implementation**
358:4,11
**implemented**
475:12
**implicate** 363:1
434:10
**imply** 368:4
**important** 393:20
425:11 521:14
**improper** 550:6
**inaccessible**
509:17
**inaccurate** 396:11
**inactive** 474:3
475:8
**inadvertently**
399:8 433:9
489:15 490:4
**inbox** 448:19
489:8,9,9 490:3
**inboxes** 489:11
**incident** 418:13
454:9
**include** 414:15
542:13
**included** 351:8
591:14
**includes** 343:19
467:11,14 492:15
**including** 512:23
554:19
**income** 548:17
549:9 550:18
551:2,8,17,23
552:9
**incoming** 356:24
**incomplete** 339:3

**inconvenience**
349:1
**incorporated**
593:12
**incredibly** 405:14
538:6
**independent** 456:9
**index** 429:14
**indicate** 364:3
432:3
**indicating** 591:14
**indication** 582:10
**indirectly** 590:2
**individual** 367:12
369:2 419:19
512:3 537:13
538:7 558:7
576:13,23 577:6
579:13
**individuals** 368:9
458:21,24 459:4
**info** 423:23
**inform** 378:4,15
378:16 379:15
407:23 518:9
**information**
317:15 332:14
334:4 336:16
339:3 378:14
385:10 413:7,11
414:16,16 415:22
426:7 446:23
455:11,15 457:4
467:8 469:11,11
469:13 478:9,10
478:19 492:10
495:2 498:9 502:4
515:13 519:13
533:24 537:14,19
537:20 538:9
543:23 547:7,9,9

548:10,11
**informed** 339:9
407:20 409:6
410:14 558:21
**ingrassia** 378:5,24
380:2,13
**initial** 334:5
473:18 474:20
475:4 567:11
**initially** 475:3
481:21 534:10
**initiate** 572:11
**initiated** 329:22
491:22 494:19
495:6,22 498:11
**initiative** 587:21
**inode** 506:19
**inodes** 359:8
**input** 442:9
**inquiries** 462:22
463:4 542:12
**inquiring** 462:6
**inside** 323:7 325:4
356:8 364:16
371:14,15 399:24
510:6 533:2 564:4
**insight** 519:2
**inspect** 323:2
**inspector** 447:19
450:18
**install** 429:11
473:1,2 482:20,24
483:2,4 485:11
503:6,18 504:1,4
504:14 505:7
**installed** 325:4
364:1 421:13
477:5 493:5,15
494:5 503:15,19
504:7 505:3,8,11
506:23 507:10,14

**[installed - julie]** Page 25

525:20 529:8
**installing** 532:1
**instance** 335:6
337:22 347:8
359:3 360:12
368:12 442:8
472:24 474:20
477:7 484:12
506:9 510:10
**instances** 347:13
399:3,5 470:9
475:4 501:23
**instituted** 439:1
**instruct** 414:20
471:5 526:18
**instructed** 350:4
471:2,8,11,13
**instructing** 415:9
437:5
**instruction** 471:6
**instructions**
415:16,18 471:7
486:8,22
**insurance** 554:20
555:12,15,18,22
556:1,9,14,18,22
557:3 561:11
564:21 565:4,15
565:24 566:2,4,6
**insure** 539:3
**intact** 364:7
508:14 587:14
**integrated** 490:1
**integrity** 339:5
505:22 558:3
**intelligent** 510:8
**intended** 329:23
445:4 583:5,8
**intent** 478:17
**intention** 353:7
457:15 496:6

517:2
**intentional** 496:1
**intentions** 535:4
**interact** 363:12
421:19
**interacted** 363:6
370:20 482:3
511:10 543:6,9
576:14
**interaction** 392:15
**interactions**
544:22
**interested** 313:2
454:18 590:2
**interface** 586:17
**interfere** 312:7
**interference** 312:6
**intermittent**
324:13
**intern** 581:1
**internal** 324:21
469:21
**internet** 318:9
455:2 458:22,24
459:1 537:18
576:14
**interpret** 557:5
**interpretation**
414:5
**interrogatories**
315:10 444:22
**interrogatory**
444:22 463:7
464:11 465:10
**interrupt** 347:18
**interview** 387:11
387:14 388:3,13
407:13
**interviewed** 385:6
386:8 387:7,11
406:16

**interviews** 386:20
388:12 402:5
403:6,11 404:8
406:9 408:2 409:8
**investigation**
406:14 452:16
534:19 545:15
**invitation** 386:20
**invited** 372:13
**invoices** 311:12
330:3 567:15
569:20
**invoke** 359:24
**involved** 453:19
539:13,19,22
583:21
**iot** 492:23
**iphone** 421:20
**iron** 482:23
**irrelevant** 416:1
**irs** 551:14
**ish** 387:16 550:24
**isolates** 478:14
**isolating** 478:9
**issue** 323:9,14,15
324:10,21,23
325:13 329:2,9,17
334:16 361:23
362:5 421:17
422:4 434:21
435:1,18 452:11
454:22 455:4,6,14
456:1,3 457:13
465:13 490:5
506:10,20 510:16
510:19 512:22
535:5 546:14,16
**issued** 337:9 455:2
455:5 456:14,17
456:21 457:6,9
482:18 490:15,16

547:16 548:5
**issues** 324:2,14
329:3 337:5
338:20,22 354:20
362:2,8 363:16
364:20 425:2
505:22 539:11
558:3 565:22
**issuing** 455:10
459:5
**item** 561:3,18,19
**itemization** 561:5
**itemized** 561:2
569:20

## j

**j** 313:11
**jados** 310:12
311:4 313:11
581:20,22 586:21
**jal** 407:16
**january** 455:7,7
519:7 554:4,14,16
562:23 566:9
**japanese** 585:7,14
585:17,20
**java** 424:21
**jesseka** 313:12
453:21
**jewel** 401:23
**jim** 477:18 478:2
529:1,14
**jkennedy** 310:9
**jll** 410:10
**job** 363:5 373:18
572:3,6 580:23
**john** 310:7
**jones** 409:12
**judge** 314:21
**judgment** 545:16
**julie** 313:13

**[july - landing]**

**july** 309:22 312:3 328:19 329:19 337:23 434:14 436:10,15,19 515:7 584:14 590:6 591:4

**jump** 406:6

**june** 327:10 332:10 338:16 421:5 426:4 430:17 431:5,9 433:23 434:6 435:7 512:16 517:13 519:17 573:7

**k**

**k** 473:14 537:24 589:3

**kaiser** 345:23,24 352:1 470:1

**kamoto** 585:18

**keep** 362:14 384:22 446:23 449:6 477:6 522:5 524:21 573:12 584:16

**keeping** 342:17

**kennedy** 310:7

**kept** 327:2,5 332:20 529:22 531:10

**kevin** 312:19

**key** 347:23 375:3 428:4 493:2,4,7,9 494:6,8,9,14 498:18 499:3,9 501:4 513:15,19 513:22 523:20,23 524:6,16,21,22,23 524:24 525:4,15 525:18,22 526:7

526:14,19,23 527:4,7,12,15,19 528:14,17,20 529:23 530:1,5,10 530:13 531:1,1,3,9 531:13 539:9 545:9

**keyed** 356:2

**keys** 487:14,16 500:20 512:23 525:5 526:14,20 526:23 587:8

**khuans** 310:8 313:8

**kim** 313:8 443:8 577:20,21

**kind** 374:11 398:1 398:11 408:10 449:20 494:3 497:6 533:20,21 535:2 573:11

**kinds** 377:23 445:8 565:6

**kinks** 337:23

**kiosk** 513:18

**knew** 344:1 392:21 404:15 410:19 411:15 413:1 463:13 488:3 519:20

**knocks** 478:12

**know** 313:16,18 314:15 317:24 318:5 322:13 324:3 325:11 328:6 329:22 331:20 332:23,24 336:23 339:14 340:10,15,22 341:14 347:5 354:11 355:24

356:10,14,15 358:23 362:12 364:17,17 367:20 370:10 371:12 373:2,18 376:5,6 377:19 378:1,2,4 379:4 380:11 381:21 383:19,20 387:4,13 389:20 390:2,21 392:2,9,9 392:20 393:11,17 393:19 394:1,3,7,9 394:16 395:7 396:10,24 400:8 400:14 403:23 407:10 408:16 410:10,12 412:10 412:14 416:3,13 416:14,22 419:3,7 420:16,20 425:20 425:24 430:14 432:13 434:11 435:10 440:21 441:18 442:10,14 452:4,10,14 454:20 456:20,23 457:16 464:14 465:21,23 466:2,6 467:4,23 468:9 469:23 470:19,23 475:10 477:13 482:11 483:16 484:19,20 487:4 488:8,19 489:21 490:14 491:18 498:15 499:14,17 501:24 504:5,20 505:5,10,11,16 511:5,9,18 512:13 516:2,4 517:16 518:24 519:10,12

519:19,20 520:2,3 520:5 521:7,8 522:9,11 528:4 531:15 535:1 539:22 541:16,19 543:14 545:12,23 547:21 549:20 550:12,12 552:3 554:10 562:19 563:12 565:3 566:17 569:17 575:8 577:17,17 578:24 579:4,20 580:23 581:4,13 583:7,15,17 586:12 587:18

**knowledge** 499:14 505:2 547:15 557:12 565:19 578:19 581:2,8,10 582:9,12,18

**known** 353:9 410:18 478:13

**knows** 316:4

**korean** 339:19,20 339:23,24 340:9,9 340:17,18,19,23 340:24 341:2,4 584:22 585:1

**l**

**l** 340:16,16 554:5 582:17,20 583:6

**lack** 346:24 412:9 415:24 417:9 418:1 453:9 454:24 520:1 521:6

**ladies** 406:20

**lake** 310:3

**landing** 430:2,5 440:17,18,23

**[lang - little]** Page 27

lang 378:6,9 380:6
  380:8,14 382:12
  383:20 390:17
  403:24 409:12
  453:18 454:9
  586:1,5,14,15
lang's 381:6
  389:21 460:15
langer 443:7
language 339:19
  339:23,24 341:8
  341:10,11 490:17
  585:2,6
languages 341:1,5
  585:9
laptop 337:11
large 368:7 516:14
  524:22
las 537:22
lasalle 409:12
late 327:13 430:12
  550:13
latest 525:12,14
  572:19
launch 425:24
launcher 515:19
  516:11 523:3,7
law 310:2 443:22
  536:9,10
lawsuit 429:5
  430:1 445:13
  467:7 503:16,22
  545:4 546:23
  547:4,5 548:8
lawyer 316:16
  317:19 318:3
  460:20,21
lawyers 540:22
  544:14
lazy 357:4 508:6

learn 404:17,21
  540:1
learned 407:3,24
  408:6
leave 318:1 372:7
  408:23 449:18
  450:4 472:17
  477:23 513:8
  531:17,19,21,23
  532:13,18 534:8,9
  558:14 567:23
  568:9 569:2
left 347:6 359:8
  366:10,11 371:23
  381:12 387:2,11
  389:5,8,9 439:9
  521:12,21 532:1,5
  533:10 534:4
  583:15
legal 312:19,20,21
  312:22 412:8
  445:17 467:18
  468:18 520:16
  536:19 540:21
  541:6 578:17
  588:7 591:1 594:1
length 366:21
letter 392:21
  408:6 442:8,9,20
  443:1,4,14,17
  444:8 450:6,16,21
  451:1,3,11,17,18
  453:8,15,17 454:7
  457:18,19,19
  458:2,4,11,12
  459:11,12,15,16
  459:19,24 460:15
  556:23 557:1,11
  557:16,21,22
  558:4,8,17 561:13
  591:20

level 363:10
  585:15
liability 553:23
license 590:9
life 326:7 353:9
  393:12,16 394:10
  449:6 456:1
lifetime 357:22,22
light 479:13
liked 576:23
  579:14
likewise 528:12
limit 385:18
limitation 356:6
  418:11
limited 424:19
line 385:4 391:23
  403:16 414:3
  433:18 438:19
  446:3,6,7 448:22
  449:6 504:16
  516:15 561:3,17
  561:19 582:14
  591:14 593:7
  594:3
lines 344:23 390:8
  393:4 422:19
  424:1 425:14
  433:7
lingers 359:4
link 365:10 395:24
  396:1,2,13 399:6
  572:7 577:4
linked 439:1
  480:18 510:21
linkedin 571:2,8
  572:2 574:21,24
  575:3,10,14,23
  576:2,4,19 577:14
  580:4

linking 510:12,19
links 429:17,23
  502:5
liposuction 554:21
  555:7,21 556:12
list 352:14 374:11
listed 466:4
  555:20 563:4,23
  593:7,17
lister 429:10,14,18
  430:3
listing 593:7
lists 339:2
literally 444:5
  449:4 552:17
litigation 321:15
  346:21 347:10
  348:12,14 353:11
  406:4 412:7 427:8
  428:21 429:1,4
  440:3 441:2,5
  442:1,6,14,15,16
  444:17 449:11
  451:19 456:22
  459:7 462:21
  463:2 465:15,24
  467:16 468:15
  503:10 517:6
  525:11 536:17
  538:10,15,16,18
  540:19 541:1,11
  580:8
little 332:1 336:5,6
  336:14 340:10
  341:16 393:9,19
  393:21 405:20
  419:8 423:6
  443:24 449:19
  469:24 475:15
  495:5 560:8
  564:12

**[live - manner]** Page 28

**live** 316:23 530:7 530:21
**living** 320:20 448:11
**llp** 310:6
**load** 477:16 530:21
**loaded** 506:13
**loading** 420:21 569:19
**location** 384:6 388:5 401:10 404:19 565:8
**lock** 484:17 486:16 487:13
**locker** 513:15
**locks** 437:24
**log** 371:13,14 484:1 493:16,20 495:16,17 509:4,8 529:23 530:2 570:21
**logging** 529:1 579:13
**logical** 462:2 587:22
**logs** 362:24 493:20
**long** 346:3 353:18 354:8 356:6 367:9 367:10 368:21 370:15,22 388:23 418:12 577:3
**longer** 335:19,22 336:5,6 339:11 357:18 381:23 419:15 426:1 494:14 496:21 499:4 524:24 553:22 557:15 567:13 575:21 576:9 577:2

