# Exhibit 20

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHRISTOPHER GEORGE PABLE,              )

                                       )

          Plaintiff,                   )

                                       )

vs.                                    ) No. 19 CV 7868

                                       )

CHICAGO TRANSIT AUTHORITY and          )

CLEVER DEVICES, LTD.,                  )

                                       )

          Defendants.                  )

_____

CHICAGO TRANSIT AUTHORITY,             )

                                       )

          Counter-Plaintiff,           )

vs.                                    )

CHRISTOPHER GEORGE PABLE,              )

          Counter-Defendant.           )

The Remote Deposition of DANIEL JERGER, called by the Defendants for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 10:00 o'clock a.m. on the 12th day of October 2021, A.D.

Page 2

APPEARANCES:

LAW OFFICE OF TIMOTHY A. DUFFY
MR. TIMOTHY A. DUFFY
725 West Orchard Circle
Lake Forest, Illinois 60093
Tduffy@tduffylaw.com
appeared on behalf of the Plaintiff;

TAFT STETTINIUS & HOLLISTER, LLP
MR. JOHN KENNEDY
MS. NICOLLETTE KHUANS
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
jkennedy@taftlaw.com
appeared on behalf of the Defendant,
CTA;

SMITHAMUNDSEN
MR. STEVEN JADOS
3815 E. Main Street
Suite A-1
St. Charles, Illinois 60174
sjados@salawus.com

appeared on behalf of the Defendant,
Clever Devices, Ltd.

Page 3

I-N-D-E-X

WITNESS: DANIEL JERGER

Direct Examination by MR. KENNEDY: 4 - 113

EXHIBITS                              PAGE

Exhibit 79  subpoena                    10
Exhibit 78  document production         15
Exhibit 83  Quest evidence inventory    52
Exhibit 80  emails with counsel         86

Page 4

(Witness sworn.)

MR. KENNEDY: Good morning, Mr. Jerger. Once again, my name is John Kennedy, and I represent the Chicago Transit system in this case that Mr. Pable has filed against the CTA, and the CTA has filed a counterclaim against Mr. Pable.

Could you state your full name for the record and spell your full name for the Court.

THE WITNESS: Daniel S. Jerger. D-a-n-i-e-l, S as in Sam. Jerger, J-e-r-g-e-r.

DANIEL S. JERGER, called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

BY MR. KENNEDY:

Q. Do you understand why you've been subpoenaed here today?

A. I do.

Q. What's your understanding?

A. There is a discussion of what was collected and how it was collected from a phone.

Q. And you were personally involved in activities dealing with Mr. Pable's telephone, is

Page 5

that right?

A. I was.

Q. Who is your employer today?

A. The Law Office of Timothy Duffy.

Q. That is your employer?

A. I'm sorry, our client. Quest Consultants International, Limited.

Q. Were you working for Quest Consultants from 2019 to the present?

A. I was.

Q. And have your job responsibilities changed from today to what they were in 2019?

A. No.

Q. Tell me what your job responsibilities are at Quest.

A. I am a lead forensic digital investigator and provide technical assistance on other investigative matters for Quest.

Q. How long have you been a lead forensic investigator person?

A. I don't know a specific year. I've been involved with Quest in some capacity since 1996, and more in a full time role since 2003, I believe.

Q. How old are you?

2 (Pages 2 - 5)

Page 6

A. I was born in ███. So 52.

Q. Is there something funny about being 52 that I missed when I was 52?

A. No. It's just not a question of how old do I think I am. That is the reason I was smiling.

Q. Where did you go to high school?

A. York Community High School, Elmhurst, Illinois.

Q. You went to college?

A. I did.

Q. Did you graduate?

A. I did.

Q. Where did you graduate from college?

A. The University of California, Los Angeles.

Q. Did you do any postgraduate studies?

A. No, I did not.

Q. What was your degree at the University of California?

A. Aerospace engineering.

Q. When did you graduate from college?

A. In 1994, I believe.

Q. And you started working at Quest you said in 1996?

A. Yes, in some capacity. That's true.

Page 7

Q. And you started full time at Quest in 2003?

A. That's true.

Q. Did you use your engineering degree, your aerospace engineering degree professionally from the time you graduated college in '94 until you started working full time at Quest in 2003?

A. I'm not sure if I understand your question, but my degree included computational dynamics, computational fluid dynamics and other things related to computers.

So I'm not sure if I could answer that fully.

Q. So what is an aerospace engineer? What is that discipline?

A. It could be a number of things. It depends on the individual. It depends on the degree program. The degree program I was involved in, as I mentioned, was very much involved. And I chose to go into drive reduction, aerospace properties with respect to airplanes and other devices as opposed to satellites or other space related things.

Q. I want to make sure I get this title right. You call yourself a lead forensic

Page 8

investigator.

Is that the right title for what you do now?

A. Officially my title is vice president of information technology.

Q. But you called yourself something involved with a lead forensic investigator, am I correct?

A. My role and the activities that I perform include being a lead digital forensic investigator and examiner.

Q. And as a lead digital forensic examiner you served in that role from 2019 to the present at Quest?

A. I'm sorry, from what year to the present?

Q. 2019 to the present.

A. Yes, that's correct.

Q. As part of the lead digital forensic examiner, part of your duties include making forensic images of cell phones?

A. It could depending on the engagement.

Q. And one of the things you did for the Duffy firm and Mr. Pable was you were tasked with, if I understand it correctly, doing some things with his phone, Pable's phone?

Page 9

A. That's correct. I was provided the phone to perform certain actions as requested by our client, Tim Duffy.

Q. Let's talk about your client because you said that twice now. I am going to put some time parameters on this so to give you a frame of reference. Okay, Mr. Jerger?

A. Okay.

Q. Tell me when you were first engaged, whether it was by Mr. Duffy or Mr. Pable or somebody else, when you were first engaged to work on this matter?

A. I don't have the specifics in front of me, but I believe it was sometime at the beginning of June of 2020.

Q. And in this case, you were served with a subpoena. Quest was served with a subpoena for documents, correct?

A. Recently?

Q. Yes, sir.

A. Yes.

Q. And Mr. Duffy has advised us that he's representing Quest in defending Quest's interest relative to that subpoena. Is that an accurate

3 (Pages 6 - 9)

Page 10

statement?

A. That is my understanding at this time, yes.

Q. Have you reviewed the subpoena in this case calling for Quest to produce documents?

A. Yes.

Q. Let me draw your attention to that subpoena and make that part of the record. It will be CTA Exhibit 79, and we'll share the screen so you could see that, Mr. Jerger. Okay?

A. Okay.

MR. DUFFY: Are you going to share it or do we need to go to exhibit share?

MR. KENNEDY: We should do exhibit share.

MR. DUFFY: Okay.

MR. KENNEDY: Let me know when you're there.

MR. DUFFY: I opened it earlier and saw the big exhibit with all of the pictures. Now here are the new ones.

You have to refresh it, Dan. If you don't see it, it takes a minute sometimes. Which number are we looking at, John?

MR. KENNEDY: We're looking at number 79.

MR. DUFFY: Let us know when you could see

Page 11

that.

THE WITNESS: I could see that.

BY MR. KENNEDY:

Q. Mr. Jerger, what you should have in front of you, CTA Exhibit number 79, is a subpoena to produce documents, information or objects or to permit inspection of premises in a civil action over 19 cv 7868, Christopher George Pable versus Chicago Transit Authority and Clever Devices, Limited.

Do you see that subpoena marked as Exhibit 79?

A. I do.

Q. And let me draw your attention to there's a heading in bold, you are commanded. Do you see that?

A. I do.

Q. And you see that this subpoena is directed to your employer, Quest Consultants International, Limited, correct?

A. I do.

Q. You saw this subpoena in real time. You've seen it before today, I take it?

A. I saw it before today.

Q. And you understood when you received it

Page 12

that you were commanded to provide the following information. I want to draw your attention to the box that is marked with a checkmark that says production. Do you see that?

A. I see that.

Q. I will read this for the record. I want to make sure that you have done a diligent search, and you produced everything in compliance with the subpoena. That is where I'm going, okay.

I want to set the table for you so you understand the foundation where I'm coming from. So the subpoena commands Quest to produce the documents that identifies one, any instructions from Christopher Pable and/or his attorneys regarding how Quest's imaging of Pable's personal cell phone was to be conducted.

And two, any notes, reports or records generated during or relating to the imaging of the phone as per the Court's 9-13-21 order attached hereto as Exhibit A. Did I read that right?

A. Your voice broke out a bit during it, and the parenthetical was not included in what you read.

Q. Other than that?

A. It appears to be what I see before me,

Page 13

yes.

Q. Who is responsible for collecting the data and the documents responsive to the subpoena at Quest?

A. Myself at Quest, and Tim Duffy at his firm.

Q. Did you conduct a diligent search for the documents and data responsive to the information requested by the subpoena?

A. I believe I have.

Q. And have you produced all of those documents to Mr. Duffy in furtherance of that subpoena, in response to that preponderance?

A. I believe I have.

Q. To your knowledge, have any documents been withheld from production to the CTA on any grounds?

A. I don't understand the question.

Q. For example, in some instances a document might be responsive, but deemed protected from discovery by the attorney-client privilege.

So there could be a responsive document, but it's privileged, and it's withheld from the other side, the CTA, on the grounds of an assertion of privilege. Do you know if any of the documents

4 (Pages 10 - 13)

Page 14

that Quest had identified as responsive to the subpoena, have been withheld from production on any grounds including privilege?

A. I do not know.

MR. KENNEDY: Tim, can you make us a representation as to whether or not any documents have been withheld on any basis, including privilege?

MR. DUFFY: I believe all of the documents that Dan provided to me have been produced. I didn't withhold any of them on privilege grounds.

And I didn't go through and parse, for example, those images and say this one isn't really responsive. I sent everything that he sent me.

BY MR. KENNEDY:

Q. Let draw your attention to -- it's a very large exhibit, Mr. Jerger. It is the totality of the documents that Mr. Duffy's office produced to us from Quest in response to the subpoena, and we have marked it as CTA Exhibit number 78.

And just for foundation and orientation, this is the packet of documents that include hundreds of photographs and then a very small volume of PDFs. Do you remember that packet?

Page 15

A. I know what I submitted to Mr. Duffy.

Q. So let's take a look at, and I just want to do it by bates stamp to make sure that we're all talking about the same thing.

I want to make sure that Exhibit 78 reflects what Quest identified as responsive to the subpoena that you turned over to Mr. Duffy and then he turned it over to us so we have a chain of custody, and we're all on the same page as to what documents Quest produced.

So on the document share or exhibit share we're looking at Exhibit number 78, and it starts with bates stamp number P 2317.

A. I'll wait for Mr. Kennedy to return.

Q. Thank you. I just wanted to get everything together that goes from P 2317 to P 3041.

A. So within the Egnyte interface for Veritext exhibit share, it tells me that I can't do it, that I need to download it. Is that what you're asking me to do?

MR. KENNEDY: Yes. Or Mr. Duffy, if you could stipulate that documents bates stamped P 002317 through P 003041 constitute the totality of the Quest response to the subpoena. Then we could move

Page 16

forward.

MR. DUFFY: Yes, I haven't flipped through every page, but presuming you didn't alter the bates numbers or anything it looks to me to be the complete production.

I think it might be smart to have Dan download the file because then when you ask him to flip to certain things I think it's going to be a lot faster than trying to access it through exhibit share since it's all on that big file, and it doesn't look like it's letting you view it on the screen because of the file size.

MR. KENNEDY: We can do that. I have also just so you know, Tim and Mr. Jerger, I have also broken out discrete documents from the total set into subsets so it's easier to do.

I want to make sure we're working from the same set of notes as to the totality of the production.

MR. DUFFY: Okay. If these other ones you've marked are selections or pages from that, that's fine. We could be probably just deal with that.

Whenever we take a break or something, he could download it. When he does that it might slow

Page 17

up his Zoom.

MR. KENNEDY: Good.

BY MR. KENNEDY:

Q. Mr. Jerger, all that aside what we're going to go is when we do take a break I'll ask you to download Exhibit number 78, which is about 700 documents, photos and some PDFs.

And your lawyer has stipulated that unless I did something to the documents, that constitutes -- that packet constitutes the entire production from Quest. I just want to make sure you agree so that when the Judge reads the transcript she will know that this is the complete production set from Quest.

So at a break you could download it, and we won't interfere with the rest of the flow of the deposition, okay. Does that work?

A. Okay.

Q. How long have you known Mr. Duffy?

A. I don't know specifically how long. I can't recall the first time we met.

Q. Has it been longer than June of 2020?

A. Yes.

Q. Longer than five years?

5 (Pages 14 - 17)

Page 18

A. It could be. I don't know.

Q. Do you work with him on a professional basis as a computer consultant? Is that the nature of your relationship?

A. I don't know how we characterize my relationship, but I have worked as a consultant with Mr. Duffy, yes.

Q. Do you consider him to be a friend?

A. I consider everyone to be a friend at first. I assume, yes, I would hope to be that is the case.

Q. Do you go to his home for dinner?

A. No, I have not.

Q. Do you spend time socially?

A. I do or I have.

Q. He's engaged you on a professional basis, and you consider him to be a friend on a personal basis?

A. A professional friend to say the least because we don't celebrate anything specific. We just have common interests.

Q. And you have known him in that capacity for at least five years and perhaps longer, is that accurate?

Page 19

A. It's possible, yes. Again, I don't know the specific time frame of how long I've known Mr. Duffy.

Q. Give me your best assessment of how long you and Mr. Duffy have known each other.

A. We have been involved with the same group for some time. I don't know when he and I first met within that group.

Q. What is that group?

A. It's a cycling, bicycling group.

Q. When did you come to know Mr. Pable, the plaintiff and counter defendant in this case?

A. Only through this matter. I previously did not know him.

Q. When you received Exhibit number 79, the the subpoena to Quest for the documents, attached to 79 is a Court order marked as Exhibit A to Exhibit 79, the subpoena.

Did you read that Court order when you read the subpoena?

A. I believe I had previously received a Court order before I received a subpoena. So at some point I did read the Court order.

Q. So coming to this deposition, you're aware

Page 20

of the scope of the subpoena that has been issued to Quest, and the scope of the Court order attached to Exhibit A to that subpoena, right?

A. I believe so, yes.

Q. Tell me what you did to prepare for the deposition.

A. I reviewed the materials that were provided for production to you, and I had a brief discussion with Mr. Duffy. And I think that is it actually.

I reviewed the materials that were responsive to and requested by the Court order and by the subpoena.

Q. When did you review the materials?

A. I initially when I reviewed to provide the materials that would have been several weeks ago when I provided them to Mr. Duffy and then also yesterday.

Q. How long did you review the materials yesterday?

A. Several hours. I didn't keep track of my time specifically for it.

Q. You suggested you spoke with Mr. Duffy once. Is that accurate, you spoke with him once in

Page 21

furtherance of your deposition today?

A. Well, during the production I spoke with him at that time as we arranged who and how the documents would be produced.

And I spoke with him recently, Sunday. And then I spoke with him again this morning to let him know I was on my way and discussed logistics.

Q. On Sunday, how long was your conversation with Mr. Duffy?

A. I believe it was an hour. Maybe it's a little bit more. Maybe a little bit less.

Q. Other than the materials that Quest had produced in response to the subpoena, did you review any other materials?

A. Not that I recall. I don't recall reviewing anything else.

Q. Do you recall reviewing any pleadings in the case?

A. I am not sure to what you're referring to.

Q. Courts documents filed by the lawyers on behalf of the clients.

A. I may have in the context of getting the scope around and activities around the time where I was in possession of Mr. Pable's mobile phone. I

6 (Pages 18 - 21)

Page 22

may have looked a some e-mails around that time frame.

So if there were attachments that might have been in the initial complaint that was part of that initial engagement, but I don't recall looking at other documents.

Q. Do you recall how many e-mails you looked at?

A. I do not.

Q. Do you recall the time frame that the e-mails arose from?

A. Because of the context as I understood it of this deposition, I reviewed the materials around the period during which I had possession or custody of the phone.

Then I also reviewed materials later that were referred to the imaging and referred to the images that were produced I believe to the law firms involved in this case.

Q. And you turned over all of those materials to Mr. Duffy for production in response to the subpoena?

A. So during our discussions several weeks ago with respect to the production, prior to me

Page 23

having seen the subpoena, but based on the Court order that was provided, Mr. Duffy advised he would take care of the e-mail communications and provide what was relevant with respect to the e-mails.

And I reviewed the other documentation that I had collected during the processing.

Q. So based on that conversation it was your understanding you were not going to be looking for any responsive e-mails to the subpoena?

A. That is correct.

MR. DUFFY: I need to step in. That is accurate. I said I would look at e-mails, but you actually sent me e-mails too, Dan.

THE WITNESS: That is true, that were not already part of what you would have received.

MR. DUFFY: That is not what I already had, but you did send me e-mails. That is what I wanted to be clear about. Along with the images you sent me e-mails.

MR. KENNEDY: Let me ask it another way.

BY MR. KENNEDY:

Q. To your knowledge, Mr. Jerger, as you sit here today, have all e-mails in Quest's possession responsive to the categories of the subpoena,

Page 24

Exhibit number 79, been produced in this case?

A. I don't know. I have not reviewed Exhibit 78 to identify what has been provided to you.

Q. Correct my memory. I thought you just said that you had reviewed what you produced, what Quest had produced in response to the subpoena to get ready for today's deposition?

A. I'm sorry, can you restate the question.

Q. Yes. I thought you testified that you did, in fact, review all of the documents that Quest had produced in response to the deposition?

A. That is correct.

Q. So I am asking you can you tell us today under oath, can you certify so the Judge knows that all of the e-mails that Quest has in its possession responsive to the subpoena have, in fact, been produced by Quest?

A. So as discussed or as I mentioned several weeks ago during our discussion between Mr. Duffy and myself, I was advised and directed to produce my files other than the e-mails.

As Mr. Duffy has clarified, I did produce some e-mails that he was not carbon copied

Page 25

on or included in that e-mail relevant to those because he had advised he had his e-mail and would produce those that were responsive.

Q. Is your best answer today that in response to the subpoena issued to Quest that Quest produced some responsive e-mails, but you cannot certify that it produced all responsive e-mails.

Is that a fair statement?

A. I think that's a fair statement because I was not charged with providing those. Mr. Duffy had suggested he would go through his and do it and directed that he would do those.

MR. DUFFY: If it helps you, I'll represent that yes, as his attorney and knowing everything I know that the e-mails that involved me and Quest and me in any capacity and Quest responsive to the subpoena have been produced.

Dan wasn't involved in the last three steps of the time of the production or something. That was me. So if that helps you. If it doesn't, fine.

BY MR. KENNEDY:

Q. Let's move forward. Tell me as best you can recall, Mr. Jerger, from A to Z the scope of your engagement and what you did to Mr. Pable's

7 (Pages 22 - 25)

Page 26

phone, which you were asked to do to his phone, what the results were and how you documented your efforts.

Just tell me as a narrative what you did.

A. I was engaged, Quest was engaged to provide digital forensic services which were to include providing and accessing and documenting communications within a certain date range and with certain key words.

And these were to include information that was present on a phone that was reportedly owned by Chris Pable and also other sources including cloud based services that Mr. Pable used.

Q. And based on that task, what did you do?

A. I arranged at the direction of Mr. Duffy to collect the phone from Mr. Pable.

I collected the phone, and I processed the phone using digital forensics. I documented what was present on the phone, and I documented with photographs as well as screen captures, specific photographs of the phone as it appeared when I was doing my exam.

I documented settings and other steps

Page 27

that I took using digital photographs. And subsequent to returning the phone to Mr. Pable, we also collected information from cloud sources and reviewed and restricted or limited those based on key word searches and other date criteria of processing of the original data.

These were gigabytes of information that was provided by online sources. We reduced that data set to the required criteria of the date range and/or depending on the circumstances the key words.

Q. What did you do next?

A. I am not sure if I understand your question.

Q. You retrieved the data as you've described. What did you do with that data once you retrieved it?

A. At the direction of Mr. Duffy, there was a number of files that were produced and provided to Mr. Duffy.

He would at some point review those and reply back to me with the respondent items that were going to be produced as I understood it. And then I created a data set that then was prepared and provided to Mr. Duffy, who as I understand then

Page 28

provided to other counsel.

Q. And did that final set of tasks conclude your engagement in this matter for Mr. Duffy and Mr. Pable?

A. Within this time frame there were additional requests for different time frames of the same data set or there was more data that was then provided or accessed.

And so the process was repeated with respect to the searches and the filtering based on date and the production of the materials as identified by Mr. Duffy. In addition, images were produced for counsel, and I Fed Exed those on USB flash drives to two attorneys, I believe.

Q. Other than being subpoenaed for your deposition and Quest being subpoenaed for its records, when did you consider your engagement concluded for Mr. Duffy and Mr. Pable, if at all?

MR. DUFFY: Objection -- withdrawn.

THE WITNESS: I don't know if I would conclude it until our client tells us that the matter is closed.

So we may not have activity that we are ongoing doing, but we wait for the direction and are

Page 29

at the service of our clients.

BY MR. KENNEDY:

Q. At this point in the relationship do you consider this engagement to still be open?

A. Yes.

Q. How much have you been paid to date on the engagement, Quest, that is?

A. Quest has a retainer that was received initially for $5,000.

Q. Has that retainer been exhausted?

A. I don't believe an invoice has been produced, so I can't answer that question.

Q. Who would be able to answer that question?

A. We just haven't produced an invoice. So we could ask our office manager, but I don't think an invoice has been produced because I would have had to submit those hours, and I don't believe that happened or occurred at this point.

Q. Do you draw down against the retainer, against an hourly rate?

MR. DUFFY: John, this is outside the scope of the subpoena.

MR. KENNEDY: Actually, it deals exactly with the nature of the relationship of what he's doing to

8 (Pages 26 - 29)

Page 30

image the phone. So it's not beyond the scope.

MR. DUFFY: You're entitled to ask background questions, and you have about the relationship, the mechanics of payment and invoicing and time tracking unless there -- you could ask him how much time he spent imaging or has he invoiced for imaging.

BY MR. KENNEDY:

Q. You could answer the question.

A. What was the question?

Q. Do you charge for your time on an hourly rate?

A. Yes.

Q. In this case, are you charging your time against the retainer?

A. When the invoice would be charged, it would be against the retainer, yes.

Q. What is your hourly rate on this engagement?

A. Quest's hourly rate for my services are $300 an hour.

Q. Do you know how many hours you have in this engagement from its initiation to date?

A. I do not.

Q. How do you maintain your time to make sure

Page 31

you could count to get a fair counting of the time you put into this engagement?

