# Exhibit 22

Page 236

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


CHRISTOPHER GEORGE PABLE,          )
                                   )
          Plaintiff,               )
                                   )
vs.                                ) No. 19 CV 7868
                                   )
CHICAGO TRANSIT AUTHORITY and      )
CLEVER DEVICES, LTD.,              )
                    Defendants.    )

                    The Continued Remote Deposition of
DANIEL JERGER, called by the Defendants for
examination, pursuant to Notice and pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts, taken before Victoria D.
Rocks, CSR, and Notary Public in and for the County
of Cook, State of Illinois, commencing at 10:00
o'clock a.m., on the 9th day of March 2022, A.D.

Page 237

APPEARANCES:

LAW OFFICE OF TIMOTHY A. DUFFY
MR. TIMOTHY A. DUFFY
725 West Orchard Circle
Lake Forest, Illinois 60093
Tduffy@tduffylaw.com
appeared on behalf of the Plaintiff;

TAFT STETTINIUS & HOLLISTER, LLP
MR. JOHN KENNEDY
MS. NICOLLETTE KHUANS
MS. ELIZABETH BABBITT
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
jkennedy@taftlaw.com
ebabbitt@taftlaw.com
appeared on behalf of the Defendant,
CTA;

SMITHAMUNDSEN
MR. STEVEN JADOS
3815 E. Main Street
Suite A-1
St. Charles, Illinois 60174
sjados@salawus.com

appeared on behalf of the Defendant,
Clever Devices, Ltd.

Page 238

I-N-D-E-X

WITNESS: DANIEL JERGER

Direct Examination by MS. BABBITT:  241 - 340
Cross-Examination by MR. DUFFY:     341 - 344

EXHIBITS                          PAGE

Exhibit 88   6-8-20 email            278
Exhibit 89   6-8-20 email            293
Exhibit 90   email                   311
Exhibit 91   10-24, 10-25 emails     325
Exhibit 92   11-15-21, 11-16-21 emails  244
Exhibit 93   2-7-22 email            255
Exhibit 94   motion to enforce subpoena 257
Exhibit 83   Daniel Jerger notes     329

Page 239

(Witness sworn.)

MS. BABBITT:  Good morning, Mr. Jerger.  My name is Elizabeth Babbitt.  I'm one of the attorneys that represents the CTA.  I'm going to be taking your deposition today.

THE WITNESS:  Good morning.

MS. BABBITT:  I know you've gone through this a few times at least on this case.  So I'm going to run through the ground rules more as a refresh than anything.

First, is there anything that would impact your ability to testify fully and truthfully today?

THE WITNESS:  Not that I'm aware of, no.

MS. BABBITT:  And if you need a break at any time the only thing I would ask is if we have a question pending that you answer the question before you ask for a break.  Is that fair?

THE WITNESS:  Yes.

MS. BABBITT:  And as far as the testimony that we are giving today, we want to try not to talk over each other.

The court reporter is going to be taking down everything we say and if we have two people talking at once it becomes much more difficult for her.  Is

Page 240

that fair?

THE WITNESS:  Yes.

DANIEL JERGER,
recalled as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION
BY MS. BABBITT:

Q.  Where are you today?

A.  I am at Quest's office in Oakbrook, Illinois.

Q.  Is anyone else in the room with you?

A.  No.

Q.  And are there any other materials available to you aside from the exhibits that are available on the exhibit share website?

A.  No, not related to this case.

Q.  Who have you discussed this deposition with?

A.  I discussed it with Quest's president, Bob Sadulsky, and I discussed it with Tim Duffy of Tim Duffy Law.

Q.  When did you last speak to Mr. Duffy about this deposition?

2 (Pages 237 - 240)

Page 241

A.  This morning for logistics.

Q.  And did you spend any other time in the last month preparing for this deposition?

A.  I did.

Q.  How did you prepare?

A.  Within the last month, I am not sure if that includes the period of production, but at that time or when documents were required I produced them to Mr. Duffy for his review and production.

And I also reviewed briefly the transcript from the previous matters, but not to any great detail from the previous occurrences in October of 2021.

Q.  Any other materials that you reviewed in order to prepare for today's deposition?

A.  No, other than preparing the documents that were being produced.  But that was some time ago.

Q.  When was the last time you spoke to Mr. Christopher Pable?

A.  I think the last and only time that I spoke with him was when the phone was returned to him back in June of 2020.

Q.  Can you tell me the last time you

Page 242

communicated with Mr. Pable, aside from that in person interaction?

A.  There were some subsequent e-mail exchanges that have been produced, I believe, that related to getting access to some of his online data.

And those were subsequent, but still back in 2020.  I have not had communications to my recollection since.  You would have this information in the e-mails, but probably July of 2020.  There was a recurrence where we had to revisit some other data.  So that may have happened later in 2020, but that would all be documented in the e-mails I produced.

Q.  We'll get into that supplemental production in a bit.  I want to make sure I understand who is representing you and all that and who your client is.

Your client for purposes of this case initially, Quest was retained by Mr. Duffy, is that correct?

A.  Mr. Duffy's firm.  Duffy Law, yes.  We were engaged, yes.

Q.  And there was an engagement agreement

Page 243

signed by Quest and by Tim Duffy on behalf of Tim Duffy Law?

A.  Yes.

Q.  So the client for Quest is Tim Duffy?

A.  Yes.

Q.  And has Quest retained or engaged any other legal counsel relating to this matter?

A.  No.

Q.  Have you retained or has Quest retained Mr. Duffy or Tim Duffy Law to represent Quest in this matter?

A.  Not beyond the original engagement letter.

Q.  My question is a little different because that original engagement letter Mr. Duffy and Tim Duffy Law was retaining Quest to do work, right?

A.  Yes, that's true.

Q.  And so my question to you is have you or has Quest retained Mr. Duffy to represent you in front of the Court or otherwise in this litigation?

A.  I'm not certain that the Quest engagement letter does not cover that circumstance.  So we have not had a separate engagement letter in this matter to my knowledge.

Q.  And are you aware that Mr. Duffy filed

Page 244

briefs on behalf of Quest that were filed with the Court in this litigation?

A.  I am.

Q.  Is anyone else representing or has been retained by Quest to represent Quest or you with respect to this litigation and these disputes?

A.  Not at this time.

Q.  Is anyone else representing you or representing Quest relative to the pending sanctions that are before the Court against Quest in the this matter?

A.  Not at this time.

Q.  So Mr. Duffy is continuing to represent you and Quest relative to the sanctions that may be awarded against Quest?

A.  As I understand it, as part of our engagement with him, yes.

Q.  I'm going to show you and if you could pull it up in your exhibit share, CTA Exhibit 92, Mr. Jerger.  Let me know when you have it.

A.  I have it.

Q.  This is an e-mail exchange dated November 15 to November 16 in CTA Exhibit 92, right?

A.  Yes, November 15 and November 16, 2021.

3 (Pages 241 - 244)

Page 245

Q. So the first e-mail at the bottom of the string is an e-mail from Tim Duffy to you, Dan Jerger, that says "Dan, our response to the CTA's motion to compel is due tomorrow. I have attached a draft for your review." Do you see that?

A. I do.

Q. And Mr. Duffy sent you a draft of a response brief he was filing on behalf of Quest to oppose the motion to enforce the subpoena that the CTA had issued against Quest, is that right?

A. I don't recall this particular motion, but I understand that the general nature of what you're saying is true.

I don't recall the particulars of which motion and what this pertained to specifically, but that's correct, he was sharing what he had drafted.

Q. And then you forward that message in Exhibit 92 to the president of your company, right?

A. Yes.

Q. And you also forwarded to someone whose e-mail is flosi@quest.net. Right?

A. I did.

Q. Who is that?

A. Leoni Flosi, and he's Quest's executive

Page 246

vice president.

Q. And you sent the note to Bob and Leoni and say "I received the attached last night from our attorney client, Timothy Duffy, in the matter I was recently deposed, the first I heard of it.

Let me know if you have any thoughts or questions, and I will also call to discuss."

Q. Did you discuss this brief and the motion to enforce the subpoena with the president of your company?

A. I would have discussed it both with Bob and Lee of our company, yes, at that time.

Q. Tell me what you recall about those discussions?

A. It was discussed the circumstances of the case, which they had already been aware of because I kept them informed throughout the process of the phone, but also throughout the case's evolution if you will as part of our normal briefings around cases.

In addition, we would have talked about Mr. Duffy and his representation of Quest in this matter and basically just briefed them on what was happening, and we proceeded.

Page 247

Q. And you say in this e-mail in CTA Exhibit 92, it's the first I heard of it.

Is that the first time you were made aware that the CTA was moving the Court to enforce the subpoena that Quest was not complying with?

A. I don't know that Quest was not complying with the subpoena, to be clear. But I understood that Mr. Duffy was responding to it.

I guess per my e-mail this is the first I heard of it being this contract. I had not seen this motion or draft of a reply to the motion. So I can't recall whether or not I had known something else prior to this point. I would have to look back to the e-mail chain.

Q. And you're aware that the Court ultimately granted the CTA's motion and found that, in fact, Quest was not in compliance with the subpoena and enforced compliance with the subpoena, which is why you're sitting here today, right?

A. I understood that there were documents that the Court believed were part of their original order. And I understood that those documents had since been produced.

I was not intending or there was no

Page 248

intent to not produce documents. So if they were not, it was based on a good faith. I didn't have any indication that we weren't providing what was necessary, but I understood that you, CTA, had questions of other documents that I believe had not been produced to you.

Q. So you were providing documents based on what Mr. Duffy was directing Quest to produce, is that right?

A. That's correct. We do not have a connection to this case other than our client relationship with Mr. Duffy.

So we will produce as directed, and Mr. Duffy can then review and produce what is as he believes as the attorney appropriate responses to the Court orders or other production within this case.

Q. And that extends then to not just what was being collected by Quest relative to the Pable discovery, but even to the discovery that was propounded directly on Quest, is that right?

A. I don't see how they necessarily can be separated completely because all of the Pable discovery was in the communications that was

4 (Pages 245 - 248)

Page 249

provided to Mr. Duffy.

As you've seen with all of the communications that have been provided, there's very little other material other -- in fact, there's probably no material other than that that relates to Mr. Pable, that is Mr. Duffy's client in this matter.

So we provided it to him, and he provided what was appropriate as he saw fit from the overall purview of this case. In a perfect world I'd give you everything all the time, but that is not my role. My role is to give it to the attorney, and they then provide to you what is appropriate as they see it.

Q. So if there were materials, and there were materials that were withheld by Quest, those materials that were withheld by Quest prior to this last production, those were withheld at the direction of Mr. Duffy?

A. I don't know whether they were in that context. You'd have to talk about specifics, and I don't know what you're talking about being withheld, whether or not they were believed to not be applicable or responsive to what the Court had

Page 250

ordered.

The Court ordered, as I understand it, a very specific limited production to protect as I understand it Mr. Pable's information. So we produced what we understood to be responsive to that, and Mr. Duffy produced information that was also responsive to that, that he had that we had already exchanged, like the e-mails we exchanged.

So he reviewed those and produced those, as I testified to, and we produced other files we thought were responsive. And we had discussions during the two previous depositions of the universe of materials that were available.

And during any of that time we were then not further directed to produce other materials. Or if those materials were in question, I believe they were produced. So I think there was an engagement letter. There was some question as to whether that was responsive.

Initially, I believe, that was determined not to be responsive, but it was produced as soon as others had said okay, that could be responsive. So the withholding of information was not by trying to hide any of the information. You

Page 251

have as I understand it all of the information.

It was the interpretation of what the Court's order was as far as keeping it limited versus more recently a broader discovery request or order.

Q. I'm not suggesting, and we'll get into what you've produced since and what Quest has produced since as far as if anything is being withheld at this point.

I'm going a little back in time, Mr. Jerger, with respect to the materials that as of October of 2021 had not yet been produced by Quest that has since been produced in February of 2022. Those materials, that bucket of materials we didn't receive, CTA didn't receive until February of '22.

Those were being withheld at the direction of Mr. Duffy is my question, is that right?

A. Yes. Or they were ones that I didn't believe were responsive to the Court order at the time, but that would have been only a subset of them.

Yes, ultimately at the direction of Mr. Duffy because we had discussions over the

Page 252

universe of information, and he decided which was appropriate to be provided. So yes.

Q. Was there anything that you reviewed that you evaluated in your judgment, Mr. Jerger, that was not responsive and was not provided to Mr. Duffy?

A. Well, I don't know if it was -- so, for example, information that was captured from the online data that was collected from the online data, that was not produced at the time because that information was part of a Google collection.

It wasn't part of the phone imaging as the Court had requested. So it seemed to be other work that was unrelated to the initial collection of the phone while the phone was in my possession.

So that would be an example of some documents that I felt were not part of it. However, I believe that there's two parts to that. One is the e-mails which Mr. Duffy had reviewed and produced what he believed was relevant or responsive to the Court's order back in October.

In addition, though, there would have been attachments or other files that may have been like the source data for the Google Hangouts or the raw data. I felt that was not applicable to the

5 (Pages 249 - 252)

Page 253

Court's order because it had nothing to do with the imaging.

It came from a different source. It didn't have anything to do directly with the phone. However, some of that data that was contained in there was on the phone, and that was verified because I could look at the photographs that were taken of the device while it was in my custody and compare them to the raw data that was provided by Google. So there were other data.

Q. So when you say you felt it was not related, I'm trying to hone in on what judgments you were making about the production, all of the production that Quest ultimately produced in this case versus the judgments that you were being directed by your client and your attorney Mr. Duffy to produce in this case?

A. I think I understand your question. Ultimately the universe of materials that I have in my possession regarding this case is known to Mr. Duffy.

I produced those materials that I thought were relevant. He also produced documents, and he also could have advised if there was anything

Page 254

else that I didn't produce to him or that he had in his possession that he chose not to produce.

So to answer your question, no matter what I would have produced to Mr. Duffy, he has the filter. And those documents that I produced to Mr. Duffy, he knows what I have. So he knew what I had throughout this case.

I kept him informed throughout the case what was collected, what was available. So if anything would have been not included, it wasn't based on my decision to not include it. I don't have a horse in this race. It's Mr. Duffy's case, and it doesn't relate to me. I have had no interactions with Mr. Pable beforehand.

This is a case where we were trying to do what we believed was appropriate, and we were asked and directed to do so.

Q. And that direction all came from Mr. Duffy?

A. That's right, yes.

Q. So you're aware that the Court ordered earlier this year that Quest comply with the subpoena and produce all those e-mails from June and July of 2020 that had been withheld previously,

Page 255

correct?

A. As I understood it, the Court enlarged or enhanced their request for production earlier this year, yes.

Q. The Court granted the CTA's motion. And the Court also granted the CTA leave to take your deposition again based on this additional traunch of materials that the Court ordered Quest to produce. Do you understand that?

A. I do.

Q. And have you received a copy of the Court's order on the motion to compel?

A. I did receive a copy of that, yes.

Q. So I'm going to turn your attention to CTA Exhibit 93. Let me know when you're there.

A. Yes, I'm there.

Q. CTA Exhibit 93, this is an e-mail exchange dated February 7, 2022, correct?

A. Yes.

Q. At the first page of Exhibit 93, there is an e-mail from Mr. Duffy to you that says "Dan, please see the attached order. We will need to produce those additional e-mails we did not include in the prior production."

Page 256

Do you see that?

A. I do.

Q. And it looks like you respond in the middle of the first page of CTA Exhibit 93, and you say Tim, there is no attachment to your email. Was it in the body or was there meant to be a separate attachment also?" Right?

A. Yes.

Q. And then Mr. Duffy responds to you on February 7 in CTA Exhibit 93. He says it's just the text in the order, right?

A. Right.

Q. Did Mr. Duffy share with you anything beyond the text message this order?

A. Subsequent to this e-mail I believe I received a PDF that contained what I believe to be the Court order.

Q. And that was not produced to the CTA?

A. I don't know what was produced to the CTA. I produced that to Mr. Duffy or Mr. Duffy sent it to me. So he would have it in his production.

Q. So you provided that correspondence where Mr. Duffy provided you with the Court order to Mr. Duffy in furtherance of complying with the

6 (Pages 253 - 256)

Page 257

Court's order?

A. That's correct.

Q. So if you could turn your attention to CTA Exhibit 94. Let me know when you're there.

A. I am there.

Q. CTA Exhibit 94 is the Court's eight page ruling on the CTA's motion to enforce the subpoena against Quest, right?

A. I believe so, yes.

Q. Have you seen this CTA Exhibit 94 before, Mr. Jerger?

A. I believe I have. This is the attachment I believe that was sent to me several days later after the e-mail exchange we just discussed.

Q. So you had an opportunity to review the Court's order on the motion to enforce against Quest?

A. I did. I reviewed this about a week after that first e-mail.

Q. You're aware that the Court -- say that again?

A. It might have been a little over a week after at the previous exchange.

Q. And you're aware, and Quest is aware that

Page 258

there is pending sanctions for Quest in which Quest and Mr. Duffy may be paying a portion of the CTA's attorney fees and other costs as a result of the failure to comply with the subpoena initially?

A. I don't understand it, but I'm aware that that is what's also included in this, yes.

Q. And in the event that the Court, in fact, orders sanctions to be paid by Quest, is it your understanding that Quest will be paying those sanctions or is it part of the engagement where Mr. Duffy would be indemnifying Quest for those sanctions?

MR. DUFFY: Objection, calls for speculation.

THE WITNESS: I am not an attorney, so I don't know. That would be related to the engagement letter.

BY MS. BABBITT:

Q. Have you had a discussion with the president of your company or anyone else about who will pay the sanctions to the CTA?

A. If there were such sanctions we have discussed that, yes.

Q. Can you tell me more about those discussions?

Page 259

A. Those discussions would have been with Quest, either Bob and/or Lee at Quest and also Mr. Duffy.

Q. And what was discussed?

MR. DUFFY: Hold on. I don't think you're entitled to discover that communication. I mean come on. It's attorney-client about potential sanctions that might happen. I mean isn't that privileged?

MS. BABBITT: So you're asserting privilege and instructing him not to answer?

MR. DUFFY: I'm trying to be cooperative and not hold you up, but I think that is privileged. I am asking you if you think it's not and if there is some reason why it is not because to me it's talking with a client about a pending motion or possible motion and award of sanctions and what might happen and how that might work.

I think we're moving from conduct in the case and production to matters that are attorney-client advice. So if you are telling me you would go to the court again and force an answer to that, I want to hear that. But I think that is privileged communication.

Page 260

BY MS. BABBITT:

Q. Mr. Jerger, can you tell me what your understanding is if the Court were to issue sanctions against Quest how those sanctions would be paid?

MR. DUFFY: That is okay to answer.

THE WITNESS: Yes. My understanding is that we would not be responsible for those payments.

BY MS. BABBITT:

Q. So to your understanding who would be responsible for those payments?

A. I don't know whether it would be Mr. Duffy's law firm or the plaintiff in this matter.

Q. The plaintiff being Mr. Pable?

A. Yes.

Q. So again in CTA Exhibit 94, I'm going to ask you, Mr. Jerger, to turn to page seven of CTA Exhibit 94. Let me know when you're there.

A. I'm there.

Q. Can you review and read to yourself the first paragraph under the title conclusion on page seven of Exhibit 94, please. Let me know when you've read that paragraph, Mr. Jerger.

7 (Pages 257 - 260)

Page 261

A. I have.

Q. So this is where the Court orders certain production for Quest, right? The first element that Quest is ordered to produce is any and all communications between Duffy and Jerger or any other Quest employee or agent relating in any way whatsoever to instructions, directions or guidance that Duffy or plaintiff gave Jerger or any other Quest employee or agent between the time that plaintiff engaged Quest to do work on this case and October 31 concerning any action that Quest and/or Jerger were to take respecting plaintiff's phone, right?

MR. DUFFY: October 31, 2020?

MS. BABBITT: Yes, October 31, 2020.

BY MS. BABBITT:

Q. Has Quest done that and complied with that order?

A. I believe so. We produced the communications to Mr. Duffy. My understanding is he produced those to you, and it is more than what was requested by the Court.

So I don't know what was produced to you, but I produced everything up to the date of

Page 262

production in 2022. So sometime in February of this year.

Q. And can you tell me what steps you took to gather those materials and then provide them to Mr. Duffy for production?

A. Sure. I did searches of e-mails to include our Quest case number, which is the Q number that you'll see on our documents.

I did a search for Mr. Duffy's name, and I did a search for Mr. Pable's name and other sort of combination searches to make sure that I have those that were responsive.

I also looked at the time period in which I had custody of the phone around June 2020. I think it was June 11, June 12, 2020. And to see if there were any other communications that may have been responsive or related to the processing of the phone while it was in my custody.

Then I looked for any text messages, SMS messages and text messages I may have had related to this case with Mr. Duffy. And I produced all of those to Mr. Duffy.

Q. And when you said that there was an element of your searching about correspondence

Page 263

around the time that you had the phone or were processing Mr. Pable's phone in 2020, are you referring to those communications with different vendors of applications that may have been on the phone?

A. Yes, including those that were produced in 2021 already. And if there were any more, I don't recall. There may have been others.

They were during that time frame. So yes, those are the examples. Those are the ones that may not have been in Mr. Duffy's possession. I didn't include him as one of the recipients, but by finding Mr. Pable, Mr. Duffy and our case number, I discovered some other internal communications, some of which you already presented here today.

Q. And the second element reflected in the Court's order in CTA Exhibit 94, it asks Quest to produce any notes, reports, records generated during or relating to any work on this case performed by Jerger or any other Quest employee or agent that have not previously been produced.

Has Quest complied with that element of the Court's order on production?

A. I believe so. The only part that has not

Page 264

been produced to Mr. Duffy as he's aware of not related to the phone but related to the online data that was collected subsequent to my having custody of the phone.

