# Exhibit 23

Page 120

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHRISTOPHER GEORGE PABLE,         )

         )

      Plaintiff,      )

         )

vs.         ) No. 19 CV 7868

         )

CHICAGO TRANSIT AUTHORITY and     )

CLEVER DEVICES, LTD.,       )

         )

      Defendants.     )

_____

CHICAGO TRANSIT AUTHORITY,     )

         )

     Counter-Plaintiff,    )

vs.         )

CHRISTOPHER GEORGE PABLE,      )

     Counter-Defendant.    )

The Continued Deposition of DANIEL JERGER, called by the Defendants for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 9:30 o'clock a.m., on the 19th day of October 2021, A.D.

Page 121

APPEARANCES:

LAW OFFICE OF TIMOTHY A. DUFFY
MR. TIMOTHY A. DUFFY
725 West Orchard Circle
Lake Forest, Illinois 60093
Tduffy@tduffylaw.com
appeared on behalf of the Plaintiff;

TAFT STETTINIUS & HOLLISTER, LLP
MR. JOHN KENNEDY
MS. NICOLLETTE KHUANS
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
jkennedy@taftlaw.com
appeared on behalf of the Defendant, CTA;

SMITHAMUNDSEN
MR. STEVEN JADOS
3815 E. Main Street
Suite A-1
St. Charles, Illinois 60174
sjados@salawus.com

appeared on behalf of the Defendant, Clever Devices, Ltd.

Page 122

I-N-D-E-X

WITNESS: DANIEL JERGER

Direct Examination by MR. KENNEDY:    125 - 223
Cross-Examination by MR. DUFFY:       223 - 226
Redirect Examination by MR. KENNEDY:  226 - 228
Recross-Examination by MR. DUFFY:     228 - 229
EXHIBITS                        PAGE
Exhibit 78A supplemental production    123
Exhibit 78B engagement letter 6-1-20   123
Exhibit 86  Excel spreadsheet          124
Exhibit 83 notes                       142
Exhibit 81 photos of flash drive       148
Exhibit 80 flash drive information     155
Exhibit 85 photo of Pable phone        162
Exhibit 87  excerpt of witness answer  185

Page 123

(Witness sworn.)

MR. KENNEDY: Good morning. This is the continued deposition of Mr. Jerger, called pursuant to subpoena and scheduled pursuant to the agreement of the parties.

As I advised counsel for Mr. Pable, that is Mr. Duffy, due to circumstances beyond my control I need to take a hard stop at 10:45 for a time sensitive conference call at 11:00. And I have advised that we could recommence the deposition if it's still outstanding at 8:30[sic] and proceed accordingly and go forward from there.

I will state for the record that since Thursday we have received from counsel additional documents, which we have marked as Exhibit 78A. It appears to be a supplemental production from Quest relative to the subpoena issued to Quest. I'll ask the witness about these in due course.

We also have attached 78B, which is the engagement letter dated June 1, 2020 from Quest to Mr. Duffy. It was the subject of some dispute at our last deposition session. And apparently that dispute has now been resolved with the production of the engagement letter.

Page 124

We have also received a cache of Signal messages on Thursday, which we have had to process ourselves to decifer into a spreadsheet that is marked as Exhibit number 86. And the spreadsheet is produced natively pages 1 through 83, and it's been represented to us that these are the Signal messages that Quest had taken from the phone of Mr. Pable in June of 2020, based on a temporary storage or SD card and then ultimately transferred from that temporary card to a secure file at Quest.

So that will complete what we have received since Thursday.

MR. DUFFY: John, I think you misspoke when you were talking about reconvening. You said 8:30, but you meant to say 12:30, is that correct?

MR. KENNEDY: Correct.

Mr. Jerger, we're going to continue your deposition. Are you ready to proceed?

THE WITNESS: I am.

2 (Pages 121 - 124)

Page 125

DANIEL JERGER, recalled as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

BY MR. KENNEDY:

Q. We're going to talk to you about instructions. You testified at the last deposition by way of foundation that with respect to the work you did on Mr. Pable's phone, you took instructions solely from Mr. Duffy, is that correct?

A. On this matter, yes, that's correct.

Q. How did you communicate with Mr. Duffy regarding these instructions?

A. If there were such instructions, do you mean instructions with respect to how to process Mr. Pable's phone?

Q. Any instructions.

A. Throughout the course of the engagement?

Q. Yes, sir.

A. Mr. Duffy and I communicated via e-mail and telephonically. If there were any other -- it's not a normal process to communicate any text messages. It's primarily telephonically.

Page 126

If there were any text messages they may be hey, I'm busy on a phone call. I'll call you right back type thing. Nothing of substance I would imagine. That is not how I communicate. So telephonically primarily.

Q. There has been an ongoing dispute with respect to e-mails between you, your firm and Mr. Duffy and whether or not those e-mails are responsive to the subpoena that's been issued on Quest, which I believe is the subject matter of the deposition of which you're sitting today.

Do you recall having e-mail exchanges with Mr. Duffy?

A. I don't understand your use of the word dispute.

Q. I will frame the issue for you. Mr. Duffy doesn't want to turn over the emails. I expect those e-mails to be produced, hence, a dispute.

I am asking you did you have e-mail communications with Mr. Duffy?

A. Yes.

Q. Did those e-mail communications include instructions on what to do with Mr. Pable's phone?

A. They may or may not. I don't recall.

Page 127

Q. They may or may not?

A. Well, instructions specifically of how to image his phone. Mr. Duffy did not instruct me specifically on how to image the phone.

Q. Fair enough. Putting aside the means and methods of how to image a phone, did he give you instructions on the scope of the imaging that is to take place?

MR. DUFFY: You're asking just about e-mails or in general?

MR. KENNEDY: Right now it's e-mails.

MR. DUFFY: Thank you.

THE WITNESS: Can you restate the question.

BY MR. KENNEDY:

Q. Did you have e-mail communications with Mr. Duffy whereby you received instructions on the scope of imaging Mr. Pable's phone?

A. Not to my recollection, no.

Q. So to be clear, because the Judge is going to be reading this transcript, your testimony is there are no emails between your firm and Mr. Duffy on the scope of imaging Mr. Pable's phone?

A. To my recollection, that is correct.

Q. Did you search in furtherance of the

Page 128

subpoena that Quest received for responsive e-mails to that question?

A. As discussed last week, as I shared last week, the process of production was split. Mr. Duffy was responding to the e-mails, as he had all the e-mails that I had between he and I.

I produced some e-mails that he did not already have in his possession. I believe you have those emails. And then I produced other documents that I believe were responsive to the subpoena.

In addition, as I understand it, Mr. Duffy would have reviewed those and determined whether or not they were truly responsive. That was an additional process that was gone through before you received any documents.

Q. Did you have any e-mail communications with Mr. Duffy with respect to the scope of documenting information from Mr. Pable's phone?

A. Probably, yes, because I was provided things like date ranges and key word searches that would need to be done at some point on either the data that was collected or available on the phone when I had it in my custody or during the time afterwards where we were also collecting data from

3 (Pages 125 - 128)

Page 129

online cloud services.

Q. So when you say probably yes, you mean yes?

A. I don't know if they're responsive is what I am trying to clarify. They were not regarding specifically imaging. They would have been regarding these are the key words, this is the date and time frame.

Q. I am moving off of this word imaging, Mr. Jerger. It seems to be a bit of a linguistic trap in my opinion. So I am moving off of that, and I use the word documented instead.

I want to know if Mr. Duffy and you had e-mail communications whereby he instructed you on the scope of documenting data on Mr. Pable's phone?

A. Well, there may be documents that are responsive to that. I don't know. But they weren't documents that I believe were responsive to the Court's order.

Q. Why is that? Why do you believe that?

A. As I say, I don't know because I didn't review that subset of materials for materials that weren't responsive.

As I mentioned, the e-mails themselves

Page 130

were not part of what I was producing.

Q. So you have no basis in knowledge to make a determination that any of these e-mails we're talking about were responsive to the subpoena because you didn't see any of these e-mails in your search for documents responsive to the subpoena?

MR. DUFFY: Object to the form of that question.

THE WITNESS: I don't know what e-mails you're referring to actually. You presume there's emails, and I am suggesting there were e-mails that had to do with documenting, right, what the dates and times. I have answered that.

With respect to imaging, which as I understand it that this deposition is about, I don't recall if there were any. And if there were any Mr. Duffy has indicated he's produced those that he believes were responsive.

BY MR. KENNEDY:

Q. What's the difference between documenting data from Mr. Pable's phone on the one hand and imaging on the other?

A. I believe we discussed this last week. Imaging is a process by which you could collect

Page 131

information from the phone.

It's one method to document information from the phone. You could acquire information from the phone manually, as I did with the project-a-phone images that I believe were provided. Also through other digital photographs and through other processes by which you could extract information from the phone.

Imaging is one step that can be used in order to document and preserve and acquire information from the phone.

Q. If I were to ask you to preserve all of the data on Mr. Pable's phone on a date certain so that that data can be utilized later, what instruction would you expect and require to do that?

A. Well, I think it would start with some statements similar to what you suggested there. However, that was not the specifications and the direction that I was provided in this matter with respect to documenting within a certain date range communications that were present on the phone at the time that I reviewed it.

Q. So tell me then what instruction you would expect or require in order to do a complete

Page 132

preservation of the data on Mr. Pable's phone on a date certain?

A. It would depend on the circumstance and the engagement. I wouldn't want to speculate, but it would be a discussion I would have with the client as to what was being needed on a particular case.

Q. Work with me on this, Mr. Jerger. I'm giving you the circumstances. The circumstances and the job is I need you to preserve literally all the data available on Mr. Pable's phone on a date certain so that parties can go back to that preserved copy set and mine that copy set for data subsequent. That's the job.

What instructions does Quest need to hear to do that job?

A. It may require -- well, it would be a dialogue. It's not a simple statement. It would be a dialogue as to the terms and circumstances of that particular case hypothetical as you're making it because that was not the circumstance in this case.

But those instructions may include things as you've stated which is that a forensic digital forensic image would be created that would

4 (Pages 129 - 132)

Page 133

also include physical and logical files. There may be other reasons or explanations as to what was needed to be documented.

We would still produce digital photographs as part of our processing procedures. So we would still do project-a-phone if we could within the context of the engagement. This is a hypothetical engagement, right?

Q. That's where we're at right now. I'm trying to figure out what are the magic words necessary for Quest to hear in order to preserve a complete set of the data on Mr. Pable's phone on a date certain.

MR. DUFFY: Objection, asked and answered.

BY MR. KENNEDY:

Q. Forget about the circumstances of the case, the contested issues in the case. We're preserving a mobile phone's data intact, in full.

What are the instructions?

MR. DUFFY: Objection, lack of foundation and asked and answered.

BY MR. KENNEDY:

Q. I am looking for an unqualified answer, Mr. Jerger. You're qualifying it with it depends on

Page 134

the circumstance of the case.

For example, it depends on a dialogue. For example, what pure instructions are necessary for a forensic investigator like yourself to understand my job is to make a complete preserved copy of this cell phone on a date certain so it can be utilized later?

MR. DUFFY: Objection to the form, asked and answered.

BY MR. KENNEDY:

Q. You could answer, sir.

A. I believe I have answered the question.

Q. Answer it again, please.

MR. DUFFY: Please don't interrupt the witness.

THE WITNESS: I believe I have answered the question. I don't know if I could answer it any more sufficiently because it seems that the terms you are using are not -- I would have a dialogue with our client.

I can't imagine any case where I don't have a communication with the client regarding what is needed in the case so we could work under their direction. There is no magic word that you would use in part because there is an inherent ambiguity

Page 135

to some of these terms from a person who is nontechnical to a person who is technical.

So a person who is technical might use some sort of terms, but if I were talking to a client, I would be asking other questions and confirming with them is this what you need as the output. For example, I might give preliminary data so that that would confirm that it would be this is what is being asked for.

BY MR. KENNEDY:

Q. Okay. Is there anything further to your answer?

A. I think I answered your question, although the question is a little vague in my mind at this point also. So I believe I have answered your question.

Q. I will try to bring clarity, and I will take up your invitation for a dialogue.

I talk to you and I say Dan, thank you for taking the engagement. Your fee of $400 an hour is a little steep, but I think we could manage. Here's what I need. I'm involved in litigation. I'm in federal court, and I need to preserve my client's phone in full so that we have a complete

Page 136

snapshot of everything that is on his phone on a date certain.

What's the dialogue from there?

MR. DUFFY: Objection, calls for speculation.

THE WITNESS: First of all, $400 an hour is not our standard rate for our services. So that is not applicable in this case.

BY MR. KENNEDY:

Q. What is your standard rate?

A. I answered that already. It is $300 an hour for our digital forensic services.

Q. What is the dialogue? I told you the mission.

A. It's a hypothetical here. I think I have answered the question. We would go back and discuss it. We would ask for particulars about the case, what types of data you are interested in, to what extent the data you need.

There would be a discussion of imaging and what needs to be produced. Is this going to be produced to outside parties or is this only going to be used for the collection of the data within a certain criteria. There would be an awful lot of different things.

5 (Pages 133 - 136)

Page 137

This is a hypothetical that I think has exceeded my understanding of what you're asking me.

Q. With all due respect, Mr. Jerger, you're a witness under subpoena, and the question is putting all of those conditions aside, what's going to be used for the information, who is going to see the information, none of that is at issue.

The question I have for you, and I am a layperson. The Court is a layperson. Juries are lay people. You're the technician. You have the aerospace engineering degree. You need to tell me what are the words you need to know in order to preserve a complete copy of the phone for a date certain so the images and all of the data on the phone is captured on that date certain.

MR. DUFFY: Objection, argumentative. Asked and answered.

THE WITNESS: I truly believe for the Court and for you I have answered that question in different ways multiple times, each time trying to understand your hypothetical and understanding that these things that you are discussing were not discussed in the matter in the way that you are discussing these terminology that you're using.

Page 138

We may very well have some understanding in this hypothetical that based on all of the things that you have shared that I would provide a physical digital forensic image that might provide all of the details you needed. But I would again circle back during the engagement and confirm that that is what you needed if that's what I was being asked to produce.

BY MR. KENNEDY:

Q. Were you ever told in any such words by Mr. Duffy to make a complete forensic preservation of all of the data on Mr. Pable's phone?

A. I don't recall in our discussions if those terms were used. I could suggest that -- okay, go ahead.

Q. I'm not asking you to parse words or to quote verbatim. I am asking you were you given instructions in word or deed that you understood to mean I am going to make a complete and capture a complete forensic documentation of everything on Mr. Pable's phone for future posterity?

MR. DUFFY: Objection.

THE WITNESS: Not to my recollection, no. I'm sorry, sir. Not to my recollection.

Page 139

BY MR. KENNEDY:

Q. Mr. Duffy never told you that by words or deed?

A. Not to my recollection.

Q. If he had, what would refresh your recollection?

A. Well, if that had been the required mission, I believe that the period during which I had the phone would have been longer.

There may have been other mechanisms by which I would have processed the phone, but that was not the mission I was told. So I produced the information I was asked to collect from the phone.

Q. What other mechanisms would you have used that you did not use had that been the mission?

A. My objective was not to troubleshoot a phone that may have had issues with it to begin with.

My objective was to document what was available on the phone at the time the phone was in my custody and that's what I did.

Q. Stop for a second. I am not talking about troubleshooting a broken phone. You said that you don't have a recollection of getting instructions

Page 140

from Mr. Duffy to make a complete preserved copy of all of the data on Mr. Pable's phone, correct?

MR. DUFFY: Objection. Those were not the words you used or he used.

THE WITNESS: You're restating it as I recall. Please go ahead. State it again, and I'll be able to answer it.

BY MR. KENNEDY:

Q. This is my understanding of your testimony and if I'm wrong please correct me. This is a critical inquiry here, Mr. Jerger.

My understanding of your testimony was you did not recall ever receiving instructions from Mr. Duffy to do a complete preservation of all of the data on Mr. Pable's phone so that it will be preserved for posterity. You were not given that instruction in word or deed from Mr. Duffy, correct?

A. I don't recall. And if I had, as I've indicated I would have perhaps taken additional steps if they were available to me at the time.

Q. Okay. That's what I'm getting at. Putting aside this idea of troubleshooting that we didn't talk about, what additional steps would you have done to fulfill the mission that I've just

6 (Pages 137 - 140)

Page 141

described that you didn't do here?

MR. DUFFY: Objection, calls for speculation. He could use whatever terms he wants to talk about what you're asking him to guess he might have done.

BY MR. KENNEDY:

Q. You could answer.

A. As you know, I produced images of the phone that were collected of the phone during my processing.

Had that been the mission of creating images, those images may have contained different information than they did. And I may have taken different steps to collect that phone or I may have retained custody of the phone if that is what was required.

Q. Let's stop there. You may have kept the phone longer than June 11 to June 12, right?

A. I may have.

Q. Okay, you may have. And you may have used other mechanisms, your words, not mine, other mechanisms to fulfill that instruction, right?

A. Beyond those that I did, yes, that's correct.

Q. Identify those other mechanisms that you

Page 142

would have used had that been your mission that you did not use.

A. I don't want to speculate at this time. So I don't know the circumstances of what would have transpired with the phone because the phone did have issues as we have discussed last week.

And I don't know what would have been required in order to take additional steps.

Q. But to be clear, more would be required than what you did to the phone?

A. So you're asking me if I was asked to do something more. Yes, more would be required to do to the phone.

Q. In Exhibit 83, you should have that in front of you, Mr. Jerger.

A. I do.

Q. Do you remember testimony about this last time we were together?

A. I remember discussing it, yes.

Q. By the way, since we met last have you done any additional search for any more responsive documents to the subpoena?

A. I did additional searches, as you know, because I produced -- well, I don't know if search

Page 143

is the appropriate term.

I did additional production of materials I was instructed and directed to do so with respect to the Signal data set. I don't believe I did any additional searches for anything else.

Q. Mr. Duffy directed you with respect to the Signal data set?

A. Yes, he did.

Q. Now, you talked about having various communications with Mr. Duffy which may or may not be reflected in e-mails.

Do you remember that subject we just talked about a few minutes ago?

A. Yes, that's true.

Q. In Exhibit 83, just to refresh your recollection and orient the Court, this is the exhibit that includes the electronic acquisition worksheet, right, Bates number 3040?

A. Yes, I see that bates number 3040 is the evidence acquisition worksheet.

Q. It includes the chain of custody sheet at 3039?

A. Yes, I see that.

Q. And you'll find that I will ask you

Page 144

questions that will sound like a declarative sentence. It's still a question.

And then you'll find an evidence inventory at 3038, correct?

A. Yes.

Q. Where do you log your communications with Mr. Duffy with respect to his instructions as to what to do with Pable's phone?

MR. DUFFY: Object to the form.

THE WITNESS: I'm sorry, I didn't hear what Mr. Duffy just said.

MR. KENNEDY: He objected to the form. He doesn't like my question.

THE WITNESS: Could you restate the question.

BY MR. KENNEDY:

Q. Where do you log your communications with Mr. Duffy on the instructions he provided as to what to do with Pable's phone?

MR. DUFFY: Objection.

THE WITNESS: I don't know what you mean by log. I have already indicated that we have exchanged e-mails and that would be our communications regarding the processing of Mr. Pable's phone.

7 (Pages 141 - 144)

Page 145

BY MR. KENNEDY:

Q. So your handling of the project with Pable's phone does not include you logging telephone calls with Mr. Duffy with respect to instructions he provides as to what to do with Pable's phone?

A. This was a very short time frame here. The time in which I was engaged and the time in which the mobile phone was in my custody and the time at which I returned the mobile phone.

There was more activities after that that would have more significance or more frequent e-mail communications with production of documents and subsets of data and so on.

But there was nominal communication at the beginning of this engagement with respect to the processing of this phone. So I don't have a log of his phone calls or our phone calls other than what would be perhaps with respect to the cellular network. But there's no content there. It would just be a communication that occurred on such and such date and time.

Q. So filtering through all of that your short answer is you do not maintain a log of telephone calls with Mr. Duffy as to instructions he

Page 146

provided to you with respect to what to do with Pable's phone?

A. Yes. I don't know what you're referring to as a log. Your term. I produced the documents that I believe were responsive to the Court's order.

Q. Well, let me ask it a different way. Do you maintain notes of conversations that you've had with Mr. Duffy with respect to instructions he gave you as to what to do with Pable's phone?

A. No.

Q. How do you remember what a client like Mr. Duffy tells you?

A. I talk with him. I communicate with him telephonically. If I have a question, I call him.

Q. And something as important as what to do with the subject phone you maintain no notes?

A. I document the process of what I did with the phone. And I have the communications that were provided me via e-mail that had to do with the date range and date and times and what I was being asked to do with the phone.

Q. Other than what you've produced, Quest has produced so far, are there other documents that would reflect what you did to the phone?

Page 147

A. So we did discuss last week that this deposition was relating to the imaging of the phone. So there were other items, but not documents with respect to instructions to image Mr. Pable's phone. There were other data sets, and we discussed those last week.

Q. To be clear then, are you telling me that all documents with respect to, and I am putting in quotes now, imaging, close quote of Pable's phone have been produced by Quest?

A. As I understand it, yes.

Q. What other subject matters are reflected in documents that you have not produced?

A. I believe this was discussed last week. And those documents could include communications that were not about instructions of imaging of the phone and how to image the phone.

They could include communications with respect to the date and time criteria, the key word searches that may be required. The possible data sources of where this data may reside. Communications with respect to producing those subsets of data once they were obtained, how to obtain those from those online sources and work to

Page 148

obtain that data.

So there's a lot of communications that were completely unrelated to the phone directly or the instructions relating to, as you've termed, imaging the phone.

Q. Well, that is your term, sir.

MR. DUFFY: No, it's not. Objection.

