# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHRISTOPHER PABLE,

        Plaintiff,

    v.

CHICAGO TRANSIT AUTHORITY, ET AL.,

        Defendants

No. 19 CV 7868

District Judge Maldonado

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER AND
## REPORT AND RECOMMENDATION

Pending before the Court are (1) defendant Chicago Transit Authority's (CTA) motion for sanctions under Fed. R. Civ. P. 37(e) against plaintiff Christopher Pable and his attorney Timothy Duffy for spoliation of electronically stored information (ESI) [129];[1] (2) CTA's motion to take discovery respecting Pable's affidavit and Duffy's "certified statement," both of which were filed in opposition to CTA's motion [143]; (3) CTA's motion for sanctions under 28 U.S.C. § 1927 and the Court's inherent authority against Duffy and Quest Consultants International, the vendor that analyzed Pable's cell phone, for their alleged misconduct respecting the forensic imaging of Pable's cell phone [91]; and (4) CTA's request for attorney's fees and costs under Fed. R. Civ. P. 37(a)(5) in connection with its successful motion to compel Pable to produce his cell phone for a second forensic imaging. These matters are fully briefed. *See* [139, 153] (briefing on spoliation motion); [145] (opposition to request for additional discovery); [95, 96, 105, 108] (briefing on sanctions motion against Duffy and Quest); [57, 58] (briefing on CTA's request for fees and costs).

The CTA's Rule 37(e) motion arises out of Pable's undisputed failure to preserve messages he exchanged on the Signal messaging application with Michael Haynes, Pable's friend, his former supervisor at the CTA, and a key witness to–and participant in–the events underlying Pable's suit against the CTA. The Rule 37(e) motion, as well as the CTA's separate motion for sanctions under § 1927 and the Court's inherent authority, also involve Pable's undisputed failure to produce a complete forensic image of the cell phone that Pable used at all relevant times and Duffy's representation to the CTA that he had secured "a complete image of the data

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

on the phone when the phone was imaged." These matters have been the subject of extensive litigation between the parties, and the undersigned has already issued three orders that bear on the issues raised by the CTA's two pending sanctions motions. *See* [54] (Apr. 2, 2021 order granting CTA's motion to compel second forensic imaging of Pable's cell phone); [85] (Sept. 13, 2021 order granting CTA's motion to extend fact discovery and serve discovery on Quest); [97] (Feb. 7, 2022 order granting in part and denying in part CTA's motion to enforce subpoena served on Quest). In its Rule 37(e) motion, the CTA asks that the Court either dismiss Pable's claim, enter a default judgment against him, or issue a mandatory adverse-inference instruction respecting the spoliated evidence. The sanctions motion under § 1927 and the Court's inherent authority asks that Duffy and/or Quest be sanctioned for unreasonably and vexatiously multiplying the proceedings related to the imaging of Pable's cell phone.

Having considered the evidence and arguments presented by the parties, the undersigned first concludes that the CTA's Rule 37(e) motion and its separate sanctions motion are dispositive matters that require the undersigned to prepare a Report and Recommendation for the District Judge in accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1).

Second, the undersigned respectfully recommends that the District Judge grant CTA's Rule 37(e) motion and dismiss Pable's complaint with prejudice as a sanction for his intentional spoliation of the Signal messages and his cell phone. To begin, Pable intentionally deleted the Signal messages that he exchanged with Haynes before November 2, 2018 and lied about the spoliation–twice, under oath–in an effort to cover his tracks. These messages were very likely to contain contemporaneous communications between Pable and Haynes about the events that led to their forced resignations from the CTA and on which Pable's whistleblower lawsuit is based. The content of these messages has not been replicated by other evidence developed in discovery, and Pable's spoliation has effectively kneecapped the CTA's ability to establish that, far from being the wrongly discharged whistleblower he claims to be, Pable was a bad actor who was forced to resign for violating CTA's policies and procedures by hacking into a CTA program. What's more, Pable intentionally spoliated a second batch of Signal messages that he exchanged with Haynes over a seventeen-month period while this litigation was pending. The record establishes that, on October 29, 2019, Pable–a highly sophisticated computer programmer–activated a feature on his Signal messaging app that automatically and permanently deleted his messages with Haynes twenty-four hours after they were sent. Pable continued to communicate with Haynes–a critical witness in this case, and perhaps the most important witness for Pable's case and likely also the CTA's defense–through March 2021, shortly before Haynes was deposed. Although Pable maintains that these messages were infrequent and innocuous, Haynes testified that the messages regularly touched on topics relevant to the litigation itself. As was true of his deletion of the pre-November 2, 2018 Signal messages, Pable's spoliation of the post-October 29, 2019 messages "deprived" the CTA "of the opportunity to know the

precise nature and frequency of [their] private communications, which occurred during" several "critical time period[s]." *Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *4 (N.D. Ill. Mar. 23, 2018) (internal quotation marks omitted). Finally, Pable and Duffy intentionally spoliated Pable's cell phone by failing to preserve the communications and other data that existed on the phone as of October 29, 2018, when Pable's duty to preserve relevant ESI arose. Despite agreeing to the CTA's request to preserve the phone, Duffy falsely represented that he obtained "a complete forensic image of the phone" and that this image was "a complete image of the data on the phone when the phone was imaged." A later forensic examination of this "complete image" revealed that it contained only 0.2 gigabytes (GB) of user-created data, including only five SMS text messages that were exchanged in May 2020, no internet browser or search histories, and no data associated with 151 of the 200 third-party apps that were installed on the phone. The spoliation of the phone not only ensured that the Signal messages could not be recovered; it also deprived the CTA of objective evidence–the phone itself and all of its data–that could have refuted Pable's various claims about how he used the Signal app, when the pre-November 2, 2018 Signal messages had been deleted, and how the messages had been erased. Given Pable's repeated and intentional spoliation of evidence, his lies about what happened to the Signal messages he exchanged with Haynes before November 2, 2018, and Duffy's misrepresentations about the first image of Pable's phone, the undersigned concludes that this is the rare case in which the sanction of dismissal is warranted under Rule 37(e)(2)(C). Finally, because Pable's and Duffy's spoliation of this ESI also prejudiced the CTA by forcing the CTA to litigate unnecessary discovery disputes, the undersigned further recommends that the District Judge require, as a curative measure under Rule 37(e)(1), Pable and/or Duffy to pay the reasonable attorney's fees and costs that the CTA incurred in bringing this motion.

Third, the undersigned respectfully recommends that the District Judge grant in part and deny in part the CTA's motion for sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent authority against Duffy and Quest. The motion should be granted to the extent that it seeks to impose financial sanctions against Duffy under § 1927. Duffy falsely represented to the CTA in October 2020, and later to the Court, that Quest, Pable's ESI vendor, had generated a complete forensic image of all data that existed on Pable's cell phone when the phone was imaged. This representation was false, and Duffy knew it was false: the Quest analyst who processed Pable's phone testified that he did not generate a complete forensic image of the phone because Duffy never asked him to do so. Duffy's misrepresentation kicked off a series of hard-fought discovery battles that lasted well into 2022, as the CTA reasonably and foreseeably sought to understand why, if a complete image of Pable's phone had been produced, that image contained suspiciously little data–and essentially none of the information that is ordinarily found in a forensic image of a cell phone. By making this misrepresentation, by failing to correct it, and by opposing the CTA's reasonable efforts to probe the circumstances surrounding the first image and discover whether the data on the phone had been preserved, Duffy unreasonably and vexatiously

multiplied the proceedings in this case. The undersigned therefore recommends that Duffy should be required to pay $53,388.00 in attorney's fees and costs that the CTA incurred in response to his conduct. However, the motion should be denied to the extent that the CTA asks the Court to invoke its inherent authority and to sanction Quest, which has not engaged in any bad-faith or abusive litigation conduct.

Third, the undersigned denies the CTA's motion to take additional discovery respecting Pable's affidavit and to strike Duffy's certified statement.

Finally, the undersigned grants CTA's request for attorney's fees and costs under Rule 37(a)(5) in connection with its successful motion to compel a second forensic imaging of Pable's cell phone.

The undersigned does not recommend these sanctions lightly. But as detailed herein, parties and attorneys cannot conduct themselves as Pable and Duffy have done and expect that they may continue to pursue their litigation. As dictated by rules and ethical standards, the discovery process–and the entire judicial system– assumes that attorneys and parties will provide complete and truthful information to adversaries, to the Court, and when under oath. Duffy and Pable repeatedly lied regarding their failure to preserve relevant discovery that very likely contained information pivotal to the lawsuit, to include the CTA's defenses. As a result of Duffy and Pable's actions, it is impossible to know the scope and quality of the now non-recoverable discovery. The recommended sanctions are harsh, to be sure, but they are supported by this record of repeated egregious abuse of the litigation process by Pable and Duffy and serve the dual purpose of penalizing the wrongdoers in this lawsuit and, hopefully, deterring others from similar misconduct.

## Background

This is a whistleblower lawsuit stemming from Pable's resignation in lieu of termination from the CTA in November 2018. Pable worked for the CTA as a computer programmer and analyst from May 2012 through mid-November 2018. [129-2] 1 (Pable's resume). Pable has "significant education, certification, and experience in information technology and information security," including a certification as a "Certified Ethical Hacker." [139-1] 1, at ¶ 2 (Pable's Aug. 9, 2022 affidavit).

## I.    The Dayton Test

On August 17, 2018, Pable was working at CTA when he discovered a "Skeleton Key" within the computer code of CTA's BusTime application. [34] 11 (Pable's answer to CTA's counterclaim). The BusTime application, which was developed by co-defendant Clever Devices, Ltd., provides real-time location and arrival information for public transportation systems in cities across the United States, including the

CTA. *See* [129-28] (screenshot of Clever Devices website describing BusTime). The Skeleton Key was "a flaw in the BusTime application that could allow an unauthorized user to take control of the application and post unauthorized alerts on the system." [54] 1; *Pable v. Chicago Transit Auth.*, No. 19 CV 7868, 2021 WL 4789023, at *1 (N.D. Ill. Apr. 2, 2021). Pable testified that he informed his friend and supervisor, Michael Haynes, about the Skeleton Key and the risks it posed. [129-1] 47, at 178:17-179:8. (Pable's March 11, 2021 deposition). He did not, however, inform any other CTA personnel about the Skeleton Key. [*Id.*] 45, at 172:17-173:1. After Pable confirmed that the Skeleton Key could be used to access CTA's BusTime application [*id.*], at 178:2-18, Haynes decided to test whether it could also be used to access the BusTime applications used by other cities. [*Id.*] 47, at 180:5-20. CTA maintains that Pable and Haynes jointly "hack[ed], or attempt[ed] to hack, the BusTime application used by 24 transit systems" [129] 9, but Haynes testified that he, not Pable, tested "a bunch of other [cities]." [129-4] 20, at 73:5-7. Haynes then asked Pable to modify a file that would allow Haynes to test whether the Skeleton Key could be used to post an unauthorized alert on another BusTime application, and Haynes chose to test the application used by the city of Dayton, Ohio. [*Id.*] 20-21, at 73:8-74:5. Pable testified that he told Haynes not to perform the test, [129-1] 48, at 182:19-183:24, but Haynes "pressed enter" and performed the test. [129-4] 20, at 73:21. By doing so, Haynes caused a service alert to be posted to the Dayton BusTime system stating that a certain bridge was closed for construction. The alert was also posted to the Twitter account of the Dayton Regional Transit Authority (RTA), which had been configured to post any BusTime alerts directly to its Twitter feed. [54] 2; *Pable*, 2021 WL 4789023, at *1.

## II.    Pable's Use of the Signal Messaging App

During the weekend after the Dayton Test, Pable and Haynes used the Signal messaging application to discuss "what to do next[.]" [129-4] 28, at 105:16-106:3; [129-7] 19, at 275:21-24 (Pable's Jul. 6, 2022 deposition).

Signal is an encrypted messaging application that Pable began using about a year before the Dayton Test. [129-1] 5, at 11:19-12:7. Signal offers "end-to-end encryption and [the] assurance that all messaging data, including the content of the communications, cannot be tracked or observed by Signal itself or any party that does not have access to the user's device." *Federal Trade Comm'n v. Noland*, No. CV-20-47-PHX-DWL, 2021 WL 3857413, at *1 n.1 (D. Ariz. Aug. 30, 2021). Signal "does not possess or control backups or copies of Signal messages sent and received by Signal users (whether on its servers or otherwise) due to the Signal messaging platform's end-to-end encryption protocol." [129-17] 5, at ¶ 10 (affidavit of Signal's Chief Operating Officer Aruna Harder). One of Signal's key features is its "Disappearing Messages" function. "If enabled by any Signal user participating in a message thread," the Disappearing Messages function "permits the automatic and permanent deletion of all messages sent and/or received in a Signal message thread from the

5

electronic device of all Signal users in the same message thread after a designated period of time." [*Id.*] 3, at ¶ 5. This feature "does not allow for manual deletion of the subject messages," and it "operates only prospectively from the time the feature is enabled by a Signal user." [*Id.*].

Pable preferred to use Signal because "it was a much more secure means of communication" than SMS text messaging, it had "ephemeral settings,"[2] and it could "limit[ ] conversation length so [a conversation thread] does not take up too much space on [his] phone." [129-1] 5, at 11:22-12:3. Before the Dayton Test, Pable had suggested that Haynes use Signal to communicate with him. [129-4] 6, at 16:4-15. There is no evidence in the record suggesting that the CTA authorized or approved of Pable's use of the Signal messaging app on his personal cell phone to discuss work matters, nor is there any evidence that the CTA was aware of Pable and Haynes's Signal communications before the litigation began.

## III. Fallout from the Dayton Test

On August 20, 2018–three days after the Dayton test–Haynes sent an email on which Pable was cc'd to a Dayton RTA employee explaining that "we . . . found a 'skeleton key' backdoor into the Clever Devices BusTime" application and performed a "small penetration test" that caused an unauthorized alert to be posted to Dayton's BusTime system and Dayton RTA's Twitter feed. [129-8] 2-3 (Haynes email thread with Dayton RTA personnel). In a response to Haynes, Dayton RTA's Chief Information Officer (CIO) wrote that he saw and "appreciate[d] the value of what [Haynes] did," but asked that Haynes notify him before attempting "such 'testing'" again. [*Id.*] 2. The CIO explained that his boss "was quite concerned and is considering whether we should be considering legal action against you," but the CIO was "working to convince her that you did not do or intend to do any harm." [*Id.*]. On August 24, Haynes forwarded Pable a different email that he had sent to Dayton's CIO, telling Pable "I guess I just wish we never did this last week. Totally my fault." [129-10] 2 (Aug. 24, 2018 email from Haynes to Pable). The email also contains the statement "Just got your text Chris . . ." [*Id.*]. At his deposition, Haynes confirmed that this referred to a Signal message that Pable had sent him. [129-4] 32, at 120:13-23.

Haynes also sent Clever Devices an email on August 20–again cc'ing Pable–informing it of the Skelton Key and Dayton Test. [129-9] 2-5 (Haynes email thread

---

[2] "Ephemeral messaging" refers to secure written communications between one or more parties that are generally considered dynamic, nonstatic, and "lasting a very short time." Sedona Conference, *Commentary on Ephemeral Messaging*, 22 Sedona Conf. J. 435, 446 (2021). "The two central components of ephemeral messaging that distinguish this technology from other electronic communication media are: (1) automated disposition of message content on the sender's application *and* that of the recipient; and (2) end-to-end encryption functionality." *Id.*

with Clever Devices). Haynes explained that the only three CTA employees who were aware of the Skeleton Key and the Dayton Test were himself, Pable, and a CTA manager. [*Id.*] 4.

On August 31, 2018, Pable drafted an email for Haynes to send to Jim Psomas, their supervisor at CTA. [129-11] (Draft "Bustime Security Fix" email from Pable to Haynes). According to the draft, Haynes's "team identified a critical security issue in Clever Device's bustime that would let anyone publish, modify or delete service alerts for bus tracker." [*Id.*] 2. The email explained that the CTA's servers, as well as "other properties that have Clever's bus tracker, such as Greater Dayton Regional Transit Authority, were affected." [*Id.*]. Finally, the draft email explained that "we reached out and let both Dayton and Clever [know] that we had found a problem and Clever quietly issued a fix without downtime on our systems." [*Id.*]. Neither the draft email nor the nearly identical version of the email that Haynes ultimately sent Psomas on August 31 (on which Pable was also copied) mentioned that Haynes's use of the Skeleton Key caused the posting of an unauthorized alert on Dayton RTA's BusTime application and its Twitter feed. [*Id.*] 2; *see also* [129-12] 2 (Aug. 31, 2018 email from Haynes to Psomas and Pable).

## A. Clever Devices' Response

Clever Devices took no action respecting the Dayton Test until October 22, 2018. That day, Clever sent a letter to CTA President Dorval Carter informing him of "certain troubling actions taken by" CTA personnel "in clear breach of Clever Devices' End User Licensing Agreement (EULA)" with the CTA. [129-13] 3 (correspondence from Clever Devices to CTA re. "Violation of End User License Agreement (Oct. 22, 2018)). The letter explained that Haynes and Pable "had discovered and exploited a vulnerability they uncovered in the BusTime Application Programming Interface (API) by injecting a customer alert into the API of another Clever Devices customer, an action in clear violation of the EULA and likely in violation of federal and state laws." [*Id.*]. Based on its own investigation into the Dayton Test, Clever Devices believed that "this recent incident may not be isolated, and that Messrs. Haynes and Pable and possibly others have engaged in similar violations of the EULA in the past, including making unauthorized modifications to Clever Devices' products." [*Id.*] 3. The letter made clear that Clever Devices expected Carter and the CTA to "promptly work to ensure that this (and any similar) conduct is addressed, remediated and curtailed." [*Id.*].

## B. CTA's Response

On October 22, 2018–the same day CTA received the Clever Devices letter– CTA placed Pable and Haynes on administrative leave. [129-1] 11-12, at 37:13-38:22. Jim Psomas, the supervisor who told Pable and Haynes that they were being placed

on leave, did not explain why or mention the Dayton Test. [139-21] 2-3, at 194:22-195:23, 197:16-198:8 (deposition of Jim Psomas).

Despite the lack of information from CTA, Haynes concluded that the leave "was related potentially to this Dayton stuff because that was the only recent thing." [129-4] 41, at 156:4-5. The fact that Pable, too, had been placed on leave reinforced Haynes's conclusion. *See* [*id.*], at 156:7-18, 158:9-14. Asked whether Pable "was on the same page" as Haynes "as to what he thought the basis for the leave would be," Haynes responded, "I presume that would be a fair assessment from our conversations when we met up" after October 22. [*Id.*] 42, at 158:24-159:6. On the evening of October 22, Haynes forwarded Pable a copy of the email that Haynes had received from the Dayton RTA's CIO explaining that the agency's head was "considering whether we should be considering legal action against [Haynes.]" [129-21] 3 (Haynes-Pable email thread). In the body of the email, Haynes wrote, "Dayton was two months ago, nearly to the date." [*Id.*]. While on leave, Pable and Haynes communicated with each other using Signal. [129-1] 13, at 43:18-44:19.

In the meantime, CTA opened an internal investigation of the incident, but it did not ask Pable or Haynes to preserve any documents or communications relating to the Dayton Test. [129-4] 6, at 17:12-24. During the investigation, the CTA discovered that Pable had encrypted his work computer using a password system that he controlled via his cell phone. *See* [129-14] (Pable-Psomas email thread dated Oct. 24-Oct. 25, 2018). Psomas asked Pable how to access the work computer, and Pable responded that the CTA had deactivated his network access when he was placed on leave, and that this "initiated" a "remote wipe" of his cell phone that caused Pable to lose "all emails, saved passwords, documents, etc. . . . for [my] work sandbox. I have no access to anything of CTA[.]" [*Id.*] 2.

## C. Pable Explores Hiring Counsel.

On October 29, 2018, Pable contacted two attorneys about potential litigation against the CTA. In his message to one prospective attorney, Pable described his legal issues as involving a potential claim against the CTA under the Family and Medical Leave Act (FMLA):

My manager (Mike Haynes) and myself were recently placed on administrative leave pending an internal investigation at [CTA]. The timing of which seems suspicious given they were made aware of an upcoming FMLA filing. We're being given no details, there is no administrative policy governing this. There is now uncertainty, they disclosed we are on leave to the office and now returning if they "find nothing" has already tarnished my reputation. I'm not allowed to seek additional employment to cover my upcoming surgery it is an ethics violation. There are further details we can discuss in person.

[129-15] 2 (Pable's Oct. 29, 2018 email to Goldman & Ehrlich law firm).

Pable sent a nearly identical email to a second law firm, adding that "I think they are trying to find any reason to terminate me so I cannot take my FMLA and prevent payment of benefits." [129-16] 2 (Pable's Oct. 29, 2018 email to prospective counsel "Mr. Johnson").

### D.    Haynes Deletes His Signal Messages with Pable.

On November 2, 2018, Pable and Haynes were separately interviewed at CTA headquarters. Before their interviews, Pable and Haynes met at a nearby Starbucks to "console each other" and discuss "what could they possibly be asking us." [129-4] 7, at 19:7-20:12; *see also* [*id.*] 6-7, at 17:9-20:12 (Haynes "vividly recall[ed]" meeting Pable at Starbucks before interviews). At the Starbucks, Haynes "made a decision to purge" his "communications with Mr. Pable via the Signal app" from his own phone. [*Id.*] 7, at 20:3-23, 21:12-17. Haynes testified that he did not delete the messages to deny CTA access to them, but because he "felt those conversations were personal" and he had not been asked to preserve them. [*Id.*] 8, at 23:17-24:2. Pable denied asking Haynes to delete the Signal messages from his phone, *see* [129-7] 22-23, at 389:15-390:15, and Haynes testified that he could "not recall if it was a direct request [from Pable] or a joint decision or even if it was just a personal decision of myself, screw it, I am deleting all these messages." [129-4] 8, at 23:2-7.

Pable also denied that he deleted any of his communications with Haynes on November 2 or any time thereafter. [129-7] 24, at 395:18-396:20.[3] But Pable also testified that, when Haynes deleted their Signal message thread from his own phone, Haynes caused the same Signal messages to be deleted from Pable's own phone:

Q:    So why don't those communications exist on your phone?

\*    \*    \*

A:    When Mr. Haynes was terminated from the CTA, I believe he wanted to make a clean break. I can't stipulate if that is exactly why he wanted to do it or what his full motivation was, but I do recall him selecting our conversation thread \* \* \* and just deleting in Signal.