**look** 319:2 329:10 349:24 354:22 355:22 365:12 396:21 412:17 414:23 431:2 434:20 435:16 489:7 495:8,10 521:8 556:4 564:4 586:19
**looked** 325:15 364:14 365:1 370:18 392:3 412:22 573:23 586:17
**looking** 345:12 414:2,11 433:18 439:3 443:19 463:9,16 491:14 517:10
**looks** 324:23 365:22,22,23 400:19 423:10,21 426:7 430:18 495:13 506:1 562:22 566:15,20 582:16
**loop** 325:6 362:16 362:18,19 363:20 363:21 502:3 505:24 506:12
**looping** 362:1,6,9 363:15 502:10 505:16
**loose** 463:23
**loosely** 416:3
**lost** 472:3 494:22 508:9,10,11,14 527:19 528:20,23 529:16 557:14 567:24 587:5

**lot** 331:15 338:19 344:20 363:2 394:3 419:2,3 472:21 484:17 522:12 585:18
**love** 419:5
**low** 325:12 326:7 363:10
**lower** 555:1,2,5
**lt** 582:21
**lunch** 388:1 389:5 389:8 405:18
**lying** 453:7

**m**

**m** 473:14 502:16 502:16
**machine** 529:20 532:9
**machines** 358:1
**madam** 591:10
**magisk** 364:15 473:11 474:1,10 474:22 475:24 476:1,6
**mail** 330:3 343:2 343:13,14,15,16 343:17 347:7 354:16 373:16,18 373:20,21 374:4,4 375:15,18,18 376:1 378:3,21,23 444:2 446:23 447:2,5,9,12,23 448:17,21,24 449:10 456:15 477:17 478:1,24 479:1,2,3,14,15,23 480:22 481:8 483:20 484:22 486:7 488:19 489:8,23 497:21

497:24 498:2,3,6 507:17 512:15 578:4 587:12
**mailed** 318:14 523:3
**mails** 331:13 374:7 456:10 468:20 479:22,24 488:14,14 489:3 491:23
**main** 310:13
**maintain** 393:1 475:9 478:14 577:7
**maintained** 419:15 475:17,18 475:18
**major** 450:3
**making** 353:16 462:22 477:15 510:20 583:2
**man** 419:5
**manage** 356:20 359:21 485:13
**managed** 497:8
**management** 355:15 475:23 477:5 484:4 525:6
**manager** 408:23 474:1,10 475:6,20 476:1 481:3,13,13 492:12 502:17,18 502:20
**manifested** 330:21
**manner** 358:18,20 359:11 414:4 476:11 487:12 488:12 490:19 496:17 527:7 529:12 530:5 541:15

manual 516:11

manually 474:11 509:24

manufacturer 330:20

map 517:21 518:5

maps 426:13

march 320:12,15 320:17,21 321:9 351:15 373:7 416:5 469:24 470:18 554:1 562:18 564:8 567:5,21

mark 401:7

marked 365:16 477:13

massive 352:15

master 588:6

material 446:16 448:3 553:10

materials 317:9,16 318:21 319:1,2,5,9 319:19 348:8,9 413:12 417:1,7 429:24 440:1,19 441:4,22,24 442:2 442:4,14,17 444:15,17 446:17 455:17 458:13,18 459:6 460:19,22 515:10 518:6,10 522:13 536:17 537:5,10 544:3,5 548:15 553:7

matter 312:13 321:9 333:22 334:10 352:19 379:13 395:10 517:1,6 541:7

mattered 507:22

matters 589:12

mean 319:15,23 321:8,16 322:19 325:2 326:22,23 326:24 328:8 331:14 338:11,21 347:18 348:24 349:11 356:11,12 357:14,17 358:20 376:18 389:5 393:13 394:21 395:5 396:4 400:18 413:1 421:10 422:15 428:9,12,13 429:19 440:10 444:22 448:5,20 455:10 456:7 473:17 478:6 481:24 483:22 485:8 487:11 495:17 507:4 513:21 514:24 520:21 523:9,14 528:18 535:9 538:4 552:5 557:23 571:4,22

meaning 462:15

means 314:6 335:22 342:22 373:14 410:16 417:21 435:7 516:8 518:3 524:15 544:24

meant 332:19 389:6 402:14 405:20 411:13 422:5

measure 522:1

measured 522:4

measurements 516:18

mechanism 505:22

mechanisms 416:7 532:22

mechi.org 576:2

media 312:11 355:14 356:7 425:1 588:7

medical 565:22

medications 316:24

meet 345:19,22 346:3 371:18 384:3 386:13 401:11 460:5,9 537:15

meeting 345:3,15 346:5,6,21,23 347:16 348:5,18 350:10,15 351:6 351:13,19 352:1 354:12 371:21 388:2 389:15 391:9 392:18 394:13 405:6 443:2 447:24 448:2,18 460:4 468:12 517:3

meetings 373:14 388:5 389:12,16 435:11,13 460:13

megabytes 516:12 520:23 521:17,19 584:20

megs 516:14

memorial 554:3

memory 402:21

menchi.dog 572:24 573:21 579:22 580:1,4,7,9

menchi.dog. 574:2

menchi.org 570:20 571:8,21 573:22 574:1 575:14,14 576:18 577:11,13 578:5,9 580:1,3

menchi.org. 574:8 576:1 577:5

mention 431:23,24 514:5 535:18 582:1,13

mentioned 320:23 323:14 324:13 330:15 332:4 334:23 336:18,24 340:22 341:21 342:20 344:19 354:11,16 356:9 361:13,14,23 363:17 364:24 367:20 373:2 374:17 379:14,24 380:15 391:1 404:13 440:24 446:8 454:16 465:13 471:21 485:19 497:16 523:8 531:16 544:1 556:2 567:16,17 580:12 584:6

menu 365:18 366:2,4,6,9,12,16 367:8,16 369:4 370:13

merry 372:22

**[message - mischaracterizing]** Page 30

**message** 311:8 333:12 349:20,21 349:22 358:8,9,13 359:9 360:24 366:21 367:6,10 368:21 369:6 370:11 382:21 387:22 396:7 398:17,24 399:1 400:2 401:4 405:9 417:21 418:11 421:1,4,21 422:8,9 422:20 423:12 424:7,16,18,24 425:8,9,12,15 426:3 430:7,17,17 431:8,17,19,20 432:7,8,15 433:6,9 433:23 434:2,23 448:6,13 469:5,6 477:21 504:11 508:17 509:23 510:4 535:7 544:15,18 547:3 582:15 583:11

**messaged** 318:14 318:15 349:14

**messages** 311:7,11 331:13 332:3,16 332:21 333:7,15 333:23 335:17,20 342:23 349:3,6 352:5 353:19 356:3,6,10,24 357:11 358:2 359:1 360:17,19 366:13,17,20 367:10,21 368:4,7 368:14 369:21,23 370:2,15,23 371:2 371:15 376:8,10

376:13 379:20 380:15 381:13,19 381:21,22 382:2,3 382:14 383:13,18 384:24 385:21 386:1,1,4 389:18 389:22,23 390:3,6 390:10,13,17 391:9,12,15 392:8 392:12 393:1,2,8 394:12,15,24 395:4,8,13,15 396:9,22 397:12 397:16,21 398:14 398:20,20,23 399:10,14 402:1,4 402:11,13,16 403:11 404:4,12 404:16,18,21 405:8,13,22 406:3 406:7 411:24 412:6,19,23 413:1 414:7,24 415:7 416:16,20 417:12 417:15,19 418:14 418:20,23 419:4 419:11,15,16 420:11 421:19,23 422:22 424:11 425:21 431:5,11 431:15,22 432:19 432:24 433:2,15 433:17 434:20,21 435:1 436:9,11,12 436:18,24 437:6 437:22 438:5,11 438:12,13,16,21 439:5,6 469:20 470:13,16,22 471:3 507:19 508:11,14 509:15

509:16 524:12 543:17 544:9 585:23 586:3,5,11

**messaging** 341:18 348:19 369:3,15 425:7 432:5

**messy** 398:12

**met** 348:9 351:20 372:14 384:4,5 386:10,17,21 387:12 388:5,20 391:16 401:21 403:5 404:4 409:7 435:9,12 447:11 447:22 461:10 511:15,18 537:13 537:17 538:8,11 576:14 587:17

**method** 451:24 463:24 465:7 466:19 473:9,15 529:15

**methodology** 494:4

**metropolitan** 446:9

**mh** 420:19,22

**michael** 336:10 345:1 407:3 481:14,16 489:15 489:18 535:6 585:23

**microphones** 312:4

**microsoft** 363:4 480:1,18 481:19 482:5,14 483:11 483:18 484:22 485:5 486:9 495:1 496:13 498:1 499:5,10 500:24

503:3 508:24 509:10,10

**middle** 421:2

**midway** 506:1

**midwest** 591:17 594:1

**migrate** 329:18 330:23 515:2,5,21

**migrated** 330:16

**migration** 329:1

**mike** 377:11 387:16,18,20,24 392:16 401:18 406:17 408:23,24 409:5 410:19 449:21 586:3

**mike's** 387:12 400:16

**mind** 370:6 468:20 584:17

**mindful** 312:6

**mine** 389:21

**mini** 358:1

**minor** 563:8

**minute** 361:5 384:14 389:10,17 436:4 453:22 457:17 471:14 509:14 516:14 570:10

**minutes** 354:8,8 354:10 386:21,24 387:9 389:9 468:3 518:13

**mirror** 364:15 517:23 573:22

**mis** 399:7

**mischaracterizes** 552:21

**mischaracterizing** 522:16 575:24

**[misdirected - need]** Page 31

**misdirected** 399:6
**misheard** 450:24
  546:10
**misinterpreted**
  546:12
**misleading** 415:5
**misrepresented**
  346:8
**missing** 413:9
  445:19 494:13
  568:15,17
**misstates** 380:22
  536:20
**misunderstanding**
  347:14
**misunderstandin...**
  355:5
**misunderstood**
  354:13,19
**misusing** 332:14
**mix** 489:2
**mixing** 488:14
**mobile** 482:23
  496:20
**mode** 476:22
  479:13
**model** 321:19
  330:7,8,10 472:11
  473:20 584:18
**modifications**
  447:7
**modified** 334:24
  335:21 470:11
  573:21
**modify** 336:1,10
  350:2 354:7 369:5
  571:18,20,23
  573:17
**modifying** 368:23
**module** 363:24

**modules** 473:1
**mom** 387:13,19,24
**moment** 322:11
  376:16 392:1
  397:5 421:8
  431:10 432:8
  433:10 557:9
  558:24 560:9
  570:4
**monday** 379:7,9
  379:13
**month** 322:1
  325:23 334:15
  367:23 368:14,14
**months** 313:17
  325:9,17 391:5
  434:9,18,23
  435:24 460:7
**morning** 312:2
  313:16 321:2,5
  337:10,11,12
  343:16 379:8,9,13
  391:10,17 392:19
  400:22 401:13
  402:5,16,23 403:4
  403:20 404:5,12
  407:5 408:19,21
  501:1,1,18 502:18
  502:20,21 509:6
  551:8,17,24 552:6
  552:10,15 553:20
  555:17,24 560:16
**mornings** 406:22
**mother** 384:4,11
  388:15,17 389:4
  392:6,9 402:20
  405:16
**motion** 413:20
**motions** 415:1
**motivation** 381:4

**motivations** 415:1
**moto** 493:2,4,7,9
  494:6,8,9,14
  498:18 499:3,9
  524:23,24 525:4
  525:14,18,22
  526:7,14,19,23
  527:4,7,12,15,19
  528:17,20 529:23
  530:1,4,10,13
  531:1
**motorola** 321:20
  525:1 527:1
**mouth** 480:5
**move** 332:16,19,21
  334:4 409:22
  500:12 501:6,8,9
  509:21 533:23
**moved** 334:2
  361:13 413:17
  501:15 514:20
  515:24 516:2,5,13
  525:6
**moveover** 516:11
**moving** 514:21,24
  544:21
**mp3s** 331:9
**mulling** 378:2
**multi** 396:1 509:6
  528:6
**multiple** 364:18
  396:15 510:9,11
**multitude** 492:19
  495:23
**multiuser** 494:4
**music** 331:7,11
  507:2 516:1,2,12
**mutual** 443:8

**n**

**n** 311:1 328:10
  340:16 364:22
  374:14 537:24
**name** 312:19
  313:5 352:22
  363:24 364:2
  380:1 391:2
  406:24 408:12
  443:9 449:18
  457:1 481:6 486:1
  486:2 511:5,6
  537:23 574:2,7
  576:12 577:18
  580:21 591:6
  592:3,4,15 593:3,4
  593:21
**named** 379:24
  486:13 487:1
  536:7 554:4
**names** 458:19
  476:2 527:22
  543:10 545:23
  577:6 579:15
  580:18
**nand** 487:15 501:4
  501:8 513:19
  517:22
**natalie** 443:9
**native** 423:11
**nature** 448:14
  473:6
**navigate** 423:24
  426:13
**necessarily** 377:17
  499:18 555:2
  583:23
**necessitate** 352:7
**need** 314:1,14
  356:19 363:8
  384:13 385:8

**[need - obtain]** Page 32

409:22 421:7
424:2 425:12
431:9 432:7
435:16 461:23
463:20,21 468:4
497:12 507:1
530:10 533:23
546:3 549:6,14
550:11
**needed** 323:12
326:6 422:6 426:5
433:9 448:11
457:5 529:12
**needing** 326:13
352:8,24 426:21
524:21
**network** 437:14
496:19 499:22
509:5 582:24
**neutral** 533:22,24
**never** 327:20
349:7 372:19
386:2 412:6,22
413:12,15 417:1,7
426:16 456:19
470:11,21 490:13
519:22 520:7
542:18 544:4,7
558:4 576:14
577:8
**new** 325:4 329:1
329:17,18,23
330:14,17,24
331:20 332:17,23
333:3,8 334:3,6,7
334:20 335:13,16
336:11,18 337:23
342:9,10 352:8,13
361:13,16,17,18
372:22 423:8
476:8 492:8