A. Through various means, communications and e-mails. Digital photographs which are time stamped.

Q. And do you maintain time sheets digital or otherwise that logs the amount of time you put into this engagement?

A. In some cases, yes.

Q. In this case did you do that?

A. I don't think so.

Q. Do you know how much time you put into this engagement hourly?

A. I do not.

Q. How would you reconstruct that?

A. Through the means that I already elaborated, through communication, e-mails and digital photographs which are time stamped.

Q. In your assessment, have you spent over 100 hours of time for the various tasks you have described in this engagement?

A. I wouldn't want to speculate.

Q. Would it be more than 100 hours?

A. I would not want to guess.

Page 32

Q. I'm not asking you to guess. I am asking you to give me your best assessment.

A. I do not have an estimate at this time.

Q. So is it accurate that Quest has not yet been paid -- strike that.

Is it accurate that Quest has not yet retained any portion of the retainer that Mr. Pable provided to the work that you and your firm have done?

A. I'm sorry, I don't understand the question.

Q. Has Quest drawn down on the $5,000 retainer initially provided to Quest by Mr. Pable for the work that's been done against the file?

A. This is not my area. I wouldn't be able to answer your question.

Q. Who do you report to if anyone at Quest?

A. Quest's president and their general executive vice president.

Q. Can you please identify the president and executive vice president?

A. The president of Quest is Robert A. Sedulski, and the executive vice president is Leoni Flossi.

Page 33

Q. Describe the process that you go through at Quest to open up an engagement matter such as this one?

THE WITNESS: It appears we lost Mr. Duffy.

MR. KENNEDY: It does appear that we have. Why don't we hold that question until Mr. Duffy gets back.

(Recess)

MR. DUFFY: Sorry, I lost my internet. We had some power issues overnight. The power didn't go out, but apparently I don't have internet anymore. I am here on the phone now. So that is fine.

The last thing I heard was the question about is it fair to say that basically Quest hasn't been paid I think was the question. I am happy to proceed this way as long as I could hear.

MR. KENNEDY: For the record, Mr. Duffy has lost his wifi access to allow him to participate in the deposition via video.

So he is participating by phone without objection from Mr. Duffy, and we may proceed accordingly. Is that correct, Tim?

MR. DUFFY: Yes. So long as this stays up. I'll message Chris or someone if I drop off and

9 (Pages 30 - 33)

Page 34

can't hear anything and trust that you will stop if he says so.

MR. KENNEDY: That's fine. Tim, in terms of mechanics forestalling any problems down the road, do you have access to the documents for purposes of my questioning Mr. Jerger throughout the course of the deposition even though you are participating via phone only?

MR. DUFFY: Yes. If everything is in that big exhibit and obviously I have what I produced. I'm sure I could find whatever.

MR. KENNEDY: Can you read the question back.

(Question read.)

MR. DUFFY: The last question I heard was whether something had been drawn against, and you said is it fair to say the retainer, you haven't been paid essentially from the retainer. I never heard an answer to that or any other question. That's what I want you to go back to.

BY MR. KENNEDY:

Q. Let's start from there. I could pick up the thread. Mr. Jerger, we're going to go back to a

Page 35

question that Mr. Duffy had not heard an answer to.

I was asking you, if I recall the gist of the question is has Quest applied any of the retainer that Mr. Pable had provided against any of the work that has been done on this engagement?

A. I believe I responded that it is not my area.

Q. So that information is available at Quest, just not your area?

A. It may be. I don't know.

Q. But you have an accounting department that handles accounts receivables and such?

A. We do.

Q. Who is in charge of that department?

A. Our office manager.

Q. What is that person's name?

A. Sue Wedrick.

Q. The next question is please describe the process or protocol that Quest requires when you open up an engagement like the engagement you have for Mr. Pable.

What are the administrative steps that need to be done?

A. An engagement letter is signed with

Page 36

ideally the named parties as well as the case name. Conflict checks are done, usually simultaneously at that point.

And we are provided the parties that are involved and then we could produce the engagement letter. The engagement letter may or may not be signed at the time it's provided. It sometimes may be signed right before an engagement begins, meaning our services are needed.

Once an engagement letter is received a case ID is assigned to that particular case.

Q. Is an engagement letter always required?

A. Yes, I believe so.

Q. That engagement letter will set forth the scope of the work?

A. In broad terms, yes. But not necessarily specifics.

Q. It will set forth the rate of compensation Quest and the client agreed to?

A. There will be a rate sheet on the engagement letter, yes.

Q. And Exhibit 78, that is the document with the bates stamped range of 2317 to 3041. I have looked through all those documents, and I could not

Page 37

find an engagement letter.

Did you produce an engagement letter in this case in response to the subpoena to Quest?

A. No, I did not produce one to Mr. Duffy because that would have been in our e-mail communications, and he had advised that he would be responding to those.

I also don't understand if that was responsive to the Court order or with respect to the subpoena. But that would have been Mr. Duffy's decision.

Q. Are there any other documents that you did not produce based upon your own judgment that the documents were not responsive to the Court order or subpoena?

A. Yes.

Q. Identify the categories of documents that you did not produce.

A. E-mails that we have already discussed. There would have been other files that were produced as we discussed also that were provided to Mr. Duffy regarding the searches.

We did not provide the raw data sets that were gigabytes of information that were

10 (Pages 34 - 37)

Page 38

provided or obtained from online sources, cloud based services. There will be other documents potentially or other materials that were, for example, the images that were previously produced.

If there were any other documents or items that were part of that collection, part of that processing they would not have been provided, as I understood this was related to the images that were produced.

Q. So if I hear you right, and I need you to check my homework, with respect to e-mails, you were directed by Mr. Duffy that Mr. Duffy's office would take care of responsive e-mails to the Quest subpoena, correct? E-mails with me, is that correct, sir?

A. So as Mr. Duffy had interjected in our discussion several weeks ago between myself and Mr. Duffy has been outlined related to e-mails that he and I had shared that he would then produce those.

I also produced some e-mails that he was not originally included on so that he had those, and he could determine whether or not they were responsive.

Page 39

Q. Now, you have reviewed Exhibit 78 before it was produced to Mr. Duffy, correct?

A. I have not reviewed what is in Exhibit 78. You had directed me to download it during the break. We had not taken such a break. So I don't know what is in Exhibit 78 at this time.

Q. The second set of e-mails if I heard your last most recent answer with respect to e-mails, there were e-mails that you, Quest, had determined were nonresponsive to the subpoena and therefore were not produced at all. Is that correct?

A. Yes, as far as I know. I don't know what Mr. Duffy produced, but I would imagine there were some e-mails that were not related to the imaging of Mr. Pable's phone.

Q. And the engagement letter that you have that Quest has with Mr. Pable exists. And as I understand your testimony, it's part of or attached to an e-mail. Is that correct?

A. I believe so, both the request and also the signed copy of it.

Q. And you understood that that e-mail engagement letter was in Mr. Duffy's hands to determine whether or not to produce it pursuant to

Page 40

the subpoena. Correct?

A. I did believe that that was the case. Also based on the subpoena, though, had I been asked to produce the e-mails between Mr. Duffy and myself may have not included that either as I did not believe and do not believe that that is within the scope of the subpoena.

Q. The Court in the subpoena Exhibit 79 authorized Quest and directed Quest to produce all documents, materials that identify any instructions from Pable and/or attorneys regarding Quest's imaging of Pable's personal cell phone.

Notes, reports, and records generated during or related to the imaging of the phone and that is attached as an exhibit. Is it your judgment that the scope of work, the nature of your relationship with Mr. Pable is beyond the scope of the Court's approved subpoena to Quest?

MR. DUFFY: Objection, asked and answered.

THE WITNESS: I am not a lawyer. I am not purporting to be a lawyer. I am suggesting that I know what is in our engagement letter.

And as I have indicated, there is a named case in there and broadly defined scope which if I

Page 41

remember correctly because it is a boiler plate engagement letter it indicates that we will work at the direction of our client.

That is the extent of the scope that would be defined in the engagement letter.

BY MR. KENNEDY:

Q. In this specific engagement, who directed you, who provided you with direction on the task involving Mr. Pable's phone?

A. Mr. Duffy.

Q. What did Mr. Duffy tell you to do with the phone?

MR. DUFFY: Objection to the extent that calls for instructions unrelated to the imaging, and I am instructing the witness not to answer except as those instructions relate to the imaging, which is exactly what the Court's order says.

BY MR. KENNEDY:

Q. You could answer, sir.

A. I was asked to document the phone's messages within a date range and/or within key words.

Q. Were you told to do anything else with respect to the imaging of the phone other than what

11 (Pages 38 - 41)

Page 42

you have just described by Mr. Duffy?

MR. DUFFY: Objection to that question. It lacks foundation and is argumentative and misconstrues testimony. Go ahead.

THE WITNESS: Other than as I have stated, we had discussions of what actions were involved with the phone, but the specific direction of how that mission was accomplished was not directly stipulated.

BY MR. KENNEDY:

Q. At any time were you informed to make a complete forensic image of Mr. Pable's phone?

A. I may have been asked during our prior to engagement regarding imaging.

We may have discussed that, but as far as for the actual processing I kept Mr. Duffy informed of the processing and the activities that I performed with Mr. Pable's phone so that he could make the appropriate decision as to how to move forward.

Q. I'm going to go back. Were you instructed to make a forensic, a complete forensic image of Mr. Pable's phone?

A. Imaging is part of our forensic

Page 43

processing. So wherever possible we attempt to obtain images of our devices that we collect data from.

We also as part of our process document the process digitally with digital photographs as well as we use other forensic techniques in order to document, including manually processing or manually collecting the items of interest, in this case, the messages and communications that are relevant or within the time frame that we were directed.

Q. Do you know what it means to make a complete forensic image of a phone?

A. What your term is I do not know.

Q. All right. So bear with me in my ignorance. What words would be used to convey to you the task to make a complete image of a phone regardless of dates, regardless of search terms, regardless of subject matter searches.

Does the words forensic extraction come closer to what I'm getting at?

A. If I could clarify, the word complete is the question, not digital forensic image.

So if you were to say digital forensic image, I may have some understanding. There are

Page 44

different types of digital forensic images and different, if you will, quote, unquote complete images.

That is not a term from a forensic standpoint that I think is in common use. That is why I am clarifying.

Q. So what words would be used to communicate the task that Quest should make a forensic image of the entire phone database regardless of time, subject matter, files, et cetera?

A. There could be different circumstances. So different tools collect different information, different digital tools. There may be circumstances that I would logically collect the files on the phone or I may physically collect the files on the phone as well.

Q. You said before you were engaged through discussions about imaging of the entire phone.

Do you remember that testimony you gave about ten minutes ago?

MR. DUFFY: Objection. He did not say that. He said there might have been.

BY MR. KENNEDY:

Q. Do you remember that testimony,

Page 45

Mr. Jerger?

A. Could you ask your question again because it appears that you said something that I did not.

Q. Well, I'm asking you to tell me what discussions you had before Quest was engaged about the imaging of Mr. Pable's phone.

A. Well, I can't remember specifically as I think I suggested. There is the possibility that we discussed imaging because as part of our processing we do frequently attempt to collect a forensic image as part of our normal digital forensic processing.

Q. When you attempt to collect a forensic image, what does that mean?

A. We use the tools available to us and our experience to process the phone in order to acquire a logical or physical image of the phone.

Q. And that is to acquire all of the user generated data on the phone, is that correct?

A. Depending on which process you do, that could include that. That is true.

Q. So there are various tools -- if I hear your testimony correctly, there are various tools that you could apply, the net result of which would be to retrieve all of the user generated data on a

12 (Pages 42 - 45)

Page 46

phone?

A. In some engagements that is correct, yes.

Q. Here you did not do that, correct?

A. We were not asked specifically to obtain a logical or physical image of the phone. We were asked, as I stipulated, to collect and document the messages that were on the phone that we could see on the phone that were available on the phone, and we did that for digital photography and manual collection acquisition.

Q. Were you told to do anything else other than what you just stated?

A. I can't recall if there were any other specifics, but that was the underlying mission was to collect and document within a particular date range and within and/or with certain key words as we've discussed.

We were also asked to collect information from e-mails and others that were communications that were also responsive.

Q. What date ranges were you told?

A. So initially when we had the phone in custody we were told a date range that was in 2019. That was during the time that we had the phone, that

Page 47

was a date range that then got altered or corrected to a 2018 time frame.

I don't know the specific dates, but if I remember correctly it was somewhere in the latter half of 2018. So we collected initially the 2019 date range, provided that subset to Mr. Duffy who then realized that there was a mistake and a typo.

So it was therefore meant to be 2018 if I recall correctly. So we went back into 2018 during the same window of custody of the Pable mobile phone.

Q. What search words were you directed to search for?

A. A list of search words. I don't have those. I don't know what those search words are off the top of my head.

Q. How were the date ranges and search terms or search words communicated to you?

A. Via e-mail.

Q. So would you have those e-mails?

A. I believe I would, yes.

Q. Did you produce those e-mails through Quest?

A. I did not. They did not have relevancy to

Page 48

imaging of the phone as I understood the Court's order to be requesting.

Q. So the emails directing you what to image from the phone you determined were not responsive to the subpoena seeking documents regarding images of the phone. Is that your testimony?

MR. DUFFY: Objection, that totally mischaracterizes the testimony and is a false predicate.

BY MR. KENNEDY:

Q. You could answer.

MR. DUFFY: No, you probably can't, but you could try.

THE WITNESS: Could you restate the question.

MR. KENNEDY: Sure. I'll ask it again.

BY MR. KENNEDY:

Q. I will ask it a different way first. Do you have those e-mails? Does Quest have those e-mails in its possession today?

A. Not with me here today.

Q. It has them in its possession, correct?

A. To clarify, what e-mails are you asking about?

Q. These are the e-mails that gave you and

Page 49

Quest direction as to what time parameters to search for and what search words to search for.

You said that information was conveyed to you by email, correct?

A. Yes, I believe so.

Q. And you said you did not produce those e-mails in response to the Quest subpoena, correct?

A. Again, those e-mails would have been also determined by Mr. Duffy, as I did not review the e-mails that Mr. Duffy included.

He would have sent those to me. He would have produced what he believed were relevant to the subpoena.

Q. So I'm asking you about what Quest did. We could put Mr. Duffy on the sidelines for a moment.

Quest did not produce those subject emails in the response to the subpoena, did it?

A. I was directed not to produce e-mails that were communicated. So that is correct, I did not produce those to Mr. Duffy.

Q. And those e-mails are still preserved by Quest on its computer system. Correct?

A. They may be. And/or Mr. Duffy would have

13 (Pages 46 - 49)

Page 50

a copy.

Q. Did you delete any e-mails?

A. Not to my knowledge.

Q. So can you say with any degree of confidence that those emails exist at Quest or are you suggesting that perhaps they don't exist for some reason?

A. So there were a number of e-mails. I have no reason to believe that I don't or we don't have those emails. In fact, there were many e-mails having to do with key words because I believe you're asking me about those key words and dates.

And subsequent to the initial processing of the phone, there were many e-mails with respect to data sets, and those would have included the key word hit counts that were requested.

Q. My point here, Mr. Jerger, is that all of those e-mails are available at Quest and can be produced, correct?

A. As directed. Those were produced, yes. If they haven't already been produced, I don't know.

Q. So the answer is yes, as directed. Correct?

A. All of the ones we would have, we would

Page 51

produce.

MR. DUFFY: When we say as directed, if one were to be so directed?

MR. KENNEDY: Correct.

MR. DUFFY: Okay.

BY MR. KENNEDY:

Q. How long did you have Mr. Pable's phone in your possession?

A. That information would be contained on the materials that I produced. The specific times we maintain following change of custody procedures from our founders, which are former FBI and other law enforcement.

We follow a chain of custody. So the chain of custody documents was provided, I believe, and that would document the time during which I had the phone.

Q. Who delivered the phone to Quest?

A. I picked up the phone from Mr. Pable.

Q. Where, at his home?

A. I believe so. I was provided an addresses. I believe that that is where he lived.

Q. Was this a weekday or a weekend, do you recall?

Page 52

A. I believe it was -- well, this is documented on the chain of custody, but I believe it was a weekday.

Q. And the chain of custody would also reflect when you returned the phone?

A. It would.

Q. It would reflect Mr. Pable's consent for you to access his phone?

A. It requires his signature. And so his signature would be on there or initials with both the collection when he provided it to us and also the return of the phone when I provided it back to him.

Q. Is it accurate you had Mr. Pable's phone in your possession on only one occasion. In other words, you did not need access to the physical phone more than the one occasion. Is that an accurate statement?

THE WITNESS: Did we lose another person?

MR. KENNEDY: We lost Nicollette Khuans, who is instrumental to this deposition team. She's back. So I feel more comfortable proceeding, and we may proceed.

Page 53

BY MR. KENNEDY:

Q. Did you have possession of Mr. Pable's phone on more than one occasion?

A. No, just the period documented on the chain of custody.

Q. Let me take a look and show you the documents that reflect the chain of custody and that would be Exhibit number 83.

MR. DUFFY: Give me a second to open that, John.

BY MR. KENNEDY:

Q. Mr. Jerger, do you have Exhibit 83 in front of you?

A. I do.

Q. Take a look at the bottom right hand corner. It should have the following numbers stamped on it. P003038 through P003041.

Are those the four pieces of paper that you have in front of you?

A. Mine has five, and it begins P003037.

Q. Okay. Please read the first page 3037, the heading.

A. Scanned documents.

Q. And then the balance of Exhibit 78 you

14 (Pages 50 - 53)

Page 54

have in front of you is 3038 through 3041?

A. I'm sorry, could you clarify. Did you say Exhibit 78?

Q. I'm sorry, 83.

A. I have Exhibit 83. I'm sorry, what was your question?

Q. The question is -- let's reframe the statement. Your Exhibit 83 has a cover page which bears the number P003037, correct?

A. Yes.

Q. And that cover page has a title on it, doesn't it?

A. It says scanned documents at the top left corner.

Q. Behind that document Exhibit 83, 3037, you have four more documents numbered 3038 through 3041, correct?

A. Yes.

Q. And that constitutes all of Exhibit 83 that you are looking at right now, correct? That is the complete exhibit.

A. With the cover page there are five pages, yes. Correct.

Q. And moving past the title page or cover

Page 55

page, drawing your attention to P003038, is the heading that is entitled Quest Consultants International Limited evidence inventory. Do you see that?

A. I do.

Q. And go to the next page, 3039. There is a top box with a description of the item. Do you see that?

A. I do.

Q. And then beneath that there is another box that says chain of custody. Do you see that, 3039?

A. Yes.

Q. Go to 3040. There's a sheet entitled electronic acquisition worksheet.

A. Yes.

Q. And 3041 appear to be handwritten notes dated June 11, 2020 at 10:30 a.m. Correct?

A. Yes.

Q. Would you identify what Exhibit 83 is?

A. I'm sorry, these are scanned documents. I don't understand your question.

Q. Then we'll break it down page by page. Exhibit 3038, do you understand this is a five page evidentiary exhibit with one number, Exhibit 83,

Page 56

right?

A. Okay.

Q. Correct?

A. That's what I understand you're telling me, yes.

Q. And these are Quest documents, aren't they?

A. Yes.

Q. They have a Quest heading at the top of each and then your notes, right?

A. Right, all except for the title page or cover page as you've called it.

Q. So let's take a look at the first page of Exhibit 83. That is a Quest document, the evidence inventory.

Do you have that in front of you?

A. I do.

Q. Tell me what an evidence inventory is in the Quest document world.

A. Sure. For each case that evidence is collected, it could be digital evidence. It could be physical evidence. Depending on the case it could be both.

The case ID and the subject are provided

Page 57

as well as a tag number that is referenced relating to a particular item that may have been collected and/or processed further.

Q. Who completed the evidence inventory that is part of Exhibit 83?

A. I completed this evidence inventory.

Q. Is this the complete evidence inventory relating to Quest's processing of Mr. Pable's phone?

A. To be clear, it includes things other than Mr. Pable's phone, but this is the complete evidence inventory to date when it was submitted for this case. This is a working and living document.

Q. And the subject is Chris Pable on the right-hand corner. Correct?

A. Yes.

Q. And Quest was assigned a case ID to this project, correct, and that is 202122, correct?

A. Yes.

Q. And Quest considers the client to be the attorney, Mr. Duffy, not the subject, Mr. Pable?

A. Right. And subject in this context is the subject of the matter, not a person. So that subject could be something else. In this case it just references Chris Pable.

15 (Pages 54 - 57)

Page 58

Q. And then you reference tags T-1, T-2, T-3 and T-4. Do you see those?

A. Yes.

Q. What does tag mean in the evidence inventory that you've utilized here?

A. It's a reference to an object or data that other things are then processed from or collected from.

So you may have derivative items from each of these, but these were the things that were collected in this case T-1, T-2, T-3 and T-4.

Q. I want to keep 3038 in front of you. I want to call your attention to 3039 as part of Exhibit 83.

A. Okay.

Q. I will draw your attention to the date at the top, June 11, 2020. Right?

A. Yes.

Q. The same case number 202122, tag T-1?

A. Yes.

Q. There's a description of items. Do you see that?

A. I do see that.

Q. Did you fill out the information contained

Page 59

on Exhibit 83 labeled 3039?

A. In part, yes.

Q. Who else did?

A. Mr. Pable.

Q. The notes under description of item, is that your handwriting?

A. Some of it is, yes.

Q. Which is your handwriting and which is Mr. Pable's handwriting?

A. With the exception of phone number that is listed there 630 -- it's not my handwriting either. 3902 676, I would have to look in other references to confirm if that's the phone number. It could be a four, a 340. That phone number was not written by me. The rest of the text that is hand printed was written by me.

Q. And the description of the item if I am reading this right it says this is your handwriting. Perhaps you can read it for me. Read what you wrote under description of item in completeness.

A. So not including the phone number. That was not written by me. My writing includes Moto E squared E Force mobile, period.

I have to confirm the time, but I

Page 60

believe it's 10:29 a.m. It may be 10:28, 10:29 a.m. A/P slash P mode. No sim. No SD card. Battery connection sensitive.