So after the phone, I had returned it or around that same time there was other data that had been collected that was reduced to the final production that I prepared and provided to Mr. Duffy. So I have provided to Mr. Duffy the raw data we already talked about that was from online sources.

And I also produced the files related to the attachments that would have been the production that I believe you then would have received if there wasn't something privileged. So basically through the e-mails and links that were included in the e-mails that were produced to Mr. Duffy, not only because he had them from the original production, but because I reproduced those as well throughout this process.

The only thing not produced to Mr. Duffy is the interim step that has nothing to do with the phone, but has to do with just a reduction of the data. So the large data set that was provided by

8 (Pages 261 - 264)

Page 265

Google had gigabytes of information.

It was then reduced based on key word searches and the date frames that are established in these e-mails. And that reduced data set was produced to Mr. Duffy, but I also have returned back and given the raw data, original data.

It's just that interim if there was any work, like an Excel spreadsheet was used to reduce the data from the large data set to the production data set, that was not produced to Mr. Duffy to date. It certainly could be, but I understood and I was directed that this would not be responsive to what the Court was asking related to it. For sure it doesn't have to do with the content of the phone and because both data sets, the raw data and the production e-mail data has been provided to Mr. Duffy.

Q. So is it your view then that those other data files and Excel files in which you were filtering some of the materials produced or collected I am guessing from Mr. Pable's Google accounts, for example, those materials wouldn't fall under category two of CTA Exhibit 94 of the Court's order of any other records generated or related to

Page 266

any other work on this case performed by Jerger or any other Quest employee?

A. I guess I understood that from the previous clause that talked about respecting plaintiff's phone.

Again, this wasn't my decision. That was shared and discussed with Mr. Duffy, and he understood that if that is something that is needed that can be produced as well, but it is not part of the phone processing at all in any way, shape or form.

So the Court, as I understood it, was this restricted testimony and the subject e-mails has to do with what was the phone, my processing of the phone. Again, I'm glad to provide those, but as I was directed those are not things relevant to this particularly since the raw data and the resulting data are available.

So one could easily see the process. All communications, however, related to this matter that I have in my possession have been produced to Mr. Duffy.

Q. And those records, beyond the records that you are referring to that have not yet been

Page 267

produced, those include the raw data pulled by Mr. Pable from his Google accounts, is that right?

A. No. I produced that data to Mr. Duffy. The only thing I'm talking about is the -- it's basically the interim process that happened from the raw large data set from Google to the reduced data set that was responsive. So I produced both ends.

It's just the middle that didn't have to do with the phone at all had not been produced to date. It gladly could be produced, but you have both ends of the spectrum. There's nothing in the middle.

One could easily compare and see the process, regardless of how the process was done, but it also doesn't have anything to do with the phone as I understood this discussion is about.

Q. So I want to make sure I am understanding this bucket of information that is sort of I think your work or reflective of some of the work you did.

I take your point that you view it as not being related to phone, although obviously it's related to Mr. Pable's communications, which I would view is triggered under the second element in CTA Exhibit 94. There's a raw set of data -- you are

Page 268

already shaking your head.

There is a raw set of data that was provided to Quest not from the phone, but from Mr. Pable that relates to his Google accounts, is that correct?

MR. DUFFY: Are you just asking him if there exists such a data set?

MS. BABBITT: Yes, we're starting there.

BY MS. BABBITT:

Q. So Quest received that raw data. Quest then did some analysis of that data, is that right?

A. Yes. More specifically, the data was reduced. So we weren't analyzing.

Q. Tell me how you reduced it.

A. That depends on the data source. Some of the data is in an unusual format. Some of it is in a VSC spreadsheet format.

It depends on the source data as to how we produce that in a usable or readable format for others. However, to be clear, that raw data has been presented and provided to Mr. Duffy. And the production, the data set has been provided to Mr. Duffy, again, not related to the phone.

The details related to the phone, more

9 (Pages 265 - 268)

Page 269

specifically what we called P-1, TAG 1 were all provided. Meaning all work related to the T-1 phone was provided to Mr. Duffy, and I believe it was produced to you.

In addition, there were T-3, T-3 and T-4. Those are tags numbers as I indicated on our evidence inventory that you have. Those three pieces of raw data were also provided. Those were the ones from Google either for gmail, for Hangouts or for Google Boys. Those were the data sets that have been produced to Mr. Duffy.

In addition to the e-mails, you have all the e-mail exchanges that were relating to all of this matter, including T-1, T-2, T-3 and T-4 with respect to the production of the data that we were directed to produce in this matter.

So those e-mail links or attachments I also have provided those to Mr. Duffy not only in the original form, but also as part of our production to Mr. Duffy.

So as I say, the only thing that has not been produced that would gladly be produced, but I was directed it was not related at this time is this small set between taking the raw data that was

Page 270

provided to us down to the production data that was then provided to Mr. Duffy, who then I believe would have provided it to you.

That is the interim step that was not produced because it does not have to do with the data that was collected from the phone. But, again, if that is something that was misunderstood, I'll gladly provide that or if someone directed me appropriately I'll provide that information to you because it doesn't have any substantive data.

It just shows you, you know, based on what we collected it what the data was and you know what the output was. And in the interim you can reproduce in any way, shape or form, and there's no communications with Mr. Duffy. It's internal processing.

It's not an analysis as much as it's a reduction of the data set and putting it in a format that is usable to someone other than a raw dump that Google provides.

MR. DUFFY: I think I need to make it clear for the record Dan is using the word produced, he's usually talking about stuff he produced to me.

Produced doesn't necessarily mean produced to

Page 271

you. We've had conversations. So I want to make that clear about what was produced and what was not produced. The things that were not produced to you, which includes the stuff that Dan is talking about.

BY MS. BABBITT:

Q. So I understand, and you're making it abundantly clear, Mr. Jerger, as to what you were instructed to do and what you provided to Mr. Duffy and what you understand to have been provided to the CTA.

My question is about in particular that interim step you just referred to. So you received certain elements of raw data. You mentioned the Google Takeout. So gmail or Google voice or gmail. Of those raw data sets what I want to understand from you is what did you do.

Let's start with the gmail. What did you do with the gmail data that was provided and what was done with that to get to that reduced set you are referring to?

A. Right. I would have to look back at the processing that occurred with that. There were different steps that had to occur because the information that we provided from Google Hangouts,

Page 272

each data set is in a different format.

So I have to look back and see in general each of these data sets were run through different scripts, which we would have to custom write or modify in order to meet the needs of searching for a data set that is relevant. We have to reduce it by date, by key words either in a combination or separately, but we used either custom script that would do that or zip, something that would allow us to reduce the data depending on the original format.

In some cases it might take two steps for us to produce the accurate and usable information so that the production that we provided to Mr. Duffy was complete and accurate to the original source.

So unfortunately it depends. You're asking me about the gmail. I don't recall exactly what gmail format came in as in this particular case and what processing had to be done, but it was using either custom tools that we had modified to meet the processing and reduction of the data or using commercial tools that would allow us to reduce the data set.

10 (Pages 269 - 272)

Page 273

Q. Did you apply search terms to the gmail data?

A. Yes. That is part of the scripting.

Q. What else was part of the scripting aside from applying search terms or applying date range parameters?

A. That's it.

Q. It sounds pretty overcomplicated when you're explaining, but I understand you got a bucket of data from gmail from Mr. Pable, and you applied certain date parameters and search terms to get the resulting reduced set of information. Is that right?

A. I think in broad terms you're absolutely right. To be clear, I am trying to be very technically accurate so that I am not trying to mislead anyone and oversimplify.

But in broad terms, you're absolutely right. It's just a reduction from date and time. The only thing I'm trying to clarify is there may have been multiple steps to do that because the tools don't do all of the things that need to be done.

But then we would verify and confirm

Page 274

either with another tool or look back at the original raw data. The data is not necessarily, like I say, in a usable format to begin with. It's in let's say an XML format versus a CSV format. Those different formats require different processing.

To be clear, you summarized that nicely. It's not complicated perhaps from the perspective that you have that I am thinking of all of the technical details involved. That is the part that I don't recall the exact steps technically of when I took it from the raw data source to the output.

But in simple terms, yes, I applied date and/or search terms that were provided to me in the emails that Mr. Duffy provided.

Q. And understand that I am the least technical person in the room, although Mr. Kennedy joined. So he may take the crown on that right now.

The broad strokes of applying the search terms and date parameters, am I missing anything? If we were to explain to the Court or jury what you did with that gmail data set you got, are there any other things -- and I take your point that there are other processing tools with respect to the final

Page 275

type, for example, that might impact how you do that analysis.

But am I missing anything else that was done to that data aside from applying those search parameters?

A. No. It just has to be massaged in order to apply those. Google gives it in a monolithic. Hangouts has attachments to the Hangouts, and they're a separate image file.

Then we to have reattach those to the original Google Hangout so someone can view those more in situ or more as it would appear to a user, but they're broken into pieces.

But you're correct, once we put the data in a structure that allows us to search it, we do exactly as you suggested, we're searching based on date and time and key words and producing the records that are responsive.

Q. And those key words that were used and searched on these various Google data sets, are these the key words that Mr. Duffy sent to you that is in the e-mail correspondence that was produced in February of this year?

A. Yes, or there could be a variation. For

Page 276

example, Mr. Duffy -- and, in fact, I believe that you were provided the key word list in a text form as part of a recent production, but those files either way the only variation would be maybe a plurality.

So if there was a word that was in the key words, in order to be more broad in the search we tried to broaden it by removing the plurality of it or providing an alternate term that would allow us to what you might think of a stem that would allow you to have the beginning of the word, and we would produce more results and not miss some of the results that would be present.

That would be the only variation. We did not come up with a list unrelated to the list that was there.

Q. So you did the wild card and things you would apply to broaden the search?

A. Yes.

Q. And anything else apply to that search aside from that on the Google data sets?

A. No. Again, your folks would have the ability to look at the raw data if it was produced to you and look at my production data set and be

11 (Pages 273 - 276)

Page 277

able to reproduce the results.

So the interim is just based on that filtering. There was no other action that was provided or intentionally done in order to not include the results that we were being asked to do. Quite the contrary. We were trying to be overgenerous in that production.

MS. BABBITT: This would be a good time to take a ten minute break.

(Recess)

BY MS. BABBITT:

Q. Mr. Jerger, I want to talk a little bit more about the messages that are reflected in the e-mail communications that were received by Quest from Mr. Pable in this case.

I know we talked a bit just now about how you received certain raw data sets from Mr. Pable, right?

A. Yes. Your communication broke up there a bit when you were asking that. Could you restate that.

Q. Sure. So I want to first talk about, orient you to the raw data that you received from Mr. Pable from his Google accounts.

Page 278

And you recall we were just talking about that raw data before the break, right?

A. Yes.

Q. Can you turn your attention, Mr. Jerger, to CTA Exhibit 88. Let me know when you're there.

A. I am there.

Q. On page two of CTA Exhibit 88 is an e-mail from Mr. Duffy to you on June 8, 2020. Correct?

A. Yes.

Q. And the second paragraph of this e-mail from Mr. Duffy to you at CTA Exhibit 88 says "For the e-mails, I have asked him to run the search terms and see how many hits we get. If the number is relatively small he could label slash folder them and we can await access on your end. And you can pull and that way you don't have to do the searching."

Correct, that's what Mr. Duffy states?

A. Yes.

Q. When Mr. Duffy is referring to him, he's referring to Mr. Pable running search terms on his e-mails, correct?

A. Yes.

Q. And so can you explain to me your

Page 279

understanding of how those e-mails were collected by Mr. Pable and provided to you at Quest?

A. I do not have information of how he selected the e-mails. I was provided downloads for Google data that he exported out through Google's Hangouts feature -- or the Google takeout feature.

And so then I was provided with different data sets as indicated, like T2, T-3 and T-4, which include multiple disk files that contain the Google Takeout data, which would include gmail, Hangouts, and Voice later.

Q. So you're aware that Mr. Pable did some searching of the Google data set prior to it being provided to Quest?

A. Some of it, yes. Not all of it.

Q. When you say some of it, but not all of it can you tell me what you mean by that?

A. I believe that the facility within Takeouts allows you to at that time export out different subfolders within your, let's say, gmail.

But when it comes to Hangouts as the messaging that is all encompassing, whatever is in the Hangouts system in your account is exported out en masse. So I believe the data sets for gmail and

Page 280

Voice were subsets of his total e-mail communications.

So I only saw what he provided to me. And that was then reduced as we talked about previously and then produced or provided to Mr. Duffy. With respect to the other data, the Hangouts data that was also provided as part of the Google Takeouts feature, that Hangouts data was en masse. And then that had to be culled down from a large data set which contained I don't recall how many hundreds of thousands of communications, but it was reduced back down to a smaller subset based on the date range and the key words that we were brought.

Q. So setting aside the Google Hangouts for a moment and focusing on the gmail communications, those gmail communications that were provided to you, that was not just a full pull or drop of Mr. Pable's entire gmail correspondence, is that right?

A. As I understand it, that is correct, yes.

Q. And do you have any understanding of what searching or limitations Mr. Pable put on his own e-mails prior to those being provided to Quest?

12 (Pages 277 - 280)

Page 281

A.   I don't recall any specifically.  However, some of that may be documented in the e-mails you have been provided, including the one you had me read from back in June of 2020.

There may be some details as to how he reduced the data set, but I don't recall specifically.

Q.   Did Mr. Pable work with you or to your knowledge work with Mr. Duffy to isolate the e-mails that he produced to Quest?

A.   He did not work with me.  I do not know if he worked with anyone else.

Q.   And Mr. Duffy did not work with you to say hey, we've got Mr. Pable's e-mail account here.  What should we do first to narrow the universe?

A.   If there was any communications it was is there a way perhaps maybe to make a folder of the data that is responsive.  That could have been discussed.

If Mr. Pable was doing the prefiltering of data that if he put it in a folder he may be able to export or remove just that folder as a subset.  But that would have just been a general technical thing, not a specific direction to Mr. Pable.

Page 282

If it were a discussion, it might have been before we were engaged.  I don't recall specifically.  If there were any, they would have been immortalized in the e-mails.  I don't think so because I had very little to do with that other than receiving the data that had been a subset of the total data.  And then taking that and turning it around and reproducing that back to Mr. Duffy because of the format that it came in or because of the structure of how he wanted to produce it on to you.

Q.   So those e-mails then, your understanding is that Mr. Pable prefiltered them I think was the word you used relative to his gmail emails prior to producing a raw data set to Quest?

A.   Only because I can suggest to you is what I received was not a complete mailbox.  It was a subset.

How that prefiltering occurred, I'm presuming that it had to be a subset because it was a separate folder that contained things that appeared to be relevant to this matter.  So it wasn't our discussion.  We didn't have any discussion, Mr. Pable and myself, regarding how that

Page 283

could be done technically.

The only discussion or communication we would have had related to those downloads between myself and Mr. Pable, it would have been immortalized in e-mails having to do with getting access to the account and how that could happen.

There was a difficulty trying to get access to his account through the forensic tools we used in order to pull specific folders directly from Google and gmail, and it had to do with how he had his authentication set up, and it didn't end up working with multiple tools we attempted.

So we ended up having him do the export at the time because the difference would have been we wouldn't have taken all this data through that gmail.  We still would have only taken the folders that he already provided labeled e-mails that were apparently relevant to this matter.

Q.   On those emails, once Quest received the set of emails that Pable had foldered out and produced to Quest, do you know how -- let me say it another way.

Do you know what the size of the raw gmail e-mail data was and how much it was reduced

Page 284

down to?

A.   I don't have that information available.  I vaguely recall that the total data set because, again, these were different, would be in the gigabyte size, but that also included the Hangouts data we already discussed, which was the entire data sets of his Hangouts communications.

So I don't have that to be able to parse that out for you.  That would be available looking at the original data set I provided to Mr. Duffy.  But the data set with respect to e-mail, I doubt that there was much reduction of those data because it had already been reduced, as I understood it.

If there were, it would have been only because we were reapplying the date range and/or search terms, and there were different folders based on date ranges.  And this case had devolved, and there was another date range that was included and some voice messages.

So there were a couple of times this occurred, maybe three times where data was provided initially around the time of the phone, which was June of 2020.  There may have been a couple of subsequent ones.  Maybe all in 2020, but I don't

13 (Pages 281 - 284)

Page 285

know.

As far as the size of the before and after I don't have that specifically, but it would be available.

Q. And then again in CTA Exhibit 88, if you still have it up. That first paragraph on page two of the June 8th e-mail from Mr. Duffy to you.

Mr. Duffy says Pable told Duffy he's getting a new phone soon and when he does it will be easy for him to turn over his current phone, and we don't have to worry about getting it back so quickly.

Ultimately it appears that that wasn't the case and that you only had a day or two with Mr. Pable's phone. Can you tell me what you recall about Mr. Pable getting a new phone or not getting a new phone?

A. So it was an evolving process. Whether as indicated by this e-mail, I don't know if at one point there was going to be a new phone and then there wasn't.

There was a discussion of whether the old phone could be statically preserved at that time, but it was one that was being in use. So the

Page 286

evolution of this collection changed I believe over time and providing the phone back to Mr. Pable, as I understood it, we were done with what needed to be collected off the phone as I was directed.

I would normally as a course of business recommend that that phone be in limited use at the time I returned the phone to Mr. Pable. I don't know what the plan was to be honest. That was outside of my knowledge whether he was planning on replacing the phone right away or whether he was going to set that one aside or continue to use it, I don't know. And that could have certainly changed even after my involvement with it, I don't know.

Yes, I only had two days with the phone or a day and a half.

Q. There was a lot in that answer you gave. So I want to unpack it a bit. You mentioned that something along the lines of what you would recommend limited use of that phone, could you tell me what you mean by limited use or recommending limited use of the phone?

A. In some cases we're directed to maintain custody of the phone when we process it, and we seal it up and secure it. In some cases we're not.

Page 287

Some cases we are asked to provide it back. Depending on what we're directed to do, we do what we are directed to do. So what I think I was alluding to is in general because the matter -- even though we were not directed to retain the phone I would have suggested to Mr. Pable and just in general to Mr. Duffy as well that either this phone, if it's not going to be used should be stored away and secured because we were not maintaining custody of that.

But whether that was done or not I have no idea. I don't know whether a new phone was purchased. I don't know when the old phone was no longer in use. None of that was part of my knowledge.

Q. The other remark that you just provided a moment ago, Mr. Jerger, you said something about it being statically preserved, the phone being statically preserved.

Could you tell me what you mean by statically preserved and if that was actually done?

A. I'm not sure. The word statically, could you provide the context in which I might have said that?

Page 288

Q. You mentioned whether or not the phone would have been statically preserved, and I guess I want to understand what you mean by a phone being statically preserved.

Could you tell me what you mean by that?

A. I don't recall the context, as I already indicated. I believe the context was related to as I just answered the previous question, which was that we would secure the phone and basically turn it off, make sure it's not connected to any network, put it in a bag that could reduce the communication it could have with a wireless network and store it securely.

That would make it a static device, not a dynamic in use device. So if I did use that word, I believe that would have been the context I would have used.

Q. So you would have upon receiving Mr. Pable's phone made it be static as much as you could have?

A. That was done. We took it in airplane mode. What I was suggesting is that after our processing, in some matters we're directed to preserve it, and we would have shut it down further

14 (Pages 285 - 288)

Page 289

and remove power from it so it didn't turn on. If possible, remove the battery, make it again in a bag to remove or minimize the possibility of wireless signal.

That would be effectively making it non-functioning as a phone and maintain that and secure that so it could be processed further and troubleshooting the problems that were occurring, those types of things at a subsequent time. This was not the direction that we received.

Q. When you say that you didn't receive that direction, Mr. Duffy or Mr. Pable didn't tell you that they wanted to have the phone statically preserved?

A. Yes. I think more specifically I don't know about the statically preserved thing. I think that is not a phrase that I would have used.

If they would have said I may have used it recently, generally we understand what we're talking about. When we say statically, they would secure custody of the phone and kept it off line. And we were not directed to do so by Mr. Duffy.

I don't believe we were directed to do anything by Mr. Pable during this matter. So it was

Page 290

only through Mr. Duffy that we would have received those directions.

Q. Did you make any recommendations or did Quest make any recommendations to Mr. Duffy or Mr. Pable to, in fact, preserve or statically preserve the phone in any way?

A. Well, that would have been part of our discussion because we always offer that as a service.

And as I indicated moments ago, when I returned the phone it would have been a normal process for me to have suggested be aware of that phone because it may need to be used, at which point taking it out of service sooner than later would be better.

This is something where the user was apparently actively using the phone and had not disabled it or no longer as was planned going to be getting a new phone. That must have changed during that time frame, but again, we would have normal as a course of order suggested that to the phone's owner when we returned it and most likely also we discussed that with Mr. Duffy.

But I don't have a specific recollection

Page 291

of when that would have been discussed. It would have been part of our normal engagement, something we would do, but not something we were directed to do.

Q. Is it something you recommend be done?

A. I don't know all the particulars of any given case. You could imagine we only take direction, and we could make a recommendation.

But ultimately the case is managed by our client, and the client makes those decisions. They have other information way outside of what we know regarding the matter. So all we can do is give them suggestions based on our experience.

At the time this phone was being processed, it was not my recollection that this was the level of concern that apparently it had become now. So that was also part of whether the phone was in our custody or not. Maybe that was the decision that was made by Mr. Duffy, but we were not directed to do that, to maintain custody of it.

Q. Mr. Jerger, back on CTA Exhibit 88, if you could turn your attention to the top of the first page of Exhibit 88. Let me know when you're there.

Do you see that, Mr. Jerger?

Page 292

A. I do. One moment. Yes.

Q. At the top of Exhibit 88 is an e-mail from Mr. Duffy to you, Mr. Jerger, on June 8, 2020.

Mr. Duffy reports to you, "he meaning "Pable, also has the mail we have to retrieve and folders in his gmail. Perhaps whoever meets him to get the phone, can get the access to that as well. In parens, that's two factor authenticate, and they can do that together maybe, question mark.