BY MR. KENNEDY:

Q. I draw your attention to Exhibit 81.

THE WITNESS: To be clear before continuing, I believe that you have been using the word imaging. In fact, the subpoena specifically refers to the instructions related to the imaging. So I'm not sure if that would be my term, as it appears to be a term you have used in requesting these materials.

BY MR. KENNEDY:

Q. Okay. That's a great statement. I appreciate that. And I want to follow up on that.

MR. DUFFY: John, your audio is dropping out.

MR. KENNEDY: Can you hear me now?

MR. DUFFY: Yes.

THE WITNESS: I can hear those words, yes.

BY MR. KENNEDY:

Q. I said that was a great observation that

8 (Pages 145 - 148)

Page 149

you made, and I want to follow up on it because there seems to be a lot of confusion and maybe it's only in my mind, but I've read the court transcripts from the judge and the magistrate with respect to this issues.

And I have read Mr. Duffy's e-mail correspondence to my firm with respect to this issue, and it appears that the use of the word imaging is a term of art in your field. Is that fair to say?

MR. DUFFY: Objection to that question. You could ask him the last part of the question. All this argument about reading transcripts and stuff is beyond the scope of his knowledge or the subpoena.

BY MR. KENNEDY:

Q. You could answer, sir.

A. I don't know all of the things that you are discussing that you read. I certainly didn't have access to that information.

I have been asked specifically about the imaging in this matter, and I have produced what I believe is responsive to the imaging in this matter. And because imaging is one aspect of the processing that I did with the phone, I responded to the

Page 150

imaging aspect of that.

If I had been asked for other materials, I may have produced other materials, but I was directed and subpoenaed to produce those related to the instructions of the imaging and specifically not beyond that in the court order.

Q. Is imaging a term of art in your field?

A. I don't know the term, term of art. I don't know exactly what that means. I know that the word imaging is used, digital forensic imaging is used in digital forensics, yes.

Q. And digital forensic imaging does not include making a complete preserved copy of all of the data on Mr. Pable's phone, correct?

A. I'm sorry, I wasn't sure. Does or does not? Could you restate your question.

Q. Imaging Mr. Pable's phone as you've described it did not include making a complete preserved copy of all of the data on Mr. Pable's phone, correct?

A. You're assuming that I was directed to do what you believe was done or was asked of me. I was not asked to create an image.

I was asked to document and collect

Page 151

information within a date range of communication on the phone as it was provided to me. I was not asked -- the process of imaging was done as a matter of course, but it was not the mission of the processing.

And as already testified to, had I been requested to do that and to provide an image of the phone that contained more than the images that I did produce or that the tools did process, then I may have taken additional steps. That is not what I was asked to do.

Q. Drawing your attention to Exhibit 81. Do you have that in front of you?

A. It's loading. I have Exhibit 81 in front of me.

Q. Would you agree that that is a photograph of a flash drive?

A. There are several photographs that appear to be of a flash or thumb drive, yes.

Q. And take a look at page one of Exhibit 81. It's the page that has the CTA Exhibit 81 stamp on it. Do you see that?

A. Yes.

Q. Do you recognize that?

Page 152

A. The stamp, the photograph, or the item depicted in the photograph?

Q. The item depicted in the photograph, do you recognize it?

A. I believe so, yes.

Q. What is it?

A. It's a flash drive. The bottom side of a flash drive with a label on it.

Q. Who prepared the label?

A. If that's the one I prepared, that's the label that I prepared. It appears to be what I would have produced. I don't know if that is the one I produced, but that appears to be a label I would have made for that flash drive.

Q. What does the top line of that label indicate to you?

A. It indicates our case number and the word prod 202122, p--r-o-d, as in production.

Q. Beneath that is the date?

A. Yes, it appears so.

Q. October 30, 2020?

A. Yes, 2020-10-30, says copy one.

Q. Do you recall creating that label?

A. I recall creating a label like that, yes.

9 (Pages 149 - 152)

Page 153

Q. Does this fairly and accurately reflect the label you created and affixed to the flash drive that you sent to Ms. Babbitt and Mr. Jados on or about October 30, 2020 by Fed Ex?

A. It seems to, but the bottom left seems to have been torn or somehow changed, and I don't know if that would have been during transfer. I don't recall. So yes, it appears to be so.

Q. I am drawing your attention to page two of Exhibit 81. Do you see that in front of you?

A. I do.

Q. For purposes of the record it appears to be an open Fed Ex packet with the flash drive labeled disk, for lack of a better word, device on the top of the envelope.

Is that a fair description of what's depicted in that photograph?

A. To be clear, I don't think that is a Fed Ex envelope. I think that is a DVD, CD disk mailer, and the flash drive appears to be on top of that, yes.

Q. So that DVD disk folder, that is what you used to send this disk to Ms. Babbitt or Mr. Jados on October 30, 2020?

Page 154

A. I don't recall what packaging was used to send the flash drive to. I don't know if this was copy one to Ms. Babbitt or whether copy two was sent to her. I don't know. But that's documented in the e-mails.

So in answer to your question I don't know if that is the package it was received in, but it could have been.

Q. Drawing your attention to page three of Exhibit 81, do you see that?

A. Page three, yes.

Q. What does that depict?

A. It looks like the top side of that same flash drive.

Q. It says scan disk on it?

A. Yes, it does in red. It says scan disk and also USB 3.0 embossed in the plastic.

Q. Do you have any reason to doubt that Exhibit 81 is photographic representations of the flash drive that you had sent to Mr. Jados and/or Ms. Babbitt on or about October 30, 2020?

A. If you say it is. I have no reason to doubt it.

Q. Does it look like it?

Page 155

A. I think so. I think the label is right. I honestly don't recall if that is the exact flash drive, but I presume it is, yes.

I don't have a recollection of what brand of flash drives was used, but I believe that might have been documented in the correspondence. So we have to look back at that.

Q. You would need to look at correspondence in order to authenticate that the flash drive depicted in 81 is the one you sent to counsel?

A. No. You asked if it was definitively that, I believe. And I said I believe it is. If you needed to confirm further details you might be able do that by looking at the e-mail correspondence regarding when this was sent.

Q. Let me draw your attention to Exhibit 80.

MR. DUFFY: 80?

MR. KENNEDY: 80.

BY MR. KENNEDY:

Q. Do you have that in front of you, sir?

A. I do.

Q. Drawing your attention to bates stamp P003018.

A. P003018, yes.

Page 156

Q. We talked about this last time. Do you recall that?

A. Yes, I do.

Q. Drawing your attention to the middle of that document, Exhibit 80 bates number 3018, you're referring to the flash drive that you sent to counsel, correct, as a general proposition just to orient your memory as to what this document means and is.

A. Yes.

Q. And you state that the flash drive, which appears to be Exhibit 81, but the flash drive contains four folders or files, is that right?

A. Files. There are four files on the flash drive that I provided, yes.

Q. What steps, if any, did you take to verify that the files that are on the flash drive reflected the files in Mr. Pable's phone?

A. So when the tool in each case, in Encase or E3 DS or Device Seizure were used, they produced these image files.

I would have hashed the contents of the files, meaning the cryptographic hash of the LX01 or the DS files. Then when -- sorry. When I made the

10 (Pages 153 - 156)

Page 157

copies to the flash drive, I would have confirmed that all of the hashes matched.

And, in fact, I provided those hash files or hash files with the files so that the recipient could also confirm that the files that I provided contained the content as it was produced by the forensic software.

Q. Did you do anything else to verify that the files that are on that flash drive you sent to counsel reflected the files on Mr. Pable's phone other than what you just testified to?

MR. DUFFY: Objection, vague. Lacks foundation.

MR. KENNEDY: No, it doesn't.

MR. DUFFY: Do you want to argue about it?

MR. KENNEDY: No, I don't.

MR. DUFFY: Then why did you?

MR. KENNEDY: Because it doesn't, and I don't like these silly frivolous objections interrupting my deposition. So I ask you to stop it. This is federal court.

MR. DUFFY: Objection, vague, lacks foundation is not a silly objection when you put words in the question that the witness hasn't endorsed.

Page 158

BY MR. KENNEDY:

Q. What other steps did you take, Mr. Jerger, if any, to verify that the data and the files on the disk flash drive matched the data in Mr. Pable's phone other than what you've already testified to?

A. So I would have reviewed the contents for the output of those files in the tools as far as I would have documented the process of the collection.

So digital photographs would have been taken of the processing where possible of the screens from the software as I did the imaging. And these images as I believe had been discussed were not what were used to produce the files and communications that I was asked to produce in this matter.

While they may have been confirmed that there was nothing that was inconsistent with the files that were produced and the communications that were produced, a complete analysis of whether or not all of the files were contained within this image was not conducted because that was not part of what was being asked to do.

These images were not what was used to produce the materials that I was asked to produce.

Page 159

(Answer read)

MR. KENNEDY: Thank you. I'm going to take a ten minute break.

MR. DUFFY: And you have to stop at 10:45 you said?

MR. KENNEDY: I can go on. We'll continue. The time right now is 10:24.

BY MR. KENNEDY:

Q. Do you recall having a conference call with the technicians at For Discovery approximately one week after you sent the flash drive disk, Exhibit 81 to counsel?

A. I recall having a conversation or a conference call with parties. I believe someone from For Discovery was there, yes.

Q. Do you recall the subject matters discussed during that conference call with For Discovery?

A. I believe parties were having difficulty accessing the files and the images that were produced on this flash drive or on the flash drives that were produced.

Q. As best you can recall, can you summarize what the problems were as you recall them?

Page 160

A. Well, ultimately I think it was one of the parties had difficulties because a file was in a rewrite status, and they couldn't open the file using Paraben's device seizure.

So they couldn't access the file. Once I advised that was a critical step that had to be done they turned off rebite on that particular, I believe the DS file that I produced, and they were able to access the image as it was produced by Device Seizure.

Q. Did you come to understand that the disk that you provided to counsel was virtually empty of data?

A. I don't understand. First of all, you're asking whether or not the 31 gigabyte flash drive was virtually empty because that was just a storage medium. I don't know what you're asking.

Q. I'll try to be more precise, and I appreciate your patience.

The flash drive that you provided to counsel, Exhibit 81, did you come to understand that when it was ultimately opened for processing by CTA's forensic investigators following your conversation with them, as you've just described,

11 (Pages 157 - 160)

Page 161

that there was virtually no data on that flash drive?

Did you come to understand that to be the case?

A. No, I was never informed. I had no communications other than that conference call and that was a very filtered conversation due to all of the attorneys being present.

But I did not have any further communications. I don't know what they did with respect to this matter or with respect to those images.

Q. I appreciate that. Let me ask you, putting aside having any subsequent conversations with the CTA's forensic investigators, did you come to understand that the flash drive that you provided to counsel contained virtually no data?

Was that ever communicated to you by anyone?

A. I don't know if I would ever say that anyone ever told me that there was virtually no data. There was clearly data in there.

There were gigabytes of data provided in the image files. Whether or not they were the data

Page 162

you were asking about I don't know. That is something else.

Q. How many gigabytes of data do you contend were on the flash drive that you provided to counsel on October 30?

A. You have it listed in Exhibit 80. You could see the size of the image file 1.18 gigabytes and 1.40 gigabytes.

Those are the sizes of the image files that were produced as produced by the tools on the dates that are listed there, on the time roughly that is listed there as well, 6-11 and 6-12.

Q. Let me draw your attention to Exhibit 85. Do you have that in front of you?

A. It's opening. I have it in front of me now.

Q. This is a photograph of Mr. Pable's phone that you took on or about June 11, 2020?

A. Page one of that appears to be a photograph of his phone, that is correct. It appears to be a photograph I would have taken as part of my documentation of the phone.

Q. Describe the uppermost bar. What are the various symbols and what do they mean?

Page 163

A. I need to zoom in. It's difficult to see.

MR. DUFFY: Which part of the phone are you asking him about?

MR. KENNEDY: The uppermost bar.

THE WITNESS: The picture is turned to the left. Where do you specifically need me to?

BY MR. KENNEDY:

Q. Pretend it's vertical.

A. So you are talking about the gray band at what would be the top of the phone?

Q. Yes. Do you know what those symbols mean?

A. It's difficult to tell what some of those symbols are because of the image itself. So some of them you could see the lightning bolt, indicating the phone is plugged in, which you could see at the bottom of the phone it's plugged in with a white cable. You could see that it's in airplane mode.

Q. Stop for just a second. I am going to take you from left to right and if it's sideways for you, you understand what I'm talking about, going from the top left hand corner assuming the phone is vertical and going from left to right identify each symbol and what it means.

A. I don't have a clear understanding or

Page 164

depiction of what some of those symbols are. So I wouldn't want to speculate. I could tell you the ones I recognize based on the image here.

Q. Let me show you a different image. Maybe it's a clear image.

Go to the same exhibit, CTA Exhibit 85, bates stamp number -- it's very small and in red at the bottom right hand corner P002435. It has a time stamp of 6-11-2020 at 12:40. And the image is black, and it highlights the gray bar we've been talking about, perhaps a little clearer for you to tell us what those are?

MR. DUFFY: Are we on page two of the PDF?

MR. KENNEDY: We're on page P002435.

BY MR. KENNEDY:

Q. Do you have that, sir?

A. I do.

Q. The top message says Signal, to orient us where on the same document, yes?

A. Yes.

Q. The time on the phone in the top right-hand corner is 12:41 p.m, yes?

A. Yes.

Q. Okay. And you took this photograph of the

12 (Pages 161 - 164)

Page 165

phone on June 11, 2020 at 12:40, according to that stamp?

A. Yes, that would have been central time.

Q. Can you see the images any better on this phone in that top bar to help you identify precisely what each of those images are?

A. I could see the images better, yes, the icons.

Q. As best you can in taking you from left to right, the far left hand corner, what does that image mean?

A. It's a lightning bolt. I would need to tap on some of these because these are specific to his phone in some cases. So I'd have to tap and see what might unfurl these. I can't tap because it's a picture.

Q. Subject to your taping the phone, as best you can tell us what those images mean?

A. You have got different messages in the top left that are status messages, indications of a status of different processes on the phone. In the middle you have --

Q. You're going too fast. I'm going one by one. The top left corner, the lightning bolt, what

Page 166

does that lightning bolt signify?

A. As I indicated, without taping on those I can't tell you what those messages are relating to.

Q. Go to the next one, the one that looks like a cycle.

A. The same answer.

Q. So your answer is given all of your experience as a forensic investigator dealing with mobile phones you can't tell the Court or me what those icons are without taping on the phone itself? Is that your answer?

A. I would not speculate without looking at this particular phone. This particular phone has unique settings, and it's also in Japanese.

I would not want to speculate as to what each of those icons are without looking at further information, and I don't have that information available in front of me in this photo.

Q. Did you at the time you had possession of the phone tap each one of those icons to determine what they were?

A. I may have. And they may be documented in other photographs, but I'm not looking at those other photographs at this point.

Page 167

Q. Other than having them documented in other photographs, did you document what those icons were as you had the phone in your possession?

A. I don't recall. If they're not in the photographs, I don't think they would be documented other than depicted in either the documentation photographs or indicated project-a-phone photographs, which are the other photographs of the screen captures.

Q. Go back to Exhibit 85, what I guess we're calling bates name P002392. That was the first photograph of the phone we talked about a few minutes ago.

A. Do you not want to continue with the other icons?

Q. You told me you couldn't be more specific without taping the phone.

A. With those four icons in the top left, that is correct.

Q. I thought you meant all the way across. Please proceed. Go to icon number five. Describe it and tell me what it is.

A. Well, it appears to be a vibration phone indicating that the phone was in vibrate mode. The

Page 168

next appears to be an indication that there is no card inserted. There is a line through it. It's very difficult to tell.

Airplane mode is indicated next by the little airplane icon. 84 percent, indicating the charge status of the phone. To the right of that is an icon with a lightning bolt, also indicating charge status and then a block in the top right.

Q. So go back to page one of Exhibit 85. You talked a few minutes ago about P002392, which bore the time stamp you made of June 11, 2020, 12:30.

Do you have that in front of you?

A. It's reloading. One moment. Yes, I have that photograph in front of me.

Q. And I want you to explain to me what the numbers mean in the top half of the phone, drawing your attention to 28.26 GB/64 GB and then in a circle 44 percent. What does that mean?

A. It's the amount of capacity of the phone is 64 gigabytes for internal storage, and the number of gigabytes that were used appear to be 28.26 gigabytes, including all of the applications, system user data, videos, photos and things like that.

And then the 44 percent is an indication

13 (Pages 165 - 168)

Page 169

of the amount used, although there are Japanese characters there, and I would want to confirm. I don't read Japanese. So I don't know, but I believe that is 44 percent used.

Q. In other words, 44 percent of the storage capabilities of this phone as configured when you received it was used, is that right?

A. The things that I mentioned, yes, and other data.

Q. If you did the math, in other words, 28.26 -- strike that. 28.26 presumably is going to be 44 percent of 64, right? That is how you would interpret that?

A. Yes, but I would also want to confirm. But yes, to those numbers. Yes, it appears that it's less than half. So 44 percent.

Q. Did you preserve all 28.26 gigabytes of data stored on this phone?

A. That was not my direction or objective or my instructions.

Q. So the answer to that question is no, you did not?

A. That is correct, no, I did not.

Q. And according to your interpretation of

Page 170

Exhibit 80, bates stamp number 3018--

A. Do you want me to look at that now?

Q. Yes, I do.

A. I have it open.

Q. Am I correct in understanding that while there are 28.26 gigabytes of data on Mr. Pable's phone when you had it in your possession on June 11, 2020, you believe you produced 2.58 gigabytes of data on the flash drive disk. Is that a correct understanding?

A. I think you're conflating two image files into one, 2.58.

Q. I was adding them up, yes.

A. Okay. So each of those images were what were produced by the tools that were used to produce those digital forensic images.

Q. And the total aggregate gigabytes produced according to you in the flash drive is 2.58 total gigabytes?

A. There were two images produced. If you add up those two digital forensic images, they come out to 2.58 gigabytes, that's correct.

Those images may contain the same data sets or similar data sets. They are two separate

Page 171

digital forensic images of the phone as of the day that I mined the tools.

Q. So while the total amount of data that you contend you produced in the flash drive is 2.58 gigabytes, if I am understanding your testimony some of that data could be duplicative in each file? Am I hearing you right?

A. Between the two files?

Q. Yes.

A. You do not add those to understand the amount of data that was being collected by these images.

Q. So let's unwind the math then. You contend that you produced 1.18 gigabytes of data in the Encase logical evidence file?

A. That is what was collected by the Encase software, yes.

Q. And you contend that you produced 1.4 gigabytes from the Paraben's Device Seizure case, correct?

A. 1.4 gigabytes is the file size of the data collected by Paraben's Device Seizure, yes.

Q. According to your testimony, that is the totality of data that you produced to counsel on

Page 172

October 30, 2020, is that right?

A. Yes. Notwithstanding the Checksum files which were just for verification, those were the two image files that were produced on or about October 30, 2020.

Q. So the answer to my question is yes?

A. I don't recall the question exactly.

Q. I'll restate it because I would like to know. The totality of data that you produced you contend is 1.18 gigabytes of the Encase logical evidence file and 1.40 gigabytes from the Paraben Device Seizure case, correct?

A. I am having difficulty with the word totality, but those were the images produced by the tools that I produced on October 30, 2020.

Q. Let's talk about totality. Am I missing something? Is there another transmission of data other than what's reflected in Exhibit 80?

A. Not to outside counsel that I provided directly. Not that I'm aware of, no.

MR. KENNEDY: My clock says 10:42. So I am going to take that break we talked about. And Tim and Mr. Jerger, if I conclude my call sooner and I may, I will let everyone know.

14 (Pages 169 - 172)

Page 173

But as I see it right now, it's scheduled for one hour, and it was beyond my control. And I do apologize for that. And it's a call that I could not control the scheduling thereof. So my best case scenario right now is we'll reconvene at 12:30 and continue the deposition. If we can go sooner I'll let everybody know. Okay, does that work for you, Mr. Jerger?

THE WITNESS: It doesn't appear that I have a choice, but I'll await to hear when we reconvene.

MR. KENNEDY: Tim?

MR. DUFFY: Steve, do you have a constraint this afternoon?

MR. JADOS: That constraint disappeared. That happened yesterday, so I'm okay. Yes, my constraint now is 4:30.

MR. KENNEDY: I don't think we're going to go until 4:30.

MR. DUFFY: I have to be downtown at 4:00 o'clock. I thought we had to stop at 2:00 for Steve. Let's get together as soon as we can, and we'll plan on 2:30.

MR. KENNEDY: Plan on 12:30, and we'll advise accordingly if it ends sooner.

Page 174

(Recess)

MR. KENNEDY: Kim Walberg has joined the proceeding.

MR. DUFFY: Who is that?

MR. KENNEDY: Kim Walberg, W-a-l-b-e-r-g.

MR. DUFFY: Okay. I didn't hear her name the first time.

BY MR. KENNEDY:

Q. Mr. Jerger, we're back on the record. Mr. Jerger, at the beginning of this deposition this morning we identified some documents that have been produced since Thursday, and I want to see if you can authenticate those documents. All right?

A. Okay.

Q. Let me draw your attention to Exhibit 78A. And that begins with bates number P003042, and a first sheet has a picture of a phone and 638 in very big numbers at the top left hand corner.

Is that the sheet you have in front of you?

A. Yes.

Q. Then it's quite a large document, and it ends with bates number P003573. Just for the record, generally describing what appears to be in

Page 175

Exhibit 78A, these appear to be photos or screen shots.

Do you see that if you page through this thing?

A. Yes, these appear to be project-a-phone photographs.

Q. Can you identify what 78A is?

A. They appear to be photographs that were taken using a device called project-a-phone by me on June 11 and possibly June 12 of 2020.