And as a Signal user when that happens, the policy applies to the other person. You have the option of having it apply there.

\*    \*    \*

---

[3] Pable admitted to some exceptions, however. Pable testified that he might have deleted a message if there was "a typo" in it or "if I paste a link and send it, but it was the wrong link[.]" [129-7] 24, at 395:23-396:17.

Q:     When you say you have nothing with him prior to November 3rd, you're saying you had messages with Mr. Haynes that you received November 3, 2018 going forward?

A:     So when he deleted the messages, I know I had messages that existed. So when he deleted them they no longer existed on my device since we were both Signal users.

Q:     When Mr. Haynes elected to delete the messages you had exchanged in August or perhaps August through October of 2018, those messages were not just deleted on Mr. Haynes' phone, they were deleted from your phone as well?

A:     So I will say that he didn't specifically select that date range. He selected the entire conversation thread.

Q:     So Mr. Haynes selected the entire conversation thread that you and him had on Signal and deleted them in November of 2018?

A:     Yes[.]

Q:     And when he selected to delete those messages, he had the option to have them deleted off of your phone as well.

A:     I believe the user is prompted, like which deletion policy do you want to use.

Q:     Can you tell me more about that?

A:     I couldn't tell you exactly how the app worked in 2018, but nowadays as a Signal user you send another Signal message to a user and then you opt to go in and delete it.

        You are saying do you want to just delete for me or delete for everyone or cancel.

Q:     Is it your understanding that Mr. Haynes elected to delete for both you and him on your phone?

A:     It's possible he elected to do that, but I can't stipulate to how the Signal application was written in 2018.

> You would have to get the exact version of Signal that his phone was running at that time to see what the specific behavior was. It has undergone many changes since.
>
> Q:    I'm not asking you to stipulate to anything. I am asking when Mr. Haynes deleted the messages that he exchanged with you over Signal in November of 2018, that deletion also deleted them off of your phone?
>
> A:    That is correct.

[129-7] 20-21, at 380:20-383:16.

Pable also testified that, after Haynes deleted the Signal messages, Pable did not try to recover the messages but he "felt a little hurt," like his "past" and "a third of his life was just being erased." [129-7] 23, at 393:5-21. Pable elaborated:

> A:    Mr. Haynes is someone that I have seen almost every single day for approximately a third of my life at that point.
>
> And the fact that, you know, he was emotional enough to just get rid of that hurt a little bit, that I didn't know how I fit into the puzzle. Was I as important to him as he was to me? Like I said, it hurt a little bit.

[*Id.*], at 393:14-21.

## E.    Pable and Haynes Continue Using Signal after Resigning from the CTA.

After being interviewed by the CTA on November 2, 2018, Haynes resigned in lieu of termination. [129-4] 7, at 19:7-12. Pable was interviewed on November 2 and again on November 8, after which he also resigned in lieu of termination. [129-1] 49, at 189:5-11.

Pable and Haynes continued to use Signal in the days immediately after their interviews on November 2, 2018 to communicate about matters relevant to this case. The messages show that Pable and Haynes discussed Pable's planned litigation against the CTA. For example, Pable messaged Haynes on November 3, saying "I have solace in the [*sic*] whatever happens, even if I keep my job, I think I have a case against cta[.]" *See* [129-18] 2 (Haynes and Pable's Signal message thread from Nov. 2, 2018 through Oct. 29, 2019). Haynes responded, "Yep, just blame me! I'm already under the bus, just toss her in reverse[.]" [*Id.*] 3. On November 4, Pable wrote to Haynes that "[t]he more I think about it the more I hope they terminate me so I can

11

sue the pants off them[.]" [*Id.*] 4. Pable also said that he was "[t]hinking of defense angles and stuff that might help us" and asked Haynes for details about an incident during which a supervisor had a "shouting match" with Haynes. [*Id.*]. In a November 5 message, Pable said that "[w]e'll catch up soon . . . We have our meeting with the lawyers tomorrow." [*Id.*] 5. On November 6, Pable wrote that he had "one consult for whistleblower set" for the following Monday. [*Id.*] 6. Pable and Haynes also discussed their resignation letters. [*Id.*] 2.

## IV.    Litigation

On May 2, 2019, Pable filed a whistleblower complaint against CTA and Clever Devices with the Occupational Health and Safety Administration (OSHA), alleging that they violated the Public Transportation Employee Protections provision of the National Transit Systems Security Act (NTSSA), 6 U.S.C. § 1142, by forcing Pable's resignation in retaliation for exposing the Skeleton Key flaw in the BusTime application. *See* [1] 5-6, at ¶¶ 18-21.

On December 2, 2019, with OSHA having taken no action on his administrative complaint, Pable filed a one-count complaint against CTA and Clever Devices in this Court, raising the same NTSSA whistleblower claim. [1]. In its answer, CTA asserted several affirmative defenses, including that it would have taken the same personnel action against Pable (*i.e.*, forcing Pable to resign or firing him), regardless of any protected activity that Pable allegedly engaged in, because of Pable's misconduct and unclean hands respecting the Dayton Test. [8] 27-28. In August 2020, CTA filed a counterclaim alleging that Pable violated the Computer Fraud & Abuse Act, 18 U.S.C. § 1030, *et seq.* (CFAA), by encrypting his work computer without CTA's knowledge or approval. *See* [32].[4]

### A.    Haynes Produces Signal Messages between Himself and Pable.

In response to a subpoena served on him during discovery, Haynes produced copies of the Signal messages he exchanged with Pable between the afternoon of November 2, 2018–shortly after Haynes deleted the messages at the Starbucks and following his interview with the CTA–and October 29, 2019. *See* [129-18].[5] According to Pable, these Signal messages involved requests for things like the names of some of their former coworkers at CTA. [129-1] 5, at 10:4-11:11. Pable did not recall communicating with Haynes via Signal about his deposition or any issues related to

---

[4] In July 2022, the District Judge granted Pable's motion for judgment on the pleadings on the counterclaim. [136]; *Pable v. Chicago Transit Auth.*, --- F. Supp. 3d ----, 2022 WL 2802320 (N.D. Ill. Jul. 18, 2022).

[5] Pable and Haynes's Signal messages have been an important piece of evidence since the case began, and it appears that the CTA received Haynes's response to the subpoena, including the Signal messages, by October 23, 2020. On that day, the CTA sent Pable's counsel an email that referred to the contents of Haynes's subpoena response. *See* [45-1] 57.

this case. [*Id.*], at 11:2-5. In contrast, Haynes testified–and the Signal messages themselves confirm–that he and Pable discussed aspects of Pable's case against the CTA, including likely deponents, materials that Pable produced and received during discovery, and information relating to the CTA's affirmative defenses. *See* [129-4] 5, at 13:14-18; [*id.*] 13, at 42:1-17, 44:1-7; [*id.*] 60, at 231:1-20. Haynes also testified that Pable had shared case-related documents via Signal, but added that "[g]enerally" these documents were "nothing that wasn't then later subsequently available on the Pacer website." [*Id.*] 12-13, at 41:19-45:15.

Although Pable and Haynes continued to communicate over Signal until April 2021, *see* [129-7] 12, at 348:16-349:17, no Signal messages sent after October 29, 2019 were produced during discovery. According to Pable, "[a]t some point prior to late October, 2019," he activated the Disappearing Messages function on his Signal app. *See* [139-1] 7, at ¶ 25 ("I set my Signal messages with Haynes to only be retained for 24 hours after being read.").[6] Consequently, all Signal messages sent between Pable and Haynes after October 29, 2019 are "inaccessible to either [Pable or Haynes] within Signal[.]"

## B. Forensic Images of Pable's Cell Phone

On March 18, 2020, CTA sent Pable a letter pursuant to Local Rule 37.2 requesting that the cell phone he used in 2018 be imaged by a third-party vendor. [45-1] 5 (L.R. 37.2 correspondence from CTA's counsel to Pable's counsel dated Mar. 18, 2020).[7] The CTA sought the forensic image because of alleged deficiencies in Pable's Mandatory Initial Discovery Pilot Program disclosures, to address Pable's assertion that a "decryption key for the secondary hard drive on [his] CTA computer was stored on plaintiff's personal cell phone," and to ensure that data on the phone was preserved. [45-1] 3-5; *see also* [*id.*] 8-9. Pable and the CTA agreed that Pable's "personal devices" would be preserved and the "work profile" on Pable's phone would be imaged, but Pable denied that his personal or "non-work related" profile should also be imaged. [*Id.*] 6, 8. The CTA maintained that it was "entitled to an image of [Pable's] entire cell phone" because Pable's discovery "production to date reflects the fact that he used his personal, non-CTA system to communicate about the facts of this case." [*Id.*] 5.[8] Pable responded that an imaging of the personal profile of his cell

---

[6] Although the undersigned has concluded that Pable is not a credible witness, his statement about when he activated the Disappearing Messages function is not disputed by the CTA.

[7] "A forensic image is an exact copy of an entire physical storage media * * * including all active and residual data and unallocated or slack space on the media." *Javeler Marine Servs., LLC v. Cross*, 189 F. Supp. 3d 659, 661 n.5 (S.D. Tex. 2016) (internal quotation marks and brackets omitted); *see also* Sedona Conference, *Sedona Conference Glossary*, 21 Sedona Conf. J. 263, 312 (2020) (defining "forensic copy" as "[a]n exact copy of an entire physical storage media" and stating that "[f]orensic copies are often called images or imaged copies").

[8] The CTA's L.R. 37.2 correspondence reflects that Pable's initial discovery production did not include any relevant text messages, even though Pable also produced an email that referred to a text message he had sent Haynes. [45-1] 3.

phone would yield no relevant information because he "did not use his personal profile for communications related to the issues in this case." [36-1] 8 (L.R. 37.2 correspondence from Pable's counsel to CTA's counsel dated Mar. 25, 2020).

The scope of the imaging remained in dispute until June 2020, when Pable's counsel informed CTA that "[w]e have imaged [plaintiff's] cell phone and are in the process of running the search terms without regard to any distinction between his personal and work profiles." [45-1] 17 (June 12, 2020 email from Pable's counsel to CTA's counsel). In a letter dated October 13, 2020, CTA observed that Pable had yet to produce the results of the forensic imaging. [45-1] 22 (L.R. 37.2 correspondence from CTA's counsel to Pable's counsel dated Oct. 13, 2020). CTA then requested that Pable provide "a complete image of Plaintiff's cell phone to fully account for the relevant information that is clearly missing from Plaintiff's productions to date, and to ensure that all responsive information on the device is discovered and produced." [*Id.*] 24.

After a meet-and-confer conference on October 22, 2020, counsel for the CTA emailed Pable's counsel to confirm the agreements the parties had reached during the conference. [45-1] 55-58. CTA counsel wrote that Pable had agreed to produce "a complete and searchable forensic image file of his personal cell phone as it was previously imaged by Pable's third-party expert during the course of written discovery[.]" [*Id.*] 57. Pable's counsel, Duffy, agreed that "[t]he image is a complete forensic image," but Duffy would not "make any representations about its searchability, which has nothing to do with the imaging process." [*Id.*]. Counsel for CTA expressed concern whether the image was, in fact, "complete," given Duffy's statement during the meet-and-confer that the CTA had effectively "wipe[d]" the work profile on Pable's cell phone by disabling his access to the CTA's networks:

> Finally, and during the course of our conversation pertaining to the imaging of Pable's cell phone, you indicated that the full image of the device may nonetheless be incomplete due to Pable's position that CTA effectuated a "wipe" of Pable's work profile upon Pable's departure from the CTA such that certain information, like text messages, is no longer available on the device. The CTA continues to dispute this allegation. You also indicated that, after Pable's cell phone was imaged by your third-party expert during the course of this litigation and the cell phone was returned to Pable's care, the cell phone will no longer turn on. You agreed that Pable will continue to preserve the cell phone at issue in this litigation, and we expect that you will likewise preserve all backups of Pable's cell phone.

[*Id.*] 58.

In response, Duffy explained that "[w]hatever the CTA did to the phone in 2018 certainly rendered some of the data on it inaccessible to Pable (which was obviously the whole point of the action it took)." [45-1] 58. But Duffy also stated that the alleged "wipe" of the phone had not affected the content of the image itself. To the contrary, Duffy reiterated that "[t]he image is a complete image of the data on the phone when the phone was imaged" and "nothing about the imaging process affected the 'completeness' of the image." [*Id.*].

### 1. Contents of the First Image

Pable produced the first image of his cell phone to the CTA on October 31, 2020. [45] 13. As the undersigned explained in an earlier decision granting the CTA's motion to compel a second forensic imaging of the phone, this image contained an unusually small amount of data and did not include many items that one would expect to find on a forensic image of a cell phone:

> [T]he forensic imaging produced only .2 GB of user-generated data, which represents less than 1% of the phone's storage capacity. Among the data that was produced, there were no communications exchanged on third-party applications; internet browsing and/or search histories; audio or visual files, including photos; information or data associated with 151 of the 200 third-party applications contained on the cell phone; or information or data associated with the cell phone's SD cards. Moreover, when Pable produced the image to CTA and Clever Devices, neither defendant's expert could access the image because the software that Pable's forensic expert had used to produce the image is not commonly used to produce forensic images of cell phones. In addition, the CTA's technical expert submitted an affidavit stating that the phone image only held 5 SMS text messages, all of which were exchanged on either May 26 or May 27, 2020. Furthermore, besides call log history, the data contained in the phone image did not predate June 5, 2020.

[54] 3; *Pable*, 2021 WL 4789023, at *3 (internal citations omitted).

### 2. CTA's Motion to Compel a Second Forensic Image

On February 5, 2021, the CTA moved to compel a second imaging of Pable's phone [45], and the undersigned granted the motion for essentially three reasons. First, "the original imaging was undertaken unilaterally by Pable without notice to, and thus without seeking input or agreement regarding the protocol for the imaging from, the CTA. By proceeding in this manner, Pable denied the CTA an opportunity to propose or comment on a protocol for the imaging or its parameters–and thus to avert the very concerns the CTA has now raised." [54] 4; *Pable*, 2021 WL 4789023, at *2. Second, the undersigned emphasized that "the extremely small amount of data

produced by the imaging . . . raised a legitimate question about the completeness of the forensic imaging that Pable unilaterally produced," [54] 4; *Pable*, 2021 WL 4789023, at *3. The undersigned recognized that Pable sought to explain away the scant amount of data on the phone with his contention that "substantially all relevant data" had been "wiped from the phone when the CTA disabled Mr. Pable's work profile" on the phone in October 2018. [47] 6. But the undersigned observed that Pable had not "cited to any evidence in the record to corroborate or substantiate this claim." [54] 4; *Pable*, 2021 WL 4789023, at *3. Third, the undersigned determined that "the information that the CTA seeks by way of a second forensic imaging–communications between Pable and Haynes about the Skeleton Key–goes to the heart of Pable's claim against the CTA and the CTA's counterclaim," which weighed in favor of permitting the CTA to re-image the phone. [54] 5; *Pable*, 2021 WL 4789023, at *3.

The CTA's ESI vendor generated a second forensic image of Pable's phone in April 2021. In contrast to the first image, the second image "contained 25 GB of unique data–substantially more than the .2 GB of user-generated data produced in the first image." [85] 2; *Pable v. Chicago Transit Auth.*, No. 19 CV 7868, 2021 WL 4789028, at *1 (N.D. Ill. Sept. 13, 2021). As the CTA represented, "[t]he data collected from the Second Image included data that pre-dated the First Image of the phone completed in June 2020–in other words, data on the phone existed (well in excess of .2 GB) prior to the initial imaging and should have been captured in the First Image." [69] 4. For example, the CTA's vendor was able to retrieve 42 Signal messages that Pable and Haynes exchanged between May 23, 2019 and October 29, 2019 that were not produced to the CTA or included in the first image. *See* [76] 7 n.4 (CTA reply brief in support of motion to extend fact discovery). Notably, this tranche of messages included discussions by Pable and Haynes about the Skeleton Key. *See* [153] 12; [153-2] 2-3. Also included in the second image were Google Hangout messages, emails, and web browsing history. *See* [80] 15 (transcript of Aug. 23, 2021 hearing on CTA's motion to extend fact discovery and serve discovery on Quest).

After the second image was generated, a dispute arose over whether and how Pable would conduct a privilege review of the data contained in that image before it was produced to the CTA. [58, 61]. The undersigned held a hearing on April 29, 2021 to resolve this dispute, and the undersigned's questions addressed the disparity in the amounts of data contained in the first and second images. In particular, the undersigned asked Duffy whether the "first image of the phone that was produced to the defense" was "a complete image or did you cull out or remove items from that image?" [62] 4 (transcript of Apr. 29, 2021 hearing). Duffy responded that, "[i]n the process of getting information out of the phone, an image was taken. When the CTA requested access to that image, that image was produced without any further review, although the content was quite limited." [*Id.*] 5. After adding that "I didn't remove anything from that image" [*id.*] 6, Duffy explained:

I'm stumbling a little bit because the image, you know, was there data that could have been in the image that wasn't in the image? One of the things that's plaguing our dispute here is that, you know, everyone likes to think * * * of computer hard drives which, you know, you can analogize to a file cabinet or something. Phones are dynamic.

When an expert goes in and looks at the phone and makes an image, there's a choice, you know: Do I look at all the pieces the phone [*sic*]? Do I look inside the applications of the phone and retrieve things that may not be physically on the phone but are in the cloud?

                          \*    \*    \*

So there's a lot of choices that are made on things there. So I just want to be clear that when we say complete, it was complete for our purposes, we think, to pick up all the communications that it takes. Were there things on the phone that were not included in that image? That's probably likely. I think that's almost true for almost any image.

[62] 6-7.

Once the privilege dispute was resolved, the CTA gained access to the data contained in the second image; it also deposed Pable a second time (on July 6, 2021) and examined him about (1) how he had used his personal cell phone while employed by the CTA, (2) whether and how he had used the phone to encrypt or otherwise manage security on his work computer, (3) what he had done with the phone after resigning from the CTA, and (4) his involvement in the first imaging process. On the latter issue, Pable testified that he was not involved in producing the first image, that he never saw or asked to see the first image, and that he had "zero insight" into the process. [129-7] 7, at 327:8-24; [*id.*] 55, at 519:2-3. When shown the set of Signal messages that the CTA's vendor retrieved during the second imaging and asked why these had not been produced to the CTA earlier, Pable testified, "I mean I obviously knew I had messages exchanged with Mr. Haynes on my phone. And I'm pretty sure that all of this is already produced by Mr. Haynes." [*Id.*] 28, at 413:1-4. Pable also testified that, after giving his phone to the forensic expert, Pable understood that the expert "provided the contents of what was relevant" to the CTA. [*Id.*], at 412:11-13.

### 3.    CTA's Discovery on Quest Consultants

On July 15, 2021, CTA moved for an extension of the fact discovery period and for leave to serve discovery on Quest Consultants International, the vendor that produced the first image of Pable's phone. [69]. In support, CTA argued that only Quest "may know the condition and composition of the phone, including the volume and content of the data it contained" when it was imaged, and only Quest could

"provide evidence of the protocol and parameters undertaken to create the First Image[.]" [*Id.*] 5.

The undersigned held a motion hearing on August 13, 2021. In pressing for the additional discovery, the CTA renewed its concerns about the apparent incompleteness of the first image and its need to understand whether Pable or Duffy had instructed Quest about "what should be kept in, what should be kept out" of the image. [80] 19. Citing excerpts from Pable's recent deposition, the CTA argued that Pable and Duffy "have changed their story a bit" concerning the completeness of the first image: whereas Duffy previously "represented to the Court and to the CTA that this was a complete image," the CTA maintained that now "we are learning from Mr. Pable's testimony" that "this was not a complete all-out, unfettered, unrestricted imaging of the phone; that it appears that there were certain instructions that were given" to Quest "perhaps related to judgment calls on relevance, on search terms, et cetera" that caused certain data on Pable's phone not to be included in the first image. [*Id.*] 10. In response to these concerns, Duffy stated that:

> [N]ow we are hearing for the first time the allegation – and it is the first time I have ever heard it – that there is some data sitting at the consulting expert that hasn't been produced – there is some relevant data that hasn't been produced. And that is, frankly, shocking to me. There has never – you know, we produced the image. It is what it is.
>
> If it is bad, it if is small, if it is wrong, it is the image. We, obviously, – and we produced lots of data, lots of communications from that phone in our initial searching. And there has never been the allegation that we're somehow – there was communications that we are improperly withholding or that we have another image that is better or has more relevant data. So, that is a brand new thing. And there is no basis for it.

[*Id.*] 22; *see also id.* [23] (Duffy stating that "this idea that that there is some cache of information that we have not shared with them is a brand new thing").

As the hearing continued, it became apparent that the parties had different understandings of how the first image had been created. *See generally* [80] 24-27, 30, 32-33, 34. For his part, Duffy referred repeatedly to the imaging process and to the fact that Pable had identified and produced relevant communications to the CTA by applying a set of search terms and a date range to "the data on the phone." [*Id.*] 26-27. This prompted counsel for the CTA to state that she was "not sure what those search terms were because at no point was the CTA informed of what those search terms may or may not have been with respect to providing an image of the device." [*Id.*] 36. Duffy then responded:

I feel like I am living in an alternate universe. We all agreed on the search terms to be applied for ESI. There is no doubt about that. And that is what we used to search e-mail, phones, whatever was on anything, to produce all of our documents on both sides. * * *

My point earlier – and I am sorry if I was unclear – there is no such thing as applying search terms to an image to create another image. A lot of this is based on the assumption – which happens to be incorrect – that our consultant worked – did all of his work – inside an image. And that happens to not be true.

He took an image and did other things to search the contents of the phone, and things that were on the cloud through the phone, and run the search terms and get any relevant communications.

[80] 37.

In response, counsel for the CTA acknowledged that:

Mr. Duffy is correct, there was an agreed-upon set of search terms that was used in order to conduct searches on both data – with respect to the CTA and with respect to Mr. Pable – in order to cull certain responsive information.

But the difference here – and it is an important one – is that at no point was it represented to the CTA that both sets of search terms was going to be applied in a way to limit the output of the image that would be provided to the CTA by Mr. Pable and his vendor.

So, while it is true that Mr. Pable did produce communications that may have been responsive to those search terms, that was separate and apart from the image as it was delivered to the CTA.

[80] 39.