495:13,15 500:10
510:15 514:17
515:10,17,19
516:2,6 522:10
531:1 535:18
584:6,13 587:13
**newly** 385:10,16
**news** 509:23
**nexus** 482:2
**nice** 356:4 372:10
430:18
**nicollette** 310:8
313:8 417:4
**nightmare** 514:23
**nintendo** 572:4,7,8
572:12,22 575:17
**node** 339:3
**nomenclature**
497:10
**nonverbal** 314:6
**normally** 407:11
411:8 472:22
473:5
**northern** 309:1
312:16
**northwestern**
554:3 559:15,19
559:23 560:12,21
560:24 561:8
562:2,7,9,14 566:9
566:22,24 567:10
567:17 568:1,7,11
569:6,10,23
**notarized** 591:15
**notary** 309:20
589:5 591:24
592:10,18 593:15
593:23 594:23
**note** 312:4 591:13
**noted** 427:11

**notes** 423:7 502:6
**notice** 309:17
**noticed** 405:8
**noticing** 313:4
**notification** 357:1
395:14
**notifications**
356:18
**notified** 429:21
**notify** 356:23
**nova** 515:19
516:11 523:3,7
**november** 381:16
381:18,20 382:11
383:14,23,24
385:1 386:2,7
389:16 391:10,17
392:19 394:13
395:19 397:13,22
398:15 400:20
401:4 402:16
403:12,20 404:5
404:12 405:2
407:6,8,14 409:9
414:3 419:12
521:22 532:6
534:14 535:6
536:4
**nowadays** 382:20
**nrl** 397:1
**nsps** 559:2 563:16
**number** 312:17
331:16,18,22
332:20 334:8,9
352:17 361:15,19
361:20 368:6
398:8 423:2,8
430:21 484:20
520:20 531:8
560:9 582:19
591:8,14

**numbers** 335:4
337:8 593:7

**o**

**o** 313:11 340:16
364:22 502:16
582:17,20 583:6
589:3,3
**o'clock** 309:22
361:7
**o'mally** 536:7
**oath** 312:24
439:22
**obeyed** 436:22
**object** 471:5
542:10
**objection** 380:22
385:8 391:11,19
403:13 412:8
414:20 415:24
417:9 418:1 419:1
426:6 427:16
436:3 452:6,23
453:9 457:8,22
459:14 461:18
462:14 467:17,24
468:6,17 499:16
520:1,15 521:6
536:18 540:20
550:20 551:4,10
551:19 552:1,20
578:17
**objections** 537:7
**obligated** 314:20
**obligation** 392:24
467:7,20 468:16
482:12 550:10
**obligations** 580:11
**observed** 392:7
402:15
**obtain** 459:15

obtained 322:5
457:20
obtaining 459:6
obviously 313:23
319:4,20 326:24
339:1 346:14
347:3 349:4 413:1
442:17 445:7
463:16 469:23
489:6 493:13
496:1 513:14,16
occasion 585:18
occasionally 337:3
occasions 340:12
occur 357:4
474:15 502:7
occurred 329:19
340:7 363:16,16
379:5 385:1 402:4
403:11 439:2
462:9 464:7
473:19 496:11
501:14 502:10,12
513:7
occurring 317:24
october 325:24
326:1 339:7,10,15
372:3,4,5 375:1,22
376:9,22 382:3
397:13,23 398:4
398:16 412:4
434:3,7,14 435:8
436:2,10,15,20
438:3,15 439:4
472:18 477:19
500:5,19 513:8
520:14 568:10
odocheck 535:10
oem 477:2
offer 447:7

offered 576:24
577:1
offers 507:15
office 310:2
407:12 590:5
official 341:8
592:15 593:21
offline 529:18,21
ogilvie 388:1
401:21 405:6
oh 348:6 349:2
390:23 408:24
ohio 591:2
okay 314:13
316:21 317:14
320:2 333:16
346:9 350:12,19
355:9 356:17
361:3 365:13
366:8 368:10
372:5 373:13
388:8 390:23
398:7,11 411:21
420:17 430:15,20
431:4 433:8
452:10 458:2
463:8,19 468:1
470:21 472:13
477:16 486:21
491:16 499:13
522:11 532:8
538:13 541:4,12
546:6 566:12,19
569:19
old 330:17,23
331:18,24 332:6
332:17,24 333:7
336:20 337:3
338:1,2 361:24
370:11 385:15
469:19 482:1,3

514:16 573:2
579:21
older 394:22
omitted 412:15
once 335:13
386:14 388:21
407:23 429:4
435:10 437:15
460:7 474:12,17
475:6,9,12 477:3
486:18,20 578:23
ones 473:8 486:24
487:15 518:2
527:21,24 579:7
ongoing 537:4
online 466:10
511:16 529:22
open 354:4 364:22
425:1,16 493:21
511:18,21 525:7
549:18 550:1
558:2
opened 374:8
404:23 405:1
opening 353:15
operating 424:11
497:21 498:3,7
operation 359:5
opinions 467:18
opposed 489:16
563:6
opt 382:22
option 366:12,16
381:10 382:14
565:8
options 342:21
oral 315:10
orchard 310:3
order 349:23
354:3 355:2
356:17 398:2

483:13 484:21
505:15 509:7
532:21 550:13
ordered 325:8
328:21 329:23
338:9 387:23
515:4 516:17,23
ordinary 435:18
435:20
oreo 525:2
org 573:15
origin 488:21
original 415:3
568:3
originally 342:13
378:4 567:22
573:9
osha 427:20 428:8
428:22,24 429:1
447:16,18,19
450:18 452:16
456:24 458:6
539:2 541:2
545:15 553:10
otc 401:7,20
outage 318:9
outcome 313:2
590:3
outlines 461:3
outside 317:6
321:5 333:13
436:11 455:1
471:10 474:24
550:21
override 419:18
overwritten 508:2
508:8
owe 553:12,23
owed 553:11
559:15,18 562:8
564:20

**[owned - people]** Page 34

owned 576:24 579:15

owner 576:8

owners 579:7

owns 579:1

**p**

p 364:22 582:17

p.m. 401:4 439:14 439:19 453:24 454:3 471:16,19 518:16,19 570:13 570:16 588:5

pable 309:3,13,16 311:3 312:12,14 313:10,16 315:8 361:12 367:19 374:3 384:22 388:13 391:18 396:21 398:18 400:13 411:18 415:13 420:15,23 430:14 433:19 439:21 442:21 450:21 451:5,15 458:3,11 461:22 462:18 464:13 471:21 477:12 480:7 491:18 495:18 502:7,24 512:12 518:21 535:23 540:22 541:15 543:13 544:11 550:19 552:22 554:9 562:19 566:14 569:16 570:18 581:23 587:3 589:10 591:6,9 592:3,4,9 593:3,4 593:13 594:20

pable's 496:24

pacer 427:22 429:7,13,15,22,24 440:8,9,12,14,23 463:7 466:12

package 504:6

packets 443:3

page 311:6 313:21 401:3 420:19 421:2 430:2,6,19 440:17,18 463:20 509:21,22 512:17 566:16 569:17,21 571:2,9 572:2 574:21,24 575:3 575:10,23 576:19 577:14 591:14,16 593:7 594:3

pages 463:18 477:15 479:11

pagination 398:1

paid 512:3 541:21 560:9 561:8 562:2 562:10 566:21 567:4,15,17 568:23 570:7

pandemic 344:10 517:8

panel 574:1

panniculectomy 554:19,24 555:4 556:10

paper 444:6

paraben 363:24 364:2 504:6 505:1 505:11,17 506:22 507:10,14

paragraph 491:14 491:18,21 494:18 498:14,21 512:17 513:4 514:11

516:15

parens 554:20

parent 358:22

parents 337:3 507:5 510:11

parsing 505:22

part 394:10 459:1 488:5 493:2 518:7 518:10 552:14 572:8,9 593:9

partially 446:3,4

participate 315:19

participated 459:3 459:5 553:20

particular 386:4 439:24

parties 312:9 367:17 368:5 369:9 371:15 400:2 590:1

partition 364:16 364:16 474:4 475:8 476:23 501:11,12,15 506:16 529:17 530:8 532:24 533:19

partitioned 528:12

partitions 529:4 530:20

parts 364:8

party 313:1,4 369:16 488:6 523:6 537:13,17 540:2,4

passed 452:18

password 465:13 465:23 466:24 480:23 492:12,23 525:6 526:3 528:4 528:5,10,18

530:19 531:7,9

passwords 491:23 492:6,12,13,22,23 493:17,22 494:7,9 525:4 526:6,10,12 526:14,19,23 527:4,7,9,11,14,17 527:20,22,24 528:1,19 587:7

paste 395:24 396:16 433:8

pasted 396:16 399:7 429:20 433:3

pasting 448:10

patch 474:1 475:2

patched 476:18 477:1 510:18

patches 475:1

patient 560:23

pavilion 569:8

pay 429:15 440:24 541:23 559:22 562:7,9 569:6

paying 560:11 562:1

payments 562:12 562:13,14 566:9 566:24 567:9 568:1,7,11 569:4

paypal 311:11 566:8,15,22 568:19

pending 440:7,9 576:20

people 332:22 337:8 341:18 342:20,23 371:5 374:20,21 385:24 421:19,20 442:8,9 454:18 489:20

**[people - phone]** Page 35

493:13 528:1
541:23 545:21
579:16
**percent** 443:10
446:19 461:13
510:13
**percentage** 560:10
**percolated** 441:19
**perform** 344:6
359:6 475:21
477:1 501:7 542:8
**performed** 554:7
556:11
**performing** 363:9
**performs** 474:5
**period** 333:23
334:12,14 335:22
351:9 368:13
374:24 375:22
376:4,21,23
389:10,17 397:22
400:12 415:4
421:8 434:9 435:4
436:17,19 456:16
**periods** 424:12
**permission** 490:23
**permissions**
485:12,15
**permissive** 420:3
**permit** 503:11
**permitted** 316:17
**persist** 477:6
**person** 327:2,6
337:6 344:10
345:3 351:19
371:18,21 372:14
373:13 375:11
376:1 379:10,12
380:9,12 381:9
407:11 435:22
444:5,13 446:18

447:2,24 448:2,18
449:10 452:3,19
452:22 454:14
457:19 460:4,6
461:9,11 464:21
465:5 468:12
484:1 498:22
499:2 511:9,16
517:8 557:18
576:11 579:1
**personal** 326:16
374:4 375:18
378:21 477:18
478:9,15,18
479:22 482:13
488:14,16,20,24
489:3,9,21 490:6,8
493:11 494:10
500:4,12,14
512:24 514:6,7
525:24 526:9,12
526:13 528:5
531:18 562:12
570:20 579:5
589:16
**personally** 495:24
498:12 503:18
504:1,18 523:2
539:5 562:7,9,10
592:11 593:15
**phone** 316:12
321:12,14,16,19
321:22 322:5,9,12
322:23,24 323:3,4
323:17 324:21
325:3,5,10,18
326:4,5,8,14,15,16
326:17,23,24
327:1,2,4,5,8,9,12
328:11,12,16,17
328:21,22 329:1

329:17,18,23
330:3,4,5,14,14,17
330:17,24,24
331:24 332:6,17
332:17 333:3,7,8
334:3,7,16,19,20
335:14,16 336:11
336:16,18,20
337:12,14,23
338:1,2,3,8,16,18
339:2,6,11,14,18
339:19,21 340:19
341:17 342:5,9,10
342:14,16,20,24
343:12 344:1,9,13
344:14,15 345:14
345:16 349:2,9
350:18,23,24
351:2,5,7,18,24
352:10,15,22
355:16,19 356:18
357:18 358:9,12
358:14 359:14,19
360:9,11,14,15,20
361:13,16,19,20
361:21,24,24
362:3,6,13,20,23
363:3,18 364:6,7
364:12,23 365:17
369:19,24 370:4
370:11 372:20,24
373:14 376:14
380:21 382:4,5,15
383:3,8,15 385:11
385:21,22 386:3
389:22 390:3,6,10
390:14,18,22
392:8,10,12
395:14,18 399:11
399:14,18 400:21
405:10 409:19,24

412:1,11,17,18,19
412:23,24 413:2,5
413:13,18,21,24
414:7,24 415:22
416:16,21 417:17
422:3 424:10
426:2 428:7
431:11 432:11,12
432:16,20 433:16
435:3,21 436:22
438:22 448:22,24
449:6 461:10
465:6 468:11
470:3 471:1,22,22
471:23 472:3,6,11
472:13,16,20
473:5,7,10,16,22
474:7,11,16,20,24
475:9,12,16 476:5
476:6,8,9,15 477:3
477:9,9,10 478:2
478:19,22 479:16
479:19,20 480:3,6
480:16,18 481:10
481:12,18 482:1,1
482:3,5,8,16,17,21
483:1,5,10 484:1,3
484:5,13,24 485:3
486:11 487:20
488:4,11 489:7,10
489:24 490:18,20
490:22 491:5
494:7,15,21 495:9
495:15 497:5
498:11 499:15
500:5,18,19 501:2
501:12,20,22
502:13 503:10,16
504:7 505:2,3,8,16
505:18,20 506:5,8
506:21,23,24

**[phone - possible]**

507:9,12,21 508:1 508:18 509:14 512:22 514:12,14 514:16,17,18,22 515:8,10,17,19 516:3,5,6 517:13 517:14 518:7,23 519:16,22 520:7 521:3,11,22 522:2 522:4,10,22 523:16,18 524:7 525:10,13,15,16 525:19 527:15,18 528:20,23 529:15 530:4 531:18 532:11,16 533:17 535:18 549:19 558:7,10,17 584:6 584:11 585:1,3,4 585:17 587:5,13 591:3