Q. What does A slash P mean?

A. It's an indication it actually would be AP mode, I believe what that was meant to say. But it's an indication that there were multiple, potentially multiple partitions on the phone.

Q. Multiple what?

A. Partitions.

Q. What does that mean?

A. Areas where the system data could be stored. So it's frequently used depending on the type of the device.

Different phones use it for different purposes based on how they're configured.

Q. Beneath the description of item there is a box marked consent required, yes. Do you see that?

A. A clarification, sorry. AP mode in this case, he had put it in airplane mode. You will see on another sheet. That is actually at about 1O:29 when he put it in airplane mode. I apologize.

There is a partition issue or a partition circumstance in some cases, but in this

Page 61

case this is AP for airplane mode.

Q. Am I reading this form correctly that Mr. Pable just beneath the description of item it says sent some parts, yes. Do you see that?

A. Your connection broke up. I could not understand your question at all.

Q. I will start again. Exhibit 83, document number 3039, beneath the description of item do you see that there's a box where it states consent required, and there's an X in the box marked yes. Do you see that?

A. Yes.

Q. And then it indicates consenting person name slash organization, Chris Pable. Do you see that?

A. I do.

Q. Then there's a horizontal kind of a scrawl. I take that to be Mr. Pable's signature?

A. I don't know what you're referring to.

Q. Under consenting person's signature?

A. That I believe with the exception of the X that precedes it, which was written by me I believe that is his signature.

Q. Was this form filled out when you went to

16 (Pages 58 - 61)

Page 62

Mr. Pable's address, he directed you to pick up the phone?

A. I doubt that much of it was filled out. There could have been a portion of it filled out. Perhaps the top header. But I don't think I had, for example, the phone number he wrote in.

I certainly didn't know what time it was in airplane mode or any other description of the item. So I can't answer the question fully. There may have been portions of it. Sometimes in order to save time and particularly this is during Covid, I may have prefilled out my name and signed my name. But certainly the areas of which Mr. Pable completed, of course, were not completed before I left.

Q. When you came to the address to pick up the phone you retrieved the phone. He signs the consent. Is that how it worked?

A. Yes. And as documented further, there is brief interaction that he shares this information. I asked him to put it in airplane mode. While I was present he did that.

He advised there was no sim or no SD card, and the battery connection was sensitive. And

Page 63

I documented that in the description box.

Q. What is a sim card?

A. It's an identification module for a subscriber. It's an identification of that phone relative to the service provider that he uses.

Q. What is the purpose of a sim card?

A. This is a mechanism by which the phone carrier can identify and register that phone on their network.

Q. It gives you access to the network?

A. That is one of its features I suppose, yes.

Q. What is an SD card's purpose?

A. It's a secured digital data card. So it could contain storage, memory.

Q. Is the purpose of an SD card to store data?

A. I don't know if that would define what the purpose of it is, but that is one of its features, yes.

Q. Does a mobile phone work without a sim card?

A. Yes.

Q. What are the limitations of its use if the

Page 64

phone lacks a sim card?

A. Without the sim card and within airplane mode there's no access to a network and no access to wifi.

Q. And if the phone is taken out of airplane mode, but lacks a sim card what are the utilities of that cell phone?

A. You would possibly be able to connect to a wifi if you chose to do so. For wireless connectivity you would not without a sim card if the phone did not have other mechanisms like an E-sim or the device did not have an electronic sim, you would not be able to access the cellular network.

Q. Would you be able to access e-mail?

A. I'm sorry, in what context?

Q. Any context?

A. Are you asking me hypothetically am I able to access e-mail?

Q. I'm asking a phone without a sim card, could the operator access e-mail?

A. They may be able to, yes.

Q. And they could send text messages?

A. In the term that you are using text messages maybe. It depends on how you defined the

Page 65

text message.

Q. Under what circumstances would you be able to send text messages without a sim card?

A. Could you clarify what you mean by text messages.

Q. Messages that you send by text. I am using it in a layperson's form of messaging, Signal messages, for example, SMS messages?

A. So these are different circumstances that you have elaborated. All of them potentially with the appropriate app could be sent if I only had a wifi on a given phone.

If I had wifi on and enabled and connected to a wifi access point and I had a correct app, then I may be able to send what you're terming text messages, but not necessarily all of the text messages that you just talked about depending on the circumstances.

Q. Did you ask Mr. Pable why his phone lacked a sim card?

A. I don't recall.

MR. DUFFY: Objection. Again, we're outside the scope of the order and discovery. You can obviously ask him some questions about how he's

17 (Pages 62 - 65)

Page 66

getting the phone and these documents, but specific conversations between him and Pable that are not related to imaging are outside the scope.

BY MR. KENNEDY:

Q. You could answer, sir.

A. I'm sorry, could you restate the question.

Q. Did Mr. Pable convey to you any information as to why his phone lacked a sim card?

MR. DUFFY: I am going to object to that. I am going to ask the witness not to answer it. It's outside the scope of the order, and it's abusive of the discovery process. So we are not answering that question.

BY MR. KENNEDY:

Q. Mr. Jerger, I want to make my record. A sim card, you testified, has some utility and lacks some utility with respect to the ability to send text messages, correct?

A. Again, that is not the way I would put things, but I am not sure if I understand what you're asking me at this point.

Q. My point is the images you gather from a phone that lacks a sim card is different than the images you gather from a phone that has an operating

Page 67

sim card, is that right?

A. Your terms that you're using, I don't know if I understand or -- I can't answer it. I'm not sure what you're asking at this point.

Q. Why did you feel it important to note in the description of the item that the phone Mr. Pable gave you did not have a sim card?

A. I was documenting the phone as it was provided to me.

Q. And the same answer for the lack of an SD card?

A. Yes. Wherever possible we document. Similarly, the battery connection sensitivity and the potential concerns with the functioning of the phone we definitely document.

In the event that we return this phone and the client were to say where's my sim card, we need to make sure that it was documented no sim card was provided to us.

Q. I'm going to ask this question. You're probably going to tell me it's an ignorant question, but I'm going to ask it anyway.

If a phone has a sim card in the general course and on June 10 Mr. Pable removes the sim card

Page 68

and delivers the phone to you without a sim card, how if at all does that impact how you go about imaging the data on that phone?

A. The premise, I don't understand. I think if I were provided a phone without a sim card, in fact, in many digital forensic processes it is recommended that a sim card be removed before imaging so that there is no possibility that the device can connect to a cellular network and potentially alter the data on the device.

Q. So it is relevant to imaging?

A. Again, those are your words. Of course, we're documenting what we provide, and these circumstances can all have an impact on the processing of the phone that we do.

Q. Now, your attorney has told you not to answer the question on the grounds it's beyond the scope of what the Court had ordered.

I have made a record to go back to court and ask the Court to compel you to answer the question, and we're going to reserve our right to do that.

MR. DUFFY: Let's be clear. When you say the question, the question was discussions with

Page 69

Mr. Pable about why he did or didn't have a sim card and that is what I didn't let him answer. So the record is clear.

MR. KENNEDY: Of course.

MR. DUFFY: Okay.

MR. KENNEDY: Are you ready to proceed, Mr. Jerger?

THE WITNESS: I believe so, yes.

BY MR. KENNEDY:

Q. Chain of custody at the bottom of 3039 part of Exhibit 83, am I interpreting the chain of custody log correctly that approximately at 10:32 a.m. on the morning of June 11, 2020 you received Mr. Pable's phone from him?

A. Yes. Approximately 10:32 a.m. 10:29 is noted up above. Yes, I believe that is correct.

Q. The signature in the middle, is that your signature, Dan Jerger of Quest?

A. It's my initials next to the word Quest, yes.

Q. And the reason if I am reading your notes right is initial presentation, acquisition and exam. Correct?

A. No, that's not correct.

18 (Pages 66 - 69)

Page 70

Q. Please tell me what you wrote.
A. It says initial preservation/acquisition and exam period.
Q. And then the next box to the left, am I reading that correctly on June 12, 2020 approximately 8:45 p.m. you returned the phone to Mr. Pable?
A. Yes.
Q. So is it accurate for the Court to conclude based upon this chain of custody log that the total time that Quest had custody of Mr. Pable's phone is from 10:32 on the morning of June 11 to 8:45 p.m. on June 12?
A. Yes.
Q. All other time periods Quest did not have possession of that phone either before June 11 or after June 12, correct?
A. That's correct.
Q. And the person you retrieved the phone from is Mr. Pable on June 11?
A. I'm sorry, is there a question?
Q. Yes. The person you retrieved the phone from on June 11 was Mr. Pable, correct?
A. Yes.

Page 71

Q. And the person you returned the phone to was Mr. Pable, correct?
A. Yes.
Q. You never returned the phone to Mr. Duffy?
A. Is that a question? I did not.
Q. Now, go to page 3040 of Exhibit 83.
A. Okay.
Q. This is a document prepared by you, correct?
A. Yes.
Q. It's entitled electronic acquisition worksheet, correct?
A. Yes.
Q. Tell me what this document reflects.
A. It reflects the key or primary processing that occurred during that initial acquisition of the Pable mobile phone.
Q. Tell me what is reflected on this worksheet that shows what you did to the phone?
A. A number of things, and it refers to other documentation. So the only thing that I would have probably been able to fill out on this form would be the top header information, client information, case information, tag number and the date.

Page 72

But the originating machine for the bulk of that I need to have access to the phone and would have reviewed the phone, the date and time. Those would have been from the phone and then the notes would have also been as I process the phone.
Q. Those are your handwritten notes at the bottom of 3040?
A. They are.
Q. And could you read out loud and verbatim what those notes are from beginning to end?
A. Yes.
Q. Please do so.
A. I used the tilde symbol to imply about or approximately. So tilde 10:29 a.m. Pable placed phone in airplane mode while examiner present.
Pable advised no sim or SD cards in phone. And battery slash cable connection was loose slash sensitive. Parenthetically internally. ███████
████████████████████████
████████████████████████
Tilde, 12:05 p.m. phone shut down. Had to be restarted. Wiped off phone parenthetically clean. Japanese characters slash apps. Tilde 12:12 p.m. connected USB hyphen C to FWKS 10.

Page 73

Paraben's E3:DFV 2.5 Also Encase forensic 20.2. Required disabling slash enabling, double quote twilight double quote inaccessibility to avoid Android error double quote because an app is obscuring a permission request, settings can't verify your response. Double quote.
Attempt enable slash disable signal backup W/N app to create encrypted backup to temp SD card period. Confidential and privileged pursuant to the direction of counsel, which is at the bottom of the footer, I did not write that.
Q. I need your help in understanding the reference to the last line of your notes. Temporary enable slash disable Signal backup W/IN app to create encrypted backup to temp SD card.
What do you mean by that?
A. I temporarily enabled and disabled the Signal backup feature within the app to create an encrypted backup to a temporary SD card.
Q. When you got to the Signal app, what did you find?
A. I am not sure. Could you be more specific?
Q. No, I can't because these are your notes.

19 (Pages 70 - 73)

Page 74

I am not quite sure what you mean when you say backup to temp SD card.

What were you backing up to the temporary SD card?

A. Sure. Within the Signal app, to be clear, taking a step back in my notes, it began processing at approximately 12:00 p.m. And that was with digital photographs.

So these steps were immortalized and documented and preserved with digital photographs. So that information, specifically that process is depicted in digital photographs that I believe were produced to you.

Q. My question is different. My question is what were you backing up to the temporary SD card relative to Signal?

A. The Signal as part of the manual acquisition and collection. The Signal app has a feature that allows you to back up to transfer messages from one phone to another.

So I utilized that feature. It creates an encrypted backup, and I put it on a temporary SD card for further processing.

Q. So the content that was contained on

Page 75

Pable's phone and his Signal app was transferred to a temporary SD card by you?

A. I'm sorry, could you restate the question.

Q. Yes. The content contained in Pable's phone in the Signal app was transferred by you to a temporary SD card?

A. I think that in your terminology that would be correct from a technical standpoint. What I can testify to is that I used the Signal backup app to back up the messages, not necessarily as you termed the content.

I don't know what that refers to, but I backed up the messages that Signal backed up as part of its feature set.

Q. So imagine you're in front of the judge or jury. Tell me what you mean when you say you backed up the messages.

Describe the messages that you are referring to.

A. Well, these are depicted in the photographs both in the projected phone photographs that I provided, screen captures as well as photographs of the messages -- the photographs that document this processing.

Page 76

So I would ideally show an example of the message or a message that might have been backed up through that process.

Q. How many messages were there?

A. I don't know that off the top of my head.

Q. What date range of the messages were they?

A. So I took photographs and documented the date range that I was provided twice, one in 2019 and also in 2018, while I had custody of the phone.

In addition, this Signal backup you do not stipulate the date range. It is whatever messages are provided by the Signal backup.

Q. Is it your testimony that you took a photograph of every single Signal message that was ultimately backed up to the temporary SD card?

A. That's not what I said.

Q. Okay. That's what I'm getting at. I'm trying to understand your testimony. Let me ask it a different way.

Where the heck is the temporary SD card?

A. I don't know where the temporary SD card is, but I would have copied the data from the Signal backup to the evidence storage drives for this case.

Q. So all of those Signal messages that you

Page 77

transferred to the temporary SD card are now backed up on an evidence database maintained by Quest?

A. I wouldn't use the term database. They're stored on encrypted drives that are secured, yes.

Q. So whatever you took off of Pable's phone from his Signal app, I'm trying to trace the chain of custody.

You open his Signal app. You have these messages you find. You transfer them to a temporary SD card. You say that you took photographs of all those messages. Maybe, maybe not. Okay, you didn't?

A. No, I did not say that.

Q. Okay. Bear with me. I'll start again. You open up the Signal App. Lo and behold there's Signal messages.

You transfer the Signal messages from Pable's phone to the temporary SD card. You then transfer the Signal messages from the temporary SD card to an encrypted file maintained at Quest. Correct?

A. We have dedicated storage drives for cases, and we maintain dedicated storage hard drives for cases. So that information was copied to an

20 (Pages 74 - 77)

Page 78

encrypted drive or drives.

Q. And so Quest can access those Signal messages, correct?

A. Should we be directed to do so, yes.

Q. And by doing so you would be able to determine the date range of those Signal messages, correct?

A. I suppose so, yes.

Q. And you would be able to read the Signal messages, correct?

A. They're encrypted. It would require some processing, but yes.

Q. You would be able to tell who they're from and who they're to, correct?

A. I believe so. To be clear, the encryption key that is documented within the photographs that you have already been provided.

So the encryption or decryption key for that backup has already been provided.

Q. So you would be able to tell who these messages were to and who they were from, correct?

A. I believe so.

Q. And you'd be able to determine whether or not they had anything to do with the CTA or the

Page 79

contested issues in this case. Correct?

A. Within the date range that was stipulated and twice, one on June 11 and one on June 12, I did take photographs of the Signal app messages that were respondent to the date range.

At the time I did not process the search terms because the date range would be, if you will, under restricted because it wouldn't also further restrict based on the key words. So at that time I produced those screen captures or shortly thereafter to Mr. Duffy. Those are the messages that I identified when I had access to the phone that were respondent to the date ranges I was provided.

I am using the plural. To be clear, there was one that was 2019 that was later corrected to 2018.

Q. Understood. You used the word stipulated. You know that the CTA never stipulated with anybody to search --

MR. DUFFY: Objection, lack of foundation. I don't know what you're talking about when you say that. How is he supposed to know what the CTA stipulated to?

MR. KENNEDY: I am allowed to ask the question

Page 80

without interference to determine what he knows and what he doesn't know. And he's authorized to answer truthfully.

The fact that you don't like the question is not a basis to object. I am going to ask the question again. Your objection is noted. Please do not step on my deposition, Mr. Duffy.

MR. DUFFY: I am entitled to object to your questions.

MR. KENNEDY: You just did. You just did. You just did.

MR. DUFFY: John, John, John. We're not going to have a shouting match.

BY MR. KENNEDY:

Q. Mr. Jerger, did you have any basis to conclude that the CTA stipulated to any time parameters for a forensic image of that phone?

MR. DUFFY: Objection, lack of foundation.

THE WITNESS: I apologize if I used the word stipulated. Could you read back where I used that word?

BY MR. KENNEDY:

Q. No, I'm going to ask you a question. Do you have any basis to conclude that the CTA agreed

Page 81

to any time limitations on the imaging of that phone?

MR. DUFFY: Objection, that question lacks foundation and is confusing. There is no predicate for it.

THE WITNESS: I'm not sure if I understand the question.

MR. KENNEDY: I'll rephrase it. I'll make it clearer.

BY MR. KENNEDY:

Q. To your knowledge, did the CTA ever agree to a time limitation on the forensic imaging of Mr. Pable's phone?

MR. DUFFY: Objection. That question assumes there was some agreement on imaging the phone, which is not true.

And your question implies that there was, which is not a legitimate question given you know what those facts are.

BY MR. KENNEDY:

Q. You could answer the question.

A. That's outside of my knowledge. I don't even know what you're asking, to be honest.

Q. That is all I'm asking is what you knew.

21 (Pages 78 - 81)

Page 82

So this is outside the scope of your knowledge?

A. To be clear, I'm not sure what your question is.

Q. I don't want to snooker you. I want to make sure I get a clean record because I want the Judge to know exactly what's going on here.

You said that there were time parameters that ultimately went back to 2018. You went to 2019. Duffy called you and says I got a typo. Better go back to 2018, probably the latter half of 2018. Words to that effect, fair?

A. Those are not the words I would use, but moving forward.

Q. And that you were looking for certain search terms within that time frame, correct?

A. So to be clear, the search terms may have been provided, but they weren't applied during the processing of the phone while I had it in my custody because the date ranges that were provided in order to document those messages, that was my mission.

That is what I was directed to do. So we had the date range and then later as Mr. Duffy saw appropriate he could also apply the key words. We did also use the key words afterwards with other

Page 83

data sources and online sources that were not present on the phone, but were still as I understood it relevant with respect to communications with Mr. Pable and others.

Q. Did you have any understanding that the CTA agreed with the protocol that you used to search this phone?

A. That is not within my knowledge. I don't work for the CTA. I worked for Mr. Duffy.

Q. Did Mr. Duffy ever tell you that the CTA agreed with the protocol that you were using to search the phone?

A. I can't recall if that was ever specified to me or not.

Q. So you don't recall, okay. The imaging of the phone, how long did that process last? And I'm going to put this into context.

You got the phone on the 11th of June and returned it on the 12th of June. When did your work of imaging the phone, mining the phone for data within the parameters that you have described, when did that begin and end?

MR. DUFFY: Objection, lacks foundation. Very confusing. So far we have not had any questions or

Page 84

answers about imaging, and you're complaining about imaging and the work you've been talking about.

MR. KENNEDY: I'm asking him how long it took to do the imaging.

MR. DUFFY: You talked about imaging, but you're mixing it up with everything else we talked about.

MR. KENNEDY: No, sir. I object. Tim, you could make your record afterwards. These are all fair questions.

The Judge is going to see this transcript, and we're going to go forward. So I'm going to move forward.

BY MR. KENNEDY:

Q. Mr. Jerger, how long did it take for you to complete the work of imaging on the phone?

A. I think you're characterizing imaging as being one process. I do not review the process that we did with Mr. Pable's phone as solely an imaging process.

It is a preservation and acquisition and that started as soon as I was back at my office and was concluded. You could see the photographs that document when it was concluded on the early morning

Page 85

of June 12, 2020.

And then it was also revisited later that same day because at that time it was then learned through communications with Mr. Duffy that a different date range had to be collected from the phone.

Q. Forgive me for my uninformed use of the word imaging. I am talking about the totality of the things you did with the phone relative to the process to bring to bear the preservation, examination and all that stuff.

How long in time did that process take?

A. I don't have that, but you do. It's in the photographs because they're date and time stamped. So you could see that window of time frame.

But in its broadest sense, that has been documented in the chain of custody form that we discussed.

Q. Bear with me a minute. The chain of custody that is Exhibit 83, document 3039. Do you have that in front of you?

A. I do.

Q. That shows that the phone is being

22 (Pages 82 - 85)

Page 86

returned at 8:45 p.m. on June 12, 2020.

Are you saying that the various processes that you utilized on the phone concluded on that date?

A. As documented in other materials, yes. That was done on June 12. That is when it was returned. So I could not have processed it after I didn't have the phone.

Q. So after June, did you do any further processing of the phone?

A. I no longer had the phone in my custody.

Q. Did you do any further processing of the data that you had retrieved from the phone and stored at Quest?

A. After what date?

Q. June of 2020.

A. This was an ongoing matter. So I would have to look back to see what was being asked or directed.

Yes, I suppose there was. For example, the images that were sent to you was sometime later in 2020. So that was after June.

Q. That is what I want to get to. By my account of the records that I received through

Page 87

Quest, you sent to counsel, Mr. Jados and counsel, Ms. Babbitt, the results of the work Quest did in processing Mr. Pable's phone in a letter dated October 30, 2020.

Do you remember that?

A. I don't believe I did submit a letter. You have a letter that I wrote in 2020?

Q. Bear with me one second. Why don't we take a look at Exhibit 80.

Do you have that in front of you, sir?

A. I have Exhibit 80, yes.

Q. You should have a bates stamp at the bottom right corner P003017 and Exhibit 80 ends at P003030.

Do you have that in front of you?

A. Yes.

Q. I'd ask you to page through Exhibit 80 and familiarize yourself with it, and I'm going to ask you questions about it. Are you ready?

A. I think so. I have not read all of the materials. Some of this is new to me. I briefly scrolled through it as you directed.

Q. I'm going to draw your attention primarily to the first page. This is an e-mail that is

Page 88

Exhibit 80, P003018.

It's the second page of Exhibit 80. It is under the cover page of e-mails with counsel. Do you see that?

A. I do.

Q. This e-mail from you to Mr. Duffy, cc, your boss I understand it, right, Mr. Sedulski. And you're sending an e-mail to Mr. Duffy, correct?

A. I am.

Q. And you're reporting to him generally that per his direction you sent the USB flash drive containing the items detailed in the email by Federal Express to Ms. Babbitt at Taft. Do you see that first paragraph?

A. I do.

Q. And that e-mail is dated October 30, 2020, right?

A. Yes.

Q. Does that refresh your recollection that you sent the email flash drive to counsel on or about October 30, 2020?

A. I may be mistaken, but I think you asked if I sent a letter to counsel, other counsel a letter. I did not. I did send an email to

Page 89

Mr. Duffy I understand, yes. This is an e-mail that I sent to Mr. Duffy.