Let me know what works best. Happy to have a person connect with him and work out these details. Thanks" I want to make sure I understand the process for gathering those folders that Mr. Pable had set up in his gmail account.

Was that something that you worked with him to get through the two factor authentication to get access to the pull of those gmail folders?

A. I think we exchanged e-mails on this, and you would have been provided those e-mails.

So only to the extent that I requested the keys and pass code in order to be able to access that through the two factor authentication. As I indicated previously, that was not successful. So we had to come up with an alternative method.

15 (Pages 289 - 292)

Page 293

Q. Can you explain that alternative method since the two factor authentication apparently didn't work to pull those e-mail folders?

A. So he used Google Takeouts, a feature of Google, to export out the data I was ultimately provided.

Q. The data that was provided was those folders that Mr. Pable had set up in his gmail account. He pushed those out to the Google Takeout platform?

A. Right. Yes. And those folders are also listed and enumerated in multiple e-mails subsequent to this one, I believe.

Q. And let's turn to that. If you could turn, Mr. Jerger, to CTA Exhibit 89. Let me know when you're there.

A. I'm there.

Q. CTA Exhibit 89 is an e-mail exchange. It's two e-mails between you and Mr. Duffy. The first one is dated June 8, 2020. And then you responded on June 9, 2020, correct?

I misstated that. Mr. Duffy sent you a note asking if he could confirm Thursday after 10:30 with Chris on June 9, right?

Page 294

A. Right. There are two e-mails, one June 8 and one June 9 both from Mr. Duffy to me.

Q. In CTA Exhibit 89, the earlier email, the June 8th e-mail is the one I want to turn your attention to.

This is where Mr. Duffy provides search terms to you, correct?

A. Yes.

Q. What were you instructed to do with those search terms?

A. As directed in the e-mail further down he had provided me a list of different folders that the gmail would be in.

Subsequent to the e-mails those folders were provided to us through Google Takeout from Mr. Pable. He then asked to be able to flip through these e-mails and their attachments so he could make a production slash privilege designation.

So we used those key words and applied them to the data we were provided in order to identify which things were responsive both from any of the online materials or if identified from the materials that were collected from the phone either manually or through other means.

Page 295

Q. So the search terms that are provided in Exhibit 89, one of the things you requested was you applied those search terms to these four folders from Mr. Pable's gmail account that he produced to Quest, is that correct?

A. Yes. And I don't know if those were the folders that ultimately ended up we received. You would have to look back through the other e-mails, but yes, there were four and other folders that were provided by Mr. Pable, as I indicated, both Hangouts and also his Voice later.

Q. And those folders that are listed here, you said that there may have been additional folders that were ultimately produced, but you were not involved, Mr. Jerger, and Quest wasn't involved in how those folders came to be set up in Mr. Pable's e-mail account, is that right?

A. That's correct. I did not create those folders or put anything into those folders prior, at any point.

Q. So you got those folders from his gmail account. Quest pulled them down, and Quest applied the 13 search terms that are listed in CTA Exhibit 89?

Page 296

A. And as applicable, the date ranges that were also provided in that e-mail.

However, on this e-mail, I believe it was later determined that there was a typo. So at the top of page two in your production it says and the agreed search time frame is June 1, 2019 through December 31, 2019.

That was subsequently corrected while I had the phone to June 1, 2018 through December 31, 2018. So the date ranges may have changed. Also subsequent to these initial folders, other folders were provided and other date ranges and/or other date ranges were provided also.

Q. So as I understand this, it looks like there was the typo of using 2019 as opposed to 2018 to do the searching and was that corrected by Mr. Duffy and conveyed to you?

A. It was. I produced -- while I had the phone in my custody, I produced screen captures of the messages that were within this date range.

I did not apply any search terms because it was sufficient to apply the date range. So it would be all the data available in the date range. The first half I did that I provided to Mr. Duffy on

16 (Pages 293 - 296)

Page 297

the 12th while I still had custody of the phone, and he advised me it was a typo, and it was meant to be 2018.

So I went back and took more screen photos of that. Those have been produced as project a phone, and I think they were previously produced to you during the course of this case.

Q. So aside from applying these search terms to the materials that Mr. Pable culled and produced to Quest with respect to his Google accounts, what else did you do with these 13 search terms that are reflected in CTA Exhibit 89?

A. I'm not sure if there is anything else. So these search terms or a reasonable facsimile of them, if there was any variations, as we discussed, were applied to any data set that we were directed to search and come up with key word hits.

So these folders were some of these folders that may have been provided ultimately. These are what are called T-2, T-3 and T-4. If there was a date range and/or search terms applied they were applied to that data set.

In addition, the T-1 phone we applied the search terms were searched against the limited

Page 298

data that was available and the images that were available from the phone when in my custody.

Then also we did screen captures based on the date range. I'm not sure if that covers all the different options, but it was basically we used them to filter or provide hit counts as directed by Mr. Duffy.

Q. I want to focus more on this T-1 bucket because if I hear you, you said you used these search terms to apply them to I think you said the limited images that were available when the phone was in your custody.

Can you explain to me what you mean by that?

A. Right. In an effort to try to identify if there was any data within those images as has been established, there were a number of images that were attempted.

They were complete in the sense that they were everything that we got from the phone. In other words, even though there were error messages that were well documented, nothing had been modified from the images, digital forensic images that we attempted to gather.

Page 299

So nonetheless, in an effort to be thorough we searched those, whatever was in there to see if any of those search terms or anything in the date range that were respondent to these filters.

And I believe none other than the ones that had already been identified through screen captures or through the Signal data were identified. So nothing else that was substantively included there from those searches of the T-1 images.

Q. And when you're referring to the images of the phone that you had in your possession, I know they were limited.

And you explained at length in your other depositions to some degree what those images looked like. Can you explain to me what segments of the phone were captured in those images that you applied the search terms on?

For example, I heard you say that it sounds like the search terms were applied to Signal data that you were able to capture off of the phone. Was there any other applications or data or other user data that the search terms in Exhibit 89 were applied to?

A. Well, you have those images. They were

Page 300

produced back in 2020. I think late 2020 they were provided to the different parties. At least the most comprehensive images that we were able to collect from the phone while the phone was in our custody. So it was all the data contained in there.

We didn't try to filter based on other types of data. We were searching everything in there that was available through the interface with the application with the Parabin, which is one of the tools. Endcase, that was used as well.

So we would search those image files, whatever they contained. Some of them as you probably have seen contained some regular text messages, SMS messages. There were very few as I recall. Those were also captured in project a phone photos.

It also included contacts and other databases that might have been included. It was just as an effort to confirm that there wasn't anything in addition that wasn't already captured with the manual collection, including documentation photos, that were 700. And including the project a phone photos, there were 5800 or so photos there. This was an additional step that was performed.

17 (Pages 297 - 300)

Page 301

Q.   You mentioned there's very few text messages, and I think there was something like five SMS messages that were collected based on what Quest did in June of 2020.

What was your understanding as to why there were such limited data on that phone?

A.   I'm sorry, limited data on the phone?

Q.   I mean here is where I'm getting.  The data that we've got from the Quest production in October of 2020 was a lot less than the data that was recovered when the CTA under a court order had the phone collected and had that data culled from that.

I'm wondering if you have any understanding of why that data set is pretty significantly different.  I think even Mr. Duffy acknowledged in one of these emails to you that it's a substantial amount of data that appeared on the second collection of the phone as opposed to what Quest collected.

Do you have any explanation for that?

A.   Well, it's been established I believe from the previous depositions and also from the materials you provided the images that were collected while

Page 302

the phone was in my custody did not represent every file on that phone.

It was done as part of our processing.  The direction was not to obtain a physical image of that phone.  If that had been discussed at any time when the phone was in our custody, I would have updated Mr. Duffy as to the status of the imaging and the data that was available and collected, including the emails I sent while I had it in my custody with the screen captures of the messages.

And also an indication that the exported Signal data didn't contain any additional messages that were not viewable on the screen, I believe.  So I would have updated him on that.  I do not know as I indicated in the previous testimony that what you or your experts were able to identify on the phone.

So I can't attest to what they found different other than I know there were certainly photos as previously discussed or other personal pictures and videos that were not collected and not part of that original image, which certainly would make the size of the image file different.

But again, our direction was not to take a complete, as previously termed by Mr. Kennedy,

Page 303

forensic image or I would say a complete logical image of the phone.

Q.   Did you recommend that an image of the phone be taken?

A.   I think we discussed this before one of the breaks here.  And I think that one of the solutions would have been to preserve the phone if the images were not successful or alternative methods of troubleshooting of the phone and why the images were not successful.

We were not directed to do so.  If we had discussions about that I did not have the understanding of what Mr. Duffy and you all had had prior to my involvement or engagement in this case.

Q.   When we talked a little earlier I think you said before the last break we were talking about this notion of statically preserving the phone, sealing it up, keeping it on a shelf until it's ready to be evaluated again.

And I understand that you were not directed to do that sort of static preservation or did you make any recommendation that any sort of preservation, whether it be a static seal it up and preserve the phone be made or any other

Page 304

recommendation to forensically capture an image of the phone?

A.   In the normal course I would have suggested that those are both options either before or during the engagement when there were errors collecting the data from the phone.

However, the discussions I would have had would have also included this is what I have recovered, and it would have been up to our client to determine whether or not that would address the needs that they had from their understanding of the matter.

So we would have made the suggestion in saying this is a possibility, you could do this.  This is an option.  We certainly would have been aware that, and our client was aware that the image was not complete, as stated by Mr. Kennedy, an image.  But it was a complete image in the sense that it is what the tools returned.

We didn't remove anything from that image.  That's just what the tools returned at the time I had it in my possession.  So ultimately we were not directed to then do any of the either try to reimage, try to troubleshoot the problems with

18 (Pages 301 - 304)

Page 305

the phone or try to, as you say, collect or preserve the phone in our custody.

Q. So you mentioned that you had certain errors in collecting certain data on the phone, and you were dealing with the tools that you were provided and based on your direction from the client.

Were there other tools at your disposal that you could have used when you got those error messages to get a fuller picture or capture a fuller picture of the data that was on the phone?

A. At the time we had custody of the phone we used all of the tools available to us at that time.

We did, as you saw, use a trial version of a tool to see if that would be more successful. And my recollection was it was not. So if we had other tools it would have been perhaps subsequent to our custody of the phone. So I did not not use a tool while it was in our custody to try to collect the image of the phone.

Q. When to your knowledge did Mr. Duffy become aware that the images you collected here were not the complete data set or did not contain what would have been a full data set or full image of the

Page 306

phone?

A. It would have been while we had the phone in our custody before we returned it. So June 11 or June 12, 2020.

Q. And how would that have been communicated to Mr. Duffy?

A. Telephonically and also maybe through e-mail because you can see that I sent e-mails in the interim of this is what is viewable on the phone.

Q. When you got the phone and you viewed the various errors and you are looking for, it looks like maybe other trial software to try to use to try to get more information off of the phone, can you tell me what your impression was of the phone and the state of the phone and the data on it.

In other words, was there any inference that you could make of what may have been done to the phone to isolate data prior to you receiving it for collection or to prevent collection of data off of the phone?

A. As I think I testified, I did not attempt to try to troubleshoot those problems beyond what's already been documented.

Page 307

So in answer, there was data that was present on the phone. I took pictures of the amount of data present on the phone. But as I was directed to only collect certain subsets of data and that's what I did, and we produced that information to Mr. Duffy.

Q. When you received the phone from Mr. Pable, did the phone have a SIM card in it?

A. According to I believe the chain of custody and also our evidence acquisition worksheet there was no SIM card in the phone when it was provided to us.

Q. Were you made aware of why it did not have a SIM card in it?

A. Not that I recall, no.

Q. Did you inquire as to why it did not have a SIM card in it?

A. No. It was indicated it didn't have a SIM card, and I made a notation.

Q. Did you follow up or ask why there wasn't a SIM card in the phone?

A. I did not. I knew that the phone may or may not be transitioning to a new phone, but I didn't make any inquiries that I recall at the time.

Page 308

Q. And you didn't direct Mr. Duffy or Mr. Pable to have the SIM card removed from the phone prior to receiving it?

A. No.

Q. Was there an SD card in the phone when you received it?

A. No.

Q. Were you made aware of why there was not an SD card in the phone?

A. No.

Q. Did you ask to copy or image any SD card that Mr. Pable would have had relating to that phone?

A. No.

Q. And were you made aware of why the SD card wasn't available or wasn't present in the phone?

A. With respect to an SD card, the phone may or may not have had an SD card similar to the SIM card.

I don't know if the user used the phone without a SIM card. Phones can function without SIM cards. They just function differently. Both the SIM card and SD card could not have normally been present, but I did not inquire.

19 (Pages 305 - 308)

Page 309

Q. You spoke a lot today and in your other depositions in particular about the things you were directed to do, and you focus on how you limited your actions to precisely what you were directed to do by Mr. Duffy. Is that fair?

A. Yes. We do that in all cases with our clients because our clients are asking us to do certain things, not asking us to do things that are outside of the scope in which they want us to pursue. So yes.

Q. Was there anything that you were directed to not do relative to your engagement with Mr. Duffy either on the phone or in any other data or information relating to the case?

A. That is a very broad and general question. But there was to my knowledge no direction to exclude results from any of our searches or results set. So there was none of that.

When we had discussions, this is where I guess I'm a little confused. When we had discussions about -- can you clarify your question. I'm not sure I understand.

Q. What I'm getting at is were you ever instructed by Mr. Duffy or Mr. Pable to collect

Page 310

this, but not that. Don't get that off of the phone. Don't preserve that from the phone or words or deeds to that effect?

A. Well, I think when we had our discussions, Mr. Duffy and I, regarding what we had collected from the phone and how we had done a manual collection there was a discussion of what are the other pools of data that might be on the phone including, as I indicated, photographs and videos.

I think at that point I was directed not to -- that wasn't important at the time. So it wasn't relevant to what he was directing me to collect.

So he didn't explicitly say don't collect that, but it was under our discussion that I was not directed to collect that. So I don't recall any circumstance where he would have said don't collect any of the data. What I got was what I got, and I did the processing that I was directed to do and produced those results.

Q. And I think you testified earlier that there was a very limited amount of SMS text messages on the phone when you collected it from Mr. Pable in June of 2020, is that right?

Page 311

A. I believe so, yes.

Q. Can you turn your attention to CTA Exhibit 90. Let me know when you are there.

A. I have it.

Q. This Exhibit CTA 90 is an e-mail from Mr. Duffy to you on June 11, and Mr. Duffy says "I assume, Dan, that if there were quote normal texts on the phone from the relevant time period we would see those too.

And if none, we'll be able to say we searched, and they were not there; i.e., we are not just relying on Chris's word. He used Signal."

Could you tell me what you understand that message to mean from Mr. Duffy or how you understood it?

A. I understood Mr. Duffy to be asking as he stated that are there any other texts, normal texts that would have been on the phone other than the text or messages that would be contained within Signal.

Q. And so did you have any other discussions -- I ask in part because at least based on what was produced this e-mail seems to be a bit of a non sequitur between you and Mr. Duffy in

Page 312

respect to evaluating the text messages.

So I wondered if there was a follow-up discussion or prior discussion about the lack of text messages that were on Mr. Pable's phone and if you recall any of those discussions with Mr. Duffy?

A. No. I believe that this was in response or followup to some other discussion that we would have had on that day later in the day of June 11. This was 5:43 when Mr. Duffy sent this. As I indicated, I had a number of discussions telephonically with Mr. Duffy while I was in custody of the phone. And I would imagine that this probably followed one of those discussions, and I don't believe I e-mailed him a reply to this.

So I would imagine I would have replied back telephonically and answered this question over the phone.

Q. And do you recall how you answered that question?

A. Whether I did it that day or the next, I don't know because I may not have been in front of the phone at that point or had that information to be able to answer him.

But I would have answered that what I

20 (Pages 309 - 312)

Page 313

found to date had been those limited number of text messages that appeared to be more almost of a spam nature, not of a personal nature. And I believe they also may have been out of the date range he stipulated.

But I still collected those and provided those to Mr. Duffy.

Q. Did you have any impression as to whether or not Mr. Pable was using SMS messaging or other platforms to communicate on his phone based on your evaluation of it?

A. Well, as has been established, he used Signal. I think that was understood. He had messages that also I think were in Hangouts. And there was these messages in his SMS or message app on the phone.

I don't recall if there were any other messaging applications that he was actively using that I know of.

Q. And what were you told about Mr. Pable's use of the Signal application?

A. I think very little. He had used it. And I think on the date of collection I noted something about Signal.

Page 314

You'll have to look back at the scanned document that were produced prior to the last deposition where it refers to my communications with Mr. Pable when I collected the phone.

Q. So you don't recall anything aside from if there's a communication about Signal, about Mr. Pable's use of Signal on the phone?

A. I think he shared something about how long he had it before it times out or erases the messages.

So again that is documented in my handwritten notes that were previously provided to you. And I don't recall any other discussion about it with Mr. Pable.

Q. There were certain files that were containing Signal backup messages from Mr. Pable's phone that were only produced to the CTA in October of 2021.

Are you aware of why those were not produced earlier?

A. I believe the results of those were produced earlier. I don't know. I produced that backup I reviewed while I had the phone in my custody.

Page 315

And I then compared that to the phone's messages that were visible on the phone, and they were consistent. Also those messages that were within both date ranges, the 2019 time frame and 2018 time frame were produced to Mr. Duffy. So the screen captures of those, they were also produced to you at some point along the way here.

I don't recall in October of 2020 that they were part of what was being requested. I believe they were requesting the image files. And I believe that I produced the image files that were the most complete at that time.

Q. So your understanding was that the CTA was not requesting the Signal communications at the time that you ultimately provided that thumb drive to me in October of 2020?

A. I was asked to produce the images. So the digital images that I collected from the phone.

And I produced the most complete and error free images that were collected from the phone in October of 2020. I was not asked to produce or directed to produce any other files that may have been related to the phone at that time. I was asked to produce the image files at that time.

Page 316

Q. And I don't want to retread too much, but when you're referring to those image files, this is very nontechnical.

Are you literally referring to those, I think you called them the photo files that were made as you were imaging the phone, like a screen grab image file?

A. No. Thank you for the clarification. They were digital forensic images. That's the term I'm using for the October production.

I was asked to produce the digital forensic images that were collected from the phone using digital forensic tools when we had the phone in our custody in June of 2020. I was directed to produce those in October of 2020 and did so on the USB drive.

The images you're talking about, project a phone, correct, that are more along the lines of photos, but sometimes those are called images too. Those I was not asked to produce. I already produced those previously to Mr. Duffy between June and October of 2020.

Q. So the Signal backup messages that you retrieved, you made those available to Mr. Duffy

21 (Pages 313 - 316)

Page 317

when you first collected them in June of 2020, is that right?

A. I don't know if he received the raw Signal backup file because many of those messages that were contained in -- well, I don't know how many, but some of them were not responsive to the date range.

So I believe that while the phone was in my custody I reviewed the encrypted version of the backup file and identified which messages were within the date range that was being specified. Then I compared them to the project a phone photos that I took of the screen, of the Signal app and identified that there was a one to one correlation, and none were missing at that time.

So he would not probably have had the backup file, but he would have had the pictures of those that were within the date range.

Q. Were you made aware that the CTA requested the Signal messages in the native format?

A. What time are you referring to?

Q. In June of 2020 or October of 2020.

A. No, I was not directed to produce or was aware that the CTA was requesting that, not to my recollection.

Page 318

Q. When did you first become aware or when were you first instructed to provide the native Signal message file or files?

A. In 2021, I think it was October 12, of the first deposition there was a discussion some of the files that were not included by I believe an accident that Mr. Duffy didn't include some of those photographs that I had produced to him.

He then brought that to your attention during that deposition on the 12th and then some other files, including the Signal backup were provided after that first deposition. Before the second deposition on, I think it was October 19, 2021, that was the first time I was directed to produce those. And I did so.

Q. So that was the first time you were directed by Mr. Duffy to produce the Signal native file was in October of 2021 at the time or directly after your first deposition in this case?

A. Yes. To be clear, the Signal exported data file?

Q. Yes.

A. Yes.

Q. Was Mr. Duffy informed when you collected

Page 319

the phone and did your work with it in June of 2020 that there were Signal messages that were recovered in that format?

A. I would have related to him as I related to you at some point during that time frame or during the time I had the phone or very shortly thereafter that I had collected a backup of the Signal data and also confirmed that those were what were represented in the project a phone images that I took of the Signal app on the phone.

So that they were the same messages that were there within the date range that I was provided.

Q. So you would have made Mr. Duffy aware in June of 2020 that you had collected the Signal backup, is that right?

A. I gave them an alternative method to collect the Signal data, yes. I think it would have been June of 2020, yes.

Q. When you say you did an alternative method to collect it, are you referring to those photographs or are you referring to the data file -- I don't know if it's a CSV file, but the Signal backup file?

Page 320

A. When I refer to the alternative method, I was saying I collected it with the manual project a phone photos.

So that was one method, and the alternative was to do the backup within the Signal app and that is what produced what ultimately you're seeing on the USB file.

Q. Mr. Duffy was made aware you did both of those steps with respect to Signal in June of 2020?

A. It would have been around that time. I think I would have discussed it. He was aware around that time frame that is what I collected, but not part of the images that I collected.

The images were a separate process by which I tried to collect data off the phone, the digital forensic images.

Q. Were those search terms, I think they were in CTA Exhibit 89 that we discussed. Were those search terms run on the Signal messages, either the backup file or in any other manner on the Signal communications?

A. I don't recall because I think that in some cases the more generous solution was to provide the date range because I understood these were both

22 (Pages 317 - 320)

Page 321

constraints.

It was the date range and the search terms, not an either. However, we did the date range sometimes as I've indicated like when we did the manual collection so that Mr. Duffy could then review and see if there were any responsive.