Q. So you took photographs of the images as they appeared on Mr. Pable's phone?

A. These would be screen photographs of the materials that I was asked to document on his phone.

Q. These were not produced, these various photographs, that comprise Exhibit 78A with the production that's been marked as Exhibit 78, correct?

This is a supplemental production for lack of a better word?

A. I don't have Exhibit 78. It doesn't seem to be part of today's document. So I don't recall what 78 is.

Q. We will correct that because you have

Page 176

access to all exhibits that were marked.

We discussed Exhibit 78 at the initial deposition session. It is a very large folder of screen shots of the phone and a handful of e-mails. Bear with me a minute.

MR. KENNEDY: Bear with us one second, Mr. Jerger. We'll make sure you have Exhibit 78 in exhibit share.

MR. DUFFY: If you go to the other dates folder there's a folder from today and a folder from last week, and 78 the label of the file is CTA Group Exhibit 78, I believe. The last time it was kind of everything they had at that time.

MR. JADOS: I see Exhibit 78 on my exhibit share for today. It's at the bottom.

THE WITNESS: I refreshed. Now I see 78.

BY MR. KENNEDY:

Q. Getting back to the original question, Exhibit 78A, which I just identified, is in addition to the documents that comprise Exhibit 78?

A. I will testify that these exhibits were not mine. So I produced prior to last week's deposition or perhaps weeks ago if I recall correctly I had produced documentation photographs.

15 (Pages 173 - 176)

Page 177

I had produced project-a-phone photographs. I had produced some e-mails as we discussed about last week. And all of those were produced to Mr. Duffy. These exhibits are not my materials. I didn't make the exhibit.

MR. DUFFY: I will stipulate that what you have apparently collected in 78A, John, is the part of the initial production that was inadvertently not given.

So if you add 78A to Group Exhibit 78, you have that complete production. I don't think those two things include the engagement letter or the Signal files we recently produced, but for separate reasons.

MR. KENNEDY: Let's break that down and make sure the witness understands it and agrees.

BY MR. KENNEDY:

Q. What Mr. Duffy has just said, Mr. Jerger, is that Exhibit 78A were files that should have been produced with Exhibit 78, inadvertently omitted and have subsequently been produced in furtherance of the subpoena.

Is that your understanding?

MR. DUFFY: We didn't produce Exhibit 78, but

Page 178

the photographs in 78A went with the stuff in 78. You put everything we produced in 78.

So 78 and 78A is everything we intended to produce two weeks ago, and there's a few other things more recent.

BY MR. KENNEDY:

Q. Is that your understanding, Mr. Jerger?

A. It is.

Q. Then also produced, and I draw your attention to Exhibit 78B, which has been represented to me to be the engagement letter between Quest on the one hand and Attorney Duffy on the other dated June 1, 2020.

Do you see that exhibit?

A. I'm sorry, what exhibit number did you say?

Q. Exhibit 78B.

A. I see 78B, yes.

Q. Can you confirm 78B is a true and accurate copy of the engagement letter between Quest and Mr. Duffy regarding the Pable lawsuit?

A. It appears to be so, yes.

Q. In the body of the engagement letter, paragraph two, five lines down it provides quote,

Page 179

Robert A. Scigalski, Quest's president, will be the executive manager of this engagement with the law office of Timothy A. Duffy, PC, paren client, close paren, hereinafter.

Did I read that sentence right?

A. I believe so, yes.

Q. And was Mr. Scigalski involved in any of the work related to the work done on Pable's phone?

A. He did not have access to Mr. Pable's phone.

Q. Did he have communications with Mr. Duffy with respect to instructions for what to do with Pable's phone?

A. Not to my knowledge. He was carboned on communications, I believe, wherever possible between myself and Mr. Duffy.

Q. Other than being carbon copied on communications between you on the one hand and Duffy on the other, to the best of your knowledge can you describe what Mr. Scigalski did on the Pable matter?

A. I don't recall if he did anything other than we would discuss status and updates as we would with other cases as well.

Q. Did you maintain notes of the updated

Page 180

status you provided Mr. Scigalski regarding the Pable matter?

A. I don't recall if I did. It would not be a normal routine. I would provide him telephonic updates on cases.

Q. It's possible you have notes, but you don't know for sure. Is that your answer?

A. No, I think it's pretty unlikely I have any notes regarding the status updates with respect to Mr. Pable's matter with Mr. Scigalski.

Q. What would you need to do to confirm pretty unlikely to a definitive no?

A. I don't know even where I would start to look because that's not something I would have kept.

I don't think I would have taken them. At this point, I would say that there wouldn't be any. I just don't have any recollection of any of those.

Q. Do you maintain a working file on the Pable matter?

A. I have a file that would contain documents that would have been received by email, but not all of them, a subset perhaps.

16 (Pages 177 - 180)

Page 181

It would also contain a chain of custody, documentation like the evidence log or evidence lists that are different pieces of evidence we have in a particular matter.

Q. Have you produced that working file in furtherance of the subpoena?

A. In those things that were responsive, yes.

Q. And the things that were not responsive can you identify what those are?

A. I believe, and I don't have my file, but I believe it would only have included things like the printout of the engagement letter.

It may even include a printout of the original complaint, although I doubt that. I don't print out a lot of them. So I don't think there was anything else that would be respondent or relevant other than the things that would have already been produced in e-mails that are responsive to the subpoena.

Q. I am looking for you to identify those things which are in that file that were not produced. If you can identify the subject matter of those things?

A. As I say, I don't believe there is, but if

Page 182

there were, it would only be materials that would have been e-mail communications that would have been printed out.

It could be a complaint. I did not print the subpoena or the court order. So they would be things that would be subsequent to the processing of the phone. And they would not be related. There may be a printout of the date range that was requested, again, from the e-mail and the key words that may be in there. But I'm not certain of that.

Q. So this working file may have actually printed out copies of the e-mails between you and Mr. Duffy with respect to the instructions he provided as to what to do with Pable's phone?

A. There could be. It would already have been represented in the e-mail. There's no new material in that case file other than the originals of the chain of custody, and the scanned documents that had been previously produced.

Q. With respect to those, you did not produce any of those pursuant to your discussion with Mr. Duffy that he would handle the e-mails, is that right?

Page 183

A. I don't even think they were responsive. They would not have to do with the imaging per se. But that's correct, Mr. Duffy handled the mail communications, and the file on this would be very light.

As a course of routine, I do not print things randomly. If it had to be printed it would have been for a reference point on the day of or something to that effect.

Q. Let me draw your attention to a new Exhibit 86. Do you have that in front of you?

A. I do.

Q. Based on what you see in front of you on Exhibit 86, can you describe and identify it?

A. It appears to be an Excel spreadsheet Signal backup XLXX with various columns. The tab, there's one tab called parsed messages and then there's various columns within it going left to right and various records going top to bottom.

MR. DUFFY: I'm sorry, John, is the witness looking at the view function of that information on exhibit share or did you download and open it in Excel? I don't think it matters, I just want to know.

Page 184

THE WITNESS: For clarification, I am looking through the exhibit share viewer. I am not looking at a local copy, I'm looking at the online copy.

MR. DUFFY: If you want to go into detail, I suggest having him download and open it.

MR. KENNEDY: What we have, and I'm going to refer to Nicollette Khuans for a moment to describe what the witness has in front of him.

MS. KHUANS: The document that is labeled Exhibit 86 that is available in exhibit share is an Excel document that contains parsed Signal messages that were produced to the CTA and the SD Signal backup file last week.

And the witness should download that Excel while we're directing him to certain portions of that exhibit.

MR. DUFFY: Are you able to do that, Dan?

THE WITNESS: I am. However, the computer I am viewing this Zoom on does not have Excel. I would only be able to preview it.

MR. DUFFY: You could open Excel and show it to him. It may not make a difference.

MR. KENNEDY: First, you need to talk to your boss, Mr. Jerger, about getting a better computer.

17 (Pages 181 - 184)

Page 185

We'll deal with Exhibit 86 in a moment.

BY MR. KENNEDY:

Q. Those are the body of the new documents that we have received since last Thursday. I do want to go back to a question I asked you in the morning session, Mr. Jerger, and the answer that you gave.

And I will put your answer up. We received it from the court reporter over the break. And at the time I asked the court reporter to actually read the answer back. This is to orient you as to time and place of what was going on in the context of the answer so I could understand what you were saying.

And I want to look at that answer, and I have some followup questions. I will show you your answer, and I will represent to you that this is the answer as provided to us by the court reporter. When we get the full transcript, you'll be able to see that it's a verbatim statement of what you said. Take a look at Exhibit 87 in exhibit share.

So it will be a PDF, and the identifiers at the top it will be from Nicollette Khuans' e-mail from thrilla15@aol.com. Today's date

Page 186

to John Kennedy, Allison Czerniak and Nicollette Khuans. Subject: Excerpt. And external message and then a paragraph.

Do you see that?

A. I am looking at Exhibit 87, yes.

Q. Take a look at Exhibit 87. Have I described it accurately so we're looking at the same piece of paper?

A. I believe so. I'm looking at what appears to be a PDF of an e-mail.

Q. Why don't you read that paragraph which, as I said, is an answer that you gave to a question from this morning's session. Just read it to yourself.

MR. DUFFY: John, can I ask, I assume this is -- I don't know to what degree she goes through a process to produce the certified transcript. I assume this has not undergone that process. In other words, it's just a draft dictation?

THE COURT REPORTER: It's basically 100 percent, it is 100 percent of what was said. I just did a temporary translation to get the information. I wrote it out, and I typed it out into the email because that is really all I could do at the moment.

Page 187

And there is a tape, also, a backup tape recording.

MR. DUFFY: Did you listen to the tape also?

THE COURT REPORTER: No.

MR. DUFFY: I just wanted to make sure where in this process you were getting it from.

BY MR. KENNEDY:

Q. I want to draw your attention, Mr. Jerger, to Exhibit 80 at the same time we're dealing with this answer. Let me know when you have that.

Do you have Exhibit 80 in front of you? Mr. Jerger, are you ready to proceed?

A. Yes.

Q. Do you have Exhibit 80 in front of you?

A. No, I have 87.

Q. I want you if you can, I am going to ask you questions from 87, and it relates to Exhibit 80 because your answer in Exhibit 87 relates to questions we had about Exhibit 80.

I can set the stage for you if it's easier that way. I'll set the table for you so we could proceed. Does that work?

A. Please continue.

Q. So if you recall this morning, and this is going to be a general characterization, not

Page 188

verbatim.

When I was asking you questions along the lines of what steps, if any, you took to verify that the files identified in Exhibit 80 on page 3018 reflected the data on the phone, Mr. Pable's phone. Do you recall that line of questioning?

A. In general, yes, I do.

Q. And you had answered as reflected in Exhibit 87. So I want to review and kind of break down your answer a little bit because there's a lot of things I need to understand in that answer.

So in that context of that question and answer, your answer was "I would have reviewed the contents for the output of those files and the tools as far as I would have documented the process of the collection." This is from Exhibit 87.

"Some digital photographs would have been taken of the processing where possible of the screen from the software as I did imaging."

Can you explain what you mean by those first two sentences?

A. So while you offered to set the table with the context here, there were a lot of discussions this morning, and I did not see the question that I

18 (Pages 185 - 188)

Page 189

am responding to here in the excerpt.

So I would have to have the context of this question to maybe answer more fully. Is there a question that preceded this?

MR. KENNEDY: Yes. Let's do that. I am going to ask the court reporter to indulge us and if you could take us back to that question. We will take a break and reconvene to get the question.

MR. DUFFY: John, you could use your time as you want. I think it is a waste of time to be trying to reconstruct the testimony.

If you want to ask him a question again, ask the question. Do whatever you want. We're not going to sit here all afternoon. This is overdone. So let's go on break.

(Recess)

MR. KENNEDY: Back on the record. I want to thank the court reporter for indulging the process of finding the original question to put into context for the witness the answer that I would like to inquire about, rather than try to just recollect or accept my general characterizations of what that question was.

Page 190

So thank you, Madam Court Reporter, for that. And let's proceed on that basis.

THE COURT REPORTER: "Question: What other steps did you take, Mr. Jerger, if any, to verify that the data in the files on the disk flash drive matched the data in Mr. Pable's phone other than what you have already testified to?

BY MR. KENNEDY:

Q. You have that question now in mind, Mr. Jerger?

A. I do.

Q. And can we now proceed to review your answer?

A. Yes. I believe that there were previous answers to the question because I think this was a line of questioning. But continue, please.

Q. So I read before the break, I will review the first two sentences again.

"I would have reviewed the contents from the output of those files, and the tools as far as I would have documented the process of the collection. Some digital photographs would have been taken of

Page 191

the processing where possible of the screen from the software as I did imaging."

Can you explain what you mean by those two sentences?

A. As clarification for the process, you're asking me about the image files that were produced in October of 2020?

Q. Correct.

A. That had originally been collected in June of 2020?

Q. From your testimony, that is my understanding of the testimony.

A. Okay. So is your question about the files related to what activity was done in June or October?

Q. Thank you. I will do my best to clarify. I am asking you what steps did you take to verify that the two files on the flash drive that you sent to counsel in October matched the data from the files in Pable's phone?

A. So there would have been the two, and I guess I can return now with that context to answer the two -- now you've asked me two different questions.

Page 192

Would you like me to answer the question about the two first sentences or the question you just asked me?

Q. Well, I don't know if they're going to be different. Why don't you answer the question that I just asked.

A. Okay.

Q. What did you mean by the first two sentences of your answer to that question?

A. Back in June of 2020, I would have reviewed the output of the tools. So for example, when the tool produced the output, I would have reviewed it at that time.

And I would have documented it at that time with digital photos, processed photos that had been produced to you, and digital photographs would have been taken where possible from the screen of the software which did the image.

The primary process or in answer to your question, the primary photos that would be relevant would have been the digital photos, not the project-a-phone photos, as I referred to them previously.

Q. Okay. Then you say these images in the

19 (Pages 189 - 192)

Page 193

next sentence, "These images as I believe had been discussed, were not what were used to produce the files and communications that I was asked to produce in this matter."

Can you explain what that sentence means? I am getting lost in the subjects of that sentence. "These images, as I believe have been discussed, were not what were used to produce the files and communications that I was asked to produce in this matter."

What do you mean by that?

A. I was asked to produce communications and documentation of those communications within a certain date range and subject to key words.

So I produced files and communications or files containing those communications as part of the processing and work services provided during this investigation.

Q. So the first two words of that sentence, these images, are you referring to the images on the flash drive?

A. Yes. I believe the context of that answer was related to the flash drive that was provided in October.

Page 194

And I am referring to the two digital forensic images, the Encase and the Device Seizure images that were on that drive.

Q. You had mentioned there's process photos and what's the other type of photos?

A. So project-a-phone. It is a device to document screening for digital forensic processing of mobile devices.

Q. What's a process photo in contrast?

A. It's documentation photos. So it's the DCIM photos. They're the photos taken from a digital camera as opposed to just the screen.

It might also include the connections or be a photograph of a computer screen.

Q. And has Quest produced all photos whether they're project-a-phone photos or processed photos that it has taken of Pable's phone?

A. Yes. I believe all have been produced to Mr. Duffy.

Q. So no photos have been withheld from the subpoena?

A. Yes. Some of the photos, the project-a-phone photos were not specifically responsive to the subpoena, but I produced those to

Page 195

Mr. Duffy. And as I understand, they were produced to you.

Q. So literally all photos that were taken by Quest, project-a-phone photos or processed photo have now been produced pursuant to the subpoena that Quest received?

A. Yes. Or just because we wanted to provide them, not necessarily they were responsive, but we provided all of them.

Q. Nothing has been held back by way of photos?

A. That's correct.

Q. So let's go back to your answer. Picking up on the next sentence, I'll quote it, "While they may have been confirmed that there was nothing that was inconsistent with the files that were produced and the communications that were produced, a complete analysis of whether or not all of the files were contained within this image was not conducted because that was not part of what was asked."

Can you break that down and explain what you're communicating there, attempting to convey?

A. So as mentioned, there were two periods of time related to the images in this matter, the

Page 196

digital forensic images. One was during the processing of the phone while it was in my custody during that period in June and subsequently in October.

During the time period or while producing materials as previously alluded to in the sentence before, communications and files, I would have confirmed that what was contained within the images that were produced by the tools while the Pable phone was in my custody contained nothing that was inconsistent with the materials that were being produced.

So, for example, I didn't see additional things that were still responsive. So I confirmed that the materials that were provided to Mr. Duffy, those files that were contained in those image files were consistent with those.

So nothing was inconsistent and with those things that were produced. And then a complete analysis of whether or not a one to one mapping was not conducted because that was not part of what was being asked.

Q. Okay. I am having trouble breaking down this sentence with the phrase contained nothing that

20 (Pages 193 - 196)

Page 197

was inconsistent. That kind of double negative is throwing me off.

I want to see if we can break it down any further. I really don't have any idea what you're talking about, and I'm not being a smart alec. Can you help me understand what that sentence has to do with attempting to verify the two files on the flash drive delivered to counsel in October and ensuring that those two files were complete from Pable's phone?

A. So now that is a different question than what you're asking.

Q. I don't mean to move the goal post. Forgive me.

A. There was a lot of feedback.

Q. I'll ask that again, Mr. Jerger. I'll try to stay to the script that we've got right now.

The third sentence or subject sentence quoting from 87. "While they may have been confirmed that there was nothing that was inconsistent with the files that were produced and the communications that were produced."

Can you explain that phrase in an alternative way other than what you have already

Page 198

explained?

A. I don't know that I can. Can you ask me a specific question of what isn't clear in my response.

Q. Yes. I don't know what it means to say there was nothing that was inconsistent with the file. What does that mean?

A. In this context in response to your inquiry and, in fact, the reporter, I believe, read it, to paraphrase what was done to confirm that the files and the images were the same that were on the Pable phone. That is what I understood was your question.

Q. Fair enough.

A. So I was attempting to answer that those files that were contained because it's been established that that image does not contain all of the files off of Mr. Pable's phone, but the files that were contained in there, the contents of those images I believe I would have checked and made sure that there was nothing of that information that was inconsistent with those things that were being produced with respect to the communications. That is what I was being asked to do.

Page 199

Q. Why weren't all of the files contained on Pable's phone produced on the October 30 flash drive?

MR. DUFFY: I'm sorry, you're using the word produced, and that is a legal process term. You're asking him why weren't all of the files on the phone on the image files he sent on October 30?

MR. KENNEDY: I'll rephrase the question.

BY MR. KENNEDY:

Q. Why didn't you transfer all of the files from Mr. Pable's phone to the flash drive and deliver that flash drive to counsel?

A. Well, on October 30 I didn't have Mr. Pable's phone.

Q. But you had preserved certain documents and images, photos and such, right?

A. I did.

Q. So why didn't you produce everything that you had from Pable's phone to counsel on the flash drive in October of 2020?

A. In October I was asked to produce image files, digital forensic image files. I produced digital forensic image files. I produced what I was asked. I sent what I was asked to send.

Page 200

Q. So you produced what you were directed to produce by Mr. Duffy?

A. I believe, yes. Mr. Duffy is our client. He would have been the one that directed us to send it directly to you or to other parties.

Q. I'm talking about the substance, the content of the flash drives. That content was determined by direction from Mr. Duffy?

A. The content that was contained within those image files was produced by the tools back in June of 2020.

Mr. Duffy did not create the content of those or have those tools create the content. That is the entire content that was produced at the time I did the imaging. And I provided those image files that I believed were in response to what was being directed.

Q. So you were providing those image files because those were the image files that Mr. Duffy directed you to produce?

A. You're suggesting that -- I was asked to produce image files and, yes, I produced the image files I was asked to produce.

Q. By Mr. Duffy?

21 (Pages 197 - 200)

Page 201

A. Yes, I believe so. Somehow in your question it appears that you were suggesting that Mr. Duffy somehow dictated what was contained in those image files.

I want to make sure that that was clear that that is the tool. Mr. Duffy did not dictate what was inside the image files. I was asked to produce the image files. Maybe I misunderstood the question, but I want to make sure I was clear in my answer.

Q. Let's break this down then. Your last sentence, the last part of the preceding sentence, I will read the full sentence for context for the Court.

"While they may have been confirmed that there was nothing that was inconsistent with the files that were produced and the communications that were produced, a complete analysis of whether or not all of the files were contained within this image was not conducted because that was not part of what was asked."

Did I read that right?

A. You read what is on this e-mail, yes.

Q. So in terms of the verification of the

Page 202

data on the phone and the files and the flash drive, you did not do a complete analysis to determine whether or not all of the files were contained within the image that was conducted of the phone?

A. That was not part of my investigation or examination.

Q. You didn't do that because you were told by Mr. Duffy not to do that?

MR. DUFFY: Objection, misstates.

THE WITNESS: The images as clarified in the subsequent sentence were not used to produce the materials that I was asked to produce. The images were collected as a matter of course during the forensic processing of the Pable phone.

BY MR. KENNEDY:

Q. And you didn't do an apples to apples comparison, a complete analysis, in other words, of whether or not all of the files were contained within the image?

A. I think you've asked me and in several answers I have answered that it was understood that they were not all contained there because that is not what I was being asked to do.

Q. Did you check to see if any of the files

Page 203

on the flash drive that you delivered to counsel in October of 2020 matched what was on the phone?

A. Yes. I would have checked and that is where there was nothing inconsistent with the files that were produced and the communications that were produced as directed.

Q. So when you say nothing inconsistent, does that mean matched, they matched?

A. In a technical term match in my mind is a very literal, very specific thing. So I don't know what you're using from the term matched.

But as I would suggest to you, for example, the materials that I was asked to produce were communications. Let's say text messages. Those messages that were contained within, if any, that were contained within the images, I would have confirmed were similar dates and times to the ones I was being asked to produce if they were responsive to what I was being asked to produce.