On September 13, 2021, the undersigned granted the CTA's motion and permitted it to serve discovery on Quest. The significant disparity in the amounts and kinds of data contained in the first and second imagings "convince[d] the Court that the circumstances surrounding the first imaging are discoverable." [85] 3; *Pable*, 2021 WL 4789028, at *2. The undersigned also found that the discovery was warranted because, given Pable's decision to image the phone without consulting CTA, "CTA could not observe the condition of the phone before, during, or after the imaging, nor did CTA know the protocol used by the vendor to produce the image." [85] 4; *Pable*, 2021 WL 4789028, at *3. The undersigned acknowledged Duffy's earlier

representation to the CTA that the first image was "'a complete image of the data on the phone when the phone was imaged; nothing about the imaging process affected the 'completeness' of the image.'" [85] 4; *Pable*, 2021 WL 4789028, at *3. But in the undersigned's view, the fact that "substantially more data was produced during the second imaging process calls that assertion into question and raises the possibility that the vendor's imaging process affected the completeness of the image." [85] 4; *Pable*, 2021 WL 4789028, at *3. Finally, the undersigned found that "the vendor that performed the imaging is in a unique position to describe, *inter alia*, the state of Pable's phone at the time of the imaging, what instructions it received from Pable with respect to producing the image, and how the imaging occurred." [85] 5; *Pable*, 2021 WL 4789028, at *3. The undersigned therefore permitted CTA to depose the Quest analyst who processed and imaged Pable's phone and discover "(1) any instructions received by the vendor from Pable or Pable's counsel regarding how the imaging was to be conducted, and (2) any notes, reports, or records generated during or relating to the first imaging." [85] 5; *Pable*, 2021 WL 4789028, at *3.

The CTA's motion also sought an order requiring Pable to disable the Disappearing Messages function on the Signal app on his phone, and Pable, acting through Duffy, opposed this request. As referenced above, as of late October 2019, Pable had enabled Signal's Disappearing Messages function, which caused all future Signal messages between him and Haynes to automatically delete within 24 hours after being sent. [129-4] 7, at 18:7-17; *see also* [139-1] 7, at ¶ 25. The undersigned denied CTA's request for several reasons, including (1) the lack of case law holding that an order directing a litigant to disable a specific function on his cell phone was an appropriate mechanism for enforcing the litigant's duty to preserve and (2) concerns about the efficacy of such an order, particularly if Haynes (who is not a party to this case) had also enabled the Disappearing Messages function on his phone. *See* [85] 6; *Pable*, 2021 WL 4789028, at *4. However, the undersigned also made clear that Duffy was being taken "at his word that Pable has been advised about his duty to preserve relevant evidence, including any Signal communication with Haynes, and the Court expects Pable . . . to fulfill [his] respective dut[y] to preserve relevant evidence." *Id.*, at *5.

### 4. Further Discovery Reveals That Duffy Never Instructed Quest to Produce a Complete Forensic Image of Pable's Cell Phone or Preserve All the Phone's Data.

Following the undersigned's order of September 13, 2021, CTA subpoenaed Quest for documents and deposed the Quest consultant who analyzed Pable's phone, Dan Jerger. [91-5]; (Jerger's Oct. 19, 2021 deposition); [93] (Jerger's Oct. 12, 2021 deposition). Regarding his work in this case, Jerger testified that he acted based solely on instructions he received from Duffy orally or via email. [91-5] 4, 125:7-22; [93] 108:23-109:3. Jerger testified that, as a forensic examiner, there were "various tools that [he] could apply, the net result of which would be to retrieve all of the user

generated data on a phone," and that this process results in "a logical or physical image of the phone." [93] 13, at 45:12-16; [*id.*] 13-14, at 45:21-46:2. Jerger then testified that he was "not asked specifically to obtain a logical or physical image of the phone," [*id.*] 14, at 46:3-5, nor was he "asked to collect all of the data of Mr. Pable's phone," [91-5] 28, at 222:8-9, or even to "preserve a copy of all the data on the phone" when the phone was imaged, [93] 27, at 101:3-7. Rather, Jerger's "underlying mission was to collect and document within a particular date range and within and/or with certain key words[.]" [93] 14, at 46:13-16. The date range and search terms were given to him by Duffy in emails, but Quest, acting on the advice of Duffy (who also represents Quest) did not produce these emails to the CTA. [93] 14, at 47:17-24.

CTA questioned Jerger about the image of Pable's phone that was produced to CTA in late October 2020. Jerger explained that this image was generated based on "[t]he content that was contained within those image files was produced by the tools back in June of 2020." [91-5] 22, at 200:6-11. Jerger acknowledged that he never analyzed this image to determine whether "all of the files" on Pable's phone were contained within the image because "it was understood that they were not all contained there because that is not what I was being asked to do." [*Id.*] 23, at 202:16-23.

Jerger also testified that there were Signal messages on Pable's phone when Jerger analyzed it, and that he created an encrypted backup of the messages and transferred it to a temporary SD card. *See* [93] 20-21, at 73:12-76:12. The CTA has represented–without contradiction by Pable or Duffy–that this cache of messages was never produced to the CTA, despite its "repeated requests for Signal messages over the course of a year of discovery." [91] 8; *see also* [93] 25, at 92:2-20 (Jerger's testimony that he did not produce Signal messages to CTA because Duffy directed him only "to produce images"). Duffy produced the Signal backup file after the first day of Jerger's deposition. [91] 8. The backup file contained communications between Pable and Haynes that were exchanged in June 2020, but the backup did not contain Pable's "message history with Haynes prior to October 2019–though those messages were on Pable's Phone at the time the Second Image was taken, nearly a year later." [91] 8.

### 5. CTA's Motion to Enforce Subpoena and for Sanctions against Duffy and Quest

In response to the CTA's subpoena for documents, Quest produced five email threads between Jerger and Duffy that were dated on or after October 30, 2020–more than four-and-a-half months after the first image had been created. *See* [91] 5. No communications sent or received in and around June 2020, when (according to Duffy's representation) the phone was imaged, were produced. After Jerger's deposition, the parties met and conferred about CTA's demand that Quest produce "all communications between Duffy and Jerger relating to the imaging of Pable's phone, including any data extraction and preservation work Quest did on Pable's phone[.]"

[*Id.*] 9. Quest offered to produce a limited set of communications between Duffy and Jerger from June 2020 through October 2020, but the CTA rejected that offer and moved to enforce its subpoena against Quest and for sanctions against Duffy and Quest. [91].

On February 7, 2022, the undersigned granted the motion insofar as it sought to compel Quest to produce all communications between Duffy and Jerger relating to the imaging of Pable's phone. [97] 4-6 (Feb. 7, 2022 order granting in part and denying in part CTA's motion to enforce subpoena and for sanctions). As the undersigned explained in that order, Quest's refusal to produce the requested documents rested on a "hyper-technical distinction," and one that was especially unsupportable given Duffy's failure to disclose that never instructed Quest to prepare a complete image of Pable's phone:

> Quest and plaintiff respond that the emails were properly withheld because "the scope of the discovery the Court allowed was limited to the ***imaging*** of the phone[.]" [95] 2 (emphasis in original). Quest and plaintiff appear to contend that the September 13 order drew a distinction between "the imaging process on the one hand, and the application of search terms [to] the contents of the phone on the other." [*Id.*] 4 (citing [91-2] 38-39). In other words, Quest and plaintiff appear to argue that the Court authorized CTA to discover any communications relating to the steps Jerger took to generate the first image, but not the initial communications in which Jerger was instructed to "collect and document" certain data "within a particular date range and within and/or with certain key words." [93] 14, at 46:13-16. Quest and plaintiff thus maintain that the emails were properly withheld because they "neither instructed Quest with respect to how to image the phone nor discussed the results of its imaging work." [95] 5.

The Court rejects that argument and holds that the September 13 order encompasses the initial communications in which Duffy instructed Jerger to collect only a limited subset of data from plaintiff's phone. CTA's request to propound discovery on Quest and depose Jerger was precipitated almost entirely by the substantial–and, until the time of Jerger's deposition, unexplained–disparity in the amount of data captured in the first and second images of plaintiff's phone. In the Court's view, the questions that this discovery was intended to answer were why Jerger's image–which Duffy had represented to be a "complete image of the data on the phone when the phone was imaged"–contained, and by what means had the image come to contain, so little data relative to the second imaging. Understood in that context, the Court's order cannot reasonably be read to include only the communications Jerger received relating to his creation of the first image, and not the

22

communications in which Duffy instructed Jerger to collect only a limited subset of the phone's data.

The only point arguably in favor of Quest and plaintiff's reading of the September 13 order is that the order identified the relevant category of instructions as those "regarding how the *imaging* was to be conducted." [85] 5 (emphasis supplied). But whatever support the Court's use of the term "imaging"–rather than a broader category of actions that Jerger might have taken with respect to the phone–lends to their position is in fact completely illusory. At no time before Jerger's deposition did Quest or Duffy advise CTA or the Court that Jerger never obtained–and had never been asked to obtain–a complete image of the data on plaintiff's phone. To the contrary, Duffy represented that "[t]he image is a complete image of the data on the phone when the phone was imaged; nothing about the imaging process affected the 'completeness' of the image." [45-1] 58. Only Duffy knew that, long before Jerger created the first image, Jerger had been instructed by Duffy to collect a limited subset of the phone's data, and that the first image was created from that limited subset of data. Consequently, CTA was under the impression–as was the Court–that plaintiff's vendor had attempted to generate a complete forensic image of plaintiff's phone, but for unknown reasons, that image captured an unusually small amount of data. It was for these reasons–and not in observance of the hyper-technical distinction on which Quest and Duffy's position rests–that the September 13 order used the term "imaging" in defining the categories of discoverable communications.

[97] 4-5.

The undersigned then took the CTA's request for sanctions against Duffy and Quest under advisement and ordered the parties to file supplemental briefing on the amount of attorney's fees and costs the CTA sought as a sanction. [97] 8.

## C.    CTA's Spoliation Motion

CTA filed its spoliation motion under Rule 37(e) on June 29, 2022, alleging that Pable spoliated Signal messages he exchanged with Haynes and the cell phone he used at the time of the Dayton test [129]. Pable filed a response on August 5, 2022 that was supported by, *inter alia*, his own affidavit, dated August 3, 2022, *see* [139-1]. Pable's affidavit purports to explain the circumstances by which his pre-November 2, 2018 Signal messages with Haynes were deleted from his cell phone. Whereas Pable previously testified that Haynes's deletion of the messages from his own phone– and, in particular, Haynes's choice to use a specific deletion setting on his own Signal app–had caused the same messages to be deleted from Pable's phone, Pable now

23

explained that the deletion was caused by a different–and previously undisclosed–configuration on his own Signal app:

> Haynes' deletion of our Signal conversation thread triggered a change in what Signal calls a "Safety Number."

> A safety number is a unique code that securely identifies each conversation thread in order to protect against a user being tricked into exchanging messages with an interloper using someone else's Signal account. The Safety Number changes in a variety of circumstances, including using Signal on a new device or from a different phone number, or, as in this case, when a fresh conversation thread is made and a new Safety Number is generated.

> Signal can be configured to take any number of actions when the Safety Number changes, from notifying the user, blocking messages with the other user, or deleting the conversation with the user.

> Signal is an open-source application that encourages the independent development of "forks" through which users can add to and customize the operation of various functions of the application while maintaining the ability to (selectively) merge in upstream changes and updates from the fork's parent. There are currently thousands of such known forks available to users through GitHub alone, and users can make their own and optionally publish it.

> Because of its open-source nature, forks can be interoperable but no one version is required to be the definitive version of the application in use by all users at any given time; many Signal users, including me, can run modified versions of the application using these various forks.

> My installation of Signal at that time was coded to delete any such potentially compromised conversations, and this is what occurred on November 2, 2018, when I lost access to my recent messages with Haynes as a result of Haynes's deletion of our conversation thread.

[139-1] 6, at ¶¶ 19-24.

## Discussion

### I. CTA's Rule 37(e) Motion Based on Spoliation of ESI

The CTA's motion alleges that Pable spoliated (1) the Signal messages he exchanged with Haynes between the Dayton Test on August 18, 2018 and November 2, 2018; (2) the Signal messages he exchanged with Haynes between October 29, 2019 and March 2021, while litigation was pending; and (3) the user-generated content on his personal cell phone.[9]

In recommending that the District Judge grant the motion and dismiss Pable's complaint with prejudice, the undersigned has placed significant weight on her finding that Pable's defenses to the CTA's spoliation arguments are completely incredible. Most importantly, Pable twice testified falsely–first at his March 2021 deposition, then again in his August 2022 affidavit–about the circumstances under which the Signal messages he and Haynes exchanged before November 2, 2018 were deleted from his phone. Furthermore, in a transparent effort to defeat the spoliation motion, Pable made the preposterous claim that he had no idea why the CTA placed him on administrative leave on October 22, 2018–and thus he had no duty to preserve relevant ESI relating to the litigation against the CTA that he soon began planning. Thereafter, and while this litigation was pending, Pable intentionally activated the Disappearing Messages function on his Signal app, thereby ensuring that the messages he exchanged with Haynes–the witness on whose shoulders Pable's case almost entirely depends–would be permanently deleted within 24 hours after they were sent. There is no dispute, moreover, that the Signal messages exchanged on and after October 29, 2019 concerned the very litigation in which Pable and Haynes were enmeshed. And while Pable testified that he activated the Disappearing Messages setting only "as a matter of general practice for automated data hygiene, privacy and security purposes" [139-1] 7, at ¶ 26, this testimony is simply not credible, not least because Pable does not explain–and cannot explain–why, despite communicating with Haynes over Signal for more than a year without activating the Disappearing Messages function, he suddenly decided to activate Disappearing Messages in the midst of active litigation.

The undersigned emphasizes Pable's lack of credibility at the outset because, as other courts have recognized, "'[w]itness credibility is critical to the resolution of a motion for spoliation sanctions, particularly where the alleged spoliator's intent is at issue.'" *Nuvasive, Inc. v. Absolute Med., LLC*, Case No. 6:17-cv-2206-Orl-41GJK, 2021 WL 3008153, at *6 (M.D. Fla. May 4, 2021) (quoting *In re Delta/AirTran Baggage*

---

[9] In deciding this motion, the undersigned addresses the spoliation issues only as they relate to Pable's whistleblower claim and the CTA's defenses to that claim, and not the CTA's counterclaim. Because the District Judge granted Pable's motion for judgment on the pleadings on the counterclaim, whether or how the spoliation affected the CTA's ability to prosecute that claim is a moot issue.

*Fee Antitrust Litig.*, No. 1:09-md-2089-TCB, 2015 WL 4635729, at *14 n.3 (N.D. Ga. Aug. 3, 2015)); *see also Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 778 (N.D. Tex. 2011 (same as to non-ESI spoliation claim). And here, Pable's lack of credibility, together with the abundant other evidence that he and his lawyer purposefully spoliated ESI, is a deciding factor in the undersigned's proposed resolution of the Rule 37(e) motion.

### A.    Legal Standard

"The district court may sanction a party that has failed to take reasonable steps to preserve electronically stored information if that information should have been preserved during the litigation, but it has been lost and cannot be restored or replaced through additional discovery." *Global Material Techs., Inc. Dazheng Metal Fibre Co. Ltd.*, No. 12 CV 1851, 2016 WL 4765689, at *1 (N.D. Ill. Sept. 13, 2016). "Rule 37(e) has five threshold requirements: (1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time of the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (C.D. Ill. 2021).

"If all these threshold requirements are met, then the court must determine if the party seeking the ESI has suffered prejudice or if the party with possession, custody, or control of the ESI intended to deprive the seeking party of the ESI." *DR Distribs.*, 513 F. Supp. 3d at 958. "If prejudice but not intent exists, then the court can impose curative measures," such as barring evidence or "instructing the jury that it can consider the circumstances surrounding the loss of the ESI." *Id.* "If intent (which presumes prejudice) exists, then the court can impose sanctions, including presuming that the information was unfavorable, instructing the jury to presume the information was unfavorable, or entering dismissal or default." *Id.* at 958-59.

### 1.    Rule 37(e) Provides the Sole Basis to Impose Sanctions for Spoliation of ESI.

Although CTA's motion rests primarily on Rule 37(e), CTA also argues that the Court should exercise its inherent authority to sanction Pable and Duffy for the alleged spoliation of ESI. The undersigned recommends that the District Judge reject this argument. Case law from the Northern District of Illinois and other district courts within the Seventh Circuit recognizes that Rule 37(e) provides "the sole source to address the loss of relevant ESI that was required to be preserved but was not because reasonable steps were not taken." *DR Distribs.*, 513 F. Supp. 3d at 956; *accord Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 617 (N.D. Ill. 2022); *Bolyard v. Vill. of Sherman*, Case No. 19-cv-3146, 2022 WL 16738647, at *2 (C.D. Ill.

Nov. 7, 2022); *Snider v. Danfoss*, 15 CV 4748, 2017 WL 2973464, at *3 n.8 (C.D. Ill. Jul. 12, 2017).[10]

In support, the undersigned observes that the Advisory Committee's Note states that the 2015 amendment to the Rule "forecloses reliance on inherent authority or state law to determine when certain measures should be used." Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment. It also makes clear that the amendment was intended to bring uniformity to this area of the law, where different "[f]ederal circuits ha[d] established significantly different standards for imposing sanctions or curative measures on parties who fail to preserve" ESI. *Id.* Finally, the undersigned concludes that exclusive reliance on Rule 37(e) is consistent with the Seventh Circuit's general approach that a court should not rely on its inherent sanctioning powers unless other rules or statutes provide an insufficient basis to issue sanctions. *See Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) ("the inherent power of the court is a residual authority, to be exercised sparingly and only when other rules do not provide sufficient basis for sanctions") (internal quotation marks omitted). Here, Rule 37(e) addresses the precise conduct that the CTA contends is sanctionable and provides multiple options for addressing the spoliation, including each sanction requested by the CTA. The undersigned therefore recommends that the District Judge rely only on Rule 37(e) in deciding the CTA's spoliation motion.

## 2. The Rule 37(e) Motion Presents a Dispositive Matter.

The undersigned agrees with Pable, *see* [139] 31-32, that, because the CTA seeks dismissal of the case with prejudice, a default judgment, or a mandatory adverse-inference instruction, the motion presents a dispositive matter that requires the undersigned to prepare a Report and Recommendation.

---

[10] Case law from outside the Seventh Circuit is in accord. *See, e.g.*, *Newberry v. Cnty. of San Bernadino*, 750 F. App'x 534, 537 (9th Cir. 2018) ("The detailed language of Rule 37(e) therefore foreclosed reliance on inherent authority to determine whether terminating sanctions were appropriate.") (internal quotation marks and bracket omitted); *Birren v. Royal Caribbean Cruises, Ltd.*, Case No. 1:20-cv-22783-Bloom/Louis, 2021 WL 9216928, at *2 (S.D. Fla. Nov. 19, 2021) (2015 amendment to Rule 37(e) "was designed to preclude the court's reliance on inherent authority or state law to fashion curative measures in the face of ESI spoliation and, in so doing, heavily limits the court's discretion to impose sanctions for the loss of such evidence.") (internal quotation marks omitted); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) (Rule 37(e) provides "exclusive remedy" for spoliation of ESI); *Packrite, LLC v. Graphic Packaging Int'l, LLC*, 1:17CV1019, 2020 WL 7133806, at *2 n.3 (M.D.N.C. Dec. 4, 2020) ("[T]he Court 'should look exclusively to Rule 37(e) in resolving" spoliation motion based on failure to preserve emails); *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 44 (D.D.C 2019) (refusing to consider spoliation motion alleging party failed to preserve relevant emails under inherent authority and relying solely on Rule 37(e)).

"Generally, a magistrate judge has the power to issue a nondispositive order to be reviewed by the district judge for clear error." *Cage v. Harper*, Case No. 17-cv-7621, 2020 WL 1248685, at *3 (N.D. Ill. Mar. 16, 2020). "Conversely, for a dispositive matter, absent the consent of all parties, a magistrate judge must issue a report and recommendation to the district judge, which is reviewed *de novo* if one party launches an objection to that recommendation." *Id.* "This scope of authority is delineated in both 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure." *Id.*

Section 636(b)(1) "distinguishes determinations that magistrate judges may make as orders, to be reviewed by the district court for clear error, *see* 28 U.S.C § 636(b)(1)(A), from determinations for which magistrate judges may only make recommendations, to be reviewed by the district court *de novo*." *Cage*, 2020 WL 1248685, at *3. Under § 636(b)(1)(A), a district court may designate a magistrate judge to hear and determine "any pretrial matter pending before the court" except motions (1) for injunctive relief; (2) for judgment on the pleadings; (3) for summary judgment; (4) to dismiss or quash an indictment or information made by the defendant; (5) to suppress evidence in a criminal case; (6) to dismiss or permit maintenance of a class action; (7) to dismiss for failure to state a claim upon which relief can be granted; and (8) to involuntarily dismiss an action. "For each of these eight excepted motions, Section 636(b)(1)(B) states that a magistrate judge may submit to the district judge 'proposed findings of fact and recommendations for the disposition[.]'" *Cage*, 2020 WL 1248685, at *3 (quoting 28 U.S.C. § 636(b)(1)(B)). "[A]lthough the list of eight excepted motions in § 636(b)(1)(A) appears to be exhaustive, courts of appeals across the country have held the list to be illustrative rather than exhaustive." *Id.*

"The Seventh Circuit has held that the matter of 'sanctions'–the Court has used the term without qualification–is for the district court, and that a magistrate judge can only issue a report and recommendation." *Cleversafe, Inc. v. Amplidata, Inc.*, 287 F.R.D. 424, 428 (N.D. Ill. 2012); *see also Ret. Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 868 (7th Cir. 1996) ("The power to award sanctions, like the power to award damages, belongs in the hands of the district court.") (internal quotation marks omitted). More specifically, as cases from the Northern District of Illinois have recognized, a request for sanctions or "other measures" under Rule 37(e) presents a dispositive matter–particularly when, as in this case, the movant seeks dismissal or a mandatory adverse-inference instruction. *See Gruenstein v. Browning*, No. 1:17-cv-2328, 2022 WL 3213261, at *4 n.6 (N.D. Ill. Jun. 21, 2022) ("The undersigned recognizes that decisions from the Northern District of Illinois have treated a Rule 37(e) motion as a dispositive motion as to which a magistrate judge may only prepare a report and recommendation, particularly if the motion seeks a default judgment and/or an adverse-inference instruction."); *CarmelCrisp LLC v. Putnam*, Case No. 19 C 2699, 2022 WL 1228191, at *1 n.1 (N.D. Ill. Apr. 26, 2022) (treating Rule 37(e) motion requesting dismissal of case and adverse-inference instruction as dispositive matter requiring preparation of report and

recommendation). Accordingly, the Court will address the Rule 37(e) motion in the form of a Report and Recommendation to the District Judge.