**phones** 326:19 329:6 330:19 336:16,23 337:1,4 357:19 481:4 490:11 515:6

**phonetic** 340:11 535:10

**photo** 585:19

**photos** 507:16,17

**phrase** 329:14 497:2

**physical** 362:16

**physically** 529:13

**physician** 565:20

**pick** 312:5 434:24

**picked** 435:24 444:6

**pictures** 331:12 500:10,16 507:4 510:11,24 514:9

533:19 584:19

**piece** 358:3

**pigeon** 341:9

**piggyback** 469:4

**pile** 443:21

**pin** 362:22 484:13 486:14 487:2

**pizza** 372:12 388:1 405:18

**pkgingo** 374:1

**pkgingo.com** 489:16

**place** 312:9 318:12 325:5 349:8 474:17 479:22 483:5,9 524:21 533:22 589:20

**placed** 408:23 449:17 450:4 472:17 477:22 505:1,18 513:7 531:17,19,21,23 532:13 534:8,9 558:13 567:23 568:8 569:1

**placement** 515:23

**places** 510:9

**plaines** 401:23

**plaintiff** 309:4,11 310:5 313:9 467:6

**plan** 558:7,11 566:3

**planning** 344:19 344:21 374:16 440:5 511:19

**platform** 476:4,7 507:13

**platforms** 499:11

**platter** 517:22

**plausible** 438:20 460:16

**play** 358:6

**player** 450:3

**playing** 463:22

**please** 312:4 313:3 397:6 406:10 409:24 461:24 462:11,19 536:1 536:24 550:3 591:12,12

**plug** 324:6 530:11

**plus** 330:11 342:6 343:4 454:19 458:16,20,22 515:4 559:2 563:16 569:10

**pocket** 564:10,15

**point** 323:19 326:4 326:10 332:2 336:4 338:16 375:15 388:20 393:16 394:7 402:18 403:22 404:22 412:22 416:12 421:15 435:15 438:10 439:4 449:22 471:2 472:8 473:18,19 478:1 504:8 533:12 534:18 535:12 556:23 571:19,24 573:3 574:21 575:4 576:17 577:1 579:4,10 580:8

**pointed** 410:20 578:21 579:6,7,16 579:20 580:5

**points** 572:2 573:1 573:24 574:7 575:5,13,14 576:1

576:2,4,5,7,18

**policies** 437:19 483:12 486:23

**policy** 333:10 368:5 369:9 381:9 382:17 417:14,16 417:17,18 419:17 419:23 420:1,5 431:15 436:21 438:7,9,9,14,17 439:1 483:3,8,9,15 483:16,17,19 484:4,6,7,11,19,20 484:23 485:3,4,10 486:8,10,19 490:11,17,21,22 491:1,6,9 496:3 497:23 501:1 524:5

**pony** 514:15

**pool** 537:13,17 540:2,4 587:22

**pop** 329:2

**posed** 391:20

**position** 324:5 427:20 583:15

**positive** 487:22

**possess** 321:21

**possession** 322:9 326:20,23 337:1 472:4 533:5 558:23 561:7

**possibilities** 495:23

**possibility** 496:8 497:16 499:6

**possible** 383:4 391:21 448:5 450:9 451:23 459:17,18 466:4 472:7,12 499:23

**[possible - produce]** Page 37

522:1 586:11,16
**possibly** 469:12
572:23
**post** 511:19
**posted** 452:15
463:7 464:11
465:11 476:18
**posts** 458:20
**potential** 323:11
496:2 500:1
535:15 536:4
**potentially** 318:11
324:9 362:24
364:3 376:5
468:20,22
**power** 323:8,15,21
323:22 324:3,8,10
324:12,14,20
362:10,13 472:23
**powershell** 496:14
496:18
**practically** 376:15
**practice** 377:22
**practices** 378:14
379:17
**pre** 429:1
**preapproval** 558:9
558:17,21 561:13
**preauthorization**
556:24
**preauthorized**
557:2
**precede** 480:13
**preceded** 388:3
480:11
**precipitated** 326:3
**precisely** 416:23
**prepare** 317:18
318:22 504:18
**prepared** 392:21
408:5 505:3

**preparing** 460:19
**present** 313:13
383:17 392:7,11
402:17 499:4
552:13
**presented** 317:17
**preserve** 467:8
468:9,9,11,15,16
469:12,14 536:16
537:4 548:9,11
**preserved** 544:23
547:7,9,10,13
**preserving** 537:9
**president** 378:7
380:2,5 451:12
**presumably** 582:2
**pretax** 560:7
**pretty** 353:20
363:14 365:7,23
370:1 391:22
394:6 413:3
449:24 479:17
581:12 586:7
587:22
**prevent** 558:3
**previous** 343:1
374:17 427:11
481:4 491:7
530:17 545:11
584:18 589:9
**previously** 357:7
399:3
**pried** 323:21
**primarily** 347:12
378:13 478:23
526:17 528:3
**primary** 331:7
343:10 355:20
374:4 421:14,18
426:1 473:8
502:11 530:9,10

530:15 534:8
**printed** 446:20
454:15 569:12
**printer** 532:19
533:11
**prior** 321:8 324:10
340:4 370:16
373:6,11 376:24
381:15,18 391:9
392:18 402:5
403:11 405:9
409:8 411:13
418:18 419:12
446:12 447:13,15
455:16 475:21
476:15 480:16
481:3,10 482:1
491:10 504:10
506:21,22 507:9
507:13 519:9
523:14,16 525:14
532:18 533:17
539:23 558:13
563:6 564:10
565:1 568:10
569:1 581:5
**private** 312:5
531:10
**privilege** 471:11
504:20 547:19
**privileges** 485:20
485:23 528:7
**privy** 416:9
449:20 488:5
**pro** 330:11 342:6
**probably** 322:17
330:3 339:8,16,17
343:13,16 349:23
389:9 409:6
422:11 423:23
425:15 427:11

430:7,11 431:14
439:1 445:6
452:18 454:14
469:3 497:14
521:19 524:20
547:11 576:8
585:15
**probe** 503:7,11
504:15
**problem** 323:8
494:3 510:6
**problematic**
354:20 355:5
**problems** 323:22
323:24 325:18
501:5 505:12
**procedure** 309:18
554:8 555:9
556:13 565:9
567:20 592:5
593:5
**procedures** 347:17
347:22 554:19
555:20 563:22
564:6 570:3
**proceed** 313:15
361:10 384:20
439:19 454:3
471:19 518:19
570:16
**proceedings**
589:18
**process** 353:18
497:3 504:9
505:18 515:5
518:7,11 519:1
560:5 578:6
**produce** 327:15
338:9 412:6
416:18,19 440:6
467:20 549:2

**[produced - quest]** Page 38

**produced** 319:3,6
321:14 327:9,13
327:19,20,21
345:13,16 347:7
371:12 378:23
385:11 396:23
397:12,21 398:15
398:19 412:14
413:3,13 414:18
416:15 417:2,8
427:22 440:2
444:17 517:15,17
517:19 519:14
524:10 548:15,21
549:21 550:9,12
550:13 552:18,24
553:1,6 554:2,13
562:17 566:8
**producing** 397:14
**production** 330:2
420:15 444:23
458:6 520:21,22
524:9 591:16,17
591:22
**productions** 320:8
**professional**
394:21 488:16
563:4 573:12
**professionally**
394:19
**professionals**
377:23
**proficiency**
585:12
**proficient** 585:9
**proficiently** 341:7
341:11,13
**profile** 478:14,20
478:22 479:5,7,16
479:19 480:17
483:23 484:6,8,10

485:1 487:10
489:1 492:7,14,18
493:3,10,11 494:9
494:10,22 495:6,8
497:4 500:11,12
514:10 520:13
526:11 533:24
572:10
**profiles** 488:12
493:5 533:22
580:5
**program** 503:7,14
504:1,4,15 505:1
505:11 553:15,20
560:8,16 562:13
**programming**
449:16
**programs** 482:20
**proile** 479:7
**project** 527:21
532:20
**prompt** 480:24
485:15,16,17
**prompted** 382:16
**proof** 556:20
**properly** 385:22
423:20 539:4
**property** 576:4
**proposal** 311:10
311:10 554:13,15
554:18 559:7
562:17,24 563:7,8
563:19,23 565:1
565:11,12,14
567:2,6 568:15,17
568:18,24 570:3
**proposals** 554:2
554:12 563:11
565:4,7,17,18
567:2

**proposes** 554:19
**proprietary** 319:7
518:4
**prorated** 567:12
**protocol** 356:1,1
356:13 415:22
469:2 582:23
**prove** 549:12,14
**provide** 314:10
317:4 347:4 447:6
509:8 557:16
**provided** 323:13
412:12 443:1
449:9 490:18
565:12,14,23
**provider** 497:8
**providers** 437:15
**provides** 566:2
**providing** 459:7
506:21
**psomas** 477:19,22
529:15 587:13
**public** 309:20
428:4 457:2,3,3
589:6 592:10,18
593:15,23 594:23
**publicly** 428:3
452:14
**publish** 510:14
**published** 428:3
580:4
**pull** 352:21 401:15
411:19 415:22
416:7 446:24
550:15
**pulled** 433:15
**purchase** 326:13
**purchased** 322:7
330:5 336:19
480:3,16 482:17

**purged** 391:15
**purported** 521:4
**purpose** 385:9
563:10 574:18
**purposes** 549:19
**pursuant** 309:17
309:17
**push** 356:17
**pushed** 324:8
483:3
**put** 322:14 323:7
338:3,4,6 348:22
350:7 353:24
362:23 363:18
364:4,8 372:6
385:8 392:13
396:15 399:22
426:11 461:19
465:19 466:7,21
467:3 468:24
469:7 479:18
480:5 494:6
503:10 507:13
515:16 531:20,22
532:8,10 533:1
559:20 560:3
**puts** 364:15
**putting** 496:23,24
514:10
**puzzle** 393:20

**q**

**qualifier** 468:22
**qualifying** 446:4
**quantify** 560:8
**quantifying**
516:10
**quarterly** 460:13
**quarters** 430:19
**quest** 327:9,18,22
328:4 338:15
362:4,7,21,22,23

363:16,18 364:4,6 364:13,24 413:13 414:18 502:13 503:12 504:1

**question** 314:10 314:17 315:1,5 328:18,20 346:14 351:11 359:18 386:5 391:20 394:23 398:17 401:7 410:2,5,6,7 411:2 414:21 415:14 436:4 442:13 443:24 449:13 453:2,4 454:4 461:22 462:1,13,18 463:17 464:9 467:22 468:3,5 474:13 475:14 495:5 509:19 527:13 535:21,24 536:23 538:14 541:16 542:1,4,14 546:11,13 549:7 550:5,17 562:6 564:13 576:20 587:22

**questioned** 409:21

**questions** 313:22 313:22 314:2 346:7 347:3,11 348:2 350:13 354:14,21 385:14 391:5 409:18 415:6 464:4,24 548:22 550:1 570:11 581:19

**quick** 353:20 587:3

**quite** 475:14 541:8 556:8 564:13 584:19

**quote** 328:24 357:3 358:5 364:10 386:19 416:5 424:7 459:1 546:13 568:24

**r**

**r** 374:14 554:5 577:16

**r.com** 577:16

**radio** 422:3

**ran** 435:15 500:1

**random** 400:2 576:11

**randomly** 325:10 338:19 505:20 528:18

**range** 382:7 397:11 412:3 419:16 436:14

**rauch** 565:21

**reaching** 378:8

**react** 415:8

**read** 340:9 386:5 396:6,8 410:6,7 414:5 423:6 431:3 449:13 454:4 461:23,24 462:1 462:13 464:9 466:3 468:5 490:17 491:17,19 491:20 508:16 509:15 513:13 533:23 592:5,6,12 593:5,6,17

**reading** 505:13 589:21 591:20

**ready** 338:12 348:6 502:13

533:3 545:14,17

**real** 456:1 511:5 516:17,24 587:3

**really** 331:13 352:19 379:22 385:15 392:14 402:12 406:15 410:18 428:16 443:12 458:15 459:9 468:4,19 507:1,2,5,6 516:19 532:12 535:17 560:13

**realm** 378:15

**reask** 453:3

**reason** 317:3 339:21 376:19 448:16 489:14 520:11 521:2 524:14 564:3 578:8 586:18 591:15 593:8 594:3

**reasoning** 548:1

**reasons** 355:17,20 472:21 473:7 520:20 524:19

**reboot** 362:14,15

**rebuild** 365:10 529:9

**recall** 318:19 319:14 325:23 328:5 336:8 338:11 345:9,13 345:20 348:1 351:4 369:20 370:18,22 371:2 371:10 373:1,9 377:4,7,17 378:19 379:19,22 380:12 381:5 384:6

391:18 392:1,6,11 392:14,23 393:3 394:11 402:22 403:19,24 404:2,9 406:24 407:2 409:4 416:17 426:4 427:6,9,13 427:23 428:16,17 428:19 429:2 430:9 432:22,24 435:5 438:18,21 441:14 443:12 446:18 447:10,11 447:22 448:7 450:14,15 451:20 451:22 453:16,18 455:7 458:15 459:19,22 460:22 461:13,17 462:10 463:2,6 464:19,22 464:23 465:2,4,5,7 465:8,17,18,20 466:17,19,20,22 466:23 467:2,5 472:9,10 475:5 480:13 492:20 504:16,19 532:12 533:4 543:10,12 551:7 558:16 559:24 561:9 563:10 565:2 568:13 570:7 572:23 576:12 587:3,9