Q. The point I'm getting at is did you transmit it on or about October 30, 2020 a flash drive of certain images that you retrieved from Pable's phone back in June of 2020. Correct?

A. Yes, and no cover letter was included with those flash drives as indicated in paragraph two. Yes, that is correct. I did as indicated in my e-mail.

Q. Then this e-mail goes on to detail in further detail what files were included on the flash drive. Do you see that?

A. Yes.

Q. Is that intended that the reference to what was included on the flash drive to be an exhaustive list of what was on the flash drive or a representative list of what was on the flash drive?

A. It says the following files were included on the flash drive. Those were the files that I included on the flash drive.

Q. So that is an exhaustive list?

A. I believe so, yes. Four files that were included I believe.

23 (Pages 86 - 89)

Page 90

Q. Then similarly, you had sent the same package to Mr. Jados, correct?

A. I was directed to do so, and I did so.

Q. Why did you wait from June of 2020 when you developed the data from Mr. Pable's phone to October 2020 to finally produce it to counsel for the CTA?

MR. DUFFY: Objection, lack of foundation and argumentative.

BY MR. KENNEDY:

Q. You could answer, sir.

A. So could you repeat the question.

Q. Yes. Why did you wait from June of 2020 when you developed the data from Mr. Pable's phone to October 30, 2020 when you delivered it to counsel for the CTA?

MR. DUFFY: The same objection.

MR. KENNEDY: You could answer.

THE WITNESS: To my recollection, this was the time that I was asked to do so.

BY MR. KENNEDY:

Q. So you were directed by Mr. Duffy to deliver them in October?

A. As indicated in my October 30, 2020 e-mail

Page 91

to Mr. Duffy, as you directed, the USB flash drive.

Q. Did any of the four files that you have identified in the e-mail to Mr. Duffy contain all of the Signal messages that you retrieved from the Pable phone that were transferred to the SD temporary card and ultimately put down in the encrypted storage at Quest?

A. I'm sorry, could you ask your question again.

Q. Yes. You see that those four files that comprise the entirety of the flash drive that was delivered to Ms. Babbitt, correct?

A. Yes.

Q. Did any of those files contain the Signal messages that you identified on Mr. Pable's phone?

A. They did not contain the backups that were collected during my manual processing of Mr. Pable's phone. That is correct.

Q. Why?

A. I believe the images were performed prior to me doing the physical collection. I would have to look back and see.

They could have been around the same time. I would have to look back at all of the

Page 92

digital photographs to sequence this.

Q. I'm talking about the Signal messages you had transferred to the temporary SD card. You did not include those in any of the files on the flash drive to Ms. Babbitt in October?

A. They were not an image. I was directed to produce images. The image files that were successfully collected from the mobile phone. There were other materials that were not responsive to what I was being directed to produce.

Those two were not produced either, including photographs and other documentation chain of custody, evidence, acquisition work sheet. I was asked to produce images, and these are the images that I produced.

Q. Who directed you to do such a thing?

A. I was working at the direction of Mr. Duffy.

MR. KENNEDY: We'll take a short break, ten minutes.

MR. DUFFY: Before we go off the record, for the record, I believe you said Allison is with you. There are other people we have received come in the background.

Page 93

It's okay if you have paralegals or other people there, but we need to know for the record who is there.

MR. KENNEDY: Allison Czerniak is here, Nicollette Khuans is here, and one of my consulting experts is here.

MR. DUFFY: I didn't know that Nicollette was also with you. Who is the consulting expert?

MR. KENNEDY: That is a privileged identification at this stage. Nicollette's name appears on the participants' screen.

MR. DUFFY: That's fine. If we were doing this live, you wouldn't be able to have the person not reveal who they are present at the deposition.

MR. KENNEDY: We'll talk about it after the break. I'll talk about it with my team. I don't know how much I'd share, that that name is disclosed without prejudice and no waiver of rights I have with respect to the consultant privilege.

On that basis and stipulation to that effect, I don't think I have any problem with disclosing. Do you so stipulate?

MR. DUFFY: I thought you said you want to discuss it.

24 (Pages 90 - 93)

Page 94

MR. KENNEDY: I'm asking you in advance of that. I don't want to see a subpoena going out to my consultant, when he's a consultant.

MR. DUFFY: I'm not going to do that unless you designate him as an expert or something else weird happens.

I'm not going to take discovery of it because he's a consultant. I have a right to know who it is.

MR. KENNEDY: So so stipulated, correct?

MR. DUFFY: Yes.

MR. KENNEDY: Thank you. Let's go offline.

MR. DUFFY: I thought you -- are you just asking me that predicate and then you're going to discuss it?

MR. KENNEDY: The latter.

MR. DUFFY: Fine.

MR. KENNEDY: It's 12:03. We will be back at 12:15.

(Recess)

MR. KENNEDY: Also present during the deposition is CTA's consultant from For Discovery.

MR. DUFFY: All right. So I could know that, but not his name. Is that what you're telling me?

Page 95

MR. KENNEDY: Nate Prender (phonetic).

[REDACTED]

BY MR. KENNEDY:

Q. Mr. Jerger, let me draw your attention back to Exhibit 80 and specifically bates stamp page number P0013018.

A. Okay.

Q. I'm going to draw your attention to the paragraph below the box. The chart of four files, the one that begins with V.LX01, current Encase, close paren. Do you see that?

A. Yes.

Q. I want you to read that paragraph to yourself. Am I understanding the data that you provided to Ms. Babbitt in this flash drive to be the data that was successfully collected from two specific software tools, namely, Paraben and Encase?

A. Paraben is a company, not a software. But

Page 96

as indicated, there were images provided that had been collected using open text or software, Encase Forensic and Parabens 3E:DS.

Q. And the device is Device Seizure?

A. Yes, that is their original name for the product. Sometimes they still refer to it as DS, yes.

Q. And that is what you called it, right? You called it Encase and Device Seizure, the first sentence of that paragraph below the chart, right?

A. Right. If you notice up in the picture it says Paraben Device Seizure case. That is what Windows assigns based on the file extension, the .DS.

I was using that term based on what Windows has assigned to it, yes. It is currently E3:DS, former name Device Seizure.

Q. Let's apply what you have written in the four files above the first file. For lack of a better reference, we'll call it type. It says Encase logical evidence case file. Do you see that?

A. I do.

Q. And that is data that was successfully retrieved using the Encase software tool?

Page 97

A. Encase forensic, yes. As documented elsewhere in the photographs that you've been provided.

Q. So that is a yes?

A. That was created by Encase, yes.

Q. What software created file number two? It's typed C-h-e-c-k-s-u-m file.

A. So Windows utility, I believe that file was created by a Windows utility called Hash Check.

Q. What created file number three, type Parabens Device Seizure case?

A. That would be Paraben Corporation's E3:DS.

Q. The same question for number four, heading Checksum file?

A. Yes. The Checksum file, Shaw 256, I believe was also created by Hash Check, Windows utilities.

Q. And am I correct in concluding that the extent of the images that you provided in this flash drive to Ms. Babbitt were limited to those images that were successfully retrieved using this licensed software referenced in your e-mail?

A. Yes, I think that is a correct characterization. I think that the successfully is

25 (Pages 94 - 97)

Page 98

a relative term in some circumstances.

You'll see as documented, these were as I understood it to be the largest of those files that would have been collected.

Q. The point being the data that is on the flash drive is limited to the data that was retrieved only using these software tools, correct?

A. Yes, with the exception of the Shaw 256, those were generated post processing.

Q. So that is yes, with the exception of the Shaw 256?

A. Yes, the Checksum files. If I understand your correction, I have gotten confused what your question is, but I believe you're asking me are these files -- could you restate your question.

Q. The four files you sent in a flash drive to Ms. Babbitt on or about October 30, 2020 via Fed Ex contained data that was retrieved from Encase Device Seizure and Hash Check.

Would that be accurate?

A. Yes, I think so.

Q. And Mr. Duffy and I have been back and forth about imaging and what imaging means. And he's raised objections to the scope of some of my

Page 99

questions on the grounds that my questions are going beyond the scope of imaging.

What is your definition of imaging?

A. So depending on the context, there could be different interpretations of what the imaging would be.

And even for myself there be could different interpretations. In this context I understood that imaging was related to the tools, forensic tools and Encase and Paraben Corporation, both commercially available digital forensic tools, and they in the process of using them create what are generally termed image files or file. And those were produced here.

Q. Do you exclude from your definition of imaging data that you preserved using physical extractions like backing up the Signal application?

A. Including such things, yes. Including the data that was obtained from the cloud, that wouldn't have been represented on the phone because it was too much.

For example, let's say e-mails or Hangouts data. It could also include other such data as well.

Page 100

Q. Go ahead, sir.

A. Sorry. Where I was headed was it could also include things like the manual acquisition, the photographs that you've been provided of the screens of the captures because in many cases our clients request those as the product of processing.

And I don't think that would be included in my understanding of what imaging is.

Q. So when you accessed the Signal application, for example, and you transferred all of that data to a temporary SD card, and you transferred that data to a secure file at Quest, you did not consider that preservation of that data to be part of the imaging that you were tasked to do in this case, is that right?

A. To be clear, I don't think I was tasked to do the imaging that you're specifying. I was tasked, as I indicated at the onset, with providing the respondent's messages based on the date and time frame that I was provided, and the key words that I was provided.

So I did that through a number of different ways. One of which was through this process of doing some imaging that would be a normal

Page 101

process that we would attempt in this case we did as well.

Q. Let me ask you a different question. Did you in the course of your work on the Pable phone preserve a copy of all the data on the phone at any time?

A. I was never asked to do such.

Q. Did you do that?

A. Well, for example, I don't think like photographs, videos, those types of things that were on the phone, they were not part of the scope of what I was asked to do.

So in answer to your question, those things were certainly not collected.

Q. So I am going to ask you again. Did you preserve a copy of all of the data on Pable's phone at any time?

A. And I think I have answered that question.

Q. The answer to that question is no, correct?

A. I was not directed to do so. It was not part of the scope of my work, and I collected the information that I was being asked to collect.

Q. True or false, a complete image of the

26 (Pages 98 - 101)

Page 102

data on the phone when the phone was imagined has been provided?

A. I'm sorry, can you restate that.

Q. Yes. True or false, the following statement: A complete image of the data on the phone when the phone was imaged has been provided?

MR. DUFFY: If you can answer the question.

THE WITNESS: You used the word complete again, and we talked about that earlier, I believe.

That is a difficult interpretation because it's not a technical term that I would use. The contents of the phone that was provided by these tools I have presented and provided to you, which as I understood was responsive and as directed.

BY MR. KENNEDY:

Q. Let me ask you a different question because I'm still not getting an answer. The cell phone image was the complete data on the phone at the time it was imaged, true or false?

A. What cell phone image?

Q. The disk, the flash drive you delivered to Ms. Babbitt?

A. I have already specified that I was not directed to do images of the device. So I provided

Page 103

the image that was collected, but it did not contain photos, other things, in particular that I wasn't asked.

In part of the normal processing, these were the results of the tools that they provided back based on the Pable phone.

Q. Did you take any steps to verify that the data that you believed was preserved by Encase and DS was, in fact, transmitted to the flash drive you provided to Ms. Babbitt and Mr. Jados?

A. I'm not sure if I understand what you're asking me.

Q. What I'm asking you is -- let me put it into context. You delivered a flash drive to Ms. Babbitt on or about October 30 via Fed Ex, right?

A. Yes, I sent it via Fed Ex.

Q. Now, a lot of stuff happened since that time that you were not involved with directly because it had to do with stuff going on in court.

I'll just fast forward to the Court ordered Mr. Pable's phone to be reimaged. And there was a substantial amount of more data found when the phone was reimaged by For Discovery than what you

Page 104

had produced.

Do you understand that as a general proposition?

A. I understand what you're telling me, I believe, yes.

Q. Do you have any explanation as to why the second imaging of the phone contained so much more data than the image you provided?

A. I don't because I haven't reviewed what data was collected from the phone during the imaging process.

And I don't know the procedures that were used. I don't know what image they're talking about, what tool set. There's too many pieces of information. I can't explain what the difference would be or why there might be a different size. I don't know.

Q. So I'm going to go back to my original question. True or false, we're talking about your cell phone, your flash drive you delivered to Ms. Babbitt.

The cell phone image is a complete image of the data on the phone when the phone was imaged, true or false?

Page 105

MR. DUFFY: Objection, asked and answered.

BY MR. KENNEDY:

Q. You may answer.

A. I think I have already answered that to the best of my ability. I want to make sure I'm accurate. So I will defer back to my previous answer.

Q. So you can't answer any better than you already have?

A. Either I don't understand what you're asking me or we're using different language, different words.

I don't understand the question that you're asking because I think I have already answered it to the best of my ability based on your question.

Q. Did you know that on October 30, 2020, Mr. Duffy made that representation to the CTA?

A. I'm sorry, made what representation?

Q. That the cell phone image is a complete image of the data on the phone when the phone was imaged?

A. Well, I mean if you are suggesting that this image was somehow altered after the fact of me

27 (Pages 102 - 105)

Page 106

doing the data collection, that didn't happen.

This is the image that was produced by the tools at the time I did the collection. If you are suggesting that somehow data was lost in the transfer, I would defer back to the communications that I think are in here referring to checking those hash values.

Shaw 256 can be used to verify whether the data was received as I sent it. So that can be done. It's listed there in the picture, and it's also in the text files the Shaw 256. I also as part of my normal processing after imaging create a hash file so that I know that those files wouldn't get changed.

So then I make them read only as they are depicted here, and I also take a hash of that file, a cryptographic hash so I could verify that nothing has changed after the point that I created that hash.

And my normal routine is to create the hash file contemporaneously with the actual images or shortly thereafter. So I am confident when I transferred the files to the flash drive I ran the hash to confirm the file that was provided, the LXO1

Page 107

and the DS files matched with what I received from the image.

And they were complete in the sense that they were the entire contents of the files created by those tools. No further processing had occurred on the LX01 or the dot DS that would have changed those to my understanding.

Q. Let's go back. You haven't answered the question. Were you aware that on October 31, 2020 Mr. Duffy made the representation that the cell phone image is, quote, "a complete image of the data on the phone when the phone was imaged. Nothing about the imaging process affected the completeness of the image."

Were you aware that Mr. Duffy said that? It's a yes or no question. It's not a filibuster.

MR. DUFFY: Objection to argument.

THE WITNESS: I don't know what you mean by filibuster. I am trying to answer your questions to the best of my ability.

BY MR. KENNEDY:

Q. Did you know that Mr. Duffy made that statement on October 31, 2020?

A. I don't recall if he shared that with me,

Page 108

and I don't recall if it was in some of the documents I may have read. I truly don't recall.

Q. Fair enough. But if I heard your last longer answer, you're telling us that you verified the completeness of the production of the data that was received via Encase and Device Seizures. Is that your testimony?

A. I think you're using this word, and I am not using that word. And for some reason the word completeness seems to be repetitively used.

And I am not using the word completeness because I don't know what you mean by that. I have answered regarding my understanding, but I mean the completeness of the image, as I've indicated, the files that I provided were the ones I believe had the most content of those images that were from these tools that were documented with the photographs that I have already provided to you.

And I was not asked to do images. I was asked to collect the messages that were within a date period or within key word searches from the phone and from other sources.

Q. Did anyone other than Mr. Duffy give you direction on what to do with Mr. Pable's phone?

Page 109

A. No. And I believe I answered that already. No one else. Mr. Duffy is our client, and we work at his direction.

Q. Did you extract data from the phone that was not provided on the flash drive to Ms. Babbitt and Mr. Jados on October 30, 2020?

A. I'm sorry, could you restate that.

Q. Did you extract data from Mr. Pable's phone that was not provided on the flash drive to Ms. Babbitt or Mr. Jados on October 30, 2020?

A. I was directed -- I believe I have answered that question perhaps multiple times, but I will clarify.

I was directed to provide images, forensic image files. I did so in October. That was the first or thereabouts was the first that I had been asked to produce image files.

Prior to that time I was working from other materials that I had collected from the phone. Those other materials were not requested in October, and I believe that I responded to what was being or what I was directed to provide.

So as I discussed, there were a number of other items that were not provided because they

28 (Pages 106 - 109)

Page 110

were not image files as I understood.

MR. KENNEDY: I'm going to be going in a new direction. I recommend a 45 minute lunch break and we will reconvene.

(Recess)

MR. KENNEDY: Back on the record. I have approximately 1:45 central time. We're back on the record.

We've had an opportunity to have an off the record conversation about three things really that bear on the continuation of the deposition from today to a date certain.

And I will generally characterize the circumstances and invite Mr. Duffy to correct me if I am incorrect. But in general as has been discovered during the course of today's deposition that Quest's production through Mr. Duffy of documents responsive to the subpoena have not been provided.

I consider it to be an inadvertent omission. I don't consider it to be an intentional omission or an abuse of the discovery process. Things like this happen. So Mr. Duffy is going to make arrangements to produce those documents to our office by the end

Page 111

of business tomorrow.

And as a consequence of the incomplete production of the documents, the parties have agreed to continue Mr. Jerger's deposition from today until next Tuesday, the 19th at 9:30 a.m. without objection and by agreement.

The parties as well as Mr. Jerger, who is a witness under subpoena and Quest, which is a company under subpoena, all agree that they would consider the subpoena to be in full force and effect to continue this compulsory discovery process and this deposition on October 19th and that the parties have also agreed to submit in a joint status report and by way of an agreed order the agreements made to date to enter and continue the deposition to accommodate the production of the missing documents.

Tim, do you agree with that characterization and Steve, do you also agree?

MR. DUFFY: Yes, that is accurate. So the record is clear, I appreciate your comments on it, John.

There was a folder of images that should have been included, and I thought was included in the bates number images that were provided to your

Page 112

office and provided to counsel. And unfortunately, we learned that that folder did not get processed correctly.

So that is what we'll be providing is some additional images.

MR. JADOS: John, responding to your question, I agree.

MR. KENNEDY: In addition, as to some substantive matters to clean up some housekeeping, two exhibits were marked and presented to the witness: Namely, Exhibit 80, which have been characterized as e-mails with counsel, and Exhibit 83, which is the Quest Consultants International evidence inventory and related documents.

And the plaintiff has stipulated both to Exhibit 80 and Exhibit 83 constitute business records as an exception to the hearsay rule, thereby avoiding the need to lay a foundation with this witness and take up deposition time doing so. So stipulated?

MR. DUFFY: Agreed. It just occurred to me that some of those documents contain hearsay from other people, and we're not waiving double hearsay,

Page 113

but they are business records.

MR. KENNEDY: So so stipulated?

MR. DUFFY: Yes.

MR. KENNEDY: Steve?

MR. JADOS: Yes. If I need to sure, yes.

MR. KENNEDY: Yes. And I just note for the record that hearsay baked into a business record is admissible in any event. But we don't have to have that discussion now.

So by agreement we will enter and continue today's deposition to Tuesday October 19 at 9:30. All parties are in agreement. An agreed order to be prepared and entered reflecting also in the status report and the subject documents to be produced by Mr. Duffy's office by the end of business tomorrow. Fair enough?

MR. DUFFY: I apologize to everybody as to the inconvenience.

MR. KENNEDY: Stuff happens. Have a good day, everyone. Thank you.

29 (Pages 110 - 113)

Page 114

STATE OF ILLINOIS   )

) ss:

COUNTY OF C O O K   )

I, VICTORIA D. ROCKS, C.S.R., Notary Public, within and for the County of Cook, State of Illinois, a Certified Shorthand Reporter of said state, do hereby certify:

That previous the commencement of the examination of the witness, DANIEL JERGER, was first duly sworn to testify to the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me and was thereafter reduced to typewriting via computer-aided transcription under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was not waived;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of

Page 115

such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois this 14th day of October, 2021.