We sometimes returned back to those and did searches for the key words just so he knew, but he still would have had the data that was within the date range.

Q. Did you limit the collection of Signal messages to a particular date range or did you pull whatever Signal messages were available on the phone at the time that you received it in June of 2020?

A. I believe for the project a phone photos that were taken, I only took photos of those that I believe were responsive.

Again, I did it twice. Once for 2019 and once for 2018, both of which I produced to Mr. Duffy. In addition, the alternative method as I indicated, the backup, I produced a decrypted version at some time later to Mr. Duffy. I didn't try to filter those down or, as I say, I just compared them within the date range and said these

Page 322

are the same as showing up in the pictures. So you already have that. You don't need the CSV file until later it was in question when I gave the backup to him.

Q. So the Signal backup file that was ultimately produced, that didn't have any search term or date parameters applied to it.

It was just whatever you were able to grab off the phone, is that fair?

A. I understand what you're asking. In the initial collection of the Signal data if I understand what you're asking me from the export feature within the Signal app on his phone when it was in my custody I did no filtering of that original backup. I did the backup -- actually the backup ran twice.

And you have I believe both of those files. One of them had a couple more messages because a couple of the messages had fallen off because of his expiration. So I think there were three messages that fell off, but because the tool did it twice within a minute of the backup and then I provided the backups to you.

Q. Is it fair to say the bulk of this work

Page 323

we've been discussing where you received the phone, you're going through the Google Takeout data, and also to the extent you did any other actions on the phone like the Signal messaging that we just talked about, was that all conducted in June and July of 2020?

A. The bulk of it, yes. Anything to do with the phone, yes. Although I would have maybe returned back in October to the images because I was being directed to produce those images.

Certainly, when I had to produce information related to this deposition or these depositions I had to revisit the data. The work that I was performing was with the phone only on those one and a half or two days, and the subsequent online data was around that same time, June of 2020.

You have to see in the e-mails when they were provided to me because I don't know. There was a revisiting at some point later. It might have been 2020 that there was some more data, either Voice data provided to me or there was also a different date range that got extended as I understood.

So we researched the data we already

Page 324

had, but were provided more within a different date range that was done later, but I don't recall when specifically that was done. However, it would have been documented in all the e-mails you've been provided.

Q. One question to revisit quickly. It sounds like you didn't inquire or receive much information about the fact that there wasn't a SIM card on Mr. Pable's phone.

Can you tell me what the impact would be to collecting data on a phone if there isn't a SIM card present?

A. It depends on the phone. Today?

Q. I'm referring specifically to this phone. We're talking about Mr. Pable's phone.

A. I can't because I didn't have the SIM card to test to see what was on the SIM card.

Q. As a general matter?

A. Right. However, today in general the SIM cards contain less and less information. They are more related to identifying that device on a cellular network.

So their identification, so they have a provision on their network that can be used on a

23 (Pages 321 - 324)

Page 325

cellular network. The SIM cards themselves these days are not typically used for storage of personal data. Very, very limited. In the past there could have been some data on there, but typically now applications don't store it there on the SIM cards anymore. It's really just an identifier.

Again, I don't have this phone specifically, and it depends on the phone and user as to what is getting stored on the SIM card. But it's a very small memory footprint comparatively to what the rest of the phone contains or could contain.

Q. At some point in this litigation in October of 2020 you were directed to produce an image of Mr. Pable's phone to me here at Taft, right?

A. Yes.

Q. Can you turn your attention to CTA Exhibit 91. Tell me when you've got that up.

A. I got it.

Q. Exhibit 91 is an e-mail exchange between you and Mr. Duffy on October 24 and October 25 of 2020, correct?

A. Yes.

Page 326

Q. And the October 24 e-mail from Mr. Duffy, it provides, "Hi, Dan. Can we talk about Pable on Monday dash say 1:00 p.m. Other side wants hit counts, perhaps another peak into his e-mail and a copy of the image of the phone." Right?

A. Yes.

Q. Was that the first time Mr. Duffy advised you that the other side, the CTA in this case, wanted a copy of the image of Mr. Pable's phone?

A. To my recollection it would be, but I would have to look through the previous e-mails to see if there is some other reference to it.

I don't recall if there was anything before that time or if it was very much farther before that time.

Q. Ultimately, did you speak to Mr. Duffy on Monday, that would have been October 26, 2020, to your recollection about this request?

A. Yes. At some point subsequent to this e-mail I would have spoke with him as indicated by my October 25th response.

Q. And at that point in time did you advise Mr. Duffy that you and Quest did not have a forensic image of Mr. Pable's phone?

Page 327

A. It was discussed, but that was already known before this time. I have images, but they were not -- the work that I had produced prior to was not -- meaning from the online data sources and the production of materials that I provided to Mr. Duffy was not from the images that were being requested at the time.

Q. And did you discuss with Mr. Duffy in October of 2020 collecting the phone again in order to create or prepare a complete forensic or copy image of the phone?

A. I don't believe that we specifically were requested to do that. If I did, I would have done that. I was asked to provide the images.

I was a little confused to be honest because it was not part of what I used to produce all the other data that had been produced in this matter to date.

So while it was being requested, or I was being directed to turn it over, I knew that it was a subset or a limited subset of the data that was being used to produce the other records that were produced to you from the online sources and from the Signal backup or as represented by the

Page 328

photos that I had also taken through the manual collection.

Q. So is it accurate to say that in June of 2020, Mr. Duffy was aware that there wasn't a complete forensic image taken of the phone?

A. Yes.

Q. When you consulted with him again in October of 2020, is it fair to say that you and Mr. Duffy conferred again, and you confirmed that, in fact, Quest did not have and had not taken an image of the phone at that time?

A. Well, I had taken an image. So there was a discussion saying yes, I can produce those images. They will contain what they contain, that they did not contain, as you have termed it, a complete.

But they didn't contain comprehensive logical or physical acquisition. They were, however, the complete data set that I did collect from the phone at the time, meaning the images that I provided or were provided to you on that USB drive were the ones that I successfully collected from the phone as they were collected back in June.

Nothing changed between June and October when those images were produced. So there was some

24 (Pages 325 - 328)

Page 329

confusion, as I indicated, because the images were not part of what all the other data was being produced from.

Q. And you weren't directed by Mr. Duffy at that point in time in October of 2020 to revisit the phone or to get a complete forensic image or complete copy of the phone at that time, right?

A. I was not, no. You are correct, I was not.

MS. BABBITT: Could we take a couple minute break.

(Recess)

BY MS. BABBITT:

Q. I should have mentioned this. If you could refresh your exhibit share, we did drop one additional exhibit in there. It's CTA Exhibit 83.three, which was used in the last deposition as well.

Mr. Jerger, if you could open that exhibit and let me know when you are at that exhibit.

A. I have it open.

Q. Turn to the last page of CTA Exhibit 83. It's marked at the bottom right as P003041. Let me

Page 330

know when you're at that page.

A. I'm there.

Q. Are these your handwritten notes, Mr. Jerger?

A. Yes.

Q. And in this page on CTA Exhibit 83, it looks like about four lines down you wrote Pable advised. Do you see that?

A. I do. One clarification. As I testified previously, there are some notes here that are not in my handwriting.

I testified to the mobile numbers, Mr. Pable, he wrote that. So everything after the mobile number question mark he wrote those. The pin number I believe is his handwriting the one, two, three, four pin number. So to be clear.

Q. Can you read for us, Mr. Jerger, what you wrote in those bullet points after you write Pable advised in CTA Exhibit 83?

A. Yes. There's four bullet points. The first one is Signal text MSG limit. Bullet point 25-50.

The second bullet point is remote wipe late oct/nov 2018 by company. And that same bullet

Page 331

points, sub bullet - some ups, backups. Tasker BUP pictures to cloud. Third bullet point VPN token and other from current employer removed.

Fourth bullet point was phone while @ symbol past employer. Tilde, launch date purchased tilde one year the letter B, the number 4 wiped by former employer.

Q. I want to make sure I understand the context or the meaning of some of those notes that you explained.

The first bullet point in Exhibit 83 that you read for us, it refers to a Signal text message limit of 25 to 5O. Can you tell me what you meant by that or what you understood that to mean?

A. I understood that Pable had advised on June 11, 2020 at or around 10:30 a.m. when I picked up the phone that he had the Signal text messaging app, and he had set the limit to something like 25 to 50 messages within the app.

Q. So Mr. Pable advised you in June of 2020 when you received the phone from him that his application for Signal was set up to retain only up to 50 messages, is that correct?

A. Yes. It's unclear whether he was saying

Page 332

at the time, but I don't have that noted whether it was the number of messages or a duration of the message.

So it could have also been that he was indicating that they were going to expire at a certain time, but that there were a finite number of a moving window that his Signal messages would be retained for.

Q. When you say moving window, are you saying that as you understood it Mr. Pable had configured his Signal messages such that he only had a certain number of messages that would be saved on a device before they were deleted off the application and deleted off the phone?

A. My understanding is he had settings so there would be a limit to the number of messages that might be on the phone. That he wouldn't have every single message that was related to or either received or sent and that there was a finite window that would be moving over time.

So that over time either with the number of messages and/or by date range he would have a limited amount of data within the Signal app, based on his settings within the Signal app.

25 (Pages 329 - 332)

Page 333

Q. To your knowledge, was Mr. Duffy aware of how those Signal messages were set to have that sort of moving retention window?

A. At some point during our engagement we discussed Signal. But I don't recall when that would have been discussed.

Q. Do you recall if that would have been in 2020?

A. It could have been I would imagine because Signal as indicated in the e-mail that you had shared with me regarding quote, unquote normal text messages, he was referring to Signal at that time too. So it may have been in 2020, sure.

It would have been consistent because we did most of our work in 2020.

Q. That second bullet point in CTA Exhibit 83 you read for us, it relates to remote wipe.

It says something like some backups, and I think you said Tasker. Could you read that?

A. I think he used an app named Tasker to back up picture to the cloud. I think that is what you're referring to. Tasker BUP is backup pictures to cloud.

Q. Is the point of this note that Mr. Pable

Page 334

reported to you that there was a remote wipe of his phone in late October November of 2018 by the company, but that some backups of the phone existed?

A. I would have inquired whether there were backups because that is always a question of where the data could reside. And his response was it was a limited backup.

There was some, but because I was genuinely interested in whether he lost personal data at that time if, as he reported to me, that the company remote wiped his device.

That would have been a natural question to see hey, did you have a backup. That was my notation, he had some backup, at least his pictures to the cloud. He didn't elaborate if there were other apps, for example, that were backing up.

However, Hangups and other Gmail I knew were not solely on the phone. They would also have been in the online server. They were already backed up.

Q. The last one of your handwritten notes on the last page of Exhibit 83, I think you said one year before wiped by former employer.

Could you tell me what you mean by that

Page 335

note?

A. The remote wipe, the VCN token, at that point was what he was reporting to me of remote wipe or wiping that occurred or loss of data related to a VCN token that related to a former employer.

The last data point specifically is referring to the duration in which he would have had the phone. So when did he first get the phone, how long has he had it. And so he advised until they launched a purchase, that was the first time he had the phone, so the first time the phone would have been in his custody, which again, was relevant to the understanding of getting a little of the info of the phone before I collected it.

We tried to document some of the information as well as any problems as I documented on the chain of custody, like that there was a problem with the power cord or the data connection to the phone that he had advised, and I also experienced during our acquisition.

In addition, the last line is about until the one year before wiped by former employer. As I recall, what was happening there is that he had the phone from when he bought it at launch date

Page 336

until one year before it was wiped he was using the phone. Then it got wiped by the former employer.

If you go three bullet points up, it was according to him reported October and November of 2018. It would have been that window where the phone was in most use. But I don't know since that time how much he had used the phone prior to me collecting it in June of 2020.

Q. Did your review of the phone reflect what sort of usage he had on the phone since that remote wipe in October or November of 2018 through the date you collected it in June of 2020?

A. I didn't do that analysis. It wasn't under our direction. These notes were taken contemporaneously because at the time it was just as a precaution because we didn't know what necessarily we were going to be asked.

We always like to have some order to confirm that what we're seeing is consistent with what has been reported over the actual use of the phone by the user. So I don't recall being directed to do any specific investigation into the reported wiping.

Q. A few more questions, Mr. Jerger. I think

26 (Pages 333 - 336)

Page 337

you were asked about this in your prior deposition. Mr. Duffy retained Quest and submitted or paid a retainer of $5,000 to Quest, correct?

A. As I recall, yes.

Q. How much of that retainer has been drawn down by Mr. Duffy to date?

A. I do not know.

Q. Who would know that?

A. As I think I testified previously, there have been no invoices. They would have shown up in the production of e-mails that you have been provided.

So there have been no generation of an invoice to the client. So at this time there has not been any invoicing.

Q. Why is that?

A. In some cases we don't invoice until the end of the case. It just depends on the matter and the case appears to be on ongoing. So we have not invoiced our clients.

Q. Have you kept track of your time?

A. As I testified to previously we will reconstruct it based on all sorts of different data points that we already have, including the duration

Page 338

of these depositions.

Or historically other activities, the chain of custody and date and time. So we reconstruct our time relevant to that.

Q. So you don't contemporaneously keep your time as you work on a matter for Quest?

A. It depends on the case. This particular case was not initially a significant amount of time. So it was not maintained contemporaneously at the time.

Q. And it still isn't being maintained contemporaneously, is that correct?

A. The amount of time being spent on this case is more related to the depositions. So yes, that is correct.

Q. Could you give me an estimate a percentage of cases which you don't keep contemporaneous time?

A. I cannot. I wouldn't be able to speculate. It's not uncommon depending on the case. Again, I don't want to speculate.

Q. I'm sure you wouldn't. With respect to not invoicing a client until the end of a matter what percentage of your cases do you wait until the end of an engagement to submit your first invoice?

Page 339

A. It depends on the case. It depends on the circumstances about the case, the engagement.

I would not have any idea particularly because we have multiple agents working on different cases, and they all had different procedures or different frequency of invoicing. But some cases we invoice monthly and some cases we invoice at the end of the case.

Q. Are you aware of how much work Mr. Duffy has done on behalf of Quest to represent Quest in its pleadings and its representation before the Court?

A. I am not.

Q. Has Mr. Duffy invoiced Quest at all for any of his attorney time spent on this matter?

A. I have not received any invoice from him.

Q. Are you aware if anyone else received an invoice from Mr. Duffy?

A. No. He would have sent it to us, and it would have been produced in the e-mails you've been provided.

MS. BABBITT: I don't have anything further.

MR. DUFFY: Just a few questions, Mr. Jerger.

Page 340

CROSS-EXAMINATION
BY MR. DUFFY:

Q. Ms. Babbitt asked you about the folders from the gmail or that contained the gmail data that Mr. Pable had generated and that you then accessed. Do you recall that?

Do you recall a discussion about those folders?

A. I do, yes.

Q. And, as I think you said, whatever work or she used the word filtering went into making the folders from the universe of his gmail data, you don't have any particular knowledge of what he did or did not do in that regard, correct?

A. That's correct.

Q. You don't know how much or whether he restricted anything or filtered anything he may have done. He may have done a lot, you just don't know?

A. I don't know the data until I received it.

Q. And do you recall one of those folders is labeled by him nonresponsive or NR?

A. I do recall that.

Q. But nevertheless, that was a folder that was provided, and you went through it. Correct?

27 (Pages 337 - 340)

Page 341

A. I did.

Q. You did the process that you described about searching and applying search terms and date ranges, you did that on all the data that he did provide, correct?

A. Yes. I don't recall treating any of the different folders that were provided differently and certainly not intentionally.

So yes, I would have searched whether it those four or subsequent folders that were provided to me or subsequent data from different sources I would have provided the same filtering process.

Q. Was there any verification process or signatures or hashes or anything to verify that you had gotten the contents from Google is the same thing he was sending?

A. One of the things I requested from Mr. Pable when he was transmitting the information he got from Google Hangouts is hash values, which is cryptographic hash values that allowed me to confirm that what I received is what he had sent.

So I definitely did that. Just to be clear with respect to some of the other folders, I did filter some of those folders. However, I

Page 342

believe you were provided all of the data for your purview.

I did the searches based on date or time. With respect to those e-mails, I think you asked for the ability to be able to search through them and look at them in their entirety.

Q. Ms. Babbitt asked you about the various tools you used to with respect to imaging the phone, and I believe you told her you used all of the tools that you had available and even a test version of one that you didn't have the full version of to see if it would produce any different result, right?

A. Yes. I tried several different tools, all of which have been documented and provided to you.

Q. Although you're not familiar with what the CTA subsequently did with the phone, their work took place at a later date.

And you don't know whether or not they had more updated or different tools that they were able to use, correct?

A. I do not know what they did or what they received with respect to the phone. The phone was a different phone inherently because it was a different period.

Page 343

Q. Is there anything we talked about that you reviewed that gave you any indication that there was any meaningful data stored on any SIM card associated with this phone?

A. Because I didn't have the SIM card, I don't know what was on there or not on there.

However, as I testified to, SIM cards in today's modern phones typically don't contain large volumes of data. It doesn't mean that it can't be relevant to a case, but they typically don't contain large volumes of data comparative to the storage capacity of a modern phone.

And the phone itself can work without the SIM card, as I testified to. It will just work differently because they won't have access to a cellular network without having any other E-SIM in the phone or set up on the phone.

Q. What was that word you used?

A. E-SIM. So electronic SIM. Sometimes some carriers will allow an electronic SIM without having a physical SIM card that allows them to provision the phone on their network.

Again, it's just an example of the SIM cards are not necessarily used or required in

Page 344

today's phones.

Q. You don't need to use an SD card with this phone or any other phone, do you?

A. No. The SD card is only for additional storage that you couldn't already store on the phone.

I don't think this phone was full with all of its data and that would be documented in the project a phone photos or the other documentation photos that were provided. So it may or may not have had an SD card.

I didn't do an analysis to that effect, but I was informed there was no SD card.

MR. DUFFY: That is all for me.

28 (Pages 341 - 344)

Page 345

STATE OF ILLINOIS   )

          ) ss:

COUNTY OF C O O K   )

          I, VICTORIA D. ROCKS, C.S.R., Notary Public, within and for the County of Cook, State of Illinois, a Certified Shorthand Reporter of said state, do hereby certify:

          That previous the commencement of the examination of the witness, DANIEL JERGER, was first duly sworn to testify to the whole truth concerning the matters herein;

          That the foregoing deposition transcript was reported stenographically by me and was thereafter reduced to typewriting via computer-aided transcription under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

          That the said deposition was taken before me at the time and place specified;

          That the reading and signing by the witness of the deposition transcript was not waived;

          That I am not a relative or employee of attorney or counsel, nor a relative or employee of

Page 346

such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

          IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois this 25th day of March, 2022.

*Victoria Rocks*

          VICTORIA D. ROCKS, C.S.R.
          License No. 084-002692

Page 347

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

March 27, 2022

To: Timothy A. Duffy, Esq.

Case Name: Pable, Christopher George v. Chicago Transit Authority And Clever Devices LTD

Veritext Reference Number: 5096646

Witness:  Daniel Jerger      Deposition Date: 3/9/2022

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 348

          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS

          ASSIGNMENT REFERENCE NO: 5096646
          CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices LTD
          DATE OF DEPOSITION: 3/9/2022
          WITNESS' NAME: Daniel Jerger
          In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
          I have made no changes to the testimony as transcribed by the court reporter.

_____
Date          Daniel Jerger
          Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

          They have read the transcript;
          They signed the foregoing Sworn Statement; and
          Their execution of this Statement is of their free act and deed.

          I have affixed my name and official seal

this _____ day of_____, 20____.

_____
          Notary Public
_____
          Commission Expiration Date

29 (Pages 345 - 348)

Page 349

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5096646
CASE NAME: Pable, Christopher George v. Chicago Transit Authority And Clever Devices LTD
DATE OF DEPOSITION: 3/9/2022
WITNESS' NAME: Daniel Jerger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____    _____
Date            Daniel Jerger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections in the appended Errata Sheet;
    They signed the foregoing Sworn Statement; and
    Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this _____ day of_____, 20____.