Q. Let me try it another way. I don't want to get into the technical manual on what matched means.

Were the images on the flash drive the same as the images that were on Mr. Pable's phone?

Page 204

MR. DUFFY: Objection.

THE WITNESS: Your use of the word images, I don't understand.

BY MR. KENNEDY:

Q. I am trying to track the language you're using in the answer. Were the files contained in the flash drive the same as the files on Mr. Pable's phone?

MR. DUFFY: Object to that question too. It's very confusing. There's only four files on that flash drive, and those particular files do not appear anywhere on the phone, and nobody thinks that.

MR. KENNEDY: First, you're testifying. And second, there's only two files.

MR. DUFFY: There's four files in the flash drive, and everyone in the room knows those four things as they exist on the flash drive do not exist on the phone, and you're wasting everyone's time because you can't accept that fact.

MR. KENNEDY: I am not wasting anyone's time, counsel. I would appreciate it if you stopped interrupting my deposition and stop testifying unless you want to take the oath and stand up and

22 (Pages 201 - 204)

Page 205

take responsibility for what you've done in this case. I would ask you to be quiet and let me interrogate this witness pursuant to court order.

BY MR. KENNEDY:

Q. Mr. Jerger, you're under oath. And I am asking you, and I will go back to my original question.

You have now pages of answer. Did you do anything other than what you have already testified to to verify that the files and the flash drive delivered to counsel in October of 2020 were the same as the images on the phone and the same as Pable's phone?

MR. DUFFY: Objection to that question.

THE WITNESS: I can't answer your question because you're asking me whether or not the images that I produced, the forensic images that were contained on October 30 were actually contained on Mr. Pable's phone, the images files.

And those image files are the product of a process I did. They were not put on Mr. Pable's phone. They were image files that were produced, digital forensic image files produced by forensic tools in June, and they contained what they

Page 206

contained in June.

And I produced the entirety of those files that appeared to be responsive to what I was being directed in October on the flash drive along with two additional Checksum files, which were produced or prepared so that others could confirm that the copies were accurate and complete with respect to the contents as they were generated in June.

BY MR. KENNEDY:

Q. So let me ask you this: Back in June of 2020, June 11 and June 12, when you had exclusive custody of Mr. Pable's phone, did any of the work you did on that phone serve to preserve intact, unchangeable the data on that phone?

A. Yes.

Q. Tell me what you did.

A. All of the forensic processing I did had been documented to the best of my ability on the digital photos that had been produced.

In addition, screen captures were taken of the specific messages responsive to what I was being directed to collect. They were preserved, a snapshot in time that was there on the date that I took those photographs.

Page 207

In addition, as you know, Signal backups were prepared from the Signal application. And they were also produced subsequent, not the image files, but other data that was collected similar to the photographs and such.

In addition, subsequent to having the phone we then did further analysis and collected data from other online sources in response to the request and the direction of Mr. Duffy.

Q. I am confused now. I thought you said earlier that the work you did on the phone was limited to search words and time ranges. Are you changing your testimony?

A. No. What in my response didn't agree with what your perception is?

Q. I asked you if you captured in an unchangeable format all of the data on Pable's phone, all of the data on Pable's phone in June of 2020, and you said yes, you did.

MR. DUFFY: Objection, that is not what you asked him.

MR. KENNEDY: Well, then, I'm asking him again because apparently I am misinformed or confused, Tim. I am asking the witness, not you, sir, to

Page 208

clarify.

Don't hey me and put your hand down. You're unprofessional, and you're being a bully. Put your hand down and act like a lawyer.

MR. DUFFY: Are you going to let me make my record?

MR. KENNEDY: No. I want the witness to answer the question. If I misunderstood I apologize, and I will let the witness answer. I don't need interference from you.

MR. DUFFY: I know you don't like it. I'll let him answer.

MR. KENNEDY: That is all I'm looking for, Tim.

MR. DUFFY: Go ahead, Dan.

THE WITNESS: Unless I misheard you, I believe you didn't ask the same question twice. You asked me did I preserve any data and now you asked me did I preserve all data.

BY MR. KENNEDY:

Q. I'll rephrase because that is my mistake. Mr. Jerger, did you take steps to preserve all of the data on Mr. Pable's phone when you had exclusive possession of it in June of 2020 so that there remains an unchangeable copy of that phone?

23 (Pages 205 - 208)

Page 209

A. That was not what I was directed to provide.

Q. So the answer is no?

A. I had attempted to do images that would potentially, forensic images that would potentially capture some or all of what you're asking, although I'm not entirely clear what you're asking about.

I had attempted to do that and as indicated, and you have seen from the captures, those captures is a subset of the data on the phone. However my mission -- those images were captured as a matter of course, and my mission during that time period and while in communication with Mr. Duffy was to capture the communications within a date range and also subsequent to applying key word searches on those messages.

Q. So the answer to my question is no, correct?

A. I have answered your question I believe.

Q. I think you have. You used Axium Acquire and Mobilize by Black Bag as well in your efforts. Is that true?

A. I used what? You broke up.

Q. Axium is a manufacturer of the tool

Page 210

Acquire. And you used Black Bag by Mobilize?

A. I did attempt to use those tools, right.

Q. Were you successful in extracting any data using those tools?

A. Those tools did not produce additional data or they failed completely during my usage.

Q. During the course of your discussions with Mr. Duffy, did you have any conversations with him words to the effect that the CTA did something to Pable's phone to cause it to wipe all or part of that phone?

A. Could you restate your question again. I want to make sure I understand.

Q. During the course of your communications with Mr. Duffy regarding Pable's phone, did you discuss the subject as to whether the CTA did anything to Pable's phone that would cause that phone to be wiped in whole or in part?

A. With respect to Mr. Duffy, I don't recall.

Q. With respect to anybody?

A. Yes.

Q. With whom?

A. Mr. Pable.

Q. And what did you and Mr. Pable discuss

Page 211

with respect to that subject matter?

A. We could refer back to notes that I produced.

Q. You're talking about the notes in Exhibit number 83?

A. I don't know what exhibit it is. I believe you termed it or called it the scanned documents.

Q. I will direct your attention to Exhibit 83, bates stamped 3041.

A. Yes, I'm looking at that document.

Q. Does that refresh your recollection as to whether you had any conversations with Mr. Pable about the suggestion that the CTA did something to cause Mr. Pable's phone to be wiped in whole or in part?

MR. DUFFY: Objection, he hasn't said he needs his recollection refreshed.

THE WITNESS: I'm not sure what the question is, but I'm looking at the document, and those are notes from my communication with Mr. Pable.

BY MR. KENNEDY:

Q. So the last bullet point on page 3041 on Exhibit 83, could you read those notes out loud?

Page 212

A. Is that the one that begins was phoned?

Q. Yes.

A. "Was phoned while the app symbol @ employer. Tilde about launch day purchase. Tilde, one year, the letter B, the number four, wiped by former employer."

Q. What's the context of those notes in respect to your conversation with Pable?

A. Well, this note is dated June 11, approximately 10:30 a.m. which I believe coincides with when the phone was collected.

So these would have been as indicated up at the top of the bullet point what Pable had devised during that brief interaction.

Q. So as best you can recall, not verbatim, tell me what Mr. Pable said to you and what you said to Mr. Pable as reflected in those notes?

A. There's four bullet points, and I can't recall the specific language that was used. They're immortalized there having to do with different topics that Mr. Pable shared.

Q. Let's take them one at a time. Pable advised bullet point Signal text message limit 25 - 50. Did I read your notes right?

24 (Pages 209 - 212)

Page 213

A. Yes.

Q. Tell me everything you can recall, not verbatim, of what Mr. Pable said to you and what you said to him about that bullet point.

A. Only from the context of the bullet point we were discussing or he was sharing that Signal on his phone would have perhaps had a limit of 25 to 50 messages. He wasn't clear what he was sharing.

I just jotted down that is what I understood he was sharing.

Q. Did I exhaust your memory on what you said to Mr. Pable and what he said to you about that subject matter?

A. Yes. These were very brief. He offered information during the collection of the phone. This was during Covid.

There wasn't a whole lot of conversation going on. We were wearing masks, keeping distance, standing outside. This was a very, very brief conversation. Effectively just transferring the phone, chain of custody signed as we already discussed. Also he was providing pin numbers so I could access.

Q. With respect to that specific subject

Page 214

matter, have I exhausted your memory at to what you said to Pable and what Pable said to you about that subject matter?

A. Yes, I think so. I don't recall anymore.

Q. Let's take a look at the next bullet point, which may be more applicable than bullet point four.

Can you read the notes on the second bullet point out loud for the reporter.

A. Remote wipe late OCT/NOVE, November 2018 by company -- some thoughts BUPS Tasker brought pictures to cloud.

Q. So the reference to late OCT/NOVE, that is late October November of 2018?

A. I believe so, yes.

Q. The reference to company, who did you understand that to be, what company?

A. I don't know if he shared who the company was. I'm not even sure. I don't recall.

Q. Have you had subsequent conversations with anyone that identifies that company to have been the CTA?

A. Only on context I would have understood it was the CTA, but I don't know that. And I don't

Page 215

recall any conversations regarding this particular bullet point and who the company was.

Q. Was this the only time that the subject matter where Pable asserts that the CTA did a live remote wipe of his phone in late October November of 2018?

A. With the exception of when I returned the phone to Mr. Pable, these were the only two conversations I had. So I don't recall that there was anything further, though.

Q. You returned the phone to him on June 12?

A. Yes, I did.

Q. Tell me what you said to Mr. Pable and what Mr. Pable said to you regarding the subject matter of wiping the phone?

A. I am sorry. I think I have already relayed all that I know. I was trying to clarify that I didn't have many conversations with them.

I think you suggested did I have any other conversations, and I clarified I only had the one when I returned the phone.

Q. I thought you said with the exception of the one you had on returning the phone.

A. I was trying to clarify there were two

Page 216

conversations I had with Mr. Pable. Nothing further that I recall regarding this bullet point.

Q. So tell me when did the second conversation, when that conversation took place with Mr. Pable?

A. When I returned the phone on June 12, 2020.

Q. Did the subject matter of the CTA allegedly wiping his phone remotely come up during that conversation?

A. I don't believe so, and I don't believe it would have.

Q. Other than that one conversation that you had with Pable about a remote wipe of his phone, have you talked to anyone else about the CTA doing any action to remotely wipe data from Mr. Pable's phone?

A. Well, in the context of the overall investigation there may have been a discussion at some point with Mr. Duffy.

Q. Tell me what you said to Mr. Duffy and what he said to you.

MR. DUFFY: That is outside the scope of the subpoena, John. He's not going to answer that.

25 (Pages 213 - 216)

Page 217

BY MR. KENNEDY:

Q. You may answer, Mr. Jerger.

MR. DUFFY: No, he may not.

MR. KENNEDY: Mr. Jerger, we're going to move to compel certain things in this case. So we may be back again under court order. Let me ask you this --

MR. DUFFY: To be clear, so we don't waste time unless you could lay a foundation how that is in furtherance of any imaging activities that he did, I'm not going to allow it. But if you can pursue it that way please do so.

BY MR. KENNEDY:

Q. Mr. Jerger, did you have any instructions from Mr. Duffy to analyze the phone to determine whether it had been remotely wiped by anyone?

MR. DUFFY: That is outside the scope.

MR. KENNEDY: Including the CTA.

MR. DUFFY: That is outside the scope. Please do not answer.

MR. KENNEDY: Mr. Jerger, you're going to follow that instruction?

THE WITNESS: As advice of counsel, I believe I will. Based on my understanding of why I'm here to

Page 218

testify, I don't understand how that relates to the imaging as I produced the images.

BY MR. KENNEDY:

Q. Nor would I expect you to understand it because you're not involved in the substance of the case.

Let me ask you this: In your work imaging the phone or however you want to characterize what you've done to the phone, did you find that there was less data than you likely would have found because somebody or something remotely wiped data from the phone before you got it?

A. I can't answer that. That is pure speculation. I have no idea. You're talking about an occurrence that occurred 18 months before I even saw the phone potentially.

More, right? June of 2020 to October. So it was quite some time. I can't answer your question.

Q. I appreciate your candor. With respect to the Signal messages that have been reduced to an Excel spreadsheet, Exhibit 86, do you recall that exhibit?

A. I recall the exhibit 86, yes.

Page 219

Q. Why weren't these Signal messages produced on the flash drive in October of 2020?

A. These are not part of an image that I produced as I was directed to do so.

Q. Were you told not to produce the Signal messages that comprise Exhibit 86?

A. I don't recall if that was a specific discussion, but there were many pieces of information, documents that were not produced in October.

As you know, all of the photographs, the project-a-phone because as I understood them they were not part of what was being requested. I was being asked to produce the image files, the digital forensic image files that were -- yes. So I produced them.

Q. With respect to Mr. Duffy's instructions to you on your work with the phone, did he instruct you not to image any data?

A. Not to my recollection, no.

Q. In your discussions with Mr. Duffy regarding imaging of the phone, did you discuss with Mr. Duffy what imaging meant?

A. It's possible at some point during an

Page 220

engagement or prior to it's possible we discussed that, but I don't recall specifically a time or any communications that would specifically talk about what imaging implies and different types of images of what might be included in that.

Q. Bear with me one moment. Would it be an accurate statement from your field of expertise as a forensic investigator that if you don't do a physical extraction of all of the data from the phone and preserve that physical extraction, the ongoing use of the phone would by its operation in the normal course cause some data to be deleted?

A. Since mobile devices are live systems, unless extensive processes are employed, changes are made to the phone while in use, yes.

And that could include deletion, but not intentional deletion, but just systematic deletion of files or old versions of contents.

Q. And you were specifically asked -- strike that.

You were never asked to do a physical extraction of all of the data on Mr. Pable's phone for preservation, correct?

A. You're using a different term now,

26 (Pages 217 - 220)

Page 221

physical extraction. Is there a clarification that you can make?

Q. I believe that's the same term I used in the preceding questions.

A. You have used consistently image, and I'm not sure if you are differentiating between image and extraction.

Q. I am. I am asking you that you were never instructed to do a physical extraction of the data on Mr. Pable's phone for preservation by Mr. Duffy, correct?

A. I don't know what you mean by extraction or physical extraction. I don't know that term as you're using it.

Q. I will try another one. Picking up on your last answer, to avoid even the unintentional changes in a mobile phone like Pable's, including deletion of data, you could have made a permanent forensic copy of all of the data on Mr. Pable's phone, correct?

A. I am not entirely clear what you're asking, but I think that if we talk of nontechnical terms I think I understand what you're talking about. That is to collect all of the contents or it

Page 222

could be not put in use.

Q. But you could have done that, yes?

A. I was not directed to do that.

Q. Let me do my questions in series. You were not asked to make that type of permanent copy of Mr. Pable's phone, correct?

A. So I was asked to collect the data within the response to the date range. I was not asked to collect all of the data of Mr. Pable's phone.

Q. Thank you. Your engagement letter Exhibit 78B, is dated June of 2020 as a point of reference.

Did you have any contact with Pable's phone at any time before June of 2020?

A. No.

Q. To your knowledge, did Quest have any contact with Pable's phone at any time before June of 2020?

A. To my knowledge, no.

Q. To be more specific than that, to the best of your knowledge neither Quest nor you had any contact with Pable's phone in May of 2020, is that right?

A. Yes, that's correct.

Page 223

MR. KENNEDY: Give me a few minutes. We may be wrapping up.

(Recess)

MR. KENNEDY: I don't have any questions at this time further for this witness. We do reserve our right to recall you, Mr. Jerger.

The Court has advised that a motion to be filed on behalf of the CTA for certain issues that may implicate Quest, and the response to the subpoena. So we reserve our right to continue this deposition. We are not terminating the deposition. But as of this stage based on where we are right now I don't have anything further for you.

MR. DUFFY: Steve, do you have questions?

MR. JADOS: No, I don't.

MR. DUFFY: I have a couple.

CROSS-EXAMINATION
BY MR. DUFFY:

Q. Mr. Jerger, while you were working with Mr. Pable's phone, did you experience any difficulties with either the power button or the power supply or the phone turning off unexpectedly?

A. I did.

Q. Tell us about those if you can?

Page 224

A. So at least on the one occasion or several occasions the phone would just completely shut off during processing or during the collection process.

Q. Do you have a view as to whether that ultimately prevented you from getting off the phone whatever you were trying to get off the phone?

A. I did not further try to investigate. This was not part of the scope of our activities to try to solve problems with the phone we were provided.

Q. I mean given whatever you were tasked to retrieve from the phone and your efforts in that regard, were any of those thwarted by this power issue in your view at the end of the day?

A. It certainly delayed the process. I'm not sure if it would have had a direct impact, but I don't know because I did not further investigate.

Q. Do you recall trying to get something and the phone shutting off and then going back and could not get it in terms of data or communication or anything like that?

A. I don't recall things happening as you described. I do recall it would stop and have to be restarted in order to try to continue a process.

27 (Pages 221 - 224)

Page 225

Q. I think you told Mr. Kennedy that you tried some imaging tools that were not successful and that is documented in the photos you provided. Right?

A. Yes.

Q. Then you also documented the ones that did produce the image files that were later given over in October. Correct?

A. Yes.

Q. Given everything that you did remember from June 11 and 12 of 2020 and now looking at all these documents, do you have any reason to think that there were any messages or communications on that phone when you got it from Mr. Pable that you were not able to retrieve and preserve in some form from the date ranges that you were instructed to look at?

A. Within the period in question I found nothing since that was inconsistent with the collection I did.

So to the best of my ability I captured all of the information that was available on the phone in the ways that were available at the time with the limited period of time that I had access to

Page 226

the phone.

MR. DUFFY: That is all I have.

REDIRECT EXAMINATION

BY MR. KENNEDY:

Q. Mr. Jerger, if you had done a complete forensic copy of the phone and all the data on the phone, the problems with the power switch would have been irrelevant and moot. Correct?

A. I don't understand how those two are together. I don't understand the question.

Q. You wouldn't have to rely on the vagaries of a power switch on Pable's phone to do any work on his phone if you just did a complete forensic image of all of the data on the phone and worked from that forensic copy, correct?

A. So our processing would include imaging, and we would still do the other processing that we did.

And the issue in the short time that I had it, it was unclear to me if it was the power button or the actual connection, the power cord which also serves to capture data. I'm not sure if that answers your question, but we took pictures, and we would have still taken the documentation

Page 227

photos and the project-a-phone photos as our normal routine to document what was on the phone at the time we had the phone.

Q. An option to you was to make a complete forensic copy of all of the data on Mr. Pable's phone.

That was a mechanical option within the capacity of Quest to do, right?

A. Yes. We have the capability to do digital forensic imaging, including logical and physical acquisitions of devices.

Q. And had you done that, you wouldn't have to worry about a power cord or a power button to do any work on the phone because you could do the work on the forensic copy of the phone, correct?

A. No. We still, as I answered, would have done the documentation as I did. Still would have taken the project-a-phone photos because in many cases our clients prefer that mechanism in order to present the way the phone looked at the time that we actually collected the phone and by the time we processed the phone.

So we still would have had the same issues and, in fact, whether or not the cord

Page 228

connection being loose may have impacted the imaging process that is not for me to say because I didn't try to troubleshoot that and diagnose with the images. It was not part of our scope.

Q. Right. So you said.

MR. KENNEDY: Nothing further for now. We reserve all rights.

RECROSS-EXAMINATION

BY MR. DUFFY:

Q. Those capabilities that Mr. Kennedy just asked you about that you could employ or could have employed, you don't know whether they would have been successful in capturing everything that he's saying you could have captured, correct?

A. It's a hypothetical, and I don't know specifically. You know, if we had a different mission, we may have had a different outcome.

MR. DUFFY: Okay, thank you.

MR. KENNEDY: And we'll never know, Mr. Jerger, because you were never asked, right?

THE WITNESS: I think I have answered that question a number of times.

MR. KENNEDY: I think you have. For the record the witness is smiling. Thank you, Mr. Jerger.

28 (Pages 225 - 228)

Page 229

MR. DUFFY: We'll reserve signature. And Mr. Jerger is smiling because this is the end of this deposition.

MR. KENNEDY: I'm not smiling at all. We'll see you in court, counsel.

Page 231

such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois this 23rd day of October, 2021.

*Victoria Rocks*

VICTORIA D. ROCKS, C.S.R.
License No. 084-002692

Page 230

STATE OF ILLINOIS   )
                    ) ss:
COUNTY OF C O O K   )

I, VICTORIA D. ROCKS, C.S.R., Notary Public, within and for the County of Cook, State of Illinois, a Certified Shorthand Reporter of said state, do hereby certify:

That previous the commencement of the examination of the witness, DANIEL JERGER, was first duly sworn to testify to the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me and was thereafter reduced to typewriting via computer-aided transcription under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was not waived;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of

Page 232

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313
October 25, 2021
To: TIMOTHY A. DUFFY
Case Name: Pable, Christopher George v. Chicago Transit Authority, et al.