**B.  Pable Intentionally Spoliated Two Different Categories of Signal Messages and His Cell Phone.**

**1.  The Signal Messages and the Contents of Pable's Phone Were ESI.**

The District Judge should find that the Signal messages Pable and Haynes exchanged, as well as the settings and contents of Pable's phone, constituted ESI.

"The Federal Rules of Civil Procedure do not define ESI. Instead, the advisory committee's notes to Rule 37(e) broadly discuss ESI as covering all current types of computer-based information." *Gruenstein*, 2022 WL 3213261, at *5 (internal brackets and quotation marks omitted). "The classification of evidence as 'electronically stored' draws a distinction between 'information that is fixed in a tangible form' and 'information that is stored in a medium from which it can be retrieved and examined.'" *Id.* (quoting Fed. R. Civ. P. 34(a), Advisory Committee Note, 2006 Amendment).

Signal messages are simply text messages that are exchanged over an app that offers enhanced security features. *See* [129-17] 3, at ¶ 2 (Harder affidavit describing Signal as an "electronic messaging platform" that can be used "on various electronic devices, such as cell phones"). Other courts have held that ordinary text messages constitute ESI. *See Schmalz*, 2018 WL 1704109, at *1-2, *3 (addressing Rule 37(e) motion alleging that defendant failed to preserve text messages); *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1012 (D. Ariz. 2021) (holding that text messages constituted ESI in granting Rule 37(e) motion). The undersigned therefore recommends that the District Judge find that Pable and Haynes's Signal messages constituted ESI. *See Noland*, 2021 WL 3857413, at *7 (granting Rule 37(e) motion based on defendants' failure to preserve Signal messages).

Likewise, the user-generated contents of Pable's cell phone, including the communications stored on the phone, qualify as ESI. *See Garrit v. City of Chicago*, No. 16 CV 7319, 2018 WL 11199008, at *3 (N.D. Ill. Mar. 6, 2018) ("Because defendants are seeking text messages, emails and electronically stored photographs and call logs" on plaintiff's cell phone, "we agree with plaintiffs that the discovery sought here is ESI."), *report and recommendation adopted*, 2018 WL 11199016 (N.D. Ill. Jun. 27, 2018); *see also Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 343-44 (D. Ariz. 2022) (granting Rule 37(e) motion based on plaintiff's failure to preserve contents of her iPhone).

## 2. Pable's Duty to Preserve Relevant ESI Arose on October 29, 2018.

The District Judge should find that Pable's duty to preserve evidence relevant to this case arose on October 29, 2018, and that this duty encompassed his Signal messages with Haynes and his personal cell phone.

CTA argues that Pable had a duty to preserve his Signal messages with Haynes that arose no later than November 2, 2018, the day Haynes deleted their Signal message thread from his phone. [129] 22-24. According to the CTA, Pable "was actively anticipating litigation against the CTA based on the very evidence contained in these Signal messages." [*Id.*] 22. In support, CTA observes that (1) Pable and Haynes were placed on administrative leave, and the CTA opened its internal investigation into their conduct, on October 22, 2018; (2) on October 29, 2018, Pable solicited two lawyers to sue the CTA; (3) Pable and Haynes discussed the possibility that the leave period was related to the Dayton Test; and (4) Pable testified that he "was aware," when he was soliciting counsel, that he had "an ongoing duty to preserve relevant materials relating to any claims that [he] bring[s] against the CTA[.]" [*Id.*] 23-24; *see also* [129-7] 59, at 536:3-537:10.

Pable responds that he had "no clear duty to preserve any messages related to the Skeleton Key or the Dayton test" as of November 2, 2018. [139] 35. Not only was there no litigation pending at that time, Pable argues, but neither he nor Haynes had been forced to resign from the CTA. [*Id.*]. Pable acknowledges that he was contemplating a lawsuit against the CTA, but contends that the claim he intended to pursue–the CTA violated the FMLA by forcing Pable to resign to avoid paying for an upcoming surgery–had nothing to do with the Dayton Test, such that he was not on notice that his Signal messages with Haynes needed to be preserved. [*Id.*].

"The duty to preserve under Rule 37(e) is based on the common law, and so is triggered when litigation is commenced or reasonably anticipated." *Hollis*, 603 F. Supp. 3d at 619. "There is no bright line rule that determines when litigation can be reasonably anticipated in any given case." *Covarrubias v. Wendy's Rest.*, No. 19 CV 4866, 2021 WL 4258701, at *3 (N.D. Ill. Jun. 21, 2021). "The inquiry is one based on the specific circumstances and facts and whether those facts give rise to a reasonable foreseeability that litigation will ensue." *Does 1-5 v. City of Chicago*, Case No. 18-cv-3054, 2019 WL 2994532, at *2 (N.D. Ill. Jul. 9, 2019). "A duty to preserve evidence can arise before litigation starts, and Rule 37(e), which applies to ESI "that should have been preserved in the anticipation or conduct of litigation," expressly contemplates this scenario." *Gruenstein*, 2022 WL 3213261, at *6.

"The scope of the duty to preserve includes ESI that is expected to be relevant and proportional to the claims or defenses in the litigation." *Hollis*, 603 F. Supp. 3d at 619. "Often the[ ] events" that trigger the duty to preserve "provide only limited

information about that prospective litigation, however, so that the scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed." Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment.

"Whether a duty to preserve has arisen is an objective inquiry, viewed from the perspective of the [alleged spoliator] at the time." *Hollis*, 603 F. Supp. 3d at 620. "Once a party reasonably anticipates litigation, it is duty-bound to take good faith steps to preserve documents and data that may be relevant to the litigation." *DR Distribs.*, 513 F. Supp. 3d at 929.

### i.      Litigation Was Foreseeable on October 29, 2018.

The undersigned recommends that the District Judge find that litigation was reasonably foreseeable as of October 29, 2018, when Pable began recruiting counsel to sue the CTA.

Pable had been placed on administrative leave on October 22, 2018. [129-1] 11-12, at 37:13-38:22. Although the CTA did not tell Pable or Haynes why they were being placed on leave, Haynes quickly surmised that the leave was related to the Dayton Test. *See* [129-4] 41, at 156:4-5. Haynes also testified that, based on his conversations with Pable after October 22, Pable was "on the same page" when it came to understanding why he, too, had been placed on leave. [*Id.*] 42, at 156:7-18, 158:9-14; *cf. Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1164 (D. Colo. 2015) ("Courts have found the duty to preserve to be triggered based on an internal investigation into an incident."). The undersigned believes that Haynes's testimony on this point is credible, as it is consistent with contemporaneous evidence showing that Pable knew or should have known that his leave was related to the Dayton Test, and that litigation related to the Dayton test was foreseeable. Most notably, after Haynes disclosed the Dayton Test to his contact at the Dayton RTA in August 2018, the agency's Chief Information Officer sent Haynes an email explaining that the agency's head "was quite concerned" by the incident and was "considering whether we should be considering legal action against" Haynes. [129-8] 2. On the evening of October 22, 2018–the same day they were placed on leave–Haynes forwarded the email to Pable, writing that "Dayton was two months ago, nearly to the date." [129-21] 3. Pable's receipt of this email corroborates Haynes's testimony that he and Pable knew why they had been placed on leave and provides additional evidence that Pable knew or should have known that his conduct respecting the Dayton test created a risk of litigation. *Cf. Puebla Paloma v. DeMaio*, 5:15-CV-1536 (LEK/TWD), 2019 WL 1323927, at *4 (N.D.N.Y. Mar. 25, 2019) ("Litigation is generally foreseeable when it is contemplated or threatened."); *Does 1-5*, 2019 WL 2994532, at *4 ("A demand letter threatening litigation may trigger the duty to preserve documents within its scope.").

Only a week after being placed on leave, moreover, Pable consulted with two attorneys about his "recent[ ] place[ment] on administrative leave pending an internal investigation," which Pable thought "suspicious" because the CTA had been "made aware of an upcoming FMLA filing" and his "upcoming surgery." [129-15] 2; [129-16] 2. That Pable solicited two attorneys about a claim against the CTA involving his placement on leave demonstrates not only that litigation relating to the events precipitating Pable's leave was reasonably foreseeable, but also that Pable in fact anticipated such litigation. *See Laub v. Horbaczewski*, Case No. CV 17-6210-JAK (KS), 2020 WL 9066078, at *5 (C.D. Cal. Jul. 22, 2020) (holding that plaintiffs' "duty to preserve ESI . . . developed long before the suit was filed" where, *inter alia*, plaintiffs "began to speak with counsel" more than 17 months before filing suit).

For these reasons, the undersigned rejects Pable's specious argument that he "was not even sure why" he "had been placed on leave" [139] 35, and recommends that the District Judge find that Pable's duty to preserve relevant evidence arose on October 29, 2018.

### ii.   Pable's Duty to Preserve Encompassed the Three Categories of ESI at Issue in the CTA's Motion.

The undersigned also recommends that the District Judge find that Pable's duty to preserve encompassed the Signal messages that he exchanged with Haynes before November 2, 2018; the Signal messages he exchanged with Haynes between October 29, 2019 and March 2021;[11] and his personal cell phone that he used to send and receive these messages.

### a.   Pre-November 2, 2018 Signal Messages

Pable contends that he had no duty to preserve these Signal messages because "he was not contemplating a whistleblower claim" against CTA, "but a claim under the FMLA[.]" [139] 35. But this claim-specific understanding of the duty to preserve– for which Pable cites no authority, *see* [139] 35–is too narrow and circumscribed. As the Advisory Committee Notes to Rule 37 make clear, in determining whether a duty to preserve exists, "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment. Courts have accordingly "reject[ed] the notion that a party's obligation to preserve information arises only after it understands the *precise* nature of the *specific* litigation at issue." *Zbylski*, 154 F. Supp. 3d at 1162 (emphases in original).

---

[11] Pable had a duty to preserve Signal messages with Haynes between November 2, 2018 and October 29, 2019, but they are not at issue in this motion because Haynes produced those Signal messages pursuant to subpoena.

Here, there is a clear link between the Signal messages and the litigation that was both reasonably foreseeable and in fact anticipated by Pable. As just discussed, Pable expected to sue the CTA for placing him on leave as an alleged pretext to avoid covering his upcoming surgery, in violation of the FMLA. Haynes credibly testified that both he and Pable knew that the leave–and thus the internal investigation that the CTA opened on October 22, 2018–related to the Dayton Test, as his testimony is corroborated by an email that was sent contemporaneously with Pable and Haynes's placement on leave. Specifically, only hours after they were placed on leave, Haynes reminded Pable that "Dayton was two months ago, nearly to the date" by forwarding Pable an email from the Dayton RTA stating that that agency was contemplating legal action against Haynes. Given Pable's expressed intent to pursue litigation for being put on leave and his knowledge that the leave was related to the Dayton Test, a reasonable person in his position would have known that the Signal messages he exchanged with Haynes about the Dayton Test would be relevant to the planned and foreseeable litigation.

Furthermore, the undersigned would make the same recommendation even if Pable were correct that the specifics of his anticipated FMLA claim defined the scope of his duty to preserve. As discussed above, Pable told prospective counsel that he believed the CTA violated the FMLA by placing him on leave and investigating him to avoid "cover[ing] my upcoming surgery." *See* [129-15] 2; [129-16] 2. This suggests that Pable's proposed FMLA claim would allege that the CTA had retaliated against him for seeking to exercise his FMLA rights, and that his placement on leave for participating in the Dayton Hack was a pretext for unlawful discrimination. *See, e.g.*, *Durns v. Family Guidance Ctrs., Inc.*, No. 19 C 4154, 2021 WL 4477919, at *7 (N.D. Ill. Sept. 29, 2021) ("To establish a dispute of fact on causation, an employee may point to circumstantial evidence, such as . . . evidence that the employer offered a pretextual reason for the termination."). Pable's communications with Haynes about the Dayton Test immediately after it occurred, during the CTA's investigation, and right before Pable's interview would be relevant to the pretext issue, as such communications–particularly if they contained statements or admissions that are inconsistent with Pable's current theory of the case–could have potentially shown whether the CTA's grounds for disciplining Pable (and ultimately forcing him to resign) had a sufficient basis in fact or were sufficient to warrant his firing. *See Haworth v. Round Lake Area Schs., Cmty. Unit Sch. Dist. 116*, No. 17 C 7038, 2019 WL 3080928, at *7 (N.D. Ill. Jul. 15, 2019) (denying summary judgment on FMLA retaliation claim because jury could find that defendant's "reasons for letting plaintiff go were pretextual . . . because they have an insufficient basis in fact or were insufficient to motivate termination").

### b. Signal Messages Exchanged between October 29, 2019 and March 2021

Likewise, Pable's duty to preserve encompassed the Signal messages he exchanged with Haynes after his duty to preserve arose and while both the administrative litigation and litigation in this Court were pending. *See Tomasian v. C.D. Peacock, Inc.*, Case No. 09 C 5665, 2012 WL 13208522, at *6 (N.D. Ill. Nov. 8, 2012) ("The duty to preserve documents *in the face of pending litigation* is not a passive obligation. Rather, it must be discharged actively.") (emphasis added and internal quotation marks omitted).

### c. Pable's Cell Phone

Finally, Pable's duty to preserve encompassed his cell phone for many reasons: he used the phone to communicate with Haynes about the Dayton Test and their anticipated interviews with the CTA, and the CTA asked him to–and his lawyer agreed to–preserve the phone. Underscoring the obviousness of this conclusion, Pable himself could not deny that he an obligation to preserve evidence related to the litigation against the CTA that he anticipated in October 2018. *See* [129-7] 59, at 537:2-10.

\*   \*   \*

For these reasons, the undersigned recommends that the District Judge find that Pable's duty to preserve relevant ESI, including the Signal messages with Haynes and Pable's cell phone, arose on October 29, 2018.

### 3. The Signal Messages and Pable's Phone Were Relevant and Should Have Been Preserved.

"Rule 37(e) only applies to relevant ESI." *Snider*, 2017 WL 2973464, at *4. "Under general discovery principles, the party seeking to compel discovery has the burden of showing relevance." *DR Distribs.*, 513 F. Supp. 3d at 978. "This burden is not a high standard for at least two reasons. First, relevance is determined under the standard in Federal Rule of Civil Procedure 26(a)(1) and not the standard of Federal Rule of Evidence 401, which itself is not a high standard." *Id.* (internal citations omitted). "Second, the principle that the party with access to the proofs generally bears the burden on an issue should temper, at least to some extent, the quantum necessary to meet the burden. In spoliation circumstances, the party seeking sanctions does not have access to all the necessary proofs in large part because the other side spoliated the evidence." *Id.* at 978-79 (internal citations omitted).

### i. Pre-November 2, 2018 Signal Messages

CTA argues that Pable's Signal messages with Haynes are relevant because Pable and Haynes used Signal to discuss the Dayton Test and their placement on administrative leave. [129] 26.

Pable responds that the CTA has not shown that any of the pre-November 2, 2018 Signal messages are relevant. [139] 33-35. First, Pable testified that, "well before the Dayton incident," he had configured his Signal app to retain only the fifty most recent messages in his conversation threads. [129-7] 29-30, at 417:14-418:21. For that reason, Pable argues, the Signal app on his phone would not have stored any of the messages with Haynes from August 2018. [139] 33. Second, Pable contends that, after he was placed on leave, he communicated with Haynes primarily in person, not through Signal, such that any pre-November 2 Signal messages were unlikely to contain relevant communications. [Id.]. Finally, Pable argues that there is no reason to believe that the pre-November 2 Signal messages "contained any unique or otherwise unavailable information[.]" [Id.] 35. This is the case, Pable explains, because the CTA has access to "hundreds of emails and other contemporaneous documents concerning the events at issue," and that he and Haynes have been "questioned extensively" about the events of August and October-November 2018. [Id.].

In reply, the CTA argues that Haynes's deposition testimony establishes that Pable and Haynes regularly communicated over Signal after they were placed on leave. [153] 7. The CTA also contends that Pable and Haynes's post-November 2 Signal messages demonstrate that they continued to communicate over Signal about the Dayton Test and Pable's anticipated lawsuit against the CTA. [Id.] 7-8. The CTA therefore maintains that there is a high likelihood that the pre-November 2 Signal messages included relevant communications about this case. [Id.]. The CTA maintains that, even if Pable had configured his Signal app to retain only the fifty most recent messages, the message thread with Haynes would likely have contained communications about Pable's placement on leave. [Id.] 7.

The undersigned recommends that the District Judge find that the Signal messages Pable and Haynes exchanged before November 2, 2018 are relevant to Pable's whistleblower claim and the CTA's defenses to that claim.

First, there is no question that Pable and Haynes used Signal to communicate with each other (1) shortly after the Dayton Test, see [129-4] 28, at 105:16-106:3; (2) shortly after the CTA placed them on administrative leave, see [129-1] 13, at 44:7-19, and (3) immediately after their interviews at CTA headquarters on November 2, 2018, see [129-18]. Therefore, even accepting that Pable and Haynes had some in-person discussions after being placed on leave, it is undisputed that they also communicated via Signal. The fact that Pable continued to use Signal after November

35

2 to discuss the Dayton Test and his placement on leave with Haynes supports a reasonable inference that their pre-November 2 Signal messages likewise included discussions about those events. Even a cursory review of the Signal messages that Pable and Haynes exchanged between the evening of November 2 and the evening of November 4–messages that Haynes produced in response to a subpoena in this case–establishes that Pable and Haynes discussed (1) their suspicions that Clever Devices or a coworker at the CTA was "behind this," (2) their respective resignation letters, (3) Pable's "solace" in knowing that he had "a case against the CTA" and his hope that "they terminate me so I can sue the pants off them," (4) Haynes's suggestion that Pable should "blame me!" because "I'm already under the bus, just toss her in reverse," (5) Pable's admission that he felt "partly responsible for making things possible," (6) Pable's litigation strategy, and (7) Pable's efforts to hire an attorney. [129-18] 2-4. Given that Pable and Haynes were communicating via Signal about events relating to the Dayton Test within days after the incident and within hours after Haynes resigned from the CTA, the undersigned has no trouble in recommending that the District Judge find that the deleted messages were very likely to have concerned the same relevant subjects. *See Noland*, 2021 WL 3857413, at *9 (defendants' admissions that they discussed subject matter of litigation on deleted Signal messages "strongly suggests that the deleted ESI was at least potentially relevant to the litigation") (internal quotation marks omitted).

Second, there is no merit to Pable's argument that the pre-November 2 Signal messages are irrelevant because the CTA has deposed Pable and Haynes about their communications and has access to their emails and other contemporaneous communications. As the party accused of having spoliated evidence, Pable has every incentive to downplay or deny the relevance of the ESI at issue. *See Waters v. AIG Claims, Inc.*, --- F. Supp. 3d ----, 2022 WL 2252748, at *12 (M.D. Ala. 2022) (finding that spoliator's argument that destroyed evidence "would have had little probative value" to plaintiff's claims "lacks credibility," "is self-serving," and "would potentially reward the spoliator" if accepted); *cf. Velez v. City of Chicago*, No. 18 C 8144, 2021 WL 3231726, at *2 (N.D. Ill. Jul. 29, 2021) ("one doesn't put the fox in charge of inspecting the hens in the henhouse"). Additionally, the record before the Court demonstrates that Pable has no credibility on issues relating to the spoliation of the Signal messages. The undersigned therefore cannot accept any representations or arguments made by Pable concerning the relevance of the spoliated messages. And from a practical standpoint, it is also unclear what basis Pable–who did not preserve the messages and thus could not have reviewed them any time recently–has to opine that the missing messages contain irrelevant information.

Third, Pable's suggestion that the pre-November 2 Signal messages are cumulative of, or less relevant than, other documents or deposition testimony in the case is purely speculative. Moreover, while it is true that both Pable and Haynes have given lengthy depositions, "[t]he content of text messages cannot be replaced simply by eliciting testimony from [a party or a witness] and by having [another party] accept

that testimony rather than relying on the actual messages to use as they deem fit." *Schmalz*, 2018 WL 1704109, at *4. As was true in *Schmalz*, "without the lost text messages" the CTA has been "deprived of the opportunity to know the precise nature and frequency of [Pable and Haynes's] private communications, which occurred during" several "critical time period[s]." *Id.* (internal quotation marks omitted). The real-time, unguarded communications between Pable and Haynes utilizing an unsanctioned, end-to-end encrypted messaging application are irreplaceable, and certainly impossible to be substituted with deposition testimony from Pable, who has been proven to have lied under oath twice in this litigation.

Fourth, the undersigned rejects Pable's argument that the relevance of the pre-November 2 Signal messages is undermined by the fact that Pable allegedly configured his Signal app to store no more than 50 messages in any given message thread. Most importantly, the undersigned does not credit Pable's claim that he had enabled a fifty-message cap on his Signal message threads. Pable cites no evidence in the record to corroborate this claim, and Pable has twice testified falsely to hide the fact that he himself deleted the pre-November 2 Signal messages. The undersigned also emphasizes that Pable and Duffy spoliated the only source of objective evidence that could have established whether Pable had, in fact, enabled the fifty-message cap: Pable's cell phone. In these circumstances, the District Judge should reject Pable's claim that his Signal app was configured to retain only the fifty most recent messages between himself and Haynes. But even if Pable's testimony were credible, the only effect of the message cap would have been to shrink the pool of relevant messages to those closer in time to Pable and Haynes's "interrogations" by the CTA on November 2. This was a critical time in the case. *See Schmalz*, 2018 WL 1704109, at *4 (spoliated text messages were relevant because they were exchanged at critical time periods); *see also Youngevity Int'l v. Smith*, Case No. 3:16-cv-704-BTM-JLB, 2020 WL 7048687, at *3 (S.D. Cal. Jul. 28, 2020) (holding that defendants' lost text messages "were probably relevant" because they "were exchanged during periods significant to the litigation").

The undersigned accordingly recommends that the District Judge find that the pre-November 2, 2018 Signal messages between Pable and Haynes are relevant to the claims and defenses in this case.

### ii.     Post-October 29, 2019 Signal Messages

The District Judge should also find that the Signal messages Pable exchanged with Haynes while this litigation was pending were relevant and should have been preserved.