**recalled** 315:9 399:11,15

**recalls** 461:16

**recap** 429:12

**receipt** 311:11 566:15 567:14 569:12 591:19

**receipts** 566:8
  567:8,16 568:19
**receive** 424:8
  554:15 565:17,18
**received** 322:19
  322:23 327:17
  330:20 361:1
  364:12 373:22
  381:19 386:19
  396:8 502:14
  549:11 552:6,10
  565:20 569:20,22
  582:16 586:5
**receives** 486:7
**receiving** 324:22
  469:16
**recess** 361:8
  384:18 439:17
  518:17 570:14
**recharge** 324:7
**recipient** 424:20
**recognize** 531:3
  566:13
**recollection**
  400:16 402:2,9
  432:18 531:24
**reconfigure** 572:1
**reconstruct**
  391:23 506:19
**reconvene** 439:12
**record** 312:3,10
  329:15 353:16
  361:6,9 380:22
  384:16,19 385:9
  439:13,19 453:22
  453:23 454:1,2
  471:15,17,18
  473:12 518:15,18
  536:20 537:24
  552:21 556:20
  570:12,15 571:18

571:24 573:1,3
  574:2,11 577:9,11
  579:23 580:10
  588:5 589:17
  593:9
**recorded** 312:12
  313:23
**recording** 312:8
**records** 557:20
  558:20 560:14,15
  561:6 567:9 571:5
  578:5,13,15
  579:19
**recover** 365:2,6
  393:7 507:20,23
  510:17
**recovered** 365:3
  412:1 431:11
  437:1 510:20
  527:20
**recovering** 544:13
**recovery** 476:21
  506:14
**recreate** 510:1
**red** 354:3
**redact** 428:4
**redirect** 464:4
  550:15 571:8
  574:24 575:2,23
**redirected** 574:21
**redirection** 577:8
  577:10 580:3
**redirects** 571:2
  575:9 576:18
**reduce** 343:22
**reduced** 343:17
  589:15
**reencrypt** 424:13
**reestablished**
  423:7

**refer** 321:7 357:8
  371:22 442:20
  492:2 513:11
  546:5
**reference** 359:13
  591:8 592:2 593:2
**referenced** 592:11
  593:15
**references** 394:21
**referencing**
  490:12
**referred** 396:22
  445:20 487:24
  509:13 557:8
  572:14 587:12
**referring** 321:14
  326:15 327:8
  334:20 343:14
  346:16 357:11
  359:10 375:3,6
  403:23 442:21
  447:8 451:11,15
  454:8 477:9,10
  481:14 482:22
  492:3 497:19
  498:1 503:9
  505:10 508:23
  509:3 510:4
  511:15 513:3,11
  514:3,7 516:20
  539:6,17 545:4,5,6
  545:7,17 546:17
  547:2,3,5,10 557:8
**refers** 401:3
  543:19
**reflect** 557:1
  558:20 567:9
**reflected** 556:21
  562:5
**reflects** 552:13,19
  561:7

**refresh** 397:2
  402:8
**refusing** 415:13,17
  545:16
**regard** 344:22
  441:19 455:21
**regarding** 449:10
  536:3 544:19
**register** 361:17
**registered** 332:22
  576:22 579:14
**regular** 344:9
  421:18 423:17
  424:4 425:7,24
**reimage** 529:10
**reimaged** 337:15
  345:14 413:18
  519:17,23 520:8
  529:12
**reimaging** 321:15
  338:9 413:21
**reimport** 424:13
**relate** 548:15
**related** 313:1
  319:19 325:11
  385:20 416:8
  427:8 432:22
  440:2 442:15
  450:5 456:11,15
  458:18 459:6
  502:12 503:21
  526:6 527:10
**relating** 428:20,22
  428:24 441:2,5,24
  442:5 456:21
  461:2 528:2 537:5
  538:9,14,24
  539:11 540:24
  553:7,10
**relationship** 378:9
  380:7 394:17

**[relationship - restrictions]** Page 41

402:14 405:24
538:1 540:22
541:9,18,24
**relative** 589:23,24
**relay** 409:11
**release** 321:24
480:9,11
**released** 326:9
**relevant** 412:13
413:7 414:7,15
467:8 529:5
536:16,17 537:4
557:15
**reliability** 469:6,8
**reliable** 328:15
**relink** 364:11
506:19
**relinked** 365:4
**relinking** 507:21
507:24
**reloading** 397:5
**rely** 323:12 356:14
**remain** 394:8
**remainder** 564:19
568:22
**remains** 581:11
**remarks** 404:3
**remember** 324:6
336:3 347:3
354:23 385:5
387:1 388:9
391:24 444:20
450:8 452:7,9,24
453:12 459:9,16
461:13 464:6
487:21 511:17
534:12,17 536:11
545:22 550:22,23
**remembers** 462:3
**remind** 439:21

**remnant** 362:23
**remnants** 363:17
508:8
**remote** 312:18
484:16 486:15
488:23 491:22
494:19 499:6
512:22 529:19,24
**remotely** 487:20
**removable** 516:3
**removal** 554:24
**remove** 492:13
507:12 515:10
**removed** 489:12
491:23 525:1
**rendered** 509:16
**renderings** 511:24
512:4,6
**renew** 577:7
**repair** 325:5
554:20
**repaired** 324:22
325:2 564:5
**repeat** 329:9
535:24
**repeating** 507:8
**rephrase** 315:2,3
453:2 465:21
509:20 527:13
**replaced** 325:8,20
326:4 369:20
396:11
**replacement**
326:12 328:22
336:20 433:6
**reply** 488:15
**report** 377:23
543:19 545:13
546:17 547:15
551:13

**reportable** 548:17
551:2,7,16,23
**reported** 378:1
535:4 589:14
**reporter** 312:21
313:24 589:7
592:7
**repositories** 529:8
**represent** 563:2
**representation**
365:24 443:19,23
520:18,18
**represented**
520:10
**representing**
541:10
**request** 444:23,24
455:11,14 456:9
456:17 457:5,9,13
457:21 542:13
552:24 593:9,11
**requested** 470:16
**requests** 452:11
454:14 456:1,4
457:7 459:5
**require** 352:12
360:8 484:12,14
484:15,16 487:1
**required** 316:19
317:13 413:7
524:17 591:24
**requirements**
509:5
**requires** 331:15
**reroot** 474:5,11
**rescheduled** 517:3
**research** 472:11
**researched** 465:3
**reset** 361:15 528:8
**resided** 320:20

**resign** 442:24
443:20
**resignation** 392:21
408:6 442:9
**resolve** 422:4
**respect** 356:10
378:23 394:19
402:9 404:3 425:3
426:3 444:15
513:10 539:7
540:18 543:21
545:24 546:1
572:15 579:22
**respective** 387:10
**respond** 489:15
**responded** 456:19
**response** 427:20
463:17 542:12
**responses** 444:22
460:20
**responsible**
377:22 378:13
379:15
**responsive** 414:11
**rest** 355:23 424:14
555:20
**restarting** 475:21
**restate** 351:11
536:23
**restaurant** 388:1
405:19
**restore** 386:4
502:4,5 510:22
587:15
**restored** 499:7,9
**restrict** 496:17
**restricted** 552:5
552:13
**restrictions**
344:11

**restrictive** 420:2
**result** 499:15
  500:5 505:24
  508:12 509:18
  510:18,23 519:4
  519:23 564:16
  570:2
**resync** 587:14
**retain** 333:22
  367:6 417:14,16
  557:19
**retained** 332:13
  334:12 366:22
  367:11,22 368:14
  368:21 370:23
  420:11 541:6,14
  541:17 557:13
  588:7
**retention** 333:11
  333:12 335:19,21
  352:11 368:5,13
  376:16
**retreading** 385:14
**retrieved** 331:23
**return** 336:14
**returned** 337:19
  362:1,3 591:19
**returning** 496:6
  531:15
**review** 317:10
  318:21 319:5
  320:10,13 340:3
  355:1 414:16
  447:12 448:18
  461:11 591:13
  592:1 593:1
**reviewed** 319:1,10
  319:19,23 320:16
  370:13 403:10
  413:12 417:1,7
  491:1 570:3

**reviewing** 402:1,8
**revised** 445:7
**revision** 449:15
**revisit** 550:14
**revisiting** 549:9
**revoked** 407:21
**rid** 393:18
**ride** 407:11
**rides** 406:21
**right** 314:7 315:14
  315:24 316:3,10
  316:12 329:20
  332:7 333:24
  340:8,23 342:8
  343:13 346:11
  349:10,20 350:1
  351:16 360:21
  361:3,16 363:19
  366:3,5,6,15,23
  367:2,6,11,14
  368:15 369:7,17
  370:6 371:8
  372:17 373:4,10
  374:23 375:15,19
  375:23 379:16
  380:18 384:3
  385:2 387:5
  391:24 394:1,5
  397:19 403:12
  405:3 413:18
  416:14 420:7,14
  420:20 426:19
  430:17,18 431:6
  433:24 435:2
  438:10,11,17
  446:1,14 450:7
  456:22 467:6,9
  468:14 469:18
  470:2,4,5,13,18
  475:24 476:2
  477:23 480:4

482:6,18 485:20
489:12 491:24
493:11 495:6
496:8 504:2
516:21 517:6
519:24 522:23
526:10 527:15
528:10,14 534:21
541:8 544:16
546:20,21,24,24
547:20 548:14
555:1 564:17
566:23 577:5
579:5 580:14
583:18 584:9
587:15
**risk** 348:23,24
  350:7 497:14
  535:4
**roam** 437:14
**roamed** 436:7
**rock** 435:10,12,16
**rocks** 309:20
  312:22 589:5
  590:9
**rode** 406:21 407:9
  407:13
**rom** 521:16,17,18
  522:10 525:1
**romanian** 341:9
**room** 315:23
  316:4,14 318:1,11
**roommate** 316:4,7
  317:24 318:3
**rooms** 387:10
  388:11
**root** 363:10
  364:14,16 395:6
  423:4 472:6,8,20
  473:7,10,22
  474:19,24 476:5

476:16 477:4
505:13
**rooted** 363:3
  471:24 472:13,16
  473:10,16,20
  474:18,20 475:3
  475:10,13,17
  476:9,11,15
  508:20
**rooting** 472:3,21
  473:15,19 474:16
**route** 573:24
**router** 533:11
**routinely** 344:12
**routing** 582:23
**row** 417:19
**rsus** 552:2,5,17,19
  553:2
**rtbm** 479:9
**rule** 550:10
**rules** 309:18
  313:18 592:5
  593:5
**run** 334:17 365:6
  435:19 475:20
  496:14 499:20
  511:20 574:4
**running** 383:8
**runs** 406:20
  429:11 478:2

---

**s**

**s** 313:11 473:14
  502:16 537:24
  554:5 591:16
  593:8,8 594:3
**safe** 491:23 492:16
  492:17
**safety** 331:16,18
  331:22 332:20
  334:8,9 335:4
  361:15 423:2,8

**[safety - seen]** Page 43

446:9
**salary** 457:3
**salawus.com** 310:14
**samsung** 478:12 533:2
**sand** 478:7
**sandbox** 491:24
**save** 368:3 524:23 525:4 526:14,19 526:23 527:4,7
**saved** 331:12 418:14,20 492:6 492:12,13 493:22 494:8 495:3 513:23 522:13 526:7,10,12 527:12,14 531:3,5 531:6,12
**saves** 357:2
**saving** 334:16 338:24
**saw** 327:20 362:24 363:17 390:22 392:10,16 405:12 415:8 417:3 435:22 443:10 444:10 454:15 458:5,7 520:23 534:23
**saying** 314:7 334:19 335:20 349:2 360:1 367:19 377:11 381:18 382:23 387:17 393:3 400:23 422:5 432:4 445:12,22 462:14 475:24 494:12,20,22 496:22 549:4

568:17
**says** 366:12 421:7 430:18 453:7 463:14 478:2 483:12 486:21 487:8 496:23 512:18 514:21 559:2,2 563:16
**scan** 411:9
**scant** 519:23
**scavenger** 587:20
**scenarios** 496:7
**scene** 387:5
**schedule** 563:13
**scheduled** 567:22 568:4,24
**schick** 311:11 537:12,15 538:2,8 538:11,15,18,19 538:21 539:1,8,12 540:10 543:18,20 544:3 581:24 583:2
**schick's** 543:24 583:10
**schierle** 554:5,6 557:8,11,17,24 558:5 561:14 562:24 563:11 564:24 565:3
**schnick** 587:17
**school** 469:19
**science** 357:20
**scope** 548:24 549:24 550:21
**score** 579:13,17
**scores** 574:19
**screen** 366:20 411:11 416:15,18 416:20 417:3 453:20,21 486:16

487:14 495:20 523:4 577:18
**script** 496:18
**scripts** 496:14 497:9,14
**scroll** 352:16
**sd** 334:16,20 376:14 500:11 531:16,18,20,22 532:1,8,10,13,15 532:22 533:5,13 533:16,20 584:7
**sdi** 488:7 497:6
**sdi's** 488:8
**seal** 590:5 592:15 593:21
**sealed** 557:21,22 557:23 558:1
**search** 352:20 415:21
**searched** 463:10
**searches** 414:12
**second** 322:3 345:10 389:15 411:19 433:15 487:5,8 519:21 544:18
**secondary** 479:21 529:17 530:6,8 532:23 573:10
**secondly** 376:18
**seconds** 367:5
**secret** 531:5,6
**secretary** 318:10
**secrets** 531:8
**section** 446:8
**sector** 508:3
**secure** 355:13,21 421:7,11 422:6,8,9 422:17,21 423:7 424:7,11,14 425:3

425:15 426:21 431:10,17 432:5,7 433:10 492:24 523:22
**securely** 423:14 424:2,7,9 426:5,19 426:20 427:1,5,7 427:14 432:9
**security** 377:23 378:15,24 392:3 406:20 407:18 446:10 535:4 537:14,18,19,20 539:15,16,20
**see** 327:22 328:3 329:12 336:3 339:24 349:3 365:14,19 366:13 374:10 378:11 383:9 397:3,3 398:1,5 403:16 408:18,21 412:4 412:18,23 419:7 421:1,5 430:16 431:21,22 433:17 433:19 434:3,19 448:13 455:15 470:24 478:4 489:5 492:21 498:12,19 503:7 504:17 506:3,15 510:2 512:19,24 517:17 524:9 534:22 539:2 544:10 545:2 564:5
**seeing** 448:24 505:12 506:18 529:2
**seen** 352:14 365:23 393:14