*Victoria Rocks*

VICTORIA D. ROCKS, C.S.R.
License No. 084-002692

Page 116

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 15, 2021

To: Mr. Duffy

Case Name: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
Veritext Reference Number: 4840301
Witness:  Daniel Jerger     Deposition Date:  10/12/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 117

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4840301
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
DATE OF DEPOSITION: 10/12/2021
WITNESS' NAME: Daniel Jerger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____     _____
Date              Daniel Jerger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

30 (Pages 114 - 117)

Page 118

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4840301
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices, Ltd.
DATE OF DEPOSITION: 10/12/2021
WITNESS' NAME: Daniel Jerger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____    _____
Date            Daniel Jerger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 119

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 4840301
PAGE/LINE(S) /     CHANGE     /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date            Daniel Jerger
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

31 (Pages 118 - 119)

**[& - able]**

### &

**&** 2:6

### 0

**002317** 15:22
**003041** 15:23
**084-002692** 115:9

### 1

**1** 2:13 58:1,11,19
**10** 3:7 67:24 72:24
**10/12/2021** 116:9
 117:3 118:3
**100** 31:20,23
**10:00** 1:22
**10:28** 60:1
**10:29** 60:1,1 69:15
 72:14
**10:30** 55:17
**10:32** 69:13,15
 70:12
**11** 55:17 58:17
 69:13 70:12,16,20
 70:23 79:3
**1100** 116:1
**111** 2:8
**113** 3:5
**11th** 83:18
**12** 70:5,13,17 79:3
 85:1 86:1,6
**1234007** 72:19
**12754** 115:8
**12:00** 72:20 74:7
**12:03** 94:18
**12:05** 72:21
**12:12** 72:24
**12:15** 94:19
**12th** 1:23 83:19
**14th** 115:6
**15** 3:8 116:4
**1820** 116:2

### 2

**19** 1:5 11:8 113:11
**1969** 6:1
**1994** 6:21
**1996** 5:22 6:23
**19th** 111:5,12
**1:45** 110:7
**1o** 60:21

### 2

**2** 58:1,11
**2.5** 73:1
**20** 117:16 118:22
 119:22
**20.2.** 73:1
**2003** 5:23 7:2,7
**2018** 47:2,5,8,9
 76:9 79:16 82:8
 82:10,11
**2019** 5:9,12 8:12
 8:15 46:23 47:5
 76:8 79:15 82:9
**2020** 9:15 17:22
 55:17 58:17 69:13
 70:5 85:1 86:1,16
 86:22 87:4,7
 88:16,21 89:4,6
 90:4,6,13,15,24
 98:17 105:17
 107:9,23 109:6,10
**2021** 1:23 115:6
 116:4
**202122** 57:17
 58:19
**216-523-1313**
 116:3
**2317** 15:13,16
 36:23
**256** 97:15 98:8,11
 106:8,11
**2800** 2:8
**29** 60:21

### 3

**3** 58:1,11
**30** 87:4 88:16,21
 89:4 90:15,24
 98:17 103:15
 105:17 109:6,10
**300** 30:20
**3037** 53:21 54:15
**3038** 54:1,16 55:23
 58:12
**3039** 55:6,11 58:13
 59:1 61:8 69:10
 85:21
**3040** 55:13 71:6
 72:7
**3041** 15:16 36:23
 54:1,16 55:16
**31** 107:9,23
**340** 59:14
**3815** 2:13
**3902** 59:12
**3e** 96:3

### 4

**4** 3:5 58:2,11
**44114** 116:2
**45** 110:3
**4840301** 116:8
 117:2 118:2 119:2

### 5

**5,000** 29:9 32:12
**52** 3:8 6:1,2,3

### 6

**60093** 2:3
**60174** 2:14
**60601** 2:8
**630** 59:11
**676** 59:12

### 7

**700** 17:6
**725** 2:3
**78** 3:8 14:20 15:5
 15:12 17:6 24:3
 36:22 39:1,3,6
 53:24 54:3
**7868** 1:5 11:8
**79** 3:7 10:9,23
 11:5,11 19:15,17
 19:18 24:1 40:8

### 8

**80** 3:9 87:9,11,13
 87:17 88:1,2
 95:11 112:11,17
**83** 3:8 53:8,12
 54:4,5,8,15,19
 55:19,24 56:14
 57:5 58:14 59:1
 61:7 69:11 71:6
 85:21 112:13,17
**86** 3:9
**8:45** 70:6,13 86:1

### 9

**9-13-21** 12:19
**94** 7:6
**9:30** 111:5 113:11

### a

**a.d.** 1:23
**a.m.** 1:22 55:17
 60:1,1 69:13,15
 72:14 111:5
**ability** 66:17 105:5
 105:15 107:20
**able** 29:13 32:15
 64:8,13,14,17,21
 65:2,15 71:22
 78:5,9,13,20,23
 93:13

**abuse** 110:22
**abusive** 66:11
**access** 16:9 33:18
    34:5 52:8,16
    63:10 64:3,3,13,14
    64:18,20 65:14
    72:2 78:2 79:12
**accessed** 28:8
    100:9
**accessing** 26:8
**accommodate**
    111:16
**accomplished** 42:8
**account** 86:24
**accounting** 35:11
**accounts** 35:12
**accurate** 9:24
    18:24 20:24 23:12
    32:4,6 52:14,17
    70:9 98:20 105:6
    111:19
**acknowledge**
    117:11 118:16
**acquire** 45:15,17
**acquisition** 46:10
    55:14 69:22 70:2
    71:11,16 74:18
    84:21 92:13 100:3
**act** 117:14 118:20
**action** 11:7 115:3
**actions** 9:2 42:6
**activities** 4:24 8:8
    21:23 42:17
**activity** 28:23
**actual** 42:16
    106:21
**addition** 28:12
    76:10 112:8
**additional** 28:6
    112:5

**address** 62:1,16
    116:16
**addresses** 51:22
**administrative**
    35:22
**admissible** 113:8
**advance** 94:1
**advised** 9:22 23:2
    24:21 25:2 37:6
    62:23 72:16
**aerospace** 6:19 7:5
    7:14,20
**affix** 115:5
**affixed** 117:15
    118:21
**ago** 20:16 22:24
    24:20 38:17 44:20
**agree** 17:12 81:11
    111:9,17,18 112:7
**agreed** 36:19
    80:24 83:6,11
    111:3,13,14
    112:22 113:12
**agreement** 81:15
    111:6 113:10,12
**agreements**
    111:14
**ahead** 42:4 100:1
**aided** 114:16
**airplane** 60:20,22
    61:1 62:8,21 64:2
    64:5 72:15
**airplanes** 7:21
**allison** 92:22 93:4
**allow** 33:18
**allowed** 79:24
**allows** 74:19
**alter** 16:3 68:10
**altered** 47:1
    105:24

**amount** 31:7
    103:23
**android** 73:4
**angeles** 6:14
**answer** 7:12 25:4
    29:12,13 30:8
    32:16 34:20 35:1
    39:8 41:15,19
    48:11 50:22 62:9
    66:5,10 67:3,10
    68:17,20 69:2
    80:2 81:21 90:11
    90:18 101:13,19
    102:7,17 105:3,7,8
    107:19 108:4
**answered** 40:19
    101:18 105:1,4,15
    107:8 108:13
    109:1,12
**answering** 66:12
**answers** 84:1
**anybody** 79:18
**anymore** 33:11
**anyway** 67:22
**ap** 60:5,19 61:1
**apologize** 60:22
    80:19 113:17
**app** 65:11,15 73:4
    73:8,14,18,20 74:5
    74:18 75:1,5,10
    77:6,8,15 79:4
**apparently** 33:11
**appear** 33:5 55:16
    117:11 118:15
**appearances** 2:1
**appeared** 2:5,10
    2:15 26:22
**appears** 12:24
    33:4 45:3 93:11
**appended** 118:11
    118:18

**application** 99:17
    100:10
**applied** 35:3 82:17
**apply** 45:23 82:23
    96:18
**appreciate** 111:20
**appropriate** 42:19
    65:11 82:23
**approved** 40:18
**approximately**
    69:12,15 70:6
    72:14 74:7 110:7
**apps** 72:23
**area** 32:15 35:7,9
**areas** 60:12 62:13
**argument** 107:17
**argumentative**
    42:3 90:9
**arose** 22:11
**arranged** 21:3
    26:16
**arrangements**
    110:23
**aside** 17:4
**asked** 26:1 40:3,19
    41:20 42:13 46:4
    46:6,18 62:21
    86:18 88:22 90:20
    92:14 101:7,12,23
    103:3 105:1
    108:19,20 109:17
**asking** 15:20
    24:14 32:1,1 35:2
    45:4 48:22 49:14
    50:12 64:17,19
    66:21 67:4 81:23
    81:24 84:3 94:1
    94:14 98:14
    103:12,13 105:11
    105:14

**assertion** 13:23
**assessment** 19:4
  31:19 32:2
**assigned** 36:11
  57:16 96:16
**assignment** 117:2
  118:2 119:2
**assigns** 96:13
**assistance** 5:17
**assume** 18:10
**assumes** 81:14
**attached** 12:19
  19:16 20:2 39:18
  40:15 118:7
**attachments** 22:3
**attempt** 43:1
  45:10,12 73:7
  101:1
**attention** 10:7
  11:13 12:2 14:16
  55:1 58:13,16
  87:23 95:10,14
**attorney** 13:20
  25:14 57:20 68:16
  114:24 115:1
**attorneys** 12:14
  28:14 40:11
**authority** 1:6,9
  11:9 116:6 117:3
  118:3
**authorize** 118:11
**authorized** 40:9
  80:2
**available** 35:8
  45:14 46:8 50:18
  99:11
**ave** 116:1
**avoid** 73:3
**avoiding** 112:19
**aware** 19:24 107:9
  107:15

**b**

**babbitt** 87:2 88:13
  91:12 92:5 95:21
  97:20 98:17
  102:22 103:10,15
  104:21 109:5,10
**back** 27:21 33:7
  34:12,21,24 42:21
  47:9 52:12,21
  68:19 74:6,19
  75:10 80:20 82:8
  82:10 84:22 86:18
  89:6 91:22,24
  94:18 95:11 98:22
  103:6 104:18
  105:6 106:5 107:8
  110:6,7 116:16
**backed** 75:13,13
  75:16 76:2,15
  77:1
**background** 30:2
  92:24
**backing** 74:3,15
  99:17
**backup** 73:8,8,14
  73:15,18,19 74:2
  74:22 75:9 76:10
  76:12,23 78:19
**backups** 91:16
**baked** 113:7
**balance** 53:24
**based** 23:1,7 26:14
  26:15 27:4 28:10
  37:13 38:2 40:3
  60:16 70:10 79:9
  96:13,15 100:19
  103:6 105:15
**basically** 33:14
**basis** 14:7 18:3,16
  18:18 80:5,15,24
  93:20

**bates** 15:3,13,22
  16:3 36:23 87:12
  95:11 111:24
**battery** 60:2 62:24
  67:13 72:17
**bear** 43:14 77:14
  85:10,20 87:8
  110:11
**bears** 54:9
**began** 72:20 74:6
**beginning** 9:14
  72:10
**begins** 36:8 53:20
  95:16
**behalf** 2:5,10,15
  21:21
**behold** 77:15
**believe** 5:23 6:21
  9:14 13:10,14
  14:9 19:21 20:4
  21:10 22:18 28:14
  29:11,17 35:6
  36:13 39:20 40:2
  40:6,6 47:21 49:5
  50:9,11 51:15,21
  51:22 52:1,2 60:1
  60:6 61:21,22
  69:8,16 74:12
  78:15,22 87:6
  89:23,24 91:20
  92:22 97:8,16
  98:14 102:9 104:5
  108:15 109:1,11
  109:21
**believed** 49:12
  103:8
**beneath** 55:10
  60:17 61:3,8
**best** 19:4 25:4,22
  32:2 105:5,15
  107:20

**better** 82:10 96:20
  105:8
**beyond** 30:1 40:17
  68:17 99:2
**bicycling** 19:10
**big** 10:17 16:10
  34:9
**bit** 12:21 21:11,11
**boiler** 41:1
**bold** 11:14
**born** 6:1
**boss** 88:7
**bottom** 53:15
  69:10 72:7 73:10
  87:13
**box** 12:3 55:7,10
  60:18 61:9,10
  63:1 70:4 95:15
**break** 16:23 17:5
  17:15 39:4,5
  55:22 92:19 93:16
  110:3
**brief** 20:8 62:20
**briefly** 87:21
**bring** 85:10
**broad** 36:16
**broadest** 85:17
**broadly** 40:24
**broke** 12:21 61:5
**broken** 16:14
**bulk** 72:1
**business** 111:1
  112:17 113:1,7,15

**c**

**c** 72:24 97:7,7
  114:3
**c.s.r.** 114:5 115:9
**ca** 116:24
**cable** 72:17
**califoria** 6:18

**california** 6:14
**call** 7:24 58:13
  96:20
**called** 1:17 4:12
  8:6 56:12 82:9
  96:8,9 97:9
**calling** 10:5
**calls** 41:13
**capacity** 5:22 6:24
  18:22 25:16
**captures** 26:21
  75:22 79:10 100:5
**carbon** 24:24
**card** 60:2 62:24
  63:2,6,14,16,22
  64:1,2,6,10,19
  65:3,20 66:8,16,23
  67:1,7,11,17,18,23
  67:24 68:1,5,7
  69:1 73:9,15,19
  74:2,4,15,23 75:2
  75:6 76:15,20,21
  77:1,10,18,20 91:6
  92:3 100:11
**card's** 63:13
**cards** 72:16
**care** 23:3 38:13
**carrier** 63:8
**case** 4:4 9:16 10:5
  18:11 19:12 21:18
  22:19 24:1 30:13
  31:10 36:1,11,11
  37:3 40:2,24 43:8
  56:20,22,24 57:12
  57:16,23 58:11,19
  60:20 61:1 71:23
  76:23 79:1 96:12
  96:21 97:11
  100:15 101:1
  116:6 117:3 118:3

**cases** 31:9 60:24
  77:23,24 100:5
**categories** 23:24
  37:17
**cc** 88:6
**celebrate** 18:20
**cell** 8:19 12:15
  40:12 64:7 102:17
  102:20 104:20,22
  105:20 107:10
**cellular** 64:13 68:9
**central** 110:7
**certain** 9:2 16:8
  26:9,10 46:16
  82:14 89:5 110:12
**certainly** 62:7,13
  101:14
**certificate** 118:11
**certification** 117:1
  118:1
**certified** 114:7
**certify** 24:15 25:6
  114:8
**cetera** 44:10
**chain** 15:8 51:14
  51:15 52:2,4 53:5
  53:7 55:11 69:10
  69:11 70:10 77:6
  85:18,20 92:12
**change** 51:11
  116:14,15 118:8
  119:3
**changed** 5:11
  106:14,18 107:6
**changes** 116:13
  117:7 118:7,9
**characterization**
  97:24 111:17
**characterize** 18:5
  110:13

**characterized**
  112:12
**characterizing**
  84:17
**characters** 72:23
**charge** 30:10
  35:14
**charged** 25:10
  30:15
**charging** 30:13
**charles** 2:14
**chart** 95:15 96:10
**check** 38:11 97:9
  97:16 98:19
**checking** 106:6
**checkmark** 12:3
**checks** 36:2
**checksum** 97:14
  97:15 98:12
**chicago** 1:6,9 2:8
  4:4 11:8 115:5
  116:6 117:3 118:3
**chose** 7:19 64:9
**chris** 26:13 33:24
  57:13,24 61:14
**christopher** 1:3,13
  11:8 12:14 116:6
  117:3 118:3
**circle** 2:3
**circumstance**
  60:24
**circumstances**
  27:10 44:11,13
  65:2,9,18 68:14
  98:1 110:14
**civil** 1:19 11:7
  117:5 118:5
**clarification** 60:19
**clarified** 24:23
**clarify** 43:21
  48:22 54:2 65:4

  109:13
**clarifying** 44:6
**clean** 72:23 82:5
  112:9
**clear** 23:18 57:9
  68:23 69:3 74:5
  78:15 79:14 82:2
  82:16 100:16
  111:20
**clearer** 81:9
**cleveland** 116:2
**clever** 1:7 2:16
  11:9 116:7 117:3
  118:3
**client** 5:6 9:3,4
  13:20 28:21 36:19
  41:3 57:19 67:17
  71:23 109:2
**clients** 21:21 29:1
  100:5
**close** 95:17
**closed** 28:22
**closer** 43:20
**cloud** 26:14 27:3
  38:1 99:19
**collect** 26:17 43:2
  44:12,14,15 45:10
  45:12 46:6,15,18
  101:23 108:20
**collected** 4:22,22
  23:6 26:18 27:3
  47:5 56:21 57:2
  58:7,11 85:5
  91:17 92:8 95:22
  96:2 98:4 101:14
  101:22 103:1
  104:10 109:19
**collecting** 13:2
  43:8
**collection** 38:6
  46:10 52:11 74:18

[collection - correct] Page 5

91:21 106:1,3
**college** 6:9,13,20
7:6
**come** 19:11 43:19
92:23
**comfortable** 52:22
**coming** 12:11
19:24
**commanded** 11:14
12:1
**commands** 12:12
**commencement**
114:9
**commencing** 1:22
**comments** 111:20
**commercially**
99:11
**commission**
117:19 118:25
119:25
**common** 18:21
44:5
**communicate** 44:7
**communicated**
47:18 49:20
**communication**
31:17
**communications**
23:3 26:9 31:3
37:6 43:9 46:20
83:3 85:4 106:5
**community** 6:7
**company** 95:24
111:8
**compel** 68:20
**compensation**
36:18
**complaining** 84:1
**complaint** 22:4
**complete** 16:5
17:13 42:12,22

43:12,16,21 44:2
54:21 57:7,10
84:16 101:24
102:5,8,18 104:22
105:20 107:3,11
**completed** 57:4,6
62:14,14 116:16
**completeness**
59:20 107:13
108:5,10,11,14
**compliance** 12:8
**comprise** 91:11
**compulsory**
111:11
**computational** 7:9
7:10
**computer** 18:3
49:23 114:16
**computers** 7:11
**concerning** 114:11
**concerns** 67:14
**conclude** 28:2,20
70:10 80:16,24
**concluded** 28:18
84:23,24 86:3
**concluding** 97:18
**conduct** 13:7
**conducted** 12:16
**confidence** 50:5
**confident** 106:22
**confidential** 73:9
95:7
**configured** 60:16
**confirm** 59:13,24
106:24
**conflict** 36:2
**confused** 98:13
**confusing** 81:4
83:24
**connect** 64:8 68:9

**connected** 65:14
72:24
**connection** 60:3
61:5 62:24 67:13
72:17
**connectivity** 64:10
**consent** 52:7 60:18
61:9 62:18
**consenting** 61:13
61:20
**consequence**
111:2
**consider** 18:8,9,17
28:17 29:4 100:13
110:20,21 111:9
**considers** 57:19
**constitute** 15:23
112:17
**constitutes** 17:10
17:10 54:19
114:17
**consultant** 18:3,6
93:19 94:3,3,8,22
**consultants** 5:6,8
11:18 55:2 112:13
**consulting** 93:5,8
**contain** 63:15 91:3
91:14,16 95:4
103:1 112:23
**contained** 51:9
58:24 74:24 75:4
98:18 104:7
**containing** 88:12
**contemporaneou...**
106:21
**content** 74:24 75:4
75:11 108:16
**contents** 102:12
107:4
**contested** 79:1

**context** 21:22
22:12 57:21 64:15
64:16 83:17 99:4
99:8 103:14
**continuation**
110:11
**continue** 111:4,11
111:15 113:10
**conversation** 21:8
23:7 110:10
**conversations**
66:2
**convey** 43:15 66:7
**conveyed** 49:3
**cook** 1:21 114:6
**copied** 24:24
76:22 77:24
**copy** 39:21 50:1
101:5,16
**corner** 53:16
54:14 57:14 87:13
**corporation** 99:10
**corporation's**
97:12
**correct** 8:7,16 9:1
9:18 11:19 23:10
24:5,13 33:22
38:14,15 39:2,11
39:19 40:1 45:18
46:2,3 48:21 49:4
49:7,20,23 50:19
50:23 51:4 54:9
54:17,20,23 55:17
56:3 57:14,17,17
65:14 66:18 69:16
69:23,24 70:17,18
70:23 71:2,9,12
75:8 77:21 78:3,7
78:10,14,21 79:1
82:15 88:8 89:6,9
90:2 91:12,18

**[correct - depends]**

94:10 97:18,23
98:7 101:20
110:14
**corrected** 47:1
79:15
**correction** 98:13
**corrections** 116:13
118:17
**correctly** 8:23
41:1 45:22 47:4,9
61:2 69:12 70:5
112:3
**counsel** 3:9 28:1
28:13 73:10 87:1
87:1 88:3,20,23,23
90:6,15 112:1,12
114:24 115:1
**count** 31:1
**counter** 1:11,14
19:12
**counterclaim** 4:6
**counting** 31:1
**counts** 50:16
**county** 1:21 114:3
114:6 117:10
118:15
**course** 34:6 62:14
67:24 68:12 69:4
101:4 110:16
**court** 1:1 4:8
19:17,19,22,23
20:2,12 23:1 37:9
37:14 40:8 68:18
68:19,20 70:9
103:20,21 117:7
**court's** 12:19
40:18 41:17 48:1
**courts** 1:20 21:20
**cover** 54:8,11,22
54:24 56:12 88:3
89:7

**covid** 62:11
**create** 73:8,15,18
99:12 106:12,20
**created** 27:23 97:5
97:6,9,10,16
106:18 107:4
**creates** 74:21
**criteria** 27:5,9
**cryptographic**
106:17
**csr** 1:20
**cta** 2:10 4:5,5 10:9
11:5 13:16,23
14:20 78:24 79:18
79:22 80:16,24
81:11 83:6,9,10
90:7,16 105:18
**cta's** 94:22
**current** 95:16
**currently** 96:16
**custody** 15:9
22:14 46:23 47:10
51:11,14,15 52:2,4
53:5,7 55:11
69:10,12 70:10,11
76:9 77:7 82:18
85:18,21 86:11
92:13
**cv** 1:5 11:8
**cycling** 19:10
**czerniak** 93:4

**d**

**d** 1:20 3:1 4:9
114:5 115:9
**dan** 10:20 14:10
16:6 23:13 25:18
69:18
**daniel** 1:16 3:3 4:9
4:11 114:10 116:9
117:4,9 118:4,13
119:20

**data** 13:2,8 27:6,9
27:14,15,23 28:7,7
37:23 43:2 45:18
45:24 50:15 58:6
60:12 63:14,17
68:3,10 76:22
83:1,20 86:13
90:5,14 95:20,22
96:23 98:5,6,18
99:16,19,23,24
100:11,12,13
101:5,16 102:1,5
102:18 103:8,23
104:8,10,23
105:21 106:1,4,9
107:11 108:5
109:4,8
**database** 44:9
77:2,3
**date** 26:9 27:5,9
28:11 29:6 30:22
41:21 46:15,21,23
47:1,6,17 57:11
58:16 71:24 72:3
76:6,8,11 78:6
79:2,5,7,13 82:19
82:22 85:5,14
86:4,15 100:19
108:21 110:12
111:15 116:9
117:3,9,19 118:3
118:13,25 119:20
119:25
**dated** 55:17 87:3
88:16
**dates** 43:17 47:3
50:12
**day** 1:23 85:3
113:19 115:6
117:16 118:22
119:22

**days** 116:19
**deal** 16:22
**dealing** 4:24
**deals** 29:23
**dear** 116:10
**decision** 37:11
42:19
**decryption** 78:18
**dedicated** 77:22
77:23
**deed** 117:14
118:20
**deemed** 13:19
116:20
**defendant** 1:14
2:10,15 19:12
**defendants** 1:8,17
**defending** 9:23
**defer** 105:6 106:5
**define** 63:18
**defined** 40:24 41:5
64:24
**definitely** 67:15
**definition** 99:3,15
**degree** 6:17 7:4,5
7:9,17,18 50:4
**delete** 50:2
**deliver** 90:23
**delivered** 51:18
90:15 91:12
102:21 103:14
104:20
**delivers** 68:1
**department** 35:11
35:14 116:22
**depending** 8:20
27:10 45:19 56:22
60:13 65:17 99:4
**depends** 7:17,17
64:24

**[depicted - drawing]**

**depicted** 74:12 75:20 106:16
**deposition** 1:16 17:17 19:24 20:6 21:1 22:13 24:8 24:12 28:16 33:19 34:7 52:21 80:7 93:14 94:22 110:11,16 111:4 111:12,15 112:20 113:11 114:13,19 114:22 116:9,12 117:1,3 118:1,3
**derivative** 58:9
**describe** 33:1 35:18 75:18
**described** 27:15 31:21 42:1 83:21
**description** 55:7 58:21 59:5,17,20 60:17 61:3,8 62:8 63:1 67:6
**designate** 94:5
**designating** 95:7
**detail** 89:11,12
**detailed** 88:12
**determine** 38:23 39:24 78:6,23 80:1
**determined** 39:9 48:4 49:9
**developed** 90:5,14
**device** 60:14 64:12 68:9,10 96:4,4,9 96:12,17 97:11 98:19 102:24 108:6
**devices** 1:7 2:16 7:21 11:9 43:2 116:7 117:3 118:3