_____
    Notary Public

_____
    Commission Expiration Date

Page 350

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 5096646
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date            Daniel Jerger
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
    Notary Public

_____
    Commission Expiration Date

30 (Pages 349 - 350)

**[& - able]**

**&**

**&** 237:7

**0**

**084-002692** 346:9

**1**

**1** 237:15 269:1,1,2 269:14 296:6,9 297:23 298:8 299:9
**10-24** 238:9
**10-25** 238:9
**11** 262:15 306:3 311:6 312:8 331:16
**11-15-21** 238:9
**11-16-21** 238:9
**1100** 347:1
**111** 237:9
**12** 262:15 306:4 318:4
**12754** 346:8
**12th** 297:1 318:10
**13** 295:23 297:11
**15** 244:23,24
**16** 244:23,24
**1820** 347:2
**19** 236:6 318:13
**1:00** 326:3
**1o** 236:16

**2**

**2** 269:14 297:20
**2-7-22** 238:10
**20** 348:16 349:22 350:22
**2018** 296:9,10,15 297:3 315:5 321:19 330:24 334:2 336:5,11
**2019** 296:6,7,15 315:4 321:18

**2020** 241:23 242:8 242:10,12 254:24 261:14,15 262:14 262:15 263:2 278:8 281:4 284:23,24 292:3 293:20,21 300:1,1 301:4,10 306:4 310:24 315:8,16 315:21 316:14,15 316:22 317:1,21 317:21 319:1,15 319:19 320:9 321:14 323:6,16 323:20 325:14,23 326:17 327:9 328:4,8 329:5 331:16,20 333:8 333:13,15 336:8 336:12
**2021** 241:13 244:24 251:12 263:7 314:18 318:4,14,18
**2022** 236:17 251:13 255:18 262:1 346:6 347:4
**216-523-1313** 347:3
**22** 251:15
**24** 325:22 326:1
**241** 238:4
**244** 238:9
**25** 325:22 331:13 331:18
**25-50** 330:22
**255** 238:10
**257** 238:10
**25th** 326:21 346:6
**26** 326:17

**27** 347:4
**278** 238:7
**2800** 237:9
**293** 238:8

**3**

**3** 269:5,5,14 279:8 297:20
**3/9/2022** 347:9 348:3 349:3
**31** 261:11,14,15 296:7,9
**311** 238:8
**325** 238:9
**329** 238:11
**340** 238:4
**341** 238:5
**344** 238:5
**3815** 237:15

**4**

**4** 269:6,14 279:9 297:20 331:6
**44114** 347:2

**5**

**5,000** 337:3
**50** 331:19,23
**5096646** 347:8 348:2 349:2 350:2
**5800** 300:23
**5:43** 312:9
**5o** 331:13

**6**

**6-8-20** 238:7,8
**60093** 237:4
**60174** 237:16
**60601** 237:10

**7**

**7** 255:18 256:10
**700** 300:22

**725** 237:4
**7868** 236:6

**8**

**8** 278:8 292:3 293:20 294:1
**83** 238:11 329:16 329:23 330:6,19 331:11 333:16 334:22
**88** 238:7 278:5,7 278:11 285:5 291:21,23 292:2
**89** 238:8 293:15,18 294:3 295:2,24 297:12 299:22 320:18
**8th** 285:7 294:4

**9**

**9** 293:21,24 294:2
**90** 238:8 311:3,5
**91** 238:9 325:19,21
**92** 238:9 244:19,23 245:18 247:2
**93** 238:10 255:15 255:17,20 256:4 256:10
**94** 238:10 257:4,6 257:10 260:17,19 260:23 263:17 265:23 267:24
**9th** 236:17

**a**

**a.d.** 236:17
**a.m.** 236:17 331:16
**ability** 239:12 276:23 342:5
**able** 277:1 281:21 284:8 292:21 294:16 299:20

**[able - attachment]**

300:3 302:16 311:10 312:23 322:8 338:18 342:5,20

**absolutely** 273:14 273:18

**abundantly** 271:7

**access** 242:5 278:15 283:6,8 292:7,17,21 343:15

**accessed** 340:5

**accident** 318:7

**account** 279:23 281:14 283:6,8 292:14 293:9 295:4,17,22

**accounts** 265:22 267:2 268:4 277:24 297:10

**accurate** 272:13 272:15 273:16 328:3

**acknowledge** 348:11 349:16

**acknowledged** 301:17

**acquisition** 307:10 328:17 335:20

**act** 348:14 349:20

**action** 261:11 277:3 346:3

**actions** 309:4 323:3

**actively** 290:17 313:18

**activities** 338:2

**actual** 336:20

**addition** 246:21 252:21 269:5,12 297:23 300:20

**additional** 255:7 255:23 295:13 300:24 302:12 329:16 344:4

**address** 304:10 347:16

**advice** 259:21

**advise** 326:22

**advised** 253:24 297:2 326:7 330:8 330:19 331:15,20 335:9,19

**affix** 346:5

**affixed** 348:15 349:21

**agent** 261:6,9 263:20

**agents** 339:4

**ago** 241:18 287:17 290:10

**agreed** 296:6

**agreement** 242:24

**aided** 345:16

**airplane** 288:21

**allow** 272:10,23 276:9,11 343:20

**allowed** 341:20

**allows** 275:15 279:19 343:21

**alluding** 287:4

**alternate** 276:9

**alternative** 292:24 293:1 303:8 319:17,20 320:1,5 321:20

**amount** 301:18 307:2 310:22 332:23 338:8,13

**analysis** 268:11 270:17 275:2

321:20 335:21

**analyzing** 268:13

**answer** 239:16 254:3 259:11,22 260:6 286:16 307:1 312:23

**answered** 288:8 312:16,18,24

**anymore** 325:6

**app** 313:15 317:12 319:10 320:6 322:13 331:18,19 332:23,24 333:20

**apparently** 283:18 290:17 291:16 293:2

**appear** 275:12 348:11 349:15

**appearances** 237:1

**appeared** 237:6,12 237:17 282:22 301:18 313:2

**appears** 285:13 337:19

**appended** 349:11 349:18

**applicable** 249:24 252:24 296:1

**application** 300:9 313:21 331:22 332:13

**applications** 263:4 299:21 313:18 325:5

**applied** 273:10 274:13 294:19 295:3,22 297:16 297:21,22,23 299:17,19,23 322:7

**apply** 273:1 275:7 276:18,20 296:21 296:22 298:10

**applying** 273:5,5 274:19 275:4 297:8 341:3

**appropriate** 248:15 249:9,13 252:2 254:16

**appropriately** 270:9

**apps** 334:16

**aside** 240:15 242:1 273:4 275:4 276:21 280:15 286:11 297:8 314:5

**asked** 254:17 277:5 278:12 287:1 294:16 315:17,21,23 316:11,20 327:14 336:17 337:1 340:3 342:5,7

**asking** 259:14 265:13 268:6 272:18 277:20 293:23 309:7,8 311:16 322:10,12

**asks** 263:17

**asserting** 259:10

**assignment** 348:2 349:2 350:2

**associated** 343:4

**assume** 311:7

**attached** 245:4 246:3 255:22 349:7

**attachment** 256:5 256:7 257:12

[attachments - bucket]

Page 3

**attachments**
252:22 264:13
269:17 275:8
294:17
**attempt** 306:22
**attempted** 283:12
298:18,24
**attention** 255:14
257:3 278:4
291:22 294:5
311:2 318:9
325:18
**attest** 302:17
**attorney** 246:4
248:15 249:12
253:16 258:3,14
259:7,20 339:15
345:24 346:1
**attorneys** 239:3
**authenticate** 292:8
**authentication**
283:11 292:16,22
293:2
**authority** 236:7
347:6 348:3 349:3
**authorize** 349:11
**available** 240:15
240:16 250:13
254:9 266:18
284:2,9 285:4
296:23 298:1,2,11
300:8 302:8
305:13 308:16
316:24 321:13
342:10
**ave** 347:1
**await** 278:15
**award** 259:17
**awarded** 244:15
**aware** 239:13
243:24 246:16

247:4,15 254:21
257:20,24,24
258:5 264:1
279:12 290:12
304:16,16 305:22
307:13 308:8,15
314:19 317:18,23
318:1 319:14
320:8,11 328:4
333:1 339:9,17

**b**

**b** 331:6
**babbitt** 237:9
238:4 239:2,3,7,14
239:19 240:8
258:17 259:10
260:1,9 261:15,16
268:8,9 271:5
277:8,11 329:10
329:13 339:22
340:3 342:7
**back** 241:23 242:8
247:13 251:10
252:20 265:5
271:21 272:2
274:1 280:12
281:4 282:8
285:11 286:2
287:2 291:21
295:8 297:4 300:1
312:16 314:1
321:7 323:9
328:22 333:21
347:16
**backed** 334:19
**backing** 334:16
**backup** 314:16,23
316:23 317:4,9,16
318:11 319:7,16
319:24 320:5,20
321:21 322:4,5,15

322:15,16,22
327:24 333:22
334:7,13,14
**backups** 322:23
331:1 333:18
334:3,5
**bag** 288:11 289:2
**based** 248:2,7
254:11 255:7
265:2 270:11
275:16 277:2
280:12 284:16
291:13 298:3
300:6 301:3 305:6
311:22 313:10
332:23 337:23
342:3
**basically** 246:23
264:15 267:5
288:9 298:5
**battery** 289:2
**beginning** 276:11
**behalf** 237:6,12,17
243:1 244:1 245:8
339:10
**believe** 242:4
248:5 250:16,20
251:20 252:17
256:15,16 257:9
257:12,13 261:19
263:24 264:14
269:3 270:2 276:1
279:18,24 286:1
288:7,16 289:23
293:13 296:3
299:5 301:22
302:13 307:9
311:1 312:6,14
313:3 314:21
315:10,11 317:7
318:6 321:15,17

322:17 327:12
330:15 342:1,9
**believed** 247:21
249:23 252:19
254:16
**believes** 248:15
**best** 292:10
**better** 290:15
**beyond** 243:12
256:14 266:23
306:23
**bit** 242:16 277:12
277:16,20 286:17
311:23
**bob** 240:20 246:2
246:11 259:2
**body** 256:6
**bottom** 245:1
329:24
**bought** 335:24
**boys** 269:10
**break** 239:14,17
277:9 278:2
303:16 329:11
**breaks** 303:6
**brief** 245:8 246:8
**briefed** 246:23
**briefings** 246:19
**briefly** 241:10
**briefs** 244:1
**broad** 273:14,18
274:19 276:7
309:15
**broaden** 276:8,18
**broader** 251:4
**broke** 277:19
**broken** 275:13
**brought** 280:14
318:9
**bucket** 251:14
267:18 273:9

**[bucket - combination]**

298:8
**bulk** 322:24 323:7
**bullet** 330:18,20
  330:21,23,24
  331:1,2,4,11
  333:16 336:3
**bup** 331:1 333:22
**business** 286:5

**c**

**c** 345:3
**c.s.r.** 345:5 346:9
**ca** 347:24
**call** 246:7
**called** 236:11
  269:1 297:20
  316:5,19
**calls** 258:13
**capacity** 343:12
**capture** 299:20
  304:1 305:10
**captured** 252:7
  299:16 300:15,20
**captures** 296:19
  298:3 299:7
  302:10 315:6
**card** 276:17 307:8
  307:11,14,17,19
  307:21 308:2,5,9
  308:11,15,17,18
  308:19,21,23,23
  324:9,12,16,17
  325:9 343:3,5,14
  343:21 344:2,4,11
  344:13
**cards** 308:22
  324:20 325:1,5
  343:7,24
**carriers** 343:20
**case** 239:8 240:17
  242:19 246:16
  248:11,17 249:10

253:15,17,20
254:7,8,12,15
259:19 261:10
262:7,21 263:13
263:19 266:1
272:19 277:15
284:17 285:14
291:7,9 297:7
303:14 309:14
318:19 326:8
337:18,19 338:7,8
338:14,19 339:1,2
339:8 343:10
347:6 348:3 349:3
**case's** 246:18
**cases** 246:20
  272:12 286:22,24
  287:1 309:6
  320:23 337:17
  338:17,23 339:5,6
  339:7
**category** 265:23
**cellular** 324:22
  325:1 343:16
**certain** 243:20
  261:2 271:13
  273:11 277:17
  305:3,4 307:4
  309:8 314:15
  332:6,11
**certainly** 265:11
  286:12 302:18,21
  304:15 323:11
  341:8
**certificate** 349:11
**certification** 348:1
  349:1
**certified** 345:7
**certify** 345:8
**chain** 247:14
  307:9 335:17

338:3
**change** 347:14,15
  349:8 350:3
**changed** 286:1,12
  290:19 296:10
  328:23
**changes** 347:13
  348:7 349:7,9
**charles** 237:16
**chicago** 236:7
  237:10 346:5
  347:6 348:3 349:3
**chose** 254:2
**chris** 293:24
**chris's** 311:12
**christopher** 236:4
  241:20 347:6
  348:3 349:3
**circle** 237:4
**circumstance**
  243:21 310:17
**circumstances**
  246:15 339:2
**civil** 236:13 348:5
  349:5
**clarification** 316:8
  330:9
**clarify** 273:20
  309:21
**clause** 266:4
**clear** 247:7 268:20
  270:21 271:2,7
  273:15 274:7
  318:20 330:16
  341:23
**cleveland** 347:2
**clever** 236:8
  237:18 347:7
  348:3 349:3
**client** 242:18,19
  243:4 246:4

248:11 249:6
253:16 259:7,16
259:20 291:10,10
304:9,16 305:7
337:14 338:22
**clients** 309:7,7
  337:20
**cloud** 331:2
  333:21,23 334:15
**code** 292:21
**collect** 300:4 305:1
  305:19 307:4
  309:24 310:13,15
  310:16,18 319:18
  319:21 320:15
  328:18
**collected** 248:19
  252:8 254:9 264:3
  264:7 265:21
  270:6,12 279:1
  286:4 294:23
  301:3,12,20,24
  302:8,20 305:22
  310:5,23 313:6
  314:4 315:18,20
  316:12 317:1
  318:24 319:7,15
  320:2,12,13
  328:21,22 335:14
  336:12
**collecting** 304:6
  305:4 324:11
  327:9 336:8
**collection** 252:10
  252:13 286:1
  300:21 301:19
  306:20,20 310:7
  313:23 321:5,11
  322:11 328:2
**combination**
  262:11 272:8

**[come - court]** Page 5

come 259:7 276:15 292:24 297:17
comes 279:21
commencement 345:9
commencing 236:16
commercial 272:23
commission 348:19 349:25 350:25
communicate 313:10
communicated 242:1 306:5
communication 259:6,24 277:19 283:2 288:11 314:6
communications 242:8 248:24 249:3 261:5,20 262:16 263:3,14 266:20 267:22 270:15 277:14 280:2,11,16,17 281:16 284:7 314:3 315:14 320:21
company 245:18 246:10,12 258:19 330:24 334:3,11
comparative 343:11
comparatively 325:10
compare 253:9 267:13
compared 315:1 317:11 321:24

compel 245:4 255:12
complete 272:15 282:17 298:19 302:24 303:1 304:17,18 305:23 315:12,19 327:10 328:5,15,18 329:6 329:7
completed 347:16
completely 248:23
compliance 247:17,18
complicated 274:8
complied 261:17 263:22
comply 254:22 258:4
complying 247:5,6 256:24
comprehensive 300:3 328:16
computer 345:16
concern 291:16
concerning 261:11 345:11
conclusion 260:22
conduct 259:19
conducted 323:5
conferred 328:9
configured 332:10
confirm 273:24 293:23 300:19 336:19 341:20
confirmed 319:8 328:9
confused 309:20 327:15
confusion 329:1
connect 292:11

connected 288:10
connection 248:11 335:18
consistent 315:3 333:14 336:19
constitutes 345:17
constraints 321:1
consulted 328:7
contacts 300:17
contain 279:9 302:12 305:23 324:20 325:12 328:14,14,15,16 343:8,10
contained 253:5 256:16 280:10 282:21 300:5,12 300:13 311:19 317:5 340:4
containing 314:16
contains 325:11
contemporaneous 338:17
contemporaneou... 336:15 338:5,9,12
content 265:14
contents 341:15
context 249:21 287:23 288:6,7,16 331:9
continue 286:11
continued 236:10
continuing 244:13
contract 247:10
contrary 277:6
conversations 271:1
conveyed 296:17
cook 236:16 345:6
cooperative 259:12

copy 255:11,13 308:11 326:5,9 327:10 329:7
cord 335:18
correct 242:21 245:16 248:10 255:1,18 257:2 268:5 275:14 278:8,18,22 280:21 293:21 294:7 295:5,18 316:18 325:23 329:8 331:23 337:3 338:12,15 340:14,15,24 341:5 342:20
corrected 296:8 296:16
corrections 347:13 349:17
correlation 317:13
correspondence 256:22 262:24 275:22 280:19
costs 258:3
counsel 243:7 345:24 346:1
counts 298:6 326:4
county 236:15 345:3,6 348:10 349:15
couple 284:20,23 322:18,19 329:10
course 286:5 290:21 297:7 304:3
court 236:1 239:22 243:19 244:2,10 247:4,15 247:21 248:16

**[court - decision]**

Page 6

249:24 250:2
251:20 252:12
254:21 255:2,5,6,8
256:17,23 257:20
258:7 259:22
260:3 261:2,22
265:13 266:12
274:21 301:11
339:12 348:7
**court's** 251:3
252:20 253:1
255:12 257:1,6,16
263:17,23 265:23
**courts** 236:14
**cover** 243:21
**covers** 298:4
**create** 295:18
327:10
**cross** 238:5 340:1
**crown** 274:18
**cryptographic**
341:20
**csr** 236:15
**csv** 274:4 319:23
322:2
**cta** 237:12 239:4
244:19,23 245:10
247:1,4 248:4
251:15 255:6,14
255:17 256:4,10
256:18,19 257:3,6
257:10 258:20
260:17,18 263:17
265:23 267:23
271:10 278:5,7,11
285:5 291:21
293:15,18 294:3
295:23 297:12
301:11 311:2,5
314:17 315:13
317:18,23 320:18

325:18 326:8
329:16,23 330:6
330:19 333:16
342:16
**cta's** 245:3 247:16
255:5 257:7 258:2
**culled** 280:9 297:9
301:12
**current** 285:10
331:3
**custody** 253:8
262:14,18 264:3
286:23 287:9
289:21 291:18,20
296:19 297:1
298:2,12 300:5
302:1,6,10 305:2
305:12,18,19
306:3 307:10
312:12 314:24
316:14 317:8
322:14 335:12,17
338:3
**custom** 272:4,8,21
**cv** 236:6

**d**

**d** 236:14 238:1
345:5 346:9
**dan** 245:2,3
255:21 270:22
271:4 311:7 326:2
**daniel** 236:11
238:3,11 240:3
345:10 347:9
348:4,9 349:4,13
350:20
**dash** 326:3
**data** 242:6,12
252:8,8,23,24
253:5,9,10 264:2,6
264:10,24,24

265:4,6,6,9,9,10
265:15,15,16,19
266:17,18 267:1,3
267:6,6,24 268:2,7
268:10,11,12,15
268:16,18,20,22
269:8,10,15,24
270:1,6,10,12,18
271:13,15,18
272:1,3,6,10,22,24
273:2,10 274:2,2
274:12,22 275:4
275:14,20 276:21
276:23,24 277:17
277:23 278:2
279:5,8,10,13,24
280:6,7,8,10 281:6
281:18,21 282:6,7
282:15 283:15,24
284:3,6,6,10,11,12
284:21 293:5,7
294:20 296:23
297:16,22 298:1
298:16 299:7,20
299:21,22 300:5,7
301:6,7,9,10,12,15
301:18 302:8,12
304:6 305:4,11,23
305:24 306:16,19
306:20 307:1,3,4
309:13 310:8,18
318:21 319:8,18
319:22 320:15
321:9 322:11
323:2,13,16,20,21
323:24 324:11
325:3,4 327:4,17
327:21 328:18
329:2 332:23
334:6,10 335:4,6
335:18 337:23

340:4,12,19 341:4
341:11 342:1
343:3,9,11 344:8
**databases** 300:18
**date** 261:24 265:3
265:11 267:10
272:7 273:5,11,19
274:13,20 275:17
280:13 284:15,17
284:18 296:1,10
296:12,13,20,22
296:23 297:21
298:4 299:4 313:1
313:4,23 315:4
317:6,10,17
319:12 320:24
321:2,3,10,12,24
322:7 323:22
324:1 327:18
331:5 332:22
335:24 336:11
337:6 338:3 341:3
342:3,17 347:9
348:3,9,19 349:3
349:13,25 350:20
350:25
**dated** 244:22
255:18 293:20
**day** 236:17 285:14
286:15 312:8,8,20
346:6 348:16
349:22 350:22
**days** 257:13
286:14 323:15
325:2 347:19
**dealing** 305:5
**dear** 347:10
**december** 296:7,9
**decided** 252:1
**decision** 254:11
266:6 291:18

**[decisions - drawn]**

| | | | |
|---|---|---|---|
| **decisions** 291:10 | 292:12 | 303:11,21 304:23 | 282:24 283:2 |
| **decrypted** 321:21 | **determine** 304:10 | 307:3 309:3,4,11 | 285:22 290:8 |
| **deed** 348:14 | **determined** | 310:10,16,19 | 310:7,15 312:3,3,7 |
| 349:20 | 250:21 296:4 | 315:22 316:14 | 314:13 318:5 |
| **deeds** 310:3 | **device** 253:8 | 317:22 318:14,17 | 328:13 340:7 |
| **deemed** 347:20 | 288:14,15 324:21 | 323:10 325:14 | **discussions** 246:14 |
| **defendant** 237:12 | 332:12 334:11 | 327:20 329:4 | 250:11 251:24 |
| 237:17 | **devices** 236:8 | 336:21 | 258:24 259:1 |
| **defendants** 236:8 | 237:18 347:7 | **directing** 248:8 | 303:12 304:7 |
| 236:11 | 348:3 349:3 | 310:12 | 309:19,21 310:4 |
| **definitely** 341:22 | **devolved** 284:17 | **direction** 249:19 | 311:22 312:5,10 |
| **degree** 299:14 | **difference** 283:14 | 251:17,23 254:18 | 312:13 |
| **deleted** 332:13,14 | **different** 243:13 | 281:24 289:10,12 | **disk** 279:9 |
| **department** | 253:3 263:3 | 291:8 302:4,23 | **disposal** 305:8 |
| 347:22 | 271:23 272:1,4 | 305:6 309:16 | **disputes** 244:6 |
| **depending** 272:10 | 274:5,5 279:8,20 | 336:14 345:17 | **district** 236:1,1,14 |
| 287:2 338:19 | 284:4,16 294:12 | **directions** 261:7 | **division** 236:2 |
| **depends** 268:15,18 | 298:5 300:2 | 290:2 | **document** 314:2 |
| 272:17 324:13 | 301:16 302:18,22 | **directly** 248:21 | 335:15 |
| 325:8 337:18 | 323:22 324:1 | 253:4 283:9 | **documentation** |
| 338:7 339:1,1 | 337:23 339:4,5,6 | 318:18 346:2 | 300:21 344:9 |
| **deposed** 246:5 | 341:7,11 342:12 | **disabled** 290:18 | **documented** |
| **deposition** 236:10 | 342:13,19,23,24 | **discover** 259:6 | 242:13 281:2 |
| 239:5 240:18,24 | **differently** 308:22 | **discovered** 263:14 | 298:22 306:24 |
| 241:3,15 255:7 | 341:7 343:15 | **discovery** 248:20 | 314:11 324:4 |
| 314:3 318:5,10,12 | **difficult** 239:24 | 248:20,24 251:4 | 335:16 342:14 |
| 318:13,19 323:12 | **difficulty** 283:7 | **discuss** 246:7,8 | 344:8 |
| 329:17 337:1 | **digital** 298:23 | 327:8 | **documents** 241:8 |
| 345:13,19,22 | 315:18 316:9,11 | **discussed** 240:18 | 241:16 247:20,22 |
| 347:9,12 348:1,3 | 316:13 320:16 | 240:20,21 246:11 | 248:1,5,7 252:16 |
| 349:1,3 | **direct** 238:4 240:7 | 246:15 257:14 | 253:23 254:5 |
| **depositions** 250:12 | 308:1 | 258:22 259:4 | 262:8 |
| 299:14 301:23 | **directed** 248:13 | 266:7 281:19 | **doing** 281:20 |
| 309:2 323:13 | 250:15 253:16 | 284:6 290:23 | **doubt** 284:11 |
| 338:1,14 | 254:17 265:12 | 291:1 297:15 | **downloads** 279:4 |
| **described** 341:2 | 266:16 269:16,23 | 302:5,19 303:5 | 283:3 |
| **designation** | 270:8 286:4,22 | 320:11,18 327:1 | **draft** 245:5,7 |
| 294:18 | 287:2,3,5 288:23 | 333:5,6 | 247:11 |
| **detail** 241:12 | 289:22,23 291:3 | **discussing** 323:1 | **drafted** 245:16 |
| **details** 268:24 | 291:19 294:11 | **discussion** 258:18 | **drawn** 337:5 |
| 274:10 281:5 | 297:16 298:6 | 267:16 282:1,23 | |