Veritext Reference Number: 4848576

Witness: Daniel Jerger , Vol II       Deposition Date:  10/19/2021

Dear Sir/Madam:

The deposition transcript taken in the above-referenced matter, with the reading and signing having not been expressly waived, has been completed and is available for review and signature. Please call our office to make arrangements for a convenient location to accomplish this or if you prefer a certified transcript can be purchased.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

29 (Pages 229 - 232)

Page 233

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4848576
CASE NAME: Pable, Christopher George v. Chicago Transit Authority, et al.
DATE OF DEPOSITION: 10/19/2021
WITNESS' NAME: Daniel Jerger , Vol II
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____        _____
Date            Daniel Jerger , Vol II
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 234

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4848576
CASE NAME: Pable, Christopher George v. Chicago Transit Authority, et al.
DATE OF DEPOSITION: 10/19/2021
WITNESS' NAME: Daniel Jerger , Vol II
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____        _____
Date            Daniel Jerger , Vol II

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 235

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 10/19/2021
PAGE/LINE(S) /        CHANGE        /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____        _____
Date            Daniel Jerger , Vol II
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

30 (Pages 233 - 235)

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

**[& - 85]**

Page 1

**&**

**&** 121:6

**0**

**084-002692** 231:9

**1**

**1** 121:13 123:20 124:5 178:13
**1.18** 162:7 171:14 172:10
**1.4** 171:18,21
**1.40** 162:8 172:11
**10/19/2021** 232:8 233:3 234:3 235:2
**100** 186:20,21
**10:24** 159:7
**10:30** 212:10
**10:42** 172:21
**10:45** 123:8 159:4
**11** 141:17 162:18 165:1 168:11 170:7 175:10 206:11 212:9 225:11
**1100** 232:1
**111** 121:8
**11:00** 123:9
**12** 141:17 175:10 206:11 215:11 216:6 225:11
**123** 122:8,8
**124** 122:9
**125** 122:4
**12754** 231:8
**12:30** 124:15 168:11 173:5,23
**12:40** 164:9 165:1
**12:41** 164:22
**142** 122:9
**148** 122:10

**155** 122:10
**162** 122:11
**18** 218:15
**1820** 232:2
**185** 122:11
**19** 120:5
**19th** 120:23

**2**

**2.58** 170:8,18,22 171:4
**2.58.** 170:12
**20** 233:16 234:22 235:22
**2018** 214:10,14 215:6
**2020** 123:20 124:8 152:21 153:4,24 154:21 162:18 165:1 168:11 170:8 172:1,5,15 175:10 178:13 191:7,10 192:10 199:20 200:11 203:2 205:11 206:11 207:19 208:23 216:7 218:17 219:2 222:11,14,18,22 225:11
**2020-10-30** 152:22
**2021** 120:23 231:6 232:4
**202122** 152:18
**216-523-1313** 232:3
**223** 122:4,5
**226** 122:5,5
**228** 122:5,6
**229** 122:6
**23rd** 231:6

**25** 212:23 213:7 232:4
**28.26** 168:17,21 169:10,11,17 170:6
**2800** 121:8
**2:00** 173:20
**2:30** 173:22

**3**

**3.0** 154:17
**30** 152:21 153:4,24 154:21 162:5 172:1,5,15 199:2,7 199:13 205:18
**300** 136:10
**3018** 156:5 170:1 188:4
**3038** 144:4
**3039** 143:22
**3040** 143:18,19
**3041** 211:10,23
**31** 160:15
**3815** 121:13

**4**

**400** 135:20 136:5
**44** 168:18,24 169:4 169:5,12,16
**44114** 232:2
**4848576** 232:7 233:2 234:2
**4:30** 173:16,18

**5**

**50** 212:24 213:7

**6**

**6-1-20** 122:8
**6-11** 162:12
**6-11-2020** 164:9
**6-12** 162:12

**60093** 121:3
**60174** 121:14
**60601** 121:8
**638** 174:17
**64** 168:17,20 169:12

**7**

**725** 121:3
**78** 175:17,21,23 176:2,7,11,12,14 176:16,20 177:10 177:20,24 178:1,2 178:3
**7868** 120:5
**78a** 122:8 123:15 174:15 175:1,7,16 176:19 177:7,10 177:19 178:1,3
**78b** 122:8 123:19 178:10,17,18,19 222:11

**8**

**80** 122:10 155:16 155:17,18 156:5 162:6 170:1 172:18 187:8,10 187:13,16,18 188:4
**81** 122:10 148:9 151:12,14,20,21 153:10 154:10,19 155:10 156:12 159:12 160:21
**83** 122:9 124:5 142:14 143:15 211:5,10,24
**84** 168:5
**85** 122:11 162:13 164:6 167:10 168:9

**[86 - appended]**

Page 2

**86** 122:9 124:4
  183:11,14 184:10
  185:1 218:22,24
  219:6
**87** 122:11 185:21
  186:5,6 187:14,16
  187:17 188:9,16
  197:19
**8:30** 123:11
  124:14

**9**

**9:30** 120:22

**a**

**a.d.** 120:23
**a.m.** 120:22
  212:10
**ability** 206:18
  225:21
**able** 140:6 155:14
  160:9 184:17,20
  185:19 225:15
**accept** 189:23
  204:20
**access** 149:19
  160:5,9 176:1
  179:9 213:23
  225:24
**accessing** 159:20
**accomplish** 232:15
**accurate** 178:19
  206:7 220:7
**accurately** 153:1
  186:7
**acknowledge**
  233:11 234:16
**acquire** 131:3,10
  209:20 210:1
**acquisition** 143:17
  143:20

**acquisitions**
  227:11
**act** 208:4 233:14
  234:20
**action** 216:16
  231:3
**activities** 145:10
  217:10 224:8
**activity** 191:14
**actual** 226:21
**add** 170:21 171:10
  177:10
**adding** 170:13
**addition** 128:11
  176:19 206:20
  207:1,6
**additional** 123:14
  128:14 140:19,23
  142:8,21,23 143:2
  143:5 151:10
  196:13 206:5
  210:5
**advice** 217:23
**advise** 173:23
**advised** 123:6,10
  160:6 212:23
  223:7
**aerospace** 137:11
**affix** 231:5
**affixed** 153:2
  233:15 234:21
**afternoon** 173:13
  189:14
**aggregate** 170:17
**ago** 143:13 167:13
  168:10 176:23
  178:4
**agree** 151:16
  207:14
**agreement** 123:4

**agrees** 177:16
**ahead** 138:15
  140:6 208:14
**aided** 230:16
**airplane** 163:17
  168:4,5
**al** 232:6 233:3
  234:3
**alec** 197:6
**allegedly** 216:9
**allison** 186:1
**allow** 217:11
**alluded** 196:6
**alternative** 197:24
**ambiguity** 134:24
**amount** 168:19
  169:1 171:3,11
**analysis** 158:19
  195:18 196:20
  201:18 202:2,17
  207:7
**analyze** 217:15
**answer** 122:11
  133:23 134:11,13
  134:16 135:12
  140:7 141:6
  145:23 149:16
  154:6 159:1 166:6
  166:7,11 169:21
  172:6 180:7 185:6
  185:8,11,13,15,17
  185:18 186:12
  187:9,17 188:10
  188:11,13,13
  189:3,21 190:15
  191:22 192:1,5,9
  192:19 193:22
  195:13 198:15
  201:10 204:6
  205:8,15 208:7,9
  208:12 209:3,17

**216:24 217:2,20
  218:13,18 221:16
**answered** 130:13
  133:14,21 134:9
  134:12,15 135:13
  135:15 136:10,15
  137:17,19 188:8
  202:21 209:19
  227:16 228:21
**answers** 190:17
  202:21 226:23
**anybody** 210:20
**anymore** 214:4
**anyone's** 204:21
**aol.com.** 185:24
**apologize** 173:3
  208:8
**app** 212:3
**apparently** 123:22
  177:7 207:23
**appear** 151:18
  168:21 173:9
  175:1,5,8 204:12
  233:11 234:15
**appearances**
  121:1
**appeared** 121:5,10
  121:15 175:12
  206:3
**appears** 123:16
  148:14 149:8
  152:11,13,20
  153:8,12,20
  156:12 162:19,21
  167:23 168:1
  169:15 174:24
  178:22 183:15
  186:9 201:2
**appended** 234:11
  234:18

**[apples - better]** Page 3

**apples** 202:16,16
**applicable** 136:7
  214:6
**application** 207:2
**applications**
  168:22
**applying** 209:15
**appreciate** 148:18
  160:19 161:13
  204:22 218:20
**appropriate** 143:1
**approximately**
  159:10 212:10
**argue** 157:15
**argument** 149:13
**argumentative**
  137:16
**arrangements**
  232:14
**art** 149:9 150:7,8
**aside** 127:5 137:5
  140:22 161:14
**asked** 133:14,21
  134:8 135:9
  137:16 138:7
  139:13 142:11
  146:20 149:20
  150:2,22,23,24
  151:3,11 155:11
  158:14,22,24
  175:14 185:5,10
  191:23 192:3,6
  193:3,9,12 195:20
  196:22 198:24
  199:21,24,24
  200:21,23 201:7
  201:21 202:12,20
  202:23 203:13,18
  203:19 207:16,21
  208:16,17 219:14
  220:19,21 222:5,7

  222:8 228:11,20
**asking** 126:19
  127:9 135:5 137:2
  138:16,17 141:4
  142:11 160:15,17
  162:1 163:3 188:2
  191:6,17 197:12
  199:6 205:6,16
  207:22,24 209:6,7
  221:8,22
**aspect** 149:23
  150:1
**asserts** 215:4
**assignment** 233:2
  234:2 235:2
**assume** 186:15,18
**assuming** 150:21
  163:21
**attached** 123:19
  234:7
**attempt** 210:2
**attempted** 209:4,8
**attempting** 195:22
  197:7 198:15
**attention** 148:9
  151:12 153:9
  154:9 155:16,22
  156:4 162:13
  168:17 174:15
  178:10 183:10
  187:7 211:9
**attorney** 178:12
  230:24 231:1
**attorneys** 161:8
**audio** 148:19
**authenticate** 155:9
  174:13
**authority** 120:6,9
  232:6 233:3 234:3
**authorize** 234:11

**available** 128:22
  132:11 139:20
  140:20 166:18
  184:10 225:22,23
  232:12
**ave** 232:1
**avoid** 221:16
**await** 173:10
**aware** 172:20
**awful** 136:23
**axium** 209:20,24

**b**

**b** 174:5 212:5
**babbitt** 153:3,23
  154:3,21
**back** 126:3 132:12
  136:15 138:5
  155:7 167:10
  168:9 174:9
  176:18 185:5,11
  189:7,18 192:10
  195:10,13 200:10
  205:6 206:10
  211:2 217:6
  224:19
**backup** 183:16
  184:13 187:1
**backups** 207:1
**bag** 209:21 210:1
**band** 163:9
**bar** 162:23 163:4
  164:10 165:5
**based** 124:8 138:2
  164:3 183:13
  217:24 223:12
**basically** 186:20
**basis** 130:2 190:2
**bates** 143:18,19
  155:22 156:5
  164:7 167:11
  170:1 174:16,23

  211:10
**bear** 176:5,6 220:6
**beginning** 145:15
  174:10
**begins** 174:16
  212:1
**behalf** 121:5,10,15
  223:8
**believe** 126:10
  128:8,10 129:18
  129:20 130:23
  131:5 134:12,15
  135:15 137:18
  139:8 143:4 146:5
  147:14 148:11
  149:22 150:22
  152:5 155:5,12,12
  158:12 159:14,19
  160:8 169:3 170:8
  176:12 179:6,15
  181:10,11,24
  186:9 190:16
  193:1,7,22 194:18
  198:9,20 200:3
  201:1 208:15
  209:19 211:7
  212:10 214:15
  216:11,11 217:23
  221:3
**believed** 200:16
**believes** 130:18
**beneath** 152:19
**best** 159:23 165:9
  165:17 173:4
  179:19 191:16
  206:18 212:15
  222:20 225:21
**better** 153:14
  165:4,7 175:20
  184:24

**beyond** 123:7
  141:22 149:14
  150:6 173:2
**big** 174:18
**bit** 129:10 188:10
**black** 164:10
  209:21 210:1
**block** 168:8
**body** 178:23 185:3
**bolt** 163:14 165:12
  165:24 166:1
  168:7
**bore** 168:10
**boss** 184:24
**bottom** 152:7
  153:5 163:16
  164:8 176:15
  183:19
**brand** 155:5
**break** 159:3
  172:22 177:15
  185:9 188:9 189:8
  189:15 190:19
  195:21 197:3
  201:11
**breaking** 196:23
**brief** 212:14
  213:14,19
**bring** 135:17
**broke** 209:23
**broken** 139:23
**brought** 214:11
**bullet** 211:23
  212:13,18,23
  213:4,5 214:5,6,9
  215:2 216:2
**bully** 208:3
**bups** 214:11
**busy** 126:2
**button** 223:21
  226:21 227:13

**c**

**c** 230:3
**c.s.r.** 230:5 231:9
**ca** 232:24
**cable** 163:17
**cache** 124:1
**call** 123:9 126:2,2
  146:14 159:9,14
  159:17 161:6
  172:23 173:3
  232:13
**called** 120:17
  123:3 175:9
  183:17 211:7
**calling** 167:11
**calls** 136:4 141:2
  145:4,17,17,24
**camera** 194:12
**candor** 218:20
**capabilities** 169:6
  228:10
**capability** 227:9
**capacity** 168:19
  227:8
**capture** 138:19
  209:6,14 226:22
**captured** 137:15
  207:16 209:11
  225:21 228:14
**captures** 167:9
  206:20 209:9,10
**capturing** 228:13
**carbon** 179:17
**carboned** 179:14
**card** 124:9,10
  168:2
**case** 132:7,20,21
  133:17,17 134:1
  134:20,22 136:7
  136:16 152:17
  156:19 161:4

  171:19 172:12
  173:4 182:18
  205:2 217:5 218:6
  232:6 233:3 234:3
**cases** 165:14
  179:23 180:5
  227:19
**cause** 210:10,17
  211:15 220:12
**cd** 153:19
**cell** 134:6
**cellular** 145:18
**central** 165:3
**certain** 131:13,20
  132:2,12 133:13
  134:6 136:2,23
  137:14,15 182:10
  184:15 193:14
  199:15 217:5
  223:8
**certainly** 149:18
  224:15
**certificate** 234:11
**certification** 233:1
  234:1
**certified** 186:17
  230:7 232:15
**certify** 230:8
**chain** 143:21
  181:1 182:19
  213:21
**change** 234:8
  235:3
**changed** 153:6
**changes** 220:14
  221:17 233:7
  234:7,9
**changing** 207:13
**characterization**
  187:24

**characterizations**
  189:23
**characterize** 218:9
**characters** 169:2
**charge** 168:6,8
**charles** 121:14
**check** 202:24
**checked** 198:20
  203:3
**checksum** 172:2
  206:5
**chicago** 120:6,9
  121:8 231:5 232:6
  233:3 234:3
**choice** 173:10
**christopher** 120:3
  120:13 232:6
  233:3 234:3
**circle** 121:3 138:5
  168:18
**circumstance**
  132:3,21 134:1
**circumstances**
  123:7 132:9,9,19
  133:16 142:4
**civil** 120:19 233:5
  234:5
**clarification** 184:1
  191:5 221:1
**clarified** 202:10
  215:20
**clarify** 129:5
  191:16 208:1
  215:17,24
**clarity** 135:17
**clear** 127:19 142:9
  147:7 148:10
  153:18 163:24
  164:5 198:3 201:5
  201:9 209:7 213:8
  217:8 221:21

[clearer - contents]

clearer   164:11
clearly   161:22
cleveland   232:2
clever   120:7
  121:16
client   132:6
  134:19,21 135:4
  146:11 179:3
  200:3
client's   135:24
clients   227:19
clock   172:21
close   147:9 179:3
cloud   129:1
  214:12
coincides   212:10
collect   130:24
  139:13 141:13
  150:24 206:22
  221:24 222:7,9
collected   128:22
  141:8 171:11,16
  171:22 177:7
  191:9 202:13
  207:4,7 212:11
  227:21
collecting   128:24
collection   136:22
  158:8 188:16
  190:23 213:15
  224:3 225:20
columns   183:16
  183:18
come   160:11,21
  161:3,15 170:21
  216:9
commencement
  230:9
commencing
  120:22

commission
  233:19 234:25
  235:25
communicate
  125:13,23 126:4
  146:13
communicated
  125:21 161:18
communicating
  195:22
communication
  134:21 145:14,20
  151:1 209:13
  211:21 224:20
communications
  126:20,22 127:15
  128:16 129:14
  131:21 143:10
  144:6,16,23
  145:12 146:18
  147:15,18,22
  148:2 158:14,18
  161:6,10 179:11
  179:15,18 182:2
  183:4 193:3,9,12
  193:13,15,16
  195:17 196:7
  197:21 198:23
  201:17 203:5,14
  209:14 210:14
  220:3 225:13
company   214:11
  214:16,17,18,21
  215:2
comparison
  202:17
compel   217:5
complaint   181:14
  182:4
complete   124:11
  131:24 133:12

134:5 135:24
137:13 138:11,19
138:20 140:1,14
150:13,18 158:19
177:11 195:18
196:20 197:9
201:18 202:2,17
206:7 226:5,13
227:4
completed   232:12
completely   148:3
  210:6 224:2
comprise   175:16
  176:20 219:6
computer   184:18
  184:24 194:14
  230:16
concerning   230:11
conclude   172:23
conditions   137:5
conducted   158:21
  195:19 196:21
  201:20 202:4
conference   123:9
  159:9,14,17 161:6
configured   169:6
confirm   135:8
  138:6 155:13
  157:5 169:2,14
  178:19 180:11
  198:10 206:6
confirmed   157:1
  158:16 195:15
  196:8,14 197:19
  201:15 203:17
confirming   135:5
conflating   170:11
confused   207:10
  207:23
confusing   204:10

confusion   149:2
connection   226:21
  228:1
connections
  194:13
consistent   196:17
consistently   221:5
constitutes   230:17
constraint   173:12
  173:14,15
contact   222:13,17
  222:22
contain   170:23
  180:22 181:1
  198:17
contained   141:11
  151:8 157:6
  158:20 161:17
  195:19 196:8,10
  196:16,24 198:16
  198:19 199:1
  200:9 201:3,19
  202:3,18,22
  203:15,16 204:6
  205:18,18,24
  206:1
containing   193:16
contains   156:13
  184:11
contend   162:3
  171:4,14,18
  172:10
content   145:19
  157:6 200:7,7,9,12
  200:13,14
contents   156:22
  158:6 188:14
  190:21 198:19
  206:8 220:18
  221:24

**[contested - data]**

contested 133:17

context 133:7
185:13 188:12,23
189:2,20 191:22
193:22 198:8
201:13 212:7
213:5 214:23
216:18

continue 124:17
159:6 167:14
173:6 187:22
190:18 223:10
224:24

continued 120:16
123:3

continuing 148:10

contrast 194:9

control 123:7
173:2,4

convenient 232:14

conversation
159:13 160:24
161:7 212:8
213:17,20 216:4,4
216:10,13

conversations
146:7 161:14
210:8 211:13
214:20 215:1,9,18
215:20 216:1

convey 195:22

cook 120:21 230:6

copied 179:17

copies 157:1
182:13 206:7

copy 132:13,13
134:6 137:13
140:1 150:13,19
152:22 154:3,3
178:20 184:3,3
208:24 221:19

222:5 226:6,15
227:5,15

cord 226:21
227:13,24

corner 163:21
164:8,22 165:10
165:24 174:18

correct 124:15,16
125:11,12 127:23
140:2,10,17
141:23 144:4
150:14,20 156:7
162:20 167:19
169:23 170:5,9,22
171:20 172:12
175:18,24 183:3
191:8 195:12
209:18 220:23
221:11,20 222:6
222:24 225:8
226:8,15 227:15
228:14

corrections 234:17

correctly 176:24

correspondence
149:7 155:6,8,14

counsel 123:6,14
155:10 156:7
157:10 159:12
160:12,21 161:17
162:4 171:24
172:19 191:19
197:8 199:12,19
203:1 204:22
205:11 217:23
229:5 230:24
231:1

counter 120:11,14

county 120:21
230:3,6 233:10
234:15

couple 223:16

course 123:18
125:19 151:4
183:6 202:13
209:12 210:7,14
220:12

court 120:1
135:23 137:9,18
143:16 149:3
150:6 157:21
166:9 182:5 185:9
185:10,18 186:20
187:3 189:6,19
190:1,3 201:14
205:3 217:6 223:7
229:5 233:7

court's 129:19
146:5

courts 120:20

covid 213:16

create 150:23
200:12,13

created 132:24
153:2

creating 141:10
152:23,24

criteria 136:23
147:19

critical 140:11
160:6

cross 122:5 223:17

cryptographic
156:23

csr 120:20

cta 121:10 151:21
164:6 176:11
184:12 210:9,16
211:14 214:22,24
215:4 216:8,15
217:18 223:8

cta's 160:23
161:15

custody 128:23
139:21 141:14
143:21 145:8
181:2 182:19
196:2,10 206:12
213:21

cv 120:5

cycle 166:5

czerniak 186:1

**d**

d 120:20 122:1
152:18 230:5
231:9

dan 135:19 184:17
208:14

daniel 120:16
122:3 125:1
230:10 232:8
233:4,9 234:4,13
235:20

data 128:22,24
129:15 130:21
131:13,14 132:1
132:11,13 133:12
133:18 135:7
136:17,18,22
137:14 138:12
140:2,15 143:4,7
145:13 147:5,20
147:21,23 148:1
150:14,19 158:3,4
160:13 161:1,17
161:22,22,23,24
162:3 168:23
169:9,18 170:6,9
170:23,24 171:3,6
171:11,14,21,24
172:9,17 188:5
190:5,7 191:19

**[data - disappeared]**

202:1 206:14 207:4,8,17,18 208:17,18,22 209:10 210:3,6 216:16 218:10,12 219:19 220:9,12 220:22 221:9,18 221:19 222:7,9 224:20 226:6,14 226:22 227:5

**date** 128:20 129:7 131:13,20 132:2 132:11 133:13 134:6 136:2 137:13,15 145:21 146:19,20 147:19 151:1 152:19 182:8 185:24 193:14 206:23 209:14 222:8 225:16 232:8 233:3,9,19 234:3 234:13,25 235:20 235:25