Haynes and Pable both testified that, except for in-person meetings in October 2020 and April 2021, their communications took place over Signal. *See* [129-4] 6, at 14:9-17; [*id.*] 60, at 21-23 (Haynes's testimony that he "never" talked to Pable on the

phone, and that he "only use[s] the Signal app as chat"); [129-7] 11, at 344:24-345:12. As Haynes explained, moreover, they discussed aspects of the litigation itself, including likely deponents in the case, materials that Pable produced and received during discovery, and information relating to the CTA's unclean-hands affirmative defense. *See* [129-4] 5, at 13:14-18; [*id.*] 13, at 42:1-17; [*id.*] 13, at 44:1-7; [*id.*] 60, at 231:1-20. There is no question that these messages are relevant to the litigation between Pable and CTA and should have been preserved. After all, as the briefing on the Rule 37(e) motion makes clear, Haynes is a critical witness–and perhaps the most critical witness for Pable–in this case. Indeed, that Pable chose to communicate with Haynes, on whose testimony so much of Pable's case rests, about the litigation using Signal's ephemeral messaging feature is itself highly relevant because it is very likely to affect the jury's view of Haynes's credibility (to say nothing of Pable's own credibility). Finally, it is reasonable to infer that the post-October 29, 2019 Signal messages may have been relevant to the CTA's position that Pable and Haynes, the self-proclaimed scapegoat, colluded to conduct the Dayton Test, that they agreed to place blame for the incident solely on Haynes, and that Pable was fired, not because he was a whistleblower, but because he was a bad actor whose misconduct violated CTA policy and procedures and jeopardized CTA's contract with Clever Devices.

### iii. Pable's Cell Phone

Finally, the District Judge should find that Pable's cell phone was relevant and should have been preserved. Pable used his cell phone at critical times–immediately before and after the Dayton test, during the following weeks, and shortly before Pable and Haynes's interviews with the CTA on November 2, 2018–to communicate about the very events on which Pable's lawsuit depends. In granting the CTA's earlier motion to compel a second imaging of Pable's phone, the undersigned found that "the information that the CTA seeks" in the imaging–"communications between Pable and Haynes about the Skeleton Key"–"goes to the heart of Pable's claim against the CTA[.]" [54] 5; *Pable*, 2021 WL 4789023, at *3.

In addition, Pable's phone became even more relevant because of Pable's own actions and the positions he has taken during the litigation. For one thing, Pable tried to place the blame on the CTA–and the CTA's remote wiping of the phone that allegedly occurred when CTA disabled his access to its networks–for the paltry amount of data that existed on his phone when the first image was taken. *See* [45-1] 72 (Nov. 29, 2020 email from Duffy to CTA counsel) ("With respect to Mr. Pable's phone, please recall that a great deal of the data stored on and accessible via the phone was lost when the CTA wiped the device without notice to Pable and, apparently, with no though to preserving any data that might be on it[.]").[12] It

---

[12] The undersigned observes that, even though Pable has maintained this position for more than two years and alludes to it in his opposition brief, *see* [139] 7, there does not appear to be any evidence in the record to support it (at least, Pable's brief cites no such evidence). And due to Pable's failure to properly preserve and image his cell phone, the CTA has no ability

therefore became incumbent on the CTA to secure access to the phone and understand what data existed on the phone and why no other data remained. For another, Pable has claimed that he configured his Signal app to (1) store no more than fifty messages in a message thread at any given time, and (2) automatically delete any message threads associated with an altered Safety Number. There is no evidence in the record to corroborate either of these claims. Had Pable properly preserved and imaged his phone, the imaging process might have confirmed–or debunked–these claims, thus establishing another reason why the phone was relevant.

### 4. Pable Failed to Take Reasonable Steps to Preserve the Signal Messages and His Cell Phone.

The District Judge should find that Pable not only failed to preserve relevant ESI, but that he also intentionally spoliated the Signal messages and his cell phone.

### i. Pable Intentionally Deleted the Pre-November 2, 2018 Signal Messages.

CTA contends that Pable intentionally and permanently deleted his entire Signal message history with Haynes. [129] 24-25. As the CTA explains, Pable testified that his Signal messages with Haynes were deleted from the Signal app on his phone when Haynes deleted their message thread from his own phone. *See* [129-7] 20, at 380:10-381:10; [*id.*] 20-21, at 381:17-383:16. CTA argues that this testimony was "an unequivocal lie" because the version of Signal operating in 2018 did not permit Haynes to "use[ ] his own phone to unilaterally delete all of his Signal messages he shared with Pable off of Pable's phone." [129] 25. This argument is based on the affidavit of Signal's Chief Operating Officer Aruna Harder, who averred that "Signal has never had a feature allowing a Signal user to unilaterally, manually, and permanently delete messages they *received* in a Signal message thread from the electronic devices of any or all other Signal users in the same message thread." [129-17] 4, at ¶ 9 (emphasis in original).

Pable offers a two-fold response. First, Pable maintains that the Harder affidavit establishes only that, in November 2018, it would have been impossible for "**specific messages** within a conversation thread to be deleted remotely by the sending user" and for "the recipient of a message to delete a **specific message** in a conversation thread from that thread on another device." [139] 18 (emphases in original). Pable argues that these points are irrelevant because Haynes "did not delete individual messages in his conversation thread with Pable." [*Id.*]. Rather, Haynes "deleted the entire conversation thread," and Pable maintains that nothing in Harder's affidavit addresses whether Haynes's deletion of his entire message thread would have caused the entire thread to be deleted from Pable's phone. [*Id.*].

---

to refute Pable's claim, as well.

Second, Pable contends that Haynes's deletion of the Signal thread would have triggered a change in the Safety Number associated with his and Haynes's conversation thread. [*Id.*]. As noted above, the Safety Number is a unique code that identifies each Signal conversation thread and can change in a variety of circumstances. *See* [139-1] 6, at ¶ 20. Because Pable had, at some unspecified time prior to November 2, 2018, "coded" his "installation of Signal . . . to delete any such potentially compromised conversations," Haynes's deletion of their conversation thread on his own phone caused the Safety Number associated with their thread to change, which, in turn, caused Pable to "los[e] access to [his] recent messages with Haynes." [*Id.*], at ¶ 24. Because the deletion of his Signal messages with Haynes was an automatic result of Haynes's deletion of the messages–about which he had no advanced notice–and Pable's prior "cod[ing]" of his own Signal app, Pable contends that he did not fail to take reasonable steps to preserve the ESI at issue.

The case law is unsettled as to whether CTA or Pable bears the burden of proving that reasonable steps to preserve the ESI were not taken. *See DR. Distribs.*, 513 F. Supp. 3d at 979. In the context of a common-law spoliation claim respecting non-ESI evidence, the party bringing a spoliation motion has the burden of proof. *See, e.g.*, *Bowen v. Bredemann*, Case No. 18-cv-675-pp, 2020 WL 5821801, at *2 (E.D. Wis. Sept. 30, 2020). As the court observed in *DR Distributors*, "burdens of proof generally fall on the party with better access to the information," such that "[i]t seems odd to place the burden on the movant to show that the party that unquestionably destroyed the ESI failed to take reasonable steps to preserve the destroyed evidence." 513 F. Supp. 3d at 979. The undersigned does not believe that the District Judge needs to resolve that question because, even if CTA has the burden of proof, it has established that Pable purposefully destroyed the pre-November 2, 2018 Signal messages.

The undersigned recommends that the District Judge find that Pable intentionally destroyed the Signal messages he exchanged with Haynes, and that Pable's two attempts to blame Haynes for the deletion of the messages are false.

At his first deposition, on March 11, 2021, Pable testified that he communicated with Haynes over Signal in the fall of 2018. [129-1] 5, at 10:16-12:3; [*id.*] 39, at 149:2-8. Pable discussed the Signal messages that Haynes had produced in response to the CTA's subpoena, *see* [*id.*] 39-44, but he was not asked whether the messages existed on his own phone or about Haynes's deletion of the text messages. Pable was deposed again in July 2021–after Haynes had testified at his own deposition that he deleted his Signal message thread with Pable on November 2, 2018. During this deposition, Pable gave two reasons for why Haynes's deletion of their Signal message thread on Haynes's phone caused the thread to be deleted from his own phone. First, Pable testified that, when Haynes deleted the message thread from his own phone, Haynes "had the option to have [the messages] deleted off of [Pable's] phone as well[.]" [129-7] 21, at 382:13-17. Pable explained that a Signal user

who wants to delete messages "is prompted, like which deletion policy do you want to use." [*Id.*], at 382:16-17. In response to a question whether Pable understood that Haynes "elected to delete for both you and him on your phone," Pable testified that "[i]t's possible he elected to do that," but "[y]ou would have to get the exact version of Signal that his phone was running at that time to see what the specific behavior was." [*Id.*], at 383:4-9. Second, Pable suggested that the automatic deletion occurred on his phone simply because he and Haynes were both Signal users. *See* [*id.*] 20, at 381:22-24 ("So when he deleted them they no longer existed on my device since we were both Signal users."). No mention was made of the Safety Number or Pable's having configured his Signal app to delete any conversation affected by a change in the associated Safety Number, despite their obvious relevance to this line of questioning.

Evidence obtained by the CTA after Pable's second deposition–the Harder affidavit–establishes that Pable's testimony could not have been true. Harder testified that Signal "has never had a feature allowing a Signal user to unilaterally, manually, and permanently delete messages they *received* in a Signal message thread from the electronic devices of any or all other Signal users in the same message thread." [129-17] 4, at ¶ 9 (emphasis in original). Applied to the facts of this case, Harder's affidavit establishes that Haynes could not have "unilaterally, manually, and permanently delete[d] messages [he] received [from Pable] in a Signal message thread from the [phone] of any or all other Signal users"–that is, Pable–"in the same message thread." Only in May 2020, long after Haynes deleted his Signal messages with Pable, did Signal offer users a limited ability to delete messages that had been sent to other Signal users. As Harder explained, individual messages could be deleted by the sending user, but only within three hours after the message had been sent. *See* [129-17] 4, at ¶¶ 7-8.

Pable's attempt to resist this conclusion by purporting to distinguish a Signal user's ability to delete an entire message thread from the user's inability to delete individual messages within that thread is not credible. In Pable's view, Harder's affidavit "says **nothing** as to the ability or effect of a user deleting **an entire conversation thread**"–and thus leaves open the possibility that Haynes, by deleting the entire message thread on his own phone, caused the deletion of the entire thread on Pable's phone. [139] 18 (emphases in original). But Harder was clear that Signal users have "never" been able to delete "messages" they received in a Signal thread "from the electronic devices of any or all other Signal users in the same message thread." [129-17] 4, at ¶ 9. The only plausible reading of this statement is that, as of November 2018, Signal users could not delete any messages–whether a single message, more than one message, or an entire message thread–that had been received from another user from that other user's electronic device. Pable's reading, in contrast, creates an internal contradiction in the affidavit. If Pable's understanding were correct, then a Signal user who admittedly cannot delete "messages" that he received from another user from that user's electronic device can nevertheless delete a thread of "messages" he received from another Signal user from that other user's

41

device.[13] Yet Harder, who has worked for Signal since 2018 and was obviously "familiar with . . . Signal's operations and the services it has offered over time," including "Signal's free messaging platform," as well as the "changes made to Signal's messaging platform over time" [*id.*] 3, at ¶¶ 2-3, drew no such distinction, and the undersigned finds it incredible to think that Harder would have ignored or overlooked such a distinction, had it existed. Nor has Pable offered any evidence–whether from Harder, from Signal, or from any other source–to support his theory. Harder's affidavit establishes, in short, that Pable's first explanation of how his Signal messages with Haynes disappeared from his phone was false.

Multiple considerations have also convinced the undersigned that Pable's second explanation of how the Signal messages disappeared from his phone is also a fabrication. To begin, Pable never mentioned Signal's Safety Number feature or having configured his Signal application to delete a message thread in response to an altered Safety Number at any point during this litigation until he executed his August 2022 affidavit. Incredibly, Pable even failed to mention these points during his second deposition, when the CTA questioned him at length about Haynes's deletion of their Signal message thread and the effect that this had on the messages stored on Pable's phone. Pable's supposed configuration of his Signal app to "delete any such potentially compromised conversation" [139-1] 6, at ¶ 24, was directly responsive to the CTA's questions, yet Pable failed to mention this critical information.

Moreover, Pable's first and second explanations conflict in a critical way. At his deposition, Pable testified that it was the settings on Haynes's phone, and the deletion-policy choice that Haynes had made, that caused their message thread to be deleted from his own phone. Pable thus explained that Haynes "had the option to have [the messages] deleted off of [my] phone as well[.]" [129-7] 21, at 382:13-17. Pable added that a Signal user wishing to delete messages "is prompted, like which deletion policy do you want to use." [*Id.*], at 382:16-17. To understand exactly what had happened, Pable continued, the CTA "would have to get the exact version of Signal that [Haynes's] phone was running at that time to see what the specific behavior was." [*Id.*], at 383:4-9. In contrast, Haynes's actions are essentially irrelevant to the account in Pable's affidavit. What mattered, according to the affidavit, was not "the option" Haynes had "to have [the messages] deleted off of [Pable's] phone" or "the exact version of Signal that [Haynes's] phone was running at that time." What mattered were the settings on Pable's own Signal app, which he supposedly configured at some earlier time to delete any conversation thread affected by a changed Safety Number. This dramatic shift in whose actions caused the deletion of the Signal messages from Pable's phone between the deposition and the affidavit gives the undersigned further reason to disbelieve Pable's affidavit.

---

[13] Pable does not dispute, nor does he offer any evidence rebutting, Harder's testimony that it is not possible for a Signal user to delete individual messages that he received from the electronic device of another user in the same Signal thread.

Furthermore, the changes in Pable's explanations are almost certainly responses to the Harder affidavit, which was executed and produced to Pable after his second deposition. Because Harder's affidavit conclusively establishes that Haynes could not have caused the deletion of the Signal message thread on Pable's own phone, Pable needed a different story to explain the missing messages. But given how late in the day that story surfaced, Pable's inexplicable failure to mention the Safety Number issue at his second deposition, and the fundamental contradiction between his deposition testimony and his affidavit, the undersigned can only conclude that the account Pable gave in the affidavit is false.

Finally, Pable's testimony that he "felt a little hurt" after discovering that Haynes had deleted their Signal messages, and that he felt like his "past" and "a third of his life was just being erased," is not supported by contemporaneous evidence and is otherwise non-sensical. As noted above, Haynes produced copies of the Signal messages he exchanged with Pable between the afternoon of November 2, 2018 and October 29, 2019. *See* [129-18]. This message thread begins with a message sent by Pable on November 2, 2018 at 1:20 p.m.–immediately after his and Haynes's interviews with the CTA–in which he asks Haynes, "Otc or hill?" [*Id.*] 2. About two hours later, Pable sent Haynes another message, saying he was "[c]urious about your [resignation] letter when you get a chance." [129-18] 2. Nowhere did Pable ask Haynes what happened to their earlier Signal messages or express surprise or hurt feelings at Haynes's having "erased" "a third of [Pable's] life." The latter claim, in particular, makes little sense: if Pable had in fact enabled the fifty-message cap for his Signal messages, it would be hard to believe Pable that the thread represented a third of his life. While the undersigned bases her conclusion that Pable deleted the Signal messages primarily on the considerations discussed above, this finding provides additional corroboration for that conclusion.

In sum, Pable has offered an evolving account of the events that caused the deletion of his Signal messages with Haynes from his phone. The first explanation, given under oath at Pable's deposition, was thoroughly debunked by the evidence from Signal's COO that Signal did not function in the way that Pable had testified. After being confronted with the Harder affidavit, Pable abandoned his earlier explanation and offered a new version of events that accounts for the Harder affidavit but does not explain why Pable initially attributed the loss of the messages to the setting on Haynes's Signal app or why Pable never mentioned the Safety Number issue before. In these circumstances, the undersigned believes that both of Pable's accounts are false, and that the only reasonable explanation for the disappearance of the message thread from Pable's phone is that Pable himself intentionally deleted it. Accordingly, the undersigned recommends that the District Judge find that Pable not only failed to take reasonable steps to preserve this ESI, but that he intentionally spoliated it.

The undersigned further recommends that the District Judge find that Pable deleted the Signal messages on November 2, 2018. There is no dispute that Haynes deleted his Signal messages with Pable that day, before his and Pable's respective interviews with the CTA: the Signal message thread that Haynes produced begins with a message from Pable to Haynes at 1:20 p.m. on November 2, 2018. *See* [129-18] 18. In describing his meeting with Pable at the Starbucks on November 2, moreover, Haynes testified that he and Pable "just felt we don't need any of these old conversations . . . and we deleted those." [129-4] 6, at 17:19-21. This testimony supports a reasonable inference that Pable and Haynes jointly decided to delete the Signal messages. Furthermore, by November 2, 2018, Pable was already anticipating and planning for litigation against the CTA by soliciting lawyers. Knowing that these messages were likely to damage his case, Pable would have had a motivation to destroy them. Most importantly, however, Pable gave two false accounts–under oath– about how Haynes's deletion of the Signal messages on November 2, 2018 caused those same messages to disappear from his Pable's own phone. The fact that Pable tried to establish that his messages were deleted on November 2, 2018, in conjunction with Haynes's deletion of his messages, further supports the finding that Pable deleted his Signal messages on November 2. The preponderance of the evidence thus establishes that Pable deleted the Signal messages on November 2, 2018.

To require the CTA to prove with greater certainty or even more evidence that the messages were deleted on November 2, 2018 would reward Pable for his spoliation of the Signal messages and of his cell phone, which is the only piece of objective evidence that could have definitively established when Pable deleted the messages. *See In re Stillwater Asset Back Offshore Fund Ltd.*, Case No. 12-14140 (MEW), 2017 WL 1956848, at *8 (Bankr. S.D.N.Y. May 10, 2017) (courts "do not permit a spoliator to benefit from the fact that the evidence which would demonstrate their culpability was destroyed by the spoliator's own actions"). Indeed, given Pable's false testimony about the loss of the pre-November 2, 2018 Signal messages, there is little reason to think CTA could ever prove definitively when the deletion occurred. *Cf. Hollis*, 603 F. Supp. 3d at 621 ("In the context of destroyed ESI, generally, the movant would not have access to the information programs or systems or the relevant resources and skills of the party that destroyed the ESI."). Regardless of these concerns, the most reasonable inference to draw from the record is that Pable deleted the messages on November 2, 2018, after his duty to preserve arose.

Finally, the undersigned recommends that the District Judge find that, even if Pable had activated a fifty-message cap on his Signal message threads,[14] Pable's failure to disable that cap on or after October 29, 2018 contributed to the spoliation of the pre-November 2, 2018 Signal messages. But for Pable's failure to disable this setting, there would have been a larger cache of Signal messages on the phone when Pable deleted the thread. Pable's failure to disable the fifty-message cap therefore

---

[14] To be clear, the undersigned does not credit Pable's claim that he activated a fifty-message cap for the reasons discussed above.

represents a further failure to take reasonable steps to preserve ESI. *See DR Distribs.*, 513 F. Supp. 3d at 979 ("[d]isabling an autodeletion function is universally understood to be one of the most basic and simple functions a party must do to preserve ESI").

### ii. Pable Intentionally Activated the Disappearing Messages Function, Thereby Spoliating the Post-October 29, 2019 Signal Messages.

The undersigned also recommends that the District Judge find that Pable failed to take reasonable steps to preserve the Signal messages. Indeed, by enabling the Disappearing Messages setting, Pable took deliberate action to ensure that these messages would not be preserved. Pable also failed to take the simple step of disabling this setting. *See D.R. Distribs.*, 513 F. Supp. 3d at 979 (emphasizing ease with which an auto-delete setting can be disabled); *Paisley Park Ents., Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) ("It takes, at most, only a few minutes to disengage the auto-delete function on a cell phone.").

Pable responds that his use of the Disappearing Messages feature cannot amount to spoliation of evidence because the undersigned previously denied the CTA's request to order Pable to disable the Disappearing Message function. [139] 37. This argument fails for multiple reasons. Most importantly, the CTA's Rule 37(e) motion raises very different questions than the question raised by the CTA's earlier request. That request required the undersigned to decide whether a prospective order, requiring Pable to disable the Disappearing Messages function for his future communications with Haynes–as a specific means of executing his duty to preserve evidence–was warranted by the evidence then before the Court.[15] *See* [85] 6-7; *Pable*, 2021 WL 4789028, at *4-5. In denying the request, the undersigned relied on (1) the CTA's inability to cite relevant case law supporting its request, (2) questions about the efficacy of such an order given that the undersigned could not order Haynes to similarly disable the Disappearing Messages function, and (3) Duffy's representation that Pable "has been instructed to preserve any written communications he may receive or send to Mr. Haynes, including any Signal messages, but that he may do so by any other means that preserves all the relevant information[.]" [85] 6.[16] CTA's Rule 37(e) motion, however, asks whether Pable's undisputed failure to disable the Disappearing Messages settings for his messages with Haynes amounts to spoliation

---

[15] With the benefit of hindsight, the undersigned recognizes it was an error to deny the CTA's request for such an order. Although there were valid reasons for that decision, judicial intervention was warranted to curb Pable's communication, via ephemeral messaging, with a critical witness while this litigation was pending.

[16] The brief in which this representation was made did not specify when Duffy had so instructed Pable. Given the course of events described in this decision, however, the instruction either came too late to preserve the relevant post-October 2019 Signal messages or was entirely disregarded by Pable.

of evidence and, if so, warrants either curative measures or sanctions. It is therefore no surprise that Pable has not pointed to any language in the September 13, 2021 decision refusing to order Pable to disable the Disappearing Messages function suggesting that Pable's having communicated with Haynes, over Signal and with Disappearing Messages enabled, during the pendency of the litigation was appropriate or consistent with his duty to preserve evidence.

For these reasons, the District Judge should find that Pable failed to take reasonable steps to preserve the post-October 29, 2019 Signal messages.

### iii. Pable Failed to Take Reasonable Steps to Preserve His Cell Phone.

Finally, the District Judge should find that Pable and Duffy failed to take reasonable steps to preserve Pable's cell phone. As the undersigned explains below in more detail, Duffy agreed to preserve Pable's cell phone and represented to the CTA that a complete forensic image of Pable's phone had been created. *See* [45-1] 6, 8 (Duffy agreeing to preserve "Plaintiff's devices"); [*id.*] 17 (informing CTA that Pable's phone had been imaged and plaintiff was "in the process of running the search terms without regard to any distinction between his personal and work profiles"); [*id.*] 57-58 (describing image as "a complete forensic image" and "a complete image of the data on the phone when the phone was imaged"). Subsequent discovery served on Quest established that Duffy neither obtained a complete forensic image of the phone nor asked Quest to preserve all user-generated data on the phone. *See* [93] 14, at 46:3-5; [*id.*] 27, at 101:3-7. In addition, the "complete forensic image" that Duffy instructed Quest to produce contained only 0.2 GB of user-generated data, only five SMS text messages (which were exchanged nearly two years after the Dayton test), no information or data associated with more than 75% of the third-party applications on the phone, and no internet browsing or search histories. *See* [54] 3; *Pable*, 2021 WL 4789023, at * 3.