413:15 419:4
455:3 470:8 491:6
519:6 521:9 522:9
566:18 584:24
**select** 366:5,7,8
367:4,8 368:20
382:7 489:8
**selected** 372:6
382:7,9,13
**selecting** 381:5
**send** 342:23 356:2
382:21 395:24
421:7,18 422:6,16
423:13,15,16,23
424:2,4,4,6,14,15
424:15,19 425:12
425:14,17 426:5
426:22,23 427:4,7
427:19 428:10
429:23 430:5
431:9 432:7 433:6
433:9,9 437:1
440:4,13 441:1
444:12 445:4,12
448:9,16 449:8
450:10 460:19
469:17 533:21
**sending** 421:10
422:7 424:17,20
426:4 445:9
446:12 451:20
453:12 455:10
510:8 558:8
**senior** 380:8
**sense** 368:1 500:20
**sensitive** 312:4
**sent** 325:3 338:13
339:13 340:1,4
373:18 396:7,13
399:8 414:15
417:19 421:4

422:10,21 423:12
425:3 426:3,10,18
426:18,20 427:14
430:2,3 431:8,23
431:24 432:8
436:2 440:7,16
441:22 445:13,15
448:12 450:6,7,11
450:15,20 451:5
451:12,18 452:1
453:8 477:17,21
510:9 561:3
577:14 586:5
**sentence** 478:2
487:5,8 514:21
**separate** 362:8
478:14 479:23
484:3 532:1
559:14 563:11
**separated** 372:1
**separately** 387:7
**separating** 478:18
**sequence** 386:16
**server** 353:22
370:20 481:6,8
483:12,12 486:22
487:19 498:2
500:24 501:21
529:6 578:5
**servers** 358:22,24
360:12 548:12
**service** 509:10
539:9
**session** 385:17
399:24 400:5
470:1 494:23
499:6
**set** 333:7,8,9,10
334:7,10 335:3,9
335:10,12,14,17
335:18 337:20

339:19 340:11,17
340:18,19 349:6
349:15,21 350:10
351:13 352:11,16
353:18 357:19,21
358:12,13 361:14
361:15 367:20
368:12 369:12,21
369:23 370:2,15
370:23 371:2,6,15
376:10,12 380:17
397:16 398:17,20
399:1,2 411:24
417:17,23 418:19
419:23 420:1
421:17 423:9
436:19,22 437:7
437:10 438:5,8
439:5,6,8 470:16
470:22 471:3
479:11 480:16
481:7 482:9
483:23 484:5,7,24
487:1,3 488:11
490:18 494:16
497:14 499:19
517:24 524:5,11
529:8 531:12
573:3 574:23
575:22 576:21
577:7 590:4
**sets** 524:6
**setting** 339:23,24
367:15 368:20
369:14 370:12
417:23 418:3,7,14
470:24 577:23
**settings** 333:4,4,22
334:24 335:8
336:10 344:2
349:15,17 350:2

352:4,10 353:5
355:14 357:8,12
365:18 366:5
368:13,24 470:12
473:4 515:22
529:11
**settle** 559:23
**settled** 329:6
**setup** 334:5 481:4
**seventy** 401:1,2
**sh** 398:8
**shame** 346:9
**share** 393:22
411:14 427:24
428:6,9,13,23
429:3,8,15,17
441:4,24 443:4,14
443:17 444:1,16
445:3,10 446:16
447:23 459:12
527:9 543:23
544:2,5 580:21
**shared** 393:6
428:19 429:6
441:17 442:2,7
445:1,24 446:12
448:3 459:18
460:18 461:6,9
462:5,21 464:12
464:14,17 466:9
527:17 528:1
572:8
**sharing** 428:15
453:21 459:19
460:22
**sharp** 517:10
**sheet** 591:14 593:7
593:10,18 594:1
**shelf** 338:6
**shell** 506:15

**[shelter - solutions]** Page 45

shelter 492:23
shick 537:23
  539:19,22
shift 344:16
  407:10
shock 553:15
shoots 585:19
shorter 346:5
  548:14
shorthand 589:7
shortly 322:16,18
  472:7,8
shots 416:15,18,20
  417:3
show 317:10
  411:11 463:20,21
  490:3 549:5,6
  550:11
showed 444:12
  447:1 457:18
  461:10 566:9
shown 422:21,22
  434:16 591:16
shows 365:18
  374:11 567:3
shrink 359:6,7
sibling 367:2
siblings 337:7
  370:6,7 441:20
  507:5 510:10
  580:13,18
sic 544:21
side 316:14 426:21
sierra 489:19
sign 442:23 492:23
  499:5 515:12
signal 311:7,7,11
  331:14 332:3,16
  332:21 333:2
  334:7 335:5,5
  336:11,14 341:15

341:17,21 342:1,3
342:11,19 343:20
348:17,20 349:18
350:5 352:17
353:15,16,16,22
355:10,11,18,21
356:1,1,10,13,22
357:8 358:21
359:23 360:5,12
360:24 361:16
365:17,18 366:1
367:17 368:5,10
368:19 369:4,15
370:20 371:13
372:16 373:4,8,14
375:22 376:4,9,20
376:21 377:16,18
378:18,19 379:21
380:10,11 381:7,8
381:24 382:10,20
382:21 383:5,8,13
385:20 389:12,19
391:15 393:2,6
399:24 402:3,11
402:13,16 403:11
411:24 417:18,24
418:16,17 419:15
419:21 420:7,8
421:12,17 422:10
422:22 423:1,13
424:6,9,12,18,24
425:15 426:1
430:7 431:17
432:5 434:21
435:1,7,14,17,24
436:1,17,23 437:3
437:17,18 438:2
444:4 448:6,9,13
449:9,24 450:11
462:9 463:15
464:18 465:16

466:16,18 470:12
508:11,13 509:24
510:5,6,7,15
523:17 524:12
535:7 543:17
586:6,8,12,16
signal's 358:22
  423:10
signature 590:8
  591:15
signed 342:13
  477:1 592:13
  593:18
significant 394:9
significantly
  343:17 344:11
  584:17
signing 589:21
  591:20
silent 447:19
sim 469:21
similar 367:16
  481:5 485:14
  491:8 500:23
  509:8 525:3
  535:10 562:22
similarly 350:8
simple 500:1
  550:5,17
simply 499:22
  538:7 587:14
sincerely 591:21
single 393:15
  422:3 431:19
  524:10
sir 591:10
sister 370:8
  581:11
sit 322:10 349:16
  379:19 427:13
  476:9 552:8 570:6

sitting 318:16
  508:5 533:8
  546:24
situation 377:20
  490:5 497:11
  499:21
size 418:5
sjados 310:14
skeleton 375:3
  428:3 539:9 545:8
skin 555:1
skipping 398:1
slash 554:21
slate 495:21
slot 334:17,21
small 439:3 499:6
  509:23
smithamundsen
  310:12
sms 333:19 420:8
  420:9 421:14,18
  421:19,23 423:17
  424:4,16,16,22
  425:21,24 426:1
  432:1,6 436:1
  437:2,7,16 438:13
  468:20,23,24
  469:2,7 586:9,19
smsc 422:4 436:6
snuff 515:7
social 355:14
soft 502:3
softer 363:20,21
software 482:21
  483:6 496:3
  497:17,19 505:6
  506:23 507:10,14
solutions 312:19
  312:21,23 478:8
  478:11 588:7
  591:1 594:1

**[solved - start]**

Page 46

solved 506:20
somebody 352:21
  426:15 496:23
someone's 411:8
soon 325:20
sorry 319:12
  329:7 345:11,21
  347:18 351:10
  377:10 380:1
  389:7,14 397:17
  398:9 401:2 406:6
  407:7 411:17
  436:14 445:20
  449:12 450:19
  451:6 452:15
  453:20 455:9
  462:12 476:2
  479:18 511:12
  526:9 537:20
  567:20 576:20
sort 323:11 357:1
  366:21 367:21
  370:12 422:14,15
  425:13 474:15
  475:17 479:13
  515:23 517:23
  523:22 535:4
  585:10 586:2,10
sorting 434:24
sound 331:10
sounded 334:23
sounds 322:4
  330:15 337:23
  346:23 372:18
  394:24 435:2
  438:20 470:5,10
  473:21 474:16
  480:4 489:9 493:7
  504:13 536:6,8,11
  536:12 554:17
  564:14 566:23

source 525:7
south 384:8,9
space 334:15,17
  334:18 368:3,6,8
  376:15,16,18
  425:22 524:18,20
  573:10 584:11
speak 314:1
  333:14 340:9
  341:5,7,11 353:11
  372:24 435:3,21
  547:21 548:2
  549:17 550:8,8
speaking 314:12
  318:2 332:23
  347:6 371:17
  403:2 417:4 468:2
  530:3 539:23
  585:9
speaks 461:19
special 485:15,19
  485:22 487:23
specialist 312:20
specially 515:24
specific 318:23,24
  319:11,13 331:5
  331:21 333:9,11
  335:1,5,12 352:17
  357:21 358:10
  383:9 419:19
  426:14 430:4,5
  437:10,13 438:1
  475:15 480:8
  481:12 493:6
  508:10 515:20
  541:10 543:11
  564:12 574:10
specifically 319:14
  320:5 331:22
  332:18 336:1
  346:12 371:17

377:5,11 382:6
  394:14 395:2
  403:24 408:11,21
  410:19,22 411:4,7
  432:21 437:24
  440:4 441:21
  443:13 444:1
  449:14 459:8,19
  465:18 466:20
  470:15 503:24
  510:24
specificity 492:20
specifics 409:4
  542:11
specified 589:20
specify 321:13
speculate 457:14
  464:6
speculating 505:4
speculation 452:6
  468:17
spell 340:14
  374:13 473:12
  490:22 537:23
spoke 317:19
  355:9 372:19
  436:16 544:14
  545:22 558:6,16
spoken 317:20
  351:20 465:19
sporadically 324:1
spot 343:9 501:7
  560:13
spring 362:1
spyware 482:22
  483:6
sqlite 359:2,4,16
  359:17 360:6
ss 589:2
st 310:14

stack 469:8,9
stagger 388:10
staggered 387:3
  388:10
stamp 376:7
  400:15,24 401:2
  402:7 506:2
stamps 403:15
standard 328:8
  359:17 556:10
  582:24
standards 497:9
standpoint 379:1
stands 391:20
  545:12
star 321:2,5
  337:10,11,12
  343:16 501:1,1,18
  502:18,20,21
  509:6 551:9,17,24
  552:6,10,15
  553:20 555:18
  556:1 560:17
starbucks 383:22
  384:3,5,6,11
  386:10,14,17,22
  387:2,12 388:2,4
  388:14,18,21,23
  389:3,11,15,18
  391:10,16 401:10
  401:11,19,21
  402:17,23,24
  403:5,20 409:8
  435:10,12 448:1
start 317:16
  325:17 330:21
  332:2 342:11
  390:21 428:23
  477:3 517:8
  522:24

**[started - surgery]**

started 325:10 326:11 332:24 333:2 442:13 453:21 501:17,19 508:1
starting 313:4 375:2
starts 352:22 476:21
state 309:21 406:10 529:7 582:8 589:1,6,8 592:10 593:15
stated 343:1 449:1 548:9 559:17
statement 427:20 482:15 583:3 592:13,14 593:19 593:19
states 309:1,19
static 531:11
status 410:10 517:3
stay 570:2
stayed 478:17
stenographically 589:14
step 437:9 447:21 503:22
stephen 313:11
steps 437:20 474:19 501:14
stettinius 310:6
steve 581:19
steven 310:12
stick 530:9
stipulate 379:2 381:3 383:5,11
stipulated 530:16
stock 552:5,14

stolen 472:3 587:6
stopped 342:14
storage 355:15 365:7 368:8 469:16,21 516:3 522:6 523:23 532:22 533:1,3 584:8,11
store 338:1 485:12 510:8 523:20,23
stored 420:11 469:21 529:5 531:2
storing 524:15
straddled 493:8
street 310:13 384:9 401:23
strength 484:14
stressful 394:2
strike 404:9 410:24 411:1,4,5 448:8
strings 585:24
struck 410:18 411:6
studying 317:16
stuff 331:2,4 373:19 385:11,12 395:23 442:15 465:3 490:7,7,8,9 493:22 504:22 515:23 525:23 526:1
stumbled 422:1
subject 438:13,17 456:13,22 507:7
submitted 324:21 325:1 413:8 553:9 565:4 572:18,19 572:21

submitting 324:11 454:20 545:8
subpoena 354:1
subscribe 356:19 429:20 466:13
subscribed 592:10 593:14 594:21
substance 377:7 466:23 467:4
substantiate 352:13
substratum 473:3
suggest 442:18
suggested 380:4 498:21 529:14 544:20 548:7
suggestions 447:7
suit 516:16,17,20 516:21,24 517:9 587:23
suite 310:8,13 591:2
suits 374:20
sum 553:22 559:14 570:8
summary 445:22
summer 330:5 331:1 336:12,19 369:20 518:23 584:7,14
superior 591:1
supplemental 549:20
supplied 376:6 416:6,24 552:16
supplies 496:13
supply 517:21 528:17
support 492:22 528:4

supported 386:23 524:24
suppose 489:5 522:1
supposed 329:11 558:2
sure 317:14 319:12 336:15 337:16 338:13 345:17 347:24 351:13 352:14,23 353:12 363:15 364:5 367:18 370:1 373:10 384:15 394:6,16 395:9,23 396:2 397:7,18,21 401:16 411:20 413:3 419:20 438:4 441:15 442:11 443:10 449:24 451:8 455:20 456:6 462:20 476:3 477:15 481:20 486:17 489:3 497:10 520:17 521:20 527:14 537:2 576:17 581:12 583:18,23 586:7,13
surfer 353:17
surgeon 554:7 557:4,7
surgery 311:10,10 534:11 553:8,11 553:17 554:2 559:6,10,12 562:24 563:5,13 563:13 564:9,11 564:16 565:19