**dfv** 73:1
**difference** 104:15
**different** 28:6 44:1 44:2,11,12,12,13 48:17 60:15,15 65:9 66:23 74:14 76:19 85:5 99:5,8 100:23 101:3 102:16 104:16 105:11,12
**difficult** 102:10
**digital** 5:16 8:9,11 8:17 26:7,19 27:1 31:4,6,18 43:5,22 43:23 44:1,13 45:11 46:9 56:21 63:14 68:6 74:8 74:10,12 92:1 99:11
**digitally** 43:5
**diligent** 12:7 13:7
**dinner** 18:12
**direct** 3:5 4:15
**directed** 11:17 24:21 25:12 38:12 39:4 40:9 41:7 43:10 47:12 49:19 50:20,22 51:2,3 62:1 78:4 82:21 86:19 87:22 90:3 90:22 91:1 92:6 92:10,16 101:21 102:14,24 109:11 109:14,22
**directing** 48:3
**direction** 26:16 27:17 28:24 41:3 41:8 42:7 49:1 73:10 88:11 92:17 108:24 109:3 110:3 114:17

**directly** 42:8 103:19 115:2
**disable** 73:7,14
**disabled** 73:17
**disabling** 73:2
**discipline** 7:15
**disclosed** 93:17
**disclosing** 93:21
**discovered** 110:16
**discovery** 13:20 65:23 66:12 94:7 94:22 103:24 110:22 111:11
**discrete** 16:15
**discuss** 93:24 94:15
**discussed** 21:7 24:19 37:19,21 42:15 45:9 46:17 85:19 109:23
**discussion** 4:21 20:9 24:20 38:17 113:9
**discussions** 22:23 42:6 44:18 45:5 68:24
**disk** 102:21
**district** 1:1,1,19
**division** 1:2
**document** 3:8 13:18,21 15:11 36:22 41:20 43:4 43:7 46:6,15 51:16 54:15 56:14 56:19 57:12 61:7 67:12,15 71:8,14 75:24 82:20 84:24 85:21
**documentation** 23:5 71:21 92:12

**documented** 26:2 26:19,20,24 52:2 53:4 62:19 63:1 67:18 74:10 76:7 78:16 85:18 86:5 97:1 98:2 108:17
**documenting** 26:8 67:8 68:13
**documents** 9:18 10:5 11:6 12:12 13:3,8,12,15,24 14:6,9,18,22 15:10 15:22 16:15 17:7 17:9 19:16 21:4 21:20 22:6 24:11 34:5 36:24 37:12 37:14,17 38:2,5 40:10 48:5 51:15 53:7,23 54:13,16 55:20 56:6 66:1 95:3 108:2 110:18 110:24 111:3,16 112:15,23 113:14
**doing** 8:23 26:23 28:24 29:24 78:5 91:21 93:12 100:24 106:1 112:20
**dot** 107:6
**double** 72:19,19 73:2,3,4,6 112:24
**doubt** 62:3
**download** 15:19 16:7,24 17:6,15 39:4
**draw** 10:7 11:13 12:2 14:16 29:19 58:16 87:23 95:10 95:14
**drawing** 55:1

**[drawn - everybody]** Page 8

**drawn** 32:12
34:17
**drive** 2:8 7:20 78:1
88:11,20 89:5,13
89:16,17,18,20,21
91:1,11 92:5
95:21 97:20 98:6
98:16 102:21
103:9,14 104:20
106:23 109:5,9
**drives** 28:14 76:23
77:4,22,23 78:1
89:8
**drop** 33:24
**ds** 96:3,6,14,17
97:12 103:9 107:1
107:6
**duffy** 2:2,2 5:4
8:22 9:3,10,22
10:12,15,17,24
13:5,12 14:9 15:1
15:7,21 16:2,20
17:19 18:7 19:3,5
20:9,17,23 21:9
22:21 23:2,11,16
24:20,23 25:10,13
26:16 27:17,19,24
28:3,12,18,19
29:21 30:2 33:4,6
33:9,17,21,23 34:9
34:16 35:1 37:4
37:21 38:12,16,18
39:2,13 40:4,19
41:10,11,13 42:1,2
42:16 44:21 47:6
48:7,12 49:9,10,15
49:21,24 51:2,5
53:9 57:20 65:22
66:9 68:23 69:5
71:4 79:11,20
80:7,8,12,18 81:3

81:14 82:9,22
83:9,10,23 84:5
85:4 88:6,8 89:1,2
90:8,17,22 91:1,3
92:18,21 93:7,12
93:23 94:4,11,13
94:17,23 95:2
98:22 102:7 105:1
105:18 107:10,15
107:17,22 108:23
109:2 110:14,17
110:23 111:19
112:22 113:3,17
116:5
**duffy's** 14:18
37:10 38:12 39:23
113:15
**duly** 4:12 114:11
**duties** 8:18
**dynamics** 7:10,10

**e**

**e** 2:8,13 3:1 4:9,10
4:10 22:1,7,11
23:3,4,9,12,13,17
23:19,23 24:16,22
24:24 25:1,2,6,7
25:15 31:4,17
37:5,19 38:11,13
38:14,18,21 39:7,8
39:9,14,19,22 40:4
46:19 47:19,20,22
48:18,19,22,24
49:7,8,10,19,22
50:2,8,10,14,18
59:22,23 64:11,14
64:18,20 87:24
88:3,6,8,16 89:1
89:10,11 90:24
91:3 97:7,22
99:22 112:12

**e3** 73:1 96:17
97:12
**earlier** 10:17 95:3
102:9
**early** 84:24
**easier** 16:16
**eastern** 1:2
**effect** 82:11 93:20
111:10
**efforts** 26:3
**egnyte** 15:17
**either** 40:5 59:11
70:16 92:11
105:10
**elaborated** 31:17
65:10
**electronic** 55:14
64:12 71:11
**elmhurst** 6:7
**email** 49:4 88:12
88:20,24 116:17
**emails** 3:9 48:3
49:18 50:5,10
**employee** 114:23
114:24
**employer** 5:3,5
11:18
**enable** 73:7,14
**enabled** 65:13
73:17
**enabling** 73:2
**encase** 73:1 95:16
95:23 96:2,9,21,24
97:1,5 98:18
99:10 103:8 108:6
**enclosed** 116:12
**encrypted** 73:8,15
73:19 74:22 77:4
77:20 78:1,11
91:7

**encryption** 78:15
78:18
**ends** 87:13
**enforcement**
51:13
**engaged** 9:9,11
18:16 26:6,6
44:17 45:5
**engagement** 8:20
22:5 25:24 28:3
28:17 29:4,7
30:18,22 31:2,8,13
31:21 33:2 35:5
35:20,20,24 36:5,6
36:8,10,12,14,21
37:1,2 39:16,23
40:22 41:2,5,7
42:14
**engagements** 46:2
**engineer** 7:14
**engineering** 6:19
7:4,5
**enter** 111:15
113:10
**entered** 113:13
118:9
**entire** 17:10 44:9
44:18 107:4 117:5
118:5
**entirety** 91:11
**entitled** 30:2 55:2
55:13 71:11 80:8
**errata** 116:14,19
118:7,10,18 119:1
**error** 73:4
**essentially** 34:19
**estimate** 32:3
**et** 44:10
**event** 67:16 113:8
**everybody** 113:17

**[evidence - forensic]** Page 9

**evidence** 3:8 55:3
  56:14,18,20,21,22
  57:4,6,7,10 58:4
  76:23 77:2 92:13
  96:21 112:14
**evidentiary** 55:24
**ex** 98:18 103:15,17
**exactly** 29:23
  41:17 82:6
**exam** 26:23 69:22
  70:3
**examination** 1:17
  3:5 4:15 85:11
  114:10
**examined** 4:13
**examiner** 8:10,11
  8:18 72:15
**example** 13:18
  14:13 38:4 62:6
  65:8 76:1 86:20
  99:22 100:10
  101:9
**exception** 59:10
  61:21 98:8,10
  112:18
**exclude** 99:15
**executed** 118:10
**execution** 117:14
  118:19
**executive** 32:19,21
  32:23
**exed** 28:13
**exhausted** 29:10
**exhaustive** 89:17
  89:22
**exhibit** 3:7,8,8,9
  10:9,13,14,18 11:5
  11:11 12:20 14:17
  14:20 15:5,11,12
  15:18 16:9 17:6
  19:15,17,18 20:3

24:1,3 34:10
  36:22 39:1,3,6
  40:8,15 53:8,12,24
  54:3,5,8,15,19,21
  55:19,23,24,24
  56:14 57:5 58:14
  59:1 61:7 69:11
  71:6 85:21 87:9
  87:11,13,17 88:1,2
  95:11 112:11,13
  112:17,17
**exhibits** 3:6
  112:10
**exist** 50:5,6
**exists** 39:17
**experience** 45:15
**expert** 93:8 94:5
**experts** 93:6
**expiration** 117:19
  118:25 119:25
**explain** 104:15
**explanation** 104:6
**express** 88:13
**extension** 96:13
**extent** 41:4,13
  97:19
**extract** 109:4,8
**extraction** 43:19
**extractions** 99:17

**f**

**fact** 24:11,17
  50:10 68:6 80:4
  103:9 105:24
**facts** 81:19
**fair** 25:8,9 31:1
  33:14 34:18 82:11
  84:10 108:3
  113:16
**false** 48:8 101:24
  102:4,19 104:19
  104:24

**familiarize** 87:18
**far** 39:12 42:15
  83:24
**fast** 103:21
**faster** 16:9
**fbi** 51:12
**feature** 73:18
  74:19,21 75:14
**features** 63:11,19
**fed** 28:13 98:17
  103:15,17
**federal** 1:18 88:13
**feel** 52:22 67:5
**file** 16:7,10,12
  32:14 77:20 96:13
  96:19,21 97:6,7,8
  97:10,14,15 99:13
  100:12 106:13,17
  106:21,24
**filed** 4:5,5 21:20
**files** 24:22 27:18
  37:20 44:10,14,15
  89:12,19,20,23
  91:2,10,14 92:4,7
  95:15 96:19 98:3
  98:12,15,16 99:13
  106:11,13,23
  107:1,4 108:15
  109:15,17 110:1
**filibuster** 107:16
  107:19
**fill** 58:24 71:22
**filled** 61:24 62:3,4
**filtering** 28:10
**final** 28:2
**finally** 90:6
**find** 34:11 37:1
  73:21 77:9 116:12
**fine** 16:22 25:20
  33:12 34:3 93:12
  94:17

**firm** 8:22 13:6
  32:8
**firms** 22:19
**first** 4:12 9:9,11
  17:21 18:10 19:7
  48:17 53:21 56:13
  87:24 88:14 96:9
  96:19 109:16,16
  114:10
**five** 17:24 18:23
  53:20 54:22 55:23
**flash** 28:14 88:11
  88:20 89:4,8,12,16
  89:17,18,20,21
  91:1,11 92:4
  95:21 97:19 98:6
  98:16 102:21
  103:9,14 104:20
  106:23 109:5,9
**flip** 16:8
**flipped** 16:2
**flossi** 32:24
**flow** 17:16
**fluid** 7:10
**folder** 111:22
  112:2
**follow** 51:14
**following** 12:1
  51:11 53:16 89:19
  102:4
**follows** 4:14
**footer** 73:11
**force** 59:23 111:10
**foregoing** 114:13
  117:13 118:18
**forensic** 5:16,19
  7:24 8:7,9,11,17
  8:19 26:7 42:12
  42:22,22,24 43:6
  43:12,19,22,23
  44:1,4,8 45:10,11

**[forensic - hours]**

45:12 68:6 73:1 80:17 81:12 96:3 97:1 99:10,11 109:15

**forensics** 26:19
**forest** 2:3
**forestalling** 34:4
**forgive** 85:7
**form** 61:2,24 65:7 71:22 85:18
**former** 51:12 96:17
**forth** 36:14,18 98:23
**forward** 16:1 25:22 42:20 82:13 84:12,13 103:21 116:16
**found** 103:23
**foundation** 12:11 14:21 42:3 79:20 80:18 81:4 83:23 90:8 112:19
**founders** 51:12
**four** 53:18 54:16 59:14 89:23 91:2 91:10 95:15 96:19 97:13 98:16
**frame** 9:6 19:2 22:2,10 28:5 43:10 47:2 82:15 85:16 100:20
**frames** 28:6
**free** 117:14 118:20
**frequently** 45:10 60:13
**friend** 18:8,9,17 18:19
**front** 9:13 11:4 53:13,19 54:1 56:16 58:12 75:15

85:22 87:10,15
**full** 4:7,8 5:23 7:1 7:7 111:10
**fully** 7:13 62:9
**functioning** 67:14
**funny** 6:2
**further** 57:3 62:19 74:23 79:8 86:9 86:12 89:12 107:5
**furtherance** 13:12 21:1
**fwks** 72:24

**g**

**g** 4:10
**gather** 66:22,24
**general** 32:18 67:23 104:2 110:15
**generally** 88:10 99:13 110:13
**generated** 12:18 40:13 45:18,24 98:9
**george** 1:3,13 11:8 116:6 117:3 118:3
**getting** 21:22 43:20 66:1 76:17 89:3 102:17
**gigabytes** 27:7 37:24
**gist** 35:2
**give** 9:6 19:4 32:2 53:9 108:23
**given** 65:12 81:18 114:18
**gives** 63:10
**go** 6:6 7:20 10:13 14:12 17:5 18:12 25:11 33:1,10 34:21,24 42:4,21 55:6,13 68:2,19

71:6 82:10 84:12 92:21 94:12 100:1 104:18 107:8
**goes** 15:16 89:11
**going** 9:5 10:12 12:9 16:8 17:5 23:8 27:22 34:24 42:21 66:9,10 67:20,21,22 68:21 80:5,12,23 82:6 83:17 84:11,12,12 87:18,23 94:2,4,7 94:14 95:14 99:1 101:15 103:20 104:18 110:2,2,23
**good** 4:2 17:2 113:19
**gotten** 98:13
**graduate** 6:11,13 6:20
**graduated** 7:6
**grounds** 13:16,23 14:3,11 68:17 99:1
**group** 19:6,8,9,10
**guess** 31:24 32:1

**h**

**h** 97:7
**half** 47:5 82:11
**hand** 53:15 57:14 59:15 115:5
**handles** 35:12
**hands** 39:23
**handwriting** 59:6 59:8,9,11,18
**handwritten** 55:16 72:6
**hangouts** 99:23
**happen** 106:1 110:23

**happened** 29:18 103:18
**happens** 94:6 113:19
**happy** 33:15
**hard** 77:23
**hash** 97:9,16 98:19 106:7,12,16,17,19 106:21,24
**head** 47:16 76:5
**headed** 100:2
**header** 62:5 71:23
**heading** 11:14 53:22 55:2 56:9 97:13
**hear** 33:16 34:1 38:10 45:21
**heard** 33:13 34:16 34:20 35:1 39:7 108:3
**hearsay** 112:18,23 112:24 113:7
**heck** 76:20
**help** 73:12
**helps** 25:13,20
**hereto** 12:20 115:2
**hereunto** 115:4
**high** 6:6,7
**hit** 50:16
**hold** 33:6
**hollister** 2:6
**home** 18:12 51:20
**homework** 38:11
**honest** 81:23
**hope** 18:10
**horizontal** 61:17
**hour** 21:10 30:20
**hourly** 29:20 30:10,17,19 31:13
**hours** 20:21 29:17 30:21 31:20,23

**[housekeeping - involved]** Page 11

**housekeeping** 95:2 112:9
**hundreds** 14:23
**hyphen** 72:24
**hypothetically** 64:17

**i**

**ideally** 36:1 76:1
**identification** 63:3 63:4 93:10
**identified** 14:1 15:6 28:12 79:12 91:3,15
**identifies** 12:13
**identify** 24:3 32:20 37:17 40:10 55:19 63:8
**ignorance** 43:15
**ignorant** 67:21
**illinois** 1:1,22 2:3 2:8,14 6:8 114:1,7 115:6
**image** 30:1 42:12 42:22 43:12,16,22 43:24 44:8 45:10 45:13,16 46:5 48:3 80:17 92:6,7 99:13 101:24 102:5,18,20 103:1 104:8,13,22,22 105:20,21,24 106:2 107:2,11,11 107:14 108:14 109:15,17 110:1
**imaged** 102:6,19 104:23 105:22 107:12
**images** 8:19 14:13 22:18 23:18 28:12 38:4,8 43:2 44:1,3 48:5 66:22,24

86:21 89:5 91:20 92:7,14,14 96:1 97:19,20 102:24 106:21 108:16,19 109:14 111:22,24 112:5
**imagine** 39:13 75:15
**imagined** 102:1
**imaging** 12:15,18 22:17 30:6,6 39:14 40:12,14 41:14,16,24 42:14 42:24 44:18 45:6 45:9 48:1 66:3 68:3,8,11 81:1,12 81:15 83:15,20 84:1,2,4,5,16,17 84:19 85:8 98:23 98:23 99:2,3,5,9 99:16 100:8,14,17 100:24 104:7,10 106:12 107:13
**immortalized** 74:9
**impact** 68:2,14
**implies** 81:17
**imply** 72:13
**important** 67:5
**inaccessibility** 73:3
**inadvertent** 110:20
**include** 8:9,18 14:22 26:8,11 45:20 92:4 99:23 100:3
**included** 7:9 12:22 25:1 38:22 40:5 49:10 50:15 89:7 89:12,16,19,21,24 100:7 111:23,23

116:14
**includes** 57:9 59:22
**including** 14:3,7 26:14 43:7 59:21 92:12 99:18,18
**incomplete** 111:2
**inconvenience** 113:18
**incorporated** 118:12
**incorrect** 110:15
**indicated** 40:23 89:8,9 90:24 96:1 100:18 108:14
**indicates** 41:2 61:13
**indicating** 116:14
**indication** 60:5,7
**indirectly** 115:2
**individual** 7:17
**information** 8:5 11:6 12:2 13:8 26:11 27:3,7 35:8 37:24 44:12 46:19 49:3 51:9 58:24 62:20 66:8 71:23 71:23,24 74:11 77:24 101:23 104:15
**informed** 42:11,17
**initial** 22:4,5 50:13 69:22 70:2 71:16
**initially** 20:15 29:9 32:13 46:22 47:5
**initials** 52:10 69:19
**initiation** 30:22
**inspection** 11:7

**instances** 13:18
**instructed** 42:21
**instructing** 41:15
**instructions** 12:13 40:10 41:14,16
**instrumental** 52:21
**intended** 89:15
**intentional** 110:21
**interaction** 62:20
**interest** 9:23 43:8
**interested** 115:2
**interests** 18:21
**interface** 15:17
**interfere** 17:16
**interference** 80:1
**interjected** 38:16
**internally** 72:18
**international** 5:7 11:18 55:3 112:14
**internet** 33:9,11
**interpretation** 102:10
**interpretations** 99:5,8
**interpreting** 69:11
**interrogatories** 4:13
**inventory** 3:8 55:3 56:15,18 57:4,6,7 57:11 58:5 112:14
**investigative** 5:18
**investigator** 5:16 5:20 8:1,7,9
**invite** 110:14
**invoice** 29:11,14 29:16 30:15
**invoiced** 30:6
**invoicing** 30:4
**involved** 4:23 5:22 7:18,19 8:6 19:6

22:19 25:15,18
36:5 42:6 103:19
**involving** 41:9
**issue** 60:23
**issued** 20:1 25:5
**issues** 33:10 79:1
**item** 55:7 57:2
59:5,17,20 60:17
61:3,8 62:9 67:6
**items** 27:21 38:6
43:8 58:9,21
88:12 109:24

**j**

**j** 4:10
**jados** 2:12 87:1
90:2 103:10 109:6
109:10 112:6
113:5
**japanese** 72:23
**jerger** 1:17 3:3 4:2
4:9,10,11 9:7
10:10 11:4 14:17
16:14 17:4 23:22
25:23 34:6,24
45:1 50:17 53:12
66:15 69:7,18
80:15 84:15 95:10
111:7 114:10
116:9 117:4,9
118:4,13 119:20
**jerger's** 111:4
**jkennedy** 2:9
**job** 5:11,14
**john** 2:7 4:3 10:22
29:21 53:10 80:12
80:12,12 111:21
112:6
**joint** 111:13
**judge** 17:12 24:15
75:15 82:6 84:11

**judgment** 37:13
40:15
**june** 9:15 17:22
55:17 58:17 67:24
69:13 70:5,12,13
70:16,17,20,23
79:3,3 83:18,19
85:1 86:1,6,9,16
86:22 89:6 90:4
90:13
**jury** 75:16

**k**

**k** 97:7 114:3
**keep** 20:21 58:12
**kennedy** 2:7 3:5
4:2,3,16 10:14,16
10:23 11:3 14:5
14:15 15:14,21
16:13 17:2,3
23:20,21 25:21
29:2,23 30:7 33:5
33:17 34:3,12,22
41:6,18 42:10
44:23 48:10,15,16
51:4,6 52:20 53:1
53:11 66:4,14
69:4,6,9 79:24
80:10,14,22 81:8
81:10,20 84:3,8,14
90:10,18,21 92:19
93:4,9,15 94:1,10
94:12,16,18,21
95:1,8,9 102:15
105:2 107:21
110:2,6 112:8
113:2,4,6,19
**kept** 42:16
**key** 26:10 27:5,10
41:21 46:16 50:11
50:12,15 71:15
78:16,18 79:9

82:23,24 100:20
108:21
**khuans** 2:7 52:20
93:5
**kind** 61:17
**knew** 81:24
**know** 5:21 10:16
10:24 13:24 14:4
15:1 16:14 17:13
17:20 18:1,5 19:1
19:7,11,14 21:7
24:2 25:15 28:20
30:21 31:12 35:10
39:5,12,12 40:22
43:11,13 47:3,15
50:21 61:19 62:7
63:18 67:2 75:12
76:5,21 79:18,21
79:22 80:2 81:18
81:23 82:6 93:2,7
93:17 94:8,23
104:12,13,17
105:17 106:13
107:18,22 108:12
**knowing** 25:14
**knowledge** 13:15
23:22 50:3 81:11
81:22 82:1 83:8
**known** 17:19
18:22 19:2,5
**knows** 24:15 80:1