**[drive - engagement]**

**drive** 237:9 315:15 316:16 328:20
**drop** 280:18 329:15
**due** 245:4
**duffy** 237:3,3 238:5 240:21,22 240:23 241:9 242:20,22 243:1,2 243:4,10,10,14,15 243:18,24 244:13 245:2,7 246:4,22 247:8 248:8,12,14 249:1,19 250:6 251:17,24 252:5 252:18 253:16,21 254:4,6,19 255:21 256:9,13,20,20,23 256:24 258:2,11 258:13 259:3,5,12 260:6 261:5,8,14 261:20 262:5,21 262:22 263:13 264:1,9,9,17,21 265:5,10,17 266:7 266:22 267:3 268:6,21,23 269:3 269:11,18,20 270:2,15,21 271:8 272:15 274:15 275:21 276:1 278:8,11,18,20 280:6 281:9,13 282:8 284:10 285:7,8,8 287:7 289:12,22 290:1,4 290:23 291:19 292:3,4 293:19,22 294:2,6 296:17,24 298:7 301:16 302:7 303:13

305:21 306:6 307:6 308:1 309:5 309:12,24 310:5 311:6,6,14,16,24 312:5,9,11 313:7 315:5 316:21,24 318:7,17,24 319:14 320:8 321:5,20,22 325:22 326:1,7,16 326:23 327:6,8 328:4,9 329:4 333:1 337:2,6 339:9,14,18,23 340:2 344:14 347:5
**duffy's** 242:22 249:6 254:12 260:13 262:9 263:11
**duly** 240:4 345:11
**dump** 270:19
**duration** 332:2 335:7 337:24
**dynamic** 288:15

**e**

**e** 237:9,15 238:1 242:3,10,13 244:22 245:1,2,21 247:1,9,14 250:8 252:18 254:23 255:17,21,23 256:15 257:14,19 262:6 264:16,17 265:4,16 266:13 269:12,13,17 275:22 277:14 278:7,10,12,22 279:1,4 280:1,24 281:2,9,14 282:4 282:12 283:5,17

283:24 284:11 285:7,19 292:2,18 292:19 293:3,12 293:18,19 294:1,4 294:11,14,17 295:8,17 296:2,3 306:8,8 311:5,23 312:14 323:17 324:4 325:21 326:1,4,11,20 333:10 337:11 339:20 342:4 343:16,19
**earlier** 254:22 255:3 294:3 303:15 310:21 314:20,22
**easily** 266:19 267:13
**eastern** 236:2
**easy** 285:10
**ebabbitt** 237:11
**effect** 310:3 344:12
**effectively** 289:5
**effort** 298:15 299:1 300:19
**eight** 257:6
**either** 259:2 269:9 272:7,8,21 274:1 276:4 287:7 294:23 304:4,23 309:13 320:19 321:3 323:20 332:18,21
**elaborate** 334:15
**electronic** 343:19 343:20
**element** 261:3 262:24 263:16,22 267:23

**elements** 271:13
**elizabeth** 237:9 239:3
**email** 238:7,8,8,10 256:5 294:3 347:17
**emails** 238:9,9 274:15 282:14 283:19,20 301:17 302:9
**employee** 261:6,9 263:20 266:2 345:23,24
**employer** 331:3,5 331:7 334:23 335:5,22 336:2
**en** 279:24 280:8
**enclosed** 347:12
**encompassing** 279:22
**encrypted** 317:8
**endcase** 300:10
**ended** 283:13 295:7
**ends** 267:7,11
**enforce** 238:10 245:9 246:9 247:4 257:7,16
**enforced** 247:18
**engaged** 242:23 243:6 261:10 282:2
**engagement** 242:24 243:12,14 243:20,22 244:17 250:17 258:10,15 291:2 303:14 304:5 309:12 333:4 338:24 339:2

**enhanced** 255:3
**enlarged** 255:2
**entered** 349:9
**entire** 280:19
　284:6 348:5 349:5
**entirety** 342:6
**entitled** 259:6
**enumerated**
　293:12
**erases** 314:9
**errata** 347:14,19
　349:7,10,18 350:1
**error** 298:21
　305:9 315:20
**errors** 304:5 305:4
　306:12
**esq** 347:5
**established** 265:3
　298:17 301:22
　313:12
**estimate** 338:16
**evaluated** 252:4
　303:19
**evaluating** 312:1
**evaluation** 313:11
**event** 258:7
**evidence** 269:7
　307:10
**evolution** 246:18
　286:1
**evolving** 285:18
**exact** 274:11
**exactly** 272:18
　275:16
**examination**
　236:12 238:4,5
　240:7 340:1
　345:10
**examined** 240:5
**example** 252:7,15
　265:22 275:1

276:1 299:18
　334:16 343:23
**examples** 263:10
**excel** 265:8,19
**exchange** 244:22
　255:17 257:14,23
　293:18 325:21
**exchanged** 250:8,8
　292:18
**exchanges** 242:4
　269:13
**exclude** 309:17
**executed** 349:10
**execution** 348:14
　349:19
**executive** 245:24
**exhibit** 238:7,8,8,9
　238:9,10,10,11
　240:16 244:19,19
　244:23 245:18
　247:2 255:15,17
　255:20 256:4,10
　257:4,6,10 260:17
　260:19,23 263:17
　265:23 267:24
　278:5,7,11 285:5
　291:21,23 292:2
　293:15,18 294:3
　295:2,24 297:12
　299:22 311:3,5
　320:18 325:19,21
　329:15,16,16,20
　329:21,23 330:6
　330:19 331:11
　333:16 334:22
**exhibits** 238:6
　240:15
**existed** 334:3
**exists** 268:7
**experience** 291:13

**experienced**
　335:20
**experts** 302:16
**expiration** 322:20
　348:19 349:25
　350:25
**expire** 332:5
**explain** 274:21
　278:24 293:1
　298:13 299:15
**explained** 299:13
　331:10
**explaining** 273:9
**explanation**
　301:21
**explicitly** 310:14
**export** 279:19
　281:22 283:13
　293:5 322:12
**exported** 279:5,23
　302:11 318:20
**extended** 323:22
**extends** 248:18
**extent** 292:20
　323:3

**f**

**facility** 279:18
**facsimile** 297:14
**fact** 247:16 249:4
　258:7 276:1 290:5
　324:8 328:10
**factor** 292:8,16,22
　293:2
**failure** 258:4
**fair** 239:17 240:1
　309:5 322:9,24
　328:8
**faith** 248:2
**fall** 265:22
**fallen** 322:19

**familiar** 342:15
**far** 239:19 251:3,8
　285:2
**farther** 326:14
**feature** 279:6,6
　280:8 293:4
　322:13
**february** 251:13
　251:15 255:18
　256:10 262:1
　275:23
**federal** 236:13
**fees** 258:3
**fell** 322:21
**felt** 252:16,24
　253:11
**file** 275:9 302:2,22
　316:7 317:4,9,16
　318:3,18,21
　319:22,23,24
　320:7,20 322:2,5
**filed** 243:24 244:1
**files** 250:10 252:22
　264:12 265:19,19
　276:3 279:9
　300:11 314:15
　315:10,11,22,24
　316:2,5 318:3,6,11
　322:18
**filing** 245:8
**filter** 254:5 298:6
　300:6 321:23
　341:24
**filtered** 340:17
**filtering** 265:20
　277:3 322:14
　340:11 341:12
**filters** 299:4
**final** 264:7 274:24
**find** 347:12

**[finding - google]**

**finding** 263:13
**finite** 332:6,19
**firm** 242:22
  260:13
**first** 239:11 240:4
  245:1 246:5 247:2
  247:3,9 255:20
  256:4 257:19
  260:22 261:3
  277:22 281:15
  285:6 291:22
  293:20 296:24
  317:1 318:1,2,5,12
  318:14,16,19
  326:7 330:21
  331:11 335:8,10
  335:11 338:24
  345:10
**fit** 249:9
**five** 301:2
**flip** 294:16
**flosi** 245:21,24
**focus** 298:8 309:3
**focusing** 280:16
**folder** 278:14
  281:17,21,22
  282:21 340:23
**foldered** 283:20
**folders** 283:9,16
  284:16 292:6,13
  292:17 293:3,8,11
  294:12,14 295:3,7
  295:9,12,13,16,19
  295:19,21 296:11
  296:11 297:18,19
  340:3,8,12,20
  341:7,10,23,24
**folks** 276:22
**follow** 307:20
  312:2

**followed** 312:13
**follows** 240:6
**followup** 312:7
**footprint** 325:10
**force** 259:22
**foregoing** 345:13
  348:13 349:18
**forensic** 283:8
  298:23 303:1
  316:9,12,13
  320:16 326:23
  327:10 328:5
  329:6
**forensically** 304:1
**forest** 237:4
**form** 266:11
  269:19 270:14
  276:2
**format** 268:16,17
  268:19 270:18
  272:1,11,19 274:3
  274:4,4 282:9
  317:19 319:3
**formats** 274:5
**former** 331:7
  334:23 335:5,22
  336:2
**forward** 245:17
  347:16
**forwarded** 245:20
**found** 247:16
  302:17 313:1
**four** 295:3,9 330:7
  330:16,20 341:10
**fourth** 331:4
**frame** 263:9
  290:20 296:6
  315:4,5 319:5
  320:12
**frames** 265:3

**free** 315:20 348:14
  349:20
**frequency** 339:6
**front** 243:19
  312:21
**full** 280:18 305:24
  305:24 342:11
  344:7
**fuller** 305:10,10
**fully** 239:12
**function** 308:21
  308:22
**functioning** 289:6
**further** 250:15
  288:24 289:7
  294:11 339:22
**furtherance**
  256:24

**g**

**gather** 262:4
  298:24
**gathering** 292:13
**general** 245:12
  272:3 281:23
  287:4,7 309:15
  324:18,19
**generally** 289:19
**generated** 263:18
  265:24 340:5
**generation** 337:13
**generous** 320:23
**genuinely** 334:9
**george** 236:4
  347:6 348:3 349:3
**getting** 242:5
  283:5 285:9,11,16
  285:16 290:19
  301:8 309:23
  325:9 335:13
**gigabyte** 284:5

**gigabytes** 265:1
**give** 249:11,12
  291:12 338:16
**given** 265:6 291:7
  345:18
**gives** 275:7
**giving** 239:20
**glad** 266:15
**gladly** 267:10
  269:22 270:8
**gmail** 269:9
  271:14,14,17,18
  272:18,19 273:1
  273:10 274:22
  279:10,20,24
  280:16,17,19
  282:14 283:10,16
  283:24 292:6,14
  292:17 293:8
  294:13 295:4,21
  334:17 340:4,4,12
**go** 259:21 336:3
**going** 239:4,8,22
  244:18 251:10
  255:14 260:17
  285:20 286:11
  287:8 290:18
  323:2 332:5
  336:17
**good** 239:2,6
  248:2 277:8
**google** 252:10,23
  253:10 265:1,21
  267:2,6 268:4
  269:9,10 270:20
  271:14,14,24
  275:7,11,20
  276:21 277:24
  279:5,6,10,13
  280:8,15 283:10
  293:4,5,9 294:15

297:10 323:2 341:15,19

**google's** 279:5

**gotten** 341:15

**grab** 316:6 322:9

**granted** 247:16 255:5,6

**great** 241:12

**ground** 239:9

**guess** 247:9 266:3 288:2 309:20

**guessing** 265:21

**guidance** 261:7

**h**

**half** 286:15 296:24 323:15

**hand** 346:5

**handwriting** 330:11,15

**handwritten** 314:12 330:3 334:21

**hangout** 275:11

**hangouts** 252:23 269:9 271:24 275:8,8 279:6,11 279:21,23 280:7,8 280:15 284:5,7 295:10 313:14 341:19

**hangups** 334:17

**happen** 259:8,17 283:6

**happened** 242:12 267:5

**happening** 246:24 335:23

**happy** 292:10

**hash** 341:19,20

**hashes** 341:14

**head** 268:1

**hear** 259:23 298:9

**heard** 246:5 247:2 247:10 299:18

**hereto** 346:2

**hereunto** 346:4

**hey** 281:14 334:13

**hi** 326:2

**hide** 250:24

**historically** 338:2

**hit** 298:6 326:3

**hits** 278:13 297:17

**hold** 259:5,13

**hollister** 237:7

**hone** 253:12

**honest** 286:8 327:15

**horse** 254:12

**hundreds** 280:11

**i**

**i.e.** 311:11

**idea** 287:12 339:3

**identification** 324:23

**identified** 294:22 299:6,7 317:9,13

**identifier** 325:6

**identify** 294:21 298:15 302:16

**identifying** 324:21

**illinois** 236:1,16 237:4,10,16 240:11 345:1,7 346:6

**image** 275:9 300:11 302:4,21 302:22 303:1,2,3 304:1,16,18,18,21 305:20,24 308:11 315:10,11,24 316:2,7 325:15

326:5,9,24 327:11 328:5,11,12 329:6

**images** 298:1,11 298:16,17,23,23 299:9,10,14,16,24 300:3 301:24 303:8,10 305:22 315:17,18,20 316:9,12,17,19 319:9 320:13,14 320:16 323:9,10 327:2,6,14 328:13 328:19,24 329:1

**imagine** 291:7 312:12,15 333:9

**imaging** 252:11 253:2 302:7 316:6 342:8

**immortalized** 282:4 283:5

**impact** 239:11 275:1 324:10

**important** 310:11

**impression** 306:15 313:8

**include** 254:11 255:23 262:7 263:12 267:1 277:5 279:9,10 318:7

**included** 254:10 258:6 264:16 284:5,18 299:8 300:17,18 304:8 318:6 347:14

**includes** 241:7 271:4

**including** 263:6 269:14 281:3 300:21,22 302:9 310:9 318:11

337:24

**incorporated** 349:12

**indemnifying** 258:11

**indicated** 269:6 279:8 285:19 288:7 290:10 292:23 295:10 302:15 307:18 310:9 312:10 321:4,21 326:20 329:1 333:10

**indicating** 332:5 347:14

**indication** 248:3 302:11 343:2

**indirectly** 346:2

**inference** 306:17

**info** 335:13

**information** 242:9 250:4,6,23,24 251:1 252:1,7,10 265:1 267:18 270:9 271:24 272:14 273:12 279:3 284:2 291:11 306:14 307:5 309:14 312:22 323:12 324:8,20 335:16 341:18

**informed** 246:17 254:8 318:24 344:13

**inherently** 342:23

**initial** 252:13 296:11 322:11

**initially** 242:20 250:20 258:4 284:22 338:8

**[inquire - lee]**

**inquire** 307:16 308:24 324:7
**inquired** 334:4
**inquiries** 307:24
**instructed** 271:8 294:9 309:24 318:2
**instructing** 259:11
**instructions** 261:7
**intending** 247:24
**intent** 248:1
**intentionally** 277:4 341:8
**interaction** 242:2
**interactions** 254:14
**interested** 334:9 346:2
**interface** 300:8
**interim** 264:22 265:7 267:5 270:4 270:13 271:12 277:2 306:9
**internal** 263:14 270:15
**interpretation** 251:2
**interrogatories** 240:5
**inventory** 269:7
**investigation** 336:22
**invoice** 337:14,17 338:24 339:7,7,16 339:18
**invoiced** 337:20 339:14
**invoices** 337:10
**invoicing** 337:15 338:22 339:6

**involved** 274:10 295:15,15
**involvement** 286:13 303:14
**isolate** 281:9 306:19
**issue** 260:3
**issued** 245:10

**j**

**jados** 237:14
**jerger** 236:11 238:3,11 239:2 240:3 244:20 245:3 251:11 252:4 257:11 260:2,18,24 261:5 261:8,12 263:20 266:1 271:7 277:12 278:4 287:17 291:21,24 292:3 293:15 295:15 329:19 330:4,17 336:24 339:23 345:10 347:9 348:4,9 349:4,13 350:20
**jkennedy** 237:10
**john** 237:8
**joined** 274:18
**judgment** 252:4
**judgments** 253:12 253:15
**july** 242:10 254:24 323:5
**june** 241:23 254:23 262:14,15 262:15 278:8 281:4 284:23 285:7 292:3 293:20,21,24 294:1,2,4 296:6,9

301:4 306:3,4 310:24 311:6 312:8 316:14,21 317:1,21 319:1,15 319:19 320:9 321:14 323:5,16 328:3,22,23 331:16,20 336:8 336:12
**jury** 274:21

**k**

**k** 345:3
**keep** 338:5,17
**keeping** 251:3 303:18
**kennedy** 237:8 274:17 302:24 304:17
**kept** 246:17 254:8 289:21 337:21
**key** 265:2 272:7 275:17,19,21 276:2,7 280:13 294:19 297:17 321:8
**keys** 292:21
**khuans** 237:8
**knew** 254:6 307:22 321:8 327:20 334:17
**know** 239:7 244:20 246:6 247:6 249:20,22 252:6 255:15 256:19 257:4 258:15 260:12,19 260:23 261:23 270:11,12 277:16 278:5 281:11 283:21,23 285:1 285:19 286:8,12

286:13 287:12,13 289:16 291:6,12 291:23 292:10 293:15 295:6 299:11 302:14,18 308:20 311:3 312:21 313:19 314:22 317:3,5 319:23 323:18 329:20 330:1 336:6,16 337:7,8 340:16,18,19 342:18,21 343:6
**knowledge** 243:23 281:9 286:9 287:15 305:21 309:16 333:1 340:13
**known** 247:12 253:20 327:2
**knows** 254:6

**l**

**label** 278:14
**labeled** 283:17 340:21
**lack** 312:3
**lake** 237:4
**large** 264:24 265:9 267:6 280:10 343:8,11
**late** 300:1 330:24 334:2
**launch** 331:5 335:24
**launched** 335:10
**law** 237:3 240:22 242:22 243:2,10 243:15 260:13
**leave** 255:6
**lee** 246:12 259:2

**[legal - meets]**

**legal** 243:7 347:1
  350:1
**length** 299:13
**leoni** 245:24 246:2
**letter** 243:12,14,21
  243:22 250:18
  258:16 331:6
  347:20
**level** 291:16
**license** 346:9
**limit** 321:11
  330:21 331:13,18
  332:16
**limitations** 280:23
**limited** 250:3
  251:3 286:6,19,20
  286:21 297:24
  298:11 299:12
  301:6,7 309:3
  310:22 313:1
  325:3 327:21
  332:23 334:7
**line** 289:21 335:21
  347:14 349:7
  350:3
**lines** 286:18
  316:18 330:7
**links** 264:16
  269:17
**list** 276:2,15,15
  294:12
**listed** 293:12
  295:12,23 349:7
  349:17
**listing** 349:7
**literally** 316:4
**litigation** 243:19
  244:2,6 325:13
**little** 243:13 249:4
  251:10 257:22
  277:12 282:5

303:15 309:20
  313:22 327:15
  335:13
**llp** 237:7
**logical** 303:1
  328:17
**logistics** 241:1
**long** 314:8 335:9
**longer** 287:14
  290:18
**look** 247:13 253:7
  271:21 272:2
  274:1 276:23,24
  295:8 314:1
  326:11 342:6
**looked** 262:13,19
  299:15
**looking** 284:9
  306:12
**looks** 256:3 296:14
  306:12 330:7
**loss** 335:4
**lost** 334:9
**lot** 286:16 301:10
  309:1 340:18

**m**

**madam** 347:10
**mail** 242:3 244:22
  245:1,2,21 247:1,9
  247:14 255:17,21
  256:15 257:14,19
  265:16 269:13,17
  275:22 277:14
  278:7,10 280:1
  281:14 283:24
  284:11 285:7,19
  292:2,5 293:3,18
  294:4,11 295:17
  296:2,3 306:8
  311:5,23 325:21
  326:1,4,20 333:10

**mailbox** 282:17
**mailed** 312:14
**mails** 242:10,13
  250:8 252:18
  254:23 255:23
  262:6 264:16,17
  265:4 266:13
  269:12 278:12,22
  279:1,4 280:24
  281:2,9 282:4,12
  283:5,17 292:18
  292:19 293:12,19
  294:1,14,17 295:8
  306:8 323:17
  324:4 326:11
  337:11 339:20
  342:4
**main** 237:15
**maintain** 286:22
  289:6 291:20
**maintained** 338:9
  338:11
**maintaining** 287:9
**making** 253:13
  271:6 289:5
  340:11
**managed** 291:9
**manner** 320:20
**manual** 300:21
  310:6 320:2 321:5
  328:1
**manually** 294:24
**march** 236:17
  346:6 347:4
**mark** 292:9
  330:14
**marked** 329:24
**massaged** 275:6
**masse** 279:24
  280:9