**dated** 123:20 178:12 212:9 222:11

**dates** 130:12 162:11 176:9 203:17

**day** 120:23 171:1 183:8 212:4 224:14 231:6 233:16 234:22 235:22

**days** 232:17

**dcim** 194:11

**deal** 185:1

**dealing** 166:8 187:8

**dear** 232:9

**decifer** 124:3

**declarative** 144:1

**deed** 138:18 139:3 140:17 233:14 234:20

**deemed** 232:19

**defendant** 120:14 121:10,15

**defendants** 120:8 120:17

**definitive** 180:12

**definitively** 155:11

**degree** 137:11 186:16

**delayed** 224:15

**deleted** 220:12

**deletion** 220:16,17 220:17 221:18

**deliver** 199:12

**delivered** 197:8 203:1 205:11

**department** 232:22

**depend** 132:3

**depends** 133:24 134:2

**depict** 154:12

**depicted** 152:2,3 153:17 155:10 167:6

**depiction** 164:1

**deposition** 120:16 123:3,10,22 124:18 125:8 126:11 130:15 147:2 157:20 173:6 174:10 176:3,23 204:23 223:11,11 229:3

230:13,19,22 232:8,10 233:1,3 234:1,3

**describe** 162:23 167:21 179:20 183:14 184:7

**described** 141:1 150:18 160:24 186:7 224:23

**describing** 174:24

**description** 153:16

**detail** 184:4

**details** 138:5 155:13

**determination** 130:3

**determine** 166:20 202:2 217:15

**determined** 128:12 200:8

**device** 153:14 156:20 160:4,10 171:19,22 172:12 175:9 194:2,6

**devices** 120:7 121:16 194:8 220:13 227:11

**devised** 212:14

**diagnose** 228:3

**dialogue** 132:18 132:19 134:2,18 135:18 136:3,12

**dictate** 201:6

**dictated** 201:3

**dictation** 186:19

**difference** 130:20 184:22

**different** 136:24 137:19 141:11,13 146:6 164:4 165:19,21 181:3

191:23 192:5 197:11 212:20 220:4,24 228:16 228:17

**differentiating** 221:6

**difficult** 163:1,12 168:3

**difficulties** 160:2 223:21

**difficulty** 159:19 172:13

**digital** 131:6 132:24 133:4 136:11 138:4 150:10,11,12 158:9 170:16,21 171:1 188:17 190:24 192:15,16 192:21 194:1,7,12 196:1 199:22,23 205:23 206:19 219:14 227:9

**direct** 122:4 125:5 211:9 224:16

**directed** 143:3,6 150:4,21 200:1,4 200:17,20 203:6 206:4,22 209:1 219:4 222:3

**directing** 184:15

**direction** 131:19 134:23 169:19 200:8 207:9 230:17

**directly** 148:3 172:20 200:5 231:2

**disappeared** 173:14

**discovery** 159:10 159:15,18
**discuss** 136:15 147:1 179:22 210:16,24 219:22
**discussed** 128:3 130:23 137:22 142:6 147:5,14 158:12 159:17 176:2 177:3 193:2 193:7 213:22 220:1
**discussing** 137:22 137:23 142:19 149:18 213:6
**discussion** 132:5 136:19 182:22 216:19 219:8
**discussions** 138:13 188:23 210:7 219:21
**disk** 153:14,19,22 153:23 154:15,16 158:4 159:11 160:11 170:9 190:6
**dispute** 123:21,23 126:6,15,18
**distance** 213:18
**district** 120:1,1,19
**division** 120:2
**document** 131:2 131:10 139:19 146:17 150:24 156:5,8 164:19 167:2 174:22 175:14,22 184:9 184:11 194:7 211:11,20 227:2
**documentation** 138:20 162:22

167:6 176:24 181:2 193:13 194:10 226:24 227:17
**documented** 129:12 133:3 154:4 155:6 158:8 166:22 167:1,5 188:15 190:23 192:14 206:18 225:3,6
**documenting** 128:18 129:15 130:12,20 131:20
**documents** 123:15 128:9,15 129:16 129:18 130:6 142:22 145:12 146:4,23 147:3,8 147:13,15 174:11 174:13 176:20 180:22 182:19 185:3 199:15 211:8 219:9 225:12
**doing** 216:15
**double** 197:1
**doubt** 154:18,23 181:14
**download** 183:22 184:5,14
**downtown** 173:19
**draft** 186:19
**draw** 148:9 155:16 162:13 174:15 178:9 183:10 187:7
**drawing** 151:12 153:9 154:9 155:22 156:4 168:16

**drive** 121:8 122:10 122:10 151:17,19 152:7,8,14 153:2 153:13,20 154:2 154:14,20 155:3,9 156:6,11,12,15,17 157:1,9 158:4 159:11,21 160:15 160:20 161:2,16 162:4 170:9,18 171:4 190:6 191:18 193:21,23 194:3 197:8 199:3 199:11,12,20 202:1 203:1,23 204:7,11,17,18 205:11 206:4 219:2
**drives** 155:5 159:21 200:7
**dropping** 148:19
**ds** 156:20,24 160:8
**due** 123:7,18 137:3 161:7
**duffy** 121:2,2 122:5,6 123:7,21 124:13 125:11,13 125:21 126:8,13 126:16,20 127:3,9 127:12,16,21 128:5,12,17 129:13 130:7,17 133:14,20 134:8 134:14 136:4 137:16 138:11,22 139:2 140:1,3,14 140:17 141:2 143:6,10 144:7,9 144:11,17,19 145:4,24 146:8,12 148:7,19,21

149:11 155:17 157:12,15,17,22 159:4 163:2 164:13 173:12,19 174:4,6 176:9 177:4,6,18,24 178:12,21 179:3 179:11,16,18 182:14,23 183:3 183:20 184:4,17 184:21 186:15 187:2,4 189:9 194:19 195:1 196:15 199:4 200:2,3,8,12,19,24 201:3,6 202:8,9 204:1,9,16 205:14 207:9,20 208:5,11 208:14 209:13 210:8,15,19 211:17 216:20,21 216:23 217:3,8,15 217:17,19 219:21 219:23 221:10 223:14,16,18 226:2 228:9,18 229:1 232:5
**duffy's** 149:6 219:17
**duly** 125:2 230:11
**duplicative** 171:6
**dvd** 153:19,22

## e

**e** 121:8,13 122:1 125:21 126:7,8,12 126:18,19,22 127:9,11,15 128:1 128:5,6,7,16 129:14,24 130:3,5 130:9,11 143:11 144:22 145:12

146:19 149:6 154:5 155:14 174:5 176:4 177:2 181:18 182:2,9,13 182:17,23 185:24 186:10 201:23

**e3** 156:20

**earlier** 207:11

**easier** 187:20

**eastern** 120:2

**effect** 183:9 210:9

**effectively** 213:20

**efforts** 209:21 224:12

**either** 128:21 167:6 223:21

**electronic** 143:17

**email** 180:23 186:23

**emails** 126:17 127:21 128:9 130:10

**embossed** 154:17

**employ** 228:11

**employed** 220:14 228:12

**employee** 230:23 230:24

**employer** 212:4,6

**empty** 160:12,16

**encase** 156:19 171:15,16 172:10 194:2

**endorsed** 157:24

**ends** 173:24 174:23

**engaged** 145:7

**engagement** 122:8 123:20,24 125:19 132:4 133:7,8 135:20 138:6

145:15 177:12 178:11,20,23 179:2 181:12 220:1 222:10

**engineering** 137:11

**ensuring** 197:9

**entered** 234:9

**entire** 200:14 233:5 234:5

**entirely** 209:7 221:21

**entirety** 206:2

**envelope** 153:15 153:19

**errata** 232:17 234:7,10,18 235:1

**established** 198:17

**et** 232:6 233:3 234:3

**everybody** 173:7

**everyone's** 204:19

**evidence** 143:20 144:3 171:15 172:11 181:2,3,3

**ex** 153:4,13,19

**exact** 155:2

**exactly** 150:9 172:7

**examination** 120:17 122:4,5,5,6 125:5 202:6 223:17 226:3 228:8 230:10

**examined** 125:3

**example** 134:2,3 135:7 192:11 196:13 203:13

**exceeded** 137:2

**excel** 122:9 183:15 183:23 184:11,14

184:19,21 218:22

**exception** 215:7 215:22

**excerpt** 122:11 186:2 189:1

**exchanged** 144:22

**exchanges** 126:12

**exclusive** 206:11 208:22

**executed** 234:10

**execution** 233:14 234:19

**executive** 179:2

**exhaust** 213:11

**exhausted** 214:1

**exhibit** 122:8,8,9,9 122:10,10,11,11 123:15 124:4 142:14 143:15,17 148:9 151:12,14 151:20,21 153:10 154:10,19 155:16 156:5,12 159:12 160:21 162:6,13 164:6,6 167:10 168:9 170:1 172:18 174:15 175:1,16,17,21 176:2,7,8,12,14,14 176:19,20 177:5 177:10,19,20,24 178:10,14,15,17 183:11,14,22 184:2,10,10,16 185:1,21,21 186:5 186:6 187:8,10,13 187:16,17,18 188:4,9,16 211:4,6 211:10,24 218:22 218:23,24 219:6 222:11

**exhibits** 122:7 176:1,21 177:4

**exist** 204:18,18

**expect** 126:17 131:15,24 218:4

**experience** 166:8 223:20

**expertise** 220:7

**expiration** 233:19 234:25 235:25

**explain** 168:15 188:20 191:3 193:5 195:21 197:23

**explained** 198:1

**explanations** 133:2

**expressly** 232:12

**extensive** 220:14

**extent** 136:18

**external** 186:2

**extract** 131:7

**extracting** 210:3

**extraction** 220:9 220:10,22 221:1,7 221:9,12,13

**f**

**fact** 148:12 157:3 198:9 204:20 227:24

**failed** 210:6

**fair** 127:5 149:10 153:16 198:14

**fairly** 153:1

**far** 146:23 158:7 165:10 188:15 190:22

**fast** 165:23

**fed** 153:4,13,19

**federal** 120:18 135:23 157:21

**[fee - gigabytes]**

**fee** 135:20
**feedback** 197:15
**field** 149:9 150:7
  220:7
**figure** 133:10
**file** 124:10 160:2,3
  160:5,8 162:7
  171:6,15,21
  172:11 176:11
  180:20,22 181:5
  181:10,21 182:12
  182:18 183:4
  184:13 198:7
**filed** 223:8
**files** 133:1 156:13
  156:14,14,17,18
  156:21,23,24
  157:4,4,4,5,9,10
  158:3,7,13,18,20
  159:20 161:24
  162:9 170:11
  171:8 172:2,4
  177:13,19 188:4
  188:14 190:6,22
  191:6,13,18,20
  193:3,8,15,16
  195:16,18 196:7
  196:16,16 197:7,9
  197:21 198:11,16
  198:18,18 199:1,6
  199:7,10,22,22,23
  200:10,15,18,19
  200:22,23 201:4,7
  201:8,17,19 202:1
  202:3,18,24 203:4
  204:6,7,10,11,15
  204:16 205:10,19
  205:20,22,23
  206:2,5 207:3
  219:14,15 220:18
  225:7

**filtered** 161:7
**filtering** 145:22
**find** 143:24 144:3
  218:10
**finding** 189:20
**firm** 126:7 127:21
  149:7
**first** 125:2 136:5
  160:14 167:11
  174:7,17 184:23
  188:21 190:20
  192:2,8 193:19
  204:14 230:10
**five** 167:21 178:24
**flash** 122:10,10
  151:17,19 152:7,8
  152:14 153:2,13
  153:20 154:2,14
  154:20 155:2,5,9
  156:6,11,12,14,17
  157:1,9 158:4
  159:11,21,21
  160:15,20 161:1
  161:16 162:4
  170:9,18 171:4
  190:6 191:18
  193:21,23 197:8
  199:2,11,12,19
  200:7 202:1 203:1
  203:23 204:7,11
  204:16,18 205:10
  206:4 219:2
**folder** 153:22
  176:3,9,10,10
**folders** 156:13
**follow** 148:18
  149:1 217:22
**following** 160:23
**follows** 125:4
**followup** 185:16

**foregoing** 230:13
  233:13 234:18
**forensic** 132:23,24
  134:4 136:11
  138:4,11,20
  150:10,12 157:7
  160:23 161:15
  166:8 170:16,21
  171:1 194:2,7
  196:1 199:22,23
  202:14 205:17,23
  205:23 206:17
  209:5 219:15
  220:8 221:19
  226:6,13,15 227:5
  227:10,15
**forensics** 150:11
**forest** 121:3
**forget** 133:16
**forgive** 197:14
**form** 130:7 134:8
  144:9,12 225:15
**format** 207:17
**former** 212:6
**forward** 123:12
**found** 218:11
  225:18
**foundation** 125:9
  133:20 157:13,22
  217:9
**four** 156:13,14
  167:18 204:10,16
  204:17 212:5,18
  214:7
**frame** 126:16
  129:8 145:6
**free** 233:14 234:20
**frequent** 145:11
**frivolous** 157:19
**front** 142:15
  151:13,14 153:10

  155:20 162:14,15
  166:18 168:12,14
  174:19 183:11,13
  184:8 187:10,13
**fulfill** 140:24
  141:21
**full** 133:18 135:24
  185:19 201:13
**fully** 189:3
**function** 183:21
**further** 135:11
  155:13 161:9
  166:16 197:4
  207:7 215:10
  216:1 223:5,13
  224:7,17 228:6
**furtherance**
  127:24 177:21
  181:6 217:10
**future** 138:21

**g**

**g** 174:5
**gb** 168:17,17
**general** 127:10
  156:7 187:24
  188:7 189:23
**generally** 174:24
**generated** 206:8
**george** 120:3,13
  232:6 233:3 234:3
**getting** 139:24
  140:21 176:18
  184:24 187:5
  193:6 224:5
**gigabyte** 160:15
**gigabytes** 161:23
  162:3,7,8 168:20
  168:21,22 169:17
  170:6,8,17,19,22
  171:5,14,19,21
  172:10,11

**[give - include]** Page 11

**give** 127:6 135:7 223:1

**given** 138:17 140:16 166:7 177:9 224:11 225:7,10 230:18

**giving** 132:9

**go** 123:12 132:12 136:15 138:14 140:6 159:6 164:6 166:4 167:10,21 168:9 173:6,17 176:9 184:4 185:5 189:15 195:13 205:6 208:14

**goal** 197:13

**goes** 186:16

**going** 124:17 125:7 127:19 136:20,21 137:5,6 138:19 159:2 163:18,20,22 165:23,23 169:11 172:22 173:17 183:18,19 184:6 185:12 187:15,24 189:5,14 192:4 208:5 213:18 216:24 217:4,11 217:21 224:19

**good** 123:2

**gray** 163:9 164:10

**great** 148:17,24

**group** 176:11 177:10

**guess** 141:4 167:10 191:22

**h**

**half** 168:16 169:16

**hand** 130:21 163:21 164:8,22

165:10 174:18 178:12 179:18 208:2,4 231:5

**handful** 176:4

**handle** 182:23

**handled** 183:3

**handling** 145:2

**happened** 173:15

**happening** 224:22

**hard** 123:8

**hash** 156:23 157:3 157:4

**hashed** 156:22

**hashes** 157:2

**hear** 132:16 133:11 144:10 148:20,22 173:10 174:6

**hearing** 171:7

**held** 195:10

**help** 165:5 197:6

**hereinafter** 179:4

**hereto** 231:2

**hereunto** 231:4

**hey** 126:2 208:2

**highlights** 164:10

**hollister** 121:6

**honestly** 155:2

**hour** 135:20 136:5 136:11 173:2

**hypothetical** 132:20 133:8 136:14 137:1,21 138:2 228:15

**i**

**icon** 167:21 168:5 168:7

**icons** 165:8 166:10 166:16,20 167:2 167:15,18

**idea** 140:22 197:4 218:14

**identified** 174:11 176:19 188:4

**identifiers** 185:23

**identifies** 214:21

**identify** 141:24 163:22 165:5 175:7 181:9,20,22 183:14

**ii** 232:8 233:4,9 234:4,13 235:20

**illinois** 120:1,22 121:3,8,14 230:1,7 231:6

**image** 127:3,4,6 132:24 138:4 147:4,17 150:23 151:7 156:21 158:20 160:9 161:24 162:7,9 163:13 164:3,4,5,9 165:11 170:11 172:4 191:6 192:18 195:19 196:16 198:17 199:7,21,22,23 200:10,15,18,19 200:22,22 201:4,7 201:8,19 202:4,19 205:20,22,23 207:3 219:3,14,15 219:19 221:5,6 225:7 226:13

**images** 131:5 137:14 141:7,11 141:11 151:8 158:12,23 159:20 161:12 165:4,6,7 165:18 170:14,16 170:20,21,23

171:1,12 172:14 175:11 192:24 193:1,7,20,20 194:2,3 195:24 196:1,9 198:11,20 199:16 202:10,12 203:16,23,24 204:2 205:12,16 205:17,19 209:4,5 209:11 218:2 220:4 228:4

**imagine** 126:4 134:20

**imaging** 127:7,17 127:22 129:6,9 130:14,22,24 131:9 136:19 147:2,9,16 148:5 148:11,13 149:9 149:21,22,23 150:1,5,7,10,10,12 150:17 151:3 158:11 183:2 188:19 191:2 200:15 217:10 218:2,8 219:22,23 220:4 225:2 226:16 227:10 228:1

**immortalized** 212:20

**impact** 224:16

**impacted** 228:1

**implicate** 223:9

**implies** 220:4

**important** 146:15

**inadvertently** 177:8,20

**include** 126:22 132:22 133:1 145:3 147:15,18

**[include - june]** Page 12

150:13,18 177:12
181:13 194:13
220:16 226:16
**included** 181:11
220:5
**includes** 143:17,21
**including** 168:22
217:18 221:17
227:10
**inconsistent**
158:17 195:16
196:11,18 197:1
197:20 198:6,22
201:16 203:4,7
225:19
**incorporated**
234:12
**indicate** 152:16
**indicated** 130:17
140:19 144:21
166:2 167:7 168:4
209:9 212:12
**indicates** 152:17
**indicating** 163:14
167:24 168:5,7
**indication** 168:1
168:24
**indications** 165:20
**indirectly** 231:2
**indulge** 189:6
**indulging** 189:19
**information**
122:10 128:18
131:1,2,3,8,11
137:6,7 139:13
141:12 149:19
151:1 166:17,17
183:21 186:22
198:21 213:15
219:9 225:22

**informed** 161:5
**inherent** 134:24
**initial** 176:2 177:8
**inquire** 189:22
**inquiry** 140:11
198:9
**inserted** 168:2
**inside** 201:7
**instruct** 127:3
219:18
**instructed** 129:14
143:3 221:9
225:16
**instruction** 131:15
131:23 140:17
141:21 217:22
**instructions** 125:8
125:10,14,15,16
125:18 126:23
127:2,7,16 132:15
132:22 133:19
134:3 138:18
139:24 140:13
144:7,17 145:4,24
146:8 147:4,16
148:4,13 150:5
169:20 179:12
182:14 217:14
219:17
**intact** 133:18
206:13
**intended** 178:3
**intentional** 220:17
**interaction** 212:14
**interested** 136:17
231:2
**interference**
208:10
**internal** 168:20
**interpret** 169:13

**interpretation**
169:24
**interrogate** 205:3
**interrogatories**
125:3
**interrupt** 134:14
**interrupting**
157:19 204:23
**inventory** 144:4
**investigate** 224:7
224:17
**investigation**
193:18 202:5
216:19
**investigator** 134:4
166:8 220:8
**investigators**
160:23 161:15
**invitation** 135:18
**involved** 135:22
179:7 218:5
**irrelevant** 226:8
**issue** 126:16 137:7
149:8 224:14
226:19
**issued** 123:17
126:9
**issues** 133:17
139:17 142:6
149:5 223:8
227:24
**item** 152:1,3
**items** 147:3

**j**

**jados** 121:12
153:3,23 154:20
173:14 176:14
223:15
**japanese** 166:14
169:1,3

**jerger** 120:17
122:3 123:3
124:17 125:1
129:10 132:8
133:24 137:3
140:11 142:15
158:2 172:23
173:8 174:9,10
176:7 177:18
178:7 184:24
185:6 187:7,11
190:4,12 197:16
205:5 208:21
217:2,4,14,21
223:6,19 226:5
228:19,24 229:2
230:10 232:8
233:4,9 234:4,13
235:20
**jkennedy** 121:9
**job** 132:10,14,16
134:5
**john** 121:7 124:13
148:19 177:7
183:20 186:1,15
189:9 216:24
**joined** 174:2
**jotted** 213:9
**judge** 127:19
149:4
**june** 123:20 124:8
141:17,17 162:18
165:1 168:11
170:7 175:10,10
178:13 191:9,14
192:10 196:3
200:11 205:24
206:1,8,10,11,11
207:18 208:23
212:9 215:11
216:6 218:17

**[june - lot]** Page 13

222:11,14,17 225:11
**juries** 137:9

**k**

**k** 230:3
**keeping** 213:18
**kennedy** 121:7 122:4,5 123:2 124:16 125:6 127:11,14 130:19 133:15,22 134:10 135:10 136:8 138:9 139:1 140:8 141:5 144:12,15 145:1 148:8,16,20 148:23 149:15 155:18,19 157:14 157:16,18 158:1 159:2,6,8 163:4,7 164:14,15 172:21 173:11,17,23 174:2,5,8 176:6,17 177:15,17 178:6 184:6,23 185:2 186:1 187:6 189:5 189:18 190:10 199:8,9 202:15 204:4,14,21 205:4 206:9 207:22 208:7,13,19 211:22 217:1,4,13 217:18,21 218:3 223:1,4 225:1 226:4 228:6,10,19 228:23 229:4
**kept** 141:16 180:15
**key** 128:20 129:7 147:19 182:10 193:14 209:15