### 5. The ESI Cannot Be Restored or Replaced through Other Discovery.

The undersigned recommends that the District Judge find that none of Pable and Haynes's Signal messages can be restored or replaced through additional discovery. The Harder affidavit establishes that Signal does not "possess or control backups or copies of Signal messages sent and received by Signal users . . . due to the Signal messaging platform's end-to-end encryption protocol." [129-17] 5, at ¶ 10. Moreover, the Disappearing Messages function ensured the "automatic and permanent deletion of all messages sent and/or received in a Signal message thread from the electronic device[s] of all Signal users in the same message thread after a designated period of time from sending and/or reading a message." [*Id.*] 3, at ¶ 5. Haynes testified that Pable had set the messages to disappear within 24 hours [129-

4] 57, at 220:11-15, and none of the Signal messages exist on Pable's or Haynes's phones. It bears repeating that the real-time and unguarded communications that Pable and Haynes had about work and litigation matters over an end-to-end encrypted application like Signal cannot be replaced with or replicated by any other form of discovery, and that, because of Pable's failure to preserve these messages, the scope and quality of the irreplaceable discovery will never be known.

As for Pable's phone, Pable failed to properly preserve it once his duty to do so arose, and Duffy did not instruct Quest to generate a complete image of Pable's phone or preserve all data that existed on the phone when the phone was delivered to Quest. *See* [91-5] 28, at 222:8-9; [93] 27, at 101:3-7. As a result, neither the user-generated data on the phone from the time of the Dayton test and what followed in October and November of 2018, nor the phone's settings, can be reproduced. Moreover, Pable testified that the "personal partition" on his phone was purportedly "wipe[d]" when he started a new job in December 2018 and connected the phone to his employer's network. [129-1] 50, at 192:21-193:6. Again, the scope and quality of what was lost will never be known. For these reasons, the District Judge should find that the contents of Pable's cell phone cannot be restored or replaced through other discovery.

## C.    Pable Intended to Deprive the CTA of the ESI.

"Intent and prejudice are both separate and related concepts under Rule 37(e)." *DR Distribs.*, 513 F. Supp. 3d at 980. As noted above, "[i]ntent must be established before a court can impose sanctions, such as adverse jury instructions, default, and dismissal under Rule 37(e)(2). If intent is established for these sanctions, prejudice need not be separately established because prejudice is assumed from the intent." *Id.* (internal citation omitted). "[I]ntent is difficult for a moving party to prove and for a court to find," and "[t]he evidence used to establish intent is almost always circumstantial[.]" *Hollis*, 603 F. Supp. 3d at 623. Although "[t]here need not be a 'smoking gun' to prove intent . . . there must be evidence of a serious and specific sort of culpability regarding the loss of the relevant ESI." *Paisley Park*, 330 F.R.D. at 236 (internal citation and quotation marks omitted). For a court to impose terminating sanctions under Rule 37(e)(2), the spoliator's intent to deprive must be proved by a preponderance of the evidence. *Ayers v. Heritage-Crystal Clean, LLC*, No. 1:20-cv-5076, 2022 WL 2355909, at *3 (N.D. Ill. Jun. 1, 2022); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777-78 (7th Cir. 2016) (court may dismiss case for discovery-related misconduct under Rule 37 or court's inherent authority if misconduct is established by preponderance of evidence).

"Prejudice under Rule 37(e) means that a party's ability to obtain the evidence necessary for its case has been thwarted." *DR Distribs.*, 513 F. Supp. 3d at 981. "Establishing prejudice when the ESI has been destroyed and the contents are unknown can be challenging." *Schmalz*, 2018 WL 1704109, at *3. "Under Rule 37(e), the ESI has been lost. It's gone. So, prejudice takes on an additional consideration.

47

Courts must consider the harm caused not only under the general concept of prejudice in other Rule 37 contexts, but also in the context of determining the harm inflicted on account of the non-existence of relevant information." *DR Distribs.*, 513 F. Supp. 3d at 981. In light of these concerns, the Advisory Committee has suggested that courts have considerable discretion in resolving the prejudice issue:

> The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in some such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment.

### 1. Pre-November 2, 2018 Signal Messages

The CTA argues that the only reasonable conclusion to draw from Pable's spoliation of the pre-November 2, 2018 Signal messages is that "Pable intentionally deleted them because they were bad for his lawsuit[.]" [153] 8. CTA also contends that the spoliation unfairly prejudiced it because the messages "may have revealed communications regarding the Dayton Test, including any plans to 'throw Haynes under the bus' in furtherance of Pable's litigation against the CTA." [*Id.*]. In response, Pable repeats his argument, which the undersigned has already rejected, that the CTA has not established that he deleted the messages. [139] 34. Alternatively, Pable argues that the CTA was not prejudiced by the loss of the Signal messages because "[t]his is not a case where any of the key events took place over or via Signal messages," and "there is no indication [the spoliated] messages would form any necessary part of the CTA's defense[.]" [*Id.*] 36. Pable also suggests that the lack of prejudice is apparent from the CTA's failure to ask Pable or Haynes to preserve their communications during its internal investigation. [*Id.*].

Given the undersigned's recommended finding that Pable intentionally deleted his pre-November 2, 2018 Signal messages with Haynes, the undersigned also recommends that the District Judge find that Pable intended to deprive the CTA of the use of the Signal messages in this litigation. Pable fabricated two materially inconsistent accounts of the events that allegedly precipitated the deletion of his and Haynes's Signal messages from his phone. He first sought to deflect responsibility for the deletion onto a non-party and then, after being confronted with evidence directly

from Signal that refuted his explanation, changed course and blamed a supposedly pre-existing configuration on his Signal app that he had never disclosed before. Pable's shifting stories about the circumstances surrounding the deletion of the Signal messages are compelling evidence that Pable did not want the CTA to have access to the pre-November 2, 2018 Signal messages and acted to ensure that it could not access them. In addition, there is no evidence in the record to corroborate or confirm either of Pable's explanations for how the messages were supposedly deleted from his phone. Because there is no other credible explanation for why these messages have been deleted from Pable's phone, the undersigned recommends that the District Judge find that Pable deleted them with the intent to deprive the CTA of their use in the litigation. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (finding that plaintiffs acted with intent to deprive defendants of certain email-related ESI because, absent "any other credible explanation for [plaintiff's alteration of] the email addresses, it is more than reasonable to infer that the intention was to manipulate the digital information specifically for purposes of this litigation").[17]

## 2.    Post-October 29, 2019 Signal Messages

The undersigned further recommends that the District Judge find that Pable activated the Disappearing Messages function to deny the CTA access to his post-October 29, 2019 Signal messages. The undersigned bases this recommendation on the following considerations. First, Pable is a sophisticated user of technology and understood that, with the Disappearing Messages setting enabled, any Signal message he sent with Haynes would be permanently deleted. *See* [129-1] 5, at 11:22-12:3 (Pable's testimony that he used Signal because of its "ephemeral messages" function). Second, the evidence is clear that Pable made a deliberate choice to enable the Disappearing Messages function. Pable and Haynes had been communicating over Signal prior to October 29, 2019, and Haynes was able to produce those messages during discovery. *See* [129-18]. After October 29, however, there is no record of their messages because of Pable's activation of the Disappearing Messages setting. Third, Pable activated Disappearing Messages long after his duty to preserve arose, which supports a reasonable inference that Pable intended that these messages would be destroyed shortly after they had been sent. "A client's use of ephemeral messaging

---

[17] The undersigned also rejects Pable's argument that the Court should permit the jury to decide this issue. [139] 7. The Advisory Committee's Note states that a finding of intent "may be made by the court when ruling on a pretrial motion[.]" *See* Fed. R. Civ. P. 37, Advisory Committee Note, 2015 Amendment. And because the undersigned has found that there is only one reasonable conclusion to draw on the issue of Pable's intent to destroy the Signal messages, there is no basis to submit this issue to the jury. *Cf. DR Distribs.*, 513 F. Supp. 3d at 981 ("So, because reasonable people could disagree as to whether Defendants intended to destroy this ESI, the Court is leaving this issue to the jury to determine and will not impose sanctions under Rule 37(e)(2).").

for relevant communications after a duty to preserve has arisen may be particularly problematic, as it would have the potential to deprive adversaries and the court of relevant evidence." The Sedona Conference, *The Sedona Conference Primer on Social Media*, 20 Sedona Conf. J. 1, 90-91 (2019). Fourth, Pable continued to communicate with Haynes from October 2019 through as late as March 2021, shortly before Haynes's deposition, despite knowing that his communications would be permanently deleted. Fifth, taken at face value, Duffy's representation in opposition to the CTA's request that Pable disable Disappearing Messages establishes that Pable had been told by counsel of the need to preserve relevant evidence, yet he continued to use an ephemeral messaging system to communicate with one of the key witnesses in the case.

In these circumstances, the undersigned finds Pable's claim that he enabled Disappearing Messages "as a matter of general practice for automated data hygiene, privacy and security purposes" to be completely incredible. [139-1] 7, at ¶ 26. Pable does not explain why, for example, he communicated with Haynes over Signal without activating Disappearing Messages from at least August 2018 through October 2019, despite his concerns about data hygiene, privacy, and security. Nor does Pable explain why he discussed the case with Haynes over Signal despite his counsel's admonition to preserve communications about the case. The lack of any credible explanation for Pable's actions is powerful circumstantial evidence that Pable acted with the intent to deprive the CTA of access to these messages. *See CAT3, LLC*, 164 F. Supp. 3d at 501.

### 3.     Pable's Cell Phone

Finally, the undersigned recommends that the District Judge find that Pable and Duffy intended to deprive the CTA of the contents of Pable's cell phone. Despite agreeing to the CTA's request to preserve the cell phone, Duffy not only failed to obtain a complete image of the phone; he falsely represented to the CTA and the Court that he had, in fact, obtained "a complete forensic image" of the phone that was a "complete image of the data on the phone when the phone was imaged."[18] He then failed to correct the record or otherwise disclose that no complete image had been obtained at any point in the litigation. In addition, Pable and Duffy maintained that the first image of Pable's phone contained 0.2 GB of user-generated data because the CTA had remotely wiped the phone. *See* [45-1] 58. However, Pable and Duffy have not established that such a remote wipe ever occurred—let alone that it caused the deletion of any specific data on Pable's phone. Indeed, there is no convincing or even satisfactory explanation in the record for what happened to the data on Pable's phone between the time his duty to preserve arose on October 29, 2018 and when the first and second images were produced. Given Duffy's false representations respecting the

---

[18] As explained below, Duffy's representation to the Court that nothing had been removed from the image produced to the CTA was false because that image did not include the Signal files that Quest had extracted during the imaging process.

first image, Pable's sophistication as a technology user, and the absence of any plausible explanation for what happened to the cell phone, the District Judge should find that Pable intended to deprive the CTA of the phone's use in this litigation.

### D. Dismissal Is the Appropriate Sanction for Pable's Intentional Spoliation of Multiple Categories of ESI.

"Courts should exercise caution . . . in using the measures specified in (e)(2)." Fed. R. Civ. P. 37(e), Advisory Committee Note, 2015 Amendment. "The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss." *Id.* However, a court need not find that the spoliation prejudiced the opponent before imposing terminating sanctions under Rule 37(e)(2). "This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Rule 37(e), Advisory Committee Note, 2015 Amendment; *see also TLS Mgmt. & Marketing Servs., LLC v. Mardis Fin. Servs., Inc.*, Cause No. 3:14-CV-881-CWR-LRA, 2018 WL 3673090, at *7 (S.D. Miss. Jan. 29, 2018) (in deciding whether terminating sanctions are warranted, "[t]he measure of the crime is *not* the harm to the opposing party, but is rather the severity of the data destruction") (emphasis in original).

The undersigned recommends that the District Judge sanction Pable under Rule 37(e)(2)(C) by dismissing his complaint with prejudice. Although neither Rule 37(e) nor the Advisory Committee Note provides explicit guidance on how a court that has found an intent to deprive should determine the proper sanction, the undersigned has relied on four considerations in arriving at the proposed sanction of dismissal with prejudice.

First, Pable repeatedly and intentionally spoliated multiple categories of ESI with the intent to deprive the CTA of that evidence: the pre-November 2, 2018 Signal messages; the post-October 29, 2019 Signal messages; and his cell phone. The sheer scope of the spoliation–"combined with the commonsense assumption, built into Rule 37(e)(2), that parties who engage in intentional spoliation have something to hide"– weighs in favor of dismissal. *Williams v. Am. Coll. of Educ., Inc.*, No. 16 C 11746, 2019 WL 4412801, at *15 (N.D. Ill. Sept. 16, 2019); *see also Global Materials Techs.*, 2016 WL 4765689, at *9-10 (entering default judgment under Rule 37(e)(2)(C) where defendants "disposed of [corporate] computers while the lawsuit was pending," "eras[ed] email[s]," and "lied" about extent of spoliation); *WeRide Corp. v. Kun Huang*, Case No. 5:18-cv-07233-EJD, 2020 WL 1967209, at *9-12 (N.D. Cal. Apr. 24, 2020) (imposing terminating sanctions under Rules 37(b) and 37(e) where defendant maintained company-wide email-deletion policy, deleted specific email accounts, and

wiped multiple employees' computers); *OmniGen Research v. Yongqiang Wang*, 321 F.R.D. 367, 372-77 (D. Ore. 2017) (imposing terminating sanctions under Rule 37(e)(2) where defendants deleted documents and emails, deleted metadata, and "donated [a] computer to Goodwill").

Second, Pable and Duffy lied repeatedly in connection with their spoliation of the ESI. For his part, Pable fabricated two under-oath explanations for why the pre-November 2, 2018 Signal messages had disappeared from his cell phone. *Accord Williams*, 2019 WL 4412801, at *15 (N.D. Ill. Sept. 16, 2019) (dismissing plaintiff's case under Rule 37(e) and court's inherent authority where plaintiff "destroyed evidence with the intent to deprive [defendant] of the destroyed information's use in the litigation, and threw up a smokescreen of farfetched fabrications in an effort to evade consequences for that misconduct") (internal quotation marks, citation, and some brackets omitted). Similarly, Duffy sought to assuage the CTA's concerns about whether the image of Pable's phone that Duffy obtained in June 2020 was complete by falsely representing that it was a "complete forensic image" of "the data on the phone when the phone was imaged." Later, Duffy misrepresented that nothing had been removed from the image produced to the CTA. Pable and Duffy's dishonesty in connection with their spoliation efforts weighs strongly in favor of the harshest sanction available. *See Global Materials Techs.*, 2016 WL 4765689, at *9 (imposing terminating sanctions under Rule 37(b) and Rule 37(e) where "defendants lied" and "[t]heir dishonesty" led court to conclude that, "when defendants discarded one source of electronic evidence and failed to preserve others, they did so deliberately and in order to prevent [plaintiff] from obtaining that evidence and using it against defendants in the litigation"); *Williams*, 2019 WL 4412801, at *15 (dismissing case where plaintiff destroyed laptop with intent to deprive defendant of its use during litigation and lied under oath about spoliation).

Third, this is not a case where the spoliated information was "relatively unimportant" or relevant only to a peripheral issue. Rule 37(e), Advisory Committee Note, 2015 Amendment. To the contrary, the spoliation has severely impaired the CTA's ability to defend against the whistleblower claim. The CTA maintains that Pable was not a whistleblower, but a bad actor who colluded with Haynes to conduct the Dayton Test–thereby violating CTA rules and policies and jeopardizing the CTA's contract with Clever Devices–and plotting to place the blame for the incident on Haynes alone. At the most critical times–immediately before and after the Dayton Test, after their placement on administrative leave, and in the run up to their "interrogations" at CTA headquarters on November 2, 2018–Pable and Haynes resorted to using Signal, an end-to-end encrypted messaging application, unsanctioned by CTA, to discuss work activities. That Pable later intentionally deleted these messages on November 2 implies that the messages were harmful to his case, and the spoliation has deprived the CTA of the ability to use the messages to rebut or refute Pable's claimed whistleblower status or any exculpatory testimony he, or the scapegoat Haynes, may give at trial. *See Schmalz*, 2018 WL 1704109, at *4

(discussing why spoliation of text messages can prejudice party bringing spoliation motion); *see also Collins-Williams v. Contour Eastwyck LLC*, Civil Action No. 1:20-CV-3129-CAP, 2022 WL 17828934, at *114 (N.D. Ga. Dec. 15, 2022) (granting Rule 37(e) motion and striking defendant's answer where, "because the defendant destroyed evidence it should have preserved . . . and did not disclose a witness whose testimony might have been exceedingly relevant, this case . . . is now incapable of resolution"); *Skyline Advanced Tech. Servs. v. Shafer*, Case No. 18-cv-6641-CRB (RMI), 2020 WL 13093877, at *10 (N.D. Cal. Jul. 14, 2020) (where defendant deliberately destroyed laptop, emails, and text messages, court recommended dismissal under Rule 37(e)(2)(C) of separate case brought by defendant because defendant's actions "prevent[ed] Skyline from either refreshing Shafer's seemingly selective recollection or, at least, establishing her knowledge of facts and her actions through contemporaneously produced documents, emails, and text messages"), *report and recommendation adopted*, 2020 WL 13093878 (N.D. Cal. Jul. 30, 2020). The same considerations hold true for the post-October 29, 2019 Signal messages, which were spoliated by Pable's intentional activation of the Disappearing Messages function on Signal. Haynes is Pable's key witness, and Pable communicated with him via ephemeral Signal messages for nearly a year-and-a-half about this case. The spoliation of these messages in all probability deprived the CTA of valuable impeachment evidence and other statements that could either support its collusion defense or undermine Pable's alleged whistleblower status. Finally, the spoliation of Pable's phone ensured, at a minimum, that essentially no relevant Signal messages would be recovered and used against Pable, and that the CTA could not use objective data from the phone to respond to Pable's claims about how he had configured his Signal app or that CTA had initialed a remote "wipe" of Pable's phone.

Fourth, a lesser sanction would be insufficient to redress Pable's and Duffy's spoliation of ESI. The only alternative sanction that is even arguably proportionate to the spoliation is a mandatory adverse-inference instruction. But it is the very scope of the spoliation–the total loss of the two categories of Signal messages and the user-generated data of the cell phone beyond the 0.2 GB contained in the first image–that makes such a sanction ineffective. In that respect, this case resembles *Williams*, on which the CTA relies. Plaintiff in that case intentionally spoliated a laptop that was critical to his claims and lied under oath about the surrounding circumstances. The district court held that even a mandatory adverse-inference instruction would be inadequate to address the prejudice to the defense. 2019 WL 4412801, at *15-16. "[B]ecause there is no way to determine what data Williams destroyed and to which issues the data were relevant," the court found that "there is no way to approximate the presumably unfavorable effect of that information, and thus no way to craft instructions or presumptions that would eliminate—or even substantially mitigate—the prejudice" to the defense. *Id.*, at *16. As in *Williams*, given the total spoliation of the Signal messages here and the near-complete loss of user-generated data on the phone, there is no way to determine the specific content of those messages and mitigate or cure the prejudice to CTA by crafting jury instructions or presumptions

based on the unfavorable effect of the messages or the spoliated phone. *See WeRide*, 2020 WL 1967209, at *11 (imposing terminating sanctions under Rule 37(e) and court's inherent authority where, due to defendant AllRide's spoliation of email and corporate computers and use of ephemeral messaging, "a fact finder will not be able to resolve" critical factual question in case "because WeRide has no ability to test AllRide's proposed theory").

Nor is there any merit to Pable's argument that no sanctions or a lesser sanction should be imposed because "[t]his is not a case where any of the key events took place over Signal." [139] 36. Pable seems to contend that, because the basic events underlying his claim and the CTA's defenses are well-known and established through other evidence, the loss of the ESI is not prejudicial to the CTA's case. [*Id*.]. But this argument begs the critical question: were the Signal messages and the user-generated data on Pable's phone relevant to the CTA's defense to the whistleblower claim? As the undersigned has found, all three categories of ESI were relevant and could have been used by the CTA to rebut Pable's claim. Moreover, "the key events" are not as clearly established as Pable maintains: all that is established is that the Dayton Test was conducted, Pable and Haynes both admitted to participating in the test to a greater or lesser extent, and they were both forced to resign. Pable's claim to be a whistleblower is far murkier, and the contemporaneous and unguarded messages he was sending to Haynes via Signal, as well as those they exchanged during pending litigation, could have shed important light on this claim.

The undersigned also rejects Pable's argument that dismissal is a disproportionate sanction because, unlike *Williams*, *Global Materials Technology*, and *WeRide*, here "there is no corroborating evidence that [he] acted to conceal his conduct in any other way or delete his communications via any other medium." [139] 36. The premise of this argument is false, however: Pable's fabrications about how the pre-November 2, 2018 Signal messages were deleted from his phone are themselves corroborating evidence of the intentional spoliation of the ESI. Pable's further argument that "he would not have preserved and produced the numerous emails, texts, and Signal messages with Haynes and other contacts" if he really had "been interested in covering his tracks" is equally baseless. [139] 36-37. Pable admitted that he preferred using Signal because of its "ephemeral settings" [129-1] 5, at 11:22-12:3, and he repeatedly chose to use Signal, rather than another form of communication with more permanence, such as his sanctioned work email account, to discuss the Dayton Test and its repercussions. Pable's argument is particularly disingenuous because it ignores the fact that he lost access to his work email after he was placed on leave on October 22, 2018.