**[surgery - testified]**                                    Page 48

567:5 569:21
**surprise** 377:5
  586:7
**surprising** 561:20
**surrounding**
  455:15 548:10
**survive** 474:5
**susan** 443:8
  577:20,21
**suspicion** 386:3
**suspicious** 449:19
  450:1
**suspiciously**
  449:16
**swim** 587:23
**switch** 437:2,16
**switched** 344:20
  421:23 431:16
  432:6
**switching** 422:24
  436:1
**sworn** 312:1
  315:10 589:11
  592:10,13 593:14
  593:18 594:21
**symbolic** 419:13
**symptoms** 395:3
**sync** 387:18
**synced** 479:24
**synchronize**
  484:21
**system** 359:8
  375:4 423:21
  469:5 473:1,24
  475:1,21,23 477:6
  481:7 493:4 494:5
  497:22 498:4,7,18
  506:12 508:21
  521:13,16,17,18
  522:10 528:6

**systems** 347:23
  354:1 466:14

**t**

**t** 313:6,6 502:16
  582:20 583:6
**table** 339:2 365:10
**tablet** 315:22
  335:6 341:22
  342:1
**taft** 310:6
**taftlaw.com** 310:9
**take** 312:9 314:15
  314:17 316:16
  320:24 349:23,24
  353:18 354:6,9
  361:4 384:14
  403:3 439:11
  447:20 471:14
  474:19 494:1
  518:13 535:3
  542:19 550:2
  570:10
**taken** 309:19
  312:13 316:24
  378:11 503:22
  523:6,17 533:19
  539:4 553:24
  576:16 589:19
**talented** 538:6
**talk** 321:12 353:14
  378:5 402:12
  406:22 408:19
  434:12 470:1
  522:11 546:7
**talked** 341:14
  378:6 379:4
  405:19 434:9
  441:20 463:12,14
  463:15 475:10
  540:2 587:6

**talking** 319:16
  380:12 430:22
  450:24 466:20
  469:19,20 494:15
  498:3 518:21
  525:13 532:6
  546:8,19 574:10
  584:20 585:6
**talks** 540:7
**tcpip** 469:8
**tduffy** 310:4
**tduffylaw.com**
  310:4
**tea** 387:23 403:2,4
  403:7
**team** 509:24
**teams** 503:3
**technical** 330:16
  489:6 538:3,4,6
**technicality** 586:9
**technically** 363:13
**technology** 462:7
  462:23 463:4
  465:1
**telegram** 343:3
**telephone** 344:21
**telephones** 469:20
**tell** 314:20 315:1
  319:8 323:6 325:2
  327:21 342:17
  346:4 348:21
  364:5 365:13
  379:4,8 382:18,19
  386:16 387:13
  390:12,16 400:18
  408:13 409:15
  410:3 411:6
  412:14 413:8
  425:23 428:12
  431:3 432:13
  439:2 452:12

453:11 456:7
  458:2,19 459:2
  464:5 473:9
  481:24 488:21
  498:24 500:22
  502:15,24 508:22
  516:9 520:5 521:9
  521:24 522:5,20
  526:22
**telling** 392:23
  402:2 468:3
  506:11 541:17
  542:3 552:22,23
**tells** 437:2
**temporal** 416:13
**ten** 354:8 361:4
  389:9,10 516:14
  518:13 584:20
**term** 448:14
**terminated** 380:24
  384:1,2 394:3
  406:18 407:3
  408:7,9,14 410:13
  411:9,16 443:2
**termination** 442:7
  442:20 443:14
  444:8 496:16
**terminations**
  497:9
**terms** 416:4,6,8,11
  585:13
**territory** 535:8
**test** 375:2,3 377:1
  377:3,4,9 379:5,16
  422:7,12,18,20
  450:7 451:13
  532:21 533:3
**testified** 315:11
  391:14 437:20
  450:10,20 451:5
  451:17 453:14

**[testified - time]** Page 49

457:17 460:18
462:5,20 463:1
465:12 466:11,15
534:7 552:14
553:1 570:19
583:17
**testify** 589:11
**testifying** 314:21
316:18
**testimony** 317:5
346:10 353:2
391:8,18 403:9
461:18 463:23
522:16 552:21
586:11 588:6
589:18 592:6,7
593:6,9,12
**testing** 421:24
526:15,16
**text** 318:14 331:13
359:9 367:1 370:7
377:15 387:17,21
422:18 425:7
507:19 544:8
**texted** 387:15
534:14
**texting** 401:6
**thank** 313:14
340:18 415:17
517:11
**thanks** 342:10
453:5 467:23
503:6 553:4 575:6
**themes** 473:2,3
**theory** 528:24
530:20 534:9
**thigh** 554:21
**thing** 322:24 323:2
328:9 331:7
361:12 397:19
452:23 460:16

468:19 484:2
486:1 488:20
504:22 509:13
517:23 582:22
585:10
**things** 342:17
344:23 351:12
354:13 356:4
357:3,13,24 363:2
363:6,10,12
364:18 365:4
376:19 379:12
394:4 396:2,15
423:19,22 428:2
440:7,14 442:10
446:10 448:22
449:4,5 472:22
473:6 484:18
485:14 486:17
487:2,22 496:12
512:18,21 514:22
522:6,15,17
525:24 526:2,3
528:24 531:8
556:7 571:6 580:6
587:6,11
**think** 316:19
317:12 318:19
320:19 328:5
329:7 333:21
336:4,6 338:5,14
340:11,16 342:12
342:15,21 343:8
344:18 348:6
355:7 358:24
361:14 364:24
367:22 370:6,7
371:19 372:21,21
373:17,17 376:23
378:6,20 379:22
383:21,24 384:7

391:19 392:17
394:14,15,23
399:6 400:11
401:6 405:2 414:6
414:10,13 416:12
417:3 419:3 420:3
422:2 427:10
428:1 430:2,3
432:2,17 439:11
440:8,21 443:9
444:19 445:1,18
447:10,17 449:1
449:14 452:15
458:7,14 460:17
460:24 469:22
473:13 474:14
475:5 480:8 481:6
485:4,11 492:21
492:22 493:1
495:5 498:18
508:9 509:13
511:12 513:18
516:11 519:6,11
523:2,5,12,13
524:7 525:9
526:17 527:5
528:4 529:22
531:22,23 537:16
546:10 565:6,7,11
566:17 567:12
569:13,14 570:10
583:1 584:23
587:12
**third** 345:10 353:9
393:12,15 433:18
488:6 491:14,18
523:6
**thirty** 591:19
**thommes** 502:15
503:4,5 504:11

**thought** 354:13
355:13 387:5
389:6 413:23
414:4 447:20
451:1,6 534:10,17
534:20 536:20
537:3 577:8
**thousand** 326:13
**thread** 352:8,13
367:13 370:21
381:5,6 382:8,10
384:23 399:1
404:23 405:1
417:21 419:24
459:3,5 505:13
**threads** 387:22
**threat** 496:21
497:13
**three** 325:6 329:5
403:14 430:19
434:23 435:24
460:7 569:10,14
569:14 570:11
**throat** 403:1
**thrown** 449:4,5
**tie** 501:20
**tied** 493:6
**tiger** 345:23,24
352:2 470:1
**tim** 320:1 398:8
453:5 467:23
549:2 575:6
**time** 314:14
315:20 317:6,6
325:15 326:8
328:24 333:23
334:12,14 335:19
335:22,23 338:17
340:5 345:14
351:9 354:7,10
361:4 367:6 371:4

**[time - trusted]**

375:1,2,5,8,15,22
376:4,7,11,13,17
376:21,23 377:18
383:8 385:4
386:16 387:4
388:20 389:10,17
389:24 391:23
392:4 394:2
395:22 397:22
399:23 400:1,5,6,8
400:12,15,16,23
401:2,18 402:6,18
403:15,16,22
404:15,22 407:9
408:2,8 412:21,22
414:3 415:4
418:12 423:1
424:11 431:15
432:6 435:4
436:14,19,22
438:10,19 439:11
446:3,6,7 458:5
459:8 462:11
468:4 471:3
472:16 473:16,17
473:19 478:17
480:2,15 482:10
489:19 490:24
494:17,21 501:22
504:16 506:2
507:7 530:18
531:1,12,17,19
532:13 534:18
536:14,16 537:2
538:16 556:18
557:4 560:3 565:7
567:7 568:5,6
577:1,3 581:18
583:11 586:8
587:24 589:20

**timers** 357:5
**times** 313:19
324:22 325:15
331:3 386:22
403:7,14 454:16
515:3 531:16
**timothy** 310:2,2
313:9
**titles** 580:23
**tld** 573:16
**today** 312:22
313:7 317:5 318:6
318:16 322:10
327:5 328:12
330:4 349:16
361:21 379:19
427:13 476:8
522:3 552:8,19
570:6
**today's** 588:6
**toggle** 563:3
**tokens** 504:21,23
**told** 344:3 348:19
350:6 352:10
385:24 407:2
411:13 428:1,2
470:21 481:20
505:19 517:3
526:24 544:14
547:23 553:13
575:16
**tool** 476:24
**tools** 505:6
**top** 330:1 336:8
338:5,6 348:1
355:7 369:22
373:10 404:6
427:17 438:24
443:13 451:22
487:21 493:1
509:23 514:15

523:5 536:12
559:24 561:9
**topic** 363:14
454:12 465:23
**topics** 348:12
538:24 548:15
**toronto** 354:17
**total** 552:13 556:5
559:1,2,3,17,18
561:18 566:20
**totally** 415:1
**touch** 394:8
571:22
**tough** 507:7
516:19
**tradition** 408:17
**traditional** 333:19
420:8,9 424:16
432:1,3,6 438:13
**train** 406:17,21,22
407:15 408:18
**training** 513:18
**transcribed** 314:2
592:7
**transcript** 320:10
320:13 348:4
355:1 463:10
558:2 589:14,22
591:12,13 592:5
592:12 593:5,11
593:17
**transcription**
589:16
**transcripts** 319:24
320:4,7,17
**transfer** 331:6,8
331:13 332:16
333:5 335:8
**transferred**
331:11

**transit** 309:6,9
312:14 313:6
354:17 401:21
446:9,9 492:22
576:3 584:3 591:6
592:3 593:3
**transit's** 584:2
**translate** 585:20
**transmission**
355:24
**transportation**
539:14,20 582:2,4
582:7
**traumatic** 391:22
**treated** 497:13
535:13
**trent** 528:4
**tribute** 573:11,18
**tried** 319:2 331:3
331:8,23 365:5
387:13 396:15
424:4 499:4
525:23 529:1
587:7
**tries** 510:7
**trimming** 368:3
**trinity** 387:15,17
401:18 417:4
**trip** 453:3
**trouble** 397:24
403:2 432:5
506:11
**troubleshoot**
425:4,5
**true** 587:11
589:17
**truncate** 376:19
**truncated** 339:1
**trust** 535:13
**trusted** 414:14

**[truth - upload]**

truth   314:20
  589:11
truthful   317:4
try   314:11 403:2
  424:20 437:8
  469:10 498:22
  499:12 522:5
  529:1 585:19
trying   319:12
  324:6 335:11
  336:3 353:13
  355:11 395:11,12
  421:13,14,24
  423:23 425:4,5
  427:9 444:19
  456:10 501:5
  504:16,19 511:17
  514:21 515:5
  523:12 560:5
  573:9,10
ttc   347:6
turano   512:10
turn   323:17,20
  324:1 333:14
  338:19 339:16,17
  341:14 400:13
  420:18 430:13
  477:8,12 502:23
  505:20 512:12
  517:12 543:13
  554:9 562:19
  566:11 569:16
turned   338:13,18
  339:6,11,15,22
  367:2 437:21
  495:14
turning   324:14
  338:16 497:1
turns   508:19
twice   471:23
  477:10

two   326:10,12
  345:6,24 354:8,10
  362:8 369:15
  384:14 387:17
  388:24 389:2
  391:6 434:20
  436:7,24 463:18
  470:8 487:2
  489:11 499:11
  501:23 502:9
  509:22 544:8
  546:13,19 554:2
  561:3 563:11
  571:5
twrp   506:14
type   352:21
  362:17,19 425:1
types   424:19
typewriting
  589:15
typo   395:24 399:7
  433:4

**u**

u   340:16 374:14
u.s.   312:15
udp   469:9
uh   314:7,7,7
  368:18 495:7
ultimately   369:20
  445:9 507:20
  513:21 559:9
  561:7 567:24
umbilical   554:20
umc   422:2 423:5
unaffected   361:2
unauthorize   527:8
unavailable   318:6
unbelievablydea...
  511:1
unc   436:5 437:11

unclear   391:12
uncommon   434:8
  447:4
undelete   414:4
undergone   383:10
underlying   501:3
understand   314:3
  314:5,19,24 315:2
  316:15 317:8
  321:8,16 346:13
  355:3 367:18
  375:5 419:20
  462:18 469:2
  472:24 474:13
  475:14 489:4
  493:9,13,18,19
  509:19 520:22
  548:1,4 556:8
  583:2 586:3
understanding
  346:24 383:1
  400:7 402:3
  517:18,20 547:24
  556:17 561:10
  576:1 582:3
  585:13
understood   315:5
  340:8 412:12
  413:6 414:1
underwear   538:12
  587:19,24
unearth   349:3
uneasy   377:19
unencrypted
  424:16
unexpected
  561:16
unfair   346:7
  347:10 350:13
  354:14

unfortunately
  500:6 573:20
uniformly   419:22
unintentional
  496:10
unintentionally
  496:9
unit   312:11
united   309:1,18
units   552:14
unlimited   376:15
unlinked   364:11
  365:11
unlinking   502:2
  506:10
unlock   477:2
  484:13 498:22
  499:1
unnecessary
  348:23,24 350:7
unpack   332:1
  496:7
unquote   329:1
  357:4 358:6
  364:10 386:19
  416:5 424:7 459:1
  546:14 568:24
unrelated   433:1
unsecure   421:23
unsent   395:23
  396:4
update   363:5,7,9
  429:22 473:24
  474:4,6 475:22
updated   466:13
  474:22
updates   477:7
updating   474:15
  475:10,11
upload   331:8
  476:24