**l**

**l** 4:9
**labeled** 59:1
**lack** 67:10 79:20
80:18 90:8 96:19
**lacked** 65:19 66:8
**lacks** 42:3 64:1,6
66:16,23 81:3
83:23

**lake** 2:3
**language** 105:11
**large** 14:17
**largest** 98:3
**law** 2:2 5:4 22:18
51:12
**lawyer** 17:8 40:20
40:21
**lawyers** 21:20
**lay** 112:19
**layperson's** 65:7
**lead** 5:16,19 7:24
8:7,9,11,17
**learned** 85:4 112:2
**left** 54:13 62:15
70:4
**legal** 116:1 119:1
**legitimate** 81:18
**leoni** 32:23
**letter** 35:24 36:6,6
36:10,12,14,21
37:1,2 39:16,23
40:22 41:2,5 87:3
87:6,7 88:23,24
89:7 116:20
**letting** 16:11
**license** 115:9
**licensed** 97:21
**limitation** 81:12
**limitations** 63:24
81:1
**limited** 5:7 11:9,19
27:4 55:3 97:20
98:6
**line** 73:13 116:14
118:7 119:3
**list** 47:14 89:17,18
89:22
**listed** 59:11
106:10 118:7,17

**[listing - multiple]** Page 13

**listing** 118:7
**little** 21:11,11
**live** 93:13
**lived** 51:22
**living** 57:12
**llp** 2:6
**lo** 77:15
**log** 69:12 70:10
**logical** 45:16 46:5
  96:21
**logically** 44:14
**logistics** 21:7
**logs** 31:7
**long** 5:19 17:19,20
  19:2,4 20:19 21:8
  33:16,23 51:7
  83:16 84:3,15
  85:12
**longer** 17:22,24
  18:23 86:11 108:4
**look** 15:2 16:11
  23:12 53:6,15
  56:13 59:12 86:18
  87:9 91:22,24
**looked** 22:1,7
  36:24
**looking** 10:22,23
  15:12 22:5 23:8
  54:20 82:14
**looks** 16:4
**loose** 72:17
**los** 6:14
**lose** 52:19
**lost** 33:4,9,18
  52:20 106:4
**lot** 16:9 103:18
**loud** 72:9
**lunch** 110:3
**lx01** 107:6
**lxo1** 106:24

**m**

**m** 97:7
**machine** 72:1
**madam** 116:10
**mail** 23:3 25:1,2
  37:5 39:19,22
  47:19 64:14,18,20
  87:24 88:6,8,16
  89:1,10,11 90:24
  91:3 97:22
**mails** 22:1,7,11
  23:4,9,12,13,17,19
  23:23 24:16,22,24
  25:6,7,15 31:4,17
  37:19 38:11,13,14
  38:18,21 39:7,8,9
  39:14 40:4 46:19
  47:20,22 48:18,19
  48:22,24 49:7,8,10
  49:19,22 50:2,8,10
  50:14,18 88:3
  99:22 112:12
**main** 2:13
**maintain** 30:24
  31:6 51:11 77:23
**maintained** 77:2
  77:20
**making** 8:18
**manager** 29:15
  35:15
**manual** 46:9 74:17
  91:17 100:3
**manually** 43:7,7
**marked** 11:10
  12:3 14:20 16:21
  19:17 60:18 61:10
  112:10
**match** 80:13
**matched** 107:1
**materials** 20:7,11
  20:14,16,19 21:12

  21:14 22:13,16,20
  28:11 38:3 40:10
  51:10 86:5 87:21
  92:9 109:19,20
**matter** 9:12 19:13
  28:3,21 33:2
  43:18 44:10 57:22
  86:17 95:2
**matters** 5:18
  112:9 114:12
**mean** 45:13 58:4
  60:4,11 65:4
  73:16 74:1 75:16
  105:23 107:18
  108:12,13
**meaning** 36:8
**means** 31:3,16
  43:11 98:23
**meant** 47:8 60:6
**mechanics** 30:4
  34:4
**mechanism** 63:7
**mechanisms** 64:11
**memory** 24:5
  63:15
**mentioned** 7:19
  24:19
**message** 33:24
  65:1 76:2,2,14
**messages** 41:21
  43:9 46:7 64:22
  64:24 65:3,5,6,8,8
  65:16,17 66:18
  74:20 75:10,13,17
  75:18,23 76:4,6,12
  76:24 77:9,11,16
  77:17,19 78:3,6,10
  78:21 79:4,11
  82:20 91:4,15
  92:2 100:19
  108:20

**messaging** 65:7
**met** 17:21 19:7
**middle** 69:17
**midwest** 116:17
  119:1
**mine** 53:20
**mining** 83:20
**minute** 10:21
  85:20 110:3
**minutes** 44:20
  92:20
**mischaracterizes**
  48:8
**misconstrues** 42:4
**missed** 6:3
**missing** 111:16
**mission** 42:8 46:14
  82:20
**mistake** 47:7
**mistaken** 88:22
**mixing** 84:6
**mobile** 21:24
  47:11 59:23 63:21
  71:17 92:8
**mode** 60:2,6,19,20
  60:22 61:1 62:8
  62:21 64:3,6
  72:15
**module** 63:3
**moment** 49:16
**morning** 4:2 21:6
  69:13 70:12 84:24
**moto** 59:22
**move** 15:24 25:22
  42:19 84:12
**moving** 54:24
  82:13
**multiple** 60:7,8,9
  109:12

**n**

**n** 3:1 4:9 73:8
**name** 4:3,7,8
35:16 36:1 61:14
62:12,12 93:10,17
94:24 96:5,17
116:6 117:3,4,15
118:3,4,21
**named** 36:1 40:23
**narrative** 26:4
**nate** 95:1
**nature** 18:3 29:24
40:16
**necessarily** 36:16
65:16 75:10
**need** 10:13 15:19
23:11 35:23 38:10
52:16 67:18 72:2
73:12 93:2 112:19
113:5
**needed** 36:9
**net** 45:23
**network** 63:9,10
64:3,13 68:9
**never** 34:19 71:4
79:18 101:7
**new** 10:19 87:21
110:2
**nicollette** 2:7
52:20 93:5,7
**nicollette's** 93:10
**nonresponsive**
39:10
**normal** 45:11
100:24 103:4
106:12,20
**northern** 1:1
**notarized** 116:15
**notary** 1:21 114:5
116:24 117:10,18
118:15,23 119:23

**note** 67:5 95:6
113:6 116:13
**noted** 69:16 80:6
**notes** 12:17 16:18
40:13 55:16 56:10
59:5 69:21 72:4,6
72:10 73:13,24
74:6
**notice** 1:18 96:11
**number** 7:16
10:21,23 11:5
14:20 15:12,13
17:6 19:15 24:1
27:18 50:8 53:8
54:9 55:24 57:1
58:19 59:10,13,14
59:21 61:8 62:6
71:20,24 95:4,12
97:6,10,13 100:22
109:23 111:24
116:8,14
**numbered** 54:16
**numbers** 16:4
53:16 118:7

**o**

**o** 114:3,3
**o'clock** 1:22 72:20
**oath** 24:15
**object** 58:6 66:9
80:5,8 84:8
**objection** 28:19
33:21 40:19 41:13
42:2 44:21 48:7
65:22 79:20 80:6
80:18 81:3,14
83:23 90:8,17
95:8 105:1 107:17
111:6
**objections** 98:24
**objects** 11:6

**obscuring** 73:5
**obtain** 43:2 46:4
**obtained** 38:1
99:19
**obviously** 34:10
65:24
**occasion** 52:15,17
53:3
**occurred** 29:18
71:16 107:5
112:22
**october** 1:23 87:4
88:16,21 89:4
90:6,15,23,24 92:5
98:17 103:15
105:17 107:9,23
109:6,10,15,20
111:12 113:11
115:6 116:4
**office** 2:2 5:4
14:18 29:15 35:15
38:12 84:22
110:24 112:1
113:15 115:5
**official** 117:15
118:21
**officially** 8:4
**offline** 94:12
**ohio** 116:2
**okay** 9:7,8 10:10
10:11,15 12:9
16:20 17:17,18
51:5 53:21 56:2
58:15 69:5 71:7
76:17 77:11,14
83:15 93:1 95:13
**old** 5:24 6:4
**omission** 110:20
110:21
**once** 4:2 20:24,24
27:15 36:10

**ones** 10:19 16:20
50:24 108:15
**ongoing** 28:24
86:17
**online** 27:8 38:1
83:1
**onset** 100:18
**open** 29:4 33:2
35:20 53:9 77:8
77:15 96:2
**opened** 10:17
**operating** 66:24
**operator** 64:20
**opportunity** 110:9
**opposed** 7:21
**oral** 4:13
**orchard** 2:3
**order** 12:19 19:17
19:19,22,23 20:2
20:12 23:2 37:9
37:14 41:17 43:6
45:15 48:2 62:10
65:23 66:11 82:19
111:14 113:12
**ordered** 68:18
103:22
**organization**
61:14
**orientation** 14:21
**original** 27:6 96:5
104:18
**originally** 38:22
**originating** 72:1
**outcome** 115:3
**outlined** 38:18
**outside** 29:21
65:22 66:3,11
81:22 82:1
**overnight** 33:10
**owned** 26:13

**[p - phone]**

| p | | | |
|---|---|---|---|
| **p** 15:13,16,16,22 15:23 60:2,2,4 | 101:16 103:22 108:24 109:8 | 100:14 101:11,22 103:4 106:11 | **phone** 4:22 8:24 8:24 9:1 12:15,19 |

**p** 15:13,16,16,22
15:23 60:2,2,4
**p.m.** 70:6,13 72:20
72:21,24 74:7
86:1
**p0013018** 95:12
**p003017** 87:13
**p003018** 88:1
**p003030** 87:14
**p003037** 53:20
54:9
**p003038** 53:17
55:1
**p003041** 53:17
**pable** 1:3,13 4:4,6
8:22 9:10 11:8
12:14 19:11 26:13
26:14,17 27:2
28:4,18 32:7,13
35:4,21 39:17
40:11,17 47:10
51:19 57:13,20,24
59:4 61:3,14
62:13 65:19 66:2
66:7 67:6,24 69:1
70:7,20,23 71:2,17
72:14,16,18 83:4
91:5 101:4 103:6
116:6 117:3 118:3
**pable's** 4:24 8:24
12:15 21:24 25:24
39:15 40:12 41:9
42:12,18,23 45:6
51:7 52:7,14 53:2
57:8,10 59:9
61:18 62:1 69:14
70:11 75:1,4 77:5
77:18 81:13 84:19
87:3 89:6 90:5,14
91:15,17 95:4

101:16 103:22
108:24 109:8
**package** 90:2
**packet** 14:22,24
17:10
**page** 3:6 15:9 16:3
53:21 54:8,11,22
54:24 55:1,6,22,22
55:23 56:11,12,13
71:6 87:17,24
88:2,3 95:11
116:14,16 118:7
119:3
**pages** 16:21 54:22
**paid** 29:6 32:5
33:15 34:19
**paper** 53:18
**paraben** 95:23,24
96:12 97:12 99:10
**paraben's** 73:1
**parabens** 96:3
97:11
**paragraph** 88:14
89:8 95:15,19
96:10
**paralegals** 93:1
**parameters** 9:6
49:1 80:17 82:8
83:21
**paren** 95:17
**parenthetical**
12:22
**parenthetically**
72:18,22
**parse** 14:12
**part** 8:17,18 10:8
22:4 23:15 38:6,6
39:18 42:24 43:4
45:9,11 57:5
58:13 59:2 69:11
74:17 75:13

100:14 101:11,22
103:4 106:11
118:9
**participants** 93:11
**participate** 33:18
**participating**
33:20 34:7
**particular** 36:11
46:15 57:2 103:2
**particularly** 62:11
**parties** 36:1,4
111:3,7,12 113:12
115:1
**partition** 60:23,24
**partitions** 60:8,10
**parts** 61:4
**passwords** 95:5
**payment** 30:4
**pdfs** 14:24 17:7
**people** 92:23 93:2
112:24
**perform** 8:8 9:2
**performed** 42:18
91:20
**period** 22:14 53:4
59:23 70:3 72:20
73:9 108:21
**periods** 70:15
**permission** 73:5
**permit** 11:7
**person** 5:20 52:19
57:22 61:13 70:19
70:22 71:1 93:13
**person's** 35:16
61:20
**personal** 12:15
18:17 40:12
114:16
**personally** 4:23
117:11 118:15

**phone** 4:22 8:24
8:24 9:1 12:15,19
21:24 22:15 26:1
26:1,12,17,18,19
26:20,22 27:2
30:1 33:12,20
34:8 39:15 40:12
40:14 41:9,12,24
42:7,12,18,23
43:12,16 44:9,15
44:16,18 45:6,15
45:16,18 46:1,5,7
46:8,8,22,24 47:11
48:1,4,6 50:14
51:7,17,18,19 52:5
52:8,12,14,16 53:3
57:8,10 59:10,13
59:14,21 60:8
62:2,6,17,17 63:4
63:7,8,21 64:1,5,7
64:11,19 65:12,19
66:1,8,23,24 67:6
67:8,15,16,23 68:1
68:3,5,15 69:14
70:6,12,16,19,22
71:1,4,17,19 72:2
72:3,4,5,15,17,21
72:22 74:20 75:1
75:5,21 76:9 77:5
77:18 79:12 80:17
81:2,13,15 82:18
83:2,7,12,16,18,20
83:20 84:16,19
85:6,9,24 86:3,8
86:10,11,13 87:3
89:6 90:5,14 91:5
91:15,18 92:8
95:4 99:20 101:4
101:5,11,16 102:1
102:1,6,6,12,18,18
102:20 103:6,22

**[phone - produced]**

103:24 104:7,10
104:20,22,23,23
105:20,21,21
107:11,12,12
108:22,24 109:4,9
109:19 116:3
**phone's** 41:20
**phones** 8:19 60:15
**phonetic** 95:1
**photograph** 76:14
**photographs**
14:23 26:21,22
27:1 31:4,18 43:5
74:8,10,12 75:21
75:21,23,23 76:7
77:10 78:16 79:4
84:23 85:14 92:1
92:12 97:2 100:4
101:10 108:18
**photography** 46:9
**photos** 17:7 103:2
**physical** 45:16
46:5 52:16 56:22
91:21 99:16
**physically** 44:15
**pick** 34:23 62:1,16
**picked** 51:19
**picture** 96:11
106:10
**pictures** 10:18
**pieces** 53:18
104:14
**pin** 72:19
**pins** 95:5
**place** 114:20
**placed** 72:14
**plaintiff** 1:4,11 2:5
19:12 112:16
**plate** 41:1
**pleadings** 21:17

**please** 32:20 35:18
53:21 70:1 72:12
80:6 116:12,12
**plural** 79:14
**point** 19:23 27:20
29:3,18 36:3
50:17 65:14 66:21
66:22 67:4 89:3
98:5 106:18
**portion** 32:7 62:4
**portions** 62:10
**possession** 21:24
22:14 23:23 24:16
48:19,21 51:8
52:15 53:2 70:16
**possibility** 45:8
68:8
**possible** 19:1 43:1
67:12
**possibly** 64:8
**post** 98:9
**postgraduate** 6:15
**potential** 67:14
**potentially** 38:3
60:8 65:10 68:10
**power** 33:10,10
**precedes** 61:22
**predicate** 48:9
81:4 94:14
**prefilled** 62:12
**prejudice** 93:18
**premise** 68:4
**premises** 11:7
**prender** 95:1
**prepare** 20:5
**prepared** 27:23
71:8 113:13
**preponderance**
13:13
**present** 5:9 8:12
8:14,15 26:12,20

62:22 72:15 83:2
93:14 94:21
**presentation**
69:22
**presented** 102:13
112:10
**preservation** 70:2
84:21 85:10
100:13
**preserve** 101:5,16
**preserved** 49:22
74:10 99:16 103:8
**president** 8:4
32:18,19,20,21,22
32:23
**presuming** 16:3
**previous** 105:6
114:9
**previously** 19:13
19:21 38:4
**primarily** 87:23
**primary** 71:15
**printed** 59:15
**prior** 22:24 42:13
91:20 109:18
**privilege** 13:20,24
14:3,8,11 93:19
**privileged** 13:22
73:9 93:9
**probably** 16:22
48:12 67:21 71:22
82:10
**problem** 93:21
**problems** 34:4
**procedure** 1:19
117:5 118:5
**procedures** 51:11
104:12
**proceed** 33:16,21
52:23 69:6

**proceeding** 52:22
**proceedings**
114:18
**process** 28:9 33:1
35:19 43:4,5
45:15,19 66:12
72:5 74:11 76:3
79:6 83:16 84:18
84:18,20 85:10,12
99:12 100:24
101:1 104:11
107:13 110:22
111:11
**processed** 26:18
57:3 58:7 86:7
112:2
**processes** 68:6
86:3
**processing** 23:6
27:6 38:7 42:16
42:17 43:1,7 45:9
45:11 50:13 57:8
68:15 71:15 72:20
74:6,23 75:24
78:12 82:18 86:10
86:12 87:3 91:17
98:9 100:6 103:4
106:12 107:5
**produce** 10:5 11:6
12:12 24:21,24
25:3 36:5 37:2,4
37:13,18 38:19
39:24 40:4,9
47:22 49:6,17,19
49:21 51:1 90:6
92:7,10,14 109:17
110:24
**produced** 12:8
13:11 14:10,18
15:10 21:4,13
22:18 24:1,6,7,12

**[produced - reason]**

24:18 25:5,7,17
27:18,22 28:13
29:12,14,16 34:10
37:20 38:4,9,21
39:2,11,13 49:12
50:19,20,21 51:10
74:13 79:10 92:11
92:15 99:14 104:1
106:2 113:14
**product** 96:6
100:6
**production** 3:8
12:4 13:16 14:2
16:5,19 17:11,13
20:8 21:2 22:21
22:24 25:19 28:11
108:5 110:17
111:3,16 116:16
116:17,22
**professional** 18:2
18:16,19
**professionally** 7:5
**program** 7:18,18
**project** 57:17
**projected** 75:21
**properties** 7:20
**proposition** 104:3
**protected** 13:19
**protocol** 35:19
83:6,11
**provide** 5:17 12:1
20:15 23:3 26:7
37:23 68:13
109:14,22
**provided** 9:1
14:10 20:8,17
23:2 24:3 27:8,18
27:24 28:1,8 32:8
32:13 35:4 36:4,7
37:21 38:1,7 41:8
47:6 51:15,21

52:11,12 56:24
67:9,19 68:5
72:19 75:22 76:8
76:12 78:17,19
79:13 82:17,19
95:21 96:1 97:3
97:19 100:4,20,21
102:2,6,12,13,24
103:5,10 104:8
106:24 108:15,18
109:5,9,24 110:19
111:24 112:1
**provider** 63:5
**providing** 25:10
26:8 100:18 112:4
**public** 1:21 114:6
117:10,18 118:15
118:23 119:23
**purporting** 40:21
**purpose** 63:6,13
63:16,19
**purposes** 34:5
60:16
**pursuant** 1:18,18
39:24 73:9
**put** 9:5 31:2,7,12
49:15 60:20,22
62:21 66:19 74:22
83:17 91:6 103:13

**q**

**quest** 3:8 5:6,8,15
5:18,22 6:22 7:1,7
8:13 9:17,23 10:5
11:18 12:12 13:4
13:5 14:1,19 15:6
15:10,24 17:11,14
19:16 20:2 21:12
24:7,11,16,18 25:5
25:5,15,16 26:6
28:16 29:7,8 32:4
32:6,12,13,17,22

33:2,14 35:3,8,19
36:19 37:3 38:13
39:9,17 40:9,9,18
44:8 45:5 47:23
48:18 49:1,7,14,17
49:23 50:5,18
51:18 55:2 56:6,9
56:14,19 57:16,19
69:18,19 70:11,15
77:2,20 78:2
86:14 87:1,2 91:7
100:12 111:8
112:13
**quest's** 9:23 12:15
23:23 30:19 32:18
40:11 57:8 110:17
**question** 6:4 7:9
13:17 24:9 27:13
29:12,13 30:8,9
32:11,16 33:6,13
33:15 34:12,14,16
34:20 35:1,3,18
42:2 43:22 45:2
48:14 54:6,7
55:21 61:6 62:9
66:6,13 67:20,21
68:17,21,24,24
70:21 71:5 74:14
74:14 75:3 79:24
80:4,6,23 81:3,7
81:14,17,18,21
82:3 90:12 91:8
97:13 98:14,15
101:3,13,18,19
102:7,16 104:19
105:13,16 107:9
107:16 109:12
112:6
**questioning** 34:6
**questions** 30:3
65:24 80:9 83:24

84:10 87:19 99:1
99:1 107:19
**quite** 74:1
**quote** 44:2 72:19
72:19 73:2,3,4,6
107:11

**r**

**r** 4:10,10
**raised** 98:24
**ran** 106:23
**range** 26:9 27:9
36:23 41:21 46:16
46:23 47:1,6 76:6
76:8,11 78:6 79:2
79:5,7 82:22 85:5
**ranges** 46:21
47:17 79:13 82:19
**rate** 29:20 30:11
30:17,19 36:18,20
**raw** 37:23
**read** 12:6,20,22
19:19,20,23 34:12
34:14 53:21 59:19
59:19 72:9 78:9
80:20 87:20 95:19
106:15 108:2
117:5,6,12 118:5,6
118:17
**reading** 59:18
61:2 69:21 70:5
114:21 116:20
**reads** 17:12
**ready** 24:8 69:6
87:19
**real** 11:21
**realized** 47:7
**really** 14:13
110:10
**reason** 6:5 50:7,9
69:21 108:9
116:15 118:8