**material** 249:4,5
**materials** 240:14
  241:14 249:15,16
  249:17 250:13,15
  250:16 251:11,14
  251:14 253:19,22
  255:8 262:4
  265:20,22 294:22
  294:23 297:9
  301:23 327:5
**matter** 243:7,11
  243:22 244:11
  246:4,23 249:7
  254:3 260:14
  266:20 269:14,16
  282:22 283:18
  287:4 289:24
  291:12 304:12
  324:18 327:18
  337:18 338:6,22
  339:15
**matters** 241:11
  259:20 288:23
  345:12
**mean** 259:6,8
  270:24 279:17
  286:20 287:20
  288:3,5 298:13
  301:8 311:14
  331:14 334:24
  343:9
**meaning** 269:2
  292:4 327:4
  328:19 331:9
**meaningful** 343:3
**means** 294:24
**meant** 256:6 297:2
  331:14
**meet** 272:5,21
**meets** 292:6

**memory** 325:10
**mentioned** 271:13
  286:17 288:1
  301:1 305:3
  329:14
**message** 245:17
  256:14 311:14
  313:15 318:3
  331:13 332:3,18
**messages** 262:19
  262:20,20 277:13
  284:19 296:20
  298:21 300:14,14
  301:2,3 302:10,12
  305:10 310:22
  311:19 312:1,4
  313:2,14,15
  314:10,16 315:2,3
  316:23 317:4,9,19
  319:2,11 320:19
  321:12,13 322:18
  322:19,21 331:19
  331:23 332:2,7,11
  332:12,16,22
  333:2,12
**messaging** 279:22
  313:9,18 323:4
  331:17
**method** 292:24
  293:1 319:17,20
  320:1,4 321:20
**methods** 303:9
**middle** 256:4
  267:8,12
**midwest** 347:17
  350:1
**minimize** 289:3
**minute** 277:9
  322:22 329:10
**mislead** 273:17

**missing** 274:20
  275:3 317:14
**misstated** 293:22
**misunderstood**
  270:7
**mobile** 330:12,14
**mode** 288:22
**modern** 343:8,12
**modified** 272:21
  298:22
**modify** 272:5
**moment** 280:16
  287:17 292:1
**moments** 290:10
**monday** 326:3,17
**monolithic** 275:7
**month** 241:3,6
**monthly** 339:7
**morning** 239:2,6
  241:1
**motion** 238:10
  245:4,9,11,15
  246:8 247:11,11
  247:16 255:5,12
  257:7,16 259:16
  259:17
**moving** 247:4
  259:19 332:7,9,20
  333:3
**msg** 330:21
**multiple** 273:21
  279:9 283:12
  293:12 339:4

**n**

**n** 238:1
**name** 239:3 262:9
  262:10 347:6
  348:3,4,15 349:3,4
  349:21
**named** 333:20

**narrow** 281:15
**native** 317:19
  318:2,17
**natural** 334:12
**nature** 245:12
  313:3,3
**necessarily** 248:22
  270:24 274:2
  336:16 343:24
**necessary** 248:4
**need** 239:14
  255:22 270:21
  273:22 290:13
  322:2 344:2
**needed** 266:8
  286:3
**needs** 272:5
  304:11
**network** 288:10
  288:12 324:22,24
  325:1 343:16,22
**nevertheless**
  340:23
**new** 285:9,16,17
  285:20 287:12
  290:19 307:23
**nicely** 274:7
**nicollette** 237:8
**night** 246:3
**non** 289:5 311:24
**nonresponsive**
  340:21
**nontechnical**
  316:3
**normal** 246:19
  290:11,20 291:2
  304:3 311:7,17
  333:11
**normally** 286:5
  308:23

**northern** 236:1
**notarized** 347:15
**notary** 236:15
  345:5 347:24
  348:10,18 349:15
  349:23 350:23
**notation** 307:19
  334:14
**note** 246:2 293:23
  333:24 335:1
  347:13
**noted** 313:23
  332:1
**notes** 238:11
  263:18 314:12
  330:3,10 331:9
  334:21 336:14
**notice** 236:12
**notion** 303:17
**nov** 330:24
**november** 244:23
  244:23,24,24
  334:2 336:4,11
**nr** 340:21
**number** 262:7,7
  263:13 278:13
  298:17 312:10
  313:1 330:14,15
  330:16 331:6
  332:2,6,12,16,21
  347:8,14
**numbers** 269:6
  330:12 349:7

**o**

**o** 345:3,3
**o'clock** 236:17
**oakbrook** 240:10
**objection** 258:13
**obtain** 302:4
**obviously** 267:21

**[occur - particularly]**

occur  271:23

occurred  271:22
  282:19 284:21
  335:4

occurrences
  241:12

occurring  289:8

oct  330:24

october  241:13
  251:12 252:20
  261:11,14,15
  301:10 314:17
  315:8,16,21
  316:10,15,22
  317:21 318:4,13
  318:18 323:9
  325:14,22,22
  326:1,17,21 327:9
  328:8,23 329:5
  334:2 336:4,11

offer  290:8

office  237:3
  240:10 346:5

official  348:15
  349:21

ohio  347:2

okay  250:22 260:6

old  285:23 287:13

once  239:24
  275:14 283:19
  321:18,19

ones  251:19
  263:10 269:9
  284:24 299:5
  328:21

ongoing  337:19

online  242:5 252:8
  252:8 264:2,10
  294:22 323:16
  327:4,23 334:19

oo  236:16

open  329:19,22

opportunity
  257:15

oppose  245:9

opposed  296:15
  301:19

option  304:15

options  298:5
  304:4

oral  240:5

orchard  237:4

order  241:15
  247:22 251:3,5,20
  252:20 253:1
  255:12,22 256:11
  256:14,17,23
  257:1,16 261:18
  263:17,23 265:24
  272:5 275:6 276:7
  277:4 283:9
  290:21 292:21
  294:20 301:11
  327:9 336:18

ordered  250:1,2
  254:21 255:8
  261:4

orders  248:16
  258:8 261:2

orient  277:23

original  243:12,14
  247:21 264:18
  265:6 269:19
  272:11,16 274:2
  275:11 284:10
  302:21 322:15

outcome  346:3

output  270:13
  274:12

outside  286:9
  291:11 309:9

overall  249:10

overcomplicated
  273:8

overgenerous
  277:7

oversimplify
  273:17

owner  290:22

**p**

p  269:1

p.m.  326:3

p003041  329:24

pable  236:4
  241:20 242:1
  248:19,23 249:6
  254:14 260:15
  263:13 267:2
  268:4 273:10
  277:15,18,24
  278:21 279:2,12
  280:23 281:8,20
  281:24 282:13,24
  283:4,20 285:8,16
  286:2,7 287:6
  289:12,24 290:5
  292:5,14 293:8
  294:16 295:10
  297:9 307:8 308:2
  308:12 309:24
  310:23 313:9
  314:4,14 326:2
  330:7,13,18
  331:15,20 332:10
  333:24 340:5
  341:18 347:6
  348:3 349:3

pable's  250:4
  262:10 263:2
  265:21 267:22
  280:19 281:14
  285:15 288:19

295:4,16 312:4
  313:20 314:7,16
  324:9,15 325:15
  326:9,24

page  238:6 255:20
  256:4 257:6
  260:18,22 278:7
  285:6 291:23
  296:5 329:23
  330:1,6 334:22
  347:14,16 349:7
  350:3

paid  258:8 260:5
  337:2

parabin  300:9

paragraph  260:22
  260:24 278:10
  285:6

parameters  273:6
  273:11 274:20
  275:5 322:7

parens  292:8

parse  284:8

part  244:16
  246:19 247:21
  252:10,11,16
  258:10 263:24
  266:9 269:19
  273:3,4 274:10
  276:3 280:7
  287:14 290:7
  291:2,17 302:3,21
  311:22 315:9
  320:13 327:16
  329:2 349:9

particular  245:11
  271:11 272:19
  309:2 321:12
  338:7 340:13

particularly
  266:17 339:3

**particulars** 245:14 291:6

**parties** 300:2 346:1

**parts** 252:17

**pass** 292:21

**pay** 258:20

**paying** 258:2,9

**payments** 260:8 260:11

**pdf** 256:16

**peak** 326:4

**pending** 239:16 244:9 258:1 259:16

**people** 239:23

**percentage** 338:16 338:23

**perfect** 249:10

**performed** 263:19 266:1 300:24

**performing** 323:14

**period** 241:7 262:13 311:8 342:24

**person** 242:2 274:17 292:11

**personal** 302:19 313:3 325:2 334:9 345:16

**personally** 348:11 349:15

**perspective** 274:8

**pertained** 245:15

**phone** 241:22 246:18 252:11,14 252:14 253:4,6 261:12 262:14,18 263:1,2,5 264:2,4 264:5,23 265:14

266:5,10,14,15 267:9,15,21 268:3 268:23,24 269:2 270:6 284:22 285:9,10,15,16,17 285:20,23 286:2,4 286:6,7,10,14,19 286:21,23 287:5,7 287:12,13,18 288:1,3,9,19 289:6 289:13,21 290:6 290:11,13,17,19 291:14,17 292:7 294:23 296:9,19 297:1,6,23 298:2 298:11,20 299:11 299:16,20 300:4,4 300:15,23 301:6,7 301:12,19 302:1,2 302:5,6,16 303:2,4 303:7,9,17,24 304:2,6 305:1,2,4 305:11,12,18,20 306:1,2,10,11,14 306:15,16,19,21 307:2,3,7,8,11,21 307:22,23 308:3,5 308:9,13,16,17,20 309:13 310:2,2,6,8 310:23 311:8,18 312:4,12,17,22 313:10,16 314:4,7 314:17,23 315:2 315:18,20,23 316:6,12,13,18 317:7,11 319:1,6,9 319:10 320:3,15 321:13,15 322:9 322:13 323:1,4,8 323:14 324:9,11 324:13,14,15

325:7,8,11,15 326:5,9,24 327:9 327:11 328:5,11 328:19,22 329:6,7 331:4,17,21 332:14,17 334:2,3 334:18 335:8,8,11 335:11,14,19,24 336:2,6,7,9,10,21 342:8,16,22,22,23 343:4,12,13,17,17 343:22 344:3,3,6,7 344:9 347:3

**phone's** 290:21 315:1

**phones** 308:21 343:8 344:1

**photo** 316:5

**photographs** 253:7 310:9 318:8 319:22

**photos** 297:5 300:16,22,23,23 302:19 316:19 317:11 320:3 321:15,16 328:1 344:9,10

**phrase** 289:17

**physical** 302:4 328:17 343:21

**picked** 331:16

**picture** 305:10,11 333:21

**pictures** 302:20 307:2 317:16 322:1 331:2 333:22 334:14

**pieces** 269:8 275:13

**pin** 330:14,16

**place** 342:17 345:20

**plaintiff** 236:5 237:6 260:13,15 261:8,10

**plaintiff's** 261:12 266:5

**plan** 286:8

**planned** 290:18

**planning** 286:9

**platform** 293:10

**platforms** 313:10

**pleadings** 339:11

**please** 255:22 260:23 347:12,12

**plurality** 276:5,8

**point** 247:13 251:9 267:20 274:23 285:20 290:13 295:20 310:10 312:22 315:7 319:5 323:19 325:13 326:19,22 329:5 330:21,23 331:2,4,11 333:4 333:16,24 335:3,6

**points** 330:18,20 331:1 336:3 337:24

**pools** 310:8

**portion** 258:2

**possession** 252:14 253:20 254:2 263:11 266:21 299:11 304:22

**possibility** 289:3 304:14

**possible** 259:16 289:2

**potential** 259:7

**power** 289:1
335:18
**precaution** 336:16
**precisely** 309:4
**prefiltered** 282:13
**prefiltering**
281:20 282:19
**prepare** 241:5,15
327:10
**prepared** 264:8
**preparing** 241:3
241:16
**present** 276:13
307:2,3 308:16,24
324:12
**presented** 263:15
268:21
**preservation**
303:21,23
**preserve** 288:24
290:5,6 303:7,24
305:1 310:2
**preserved** 285:23
287:18,19,21
288:2,4 289:14,16
**preserving** 303:17
**president** 240:20
245:18 246:1,9
258:19
**presuming** 282:20
**pretty** 273:8
301:15
**prevent** 306:20
**previous** 241:11
241:12 250:12
257:23 266:4
288:8 301:23
302:15 326:11
345:9
**previously** 254:24
263:21 280:5

292:23 297:6
302:19,24 314:12
316:21 330:10
337:9,22
**prior** 247:13
249:17 255:24
279:13 280:24
282:14 295:19
303:14 306:19
308:3 312:3 314:2
327:3 336:7 337:1
**privilege** 259:10
294:18
**privileged** 259:9
259:13,23 264:15
**probably** 242:10
249:5 300:13
312:13 317:15
**problem** 335:18
**problems** 289:8
304:24 306:23
335:16
**procedure** 236:13
348:5 349:5
**procedures** 339:5
**proceeded** 246:24
**proceedings**
345:18
**process** 246:17
264:20 266:19
267:5,14,14
285:18 286:23
290:12 292:13
320:14 341:2,12
341:13
**processed** 289:7
291:15
**processing** 262:17
263:2 266:10,14
270:16 271:22
272:20,22 274:6

274:24 288:23
302:3 310:19
**produce** 248:1,8
248:13,14 250:15
253:17 254:1,2,23
255:8,23 261:4
263:18 268:19
269:16 272:13
276:12 282:10
315:17,21,22,24
316:11,15,20
317:22 318:15,17
323:10,11 325:14
327:16,22 328:13
342:12
**produced** 241:8
241:17 242:4,14
247:23 248:6
250:5,6,9,10,17,21
251:7,8,12,13
252:9,19 253:14
253:22,23 254:4,5
256:18,19,20
261:19,21,23,24
262:21 263:6,21
264:1,12,17,21
265:5,10,20 266:9
266:21 267:1,3,7,9
267:10 269:4,11
269:22,22 270:5
270:22,23,24,24
271:2,3,3 275:22
276:23 280:5
281:10 283:21
295:4,14 296:18
296:19 297:5,6,9
300:1 307:5
310:20 311:23
314:2,17,20,22,22
315:5,6,11,19
316:21 318:8

320:6 321:19,21
322:6 327:3,17,23
328:24 329:3
339:20
**producing** 275:17
282:15
**production** 241:7
241:9 242:16
248:16 249:18
250:3 253:13,14
255:3,24 256:21
259:20 261:3
262:1,5 263:23
264:8,13,18 265:9
265:16 268:22
269:15,20 270:1
272:14 276:3,24
277:7 294:18
296:5 301:9
316:10 327:5
337:11 347:16,17
347:22
**project** 297:5
300:15,22 316:17
317:11 319:9
320:2 321:15
344:9
**propounded**
248:21
**protect** 250:3
**provide** 249:13
262:4 266:15
270:8,9 287:1,23
298:6 318:2
320:23 327:14
341:5
**provided** 249:1,3
249:8,9 252:2,5
253:9 256:22,23
264:8,9,24 265:16
268:3,21,22 269:2

**[provided - received]**

269:3,8,18 270:1,2 270:3 271:8,9,18 271:24 272:14 274:14,15 276:2 277:4 279:2,4,7,14 280:3,5,7,17,24 281:3 283:17 284:10,21 287:16 292:19 293:6,7 294:12,15,20 295:1,10 296:2,12 296:13,24 297:19 300:2 301:24 305:6 307:12 313:6 314:12 315:15 318:12 319:13 322:23 323:18,21 324:1,5 327:5 328:20,20 337:12 339:21 340:24 341:7,10 341:12 342:1,14 344:10

**provides** 270:20 294:6 326:2

**providing** 248:3,7 276:9 286:2

**provision** 324:24 343:21

**public** 236:15 345:6 348:10,18 349:15,23 350:23

**pull** 244:19 278:16 280:18 283:9 292:17 293:3 321:12

**pulled** 267:1 295:22

**purchase** 335:10

**purchased** 287:13 331:5

**purposes** 242:19

**pursuant** 236:12 236:12

**pursue** 309:10

**purview** 249:10 342:2

**pushed** 293:9

**put** 275:14 280:23 281:21 288:11 295:19

**putting** 270:18

**q**

**quest** 242:20 243:1,4,6,9,10,15 243:18,20 244:1,5 244:5,9,10,14,15 245:8,10 246:22 247:5,6,17 248:8 248:19,21 249:16 249:17 251:7,12 253:14 254:22 255:8 257:8,17,24 258:1,1,8,9,11 259:2,2 260:4 261:3,4,6,9,10,11 261:17 262:7 263:17,20,22 266:2 268:3,10,10 277:14 279:2,14 280:24 281:10 282:15 283:19,21 290:4 295:5,15,22 295:22 297:10 301:3,9,20 326:23 328:10 337:2,3 338:6 339:10,10 339:14

**quest's** 240:10,20 245:24

**quest.net.** 245:21

**question** 239:16 239:16 243:13,17 250:16,18 251:17 253:18 254:3 271:11 288:8 292:9 309:15,21 312:16,19 322:3 324:6 330:14 334:5,12

**questions** 246:7 248:5 336:24 339:23

**quickly** 285:12 324:6

**quite** 277:6

**quote** 311:7 333:11

**r**

**race** 254:12

**ran** 322:16

**range** 273:5 280:13 284:15,18 296:20,22,23 297:21 298:4 299:4 313:4 317:6 317:10,17 319:12 320:24 321:2,4,10 321:12,24 323:22 324:2 332:22

**ranges** 284:17 296:1,10,12,13 315:4 341:4

**raw** 252:24 253:9 264:9 265:6,15 266:17 267:1,6,24 268:2,10,20 269:8 269:24 270:19 271:13,15 274:2 274:12 276:23 277:17,23 278:2 282:15 283:23

317:3

**read** 260:21,24 281:4 330:17 331:12 333:17,19 348:5,6,12 349:5,6 349:17

**readable** 268:19

**reading** 345:21 347:20

**ready** 303:19

**really** 325:6

**reapplying** 284:15

**reason** 259:15 347:15 349:8 350:3

**reasonable** 297:14

**reattach** 275:10

**recall** 245:11,14 246:13 247:12 263:8 272:18 274:11 278:1 280:10 281:1,6 282:2 284:3 285:15 288:6 300:15 307:15,24 310:16 312:5,18 313:17 314:5,13 315:8 320:22 324:2 326:13 333:5,7 335:23 336:21 337:4 340:6,7,20,22 341:6

**recalled** 240:4

**receipt** 347:19

**receive** 251:15,15 255:13 289:11 324:7

**received** 246:3 255:11 256:16 264:14 268:10

271:12 277:14,17
277:23 282:17
283:19 289:10
290:1 295:7 307:7
308:6 317:3
321:14 323:1
331:21 332:19
339:16,17 340:19
341:21 342:22
**receiving**  282:6
288:18 306:19
308:3
**recess**  277:10
329:12
**recipients**  263:12
**recollection**  242:9
290:24 291:15
305:16 317:24
326:10,18
**recommend**  286:6
286:19 291:5
303:3
**recommendation**
291:8 303:22
304:1
**recommendations**
290:3,4
**recommending**
286:20
**reconstruct**
337:23 338:4
**record**  270:22
345:17 349:9
**records**  263:18
265:24 266:23,23
275:18 327:22
**recovered**  301:11
304:9 319:2
**recurrence**  242:11
**reduce**  265:8
272:7,10,23

288:11
**reduced**  264:7
265:2,4 267:6
268:13,14 271:19
273:12 280:4,12
281:6 283:24
284:13 345:15
**reduction**  264:23
270:18 272:22
273:19 284:12
**refer**  320:1
**reference**  326:12
347:8 348:2 349:2
**referenced**  348:11
349:15
**referred**  271:12
**referring**  263:3
266:24 271:20
278:20,21 299:10
316:2,4 317:20
319:21,22 324:14
333:12,22 335:7
**refers**  314:3
331:12
**reflect**  336:9
**reflected**  263:16
277:13 297:12
**reflective**  267:19
**refresh**  239:9
329:15
**regard**  340:14
**regarding**  253:20
282:24 291:12
310:5 333:11
**regardless**  267:14
**regular**  300:13
**reimage**  304:24
**relate**  254:13
**related**  240:17
242:5 253:12
258:15 262:17,20

264:2,2,12 265:13
265:24 266:20
267:21,22 268:23
268:24 269:2,23
283:3 288:7
315:23 319:4,4
323:12 324:21
332:18 335:4,5
338:14
**relates**  249:5
268:4 333:17
**relating**  243:7
261:6 263:19
269:13 308:12
309:14
**relationship**
248:12
**relative**  244:9,14
248:19 282:14
309:12 345:23,24
**relatively**  278:14
**relevant**  252:19
253:23 266:16
272:6 282:22
283:18 310:12
311:8 335:12
338:4 343:10
**relying**  311:12
**remark**  287:16
**remote**  236:10
330:23 333:17
334:1,11 335:2,3
336:10
**remove**  281:22
289:1,2,3 304:20
**removed**  308:2
331:3
**removing**  276:8
**replacing**  286:10
**replied**  312:15

**reply**  247:11
312:14
**reported**  334:1,10
336:4,20,22
345:14
**reporter**  239:22
345:7 348:7
**reporting**  335:3
**reports**  263:18
292:4
**represent**  243:10
243:18 244:5,13
302:1 339:10
**representation**
246:22 339:11
**represented**  319:9
327:24
**representing**
242:17 244:4,8,9
**represents**  239:4
**reproduce**  270:14
277:1
**reproduced**
264:19
**reproducing**  282:8
**request**  251:4
255:3 326:18
349:9,11
**requested**  252:12
261:22 292:20
295:2 315:9
317:18 327:7,13
327:19 341:17
**requesting**  315:10
315:14 317:23
**require**  274:5
**required**  241:8
343:24 347:24
**researched**  323:24
**reside**  334:6