**khuans** 121:7 184:7,9 185:24 186:2
**kim** 174:2,5
**kind** 176:12 188:9 197:1
**know** 129:4,13,17 129:21 130:9 134:16 137:12 141:7 142:4,7,23 142:24 144:20 146:3 149:17 150:8,9,9 152:12 153:6 154:2,4,7 160:17 161:10,20 162:1 163:11 169:3 172:9,24 173:7 180:7,13 183:24 186:16 187:9 192:4 198:2 198:5 203:10 207:1 208:11 211:6 214:18,24 215:17 219:11 221:12,13 224:17 228:12,15,16,19
**knowledge** 130:2 149:14 179:14,19 222:16,19,21
**knows** 204:17

**l**

**l** 174:5
**label** 152:8,9,11 152:13,15,23,24 153:2 155:1 176:11
**labeled** 153:14 184:9
**lack** 133:20 153:14 175:20

**lacks** 157:12,22
**lake** 121:3
**language** 204:5 212:19
**large** 174:22 176:3
**late** 214:10,13,14 215:5
**launch** 212:4
**law** 121:2 179:2
**lawsuit** 178:21
**lawyer** 208:4
**lay** 137:10 217:9
**layperson** 137:9,9
**left** 153:5 163:6,19 163:21,22 165:9 165:10,20,24 167:18 174:18 183:18
**legal** 199:5 232:1 235:1
**letter** 122:8 123:20,24 177:12 178:11,20,23 181:12 212:5 222:10 232:18
**license** 231:9
**light** 183:5
**lightning** 163:14 165:12,24 166:1 168:7
**limit** 212:23 213:7
**limited** 207:12 225:24
**line** 152:15 168:2 188:6 190:18 234:7 235:3
**lines** 178:24 188:3
**linguistic** 129:10
**listed** 162:6,11,12 234:7,17

**listen** 187:2
**listing** 234:7
**lists** 181:3
**literal** 203:10
**literally** 132:10 195:3
**litigation** 135:22
**little** 135:14,21 164:11 168:5 188:10
**live** 215:4 220:13
**llp** 121:6
**loading** 151:14
**local** 184:3
**location** 232:14
**log** 144:6,16,21 145:16,23 146:4 181:2
**logging** 145:3
**logical** 133:1 171:15 172:10 227:10
**longer** 139:9 141:17
**look** 151:20 154:24 155:7,8 170:2 180:14 185:15,21 186:6 214:5 225:17
**looked** 227:20
**looking** 133:23 155:14 166:12,16 166:23 181:20 183:21 184:1,2,3 186:5,7,9 208:13 211:11,20 225:11
**looks** 154:13 166:4
**loose** 228:1
**lost** 193:6
**lot** 136:23 148:2 149:2 181:15

**[lot - moving]** Page 14

188:10,23 197:15 213:17
**loud** 211:24 214:9
**lx01** 156:23

**m**

**madam** 190:1 232:9
**magic** 133:10 134:23
**magistrate** 149:4
**mail** 125:21 126:12,19,22 127:15 128:16 129:14 145:12 146:19 149:6 155:14 182:2,9,17 183:3 185:24 186:10 201:23
**mailer** 153:20
**mails** 126:7,8,18 127:9,11 128:1,5,6 128:7 129:24 130:3,5,9,11 143:11 144:22 154:5 176:4 177:2 181:18 182:13,23
**main** 121:13
**maintain** 145:23 146:7,16 179:24 180:20
**making** 132:20 150:13,18
**manage** 135:21
**manager** 179:2
**manual** 203:21
**manually** 131:4
**manufacturer** 209:24
**mapping** 196:21
**marked** 123:15 124:4 175:17

176:1
**masks** 213:18
**match** 203:9
**matched** 157:2 158:4 190:7 191:19 203:2,8,8 203:11,21
**material** 182:18
**materials** 129:22 129:22 143:2 148:15 150:2,3 158:24 175:14 177:5 182:1 196:6 196:11,15 202:12 203:13
**math** 169:10 171:13
**matter** 125:12 126:10 131:19 137:23 149:21,22 151:3 158:15 161:11 179:20 180:2,10,21 181:4 181:22 193:4,10 195:24 202:13 209:12 211:1 213:13 214:1,3 215:4,15 216:8 232:11
**matters** 147:12 159:16 183:23 230:12
**mean** 125:16 129:2 138:19 144:20 162:24 163:11 165:11,18 168:16,18 188:20 191:3 192:8 193:11 197:13 198:7 203:8 221:12 224:11

**meaning** 156:23
**means** 127:5 150:9 156:8 163:23 193:5 198:5 203:22
**meant** 124:15 167:20 219:23
**mechanical** 227:7
**mechanism** 227:19
**mechanisms** 139:10,14 141:20 141:21,24
**medium** 160:17
**memory** 156:8 213:11 214:1
**mentioned** 129:24 169:8 194:4 195:23
**message** 164:18 186:2 212:23
**messages** 124:2,6 125:24 126:1 165:19,20 166:3 183:17 184:11 203:14,15 206:21 209:16 213:8 218:21 219:1,6 225:13
**met** 142:20
**method** 131:2
**methods** 127:6
**middle** 156:4 165:22
**midwest** 235:1
**mind** 135:14 149:3 190:11 203:9
**mine** 132:13 141:20 176:22
**mined** 171:2

**minute** 159:3 176:5
**minutes** 143:13 167:13 168:10 223:1
**misheard** 208:15
**misinformed** 207:23
**missing** 172:16
**mission** 136:13 139:8,12,15 140:24 141:10 142:1 151:4 209:11,12 228:17
**misspoke** 124:13
**misstates** 202:9
**mistake** 208:20
**misunderstood** 201:8 208:8
**mobile** 133:18 145:8,9 166:9 194:8 220:13 221:17
**mobilize** 209:21 210:1
**mode** 163:17 167:24 168:4
**moment** 168:13 184:7 185:1 186:24 220:6
**months** 218:15
**moot** 226:8
**morning** 123:2 174:11 185:6 187:23 188:24
**morning's** 186:13
**motion** 223:7
**move** 197:13 217:4
**moving** 129:9,11

Page 15

**multiple** 137:20

**n**

**n** 122:1
**name** 167:11
174:6 232:6 233:3
233:4,15 234:3,4
234:21
**natively** 124:5
**necessarily** 195:8
**necessary** 133:11
134:3
**need** 123:8 128:21
132:10,15 135:6
135:22,23 136:18
137:11,12 155:8
163:1,6 165:12
180:11 184:23
188:11 208:9
**needed** 132:6
133:3 134:22
138:5,7 155:13
**needs** 136:20
211:17
**negative** 197:1
**neither** 222:21
**network** 145:19
**never** 139:2 161:5
220:21 221:8
228:19,20
**new** 182:17 183:10
185:3
**nicollette** 121:7
184:7 185:23
186:1
**nominal** 145:14
**nontechnical**
135:2 221:22
**normal** 125:23
180:4 220:12
227:1

**northern** 120:1
**notary** 120:21
230:5 232:24
233:10,18 234:15
234:23 235:23
**note** 212:9
**notes** 122:9 146:7
146:16 179:24
180:6,9 211:2,4,21
211:24 212:7,17
212:24 214:8
**notice** 120:18
**notwithstanding**
172:2
**nove** 214:10,13
**november** 214:10
214:14 215:5
**number** 124:4
143:18,19 152:17
156:5 164:7
167:21 168:20
170:1 174:16,23
178:15 211:5
212:5 228:22
232:7
**numbers** 168:16
169:15 174:18
213:22 234:7

**o**

**o** 152:18 230:3,3
**o'clock** 120:22
173:20
**oath** 204:24 205:5
**object** 130:7 144:9
204:9
**objected** 144:12
**objection** 133:14
133:20 134:8
136:4 137:16
138:22 140:3
141:2 144:19

148:7 149:11
157:12,22,23
202:9 204:1
205:14 207:20
211:17
**objections** 157:19
**objective** 139:16
139:19 169:19
**observation**
148:24
**obtain** 147:24
148:1
**obtained** 147:23
**occasion** 224:1
**occasions** 224:2
**occurred** 145:20
218:15
**occurrence** 218:15
**oct** 214:10,13
**october** 120:23
152:21 153:4,24
154:21 162:5
172:1,5,15 191:7
191:15,19 193:24
196:4 197:8 199:2
199:7,13,20,21
203:2 205:11,18
206:4 214:14
215:5 218:17
219:2,10 225:8
231:6 232:4
**offered** 188:22
213:14
**office** 121:2 179:3
231:5 232:13
**official** 233:15
234:21
**ohio** 232:2
**okay** 135:11
138:14 140:21
141:19 148:17

164:24 170:14
173:7,15 174:6,14
191:13 192:7,24
196:23 228:18
**old** 220:18
**omitted** 177:20
**once** 147:23 160:5
**ones** 164:3 203:17
225:6
**ongoing** 126:6
220:11
**online** 129:1
147:24 184:3
207:8
**open** 153:13 160:3
170:4 183:22
184:5,21
**opened** 160:22
**opening** 162:15
**operation** 220:11
**opinion** 129:11
**opposed** 194:12
**option** 227:4,7
**oral** 125:3
**orchard** 121:3
**order** 129:19
131:10,24 133:11
137:12 142:8
146:5 150:6 155:9
182:5 205:3 217:6
224:24 227:19
**orient** 143:16
156:8 164:18
185:11
**original** 176:18
181:14 189:20
205:6
**originally** 191:9
**originals** 182:18
**outcome** 228:17
231:3

**[output - phone]**

output 135:6
158:7 188:14
190:22 192:11,12
outside 136:21
172:19 213:19
216:23 217:17,19
outstanding
123:11
overall 216:18
overdone 189:14

**p**

p 152:18
p.m 164:22
p002392 167:11
168:10
p002435 164:8,14
p003018 155:23
155:24
p003042 174:16
p003573 174:23
pable 120:3,13
122:11 123:6
124:7 178:21
179:20 180:2,21
196:10 198:12
202:14 210:23,24
211:13,21 212:8
212:13,16,17,21
212:22 213:3,12
214:2,2 215:4,8,13
215:14 216:1,5,14
225:14 232:6
233:3 234:3
pable's 125:10,17
126:23 127:17,22
128:18 129:15
130:21 131:13
132:1,11 133:12
138:12,21 140:2
140:15 144:8,18
144:24 145:3,5

146:2,9 147:4,9
150:14,17,19
156:18 157:10
158:4 162:17
170:6 175:12
179:8,9,13 180:10
182:15 188:5
190:7 191:20
194:17 197:10
198:18 199:2,11
199:14,19 203:24
204:7 205:13,19
205:21 206:12
207:17,18 208:22
210:10,15,17
211:15 216:16
220:22 221:10,17
221:19 222:6,9,13
222:17,22 223:20
226:12 227:5
package 154:7
packaging 154:1
packet 153:13
page 122:7 151:20
151:21 153:9
154:9,11 162:19
164:13,14 168:9
175:3 188:4
211:23 234:7
235:3
pages 124:5 205:8
paper 186:8
paraben 172:11
paraben's 160:4
171:19,22
paragraph 178:24
186:3,11
paraphrase
198:10
paren 179:3,4

parse 138:16
parsed 183:17
184:11
part 130:1 133:5
134:24 149:12
158:21 162:22
163:2 175:22
177:7 193:16
195:20 196:21
201:12,20 202:5
210:10,18 211:16
219:3,13 224:8
228:4 234:9
particular 132:6
132:20 160:7
166:13,13 181:4
204:11 215:1
particulars 136:16
parties 123:5
132:12 136:21
159:14,19 160:2
200:5 231:1
patience 160:19
pc 179:3
pdf 164:13 185:22
186:10
people 137:10
percent 168:5,18
168:24 169:4,5,12
169:16 186:21,21
perception 207:15
period 139:8
196:3,5 209:13
225:18,24
periods 195:23
permanent 221:18
222:5
person 135:1,2,3
personal 230:16
personally 233:11
234:15

phone 122:11
124:7 125:10,17
126:2,23 127:3,4,6
127:17,22 128:18
128:22 129:15
130:21 131:1,3,4,5
131:8,11,13,21
132:1,11 133:6,12
134:6 135:24
136:1 137:13,15
138:12,21 139:9
139:11,13,17,20
139:20,23 140:2
140:15 141:8,8,13
141:14,17 142:5,5
142:10,13 144:8
144:18,24 145:3,5
145:8,9,16,17,17
146:2,9,16,18,21
146:24 147:2,4,9
147:17,17 148:3,5
149:24 150:14,17
150:20 151:2,8
156:18 157:10
158:5 162:17,20
162:22 163:2,10
163:15,16,21
164:21 165:1,5,14
165:17,21 166:10
166:13,13,20
167:3,7,12,17,23
167:24 168:6,16
168:19 169:6,18
170:7 171:1
174:17 175:5,9,12
175:14 176:4
177:1 179:8,10,13
182:7,15 188:5,5
190:8 191:20
192:22 194:6,16
194:17,23 195:4

**[phone - print]**

196:2,10 197:10
198:12,18 199:2,6
199:11,14,19
202:1,4,14 203:2
203:24 204:8,12
204:19 205:12,13
205:19,22 206:12
206:13,14 207:7
207:11,18,18
208:22,24 209:10
210:10,11,15,17
210:18 211:15
212:11 213:7,15
213:21 215:5,8,11
215:15,21,23
216:6,9,14,17
217:15 218:8,9,12
218:16 219:12,18
219:22 220:10,11
220:15,22 221:10
221:17,20 222:6,9
222:14,17,22
223:20,22 224:2,5
224:6,9,12,19
225:14,23 226:1,6
226:7,12,13,14
227:1,2,3,6,14,15
227:18,20,21,22
232:3
**phone's** 133:18
**phoned** 212:1,3
**phones** 166:9
**photo** 122:11
166:18 194:9
195:4
**photograph**
151:16 152:1,2,3
153:17 162:17,20
162:21 164:24
167:12 168:14
194:14

**photographic**
154:19
**photographs**
131:6 133:5
151:18 158:9
166:23,24 167:2,5
167:7,8,8 175:6,8
175:11,13,16
176:24 177:2
178:1 188:17
190:24 192:16
206:24 207:5
219:11
**photos** 122:10
168:23 175:1
192:15,15,20,21
192:22 194:4,5,10
194:11,11,15,16
194:16,20,22,23
195:3,4,11 199:16
206:19 225:3
227:1,1,18
**phrase** 196:24
197:23
**physical** 133:1
138:3 220:9,10,21
221:1,9,13 227:10
**picking** 195:13
221:15
**picture** 163:5
165:16 174:17
**pictures** 214:12
226:23
**piece** 186:8
**pieces** 181:3 219:8
**pin** 213:22
**place** 127:8 185:12
216:4 230:20
**plaintiff** 120:4,11
121:5

**plan** 173:22,23
**plastic** 154:17
**please** 134:13,14
140:6,10 167:21
187:22 190:18
217:12,19 232:13
**plugged** 163:15,16
**point** 128:21
135:15 166:24
180:17 183:8
211:23 212:13,23
213:4,5 214:6,7,9
215:2 216:2,20
219:24 222:11
**points** 212:18
**portions** 184:15
**possession** 128:8
166:19 167:3
170:7 208:23
**possible** 147:20
158:10 179:15
180:6 188:18
191:1 192:17
219:24 220:1
**possibly** 175:10
**post** 197:13
**posterity** 138:21
140:16
**potentially** 209:5
209:5 218:16
**power** 223:21,22
224:13 226:7,12
226:20,21 227:13
227:13
**preceded** 189:4
**preceding** 201:12
221:4
**precise** 160:18
**precisely** 165:5
**prefer** 227:19
232:15

**preliminary** 135:7
**prepared** 152:9,10
152:11 206:6
207:2
**present** 131:21
161:8 227:20
**preservation**
132:1 138:11
140:14 220:23
221:10
**preserve** 131:10
131:12 132:10
133:11 135:23
137:13 169:17
206:13 208:17,18
208:21 220:10
225:15
**preserved** 132:13
134:5 140:1,16
150:13,19 199:15
206:22
**preserving** 133:18
**president** 179:1
**presumably**
169:11
**presume** 130:10
155:3
**pretend** 163:8
**pretty** 180:8,12
**prevented** 224:5
**preview** 184:20
**previous** 190:16
230:9
**previously** 182:20
192:23 196:6
**primarily** 125:24
126:5
**primary** 192:19
192:20
**print** 181:15 182:5
183:6

**[printed - question]**

**printed** 182:3,13 183:7
**printout** 181:12 181:13 182:8
**prior** 176:22 220:1
**probably** 128:19 129:2
**problems** 159:24 224:9 226:7
**procedure** 120:19 233:5 234:5
**procedures** 133:5
**proceed** 123:11 124:18 167:21 187:11,21 190:2 190:14
**proceeding** 174:3
**proceedings** 230:18
**process** 124:2 125:16,23 128:4 128:14 130:24 146:17 151:3,9 158:8 186:17,18 187:5 188:15 189:19 190:23 191:5 192:19 194:4,9 199:5 205:21 224:3,15 224:24 228:2
**processed** 139:11 192:15 194:16 195:4 227:22
**processes** 131:7 165:21 220:14
**processing** 133:5 141:9 144:23 145:16 149:23 151:5 158:10 160:22 182:7 188:18 191:1

193:17 194:7 196:2 202:14 206:17 224:3 226:16,17
**prod** 152:18
**produce** 133:4 138:8 150:4 151:9 158:13,14,24,24 170:15 177:24 178:4 182:21 186:17 193:2,3,8,9 193:12 199:18,21 200:2,20,22,23 201:8 202:11,12 203:13,18,19 210:5 219:5,14 225:7
**produced** 124:5 126:18 128:7,9 130:17 136:20,21 139:12 141:7 142:24 146:4,22 146:23 147:10,13 149:21 150:3 152:12,13 156:20 157:6 158:18,19 159:21,22 160:8,9 162:10,10 170:8 170:15,17,20 171:4,14,18,24 172:4,9,14,15 174:12 175:15 176:22,24 177:1,2 177:4,13,20,21 178:2,9 181:5,18 181:22 182:20 184:12 191:6 192:12,16 193:15 194:15,18,24 195:1,5,16,17 196:9,12,19

197:21,22 198:23 199:2,5,22,23 200:1,10,14,22 201:17,18 203:5,6 205:17,22,23 206:2,5,19 207:3 211:3 218:2 219:1 219:4,9,16
**producing** 130:1 147:22 196:6
**product** 205:20
**production** 122:8 123:16,23 128:4 143:2 145:12 152:18 175:17,19 177:8,11 232:22
**project** 131:5 133:6 145:2 167:7 175:5,9 177:1 192:22 194:6,16 194:23 195:4 219:12 227:1,18
**proposition** 156:7
**provide** 138:3,4 151:7 180:4 195:7 209:2
**provided** 128:19 131:5,19 144:17 146:1,19 151:2 156:15 157:3,6 160:12,20 161:16 161:23 162:4 172:19 180:1 182:15 185:18 193:17,23 195:9 196:15 200:15 224:10 225:3
**provides** 145:5 178:24
**providing** 200:18 213:22

**public** 120:21 230:6 233:10,18 234:15,23 235:23
**purchase** 212:4
**purchased** 232:16
**pure** 134:3 218:13
**purposes** 153:12
**pursuant** 120:18 120:18 123:3,4 182:22 195:5 205:3
**pursue** 217:11
**put** 157:23 178:2 185:8 189:20 205:21 208:2,3 222:1
**putting** 127:5 137:4 140:22 147:8 161:14

**q**

**qualifying** 133:24
**quest** 123:16,17,20 124:7,10 126:10 128:1 132:15 133:11 146:22 147:10 178:11,20 194:15 195:4,6 222:16,21 223:9 227:8
**quest's** 179:1
**question** 127:13 128:2 130:8 134:12,16 135:13 135:14,16 136:15 137:4,8,19 144:2 144:13,14 146:14 149:11,12 150:16 154:6 157:24 169:21 172:6,7 176:18 185:5 186:12 188:12,24

189:3,4,7,8,12,13
189:20,24 190:3
190:11,17 191:13
192:1,2,5,9,20
197:11 198:3,13
199:8 201:2,9
204:9 205:7,14,15
208:8,16 209:17
209:19 210:12
211:19 218:19
225:18 226:10,23
228:22
**questioning** 188:6
190:18
**questions** 135:5
144:1 185:16
187:16,18 188:2
191:24 221:4
222:4 223:4,14
**quiet** 205:2
**quite** 174:22
218:18
**quote** 138:17
147:9 178:24
195:14
**quotes** 147:9
**quoting** 197:19

**r**

**r** 152:18 174:5
**randomly** 183:7
**range** 131:20
146:20 151:1
182:8 193:14
209:14 222:8
**ranges** 128:20
207:12 225:16
**rate** 136:6,9
**read** 149:3,6,18
159:1 169:3 179:5
185:11 186:11,13
190:19 198:9

201:13,22,23
211:24 212:24
214:8 233:5,6,12
234:5,6,17
**reading** 127:20
149:13 230:21
232:11,18
**ready** 124:18
187:11
**really** 186:24
197:4
**reason** 154:18,22
225:12 234:8
235:3
**reasons** 133:2
177:14
**rebite** 160:7
**recall** 126:12,24
130:16 138:13
140:5,13,18
152:23,24 153:8
154:1 155:2 156:2
159:9,13,16,23,24
167:4 172:7
175:22 176:23
179:21 180:3
187:23 188:6
210:19 212:15,19
213:2 214:4,19
215:1,9 216:2
218:22,24 219:7
220:2 223:6
224:18,22,23
**recalled** 125:2
**receipt** 232:18
**received** 123:14
124:1,11 127:16
128:1,15 154:7
169:7 180:23
185:4,9 195:6