In the end, the undersigned concludes that only the harshest possible sanction would "reflect the seriousness" of Pable's and Duffy's spoliation of ESI, and that this sanction is necessary to "punish [them] for their dishonesty[.]" *Global Material Techs.*, 2016 WL 4765689, at *10; *see also Balancecxi, Inc. v. Int'l Consulting*,

No. 1:19-CV-767-RP, 2020 WL 6886258, at *14 (W.D. Tex. Nov. 24, 2020) (where defendants' spoliation efforts were "intentional, repeated, concealed, and addressed to as many as ten separate devices," court found that any sanction other than default judgment under Rule 37(e)(2)(C) "would have less of a deterrent effect, and would not punish the Defendants in a manner proportionate to the severity of their actions"). Pable and Duffy intentionally spoliated multiple categories of ESI at different times. They repeatedly lied about their actions, and Pable did so under oath–twice. The spoliation severely compromised the CTA's ability to attack Pable's claimed whistleblower status by depriving it of the full record of Pable and Haynes's communications at multiple critical time periods. And a lesser sanction would be inadequate to cure the prejudice to the CTA, nor would it any way address "the severity of the data destruction." *TLS Mgmt. & Marketing Servs.*, 2018 WL 3673090, at *7. "Although the interests of justice are best served by resolving cases on their merits," Pable and Duffy's "intentional spoliation obfuscated the true merits of this case to the point where doing so is no longer a viable option." *Williams*, 2019 WL 4412801, at *16 (internal quotation marks and citation omitted). For all these reasons, the undersigned recommends that the District Judge dismiss Pable's complaint with prejudice under Rule 37(e)(2)(C). *See id.*, at *15-16; *Global Material Techs.*, 2016 WL 4765689, at *9-10; *Collins-Williams*, 2022 WL 17828934, at *114; *Balancecxi*, 2020 WL 6886258, at *14 (imposing terminating sanctions under Rule 37(e)(2)(C) where defendants "deleted evidence multiple times, did so intentionally, and did so despite knowing they had a duty to preserve evidence"); *WeRide*, 2020 WL 1967209, at *9-12; *OmniGen*, 321 F.R.D. at 372-77.

## E.    Pable's Request for an Evidentiary Hearing

Pable argues that the Court should hold an evidentiary hearing "if the Court should be called upon to make any of the determinations required under Rule 37(e)(2)." [139] 29. In support, Pable contends that "there can be debate that 'the requirements of due process of law are applicable to a proceeding to impose sanctions,' and, as such, a party subject to sanctions has a right to an evidentiary hearing where a finder of fact is called upon to resolve facts reasonably in dispute and assess credibility." [*Id.*] (quoting *Kapco Mfg. Co., Inc. v. C&O Ents., Inc.*, 886 F.2d 1485, 1494-95 (7th Cir. 1989)). The undersigned recommends that the District Judge reject this argument.

*Kapco* does not suggest that Pable has a right to an evidentiary hearing to defend against the spoliation motion. *Kapco* simply recognizes that, in a "proceeding to impose sanctions," "a party or attorney" against whom sanctions are sought has the right to "notice and [an] opportunity to respond[.]" 886 F.2d at 1494. Pable and Duffy have been afforded notice and multiple opportunities to be heard. *Kapco* also explains that "the right to a hearing in these circumstances is obviously limited to cases where a hearing could assist the court in its decision." *Id.* at 1495. But Pable has made "no effort to identify the evidence [he] would attempt to submit during such

a hearing or explain how it would differ from the voluminous evidence already submitted by the parties[.]" *Noland*, 2021 WL 3857413, at *15 (denying spoliating party's request to hold evidentiary hearing in connection with Rule 37(e) motion); *see also Martin v. Redden*, 34 F.4th 564, 569 (7th Cir. 2022) (district court "reasonably decided not to hold a live hearing on [plaintiff's] alleged fraud and sanctions" where, *inter alia*, plaintiff "failed to identify any evidence or plausible argument that could affect the court's decision"). Nor does the undersigned believe that a live hearing would assist the District Judge in making any of the findings necessary to impose sanctions under Rule 37(e)(2). For that reason, the District Judge should reject Pable's cursory request for an evidentiary hearing.

## F.    CTA's Request for Attorney's Fees and Costs

The CTA also argues that it is entitled to recover the attorney's fees and costs it incurred in bringing its Rule 37(e) motion. [129] 42. Pable responds that Rule 37(e) does not provide for an award of costs and fees. He observes that, whereas other subsections of Rule 37 expressly provide for attorney's fees and costs in connection with the motions authorized by those subsections, Rule 37(e) contains no such provision. [139] 32-33.

The undersigned recommends that the District Judge award CTA its reasonable attorney's fees and costs incurred in bringing this motion. Pable is correct that Rule 37(e) does not expressly authorize an award of fees and costs. But Pable's argument ignores a court's ability to impose curative measures under Rule 37(e)(1) to cure prejudice caused by the spoliation of ESI. As other courts have recognized, prejudice "occurs when parties are forced to unnecessarily litigate e-discovery issues when ESI is spoliated." *DR Distribs.*, 513 F. Supp. 3d at 981. Rule 37(e) also encompasses "financial prejudice–*i.e.*, prejudice that results from costs incurred due to unnecessary litigation." *Doe*, 2021 WL 2767405, at *12. Accordingly, in *Bolyard*, the district court relied on Rule 37(e)(1) to hold that the defendants, who brought a partly successful motion based on spoliation of ESI, were "entitled to the reasonable attorney's fees . . . incurred in filing the instant motion for discovery sanctions." 2022 WL 16738647, at *6; *see also Sonrai Sys., LLC v. Romano*, No. 16 C 3371, 2021 WL 1418405, at *16 (N.D. Ill. Jan. 20, 2021) (recommending that defendant be required to pay attorney's fees and costs incurred by plaintiff in bringing successful Rule 37(e) motion "because such an award will help address the prejudice caused by Romano's spoliation"), *report and recommendation adopted*, 2021 WL 1418403 (N.D. Ill. Mar. 18, 2021); *DR Distribs.*, 513 F. Supp. 3d at 982 ("Had the Court not already imposed attorneys' fees under several other rules, it might be inclined to reverse its previously stated view on the availability of attorneys' fees and impose that purported curative measure under the facts of this case.").

Here, the CTA has been prejudiced by Pable's spoliation of ESI. Because of Pable's spoliation of multiple categories of ESI, the CTA has been forced to incur fees

and costs in order to bring this motion and thereby establish its entitlement to sanctions under Rule 37(e)(2). The financial prejudice that CTA has incurred is cognizable under Rule 37(e), *see Doe*, 2021 WL 2767405, at *12, and because the undersigned has recommended that the District Judge grant the CTA's motion in its entirety, the undersigned further recommends that the District Judge award CTA its reasonable attorney's fees and costs as a curative measure under Rule 37(e)(1). Within ten days of the date of this decision, the CTA shall file its fee petition and supporting materials for the fees it seeks to recover. Pable's response to the fee petition is due within ten days after the petition is filed. Each side's submission should address whether the fee award should be paid by Pable, Duffy, or both. The undersigned will review the filings and prepare a supplemental Report and Recommendation to the District Judge regarding the amount of fees to which the CTA is entitled.

## II. CTA's Motion for Sanctions against Duffy and Quest under 28 U.S.C. § 1927 and the Court's Inherent Authority

In a separate motion, the CTA seeks an award of attorney's fees and costs against Duffy and Quest for their alleged misconduct respecting the imaging of Pable's cell phone. [91]. The motion asks the Court to impose these sanctions under either its inherent power to sanction bad-faith litigation conduct and 28 U.S.C. § 1927, which permits a court to sanction an attorney whose unreasonable and vexatious conduct multiplies the proceedings.[19] For the reasons set forth below, the undersigned recommends that the District Judge grant this motion in part and impose sanctions against Duffy under § 1927 but not the Court's inherent authority. To the extent that the motion seeks sanctions against Quest, the motion should be denied.

### A. Legal Standard

"[A]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Sanctions awarded under § 1927 are to be paid by the lawyer, who must satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017) (internal quotation marks omitted). An award of sanctions under § 1927 requires a

---

[19] The CTA also asks that fees be awarded under Fed. R. Civ. P. 45, which governs the enforcement of subpoenas. *See* [96] 8-9. Because the evidence establishes that Duffy's sanctionable conduct extends beyond his and Quest's opposition to the motion to enforce the subpoena, and that § 1927 provides a sufficient basis to sanction this conduct, the undersigned recommends that the District Judge need not address whether Rule 45(g) authorizes an award of fees and costs in connection with a motion to enforce a subpoena.

"causal link between the misconduct and fees." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 n.5 (2017).

"Vexatious-litigation sanctions under § 1927 require a showing of either subjective or objective bad faith." *4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 913 (7th Cir. 2019). To merit a fee award under § 1927, the attorney conduct "must multiply the proceedings, meaning prolong the case." *DR Distribs.*, 513 F. Supp. 3d at 951. In addition, "the attorney's actions must be both unreasonable and vexatious." *Id.* "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Gravitt v. Mentor Worldwide, LLC*, 17 C 5428, 2021 WL 5564862, at *2 (N.D. Ill. Nov. 29, 2021) (internal quotation marks omitted).

As with the CTA's Rule 37(e) motion, the CTA's motion for sanctions under § 1927 is "akin to [an] independent claim[ ] for inappropriate conduct during litigation" and must be adjudicated by the District Judge. *Belcastro v. United Airlines, Inc.*, No. 17-cv-1682, 2020 WL 1248343, at *4 (N.D. Ill. Mar. 15, 2020) (internal quotation marks omitted); *see also Cleversafe*, 287 F.R.D. at 428 ("a request for sanction under Rule 11 and 28 U.S.C. § 1927" may not be decided by magistrate judge under 28 U.S.C. § 636(b)(1)(A) "because the grant or denial of a request for sanctions constitutes a dispositive matter") (internal quotation marks omitted); *Ret. Chicago Police Ass'n*, 76 F.3d at 868 (district court erred by reviewing magistrate judge's order recommending sanctions under Rule 11 and § 1927 for clear error, rather than de novo). Accordingly, the undersigned has prepared a Report and Recommendation containing proposed findings and rulings on the CTA's sanctions motion.

Finally, the undersigned recommends that the District Judge rely solely on § 1927 to impose sanctions on Duffy. The Court's inherent authority to sanction bad-faith litigation conduct "is a residual authority, to be exercised sparingly and only when other rules do not provide sufficient basis for sanctions." *Dal Pozzo*, 463 F.3d at 614. "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). The sanctionable conduct at issue here–making and failing to correct misrepresentations about a key piece of evidence that foreseeably led an opponent to undertake time-consuming and expensive discovery efforts–is squarely addressed by § 1927. The undersigned is mindful that a court may exercise its inherent authority if "conduct sanctionable under the Rules [is] intertwined within conduct that only the inherent power [can] address." *Chambers*, 501 U.S. at 51. However, the CTA has not identified any conduct by Duffy relating to the imaging process that cannot be addressed by § 1927. Therefore, the undersigned concludes that § 1927 provides a sufficient mechanism to address Duffy's conduct, such that the District Judge need not resort to the Court's inherent authority.

### B.    Parties' Arguments

CTA argues that the Court should award fees and costs because "Pable, Quest, and Duffy have acted in bad faith and misled the CTA and the Court for the past year[.]" [96] 9. CTA contends that, although Duffy represented to CTA in October 2020 that the first image of Pable's phone was "a complete image of the data on the phone when the phone was imaged," that representation was ultimately refuted by the testimony of Dan Jerger, the Quest consultant who analyzed and processed Pable's phone. At his deposition in October 2021, Jerger testified that Duffy had never instructed him to produce a complete image of the phone or even to preserve all the data on the phone. CTA also emphasizes that Quest and Duffy "did not disclose" that "Quest was never directed to create a complete forensic image of the data on Pable's Phone" either to CTA or the Court "at any time in the year prior to Jerger's depositions." [Id.] 8. CTA argues that, had Duffy disclosed the fact that what had been represented to be a complete image was not, in fact, complete, CTA's efforts "to obtain this relevant evidence . . . would not be necessary[.]" [91] 13.

Quest and Duffy respond that no sanctions are warranted. They first argue that Duffy's "representations as to the 'completeness' of the image files were made in response to questions (and accusations) that data had been removed from the image files or was somehow being withheld from the copies produced to the CTA." [95] 9. Duffy reiterates this point in the opposition to the Rule 37(e) motion, arguing that "the statement as to whether the image was 'complete' was made in response to questions by the CTA as to whether anything had been removed from or withheld from the imaging files Jerger generated." [139] 31. According to Duffy, "[t]his was, at worst, a misunderstanding, and by no means a misrepresentation." [Id.]. In responding to such questions, Quest and Duffy observe that Duffy truthfully responded that "no, nothing had been removed from the image file" and CTA "was given the complete file (actually two image files) that Mr. Jerger generated." [95] 9. Quest and Duffy also observe that CTA had two opportunities to depose Jerger and "discover the process that [he] employed and the instructions given to him with respect to imaging." [Id.]. Finally, Quest and Duffy insist that "[a]ny confusion over the image is resolved" because "[w]e all know who did what, when they did it, and the results." [Id.] 10.

### C.    Duffy's Misrepresentations Unreasonably, Vexatiously, and Predictably Multiplied the Proceedings Relating to the Imaging of Pable's Cell Phone.

#### 1.    The False Representations on October 24, 2020

The undersigned recommends that the District Judge find that Duffy's representations to the CTA on October 24, 2020 that the first image of Pable's cell phone was "a complete forensic image" and that "the image is a complete image of the

data on the phone when the phone was imaged," [45-1] 57-58, were false and that Duffy knew they were false when he made them. Jerger testified clearly and without qualification that he was "not asked specifically to obtain a logical or physical image of the phone." [93] 14, at 46:3-5. He also testified that he "was not asked to collect all of the data of Mr. Pable's phone," [91-5] 28, at 22:8-9, or even to "preserve a copy of all the data on the phone[.]" [93] 27, at 101:3-7. Rather, Jerger's "underlying mission" was far more limited: he was "to collect and document within a particular date range and within and/or with certain key words[.]" [*Id.*] 14, at 46:13-16. Thereafter, and at Duffy's direction, Jerger prepared the first image based on the limited subset of data that had been collected from the phone in June 2020. *See* [91-5] 22, at 200:6-201:10 ("[t]he content that was contained within those image files was produced by the tools back in June of 2020"). Because Jerger never prepared a complete image of Pable's phone, Duffy's representations to the CTA that the image was "complete" and "a complete image of the data on the phone when the phone was imaged" could not have been true. And because Duffy was the one who instructed Jerger what work to perform, he knew that the representations were untrue.

### 2. Duffy's Failure to Correct the Misrepresentations

The undersigned further recommends that the District Judge find that Duffy's misrepresentations predictably affected how the CTA prosecuted this issue and effectively prolonged the basic underlying discovery dispute for more than a year.

To begin, Duffy never disclosed–he does not even contend that he disclosed–to the CTA at any point before Jerger's October 2021 deposition that he instructed Jerger, not to produce a complete image of Pable's phone, but to collect a far narrower data set, based on a date range and a set of search terms, and use that data set to generate the first image. Nor did Duffy disclose that content had been removed from the image provided to CTA, namely the cache of Signal messages that were not produced until after Jerger's deposition. As a result, the CTA was understandably left with the mistaken impression that the first image was intended to be, in Duffy's words, "a complete image of the data on the phone when the phone was imaged," but, for unknown reasons, the image contained an unusually small amount of information. Laboring under this misapprehension, the CTA reasonably sought to take the following discovery to better understand not only the circumstances surrounding the creation of the first image, but also whether the data on Pable's phone had been preserved: (1) a motion to compel a second imaging of Pable's cell phone, filed on February 5, 2021; (2) a motion to extend fact discovery and to serve discovery on Quest, filed on July 15, 2021; (3) propounding written discovery on Quest in September 2021 and deposing Jerger twice the following month; and (4) the motion to enforce the subpoena served on Quest, filed on November 1, 2021. All this discovery was opposed by Duffy in his capacity as Pable's attorney, Quest's attorney, or both. The undersigned agrees with CTA that, had Duffy simply disclosed to the CTA that the first image neither captured nor preserved all of the data on Pable's phone, most

or all of these discovery disputes would have been averted, and CTA could have pursued a much shorter path to obtaining a complete image of Pable's phone and an accurate understanding of the extent to which the data on the phone had been preserved.

### 3. "Context" Does Not Cure the Misleading Nature of the Representations.

Duffy contends that his representations about the first image must be understood in the context in which they were made: "in response to questions (and accusations) that data had been removed from the image files or was somehow being withheld from the copies produced to the CTA." [95] 9; *see also* [139] 31. So understood, Duffy maintains, his representations were neither false nor misleading. [95] 9. Duffy also asserts that, during the August 13, 2021 hearing on CTA's motion to serve discovery on Quest, he "took pains to point out that there was a distinct difference between imaging Pable's cell phone and "the application of search terms [to] the contents of the phone." [*Id.*] 4. Finally, Duffy observes that he advised CTA and the Court during the August 13 hearing that CTA's position respecting the imaging was "based on the assumption – which happens to be incorrect – that our consultant worked – did all of his work inside an image. And that happens not to be true." [*Id.*] 4. None of these arguments has merit.

First, it would be unreasonable–and inaccurate–to conclude that all of Duffy's representations were simply limited or tailored responses to questions and concerns articulated by the CTA (and the undersigned) about whether data had been removed from the first image. This is especially true with respect to Duffy's statement on October 24, 2020 that the first image was "a complete forensic image" and "a complete image of the data on the phone when the phone was imaged." At this point in time, the record reflects, the CTA was not concerned that data had been removed from the image, which had not even been produced to the CTA. In an email to Duffy, counsel for CTA expressed concern that "the full image of the device may nonetheless be incomplete due to" the CTA's alleged "'wipe' of Pable's work profile upon Pable's departure from the CTA such that certain information, like text messages, is no longer on the device." [45-1] 58. Duffy responded that "[t]his is incorrect. The image is a complete image of the data on the phone when the phone was imaged; nothing about the imaging process affected the 'completeness' of the image." [*Id.*]. There is only one way to understand this representation, and it has nothing to do with a purported concern that data "had been removed from the image files." The undersigned finds it telling in the extreme that neither Duffy's response to the CTA's sanctions motion nor his response to the Rule 37(e) motion addresses that representation in any way.

Second, nothing that Duffy said or did during subsequent hearings on April 29, 2021 or August 13, 2021 sufficed to correct his earlier misrepresentation or would

have put the CTA, or the Court, on notice that the first image was anything other than the complete forensic imaged that he had represented it to be. Here the undersigned emphasizes that, of all the participants in those hearings, Duffy was the only one who knew the first image was not, and was never intended to be, a complete image of the data on Pable's cell phone when it was imaged, and that the reason why the image was not a complete image is because Duffy never instructed Quest to generate such an image. Yet Duffy never disclosed this critical fact at any point during the litigation, which was revealed by Jerger–and only after Duffy unsuccessfully fought to prevent the CTA from serving discovery on Quest.

Turning to the particulars, Duffy is correct that, in response to a question from the undersigned at the April 29, 2021 hearing whether the first image was "a complete image or did you cull out or remove items from that image," Duffy stated that he did not remove anything from the image. *See* [62] 4-6. Fundamentally, this was a false statement–the image produced to the CTA did not include the Signal files that Quest had extracted during the imaging process. But the undersigned is hard-pressed to understand how the CTA should have gleaned from this statement that Duffy had not instructed Quest to obtain a complete image. Beyond failing to correct his initial misrepresentation—"a complete image of the data on the phone when the phone was imaged"—Duffy made other statements that could reasonably have reinforced the CTA's–and the undersigned's–understanding that the first image had captured all the data on Pable's phone. For example, Duffy asked several rhetorical questions acknowledging the possibility that an image might not capture all a phone's data, but never admitted that those possibilities had materialized in this case because of the instructions he issued to Jerger. He first asked, "[W]as there data that could have been in the image that wasn't in the image?" [*Id.*] 6. He also acknowledged that "[w]hen an expert goes in and looks at the phone and makes an image, there's a choice, you know" as to how extensive an image the expert generates. [*Id.*] 7. Duffy even wondered "[w]ere there things on the phone that were not included in that image? *That's probably likely. I think that's almost true for almost any image.*" [*Id.*] (emphasis added). This was extremely misleading, given Duffy's certain knowledge that there were things on Pable's phone that were not included on the first image.

Likewise, Duffy's statement at the April 29 hearing that the "image was complete for our purposes, we think, to pick up all the communications that it takes" [62] 7, was at best a carefully worded evasion of the fact that the first image was not complete. After all, how could CTA–which had been excluded from the imaging process by Pable and Duffy, and which had been advised by Duffy that the first image was "a complete image of the data on the phone when the phone was imaged"–know what Duffy meant by "complete for our purposes?" At worst it was a significant misrepresentation about "the communications" that had been "picke[ed] up" by Quest. As discussed above, Jerger obtained Signal messages from Pable's phone and backed them up to an encrypted SD card, yet Duffy never disclosed this fact to the

CTA, the messages themselves were not included in the first image, and Duffy did not produce the messages to CTA until after Jerger's deposition in mid-October 2021.

Finally, even accepting Duffy's claim that he "took pains to point out," during the August 13, 2021 hearing, the difference between imaging a phone and applying search terms to the data on a phone, CTA's immediate response to this claim demonstrates that CTA had no idea that the first image was based on the limited data collected in response to the search terms that Duffy provided to Jerger:

> Mr. Duffy is correct, there was an agreed-upon set of search terms that was used in order to conduct searches on both data – with respect to the CTA and with respect to Mr. Pable – in order to cull certain responsive information.
>
> But the difference here – and it is an important one – is that at no point was it represented to the CTA that both sets of search terms was going to be applied in a way to limit the output of the image that would be provided to the CTA by Mr. Pable and his vendor.
> So, while it is true that Mr. Pable did produce communications that may have been responsive to those search terms, that was separate and apart from the image as it was delivered to the CTA.

[80] 39.

This was the time–rather, it was long past time–for Duffy to inform the CTA that the first image was not, in fact, "a complete image of the data on the phone when the phone was imaged." Yet again, however, Duffy withheld the critical information from the CTA.

## D. Duffy's Certified Statement

Pable supported his opposition to the Rule 37(e) motion with, *inter alia*, a certified statement prepared by Duffy that purports to offer Duffy's understanding of the events that culminated in the filing of the CTA's two sanctions motions. [139-23]. The certified statement discusses the events surrounding the first imaging of Pable's phone at length. But the undersigned concludes that, for the most part, the certified statement is duplicative of other evidence–namely, the parties' meet-and-confer correspondence and arguments made to the Court during prior briefing and motion hearings–that has already been discussed at length above. *See* [*id.*] 2-3, at ¶¶ 1-5, 13 (summarizing parties' initial meet-and-confer efforts regarding preservation of Pable's phone and later expansion of scope of ESI discovery); [*id.*] 3-4, at ¶¶ 6, 10-12 (describing Jerger's methodology); [*id.*] 4-5, at ¶¶ 9, 15-20, 22 (events precipitating parties' discovery disputes regarding second imaging of phone, results of second imaging generated by CTA, and CTA's discovery on Quest). However, the statement

63

does purport to set forth certain new information that is arguably relevant to Duffy's culpability for his actions relating to the initial imaging of Pable's phone. According to Duffy:

> Jerger undertook this imaging work as part of his standard protocol in working with cell phone [*sic*]. I did not instruct him to make any particular image of the phone, but understood that he would be taking an image reasonably expected to preserve the relevant information on the phone, including all communications contained on the phone.