**[ups - wallpaper]** Page 52

ups 535:13
upsetting 418:22
urgent 496:17
urgently 497:12
url 454:24 571:8
  572:7,15
urls 578:16
usage 344:17
  462:6,16 465:1
usb 513:23
use 324:17 326:24
  328:12,16 329:23
  335:5 337:1,7,14
  337:24 338:1
  339:20 341:17,24
  342:13,22 343:2,2
  343:11 344:9
  349:18 355:12,18
  356:20 357:10
  358:7,11 359:16
  361:21 363:4
  364:15 367:8
  374:5 382:17
  416:7 421:13,14
  430:22 437:18
  449:4,5 462:22
  463:4 472:23
  473:9 476:4,8,22
  476:24 477:6
  479:8 480:24
  483:13 492:9
  493:13,16 494:14
  497:11,14 507:16
  509:10 510:1
  515:9 522:20,23
  525:4,22 526:1,19
  527:6 528:17
  549:12 573:10
  575:18,20
user 334:24
  359:20,23 368:19

368:19 376:21
381:8 382:16,20
382:21 418:17
472:23,23 479:21
483:21,22 488:9
488:24 492:8,14
492:14 493:6
494:23 495:3,14
496:13,21 497:15
499:3,9 506:15
507:15 508:14
521:13 523:9
527:22 528:6
586:17
user's 490:11
users 369:15
  381:24 418:16,17
  571:8
uses 339:3 359:16
  368:24 421:16
  574:1
usually 340:5
  363:23 372:12
  376:18 408:19
  423:15
utility 489:20

**v**

v 374:14 423:19
  425:13 426:10
  427:3 511:7
  582:17,20 583:6
  591:6 592:3 593:3
vacation 500:17
vacuum 359:2
vacuuming 359:5
  359:13
vague 468:6,18
valid 399:24
valuation 559:20
value 347:23
  552:13

values 552:19
various 587:6
vce 547:6
vegas 537:22
vein 415:6
verbally 411:12
verify 539:5
veritext 312:19,21
  312:22 588:7
  591:1,8 594:1
veritext.com.
  591:17
versa 488:17
versary 371:19,22
  372:3,11
version 383:7
  510:15
versions 356:22
versus 312:14
  563:8
vice 488:17
vicinity 319:17
victor 347:20
victoria 309:19
  312:22 589:5
  590:9
video 312:3,8,11
  312:20 344:22
  361:6 384:16
  439:13 471:15
  574:19 579:13
  588:4
videographer
  312:2 313:14,24
  361:6,9 384:16,19
  439:13,18 453:23
  454:2 471:15,18
  518:15,18 570:12
  570:15 588:4
view 348:8 358:14
  358:16 488:19

viewed 347:10
  358:17,19,21
  558:4
virtual 312:18
  358:1
virtue 397:14
  398:18 400:23
  402:1 484:10
  560:23 561:13
visible 358:9
voice 343:4 582:23
voiceover 582:21
volpe 582:17,18
  583:3
voltage 325:12
vpm 479:14
vpn 479:5,6
vs 309:5,12
vulnerabilities
  377:24
vulnerability
  539:4,6,7 545:13

**w**

wacker 310:8
wage 553:14,19
  560:7,16,18
wait 314:9,16
  544:20 545:15
  548:7
waited 388:17
waiting 389:6
  548:4
waived 589:22
  591:20
walberg 313:8
walk 355:4 476:14
walked 386:24
wall 429:15
  440:24
wallpaper 515:22

**[want - witness]**

**want** 313:17 331:19,19 336:15 341:7,15 342:12 344:4 348:22 349:1,2 350:6 356:6,7 361:12 364:9 366:21 374:24 376:19 382:17,23 384:22 394:7,8,16,19 396:21 408:17 423:15 434:10 439:12,23 440:1 448:12 452:12 454:21,23,23 455:13 468:8 477:8 479:21 480:5 488:15,24 489:2,3,22 490:4 496:16 497:1 501:24 512:16 519:21 534:10 548:20 549:5,22 550:14 553:2 563:3 565:10 566:16 571:19 572:4 581:23 583:18 585:11,12 585:22 586:2,10

**wanted** 326:11 343:24 367:9 378:4 381:1,4 387:4,6 388:10 391:1 392:17 394:17 395:9 403:21 405:15 422:7 423:13 426:8 455:19,23 456:6,15 475:19 489:10 507:5 529:1 539:3

563:12,12 575:22 576:23

**wanting** 344:2 390:8

**wants** 514:13

**warnick** 481:6,9 482:4

**watch** 482:23 490:15

**watched** 383:20 389:21 390:4

**watches** 466:12

**way** 318:4 323:4 324:7 333:4,15,17 333:19 344:7,8 349:12 350:17 355:23 357:4,19 358:13 362:11 387:18 392:14 401:18 402:9 411:5 420:10 424:5 425:16 426:12 428:13 430:7,9,19 451:7 454:6 464:17 470:8 475:18,19 479:23 485:17 487:16 488:12 489:10 494:6 495:1 516:10 518:3 527:20 530:21 548:24 561:6 573:22 575:22

**ways** 448:23 530:22 562:22

**we've** 330:24

**wear** 326:11 374:20

**wearing** 517:9 538:12 587:18,23

**web** 479:11 492:11

**website** 429:10,18 430:1 440:12,15 440:20,24 570:20 570:22 571:1,3,21 572:7,16,24 573:4 573:17,22 574:4,6 574:9,18,20,23 575:5 577:13,24 579:5,11,16,24 580:6,10

**websites** 571:5 575:4 578:9,11

**week** 345:10 369:7 369:11 504:15 516:18

**weekend** 377:3,12 377:21 379:3,6

**weeks** 319:17 367:5

**went** 313:17 329:5 342:15 383:21 386:21,24 387:1,2 387:8,9,12,22,24 388:6,13 391:3 404:7 405:18 409:2 428:3 435:10,16 440:20 499:4 500:24 525:2 545:11 577:10 579:16

**west** 310:3 325:6

**whatnot** 443:3,23 445:18 448:12

**whatsoever** 565:19

**whereof** 590:4

**whichever** 563:14

**whisper** 354:1

**whispering** 312:5

**whistleblower** 446:10 535:16 536:4

**wide** 473:1

**widget** 515:22

**willing** 499:12

**windows** 513:14

**wipe** 484:16 486:15 487:20 488:23 490:20,22 491:5,22 492:13 494:19 495:6,11 495:11,12,13,22 496:10 497:4,17 498:11 499:15 500:5,19 502:1 509:18 512:22 513:6 521:4

**wiped** 364:10 365:1 400:21 494:20 496:4,5,8 500:4,8,9,14,18 501:22 506:5,8 508:18 520:12

**wiping** 477:8 490:10

**wireless** 489:19

**wish** 372:22

**witness** 311:3 312:1 314:4,8,13 314:18,23 315:3,7 315:9 320:1,6 377:17 380:24 391:21 397:5 403:15 410:8 412:11 414:21 415:9 416:3 418:3 419:2 426:7 427:17 428:15 436:5 452:10 453:11 455:14

**[witness - zoom]**

457:10 459:15 461:20 463:24 464:5 468:7,19 471:5,10 499:17 520:3,17 521:7 535:22,24 536:23 537:8 542:5,15 546:9,12 550:23 551:5,11,20 552:2 578:19 589:10,22 590:4 591:9,12 592:1,4,11 593:1,4 593:15

**witnessed** 389:20

**witnesses** 409:20

**witness'** 591:15

**woman** 410:4

**wood** 443:21

**word** 331:15 357:10 387:5 422:12 454:24 463:14,17 467:19 494:1 504:6 509:7 517:21 541:17

**words** 333:6 334:6 362:5 404:1 410:8 410:9 480:5 498:17 505:15 531:11 557:2

**work** 315:22 318:5 319:4 323:9 344:19 346:5 347:22 422:1 423:18,20 424:22 472:22 478:3,13 478:14,16,19,20 478:21,21 479:7 479:16,19,21,22 479:23 480:17 483:21,22,23 484:6,8,9,24

487:10 488:14,20 489:3,9 490:7,8 491:24 492:3,7,18 493:2,10 494:8 495:6,8 496:6 497:4 498:23 499:1,12 500:11 511:22 514:10 520:13 524:3 525:23 526:1 529:2,5 532:24 533:19 535:11 540:23 553:15,19 575:19 587:5

**workable** 515:8

**worked** 337:24 382:20 394:18 407:18 446:3 469:2 489:20 513:15,16,18,20 514:1

**working** 337:4 489:19 510:13 532:19 543:21

**works** 356:1,1 378:14,24 437:18 440:22 533:20 560:7,16,18 562:11,13

**world** 529:4

**worse** 325:17

**write** 338:23 378:3 446:22 447:5 508:3 518:2

**writing** 445:17

**written** 383:6 479:9,12 508:4 565:12,14 569:11 585:14

**wrong** 324:4 362:11 396:1,16

433:4

**wrote** 445:22

**x**

**x** 311:1 449:1

**xml** 429:21 440:17 466:13

**y**

**yea** 409:1

**year** 322:1,2 327:13 336:4 338:12 362:4 372:22 430:10 455:7 480:9 519:18 551:23

**years** 326:10,12 342:12 376:24 391:6 427:10 459:9 550:24

**yellow** 421:2

**yesterday** 317:19 318:9

**york** 500:10

**z**

**z2** 321:20

**zero** 519:2

**zeros** 518:2

**zoom** 350:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 593

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4666379
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
DATE OF DEPOSITION: 7/6/2021
WITNESS' NAME: Christopher George Pable

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_8-4-2021_      _Ch Pa_
Date          Christopher George Pable

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this __4__ day of __August__, 20__21__.

_____
Notary Public

DUY T NGUYEN
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 14, 2023

_____
Commission Expiration Date

Veritext Legal Solutions

www.veritext.com          888-391-3376

Page 594

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4666379

PAGE/LINE(S) /            CHANGE            /REASON

See attached list.

8-4-2021                        ChPa

Date                         Christopher George Pable

SUBSCRIBED AND SWORN TO BEFORE ME THIS __4__

DAY OF __August_____, 20__21__.

_____

Notary Public

DUY T NGUYEN
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 14, 2023

Feb 14, 2023

Commission Expiration Date

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

| Page : Line | Change | Reason |
|---|---|---|
| 318:10 | change secretary to CISO | Mistranscribed |
| 320:24 | change bower to Bauer | Misspelled |
| 325:13 | change contract to contact | Mistranscribed |
| 328:10 | change N chip to nand chip | Mistranscribed |
| 329:3 | change HRD to HDR | Misspelled |
| 331:20 | change "to know", to "to not know" | Mistranscribed |
| 345:12 | change I'm to "without my" | Mistranscribed |
| 347:14 | change question to questions | Mistranscribed |
| 347:9 | There is a missing remark "Oh yeah, that was a good one!" | Not transcribed |
| 352:17 | change surfer to server | Mistranscribed |
| 358:1 | change "cooper minis" to Kubernetes | Mistranscribed |
| 364:17 | change "assist call hook" to "syscall hook" | Mistranscribed |
| 364:19 | change "assist call hook" to "syscall hook" | Mistranscribed |
| 407:16 | change JAL to JLL | Misspelled |
| 421:16 | change FYI to Fi | Misspelled |
| 422:2 | Change UMC to USSD | Typo and wrong acronym |
| 423:5 | Change UMC to USSD | Typo and wrong acronym |
| 431:23 | Change expert to excerpt | Mistranscribed |
| 436:5 | Change UNC to USSD | Wrong acronym |
| 437:10 | change FYI to Fi | Spelling |
| 437:11 | Change UNC to USSD | Wrong acronym |
| 449:15 | change APR to API | Mistranscribed |
| 454:24 | change URL to IRL | Mistranscribed |
| 478:12 | change Knocks to Knox | Mistranscribed |
| 492:13 | change remove to remote | Mistranscribed |
| 502:6 | change i-notes to inodes | Mistranscribed |
| 509:8 | change FMA to MFA | Misspelled |
| 510:1 | change boot to brute | Mistranscribed |
| 510:5 | change "Get hub" to GitHub | Misspelled |
| 510:14 | change "Get hub" to GitHub | Misspelled |
| 511:18 | change "high end open for commissions" to " 'Hi I'm open for commissions' " | Mistranscribed |
| 512:10 | Change "Gingi" to "Ginji" | Misspelled |
| 517:21 | change byte to bit | Mistranscribed |
| 518:5 | change byte to bit | Mistranscribed |

| 528:4 | change "trent support" to transitsupport | Mistranscribed |
| 535:10 | change odocheck to Radojcic | Mistranscribed |
| 547:6 | change VCE to CVE | Misspelled |
| 562:11 | change H to wage | Mistranscribed |
| 562:13 | change H to wage | Mistranscribed |
| 569:8 | change Arc to Arks | Misspelled |
| 571:5 | change DMS to DNS | Misspelled |
| 571:16 | change DMS to DNS | Misspelled |
| 571:18 | change DMS to DNS | Misspelled |
| 571:24 | change DMS to DNS | Misspelled |
| 573:1 | change DMS to DNS | Misspelled |
| 576:3 | change "transit of" to transitive | Mistranscribed |
| 576:11 | change farm to forum | Mistranscribed |
| 577:11 | change "to" to "of" | Mistranscribed |
| 578:5 | change DMS to DNS | Misspelled |
| 578:13 | change DMS to DNS | Misspelled |
| 578:15 | change DMS to DNS | Misspelled |
| 579:19 | change DMS to DNS | Misspelled |
| 579:23 | change DMS to DNS | Misspelled |
| 580:10 | change DMS to DNS | Misspelled |
| 582:20 | change V-O-L-T to V-O-L-T-E | Missing a letter |
| 582:21 | change LT to LTE | Missing a letter |
| 585:15 | change Congi to kanji | Misspelled |
| 585:18 | change Kamoto to kemono | Misspelled |

Christopher G. Pable