119:3

**recall** 17:21 21:15
21:15,17 22:5,7,10
25:23 35:2 46:13
47:9 51:24 65:21
83:13,15 107:24
108:1,2

**receipt** 116:19

**receivables** 35:12

**received** 11:24
19:15,21,22 23:15
29:8 36:10 69:14
86:24 92:23 106:9
107:1 108:6

**recess** 33:8 94:20
110:5

**recollection** 88:19
90:19

**recommend** 110:3

**recommended**
68:7

**reconstruct** 31:15

**reconvene** 110:4

**record** 4:7 10:8
12:6 33:17 66:15
68:19 69:3 82:5
84:9 92:21,22
93:2 95:6 110:6,8
110:10 111:20
113:7,7 114:17
118:9

**records** 12:17
28:17 40:13 86:24
112:18 113:1

**reduced** 27:8
114:15

**reduction** 7:20

**refer** 96:6

**reference** 9:7 58:1
58:6 73:13 89:15
96:20 116:8 117:2

118:2

**referenced** 57:1
97:22 117:11
118:15

**references** 57:24
59:12

**referred** 22:17,17

**referring** 21:19
61:19 75:19 106:6

**refers** 71:20 75:12

**reflect** 52:5,7 53:7

**reflected** 71:18

**reflecting** 113:13

**reflects** 15:6 71:14
71:15

**reframe** 54:7

**refresh** 10:20
88:19

**regarding** 12:14
37:22 40:11 42:14
48:5 108:13

**regardless** 43:17
43:17,18 44:9

**register** 63:8

**reimaged** 103:22
103:24

**relate** 41:16

**related** 7:11,22
38:8,18 39:14
40:14 66:3 99:9
112:14

**relating** 12:18
57:1,8

**relationship** 18:4
18:6 29:3,24 30:3
40:17

**relative** 9:24 63:5
74:16 85:9 98:1
114:23,24

**relevancy** 47:24

**relevant** 23:4 25:1
43:9 49:12 68:11
83:3

**remember** 14:24
41:1 44:19,24
45:7 47:4 87:5

**remote** 1:16

**removed** 68:7

**removes** 67:24

**repeat** 90:12

**repeated** 28:9

**repetitively**
108:10

**rephrase** 81:8

**reply** 27:21

**report** 32:17
111:13 113:14

**reported** 114:14

**reportedly** 26:12

**reporter** 114:7
117:7

**reporting** 88:10

**reports** 12:17
40:13

**represent** 4:3
25:13

**representation**
14:6 105:18,19
107:10

**representative**
89:18

**represented** 99:20

**representing** 9:23

**request** 39:20 73:5
100:6 118:9,11

**requested** 9:2 13:9
20:12 50:16
109:20

**requesting** 48:2

**requests** 28:6

**require** 78:11

**required** 27:9
36:12 60:18 61:10
73:2 116:24

**requires** 35:19
52:9

**reserve** 68:21

**respect** 7:21 22:24
23:4 28:10 37:9
38:11 39:8 41:24
50:14 66:17 83:3
93:19

**responded** 35:6
109:21

**respondent** 27:21
79:5,13

**respondent's**
100:19

**responding** 37:7
112:6

**response** 13:13
14:19 15:24 21:13
22:21 24:7,12
25:4 37:3 49:7,18
73:6

**responsibilities**
5:11,14

**responsible** 13:2

**responsive** 13:3,8
13:19,21 14:1,14
15:6 20:12 23:9
23:24 24:17 25:3
25:6,7,16 37:9,14
38:13,24 46:20
48:4 92:9 102:14
110:18

**rest** 17:16 59:15

**restarted** 72:22

**restate** 24:9 48:14
66:6 75:3 98:15
102:3 109:7

**[restrict - shares]** Page 19

**restrict** 79:9
**restricted** 27:4 79:8
**result** 45:23
**results** 26:2 87:2 103:5
**retained** 32:7
**retainer** 29:8,10 29:19 30:14,16 32:7,13 34:18,19 35:4
**retrieve** 45:24
**retrieved** 27:14,16 62:17 70:19,22 86:13 89:5 91:4 96:24 97:21 98:7 98:18
**return** 15:14 52:12 67:16
**returned** 52:5 70:6 71:1,4 83:19 86:1,7 116:19
**returning** 27:2
**reveal** 93:14
**review** 20:14,19 21:13 24:11 27:20 49:9 84:18 116:13 117:1 118:1
**reviewed** 10:4 20:7,11,15 22:13 22:16 23:5 24:2,6 27:4 39:1,3 72:3 104:9
**reviewing** 21:16 21:17
**revisited** 85:2
**right** 5:1 7:24 8:2 12:20 20:3 36:8 38:10 43:14 53:15 54:20 56:1,10,11 57:14,21 58:17

59:18 67:1 68:21 69:22 87:13 88:7 88:17 94:8,23 96:8,10,11 100:15 103:16
**rights** 93:18
**road** 34:4
**robert** 32:22
**rocks** 1:20 114:5 115:9
**role** 5:23 8:8,12
**routine** 106:20
**rule** 112:18
**rules** 1:18 117:5 118:5

**s**

**s** 4:9,9,11 97:7 116:16 118:8,8 119:3
**salawus.com** 2:14
**sam** 4:10
**satellites** 7:22
**save** 62:11
**saw** 10:17 11:21 11:23 82:23
**saying** 86:2
**says** 12:3 34:2 41:17 54:13 55:11 59:18 61:4 70:2 82:9 89:19 96:12 96:20
**scanned** 53:23 54:13 55:20
**school** 6:6,7
**scope** 20:1,2 21:23 25:23 29:21 30:1 36:15 40:7,16,17 40:24 41:4 65:23 66:3,11 68:18 82:1 98:24 99:2 101:11,22

**scrawl** 61:18
**screen** 10:9 16:12 26:21 75:22 79:10 93:11
**screens** 100:4
**scrolled** 87:22
**sd** 60:2 62:23 63:13,16 67:10 72:16 73:8,15,19 74:2,4,15,22 75:2 75:6 76:15,20,21 77:1,10,18,19 91:5 92:3 100:11
**seal** 115:5 117:15 118:21
**search** 12:7 13:7 43:17 47:12,13,14 47:15,17,18 49:1,2 49:2 79:6,19 82:15,16 83:6,12
**searches** 27:5 28:10 37:22 43:18 108:21
**second** 39:7 53:9 87:8 88:2 104:7
**secure** 100:12
**secured** 63:14 77:4
**sedulski** 32:23 88:7
**see** 10:10,21,24 11:2,10,14,17 12:4 12:5,24 46:7 55:4 55:7,11 58:2,22,23 60:18,20 61:4,9,11 61:14 84:11,23 85:15 86:18 88:4 88:13 89:13 91:10 91:22 94:2 95:17 96:21 98:2

**seeking** 48:5
**seen** 11:22 23:1
**seizure** 96:4,9,12 96:17 97:11 98:19
**seizures** 108:6
**selections** 16:21
**send** 23:17 64:22 65:3,6,15 66:17 88:24
**sending** 88:8
**sense** 85:17 107:3
**sensitive** 60:3 62:24 72:18
**sensitivity** 67:13
**sent** 14:14,14 23:13,18 49:11 61:4 65:11 86:21 87:1 88:11,20,23 89:2 90:1 98:16 103:17 106:9
**sentence** 96:10
**sequence** 92:1
**served** 8:12 9:16 9:17
**service** 29:1 63:5
**services** 26:7,14 30:19 36:9 38:2
**set** 12:10 16:15,18 17:14 27:9,23 28:2,7 36:14,18 39:7 75:14 104:14 115:4
**sets** 37:23 50:15
**settings** 26:24 73:5
**share** 10:9,12,13 10:14 15:11,12,18 16:10 93:17
**shared** 38:19 107:24
**shares** 62:20

**[shaw - stuff]**

**shaw** 97:15 98:8 98:11 106:8,11
**sheet** 36:20 55:13 60:21 92:13 116:14 118:7,10 118:18 119:1
**sheets** 31:6
**short** 92:19
**shorthand** 114:7
**shortly** 79:10 106:22
**shouting** 80:13
**show** 53:6 76:1
**shown** 116:16
**shows** 71:19 85:24
**shut** 72:21
**side** 13:23
**sidelines** 49:15
**signal** 65:7 73:7,14 73:18,20 74:5,16 74:17,18 75:1,5,9 75:13 76:10,12,14 76:22,24 77:6,8,15 77:16,17,19 78:2,6 78:9 79:4 91:4,14 92:2 99:17 100:9
**signature** 52:9,10 61:18,20,23 69:17 69:18 115:8 116:15
**signed** 35:24 36:7 36:8 39:21 62:12 117:13 118:18
**signing** 114:21 116:20
**signs** 62:17
**sim** 60:2 62:23 63:2,6,21 64:1,2,6 64:10,11,12,19 65:3,20 66:8,16,23 67:1,7,17,18,23,24

68:1,5,7 69:1 72:16
**similarly** 67:13 90:1
**simultaneously** 36:2
**sincerely** 116:21
**single** 76:14
**sir** 9:20 38:15 41:19 66:5 84:8 87:10 90:11 100:1 116:10
**sit** 23:22
**size** 16:12 104:16
**sjados** 2:14
**slash** 60:2,4 61:14 72:17,18,23 73:2,7 73:14
**slow** 16:24
**small** 14:23
**smart** 16:6
**smiling** 6:5
**smithamundsen** 2:12
**sms** 65:8
**snooker** 82:4
**socially** 18:14
**software** 95:23,24 96:2,24 97:6,22 98:7
**solely** 84:19
**solutions** 116:1 119:1
**somebody** 9:10
**soon** 84:22
**sorry** 5:6 8:14 24:9 32:10 33:9 54:2,4,5 55:20 60:19 64:15 66:6 70:21 75:3 91:8 100:2 102:3

105:19 109:7
**sources** 26:13 27:3 27:8 38:1 83:1,1 108:22
**space** 7:22
**specific** 5:21 18:20 19:2 26:21 41:7 42:7 47:3 51:10 66:1 73:23 95:23
**specifically** 17:20 20:22 45:7 46:4 74:11 95:11
**specifics** 9:13 36:17 46:14
**specified** 83:13 102:23 114:20
**specifying** 100:17
**speculate** 31:22
**spell** 4:8
**spend** 18:14
**spent** 30:6 31:19
**spoke** 20:23,24 21:2,5,6
**squared** 59:23
**ss** 114:2
**st** 2:14
**stage** 93:10
**stamp** 15:3,13 87:12 95:11
**stamped** 15:22 31:5,18 36:23 53:17 85:15
**standpoint** 44:5 75:8
**start** 34:23 61:7 77:14
**started** 6:22 7:1,6 84:22
**starts** 15:13
**state** 1:21 4:7 114:1,6,8 117:10

118:15
**stated** 42:5 46:12
**statement** 10:1 25:8,9 52:18 54:8 102:5 107:23 117:13,14 118:19 118:19
**states** 1:1,19 61:9
**status** 111:13 113:13
**stays** 33:23
**stenographically** 114:14
**step** 23:11 74:6 80:7
**steps** 25:18 26:24 35:22 74:9 103:7
**stettinius** 2:6
**steve** 111:18 113:4
**steven** 2:12
**stipulate** 15:22 76:11 93:22
**stipulated** 17:8 42:9 46:6 79:2,17 79:18,23 80:16,20 94:10 112:16,21 113:2
**stipulation** 93:20
**stop** 34:1
**storage** 63:15 76:23 77:22,23 91:7
**store** 63:16
**stored** 60:13 77:4 86:14
**street** 2:13
**strike** 32:5
**studies** 6:15
**stuff** 85:11 103:18 103:20 113:19

**[subject - think]** Page 21

subject 43:18 44:10 49:17 56:24 57:13,20,21,22,23 113:14

submit 29:17 87:6 111:13

submitted 15:1 57:11

subpoena 3:7 9:17 9:17,24 10:4,8 11:5,10,17,21 12:9 12:12 13:3,9,13 14:2,19 15:7,24 19:16,18,20,22 20:1,3,13 21:13 22:22 23:1,9,24 24:7,17 25:5,17 29:22 37:3,10,15 38:14 39:10 40:1 40:3,7,8,18 48:5 49:7,13,18 94:2 110:18 111:8,9,10

subpoenaed 4:18 28:15,16

subscribed 117:10 118:14 119:21

subscriber 63:4

subsequent 27:2 50:13

subset 47:6

subsets 16:16

substantial 103:23

substantive 112:9

successfully 92:8 95:22 96:23 97:21 97:24

sue 35:17

suggested 20:23 25:11 45:8

suggesting 40:21 50:6 105:23 106:4

suite 2:8,13 116:2

sunday 21:5,8

superior 116:1

suppose 63:11 78:8 86:20

supposed 79:22

sure 7:8,12,23 12:7 15:3,5 16:17 17:11 21:19 27:12 30:24 34:11 48:15 56:20 66:20 67:4 67:18 73:22 74:1 74:5 81:6 82:2,5 103:11 105:5 113:5

sworn 4:1,13 114:11 117:10,13 118:14,18 119:21

symbol 72:13

system 4:4 49:23 60:12

**t**

t 58:1,1,1,2,11,11 58:11,11,19

table 12:10

taft 2:6 88:13

taftlaw.com 2:9

tag 57:1 58:4,19 71:24

tags 58:1

take 11:22 15:2 16:23 17:5 23:3 38:13 53:6,15 56:13 61:18 79:4 84:15 85:12 87:9 92:19 94:7 103:7 106:16 112:20

taken 1:20 39:5 64:5 114:19

takes 10:21

talk 9:4 93:15,16

talked 65:17 84:5 84:6 102:9

talking 15:4 79:21 84:2 85:8 92:2 104:13,19

task 26:15 41:8 43:16 44:8

tasked 8:22 100:14,16,18

tasks 28:2 31:20

tduffy 2:4

tduffylaw.com 2:4

team 52:21 93:16

technical 5:17 75:8 102:11

techniques 43:6

technology 8:5

telephone 4:24

tell 5:14 9:9 20:5 24:14 25:22 26:4 41:11 45:4 56:18 67:21 70:1 71:14 71:18 75:16 78:13 78:20 83:10

telling 56:4 94:24 104:4 108:4

tells 15:18 28:21

temp 73:8,15 74:2

temporarily 73:17

temporary 73:13 73:19 74:4,15,22 75:2,6 76:15,20,21 77:1,9,18,19 91:6 92:3 100:11

ten 44:20 92:19

term 43:13 44:4 64:23 77:3 96:15 98:1 102:11

termed 75:11 99:13

terming 65:15

terminology 75:7

terms 34:3 36:16 43:17 47:17 67:2 79:7 82:15,16

testified 4:14 24:10 66:16

testify 75:9 114:11

testimony 39:18 42:4 44:19,24 45:22 48:6,8 76:13,18 95:3 108:7 114:18 117:6,7 118:6,9,12

text 59:15 64:22 64:23 65:1,3,4,6 65:16,16 66:18 96:2 106:11

thank 15:15 94:12 113:20

thereabouts 109:16

thing 15:4 33:13 71:21 92:16

things 7:11,16,22 8:21,23 16:8 57:9 58:7,10 66:20 71:20 85:9 99:18 100:3 101:10,14 103:2 110:10,22

think 6:5 16:6,8 20:9 25:9 29:15 31:11 33:15 44:5 45:8 62:5 68:4 75:7 84:17 87:20 88:22 93:21 97:23 97:24 98:21 100:7 100:16 101:9,18 105:4,14 106:6 108:8

**[thirty - v.lx01]**

**thirty** 116:19
**thought** 24:5,10
  93:23 94:13
  111:23
**thread** 34:24
**three** 25:18 97:10
  110:10
**tilde** 72:13,14,20
  72:21,23
**tim** 9:3 13:5 14:5
  16:14 33:22 34:3
  84:8 111:17
**time** 5:23 7:1,6,7
  9:5 10:2 11:21
  17:21 18:14 19:2
  19:7 20:22 21:3
  21:23 22:1,10
  25:19 28:5,6 30:4
  30:5,10,13,24 31:1
  31:4,6,7,12,18,20
  32:3 36:7 39:6
  42:11 43:10 44:9
  46:24 47:2 49:1
  51:16 59:24 62:7
  62:11 70:11,15
  72:3 79:6,9 80:16
  81:1,12 82:7,15
  85:3,12,14,15
  90:20 91:24
  100:19 101:6,17
  102:19 103:19
  106:3 109:18
  110:7 112:20
  114:20
**times** 51:10
  109:12
**timothy** 2:2,2 5:4
**title** 7:23 8:2,4
  54:11,24 56:11
**today** 4:18 5:3,12
  11:22,23 21:1

23:23 24:14 25:4
  48:19,20 110:12
  111:4
**today's** 24:8
  110:16 113:11
**told** 41:23 46:11
  46:21,23 68:16
**tomorrow** 111:1
  113:15
**tool** 96:24 104:14
**tools** 44:12,13
  45:14,21,22 95:23
  98:7 99:9,10,11
  102:13 103:5
  106:3 107:5
  108:17
**top** 47:16 54:13
  55:7 56:9 58:17
  62:5 71:23 76:5
**total** 16:15 70:11
**totality** 14:17
  15:23 16:18 85:8
**totally** 48:7
**trace** 77:6
**track** 20:21
**tracking** 30:4
**transcribed** 117:7
**transcript** 17:12
  84:11 114:14,22
  116:12,13 117:5
  117:12 118:5,11
  118:17
**transcription**
  114:16
**transfer** 74:19
  77:9,17,19 106:5
**transferred** 75:1,5
  77:1 91:5 92:3
  100:10,12 106:23
**transit** 1:6,9 4:4
  11:9 116:6 117:3

118:3
**transmit** 89:4
**transmitted** 103:9
**true** 6:24 7:3
  23:14 45:20 81:16
  101:24 102:4,19
  104:19,24 114:17
**truly** 108:2
**trust** 34:1
**truth** 114:11
**truthfully** 80:3
**try** 48:13
**trying** 16:9 76:18
  77:6 107:19
**tuesday** 111:5
  113:11
**turned** 15:7,8
  22:20
**twice** 9:5 76:8
  79:3
**twilight** 73:3
**two** 12:17 28:14
  89:8 92:11 95:22
  97:6 112:10
**type** 60:14 96:20
  97:10
**typed** 97:7
**types** 44:1 101:10
**typewriting**
  114:15
**typo** 47:7 82:10

**u**

**u** 97:7
**ultimately** 76:15
  82:8 91:6
**underlying** 46:14
**understand** 4:17
  7:8 8:23 12:11
  13:17 27:12,24
  32:10 37:8 39:18
  55:21,23 56:4

61:6 66:20 67:3
  68:4 76:18 81:6
  88:7 89:1 98:12
  103:11 104:2,4
  105:10,13
**understanding**
  4:20 10:2 23:8
  43:24 73:12 83:5
  95:20 100:8 107:7
  108:13
**understood** 11:24
  22:12 27:22 38:8
  39:22 48:1 79:17
  83:2 98:3 99:9
  102:14 110:1
**unfortunately**
  112:1
**uninformed** 85:7
**united** 1:1,19
**university** 6:14,17
**unquote** 44:2
**unrelated** 41:14
**usb** 28:13 72:24
  88:11 91:1
**use** 7:4 43:6 44:5
  45:14 60:15 63:24
  77:3 82:12,24
  85:7 102:11
**user** 45:17,24
**uses** 63:5
**usually** 36:2
**utilities** 64:6 97:17
**utility** 66:16,17
  97:8,9
**utilized** 58:5 74:21
  86:3

**v**

**v** 116:6 117:3
  118:3
**v.lx01** 95:16

[values - zoom]                                                                Page 23

**values** 106:7
**various** 31:3,20
  45:21,22 86:2
**verbatim** 72:9
**verified** 108:4
**verify** 73:6 103:7
  106:8,17
**veritext** 15:18
  116:1,8 119:1
**veritext.com.**
  116:17
**versus** 11:8
**vice** 8:4 32:19,21
  32:23
**victoria** 1:20
  114:5 115:9
**video** 33:19
**videos** 101:10
**view** 16:11
**voice** 12:21
**volume** 14:24
**vs** 1:5,12

**w**

**w** 73:8,14
**wacker** 2:8
**wait** 15:14 28:24
  90:4,13
**waived** 114:22
  116:20
**waiver** 93:18
**waiving** 112:24
**want** 7:23 12:2,6
  12:10 15:2,5
  16:17 17:11 31:22
  31:24 34:21 58:12
  58:13 66:15 82:4
  82:4,5 86:23
  93:23 94:2 95:6
  95:19 105:5
**wanted** 15:15
  23:17

**way** 21:7 23:20
  33:16 48:17 66:19
  76:19 111:14
**ways** 100:23
**we've** 46:17 110:9
**wedrick** 35:17
**weekday** 51:23
  52:3
**weekend** 51:23
**weeks** 20:16 22:23
  24:20 38:17
**weird** 94:5
**went** 6:9 47:9
  61:24 82:8,9
**west** 2:3
**whereof** 115:4
**wifi** 33:18 64:4,9
  65:12,13,14
**window** 47:10
  85:15
**windows** 96:13,16
  97:8,9,16
**wiped** 72:22
**wireless** 64:9
**withdrawn** 28:19
**withheld** 13:16,22
  14:2,7
**withhold** 14:11
**witness** 3:3 4:1,9
  4:12 11:2 23:14
  28:20 33:4 40:20
  41:15 42:5 48:14
  52:19 66:10 69:8
  80:19 81:6 90:19
  102:8 107:18
  111:8 112:11,20
  114:10,22 115:4
  116:9,12 117:1,4
  117:11 118:1,4,15
**witness'** 116:15

**word** 27:5 43:21
  50:16 69:19 79:17
  80:19,21 85:8
  102:8 108:8,9,9,11
  108:21
**words** 26:10 27:10
  41:22 43:15,19
  44:7 46:16 47:12
  47:14,15,18 49:2
  50:11,12 52:16
  68:12 79:9 82:11
  82:12,23,24
  100:20 105:12
**work** 9:11 17:17
  18:2 32:8,14 35:5
  36:15 40:16 41:2
  63:21 83:9,20
  84:2,16 87:2
  92:13 101:4,22
  109:3
**worked** 18:6 62:18
  83:9
**working** 5:8 6:22
  7:7 16:17 57:12
  92:17 109:18
**worksheet** 55:14
  71:12,19
**world** 56:19
**write** 73:11
**writing** 59:22
**written** 59:14,16
  59:22 61:22 96:18
**wrote** 59:19 62:6
  70:1 87:7

**x**

**x** 3:1 61:10,21

**y**

**year** 5:21 8:14
**years** 17:24 18:23

**yesterday** 20:18
  20:20
**york** 6:7

**z**

**z** 25:23
**zoom** 17:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.