**respect** 244:6 251:11 269:15 274:24 280:6 284:11 297:10 308:17 312:1 320:9 338:21 341:23 342:4,8,22
**respecting** 261:12 266:4
**respond** 256:3
**responded** 293:21
**respondent** 299:4
**responding** 247:8
**responds** 256:9
**response** 245:3,8 312:6 326:21 334:6
**responses** 248:15
**responsible** 260:8 260:11
**responsive** 249:24 250:5,7,11,19,21 250:23 251:20 252:5,19 262:12 262:17 265:12 267:7 275:18 281:18 294:21 317:6 321:6,17
**rest** 325:11
**restate** 277:20
**restricted** 266:13 340:17
**result** 258:3 342:12
**resulting** 266:17 273:12
**results** 276:12,13 277:1,5 309:17,17 310:20 314:21
**retain** 287:5 331:22

**retained** 242:20 243:6,9,9,18 244:5 332:8 337:2
**retainer** 337:3,5
**retaining** 243:15
**retention** 333:3
**retread** 316:1
**retrieve** 292:5
**retrieved** 316:24
**returned** 241:22 264:5 265:5 286:7 290:11,22 304:19 304:21 306:3 321:7 323:9 347:19
**review** 241:9 245:5 248:14 257:15 260:21 321:6 336:9 347:13 348:1 349:1
**reviewed** 241:10 241:14 250:9 252:3,18 257:18 314:23 317:8 343:2
**revisit** 242:11 323:13 324:6 329:5
**revisiting** 323:19
**right** 243:15 244:23 245:10,18 245:21 247:19 248:9,21 251:18 254:20 256:7,11 256:12 257:8 261:3,13 267:2 268:11 271:21 273:13,15,19 274:18 277:18 278:2 280:20

286:10 293:11,24 294:1 295:17 298:15 310:24 317:2 319:16 324:19 325:16 326:5 329:7,24 342:12
**rocks** 236:15 345:5 346:9
**role** 249:12,12
**room** 240:12 274:17
**rules** 236:13 239:9 348:5 349:5
**ruling** 257:7
**run** 239:9 272:3 278:12 320:19
**running** 278:21

**s**

**s** 347:16 349:8,8 350:3
**sadulsky** 240:21
**salawus.com** 237:16
**sanctions** 244:9,14 258:1,8,10,12,20 258:21 259:8,17 260:4,4
**saved** 332:12
**saw** 249:9 280:3 305:14
**saying** 245:13 304:14 320:2 328:13 331:24 332:9
**says** 245:3 255:21 256:10 278:11 285:8 296:5 311:6 333:18
**scanned** 314:1

**scope** 309:9
**screen** 296:19 297:4 298:3 299:6 302:10,13 315:6 316:6 317:12
**script** 272:9
**scripting** 273:3,4
**scripts** 272:4
**sd** 308:5,9,11,15 308:17,18,23 344:2,4,11,13
**seal** 286:23 303:23 346:5 348:15 349:21
**sealing** 303:18
**search** 262:9,10 273:1,5,11 274:14 274:19 275:4,15 276:7,18,20 278:12,21 284:16 294:6,10 295:1,3 295:23 296:6,21 297:8,11,14,17,21 297:24 298:10 299:3,17,19,22 300:11 320:17,19 321:2 322:6 341:3 342:5
**searched** 275:20 297:24 299:2 311:11 341:9
**searches** 262:6,11 265:3 299:9 309:17 321:8 342:3
**searching** 262:24 272:6 275:16 278:17 279:13 280:23 296:16 300:7 341:3

**[second - spam]**

**second** 263:16 267:23 278:10 301:19 318:13 330:23 333:16

**secure** 286:24 288:9 289:6,21

**secured** 287:9

**securely** 288:13

**see** 245:5 248:22 249:14 255:22 256:1 262:8,15 266:19 267:13 272:2 278:13 291:24 299:3 305:15 306:8 311:9 321:6 323:17 324:17 326:12 330:8 334:13 342:11

**seeing** 320:7 336:19

**seen** 247:10 249:2 257:10 300:13

**segments** 299:15

**selected** 279:4

**sending** 341:16

**sense** 298:19 304:18

**sent** 245:7 246:2 256:20 257:13 275:21 293:22 302:9 306:8 312:9 332:19 339:19 341:21

**separate** 243:22 256:6 275:9 282:21 320:14

**separated** 248:23

**separately** 272:8

**sequitur** 311:24

**server** 334:19

**service** 290:9,14

**set** 264:24 265:4,9 265:10 267:6,7,24 268:2,7,22 269:24 270:18 271:19 272:1,6,24 273:12 274:22 276:24 279:13 280:10 281:6 282:15 283:11,20 284:3 284:10,11 286:11 292:14 293:8 295:16 297:16,22 301:15 305:23,24 309:18 328:18 331:18,22 333:2 343:17 346:4

**sets** 265:15 269:10 271:15 272:3 275:20 276:21 277:17 279:8,24 284:7

**setting** 280:15

**settings** 332:15,24

**seven** 260:18,23

**shaking** 268:1

**shape** 266:10 270:14

**share** 240:16 244:19 256:13 329:15

**shared** 266:7 314:8 333:11

**sharing** 245:16

**sheet** 347:14 349:7 349:10,18 350:1

**shelf** 303:18

**shorthand** 345:7

**shortly** 319:6

**show** 244:18

**showing** 322:1

**shown** 337:10 347:16

**shows** 270:11

**shut** 288:24

**side** 326:3,8

**signal** 289:4 299:7 299:19 302:12 311:12,20 313:13 313:21,24 314:6,7 314:16 315:14 316:23 317:3,12 317:19 318:3,11 318:17,20 319:2,8 319:10,15,18,23 320:5,9,19,20 321:11,13 322:5 322:11,13 323:4 327:24 330:21 331:12,17,22 332:7,11,23,24 333:2,5,10,12

**signature** 346:8 347:15

**signatures** 341:14

**signed** 243:1 348:13 349:18

**significant** 338:8

**significantly** 301:16

**signing** 345:21 347:20

**sim** 307:8,11,14,17 307:18,21 308:2 308:18,21,21,23 324:8,11,16,17,19 325:1,5,9 343:3,5 343:7,14,16,19,19 343:20,21,23

**similar** 308:18

**simple** 274:13

**sincerely** 347:21

**single** 332:18

**sir** 347:10

**sitting** 247:19

**situ** 275:12

**size** 283:23 284:5 285:2 302:22

**sjados** 237:16

**slash** 278:14 294:18

**small** 269:24 278:14 325:10

**smaller** 280:12

**smithamundsen** 237:14

**sms** 262:19 300:14 301:3 310:22 313:9,15

**software** 306:13

**solely** 334:18

**solution** 320:23

**solutions** 303:7 347:1 350:1

**soon** 250:22 285:9

**sooner** 290:14

**sorry** 301:7

**sort** 262:10 267:18 303:21,22 333:2 336:10

**sorts** 337:23

**sounds** 273:8 299:19 324:7

**source** 252:23 253:3 268:15,18 272:16 274:12

**sources** 264:11 327:4,23 341:11

**spam** 313:2

**speak**  240:23 326:16

**specific**  250:3 281:24 283:9 290:24 336:22

**specifically**  245:15 268:12 269:1 281:1,7 282:3 285:3 289:15 324:3,14 325:8 327:12 335:6

**specifics**  249:21

**specified**  317:10 345:20

**spectrum**  267:11

**speculate**  338:19 338:20

**speculation** 258:13

**spend**  241:2

**spent**  338:13 339:15

**spoke**  241:19,22 309:1 326:20

**spreadsheet**  265:8 268:17

**ss**  345:2

**st**  237:16

**start**  271:17

**starting**  268:8

**state**  236:16 306:16 345:1,6,8 348:10 349:15

**stated**  304:17 311:17

**statement**  348:13 348:14 349:19,19

**states**  236:1,14 278:18

**static**  288:14,19 303:21,23

**statically**  285:23 287:18,19,21,22 288:2,4 289:13,16 289:20 290:5 303:17

**status**  302:7

**stem**  276:10

**stenographically** 345:14

**step**  264:22 270:4 271:12 300:24

**steps**  262:3 271:23 272:12 273:21 274:11 320:9

**stettinius**  237:7

**steven**  237:14

**stipulated**  313:5

**storage**  325:2 343:11 344:5

**store**  288:12 325:5 344:5

**stored**  287:8 325:9 343:3

**street**  237:15

**string**  245:2

**strokes**  274:19

**structure**  275:15 282:10

**stuff**  270:23 271:4

**sub**  331:1

**subfolders**  279:20

**subject**  266:13

**submit**  338:24

**submitted**  337:2

**subpoena**  238:10 245:9 246:9 247:5 247:7,17,18 254:23 257:7 258:4

**subscribed**  348:10 349:14 350:21

**subsequent**  242:3 242:7 256:15 264:3 284:24 289:9 293:12 294:14 296:11 305:17 323:15 326:19 341:10,11

**subsequently** 296:8 342:16

**subset**  251:21 280:12 281:22 282:6,18,20 327:21,21

**subsets**  280:1 307:4

**substantial**  301:18

**substantive** 270:10

**substantively** 299:8

**successful**  292:23 303:8,10 305:15

**successfully** 328:21

**sufficient**  296:22

**suggest**  282:16

**suggested**  275:16 287:6 290:12,21 304:4

**suggesting**  251:6 288:22

**suggestion**  304:13

**suggestions** 291:13

**suite**  237:9,15 347:2

**summarized**  274:7

**superior**  347:1

**supplemental** 242:15

**sure**  241:6 242:16 262:6,11 265:13 267:17 277:22 287:22 288:10 292:12 297:13 298:4 309:22 331:8 333:13 338:21

**sworn**  239:1 240:5 345:11 348:10,13 349:14,18 350:21

**symbol**  331:5

**system**  279:23

**t**

**t**  269:2,5,5,6,14,14 269:14,14 279:8,9 297:20,20,20,23 298:8 299:9

**t2**  279:8

**taft**  237:7 325:15

**taftlaw.com** 237:10,11

**tag**  269:1

**tags**  269:6

**take**  255:6 261:12 267:20 272:12 274:18,23 277:8 291:7 302:23 329:10

**taken**  236:14 253:8 283:15,16 303:4 321:16 328:1,5,10,12 336:14 345:19

**takeout**  271:14 279:6,10 293:9 294:15 323:2

**takeouts**  279:19 280:8 293:4

**talk**  239:20 249:21 277:12,22 326:2

talked   246:21
  264:10 266:4
  277:16 280:4
  303:15 323:4
  343:1
talking   239:23
  249:22 259:15
  267:4 270:23
  271:4 278:1
  289:20 303:16
  316:17 324:15
tasker   331:1
  333:19,20,22
tduffy   237:5
tduffylaw.com
  237:5
technical   274:10
  274:17 281:23
technically   273:16
  274:11 283:1
telephonically
  306:7 312:11,16
tell   241:24 246:13
  258:23 260:2
  262:3 268:14
  279:17 285:15
  286:19 287:20
  288:5 289:12
  306:15 311:13
  324:10 325:19
  331:13 334:24
telling   259:21
ten   277:9
term   276:9 316:9
  322:7
termed   302:24
  328:15
terms   273:1,5,11
  273:14,18 274:13
  274:14,20 278:13
  278:21 284:16

294:7,10 295:1,3
295:23 296:21
297:8,11,14,21,24
298:10 299:3,17
299:19,22 320:17
320:19 321:3
341:3
test   324:17 342:10
testified   240:6
  250:10 306:22
  310:21 330:9,12
  337:9,22 343:7,14
testify   239:12
  345:11
testimony   239:19
  266:13 302:15
  345:18 348:6,7
  349:6,9,12
text   256:11,14
  262:19,20 276:2
  300:13 301:1
  310:22 311:19
  312:1,4 313:1
  330:21 331:12,17
  333:11
texts   311:7,17,17
thank   316:8
thanks   292:12
thing   239:15
  264:21 267:4
  269:21 273:20
  281:24 289:16
  341:16
things   266:16
  271:3 273:22
  274:23 276:17
  282:21 289:9
  294:21 295:2
  309:2,8,8 341:17
think   241:21
  250:17 253:18

259:5,13,14,19,23
262:15 267:18
270:21 273:14
276:10 282:4,13
287:3 289:15,16
292:18 297:6
298:10 300:1
301:2,16 303:5,6
303:15 306:22
310:4,10,21
313:13,14,22,23
314:8 316:5 318:4
318:13 319:18
320:11,17,22
322:20 333:19,20
333:21 334:22
336:24 337:9
340:10 342:4
344:7
thinking   274:9
third   331:2
thirty   347:19
thorough   299:2
thought   250:11
  253:23
thoughts   246:6
thousands   280:11
three   269:7 284:21
  322:21 329:17
  330:16 336:3
thumb   315:15
thursday   293:23
tilde   331:5,6
tim   240:21,21
  243:1,1,4,10,14
  245:2 256:5
time   239:15 241:2
  241:8,17,19,21,24
  244:7,12 246:12
  247:3 249:11
  250:14 251:10,21

252:9 261:9
262:13 263:1,9
264:6 269:23
273:19 275:17
277:8 279:19
283:14 284:22
285:24 286:2,7
289:9 290:20
291:14 296:6
302:5 304:22
305:12,13 307:24
310:11 311:8
315:4,5,12,14,23
315:24 317:14,20
318:14,16,18
319:5,6 320:10,12
321:14,22 323:16
326:7,14,15,22
327:2,7 328:11,19
329:5,7 332:1,6,20
332:21 333:12
334:10 335:10,11
336:7,15 337:14
337:21 338:3,4,6,8
338:10,13,17
339:15 342:4
345:20
times   239:8
  284:20,21 314:9
timothy   237:3,3
  246:4 347:5
title   260:22
today   239:5,12,20
  240:9 247:19
  263:15 309:1
  324:13,19
today's   241:15
  343:8 344:1
token   331:2 335:2
  335:5

**[told - various]** Page 24

| | | | |
|---|---|---|---|
| **told** 285:8 313:20 342:9 | **true** 243:16 245:13 345:17 | **u** | **united** 236:1,13 |
| **tomorrow** 245:4 | **truth** 345:11 | **ultimately** 247:15 251:23 253:14,19 285:13 291:9 293:5 295:7,14 297:19 304:22 315:15 320:6 322:6 326:16 | **universe** 250:12 252:1 253:19 281:15 340:12 |

**told** 285:8 313:20 342:9

**tomorrow** 245:4

**tool** 274:1 305:15 305:19 322:21

**tools** 272:21,23 273:22 274:24 283:8,12 300:10 304:19,21 305:5,8 305:13,17 316:13 342:8,9,13,19

**top** 291:22 292:2 296:5

**total** 280:1 282:7 284:3

**track** 337:21

**transcribed** 348:7

**transcript** 241:11 345:14,22 347:12 347:13 348:5,12 349:5,11,17

**transcription** 345:16

**transit** 236:7 347:6 348:3 349:3

**transitioning** 307:23

**transmitting** 341:18

**traunch** 255:7

**treating** 341:6

**trial** 305:14 306:13

**tried** 276:8 320:15 335:15 342:13

**triggered** 267:23

**troubleshoot** 304:24 306:23

**troubleshooting** 289:8 303:9

**true** 243:16 245:13 345:17

**truth** 345:11

**truthfully** 239:12

**try** 239:20 298:15 300:6 304:23,24 305:1,19 306:13 306:13,23 321:23

**trying** 250:24 253:12 254:15 259:12 273:15,16 273:20 277:6 283:7

**turn** 255:14 257:3 260:18 278:4 285:10 288:9 289:1 291:22 293:14,15 294:4 311:2 325:18 327:20 329:23

**turning** 282:7

**twice** 321:18 322:16,22

**two** 239:23 250:12 252:17 265:23 272:12 278:7 285:6,14 286:14 292:8,16,22 293:2 293:19 294:1 296:5 323:15 330:15

**type** 275:1

**types** 289:9 300:7

**typewriting** 345:15

**typically** 325:2,4 343:8,10

**typo** 296:4,15 297:2

**u**

**ultimately** 247:15 251:23 253:14,19 285:13 291:9 293:5 295:7,14 297:19 304:22 315:15 320:6 322:6 326:16

**unclear** 331:24

**uncommon** 338:19

**understand** 242:17 244:16 245:12 250:2,4 251:1 253:18 255:9 258:5 271:6 271:9,15 273:9 274:16 280:21 288:3 289:19 292:12 296:14 303:20 309:22 311:13 322:10,12 331:8

**understanding** 258:9 260:3,7,10 261:20 267:17 279:1 280:22 282:12 301:5,15 303:13 304:11 315:13 332:15 335:13

**understood** 247:7 247:20,22 248:4 250:5 255:2 265:11 266:3,8,12 267:16 284:13 286:3 311:15,16 313:13 320:24 323:23 331:14,15 332:10

**unfortunately** 272:17

**united** 236:1,13

**universe** 250:12 252:1 253:19 281:15 340:12

**unpack** 286:17

**unquote** 333:11

**unrelated** 252:13 276:15

**unusual** 268:16

**updated** 302:7,14 342:19

**ups** 331:1

**usable** 268:19 270:19 272:13 274:3

**usage** 336:10

**usb** 316:16 320:7 328:20

**use** 285:24 286:6 286:11,19,20,21 287:14 288:15,15 305:14,18 306:13 313:21 314:7 336:6,20 342:20 344:2

**user** 275:12 290:16 299:22 308:20 325:8 336:21

**usually** 270:23

**v**

**v** 347:6 348:3 349:3

**vaguely** 284:3

**values** 341:19,20

**variation** 275:24 276:4,14

**variations** 297:15

**various** 275:20 306:12 342:7

**[vcn - zip]** Page 25

**vcn** 335:2,5
**vendors** 263:4
**verification** 341:13
**verified** 253:6
**verify** 273:24 341:14
**veritext** 347:1,8 350:1
**veritext.com.** 347:17
**version** 305:14 317:8 321:22 342:10,11
**versus** 251:4 253:15 274:4
**vice** 246:1
**victoria** 236:14 345:5 346:9
**videos** 302:20 310:9
**view** 265:18 267:20,23 275:11
**viewable** 302:13 306:9
**viewed** 306:11
**visible** 315:2
**voice** 271:14 279:11 280:1 284:19 295:11 323:21
**volumes** 343:9,11
**vpn** 331:2
**vs** 236:6
**vsc** 268:17

**w**

**wacker** 237:9
**wait** 338:23
**waived** 345:22 347:20

**want** 239:20 242:16 259:22 267:17 271:1,15 277:12,22 286:17 288:3 292:12 294:4 298:8 309:9 316:1 331:8 338:20
**wanted** 282:10 289:13 326:9
**wants** 326:3
**way** 261:6 266:10 270:14 276:4 278:16 281:17 283:22 290:6 291:11 315:7
**we've** 271:1 281:14 301:9 323:1
**website** 240:16
**week** 257:18,22
**went** 297:4 340:11 340:24
**west** 237:4
**whatsoever** 261:7
**whereof** 346:4
**wild** 276:17
**window** 332:7,9 332:19 333:3 336:5
**wipe** 330:23 333:17 334:1 335:2,3 336:11
**wiped** 331:6 334:11,23 335:22 336:1,2
**wiping** 335:4 336:23
**wireless** 288:12 289:3

**withheld** 249:16 249:17,18,22 251:9,16 254:24
**withholding** 250:23
**witness** 238:3 239:1,6,13,18 240:2,4 258:14 260:7 345:10,22 346:4 347:9,12 348:1,4,11 349:1,4 349:15
**witness'** 347:15
**wondered** 312:2
**wondering** 301:14
**word** 265:2 270:22 276:2,6,11 282:14 287:22 288:15 297:17 311:12 340:11 343:18
**words** 272:7 275:17,19,21 276:7 280:13 294:19 298:21 306:17 310:2 321:8
**work** 243:15 252:13 259:18 261:10 263:19 265:8 266:1 267:19,19 269:2 281:8,9,11,13 292:11 293:3 319:1 322:24 323:13 327:3 333:15 338:6 339:9 340:10 342:16 343:13,14
**worked** 281:12 292:15

**working** 283:12 339:4
**works** 292:10
**worksheet** 307:10
**world** 249:10
**worry** 285:11
**write** 272:5 330:18
**wrote** 330:7,13,14 330:18

**x**

**x** 238:1
**xml** 274:4

**y**

**year** 254:22 255:4 262:2 275:23 331:6 334:23 335:22 336:1

**z**

**zip** 272:9

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions


**Ukipkpi"cpf"Hknkpi"Fgrqukvkqpu**

(a) Submission to Deponent; Changes; Signing. Unless signature is waived by the deponent, the officer shall instruct the deponent that if the testimony is transcribed the deponent will be afforded an opportunity to examine the deposition at the office of the officer or reporter, or elsewhere, by reasonable arrangement at the deponent's expense, and that corrections based on errors in reporting or transcription which the deponent desires to make will be entered upon the deposition with a statement by the deponent that the reporter erred in reporting or transcribing the answer or answers involved. The deponent may not otherwise change either the form or substance of his or her answers. The deponent shall provide the officer with an electronic or physical address to which notice is to be sent when the transcript is available for examination and signing. When the deposition is fully transcribed, the officer shall deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.
(1) If the testimony is transcribed, the officer

shall certify within the deposition transcript that the deponent was duly sworn by the officer and that the deposition is a true record of the testimony given by the deponent.  A deposition so certified requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with the clerk of the court as a matter of course.  The party filing a deposition shall promptly serve notice thereof on the other parties and shall file the transcript and any exhibits in the form and manner specified by local rule.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.