**receiving** 140:13
**recess** 174:1
189:16 223:3
**recipient** 157:5
**recognize** 151:24
152:4 164:3
**recollect** 189:22
**recollection**
127:18,23 138:23
138:24 139:4,6,24
143:16 155:4
180:18 211:12,18
219:20
**recommence**
123:10
**reconstruct**
189:11
**reconvene** 173:5
173:10 189:8
**reconvening**
124:14
**record** 123:13
153:12 174:9,24
189:18 208:6
228:23 230:17
234:9
**recording** 187:1
**records** 183:19
**recross** 122:6
228:8
**red** 154:16 164:7
**redirect** 122:5
226:3
**reduced** 218:21
230:15
**refer** 184:7 211:2
**reference** 183:8
214:13,16 222:12
232:7 233:2 234:2
**referenced** 232:10
233:11 234:15

**referred** 192:22
**referring** 130:10
146:3 156:6
193:20 194:1
**refers** 148:12
**reflect** 146:24
153:1
**reflected** 143:11
147:12 156:17
157:10 172:18
188:5,8 212:17
**refresh** 139:5
143:15 211:12
**refreshed** 176:16
211:18
**regard** 224:13
**regarding** 125:14
129:5,7 134:21
144:23 155:15
178:21 180:1,9
210:15 215:1,14
216:2 219:22
**related** 148:13
150:4 179:8 182:8
191:14 193:23
195:24
**relates** 187:16,17
218:1
**relating** 147:2
148:4 166:3
**relative** 123:17
230:23,24
**relayed** 215:17
**relevant** 181:16
192:20
**reloading** 168:13
**rely** 226:11
**remains** 208:24
**remember** 142:17
142:19 143:12
146:11 225:10

**[remote - see]** Page 20

**remote** 214:10 215:5 216:14
**remotely** 216:9,16 217:16 218:11
**rephrase** 199:8 208:20
**reported** 230:14
**reporter** 185:9,10 185:18 186:20 187:3 189:6,19 190:1,3 198:9 214:9 230:7 233:7
**represent** 185:17
**representations** 154:19
**represented** 124:6 178:10 182:17
**request** 207:9 234:9,11
**requested** 151:7 182:9 219:13
**requesting** 148:15
**require** 131:15,24 132:17
**required** 139:7 141:15 142:8,9,12 147:20 232:24
**reserve** 223:5,10 228:7 229:1
**reside** 147:21
**resolved** 123:23
**respect** 125:9,16 126:7 128:17 130:14 131:20 137:3 143:3,6 144:7 145:4,15,18 146:1,8 147:4,8,19 147:22 149:4,7 161:11,11 179:12 180:9 182:14,21 198:23 206:7

210:19,20 211:1 212:8 213:24 218:20 219:17
**responded** 149:24
**respondent** 181:16
**responding** 128:5 189:1
**response** 198:4,8 200:16 207:8,14 222:8 223:9
**responsibility** 205:1
**responsive** 126:9 128:1,10,13 129:4 129:17,18,23 130:4,6,18 142:21 146:5 149:22 181:7,8,18 183:1 194:24 195:8 196:14 203:18 206:3,21
**restarted** 224:24
**restate** 127:13 144:14 150:16 172:8 210:12
**restating** 140:5
**retained** 141:14
**retrieve** 224:12 225:15
**return** 191:22
**returned** 145:9 215:7,11,21 216:6 232:17
**returning** 215:23
**review** 129:22 188:9 190:14,19 232:13 233:1 234:1
**reviewed** 128:12 131:22 158:6 188:13 190:21

192:11,13
**rewrite** 160:3
**right** 126:3 127:11 130:12 133:8,9 141:17,21 143:18 155:1 156:13 159:7 163:19,22 164:8,22 165:10 168:6,8 169:7,12 171:7 172:1 173:1 173:5 174:13 179:5 182:24 183:19 197:17 199:16 201:22 210:2 212:24 218:17 222:23 223:6,10,12 225:4 227:8 228:5,20
**rights** 228:7
**robert** 179:1
**rocks** 120:20 230:5 231:9
**room** 204:17
**roughly** 162:11
**routine** 180:4 183:6 227:2
**rules** 120:18 233:5 234:5

**s**

**s** 234:8,8 235:3
**salawus.com** 121:14
**saw** 218:16
**saying** 185:14 228:14
**says** 152:22 154:15,16 164:18 172:21
**scan** 154:15,16
**scanned** 182:19 211:7

**scenario** 173:5
**scheduled** 123:4 173:1
**scheduling** 173:4
**scigalski** 179:1,7 179:20 180:1,10
**scope** 127:7,17,22 128:17 129:15 149:14 216:23 217:17,19 224:8 228:4
**screen** 167:9 175:1 175:13 176:4 188:19 191:1 192:17 194:12,14 206:20
**screening** 194:7
**screens** 158:11
**script** 197:17
**sd** 124:8 184:12
**se** 183:2
**seal** 231:5 233:15 234:21
**search** 127:24 130:6 142:21,24 207:12
**searches** 128:20 142:23 143:5 147:20 209:15
**second** 139:22 163:18 176:6 204:15 214:8 216:3
**secure** 124:10
**see** 130:5 137:6 143:19,23 151:22 153:10 154:10 162:7 163:1,14,15 163:17 165:4,7,14 173:1 174:12 175:3 176:14,16

**[see - start]** Page 21

178:14,18 183:13
185:20 186:4
188:24 196:13
197:3 202:24
229:5
**seen** 209:9
**seizure** 156:20
160:4,10 171:19
171:22 172:12
194:2
**send** 153:23 154:2
199:24 200:4
**sensitive** 123:9
**sent** 153:3 154:3
154:20 155:10,15
156:6 157:9
159:11 191:18
199:7,24
**sentence** 144:2
179:5 193:1,5,6,19
195:14 196:7,24
197:6,18,18
201:12,12,13
202:11
**sentences** 188:21
190:20 191:4
192:2,9
**separate** 170:24
177:13
**series** 222:4
**serve** 206:13
**serves** 226:22
**services** 129:1
136:6,11 193:17
**session** 123:22
176:3 185:6
186:13
**set** 132:13,13
133:12 143:4,7
187:19,20 188:22
231:4

**sets** 147:5 170:24
170:24
**settings** 166:14
**share** 176:8,15
183:22 184:2,10
185:21
**shared** 128:3
138:3 212:21
214:18
**sharing** 213:6,8,10
**sheet** 143:21
174:17,19 234:7
234:10,18 235:1
**short** 145:6,23
226:19
**shorthand** 230:7
**shots** 175:2 176:4
**show** 164:4 184:21
185:16
**shut** 224:2
**shutting** 224:19
**sic** 123:11
**side** 152:7 154:13
**sideways** 163:19
**signal** 124:1,6
143:4,7 164:18
177:13 183:16
184:11,12 207:1,2
212:23 213:6
218:21 219:1,5
**signature** 229:1
231:8 232:13
**signed** 213:21
233:13 234:18
**significance**
145:11
**signify** 166:1
**signing** 230:21
232:11,18
**silly** 157:19,23

**similar** 131:17
170:24 203:17
207:4
**simple** 132:18
**sincerely** 232:21
**sir** 125:20 134:11
138:24 148:6
149:16 155:20
164:16 207:24
232:9
**sit** 189:14
**sitting** 126:11
**size** 162:7 171:21
**sizes** 162:9
**sjados** 121:14
**small** 164:7
**smart** 197:5
**smiling** 228:24
229:2,4
**smithamundsen**
121:12
**snapshot** 136:1
206:23
**software** 157:7
158:11 171:17
188:19 191:2
192:18
**solely** 125:11
**solutions** 232:1
235:1
**solve** 224:9
**somebody** 218:11
**soon** 173:21
**sooner** 172:23
173:6,24
**sorry** 138:24
144:10 150:15
156:24 178:15
183:20 199:4
215:16

**sort** 135:4
**sound** 144:1
**sources** 147:21,24
207:8
**specific** 165:13
167:16 198:3
203:10 206:21
212:19 213:24
219:7 222:20
**specifically** 127:2
127:4 129:6
148:12 149:20
150:5 163:6
194:23 220:2,3,19
228:16
**specifications**
131:18
**specified** 230:20
**speculate** 132:4
142:3 164:2
166:12,15
**speculation** 136:4
141:2 218:14
**split** 128:4
**spreadsheet** 122:9
124:3,4 183:15
218:22
**ss** 230:2
**st** 121:14
**stage** 187:19
223:12
**stamp** 151:21
152:1 155:22
164:7,9 165:2
168:11 170:1
**stamped** 211:10
**stand** 204:24
**standard** 136:6,9
**standing** 213:19
**start** 131:16
180:13

state   120:21
  123:13 140:6
  156:11 230:1,6,8
  233:10 234:15
stated   132:23
statement   132:18
  148:17 185:20
  220:7 233:13,14
  234:19,19
statements   131:17
states   120:1,19
status   160:3
  165:20,21 168:6,8
  179:22 180:1,9
stay   197:17
steep   135:21
stenographically
  230:14
step   131:9 160:6
steps   140:20,23
  141:13 142:8
  151:10 156:16
  158:2 188:3 190:4
  191:17 208:21
stettinius   121:6
steve   173:12,21
  223:14
steven   121:12
stipulate   177:6
stop   123:8 139:22
  141:16 157:20
  159:4 163:18
  173:20 204:23
  224:23
stopped   204:22
storage   124:8
  160:16 168:20
  169:5
stored   169:18
street   121:13

strike   169:11
  220:19
stuff   149:13 178:1
subject   123:21
  126:10 143:12
  146:16 147:12
  159:16 165:17
  181:22 186:2
  193:14 197:18
  210:16 211:1
  213:13,24 214:3
  215:3,14 216:8
subjects   193:6
subpoena   123:4
  123:17 126:9
  128:1,10 130:4,6
  137:4 142:22
  148:12 149:14
  177:22 181:6,19
  182:5 194:21,24
  195:5 216:24
  223:10
subpoenaed   150:4
subscribed   233:10
  234:14 235:21
subsequent   132:14
  161:14 182:6
  202:11 207:3,6
  209:15 214:20
subsequently
  177:21 196:3
subset   129:22
  180:24 209:10
subsets   145:13
  147:23
substance   126:3
  200:6 218:5
successful   210:3
  225:2 228:13
sufficiently   134:17

suggest   138:14
  184:5 203:12
suggested   131:17
  215:19
suggesting   130:11
  200:21 201:2
suggestion   211:14
suite   121:8,13
  232:2
summarize   159:23
superior   232:1
supplemental
  122:8 123:16
  175:19
supply   223:22
sure   148:14
  150:15 176:7
  177:16 180:7
  187:4 198:20
  201:5,9 210:13
  211:19 214:19
  221:6 224:16
  226:22
switch   226:7,12
sworn   123:1 125:3
  230:11 233:10,13
  234:14,18 235:21
symbol   163:23
  212:3
symbols   162:24
  163:11,13 164:1
system   168:22
systematic   220:17
systems   220:13

**t**

tab   183:16,17
table   187:20
  188:22
taft   121:6
taftlaw.com   121:9

take   123:8 127:8
  135:18 142:8
  151:20 156:16
  158:2 159:2
  163:19 172:22
  185:21 186:6
  189:7,7 190:4
  191:17 204:24
  205:1 208:21
  212:22 214:5
taken   120:20
  124:7 140:19
  141:12 151:10
  158:10 162:21
  175:9 180:16
  188:18 190:24
  192:17 194:11,17
  195:3 206:20
  226:24 227:18
  230:19 232:10
talk   125:7 135:19
  140:23 141:3
  146:13 172:16
  184:23 220:3
  221:22
talked   143:9,13
  156:1 167:12
  168:10 172:22
  216:15
talking   124:14
  130:4 135:4
  139:22 163:9,20
  164:11 197:5
  200:6 211:4
  218:14 221:23
tap   165:13,14,15
  166:20
tape   187:1,1,2
taping   165:17
  166:2,10 167:17

**[tasked - torn]** Page 23

tasked   224:11
tasker   214:11
tduffy   121:4
tduffylaw.com
   121:4
technical   135:2,3
   203:9,21
technician   137:10
technicians   159:10
telephone   145:3
   145:24
telephonic   180:4
telephonically
   125:22,24 126:5
   146:14
tell   131:23 137:11
   163:12 164:2,12
   165:18 166:3,9
   167:22 168:3
   206:16 212:16
   213:2 215:13
   216:3,21 223:24
telling   147:7
tells   146:12
temporary   124:8
   124:10 186:22
ten   159:3
term   143:1 146:4
   148:6,14,15 149:9
   150:7,8,8 199:5
   203:9,11 220:24
   221:3,13
termed   148:4
   211:7
terminating
   223:11
terminology
   137:24
terms   132:19
   134:17 135:1,4
   138:14 141:3

201:24 221:23
224:20
testified   125:4,8
   151:6 157:11
   158:5 190:9
   205:10
testify   176:21
   218:1 230:11
testifying   204:14
   204:23
testimony   127:20
   140:9,12 142:17
   171:5,23 189:11
   191:11,12 207:13
   230:18 233:6,7
   234:6,9,12
text   125:23 126:1
   203:14 212:23
thank   127:12
   135:19 159:2
   189:19 190:1
   191:16 222:10
   228:18,24
thereof   173:4
thing   126:3 175:4
   203:10
things   128:20
   132:23 136:24
   137:22 138:2
   149:17 168:23
   169:8 177:12
   178:5 181:7,8,11
   181:17,21,23
   182:6 183:7
   188:11 196:14,19
   198:22 204:18
   217:5 224:22
think   124:13
   131:16 135:13,21
   136:14 137:1
   153:18,19 155:1,1

160:1 167:5
170:11 173:17
177:11 180:8,16
181:15 183:1,23
189:10 190:17
202:20 209:20
214:4 215:16,19
221:22,23 225:1
225:12 228:21,23
thinks   204:12
third   197:18
thirty   232:17
thought   167:20
   173:20 207:10
   215:22
thoughts   214:11
three   154:9,11
thrilla15   185:24
throwing   197:2
thumb   151:19
thursday   123:14
   124:2,12 174:12
   185:4
thwarted   224:13
tilde   212:4,4
tim   172:22 173:11
   207:24 208:13
time   123:8 128:23
   129:8 131:22
   137:20 139:20
   140:20 142:3,18
   145:6,7,7,9,21
   147:19 156:1
   159:7 162:11
   164:8,21 165:3
   166:19 168:11
   174:7 176:12,13
   185:10,12 187:8
   189:9,10 192:13
   192:15 195:24
   196:5 200:14

204:19,21 206:23
207:12 209:12
212:22 215:3
217:8 218:18
220:2 222:14,17
223:5 225:23,24
226:19 227:3,20
227:21 230:20
times   130:13
   137:20 146:20
   203:17 228:22
timothy   121:2,2
   179:3 232:5
today   126:11
   176:10,15
today's   175:22
   185:24
told   136:12 138:10
   139:2,12 161:21
   167:16 202:7
   219:5 225:1
tool   156:19 192:12
   201:6 209:24
tools   151:9 158:7
   162:10 170:15
   171:2 172:15
   188:14 190:22
   192:11 196:9
   200:10,13 205:24
   210:2,4,5 225:2
top   152:15 153:15
   153:20 154:13
   163:10,21 164:18
   164:21 165:5,19
   165:24 167:18
   168:8,16 174:18
   183:19 185:23
   212:13
topics   212:21
torn   153:6

**[total - viewer]** Page 24

total 170:17,18
171:3
totality 171:24
172:9,14,16
track 204:5
transcribed 233:7
transcript 127:20
185:19 186:17
230:14,22 232:10
232:15 233:5,12
234:5,11,17
transcription
230:16
transcripts 149:3
149:13
transfer 153:7
199:10
transferred 124:9
transferring
213:20
transit 120:6,9
232:6 233:3 234:3
translation 186:22
transmission
172:17
transpired 142:5
trap 129:11
tried 225:2
trouble 196:23
troubleshoot
139:16 228:3
troubleshooting
139:23 140:22
true 143:14
178:19 209:22
230:17
truly 128:13
137:18
truth 230:11
try 135:17 160:18
189:22 197:16

203:20 221:15
224:7,9,24 228:3
trying 129:5
133:10 137:20
189:11 204:5
215:17,24 224:6
224:18
turn 126:17
turned 160:7
163:5
turning 223:22
twice 208:16
two 153:9 154:3
164:13 170:11,20
170:21,24 171:8
172:3 177:12
178:4,24 188:21
190:20 191:4,18
191:21,23,23
192:2,8 193:19
194:1 195:23
197:7,9 204:15
206:5 215:8,24
226:9
type 126:3 194:5
222:5
typed 186:23
types 136:17 220:4
typewriting
230:15

**u**

ultimately 124:9
160:1,22 224:5
unchangeable
206:14 207:17
208:24
unclear 226:20
undergone 186:18
understand
126:14 128:11
130:15 134:5

137:20 147:11
160:11,14,21
161:3,16 163:20
171:10 185:13
188:11 195:1
197:6 204:3
210:13 214:17
218:1,4 221:23
226:9,10
understanding
137:2,21 138:1
140:9,12 163:24
170:5,10 171:5
177:23 178:7
191:12 217:24
understands
177:16
understood
138:18 198:12
202:21 213:10
214:23 219:12
unexpectedly
223:22
unfurl 165:15
unintentional
221:16
unique 166:14
united 120:1,19
unprofessional
208:3
unqualified
133:23
unrelated 148:3
unwind 171:13
updated 179:24
updates 179:22
180:5,9
uppermost 162:23
163:4
usage 210:6

usb 154:17
use 126:14 129:12
134:24 135:3
139:15 141:3
142:2 149:8 189:9
204:2 210:2
220:11,15 222:1
user 168:23
utilized 131:14
134:7

**v**

v 232:6 233:3
234:3
vagaries 226:11
vague 135:14
157:12,22
various 143:9
162:24 175:15
183:16,18,19
verbatim 138:17
185:20 188:1
212:15 213:3
verification 172:3
201:24
verify 156:16
157:8 158:3 188:3
190:5 191:17
197:7 205:10
veritext 232:1,7
235:1
versions 220:18
vertical 163:8,22
vibrate 167:24
vibration 167:23
victoria 120:20
230:5 231:9
videos 168:23
view 183:21 224:4
224:14
viewer 184:2

**[viewing - zoom]** Page 25

| | | | |
|---|---|---|---|
| **viewing** 184:19 | **ways** 137:20 | 217:23 223:5 | **x** |
| **virtually** 160:12 | 225:23 | 228:21,24 230:10 | |
| 160:16 161:1,17 | **we've** 164:10 | 230:22 231:4 | **x** 122:1 |
| 161:21 | 197:17 | 232:8 233:1,4,11 | **xlxx** 183:16 |
| **vol** 232:8 233:4,9 | **wearing** 213:18 | 234:1,4,15 | **y** |
| 234:4,13 235:20 | **week** 128:3,4 | **word** 126:14 | |
| **vs** 120:5,12 | 130:23 142:6 | 128:20 129:9,12 | **year** 212:5 |
| **w** | 147:1,6,14 159:11 | 134:23 138:18 | **yesterday** 173:15 |
| | 176:11 177:3 | 140:17 147:19 | **z** |
| **w** 174:5 | 184:13 | 148:11 149:8 | |
| **wacker** 121:8 | **week's** 176:22 | 150:10 152:17 | **zoom** 163:1 |
| **waived** 230:22 | **weeks** 176:23 | 153:14 172:13 | 184:19 |
| 232:12,19 | 178:4 | 175:20 199:4 | |
| **walberg** 174:2,5 | **went** 178:1 | 204:2 209:15 | |
| **want** 126:17 | **west** 121:3 | **words** 129:7 | |
| 129:13 132:4 | **whereof** 231:4 | 133:10 137:12 | |
| 142:3 148:18 | **white** 163:16 | 138:10,16 139:2 | |
| 149:1 157:15 | **wipe** 210:10 | 140:4 141:20 | |
| 164:2 166:15 | 214:10 215:5 | 148:22 157:23 | |
| 167:14 168:15 | 216:14,16 | 169:5,10 182:10 | |
| 169:2,14 170:2 | **wiped** 210:18 | 186:19 193:14,19 | |
| 174:12 183:23 | 211:15 212:5 | 202:17 207:12 | |
| 184:4 185:5,15 | 217:16 218:12 | 210:9 | |
| 187:7,15 188:9 | **wiping** 215:15 | **work** 125:9 132:8 | |
| 189:10,12,13,18 | 216:9 | 134:22 147:24 | |
| 197:3 201:5,9 | **withheld** 194:20 | 173:7 179:8,8 | |
| 203:20 204:24 | **witness** 122:3,11 | 187:21 193:17 | |
| 208:7 210:13 | 123:1,18 124:19 | 206:12 207:11 | |
| 218:8 | 125:2 127:13 | 218:7 219:18 | |
| **wanted** 187:4 | 130:9 134:14,15 | 226:12 227:14,14 | |
| 195:7 | 136:5 137:4,18 | **worked** 226:14 | |
| **wants** 141:3 | 138:23 140:5 | **working** 180:20 | |
| **waste** 189:10 | 144:10,14,20 | 181:5 182:12 | |
| 217:8 | 148:10,22 157:24 | 223:19 | |
| **wasting** 204:19,21 | 163:5 173:9 | **worksheet** 143:18 | |
| **way** 125:9 137:23 | 176:16 177:16 | 143:20 | |
| 142:20 146:6 | 183:20 184:1,8,14 | **worry** 227:13 | |
| 167:20 187:20 | 184:18 189:21 | **wrapping** 223:2 | |
| 195:10 197:24 | 202:10 204:2 | **wrong** 140:10 | |
| 203:20 217:12 | 205:3,15 207:24 | **wrote** 186:23 | |
| 227:20 | 208:7,9,15 211:19 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.