> I did not request that Jerger generate what he later described as a physical or forensic image of the phone. Such an image (if successfully obtained) would preserve things like photos, videos, and additional data related to the operating system and hardware of the phone, such as location data for example, but would not have been expected to preserve any additional communications or messaging data.

> *     *     *

> Not satisfied with the communications provided by Pable, the CTA requested the image files taken from the phone. These were provided to the CTA on October 31, 2020, and it is in connection with discussing these image files that counsel for the CTA asked counsel for Pable whether any information had been removed or withheld from these files, to which counsel for Pable responded that these were the complete image files. These words were later asserted by the CTA to have been a representation that the image taken by Jerger was a "complete forensic image" which was ***not*** the case and which was ***not*** what counsel for Pable was asked ***nor*** what he represented.

[139-23] 4-6, at ¶¶ 7-8, 14 (emphases in original).

The undersigned concludes that nothing in the certified statement affects the recommendation that sanctions are warranted under § 1927. First, Duffy's private understanding that the image produced by Jerger was "reasonably expected to preserve the relevant information on the phone" is simply not relevant to the issues raised by CTA's sanctions motions. What matters are Duffy's representations to the CTA that the image was "a complete forensic image" and "a complete image of the data on the phone when the phone was imaged." These representations, in combination with the unusually small amount of user-generated data included in the first image, predictably led the CTA to undertake lengthy, but reasonable, efforts to discover the circumstances surrounding the creation of the first image and the extent to which data on the phone had been preserved. In fact, paragraph 7 of the certified statement simply confirms that Duffy knew that Jerger had not prepared a complete forensic image of the phone–and that his statements to the CTA on October 24, 2020

were false. Likewise, Duffy's understanding that even "a physical or forensic image of the phone . . . would not have been expected to preserve any additional communications or messaging data" is irrelevant. This was a point to make–and was in fact made by Duffy–in meet-and-confer negotiations with the CTA about whether Pable's phone should have been imaged or what the proper scope of any such imaging would be. *See* [36-1] 8. But once Duffy represented to the CTA that a complete forensic image had been produced, Duffy's own belief about the amount of relevant data that such an image likely contained was beside the point. Finally, for the reasons already discussed, Duffy's claim that it was only "in connection with discussing these image files" that were produced to the CTA on October 31, 2020 that he made representations about the completeness of the first image is not accurate. The CTA articulated a concern about the completeness of the first image (1) before the image files were produced (2) that had nothing do with whether any data had been removed from the image files. It was a gross misrepresentation for Duffy to address that concern by representing–falsely–that the image was a "complete forensic image" that captured all "data on the phone when the phone was imaged."

### E.    Quest Should Not Be Sanctioned.

Finally, the undersigned recommends that no sanctions be imposed against Quest. The evidence before the Court demonstrates that Quest and Jerger took the actions they did only in response to Duffy's instructions, and the CTA has not identified any instances of misconduct allegedly committed by Quest that were not taken in response to Duffy's instructions. Therefore, the record provides no basis for imposing sanctions against Quest.

\*    \*    \*

For these reasons, the undersigned recommends that the District Judge sanction Duffy under § 1927 for unreasonably and vexatiously multiplying the proceedings relating to the imaging of Pable's cell phone. Duffy falsely represented to the CTA on October 24, 2020 that the first image of Pable's cell phone was "a complete forensic image" and a "complete image of the data on the phone when the phone was imaged." Duffy knew this representation was false when he made it, because he never instructed Quest or Jerger to generate a complete image of the cell phone. After the CTA discovered that the first image contained only 0.2 GB of user-generated data, the CTA reasonably undertook additional discovery to understand why the "complete image" contained so little information. At no point during the ensuing litigation did Duffy disclose that he had not instructed Quest to generate a complete forensic image of the phone. Duffy's conduct unjustifiably prolonged this litigation and multiplied the proceedings by causing CTA to embark on a discovery expedition, beginning in February 2021 and continuing through February 2022, to understand how the first image was created and the extent to which the data on Pable's phone was produced. Because Duffy "pursue[d] a path that a reasonably careful attorney would have

known, after appropriate inquiry, to be unsound," Duffy's conduct was "objectively unreasonable and vexatious" and in bad faith. *Gravitt*, 2021 WL 5564862, at *2. The District Judge should therefore sanction Duffy under § 1927.

## F. Amount of Attorney's Fees and Costs

In the order granting in part the CTA's motion to enforce subpoena, the undersigned indicated that it was taking the CTA's request for sanctions under advisement and ordered the CTA to file a "supplemental brief in support of its motion for sanctions that includes a detailed list of all fees and expenses it seeks to recover via its motion for sanctions as well as supporting materials needed to show that the specific rates sought and hours expended are reasonable." [97] 7. The CTA filed its supplemental brief on April 6, 2022, arguing that it is entitled to recover $63,658.30 in attorney's fees and costs. [105] 11. It contends that these fees and costs can be grouped into four categories: (1) the attorney's fees it incurred in addressing Quest's response to the CTA's subpoena; (2) the costs associated with the second and third depositions of Dan Jerger; (3) "expert costs incurred in evaluating and attempting to ensure Quest's compliance with the subpoena"; and (4) the attorney's fees it incurred in preparing the supplemental brief. *See* [*id.*] 5.[20]

Duffy responds that, to the extent that the CTA is entitled to recover any attorney's fees and costs, the fees and costs should be limited to those incurred in preparing the motion to enforce, the CTA's reply brief, its supplemental brief, and "the incremental cost" of Jerger's third deposition. [108] 5-6. Duffy maintains that the CTA cannot recover the fees it incurred preparing for and conducting Jerger's second deposition or reviewing Quest's response to the subpoena because these fees would have been incurred regardless of whether any further discovery disputes arose. [*Id.*] 6. According to Duffy's calculations, the CTA would be entitled to only $24,662 in fees (58.4 hours x $295 hourly rate) and $1,640.15 in costs, for a total award of $26,302.15. [*Id.*] 6-7.

---

[20] The undersigned observes that the CTA previously indicated it would seek to recover all attorney's fees and costs it incurred "in prosecuting these issues since October 2020." [91] 3. However, in its reply brief in support of the motion to enforce the subpoena, the CTA sought only the attorney's fees and costs "associated with prosecuting the issues raised in this Motion, including deposing Jerger on October 12 and October 19, seeking Quest's compliance with the Subpoena, and the preparation of this Motion." [96] 10. After the undersigned took the sanctions motion under advisement and ordered the CTA to file a supplemental brief containing "a detailed list of all fees and expenses it seeks to recover via its motion for sanctions," the CTA filed its supplemental brief seeking only the fees described above, amounting to $63,658.30. Accordingly, the undersigned addresses the CTA's claimed entitlement to these fees only.

### 1. Reasonableness of Counsel's Rates

"In order to arrive at the amount to be awarded as reasonable fees, this court must determine the reasonable hourly rate to be applied and the number of hours reasonably expended, and then multiply the two figures." *Haywood v. Wexford Health Sources, Inc.*, No. 16 CV 3566, 2021 WL 2254968, at *10 (N.D. Ill. Jun. 3, 2021) (internal quotation marks omitted). "This calculation, known as the lodestar rate, yields a presumptively reasonable fee, but the court may nevertheless adjust the fee based on factors not included in the computation." *Id.* (internal quotation marks omitted).

"The Seventh Circuit has defined a reasonable hourly rate as one that is derived from the market rate for the services rendered." *Melikhov v. Drab*, No. 16 C 9332, 2018 WL 3190824, at *3 (N.D. Ill. May 21, 2018) (internal quotation marks omitted). "The best evidence of the market rate is the amount the attorney actually bills for similar work[.]" *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). The fee applicant "has the burden of proving the market rate; however, once the attorney provides evidence of the market rate, the burden shifts to the opposing party to show why a lower rate should be awarded." *Vega v. Chicago Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021).

In support of its request, the CTA has submitted a declaration from one of its attorneys, John F. Kennedy of Taft Stettinius & Hollister LLP, that sets forth the hourly rate of each attorney who has worked on the case. [105-1] (Apr. 6, 2022 declaration of John F. Kennedy). The declaration also states that, in recognition of the CTA's status as a public entity, Taft steeply discounted its attorneys' billing rates and adopted a blended rate of $295 per hour for all attorneys. [*Id.*] 4-5, at ¶ 4. Taft's paralegal and litigation support analyst also discounted their rates and charged a blended rate of $100 per hour. [*Id.*] 5, at ¶ 5. Finally, the declaration establishes that CTA has paid all invoices to date, except for those dated March 22, 2022 and March 31, 2022, which the CTA has agreed to pay. [*Id.*] 6, ¶ 7.

The undersigned recommends that the District Judge find that the Kennedy declaration is sufficient to meet CTA's burden to show that the $295 blended hourly rate is reasonable. *See Shakman v. Cook Cnty. Clerk*, No. 1:69-cv-2145, 2021 WL 5140500, at *6 (N.D. Ill. Nov. 4, 2021) (attorneys' affidavits constituted "credible evidence of their firms' billable rates"); *Herrera v. Grand Sports Arena, LLC*, 2018 WL 6511155, at *3 (N.D. Ill. Dec. 11, 2018) ("Because an attorney's actual billing rate is presumptively appropriate for use as the market rate, the billing statements and attorneys' affidavits are sufficient to shift the burden to the Defendants to show that Plaintiff's requested rates are not reasonable and that lower rates are appropriate."). This is especially true, given that the CTA has paid the fees at the billed rate. *See In re Direct Media Power, Inc.*, 18 C 7397, 2019 WL 4601736, at *6 (N.D. Ill. Sept. 23, 2019) ("Numerous courts have concluded that where the client has actually paid the

attorney at the requested rate, the rate is presumptively reasonable."). Furthermore, $100 per hour is a reasonable rate for paralegal work. *See Sommerfield v. Knasiak*, Case No. 08-cv-3025, 2021 WL 5795303, at *8 (N.D. Ill. Dec. 7, 2021) (collecting cases holding that $125 per hour was reasonable for paralegal work). Finally, Duffy does not argue that the billed rates are unreasonable. *See* [108] 5-8.

### 2.    Reasonableness of the Hours Expended

"What qualifies as a reasonable use of a lawyer's time is a highly contextual and fact-specific enterprise, and as such, the court has wide latitude in awarding attorney's fees." *Williams v. City of Chicago*, No. 17 C 5186, 2022 WL 971604, at *2 (N.D. Ill. Mar. 31, 2022) (internal quotation marks omitted). "The court considers whether hours are excessive, redundant, or otherwise unnecessary and may reduce the lodestar calculation, for example, for hours spent on unrelated and unsuccessful claims, hours attorneys would not bill to their clients, and hours for which the prevailing party has failed to provide adequate support." *Id.* However, a court is "not obligated to conduct a line-by-line review of the bills to assess the charges for reasonableness." *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 738 (7th Cir. 2010).

### i.    Fees Incurred between September 30, 2021 and October 12, 2021

The CTA first seeks to recover the fees and costs it incurred between September 30, 2021, when Quest produced its response to the CTA's subpoena, and October 12, 2021, the date of Jerger's first deposition. According to the CTA, it incurred fees during this time as it worked to analyze the subpoena response, identified multiple deficiencies in the response, attempted to resolve the issues with Duffy in the meet-and-confer process, and consulted with its ESI vendor, 4Discovery, about the production.

The undersigned recommends that the District Judge exclude these fees, which represent 9.3 hours of attorney time and 2.1 hours of paralegal time,[21] from the award of fees and costs. In the undersigned's view, the CTA would have incurred these fees regardless of any further discovery disputes that arose out of Quest's deficient discovery response. Stated another way, whether or not the subpoena response was complete or deficient, the CTA needed to spend time analyzing the documents that Quest produced. In this respect, the undersigned observes that the CTA states in its supplemental brief that it is not seeking to recover the fees and costs associated with the first deposition of Jerger because "Jerger would have been deposed once in the normal course regardless of Quest's and Duffy's attempts to prevent CTA from discovering information regarding the first imaging." [105] 8. The undersigned

---

[21] The undersigned has arrived at this figure by adding the entries on Exhibit B to Kennedy's declaration that reflect hours billed on or before October 12, 2021. *See* [105-2] 3 (2.40 hours); [*id.*] 8 (8.9 hours); [*id.*] 9 (0.2 hours); [*id.*] 10 (2.3 hours).

believes that this same logic also applies to the other fees and costs that the CTA incurred between September 30, 2021 and October 12, 2021, and that such fees and costs should not be awarded.

### ii.    Fees Incurred on or after October 13, 2021

The undersigned further recommends that the District Judge award the CTA the remainder of the fees and costs it incurred from October 13, 2021 through March 9, 2022, which was the date of Jerger's third deposition. Jerger's testimony at his first deposition on October 12 established that (1) Duffy never asked Quest to produce a complete image of Pable's phone, (2) Duffy had issued written instructions to Jerger regarding the analysis that he was to perform, (3) these instructions were not produced in response to the CTA's subpoena, and (4) rather than produce Jerger's and/or Quest's emails that were responsive to the subpoena, Duffy produced emails from his own account that he had sent to or received from Quest. As a result, Jerger's deposition was continued until October 19, 2021 to allow Quest to supplement its document production, but the critical emails (discussed in the undersigned's order of February 7, 2022) were still not produced. In light of all this, the CTA prepared and succeeded almost entirely on its motion to enforce subpoena. But for Duffy's efforts to obscure the circumstances surrounding the first imaging, none of this discovery would have been necessary. Accordingly, CTA should recover the attorney's fees and costs it incurred between October 13, 2021 and March 9, 2022.

For these reasons, the District Judge impose sanctions against Duffy under 28 U.S.C. § 1927 in the amount of $53,388.00:

- $44,958 in attorney's fees (161.70 attorney hours claimed (minus) 9.3 hours incurred before October 13, 2021 = 152.4 hours (multiplied by) $295/hour = $44,958).

- $370.00 in paralegal fees (5.8 paralegal hours claims (minus) 2.1 hours = 3.7 hours (multiplied by) $100/hour = $370).

- $4,185.00 in expert costs, all of which were incurred on or after October 13, 2021. *See* [105-4] 2-3 (invoices submitted by 4Discovery).

- $3,875.00 in costs associated with Jerger's second and third depositions. *See* [105-3] 2-3 (deposition invoices).

- Total amount of sanctions: $53,388.00

### III. CTA's Motion for Additional Discovery and to Strike Duffy's Certified Statement

After Pable filed his response to the CTA's Rule 37(e) motion, the CTA moved to take additional discovery respecting Pable's August 3, 2022 affidavit and to strike Duffy's certified statement. [143]. Having considered the motion and Pable's response [145], the undersigned denies this motion.

First, there is no need for additional discovery regarding the statements in Pable's affidavit. The CTA seeks to explore the circumstances underlying Pable's claim in the affidavit that the deletion of his Signal messages with Haynes was the result of Pable's having configured his Signal app to delete any conversation thread affected by a changed Safety Number. In essence, the CTA seeks to build evidentiary support for its position that this explanation is untrue. But based on the entire record before it, the undersigned has already concluded that this claim is false, and the undersigned does not believe that further discovery is necessary or appropriate.

Second, the undersigned does not believe that the CTA has shown that striking Duffy's certified statement is warranted. The CTA argues that the submission of the affidavit amounted to "unfair surprise" because Duffy makes "sweeping, self-serving conclusions regarding the disputed facts at issue in the Spoliation Motion without any evidentiary basis." [143] 6. As explained above, however, the undersigned has found that Duffy's statement largely duplicates other evidence in the record, such as the parties' meet-and-confer correspondence, the CTA's discovery motions recounting the sequence of events leading to the production of the first imaging of Pable's phone, and arguments and evidence discussed during hearings before the undersigned. Nor is there merit in the CTA's unfair-surprise argument because the undersigned expressly invited Duffy to file his own response to the sanctions motion. *See* [97].

Nor, finally, does the undersigned believe that it is necessary to strike the statement to address the CTA's concern that Duffy, by submitting the certified statement, is acting as both a fact witness and a lawyer for Pable, in violation of ABA Model Rule of Professional Conduct 3.7. *See* [143] 6-7. As discussed above, the Duffy statement is almost entirely duplicative of or cumulative to other evidence bearing on the issues raised in the sanctions motion that the undersigned has already accounted for. To the extent that the statement purported to offer evidence bearing on Duffy's culpability, the undersigned has assumed, *arguendo*, that this evidence could be considered without running afoul of Rule 3.7 and has explained why that evidence does not change the recommendation that Duffy should be sanctioned. Therefore, it is not necessary to strike the statement to avert the concerns raised by the CTA.

For these reasons, CTA's motion for additional discovery and to strike is denied.

## IV. CTA's Request for Attorney's Fees and Costs in Connection with the Motion to Compel a Second Forensic Imaging of Pable's Phone

CTA also seeks the attorney's fees and costs under Fed. R. Civ. P. 37(a)(5) in connection with its successful motion to compel a second forensic imaging of plaintiff's cell phone. The undersigned took the matter under advisement after plaintiff submitted a response [57] and CTA filed a reply [59].[22]

Rule 37(a)(5) provides that if a motion to compel "is granted–or if the requested discovery is provided after the motion was filed–the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5). But a court may not award fees "if the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii), (iii). "The test for substantial justification for this purpose is whether there is a genuine dispute." *Forth v. Walgreen Co.*, No. 17 C 2246, 2019 WL 10255628, at *7 (N.D. Ill. July 10, 2019). "The burden is on the losing party to avoid assessment of expenses and fees, rather than on the winning party to obtain such an award." *Torres v. Nation One Landscaping, Inc.*, Case No. 1:12-cv-9723, 2017 WL 5296023, at *2 (N.D. Ill. Nov. 13, 2017) (internal quotation marks omitted).

In granting CTA's motion to compel, the undersigned found that CTA had "good cause and a justified need for a second imaging of Pable's phone." [54] 4; *Pable*, 2021 WL 4789023, at *2. The undersigned's ruling was based on the its findings that (1) "the original imaging of was undertaken unilaterally by Pable without notice to, and thus without seeking input or agreement regarding the protocol for the imaging from, the CTA"; (2) by proceeding in that manner, Pable "denied the CTA an opportunity to propose or comment on a protocol for the imaging or its parameters – and thus to avert the very concerns the CTA has now raised"; (3) the first imaging produced an "extremely small amount of data" and did not contain many types of data–pictures, internet browsing history, MMS messages, and communications exchanged on third-party applications–that are ordinarily found on cell phones; and (4) the communications that CTA sought via the imaging went to "the heart of Pable's claim against the CTA and the CTA's counterclaim." [*Id.*] 4-5; *Pable*, 2021 WL 4789023, at *2-3. The undersigned also granted CTA's further request to compel plaintiff to produce complete copies of plaintiff's personal website, finding that plaintiff's contention that he did not have such an archive "does not answer the question whether such an archive is in his possession, custody, or control and

---

[22] In contrast to sanctions under § 1927, a magistrate judge has authority to award fees and costs under Rule 37 to a party that files a successful motion to compel. *See Cage*, 2020 WL 1248685, at *20.

therefore can and should be produced to CTA in accordance with Fed. R. Civ. P. 34(a)(1)." [54] 5-6; *Pable*, 2021 WL 4789023, at *3.

The undersigned concludes that Pable has not shown that his opposition to the motion to compel was substantially justified. As just explained, the forensic imaging that CTA sought was relevant and appropriate–and necessitated almost entirely by Pable's decision to generate the first image unilaterally and without seeking or obtaining any input from CTA regarding the imaging. Finally, the undersigned concludes that Pable's failure to produce archived copies of the websites he owned or operated was not substantially justified, given that such materials were in his possession, custody, or control but were not produced.

Pable argues that "there was no reason to suspect that any of the communications that the CTA alleged were 'missing' from his discovery productions would be found via a further examination of his cell phone." [57] 4. He also contends that "any relevant communications stored on his cell phone from the key time period were wiped from that phone by the CTA on or around October 22, 2018." [*Id.*]. However, these assertions were largely speculative when made and counter to the undersigned's decision. Moreover, despite having ample opportunity to prove his claim, Pable has not cited any evidence in any of his voluminous filings tends to substantiate his claim that the CTA somehow remotely wiped his cell phone when it disabled his access to its networks. For these reasons, Pable was not substantially justified in seeking to avoid discovery on this basis.

Within ten days of the date of this decision, the CTA shall file its fee petition and supporting materials. Pable shall file a response within ten days after the CTA's fee petition is filed.

## Conclusion

In accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)(1), and for the reasons given above, the undersigned respectfully recommends that the District Judge grant the CTA's Rule 37(e) motion based on spoliation of ESI [129]. The District Judge should dismiss Pable's complaint with prejudice pursuant to Rule 37(e)(2)(C) and award the CTA its reasonable attorney's fees and costs incurred with bringing the motion as curative measure under Rule 37(e)(1). The undersigned also respectfully recommends that the District Judge grant in part and deny in part the CTA's motion for sanctions against Timothy Duffy and Quest Consultants International [91]. The motion should be granted to the extent it seeks sanctions against Duffy under 28 U.S.C. § 1927, and Duffy should be ordered to pay $53,388.00 in attorney's fees and costs. In all other respects, the motion should be denied. Within ten days of the date of this decision, the CTA shall file its fee petition and supporting materials in connection with its Rule 37(e) motion. Pable shall file his response within ten days after the filing of the fee petition. The undersigned will review the filings and prepare a supplemental Report and Recommendation for the District Judge determining the amount of fees that the CTA should be awarded under Rule 37(e)(1). The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. *See Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

CTA's motion for leave to take additional discovery and to strike Duffy's certified statement [143] is denied.

Finally, CTA's request for an award of attorney's fees and costs incurred in connection with its motion to compel a second forensic imaging of Pable's phone is granted. CTA's fee petition and supporting materials must be filed within ten days of the date of this decision, and Pable's response must be filed within ten days of the date of this decision. The undersigned will review the filings and enter an order determining the amount of fees and costs to which the CTA is entitled.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: March 2, 2023**

73